**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT
SYSTEM, BANK ACCOUNTS, AND BUSINESS FORMS AND PAYMENT OF
RELATED PREPETITION OBLIGATIONS, (II) AUTHORIZING CONTINUATION
OF ORDINARY COURSE INTERCOMPANY TRANSACTIONS, (III) EXTENDING
TIME TO COMPLY WITH THE REQUIREMENTS OF 11 U.S.C. § 345(b),
AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by

and through their undersigned proposed counsel, respectfully move (the "<u>Motion</u>") as follows:

**<u>Relief Requested</u>**

1.      The Debtors respectfully seek entry of interim and final orders, substantially in the

forms attached hereto as **Exhibit A** (the "<u>Interim Order</u>") and **Exhibit B** (the "<u>Final Order</u>," and

together with the Interim Order, the "<u>Proposed Orders</u>"), (i) authorizing, but not directing the

Debtors to (a) continue their existing cash management system, (b) honor certain prepetition

obligations related thereto, (c) maintain their existing bank accounts and business forms, (d)

implement any changes to the existing cash management system as the Debtors deem necessary or

appropriate, including, without limitation, opening new bank accounts or closing existing bank

accounts, and (e) continue ordinary course Intercompany Transactions (as defined below); (ii)

---

[1]      The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

extending the time to comply with the requirements of section 345(b) of title 11 of the United States Code (the "Bankruptcy Code") and the operating guidelines (the "U.S. Trustee Guidelines") established by the Office of the United States Trustee; and (iii) granting any related relief that is necessary to carry out the foregoing, or is otherwise appropriate under the circumstances.

## Jurisdiction and Venue

2.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are sections 105(a), 345(b) and 363(c) of the Bankruptcy Code, as supplemented by rules 2015, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4.    On the date hereof (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

5.    A description of the Debtors' business, the reasons for commencing these cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Robert Gorin in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") filed concurrently with this Motion and incorporated herein by reference.

### The Cash Management System

6.      The Debtors maintain an integrated, centralized cash management system (the "Cash Management System") to collect, transfer, manage and disburse funds generated and used in their operations. As of the Petition Date, the Debtors' Cash Management System includes fourteen bank accounts (collectively, the "Bank Accounts"): thirteen bank accounts held by Debtor Diamond Comic Distributors, Inc. ("DCD"), and one bank account held by Debtor Diamond Select Toys & Collectibles, LLC ("DST").   A schedule of the Bank Accounts, including the last four digits of each Bank Account number, is attached hereto as **Exhibit C**.   The Bank Accounts are maintained at JPMorgan Chase Bank, N.A. ("JPM") and Bank of Montreal ("BMO," and together with JPM, the "Banks").   The Debtors' accounting department, principally located at the Debtors' corporate office in Hunt Valley, Maryland, maintains daily oversight and control of the Cash Management System and implements controls for collecting, concentrating and disbursing funds from the Bank Accounts.

7.      As detailed in the First Day Declaration, the Debtors' principal source of revenue is the sales of comic books, graphic novels, collectible card games, toys, collectors' cards and related merchandise.   Cash generated from these sales flows into the Cash Management System by check, wire transfer, and/or electronic fund transfer to either one of the Debtors' Collections Accounts or Operating Accounts (each defined below).   A diagram depicting the funds flow within the Debtors' Cash Management System is attached hereto as **Exhibit D**.

8.      ***Cash Flow for DCD's Diamond and Alliance Divisions***.   Of the fourteen Bank Accounts, two accounts are collections accounts at JPM, which collect cash from operations for Debtor DCD's Diamond and Alliance divisions (the "Collections Accounts").   The Debtors also maintain four Canadian operating accounts, which collect cash, on a smaller scale, from operations

for DCD's Diamond division (the "<u>Canadian Operating Accounts</u>").   Two of the Canadian Operating Accounts are at JPM and two are at BMO.  Funds in the Canadian Operating Accounts are typically manually transferred on a bi-weekly basis to the Collections Account for DCD's Diamond division.

9.    Throughout the day, funds received into the Collections Accounts are automatically swept into a third-party bank account in the name of, and controlled by, JPM (the "<u>JPM ABL Account</u>").  Funds swept into the JPM ABL Account are applied to pay down outstanding revolver amounts in accordance with the terms of that certain Credit Agreement dated May 16, 2019 (as amended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>") by and among Debtor Diamond Comic Distributors, Inc., as borrower, and JPM, as lender.  Pursuant to the Credit Agreement, JPM currently provides up to $35 million in borrowing to the Debtors (the "<u>ABL Facility</u>").

10.    Before the commencement of these cases and to fund their ongoing operations, the Debtors would access undrawn amounts available under the ABL Facility by submitting a request for a loan advance.  The Debtors would submit this request on a daily basis to pay certain expenses of their Diamond and Alliance divisions.  Upon receipt of a request, and subject to availability and the Debtors' compliance with other terms and conditions of the Credit Agreement, JPM would advance funds from the JPM ABL Account to Debtor DCD's U.S. operating account for the Diamond division or the U.S. operating account for the Alliance division, as applicable (the "<u>U.S. Operating Accounts</u>").  The U.S. Operating Accounts for the Diamond and Alliance divisions would thus be funded on an as-needed basis to pay operating expenses, including vendor payments, merchant fees, custom duties, taxes, and payroll and benefit expenses.  Separately, the Canadian Operating Accounts for the Diamond division would pay certain operating expenses such as

vendor payments, rent and taxes, from funds deposited into those accounts.

11.     For operating expenses that require payment by check, JPM would automatically advance funds from the JPM ABL Account to the applicable controlled distribution account at JPM (the "Controlled Distribution Accounts") on a daily basis, subject to availability and the Debtors' compliance with the terms of the Credit Agreement.

12.     ***Cash Flow for DCD's Collectible Grading Authority Division***.  Revenue for Debtor DCD's Collectible Grading Authority ("CGA") division is deposited into an operating account at JPM (the "CGA Operating Account").  DCD's CGA division also pays its operating expenses from the CGA Operating Account using the funds deposited into that account (excluding payroll, which is paid out of the Operating Account for the Diamond division).  Funds for operating expenses that require payment by check are automatically advanced by JPM from the JPM ABL Account to the CGA Controlled Distribution Account.  Excess funds in the CGA Operating Account are manually transferred on an as-needed basis to the U.S. Operating Account for DCD's Diamond division.

13.     ***Cash Flow for DST***.  Revenue for Debtor DST is deposited into an operating account at JPM (the "DST Operating Account").  DST also pays its operating expenses from the DST Operating Account using the funds deposited into that account, including vendor payments, taxes and payroll.

14.     The Bank Accounts and the Cash Management System are described further in the following table:

| Bank Account(s) | Description of Bank Account(s) |
|---|---|
| **Collections Accounts**<br><br>JPM account ending 0555 | The Collections Accounts receive revenue generated by Debtor DCD's operating activities.  Funds are deposited into the applicable Collections Account depending on the identity of the payor and the applicable division responsible for generating the revenues. |

| | |
|---|---|
| JPM account ending 0569 | |
| | The Collections Accounts are automatically swept on a daily basis to the JPM ABL Account to be applied to any outstanding draws under the ABL Facility. |
| **Operating Accounts**<br><br>JPM account ending 9564<br><br>JPM account ending 9566<br><br>JPM account ending 5979<br><br>JPM account ending 3396<br><br>JPM account ending 0020<br><br>JPM account ending 8307<br><br>BMO account ending 5025<br><br>BMO account ending 0859 | The Canadian Operating Accounts for DCD's Diamond and Alliance divisions receive revenue generated by Debtor DCD's operating activities and make payments for operating expenses including vendor payments, merchant fees, custom duties, taxes, and payroll. The Canadian Operating Accounts are typically manually transferred on a bi-weekly basis to the Collections Account for DCD's Diamond division.<br><br>The U.S. Operating Accounts for DCD's Diamond and Alliance divisions receive funds from the JPM ABL Account to make payments for operating expenses. Upon JPM's receipt of a loan advance request, JPM will fund the corresponding revolving loan proceeds into the applicable U.S. Operating Account.<br><br>The CGA Operating Account receives revenue generated by the operating activities of DCD's CGA division in addition to making payments for certain operating expenses. Excess funds in the CGA Operating Account are manually transferred on an as-needed basis to the U.S. Operating Account for DCD's Diamond division.<br><br>The DST Operating Account receives revenue generated by DST's operating activities. The DST Operating Account also makes payments for DST's operating expenses including vendor payments, merchant fees, taxes, and payroll. |
| **Controlled Distribution Accounts**<br><br>JPM account ending 6266<br><br>JPM account ending 3719<br><br>JPM account ending 0871 | Each division of DCD maintains a Controlled Distribution Account to pay operating expenses that require payment by check. |
| **Inactive Account**<br><br>JPM account ending 8118 | DCD maintains an inactive account with JPM that has a balance of $0.00. |

15.    Maintaining the prepetition Cash Management System is critical to the Debtors' ability to administer these chapter 11 cases. If the Debtors are unable to maintain their Cash Management System, then the Debtors' operations will be severely impeded. The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising

postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.  Therefore, the Debtors request authority, but not direction, to (i) continue to maintain their Cash Management System, including the Bank Accounts, in the ordinary course of business and in accordance with the agreements governing the Bank Accounts (the "Bank Account Agreements"), and (ii) implement any changes to the Cash Management System as the Debtors deem necessary or appropriate.

16.    ***Service Charges***. In the ordinary course of business, the Debtors incur periodic service charges, and other fees to the Banks or other merchant service providers or processors in connection with utilizing and maintaining the Cash Management System (collectively, the "Service Charges").  In particular, the Debtor DCD is party to that certain U.S. Select Merchant Processing Agreement with JPM and Paymentech, LLC (collectively, the "Merchant Processor"), dated April 15, 2019 (the "Merchant Services Agreement"), pursuant to which the Merchant Processor provides payment processing services to DCD for its U.S. transactions.  The Debtors incur approximately $15,000 in bank fees and $235,000 of merchant processing fees each month on average.  The Debtors request authority, but not direction, to honor and pay the Service Charges in the ordinary course of business regardless of whether the obligations arose before or after the Petition Date.

17.    ***Commercial Card Program***. As detailed in the Debtors' motion to authorize payment of prepetition employee compensation obligations and maintain employee benefits (the "Wages Motion"), filed concurrently herewith, the Debtors maintain credit cards (the "Commercial Credit Cards") to be used in connection with the Debtors' business operations, primarily for certain employees to pay for work and travel expenses.  These Commercial Credit Cards are provided to the Debtors by JPM under that certain Commercial Card Application &

Agreement, dated June 24, 2019, between Debtor DCD and JPM (the "Commercial Card Agreement"). The Debtors' continued use of the Commercial Credit Cards, pursuant to the terms of the Commercial Card Agreement, is necessary to allow the Debtors to fund expenses for their ongoing business operations in the ordinary course. Accordingly, the Debtors request authority, but not direction to honor their obligations arising under the Commercial Card Agreement (the "Commercial Card Obligations"), and to make timely payments to JPM in respect of the Commercial Card Obligations in the ordinary course of business.

18.    ***Cash Collateral Account***. The Debtors further request authority to open a new cash collateral account at JPM. As stated in the Debtors' motion to authorize debtor-in-possession financing and use of cash collateral (the "DIP Motion"), filed concurrently herewith, the Debtors intend to borrow funds from JPM, in its capacity as "DIP Lender", to collateralize the Commercial Card Obligations as well as reimbursement obligations (the "LC Reimbursement Obligations") in connection with the Irrevocable Standby Letter of Credit No. NUSCGS048065, issued by JPM for the account of Debtor DCD in favor of BC Industrial Exchange Portfolio II Master Tenant, LLC. Consistent with the relief requested in the DIP Motion, the Debtors request authority to open a new cash collateral account at JPM.

19.    ***Intercompany Transactions***. The Debtors engage in ordinary course intercompany transactions with certain non-debtor affiliates (the "Intercompany Transactions") whereby (i) the Debtors pay certain non-debtor affiliates, including E. Gerber Products, LLC ("Gerber"), Renegade Games, LLC ("Renegade"), and Gemstone Publishing, Inc. ("Gemstone"), for goods purchased by Debtor DCD, (ii) non-debtor affiliates Gerber, Diamond International Galleries, LLC, Rosebud Entertainment, LLC, and Gemstone pay Debtor DCD for certain management services, including accounting, human resources and information technology services, (iii) non-

debtor affiliates Renegade, Gerber and Gemstone pay Debtor DST for certain software platform services, including administrative and security services for their respective websites, and (iv) certain non-debtor affiliates reimburse Debtor DCD for the affiliates' pro rata share of the cost of certain employee benefit programs, including health insurance and the Debtors' 401(k) plan. In addition, funds from non-debtor affiliate Gemstone's customer sales are deposited into the DST Operating Account. These funds are de minimis and set off against the amounts owed by Gerber to Debtor DST for the software platform services. The Debtors maintain records of the Intercompany Transactions and thus can ascertain, trace and account for their Intercompany Transactions.

20.    The Debtors seek authority to continue these Intercompany Transactions in the ordinary course of business, including according all postpetition, undisputed, ordinary course intercompany transactions administrative expense priority and honoring such obligations in the ordinary course of business.[2] For the avoidance of doubt, the Debtors do not by this Motion seek authority to pay any *prepetition* intercompany amounts due to non-debtor affiliates.

21.    ***Business Forms***. The Debtors use various business forms, such as checks, invoices, letterhead, and other business and marketing materials in the ordinary course of their business (the "Business Forms"). To minimize expenses and disruption, the Debtors seek authority to continue to use all Business Forms in substantially the form used immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. The Debtors will communicate with their various

---

[2]    Because the Debtors are authorized to operate their business and incur and pay ordinary course debts, including intercompany debts, in the ordinary course of business and without Court approval pursuant to section 363(c) of the Bankruptcy Code, the Debtors seek this relief out of an abundance of caution and in the interest of disclosure.

vendors and counterparties to notify them of the commencement of these cases, which the Debtors believe will provide adequate notice of the Debtors' status as debtors in possession.  However, to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the applicable case number.

### Basis For Relief

**I.      The Court should authorize the Debtors' continued use of the Cash Management System.**

22.      The *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") require debtors in possession to, among other things:

     i.    establish one debtor in possession bank account for all estate monies required for the payment of taxes, including payroll taxes;

    ii.    close all existing bank accounts and open new debtor in possession accounts;

   iii.    maintain a separate debtor in possession account for cash collateral; and

   iv.    obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.

23.      These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date. Considering, however, that the Debtors' business and financial affairs are complex and require the collection, disbursement and movement of funds through their Bank Accounts, enforcement of the provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt and delay the Debtors' ability to administer their estates during the pendency of these cases.

Accordingly, the Debtors respectfully request that the Court allow the Debtors to operate their Bank Accounts as they were maintained in the ordinary course of business before the Petition Date.

24.    Continuing the Cash Management System is permitted pursuant to section 363(c)(l) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Additionally, courts in this and other districts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

25.    Bankruptcy courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtor and certain of its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id.* at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash

management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id.* at 621.

26.     Here, the Debtors intend to utilize the Cash Management System in its current form as part of their ordinary and usual business practices, and as such, the Debtors believe the continued use of the Cash Management System falls within the purview of ordinary course transactions permitted under section 363(c)(1) of the Bankruptcy Code.  Moreover, appropriate circumstances exist for the Court to authorize the Debtors' continued use of the Cash Management System under sections 363(b)(1) and 105(a) of the Bankruptcy Code.  Furthermore, the Debtors have in place internal controls and procedures to prohibit payments on account of prepetition debts and to account for intercompany transactions within their Cash Management System and Bank Accounts. Decentralizing the cash management system and creating new bank accounts would unnecessarily complicate such controls and procedures.  In light of the existing protective measures, the Debtors submit that maintaining the Cash Management System will benefit parties in interest and is in the best interests of the Debtors' estates and creditors.

27.     Further, the relief requested in this Motion will help minimize any disruption in the Debtors' business operations during these chapter 11 cases and preserve the value of the Debtors' estates.  Indeed, any disruptions in the Cash Management System could lead to delays in satisfying the Debtors' obligations to their vendors, customers and employees.  To avoid the potential erosion of value that could ensue from any such interruptions in the Debtors' ordinary course business operations, the Debtors believe it is imperative that they be authorized to continue the Cash Management System and use of the Bank Accounts.

28.     The Debtors further request that the Court grant relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check.  In particular,

the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH, wire transfer and other similar methods.  If the Debtors' ability to conduct transactions according to historical practice is impaired, then the Debtors may be unable to timely perform under certain contracts, may incur penalties and fines with taxing authorities, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.  Accordingly, the Debtors submit that they should be allowed to continue utilizing all existing payment methods.

29.    Finally, the U.S. Trustee Guidelines prohibit disbursements other than by numbered checks, which checks must bear the applicable debtor's case name and case number, a "debtor in possession" designation and an indication of the account type.  Under the circumstances, the Debtors submit that waiving compliance with the U.S. Trustee Guidelines and authorizing continued use of the Bank Accounts and the Business Forms is appropriate and in the best interests of the estates.  To the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the applicable case number.

30.    For these reasons, the Debtors should be allowed to continue using the Cash Management System and Bank Accounts consistent with historical practice.

## II.    The Court should authorize the Debtors to continue Intercompany Transactions in the ordinary course and afford administrative expense priority to such Intercompany Transactions.

31.    The Debtors' funds move through the Cash Management System as described above.  The Debtors track all Intercompany Transactions in their accounting system and can ascertain, trace, and account for all Intercompany Transactions.

32.    If the Intercompany Transactions were discontinued, then the Cash Management

System and related administrative controls would be disrupted, to the detriment of the Debtors and their estates. Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and creditors, and, therefore, the Debtors should be permitted to continue performing such Intercompany Transactions. Furthermore, if postpetition intercompany claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System will receive credit or bear ultimate repayment responsibility for such ordinary course transactions, thereby ensuring that entity separateness is maintained and that each estate bears its actual costs of administering these cases.

33. For these reasons, the Court should authorize the Debtors to continue ordinary course Intercompany Transactions on a postpetition basis and accord postpetition intercompany claims arising from such Intercompany Transactions administrative expense priority.

## III. The Court should extend the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code on an interim basis.

34. Section 345(a) of the Bankruptcy Code authorizes deposit or investment of the money of the estate, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345 of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise. 11 U.S.C. § 345(a)–(b); *see also In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting the 1994 amendments to the

Bankruptcy Code which explained that the new amendments to the Code would allow the courts to approve investments other than those permitted by section 345(b) for just cause).

35.    In *Service Merchandise*, the court identified the following factors for determining whether cause to waive the requirements of section 345(b) exists: (i) the sophistication of the debtor's business; (ii) the size of the debtor's business operations; (iii) the amount of investments involved; (iv) the bank ratings of the financial institutions where the debtor's funds are held; (v) the complexity of the case; (vi) the safeguards in place within the debtor's own business for insuring the safety of the funds; (vii) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (viii) the benefit to the debtor of current practices; (ix) the harm, if any, to the estate; and (x) the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case. *Serv. Merch.*, 240 B.R. at 896–97.

36.    With the exception of the two Bank Accounts held at BMO, the Bank Accounts are held at JPM—a U.S. Trustee-approved depository institution.  With respect to the Bank Accounts with BMO, the Debtors request that the Court grant an extension of time to comply with section 345(b) of thirty (30) days (or such later time as may be agreed to by the U.S. Trustee or otherwise approved by the Court).  During such time, the Debtors propose to engage in discussions with the U.S. Trustee, BMO, and any other constituents to determine what modifications to the Bank Accounts held at BMO, if any, are necessary under the circumstances.  Immediate enforcement of the U.S. Trustee Guidelines would severely disrupt the Debtors' ordinary financial operations, as it would require a significant overhaul of their Cash Management System and the transfer of cash to all new accounts.  In addition, if the Debtors were required to immediately open new bank accounts, then they would likely be unable to timely implement the payment of prepetition

obligations sought in the other motions filed concurrently with this Motion. Opening new Bank Accounts would further require administrative, personnel and monetary resources that should not be diverted or distracted at this critical time in the Debtors' chapter 11 cases. Accordingly, the Debtors respectfully request that the Court allow the Debtors to operate each of the Bank Accounts as they were maintained in the ordinary course of business before the Petition Date so that the Debtors may engage in discussions with the U.S. Trustee and BMO regarding compliance with the U.S. Trustee Guidelines.

37.    In light of the foregoing, the Debtors submit that cause exists for an extension of time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent that those requirements are inconsistent with the Debtors' current deposit and investment practices. The Debtors request a 30-day extension of time to comply with the section 345 requirements.

**IV.  The Court should authorize the Banks to continue to maintain, service and administer the Debtors' Bank Accounts in the ordinary course of business.**

38.    To further implement continued use of their existing Cash Management System and Bank Accounts, the Debtors respectfully request that the Court authorize and direct the Banks to: (i) continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession and provide related treasury, account and cash management services, all without interruption and in the ordinary course of business; (ii) receive, process, honor and pay, to the extent of available funds, any and all checks, drafts, EFT (including wires or ACH transfers), credit card payments and other items presented, issued or drawn on the Bank Accounts; provided, however, that any check, draft or other notification that the Debtors advise the Banks to have been drawn, issued or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court; (iii) accept and honor all representations from the Debtors as to which checks, drafts, EFT (including wires or ACH transfers), credit card payments

and other items presented, issued or drawn should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, EFT (including wires or ACH transfers), credit card payments and other items are dated before or after the Petition Date; and (iv) debit or charge the Bank Accounts for all undisputed Service Charges, whether arising before, on or after the Petition Date.

39.     In addition, to protect the Banks, the Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account that is the subject of the Motion: (a) at the direction of the Debtors, or (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

40.     The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on account of debts incurred before the Petition Date (other than those authorized by the Court). To prevent the inadvertent, unauthorized payment of prepetition claims, the Debtors will work closely with the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without Court approval.

## V. The Court should authorize the payment of all undisputed Service Charges and Commercial Card Obligations.

41.     Payment of the prepetition Service Charges, including any obligations under the Merchant Services Agreement, and the Commercial Card Obligations is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent unnecessary

53122265.7 01/14/2025

disruptions to the Cash Management System and the Debtors' business operations, and ensure that the Debtors' receipt of funds is not delayed.  Payment of prepetition Service Charges will not prejudice any parties in interest.  Indeed, because the Banks and merchant processors likely have setoff rights for the Service Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in these chapter 11 cases.  Even if such Service Charges were unsecured in whole or part, the cost of any disruption or delay in being able to utilize the Cash Management System far outweighs the cost of paying the Service Charges and justifies the payment of the fees under the "doctrine of necessity."

42.     Accordingly, the Debtors request authority, but not direction, to honor and pay all undisputed Service Charges and Commercial Card Obligations in the ordinary course of business regardless of whether such obligations arose before or after the Petition Date, and to allow the Bank to debit, charge or deduct, as applicable, such undisputed amounts in the ordinary course of business without interruption or delay.

### Waiver of Memorandum of Law

43.     Pursuant to rule 9013-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, the Debtors state that, in lieu of submitting a memorandum in support of this Motion, the Debtors will rely on the grounds and authorities set forth herein.

### Reservation of Rights

44.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (i) an admission as to the validity of any claim against a Debtor entity; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) an implication or

admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (v) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (vi) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (vii) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

### The Requirements of Bankruptcy Rule 6003 are Satisfied

45.     Bankruptcy Rule 6003 empowers the Court to issue an order, within the Interim Period, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  Because of the complexity of the Debtors' operations and Cash Management System, any disruption to the Cash Management System would greatly harm the Debtors and their estates.  Without the Cash Management System, the Debtors would be unable to timely monitor revenues or make on-time payments, precluding the Debtors from, among other things, adequately assessing their liquidity.  This, along with the possibility that third parties would refuse to provide essential services in the event the Debtors failed to remit payment, could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest.  Consequently, immediate and irreparable harm would result without the relief requested herein being granted on an interim basis.  Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(h)**

46.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h).  As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates and continue their operations without disruption. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**Notice**

47.     Notice of this Motion will be given to the following parties, or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Maryland; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to JPMorgan Chase Bank, N.A., (iv) the United States Attorney for the District of Maryland; (v) the offices of the attorneys general for the states in which the Debtors operate;  (vi) the Internal Revenue Service; (vii) Bank of Montreal; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit the no other or further notice is necessary.

**<u>Conclusion</u>**

WHEREFORE, the Debtors respectfully request the entry of the Proposed Orders, granting

the relief requested herein and such other and further relief as is just and proper.


Dated: January 14, 2025                              **SAUL EWING LLP**


By: *<u>/s/ Jordan D. Rosenfeld</u>*
       Jordan D. Rosenfeld (MD Bar No. 13964)
       1001 Fleet Street, 9th Floor
       Baltimore, MD 21202
       Telephone: (410) 332-8600
       Email: jordan.rosenfeld@saul.com

       -and-

       Jeffrey C. Hampton (*pro hac vice* pending)
       Adam H. Isenberg (*pro hac vice* pending)
       Turner N. Falk (*pro hac vice* pending)
       1500 Market Street, 38th Floor
       Philadelphia, PA 19102
       Telephone: (215) 972-7777
       Email: jeffrey.hampton@saul.com
           adam.isenberg@saul.com
           turner.falk@saul.com

       -and-

       Mark Minuti (*pro hac vice* pending)
       Paige N. Topper (*pro hac vice* pending)
       Nicholas Smargiassi (*pro hac vice* pending)
       1201 N. Market Street, Suite 2300
       Wilmington, DE 19801
       Telephone: (302) 421-6800
       Email: mark.minuti@saul.com
           paige.topper@saul.com
           nicholas.smargiassi@saul.com

       *Proposed Counsel for Debtors and Debtors in*
       *Possession*