**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY PREPETITION OBLIGATIONS OWED TO CRITICAL VENDORS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned proposed counsel, respectfully move (the "Motion") as follows:

**Relief Requested**

1. The Debtors respectfully seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** (the "Interim Order") and **Exhibit B** (the "Final Order," and together with the Interim Order, the "Proposed Orders"), (i) authorizing, but not directing, the Debtors to pay prepetition claims of certain vendors that provide critical goods or services (the "Critical Vendors," and their prepetition claims, the "Critical Vendor Claims") in a total amount not to exceed $4 million on an interim basis and $7 million on a final basis (the "Critical Vendor Claims Cap"); and (ii) granting related relief.

**Jurisdiction and Venue**

2. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

4. On the date hereof (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

5. A description of the Debtors' business, the reasons for commencing the chapter 11 cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Robert Gorin in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") filed concurrently with this Motion and incorporated herein by reference.

## Critical Vendors

6. The Debtors are a leading distributor of comic books, graphic novels, role-playing and tabletop game books, collectable card games and related merchandise. The Debtors' customers range from major retail customers, including Amazon, Target, Walmart, Barnes & Noble, Scholastic, and Walgreen's, to smaller mom-and-pop comic book stores. Customers generally order products from the Debtors in bulk in order to stock their retail or wholesale locations.

7. Debtor Diamond Comic Distributors, Inc. ("DCD"), does not manufacture the goods it distributes, and thus relies on a network of Critical Vendors to provide it with inventory and other associated services. These Critical Vendors are, by and large, the sole source or limited source for certain goods and services. Certain Critical Vendors provide the Debtors with goods and services that carry brand names for which there is no alternative purchasing option, and these brands represent a key component of customer demand. Moreover, without these Critical Vendors, the Debtors could not maintain inventory and merchandise at levels necessary to satisfy current customer demands and attract new customers. The Debtors' customers expect the Debtors to satisfy purchase orders in a timely manner due to the need to place newly-released products in stores and maintain customers' stock of certain products. The Debtors' responsiveness to their customers requires uninterrupted goods and services from the Critical Vendors. Uninterrupted supply of these goods and services is essential to the Debtors' continued operations, and the Debtors would be highly disadvantaged within the industry without access to the good and services provided by the Critical Vendors.

8. Further, certain Critical Vendors have extensive discretion, pursuant to their respective agreements with the Debtors, regarding the allocation of products to the Debtors. Historically, the Debtors have received a favorable allocation of products from their Critical Vendors, allowing the Debtors to capitalize on newly-released products with high customer and, by extension, consumer demand. However, the Debtors believe that absent the relief requested in this Motion the Critical Vendors may modify the Debtors' allocation percentage, in accordance with the terms of their agreements, resulting in a decrease of the Debtors' inventory to the detriment of the Debtors, their estates and their creditors. An unfavorable change in allocation under the Critical Vendor agreements could irreparably damage the Debtors' business by

53099902.8 01/14/2025

disrupting or cutting off the supply of the goods in the highest demand, at exactly the time the Debtors need them most. To maintain continued favorable allocation of product, the Debtors believe that they need the discretion to pay prepetition amounts due to the Critical Vendors.

9. Certain Critical Vendors are located outside the United States, including in Japan and Germany (the "Foreign Critical Vendors"). In addition to the Debtors' concerns noted above, the Debtors believe there is a significant risk that the nonpayment of any invoices to Foreign Critical Vendors could cause a Foreign Critical Vendor to stop shipping goods to the Debtors on a timely basis or to sever completely its business relationship with the Debtors. Foreign Critical Vendors often have skeptical reactions to the United States bankruptcy process because many of them are unfamiliar with the unique debtor-in-possession mechanism in chapter 11 proceedings. Short of severing their contractual relationships with the Debtors, nonpayment of prepetition claims may cause Foreign Critical Vendors to delay shipments until more certainty develops with respect to the Debtors' reorganization. The Debtors cannot afford delays of the key products manufactured by the Foreign Critical Vendors.

10. Absent payment of prepetition claims, the Foreign Critical Vendors may take action in the erroneous belief they are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code. Although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often an expensive and fruitless exercise.

11. More fundamentally, the Foreign Critical Vendors could simply refuse to do business with the Debtors. Because the Foreign Critical Vendors generally have no or *de minimis* assets or operations in the United States that would be subject to the jurisdiction of this Court, the Debtors have no workable enforcement mechanism against these parties. The cumulative effect of

the Foreign Critical Vendors' breach of their contracts with the Debtors could be detrimental to the Debtors' operations and their ability to reorganize. Without timely deliveries from their Foreign Critical Vendors, the Debtors' operations would suffer—to the detriment of the Debtors and their stakeholders. The Debtors cannot risk delay or disruption in maintaining their inventory and receiving newly-released products as such products are launched.

12. For the foregoing reasons, the Debtors believe it is necessary to maintain positive business relationships with the Critical Vendors. Indeed, the Debtors believe that the amount of the Critical Vendor Claims pales in comparison to the potential damage to the Debtors' business if the Debtors' operations were to experience significant disruption. Therefore, the Debtors and their stakeholders would benefit from the relief requested herein.

13. The Debtors seek authority to pay, in their sole discretion and business judgment, all or a portion of the Critical Vendor Claims not to exceed the applicable Critical Vendor Claims Cap. The Debtors are not seeking to pay these amounts immediately or in one lump sum. Rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business and subject to the procedures set forth in this Motion.

**Proposed Conditions to Receiving Payment in Ordinary Course**

14. To preserve liquidity during the chapter 11 cases and ensure that the Debtors continue to receive vital goods and services, the Debtors may condition payment on account of Critical Vendor Claims on such Critical Vendor's agreement that it will continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, pricing, cash discounts, timing of payments, allocation of products, availability and other applicable terms and programs), which were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors on a historical basis for the period within one hundred eighty (180) days of the Petition Date (the "Customary Trade Terms").

5

The Debtors, however, reserve the right to negotiate different trade terms with any Critical Vendor, as a condition to paying any Critical Vendor Claim, whether or not memorialized by a Trade Agreement (as defined below), to the extent the Debtors determine that such trade terms are necessary to procure essential goods or services or are otherwise in the best interests of the Debtors' estates.

15. The Debtors further propose that in the event the Debtors make a payment pursuant to this Motion, the Debtors may send a letter, in the form, or substantially similar to that, attached hereto as **Exhibit C**, to the Critical Vendors to which it is making such payment, along with a copy of the Interim or Final Order, as applicable, including, without limitation the following terms:

  a. The amount of such Critical Vendor's estimated claim, after accounting for any setoffs, other credits and discounts thereto, shall be as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount shall be used only for purposes of the Interim or Final Order, as applicable, and shall not be deemed a claim allowed by the Court, and the rights of all parties in interest to object to such claim shall be fully preserved until further order of the Court);

  b. The amount of payment toward the Critical Vendor's estimated claim;

  c. The Critical Vendor's agreement to be bound by the Customary Trade Terms, or such other trade terms as mutually agreed to by the Debtors and such Critical Vendor;

  d. The Critical Vendor's agreement to provide goods and services to the Debtors based upon Customary Trade Terms, and the Debtors' agreement to pay the Critical Vendor postpetition in accordance with such terms;

  e. The Critical Vendor's agreement not to file or otherwise assert against the Debtors, their estates or their respective assets or property (real or personal) any lien (a "Lien") (regardless of the statute or other legal authority upon which such Lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from goods or services provided to the Debtors prior to the Petition Date, and that, to the extent that the Critical Vendor has previously obtained such a Lien, the Critical Vendor shall immediately take all necessary action to release such Lien;

  f. The Critical Vendor's acknowledgement that it has reviewed the terms and provisions of the Interim or Final Order, as applicable, and consents to be bound thereby;

6

    g. The Critical Vendor's agreement that it will not separately assert or otherwise seek payment of any reclamation or Bankruptcy Code section 503(b)(9) claim; and

    h. If a Critical Vendor who has received payment toward a Critical Vendor Claim subsequently refuses to supply goods or services to the Debtors on Customary Trade Terms or other terms as mutually agreed by the Critical Vendor and the Debtors, the Debtors may seek a judicial determination that any payment received by the Critical Vendor on account of its Critical Vendor Claim will be deemed to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor pursuant to section 549(a) of the Bankruptcy Code, whereupon such Critical Vendor shall immediately repay to the Debtors any payments received on account of its Critical Vendor Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations then outstanding, without the right of setoff or reclamation.

    16. Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their postpetition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms (the "<u>Trade Agreement</u>").[2] The Debtors hereby seek authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.

    17. If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority, in their discretion and without further order of the Court but with notice to the affected Critical Vendor (i) to declare such Trade Agreement immediately terminated (if applicable) and (ii) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

---

[2] The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims and shall not constitute an assumption or rejection of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor.

7

53099902.8 01/14/2025

18. In the event that the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of the Interim Order or Final Order, as applicable, in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following any payment of its Critical Vendor Claim.

## Basis for Relief Requested

**A.    The Court should grant the relief requested in this Motion pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.**

19. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

20. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a "sound business justification" exists for doing so. *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (citing *In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996)); *see also Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).

21. The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 824–25 (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that the bankruptcy court has "power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"). Bankruptcy courts regularly rely on their authority under section 105(a) and the doctrine of necessity to grant debtors the discretionary authority to pay certain prepetition claims "if the movant establishes a good and sound business reason for the pre-confirmation proposed use, sale, or lease of the property." *In re Floyd*, 2020 WL 6164328, at *2 (Bankr. E.D.N.C. Oct. 20, 2020) (citing *In re Taylor*, 198 B.R. 142, 156–57 (Bankr. D.S.C. 1996)); *In re Synteen Techs.*, Inc., 2000 WL 33709667, at *2 (Bankr. D.S.C. Apr. 14, 2000) ("the equitable powers specified in § 105(a) give bankruptcy courts the permission to allow payment of a pre-petition claim 'when essential to the continued operation of the debtor.'") (quoting *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992)).

22. Where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in the Fourth Circuit have authorized payments to

prepetition critical vendors to prevent greater harm to the estate. *In re Surtronics, Inc.*, No. 13-05672-8-SWH, 2009 WL 10815299, at *1 (Bankr. E.D.N.C. July 24, 2009) (granting the debtor interim authority to pay critical vendors "in the ordinary course of business, when due, and not on an accelerated basis"); *In re TVI Corp.*, No. 09-15677, 2013 WL 12577925, at *2 (Bankr. D. Md. Apr. 5, 2013) (granting the debtors final authority to pay prepetition claims of critical vendors "if the Debtors determine, in their discretion and business judgment, that failure to pay such Critical Vendor Claim is likely to result in significant harm to the Debtors' business operations").

23. Here, the payment of the Critical Vendor Claims is sufficiently justified as it is essential to ensure the continuous and uninterrupted operation of the Debtors' business. As described above, the Debtors require continuing performance from their Critical Vendors to maintain inventory levels and favorable allocation of product as the Debtors transition into chapter 11. Failure to pay the Critical Vendor Claims could disrupt the Debtors' timely receipt of necessary goods and services, which would negatively impact the Debtors' operations. In particular, without the goods and services provided by the Critical Vendors, the Debtors may be forced to cease or substantially curtail their operations as Critical Vendors may modify the allocation terms of their respective agreements, resulting in a loss of revenue and damaging the Debtors' market reputation to the detriment of the Debtors, their estates and their stakeholders. Accordingly, it is imperative that the Debtors maintain positive relationships with their goods and services vendors, which are essential to the Debtors' business operations, throughout the course of these chapter 11 cases.

24. The Debtors' payment of prepetition claims of Foreign Critical Vendors is essential to address two additional concerns: (i) the Foreign Vendors' potential, and erroneous, assertion that the automatic stay does not apply to them, and (ii) the Debtors' reduced ability to obtain

practical relief against Foreign Vendors with little presence in the United States. Courts in this Circuit recognize that commercial relationships with foreign entities add extra complexity to the administration of a chapter 11 case, and authorize debtors to pay the kind of prepetition claims held by the Foreign Vendors in these cases. *See, e.g.*, *In re The Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (authorizing payments up to $75.2 million for prepetition foreign vendor obligations); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (authorizing payments up to $1.1 million for prepetition foreign creditor obligations); *In re US Airways, Inc.*, No. 04-13819 (SSM) (Bankr. E.D. Va. Sept. 14, 2004) (authorizing payment of all outstanding obligations to foreign vendors). Payment of Critical Vendor Claims to Foreign Critical Vendors will ensure the uninterrupted flow of crucial foreign inventory, and moot the need for complex international enforcement of the Bankruptcy Code. For these reasons, the Court should authorize payment of Foreign Critical Vendors' prepetition claims.

      **B.**    **Paying Critical Vendor Claims that satisfy section 503(b)(9) will have little to no impact on creditor recoveries in these cases.**

25. Section 503(b)(9) of the Bankruptcy Code provides administrative priority of a claim for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." Because such claims are entitled to priority status, they must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). As such paying claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.

26. Although section 503(b)(9) of the Bankruptcy Code does not specify a time for paying these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability and there is a need to

11

pay. *See In re Global Home Prods., LLC*, 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that administrative expense claim is left to the discretion of the Court."). Thus, paying Critical Vendor Claims with section 503(b)(9) priority only affects the timing, but not the amount, of any such payment. Here, the Debtors have a need to pay claimants who could potentially disrupt operations prior to the closing of a sale of their business.

27. As a result, the Debtors request that they should have the authority, but not direction, to pay Critical Vendor Claims subject to the Critical Vendor Claims Cap, a substantial amount of which would be paid ahead of general unsecured creditors even absent the relief requested in the motion. Providing the Debtors with the ability to pay these claims will help maximize the value of the estates as it will allow the Debtors to more efficiently and effectively operate their business by being able to secure more favorable trade terms with their vendors.

C. **Paying Critical Vendor Claims is authorized under sections 1107(a) and 1108 of the Bankruptcy Code.**

28. The Debtors, operating their businesses as debtors in possession under Bankruptcy Code sections 1107(a) and 1108, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [its] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

29. Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id.* at 498.

12

The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

30.     Payment of the Critical Vendor Claims meets the test set forth in *CoServ*. As described above, the Critical Vendors play a critical role in the Debtors' overall operations and any modifications to trade terms or services provided could cause irreparable harm to the Debtors and their estates. The potential harm and economic disadvantage that would stem from the failure of any of the Critical Vendors to perform is disproportionate to the amount of the prepetition claims that the Debtors are seeking to pay in this Motion. Moreover, with respect to each Critical Vendor, the Debtors have examined other options short of payment of such Critical Vendor Claims and have determined that to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of the Critical Vendor Claims. Therefore, the Debtors can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by payment of the Critical Vendor Claims. Accordingly, the Court should grant the relief requested herein.

### D. Cause exists to authorize the Debtors' financial institutions to honor checks and electronic fund transfers.

31.     The Debtors believe that they have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of Critical Vendor Claims. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that this Court authorize and direct all applicable financial institutions, when

13

requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## Waiver of Memorandum of Law

32. Pursuant to Rule 9013-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, the Debtors state that, in lieu of submitting a memorandum in support of this Motion, the Debtors will rely on the grounds and authorities set forth herein.

## Reservation of Rights

33. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (i) an admission as to the validity, amount or priority of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim on any grounds; (iii) a promise or requirement to pay any claim; (iv) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (v) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (vi) a concession by the Debtors that any lien (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion is valid, and the Debtors expressly reserve their right to contest the extent, validity, or perfection or seek avoidance of any such lien.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

34. Bankruptcy Rule 6003 empowers the Court to issue an order, on an interim basis, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, entry of an order granting this Motion is integral to the Debtors' ability to successfully transition into chapter 11

and to avoid disruptions to the Debtors' operations, to the detriment of the Debtors' estates, customers and creditors. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(h)

35. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

36. Notice of this Motion will be given to the following parties, or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Maryland; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to JPMorgan Chase Bank, N.A.; (iv) the United States Attorney for the District of Maryland; (v) the offices of the attorneys general for the states in which the Debtors operate; (vi) the Internal Revenue Service; (vii) Bank of Montreal; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit the no other or further notice is necessary.

**Conclusion**

WHEREFORE, the Debtors respectfully request the entry of the Proposed Orders, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: January 14, 2025                    **SAUL EWING LLP**


By: /s/ *Jordan D. Rosenfeld*
Jordan D. Rosenfeld (MD Bar No. 13694)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
Telephone: (410) 332-8600
Email: jordan.rosenfeld@saul.com

-and-

Jeffrey C. Hampton (*pro hac vice* pending)
Adam H. Isenberg (*pro hac vice* pending)
Turner N. Falk (*pro hac vice* pending)
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Email: jeffrey.hampton@saul.com
          adam.isenberg@saul.com
          turner.falk@saul.com

-and-

Mark Minuti (*pro hac vice* pending)
Paige N. Topper (*pro hac vice* pending)
Nicholas Smargiassi (*pro hac vice* pending)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6800
Email: mark.minuti@saul.com
          paige.topper@saul.com
          nicholas.smargiassi@saul.com

*Proposed Counsel for Debtors and Debtors in Possession*

53099902.8