**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN SENIOR SECURED FINANCING AND THE USE
OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III)
GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A
<u>FINAL HEARING; AND (VI) GRANTING RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by

and through their undersigned proposed counsel, file this motion ("<u>Motion</u>") pursuant to sections

105, 361, 362, 363, 364, 503, 506, 507(b) and 552 of title 11 of the United States Code (the

"<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004(h), and 9014, of the Federal Rules of

Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1 and 4001-5 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the District of Maryland (the "<u>Local</u>

<u>Bankruptcy Rules</u>") for entry of an interim order (the "<u>Interim Order</u>"), substantially in the form

attached hereto as **Exhibit A**, and a final order (the "<u>Final Order</u>" and together with the Interim

Order, the "<u>Proposed Orders</u>"), granting the following relief:

> i.       authorizing the Debtors to obtain secured postpetition financing in the form
> of a superpriority senior secured revolving credit facility (the "<u>DIP</u>
> <u>Facility</u>"), pursuant to which revolving loans (the "<u>DIP Loans</u>") in a
> maximum amount not to exceed $41,000,000 (the "<u>Maximum DIP Facility</u>
> <u>Amount</u>"), of which the maximum amount available to be drawn under the

---

[1]    The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

interim DIP Facility (the "<u>Interim Facility</u>") shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations (as defined below) from the Petition Date through the entry of the Final Order in excess of $5,500,000, subject to the terms and conditions of the Interim Order, Final Order and the senior secured Debtor-in-Possession Credit Agreement by and among the Debtor Diamond Comic Distributors, Inc. ("<u>Diamond Comic</u>"), as borrower, JPMorgan Chase Bank, N.A. (in such capacity, the "<u>DIP Lender</u>"), as lender, and the following guarantors (collectively, the "<u>DIP Entity Guarantors</u>"): Debtor Comic Exporters, Inc., Debtor Comic Holdings, Inc., Debtor Diamond Select Toys & Collectibles, LLC, and non-debtor affiliates Diamond Comic Distributors UK, an unlimited liability company incorporated under the laws of England and Wales, Rosebud Entertainment, LLC, Renegade Games, LLC, and Game Consolidator, LLC, substantially in the form attached to the Interim Order as <u>Exhibit 1</u> (the "<u>DIP Credit Agreement</u>," and together with the schedules and exhibits attached thereto, and all agreements, documents, and instruments executed and delivered in connection therewith, the "<u>DIP Loan Documents</u>");

ii.     authorizing the Debtors to execute, enter into and deliver the DIP Loan Documents, including without limitation, definitive pledge and security agreements granting first priority liens in substantially all the Debtors' assets to secure the obligations under the DIP Credit Agreement, and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

iii.    granting the DIP Lender fully-perfected, priming, first priority security interests in the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, subject to the Carve-Out and Permitted Priority Liens (each as defined below);

iv.     granting the DIP Lender (i) superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) liens pursuant to sections 634(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Permitted Priority Liens, and (iii) priming liens pursuant to section 364(d) of the Bankruptcy Code, on the DIP Collateral and all proceeds thereof (including, upon entry of the Final Order, any Avoidance Actions/Proceeds (as defined below));

v.      authorizing the Debtors to continue to use Cash Collateral (as defined below) in which JPMorgan Chase Bank, N.A. (in such capacity, the "<u>Prepetition Lender</u>") has an interest in accordance with the terms and conditions of the Proposed Orders, and granting adequate protection, subject to the Carve-Out, to the Prepetition Lender to secure, *inter alia*, postpetition financing under the DIP Facility and the use of Cash Collateral;

52349238.7 01/14/2025

vi. upon entry of the Final Order, waiving the Debtors' right to surcharge the Prepetition Collateral or DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

vii. upon entry of the Final Order, finding that neither the DIP Lender nor the Prepetition Lender, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

viii. authorizing and directing the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Unused Line Fee and Success Fee, under and as defined in the DIP Credit Agreement), expenses and other amounts payable under the DIP Loan Documents, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, the Proposed Orders and the applicable DIP Loan Documents;

ix. subject to the restrictions set forth in the DIP Loan Documents and the Proposed Orders, authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral in accordance with both the Budget (as defined below) and the DIP Loan Documents;

x. modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Proposed Orders and the DIP Loan Documents;

xi. scheduling a final hearing to consider entry of the Final Order;

xii. providing for the immediate effectiveness of the Interim Order and Final Order (upon entry) and waiving any applicable stay, including under Bankruptcy Rule 6004, to permit such immediate effectiveness; and

xiii. granting related relief.

In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Robert Gorin in Support of First Day Motions for Relief* (the "First Day Declaration") and the *Declaration Alec Haesler in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final*

*Hearing; and (VI) Granting Related Relief* (the "Haesler Declaration"), and respectfully represent

as follows:

### Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-5 Concise Statement[2]

1.      Pursuant to Bankruptcy Rules 4001(b)(1) and (d) and Local Bankruptcy Rule 4001-

5, the Debtors submit the following concise statement of the material terms of the Interim Order:

| Summary of Material Terms | | Location |
|---|---|---|
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Debtor Diamond Comic Distributors, Inc. | Interim Order preamble<br><br>DIP Credit Agreement preamble |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Debtor Comic Exporters, Inc., Debtor Comic Holdings, Inc., Debtor Diamond Select Toys & Collectibles, LLC, and non-debtor affiliates Diamond Comic Distributors UK, an unlimited liability company incorporated under the laws of England and Wales, Rosebud Entertainment, LLC, Renegade Games, LLC, and Game Consolidator, LLC | Interim Order preamble<br><br>DIP Credit Agreement preamble |
| **DIP Lender**<br>*Bankruptcy Rule 4001(c)(1)(B)* | JPMorgan Chase Bank, N.A. | Interim Order preamble<br><br>DIP Credit Agreement preamble |
| **Amount and Facility**<br>*Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-5(a)(2)(A)* | The sum of (i) the maximum principal amount of the DIP Debt and (ii) the principal amount of the Prepetition Debt (including Allowable 506(b) Amounts) outstanding at any time shall not exceed the lesser of $41,000,000 and the Borrowing Base (as defined in the DIP Credit Agreement); provided that, until entry of the Final Order, the maximum amount available to be drawn under the Interim Facility shall be limited to an amount that shall not result in a total increase in the outstanding principal amount of Prepetition Debt and DIP Debt (collectively, the "Aggregate Credit Obligations") from the Petition Date through the date of entry of the Final Order in excess of $5,500,000. | Interim Order preamble & ¶ 6(a)<br><br>DIP Credit Agreement Section 2.01 |

---

[2]      Any summary of the terms of the Interim Order contained in this Motion is qualified in its entirety by reference to the provisions of the Interim Order. To the extent there is a conflict between the Motion and the Interim Order, the Interim Order shall control. The Debtors reserve the right to supplement the statements made herein.

4

| Summary of Material Terms | | Location |
|---|---|---|
| | | |
| **Interest Rate**<br>*Local Bankruptcy Rule 4001-5(a)(2)(A)* | The DIP Debt shall bear interest at a per annum rate equal to the Adjusted REVSOFR30 Rate (as defined in the Prepetition Credit Agreement) plus 4.50%. Interest shall accrue on the principal balance of the DIP Debt, from time to time, based on a 365-day year and charged for the actual number of days outstanding. Interest shall accrue and be payable in cash monthly in arrears. | Interim Order ¶ 6(c)<br><br>DIP Credit Agreement Section 2.12 |
| **Fees**<br>*Local Bankruptcy Rule 4001-5(a)(2)(A)* | <u>Unused Line Fee</u>. An unused line fee shall accrue at the rate of 0.25% per annum on the average daily amount by which (i) the Maximum DIP Facility Amount exceeds (ii) the outstanding principal amount of Aggregate Credit Obligations, and shall be payable in arrears on the first business day of each calendar month.<br><br><u>Success Fee</u>. Subject to entry of the Final Order, a fee in an amount equal to the Applicable Success Fee Percentage (as defined below) of the Maximum DIP Facility Amount shall be due and payable on or before the sixtieth (60th) day following the Termination Date (the "<u>Success Fee Payment Date</u>"). The Applicable Success Fee Percentage shall equal: (i) 0% if the aggregate gross proceeds from the Sale Transaction and all other asset sales consummated prior to the Success Fee Payment Date (collectively, the "<u>Aggregate Sale Proceeds</u>") are less than $42,000,000, (ii) 1.50% if the Aggregate Sale Proceeds equal or exceed $42,000,000 but are less than $43,000,000, and (iii) 2.50% if the Aggregate Sale Proceeds are greater than $43,000,000. | Interim Order ¶ 6(d) & (e)<br><br>DIP Credit Agreement, Sections 2.11 (a) & (c) |
| **Letter of Credit and Commercial Credit Cards**<br>*Local Bankruptcy Rule 4001-5(a)(2)(A)* | Upon entry of the Interim Order, (i) the letter of credit in favor of BC Industrial Exchange Portfolio II in the amount of $1,000,000 that is issued and outstanding under the Prepetition Credit Agreement shall be deemed issued under the DIP Credit Agreement, and (ii) the DIP Lender shall maintain the Debtors' commercial credit card programs under the terms and conditions of those programs.<br><br>Upon entry of the Final Order, the Borrower shall immediately borrow $1,300,000 under the DIP Credit Agreement, with such proceeds to be held by DIP Lender in a segregated blocked account maintained by and in the name of the DIP Lender as cash collateral to secure (A) the Borrower's reimbursement obligations in connection with any draws under the letter of credit, (B) the Borrower's payment obligations in connection with the commercial | Interim Order ¶ 6(f)<br><br>DIP Credit Agreement, Sections 2.05(g) & 2.11(b) |

| Summary of Material Terms | | Location |
|---|---|---|
| | credit card programs and (C) the Borrower's other obligations under the DIP Credit Agreement, including, but not limited to, the obligation to repay the Aggregate Credit Obligations in full. | |
| **DIP Budget and Related Covenants** *Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility is subject to the budget (the "Budget"), a copy of which is attached to the proposed Interim Order at Exhibit B, and the terms and conditions of the DIP Credit Documents and the Proposed Orders. | Interim Order ¶ 3(a)–(c)<br><br>DIP Credit Agreement preamble & Reporting Schedule |
| **Reporting** *Bankruptcy Rule 4001(c)(1)(B)* | The Proposed Orders require compliance with certain periodic reporting covenants that are usual and customary for debtor-in-possession financing like the DIP Facility. | Interim Order ¶¶ 3(d) & 11(d)<br><br>DIP Credit Agreement Reporting Schedule |
| **Security and Priority** *Bankruptcy Rule 4001(c)(1)(B)(i)* | In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, and 364(d) of the Bankruptcy Code, the DIP Lender shall be granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all of the Debtors' property, assets or interests in property or assets of the Debtors, including, without limitation, (i) subject to entry of the Final Order, claims and causes of action under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), (ii) all proceeds and products of any of the foregoing, and (iii) all other property and assets including cash collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and products of any of the collateral (the "DIP Collateral").<br><br>The DIP Liens securing the DIP Obligations shall be valid, automatically perfected, non-avoidable, senior in priority, and superior to any other security, mortgage, collateral interest, lien, or claim, except that the DIP Liens shall be | Interim Order ¶¶ 13 & 14 |

| Summary of Material Terms | | Location |
|---|---|---|
| | subject to the Carve-Out and the Permitted Priority Liens (each as defined in the Interim Order).<br><br>Subject to the Carve-Out, the DIP Obligations shall be entitled to superpriority administrative expense claim status, with priority over any and all administrative expense claims (the "<u>DIP Superpriority Claims</u>"). | |
| **Proposed Adequate Protection**<br>*Bankruptcy Rules 4001(b)(1)(B)(iv) & 4001(c)(1)(B)(ii)* | The Debtors propose the following (collectively, the "<u>Adequate Protection Obligations</u>") as adequate protection for the interests of the Prepetition Lender in the Prepetition Collateral (as defined in the Interim Order),<br><br>1.  Subject only to the terms of the Interim Order, the Debtors shall be authorized to grant, and as of entry of the Interim Order shall be deemed to have granted, to the Prepetition Lender, solely to the extent of any diminution in value of the Prepetition Collateral, valid, binding, enforceable, non-avoidable, and automatically perfected, *nunc pro tunc* to the Petition Date, replacement liens on and security interests in (the "<u>Adequate Protection Liens</u>") the Prepetition Lender Collateral, with a priority subject and subordinate only to the DIP Liens, payment of the Carve-Out, and the Permitted Priority Liens.<br><br>2.  Moreover, except as provided otherwise in the Interim Order, the Adequate Protection Liens shall not be subject or subordinate to or made *pari passu* with any lien or security interest granted in the chapter 11 cases or any Successor Cases (as defined in the Interim Order).<br><br>3.  The Prepetition Lender shall be granted, subject only to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (the "<u>Adequate Protection Superpriority Claims</u>"), payable from and having recourse to all prepetition and postpetition property of the Debtors and the proceeds thereof. Subject only to the Carve-Out and the DIP Debt, the Adequate Protection Superpriority Claims granted to the Prepetition Lender will not be junior to any administrative expense claims and will have priority over all administrative expense claims against each of the Debtors, of any kind or nature whatsoever, | Interim Order ¶ 11 |

| Summary of Material Terms | | Location |
|---|---|---|
| | including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. | |
| | 4. The Prepetition Lender shall receive from the Debtors the following payments (collectively, "<u>Adequate Protection Payments</u>"): the Debtors shall pay in cash, as and when such payments would have come due under the Prepetition Credit Agreement had the chapter 11 cases not been commenced, all interest, which shall accrue and be payable at the contract rate or, to the extent applicable and at the option of the Prepetition Lender, the default rate under the Prepetition Credit Agreement. | |
| | 5. The Debtors shall pay the fees, costs and expenses of the Prepetition Lender in the manner set forth in paragraph 7 of the Interim Order. | |
| | 6. The Debtors shall provide the Prepetition Lender and its advisors with (i) monthly financial reports within thirty (30) days after the end of each calendar month consistent with Section (b)(ii) of the Reporting Schedule attached to the Prepetition Credit Agreement, (ii) weekly Borrowing Base Certificates and related collateral reports consistent with Section (C) of the Reporting Schedule attached to the Prepetition Credit Agreement, (iii) such other information as may from time to time be requested by the Prepetition Lender consistent with Section (D) of the Reporting Schedule attached to the Prepetition Credit Agreement, and (iv) as well as the Budget and variance reporting described in paragraph 3 of the Interim Order. | |
| **Stipulations as to Prepetition Claims and Liens** *Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Interim Order contains provisions or findings of fact that bind the Debtors' estates and DIP Entity Guarantors with respect to the validity, perfection or amount of the Prepetition Lender's claims and includes a waiver of claims against the Prepetition Lender. | Interim Order ¶¶ F(i)–(viii) & 21 |
| **Automatic Stay Waiver/Modification** | Pursuant to the Interim Order, the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as | Interim Order ¶ 20 |

| Summary of Material Terms | | Location |
|---|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)(iv)* | necessary to permit the Debtors to perform their obligations, and to permit the DIP Lender to enforce its rights, in connection with the DIP Facility. | |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** *Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens, without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or Adequate Protection Liens, or to entitle the DIP Liens or Adequate Protection Liens to the priorities granted herein. | Interim Order ¶¶ 11(a) & 28 |
| **Releases** *Bankruptcy Rule 4001(c)(1)(B)(viii)* | The Debtors and their respective estates waive, discharge, and release any right to challenge any of the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan Documents, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender and the Prepetition Lender; *provided*, that such release with respect to the DIP Obligations and DIP Liens shall be effective upon entry of the Final Order. | Interim Order ¶¶ F(vi) & 19

DIP Credit Agreement, Section 8.20 |
| **506(c) Waiver** *Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to entry of the Final Order, the costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Cases shall not be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Lender, the Prepetition Lender or any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender. | Interim Order ¶ 23 |
| **Entities with an Interest in Cash Collateral** | The Prepetition Lender | Interim Order ¶ F |

9

| | | |
|---|---|---|
| *Bankruptcy Rule 4001(b)(1)(B)(i)* | | |
| **Purposes for Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii)* | All DIP Loan proceeds and Cash Collateral shall be used (i) for working capital and general corporate purposes, (ii) to pay fees and expenses incurred by the DIP Lender in connection with the DIP Loan Documents, (iii) to pay restructuring costs and Professional Fees (as defined below) relating solely to these Chapter 11 Cases, and (iv) for other purposes as provided in and subject to the terms of the DIP Credit Agreement, and subject to compliance with the Budget and Permitted Variances. | Interim Order ¶ G |
| **Material Terms of the Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | Subject to the terms and conditions of the Interim Order and Final Order, at the times and for the purposes set forth in the Budget, the Debtors are authorized to use Cash Collateral until five (5) business days' after written notice of an Event of Default, as described below. | Interim Order ¶ 20(b) |
| **Duration of Use of Cash Collateral/ Events of Default** *Bankruptcy Rules 4001(b)(1)(B)(iii) & 4001(c)(1)(B)* | The occurrence and continuance of any of the following events, unless such occurrence and continuance is waived in writing by the DIP Lender in its sole discretion, shall constitute an event of default (collectively, the "Events of Default"):<br><br>1.  The failure of any Debtor to perform, in any respect, any of the material terms, provisions, covenants, or obligations under the Interim Order; and<br><br>2.  The occurrence of an "Event of Default" under the DIP Credit Agreement. | Interim Order ¶ 20(a)<br><br>DIP Credit Agreement, Article VII |
| **Milestones** *Bankruptcy Rule 4001(c)(1)(B)* | 1.  On or within one (1) day after the Petition Date, the Borrower shall have filed: (i) a motion seeking approval of the DIP Facility, including the Interim Order; and (ii) other customary First Day Pleadings (including the Cash Management Order), all in form and substance reasonably acceptable to the DIP Lender;<br><br>2. No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;<br><br>3. No later than three (3) Business Days after the Petition Date, the Debtors shall have filed an application, in form and substances reasonably acceptable to the DIP Lender, seeking approval of the | Interim Order ¶ 6(l)<br><br>DIP Credit Agreement Section 5.19 & Exhibit B |

| | | |
|---|---|---|
| | Debtors' retention of Raymond James & Associates, Inc. ("<u>Raymond James</u>"), as investment banker to the Debtors; | |
| | 4.  No later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; | |
| | 5.  No later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving (i) the Bidding Procedures and (ii) seeking approval of a stalking horse asset purchase agreement as the stalking horse bid for the purchase of the Debtors' assets, which asset purchase agreement shall be in form and substance reasonably acceptable to the DIP Lender (the "<u>Bidding Procedures Order</u>"); | |
| | 6.  No later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Debtors' retention of Raymond James; | |
| | 7.  No later than forty-five (45) days after the Petition Date, the Debtors shall have filed Schedules of Assets and Liabilities and Statements of Financial Affairs; | |
| | 8.  No later than forty-five (45) days after the entry of the Bidding Procedures Order, the Debtors shall have conducted an auction in accordance with the Bidding Procedures (the "<u>Auction</u>"); | |
| | 9.  No later than seven (7) days after conclusion of the Auction, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Sale Transaction; and | |
| | 10. No later than fifteen (15) days after the entry of the order of the Bankruptcy Court approving the Sale Transaction, the Debtors shall have consummated the Sale Transaction, and indefeasibly paid all amounts owing to the Lenders. | |
| **Carve-Out**<br>*Bankruptcy Rules 4001(b)(1)(B)(iii) & 4001(c)(1)(B)* | The DIP Liens, DIP Superpriority Claim, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject only to the right of | Interim Order<br>¶ 16 |

payment of the following expenses, to the extent provided in the Interim Order: (i) statutory fees payable to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) with respect to the Debtors (the "Case Administration Fees"); (ii) the reasonable fees and costs of the Debtors' claims and noticing agent; (iii) unpaid professional fees and expenses payable to any the Carveout Professionals[3] (collectively, the "Professional Fees") that are incurred or accrued prior to the date on which the DIP Lender provides written notice to the Debtors, Debtors' counsel, the U.S. Trustee and counsel to the Creditors' Committee (if any) of the occurrence of either an Event of Default or the Termination Date (such notice, the "Carve-Out Notice", and the date of a delivery of such notice, the "Carve-Out Effective Date"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date) to the extent allowed whether by interim order or procedural order and have been provided for in, and are consistent with, the Budget (subject to the Permitted Variances); and (iv) unpaid Professional Fees of the Debtors and the Creditors' Committee (if any), in each incurred or accrued on or after the Carve-Out Effective Date in an aggregate amount not to exceed $150,000 to the extent allowed at any time, whether by interim order or procedural order (clauses (i)–(iii), collectively, the "Carve-Out," and clause (iv) alone, the "Capped Carve-Out"). Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtors unless agreed to in writing by the DIP Lender.

The Debtors shall maintain a segregated account (the "Carve-Out Reserve Account") with Saul Ewing for the

---

[3]     "Carveout Professionals" means Professionals retained by the Debtors, including Saul Ewing LLP ("Saul Ewing"), as counsel for the Debtor, Getzler Henrich, as financial advisor to the Debtors, Stephenson Harwood LLP, as U.K. counsel to the Debtors, Raymond James & Associates, Inc. ("Raymond James"), as investment bank to the Debtors, any counsel and financial advisor that may be authorized by the Court to be retained by a Committee, and the U.S. Trustee (solely to the extent of fees required pursuant to 28 U.S.C. § 1930(a)). For the avoidance of doubt, no other investment bank or financial advisor of the Debtors other than Getzler Henrich and Raymond James shall be deemed a Carveout Professional or otherwise eligible to share in the Carveout.

payment of Professional Fees for Saul Ewing, Getzler Henrich, Stephenson Harwood, and any counsel and financial advisor that may be authorized by the Court to be retained by the Committee (the "Carve-Out Reserve Professionals"), which account shall be funded by the Debtors in accordance with the Budgets on a weekly basis, until the occurrence of the Carve-Out Effective Date. No funding shall be provided over and above the amounts set forth in the Budgets proposed by the Debtors and approved by the DIP Lender.  After the Carve-Out Effective Date, the Capped Carve-Out and all fees reflected in the Budget for the Carve-Out Reserve Professionals prior to the Carve-Out Effective Date, but not paid or funded by the Debtors as of that date, will be funded to the Carve-Out Reserve Account, but no further amounts shall be funded to this account.  From funds in the Carve-Out Reserve Account, Saul Ewing shall pay the Carve-Out Reserve Professionals in compliance with an interim compensation procedures and in the manner set forth in the Interim Order or the Final Order in accordance with the Budget; *provided*, *however*, that, prior to payment in full of the Prepetition Debt and termination of the Carve-Out, to the extent that Professional Fees for the Carve-Out Reserve Professionals that have accrued from the Petition Date through and including the Carve-Out Effective Date are less than the amounts funded into the Carve-Out Reserve Account, or to the extent that any portion of these Professional Fees are ultimately disallowed by the Bankruptcy Court by Final Order, then Saul Ewing shall immediately refund these excess monies to the DIP Lender. For the avoidance of doubt, (i) in making payments from the Carve-Out Reserve Account, Saul Ewing shall be entitled to conclusively rely upon written certifications of each Professional as to the amount due and owing to such Professional from the Carve-Out Reserve Account and in accordance with the Budget and shall have no liability to any party based upon its commercially reasonable reliance on such certifications; and (ii) in no circumstances shall Saul Ewing be obligated to pay any Professional other than from funds held in the Carve-Out Reserve Account.

52349238.7 01/14/2025

| Local Rule 4001-5 Concise Statements | | Location |
|---|---|---|
| **Cross Collateralization** *Local Rule 4001-5(a)(1)(A)* | The Interim Order does not provide for cross-collateralization, other than replacement liens and superpriority claims as adequate protection, because the Prepetition Lender has a blanket lien on substantially all the Debtors' assets. | N/A |
| **Challenge Period** *Local Rule 4001-5(a)(1)(B)* | The Interim Order contains provisions or findings of fact that bind the estates with respect to the validity, perfection or amount of the Prepetition Lender's claims and includes a waiver of claims against the Prepetition Lender. The stipulations and admissions contained in the Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Committee (if any) or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless and to the extent that (a) a Committee (if any), a Trustee appointed prior to the Challenge Period Termination Date (as defined below), or any other party in interest (other than any Debtor), after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part any such stipulations, releases and admissions, including the Debtors' Stipulations, or has otherwise asserted an Estate Claim (each, a "<u>Challenge</u>") by no later than (i) the earlier of (1) the date upon which Sale Transaction is closed and (2) sixty (60) days from the appointment of a Creditors' Committee, and (ii) any such later date agreed to in writing by the Debtors and the Prepetition Lender (the time period established by the later of the foregoing clauses, the "<u>Challenge Period</u>" and the date of expiration of each Challenge Period being a "<u>Challenge Period Termination Date</u>"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding. | Interim Order ¶ 21 |
| **Section 506(c) Waiver** *Local Rule 4001-5(a)(1)(C)* | Subject to entry of the Final Order, the costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Cases shall not be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Lender, the Prepetition Lender or any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender. | Interim Order ¶ 23 |

| | | |
|---|---|---|
| **Prepetition Lender's Liens on Avoidance Actions** *Local Rule 4001-5(a)(1)(D)* | Subject to entry of the Final Order, the Prepetition Lender and DIP Lender shall have liens on the proceeds of and property received from such claims and causes of action, under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions"). | Interim Order ¶ 11(a) |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** *Local Rule 4001-5(a)(1)(E)* | Upon Entry of the Final Order, the Debtors shall borrow DIP Loans sufficient to pay the full amount of the Prepetition Debt then due and owing under the Prepetition Facility as of the date the Court enters the Final Order.   The proceeds of such DIP Loans shall be remitted to the Prepetition Lender to pay down the Prepetition Facility (the "Roll-Up"). The Roll-Up is part of a global negotiation of the DIP Facility terms.  Without the Roll-Up, the Debtors would not receive the DIP Loans that are necessary for the Debtors to maintain their operations and fund administrative expenses during these chapter 11 cases.  Accordingly, the Debtors believe that the Roll-Up of JPM's prepetition debt is necessary and reasonable under the circumstances. | Interim Order ¶ 6(b) |
| **Treatment of Professionals Under Carve-Out** *Local Rule 4001-5(a)(1)(F)* | While the Budget has separate line items for the Debtors' and the Committees' Professionals, the Interim Order contains no provision for different treatment for Committee professionals, if any, with respect to the Carve-Out. | N/A |
| **Non-Consensual Priming Liens** *Local Rule 4001-5(a)(1)(G)* | The Prepetition Lender consents to the DIP Liens priming the Prepetition Lender's validly attached and properly perfected Prepetition Liens (as defined below). | N/A |
| **Relief from Automatic Stay** *Local Rule 4001-5(a)(1)(H)* | Pursuant to the Interim Order, the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as necessary to permit the Debtors to perform their obligations, and to permit the DIP Lender to enforce its rights, in connection with the DIP Facility. | Interim Order ¶ 20 |

### Jurisdiction and Venue

2.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

3.      On the date hereof (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

4.      A description of the Debtors' businesses, the reasons for commencing these cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declaration filed concurrently with this Motion and incorporated herein by reference.

I.      **The Debtors' Prepetition Secured Indebtedness**

5.      On May 16, 2019, Debtor Diamond Comic, as borrower, Debtor Comic Exporters, Debtor Comic Holdings, and non-debtor Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales ("DCDUK"), each as guarantors, and JPMorgan Chase Bank, N.A., as the Prepetition Lender, entered into that certain Credit Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, pursuant to various amendments and letter agreements, including, without limitation, the most recent Fifteenth Amendment to Credit Agreement dated as of December 20, 2024, the "Prepetition Credit Agreement"), pursuant to which JPM agreed to extend to Diamond Comic a revolving line of credit in the maximum amount of $40,000,000 and a term loan for $3,000,000 (the "Prepetition Loan").  Debtor Diamond Select Toys & Collectibles, LLC ("DST"), and non-debtor affiliates Rosebud Entertainment, LLC ("Rosebud"), Game Consolidators, LLC ("Consolidators"), and Renegade Games, LLC ("Renegade"), subsequently joined as guarantors of the Credit Agreement

(collectively, the "Entity Guarantors").[4]  Stephen Geppi, an executive officer of the Debtors, executed a Personal Guaranty dated January 15, 2024.

6.    With the Credit Agreement, Diamond Comic, the Entity Guarantors, and JPM, entered into that certain Security Agreement, dated May 16, 2019 (as amended, the "Security Agreement").  The Security Agreement provides a first-priority, fully-perfected security interest and lien on Diamond Comic's and the Entity Guarantors' right, title, and interest in, to and under the "Collateral" as defined in the Security Agreement.

7.    Moreover, as further security for the Prepetition Loan, non-debtors SG Resource, LLC, and Stephen A. Geppi Revocable Trust pledged to JPM their right, title and interest in their respective interests in Diamond Comic and any related distributions and proceeds, pursuant to that certain Pledge Agreement, dated May 16, 2019.  On March 21, 2024, the holders of all outstanding membership interests in non-debtor affiliates Rosebud, Consolidators and Renegade pledged to JPM their right, title, and interest in their respective interests of Rosebud, Consolidators and Renegade and any related distributions and proceeds.  On September 13, 2024, the holders of all outstanding membership interests in Debtor DST pledged to JPM their right, title, and interest in their respective interests in DST and any related distributions and proceeds in exchange for access to certain funding under the Credit Agreement.

8.    As of the Petition Date, the total principal outstanding under the Prepetition Credit Agreement is approximately $32,600,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (the "Prepetition Secured Obligations").

---

[4]    Debtor DST joined as guarantor under the Credit Agreement in late 2024 as a condition to a further amendment and forbearance agreement with JPM.

**II.       The Debtors' Need for Post-Petition Financing and Access to Cash Collateral**

9.       As detailed in the First Day Declaration and Haesler Declaration, given the Debtors' liquidity constraints and financial struggles, the Debtors urgently need access to the debtor-in-possession financing and use of cash collateral to continue to operate their businesses, run the proposed postpetition sale process for all or substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code, and fund the administration of these chapter 11 cases. Absent the relief requested herein, the Debtors likely will not have sufficient liquidity to continue to operate their business, fund payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring. All of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern.

**III.      The Debtors' DIP Financing / Cash Collateral Negotiations**

10.      The Debtors have engaged in extensive, arm's-length negotiations with the DIP Lender about the terms of the postpetition financing and use of Cash Collateral. As a result of those negotiations, the Debtors and DIP Lender reached agreement on the terms of a DIP Facility and use of Cash Collateral, as set forth in the Proposed Orders. Ultimately, the DIP Facility proposed was the best and only actionable financing proposal available to the Debtors and provides necessary liquidity for the administration of these cases. In the sound exercise of their business judgment, the Debtors concluded that entering into the DIP Loan Documents is in the best interests of the Debtors, their estates and their creditors.

**IV.      The DIP Facility And Use Of Cash Collateral Are In the Best Interests of the Estates**

11.      The DIP Facility and continued use of Cash Collateral, as set forth in the Proposed Orders, will provide the liquidity needed to stabilize and fund the Debtors' operations during the

course of these chapter 11 cases as the Debtors seek to preserve and maximize the value of their estates for the benefit of all parties in interest.  Moreover, the liquidity provided under the DIP Facility and use of Cash Collateral is necessary to facilitate the administration of these chapter 11 cases, fund postpetition operations and restructuring expenses, and ensure that the Debtors are able to pursue a sale of all or substantially all their assets.  The Debtors believe that approval of the DIP Facility and use of Cash Collateral is critical to assuring parties in interest of the Debtors' ability to maintain their operations during the proposed sale process for these chapter 11 cases.

12.    For these reasons and those set forth below, the Debtors believe that the DIP Facility will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the Interim Order and, as later applicable, the Final Order.

## Basis for Relief

### I.    The Debtors Should Be Authorized To Obtain Postpetition Financing On A Senior Secured And Superpriority Basis.

#### A.    The Debtors Exercised Sound And Reasonable Business Judgment In Deciding To Enter Into The DIP Facility.

13.    Provided that an agreement to obtain postpetition credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("[Courts generally] defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.")

(internal citation omitted); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

14.    Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (internal alterations and quotations omitted)); *In re Pittsburgh Sports Assocs. Holdings Co.*, 239 B.R. 75, 87 (Bankr. W.D. Pa. 1999). Courts require only that the debtors "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

15.    Under the circumstances, the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment. Most importantly, without access to the DIP Facility, the Debtors will not be able to pay expenses necessary to sustain their operations, which would irreparably impair the value of the Debtors' estates during these chapter 11 cases. The DIP Facility is the only available and viable source of liquidity to make such payments. In addition, the Debtors negotiated the terms of the DIP Facility with the DIP Lender in good faith,

at arm's length, and with the assistance of the Debtors' advisors.  Based on such negotiations, the Debtors believe the terms of the DIP Facility, as set forth in the DIP Loan Documents and Proposed Orders, are fair, reasonable, reflective of the market for financings of this type, offers a significant benefit to the Debtors' estates, and is the best financing available under the circumstances. Moreover, the milestones in the Proposed Orders are tailored to comport with the timeline of the sale process for all or substantially all of the Debtors' assets.  Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' business judgment.

> **B.      The Debtors Meet The Conditions Necessary Under Section 364(d)(1) To Obtain Postpetition Financing On A Senior Secured And Superpriority Basis.**

16.      The Debtors propose to obtain financing under the DIP Facility by providing the DIP Lender the DIP Liens and DIP Superpriority Claims pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code.  Specifically, the Debtors propose to provide the DIP Lender first priority DIP Liens on all DIP Collateral, together with any proceeds, products or profits of the DIP Collateral, whether arising under section 552(b) of the Bankruptcy Code or otherwise (subject in each case only to the Carve-Out and Permitted Priority Liens).

17.      The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate.  *See, e.g.*, *In re Los Angeles Dodgers*, 457 B.R. at 312; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549-51 (Bankr. E.D. Pa. 1987); *see also Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *In re Ames Dep't Stores*, 115 B.R. at 37–40.

18.      Further, the Debtors meet the requirements for relief under section 364(d) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain post-petition financing secured by liens that are senior to prepetition liens.  Specifically, section 364(d) of the Bankruptcy Code provides as follows:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

52349238.7 01/14/2025

11 U.S.C. § 364(d).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lender has consented or (b) the Prepetition Lender's interests in collateral are adequately protected.

19.    Here, the Debtors satisfy the necessary conditions under section 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Loan Documents.  Given the circumstances, the Debtors could not obtain credit on an unsecured, junior secured, or administrative expense basis.  Moreover, the Prepetition Lender has consented to the DIP Liens priming its respective Prepetition Liens.  For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Loan Documents pursuant to section 364(c) and (d) of the Bankruptcy Code.

    1.    <u>The Debtors are unable to obtain financing on more favorable terms than the DIP Facility.</u>

20.    In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *In re Pearl-Phil GMT (Far East Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c), to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders).  This is especially true where time is of the essence.  *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

21.     Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic or unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

22.     As detailed in the Haesler Declaration, the Debtors communicated with both the Prepetition Lender and various other parties about their willingness to provide sufficient financing, including financing on a junior basis.  However, none of these parties were willing to provide financing on an unsecured, non-superpriority or junior basis. As the Debtors' senior secured lender, the Prepetition Lender was the natural candidate to serve as the postpetition lender on a superpriority basis, while the other parties failed to present a financing option that was actionable. Among other issues, any alternative lender funding on a super-priority basis would have had to either (i) gain the consent of the Prepetition Lender to prime the Prepetition Obligations or (ii) attempt to undertake (or cause the Debtors to undertake) a priming fight at considerable cost and with little practical likelihood of success. In addition, given the circumstances facing the Debtors' businesses, the Debtors have not had any realistic prospects for raising alternative capital.

23.     After carefully evaluating their options in light of such circumstances, the Debtors engaged in extensive, good faith, and arm's-length negotiations with the Prepetition Lender to obtain the best financing terms available.  Because the DIP Facility provides the Debtors with the

liquidity they need at the lowest cost available, the Debtors have concluded that the DIP Facility represents the Debtors' best (and only) available post-petition financing option. For these reasons, the Debtors submit that they have met the standard for obtaining the proposed DIP financing.

      2.    <u>The DIP Facility is necessary to preserve the value of the Debtors' estates</u>.

24.    The Debtors, as debtors in possession, have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The Debtors' access to postpetition financing is essential to their ability to effectively carry out that duty.  Without the proceeds of the DIP Facility, the Debtors will be unable to fund critical payments in the ordinary course of business that are essential to the Debtors' continued operations, which would have irreparable consequences to the Debtors' estates and stakeholders.  The DIP Facility will provide the Debtors with sufficient liquidity to fund their operations and maximize the value of their assets as they work toward a sale of all or substantially all the Debtors' assets.

      3.    <u>The terms of the DIP Facility are fair, reasonable, and adequate under the circumstances</u>.

25.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [debtor-in-possession financing] pricing terms are, I find the provisions [of the financing] reasonable here and now.").

26.     Here, the terms of the DIP Facility set forth in the DIP Credit Agreement and Proposed Orders are fair, appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Debtors, their estates and their creditors.  As set forth in the First Day Declaration, the covenants and milestones included in the Proposed Orders are reasonable and are not designed to make the Debtors disproportionately susceptible to a breach of such terms.  All terms regarding the DIP Facility were extensively negotiated by the Debtors and their advisors to ensure that the terms were as favorable to the Debtors as possible under the circumstances, and the Debtors believe that such terms represent fair consideration for the critical financing proposed to be provided by JPM.

27.     In particular, the Roll-Up is appropriate.  Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  The importance of roll-up features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Frank Parsons, Inc.*, No. 11-10338, 2011 WL 2750844, at *6 (Bankr. D. Md. Jan. 6, 2011) (where good cause and no more favorable available credit was shown, granting final authorization to the debtors to use DIP loan proceeds "to pay Agent and Lenders in respect of all Pre-Petition Obligations"); *In re Hedwin Corp.*, No. 14-15194, 2009 WL 10805962, at *6 (Bankr. D. Md. Dec. 30, 2009) (authorizing the Debtors to enter into a DIP Facility that included a roll up of the Debtors' prepetition revolving loans); *In re TVI Corp.*, No. 09-15677, 2009 WL 8189167, at *5 (Bankr. D. Md. May 4, 2009) (authorizing DIP lending providing for "the post-petition continuation and gradual "roll up" of the Debtors' pre-petition Revolving Loan").  This repayment is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility.  Without access to the additional liquidity provided under the DIP Facility, the

Debtors will be unable to fund the necessary administrative costs of these chapter 11 cases and the sale process. Accordingly, the Debtors submit that the terms of the DIP Facility, including the Roll-Up, are fair, appropriate, reasonable, and adequate under the circumstances, and in the bests interests of the Debtors, their estates and their creditors.

28.    The Roll-up is also well justified and appropriate because both the pre-petition facility and the proposed DIP facility are asset-based lending ("ABL") credit facilities. Therefore, the DIP Lender would essentially be loaning against the same accounts receivable and inventory that secure the loans made by the Prepetition Lender. Absent a Roll-up, the Prepetition Lender and the DIP Lender would need to split the collateral pool, and it would be difficult to provide sufficient availability to borrow under the DIP Facility while also adequately protecting the claims and liens of the Prepetition Lender. As the proposed stalking horse bid provides for a purchase price in excess of the amount owed to the Prepetition Lender, the Roll-up solves the immediate timing and liquidity needs of the Debtors' estates, and enhances (rather than erodes) the possibility of recovery for unsecured creditors.

29.    Moreover, the DIP Lender's ability to cash collateralize certain obligations upon entry of the Final Order is appropriate. In particular, Debtor DCD, upon entry of the Final Order, shall borrow $1,300,000 under the DIP Credit Agreement, with such proceeds to be held by the DIP Lender in a segregated blocked account maintained by and in the name of the DIP Lender (the "LC and Commercial Card Collateral Account"), to collateralize the Debtors' obligations to JPM with respect to the Debtors' commercial credit cards as well as reimbursement obligations in connection with the Irrevocable Standby Letter of Credit No. NUSCGS048065, issued by JPM for the account of Debtor DCD in favor of BC Industrial Exchange Portfolio II Master Tenant, LLC. The Debtors' funding of the LC and Commercial Card Collateral Account is part of a global

negotiation of the DIP Facility terms.  Absent this relief, the Debtors would not receive the DIP

Loans that are necessary for the Debtors to maintain their operations, including their commercial

credit cards, and fund administrative expenses during these chapter 11 cases.  Accordingly, the

Debtors believe that establishing and funding the LC and Commercial Card Collateral Account is

necessary and reasonable under the circumstances.

30.     The Debtors have further satisfied section 364(d) of the Bankruptcy Code.  When

priming of liens is sought under section 364(d) of the Bankruptcy Code, the courts also examine

whether prepetition secured creditors are being provided adequate protection for the value of their

liens.  *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah, July

3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986). The Bankruptcy

Code does not expressly define "adequate protection."   Section 361 of the Bankruptcy Code,

however, provides a non-exhaustive list of examples of adequate protection, specifically including

replacement liens.  *See* 11 U.S.C. § 361.  Section 361(3) of the Bankruptcy Code goes on to provide

the flexible concept that adequate protection may also take other forms, so long as the relief "will

result in the realization by [creditor] of the indubitable equivalent of such [creditor's] interest in

[cash collateral]."  *See* 11 U.S.C. § 361.

31.     Generally, courts decide what constitutes adequate protection on a case-by-case

basis.  *See, e.g.*, *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp.,*

*Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection

is made on a case by case basis."); *In re N.J. Affordable Homes Corp*, No. 05-60442, 2006 WL

2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be

a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2

(Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in

the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (internal citation omitted).

32.     As described above, the Prepetition Lender, to the extent applicable, has consented to the DIP Liens priming its respective Prepetition Liens.  Nonetheless, the Debtors propose to provide a variety of adequate protection—including, the Adequate Protection Liens, Adequate Protection Superpriority Claims, and Adequate Protection Payments—to protect the interests of the Prepetition Lender in the Debtors' property from any diminution in value of the Prepetition Lender Collateral resulting from the priming of the Prepetition Liens, use of the Cash Collateral and the imposition of automatic stay (the "Adequate Protection").  The Debtors submit that the Adequate Protection as described herein is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.    The DIP Lender Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code.

33.     Section 362(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring

> of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id.*

34.     As described in detail above, the DIP financing is the result of (a) the Debtors' reasonable and informed determination that the DIP Lender offers the most favorable terms on which to obtain vital postpetition financing and (b) extensive arm's-length, good faith negotiations between the Debtors and the DIP Lender.  The Debtors submit that the terms and conditions of the DIP Facility, as set forth in the DIP Loan Documents and Proposed Orders, are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP financing has been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and, therefore, the DIP Lender is entitled to the protections afforded thereby.

### III.    The Debtors Should Be Authorized to Use the Cash Collateral

35.     The Debtors should be permitted to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use, sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."  *Id.* at § 363(e).

36.     The Adequate Protection, described above, is intended to protect the Prepetition Lender from any diminution in value of its interests in the Prepetition Lender Collateral, resulting

from the Debtors' use thereof during the pendency of the chapter 11 cases.  Without access to Cash Collateral, the Debtors will be unable to continue operating.  The Debtors believe the Adequate Protection is necessary and sufficient for the Debtors to continue to use Cash Collateral.

37.    In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Lender is appropriate.  The Debtors' proposed Adequate Protection is not only necessary to protect the Prepetition Lender against any diminution in value, but is also fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral in the near term for the benefit of all parties in interest and their estates.

## IV.    The Scope of the Proposed Carve-Out is Reasonable and Appropriate

38.    The DIP Facility and Interim Order subject the security interests and administrative expense claims under the DIP Facility to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See, e.g.*, *In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for payment of the Clerk of the Court and the U.S. Trustee fees, the fees and costs of the Debtors' claims and noticing agent, and Professional Fees.

## V.    The Automatic Stay Should Be Modified on a Limited Basis

39.    The relief requested herein contemplates a modification of the automatic stay to (a) permit the Debtors to grant the DIP Liens, DIP Superiority Claims, Adequate Protection Liens

and Adequate Protection Superpriority Claims; (b) permit the Debtors to incur all liabilities and obligations to the DIP Lender and Prepetition Lender under the Proposed Orders; (c) subject to the Carve-Out, authorize the Debtors to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of the Proposed Orders; and (d) authorize the DIP Lender, subject to certain limitations in the Interim Order, to exercise remedies upon the occurrence and during the continuation of an event of default under the Interim Order.  Stay modifications of this kind are ordinary and standard features for debtor in possession financing arrangements, and in the Debtors' business judgment, are reasonable and fair under the circumstances.

## VI.    Interim Relief Should Be Granted

40.    Bankruptcy Rule 4001 provides that a final hearing on a motion for authority to use cash collateral or obtain credit may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is authorized to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral or obtain DIP financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  *See* Fed. R. Bankr. P. 4001(b)(2) & 4001(c)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3).

41.    Pending the Final Hearing, the Debtors require immediate access to Cash Collateral and proceeds of the DIP Facility to satisfy the day-to-day needs of the Debtors' business operations.  Access to liquidity will help to address any concerns of employees, vendors or customers regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases.  The Debtors have an immediate need for liquidity to, among other things,

maintain business relationships with their vendors and suppliers, pay payroll and certain benefits, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  In addition, the Budget establishes that the Debtors' use of Cash Collateral and proceeds of the DIP Facility will not prejudice the DIP Lender or Prepetition Lender.

42.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b) & (c), the Debtors request an expedited hearing to consider the Motion and entry of the Interim Order.

<u>**Bankruptcy Rule 4001(a)(4) Should Be Waived**</u>

43.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(4).  Bankruptcy Rule 4001(a)(4) provides, "[u]nless the court orders otherwise, an order granting a motion for relief from the automatic stay under [Rule 4001(a)(1)] is stayed for 14 days after it is entered." Fed. R. Bankr. P. 4001(a)(4).  As explained above and in the First Day Declaration, access to the DIP Facility and use of Cash Collateral is essential to prevent irreparable damage to the Debtors' operations.  Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

<u>**The Requirements of Bankruptcy Rule 6003 Are Satisfied**</u>

44.     Bankruptcy Rule 6003 empowers the Court to issue an order, within the Interim Period, granting a motion to "use . . . property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed" if such requested relief "is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  For the reasons discussed above, entry of an interim order granting this Motion is integral to the Debtors' ability to successfully transition into chapter 11 and to avoid disruptions to the Debtors' operations, to the detriment of the Debtors'

52349238.7 01/14/2025

estates and creditors.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

### Waiver of Bankruptcy Rule 6004(h)

45.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### Notice

46.     Notice of this Motion will be given to the following parties, or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Maryland; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to JPMorgan Chase Bank, N.A., (iv) the United States Attorney for the District of Maryland; (v) the offices of the attorneys general for the states in which the Debtors operate;  (vi) the Internal Revenue Service; and (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit the no other or further notice is necessary.


*[Remainder of Page Left Intentionally Blank]*

52349238.7 01/14/2025

## Conclusion

WHEREFORE, the Debtors respectfully request the entry of the proposed Interim and Final Orders, granting the relief requested herein and such other and further relief as is just and proper.

Dated: January 14, 2025

**SAUL EWING LLP**

By: */s/ Jordan D. Rosenfeld*
    Jordan D. Rosenfeld (MD Bar No. 13694)
    1001 Fleet Street, 9th Floor
    Baltimore, MD 21202
    Telephone: (410) 332-8600
    Email: jordan.rosenfeld@saul.com

    -and-

    Jeffrey C. Hampton (*pro hac vice* pending)
    Adam H. Isenberg (*pro hac vice* pending)
    Turner N. Falk (*pro hac vice* pending)
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7777
    Email: jeffrey.hampton@saul.com
        adam.isenberg@saul.com
        turner.falk@saul.com

    -and-

    Mark Minuti (*pro hac vice* pending)
    Paige N. Topper (*pro hac vice* pending)
    Nicholas Smargiassi (*pro hac vice* pending)
    1201 N. Market Street, Suite 2300
    Wilmington, DE 19801
    Telephone: (302) 421-6800
    Email: mark.minuti@saul.com
        paige.topper@saul.com
        nicholas.smargiassi@saul.com

    *Proposed Counsel for Debtors and Debtors in Possession*