## Exhibit A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)**

| | |
|---|---|
| In re: | Chapter 11 |
| DIAMOND COMIC DISTRIBUTORS, INC., *et al.*[1] | Case No. 25-10308 (DER) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
SENIOR SECURED FINANCING AND THE USE OF CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION; (III) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE
AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND
(VI) GRANTING RELATED RELIEF**

**THIS MATTER** having come before this Court (this "**Court**" or "**Bankruptcy Court**")

upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting*

*Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV)*

*Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*

---

[1] The Debtors in these chapter 11 cases and the last four (4) digits of each Debtor's federal taxpayer identification number are as follows: Diamond Comic Distributors, Inc. (3450), Comic Exporters, Inc (7457), Comic Holdings, Inc. (7458), and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

(the "***Motion***"), filed by the above-captioned debtors, as debtors-in-possession (the "***Debtors***") in the above-captioned cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rules 2002-1 and 4001-5 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "***Local Rules***"), seeking, among other things*:*

(a) authorization for the Debtors to obtain senior secured postpetition financing on a superpriority basis in the form of a superpriority senior secured revolving credit facility (the "***DIP Facility***"), pursuant to which revolving loans (the "***DIP Loans***") in a maximum amount not to exceed $41,000,000 (the "***Maximum DIP Facility Amount***"), of which the maximum amount available to be drawn under the interim DIP Facility (the "***Interim Facility***") shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations (as defined below) from the Petition Date through the entry of the Final Order in excess of $5,500,000, shall be made available upon entry of this interim order (this "***Interim Order***") pursuant to the terms and conditions of this Interim Order, the Final Order (upon entry), and that certain senior secured Debtor-in-Possession Credit Agreement, dated as of January [   ], 2025 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***"[2] together with the schedules and exhibits attached thereto, and all agreements, documents, and instruments executed and delivered in connection therewith, the "***DIP Loan Documents***") by and among Diamond Comic Distributors, Inc., a Maryland Corporation (the "***Borrower***" or "***Diamond Comic***"), and JPMorgan Chase Bank, N.A., as lender (the "***DIP Lender***"), and unconditionally guaranteed by Comic Exporters, Inc., a Maryland corporation ("***Comic Exporters***"), Comic Holdings, Inc., a Maryland Corporation ("***Comic Holdings***") and Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company (individually, "***Diamond Select***" and collectively, the "***Debtor Guarantors***"), and Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales ("***DCDUK***"), Rosebud Entertainment, LLC, a Maryland limited liability company ("***Rosebud***"), Renegade Games, LLC, a Delaware limited liability company ("***Renegade***"), and Game Consolidator, LLC, a Delaware limited liability company (individually, "***Consolidator***" and collectively with DCDUK, Rosebud and Renegade, the "***Non-Debtor Entity Guarantors***," and together with the Debtor Guarantors and Non-

---

[2] Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in the DIP Credit Agreement.

Debtor Guarantors collectively referred to herein as the "***DIP Entity Guarantors***"), and individually guaranteed by Stephen A. Geppi (the "***Individual Guarantor***"), substantially in the form of __Exhibit A__ attached hereto;

(b)    approval of the terms of, and authorization for the Debtors to execute, enter into and deliver the DIP Loan Documents, including without limitation, definitive pledge and security agreements granting first priority liens in substantially all of the Debtors' assets to secure the obligations under the DIP Credit Agreement (collectively, the "***Pledge and Security Agreement***"), and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

(c)    subject to the Carve-Out (as defined below), granting to the DIP Lender fully-perfected, priming, first priority senior security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents and this Interim Order (collectively, and including indebtedness or obligations of the Debtors to DIP Lender incurred on or after the Petition Date pursuant to this Interim Order or otherwise, including, without limitation, all Obligations and any advances made by the DIP Lender to pay the Carve-Out, the "***DIP Debt***"), which shall rank senior in priority to all other liens, claims and encumbrances, subject to Permitted Priority Liens (as defined below);

(d)    subject to the Carve-Out (as defined below), the granting of adequate protection to the Prepetition Lender (as defined below), in its capacity as lender under that certain Credit Agreement, dated as of May 16, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, pursuant to various amendments and letter agreements, including, without limitation, the most recent Fifteenth Amendment to Credit Agreement dated as of December 20, 2024 (as so amended, the "***Prepetition Credit Agreement***" and together with all related loan documents, as more specifically defined below, the "***Prepetition Loan Documents***", and the outstanding obligations under the Prepetition Credit Agreement and Prepetition Loan Documents shall be referred to collectively as the "***Prepetition Debt***"), among the borrowers thereto, the guarantors from time to time thereto, and JPMorgan Chase Bank, N.A., as lender (the "***Prepetition Lender***" and collectively with the DIP Lender, the "***Lenders***"), for any diminution in value of its interests in the applicable Prepetition Collateral (as defined below), including as a result of any or all of the imposition of the automatic stay and the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral (collectively, the "***Diminution in Value***");

(e)    subject to the restrictions, terms and conditions set forth in the DIP Loan Documents and this Interim Order, authorization for the Debtors to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which the Prepetition Lender has an interest and the granting of adequate

protection to the Prepetition Lender with respect to, *inter alia*, such use of Cash Collateral (as defined below) and the other Prepetition Collateral;

(f)     subject to the Carve-Out, the granting of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lender as well as liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Permitted Priority Liens, and priming liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all DIP Collateral (as defined below) and all proceeds thereof (including, upon entry of the Final Order, any Avoidance Actions/Proceeds (as defined below)), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral) (collectively, and as more specifically defined below, "***Cash Collateral***");

(g)     upon entry of the Final Order, the waiver of the Debtors' right to surcharge the Prepetition Collateral or DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(h)     subject to entry of the Final Order, a finding that neither the DIP Lender nor the Prepetition Lender, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

(i)     authorization and direction for the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Unused Line Fee and Success Fee, under and as defined in the DIP Credit Agreement), expenses and other amounts payable under the DIP Loan Documents, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, this Interim Order, the Final Order (upon entry) and the applicable DIP Loan Documents;

(j)     subject to the restrictions set forth in the DIP Loan Documents and this Interim Order, authorization for the Debtors to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) in accordance with both the Budget (as defined below) and the DIP Loan Documents;

(k)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order, the Final Order and the DIP Loan Documents;

(l)     setting the date for the hearing (the "***Final Hearing***") to consider, on a final basis, the Motion and the entry of a final order (the "***Final Order***" and together with the

4

Interim Order, the "**_DIP Orders_**"), authorizing and approving the transactions described in the foregoing clauses, which Final Order shall be in form and substance (including with respect to any subsequent modifications made in response to any objections or comments made by this Court) acceptable to the Debtors and the DIP Lender;

(m)    providing for the immediate effectiveness of this Interim Order and Final Order (upon entry) and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness; and

(n)    granting the Debtors such other and further relief as is just and proper.

The Court having considered the Motion, the exhibits attached thereto, the DIP Loan Documents, the _Declaration of Robert Gorin in Support of Debtors' Chapter 11 Petition and First Day Motions_ (the "**_First Day Declaration_**"), and the evidence submitted at the interim hearing (the "**_Interim Hearing_**") held before this Court on January [  ], 2025; and adequate notice of the Motion and the Interim Hearing having been given under the circumstances and in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and Local Rules 2002-1, 4001-1 and 4001-5 and no further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is fair and reasonable and in the best interests of the Debtors, their respective estates, and their creditors and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets pending the Final Hearing; and any objections to the entry of this Interim Order having been withdrawn or overruled on the merits; and upon the record herein and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.        <u>Debtor-in-Possession Operation.</u> On January 14, 2025 (the "***Petition Date***"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland (Baltimore Division). The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.        <u>Jurisdiction and Venue.</u> The Court has jurisdiction over the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and *Standing Order 2012-05* from the United States District Court for the District of Maryland. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceeding on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors have consented to the Court's entry of a final order regarding the Motion, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.        <u>Committee.</u> As of the date of the Interim Hearing, the United States Trustee for Region 4 (the "***U.S. Trustee***") has not yet appointed an official committee of unsecured creditors (a "***Committee***") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

D.        <u>Notice</u>. Proper, timely, adequate and sufficient notice under the circumstances of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be

---

[3]        The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable.

required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 6003.

E.    <u>Necessary Approvals</u>. Upon entry of this Interim Order, the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents as provided herein.

F.    <u>Debtors' and DIP Entity Guarantors' Stipulations</u>.  Without prejudice to the rights of parties in interest as set forth in paragraph 21 herein, the Debtors, on their behalf and on behalf of  their estates, and the DIP Entity Guarantors, admit, acknowledge, agree and stipulate to the following, which stipulations shall be binding on the Debtors and their estates, the DIP Entity Guarantors, and all parties in interest (Paragraphs F(i) through F(viii) below are referred to, collectively, as the "***Stipulations***"):

(i)    <u>Prepetition Loan Documents</u>. Diamond Comic, as Borrower, is party to the following pre-bankruptcy agreements:  (a) the Prepetition Credit Agreement, by and among the Borrower, Comic Exporters, Comic Holdings, DCDUK, Rosebud, Consolidators, Renegade and Diamond Select, as joint and several guarantors (the "***Prepetition Entity Guarantors***"), and the Prepetition Lender; (b) the Security Agreement dated as of May 16, 2019, as amended, by and among the Borrower, the Prepetition Entity Guarantors, and the Prepetition Lender (the "***Prepetition Security Agreement***"); (c) the Pledge Agreement dated as of May 16, 2019, from the holders of all outstanding equity interests in the Borrower in favor of the Prepetition Lender (the "***Prepetition Borrower Equity Pledge Agreement***"); (d) the Charge Over Shares dated as of May 16, 2019, from the holders of all outstanding shares of equity issued by DCDUK in favor of the

7

Prepetition Lender (the "***DCDUK Share Charge***"); (e) the Personal Guaranty dated as of January 15, 2024, from the Individual Guarantor in favor of the Prepetition Lender (the "***Geppi Guaranty***"); (f) the Pledge Agreements dated as of March 21, 2024, from the holders of all outstanding membership interests in Rosebud, Consolidators and Renegade in favor of the Prepetition Lender (the "***Rosebud/Consolidators/Renegade Pledge Agreements***"); and (g) the Pledge Agreement dated as of September 13, 2024, from the holders of all outstanding membership interests in Diamond Select in favor of the Prepetition Lender (collectively with the Prepetition Credit Agreement, Prepetition Security Agreement, Prepetition Borrower Equity Pledge Agreement, DCDUK Share Charge, Geppi Guaranty, Rosebud/Consolidators/Renegade Pledge Agreements, and all other "Loan Documents" as such term is defined in the Prepetition Credit Agreement, as the same have been amended, restated, modified or supplemented from time to time prior to the date hereof, including all exhibits thereto, the "***Prepetition Loan Documents***").

> (ii)    <u>Prepetition Debt</u>.  Prior to the Petition Date and pursuant to the Prepetition Credit Agreement, the Debtors were indebted and liable to the Prepetition Lender with respect to the outstanding obligations under the Prepetition Credit Agreement, for loans advanced under the Prepetition Credit Agreement in an aggregate amount of approximately $32,600,000 (together with (a) all secured indebtedness or obligations under the Prepetition Loan Documents as of the Petition Date, including all "Secured Obligations" (as defined in the Prepetition Credit Agreement), and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Loan Documents, plus (b) all Allowable 506(b) Amounts (defined below), collectively the "***Prepetition Debt***"). As used herein, "***Allowable 506(b) Amounts***" shall mean, to the extent allowable under Bankruptcy Code section 506(b), interest at the default rate of interest as set forth in Section 2.12(d) of the Prepetition Credit Agreement, all fees, costs, expenses, and other charges due or

coming due under the Prepetition Loan Documents (regardless of whether such fees, costs, interest and other charges are included in the Budget), and all costs and expenses at any time incurred by Prepetition Lender in connection with (a) the negotiation, preparation and submission of this Order and any other order or document related hereto, and (b) the representation of Prepetition Lender in the Chapter 11 Cases, including in defending any Challenge (as defined herein).

(iii)    <u>Prepetition Liens and Prepetition Collateral.</u>  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Debtors granted to the Prepetition Lender a first priority security interest in, and continuing lien on, substantially all of their assets and personal property (subject only to the exceptions set forth in the Prepetition Loan Documents) (the "***Prepetition Liens***") and all proceeds, products, and accessions thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "***Prepetition Collateral***") to secure the Prepetition Debt, including the Debtors' respective obligations under the Prepetition Credit Agreement. Upon entry of this Interim Order, for purposes of sections 506(c) and 507(b) of the Bankruptcy Code and Bankruptcy Rule 3012, as of the Petition Date, the Prepetition Debt is fully secured by Prepetition Collateral with a value in excess of the Prepetition Debt; *provided, however,* that nothing herein shall prejudice Prepetition Lender's right to later assert that its interest in the Prepetition Collateral has not received or is not receiving sufficient adequate protection.

(iv)    <u>Validity, Perfection and Priority of Prepetition Liens and Prepetition Debt.</u> As of the Petition Date, (a) the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable, and properly perfected; (b) were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value; (c) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, except in the case of the Permitted Priority Liens (as defined below); (d) the Prepetition Debt constitutes legal, valid,

binding, and non-avoidable obligations of the Borrower and the Prepetition Entity Guarantors enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Liens or Prepetition Debt exist, and no portion of the Prepetition Liens nor the Prepetition Debt is subject to any challenge or defense including, without limitation, impairment, set-off, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, subordination (whether equitable or otherwise), counterclaims, or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) each of the Debtors, and their respective estates, and the DIP Entity Guarantors, do not have any claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Lender (solely in its capacity as such) or any of its affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees (in each case, solely, in such respective capacity) arising out of, based upon, or related to the Prepetition Loan Documents (the "**Estate Claims**"); and (f) the Prepetition Debt constitutes allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)    <u>Cash Collateral.</u>    As of the Petition Date, all or substantially all of the Debtors' cash and cash equivalents, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral, as such term is defined in section 363(a) of the Bankruptcy Code, of the Prepetition Lender under the Prepetition Loan Documents.  The Debtors have an immediate need to use Cash Collateral and to incur the DIP Debt as provided herein through the conclusion of the Final Hearing in order to prevent immediate and irreparable harm to the estates, minimize disruption to and avoid the termination of business operations, and to maintain the value of their assets and businesses and maximize return to all creditors.

10

(vi)    <u>Releases</u>.    Subject to entry of the Final Order, the Debtors, on behalf of themselves and their respective estates (including any successor, trustee, or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through, or under the Debtors or their estates) and the DIP Entity Guarantors by their execution of the DIP Credit Agreement, hereby forever, unconditionally, and irrevocably release, discharge, and acquit the Prepetition Lender (solely in its capacity as such) and its successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, agents, and professionals, and its heirs, predecessors, successors, and assigns (in each case, solely in such respective capacity) (collectively, the "***Released Parties***") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, and (b) any Estate Claims; *provided* that no party shall be released from any claims found in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from such party's actual fraud.

(vii)    <u>No affiliation</u>. The Debtors and the DIP Entity Guarantors by their execution of the DIP Credit Agreement acknowledge and agree that the Prepetition Lender is not directly or indirectly, through one or more intermediaries, nor will it be by operation of this Interim Order, controlling, controlled by or under common control with the Debtors and DIP Entity Guarantors.  As used herein, control shall mean possessing, directly or indirectly, the power to

direct or cause the direction of the management, policies and operations of the Debtors and DIP Entity Guarantors, whether through ownership of voting securities, by contract, or otherwise.

(viii)    <u>DIP Liens and DIP Debt</u>. The liens and security interests granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents shall be valid, binding, properly perfected, enforceable and non-avoidable liens against the Debtors. Until such time as all DIP Debt has been indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens and security interests provided to the DIP Lender by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (a) prior payment of the Carve-Out and (b) the Permitted Priority Liens. Until such time as all DIP Debt has been indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against any Debtor of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, subject to the Carve-Out.

G.    <u>Purpose and Necessity of Financing.</u> An immediate and ongoing need exists for the Debtors to obtain the DIP Loans to permit, among other things, the Debtors to fund their sale process and to meet their obligations arising during the Chapter 11 Cases.  The Debtors require the DIP Loans (i) for working capital and general corporate purposes, (ii) to pay fees and expenses incurred by the DIP Lender in connection with the DIP Loan Documents as provided therein, (iii) to pay restructuring costs and Professional Fees (as defined below) relating solely to the Chapter 11 Cases, and (iv) for other purposes as provided in and subject to the terms of the DIP Credit

Agreement, and subject to compliance with the Budget and the Permitted Variances, as provided in the DIP Credit Agreement. If the Debtors do not obtain authorization to borrow under the DIP Credit Agreement, they will suffer immediate and irreparable harm. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Lender superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to it at this time.

H.     Adequate Protection. The Prepetition Lender is entitled to receive adequate protection on account of the Prepetition Debt for any Diminution in Value of its interests in the Prepetition Collateral from and after the Petition Date resulting from, among other things, the use of Cash Collateral, the imposition of priming liens on the Prepetition Collateral by the DIP Lender, the use, sale, lease, consumption, or disposition of Prepetition Collateral, or the imposition of the automatic stay pursuant to sections 361, 362, 363, 364, 503(b), and 507(b) of the Bankruptcy Code. Consequently, as adequate protection, and subject to the Carve-Out (i) the Prepetition Lender shall be granted the Adequate Protection Liens (as defined below) and the Adequate Protection Superpriority Claim (as defined below), and (ii) the Prepetition Lender shall receive the Adequate Protection Payments (as defined below). The adequate protection provided herein and other benefits and privileges contained herein are necessary to protect the Prepetition Lender from any

Diminution in Value of its interests in the Prepetition Collateral and to obtain the consents and agreements contained herein, including that the adequate protection provided herein is subject and subordinate to the Carve-Out (as defined below).  As described in the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) were negotiated in good faith, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

I.     <u>Good Cause Shown.</u> The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Bankruptcy Local Rule 4001-2(b).  Good cause has been shown for entry of this Interim Order and authorization for: (i) the DIP Lender to provide the Debtors with the DIP Loans and (ii) the Debtors to accept, incur and undertake the DIP Debt pursuant to the DIP Credit Agreement as hereinafter provided. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors. The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course, to preserve the value of the Debtors' assets, and to proceed with an orderly sale process. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their stakeholders. Based on the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Credit Agreement, this Interim Order, and the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

J.      No Credit Available on More Favorable Terms.  Despite diligent efforts and a sufficient marketing process, the Debtors have been unable to obtain post-petition financing on terms more favorable than those offered by the DIP Lender under the DIP Loan Documents.

K.      Sections 506(c), 552(b) and Marshaling. In light of the DIP Lender's agreement to permit its DIP Liens and DIP Superpriority Claim (as defined below) to be subject to prior payment of the Carve-Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Facility, and in light of the Prepetition Lender's agreement to permit its Prepetition Liens to be subject to prior payment of the Carve-Out and the DIP Liens, subject to entry of the Final Order, the DIP Lender and the Prepetition Lender are each entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, a waiver of the provision of section 506(c) of the Bankruptcy Code, and a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the Prepetition Collateral, respectively, and the Debtors intend to seek in the Final Order a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, a waiver of the provisions of section 506(c) of the Bankruptcy Code, and a waiver of the "marshaling" doctrine with respect to the Aggregate Collateral (as defined below).

L.      Good Faith.

(i)      The DIP Lender has indicated a willingness to provide financing to the Debtors, but solely on the terms and conditions set forth in the DIP Loan Documents, including, without limitation: (a) entry of this Interim Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents, including, without limitation, the Debtors' ability to enter into such documents and to incur all of the obligations thereunder, and to confer upon the DIP Lender all rights, powers and remedies thereunder; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility and the

Debtor's use of the DIP Loans are essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Loan Documents and this Interim Order in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code. Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loans to be provided by the DIP Lender, pursuant to the terms of the DIP Loan Documents, represent the best financing currently available to the Debtors.

(ii)    The terms of the DIP Loan Documents, including, without limitation, the interest rates and fees applicable, are more favorable to the Debtors than any available from alternative sources. Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length among the Debtors and the DIP Lender. Any DIP Loans and other financial accommodations made to the Debtors by the DIP Lender pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lender shall be entitled to all protections afforded thereby.

M.    <u>Fair Consideration and Reasonably Equivalent Value</u>. The Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim Order. The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

N.    <u>Third Party Consent.</u> To the extent consent is required, the Prepetition Lender has consented or is deemed to have consented to the DIP Loan Parties' entry into the DIP Loan Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Loan Documents.

O.    <u>Good Cause Shown; Best Interest</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Bankruptcy Local Rule 4001-2(b).  Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful chapter 11 process.

P.    <u>Final Hearing</u>.  The Debtors will seek approval of the relief requested in the Motion on a final basis pursuant to a Final Order at the Final Hearing.

Based upon the foregoing findings, acknowledgements and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Motion Approved.</u> The Motion is granted as and to the extent set forth herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Credit Agreement, in substantially the form annexed hereto, and of all instruments, guaranties, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender (including but not limited to the Pledge and Security

Agreement), to give effect to the terms thereof and as will be drafted and executed as contemplated therein, each in final form and substance acceptable to the DIP Lender.

2.    <u>Objections Overruled.</u> Any objections, reservations of rights or other statements with respect to the Motion and entry of this Interim Order, to the extent not withdrawn or resolved, are overruled on the merits. This Interim Order shall become effective immediately upon its entry.

<b><u>AUTHORIZATION FOR DIP FINANCING</u></b>

3.    <u>Authorization for DIP Financing Pursuant to Budget.</u>

(a)    The Debtors are hereby authorized to incur DIP Debt, subject to the terms of this Interim Order, the Budget (subject to the Permitted Variances) and the DIP Loan Documents, and also subject to any conditions and limitations on availability in the DIP Credit Agreement, plus all interest, fees and other charges payable in connection with such DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents.

(b)    The Debtors have delivered to the DIP Lender a 13-week cashflow forecast of receipts and disbursements, and sources and uses of the Borrower, broken down by week, including the anticipated uses of the DIP Facility for such period (a "***Budget***"), in each case, in form and substance acceptable to the DIP Lender. The initial Budget is attached to this Interim Order as **<u>Exhibit B</u>**. The Debtors shall update the Budget monthly subject to the Borrower's month-end closing process, but no later than ten (10) calendar days after month-end. The Debtors shall update the Budget at the end of each two-week period and provide an updated Budget for the subsequent two-week period (which in each case must be satisfactory to the DIP Lender) extending and supplementing the Budget; *provided, however,* if a line item is not approved by the DIP Lender it shall be deemed excluded and disregarded. For the avoidance of doubt, Budget payments shall be funded through the issuance of DIP Debt and not through the use of Prepetition Lender's Cash

Collateral; for the further avoidance of doubt, no use of Prepetition Lender's Cash Collateral will be permitted without the Prepetition Lender's consent.

(c)     The Budget shall at all times be in form and substance acceptable to, and as approved by, the DIP Lender, in accordance with the DIP Credit Agreement. The Debtors shall deliver notice copies of each updated Budget to the DIP Lender.

(d)     Together with the delivery of each updated Budget, the Debtors shall also provide a bi-weekly report/reconciliation to the DIP Lender setting forth the immediately preceding two weeks, the actual and budgeted results for such week by line item in the Budget (the "***Budget Variance Report***"), as well as additional customary reporting to be agreed among the Debtors and the DIP Lender.

(e)     Funds borrowed under the DIP Credit Agreement shall be used by the Debtors in accordance with the Budget (subject to the Permitted Variances), the DIP Loan Documents and this Interim Order. The consent of the DIP Lender to any Budget shall not be construed as a commitment to provide DIP Loans after the occurrence of the Termination Date (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the Budget have been expended.  If the DIP Lender advances monies to the Debtors and the Debtors use such monies other than in accordance with the terms or provisions of this Interim Order, such advances shall be considered DIP Debt for purposes of this Interim Order.

(f)     Any amendments, supplements or modifications to the Budget must be consented to in writing by the DIP Lender, in accordance with the DIP Credit Agreement, prior to the implementation thereof and shall not require further notice, hearing, or court order.

(g)     The DIP Lender (i) may assume the Debtors will comply with the Budget (subject to the Permitted Variances), (ii) shall have no duty to monitor such compliance, and (iii)

shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Budget. The DIP Lender may rely on the Debtors' representations that the amount of the DIP Debt requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the Budget, the DIP Loan Documents, the Bankruptcy Code and the Bankruptcy Rules. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time.

(h)     Notwithstanding anything in this Interim Order to the contrary and upon the Termination Date, the DIP Lender's obligation to make loans under the DIP Loan Documents shall expire, and the DIP Loans made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise).

4.     <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)     The Debtors are authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto. The Debtors are further authorized to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, deposit account control agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' Obligations under the DIP Loan Documents, each as may be provided for under the DIP Credit Agreement or as otherwise reasonably requested by the DIP Lender.

(b)      The Debtors are further authorized to (i) perform and incur all of their Obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

(c)      The DIP Loan Documents and any amendments thereto may be executed and delivered on behalf of the Debtors by any officer, director or agent of the Debtors, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents and amendments for and on behalf of the Debtors and the DIP Lender shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents and any amendments thereto as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Loan Documents or any amendments thereto by any such person on behalf of the Debtors shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company or other entity action (as applicable) of the Debtors.

5.      <u>Valid and Binding Obligations</u>.  All DIP Debt under the DIP Loan Documents shall constitute valid, binding, and nonavoidable obligations of the Debtors, enforceable against them and their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims,

defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Lender to the Debtors or any of their affiliates against any of the DIP Debt without the prior written consent of the DIP Lender, and no such consent shall be implied by any action, inaction, or acquiescence by the DIP Lender.

6.    Additional Terms of DIP Debt.  The following terms shall apply to the DIP Debt:

(a)    Maximum DIP Facility Amount. The sum of (i) the maximum principal amount of the DIP Debt and (ii) the principal amount of the Prepetition Debt (including Allowable 506(b) Amounts) outstanding at any time shall not exceed the lesser of $41,000,000 (the "*Maximum DIP Facility Amount*") and the Borrowing Base (as defined in the DIP Credit Agreement); *provided* that, until entry of the Final Order, the maximum amount available to be drawn under the Interim Facility shall be limited to an amount that shall not result in a total increase in the outstanding principal amount of the Prepetition Debt and DIP Debt (collectively, the "*Aggregate Credit Obligations*") from the Petition Date through the date of entry of the Final Order in excess of $5,500,000.  All DIP Loans made under the Interim Facility shall be subject to (a) Availability, and (b) compliance with the terms, conditions and covenants set forth in the DIP Documents and the Interim Order (including compliance with the Budget).  All DIP Loans made under the Interim Facility shall be due and payable on the date that is the earlier of (a) twenty-five (25) days after the entry of the Interim Order, (the "*Interim Facility Maturity Date*") unless a Final Order shall have been entered on or before each such date (*provided, however*, that the Interim Facility Maturity Date may be extended from time to time by the prior written consent of the DIP Lender) and (b) the occurrence of an Event of Default. Upon the Bankruptcy Court's entry of the

Final Order (the date upon which the Final Order is entered, the "***Final Order Entry Date***"), the full Maximum DIP Facility Amount shall be available to the Debtors from time to time, subject to (a) Availability, and (b) compliance with the terms, conditions and covenants as set forth in the DIP Loan Documents and the Final Order (including compliance with the Budget).

(b)     <u>Roll-Up</u>.   Upon entry of the Final Order, the Borrower shall borrow DIP Loans sufficient to pay the full amount of the Prepetition Debt then due and owing under the Prepetition Facility as of the Final Order Entry Date.   The proceeds of such DIP Loans shall be remitted to the Prepetition Lender to pay down the Prepetition Facility (the "***Roll-Up***").   If for any reason the Roll-up is not approved or effectuated, the Maximum DIP Facility Amount shall be reduced by the portion of the Roll-up not approved or otherwise effectuated.

(c)     <u>Interest</u>.   The DIP Debt shall bear interest at a per annum rate equal to the Adjusted REVSOFR30 Rate (as defined in the Prepetition Credit Agreement) plus 4.50%.   Interest shall accrue on the principal balance of the DIP Debt, from time to time, based on a 365-day year and charged for the actual number of days outstanding. Interest shall accrue and be payable in cash monthly in arrears. Default interest shall be payable upon the DIP Lender's demand. Any fees or expenses required to be paid or reimbursed, as applicable, pursuant to the DIP Loan Documents shall be payable upon the DIP Lender's demand.

(d)     <u>Unused Line Fee</u>. An unused line fee shall accrue at the rate of 0.25% per annum on the average daily amount by which (i) the Maximum DIP Facility Amount exceeds (ii) the outstanding principal amount of the Aggregate Credit Obligations, and shall be payable in arrears on the first Business Day of each calendar month.

(e)     <u>Success Fee</u>. Subject to entry of the Final Order, a fee in an amount equal to the Applicable Success Fee Percentage (as defined below) of the Maximum DIP Facility

Amount shall be due and payable on or before the sixtieth (60th) day following the Termination Date (the "***Success Fee Payment Date***"). The Applicable Success Fee Percentage shall equal: (i) 0% if the aggregate gross proceeds from the Sale Transaction and all other asset sales consummated prior to the Success Fee Payment Date (collectively, the "***Aggregate Sale Proceeds***") are less than $42,000,000, (ii) 1.50% if the Aggregate Sale Proceeds equal or exceed $42,000,000 but are less than $43,000,000, and (iii) 2.50% if the Aggregate Sale Proceeds are greater than $43,000,000.

   (f) <u>Letter of Credit and Commercial Credit Cards</u>. Upon entry of the Interim Order, (i) the letter of credit in favor of BC Industrial Exchange Portfolio II in the amount of $1,000,000 that is issued and outstanding under the Prepetition Credit Agreement shall be deemed issued under the DIP Credit Agreement, and (ii) the DIP Lender shall maintain the Debtors' commercial credit card programs under the terms and conditions of those programs. Upon entry of the Final Order, the Borrower shall immediately borrow $1,300,000 under the DIP Credit Agreement, with such proceeds to be held by DIP Lender in a segregated blocked account maintained by and in the name of the DIP Lender (the "***LC and Commercial Card Collateral Account***") as cash collateral to secure (A) the Borrower's reimbursement obligations in connection with any draws under the letter of credit, (B) the Borrower's payment obligations in connection with the commercial credit card programs and (C) the Borrower's other obligations under the DIP Credit Agreement, including, but not limited to, the obligation to repay the Aggregate Credit Obligations in full.

   (g) <u>Maturity</u>. The DIP Debt shall mature and be due and payable in full by the Borrower on the Termination Date.

(h)    <u>DIP Entity Guarantors</u>.  The DIP Entity Guarantors shall be guarantors of the DIP Debt and shall likewise reaffirm their prior guaranties of the Prepetition Debt. The joint and several nature of the obligations of the DIP Entity Guarantors as guarantors relating to the Prepetition Debt and all related security documents shall remain in full force and effect.  The DIP Entity Guarantors shall reaffirm, and be deemed to have reaffirmed, their joint and several liability under the Prepetition Loan Documents. The DIP Entity Guarantors shall be required to execute the DIP Credit Agreement and all applicable DIP Loan Documents.

(i)    <u>Collateral Access Agreements</u>.  All "Collateral Access Agreements" (as defined in the Prepetition Credit Agreement) relating to the Borrower and DIP Entity Guarantors in effect as of the Petition Date shall remain in full force and effect and in favor of both Prepetition Lender and DIP Lender, notwithstanding the entry of the Interim Order or any subsequent orders amending the Interim Order.

(j)    <u>Compliance with Budget</u>.  The Debtors shall be required to comply with the Budget (including any Permitted Variances as defined in the DIP Credit Agreement).

(k)    <u>Compliance with Availability Requirement</u>.  DIP Loans will be limited to Availability.

(l)    <u>Milestones</u>. The Debtors shall comply in all respects with the following milestones (the "***Milestones***"), which are also set forth in Exhibit B to the DIP Credit Agreement, and will likewise be set forth in the Final Order.  These Milestones may be extended in writing by the DIP Lender in its sole and absolute discretion.  Failure to comply fully and timely with these Milestones will be an Event of Default under the DIP Facility:

(a)    on or one (1) day after the Petition Date, the Borrower shall have filed: (i) a motion seeking approval of the DIP Facility, including the Interim Order; and (ii) other customary First Day Pleadings (including the cash management first day order), all in form and substance reasonably acceptable to the DIP Lender;

25

(b)      no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;

(c)      no later than three (3) Business Days after the Petition Date, the Debtors shall have filed an application, in form and substances reasonably acceptable to the DIP Lender, seeking approval of the Debtors' retention of Raymond James & Associates, Inc., as investment banker to the Debtors ("***Raymond James***");

(d)      no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;

(e)      no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving (i) the Bidding Procedures and (ii) seeking approval of a stalking horse asset purchase agreement as the stalking horse bid for the purchase of the Debtors' assets (the "***Sale Transaction***"), which asset purchase agreement shall be in form and substance reasonably acceptable to the DIP Lender (the "***Bidding Procedures Order***");

(f)      no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Debtors' retention of Raymond James;

(g)      no later than forty-five (45) days after the Petition Date, the Debtors shall have filed Schedules of Assets and Liabilities and Statement of Financial Affairs;

(h)      no later than forty-five (45) days after entry of the Bidding Procedures Order, the Debtors shall have conducted an auction in accordance with the Bidding Procedures;

(i)      no later than seven (7) days after conclusion of the auction, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Sale Transaction; and

(j)      no later than fifteen (15) days after the entry of the order of the Bankruptcy Court approving the Sale Transaction, the Debtors shall have consummated the Sale Transaction, and indefeasibly paid all amounts owing to the Lenders.

7.      <u>DIP Charges</u>. All DIP Charges[4] are hereby approved and shall be promptly paid by

the Debtors in accordance with this Interim Order and the DIP Loan Documents, without need for

filing an application with the Court for approval or payment of the DIP Charges. Reasonable

---

[4]      The term "***DIP Charges***", as used herein and in the DIP Credit Agreement, shall mean interest at the applicable rate of interest under the DIP Credit Agreement and all fees, costs, and expenses provided for in the DIP Credit Agreement, including those incurred by DIP Lender in connection with the DIP Debt (regardless of whether any such fees, costs, interest and other charges are included in the Budget).

professional fees and expenses incurred by the Lenders in connection with the Chapter 11 Cases in their respective administration of the Prepetition Loan Documents and DIP Loan Documents shall be paid in each case within five (5) Business Days subsequent to the receipt by the Debtors, any Committee and the U.S. Trustee of summary form invoices (the "***Invoiced Fees***") which may be redacted for privileged information (the "***Review Period***").  The Debtors, the Committee and the U.S. Trustee may object to any portion of the Invoiced Fees (the "***Disputed Invoiced Fees***") within the Review Period.  Any disputes regarding the professional fees shall be submitted to the Bankruptcy Court for resolution. The Debtors shall pay (i) any Invoiced Fees that are not Disputed Invoiced Fees promptly after expiration of the Review Period; and (ii) any Disputed Invoiced Fees that the Court approves in a final order requiring payment thereof within five (5) Business Days after entry of that order. The submission of such summary invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  The DIP Charges, including all professional fees and expenses, shall constitute a portion of the adequate protection required to be provided to the DIP Lender under the terms of this Interim Order.

8.      Amendments, Consents, Waivers, and Modifications. The Debtors, with the express written consent of the DIP Lender and in accordance with the DIP Credit Agreement, may enter into any non-material amendments, consents, waivers, or modifications to the DIP Loan Documents without the need for further notice and hearing or any order of this Court, it being further understood that further approval of this Court, upon notice and a hearing, shall be required for any such authorizations, amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that are material or that shorten the maturity of the

extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Budget required to be delivered under the DIP Loan Documents shall not be considered amendments or modifications to the Budget or the DIP Loan Documents; *provided further* that, the Debtors and the DIP Lender shall have the right to seek approval from the Court of material amendments, waivers, consents or other modifications on an expedited basis.

## CASH COLLATERAL AND ADEQUATE PROTECTION

9. <u>Authorization to Use Cash Collateral</u>.  Upon entry of this Interim Order, the Debtors are authorized to use Cash Collateral solely in accordance with the terms and provisions of this Interim Order.

10. <u>Procedure for Use of Cash Collateral</u>.

(a) <u>Delivery of Cash Collateral to DIP Lender</u>. Debtors shall deposit all Cash Collateral now or hereafter in their possession or control into one or more Blocked Accounts (or otherwise deliver such Cash Collateral to the DIP Lender and the Prepetition Lender) promptly upon receipt thereof. As used herein, the "***Blocked Account***" shall mean the Lock Box or Collateral Deposit Account, in each case, as such term is defined in the DIP Credit Agreement.

(b) <u>Cash Collateral in Lenders' Possession</u>.  The Lenders are authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into their possession or control that constitute Aggregate Collateral (defined below) or the proceeds thereof, and to apply such amounts in accordance with this Interim Order.

(c) <u>Application of Cash Collateral</u>.  The Lenders are authorized to apply all Cash Collateral now or hereafter in their possession or control as follows: (i) first, to the payment

28

of all Prepetition Debt (including Allowable 506(b) Amounts); (ii) second, to payment of DIP Charges; and (iii) third, to payment of all other DIP Debt in accordance with the DIP Credit Agreement. All such applications to DIP Debt shall be final and not subject to challenge by any person, including any chapter 7 or chapter 11 trustee (the "**Trustee**") appointed or elected. All such applications to Prepetition Debt shall be final, subject only to the right of the parties in interest to assert a Challenge in accordance with paragraph 21 that such applications to other Prepetition Debt resulted in payment of an unsecured prepetition claim of Prepetition Lender. Any amounts disgorged in connection with any such objection or determination shall be first applied to reduce the DIP Debt, dollar-for-dollar. The Lenders shall have the right (but not the obligation) to apply Cash Collateral to amounts of the DIP Debt ahead of amounts of Prepetition Debt in their discretion.

(d)    <u>Prohibition Against Use of Cash Collateral</u>.  Except as provided for in this Interim Order, the Debtors will not use Cash Collateral, unless, in addition to the satisfaction of all requirements of section 363 of the Bankruptcy Code, the Lenders have consented to such use.

11.    <u>Adequate Protection</u>. The Prepetition Lender is entitled on account of the Prepetition Debt and the Prepetition Liens, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral (including Cash Collateral) (such adequate protection as set forth in clauses (a)–(e) below, the "**Adequate Protection Obligations**"). Accordingly, the Prepetition Lender is hereby granted, as applicable, the following liens, claims, rights and protections:

(a)    <u>Adequate Protection Liens</u>.  As adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral against any Diminution in Value of such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are authorized to grant,

and as of entry of this Interim Order are deemed to have granted to the Prepetition Lender additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (collectively, the "**Adequate Protection Liens**") all of each Debtor's presently owned or hereafter acquired property and assets (including, subject to entry of a Final Order, any proceeds of, or property recovered in connection with, any of the Debtors' Avoidance Actions), whether such property and assets were acquired by such Debtor before or after the Petition Date or were subject to a lien that was avoided pursuant to section 549 of the Bankruptcy Code, of any kind or nature, whether real or personal, tangible or intangible, wherever located, including, without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts, owned real estate, real and personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and any investment thereof, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the Debtors, and the proceeds and products of the foregoing (collectively, together with the Prepetition Collateral and any Cash Collateral, the "**Collateral**"). The Adequate Protection Liens shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any Trustee or other estate representative appointed in these Chapter 11 Cases, or any Successor Cases.  Except as expressly provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any Trustee or other estate representative appointed in any of these Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of these Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to

30

section 510, 549, or 550 of the Bankruptcy Code and, subject to entry of the Final Order, the

Adequate Protection Liens and the Collateral shall not be subject to surcharge under section 506(c)

of the Bankruptcy Code. The Adequate Protection Liens shall be deemed legal, valid, binding,

enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all

purposes in these Chapter 11 Cases and any Successor Cases. For the avoidance of doubt, the

Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the

Petition Date and without the necessity of the execution by the Debtors, or the filing of, as

applicable, mortgages, security agreements, pledge agreements, financing statements, state or

federal notices, recordings (including, without limitation, any recordings with the United States

Patent and Trademark or Copyright Office), or other agreements, and without the necessity of

taking possession or control of any Collateral. Except as otherwise expressly provided herein,

under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any

other party, no matter when arising. The Adequate Protection Liens granted to the Prepetition

Lender hereunder shall be subject only to (i) the Carve-Out, (ii) the DIP Liens, and (iii) any existing

liens in favor of third parties upon the Prepetition Collateral (including, without limitation, any

purchase money security interests), which third-party liens, as of the Petition Date: (1) had priority

under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or

applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the

Petition Date, the "***Permitted Priority Liens***"), and shall otherwise be senior to all other security

interests in, liens on, or claims against any of the Collateral. The Adequate Protection Liens shall

be and hereby are deemed fully perfected liens and security interests, effective and perfected upon

the date of this Interim Order, without the necessity of execution by the Debtors of mortgages,

control agreements, security agreements, pledge agreements, financing agreements, financing

31

statements or any other agreements or instruments, such that no additional actions need be taken by the Prepetition Lender to perfect such interests.

(b)   *Adequate Protection Superpriority Claims*.  As additional adequate protection, the Prepetition Lender shall be granted an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "***Adequate Protection Superpriority Claim***") to the extent of any Diminution in Value.  The Adequate Protection Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors and the proceeds thereof, but subject to the Carve-Out. Subject only to the Carve-Out and the DIP Debt, the Adequate Protection Superpriority Claim granted to the Prepetition Lender hereunder shall not be junior to any administrative expense claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

(c)   *Adequate Protection Payments*.  Current cash payments payable under the Prepetition Credit Agreement shall be made to the Prepetition Lender of all interest then due and owing under the applicable contract rate (or, to the extent applicable and at the option of the Prepetition Lender, the default rate under the Prepetition Credit Agreement), as well as all undisputed reasonable professional fees and expenses incurred by the Prepetition Lender in connection with the Chapter 11 Cases and in its administration of the Prepetition Loan Documents,

32

in each case subject to the procedures set forth in Paragraph 7 of this Interim Order (such payments, collectively, the "***Adequate Protection Payments***").

(d)    <u>Budget and Variance Reporting</u>.  The Borrower and the Debtor Entity Guarantors shall provide the Prepetition Lender and its advisors with (i) monthly financial reports within thirty (30) days after the end of each calendar month consistent with Section (B)(ii) of the Reporting Schedule attached to the Prepetition Credit Agreement, (ii) weekly Borrowing Base Certificates and related collateral reports consistent with Section (C) of the Reporting Schedule attached to the Prepetition Credit Agreement, (iii) such other information as may from time to time be requested by the DIP Lender consistent with Section (D) of the Reporting Schedule attached to the Prepetition Credit Agreement, and (iv) as well as the Budget and variance reporting described in Paragraph 3 hereof.

(e)    <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Lender to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

12.    <u>Prepayments</u>.  The DIP Facility may be prepaid in whole or in part without premium or penalty at any time.  The Debtors shall make the following mandatory prepayments of the outstanding Aggregate Credit Obligations:

(1)    <u>Asset Sales</u>:  Prepayments in the amount of all cash proceeds of the sale or other disposition of any property or assets of the Borrower or the DIP Entity Guarantors (pursuant to Bankruptcy Code section 363 or otherwise), net of payments of or reservations for required tax payments, the amount secured by valid and perfected liens, if any,  that are senior to the liens on such assets held by the Lenders, customary closing costs, and to the extent the

Bankruptcy Court enters an Order authorizing the retention of Raymond James as investment banker for the Debtors, payment of the following fees and reimbursement of the following expenses of Raymond James: (i) the Business Combination Transaction Fee described in Section 2(c)(i) of that certain Engagement Letter dated September 30, 2024 between Raymond James and the Borrower (as amended, the "***RJ Engagement Letter***"), and (ii) reimbursement of Expenses as provided for in Section 3 of the RJ Engagement Letter; *provided, however,* that no other amounts shall be permitted to be paid by the Borrower or the DIP Entity Guarantors to Raymond James without the prior written approval of the Lenders.

(2)    Insurance Proceeds:  Prepayments in the amount of all cash proceeds of insurance on account of any loss of any property or assets of the DIP Loan Parties net of payments of or reservations for required tax payments and the amount secured by valid and perfected liens, if any, that are senior to the liens on such property or assets held by the Lenders.

(3)    DIP Debt in Excess of Availability:  Prepayments to the extent that the DIP Debt outstanding at any time exceeds the lesser of (i) either (A) under the Interim Facility, the maximum amount that shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations from the Petition Date through the entry of the Final Order in excess of $5,500,000, or (B) from and after the entry of the Final Order, the Maximum DIP Facility Amount, and (ii) the Borrowing Base.

(4)    All such prepayments shall be applied without penalty or premium, first, to outstanding Prepetition Debt, and second, to outstanding DIP Debt.

**DIP LIENS AND DIP SUPERPRIORITY CLAIMS**

13.    <u>DIP Liens.</u>

(a)    To secure the DIP Debt, the DIP Lender is hereby granted (i) pursuant to section 364(c)(2), a fully-perfected, priming, first priority senior secured lien on the DIP Collateral, subject only to any Permitted Priority Liens and the Carve-Out, and (ii) pursuant to section 364(d)(1), a fully-perfected, priming, first priority senior secured lien on the DIP Collateral, which lien shall have priority over all other liens, including, for the avoidance of doubt, the Prepetition Liens and the Adequate Protection Liens and shall be junior only to any Permitted Priority Liens (the liens described in (i) and (ii) hereof, collectively, the "***DIP Liens***").

(b)    The DIP Liens shall attach to all of the property, assets or interests in property or assets of the Debtors, and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all the Debtors' now owned or hereafter acquired right, title, and interest in and to: (i) all of the property, assets or interests in property or assets of the Debtors and all "property of the estate" (other than Excluded Assets (as defined in the DIP Credit Agreement)), expressly including without limitation all of the Prepetition Collateral, and subject to entry of the Final Order, any and all claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "***Avoidance Actions***") and, to the extent any property, assets or interests of any Debtor is excluded from the DIP Collateral, the proceeds of such property, assets or interests; (ii) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale,

35

exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; and (iii) all other property and assets including, without limitation, cash collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively with (i)-(iv), the "**DIP Collateral**", and, together with the Prepetition Collateral, the "**Aggregate Collateral**"); subject only to (1) the Permitted Priority Liens, and (2) prior payment of the Carve-Out.

(c)     The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364 of the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens as provided herein, and (ii) prior payment of the Carve-Out.

(d)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by any Debtor of mortgages, control agreements, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the DIP Lender to perfect such interests.

14.     DIP Lender's Superpriority Claim. The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**") pursuant to section 364(c)(1) of the Bankruptcy Code in the Debtors' Chapter 11 Cases and in any successor case under the Bankruptcy Code (including any case under chapter 7 of the Bankruptcy Code, the "**Successor Case**") for all DIP Debt, having priority over any and all other administrative expenses of and unsecured claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or

36

arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c)(upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds thereof including, without limitation, any Avoidance Actions Proceeds. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. Except as referenced in this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case. Other than the Adequate Protection Superpriority Claim, the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in this Chapter 11 Case.

15.     Survival of DIP Liens and DIP Superpriority Claim. The DIP Liens, DIP Superpriority Claim and other rights and remedies granted under this Interim Order to the DIP Lender, shall continue in these cases and any Successor Cases and shall be valid and enforceable against any Trustee appointed in any Debtor's Chapter 11 Case and/or upon the dismissal of any Debtor's Chapter 11 Case or any Successor Case and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Debt has been indefeasibly paid in full in cash and the DIP Lender's commitments have been terminated in accordance with the DIP Loan Documents.

## CARVE-OUT; RESTRICTIONS ON USE OF FUNDS

16.    Carve-Out.

(a)    The Prepetition Liens, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall be subject and subordinate only to prior payment of: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Court as and when they are due without reference to the Budget (the "***Case Administration Fees***"); (ii) the allowed fees and costs of the Debtors' claims and noticing agent, (iii) unpaid professional fees and expenses payable to any the Carveout Professionals[5] (collectively, the "***Professional Fees***") that are incurred or accrued prior to the date on which the DIP Lender provides written notice to the Debtors, Debtors' counsel, the U.S. Trustee and counsel to the Committee (if any) of the occurrence of either an Event of Default or the Termination Date (such notice, the "***Carve-Out Notice***", and the date of a delivery of such notice, the "***Carve-Out Effective Date***"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date), are allowed whether by interim order or procedural order, and have been provided for in, and are consistent with, the Budget (subject to the Permitted Variances), and (iv) unpaid Professional Fees of the Debtors and the Committee (if any), in each case incurred or accrued on or after the Carve-Out Effective Date in an aggregate amount not to exceed $150,000 to the extent allowed at any time, whether by interim order or procedural order (clauses (i)—(iii), collectively, the "***Carve-Out***", and clause (iv) alone, the

---

[5]    "***Carveout Professionals***" means Professionals retained by the Debtors, including Saul Ewing LLP, as counsel for the Debtor ("***Saul Ewing***"), Getzler Henrich & Associates, LLC, as financial advisor to the Debtors ("***Getzler Henrich***"), Stephenson Harwood, LLP, as U.K. counsel to the Debtors ("***Stephenson Harwood***"), Raymond James, as investment banker to the Debtors, any counsel and financial advisor that may be authorized by the Court to be retained by a Committee, and the U.S. Trustee (solely to the extent of fees required pursuant to 28 U.S.C. § 1930(a)).  For the avoidance of doubt, no other investment bank or financial advisor of the Debtors other than Getzler Henrich and Raymond James shall be deemed a Carveout Professional or otherwise eligible to share in the Carveout.

"***Capped Carve-Out***"). Subject to the immediately preceding sentence, so long as the Carve-Out Effective Date has not occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under the Bankruptcy Code as provided in the DIP Loan Documents and the Budget (subject to the Permitted Variances). Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtors unless agreed to in writing by the DIP Lender.

(b)     The Debtors shall maintain a segregated account (the "***Carve-Out Reserve Account***") with Saul Ewing for the payment of Professional Fees for Saul Ewing, Getzler Henrich, Stephenson Harwood, and any counsel and financial advisor that may be authorized by the Court to be retained by the Committee (the "***Carve-Out Reserve Professionals***"), which account shall be funded by the Debtors  in accordance with the Budgets on a weekly basis, until the occurrence of the Carve-Out Effective Date.  No funding shall be provided over and above the amounts set forth in the Budgets proposed by the Debtors and approved by the DIP Lender.  After the Carve-Out Effective Date, the Capped Carve-Out and all fees reflected in the Budget for the Carve-Out Reserve Professionals prior to the Carve-Out Effective Date, but not paid or funded by the Debtors as of that date, will be funded to the Carve-Out Reserve Account, but no further amounts shall be funded to this account.  From funds in the Carve-Out Reserve Account, Saul Ewing shall pay the Carve-Out Reserve Professionals in compliance with an interim compensation procedures order and in the manner set forth in this Interim Order; *provided, however,* prior to payment in full of

the Prepetition Debt and termination of the Carve-Out, to the extent that Professional Fees for the Carve-Out Reserve Professionals that have accrued from the Petition Date through and including the Carve-Out Effective Date are less than the amounts funded into the Carve-Out Reserve Account, or to the extent that any portion of these Professional Fees are ultimately disallowed by the Bankruptcy Court by Final Order, then Saul Ewing shall immediately refund these excess monies to the DIP Lender. For the avoidance of doubt, (i) in making payments from the Carve-Out Reserve Account, Saul Ewing shall be entitled to conclusively rely upon written certifications of each Professional as to the amount due and owing to such Professional from the Carve-Out Reserve Account and in accordance with the Budget and shall have no liability to any party based upon its commercially reasonable reliance on such certifications; and (ii) in no circumstances shall Saul Ewing be obligated to pay any Professional other than from funds held in the Carve-Out Reserve Account.

(c)    Carveout Usage. No portion of the Carveout and no DIP Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the Debtors, any Committee or the Carveout Professionals, in connection with claims or causes of action adverse to Lenders' interests in the Aggregate Collateral, including (i) preventing, hindering or delaying Lenders' enforcement or realization upon any of the Aggregate Collateral once an Event of Default has occurred; (ii) using or seeking to use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate Collateral outside the ordinary course of business without Lenders' consent; or (iii) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Aggregate Credit Obligations or any mortgages, liens or security interests with respect thereto or any other rights or interests of Lenders, or in asserting any claims or causes of action, including,

without limitation, any actions under chapter 5 of the Code, against Lenders; *provided, however*, that the foregoing shall not apply to costs and expenses, in an amount not to exceed $50,000, incurred by any Committee's professionals in connection with the investigation of a potential Challenge in accordance with Paragraph 21 of this Interim Order; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Interim Order, the Final Order or any amendment hereto consented to by DIP Lender.

(d)    <u>Carveout Procedure</u>. The Debtors shall periodically, upon the request of the DIP Lender, provide to the DIP Lender a written report (the "***Carveout Report***"), in which the Debtors disclose their then-current, documented estimate of (i) the aggregate amount of unpaid professional fees, costs and expenses accrued or incurred by the Carveout Professionals, through the date of the Carveout Report and (ii) projected fees, costs and expenses of the Carveout Professionals for the two-week period following the date of such Carveout Report. Nothing herein shall be construed as consent by the DIP Lender or the Prepetition Lender to the allowance of any fees or expenses of the Carveout Professionals or shall affect the right of the DIP Lender or the Prepetition Lender to object to the allowance and payment of such fees, costs or expenses, or the right of the DIP Lender or the Prepetition Lender to the return of any portion of the Carve-Out that is funded with respect to fees and expenses for a Carveout Professional that are approved on an interim basis that are later denied on a final basis. For the avoidance of doubt, no Carveout Professional shall be entitled to any portion of the Carve-Out allocated for any other Carveout Professional in the Budget.

(e)    The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any professionals incurred in connection with the Chapter 11 Case or

any Successor Case under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way, to pay compensation to, or to reimburse expenses of, professionals retained by the Debtors or, if applicable, the Committee or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

17.     Restrictions on Use of Funds.

(a)     The Debtors are authorized to use the DIP Debt solely: (i) in accordance with the terms of this Interim Order, Final Order (upon entry) and the DIP Loan Documents; (ii) to fund the LC and Commercial Card Collateral Account; (iii) to pay those expenses in the amounts set forth in the Budget (including any Permitted Variance therefrom, solely as allowed under the DIP Credit Agreement), including funding of the Carve-Out, as and when such expenses become due and payable in accordance with the Budget; (iv) to pay Allowable 506(b) Amounts and the DIP Charges; and (v) upon entry of the Final Order, to repay the remaining outstanding amount of the Prepetition Debt.

(b)     Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no portion of the DIP Facility, DIP Collateral, the Cash Collateral or any portion of the Carve-Out may be used in any manner to, and it shall constitute an Event of Default under the DIP Loan Documents if any DIP Proceeds are used to: (i) request authorization to obtain DIP Loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise that are senior to or *pari passu* with the DIP Debt, the DIP Liens or the DIP Superpriority Claim, other than from the DIP Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Debt; (ii) pay any amount for any use not provided for in this Interim Order and/or the Final Order, as applicable, the DIP Credit Agreement and as set forth in the Budget (subject to the

Permitted Variances) or otherwise approved by the DIP Lender; (iii) without the prior written consent of the DIP Lender, to make any payment or distribution to or for the benefit of any non-Debtor affiliate or insider of the Debtors (other than ordinary course wages, payments made pursuant to employment agreements, or payments made in accordance with the Budget); (iv) make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement and Budget; (v) to finance in any way: (1) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any or all of the DIP Lender or the Prepetition Lender or their respective rights and remedies under DIP Loan Documents, the Interim Order, the Final Order or the Prepetition Loan Documents, or (2) any other action which with the giving of notice or passing of time would result in an Event of Default as defined under the DIP Loan Documents or the Prepetition Loan Documents; (vi) to make any distribution under a plan of reorganization in the Chapter 11 Cases without the prior written consent of the DIP Lender; (vii) pay any prepetition Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lender; (viii) for any purpose that is prohibited under the Bankruptcy Code or this Interim Order; and/or (ix) to make any payment in excess of $50,000 in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender.

18.      <u>Prohibition on Granting of Additional Liens and Interests.</u> No liens, claims, interests or priority status, other than the Carve-Out or Permitted Priority Liens, having a lien or administrative priority superior to, *pari passu* with, or junior to that of the DIP Liens or the DIP Superpriority Claim granted by this Interim Order, shall be granted while any portion of the DIP

Debt remains outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Lender.

19.    <u>Release.</u>    The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph shall be deemed effective upon entry of the Final Order. The Debtors and the DIP Entity Guarantors, by their execution of the DIP Credit Agreement, on behalf of themselves and on behalf of their successors and assigns (collectively, "***Releasors***" and, individually, a "***Releasor***"), each hereby (a) releases, acquits, and forever discharges the DIP Lender, and any of its officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates or shareholders (the "***Releasees***") from any and all liabilities, claims, demands, actions or causes of action of every kind or nature (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any Releasor now has, ever had or hereafter may have against the Releasees based on acts, transactions or circumstances that have occurred or been consummated on or before the closing of the DIP Credit Agreement and that arise out of or relate to (i) the DIP Facility or any other extension of credit by the DIP Lender to any Debtor including any equitable subordination or recharacterization claims or defenses; (ii) any of the DIP Loan Documents or DIP Collateral; (iii) any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents; or (iv) any aspect of the dealings or relationships between or among the Releasors, on the one hand, and the Releasees on the other hand, under or in connection with any of the DIP Loan Documents or any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents (collectively, the "***Claims***"); and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority,

enforceability and non-avoidability of the DIP Debt and the DIP Liens. The provisions of this paragraph shall survive the termination of the DIP Facility and any other DIP Loan Documents and payment in full of any Obligations thereunder. Each of the Debtors and the DIP Entity Guarantors, by their execution of the DIP Credit Agreement, on behalf of themselves and on behalf of their successors, assigns and other legal representatives, hereby unconditionally and irrevocably agrees that such Releasor shall not sue any Releasee on the basis of any Claim released, remised and discharged pursuant to the foregoing provisions of this paragraph, and if any Releasor violates the foregoing covenant, such Releasor, for itself and its successors and assigns, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.  For the avoidance of doubt, nothing contained in this Interim Order shall be construed to release, discharge or acquit the DIP Lender from any of their Obligations hereunder or under the DIP Loan Documents.

## **REMEDIES; MODIFICATION OF AUTOMATIC STAY**

20.    <u>Remedies and Stay Modification.</u>

(a)    The occurrence of any of the following events, unless waived by the DIP Lender in writing and in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (an "***Event of Default***") of this Interim Order: (i) the failure of any Debtor to perform, in any respect, any of the material terms, provisions, covenants, or obligations under this Interim Order, or (ii) the occurrence of an "Event of Default" under the DIP Credit Agreement.

(b)    The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be

utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not an Event of Default under the DIP Loan Documents or a default by any Debtor of any of its obligations under this Interim Order has occurred, including without limitation: (i) to require all cash, checks or other collections or proceeds from DIP Collateral received by the Debtors to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender under the DIP Loan Documents in accordance with any requirements of the DIP Loan Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein; (iv) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order; and (v) the right to declare (1) the termination, reduction or restriction of any further commitment under the DIP Loan Documents to the extent any such commitment remains unfunded; (2) all DIP Debt to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Debtors; and/or (3) the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens on the DIP Collateral or the Obligations of the Debtors; *provided* that with respect to the enforcement of the DIP Liens on the DIP Collateral or the exercise of any other rights or remedies with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral), the DIP Lender shall file a written notice with the Court, which notice can be the same as the Carve-Out Notice (the "***Default Notice***") setting forth the Event of

Default(s) and, if a Default Notice is filed, shall serve such Default Notice upon the Debtors, their counsel, counsel to the Creditors' Committee (if any), counsel to the Prepetition Lender, and the U.S. Trustee.  Effective five (5) Business Days after the Default Notice (the "***Enforcement Notice Period***") is filed (and during which time the DIP Lender shall permit the Debtors to cure such Event of Default and use cash collateral in accordance with the Budget), the DIP Lender shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Debtors or any other interested party, to enforce the DIP Liens on the DIP Collateral or exercise any other rights or remedies with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral).

(c)     During the Enforcement Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility and (ii) the only basis on which the Debtors shall be entitled to seek an emergency hearing within the Enforcement Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing. The Enforcement Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

(d)     The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Committee (if any), any other party in interest and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Enforcement Notice Period.

(e)     If the DIP Lender is entitled, and has elected in accordance with the provisions hereof, to enforce the DIP Liens or exercise any other default-related remedies following

expiration of the Enforcement Notice Period, the Debtors shall cooperate with the DIP Lender in connection with such enforcement by, among other things, (i) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Lender (including any collateral liquidator or consultant), (ii) providing the DIP Lender and its representatives or agents, at all reasonable times access to the Debtors' non-privileged books and records and any information or documents requested by the DIP Lender or its representatives, (iii) performing all other Obligations set forth in the DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Lender's enforcement of rights.

(f)     Upon the occurrence of the Termination Date, the DIP Lender shall have no further obligation to provide financing under the DIP Loan Documents; provided that the DIP Debt shall remain subject to the Carve-Out.

(g)     Unless extended by the Court upon written agreement of the DIP Lender, upon the Termination Date and without further notice or order of Court: (i) the Debtors' authorization to use Cash Collateral and incur DIP Debt hereunder will automatically terminate and (ii) at DIP Lender's election: (1) the DIP Debt shall immediately be due and payable and (2) DIP Lender shall be entitled to setoff any cash in DIP Lender or Prepetition Lender's possession or control and apply such cash to the Aggregate Credit Obligations.

## BAR OF CHALLENGES AND CLAIMS

21.     <u>Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims</u>.  The stipulations, releases, and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and

relinquished all Challenges (as defined below). The stipulations, releases, and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon all other parties-in-interest, including, without limitation, any Trustee appointed or elected for a Debtor or any Committee (if appointed), unless and to the extent that (a) a Committee (if any), a Trustee appointed prior to the Challenge Period Termination Date (as defined below), or any other party in interest (other than any Debtor), after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part any such stipulations, releases and admissions, including the Debtors' Stipulations, or has otherwise asserted an Estate Claim (each, a "*Challenge*") by no later than (i) the earlier of (1) the date upon which a Sale Transaction is closed and (2) sixty (60) days following the date of appointment of a Committee, and (ii) any such later date agreed to in writing by the Debtors and the Prepetition Lender (the time period established by the later of the foregoing clauses, the "*Challenge Period*" and the date of expiration of each Challenge Period being a "*Challenge Period Termination Date*"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding. Notwithstanding the foregoing, if a Trustee is appointed or elected prior to the Challenge Period Termination Date, such Trustee shall have until the longer of (i) thirty (30) days after such appointment or election, and (ii) the remaining time under the Challenge Period to commence a Challenge.

22.    Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges shall be deemed to be forever waived, released, and barred; (b) the Prepetition Debt shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination,

recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected first priority liens in the Prepetition Collateral, not subject to recharacterization, subordination, or avoidance; (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Debt and Prepetition Liens shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases; and (e) all Estate Claims shall be waived.   If any such adversary proceeding is timely filed, the stipulations and admissions contained in this Interim Order, including the Stipulations, shall nonetheless remain binding and preclusive on the Debtors' estates, successors, any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges, and an order of the Court conferring such standing on a Committee (if appointed) or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee (if appointed) or such other party-in-interest.

## **MISCELLANEOUS**

23.    <u>Limitation on Section 506(c) Claims.</u> Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in this Chapter 11 Case or any

Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the Lenders or any of their respective claims, the Carve-Out or the DIP Collateral or the Prepetition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Lenders. No action, inaction, or acquiescence by the Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the Lenders, any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral.

24.     <u>No Marshaling.</u> Subject to entry of the Final Order, the Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents or termination or breach under the DIP Loan Documents, or of the Prepetition Collateral after an Event of Default under the Prepetition Loan Documents or termination or breach under the Prepetition Loan Documents.

25.     <u>Waiver of Right to Return/Consent to Setoff.</u> The Debtors shall not, without the prior written consent of the Lenders, exercise their rights: (a) to return any of the Aggregate Collateral pursuant to section 546(h) of the Bankruptcy Code; (b) to consent to any order permitting any claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) to consent to setoff pursuant to section 553 of the Bankruptcy Code.

26.     <u>Indemnification</u>. The Debtors shall indemnify and hold harmless Lenders in accordance with the DIP Credit Agreement and the Prepetition Credit Agreement, as applicable.

27.     <u>Payments Free and Clear.</u> Any and all payments or proceeds remitted to DIP Lender or its counsel pursuant to the provisions of this Interim Order, the DIP Loan Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code whether asserted or assessed by, through, or on behalf of the Debtors.

28.     <u>Additional Perfection Measures.</u> The DIP Liens shall be perfected by operation of law immediately upon entry of this Interim Order. None of the Debtors nor the DIP Lender shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or any other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens.

(a)     If the DIP Lender chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments or to otherwise record or perfect such security interests and liens, the DIP Lender is hereby authorized, but not directed, to take such action or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized and directed to take such action), and

no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lender may choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the Collateral and such filing by the DIP Lender shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

(c)    Upon entry of the Final Order, the DIP Lender shall establish the LC and Commercial Card Collateral Account referenced in paragraph 6(f), and such account and the monies deposited therein shall be deemed a portion of the DIP Collateral, and shall secure all of the DIP Obligations (as defined in the DIP Credit Agreement), including, but not limited to, the commercial credit card obligations and the letter of credit reimbursement obligations described in paragraph 6(f).  The DIP Lender's lien encumbering the LC and Commercial Card Collateral Account shall be deemed fully attached, valid, enforceable and perfected in accordance with the other terms of this Interim Order.

29.    <u>Delivery of Documentation.</u> The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Lender and counsel to the DIP Lender, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings and/or filings that are either (a) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Lender pursuant to the DIP Loan Documents or (b) reasonably requested by the DIP Lender (or their legal and financial advisors), as the case may be.

30.     <u>Access to Books and Records.</u> The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true, and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with and provide to the DIP Lender all such information as required or allowed under the DIP Loan Documents or the provisions of this Interim Order, (c) permit, consistent with the DIP Loan Documents, representatives of the DIP Lender to visit and inspect any of their respective properties (to the extent practicable, during customary business hours), to examine and make abstracts or copies from any of their non-privileged respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties (to the extent practicable, during customary business hours), and to discuss and be informed as to the Debtors' respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit, consistent with the DIP Loan Documents, representatives of the DIP Lender to consult with and be informed by the Debtors' management on matters concerning the general status of the Debtors' businesses, financial condition and operations.

31.     <u>Lenders Not Responsible Persons; No Control.</u> In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; and (d) making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lender shall not be considered to (i) owe any fiduciary obligation to any Debtor or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (ii) be exercising control over the Debtors or their operations, have authority to determine the manner in which any

of the Debtors' operations are conducted, or acting in any way as a responsible person, a control person, insider or as an owner or operator of any Debtor or any of its affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, and/or the DIP Loan Documents, under any applicable law.

32.    <u>Successors and Assigns.</u> The DIP Loan Documents and the provisions of this Interim Order shall be binding upon each Debtor, the DIP Lender, and each of their respective successors and assigns, and shall inure to the benefit of each Debtor, the DIP Lender, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code. The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders and all other parties in interest, including, but not limited to any Trustee appointed or elected.

33.    <u>DIP Credit Bid Rights.</u> The DIP Lender shall be entitled to credit bid up to the full amount of the outstanding DIP Debt, including, without limitation, any accrued interest and expenses, in any sale of any DIP Collateral, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding or otherwise, and the DIP Lender expressly reserves the right to credit bid up to the full amount of its outstanding DIP Debt including, without limitation, all principal, interest, fees, expenses, call and make-whole premiums, yield maintenance premiums and other fees and charges.

34.    <u>Prepetition Credit Bid Rights</u>.  Subject to the consent of the DIP Lender, the Prepetition Lender shall be entitled to credit bid up to the full amount of the outstanding Prepetition Debt, including, without limitation, any accrued interest and expenses, in any sale of any

Prepetition Collateral, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding or otherwise, and the Prepetition Lender expressly reserves the right to credit bid up to the full amount of its outstanding Prepetition Debt including, without limitation, all principal, interest, fees, expenses, call and make-whole premiums, yield maintenance premiums and other fees and charges.

35.    Binding Nature of Agreement. Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable in accordance with their terms. Unless otherwise consented to in writing, the rights, remedies, powers, privileges, liens and priorities of the DIP Lender provided for in this Interim Order, the DIP Loan Documents or otherwise shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code.

36.    Subsequent Reversal or Modification. This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), and the DIP Lender is accordingly entitled to all protections afforded by section 364(e) of the Bankruptcy Code with respect to all right, claims, liens and interests granted under this Interim Order.

37.    Collateral Rights. If any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Debt under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents, such junior or subordinate lienholder shall be deemed

to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Lender and shall immediately turn over such proceeds for application by the DIP Lender, in accordance with the DIP Loan Documents to repay the DIP Debt in accordance with the DIP Loan Documents, and this Interim Order until indefeasibly paid in full in cash.

38.    No Waiver. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

39.    No Discharge.   None of the DIP Debt (unless paid in full in cash) shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in these Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such discharge.

40.    Limits on Lender's Liability. Nothing in this Interim Order or in any of the DIP Loan Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts, including the negotiation and entry into any agreements, or documents relating to the DIP Loans. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person; and all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

41.    <u>Priority of Terms; Inconsistencies.</u> To the extent of any conflict or inconsistencies between or among (a) the express terms or provisions of any of the DIP Loan Documents, the relief requested in the Motion, any other order of this Court or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern and control.

42.    <u>No Third-Party Beneficiary.</u> Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

43.    <u>Survival.</u>

(a)    Upon the occurrence of any Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement. Notwithstanding any order that may be entered dismissing any of these Chapter 11 Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claim, the DIP Liens, the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Debt shall have been paid in full (and that such DIP Superpriority Claim, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(b)  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Debt incurred prior to the actual receipt of written notice by the DIP Lender, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Prior to the actual receipt of written notice by the DIP Lender of the effective date of any such reversal, modification, or vacatur of this Interim Order, the DIP Loans shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents with respect to the DIP Debt, and all DIP Loans under the DIP Loan Documents are deemed to have been made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP Loans prior to the effective date of any modification or reversal of this Interim Order cannot as a result of any subsequent order the Debtor's Chapter 11 Case, or any Successor Case, (i) be subordinated or (ii) be deprived of the benefit or priority of the DIP Superpriority Claim or DIP Liens granted to the DIP Lender under this Interim Order or the DIP Loan Documents.

(c)  Except as otherwise provided herein, (i) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (1) dismissing these Chapter 11 Cases or (2) converting these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code; and (ii) the DIP Liens, the DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim continue to be valid and

enforceable in these Chapter 11 Cases, in any such successor case or after any such dismissal. Except as otherwise provided herein, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall maintain their priorities as provided in this Interim Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Lender in accordance with the Interim Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of this Chapter 11 Case or by any other act or omission until all DIP Debt is indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance therewith.

44.    <u>Adequate Notice.</u> The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules and the Local Rules, such notice was sufficient under the particular circumstances, and no other or further notice of the request for relief granted at the Interim Hearing is required. The Debtors shall promptly mail copies of this Interim Order to any known party affected by the terms of this Interim Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (a) proposed counsel to the Debtors, Saul Ewing LLP, (i) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn:, Jeffrey C. Hampton and Adam H. Isenberg (jeffrey.hampton@saul.com and adam.isenberg@saul.com) and (ii) 1201 N. Market St., Suite 2300, Wilmington, DE 19801, Attn: Mark Minuti and Paige N. Topper (mark.minuti@saul.com) and (paige.topper@saul.com); (b) counsel to the DIP Lender and

Prepetition Lender, Troutman Pepper Locke, 701 8th Street, N.W., Suite 500, Washington DC 200001, Attn: Jonathan W. Young and Katherine Culbertson (Jonathan.young@troutman.com and katherine.culbertson@troutman.com); (e) the Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, Attn: Gerard R. Vetter (gerard.r.vetter@usdoj.gov); and (f) any Creditors' Committee appointed in these cases. The Court shall conduct a Final Hearing on the Motion commencing on [•], 2025 at [•] p.m. (Eastern).

45.     <u>Immediate Binding Effect; Entry of Interim Order.</u> This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry. The Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in this Chapter 11 Case; there shall be no stay of execution or effectiveness of this Interim Order and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

46.     <u>Headings.</u> Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

47.     <u>Proofs of Claim.</u> Notwithstanding any order of this Court to the contrary, each of the DIP Lender and the Prepetition Lender are hereby relieved of any obligation or requirement to file proofs of claim or applications for administrative claims in this Chapter 11 Case with respect to any of the DIP Debt or the Prepetition Debt and any other claims or liens granted hereunder or created hereby.

48.     <u>Retention of Jurisdiction.</u> This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

**<u>EXHIBIT A</u>**

**DIP Credit Agreement**

Final Version
(Subject to Bankruptcy Court Approval)

# J.P.Morgan

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**dated as of**

**January __, 2025**

**among**

**DIAMOND COMIC DISTRIBUTORS, INC.,**

as Borrower,

**THE OTHER PERSONS PARTY HERETO,**

as Loan Parties,

**STEPHEN A. GEPPI**,

as Individual Guarantor,

and

**JPMORGAN CHASE BANK, N.A.,**

as DIP Lender

## ASSET BASED LENDING

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS....................................................................................2

SECTION 1.01.  Defined Terms ...........................................................................2

SECTION 1.02.  Classification of Loans and Borrowings.....................................2

SECTION 1.03.  Terms Generally .........................................................................2

SECTION 1.04.  Accounting Terms; GAAP ..........................................................3

SECTION 1.05.  Interest Rates; SOFR Notifications............................................3

SECTION 1.06.  Business Day Convention ...........................................................3

SECTION 1.07.  Currency Matters ........................................................................4

SECTION 1.08.  Divisions .....................................................................................4

ARTICLE II THE CREDITS .................................................................................4

SECTION 2.01.  Revolving Commitment...............................................................4

SECTION 2.02.  Loans and Borrowings ...............................................................4

SECTION 2.03.  Borrowing Procedures; Requests for Revolving Borrowings.........4

SECTION 2.04.  Protective Advances ...................................................................5

SECTION 2.05.  Prepetition Letter of Credit ........................................................5

SECTION 2.06.  Funding of Borrowings ...............................................................7

SECTION 2.07.  [Reserved] ...................................................................................7

SECTION 2.08.  Termination of Revolving Commitment.......................................7

SECTION 2.09.  Repayment and Amortization of Loans; Collection and Application of
                Collateral Proceeds; Evidence of Debt. ....................................8

SECTION 2.10.  Prepayment of Loan.....................................................................9

SECTION 2.11.  Fee...............................................................................................10

SECTION 2.12.  Interest.........................................................................................11

SECTION 2.13.  Alternate Rate of Interest; Illegality ..........................................11

SECTION 2.14.  Increased Cost .............................................................................13

SECTION 2.15.  [Reserved]....................................................................................14

SECTION 2.16.  Taxes............................................................................................14

SECTION 2.17.  Payments Generally; Allocation of Proceed ................................15

SECTION 2.18.  Indemnity for Returned Payments ..............................................16

ARTICLE III REPRESENTATIONS AND WARRANTIES .................................16

SECTION 3.01.  Organization; Powers.................................................................16

SECTION 3.02.  Authorization; Enforceability .....................................................16

SECTION 3.03.  Governmental Approvals; No Conflicts ........................................................17

SECTION 3.04.  Approved Budget ......................................................................................17

SECTION 3.05.  Properties ..................................................................................................17

SECTION 3.06.  Litigation and Environmental Matters ......................................................17

SECTION 3.07.  Compliance with Laws and Agreements; No Default ................................18

SECTION 3.08.  Investment Company Status .....................................................................18

SECTION 3.09.  Taxes .........................................................................................................18

SECTION 3.10.  ERISA .......................................................................................................18

SECTION 3.11.  Disclosure .................................................................................................18

SECTION 3.12.  [Reserved] .................................................................................................19

SECTION 3.13.  Solvency ....................................................................................................19

SECTION 3.14.  Insurance ...................................................................................................19

SECTION 3.15.  Capitalization and Subsidiaries ................................................................19

SECTION 3.16.  Security Interest in Collateral. .................................................................19

SECTION 3.17.  Employment Matters .................................................................................20

SECTION 3.18.  Margin Regulations ..................................................................................20

SECTION 3.19.  Use of Proceeds ........................................................................................20

SECTION 3.20.  No Burdensome Restrictions ....................................................................20

SECTION 3.21.  Anti-Corruption Laws and Sanctions.......................................................20

SECTION 3.22.  Affiliate Transactions ...............................................................................20

SECTION 3.23.  Common Enterprise ..................................................................................21

SECTION 3.24.  Plan Assets; Prohibited Transactions .......................................................21

SECTION 3.25.  Interim Order; Final Financing Order.......................................................21

ARTICLE IV CONDITIONS ..............................................................................................21

SECTION 4.01.  Effective Date ...........................................................................................21

SECTION 4.02.  Each Credit Event .....................................................................................22

ARTICLE V AFFIRMATIVE COVENANTS......................................................................22

SECTION 5.01.  Financial Statements; Borrowing Base and Other Information ...................22

SECTION 5.02.  Notices of Material Events........................................................................23

SECTION 5.03.  Existence; Conduct of Business ...............................................................23

SECTION 5.04.  Payment of Taxes and Certain Other Obligations....................................24

SECTION 5.05.  Maintenance of Properties ........................................................................24

SECTION 5.06.  Books and Records; Inspection Rights .....................................................24

SECTION 5.07.  Compliance with Laws and Material Contractual Obligations....................24

ii

SECTION 5.08.  Use of Proceeds ...................................................................................24

SECTION 5.09.  Accuracy of Information .......................................................................25

SECTION 5.10.  Insurance ...............................................................................................25

SECTION 5.11.  Casualty and Condemnation .................................................................26

SECTION 5.12.  Appraisals ..............................................................................................26

SECTION 5.13.  Depository Banks ..................................................................................26

SECTION 5.14.  Additional Collateral; Further Assurances ...........................................26

SECTION 5.15.  Receivables ...........................................................................................27

SECTION 5.16.  Inventory and Equipment .....................................................................28

SECTION 5.17.  Agency Goods Distribution Agreements ..............................................28

SECTION 5.18.  Responsible Officer ..............................................................................29

SECTION 5.19.  Milestones .............................................................................................29

SECTION 5.20.  Bankruptcy Matters ..............................................................................29

ARTICLE VI NEGATIVE COVENANTS .....................................................................................29

SECTION 6.01.  Indebtedness .........................................................................................29

SECTION 6.02.  Liens .....................................................................................................30

SECTION 6.03.  Fundamental Changes ..........................................................................30

SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions .....................31

SECTION 6.05.  Asset Sales ............................................................................................31

SECTION 6.06.  Sale and Leaseback Transactions .........................................................32

SECTION 6.07.  Swap Agreements .................................................................................32

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness ............................32

SECTION 6.09.  Transactions with Affiliates .................................................................32

SECTION 6.10.  Restrictive Agreements .........................................................................32

SECTION 6.11.  Amendment of Material Documents .....................................................33

SECTION 6.12.  Payments to Raymond James ...............................................................33

SECTION 6.13.  Financing Order ....................................................................................33

ARTICLE VII EVENTS OF DEFAULT .........................................................................................34

ARTICLE VIII MISCELLANEOUS ..............................................................................................37

SECTION 8.01.  Notices ..................................................................................................37

SECTION 8.02.  Waivers; Amendments .........................................................................39

SECTION 8.03.  Expenses; Indemnity; Damage Waiver ................................................39

SECTION 8.04.  Successors and Assigns ........................................................................41

SECTION 8.05.  Survival .................................................................................................42

SECTION 8.06.   Counterparts; Integration; Effectiveness; Electronic Execution ..................42

SECTION 8.07.   Severability .....................................................................................43

SECTION 8.08.   Right of Setoff.................................................................................43

SECTION 8.09.   Governing Law; Jurisdiction; Consent to Service of Process.......................44

SECTION 8.10.   WAIVER OF JURY TRIAL.............................................................44

SECTION 8.11.   Headings .........................................................................................45

SECTION 8.12.   Confidentiality .................................................................................45

SECTION 8.13.   Nonreliance; Violation of Law..........................................................45

SECTION 8.14.   USA PATRIOT Act ..........................................................................45

SECTION 8.15.   Disclosure .......................................................................................45

SECTION 8.16.   Interest Rate Limitation ...................................................................46

SECTION 8.17.   Marketing Consent...........................................................................46

SECTION 8.18.   Termination .....................................................................................46

SECTION 8.19.   No Fiduciary Duty, etc. ....................................................................46

SECTION 8.20.   Release ............................................................................................47

ARTICLE IX LOAN GUARANTY ...........................................................................48

SECTION 9.01.   Guaranty .........................................................................................48

SECTION 9.02.   Guaranty of Payment. ......................................................................48

SECTION 9.03.   No Discharge or Diminishment of Loan Guaranty. ..............................48

SECTION 9.04.   Defenses Waived .............................................................................49

SECTION 9.05.   Rights of Subrogation ......................................................................49

SECTION 9.06.   Reinstatement; Stay of Acceleration .................................................50

SECTION 9.07.   Information ......................................................................................50

SECTION 9.08.   Termination .....................................................................................50

SECTION 9.09.   Taxes ..............................................................................................50

SECTION 9.10.   Maximum Liability ..........................................................................50

SECTION 9.11.   Contribution ....................................................................................51

SECTION 9.12.   Liability Cumulative ........................................................................51

<u>SCHEDULES:</u>

Definitions Schedule
Borrowing Base Schedule
Reporting Schedule
Disclosure Schedule

<u>EXHIBITS:</u>

Exhibit A - Approved Budget
Exhibit B - Milestones

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of January [    ], 2025 (as it may be amended or modified from time to time, together with all Exhibits and Schedules annexed hereto from time to time, each of which is hereby incorporated herein and made a part hereof, this "DIP Credit Agreement") by and among debtor-in-possession DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation ("Diamond") as the "Borrower" hereunder (in such capacity, the "Borrower"), the other Loan Parties from time to time party hereto, STEPHEN A. GEPPI (the "Individual Guarantor"), and JPMORGAN CHASE BANK, N.A. as the "DIP Lender" hereunder (the "DIP Lender").

WHEREAS, on January 14, 2025 (the "Filing Date"), Diamond, Comic Exporters, Inc., a Maryland corporation ("Comic Exporters"), Comic Holdings, Inc., a Maryland corporation ("Comic Holdings"), and Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("Diamond Select"; collectively with Diamond, Comic Exporters and Comic Holdings, the "Debtors"; and each, individually, a "Debtor") filed voluntary petitions for relief that commenced cases under chapter 11 of the Bankruptcy Code that are jointly administered as Bankruptcy Case No. 25-10308 (DER) (the "Chapter 11 Cases") before the United Stated Bankruptcy Court for the District of Maryland (together with any other court having competent jurisdiction over the Chapter 11 Cases from time to time, the "Bankruptcy Court");

WHEREAS, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to that certain Credit Agreement, dated as of May 16, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Diamond as borrower (in such capacity, the "Prepetition Borrower"), the other Debtors, Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales ("DCDUK"), Rosebud Entertainment, LLC, a Maryland limited liability company ("Rosebud"), Game Consolidators, LLC, a Delaware limited liability company ("Game Consolidators"), and Renegade Games, LLC, a Delaware limited liability company ("Renegade"), as loan guarantors (collectively, with the Prepetition Borrower, the "Prepetition Loan Parties"), and JPMorgan Chase Bank N.A. as lender (in such capacity, the "Prepetition Lender"), the Prepetition Lender made certain revolving loans and other financial accommodations to the Prepetition Borrower prior to the Filing Date on the terms and conditions set forth therein, which loans and other financial accommodations and all other Prepetition Obligations (as defined in the Definitions Schedule attached hereto) are secured by Liens on substantially all of the assets of the Prepetition Loan Parties;

WHEREAS, the Individual Guarantor also unconditionally guaranteed all of the Prepetition Obligations;

WHEREAS, as of the Filing Date, the outstanding principal amount of the Prepetition Obligations totaled approximately $32,600,000

WHEREAS, the Borrower has requested that the DIP Lender provide a secured revolving credit facility (the "DIP Facility") to the Borrower (i) to fund certain fees and expenses associated with the DIP Facility incurred during the Chapter 11 Cases, (ii) to finance the ongoing general corporate needs of the Borrower and the other Loan Parties in accordance with the Approved Budget (as defined in the Definitions Schedule attached hereto, and including any Permitted Variances as defined in the Definitions Schedule attached hereto), (iii) to pay for certain other administrative expenses incurred during the Chapter 11 Cases in accordance with the Approved Budget, (iv) to finance the LC and Commercial Card Collateral Amount (as defined below), (v) to provide for adequate protection in favor of the Prepetition Lender, and (vi) to pay the Prepetition Obligations (as defined in the Definitions Schedule attached hereto), all subject to the approval of the Bankruptcy Court; and

1

WHEREAS, each of the Loan Parties (including the Individual Guarantor) other than the Borrower has agreed to guaranty the DIP Obligations (as defined in the Definitions Schedule attached hereto); and

WHEREAS, the DIP Lender is willing to provide the DIP Facility on the terms and conditions set forth in this DIP Credit Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

SECTION 1.01. <u>Defined Terms</u>. As used in this DIP Credit Agreement, capitalized terms not otherwise defined herein shall have the meanings specified in the Definitions Schedule attached hereto.

SECTION 1.02. <u>Classification of Loans and Borrowings</u>. For purposes of this DIP Credit Agreement, Loans may be classified and referred to by Class (e.g., a "<u>Revolving Loan</u>") or by Type (e.g., a "<u>CBFR Loan</u>") or by Class and Type (e.g., a "<u>CBFR Revolving Loan</u>"). Borrowings also may be classified and referred to by Class (e.g., a "<u>Revolving Borrowing</u>") or by Type (e.g., a "<u>CBFR Borrowing</u>") or by Class and Type (e.g., a "<u>CBFR Revolving Borrowing</u>").

SECTION 1.03. <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this DIP Credit Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this DIP Credit Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

2

SECTION 1.04.  Accounting Terms; GAAP.

(a)     Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, notwithstanding the occurrence of any change after the date hereof in GAAP or in the application thereof on the operation of any provision hereof, such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective unless and until such provision is amended in accordance herewith.

(b)     Notwithstanding anything to the contrary contained in Section 1.04(a) or in the definition of "Capital Lease Obligations," any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2019, such lease shall not be considered a capital lease, and all calculations and deliverables under this DIP Credit Agreement or any other DIP Loan Document shall be made or delivered, as applicable, in accordance therewith.

SECTION 1.05.  Interest Rates; SOFR Notifications.  The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.13(c) provides a mechanism for determining an alternative rate of interest.  The DIP Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this DIP Credit Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The DIP Lender and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this DIP Credit Agreement or any alternative, successor or alternative rate (including any Alternate Rate) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The DIP Lender may select information sources or services in its reasonable discretion to ascertain any interest rate used in this DIP Credit Agreement, any component thereof, or rates referenced in the definition thereof, in each of the cases pursuant to the terms of this DIP Credit Agreement, and shall have no liability to the Borrower or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 1.06.  Business Day Convention. If any report, financial statement, certificate, notice or other communication required to be delivered under this DIP Credit Agreement or any other DIP Loan Document is due on a day that is not a Business Day (or if the last day such report, financial statement, certificate, notice or other communication may be delivered hereunder in accordance with the terms hereof is not a Business Day), then such report, financial statement, certificate or notice may be delivered on the next succeeding Business Day and if made on such Business Day shall be deemed to have been delivered in compliance with the terms hereof or thereof. If any Sale Milestone deadline or other deadline under this DIP Credit Agreement or any other DIP Loan Document falls on a day that is not a Business Day, then such Sale Milestone deadline or other deadline shall be extended until the next succeeding Business Day and if satisfied on such Business Day shall be deemed to have been satisfied in compliance with the terms hereof or thereof.

SECTION 1.07.  Currency Matters.  Principal, interest, reimbursement obligations, fees, and all other amounts payable under this DIP Credit Agreement and the other DIP Loan Documents to the DIP Lender shall be payable in dollars.  Unless stated otherwise, all calculations, comparisons, measurements or determinations under this DIP Credit Agreement shall be made in dollars.  For the purpose of such calculations, comparisons, measurements or determinations, amounts or proceeds denominated in other currencies shall be converted to the Dollar Equivalent on the date of calculation, comparison, measurement or determination.  Unless expressly provided otherwise, where a reference is made to a dollar amount, the amount is to be considered as the amount in dollars and, therefore, each other currency shall be converted into the Dollar Equivalent.

SECTION 1.08.  Divisions.  For all purposes under the DIP Loan Documents, in connection with any Division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

# ARTICLE II
# THE CREDITS

SECTION 2.01.  Revolving Commitment. Subject to the terms and conditions set forth herein and the Financing Order, the DIP Lender agrees to make Revolving Loans to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (a) the sum of (i) the Revolving Exposure and (ii) the Prepetition Obligations outstanding at any time (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) (the sum of (a)(i) and (ii) being referred to herein as the "**Aggregate Credit Obligations**") exceeding (b) the lesser of (i) the Maximum DIP Facility Amount, and (y) the Borrowing Base, subject to the DIP Lender's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.04. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.  Notwithstanding anything to the contrary set forth herein, the maximum amount of Revolving Loans available to be drawn under this DIP Credit Agreement prior to the entry of the Final Financing Order shall not result in an increase in the Aggregate Credit Obligations from the Petition Date through date of entry of the Final Financing Order in excess of the Maximum Interim Increase Amount.

SECTION 2.02.  Loans and Borrowings.

(a)      Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type. Any Protective Advance shall be made in accordance with the procedures set forth in Section 2.04.

(b)      Subject to Section 2.13, each Borrowing, if applicable, shall be comprised entirely of CBFR Loans.

(c)      CBFR Borrowings may be in any amount. Borrowings of more than one Type and Class may be outstanding at the same time.

SECTION 2.03.  Borrowing Procedures; Requests for Revolving Borrowings.  To request a Revolving Borrowing, the Borrower shall notify the DIP Lender of such request either in writing (delivered by hand, fax or other means acceptable to the DIP Lender) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower or through an Electronic System if arrangements for doing so have

been approved by the DIP Lender (or if an Extenuating Circumstance shall exist, by telephone) not later than noon, Chicago time, on the date of the proposed Borrowing; provided that any such notice of a CBFR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(c) may be given not later than 10:00 a.m., Chicago time, on the date of the proposed Borrowing.

Each such Borrowing Request shall be irrevocable and each such telephonic Borrowing Request, if permitted, shall be confirmed immediately upon cessation of the Extenuating Circumstance by hand delivery, facsimile or a communication through Electronic System to the DIP Lender of a written Borrowing Request in a form approved by the DIP Lender and signed by a Responsible Officer of the Borrower. Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information:

(i)    the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing; and

(ii)    the date of such Borrowing, which shall be a Business Day.

For the avoidance of doubt, the Borrower shall not request, and the DIP Lender shall have no obligation to make, any Revolving Loan (a) to the extent that a prepayment obligation exists or would arise under Section 2.10(b), or (b) if the proceeds thereof would be used for an expense not consistent with the Approved Budget (subject to the Permitted Variances) and otherwise in accordance with the Financing Order.

Upon the entry of the Final Financing Order, the Borrower shall be deemed to have made irrevocable Borrowing Requests for Revolving Loan Borrowings in the amount of (x) the LC and Commercial Card Collateral Amount (as defined in Section 2.05(g)) and (y) the then outstanding Prepetition Obligations (including any Reinstated Prepetition Obligations and Allowable 506(b) Amounts).

SECTION 2.04.  Protective Advances. Subject to the limitations set forth below, the DIP Lender is authorized by the Borrower, from time to time in the DIP Lender's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrower, which the DIP Lender, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and the other DIP Obligations or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this DIP Credit Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.03) and other sums payable under the DIP Loan Documents (any of such Loans are herein referred to as "Protective Advances"). Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the DIP Lender in and to the Collateral and shall constitute DIP Obligations hereunder. All Protective Advances shall be CBFR Borrowings. The making of a Protective Advance on any one occasion shall not obligate the DIP Lender to make any Protective Advance on any other occasion.

SECTION 2.05.  Prepetition Letter of Credit.

(a)    General. A portion of the Revolving Commitment equal to the LC Sublimit shall be available for the issuance and maintenance of the Prepetition Letter of Credit.  Upon entry of the Interim Order, the Prepetition Letter of Credit shall be deemed issued by the DIP Lender and outstanding hereunder. In the event of any inconsistency between the terms and conditions of this DIP Credit Agreement and the terms and conditions of the documents governing the Prepetition Letter of Credit, the terms and conditions of this DIP Credit Agreement shall control. The DIP Lender shall have no obligation hereunder to issue, and shall not issue, and shall not permit to remain outstanding, any letter of credit other than the Prepetition Letter of Credit.

(b)    <u>Expiration Date</u>. The Prepetition Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the DIP Lender to the beneficiary thereof) on the date set forth in the Prepetition Letter of Credit.

(c)    <u>Reimbursement</u>. If the DIP Lender shall make any LC Disbursement in respect of the Prepetition Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the DIP Lender an amount equal to such LC Disbursement on the date that such LC Disbursement is made; provided that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 or 2.04 that such payment be financed with a CBFR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting CBFR Revolving Borrowing.

(d)    <u>Obligations Absolute</u>. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (c) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this DIP Credit Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of the Prepetition Letter of Credit, the documents governing the Prepetition Letter of Credit, or this DIP Credit Agreement, or any term or provision herein or therein, (ii) any draft or other document presented under the Prepetition Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the DIP Lender under the Prepetition Letter of Credit against presentation of a draft or other document that does not comply with the terms of the Prepetition Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligation hereunder. Neither the DIP Lender nor any of its Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of the Prepetition Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to the Prepetition Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the DIP Lender; <u>provided</u> that the foregoing shall not be construed to excuse the DIP Lender from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the DIP Lender's failure to exercise care when determining whether drafts and other documents presented under the Prepetition Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the DIP Lender (as finally determined by a court of competent jurisdiction), the DIP Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of the Prepetition Letter of Credit, the DIP Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of the Prepetition Letter of Credit.

(e)    <u>Disbursement Procedures</u>. The DIP Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under the Prepetition Letter of Credit. The DIP Lender shall promptly notify the Borrower by telephone (confirmed by fax or through Electronic Systems) of such demand for payment and whether the DIP Lender has made or will make an LC Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not

relieve the Borrower of its obligation to reimburse the DIP Lender with respect to any such LC Disbursement.

(f)    <u>Interim Interest</u>. If the DIP Lender shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to CBFR Revolving Loans and such interest shall be due and payable on the date when such reimbursement is payable; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (c) of this Section, then Section 2.12(c) shall apply.

(g)    <u>Cash Collateralization</u>. Upon entry of the Final Financing Order, the Borrower shall promptly request a CBFR Borrowing in an amount equal to $1,300,000 (which amount (the "<u>LC and Commercial Card Collateral Amount</u>") is equal to (x) 105% the amount of the LC Exposure in respect of the Prepetition Letter of Credit and (y) $250,000 in respect of the Borrower's obligations for commercial credit cards provided by the DIP Lender), and shall remit the proceeds of such CBFR Borrower to the DIP Lender to be held in a deposit account maintained at the DIP Lender, in the name and for the benefit of the DIP Lender (the "<u>LC and Commercial Card Collateral Account</u>"). Such deposit and all other amounts from time to time deposited in the LC and Commercial Card Collateral Account shall be held by the DIP Lender as collateral for the payment and performance of the DIP Obligations. The DIP Lender shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC and Commercial Card Collateral Account and the Borrower hereby grants the DIP Lender a security interest in the LC and Commercial Card Collateral Account and all money or other assets on deposit therein or credited thereto. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the DIP Lender and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the LC and Commercial Card Collateral Account. Moneys in the LC and Commercial Card Collateral Account shall be applied by the DIP Lender for LC Disbursements and obligations of the Borrower in respect of commercial credit cards provided by the DIP Lender for which the DIP Lender has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure and for obligations of the Borrower in respect of commercial credit cards provided by the DIP Lender at such time or, if the maturity of the Loans has been accelerated, shall be applied to satisfy other DIP Obligations.

SECTION 2.06.  <u>Funding of Borrowings</u>. The DIP Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrower by promptly crediting the amounts in immediately available funds to the Funding Account(s); provided that the proceeds of any CBFR Revolving Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(c), deemed requests for Borrowings under Section 2.17(c), and Protective Advances shall be retained by the DIP Lender.

SECTION 2.07.  **[Reserved].**

SECTION 2.08.  <u>Termination of Revolving Commitment.</u>

(a)    Unless previously terminated, the Revolving Commitment shall terminate on the Maturity Date.

(b)    The Borrower may at any time terminate the Revolving Commitment upon the Payment in Full of the Aggregate Credit Obligations.

(c)     The Borrower shall notify the DIP Lender of any election to terminate the Revolving Commitment under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination, specifying such election and the effective date thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; <u>provided</u> that a notice of termination of the Revolving Commitment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the DIP Lender on or prior to the specified effective date) if such condition is not satisfied. Any termination of the Revolving Commitment shall be permanent.

SECTION 2.09.  <u>Repayment and Amortization of Loans; Collection and Application of Collateral Proceeds; Evidence of Debt.</u>

(a)     The Borrower hereby unconditionally, jointly and severally, promises to pay to the DIP Lender (i) the then unpaid Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) upon entry of the Final Financing Order, (ii) the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the DIP Lender and (iii) the unpaid Aggregate Credit Obligations on the Maturity Date.

(b)     The Debtors shall direct all of their Account Debtors to forward payments directly to Lock Boxes subject to Lock Box Agreements, except that the Borrower may direct Account Debtors located in, or organized under the laws of, Canada to forward payments to the BMO Deposit Accounts. The DIP Lender shall have sole access to the Lock Boxes at all times, and each Debtor shall take all actions necessary to grant the DIP Lender such sole access.  At no time shall any Debtor remove any item from a Lock Box or a Collateral Deposit Account without the DIP Lender's prior written consent.  If any Debtor shall refuse or neglect to notify any Account Debtor to forward payments directly to a Lock Box subject to a Lock Box Agreement after notice from the DIP Lender, the DIP Lender shall be entitled to make such notification directly to such Account Debtor.  All funds deposited into any Lock Box subject to a Lock Box Agreement or into a Collateral Deposit Account will be swept on a daily basis into a collection account maintained by the Borrower with the DIP Lender (the "<u>Collection Account</u>").  If notwithstanding the foregoing instructions, any Debtor receives any proceeds of any Receivables, such Debtor shall receive such payments as the DIP Lender's trustee, and shall immediately deposit all cash, checks or other similar payments related to or constituting payments made in respect of Receivables received by such Debtor into a Collateral Deposit Account (or, if such amounts are received from Account Debtors located in, or organized under the laws of, Canada, such amounts shall be immediately deposited into the BMO Deposit Accounts). The DIP Lender shall hold and apply funds received into the Collection Account as provided herein below. At all times during the continuance of an Event of Default, each Loan Party that is not a Debtor shall comply with all instructions of the DIP Lender with respect to the remittance and deposit of all collections and other payments in respect of Receivables and the disposition and application of all proceeds of Collateral.

(c)     From and after the Interim Order Date, if the aggregate amount in any BMO Deposit Account on any Business Day exceeds the BMO Deposit Account Threshold Amount, the Borrower shall cause all amounts in such BMO Deposit Account in excess of the BMO Deposit Account Threshold Amount to be swept into the Collection Account, provided that the Borrower shall not be obligated to cause any such excess amount to be swept in the Collection Amount unless and until such excess is equal to or greater than $10,000.  The Borrower shall cause any amounts in the BMO Deposit Accounts that are denominated in Canadian Dollars to be converted into US Dollars prior to effectuating any such sweep referred to in the preceding sentence, in each case, at the sole cost and expense of the Borrower.

(d)     All amounts deposited in the Collection Account shall be deemed received by the DIP Lender in accordance with Section 2.17. On each Business Day, the DIP Lender shall apply all immediately available funds credited to the Collection Account first to prepay any Protective Advances that may be outstanding, and second to prepay the Revolving Loans, except as otherwise set forth in the Financing Order, *provided* that, subject to the terms of the Financing Order, the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) will be Paid in Full before any payment is applied to the DIP Obligations (unless otherwise elected by the DIP Lender).

(e)     The DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the DIP Lender resulting from each Loan made by the DIP Lender, in which the DIP Lender shall record (i) the amount of each Loan made hereunder and the Class and Type thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the DIP Lender hereunder and (iii) the amount of any sum received by the DIP Lender hereunder. The entries made in such accounts shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the DIP Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans and other DIP Obligations in accordance with the terms of this DIP Credit Agreement.

(f)     The DIP Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to the DIP Lender a promissory note payable to the DIP Lender (or, if requested by the DIP Lender, to the DIP Lender and its registered assigns) and in a form prepared by the DIP Lender. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form.

SECTION 2.10.  Prepayment of Loans.

(a)     Subject to the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) having been Paid in Full (to the extent permitted under the Financing Order), the Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with paragraph (e) of this Section and, if applicable, payment of any break funding expenses under Section 2.15.

(b)     In the event and on such occasion that the Aggregate Credit Obligations then outstanding exceed the lesser of (i) the Maximum DIP Facility Amount (or, prior to the entry of the Final Financing Order, the Maximum Interim Facility Amount), and (ii) the Borrowing Base at such time, the Borrower shall prepay the Prepetition Obligations (to the extent permitted under the Financing Order) or the Revolving Loans (if prepayment of the Prepetition Obligations is not permitted under the Financing Order), in an aggregate amount equal to such excess.

(c)     In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, immediately after such Net Proceeds are received by any Loan Party, prepay Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and Allowable 506(b) Amounts), and prepay the DIP Obligations in an aggregate amount equal to 100% of such Net Proceeds, in all cases in accordance with the terms of the Financing Order.

(d)     All such amounts pursuant to Section 2.10(c), shall be applied, first to prepay Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and Allowable 506(b) Amounts), second, to prepay any Protective Advances that may be outstanding, third, to prepay the

9

Revolving Loans with a corresponding reduction in the Revolving Commitment, and fourth, to prepay any other DIP Obligations, in all cases in accordance with the terms of the Financing Order.

(e)    The Borrower shall notify the DIP Lender by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the DIP Lender, of any prepayment hereunder not later than 10:00 a.m., Chicago time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitment as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the Chapter 11 Cases of an advance of a Borrowing of the same Type as provided in Section 2.02. Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.12 and (ii) break funding payments pursuant to Section 2.15.

(f)    In the event that the Prepetition Lender is required to repay or disgorge to any Debtor, or any representatives of any Debtor's estate (as agents, with derivative standing or otherwise) all or any portion of the Prepetition Obligations authorized to be repaid pursuant to the Financing Order, or any payment on account of such Prepetition Obligations made to any Prepetition Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, Borrower shall prepay the outstanding principal amount of the Revolving Loans, as applicable in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by the Borrower or any representative of the Borrower's estate, for application in accordance with Section 2.10(d) above.

SECTION 2.11.  Fees.

(a)    The Borrower agrees to pay to the DIP Lender an unused fee, which shall accrue at the Unused Fee Rate on the average daily amount of the Available Revolving Commitment during the period from and including the Effective Date to but excluding the date on which the Revolving Commitment terminates. Accrued unused fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates, commencing on the first such date to occur after the date hereof. All unused fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)    The Borrower agrees to pay (i) to the DIP Lender a letter of credit fee with respect to the Prepetition Letter of Credit, which shall accrue at the Applicable Margin on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which the Revolving Commitment terminates and the date on which the DIP Lender ceases to have any LC Exposure, and (ii) the DIP Lender's standard fees and commissions with respect to the issuance, amendment, cancellation, negotiation, transfer, presentment, renewal or extension of the Prepetition Letter of Credit or processing of drawings thereunder. Accrued letter of credit fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand. Any other fees payable to the DIP Lender pursuant to this paragraph shall be payable within 10 days after demand. All letter of credit fees shall be computed on the basis of a year of 360 days

10

and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     Subject to the entry of the Final Financing Order, the Borrower agrees to pay to the DIP Lender on the Success Fee Payment Date, a success fee in an amount equal to the product of (x) the Success Fee Percentage multiplied by (y) the Maximum DIP Facility Amount.

(d)     The Borrower agrees to pay to the DIP Lender, a fee equal to the additional interest that the Borrower would have paid in respect of the Revolving Loans, at the CBFR plus the Applicable Margin, as if each uncollected check had not been received in the Collection Account and credited to the Borrower until the earlier of (i) the date that such check is actually collected and (ii) three Business Days after the Business Day that such check was actually received in the Collection Account. Such fee will be payable monthly in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand.

(e)     All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the DIP Lender. Fees paid shall not be refundable under any circumstances, subject only to the terms and conditions of the Financing Order.

SECTION 2.12.  Interest.

(a)     The Loans (other than Protective Advances) shall bear interest at the Adjusted REVSOFR30 Rate plus the Applicable Margin.

(b)     Each Protective Advance shall bear interest at the Adjusted REVSOFR30 Rate plus the Applicable Margin plus 2%.

(c)     Notwithstanding the foregoing, during the occurrence and continuance of a Default, the DIP Lender may, at its option, by notice to the Borrower, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder (including any unreimbursed LC Disbursement), such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(d)     Accrued interest on each Loan (accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Revolving Commitment; provided that (i) interest accrued pursuant to paragraphs (c) and (d) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a CBFR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)     All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Rate Indices shall be determined by the DIP Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.13.  Alternate Rate of Interest; Illegality.

(a)     Subject to clause (c) of this Section 2.13, if:

11

(i)    the DIP Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted REVSOFR30 Rate or the REVSOFR30 Rate, as applicable (including because the Term SOFR Reference Rate is not available or published on a current basis) for such Interest Period; or

(ii)    the DIP Lender determines the Adjusted REVSOFR30 Rate or the REVSOFR30 Rate, as applicable will not adequately and fairly reflect the cost to the DIP Lender of making or maintaining its Loans included in such Borrowing;

then the DIP Lender shall give notice thereof to the Borrower through Electronic System as provided in Section 8.01 as promptly as practicable thereafter and, until the DIP Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist, all Loans and other DIP Obligations shall bear interest by reference to the CB Floating Rate.

(b)    If the DIP Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for the DIP Lender or its applicable lending office to make, maintain, fund or continue any Borrowing bearing interest by reference to the REVSOFR30 Rate, or any Governmental Authority has imposed material restrictions on the authority of the DIP Lender to purchase or sell, or to take deposits of, dollars in the interbank offering market, then, on notice thereof by the DIP Lender to the Borrower, any obligations of the DIP Lender to make, maintain, fund or continue Borrowings bearing interest by reference to the REVSOFR30 Rate will be suspended and all Loans and other DIP Obligations shall bear interest by reference to the CB Floating Rate until the DIP Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist.

(c)    Notwithstanding anything to the contrary herein or in any other DIP Loan Document, if a Benchmark Transition Event occurs, the DIP Lender may, by written notice to the Borrower, amend this DIP Credit Agreement to establish an alternate rate of interest for the REVSOFR30 Rate that gives due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) the then-evolving or prevailing market convention for determining a rate of interest for business loans in Dollars at such time (the "Alternate Rate"); the Borrower acknowledges that the Alternate Rate may include a mathematical adjustment using any then-evolving or prevailing market convention or method for determining a spread adjustment for the replacement of the REVSOFR30 Rate (which may include, if the REVSOFR30 Rate already contains such a spread, adding that spread to the Alternate Rate). The DIP Lender may further amend this DIP Credit Agreement by such notice to the Borrower to make technical, administrative or operational changes (including, without limitation, changes to the definition of "CBFR", timing and frequency of determining rates and making payments of interest, the timing of prepayment or conversion notices, the length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that the DIP Lender decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of the Alternate Rate. The Alternate Rate, together with all such technical, administrative and operational changes as specified in any notice, shall become effective at the later of (i) the fifth (5th) Business Day after the DIP Lender has provided notice (including without limitation for this purpose, by electronic means) to the Borrower (the "Objection Date") and (ii) a date specified by the DIP Lender in the notice, without any further action or consent of the Borrower, so long as the DIP Lender has not received, by 5:00 pm Eastern time on the Objection Date, written notice of objection to the Alternate Rate from the Borrower. If, on the date the REVSOFR30 Rate actually becomes permanently unavailable pursuant to a Benchmark Transition Event, an Alternate Rate has not been established in this manner, the Loans will, until an Alternate Rate is so established, bear interest by reference to the CB Floating Rate. In no event shall the Alternate Rate be less than the Floor.

(d)    All determinations by the DIP Lender under this Section 2.13 shall be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this DIP Credit Agreement or any other DIP Loan Document, except, in each case, as expressly required pursuant to this Section 2.13.

SECTION 2.14.    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, the DIP Lender (except any such reserve requirement reflected in the applicable Rate Indices);

(ii)    impose on the DIP Lender or the offshore interbank market any other condition, cost or expense (other than Taxes) affecting this DIP Credit Agreement or Loans hereunder or the Prepetition Letter of Credit; or

(iii)    subject the DIP Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clause (b) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the DIP Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the DIP Lender of issuing or maintaining the Prepetition Letter of Credit or to reduce the amount of any sum received or receivable by the DIP Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to the DIP Lender such additional amount or amounts as will compensate the DIP Lender for such additional costs incurred or reduction suffered.

(b)    If the DIP Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the DIP Lender's capital or on the capital of the DIP Lender's holding company, if any, as a consequence of this DIP Credit Agreement or the Loans made by, or the Revolving Commitment of, the DIP Lender, or the Prepetition Letter of Credit, to a level below that which the DIP Lender or the DIP Lender's holding company could have achieved but for such Change in Law (taking into consideration the DIP Lender's policies and the policies of the DIP Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to the DIP Lender such additional amount or amounts as will compensate the DIP Lender or the DIP Lender's holding company for any such reduction suffered.

(c)    A certificate of the DIP Lender setting forth the amount or amounts necessary to compensate the DIP Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay the DIP Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Failure or delay on the part of the DIP Lender to demand compensation pursuant to this Section shall not constitute a waiver of the DIP Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate the DIP Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the DIP Lender notifies

13

the Borrower of the Change in Law giving rise to such increased costs or reductions and of the DIP Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15.   [Reserved].

SECTION 2.16.   Taxes.

(a)      Withholding of Taxes; Gross Up. Any and all payments by or on account of any obligation of any Loan Party under any DIP Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.16) the DIP Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the DIP Lender timely reimburse it for, Other Taxes.

(c)      Evidence of Payment. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.16, such Loan Party shall deliver to the DIP Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Lender.

(d)      Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify the DIP Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the DIP Lender or required to be withheld or deducted from a payment to the DIP Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by the DIP Lender shall be conclusive absent manifest error.

(e)      Treatment of Certain Refunds. If the DIP Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the DIP Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of the DIP Lender, shall repay to the DIP Lender the amount paid over pursuant to this Section 2.16(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the DIP Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything

14

to the contrary in this Section 2.16(e), in no event will the DIP Lender be required to pay any amount to an indemnifying party pursuant to this Section 2.16 the payment of which would place the DIP Lender in a less favorable net after-Tax position than the DIP Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.16(e) shall not be construed to require the DIP Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)     Survival. Each party's obligations under this Section shall survive the termination of the Revolving Commitment and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document (including the Payment in Full of the DIP Obligations).

(g)     Defined Terms. For purposes of this Section 2.16, the term "applicable law" includes FATCA.

SECTION 2.17.  Payments Generally; Allocation of Proceeds.

(a)     The Borrower shall make each payment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.14 or 2.16, or otherwise) prior to 2:00 p.m., Chicago time, on the date when due, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the DIP Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the DIP Lender at its offices at 10 South Dearborn Street, Floor L2, Chicago, Illinois. Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     Subject to the terms of the Financing Order, any payments received by the DIP Lender (including from proceeds of Collateral) (i) not constituting either (A) a specific payment of principal, interest, fees or other sums payable under the DIP Loan Documents (which shall be applied as specified by the Borrower), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.10), or (C) amounts to be applied from the Collection Account (which shall be applied in accordance with Section 2.09(c)), shall be applied by the DIP Lender to the payment of the DIP Obligations in such order as the DIP Lender may elect in its sole discretion.  The DIP Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding) or the DIP Obligations.

(c)     At the election of the DIP Lender, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 8.03), and other sums chargeable to or required to be paid by the Borrower under the DIP Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of the Borrower maintained with the DIP Lender. The Borrower hereby irrevocably authorizes (i) the DIP Lender, even if the conditions precedent set forth in Section 4.02 have not been satisfied, to make a Borrowing for the purpose of paying

15

each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the DIP Loan Documents and agrees that all such amounts charged shall constitute Loans (but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses as described in Section 8.03) and that all such Borrowings shall be deemed to have been requested pursuant to Sections 2.03 or 2.04, as applicable and (ii) the DIP Lender to charge any deposit account of the Borrower maintained with the DIP Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the DIP Loan Documents.

(d)    The DIP Lender may from time to time provide the Borrower with account statements or invoices with respect to any of the DIP Obligations (the "Statements"). The DIP Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrower's convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other DIP Obligations. If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the DIP Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the DIP Lender's right to receive payment in full at another time.

SECTION 2.18.  Indemnity for Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the DIP Obligations (including a payment effected through exercise of a right of setoff), the DIP Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the DIP Lender in its discretion), then the DIP Obligations or part thereof intended to be satisfied shall be revived and continued and this DIP Credit Agreement shall continue in full force as if such payment or proceeds had not been received by the DIP Lender. The provisions of this Section 2.18 shall be and remain effective notwithstanding any contrary action which may have been taken by the DIP Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.18 shall survive the termination of this DIP Credit Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the DIP Lender that:

SECTION 3.01.  Organization; Powers. Each Loan Party is duly organized, or formed, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02.  Authorization; Enforceability. Subject to entry by the Bankruptcy Court of the Financing Order, the Transactions are within each Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Subject to entry by the Bankruptcy Court of the Financing Order, each DIP Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting

creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.  <u>Governmental Approvals; No Conflicts</u>. Subject to entry by the Bankruptcy Court of the Financing Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the DIP Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or the assets of any Loan Party, or give rise to a right thereunder to require any payment to be made by any Loan Party, and (d) will not result in the creation or imposition of, or the requirement to create, any Lien on any asset of any Loan Party, except Liens created pursuant to the DIP Loan Documents.

SECTION 3.04.  <u>Approved Budget</u>.  The Approved Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and presented, at the time of delivery, the Debtors' good faith estimate of future performance.

SECTION 3.05.  <u>Properties.</u>

(a)      As of the date of this DIP Credit Agreement, Section 3.05 of the Disclosure Schedule sets forth the address of each parcel of real property that is owned or leased by any Loan Party. Subject to the commencement of the Chapter 11 Cases, each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect against each applicable Loan Party, and to the knowledge of each applicable Loan Party, each third party that is a party thereto, and no default with respect to any such lease or sublease by any Loan Party, and to the knowledge of each Loan Party, by any third party that is a party thereto, exists. Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)      Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, and the use thereof by each Loan Party does not infringe in any material respect upon the rights of any other Person.

SECTION 3.06.  <u>Litigation and Environmental Matters.</u>

(a)      Other than the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any DIP Loan Document or the Transactions.

(b)      (i) Except for the Disclosed Matters, (i) no Loan Party has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)    Since the Filing Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.  Compliance with Laws and Agreements; No Default.  Except where failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party is in compliance with (i) all Requirements of Law applicable to it or its property and (ii) except as directly caused by the filing of a petition for relief under the Bankruptcy Code, all indentures, agreements and other instruments binding upon it or its property. No Default has occurred and is continuing.

SECTION 3.08.  Investment Company Status.  No Loan Party is an investment company as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.  Taxes.  Except for Disclosed Matters, each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not be expected to result in a Material Adverse Effect. No Liens have been filed and no claims are being asserted with respect to any such Taxes.

SECTION 3.10.  ERISA.  Except as a result of the Chapter 11 Cases and the effects thereof, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur could reasonably be expected to have a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87 or subsequent recodification thereof, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by more than the Threshold Amount and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by more than the Threshold Amount.

SECTION 3.11.  Disclosure.

(a)    The Loan Parties have disclosed to the DIP Lender all agreements, instruments and corporate or other restrictions to which any Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the DIP Lender in connection with this DIP Credit Agreement or any other DIP Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

(b)    As of the Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to the Prepetition Lender in connection with the Prepetition Credit Agreement was and continues to be true and correct in all respects.

SECTION 3.12.  [Reserved].

SECTION 3.13.  <u>Solvency</u>. No Loan Party intends to, and no Loan Party believes that it will, incur debts from and after the Effective Date beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness.

SECTION 3.14.  <u>Insurance</u>. Section 3.14 of the Disclosure Schedule sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date. As of the Effective Date, all premiums in respect of such insurance have been paid. The Loan Parties maintain, and have caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.15.  <u>Capitalization and Subsidiaries</u>. Section 3.15 of the Disclosure Schedule sets forth (a) a correct and complete list of the name and relationship to the Borrower of each Loan Party and each Subsidiary that is not a Loan Party, (b) a true and complete listing of each class of each Loan Party's authorized Equity Interests, all of which issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified in Section 3.15 of the Disclosure Schedule, and (c) the type of entity of each Loan Party. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable. There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

SECTION 3.16.  <u>Security Interest in Collateral</u>.

(a)     Subject to entry by the Bankruptcy Court of the Financing Order, the provisions of this DIP Credit Agreement and the other DIP Loan Documents create legal and valid Liens on all of the Collateral in favor of the DIP Lender, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the DIP Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of "Permitted Priority Liens" (as defined in the Financing Order).

(b)     The entry of the Financing Order is effective to create in favor of the DIP Lender, for the benefit of the DIP Lender, as security for the DIP Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and (ii) an allowed administrative expense in the Chapter 11 Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carveout. Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the pledge or grant by any Loan Party of the Liens purported to be created in favor of the DIP Lender pursuant to this DIP Credit Agreement or any of the DIP Loan Documents.

SECTION 3.17.  Employment Matters. There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party.

SECTION 3.18.  Margin Regulations. No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing or the Prepetition Letter of Credit extension hereunder will be used to buy or carry any Margin Stock. Following the application of the proceeds of each Borrowing or drawing under the Prepetition Letter of Credit, not more than 25% of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock.

SECTION 3.19.  Use of Proceeds. The proceeds of the Loans have been used and will be used, whether directly or indirectly, as set forth in Section 5.08.

SECTION 3.20.  No Burdensome Restrictions. No Loan Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21.  Anti-Corruption Laws and Sanctions. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and, to the knowledge of such Loan Party, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) the Loan Parties, or any of their respective directors, officers or, to the knowledge of any Loan Party, amu employees, or (b) to the knowledge of any such Loan Party, any agent of any Loan Party that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or the Prepetition Letter of Credit, use of proceeds, Transaction or other transaction contemplated by this DIP Credit Agreement or the other DIP Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22.  Affiliate Transactions. Except as set forth on Section 3.22 of the Disclosure Schedule, as of the date of this DIP Credit Agreement, (a) there are no existing agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, directors, stockholders, or Affiliates (other than Subsidiaries) of any Loan Party, (b) to the knowledge of the Loan Parties, none of the foregoing Persons are directly or indirectly indebted to (i) any Affiliate of any Loan Party or (ii) any Person (other than any Affiliate of any Loan Party) with which any Loan Party has a business relationship or which competes with any Loan Party, and (c) to the knowledge of the Loan Parties, none of the foregoing Persons has any direct or indirect ownership, partnership, or voting interest in (i) any Affiliate of any Loan Party or (ii) any Person (other than any Affiliate of a Loan Party) with which any Loan Party has a business relationship or which competes with any Loan Party (excluding any Equity Interests owned by such Person in (but not exceeding 2.0% of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party).

SECTION 3.23.  Common Enterprise. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its stockholders or members, board of directors or other governing body, as applicable, have determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the DIP Lender to the Borrower hereunder, both in their separate capacities and as members of a commonly controlled, affiliated group of companies. Each Loan Party has determined that execution, delivery, and performance of this DIP Credit Agreement and any other DIP Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.24.  Plan Assets; Prohibited Transactions. No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery or performance of the transactions contemplated under this DIP Credit Agreement, including the making of any Loan or maintenance of the Prepetition Letter of Credit hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

SECTION 3.25.  Interim Order; Final Financing Order.  At all times prior to the entry of the Final Financing Order, the Interim Order has been entered by the Bankruptcy Court, is in full force and effect, has not been vacated, reversed, modified, amended or stayed, and is not subject to any pending appeal.  At all times from and after the entry of the Final Financing Order, the Final Financing Order has been entered by the Bankruptcy Court, is in full force and effect, has not been vacated, reversed, modified, amended or stayed, and is not subject to any pending appeal.

# ARTICLE IV
## CONDITIONS

SECTION 4.01.  Effective Date. The obligations of the DIP Lender to make Loans and to maintain the Prepetition Letter of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)    DIP Credit Agreement and DIP Loan Documents. The DIP Lender (or its counsel) shall have received (i) a counterpart of this DIP Credit Agreement signed on behalf of each party hereto or written evidence satisfactory to the DIP Lender (which may include facsimile or other electronic transmission of a signed signature page of this DIP Credit Agreement) that each such party has signed a counterpart of this DIP Credit Agreement, (ii) a counterpart of each other DIP Loan Document (each in form and substance reasonably satisfactory to the DIP Lender) signed on behalf of each party thereto or written evidence satisfactory to the DIP Lender (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such DIP Loan Document, (iii) such other certificates, documents, instruments and agreements as the DIP Lender shall reasonably request in connection with the Transactions, including all those documents and requirements listed in the Closing Conditions Schedule dated as of the date hereof and attached hereto, in each case in form and substance satisfactory to the DIP Lender, and (iv) evidence satisfactory to the DIP Lender as to the satisfaction of each of the items and requirements set forth in such Closing Conditions Schedule in a manner satisfactory to the DIP Lender.

(b)    Other Documents. The DIP Lender shall have received such other documents as the DIP Lender or its counsel may have reasonably requested.

(c)    Interim Order.  The Interim Order shall be full force and effect and shall not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such order and shall not have been reversed, modified, stayed or vacated absent the DIP Lender's written consent.

The DIP Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the DIP Lender to make Loans and to maintain the Prepetition Letter of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 8.02) at or prior to 2:00 p.m., Chicago time, on the 2nd Business Day following the date of this DIP Credit Agreement (and, in the event such conditions are not so satisfied or waived, the Revolving Commitment shall terminate at such time).

SECTION 4.02.  Each Credit Event. The obligation of the DIP Lender to make a Loan on the occasion of any Borrowing, and to amend, renew or extend the Prepetition Letter of Credit, is subject to the satisfaction of the following conditions:

(a)    The representations and warranties of the Loan Parties set forth in the DIP Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing or the date of amendment, renewal or extension of the Prepetition Letter of Credit, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).

(b)    At the time of and immediately after giving effect to such Borrowing or the amendment, renewal or extension of the Prepetition Letter of Credit, as applicable, (i) no Default or Event of Default shall have occurred and be continuing and (ii) no Protective Advance shall be outstanding.

(c)    After giving effect to any Borrowing or the amendment, renewal or extension of the Prepetition Letter of Credit, Availability shall not be less than zero.

(d)    With respect to any Loan made on or after the date that is twenty-five (25) days after the Filing Date (or such later date acceptable to the DIP Lender in its sole discretion), the Bankruptcy Court shall have entered the Final Financing Order, which Final Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

Each Borrowing and each amendment, renewal or extension of the Prepetition Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a), (b), (c) and (d) of this Section.

## ARTICLE V
## AFFIRMATIVE COVENANTS

Until the Aggregate Credit Obligations shall have been Paid in Full, each Loan Party executing this DIP Credit Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the DIP Lender that:

SECTION 5.01.  Financial Statements; Borrowing Base and Other Information. The Borrower will furnish to the DIP Lender the information required under the Reporting Schedule attached hereto within the applicable time periods set forth therein.

22

SECTION 5.02. <u>Notices of Material Events</u>. The Loan Parties will furnish to the DIP Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a)  the occurrence of any Default or Event of Default;

(b)  receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party that (i) seeks damages in excess of the Threshold Amount, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party in excess of the Threshold Amount, in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c)  any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)  any loss, damage, or destruction to the Collateral in an amount equal to or exceeding the Threshold Amount, whether or not covered by insurance;

(e)  within two Business Days of receipt thereof, any and all written default notices received under or with respect to any leased location or public warehouse where Collateral is located;

(f)  all material amendments to or termination of any Material Agreement, together with a copy of each such amendment;

(g)  any material change in accounting or financial reporting practices by any Loan Party;

(h)  the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding the Threshold Amount;

(i)  the filing of any claim under any insurance policy maintained by the Loan Parties (whether such claim is filed by a Loan Party or a third party insured) or notice of payment made or to be made thereunder;

(j)  any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(k)  any change in the information provided in the Beneficial Ownership Certification most recently delivered to the Prepetition Lender that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. <u>Existence; Conduct of Business</u>. Each Loan Party will (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights,

qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04.  Payment of Taxes and Certain Other Obligations. Each Loan Party will pay or discharge all Taxes attributable to periods or events from and after the Filing Date and all other material liabilities or obligations that if not paid when due may have priority over the DIP Obligations, in each case, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) the failure to make payment pending such contest could not reasonably be expected to result in aggregate liabilities in excess of the Threshold Amount and (d) such Tax liability or obligation need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code; provided, however, each Loan Party will remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05.  Maintenance of Properties. Each Loan Party will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06.  Books and Records; Inspection Rights. Each Loan Party will (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the DIP Lender (including employees of the DIP Lender, or any consultants, accountants, lawyers, agents and appraisers retained by the DIP Lender), upon reasonable prior written notice, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, and non-privileged books, records and other information, including examining and making extracts from its non-privileged books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. Each Loan Party acknowledges that the DIP Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the DIP Lender. After the occurrence and during the continuance of any Event of Default, each Loan Party shall provide the DIP Lender with access to its suppliers.

SECTION 5.07.  Compliance with Laws and Material Contractual Obligations. Each Loan Party will (i) comply in all material respects with each Requirement of Law applicable to it or its property (including without limitation Environmental Laws), and (ii) perform in all material respects its obligations under Material Agreements to which it is a party, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in aggregate liabilities in excess of the Threshold Amount.  Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08.  Use of Proceeds.

(a)    The proceeds of the Loans and the Prepetition Letter of Credit will be used only (i) to fund certain fees and expenses associated with the DIP Facility incurred during the Chapter 11 Cases, (ii) to pay for certain administrative expenses incurred during the Chapter 11 Cases in accordance with the

Approved Budget, (iii) to finance the ongoing general corporate needs of the Debtors in accordance with the Approved Budget, (iv) to finance the LC and Commercial Card Collateral Amount, (v) to provide for adequate protection in favor of the Prepetition Lender, and (vi) to pay the Prepetition Obligations, in each case, subject to the Financing Order and this DIP Credit Agreement. No part of the proceeds of any Loan will be used, whether directly or indirectly, (x) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X or (y) to make any Acquisition.

(b)      The Borrower shall not request any Borrowing, the Borrower shall not use, and the Borrower shall procure that none of the Loan Parties or any of its or their respective directors, officers, employees and agents shall use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws to the extent such activity, businesses or transactions would be prohibited by Sanctions, if conducted by a corporation incorporated in the United States or the European Union, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 5.09.  <u>Accuracy of Information</u>. The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the DIP Lender in connection with this DIP Credit Agreement or any other DIP Loan Document contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by each Loan Party on the date thereof as to the matters specified in this Section; provided that, with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 5.10.  <u>Insurance.</u>

(a)      Each Loan Party will maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the DIP Collateral Documents. The Loan Parties will furnish to the DIP Lender, upon request of the DIP Lender, but no less frequently than annually, information in reasonable detail as to the insurance so maintained.

(b)      In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "<u>Special Flood Hazard Area</u>", the applicable Loan Party shall purchase and maintain flood insurance on such Collateral (including any personal property which is located on any real property leased by such Loan Party within a "<u>Special Flood Hazard Area</u>"). The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Revolving Commitment or the total replacement cost value of the improvements.

(c)      All insurance policies required hereunder or under this Section 5.10 shall name the DIP Lender as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses or mortgagee clauses, through endorsements in form and substance satisfactory to the DIP Lender, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to

the DIP Lender; (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and lender loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least 30 days prior written notice given to the DIP Lender.

(d)    All premiums on such insurance shall be paid when due, and copies of the policies delivered to the DIP Lender. If a Loan Party fails to obtain any insurance as required by this Section, the DIP Lender may obtain such insurance at the Loan Parties' expense. By purchasing such insurance, the DIP Lender shall not be deemed to have waived any Default arising from the applicable Loan Party's failure to maintain such insurance or pay any premiums therefor.

SECTION 5.11.  Casualty and Condemnation. The Loan Parties will (a) furnish to the DIP Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with any applicable provisions of this DIP Credit Agreement and the DIP Collateral Documents.

SECTION 5.12.  Appraisals. At any time that the DIP Lender requests, each Loan Party will provide the DIP Lender with appraisals or updates thereof of its Inventory from an appraiser selected and engaged by the DIP Lender, and prepared on a basis satisfactory to the DIP Lender, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law.

SECTION 5.13.  Depository Banks. Each of the Loan Parties will maintain the DIP Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other Deposit Accounts for the conduct of its business; provided, that (i) the Borrower may continue to maintain the BMO Deposit Accounts subject to the provisions of Section 2.09(b), and (ii) DCDUK may continue to maintain Deposit Accounts at Barclays Bank PLC.

SECTION 5.14.  Additional Collateral; Further Assurances.

(a)    Each Loan Party will obtain the prior written consent of the DIP Lender (which will be provided in the DIP Lender's sole discretion) before acquiring, creating, or allowing to be created or acquired, any direct or indirect Subsidiary. Subject to applicable Requirements of Law and the DIP Lender's approval, each Loan Party will cause each Domestic Subsidiary formed or acquired after the date of this DIP Credit Agreement (other than any Domestic Subsidiary that is a direct Subsidiary of a Foreign Subsidiary), each Division Successor and any limited liability company formed pursuant to any Division to become a Loan Party by executing a joinder agreement in form satisfactory to the DIP Lender. Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the DIP Loan Documents and (ii) will grant Liens to the DIP Lender, for the benefit of the Secured Parties, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b)    Each Loan Party will cause (i) 100% of the issued and outstanding Equity Interests of each of its Domestic Subsidiaries (other than any Domestic Subsidiary that is a direct Subsidiary of a Foreign Subsidiary), (ii) 100% of the issued and outstanding Equity Interests of DCDUK, and (iii) 65% (or such greater percentage that could not reasonably be expected to cause material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the

meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary owned by such Loan Party (and each Domestic Subsidiary that is a direct Subsidiary of any such Foreign Subsidiary), in each case, to be subject at all times to a first priority, perfected Lien in favor of the DIP Lender, for the benefit of the Secured Parties, pursuant to the terms and conditions of the DIP Loan Documents or other security documents as the DIP Lender shall reasonably request.

(c)    Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the DIP Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the DIP Lender may, from time to time, reasonably request to carry out the terms and conditions of this DIP Credit Agreement and the other DIP Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the DIP Collateral Documents, all in form and substance reasonably satisfactory to the DIP Lender and all at the expense of the Loan Parties.

(d)    If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower will (i) notify the DIP Lender, and, if requested by the DIP Lender, cause such assets to be subjected to a Lien securing the DIP Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the DIP Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

(e)    Notwithstanding anything to the contrary herein, no Loan Party or any of its Subsidiaries shall be required to take any Excluded Perfection Action (as defined in the Security Agreement).

SECTION 5.15.  Receivables.

(a)    Certain Agreements on Receivables. No Loan Party will make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence of an Event of Default, the Loan Parties may reduce the amount of Accounts arising from the sale of Inventory in a manner consistent with their present policies and in the ordinary course of business.

(b)    Collection of Receivables. Except as otherwise provided in this DIP Credit Agreement or the Security Agreement, each Loan Party will collect and enforce, at the Loan Party's sole expense, all amounts due or hereafter due to such Loan Party under the Receivables.

(c)    Delivery of Invoices. At the DIP Lender's request, the Borrower will deliver to the DIP Lender alongside delivery to customers duplicate invoices with respect to each Account of the Loan Parties bearing such language of assignment as the DIP Lender shall specify.

(d)    Disclosure of Counterclaims on Receivables. If (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable of the Borrower exists or (ii) if, to the knowledge of the Borrower, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened in writing with respect to a Receivable of the Borrower, the Borrower will promptly disclose such fact to the DIP Lender on the Borrowing Base Certificate submitted by the

Borrower. The Borrower shall send the DIP Lender a copy of each credit memorandum where the discount, credit, agreement to make a rebate, dispute, setoff, claim, counterclaim or defense exceeds the Threshold Amount as soon as issued by the Borrower, and the Borrower shall promptly report each credit memo and each of the facts required to be disclosed to the DIP Lender in accordance with this Section 5.15(d) on the next and all subsequent Borrowing Base Certificates submitted by the Borrower.

SECTION 5.16.  Inventory and Equipment.

(a)     Maintenance of Goods. Each Loan Party will do all things necessary to maintain, preserve, protect and keep its Inventory and Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Loan Party's business and except for ordinary wear and tear in respect of its Equipment.

(b)     Returned Inventory. If an Account Debtor returns any Inventory to the Borrower or Diamond Select when no Event of Default exists, then the Borrower shall promptly determine the reason for such return and the Borrower or Diamond Select, as applicable, shall issue a credit memorandum to the Account Debtor in the appropriate amount.  The Borrower shall immediately report to the DIP Lender any return involving an amount in excess of the Threshold Amount. Each such report shall indicate the reasons for the returns and the locations and condition of the returned Inventory.  In the event any Account Debtor returns Inventory to the Borrower or Diamond Select when an Event of Default exists, the Borrower or Diamond Select, as applicable, upon the request of the DIP Lender in its Permitted Discretion, shall: (i) hold the returned Inventory in trust for the DIP Lender; (ii) segregate all returned Inventory from all of its other property; (iii) dispose of the returned Inventory solely according to the DIP Lender's written instructions; and (iv) not issue any credits or allowances with respect thereto without the DIP Lender's prior written consent.  All returned Inventory (other than Inventory of DCDUK) shall be subject to the DIP Lender's Liens thereon.  Whenever any Inventory is returned, the related Account shall be deemed ineligible to the extent of the amount owing by the Account Debtor with respect to such returned Inventory and such returned Inventory shall not be Eligible Inventory.

(c)     Inventory Count; Perpetual Inventory System. Each Loan Party will conduct a physical count of the Inventory at least once per fiscal year, and after and during the continuation of an Event of Default, at such other times as the DIP Lender requests. Each Loan Party, at its own expense, shall deliver to the DIP Lender the results of each physical verification, which such Loan Party has made, or has caused any other Person to make on its behalf, of all or any portion of its Inventory. Unless waived by the DIP Lender, each Loan Party will maintain a perpetual inventory reporting system at all times.

(d)     Equipment. Each Loan Party shall promptly inform the DIP Lender of any additions to or deletions from the Equipment which individually or in the aggregate exceed the Threshold Amount. Each Loan Party shall not permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the DIP Lender does not have a Lien. Each Loan Party will not, without the DIP Lender's prior written consent, alter or remove any identifying symbol or number on any of such Loan Party's Equipment constituting Collateral.

SECTION 5.17.  Agency Goods Distribution Agreements.  The Borrower shall promptly notify the DIP Lender (a) of any amendment, modification or extension of any Agency Goods Distribution Agreement (and promptly provide the DIP Lender with copies of such amendment, modification or extension), (b) of any termination or expiration of any Agency Goods Distribution Agreement, (c) if any Agency Supplier shall allege that the Borrower is in breach of any of the terms of any Agency Goods Distribution Agreement,

28

or (d) if any Agency Supplier or other supplier of Inventory to the Borrower on consignment shall contact any DCD Customer or take any action to collect any Accounts arising from the sale by the Borrower to any DCD Customer of any Agency Goods or any Inventory supplied to the Borrower on consignment.

SECTION 5.18.  Responsible Officer. The Borrower will (a) retain, at all times, a Responsible Officer satisfactory to the DIP Lender, and on terms and conditions satisfactory to the DIP Lender and (b) provide reasonable, direct access to such Responsible Officer for the DIP Lender, at the Borrower's expense.

SECTION 5.19.  Milestones. The Borrower will timely perform and deliver each of the actions and/or items set forth on **Exhibit B** attached hereto (each a "Milestone") on or before the dates specified therein (provided that any milestone deadline occurring on a day that is not a Business Day will automatically be extended to the following Business Day), or by such later date as agreed by the DIP Lender.

SECTION 5.20.  Bankruptcy Matters. The Borrower will: (a) contemporaneously with the filing thereof, deliver to the DIP Lender copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Loan Parties in the Chapter 11 Cases, which copies of such papers and documents may be provided to or served on the DIP Lender's counsel, and (b) contemporaneously with the receipt thereof, deliver to the DIP Lender copies of all letters of intent, expressions of interest, offers to purchase or draft purchase agreements (together with subsequent drafts) with respect to any of the Collateral, or any other transactions requiring Bankruptcy Court approval.

# ARTICLE VI
## NEGATIVE COVENANTS

Until the Aggregate Credit Obligations shall have been Paid in Full, each Loan Party executing this DIP Credit Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the DIP Lender that:

SECTION 6.01.  Indebtedness. No Loan Party will create, incur or suffer to exist any Indebtedness, except:

(a)    the DIP Obligations and the Prepetition Obligations (including any Reinstated Prepetition Obligations and Allowable 506(b) Amounts);

(b)    Indebtedness existing on the Filing Date and set forth on Section 6.01 of the Disclosure Schedule;

(c)    Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(d)    Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business; and

(e)    Indebtedness (i) resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business or (ii) arising under or in connection with cash management services in the ordinary course of business.

SECTION 6.02.  Liens. No Loan Party will create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a)    Liens created pursuant to any DIP Loan Document or Prepetition Loan Document;

(b)    Permitted Encumbrances;

(c)    Permitted Priority Liens;

(d)    any Lien on any property or asset of the Borrower existing on the Filing Date and set forth in Section 6.02 of the Disclosure Schedule; and

(e)    Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than (x) those permitted under clause (a) of the definition of Permitted Encumbrances and (y) those permitted under clause (a) above, or (2) Inventory, other than (x) those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and (y) those permitted under clause (a) above.

SECTION 6.03.  Fundamental Changes.

(a)    Absent a confirmed chapter 11 plan of reorganization or an order approving a sale pursuant to 11 U.S.C § 363 in each of the Chapter 11 Cases containing terms and conditions thereof are satisfactory to the DIP Lender in its discretion, no Loan Party will merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, or otherwise Dispose of a material amount of its assets.

(b)    No Loan Party will consummate a Division as the Dividing Person, without the prior written consent of the DIP Lender. Without limiting the foregoing, if any Loan Party that is a limited liability company consummates a Division (with or without the prior consent of the DIP Lender as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.14 and the other further assurances obligations set forth in the DIP Loan Documents and become a Loan Party under this DIP Credit Agreement and the other DIP Loan Documents

(c)    No Loan Party will engage to any material extent in any business other than businesses of the type conducted by the Loan Parties on the date of hereof and businesses reasonably related thereto.

(d)    No Loan Party will change its fiscal year from the basis in effect on the Effective Date.

(e)    No Loan Party will change the accounting basis upon which its financial statements are prepared.

(f)    No Loan Party will change (i) the tax filing elections it has made under the Code, (ii) the type of entity that it is, (iii) its organization identification number, if any, issued by its state of incorporation or other organization, or (iv) its state of incorporation or organization.

SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions. No Loan Party will form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)    Permitted Investments of the Borrower subject to Control Agreements in favor of the DIP Lender or otherwise subject to a perfected security interest in favor of the DIP Lender;

(b)    (i) investments by the Borrower in the Equity Interests of Comic Exporters and Comic Holdings in existence on the date hereof and described in Section 6.04 of the Disclosure Schedule, provided that such Equity Interests shall be pledged to the DIP Lender pursuant to the Security Agreement, (ii) investments by Comic Exporters and Comic Holdings in the Equity Interests of DCDUK in existence on the date hereof and described in Section 6.04 of the Disclosure Schedule, provided that such Equity Interests shall be pledged to the DIP Lender pursuant to the DCDUK Share Pledge Agreement, (iii) loans and advances made to DCDUK by the Borrower prior to the Petition Date and described in Section 6.04 of the Disclosure Schedule; and (iv) loans and advances made to Affiliated Persons by the Borrower prior to the Petition Date and described in Section 6.04 of the Disclosure Schedule;

(c)    Guarantees constituting Indebtedness permitted by Section 6.01;

(d)    notes payable, or stock or other securities, issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(e)    investments received in connection with the disposition of assets permitted by Section 6.05;

(f)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances; and

(g)    Investments consisting of the endorsement by the Borrower of negotiable instruments payable to such Person for deposit in the ordinary course of business.

SECTION 6.05.  Asset Sales. No Loan Party will sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will any Loan Party issue any additional Equity Interests, except:

(a)    sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business;

(b)    sales, transfers and dispositions of Accounts in connection with the compromise, settlement or collection thereof in the ordinary course of business;

(c)    dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party;

(d)    the Sale Transaction; or

(e)    such other sales, transfers and dispositions of assets as may be approved by the DIP Lender in writing;

provided that all sales, transfers, leases and other dispositions permitted hereby shall be made for fair value and for at least 75% cash consideration.

SECTION 6.06.  Sale and Leaseback Transactions. No Loan Party will enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction").

SECTION 6.07.  Swap Agreements. No Loan Party will enter into any Swap Agreement.

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness.

(a)    No Loan Party will declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, excluding Restricted Payments by a Loan Party to another Loan Party that are expressly set forth in the Approved Budget and permitted by the Financing Order.

(b)    No Loan Party will make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness without prior written consent of the DIP Lender and such payments must be in accordance with the Financing Order, except (i) payment of Indebtedness created under the DIP Loan Documents, (ii) payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01 and paid in accordance with the Approved Budget and (iii) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05, paid in accordance with the Financing Order and any order of the Bankruptcy Court authorizing such sale or transfer.

SECTION 6.09.  Transactions with Affiliates. No Loan Party will sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions (including, without limitation, purchases of Inventory) that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among any two or more Loan Parties not involving any other Affiliate, (c) the payment of reasonable fees to directors of the Borrower who are not employees of any Loan Party, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Loan Parties to the extent set forth in the Approved Budget, (d) such other transactions involving Affiliates as to which the DIP Lender has consented in writing or (e) so long as it is expressly contemplated by the Approved Budget, with respect to any other transactions occurring on or after the Effective Date.

SECTION 6.10.  Restrictive Agreements. No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits,

restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Loan Party or to Guarantee Indebtedness of the Borrower or any other Loan Party; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any DIP Loan Document, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this DIP Credit Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11.  Amendment of Material Documents. No Loan Party will amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness or any other Indebtedness of a Loan Party to Affiliated Persons, (b) its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational or governing documents or (c) any Material Agreement.

SECTION 6.12.  Payments to Raymond James.  To the extent the Bankruptcy Court enters an order authorizing the retention of Raymond James as investment banker for the Debtors, subject to Bankruptcy Court Approval the Borrower shall be permitted to make payments to Raymond James of the following fees, and to reimburse Raymond James for the following expenses: (i) the Monthly Advisory Fees payable pursuant to Section 2(a) of the RJ Engagement Letter to the extent such Monthly Advisory Fees are included in the Approved Budget, (ii) upon entry of the Interim Order, the first half of the DIP Financing Fee payable pursuant to Section 2(b)(i) of the RJ Engagement Letter in an amount not exceeding $75,000 to the extent such first half of the DIP Financing Fee is included in the Approved Budget, (iii) upon entry of the Final Financing Order, the second half of the DIP Financing Fee payable pursuant to Section 2(b)(i) of the RJ Engagement Letter in an amount not exceeding $75,000 to the extent such second half of the DIP Financing Fee is included in the Approved Budget, (iv) upon consummation of the Sale Transaction, the Business Combination Transaction Fee described in Section 2(c)(i) of the RJ Engagement Letter, and (v) reimbursement of Expenses as provided for in Section 3 of the RJ Engagement Letter provided that such Expenses are included in the Approved Budget.  Except as expressly set forth above, until the Aggregate Credit Obligations shall have been Paid in Full, no Loan Party shall pay or reimburse Raymond James for any other amounts without the prior written approval of the DIP Lender.

SECTION 6.13.  Financing Order. Loan Parties will not:

(a)        seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by the DIP Lender;

(b)        seek the use of Cash Collateral in a manner inconsistent with the terms of the Financing Order without the prior written consent of the DIP Lender;

(c)        suffer to exist at any time a priority for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any super priority claim

which is equal or superior to the priority of the DIP Lender in respect of the DIP Obligations or the Prepetition Lender in respect of the Prepetition Obligations, except for the Carveout;

(d)     directly or indirectly seek, consent to, or allow to exist at any time after the Effective Date any Lien on any properties, assets or rights except for Permitted Liens; or

(e)     prior to the date on which the Prepetition Obligations (and any Reinstated Prepetition Obligations then outstanding) and the DIP Obligations have been paid in full, pay any administrative expenses or pre-petition claims other than (i) as provided for in the Approved Budget or (ii) otherwise consented to by the DIP Lender in writing.

## ARTICLE VII
## EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of any Loan, or any reimbursement obligation in respect of any LC Disbursement, any interest on any Loan, or any fee or other amount payable under this DIP Credit Agreement, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     any representation or warranty made or deemed made by or on behalf of any Loan Party in, or in connection with, this DIP Credit Agreement or any other DIP Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this DIP Credit Agreement or any other DIP Loan Document, shall prove to have been materially incorrect when made or deemed made;

(c)     any Loan Party shall fail to comply with, observe or perform any covenant, condition or agreement contained in this DIP Credit Agreement, the other DIP Loan Documents or the Financing Order;

(d)     any of the Milestones shall not have been timely satisfied or waived by the DIP Lender in its sole discretion;

(e)     any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(f)     a trustee, examiner or receiver with enlarged powers shall be appointed or designated in any of the Chapter 11 Cases without the consent of the DIP Lender;

(g)     except as expressly set forth in the Interim Order, the Final Financing Order or this DIP Credit Agreement, any Loan Party (i) incurs any additional Indebtedness, or (ii) grants or requests authority to grant any lien or security interest to secure any Indebtedness (other than the DIP Obligations) without the prior written consent of the DIP Lender;

(h)     any Financing Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Loan Parties shall apply for authority to do so) without the written consent of the DIP Lender or any Financing Order shall cease to be in full force and effect;

(i)     entry of the Final Financing Order shall not have occurred within twenty-five (25) days after the Filing Date;

34

(j)     the Loan Parties all take any action, including the filing of an application, in support of any of the events described in clauses (c) through (i) of this Article VII, or any person other than the Loan Parties shall do so and such application is not contested in good faith by the Loan Parties;

(k)     the Debtors shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition claim other than (x) as provided for in a "first day order" and included in the Approved Budget or (y) otherwise consented to by the DIP Lender in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of the Threshold Amount in the aggregate or to permit other actions that would have a Material Adverse Effect on the Loan Parties or the estates of the Debtors, or (iii) approving any settlement or other stipulation not approved by the DIP Lender and not included in the Approved Budget with any secured creditor of the Loan Parties providing for payments as adequate protection or otherwise to such secured creditor;

(l)     the filing or express written support by the Debtors of bidding procedures, sale processes, transactions, plans of liquidation or related disclosure statements that are not acceptable to the DIP Lender.

(m)     the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of the Debtor in which the Prepetition Lender or the DIP Lender holds a first priority security interest.

(n)     any material contract is rejected or otherwise terminated or any material property of the Debtors is sold, in each instance, without the prior written consent of the DIP Lender;

(o)     the Debtors file a motion in the Chapter 11 Cases without the express written consent of the DIP Lender, to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code or to use Cash Collateral under Section 363(c) of the Bankruptcy Code the proceeds of which additional financing or Cash Collateral use are insufficient to indefeasibly pay in full all DIP Obligations and all Prepetition Obligations immediately upon entry of an order approving such financing or Cash Collateral use;

(p)     entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtors to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender;

(q)     the Debtors shall support any other person's opposition of any motion made in the Bankruptcy Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim or the validity and enforceability of the Liens in favor of the DIP Lender;

(r)     the Debtors shall seek to, shall support, acquiesce in, or not challenge (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of any Debtor) any other person's motion to disallow in whole or in part the DIP Lender's claims or to challenge the validity and enforceability of the liens in favor of the DIP Lender securing the DIP Obligations or contest any material provision of this Credit Agreement or any other DIP Loan Document, (ii) the liens in favor of the DIP Lender securing the Obligation or the DIP Lender's superpriority claims shall otherwise cease to be valid, perfected and/or enforceable in all respects, or (iii) any provision of any DIP Loan Document ceases to be effective;

(s)    any judgments that are in the aggregate in excess of the Threshold Amount as to any obligation of any of the Debtors incurred after the Filing Date shall be rendered against any Debtor and the enforcement thereof shall not be stayed;

(t)    (i) the Debtors or any of their affiliates shall file any pleading or proceeding that could reasonably be expected to result in an impairment of the rights or interests of the DIP Lender or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other person which results in such impairment of the rights or interests of the DIP Lender;

(u)    the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notice of lien or similar instrument or other document that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the DIP Lender;

(v)    the Debtors shall fail to pay at maturity, or within any applicable period of grace, any obligation for Indebtedness (other than the DIP Obligations) in excess of $100,000, or fail to observe or perform any material term, covenant or agreement (other than (i) in connection with or as a result of the Chapter 11 Cases or (ii) any such obligation with respect to which the Bankruptcy Code prohibits the Debtors from complying with such obligation or permits the Debtors not to comply with such obligation) contained in any agreement by which it is bound, evidencing or securing Indebtedness (other than the DIP Obligations) in excess of $100,000 for such period of time as would permit (assuming the lapse of time and/or giving of appropriate notice if required and assuming such breach has not been cured within the applicable grace period thereunder) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity thereof;

(w)    there shall occur any damage to, or loss, theft or destruction of, any Collateral in an amount greater than the Threshold Amount that is not covered by insurance;

(x)    any Loan Party or the Individual Guarantor shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Lender, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the Financing Order with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by any Loan Party or the Individual Guarantor that contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Lender created by the Financing Order;

(y)    Liens or superpriority claims with respect to the DIP Obligations shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein; or

(z)    any party, including, but not limited to, any Debtor, files a plan of reorganization or a motion to sell all or substantially all of the assets of the Borrower or any other Loan Party, in either case, without the express prior written consent of the DIP Lender except for any such plan that contemplates the indefeasible payment in full in cash of all the DIP Obligations and all Prepetition Obligations (other than contingent indemnification obligations);

then, and in every such event, and at any time thereafter during the continuance of such event, the DIP Lender may, by notice to the Borrower, take any or all of the following actions, at the same or different times, subject to the terms and conditions of the Financing Order: (i) terminate the Revolving Commitment, whereupon the Revolving Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Classes of Loans and the Loans of each Class at the time outstanding, in which case any principal not so declared to be due and

payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other DIP Obligations of the Borrower accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender may increase the rate of interest applicable to the Loans and other DIP Obligations as set forth in this DIP Credit Agreement and exercise any rights and remedies provided to the DIP Lender under the DIP Loan Documents or at law or equity, including all remedies provided under the UCC.

# ARTICLE VIII
## MISCELLANEOUS

SECTION 8.01.  Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by e-mail, to the Loan Parties and to the DIP Lender at the following addresses:

if to any Debtor, DCDUK or Game Consolidators, to the Borrower at:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, MD 21030
Attention:  Charles Parker
Email: pchuck@diamondcomics.com

with copies (which shall not constitute notice) to:

Robert Gorin and William Henrich, Chief Restructuring Officers
of Diamond Comic Distributors, Inc.
c/o Getzler Henrich & Associates LLC
295 Madison Avenue
New York, NY 10017
Email:  rgorin@getzlerhenrich.com and whenrich@getzlerhenrich.com

Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Attention:  Jeffrey Hampton and Adam Isenberg
Email:  Jeffrey.Hampton@saul.com and Adam.Isenberg@saul.com

if to Renegade, Rosebud, Game Consolidators or the Individual Guarantor:

c/o Stephen A. Geppi
10150 York Road, Suite 300
Hunt Valley, MD 21030
Email: gsteve@diamondcomics.com

with copies (which shall not constitute notice) to:

     DLA Piper LLP (US)
     650 South Exeter Street, Suite 1100
     Baltimore, MD 21202
     Attn: C. Kevin Kobbe
     Email: kevin.kobbe@us.dlapiper.com

if to the DIP Lender, to:

     JPMorgan Chase Bank, N.A.
     3424 Peachtree Road NE, Floor 21
     Atlanta, GA 30326
     Attention: Diamond Comic Account Representative
     Email: angela.leake@jpmorgan.com

with copies (which shall not constitute notice) to:

     JPMorgan Chase Bank, N.A.
     250 Pehle Ave, Floor 001
     Saddle Brook, NJ 07663
     Attention: Michael Fondacaro
     Email: michael.a.fondacaro@chase.com

     Troutman Pepper Locke LLP
     111 Huntington Avenue
     Boston, MA 02199
     Attention: David Ruediger and Jonathan Young
     Email: David.Ruediger@troutman.com and Jonathan.Young@troutman.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by e-mail shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph. Any notice or other communication to be given (A) to the Debtors, or any Debtor individually, or to DCDUK hereunder may be given to the Borrower on behalf of the Debtors, or any individual Debtor, or DCDUK, and (B) to Renegade, Rosebud, Game Consolidators or the Individual Guarantor, may be given to the Individual Guarantor on behalf of Renegade, Rosebud, Game Consolidators or the Individual Guarantor.

     (b)     Notices and other communications to the DIP Lender hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the DIP Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to item (c) of the Reporting Schedule attached hereto unless otherwise agreed by the DIP Lender. Each of the DIP Lender and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the DIP Lender otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail

or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)    Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02.  Waivers; Amendments.

(a)    No failure or delay by the DIP Lender in exercising any right or power hereunder or under any other DIP Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the DIP Lender hereunder and under any other DIP Loan Document are cumulative and are not exclusive of any rights or remedies that it would otherwise have. No waiver of any provision of any DIP Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the DIP Lender may have had notice or knowledge of such Default at the time.

(b)    Neither this DIP Credit Agreement nor any other DIP Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this DIP Credit Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the DIP Lender, or (ii) in the case of any other DIP Loan Document, pursuant to an agreement or agreements in writing entered into by the DIP Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.  Expenses; Indemnity; Damage Waiver.

(a)    The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the DIP Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel (including, without limitation, local counsel) for the DIP Lender, in connection with the credit facilities provided for herein, the preparation and administration of the DIP Loan Documents and any amendments, modifications or waivers of the provisions of the DIP Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) reasonable out-of-pocket expenses incurred by the DIP Lender in connection with the issuance, amendment, renewal or extension of the Prepetition Letter of Credit or any demand for payment thereunder and (iii) out-of-pocket expenses incurred by the DIP Lender, including the fees, charges and disbursements of any counsel for the DIP Lender, in connection with the Chapter 11 Cases and/or the enforcement, collection or protection of its rights in connection with the DIP Loan Documents, including its rights under this Section, or in connection with the Loans made or the Prepetition Letter of Credit, including all such out-of-pocket expenses incurred in the Chapter 11 Cases and during any restructuring or negotiations in respect of such Loans or the Prepetition Letter of Credit. Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with: (A)

appraisals and insurance reviews; (B) field examinations and the preparation of Reports based on the fees charged by a third party retained by the DIP Lender or the internally allocated fees for each Person employed by the DIP Lender with respect to each field examination; (C) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the DIP Lender; (D) Taxes, fees and other charges for (1) lien and title searches and title insurance and (2) filing financing statements and continuations, recording any Mortgages, and other actions to perfect, protect, and continue the DIP Lender's Liens; (E) sums paid or incurred to take any action required of any Loan Party under the Financing Order or DIP Loan Documents that such Loan Party fails to pay or take; and (F) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral. All of the foregoing fees, costs and expenses may be charged to the Borrower as Revolving Loans or to another deposit account, all as described in Section 2.17(c).

(b)    The Loan Parties, jointly and severally, shall indemnify the DIP Lender, and each Related Party of the DIP Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the filing of the Chapter 11 Cases, (ii) the execution or delivery of the DIP Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iii) any Loan or the Prepetition Letter of Credit or the use of the proceeds therefrom (including any refusal by the DIP Lender to honor a demand for payment under the Prepetition Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of the Prepetition Letter of Credit), (iv) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (v) the failure of a Loan Party to deliver to the DIP Lender the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.16, or (vi) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)    To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this DIP Credit Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the Prepetition Letter of Credit or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)    All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.04.    <u>Successors and Assigns.</u>

(a)    The provisions of this DIP Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the DIP Lender), except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the DIP Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this DIP Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the DIP Lender) any legal or equitable right, remedy or claim under or by reason of this DIP Credit Agreement.

(b)    The DIP Lender may assign to one or more Persons all or a portion of its rights and obligations under this DIP Credit Agreement (including all or a portion of the Revolving Commitment and the Loans at the time outstanding hereunder). Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the DIP Lender under this DIP Credit Agreement, and the DIP Lender shall, to the extent of the interest assigned, be released from its obligations under this DIP Credit Agreement (and, in the case of an assignment covering all of the DIP Lender's rights and obligations under this DIP Credit Agreement, the DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16 and 8.03). The Borrower and each other Loan Party hereto hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this DIP Credit Agreement to provide for multiple lenders and an administrative agent to act on behalf of such lenders. Any assignment or transfer by the DIP Lender of rights or obligations under this DIP Credit Agreement that does not comply with this paragraph shall be treated for purposes of this DIP Credit Agreement as a sale by the DIP Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(c)    The DIP Lender may, without the consent of, or notice to, the Borrower, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of the DIP Lender's rights and obligations under this DIP Credit Agreement (including all or a portion of the Revolving Commitment and/or the Loans outstanding hereunder); provided that (i) the DIP Lender's obligations under this DIP Credit Agreement shall remain unchanged, (ii) the DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the DIP Lender in connection with the DIP Lender's rights and obligations under this DIP Credit Agreement. Subject to paragraph (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14 and 2.16 (subject to the requirements and limitations therein) to the same extent as if it were the DIP Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14 or 2.16, with respect to any participation, than its participating the DIP Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were the DIP Lender. If the DIP Lender shall sell a participation, it shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in

the Loans or other obligations under this DIP Credit Agreement or any other DIP Loan Document (the "Participant Register"); provided that the DIP Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in the Revolving Commitment, the Loans, the Prepetition Letter of Credit or its other obligations under any DIP Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such interest in the Revolving Commitment, the Loans, the Prepetition Letter of Credit or other obligations is in registered form under Section 5f. 103-1 (c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the DIP Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this DIP Credit Agreement notwithstanding any notice to the contrary.

(d)     The DIP Lender may at any time pledge or assign a security interest in all or any portion of its rights under this DIP Credit Agreement to secure obligations of the DIP Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the DIP Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the DIP Lender as a party hereto.

SECTION 8.05.  Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the DIP Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this DIP Credit Agreement or any other DIP Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the DIP Loan Documents and the making of any Loans and maintenance of the Prepetition Letter of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the DIP Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this DIP Credit Agreement is outstanding and unpaid or the Prepetition Letter of Credit is outstanding and so long as the Revolving Commitment has not expired or terminated. The provisions of Sections 2.14, 2.16 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Prepetition Letter of Credit and the Revolving Commitment or the termination of this DIP Credit Agreement or any other DIP Loan Document or any provision hereof or thereof.

SECTION 8.06.   Counterparts; Integration; Effectiveness; Electronic Execution.

(a)     This DIP Credit Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This DIP Credit Agreement, the other DIP Loan Documents and any separate letter agreements with respect to fees payable to the DIP Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this DIP Credit Agreement shall become effective when it shall have been executed by the DIP Lender and when the DIP Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. To the extent of any conflict between the terms of the Financing Order and the terms of this DIP Credit Agreement, the terms of the Financing Order shall govern and control.

(b)     Delivery of an executed counterpart of a signature page of (i) this DIP Credit Agreement, (ii) any other DIP Loan Document and/or (iii) any document, amendment, approval, consent,

information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 8.01), certificate, request, statement, disclosure or authorization related to this DIP Credit Agreement, any other DIP Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this DIP Credit Agreement, such other DIP Loan Document or such Ancillary Document, as applicable.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Credit Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the DIP Lender to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (A) to the extent the DIP Lender has agreed to accept any Electronic Signature, the DIP Lender shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (B) upon the request of the DIP Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Loan Party hereby (w) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the DIP Lender and the Loan Parties, Electronic Signatures transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this DIP Credit Agreement, any other DIP Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (x) the DIP Lender may, at its option, create one or more copies of this DIP Credit Agreement, any other DIP Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of its business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (y) waives any argument, defense or right to contest the legal effect, validity or enforceability of this DIP Credit Agreement, any other DIP Loan Document and/or any Ancillary Document based solely on the lack of paper original copies of this DIP Credit Agreement, such other DIP Loan Document and/or Ancillary Document, respectively, including with respect to any signature pages thereto and (z) waives any claim against any DIP Lender-Related Person for any Liabilities arising solely from the DIP Lender's reliance on or use of Electronic Signatures and/or transmission by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 8.07.  Severability. Any provision of any DIP Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08.  Right of Setoff. Subject to the terms and conditions of the Financing Order, the DIP Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the DIP Lender or such Affiliate to or for the credit or the account of the Borrower or any Loan Guarantor against any and all of

the DIP Obligations held by the DIP Lender or such Affiliate, irrespective of whether or not the DIP Lender shall have made any demand under the DIP Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of the DIP Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness. The rights of the DIP Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the DIP Lender and its Affiliates may have.

SECTION 8.09.   <u>Governing Law; Jurisdiction; Consent to Service of Process.</u>

(a)     This DIP Credit Agreement and the other DIP Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the State of New York, but giving effect to federal laws applicable to national banks.

(b)     Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York State court sitting in New York, New York and the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any DIP Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the DIP Lender or any of its Related Parties may only) be heard and determined in the courts of the State of New York or, to the extent permitted by law, in such federal court and each of the parties agrees to waive any rights it may have to object to adjudication by a judge of the Bankruptcy Court on the basis of a right to have matters adjudicated in front of an Article III judge. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this DIP Credit Agreement or any other DIP Loan Document shall affect any right that the DIP Lender may otherwise have to bring any action or proceeding relating to this DIP Credit Agreement or any other DIP Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)     Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this DIP Credit Agreement or any other DIP Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this DIP Credit Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this DIP Credit Agreement or any other DIP Loan Document will affect the right of any party to this DIP Credit Agreement to serve process in any other manner permitted by law.

SECTION 8.10.   <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS DIP CREDIT AGREEMENT, ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY

WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS DIP CREDIT AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11.  <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this DIP Credit Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this DIP Credit Agreement.

SECTION 8.12.  <u>Confidentiality</u>. The DIP Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested or required by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) having jurisdiction over the DIP Lender, (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this DIP Credit Agreement, (e) in connection with the Chapter 11 Cases, or the exercise of any remedies under this DIP Credit Agreement or any other DIP Loan Document or any suit, action or proceeding relating to this DIP Credit Agreement or any other DIP Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this DIP Credit Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower, (h) to holders of Equity Interests in the Borrower, (i) to any Person providing a Guarantee of all or any portion of the DIP Obligations or (j) to the extent such Information (i) becomes publicly available pursuant to the Chapter 11 Cases or otherwise than as a result of a breach of this Section or (ii) becomes available to the DIP Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available pursuant to the Chapter 11 Cases or is otherwise available to the DIP Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13.  <u>Nonreliance; Violation of Law</u>. The DIP Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein. Anything contained in this DIP Credit Agreement to the contrary notwithstanding, the DIP Lender shall not be obligated to extend credit to the Borrower in violation of any Requirement of Law.

SECTION 8.14.  <u>USA PATRIOT Act</u>. The DIP Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the DIP Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15.  <u>Disclosure</u>. Each Loan Party hereby acknowledges and agrees that the DIP Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16.  Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the DIP Lender in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the DIP Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by the DIP Lender.

SECTION 8.17.  Marketing Consent. The Borrower hereby authorizes the DIP Lender, at its sole expense, but without any prior approval by the Borrower, to publish such tombstones and give such other publicity to this DIP Credit Agreement as it may from time to time determine in its sole discretion. The foregoing authorization shall remain in effect unless and until the Borrower notifies the DIP Lender in writing that such authorization is revoked.

SECTION 8.18.  Termination.  This DIP Credit Agreement and all of the other DIP Loan Documents shall automatically terminate upon Payment in Full, other than such terms as expressly survive termination.  At any time on or after Payment in Full, promptly following the Borrower's request, the DIP Lender shall execute and deliver such documents and agreements requested by the Borrower to evidence the termination of this Agreement and any of the other DIP Loan Documents and reasonably necessary or desirable to release and terminate the security interest and Liens created under any of the DIP Loan Documents, in each case at the sole cost and expense of the Borrower.

SECTION 8.19.  No Fiduciary Duty, etc. The Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the DIP Lender will not have any obligations except those obligations expressly set forth herein and in the other DIP Loan Documents and the DIP Lender is acting solely in the capacity of an arm's length contractual counterparty to the Borrower with respect to the DIP Loan Documents and the transaction contemplated therein and not as a financial advisor or a fiduciary to, or an agent of, the Borrower or any other person. The Borrower agrees that it will not assert any claim against the DIP Lender based on an alleged breach of fiduciary duty by the DIP Lender in connection with this DIP Credit Agreement and the transactions contemplated hereby. Additionally, the Borrower acknowledges and agrees that the DIP Lender is not advising the Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction. The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the DIP Lender shall have no responsibility or liability to the Borrower with respect thereto. The Borrower further acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the DIP Lender, together with its affiliates, is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, the DIP Lender may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, the Borrower and other companies with which the Borrower may have commercial or other relationships. With respect to any securities and/or financial instruments so held by the DIP Lender or any of its customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the DIP Lender and its affiliates may be providing debt financing, equity capital or other services (including

financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. The DIP Lender will not use confidential information obtained from the Borrower by virtue of the transactions contemplated by the DIP Loan Documents or its other relationships with the Borrower in connection with the performance by the DIP Lender of services for other companies, and the DIP Lender will not furnish any such information to other companies. The Borrower also acknowledges that the DIP Lender has no obligation to use in connection with the transactions contemplated by the DIP Loan Documents, or to furnish to the Borrower, confidential information obtained from other companies.

SECTION 8.20. <u>Release</u>. Effective upon entry of the Final Financing Order, each Debtor, on behalf of itself, its estate and its successors, assigns and other legal representatives (including any successor, trustee, or other estate representative in the Chapter 11 Cases or any Successor Cases, and any party acting by, through, or under such Debtor or its estate), each other Loan Party, on behalf of itself and its successors, assigns and other legal representatives, and the Individual Guarantor, on behalf of himself and his heirs, successors, assigns and other legal representatives (collectively, "<u>Releasors</u>" and, individually, a "<u>Releasor</u>"): (a) hereby absolutely, unconditionally and irrevocably releases, remises, acquits, and forever discharges the DIP Lender and its successors and assigns, and its affiliates, subsidiaries, predecessors, directors, officers, shareholders, attorneys, employees, agents, professionals and other representatives (collectively, "<u>Releasees</u>" and, individually, a "<u>Releasee</u>"), of and from all demands, actions, causes of action, suits, controversies, sums of money, accounts, bills, reckonings, damages, expenses (including, without limitation, reasonable attorneys' fees) and any and all other claims, counterclaims, defenses, rights of setoff, debts, liens, demands and liabilities of every kind or nature (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any Releasor now has, ever had or hereafter may have against the Releasees based on any act, transaction or circumstance, action, cause or thing whatsoever that has occurred or has been consummated on or before the closing of the DIP Credit Agreement and that arise out of or relate to (i) the DIP Facility or any other extension of credit by the DIP Lender to the Borrower or any other Loan Party including any equitable subordination or recharacterization claims or defenses; (ii) any of the DIP Loan Documents or the Collateral; (iii) any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents; or (iv) any aspect of the dealings or relationships between or among the Releasors, on the one hand, and the Releasees on the other hand, under or in connection with any of the DIP Loan Documents or any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents (collectively, "<u>Claims</u>"); (b) hereby irrevocably waives any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DIP Obligations, the DIP Loan Documents and the Liens granted in favor of the DIP Lender securing the DIP Obligations; and (c) hereby absolutely, unconditionally and irrevocably covenants and agrees with and in favor of each Releasee that such Releasor shall not sue any Releasee on the basis of any Claim released, remised and discharged pursuant to the foregoing clauses of this Section 8.20, and if any Releasor violates the foregoing covenant, such Releasor, for itself and its successors and assigns, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation. Each Releasor understands, acknowledges and agrees that the release set forth in this Section 8.20 may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release. Each Releasor further agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth in this Section 8.20. For the avoidance of doubt, nothing contained in this Section 8.20 shall be construed to release, discharge or acquit the DIP Lender from any of the DIP Lender's obligations hereunder or under the DIP Loan Documents. The provisions of this paragraph shall survive the termination of the DIP Facility and any other DIP Loan Documents and payment in full of the DIP Obligations.

## ARTICLE IX
## LOAN GUARANTY

SECTION 9.01.  <u>Guaranty</u>. Each Loan Guarantor (including, without limitation, the Individual Guarantor) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the DIP Obligations and the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts), and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the DIP Lender in endeavoring to collect all or any part of the Prepetition Obligations (including Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) or the DIP Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor, or any other guarantor of all or any part of the Prepetition Obligations (including Reinstated Prepetition Obligations then outstanding and Allowable 506(b) Amounts) or the DIP Obligations (such costs and expenses, together with the Prepetition Obligations (including Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) and the DIP Obligations, collectively the "<u>Guaranteed Obligations</u>"). Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from any Loan Guarantor, and that each Loan Guarantor remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the DIP Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02.  <u>Guaranty of Payment</u>. This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Guarantor waives any right to require the DIP Lender to sue the Borrower, any other Loan Guarantor, any other guarantor of, or any other Person obligated for, all or any part of the Guaranteed Obligations (each, an "<u>Obligated Party</u>"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03.  <u>No Discharge or Diminishment of Loan Guaranty.</u>

(a)  Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the DIP Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)  The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)      Further, none of the obligations of any Loan Guarantor hereunder shall be discharged or impaired or otherwise affected by: (i) the failure of the DIP Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the DIP Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

SECTION 9.04.  Defenses Waived. To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Loan Guarantor, or any other Obligated Party other than the Payment in Full of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person. Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder. The DIP Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of any Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been Paid in Full. To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any other Obligated Party or any security.

SECTION 9.05.  Rights of Subrogation. Notwithstanding anything to the contrary contained in this DIP Credit Agreement or in any other agreement or other document between any Loan Guarantor or the Borrower, each Loan Guarantor covenants and agrees that any Indebtedness of the Borrower owing to such Loan Guarantor and all obligations of the Borrower to make any payments of principal or interest in respect of any such Indebtedness and any right of any Loan Guarantor to receive payments in respect of any such Indebtedness, are expressly junior and subordinate to the DIP Obligations until the indefeasible payment in full of all DIP Obligations (and the termination of all commitments to lend in respect thereof).  The Borrower shall not make, nor shall any Loan Guarantor accept, retain, accrue or receive, any payments in respect of any Indebtedness owing from or on behalf of the Borrower so long as any Event of Default shall have occurred and be continuing; provided, that, solely to the extent an Event of Default is not continuing, the Borrower shall be permitted to make such payments in the ordinary course of business and the Loan Guarantors shall be permitted to receive and retain such payments.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Borrower, the Loan Guarantors have fully performed all their obligations to the DIP Lender.

SECTION 9.06.  <u>Reinstatement; Stay of Acceleration</u>. If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Obligated Party or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the DIP Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Obligated Party, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the DIP Lender.

SECTION 9.07.  <u>Information</u>. Each Loan Guarantor assumes all responsibility for being and keeping itself informed of each Obligated Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the DIP Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08.  <u>Termination</u>. The DIP Lender may continue to make loans or extend credit to the Borrower and each Loan Guarantor shall remain obligated under this Loan Guaranty until five days after the DIP Lender receives written notice of termination from any Loan Guarantor. Notwithstanding receipt of any such notice, (a) such notifying Loan Guarantor will continue to be liable to the DIP Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations, and (b) each  Loan Guarantor (other than the notifying Loan Guarantor) shall continue to remain liable to the DIP Lender for any Guaranteed Obligations created, assumed or committed notwithstanding any such notification. Nothing in this Section 9.08 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the DIP Lender may have in respect of, any Default or Event of Default that shall exist under Article VII hereof as a result of any such notice of termination.

SECTION 9.09.  <u>Taxes</u>. Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law. If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law. If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the DIP Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10.  <u>Maximum Liability</u>. Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law. In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 9.11.  Contribution.

(a)    To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the Payment in Full of the Guaranteed Obligations and the termination of this DIP Credit Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, all other Loan Guarantors for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)    As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)    This Section 9.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 9.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)    The parties hereto acknowledge that the rights of contribution and indemnification of each Loan Guarantor hereunder shall constitute assets of such Loan Guarantor to which such rights of contribution and indemnification are owing.

(e)    The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 9.11 shall be exercisable after the Payment in Full of the Guaranteed Obligations and the termination of this DIP Credit Agreement.

SECTION 9.12.  Liability Cumulative. The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be cumulative with all liabilities of each Loan Party to the DIP Lender under this DIP Credit Agreement and the other DIP Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

**(Signature Page Follows)**

IN WITNESS WHEREOF, the parties hereto have caused this DIP Credit Agreement to be duly executed and delivered by their respective authorized officers as of the day and year first above written.

**<u>BORROWER:</u>**

DIAMOND COMIC DISTRIBUTORS, INC.

By:_____
Name:_____
Title: _____

**<u>OTHER LOAN PARTIES:</u>**

COMIC EXPORTERS, INC.

By:_____
Name:_____
Title: _____

COMIC HOLDINGS, INC.

By:_____
Name:_____
Title: _____

DIAMOND SELECT TOYS AND COLLECTIBLES, LLC

By:_____
Name:_____
Title: _____

DIAMOND COMIC DISTRIBUTORS, an unlimited liability company incorporated under the laws of England and Wales

By:_____
Name:_____
Title: _____

ROSEBUD ENTERTAINMENT, LLC


By:_____
Name:_____
Title: _____


RENEGADE GAMES, LLC


By:_____
Name:_____
Title: _____


GAME CONSOLIDATORS, LLC


By:_____
Name:_____
Title: _____


**<u>INDIVIDUAL GUARANTOR:</u>**


_____
Stephen A. Geppi, individually

**<u>DIP LENDER:</u>**

JPMORGAN CHASE BANK, N.A.


By:_____

Name:_____

Title: _____

### Definitions Schedule

"Acceptable Payment Collection Service Provider" means UPS Capital or any other payment collection service provider reasonably acceptable to the DIP Lender that collects payments on behalf of the Borrower from certain Account Debtors of the Borrower that are required to remit payment for goods sold by the Borrower to such Account Debtors contemporaneous with the delivery of such goods to such Account Debtors; provided that no Person (including UPS Capital) shall be deemed to be an Acceptable Payment Collection Service Provider unless and until such Person shall have entered into an Acceptable Payment Collection Service Provider Agreement.

"Acceptable Payment Collection Service Provider Agreement" means an agreement in form and substance reasonably acceptable to the DIP Lender among the Borrower, an Acceptable Payment Collection Service Provider, and the Prepetition Lender, whereby such Acceptable Payment Collection Service Provider (a) acknowledges that the Borrower has granted Liens in favor of the Prepetition Lender on all rights of the Borrower to payments owing from such Acceptable Payment Collection Service Provider in respect of amounts collected by such Acceptable Payment Collection Service Provider to the Borrower, and (b) agrees to exclusively follow all written instructions given to such Acceptable Payment Collection Service Provider by the Prepetition Lender with respect to any and all payments required to be paid to the Borrower in respect of amounts collected by such Acceptable Payment Collection Service Provider from Account Debtors of the Borrower.

"Account" has the meaning assigned to such term in the UCC.

"Account Debtor" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Effective Date, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Adjusted REVSOFR30 Rate" means an interest rate per annum equal to (a) the REVSOFR30 Rate plus (b) 0.1%; provided that (x) if the Adjusted REVSOFR30 Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this DIP Credit Agreement and (y) if the REVSOFR30 Rate shall not be available, then the Adjusted REVSOFR30 Rate shall be equal to the CB Floating Rate (unless an Alternate Rate shall have been established in accordance with Section 2.13).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Affiliated Person Subordination Agreement" means the Affiliated Person Subordination Agreement dated as of the Prepetition Facility Effective Date by and among the Affiliated Persons and the Prepetition Lender, as the same may be amended, modified, supplemented, restated, amended and restated, ratified or confirmed from time to time.

"<u>Affiliated Persons</u>" means Stephen A. Geppi (together with members of his immediate family, trusts established for the benefit of members of his immediate family, his descendants and his beneficiaries), SG Resource LLC, Armory, Gemstone Publishing, Inc., Diamond International Galleries, LLC, Diamond Select, E. Gerber Products, LLC, Mamanook I, LLC, Mid-Atlantic Acquisition I, LLC, Game Consolidators, Renegade, DST Investments, LLC and any other entity (other than a Loan Party) that is owned or controlled by Stephen A. Geppi or by any member of his immediate family, or by any trust established by his immediate family.

"<u>Agency Goods</u>" means all comic books, trade paperbacks, art books, soft-cover and hard cover books, games, toys, statues, posters, collectibles, merchandise and other goods distributed and sold by the Borrower pursuant to an Agency Goods Distribution Agreement that provides for the Agency Supplier to retain title to such books, paperbacks, games, toys, statutes, posters, collectibles, merchandise and other goods until such time as they are sold to a DCD Customer.

"<u>Agency Goods Distribution Agreements</u>" means any agreement between the Borrower and a publisher or supplier of Agency Goods that provides for the Borrower to act as the distributor of Agency Goods and for title to such Agency Goods to remain with the publisher or supplier until such Agency Goods are sold to a DCD Customer.

"<u>Agency Suppliers</u>" means any publisher or supplier of Agency Goods that enters into an Agency Goods Distribution Agreement with the Borrower.

"<u>Agency Supplier Subordination Letter Agreements</u>" means the letter agreements dated on or before the Prepetition Effective Date by the Prepetition Lender and each Agency Supplier (and any similar letter agreements executed on or after the Prepetition Effective Date), pursuant to which the Agency Suppliers acknowledged and agreed that the Borrower (x) owns all Accounts arising from the sale of the Agency Goods to DCD Customers, and (y) all security interests, liens, rights or other interests the Agency Suppliers have in any Accounts arising from the sale of Agency Goods to DCD Customers are subordinated and junior in priority to security interests, liens, rights and other interests of the Prepetition Lender in such Accounts.

"<u>Aggregate Credit Obligations</u>" means, at any time, the sum at such time of (a) the aggregate outstanding Prepetition Obligations (including, without limitation, all Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts), and (b) the aggregate outstanding DIP Obligations.

"<u>Aggregate Sale Proceeds</u>" means the aggregate gross proceeds received by the Debtors from the Sale Transaction and all other asset sales consummated prior to the Success Fee Payment Date.

"<u>Allowable 506(b) Amounts</u>" means, to the extent allowable under Bankruptcy Code section 506(b), interest at the default rate of interests as set forth in Section 2.12(d) of the Prepetition Credit Agreement, all fees, costs, expenses, and other charges due or coming due under the Prepetition Documents or in connection with the Prepetition Obligations (regardless of whether such fees, costs, interest and other charges are included in the Budget), and all costs and expenses at any time incurred by Prepetition Lender in connection with (a) the negotiation, preparation and submission of the Financing Order and any other order or document related to the Financing Order, and (b) the representation of the Prepetition Lender in the Chapter 11 Cases, including in defending any Challenge.

"<u>Alternative Currency</u>" means Canadian Dollars, Pounds Sterling, Euros and any additional currencies determined after the Effective Date by mutual agreement of the Borrower and the DIP Lender; provided that each such currency is a lawful currency that is readily available, freely transferable and not restricted, able to be converted into dollars and available in the interbank deposit market.

-2-

"Alternative Rate" has the meaning assigned to it in Section 2.13(c).

"Ancillary Document" has the meaning assigned to such term in Section 8.06(b).

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to any of the Loan Parties or any of their Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Margin" means a percentage rate per annum equal to four and one-half percent (4.50%).

"Approved Budget" means the "Budget" approved by the DIP Lender and in effect from time to time as defined in the Financing Order, including each updated Budget delivered to, and approved by, the DIP Lender as provided in the Reporting Schedule attached hereto.  A copy of the initial Approved Budget is attached to the DIP Credit Agreement as **Exhibit A**.

"Approved Plan" means a confirmed Chapter 11 plan with respect to the Debtors in the Chapter 11 Cases, in form and substance approved by the DIP Lender.

"Availability" means, at any time, an amount equal to (a) the lesser of (i) (A) prior to the entry of the Final Financing Order, the Maximum Interim Facility Amount and (B) from and after the entry of the Final Financing Order, the Maximum DIP Facility Amount, and (ii) the Borrowing Base at such time minus (b) the Aggregate Credit Obligations outstanding at such time.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commitment.

"Available Revolving Commitment" means, at any time, the Revolving Commitment minus the Aggregate Credit Obligations.

"Avoidance Action" means any and all claims and causes of action of any Debtor's estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payment" has the meaning set forth in Section 2.10(f) of this DIP Credit Agreement.

"Banking Services" means each and any of the following bank services provided to any Loan Party by the DIP Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts, cash pooling services, and interstate depository network services), and (e) Lease Financing.

"Banking Services Obligations" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services, provided, however, Banking Services Obligations in respect of Lease Financing shall be limited to Lease Deficiency Obligations.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

-3-

"Bankruptcy Court" has the meaning assigned to such term in the Recitals.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the REVSOFR30 Rate:

(a)    a public statement or publication of information by or on behalf of the CME Term SOFR Administrator (or any successor administrator of the REVSOFR30 Rate, or the published component used in the calculation thereof) announcing that such CME Term SOFR Administrator has ceased or will cease to provide the REVSOFR30 Rate (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the REVSOFR30 Rate (or such component thereof); or

(b)    a public statement or publication of information by the NYFRB, the Federal Reserve Board, or, as applicable, the regulatory supervisor for the CME Term SOFR Administrator, an insolvency official with jurisdiction over the CME Term SOFR Administrator, a resolution authority with jurisdiction over the CME Term SOFR Administrator, or a court or an entity with similar insolvency or resolution authority over the CME Term SOFR Administrator, in each case, which states that the CME Term SOFR Administrator (or any successor administrator of the REVSOFR30 Rate, or the published component used in the calculation thereof) has ceased or will cease to provide the REVSOFR30 Rate (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the REVSOFR30 Rate (or such component thereof); or

(c)    a public statement or publication of information by the Federal Reserve Board, the NYFRB, the CME Term SOFR Administrator, or the regulatory supervisor for the CME Term SOFR Administrator (or any successor administrator of the REVSOFR30 Rate, or the published component used in the calculation thereof), announcing that the REVSOFR30 Rate (or such component thereof) is no longer, or as of a specified future date will no longer be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to the REVSOFR30 Rate if a public statement or publication of information set forth above has occurred with respect to each then-current available tenor of the REVSOFR30 Rate.

"Beneficial Ownership Certification" means a certification regarding the beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Bidding Procedures" means, a set of processes and procedures governing the sale and marketing process for the sale of all or substantially all of the Debtors' assets, which procedures shall be in form and substance reasonably acceptable to the DIP Lender.

"BMO Deposit Account Threshold Amount" means $100,000.

"BMO Deposit Accounts" means the Borrower's two Deposit Accounts maintained with Bank of Montreal in Canada with account numbers XXXXXX2025, and XXXXXX0859.

"Borrower" has the meaning assigned to such term in the Recitals hereto.

"Borrowing" means (a) Revolving Loans of the same Type, made, converted or continued on the same date, or (b) a Protective Advance.

"<u>Borrowing Base Certificate</u>" means a certificate, signed and certified as accurate and complete by a Financial Officer of the Borrower, in form which is acceptable to the DIP Lender in its sole discretion.

"<u>Borrowing Request</u>" means a request by the Borrower for a Revolving Borrowing in accordance with Section 2.03.

"<u>Burdensome Restriction</u>" means any consensual encumbrance or restriction of the type described in Section 6.10.

"<u>Business Day</u>" means any day (other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed); provided that, when determining the Term SOFR Reference Rate used in connection with a Loan accruing interest at the Adjusted REVSOFR30 Rate without giving effect to the proviso contained in the definition for "REVSOFR30 Rate", the term "Business Day" shall also exclude any day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>Canadian Dollars</u>" means the lawful currency of Canada.

"<u>Capital Lease Obligations</u>" has the meaning assigned to such term in the Financial Covenants Schedule attached hereto.

"<u>Carveout</u>" has the meaning assigned to such term in the Financing Order.

"<u>Cash Collateral</u>" has the meaning assigned to such term in the Financing Order.

"<u>Cash Management Order</u>" means that certain order entered in the Chapter 11 Cases authorizing Debtors to continue using their current Cash Management Services, in form and substance reasonably satisfactory to the DIP Lender.

"<u>CB Floating Rate</u>" means the greater of the Prime Rate or 2.5%. Any change in the CB Floating Rate due to a change in the Prime Rate shall be effective from and including the effective date of such change in the Prime Rate.

"<u>CBFR</u>", when used in reference to: (a) a rate of interest, refers to the Adjusted REVSOFR30 Rate, and (b) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Adjusted REVSOFR30 Rate.

"<u>Challenge</u>" means a claim or cause of action challenging the extent, validity, perfection, priority or enforceability of the Prepetition Debt, the Prepetition Liens or any other claims or causes of action against Prepetition Lender, which any Committee, or another party-in-interest may bring, in the Chapter 11 Cases.

"<u>Change in Law</u>" means the occurrence after the date of this DIP Credit Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by the DIP Lender (or, for purposes of Section 2.14(b), by any lending office of the DIP Lender or by the DIP Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this DIP Credit Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation

thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning assigned to such term in the Recitals.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is a Revolving Loan or a Protective Advance.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited as administrator of the forward looking term SOFR (or a successor administrator).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the DIP Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the DIP Lender, on behalf of the Secured Parties, to secure the DIP Obligations.

"Collateral Access Agreement" has the meaning assigned to such term in the Security Agreement.

"Collateral Deposit Account" has the meaning assigned to such term in the Security Agreement.

"Comic Exporters" has the meaning assigned to such term in the recitals to this DIP Credit Agreement.

"Comic Holdings" has the meaning assigned to such term in the recitals to this DIP Credit Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Committee" means any official committee appointed in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102.

"Compliance Certificate" has the meaning assigned to such term in the Reporting Schedule.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" has the meaning assigned to such term in the Security Agreement.

"DCD Customer" means any direct market customer, mass market bookstore, other bookstore, hobby shop, novelty store, specialty retailer or other person or entity to whom the Borrower sells comic books, trade paperbacks, art books, soft-cover and hard cover books, games, toys, statues, posters, collectibles, merchandise and other goods.

-6-

"<u>DCDUK</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>DCDUK Share Pledge Agreement</u>" means the Share Pledge Agreement from Comic Exporters and Comic Holdings in favor of the Prepetition Lender with respect to all outstanding shares of DCDUK dated as of the Prepetition Facility Effective Date, as the same may be amended, modified, supplemented, restated, amended and restated, ratified or confirmed from time to time.

"<u>Debtors</u>" has the meaning assigned to such term in the Recitals.

"<u>Default</u>" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>Deposit Account</u>" has the meaning assigned to such term in the UCC.

"<u>Diamond Select</u>" has the meaning assigned to such term in the recitals to this Agreement.

"<u>DIP Collateral Documents</u>" means, collectively, the Security Agreement, the Pledge Agreement (as ratified, amended and reaffirmed), the DCDUK Share Pledge Agreement (as ratified, amended and reaffirmed), the Affiliated Person Subordination Agreement(as ratified, amended and reaffirmed), the Agency Supplier Subordination Letter Agreements, the Acceptable Payment Collection Service Provider Agreements, and any other agreements, instruments and documents executed in connection with this DIP Credit Agreement that are intended to create, perfect or evidence Liens to secure the DIP Obligations, including, without limitation, all other security agreements, pledge agreements, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the DIP Lender.

"<u>DIP Facility</u>" has the meaning assigned to such term in the Recitals.

"<u>DIP Loan Documents</u>" means, collectively, this DIP Credit Agreement, the Financing Order, any promissory notes issued pursuant to this DIP Credit Agreement, any agreement relating to the Prepetition Letter of Credit, the DIP Collateral Documents, the Loan Guaranty, any Obligation Guaranty, and all other agreements, instruments, documents and certificates identified in or contemplated by Section 4.01 executed and delivered to, or in favor of, the DIP Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements, letter of credit applications and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the DIP Lender in connection with this DIP Credit Agreement or the transactions contemplated hereby. Any reference in this DIP Credit Agreement or any other DIP Loan Document to a DIP Loan Document shall include all appendices, exhibits, riders or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, all waivers thereunder, and shall refer to this DIP Credit Agreement or such other DIP Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>DIP Obligations</u>" means (a) all unpaid principal of and accrued and unpaid interest on the Loans, all LC Exposure, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of the Chapter 11 Cases or any other bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to the DIP

Lender or any indemnified party individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this DIP Credit Agreement or any of the other DIP Loan Documents or in respect of any of the Loans made or reimbursement or other obligations incurred or the Prepetition Letter of Credit or other instruments at any time evidencing any thereof, and (b) all Banking Services Obligations owing to the DIP Lender or its Affiliates.

"Disclosed Matters" means the actions, suits and proceedings and other matters disclosed in Section 3.06 of the Disclosure Schedule.

"Disclosure Schedule" means the disclosure schedule attached hereto or intended to be attached hereto.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (in one transaction or in a series of transactions and whether effected pursuant to a Division or otherwise) of any property by any Person (including any sale and leaseback transaction and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dividing Person" has the meaning assigned to it in the definition of "Division."

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Division Successor" means any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"Document" has the meaning assigned to such term in the UCC.

"dollars" or "$" refers to lawful money of the United States of America.

"Dollar Equivalent" means, for any amount, at the time of determination thereof, (a) if such amount is expressed in dollars, such amount, (b) if such amount is expressed in an Alternative Currency, the equivalent of such amount in dollars determined by using the rate of exchange for the purchase of dollars with the Alternative Currency in the London foreign exchange market at or about 11:00 a.m. London time (or New York time, as applicable) on a particular day as displayed by ICE Data Services as the "ask price", or as displayed on such other information service which publishes that rate of exchange from time to time in place of ICE Data Services (or if such service ceases to be available, the equivalent of such amount in dollars as determined by the DIP Lender using any method of determination it deems appropriate in its sole discretion) and (c) if such amount is denominated in any other currency, the equivalent of such amount in dollars as determined by the DIP Lender using any method of determination it deems appropriate in its sole discretion.

"Domestic Subsidiary" means a Subsidiary organized under the laws of a jurisdiction located in the U.S.

-8-

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 8.02).

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Electronic System" means any electronic system, including e-mail, e-fax, web portal access for the Borrower, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the DIP Lender or any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"Eligible Accounts" has the meaning assigned to such term in the Borrowing Base Schedule attached hereto.

"Eligible Inventory" has the meaning assigned to such term in the Borrowing Base Schedule attached hereto.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (i) the environment, (ii) preservation or reclamation of natural resources, (iii) the management, Release or threatened Release of any Hazardous Material or (iv) health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning assigned to such term in the UCC.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure of any Plan to satisfy the "minimum funding standard" (as defined in Section 412

of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any Plan of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"Euro" means the single currency of the member states of the European Union relating to Economic and Monetary Union.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the DIP Lender or required to be withheld or deducted from a payment to the DIP Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the DIP Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, and (b) any withholding Taxes imposed under FATCA.

"Extenuating Circumstance" means any period during which the DIP Lender has determined in its sole discretion (a) that due to unforeseen and/or nonrecurring circumstances, it is impractical and/or not feasible to submit or receive a Borrowing Request by email or fax or through Electronic System, and (b) to accept a Borrowing Request telephonically.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this DIP Credit Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as shall be set forth on the Federal Reserve Bank of New York's Website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that, if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this DIP Credit Agreement.

"Federal Reserve Bank of New York's Website" means the website of the NYFRB at http://www.newyorkfed.org, or any successor source.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Filing Date" has the meaning assigned to such term in the Recitals.

"<u>Final Financing Order</u>" means the entry of a final order in form and substance (including with respect to any subsequent modifications made in response to any objections or comments made to the Bankruptcy Court) acceptable to the DIP Lender at the Final Hearing authorizing and approving the DIP Facility and the use of Cash Collateral, granting adequate protection, lies and superpriority administrative claims, modifying the automatic stay and granting related relief.

"<u>Final Hearing</u>" means the final hearing to be conducted in accordance with Fed. R. Bankr. P. 4001 on the motion to be filed by the Debtors seeking authority to use Cash Collateral and incur the DIP Facility.

"<u>Financing Order</u>" means, as applicable, the Interim Order and Final Financing Order, as the same may be amended or modified from time to time with the DIP Lender's written consent.

"<u>Financial Officer</u>" means the chief financial officer, chief accounting officer, treasurer or controller of any Loan Party, as applicable.

"<u>Floor</u>" means the benchmark rate floor, if any, provided in this DIP Credit Agreement initially (as of the execution of this DIP Credit Agreement, the modification, amendment or renewal of this DIP Credit Agreement or otherwise) with respect to the Adjusted Term SOFR Rate or the Adjusted REVSOFR30 Rate, as applicable.  For the avoidance of doubt, the initial Floor for each of the Adjusted Term SOFR Rate or the Adjusted REVSOFR30 Rate shall be 0%.

"<u>Foreign Subsidiary</u>" means a Subsidiary that is not a Domestic Subsidiary.

"<u>Funding Account</u>" means the deposit account of the Borrower to which the DIP Lender is authorized by the Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this DIP Credit Agreement.

"<u>GAAP</u>" means generally accepted accounting principles in the U.S.

"<u>Game Consolidators</u>" has the meaning assigned to such term in the recitals to this DIP Credit Agreement.

"<u>Governmental Authority</u>" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"<u>Guarantee</u>" of or by any Person (the "Guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"<u>Guaranteed Obligations</u>" has the meaning assigned to such term in Section 9.01.

-11-

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any earn-out (which for all purposes of this DIP Credit Agreement shall be valued at the maximum potential payable with respect to each such earn-out), (l) any other Off-Balance Sheet Liability of such Person, and (m) all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any DIP Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Individual Guarantor" has the meaning assigned to such term in the Recitals hereto.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interim Order" means that certain Interim Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief, entered on January [__], 2025 in the Chapter 11 Cases at docket number [      ].

"Interim Order Date" means the date of entry of the Interim Order by the Bankruptcy Court.

"Interest Payment Date" means the first Business Day of each calendar month and the Maturity Date.

"Inventory" has the meaning assigned to such term in the UCC.

-12-

"LC and Commercial Card Collateral Account" has the meaning assigned to such term in Section 2.05(g).

"LC and Commercial Card Collateral Amount" has the meaning assigned to such term in Section 2.05(g).

"LC Disbursement" means any payment made by the DIP Lender pursuant to the Prepetition Letter of Credit.

"LC Exposure" means, at any time, the sum of the Dollar Equivalent of (a) the aggregate undrawn amount of the Prepetition Letter of Credit at such time plus (b) the aggregate amount of all LC Disbursements relating to the Prepetition Letter of Credit that have not yet been reimbursed by or on behalf of the Borrower at such time.

"LC Sublimit" means a sublimit of the Revolving Commitment in the amount of $1,000,000.

"Lease Deficiency Obligation" means after default, repossession and disposition of the Equipment which is the subject of or which secures a Lease Financing, the amount, if any, by which (i) any and all obligations of the Loan Parties to a Lessor, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with a specific Lease Financing, exceeds (ii) the Net Proceeds realized by the Lessor upon the disposition of the Equipment which is the subject of or which secures the specific Lease Financing.

"Lease Financing" means (i) a lease of specific Equipment as defined in Article 2-A of the UCC, and (ii) a secured financing transaction secured by specific Equipment, whether that transaction is called a lease or a loan, entered into by any Loan Party with the DIP Lender or any of its Affiliates (in-this context, the "Lessor").

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Guarantor" means (a) each Loan Party other than the Borrower, and (b) the Individual Guarantor.

"Loan Guaranty" means Article IX of this DIP Credit Agreement and each separate Guarantee, in form and substance satisfactory to the DIP Lender, delivered by each Loan Guarantor.

"Loan Parties" means the Borrower, Comic Exporters, Comic Holdings, Diamond Select, DCDUK, Rosebud, Renegade, Game Consolidators and any other Person (excluding the Individual Guarantor) who becomes a party to this DIP Credit Agreement pursuant to a joinder agreement and their respective successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"Loans" means the loans and advances made by the DIP Lender pursuant to this DIP Credit Agreement, including any Revolving Loans and any Protective Advances.

"Margin Stock" means margin stock within the meaning of Regulations T, U and X, as applicable.

-13-

"Material Adverse Effect" means a material adverse effect on (a) the ability of any Loan Guarantor to perform its obligations under any of the DIP Loan Documents, (b) the ability of any Loan Party to operate its business in conformance with the then current Budget, (c) the value, cash flow or marketability of the Collateral, either as operated, constructed, used, leased or configured as of the Effective Date or as contemplated to be operated, constructed, used, leased or configured pursuant to the then current business plan of the Loan Parties as approved by the DIP Lender, (d) the enforceability of any DIP Loan Document, the perfection or priority of any lien created under any Loan Document or the rights of or benefits available to the DIP Lender under any of the DIP Loan Documents, or (e) the business operations, economic performance, assets or financial condition of any Loan Party; provided, that the filing of the Chapter 11 Cases, either alone or in combination, will not be considered in determining whether there has been a "Material Adverse Effect".

"Material Agreement" means any agreement or arrangement to which any Loan Party is party (a) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect or (b) which could reasonably be expected to involve payments during any fiscal year of the Borrower equal to or exceeding $100,000 (other than purchase orders entered into in the ordinary course of business).

"Material Indebtedness" means Indebtedness (other than the Loans and the Prepetition Letter of Credit) or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties or any Subsidiary in an aggregate principal amount exceeding the Threshold Amount.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Loan Parties or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party or Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Maturity Date" means, at the election of the DIP Lender, the earliest to occur of: (a) the date on which the DIP Lender provides, via electronic or overnight mail, written notice to counsel for the Debtors and counsel for any Committee of the occurrence and continuance of an Event of Default; (b) the date that is thirty (30) days following the Interim Order Date if the Final Financing Order is not entered in form and substance satisfactory to the DIP Lender by such date; (c) the date of the Final Hearing, if the Interim Order is modified at the Final Hearing in a manner that is not reasonably acceptable to the DIP Lender; (d) the closing date of the Sale Transaction; (e) the date on which the Aggregate Credit Obligations are indefeasibly paid in full in cash; (f) the effective date of an Approved Plan; (g) the filing of any chapter 11 plan other than an Approved Plan by the Debtors or any party in interest; unless such plan contemplates the indefeasible payment in full in cash of the Aggregate Credit Obligations; (h) the date that the Bankruptcy Court orders (x) the conversion of the Chapter 11 Cases to Chapter 7 liquidations, or (y) a dismissal of the Chapter 11 Cases; or (i) May 21, 2025.

"Maximum DIP Facility Amount" means $41,000,000.

"Maximum Interim Facility Amount" means the sum of (a) the outstanding principal amount of the Prepetition Obligations on the Petition Date plus (b) the Maximum Interim Increase Amount.

"Maximum Interim Increase Amount" means $5,500,000.

"Milestone" has the meaning assigned to such term in Section 5.18.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA, with respect to which the Borrower or any ERISA Affiliate has any liability, contingent or otherwise.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) any casualty, insurance proceeds and (iii) any payment in respect of any condemnation or similar event, any condemnation awards and any other similar payments, minus (b) to the extent approved by the Bankruptcy Court, the sum of the following amounts: (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than amounts paid to Affiliates or to Raymond James) in connection with such event, in each case, to the extent consented to by the DIP Lender, (ii) the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, in each case, to the extent consented to by the DIP Lender, (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable during the year that such event occurred and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer of the Borrower and approved by the DIP Lender), and (iv) upon consummation of the Sale Transaction, the Business Combination Fee payable to Raymond James pursuant to Section 2(c)(i) of the RJ Engagement Letter and related Expenses payable to Raymond James pursuant to Section 3 of the RJ Engagement Letter, in each case to the extent permitted by Section 6.12.

"Notice Date" has the meaning assigned to it in Section 2.13(c)

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the DIP Lender from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this DIP Credit Agreement.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligation Guaranty" means any Guarantee of all or any portion of the DIP Obligations executed and delivered to the DIP Lender by a guarantor who is not a Loan Party.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"Other Connection Taxes" means, with respect to the DIP Lender, Taxes imposed as a result of a present or former connection between the DIP Lender and the jurisdiction imposing such Taxes (other than

a connection arising from the DIP Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any DIP Loan Document, or sold or assigned an interest in any Loan, the Prepetition Letter of Credit or any DIP Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any DIP Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on the Federal Reserve Bank of New York's Website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full" or "Payment in Full" means, (i) the indefeasible payment in full in cash of all outstanding Loans and LC Disbursements, together with accrued and unpaid interest thereon, (ii) the termination, expiration, or cancellation and return of the Prepetition Letter of Credit (or alternatively, with respect to each the Prepetition Letter of Credit, the furnishing to the DIP Lender of a cash deposit, or at the discretion of the DIP Lender a backup standby letter of credit satisfactory to the DIP Lender, in an amount equal to 105% of the LC Exposure as of the date of such payment), (iii) the indefeasible payment in full in cash of the accrued and unpaid fees, (iv) the indefeasible payment in full in cash of all reimbursable expenses and other DIP Obligations (other than, in connection with the foregoing, Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this DIP Credit Agreement), together with accrued and unpaid interest thereon, (v) the termination of the Revolving Commitment, (vi) the termination of the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties thereto; (vii) the indefeasible payment in full in cash of the Prepetition Obligations (including any Reinstated Prepetition Obligations and Allowable 506(b) Amounts) and (viii) delivery of a general release of any and all claims and causes of action of Loan Parties against the DIP Lender. Any reference herein or in any DIP Loan Document to the satisfaction, repayment, or payment in full of the Prepetition Obligations shall mean the payment or repayment in full in immediately available funds of all outstanding Prepetition Obligations (including all Reinstated Prepetition Obligations and all Allowable 506(b) Amounts).

"Participant" has the meaning assigned to such term in Section 8.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

-16-

(b)        carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c)        pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)        deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)        judgment Liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)        easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower; and

(g)        the interests of an Agency Supplier in (i) Agency Goods delivered to the Borrower by such Agency Supplier, and (ii) Accounts arising from the sale of such Agency Goods to DCD Customers;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clauses (e) and (g) above.

"Permitted Investments" means:

(a)        direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)        investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)        investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)        fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)        money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(f)        in the case of a Subsidiary of a Loan Party that is not a Domestic Subsidiary, investments of a kind or type similar to the investments described above (replacing, where applicable, United States of America or any agency or instrumentality thereof with the corresponding governmental authorities of any foreign jurisdiction and using comparable ratings, if any, customary in the relevant jurisdiction) in any country other than the United States of America where such Subsidiary is organized.

"Permitted Priority Liens" mean (a) the Carveout, (b) all Liens in favor of third parties, which third-party liens, as of the Filing Date, had priority under applicable law over the Liens in favor of the Prepetition Lender, solely to the extent that such Liens are valid and non-avoidable as of the Filing Date and are either perfected as of the Filing Date or subject to perfection after the Filing Date pursuant to section 546(b) of the Bankruptcy Code, were not subordinated by agreement or applicable law, and do not secure Indebtedness incurred on or after the Filing Date; in each case subject to the terms of the Financing Order and otherwise agreed to by the DIP Lender and (c) the Liens in favor of Prepetition Lender securing the Prepetition Obligations.

"Permitted Variance" means, for each two-week period (each, a "Variance Testing Period"), a twelve percent (12%) negative variance with respect to the operating receipts and operating disbursements set forth in the Approved Budget on a line item and cumulative basis; provided that any positive variance may be carried forward and credited to subsequent Variance Testing Periods.

"Person" means any natural person, corporation, limited liability company, unlimited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledge Agreement" means the Pledge Agreement from SG Resource LLC and the Stephen A. Geppi Revocable Trust in favor of the Prepetition Lender, pursuant to which SG Resource LLC and the Stephen A. Geppi Revocable Trust pledged to the Prepetition Lender 100% of the outstanding capital stock of the Borrower, as the same may be amended, modified, supplemented, restated, amended and restated, ratified or confirmed from time to time.

"Prepayment Event" means:

(a)        any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in Section 6.05(a); or

(b)        any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party; or

(c)        the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Prepetition Lender" has the meaning assigned to such term in the Financing Order.

"Prepetition Borrower" has the meaning assigned to such term in the Recitals.

"Prepetition Credit Agreement" as the meaning assigned to such term in the Recitals.

-18-

"Prepetition Facility Effective Date" means May 16, 2019.

"Prepetition Letter of Credit" means that certain letter of credit issued by Lender and outstanding under the Prepetition Loan Documents as of the Filing Date in the original face amount of $1,000,000.

"Prepetition Loan Document Reaffirmation Agreements" means all reaffirmation, amendment and confirmation agreements reasonably requested by the Prepetition Lender and/or the DIP Lender to ratify, confirm, reaffirm and, to the extent applicable, amend any or all of the Prepetition Loan Documents.

"Prepetition Loan Documents" means the "Loan Documents" as defined in the Prepetition Credit Agreement.

"Prepetition Obligations" means the "Secured Obligations" as defined in the Prepetition Credit Agreement, together with all Allowable 506(b) Amounts.

"Prime Rate" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the DIP Lender) or any similar release by the Federal Reserve Board (as determined by the DIP Lender). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"Rate Indices" means CB Floating Rate and REVSOFR30 Rate.

"Raymond James" means Raymond James & Associates.

"Receivables" has the meaning given it in the Security Agreement.

"Regulation D" means Regulation D of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation T" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"Reinstated Prepetition Obligations" means any Prepetition Obligations constituting an Avoided Payment, to the extent such obligations have been reinstated, in any of the Chapter 11 Cases, pursuant to, and subject to the requirements and terms of, a final and nonappealable order of the Bankruptcy Court.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

-19-

"<u>Release</u>" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"<u>Relevant Governmental Body</u>" means the Federal Reserve Board and/or the NYFRB, the CME Term SOFR Administrator, as applicable, or a committee officially endorsed or convened by the Federal Reserve Board and/or the NYFRB or, in each case, any successor thereto.

"<u>Renegade</u>" has the meaning assigned to such term in the recitals to this DIP Credit Agreement.

"<u>Report</u>" means reports prepared by the DIP Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Loan Parties from information furnished by or on behalf of the Borrower, after the DIP Lender has exercised its rights of inspection pursuant to this DIP Credit Agreement.

"<u>Requirement of Law</u>" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Person; and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Reserves</u>" has the meaning assigned to such term in the Borrowing Base Schedule attached hereto.

"<u>Responsible Officer</u>" means the president or any Financial Officer of any Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party or Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"<u>Reuters</u>" means, as applicable, Thomson Reuters Corp., Refinitiv, or any successor thereto.

"<u>REVSOFR30 Rate</u>" (i) means the Term SOFR Reference Rate for a (1) month period, as such rate is published by the CME Term SOFR Administrator, at approximately 5:00 a.m., Chicago time, two (2) Business Days prior to the first (1st) Business Day of each month, adjusted monthly on the first (1st) Business Day of each month and (ii) when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted REVSOFR30 Rate. Any change in the REVSOFR30 Rate shall be effective from and include the effective date of such change.

"<u>Revolving Borrowing</u>" means Revolving Loans of the same Type, made, converted or continued on the same date.

"<u>Revolving Commitment</u>" means the commitment of the DIP Lender to make Revolving Loans hereunder in a maximum amount equal to the Maximum DIP Facility Amount.

"<u>Revolving Exposure</u>" means, at any time, the sum of (a) the outstanding principal amount of Revolving Loans and LC Exposure at such time, plus (b) the aggregate principal amount of Protective Advances outstanding at such time.

"<u>Revolving Loan</u>" means a Loan made pursuant to Section 2.01(a).

"<u>RJ Engagement Letter</u>" means the Engagement Letter dated September 30, 2024, as amended, between Raymond James and the Borrower.

"<u>Rosebud</u>" has the meaning assigned to such term in the recitals to this DIP Credit Agreement.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"<u>Sale Transaction</u>" means a transaction by which all or substantially all of the Debtors' assets (or such lesser portion of the assets as may be consented to by the DIP Lender) are to be sold to a third party, with the sale proceeds to be used to pay down the Aggregate Senior Debt, and which transaction shall be in form and substance reasonably acceptable to the DIP Lender.

"<u>Sanctioned Country</u>" means, at any time, a country, region, or territory which is itself the subject or target of any Sanctions (at the time of this DIP Credit Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"<u>Sanctioned Person</u>" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State. the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"<u>Sanctions</u>" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"<u>SEC</u>" means the Securities and Exchange Commission of the U.S.

"<u>Secured Parties</u>" means (a) the DIP Lender, (b) each Affiliate of the DIP Lender that provides Banking Services, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any DIP Loan Document, and (d) the successors and assigns of each of the foregoing.

"<u>Security Agreement</u>" means that certain Security Agreement (including any and all supplements thereto), dated as of the Effective Date, among the Loan Parties and the DIP Lender, for the benefit of the Secured Parties, and any other pledge or security agreement entered into, after the date of this DIP Credit Agreement by any other Loan Party (as required by this DIP Credit Agreement or any other DIP Loan Document), or any other Person, for the benefit of the Secured Parties.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the NYFRB (or a successor administrator of the secured overnight financing rate).

-21-

"<u>Subordinated Indebtedness</u>" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the DIP Obligations to the written satisfaction of the DIP Lender.

"<u>subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and/or one or more subsidiaries of the parent.

"<u>Subsidiary</u>" means any direct or indirect subsidiary of a Loan Party.

"<u>Success Fee Payment Date</u>" means the date that is sixty (60) days after the Maturity Date.

"<u>Success Fee Percentage</u>" means (i) 0% if the Aggregate Sale Proceeds are less than $42,000,000, (ii) 1.50% if the Aggregate Sale Proceeds equal or exceed $42,000,000 but are less than $43,000,000, and (iii) 2.50% if the Aggregate Sale Proceeds are greater than $43,000,000.

"<u>Successor Case</u>" has the meaning assigned to such term in the Financing Order.

"<u>Swap Agreement</u>" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or its Subsidiaries shall be a Swap Agreement.

"<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR Reference Rate</u>" means, for any day and time, and for any tenor comparable to the applicable interest period, the rate per annum determined by the DIP Lender as the forward-looking term rate based on SOFR.

"<u>Threshold Amount</u>" means $50,000.

"<u>Transactions</u>" means compliance with the Financing Order, the execution, delivery and performance by the Loan Parties of this DIP Credit Agreement and the other DIP Loan Documents, the borrowing of Loans and other credit extensions and the use of the proceeds thereof.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted REVSOFR30 Rate or the CBFR.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Unliquidated Obligations" means, at any time, any Prepetition Obligations (including Reinstated Prepetition Obligations then outstanding and Allowable 506(b) Amounts), DIP Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any DIP Obligation that is: (i) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"Unused Fee Rate" means a percentage rate per annum equal one quarter of one percent (0.25%).

"U.S." means the United States of America.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools. Required to Intercept and Obstruct Terrorism Act of 2001.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**Borrowing Base Schedule**

"<u>Borrowing Base</u>" means, at any time, the sum of:

        (a)       90% of Eligible Accounts at such time, plus

        (b)       90% of Eligible Foreign Accounts at such time, plus

        (c)       90% of Net Eligible COD Accounts at such time, plus

        (d)       the lesser of (x) 65% of Eligible Borrower Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time and (y) the product of 100% multiplied by the NOLV Percentage identified in the most recent inventory appraisal ordered by the DIP Lender multiplied by Eligible Borrower Inventory, valued at the lower of cost or market value, determined on a first-in-first out basis, at such time, <u>plus</u>

        (e)       50% of Eligible Diamond Select Inventory, valued as the lower of cost or market value, determined on a first-in-first-out basis, at such time, <u>plus</u>

        (f)       the amount of cash on deposit in the LC and Commercial Card Collateral Account, <u>plus</u>

        (g)       the Overadvance Amount, <u>minus</u>

        (h)       Reserves;

<u>provided</u> that (x) the portion of the Borrowing Base attributable to clause (b) above shall not exceed $3,000,000, and (y) the portion of the Borrowing Base attributable to clause (c) above shall not exceed $1,500,000.

The DIP Lender may, in its Permitted Discretion, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

"<u>Eligible Accounts</u>" means, at any time, the Accounts of the Borrower which the DIP Lender determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans and the maintenance of the Prepetition Letter of Credit hereunder.  Without limiting the DIP Lender's discretion provided herein, Eligible Accounts shall not include any Account:

        (a)       which is not subject to a first priority perfected security interest in favor of the DIP Lender;

        (b)       which is subject to any Lien other than (i) a Lien in favor of the DIP Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the DIP Lender;

        (c)       which (i) in the case of any Alliance Games Account, such Account is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date therefor, (ii) in the cases of any Account (other than an Alliance Games Account), (A) if such Account is, by its terms, due and payable within 60 days after the date of the original invoice therefor, such Account is unpaid more than 60 days after the original due date therefor, and (B) if such Account is, by its terms, due and payable later than 60 days after the date of the original invoice therefor, such Account is unpaid after

the original due date therefor, or (iii) in the cases of any Account (including any Alliance Games Account), has been written off the books of the Borrower or otherwise designated as uncollectible;

(d)       which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)       which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Borrower exceeds 15% of the aggregate Eligible Accounts; provided that, so long as the long term unsecured credit of Amazon.com, Inc. is rated Baa3 or higher by Moody's, or BBB- or higher by S&P Accounts owing from Amazon.com, Inc. and its Affiliates shall only be excluded from Eligible Accounts pursuant to this clause (e) to the extent the aggregate amount of Accounts owing from Amazon.com, Inc. and its Affiliates to the Borrower exceeds 25% of the aggregate Eligible Accounts;

(f)       with respect to which any covenant, representation, or warranty contained in this DIP Credit Agreement or in the Security Agreement has been breached or is not true;

(g)       which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the DIP Lender which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon the Borrower's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis (provided that Accounts arising from the sale by the Borrower of Agency Goods pursuant to an Agency Goods Distribution Agreement shall not be excluded from Eligible Accounts pursuant to this clause (g)(v) as long as the applicable Agency Supplier has executed and delivered an Agency Supplier Subordination Letter Agreement, and such Agency Supplier Subordination Letter Agreement remains in full force and effect), or (vi) relates to payments of interest;

(h)       for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by the Borrower or if such Account was invoiced more than once;

(i)       with respect to which any check or other instrument of payment has been returned uncollected for any reason until such time as good funds have been paid in substitution therefor;

(j)       which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary proceedings under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)       which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)       which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. (including any territory thereof) or Canada or (ii) is not organized under applicable law of the U.S., any state of the U.S. or the District of Columbia, Canada, or any province of Canada unless, in any such case, such Account is backed by a letter of credit acceptable to the DIP Lender which is in the possession of, and is directly drawable by, the DIP Lender;

-2-

(m)     which is owed in any currency other than dollars or Canadian Dollars;

(n)     which is owed by (i) any government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a letter of credit acceptable to the DIP Lender which is in the possession of, and is directly drawable by, the DIP Lender, or (ii) any government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect or protect the Lien of the DIP Lender in such Account, have been complied with to the DIP Lender's satisfaction;

(o)     which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(p)     which, for any Account Debtor, exceeds a credit limit determined by the DIP Lender, to the extent of such excess;

(q)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which the Borrower is indebted, but only to the extent of such indebtedness, or is subject to any security deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)     which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent thereof;

(s)     which is evidenced by any promissory note, chattel paper, or instrument;

(t)     which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the applicable Borrower to seek judicial enforcement in such jurisdiction of payment of such Account, unless the Borrower has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)     with respect to which the Borrower has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and the Borrower created a new receivable for the unpaid portion of such Account;

(v)     which does not comply in all material respects with the requirements of all applicable laws and regulations, whether federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w)     which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than the Borrower has or has had an ownership interest in such goods, or which indicates any party other than the Borrower as payee or remittance party;

(x)     which (i) was created on cash on delivery terms or (ii) is owing from any Account Debtor that is required by the Borrower to make payment for goods sold by the Borrower contemporaneous with the delivery of such goods to such Account Debtor; or

-3-

(y)      which the DIP Lender determines may not be paid by reason of the Account Debtor's inability to pay or which the DIP Lender otherwise determines is unacceptable in its Permitted Discretion.

In the event that an Account of the Borrower which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower shall notify the DIP Lender thereof on and at the time of submission to the DIP Lender of the next Borrowing Base Certificate.  In determining the amount of an Eligible Account of the Borrower, the face amount of an Account may, in the DIP Lender's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrower to reduce the amount of such Account.

"Eligible COD Accounts" means, at any time, the Accounts of the Borrower that meet all of the criteria for inclusion as Eligible Accounts except clause (x) of the definition of "Eligible Accounts", and which the DIP Lender determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans and the maintenance of the Prepetition Letter of Credit hereunder; provided, that, without limiting the DIP Lender's discretion provided herein, Eligible COD Accounts shall not include any Account:

(a)      which is unpaid after the original due date therefor; or

(b)      which is owing from an Account Debtor from whom payments are not being collected by an Acceptable Payment Collection Service Provider that has entered into an Acceptable Payment Collection Service Provider Agreement.

"Eligible Borrower Inventory" means, at any time, Eligible Inventory owned by the Borrower.

"Eligible Diamond Select Inventory" means, at any time, Eligible Inventory owned by Diamond Select.

"Eligible Foreign Account Debtor" means any Account Debtor which is organized under the applicable laws of Australia, England, France, Germany, Italy, Spain, and the Netherlands, other than an Account Debtor which the DIP Lender, in its discretion, has determined is not an "Eligible Foreign Account Debtor".

"Eligible Foreign Accounts" means, at any time, the Accounts of the Borrower which meet all of the criteria for eligibility as "Eligible Accounts" except clauses (l) and (m) of the definition of "Eligible Accounts"; provided that, without limiting the DIP Lender's discretion provided for herein, Eligible Foreign Accounts shall not include any Account:

(a)      which is owed by an Account Debtor that is not an Eligible Foreign Account Debtor; or

(b)      which is owed in any currency other than dollars or an Alternative Currency.

"Eligible Inventory" means, at any time, the Inventory of the Borrower or Diamond Select which the DIP Lender determines in its Permitted Discretion is eligible as the basis for the extension of Revolving

-4-

Loans, and the maintenance of the Prepetition Letter of Credit hereunder. Without limiting the DIP Lender's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the DIP Lender;

(b)     which is subject to any Lien other than (i) a Lien in favor of the DIP Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the DIP Lender;

(c)     which is, in the DIP Lender's opinion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business, or unacceptable due to age, type, category and/or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this DIP Credit Agreement or the Security Agreement has been breached or is not true, or which does not conform to all standards imposed by any Governmental Authority;

(e)     in which any Person other than the Borrower shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)     which is unfinished goods or which constitutes work-in-process, raw materials, spare or replacement parts, subassemblies, packaging and shipping materials, manufacturing supplies, samples, prototypes, brochures, displays or display items, bill-and-hold or ship-in-place goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, Agency Goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)     which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers within the U.S.;

(h)     which is located in any location leased by the Borrower or Diamond Select unless (i) (A) the lessor has delivered to the DIP Lender a Collateral Access Agreement or (B) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the DIP Lender in its Permitted Discretion, and (ii) Inventory having a market value of not less than the Threshold Amount is located at such location;

(i)     which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document, unless (i) (A) such warehouseman or bailee has delivered to the Prepetition Lender a Collateral Access Agreement and such other documentation as the DIP Lender may require or (B) an appropriate Reserve has been established by the DIP Lender in its Permitted Discretion, and (ii) Inventory having a market value of not less than the Threshold Amount is located at such third party warehouse or is in the possession of such bailee;

(j)     which is being processed offsite at a third party location or outside processor (including, without limitation, at any facility owned or operated by any vendor, or is in transit to or from such third party location or outside processor;

(k)     which is a discontinued product or component thereof;

(l)     which is the subject of a consignment by the Borrower or Diamond Select as consignor;

(m)     which is perishable;

(n)     which contains or bears any intellectual property rights licensed to the Borrower or Diamond Select unless the DIP Lender is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(o)     which is not reflected in a current perpetual inventory report of the Borrower;

(p)     for which reclamation rights have been asserted by the seller;

(q)     which has been acquired from a Sanctioned Person; or

(r)     which the DIP Lender otherwise determines is unacceptable in its Permitted Discretion.

In the event that Inventory of the Borrower or Diamond Select which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower shall notify the DIP Lender thereof on and at the time of submission to the DIP Lender of the next Borrowing Base Certificate.

"Net Eligible COD Accounts" means, at any time, the aggregate amount of Eligible COD Accounts *minus* the aggregate amount owed by the Loan Parties to any Acceptable Payment Collection Service Provider (including UPS Capital) or its Affiliates (including, in the case of UPS Capital, United Parcel Service, Inc.).

"NOLV Percentage" means, as of any date of determination, the percentage of the book value of Borrower's Inventory that is estimated to be recoverable in an orderly liquidation thereof net of all associated costs of such liquidation, as such percentage is specified in the most recent appraisal received by the DIP Lender from an appraiser selected by the DIP Lender.

"Overadvance Amount" means the applicable amounts set forth below during the applicable periods set forth below:

| Applicable Period | Overadvance Amount |
|---|---|
| Filing Date through date of entry of Final Financing Order | $6,750,000 |
| Date of entry of Final Financing Order through the date of entry of Sale Transaction Order | $12,500,000 |
| Date of entry of Sale Transaction Order through closing of Sale Transaction1 | $14,500,000 |

Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, increase or reduce the Overadvance Amount in its sole discretion.  For each of the periods set forth above, the Overadvance Amount represents the cumulative maximum Overadvance Amount permitted during such period.

"Reserves" means any and all reserves which the DIP Lender deems necessary, in its Permitted Discretion, to maintain (including, without limitation, an availability reserve, reserves for accrued and unpaid interest on the DIP Obligations and Prepetition Obligations, Banking Services Reserves, volatility

reserves, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, unindemnified or under indemnified liabilities, existing or potential Environmental Liabilities or with respect to any litigation, and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral, the Loans, any Loan Party or any existing or potential liability of any Loan Party.

**Reporting Schedule**

The Borrower will furnish to the DIP Lender:

(a)    not later than Wednesday of each week with information current through the last Business Day of the immediately preceding week, and at such other times as may be requested by the DIP Lender, as of the period then ended, all delivered electronically in a text formatted file acceptable to the DIP Lender (not in an Adobe *.pdf file):

(i)    a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the DIP Lender may reasonably request;

(ii)    a detailed aging of the Borrower's Accounts including all invoices aged by invoice date and due date (with an explanation of the terms offered) prepared in a manner reasonably acceptable to the DIP Lender, together with a summary specifying the name, address, and balance due for each Account Debtor;

(iii)    a schedule detailing the Borrower's and Diamond Select's Inventory, in form satisfactory to the DIP Lender, (1) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the DIP Lender has previously indicated to the Borrower are deemed by the DIP Lender to be appropriate and (2) including a report of any variances or other results of Inventory counts performed by the Borrower or Diamond Select s since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Borrower or Diamond Selects and complaints and claims made against the Borrower or Diamond Select);

(iv)    a worksheet of calculations prepared by the Borrower to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion; and

(v)    a schedule and aging of the Borrower's and Diamond Select's accounts payable, delivered electronically in a text formatted file acceptable to the DIP Lender;

(b)    promptly upon the DIP Lender's request:

(i)    copies of invoices issued by the Borrower in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)    copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and

(iii)    a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)    an updated customer list for the Borrower and its Subsidiaries, which list shall state the customer's name, mailing address and phone number, delivered electronically in a

text formatted file acceptable to the DIP Lender and certified as true and correct by a Financial Officer;

        (v)     the Borrower's sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

        (vi)     copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

        (vii)     a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction;

        (c)     every other Thursday and no later than ten (10) calendar days after month-end, the Borrower shall deliver to the DIP Lender an updated Budget, for review and approval by the DIP Lender (provided that if a line item is not approved by the DIP Lender in any updated Budget, such line items shall be deemed excluded and disregarded), which updated Budget shall be in form and substance satisfactory to the DIP Lender, and shall extend and supplement the prior Approved Budget for an additional two week period; it being agreed that any such updated Budget if and when approved by the DIP Lender shall thereafter constitute the "Approved Budget" until such time as the next updated Budget has been delivered to, and approved by, the Lender;

        (d)     on each Thursday (each such day being a "<u>Variance Report Date</u>"), the Borrower shall deliver to the DIP Lender a variance report certified as true and correct in all material respects by an officer of the Borrower (each such report, a "<u>Variance Report</u>") that includes a (i) reconciliation of the Loan Parties' actual performance for the 1-week period ending the prior Friday to the projected performance for such week in the Approved Budget, (ii) a reconciliation of the Loan Parties' actual to budgeted performance for the period beginning on the Petition Date through the prior Friday, and (iii) a written explanation in reasonable detail of the reasons for material line item variances during the applicable reconciliation periods;

        (e)     promptly after any request therefor by the DIP Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof;

        (f)     promptly following any request therefor, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors or other similar governing body (or the audit committee of the board of directors) of the Borrower by independent accountants in connection with the accounts or books of the Borrower or any other Loan Party, or any audit of any of them as the DIP Lender may reasonably request;

        (g)     promptly following any request therefor, a list of all Material Contracts in effect and, if copies of any such Material Contracts as the DIP Lender may reasonably request; and

        (h)     promptly following any request therefor, (x) such other information regarding the operations, assets, liabilities, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of the DIP Loan Documents,

as the DIP Lender may reasonably request, and (y) information and documentation reasonably requested by the DIP Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

## Closing Conditions Schedule

(a)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The DIP Lender shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its Secretary, Assistant Secretary or Manager or any Director thereof, which shall (A) certify the resolutions of its Board of Directors, members, managers or other body authorizing the execution, delivery and performance of the DIP Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the each Financial Officer and any other officers or directors, as applicable, of such Loan Party authorized to sign the DIP Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization, certificate of formation, or other similar document of such Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws, articles of association or operating, management or partnership agreement, and (ii) if applicable, a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(b)    <u>Approved Budget</u>. The DIP Lender shall have received and be reasonably satisfied with the initial Approved Budget.

(c)    <u>Fees</u>. The DIP Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Effective Date. All such amounts will be paid with proceeds of Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrower to the DIP Lender on or before the Effective Date.

(d)    <u>Filings, Registrations and Recordings</u>. Each document (including any Uniform Commercial Code financing statement) required by the DIP Collateral Documents or under law or reasonably requested by the DIP Lender to be filed, registered or recorded in order to create in favor of the DIP Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(e)    <u>No Default Certificate</u>. The DIP Lender shall have received a certificate, signed by the Financial Officer of the Borrower, on the initial Borrowing date (i) stating that no Default has occurred and is continuing, (ii) stating that the representations and warranties contained in Article III are true and correct as of such date, and (iii) certifying any other factual matters as may be reasonably requested by the DIP Lender.

(f)    <u>Funding Account</u>. The DIP Lender shall have received a notice designating the Funding Account.

(g)    <u>Borrowing Base Certificate</u>. The DIP Lender shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of a recent date determined by the DIP Lender.

(h)    <u>Money Transfer Authorizations</u>. The Borrower shall have delivered money transfer authorizations as the DIP Lender may have reasonably requested.

(i)    <u>Insurance</u>. The DIP Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the DIP Lender and otherwise in compliance with the terms of Section 5.10 of the DIP Credit Agreement.

(j)      <u>Commencement of Chapter 11 Cases</u>. The Chapter 11 Cases shall have been commenced in the Bankruptcy Court, no trustee or examiner shall have been appointed with respect to any of the Loan Parties or any property of or any estate of any Loan Party and the Bankruptcy Court shall have entered all "first day orders", each in form and substance reasonably satisfactory to the DIP Lender.

(k)      <u>Interim Order</u>. The Bankruptcy Court shall have (i) entered the Interim Order, which Interim Order (x) shall have been entered upon an application or motion of the Debtors in form and substance reasonably satisfactory to the DIP Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by the DIP Lender; (y) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Revolving Loans, or the performance by the Loan Parties of any of the DIP Obligations shall be the subject of a presently effective stay, and (z) shall otherwise satisfy the requirements of the definition of Interim Order set forth herein, and (ii) authorized, confirmed and approved the terms and provisions of the DIP Facility, the DIP Credit Agreement and the DIP Loan Documents.

(l)      <u>Cash Management Order</u>. The Bankruptcy Court shall have entered a Cash Management Order authorizing the Loan Parties to maintain and continue to use their Cash Management System in the ordinary course of business, in form and substance reasonably satisfactory to the DIP Lender.

(m)      <u>Other Closing Deliverables</u>. The Borrower shall have delivered to the DIP Lender, in form and substance reasonably satisfactory to the Lender, each of the other agreements, instruments, certificates and items set forth in the closing checklist or schedule of closing documents most recently provided by the DIP Lender (or its counsel) to the Borrower (or their counsel).

**<u>EXHIBIT A</u>**

**Approved Budget**


SEE ATTACHED

## <u>EXHIBIT B</u>

### Milestones

The following events constitute the Chapter 11 Case milestones required under the DIP Credit Agreement (each, a "<u>Milestone</u>"), which Milestones may be extended in writing by the DIP Lender in its sole and absolute discretion:

       (a)     on or within one (1) day after the Filing Date, the Borrower shall have filed: (i) a motion seeking approval of the DIP Facility, including the Interim Order; and (ii) other customary "first day orders" (including the Cash Management Order), all in form and substance reasonably acceptable to the DIP Lender;

       (b)     no later than three (3) Business Days after the Filing Date, the Bankruptcy Court shall have entered the Interim Order;

       (c)     no later than three (3) Business Days after the Filing Date, the Debtors shall have filed a motion, in form and substances reasonably acceptable to the DIP Lender, seeking approval of the Debtors' retention of Raymond James;

       (d)     no later than twenty-five (25) days after the Filing Date, the Bankruptcy Court shall have entered the Final Financing Order;

       (3)     no later than twenty-five (25) days after the Filing Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender (the "<u>Bidding Procedures Order</u>"), approving (i) the Bidding Procedures and (ii) seeking approval of a stalking horse asset purchase agreement as the stalking horse bid for the purchase of the Debtors' assets, which asset purchase agreement shall be in form and substance reasonably acceptable to the DIP Lender;

       (f)     no later than twenty-five (25) days after the Filing Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Debtors' retention of Raymond James;

       (g)     no later than forty-five (45) days after the Filing Date, the Debtors shall have filed Schedules of Assets and Liabilities and Statement of Financial Affairs;

       (h)     no later than forty-five (45) days after the entry of the Bidding Procedures Order, the Debtors shall have conducted an auction in accordance with the Bidding Procedures Order (the "<u>Auction</u>");

       (i)     no later than seven (7) days after conclusion of the Auction, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Sale Transaction (the "<u>Sale Transaction Order</u>"); and

       (j)     no later than fifteen (15) days after the entry of the Sale Transaction Order, the Debtors shall have consummated the Sale Transaction.

## EXHIBIT B

**Budget**

| CONSOLIDATED_WF CF FORECAST WEEK WEEK ENDED | FORECAST 1 1/18/2025 | FORECAST 2 1/25/2025 | FORECAST 3 2/1/2025 | FORECAST 4 2/8/2025 | FORECAST 5 2/15/2025 | FORECAST 6 2/22/2025 | FORECAST 7 3/1/2025 | FORECAST 8 3/8/2025 | FORECAST 9 3/15/2025 | FORECAST 10 3/22/2025 | FORECAST 11 3/29/2025 | FORECAST 12 4/5/2025 | FORECAST 13 4/12/2025 | FORECAST GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | 1/18/2025 | 1/25/2025 | 2/1/2025 | 2/8/2025 | 2/15/2025 | 2/22/2025 | 3/1/2025 | 3/8/2025 | 3/15/2025 | 3/22/2025 | 3/29/2025 | 4/5/2025 | 4/12/2025 | TOTAL |
| Customer Receipts | 4,455,430 | 4,922,613 | 5,402,269 | 7,123,207 | 6,963,646 | 6,871,601 | 6,661,395 | 6,490,913 | 6,614,730 | 6,144,570 | 5,163,956 | 5,163,956 | 5,163,956 | 77,142,242 |
| **TOTAL RECEIPTS** | **4,455,430** | **4,922,613** | **5,402,269** | **7,123,207** | **6,963,646** | **6,871,601** | **6,661,395** | **6,490,913** | **6,614,730** | **6,144,570** | **5,163,956** | **5,163,956** | **5,163,956** | **77,142,242** |
| **CASH DISBURSEMENTS** | 1/18/2025 | 1/25/2025 | 2/1/2025 | 2/8/2025 | 2/15/2025 | 2/22/2025 | 3/1/2025 | 3/8/2025 | 3/15/2025 | 3/22/2025 | 3/29/2025 | 4/5/2025 | 4/12/2025 | TOTAL |
| ***OPERATING DISBURSEMENTS*** | | | | | | | | | | | | | | |
| Bank/Credit Card Fees | (21,000) | – | (150,983) | – | (21,000) | – | (150,383) | – | – | (21,000) | – | (173,901) | – | (538,267) |
| Contingency | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (325,000) |
| Employee Benefits | (200,000) | (75,000) | (212,290) | (75,000) | (200,000) | (75,000) | (212,290) | (75,000) | (200,000) | (75,000) | (200,000) | (87,290) | (200,000) | (1,886,871) |
| Freight | (158,862) | (588,971) | (591,405) | (468,265) | (456,900) | (491,488) | (480,424) | (433,082) | (340,107) | (361,119) | (383,606) | (350,466) | (359,960) | (5,464,654) |
| Insurance | – | – | – | (89,535) | – | – | – | (89,535) | (700,000) | – | – | (89,535) | – | (968,605) |
| Inventory | (1,973,975) | (4,649,564) | (5,023,804) | (4,231,608) | (5,147,205) | (5,051,276) | (5,590,716) | (4,337,026) | (4,096,048) | (4,487,313) | (4,229,886) | (2,720,347) | (2,358,805) | (53,897,572) |
| Other Operating Expense | (155,222) | (155,222) | (455,222) | (265,016) | (155,222) | (155,222) | (155,222) | (155,222) | (155,222) | (155,222) | (155,222) | (155,222) | (155,222) | (2,427,679) |
| Payroll | – | (1,114,750) | – | (1,211,106) | – | (1,114,750) | – | (1,213,350) | – | (811,949) | – | (939,449) | – | (6,405,354) |
| Payroll - Accrued PTO | – | – | – | – | – | – | – | – | – | – | – | – | (1,000,000) | (1,000,000) |
| Payroll - KEIP | – | – | – | – | – | – | – | – | – | – | – | (1,300,000) | – | (1,300,000) |
| Rent & Utilities | – | (82,059) | (387,458) | (165,043) | (6,896) | (4,065) | (297,458) | (116,263) | (6,896) | (4,065) | (4,065) | (384,954) | (31,598) | (1,490,820) |
| Temporary Labor | (193,518) | (193,518) | (193,518) | (193,518) | (193,518) | (193,518) | (193,518) | (193,518) | (119,518) | (119,518) | (119,518) | (119,518) | (119,518) | (2,145,734) |
| Total Operating Disbursements | (2,727,576) | (6,884,085) | (7,039,680) | (6,724,091) | (6,205,741) | (7,110,319) | (7,105,010) | (6,637,996) | (5,642,791) | (6,060,186) | (5,117,297) | (5,045,682) | (5,550,103) | (77,850,556) |
| **NET OPERATING CASH FLOW** | **1,727,854** | **(1,961,471)** | **(1,637,411)** | **399,116** | **757,906** | **(238,717)** | **(443,616)** | **(147,083)** | **971,939** | **84,384** | **46,659** | **118,274** | **(386,147)** | **(708,314)** |
| ***NON-OPERATING DISBURSEMENTS*** | | | | | | | | | | | | | | |
| Claims & Noticing Agent | – | – | – | (50,000) | – | – | – | (50,000) | – | – | – | – | (50,000) | (150,000) |
| GUC's Professional Fees | – | – | – | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (30,000) | (300,000) |
| RJ DIP Fee, Monthly Fee + Expenses | – | (75,000) | – | (60,000) | (75,000) | – | – | (60,000) | – | – | – | (60,000) | – | (330,000) |
| Raymond James Transaction Fee[1] | – | – | – | – | – | – | – | – | – | – | – | – | (1,500,000) | (1,500,000) |
| Lender Professional Fees | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (15,000) | (195,000) |
| Professional Fees - Debtor | (185,000) | (185,000) | (210,000) | (215,000) | (200,000) | (210,000) | (185,000) | (185,000) | (200,000) | (185,000) | (185,000) | (185,000) | (200,000) | (2,530,000) |
| US Trustee | – | – | – | – | – | – | – | – | – | – | – | – | (250,000) | (250,000) |
| Total Non-Operating Disbursements | (200,000) | (275,000) | (225,000) | (370,000) | (320,000) | (255,000) | (230,000) | (340,000) | (245,000) | (230,000) | (230,000) | (290,000) | (2,045,000) | (5,255,000) |
| DIP Interest & Financing Fees | – | – | – | (304,828) | – | – | – | (274,234) | – | – | – | (360,925) | – | (939,988) |
| Interest & Other Fees | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Total Credit Disbursements | – | – | – | (304,828) | – | – | – | (274,234) | – | – | – | (360,925) | – | (939,988) |
| **TOTAL DISBURSEMENTS** | **(2,927,576)** | **(7,159,085)** | **(7,264,680)** | **(7,398,920)** | **(6,525,741)** | **(7,365,319)** | **(7,335,010)** | **(7,252,230)** | **(5,887,791)** | **(6,290,186)** | **(5,347,297)** | **(5,696,607)** | **(7,595,103)** | **(84,045,544)** |
| **NET CASH FLOW** | **1,527,854** | **(2,236,471)** | **(1,862,411)** | **(275,712)** | **437,906** | **(493,717)** | **(673,616)** | **(761,317)** | **726,939** | **(145,616)** | **(183,341)** | **(532,651)** | **(2,431,147)** | **(6,903,302)** |
| *Cum. Change in Cash* | *1,527,854* | *(708,617)* | *(2,571,028)* | *(2,846,740)* | *(2,408,835)* | *(2,902,552)* | *(3,576,168)* | *(4,337,485)* | *(3,610,545)* | *(3,756,162)* | *(3,939,503)* | *(4,472,154)* | *(6,903,302)* | *(6,903,302)* |

| RECONCILIATION SUMMARY / WEEK ENDED | FORECAST 1/18/2025 | FORECAST 1/25/2025 | FORECAST 2/1/2025 | FORECAST 2/8/2025 | FORECAST 2/15/2025 | FORECAST 2/22/2025 | FORECAST 3/1/2025 | FORECAST 3/8/2025 | FORECAST 3/15/2025 | FORECAST 3/22/2025 | FORECAST 3/29/2025 | FORECAST 4/5/2025 | FORECAST 4/12/2025 | FORECAST TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Book Cash Balance, Beginning of period | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Net Change in Cash | 1,527,854 | (2,236,471) | (1,862,411) | (275,712) | 437,906 | (493,717) | (673,616) | (761,317) | 726,939 | (145,616) | (183,341) | (532,651) | (2,431,147) | (6,903,302) |
| Revolver - Net Change | (1,527,854) | – | – | – | – | – | – | – | – | – | – | – | – | (1,527,854) |
| DIP - Net Change | – | 2,236,471 | 1,862,411 | 275,712 | (437,906) | 493,717 | 673,616 | 761,317 | (726,939) | 145,616 | 183,341 | 532,651 | 2,431,147 | 8,431,156 |
| **Book Cash Balance, End of period** | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Revolver, Beginning of Period | 32,599,067 | 28,143,637 | 23,221,023 | 17,818,755 | 10,695,547 | – | – | – | – | – | – | – | – | 32,599,067 |
| Revolver Paydown | (4,455,430) | (4,922,613) | (5,402,269) | (7,123,207) | (10,695,547) | – | – | – | – | – | – | – | – | (32,599,067) |
| Revolver - Net Change | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Revolver, End of Period** | 28,143,637 | 23,221,023 | 17,818,755 | 10,695,547 | – | – | – | – | – | – | – | – | – | – |
| DIP Revolver, Beginning of Period | – | 2,927,576 | 10,086,661 | 17,351,340 | 26,050,260 | 36,307,902 | 36,801,619 | 37,475,234 | 38,236,552 | 37,509,612 | 37,655,229 | 37,838,570 | 38,371,221 | – |
| DIP Revolver Paydown | – | – | – | – | 3,731,901 | (6,871,601) | (6,661,395) | (6,490,913) | (6,614,730) | (6,144,570) | (5,163,956) | (5,163,956) | (5,163,956) | (44,543,175) |
| DIP Revolver Draw | 2,927,576 | 7,159,085 | 7,264,680 | 7,398,920 | 6,525,741 | 7,365,319 | 7,335,010 | 7,252,230 | 5,887,791 | 6,290,186 | 5,347,297 | 5,696,607 | 6,095,103 | 82,545,544 |
| Cash Collateral Credit Cards | – | – | – | 250,000 | – | – | – | – | – | – | – | – | – | 250,000 |
| Cash Collateral LC | – | – | – | 1,050,000 | – | – | – | – | – | – | – | – | – | 1,050,000 |
| **DIP Revolver, End of Period** | 2,927,576 | 10,086,661 | 17,351,340 | 26,050,260 | 36,307,902 | 36,801,619 | 37,475,234 | 38,236,552 | 37,509,612 | 37,655,229 | 37,838,570 | 38,371,221 | 39,302,369 | 39,302,369 |
| Total Debt, End of Period | 31,071,213 | 33,307,684 | 35,170,095 | 36,745,807 | 36,307,902 | 36,801,619 | 37,475,234 | 38,236,552 | 37,509,612 | 37,655,229 | 37,838,570 | 38,371,221 | | 37,838,570 |
| Gross Sale Proceeds | | | | | | | | | | | | | (40,802,369) | |
| Raymond James Transaction Fee | | | | | | | | | | | | | 1,500,000 | 1,500,000 |
| **Total Debt Balance** | 31,071,213 | 33,307,684 | 35,170,095 | 36,745,807 | 36,307,902 | 36,801,619 | 37,475,234 | 38,236,552 | 37,509,612 | 37,655,229 | 37,838,570 | 38,371,221 | | 37,838,570 |
| Borrowing Base Availability | 29,671,466 | 29,759,375 | 30,132,925 | 30,129,404 | 28,802,569 | 27,831,072 | 28,461,585 | 27,752,207 | 27,291,940 | 25,737,380 | 24,605,964 | 24,470,371 | 24,313,116 | 24,313,116 |
| Cash Collateral LC / Credit Card | – | – | – | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 | 1,300,000 |
| Total Debt, End of Period | (31,071,213) | (33,307,684) | (35,170,095) | (36,745,807) | (36,307,902) | (36,801,619) | (37,475,234) | (38,236,552) | (37,509,612) | (37,655,229) | (37,838,570) | (38,371,221) | (39,302,369) | (39,302,369) |
| Letter of Credit | (1,000,000) | (1,000,000) | (1,000,000) | – | – | – | – | – | – | – | – | – | – | – |
| Rent Reserve | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) | (53,705) |
| **Net Availability / (Overadvance)** | (2,453,453) | (4,602,014) | (6,090,876) | (5,370,109) | (6,259,039) | (7,724,253) | (7,767,355) | (9,238,050) | (8,971,378) | (10,671,554) | (11,986,312) | (12,654,556) | (13,742,958) | (13,742,958) |
| **Post Close - Net Availability / (Overadvance)** | (2,453,453) | (4,602,014) | (6,090,876) | (5,370,109) | (6,259,039) | (7,724,253) | (7,767,355) | (9,238,050) | (8,971,378) | (10,671,554) | (11,986,312) | (12,654,556) | | |
| | – | – | – | – | – | – | – | – | – | – | – | – | – | – |

**Footnote**

[1]   Transaction fee to be paid at closing, subject to increase based on final transaction value.