**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Joint Administration Requested) |

## DECLARATION OF ROBERT GORIN IN SUPPORT OF FIRST DAY RELIEF

I, Robert Gorin, hereby declare as follows:

1.      I am the co-Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2]  I have been engaged as CRO of Diamond Comic Distributors, Inc. ("DCD"), since July 17, 2024, and before that provided financial advisory services to DCD since March 7, 2024.  I was more recently appointed Co-CRO of the other Debtors herein.  Through such capacities, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      I am a Managing Director at Getzler Henrich & Associates LLC ("Getzler Henrich") and lead Getzler Henrich's consumer products practice.  I have more than thirty years of business strategy and turnaround experiences, as well as extensive experience advising insolvent companies in turnaround and crisis situations and navigating such companies through turnaround, process design and improvements, and merger and acquisition processes.  I have frequently been involved in complex matters requiring expertise in corporate turnarounds and operational analysis.

---

[1]     The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2]     I serve as co-CRO with my colleague, William H. Henrich, co-chairman of Getzler Henrich (as defined above).

3.      On January 14, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in this Court.  The Debtors continue to operate their businesses and manage their affairs in the ordinary course of business as debtors in possession.  The Debtors have filed several motions identified herein requesting "first day" relief.  I submit this declaration in support of such first day relief, as well as to provide background on the Debtors' business and these chapter 11 cases.

4.      Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition.  I am authorized to submit this declaration on behalf of the Debtors.  If called to testify, I could and would testify competently to the matters set forth in this declaration.

## I.     OVERVIEW OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS

### A.     The Debtors' Business

5.      The Debtors are a leading distributor of comics, graphic novels, toys, games and other pop culture related merchandise to retailers across the world.  The Debtors began their existence in 1982 to provide comic shop retailers with wholesale, non-returnable comic books and related merchandise.  At its inception, the Debtors distributed their products out of a single warehouse to 17 retail customers.  Today, the Debtors operate out of five warehouses, comprising over one million square feet of distribution space, to distribute products to thousands of customers. The Debtors also carry a significant number of pop-culture product lines.

53446928.5

6.     Debtor DCD conducts business through its four operating divisions: (1) Alliance Game Distributors ("Alliance"), (2) Diamond Comic Distributors ("Diamond"), (3) Collectible Grading Authority ("CGA"), and (4) Diamond Comic Distributors UK, an unlimited company incorporated under the laws of England and Wales ("DUK").  Alliance, Diamond, and CGA each operate as unincorporated divisions of Debtor DCD.  DUK operates as a separate, non-debtor entity and is the subsidiary of Debtors Comic Holdings, Inc. ("CHI"), and Comic Exporters, Inc. ("CEI").

7.     Alliance.  Alliance is one of the oldest hobby game distributors in the United States, having been founded in 1976 as "The Armory."  It was acquired by DCD in 2001.  Alliance is a premier distributor of role-playing games, collectible card games, board games, miniatures, and other gaming and hobby accessories.  Among the product brands that Alliance distributes are Wizards of the Coast, Bandai NAMCO, and Pokémon.  Popular products that Alliance distributes include Dungeons & Dragons, Magic the Gathering: Lord of the Rings, Warhammer 40k, Cascadia, Pokémon trading cards, and Dragon Ball.

8.     Alliance distributes its products to a diverse, nationwide base of independent retail customers.  Although Alliance also distributes to large retailers and wholesalers in the mass market, such as Barnes & Noble and Books-A-Million, the majority of Alliance's customers are local retail shop owners in the direct market.  As a leading, national distributor, Alliance has distribution centers in Visalia, California, Austin, Texas, Fort Wayne, Indiana, and Red Lion, Pennsylvania.  These distribution centers allow Alliance to provide shipping in two days or less to 80% of the United States.  Alliance also maintains a storage facility in Fort Wayne, Indiana, to store excess inventory and inventory for its fulfillment customers for a fee.

9.      In addition to its distribution services, Alliance also offers product spotlights for producers in its monthly trade publication, Game Trade Magazine ("GTM"). GTM is the only magazine in the industry that is designed for and distributed to both retailers and consumers. Although the magazine generates a nominal amount of revenue, it provides the Debtors' retail customers and consumers with monthly content regarding new board, card, tabletop and miniature games. The Debtors print over 17,000 copies of GTM each month.

10.      Diamond.  Diamond focuses on the sale and distribution of comic books, graphic novels, trade paperback books, and other pop-culture books, toys and merchandise.  Diamond is one of the largest international distributors of English-language graphic novels, manga, games and merchandise with operations that extend into more than 85 countries.  Sales of comic books and graphic novels equate to approximately 59% of Diamond's revenue.  Among the top publishers for the comic books and graphic novels that Diamond distributes are Marvel Comics, Image Comics, Darks Horse Comics, IDW Publishing, Dynamite Entertainment, Viz and BOOM! Entertainment.  Popular toys and collectibles that Diamond distributes include Funko Pops! and Star Wars statues.

11.      Diamond has three sales channels: (i) mass market retailers, including Walmart, Target, and Amazon, (ii) specialty stores, such as comic book shops and collectible stores that focus on graphic novels, statues, and toys, and (iii) bookstores, including Barnes & Noble.  In particular, Diamond distributes products to over 4,000 mass market retail stores and over 2,500 comic book and collectible stores.

12.      Diamond operates primarily out of its distribution center in Olive Branch, Mississippi, with over 650,000 pieces distributed weekly.  Diamond historically maintained an additional distribution center in Plattsburgh, New York.  The Plattsburgh lease term expired on

53446928.5

November 30, 2024, and Diamond moved its inventory and distribution services previously operated out of Plattsburgh to the Olive Branch distribution center.

13.      CGA.  CGA provides professional evaluation, authentication and grading of vintage and modern toys (including action figures, dolls and die-cast vehicles), video games and other related collectibles from its headquarters in Atlanta, Georgia.  Grading a collectible item enhances its value and boosts its protection, presentation and preservation, which in turn drives demand and growth in the industry for collecting such items.  CGA grades different types of products under four different grading divisions: modern grading scale, standard grading scale, loose grading scale and qualified grading scale.  CGA also provides acrylic cases for every graded item, ensuring protection and enhancing the customer's display quality for the item.  In addition to its grading services, CGA offers a wide range of collectible action figures, video games, Legos, comic books and related merchandise for purchase on its website.

14.      DUK.  Non-debtor affiliate DUK is headquartered in Runcorn, Cheshire England and is a standalone business focused on serving the United Kingdom, European, Middle Eastern, and Australian comic book, collectible, and book markets.  DUK serves over 300 United Kingdom comic books and collectibles retailers and, like Diamond, is the dominant distributor for major publishers such as Marvel, DC Comics, Image Comics, Dark Horse, and Kodansha.

15.      Debtor Diamond Select Toys & Collectibles, LLC ("DST") manufactures collectible toys and animated style statues based on licensed intellectual property from companies like Disney, Marvel, and Warner Bros.  DST operates from its facility in Burbank, California, and employs sculptors, painters and 3D print technicians to manufacture its products.  DST distributes over 95% of its products through DCD.

53446928.5

16.     Debtors CHI and CEI are each holding companies that have no business operations or assets other than their respective equity interests in DUK.

17.     The Debtors recognize the passion that store owners in the industry have for the products that they shelve, with many retail locations being social gathering places to play, discuss games and engage with a like-minded enthusiast community.  Given this unique dynamic, the Debtors emphasize building trust with their consumers, an approach that has increased the Debtor DCD's customer base and ensures that customers continue to use the Debtors as their core distributor.

18.     In addition to the Debtors' longstanding customer relationships, the Debtors maintain strong relationships with key publishers and content producers in the industry.  These relationships are a vital part of the business, as many established vendors with the most popular intellectual property will not conduct business with new distributors. In addition, industry publishers have leveraged the growth in popularity by releasing (or "dropping") limited-time or other "exclusive" products. The Debtors' relationships with these publishers ensures that the Debtors receive significant allocations of these exclusive product releases.

**B.     The Debtors' Ownership and Corporate Structure**

19.     All of the Debtors are direct or indirect subsidiaries of non-debtor Stephen A. Geppi Revocable Trust and non-debtor Stephen A. Geppi Irrevocable Trust.  Debtor DCD is owned by non-debtor SG Resource LLC (99%) and non-debtor Stephen A. Geppi Revocable Trust (1%). Debtors CHI and CEI, are wholly owned by Debtor DCD, and in turn each own 50% of non-debtor affiliate DUK.  Debtor DST is owned by non-debtor DST Investments, LLC (99%) and non-debtor Stephen A. Geppi Revocable Trust (1%).

20.    The following chart depicts the Debtors' organizational structure with the Debtor entities in bold:

### Organization Chart



### C.    The Debtors' Debt Obligations

21.    JPM Credit Agreement.  On May 16, 2019, Debtor DCD, as borrower, Debtor CEI, Debtor CHI, and non-debtor DUK, each as guarantors, and JPMorgan Chase Bank, N.A., as lender (in such capacity, "JPM" or the "Prepetition Lender"), entered into that certain Credit Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, pursuant to various amendments and letter agreements, including, without limitation, the most recent Fifteenth Amendment to Credit Agreement dated as of December 20, 2024, the "Credit Agreement"), pursuant to which JPM agreed to extend to DCD a revolving line of credit in the maximum amount of $40,000,000 and a term loan for $3,000,000 (the "Prepetition Loan").  Debtor

53446928.5

DST and non-debtor affiliates DUK, Rosebud Entertainment, LLC ("Rosebud"), Game Consolidators, LLC ("Consolidators"), and Renegade Games, LLC ("Renegade"), subsequently joined as guarantors of the Credit Agreement (collectively, the "Entity Guarantors").[3]  Stephen Geppi, an executive officer of the Debtors, executed a Personal Guaranty dated January 15, 2024.

22.     With the Credit Agreement, DCD, CHI, and CEI, as grantors, and JPM, as lender entered into that certain Security Agreement, dated May 16, 2019 (as amended, the "Security Agreement").  The Security Agreement provides a first-priority, fully-perfected security interest and lien on DCD's, CHI's and CEI's right, title, and interest in, to and under the "Collateral" as defined in the Security Agreement.  Debtor DST and non-debtor affiliates DUK, Rosebud, Consolidators, and Renegade subsequently joined as grantors under the Security Agreement.

23.     Moreover, as further security for the Prepetition Loan, non-debtors SG Resource, LLC, and Stephen A. Geppi Revocable Trust pledged to JPM their right, title and interest in their respective interests in DCD and any related distributions and proceeds, pursuant to that certain Pledge Agreement, dated May 16, 2019.  On March 21, 2024, the holders of all outstanding membership interests in non-debtor affiliates Rosebud, Consolidators and Renegade pledged to JPM their right, title, and interest in their respective interests of Rosebud, Consolidators and Renegade and any related distributions and proceeds.  On September 13, 2024, the holders of all outstanding membership interests in Debtor DST pledged to JPM their right, title, and interest in their respective interests in DST and any related distributions and proceeds in exchange for access to certain funding under the Credit Agreement.

---

[3]    Debtor DST joined as guarantor under the Credit Agreement in late 2024 as a condition to a further amendment and forbearance agreement with JPM.

24.     As of the Petition Date, the total principal outstanding under the Credit Agreement is approximately $32,600,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (the "Prepetition Secured Obligations").  DCD's obligations under the Credit Agreement mature on January 15, 2025.  Based upon the nature of the Prepetition Collateral (as defined in the DIP Motion) and the purchase price of the Debtors' proposed stalking horse bid, the Debtors believe that the Prepetition Secured Obligations are fully secured by the Prepetition Collateral with a value in excess of the Prepetition Secured Obligations.

25.     Trade Debt.  The Debtors estimate that they owe approximately $40,000,000 to vendors and other parties in trade debt as of December 31, 2024.

## II.     EVENTS LEADING TO FILING THE CHAPTER 11 CASES

26.     Since 2019, and particularly during and after the COVID-19 pandemic, the Debtors have experienced a decline in sales of comic books and graphic novels through DCD's Diamond division.  The two primary drivers behind the decrease in sales were (i) the loss of exclusive distribution agreements with two major comic publishers, and (ii) macroeconomic headwinds resulting in higher interest rates on the Debtors' secured debt and inflationary increases in wage and freight related expenses (as detailed below).  This decline in the Diamond business has been offset, in part, by significant revenue growth in DCD's Alliance division during the same time period.  In particular, Alliance has grown its distribution sales significantly, from $85.5 million in 2020 to $149.1 million in 2023.  However, Alliance's success is not enough to support the Debtors' other business operations long-term.

27.     Historically, the Debtors had agreements with DC Entertainment, Marvel Worldwide, Inc. ("Marvel"), and Image Comics, Inc. ("Image") to act as their exclusive agent with

respect to sales of their products to comic book specialty shops.  In 2020, DC Entertainment terminated its exclusive agreement with the Debtors, moving its business to a newly-launched competitive distributor.  Since then, the Debtors have not distributed DC Entertainment's comic books and related products outside of non-debtor affiliate DUK.  In 2021 and 2023, Marvel and Image, respectively, converted their exclusive agreements to non-exclusive agreements with the Debtors for the distribution of their comic books.  The loss of these exclusive distribution agreements directly resulted in a loss of the Debtors' overall sales volume.

28.     The impact from the Debtors' recent sales decline has been compounded with a rise in operating expenses.  Total operating expenses for the Debtors have risen in recent years as a percentage of sales—from 5.44% in 2019 to 8.73% in 2023.  This is a result of smaller order quantities of comic books, graphic novels, and toys or merchandise products per shipment from the same existing customer base.  Because the Debtors service thousands of customers, the associated overhead—including labor costs and rent—for fulfilling customer orders has remained constant despite the smaller individual order quantities.  In addition, the Debtors have to meet volume thresholds for their freight carriers, and these costs have contributed to the rise in operating expenses as a percentage of sales.  Finally, inflation and pressure from rising wages in recent years has resulted in further unanticipated increases in labor costs.  The increased operating expenses combined with the decline in revenue have created an unsustainable liquidity position for the Debtors.

29.     Recognizing the need to improve its liquidity position, the Debtors began considering their strategic options, including a refinancing or sale of their assets. In late 2023, DCD retained an investment banker to market some or all of its assets.  In March 2024, the Debtors retained Getzler, as their financial advisor, and later appointed me as CRO of DCD.  While DCD

53446928.5

conducted a prepetition marketing process for certain of its business divisions, no transaction was consummated due to certain structural issues that made any such transaction difficult to consummate.

30.     As it became apparent that the Debtors may have to consider a marketing and sale process in a distressed scenario, the Debtors retained Saul Ewing LLP, as restructuring counsel, to assist in assessing and pursuing strategic alternatives, including a potential chapter 11 filing. The Debtors also engaged Raymond James & Associates, Inc. ("Raymond James"), as investment banker, to construct and consummate a marketing process in connection with a potential section 363 sale. In addition, DCD's and DST's boards of directors each appointed an independent restructuring committee comprising one independent director and delegated to the independent restructuring committee all matters involving, among other things, a chapter 11 filing.

## III.    THE DEBTORS COMMENCE THESE CHAPTER 11 CASES TO PURSUE A VALUE-MAXIMIZING SECTION 363 SALE

31.     After considering alternatives, the Debtors have determined that pursuing a going concern section 363 sale in chapter 11 represents the best path forward to preserve and maximize value for the benefit of their stakeholders. To that end, and before the Petition Date, the Debtors' investment banker, Raymond James, developed marketing materials, including a teaser and confidential information memorandum, created a virtual data room and initiated a marketing process. In connection with marketing the Debtors' assets for a stalking horse bidder, Raymond James contacted over 110 parties, of which 28 executed non-disclosure agreements to access the data room and review the confidential information memorandum. Ultimately, six parties submitted indications of interest in the Debtors' Assets. After negotiating with these parties, including extensive, arm's-length negotiations regarding various asset purchase agreements, the

Debtors selected Universal Distribution, Inc., to serve as their stalking horse purchaser for DCD's Alliance division, subject to Court approval.

32.     The Debtors intend to conduct a competitive postpetition sale process to maximize the value of their estates for creditors and other stakeholders.  As detailed above, the Debtors and Raymond James have completed the steps necessary to conduct a fulsome postpetition marketing process, including preparing marketing materials, compiling (and contacting) a list of potential buyers, responding to due diligence requests, and negotiating with potential buyers to serve as a stalking horse purchaser.  The Debtors and Raymond James intend to launch the postpetition marketing process immediately, and the Debtors will be filing a motion for approval of bid procedures to facilitate the Debtors' sale efforts (the "Bid Procedures Motion") and a companion motion seeking the approval of a sale (the "Sale Motion") in short order.  Given the significant interest in the Debtors' assets in connection with the prepetition marketing process, the Debtors expect a robust and competitive postpetition sales process.

33.     In the interim, as discussed below, and subject to Court approval, the Debtors have secured funding for these cases through debtor-in-possession financing and consensual use of the Prepetition Lender's cash collateral, to ensure that the Debtors can honor their postpetition obligations and continue to operate effectively during these chapter 11 cases.  As detailed below, the Debtors believe that access to the debtor-in-possession financing and cash collateral pursuant to an agreed upon budget is sufficient to fund these cases through a sale process.

34.     Pursuant to the Sale Motion, Bid Procedures Motion and DIP Motion (defined below), the Debtors anticipate closing a going concern sale within eighty-five days of the Petition Date.

## IV.     FIRST DAY MOTIONS

53446928.5

35.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of motions identified herein requesting "first day" relief (the "First Day Motions").  The Debtors request that the Court grant the First Day Motions as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases.  I have reviewed each of the First Day Motions discussed below, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge, information and belief with appropriate reliance on the Debtors' personnel and advisors.

**A.     Joint Administration Motion**

36.     The Debtors seek the entry of an order directing joint administration of their chapter 11 cases for procedural purposes, as well as related relief (the "Joint Administration Motion"). The Debtors also request that (a) the Court maintain one file and one docket for the jointly-administered chapter 11 cases under the case number assigned to Debtor DCD, and (b) these chapter 11 cases be administered under a consolidated caption as described in the Joint Administration Motion.

37.     The Debtors are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, as all of the Debtors are direct or indirect subsidiaries of non-debtor Stephen A. Geppi Revocable Trust and non-debtor Stephen A. Geppi Irrevocable Trust.  Many of the motions, hearings, and orders in these chapter 11 cases will affect all of the Debtors.

38.     Entry of an order directing joint administration of the Debtors' chapter 11 cases will avoid duplicative notices, applications and orders, thereby saving the Debtors and parties in interest considerable time and expense, as well as ease the administrative burden on the Court and the parties. The rights of creditors will not be adversely affected because the Joint Administration Motion requests only administrative consolidation of the chapter 11 cases. By aggregating all papers related to the Debtors under the same case caption and docket, creditors and parties in

interest will be able to access and review relevant information concerning the Debtors in one place, and will thereby be better able to keep apprised of the matters before this Court.

39.     Accordingly, I believe that joint administration of the Debtors' estates is in the best interest of the Debtors, their estates and creditors, and parties in interest.

**B.     Motion to Appoint Claims and Noticing Agent**

40.     The Debtors request entry of an order authorizing the retention and appointment of Omni Agent Solutions ("Omni") as claims and noticing agent in connection with the chapter 11 cases, effective *nunc pro tunc* to the Petition Date (the "Omni Retention Application"). The Omni Retention Application pertains only to the work to be performed by Omni under the Clerk of the Court's delegation of duties permitted by section 156(c) of the Judicial Code.  Among other things, Omni will: (i) prepare and serve required notices in these chapter 11 cases; (ii) maintain a list of all potential creditors, equity holders and other parties in interest, and a core mailing list; and (iii) maintain an official claims register for each Debtor, if necessary, and process all proofs of claim received, if any.

41.     Prior to selecting Omni to act as the claims and noticing agent, the Debtors obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process. Based on all engagement proposals obtained and reviewed, I believe that Omni's rates are competitive and reasonable given Omni's quality of services, experience and expertise.  The terms of Omni's retention are set forth in the engagement agreement attached to the Omni Retention Application as Exhibit C.

42.     I believe that the relief requested in the Omni Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will ease the administrative burden on the Clerk in connection with these chapter 11 cases.  In particular, in

14

view of the number of anticipated claimants and the complexity of the Debtors' businesses, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes, and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Debtors' application to retain Omni should be approved.

### C.    Consolidated Lists Motion

43.    The Debtors have filed a motion (the "Consolidated Lists Motion") seeking entry of an order authorizing the Debtors to: (i) file (a) a consolidated list of creditors and (b) a consolidated list of the Debtors' 30 largest unsecured creditors,[4] (ii) redact the names and home addresses of individual customers (the "Individual Customer Information") of the Debtors from all public filings, and (iii) grant such other and further relief as the Court deems just and proper.

44.    In addition to the reasons set forth in the Consolidated Lists Motion, which I confirm, I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, especially considering that the Debtors share creditors. In addition, filing a single consolidated Creditor Matrix would facilitate the U.S. Trustee's review of creditors' claims and its appointment of a single creditors' committee in these cases.

---

[4]    In connection with this request, the Debtors also request authority to submit one declaration under Bankruptcy Rule 1008 verifying the validity of the consolidated creditor matrix and consolidated list of the Debtors' 30 largest unsecured creditors.

45.    In addition to the reasons set forth in the Consolidated Lists Motion, which I confirm, I believe that the Individual Customer Information is valuable confidential commercial information that should not be disclosed to competitors.  Individual Customer Information is primarily associated with the Collectible Grading Authority and FandomWorld business segments, which segments have a heavier direct-to-consumer focus than the retailer and wholesaler focus of the other business segments.  Further, the Individual Customer Information could be used to perpetrate identity theft, harassment, or for other unwanted or improper purposes.

46.    As set forth in the Consolidated Lists Motion, the Debtors' claims and noticing agent will serve the individual creditors at their personal home addresses, so these creditors will receive the same notice in these chapter 11 cases without the unnecessary public disclosure of their personal home address.  Unredacted versions of all filings containing Individual Customer Information will be provided to (a) the Office of the United States Trustee for the District of Maryland; (b) counsel to any official committee appointed in these cases; (c) the Court; and (d) any other party that the Court may direct.

47.    For the foregoing reasons, I believe granting the Consolidated Lists Motion is in the best interests of the Debtors, their estates and creditors, and parties in interest.

**D.    Motion to Extend Deadline for Schedules and Statements**

48.    The Debtors have filed a motion (the "Schedules Extension Motion") to extend the initial 14-day period by which the Debtors are required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by 24 days, through and including February 21, 2025, without prejudice to the Debtors' ability to request additional time should it become necessary.

49.     In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for the commencement of these chapter 11 cases as expeditiously and efficiently as possible, including preparing their business to transition into chapter 11, negotiating with key constituencies for a smooth transition into chapter 11, and conducting a prepetition marketing effort in preparation for these cases.  Given the substantial burdens already imposed on the Debtors' management by the commencement of these chapter 11 cases, the competing demands upon the Debtors' employees to collect information (including in connection with the diligence requests to facilitate the Debtors' ongoing sale process), and the significant effort required to complete the Schedules and Statements, good cause exists to extend the current deadline by 24 days, until 38 days after the Petition Date.  I believe that the requested extension will ensure that the Schedules and Statements are prepared properly and with accuracy, and will help alleviate the potential necessity of substantial subsequent amendments.

50.     For the foregoing reasons, I believe granting the Schedules Extension Motion is in the best interests of the Debtors, their estates and creditors, and parties in interest.

### E.     Utilities Motion

51.     The Debtors have filed a motion (the "Utilities Motion") seeking entry of interim and final orders: (i) prohibiting Utility Providers (as defined below) from altering, refusing, or discontinuing services or discriminating against the Debtors solely on the basis of the commencement of these cases or that the Debtors did not pay a debt when due prepetition; (ii) determining that the Debtors have provided each of the Utility Providers with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code based on the Debtors establishing a segregated account in the amount of $28,000, which is equal to the Debtors' estimate of two weeks of postpetition Utility Services (as defined below) based on the monthly average of

53446928.5

all Utility Services; (iii) establishing procedures (the "<u>Additional Assurance Procedures</u>") for determining additional adequate assurance of payment, if any, and authorizing the Debtors to provide additional adequate assurance of payment to the Utility Providers; and (iv) granting related relief.

52.     In the ordinary course of business, the Debtors obtain telephone, internet, gas, electric, water and other utility services (the "<u>Utility Services</u>") from several utility providers (collectively, the "<u>Utility Providers</u>"). The Debtors estimate that, as of the Petition Date, approximately sixteen Utility Providers provide Utility Services to the Debtors. The Utility Services are provided to the Debtors' distribution centers and headquarters located in Hunt Valley, Maryland. The Utility Providers include, without limitation, the entities identified on the list attached to the Utilities Motion as Exhibit C (the "<u>Utility Providers List</u>").

53.     The Debtors cannot operate their business and serve their customers without Utility Services. Even a temporary interruption of such services would cause significant disruption to the Debtors' day-to-day operations that could impair the Debtors' goodwill and other assets, and thereby negatively impact the Debtors' efforts to maximize the value of their estates. Accordingly, it is critical that the Debtors have uninterrupted Utility Services.

54.     In general, the Debtors have established a good payment history with their Utility Providers, making regular, timely payments. Over the past year, the Debtors have paid an average of approximately $56,000 per month on account of all Utility Services.  To the best of the Debtors' knowledge, there are generally no material defaults or arrearages with respect to undisputed invoices for the Utility Services provided at the Debtors' manufacturing facility as of the Petition Date.

18

55.    The Debtors propose to deposit, within 20 days of the Petition Date, an amount equal to the estimated cost for two weeks of Utility Services (*i.e.*, approximately $28,000) (the "Adequate Assurance Deposit"), calculated based on the historical data for the past year, into one segregated bank account (the "Utility Deposit Account") designated for the Adequate Assurance Deposit for the benefit of all Utility Providers.  Thereafter, the Debtors propose to adjust the amount in the Utility Deposit Account as follows: (i) reducing the amount held in the Utility Deposit Account to account for the payment and termination of Utility Services by the Debtors for any given account; (ii) modifying the amount held in the Utility Deposit Account on the basis of agreements reached with Utility Providers regarding additional assurance requests, including, to the extent any Utility Provider receives any other value from the Debtors as adequate assurance of payment, reducing the Adequate Assurance Deposit maintained in the Utility Deposit Account on account of such Utility Provider by the amount of such other value; and (iii) adding additional amounts in the event that the Debtors amend the Utility Providers List to add one or more additional Utility Providers.  These adjustments will permit the Debtors to maintain the Utility Deposit Account with an amount that consistently provides the Utility Providers with a two-week deposit on account of such services.

56.    The Adequate Assurance Deposit amounts are equal to approximately two weeks of utility services provided by each utility provider, calculated based on the historical monthly average of all billings for that utility provider over the last twelve months (or if the utility provider has not provided services for twelve months, the historical monthly average of all billings for the utility provider to date).  If any Utility Provider believes additional assurance ("Additional Assurance") is required, the Debtors propose that such Utility Provider be required to request such

Additional Assurance by following the Additional Assurance Procedures described in the Utilities Motion.

57.    The Additional Assurance Procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to administer their chapter 11 estates without undue distraction or interruption. Absent compliance with the Additional Assurance Procedures, the Debtors are requesting that the Utility Providers, including Utility Providers that begin providing services to the Debtors during the pendency of these cases, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance.

58.    I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for postpetition utility services in the ordinary course of business through revenue generated in operations and access to cash collateral (together, the "Proposed Adequate Assurance"), constitutes adequate assurance to the Utility Providers to satisfy the requirements of section 366 of the Bankruptcy Code. Further, I believe the Adequate Assurance Procedures are reasonable under the circumstances.

59.    For the foregoing reasons, I believe granting the Utilities Motion is in the best interests of the Debtors, their estates and creditors, and parties in interest.

**F.    Insurance Motion**

60.    The Debtors have filed a motion (the "Insurance Motion") seeking entry of an order authorizing but not directing the Debtors to (i) maintain existing Insurance Policies (as defined below) and to pay on an uninterrupted basis all premiums, Brokerage Fees (as defined below), deductibles and administration fees (collectively, the "Insurance Obligations") arising thereunder

or in connection therewith, including any Insurance Obligations for prepetition periods; and (ii) renew, revise, extend, supplement, change or enter into new insurance policies as needed in their business judgment without further order of the Court.

61.     The Debtors also request that the Court: (a) authorize and direct any and all banks with which the Debtors maintain accounts that the Debtors use to make payments related to the Insurance Policies (as defined below) and Insurance Obligations to receive, process, honor and pay all checks drawn on such accounts and fund transfers for payments with respect to the Insurance Policies and Insurance Obligations whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments; and (b) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Insurance Policies and Insurance Obligations and to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

62.     <u>Insurance Policies</u>.   In the ordinary course of business, the Debtors maintain, amongst other policies, comprehensive insurance policies that provide coverage related to general liability, cyber security liability, workers' compensation liability,  property liability, automobile liability, ocean cargo liability, directors' and officers' liability, media liability, and crime liability (collectively the "<u>Insurance Policies</u>").  For the Insurance Policies' current policy periods, the total annual premiums allocated to the Debtors under the Insurance Policies is approximately $635,000. The Insurance Policies, which the Debtors have obtained through third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>") are listed on Exhibit C attached to the Insurance Motion. In connection with the Insurance Policies, the Debtors make payments to Insurance Carriers on account of certain Insurance Obligations, including premiums, deductibles and administration fees.

63.     The Debtors seek authority to honor the Insurance Obligations that arise after the Petition Date in the ordinary course.  The Insurance Policies are essential to preserving the value of the Debtors' business, property and assets.  Much of the coverage provided by the Insurance Policies is required by regulations, laws and contracts that govern the Debtors' commercial activities.  Furthermore, section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal.

64.     Brokerage Fees.  The Debtors employ RCM&D (the "Insurance Broker") to assist with the procurement and negotiation of their Insurance Policies.  The Debtors pay brokerage fees to their Insurance Broker upon the signing or renewal of certain policies (the "Brokerage Fees").  The Brokerage Fees are bundled into premium costs for each insurance policy the Debtors maintain, and generally are not paid or identified separately.

65.     The Debtors believe that it is in the best interests of their creditors and estates to continue their relationship with their Insurance Broker.  The Debtors believe they are current on all Brokerage Fees as of the Petition Date.  However, out of an abundance of caution, the Debtors request the authority to pay, in their discretion, any Brokerage Fees or other amounts owing to the Insurance Broker that may subsequently be determined to be owed for the period prior to the Petition Date, and to continue making payments to the Insurance Broker on account of the obligations related to the Insurance Policies in the ordinary course, since the Debtors' failure to pay such amounts could result in a loss of the Insurance Broker's assistance in maintaining the Debtors' beneficial business relationships with their insurance carriers.

66.     For the foregoing reasons, I believe granting the Insurance Motion is in the best interest of the Debtors, their estates and creditors and parties in interest.

### G.    Taxes Motion

67.    The Debtors have filed a motion (the "Tax Motion") seeking entry of interim and final orders, (i) authorizing, but not directing, the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these chapter 11 cases in the ordinary course of business, in an aggregate amount not to exceed $290,000 on an interim basis and $397,000 on a final basis, and (ii) granting related relief.

68.    In the ordinary course of their business, the Debtors collect, withhold, and incur sales, use, property, and business and occupation based tax obligations, as well as other fees (collectively, the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state and local, and foreign governments, including taxing and licensing authorities (collectively, the "Taxing Authorities"). The Taxes and Fees are generally but not exclusively remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

69.    Sales and Use Tax. The Debtors incur, collect, and remit sales taxes to the Taxing Authorities in the United States and Canada in connection with the operation of their business and the sale of their products. Additionally, the Debtors purchase a variety of materials, supplies, and catalogs necessary for the operation of their business from vendors who may not operate in the state where the property is to be delivered and, therefore, do not charge the Debtors sales tax in connection with such purchases. In these cases, applicable law typically requires the Debtors to subsequently pay use taxes on such purchases to the applicable Taxing Authorities. The Debtors remit sales and use taxes on a monthly, quarterly, and annual basis, depending on the jurisdiction.

70.    As of the Petition Date, the Debtors estimate that they will owe approximately $75,000 to the relevant Taxing Authorities on account of prepetition sales and use taxes. Sales

and use tax filing and payment deadlines are typically due the 20th of the month with larger amounts due at the end of the month. As such, the Debtors request authority, but not direction, to pay such taxes as they become due and payable in the ordinary course of business.

71.     <u>Property Taxes</u>. State and local laws in the jurisdictions in which the Debtors operate generally grant Taxing Authorities the power to levy property taxes against the Debtors' personal property located in such jurisdictions. The Debtors typically pay property taxes in the ordinary course, and such taxes are typically invoiced in arrears for the prior year. Paying property taxes is critical because failing to pay certain property taxes may give rise to liens on the Debtors' property in favor of the relevant Taxing Authority to secure payment of those taxes. Not paying property taxes could also result in additional fees and penalties being assessed against the Debtors.

72.     The Debtors estimate that as of the Petition Date, they have accrued approximately $200,000 of property taxes, of which approximately $170,000 may become due and payable during the Interim Period. Accordingly, the Debtors request authority, but not direction, to pay such property tax obligations as they become due and payable in the ordinary course of business.

73.     <u>Business and Occupation Taxes</u>. The Debtors pay various revenue-based taxes to the Taxing Authorities. These business and occupation taxes are measured in different ways depending upon the Taxing Authority. These obligations are all based upon the total amount of revenue generated from within a certain state. As of the Petition Date, the Debtors estimate they will owe business and occupation tax obligations to various states of approximately $10,000, none of which will be due and owing during the Interim Period. The Debtors request authority, but not direction, to pay such taxes as they become due and payable in the ordinary course of business.

74.     <u>Capital Based Taxes</u>. In addition to the business and occupation taxes, the Debtors pay various taxes related to the operation of their business in a certain state based on capital. These

obligations are based upon the Debtors' capital apportioned to that state based upon the revenue, payroll, and property within that state. For example, the Debtors pay a corporate activity tax in Oregon related to commercial activity within the state and a franchise tax in Texas for operating within the state. As of the Petition Date, the Debtors estimate they will owe capital related tax obligations to various states of approximately $62,000, none of which will be due and owing during the Interim Period. The Debtors request authority, but not direction, to pay such taxes as they become due and payable in the ordinary course of business.

75.    <u>Fees and Licenses</u>.  In the ordinary course of business, the Debtors pay certain licensing and other operational fees, including fee payments to the United States Customs and Border Protection in connection with the importation of goods (collectively, the "<u>Fees</u>"). The Fees allow the Debtors to operate their business within the applicable states. As of the Petition Date, the Debtors estimate that they have approximately $50,000 in accrued but unpaid Fees, $35,000 of which will become due and owing during the Interim Period. The Debtors request authority to pay the Fees as they become due and payable in the ordinary course of business.

76.    I believe that any failure to pay the Taxes and Fees may materially disrupt the Debtors' business operations in several ways: (i) the Taxing Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (ii) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (iii) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both. For the foregoing

reasons, I believe that it is in the best interests of the Debtors' estates that the Debtors be authorized to pay the Taxes and Fees.

**H.    Customer Programs Motion**

77.    The Debtors have filed a motion (the "<u>Customer Programs Motion</u>") seeking entry of interim and final orders: authorizing, but not directing, the Debtors to (i) administer the Customer Programs (as defined below) in the ordinary course of business, (ii) continue, modify or terminate the Customer Programs in the Debtors' discretion, in the ordinary course of business and without further application to this Court, and (iii) continue paying the Processing Obligations (as defined below) in the ordinary course of business.

78.    The Debtors provide certain accommodations to their customers to attract and maintain positive customer relationships (such programs, as described below, collectively the "<u>Customer Programs</u>").  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  The Debtors believe that their ability to continue the Customer Programs and to honor any obligations thereunder in the ordinary course of business is necessary to retain their reputation, attract new customers, and meet competitive market pressures.  The Debtors further believe it is critical that they maintain positive customer relationships and their reputation for reliability to ensure that their customers continue to place and pay for orders with the Debtors during the pendency of these chapter 11 cases. Because maintaining their reputation and the goodwill of customers is important to the Debtors' ability to efficiently administer their estates during the pendency of these chapter 11 cases, maintaining the Customer Programs is of vital importance.

79.    <u>Discounts</u>.  In the ordinary course of business, the Debtors provide a discount to eligible customers based on tiered amounts of products purchased.  At the customer's request, and

in the Debtors' discretion, the discount may be adjusted based on changes to the volume of the customer's orders.

80.     The discounts allow the Debtors to maintain customer satisfaction and loyalty, which, in turn, retains the customer base and stabilizes the flow of cash receipts into the business. The Debtors' ability to continue the discounts in the ordinary course of business is important to the Debtors' reputation and the uninterrupted distribution of their products to customers.  I understand that, without the ability to continue offering discounts, the Debtors expect that customers may be unwilling to transact with the Debtors or purchase certain products, which could lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates.

81.     <u>Returns and Product Credit</u>. The Debtors may issue credit to their customers under certain circumstances, including for products that have been damaged prior to delivery or become unavailable after an order is placed.  When a product is either damaged and returned or unavailable, the customer receives either a replacement product or a credit on its next invoice.

82.     In addition to credits for damaged or unavailable products, for the Debtors' national sales channel, which distributes products to major retailers including Barnes & Noble, Amazon, Walmart, and Walgreen's, the Debtors accept eligible returns of books and graphic novels and credit the customer for the price of the returned item on the customer's next invoice.

83.     For the Debtors' direct sales channel, which primarily distributes to mom-and-pop comic book stores, the Debtors accept "affidavit returns".  Publishers sometimes offer returns on a limited number of new products as a promotional marketing device. In those instances, the Debtors pass that promotion through to their customers, accepting returns of unsold copies and crediting the customer on their next invoice.  The Debtors then collect the promotional credit from the publisher.  In this way, the Debtors administer the affidavit return program without a net impact

53446928.5

on their profits.   The Debtors request authority to continue to honor returns and provide customers with replacement product or credit toward future purchases in the ordinary course of business.

84.    <u>CGA's Premium Membership</u>. CGA offers its customers a one-year premium membership for a $150 fee.  Premium members are entitled to special discounts, a $50 sign-up bonus, a welcome box of branded merchandise, and the ability to accumulate reward points that may be redeemed for credit.  Membership is valid for one year.

85.    CGA's premium membership does not generate any outstanding obligations for the Debtors because the annual fee covers the member bonus and welcome box, and all other benefits take the form of credits or discounts that can only be applied to future purchases.  The Debtors request authority to honor the premium membership in the ordinary course of business.

86.    <u>Gentle Giant Premier Guild Program</u>. Gentle Giant offers a one-year customer membership program.  Customers have the option to become a member of Gentle Giant's "Premier Guild" at either the "Apprentice" level (for $100 a year) or "Master" level (for $150 a year).  Members are granted, among other things, access to exclusive products, discounts on other products, sneak peeks of future products, and, for Master-level members, the ability to pre-order products before other customers.

87.    The Premier Guild membership does not generate any outstanding obligations for the Debtors because the annual fee covers the gift products, and all other benefits take the form of credits or discounts that can only be applied to future purchases.  The Debtors request authority to honor the Premier Guild membership in the ordinary course of business.

88.    <u>Fandomworld's Rewards and Referral Programs</u>. DCD offers a rewards and referral program for its U.S. customers that purchase items from DCD's FandomWorld business segment.  Individual customers receive rewards points for purchases, which can be used as credits toward

future purchases.  FandomWorld's individual and retail customers may also take advantage of FandomWorld's referral program whereby the customer receives credits toward future purchases for directing consumers to FandomWorld who then complete a purchase.  The Debtors request authority to honor FandomWorld's rewards and referral program in the ordinary course of business.

89.    Credit Card and Other Payment Processors. The Debtors accept a variety of payment methods from customers, including checks, ACH transactions or equivalents, and PayPal (collectively, the "Non-Cash Payments").  To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements") with certain payment processors, including Authorize.net and PayPal (the "Payment Processing Companies").  Pursuant to the Payment Processing Agreements, the Debtors generally receive the net customer sales less any chargebacks and processing fees charged. The processing fees charged by each Payment Processing Company (the "Processing Fees") are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a monthly basis.  The additional fees owing to the Payment Processing Companies that are customarily charged with every credit card and debit card transaction (the "Interchange Rates" and together with the Processing Fees the "Processing Obligations") are generally set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a daily basis.

90.    The Debtors' continued acceptance of Non-Cash Payments is essential to the administration of the Debtors' estates because the majority of the Debtors' sales are made using Non-Cash Payments.  Refusing to accept Non-Cash Payments would have a severe negative effect on the Debtors' efficient administration of their estates during the pendency of these chapter 11 cases—the cost of which would be borne by their estates and all stakeholders. To avoid disrupting

these vital payment processing services, the Debtors seek authority to continue paying the Processing Obligations in the ordinary course of business pursuant to the terms of the Payment Processing Agreements, and request that the Court authorize the Payment Processing Companies to continue to set off the Processing Obligations against amounts remitted to the Debtors, whether arising before or after the Petition Date, in a manner consistent with the Debtors' historical practices.

91.     For the foregoing reasons, I believe granting the relief sought in the Customer Programs Motion is in the best interest of the Debtors, their estates and creditors and parties in interest.

### I.     Cash Management Motion

92.     The Debtors have filed a motion (the "Cash Management Motion") seeking entry of interim and final orders: (i) authorizing the Debtors to continue using their existing cash management system, bank accounts, and business forms and payment of related prepetition obligations, (ii) authorizing the Debtors to continue ordinary course intercompany transactions and granting administrative priority to postpetition intercompany claims, (iii) scheduling a hearing to consider entry of the proposed final order, to the extent necessary, (iv) extending the Debtors' time to comply with the requirements of section 345 of the Bankruptcy Code and the operating guidelines established by the Office of the United States Trustee (the "U.S. Trustee"), and (v) granting related relief, as more fully set forth in the Cash Management Motion.

93.     The Debtors maintain an integrated, centralized cash management system (the "Cash Management System") to collect, transfer, manage and disburse funds generated and used in their operations.  As of the Petition Date, the Debtors' Cash Management System includes fourteen bank accounts (collectively, the "Bank Accounts"), thirteen bank accounts held by Debtor

Diamond Comic Distributors, Inc. ("DCD"), and one bank account held by Debtor Diamond Select Toys & Collectibles, LLC ("DST").  A schedule of the Bank Accounts, including the last four digits of each Bank Account number, is attached to the Cash Management Motion as Exhibit C.

94.    The Debtors' accounting department, principally located at the Debtors' corporate office in Hunt Valley, Maryland, maintains daily oversight and control of the Cash Management System and implements controls for collecting, concentrating and disbursing funds from the Bank Accounts.

95.    Bank Accounts.  The Cash Management System is operated primarily through twelve Bank Accounts maintained by Debtors DCD and DST at JPM and two Bank Accounts maintained by Debtor DCD at Bank of Montreal ("BMO").

96.    *Cash Flow for DCD's Diamond and Alliance Divisions*.  Of the Debtors' fourteen Bank Accounts, two accounts are collections accounts at JPM, which collect cash from operations for Debtor DCD's Diamond and Alliance divisions (the "Collections Accounts").  The Debtors also maintain four Canadian operating accounts, which collect cash, on a smaller scale, from operations for DCD's Diamond division (the "Canadian Operating Accounts").  Two of the Canadian Operating Accounts are at JPM and two are at BMO.  Funds in the Canadian Operating Accounts are typically manually transferred on a bi-weekly basis to the Collections Account for DCD's Diamond division.

97.    Throughout the day, funds received into the Collections Accounts are automatically swept into a third-party bank account in the name of, and controlled by, JPM (the "JPM ABL Account").  Funds swept into the JPM ABL Account are applied to pay down outstanding revolver amounts in accordance with the terms of the Credit Agreement.  Pursuant to the Credit Agreement, JPM currently provides up to $35,000,000 in borrowing to the Debtors (the "ABL Facility").

31

98.    Before the commencement of these cases and in order to fund their ongoing operations, the Debtors would access undrawn amounts available under the ABL Facility by submitting a request for a loan advance.  The Debtors would submit this request on a daily basis to pay certain expenses of their Diamond and Alliance divisions.  Upon receipt of a request, and assuming availability and compliance with the other terms and conditions of the Credit Agreement, JPM would advance funds from the JPM ABL Account to Debtor DCD's U.S. operating account for the Diamond division or the U.S. operating account for the Alliance division, as applicable (the "U.S. Operating Accounts").  The U.S. Operating Accounts for the Diamond and Alliance divisions would thus be funded on an as-needed basis to pay operating expenses, including vendor payments, merchant fees, custom duties, taxes, and payroll and benefit expenses.  Separately, the Canadian Operating Accounts for the Diamond division would pay certain operating expenses such as vendor payments, rent and taxes, from funds deposited into those accounts.

99.    For operating expenses that require payment by check, JPM would automatically advance funds from the JPM ABL Account to the applicable controlled distribution account at JPM (the "Controlled Distribution Accounts") on a daily basis, assuming availability and compliance with the terms of the Credit Agreement.

100.    *Cash Flow for DCD's CGA Division*.  Revenue for Debtor DCD's CGA division is deposited into an operating account at JPM (the "CGA Operating Account").  DCD's CGA division also pays its operating expenses from the CGA Operating Account using the funds deposited into that account (excluding payroll, which is paid out of the Operating Account for the Diamond division).  Funds for operating expenses that require payment by check are automatically advanced by JPM from the JPM ABL Account to the CGA Controlled Distribution Account.

Excess funds in the CGA Operating Account are manually transferred on an as-needed basis to the U.S. Operating Account for DCD's Diamond division

101.    *Cash Flow for DST*.   Revenue for Debtor DST is deposited into an operating account at JPM (the "<u>DST Operating Account</u>").   DST also pays its operating expenses from the DST Operating Account using the funds deposited into that account, including vendor payments, taxes and payroll.

102.    Maintaining the prepetition Cash Management System is critical to the Debtors' ability to administer these chapter 11 cases.   If the Debtors are unable to maintain their Cash Management System, then the Debtors' operations will be severely impeded.   The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising postpetition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.

103.    <u>Service Charges</u>.   In the ordinary course of business, the Debtors incur periodic service charges, and other fees to the Banks or other merchant service providers or processors in connection with utilizing and maintaining the Cash Management System (collectively, the "<u>Service Charges</u>").   The Debtors incur approximately \$15,000 in bank fees and \$235,000 of merchant processing fees each month on average.   Accordingly, the Debtors request authority, but not direction, to honor and pay prepetition Services Charges in the ordinary course postpetition regardless of whether such obligations arose before or after the Petition Date.

104.    <u>Intercompany Transactions</u>.   The Debtors engage in ordinary course intercompany transactions with certain non-debtor affiliates (the "<u>Intercompany Transactions</u>") whereby (i) the Debtors pay certain non-debtor affiliates, including E. Gerber Products, LLC ("<u>Gerber</u>"), Renegade, and Gemstone Publishing, Inc. ("<u>Gemstone</u>"), for goods purchased by Debtor DCD,

(ii) non-debtor affiliates Gerber, Diamond International Galleries, LLC, Rosebud, and Gemstone pay Debtor DCD for certain management services, including accounting, human resources and information technology services, (iii) non-debtor affiliates Renegade, Gerber and Gemstone pay Debtor DST for certain software platform services, including administrative and security services for their respective websites, and (iv) certain non-debtor affiliates reimburse Debtor DCD for the affiliates' pro rata share of the cost of certain employee benefit programs, including health insurance and the Debtors' 401(k) plan.  In addition, funds from non-debtor affiliate Gemstone's customer sales are deposited into the DST Operating Account.  These funds are de minimis and set off against the amounts owed by Gerber to Debtor DST for the software platform services.  The Debtors maintain records of the Intercompany Transactions and thus can ascertain, trace and account for their Intercompany Transactions.

105.    <u>Existing Business Forms</u>.  The Debtors use various business forms, such as checks, invoices, letterhead, and other business and marketing materials in the ordinary course of their business (the "<u>Business Forms</u>").  To minimize expenses and disruption, the Debtors seek authority to continue to use all Business Forms in substantially the form used immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates.  The Debtors will communicate with their various vendors and counterparties to notify them of the commencement of these cases, which the Debtors believe will provide adequate notice of the Debtors' status as debtors in possession. However, to the extent the Debtors exhaust their existing supply of checks during these cases and require new checks, the Debtors will order checks with a notation indicating the designation "debtor in possession" and the applicable case number.

**J.      Wages Motion**

106.    The Debtors have filed a motion (the "Wages Motion") seeking entry of an order (i) authorizing, but not directing, the Debtors to (a) pay and honor certain prepetition wages, benefits and other compensation obligations in an aggregate amount not to exceed $1,235,500, and (b) continue to administer their employee programs, benefits and policies in the ordinary course of business; and (ii) granting related relief.

107.    As of the Petition Date, the Debtors employ approximately 487 people (collectively, the "Employees").  The Employees include 481 Employees who are employed on a full-time basis, and 6 Employees who are employed on a part-time basis.

108.    The Employees perform a wide variety of functions critical to providing service and support to the Debtors' vendors and customers and the administration of these chapter 11 cases.  The Employees' skills, knowledge, and understanding of the Debtors' operations are essential to preserving operational safety, stability, and efficiency.  Without the continued, uninterrupted services of their employees, the Debtors' value-maximizing administration of these chapter 11 cases would be materially impaired.

109.    In addition to the Employees' compensation, the Debtors also incur other obligations related to the Employees, such as vacation, federal and state withholding taxes and other withheld amounts, health and welfare benefits, workers' compensation and programs that the Debtors historically have provided in the ordinary course of business.  The compensation practices, programs, benefits and policies provided by the Debtors to their Employees, as more fully described in the Wages Motion, are referred to herein as the "Employee Programs" and the Debtors' obligations thereunder are referred to herein as the "Employee Obligations."

110.    <u>Wage Obligations</u>.  In the ordinary course of business, the Debtors incur obligations to their Employees for wages, overtime, and similar obligations (collectively, "<u>Wage Obligations</u>").  On average, the Debtors pay approximately $2.7 million in gross wages and salary per month on account of their Employee base.  The Debtors pay their Employees on a bi-weekly basis, with Wage Obligations accruing on either a salaried or hourly basis.  Because the Employees are paid in arrears, certain Employees will be owed accrued but unpaid wages as of the Petition Date.  The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts.

111.    As of the Petition Date, the Debtors estimate that they owe approximately $850,000 on account of accrued but unpaid Wage Obligations.  The Debtors do not owe Wage Obligations to any individual in excess of the statutory cap of $15,150 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "<u>Priority Cap</u>").  Accordingly, the Debtors request authority to continue to honor the Wage Obligations and to pay any prepetition claims with respect thereto in the ordinary course of business, including by reissuing any uncashed paychecks as necessary.

112.    <u>Withholding Obligations</u>. Each pay period, the Debtors deduct certain amounts directly from Employees' pay, including, but not limited to: (i) garnishments, child support, and other similar deductions as applicable; and (ii) other pre- and after-tax deductions payable pursuant to certain employee benefits plans described herein, legally-ordered deductions and other miscellaneous deductions (collectively, the "<u>Deductions</u>").

113.    Based upon the Employees' salaries and wages, the Debtors also are required by law to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare, and to remit such withholdings to the applicable authorities.  The Debtors are additionally required to make matching payments from their own funds for Social Security and

Medicare and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, and employment training taxes (collectively, the "Payroll Tax Obligations", and together with the Deductions, the "Withholding Obligations").  Each pay cycle, the Debtors withhold applicable Payroll Tax Obligations from Employees' wages and remit such amounts to the applicable authorities.

114.    The Debtors estimate that, as of the Petition Date, they have withheld approximately $70,000 in prepetition Withholding Obligations.  Through the Wages Motion, the Debtors seek authority, but not direction, to pay and remit the Withholding Obligations to the appropriate authorities consistent with the Debtors' prepetition practices.

115.    Payroll Services. To efficiently manage the processing and payment of the various Employee Obligations, the Debtors rely on services provided by ADP, LLC ("ADP"), to facilitate the Debtors' payroll processing and payroll transfer administration (the "Payroll Services"). Each payroll period, the Debtors calculate that period's payroll and any Withholding Obligations, and remit that information to ADP, which then processes a direct deposit transfer for each Employee.

116.    The Debtors pay approximately $35,000 annually in fees to ADP for these services. As of the Petition Date, the Debtors estimate they will owe approximately $3,500 on account of prepetition fees relating to Payroll Services. The Debtors seek authority to pay all such fees, including any prepetition amounts, as Employee Obligations come due in the ordinary course of business.

117.    Accrued PTO. In the ordinary course of business, the Debtors provide eligible Employees with paid time off for vacation, sick leave and other reasons (collectively, "Accrued PTO").  Vacation days are available to Employees working at least 80 hours per bi-weekly period

and are accrued on a per pay basis. The maximum accrual balance depends on the Employee's years of service with the Debtors, as detailed in the below chart:

| Years of Service | Multiplier | Maximum Vacation Days |
|---|---|---|
| 0–1 (hourly and salary) | 0.0246 | 8 days |
| 1-10 (hourly) | 0.0400 | 13 days |
| 1-5 (salary) | 0.0400 | 13 days |
| 5-10 (salary) | 0.0540 | 18 days |
| 10+ (hourly) | 0.0461 | 15 days |
| 10+ (salary) | 0.0615 | 20 days |

Although Employees begin accruing Accrued PTO on the first day of employment, they are not permitted to use Accrued PTO until completion of a 90-day introductory period. On the Employee's anniversary date, the Employee may rollover up to 56 hours of earned and unused accrued vacation hours. The Employee's anniversary date is based on their date of hire (or if the individual is already an Employee, the date the Employee becomes a full-time Employee). If the Employee has taken 40 hours or more Accrued PTO during a year, any time above 56 hours in earned and unused Accrued PTO for the year is cashed out at 60% of the Employee's base pay rate. If the Employee has not taken 40 hours or more Accrued PTO during a year, the Employee must either use up to 40 hours or those hours of Accrued PTO will be forfeited by the Employee. Unused pro-rated Accrued PTO is paid to an Employee upon termination. Unused pro-rated Accrued PTO is also paid to an Employee upon resignation or retirement, subject to the Employee providing proper notice of resignation in accordance with the Debtors' internal policies.

118. Full-time Employees are also awarded paid sick leave and, in special circumstances, personal days. Under the Debtors' sick leave policy, full-time Employees also

accrue sick leave at a rate of 1.85 hours per bi-weekly pay period. Eligible Employees begin to accrue sick leave on the first day of employment but may not use earned sick leave until completion of a 90-day introductory period. Personal days are offered at the Debtors' discretion in special situations for Employees who require time off unexpectedly. Employees must be employed for over a year to be eligible for the Debtors' personal day program. Personal days and sick leave are not paid out to Employees upon resignation, retirement or termination

119. As of the Petition Date, the Debtors estimate that, in total, the value of all accrued and unpaid prepetition Accrued PTO is approximately $780,000. The Debtors believe that continuing to honor Accrued PTO in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend, and the continuation of such programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations. Accordingly, the Debtors request authority to honor all prepetition Accrued PTO if and when it comes due in the ordinary course, and continue to honor all postpetition Accrued PTO in the ordinary course of business.

120. <u>Reimbursable Expenses and Credit Card Obligations</u>. Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed certain Employees for approved expenses incurred on behalf of the Debtors in the scope of their employment ("<u>Reimbursable Expenses</u>"). Reimbursable Expenses include travel, lodging, transportation, mileage, meals and other miscellaneous expenses. As of the Petition Date, the Debtors estimate that they currently owe approximately $1,000 on account of accrued and unpaid Reimbursable Expenses to Employees.

121.    In addition, the Debtors maintain credit cards (the "Commercial Credit Cards") to be used in connection with Employees' day-to-day job functions and travel expenses. These Commercial Credit Cards are held by select employees in leadership positions. Employees may use the Commercial Credit Cards to pay for job-related expenses. All Commercial Credit Cards issued by the Debtors to their Employees have detailed restrictions on permissible expenditures, and Employees are responsible for any non-reimbursable amounts charged to the Commercial Credit Cards. The obligations arising under the Commercial Credit Cards are paid directly by the Debtors. The Debtors estimate that they incur obligations under the Commercial Credit Cards of approximately $200,000 per month (the "Commercial Credit Card Obligations"). As of the Petition Date, the Debtors estimate that they owe approximately $135,000 in outstanding Commercial Credit Card Obligations.

122.    The Debtors seek authority to satisfy all prepetition obligations related to the Reimbursable Expenses and Commercial Credit Card Obligations, as and when they arise, in the ordinary course of business.

123.    Benefits Programs. In the ordinary course, the Debtors maintain various benefits plans, policies, and programs (the "Benefits Programs", and all amounts required under or relating thereto, the "Benefits Obligations"). The Benefits Programs generally fall into the following categories: (i) medical, dental, and vision benefits; (ii) 401(k) contributions; (iii) workers' compensation benefits; and (iv) certain other miscellaneous benefits programs, such as life insurance, short and long-term disability programs, and employee discounts.

124.    The Debtors request authority to maintain the Benefits Programs in the ordinary course of business and to pay all Benefits Obligations, whether related to the period before or after the Petition Date. As of the Petition Date, the Debtors estimate that the amount of accrued but

unpaid Benefits Obligations, including administrative fees, is approximately $106,000, as detailed below:

    i.    **Health Insurance Programs:** The Debtors maintain, and eligible Employees may participate in, a number of health insurance programs, including (a) medical plans through CIGNA provided by Luminare Health Benefits, Inc., (b) dental insurance through AETNA provided by Luminare Health Benefits, Inc. and vision insurance through Davis Vision, (c) a health flexible spending account and a dependent care flex spending account, and (d) arrangements with three Employees to make partial payment for premiums on these Employees' private health insurance plans in a manner that reduces the Debtors' costs versus coverage on the Debtors' medical insurance plan (collectively, the "Health Insurance Programs"). As of the Petition Date, the Debtors estimate that they will owe approximately $78,000 on account of the Health Insurance Programs.

    ii.    **401(k) Plan:** The Debtors maintain a retirement savings plan for the benefit of their Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan") through JPMorgan. Historically, the Debtors matched, on a discretionary basis, up to a percentage of each Employees' annual income that is contributed to the 401(k) Plan, based on each Employees' years of service (the "401(k) Matching Contributions"). The Debtors may also elect, in their discretion, to make a "profit sharing" contribution to the 401(k) Plan (the "Profit Sharing Contributions"). The Debtors are not currently making 401(k) Matching Contributions or Profit Sharing Contributions. Accordingly, as of the Petition Date, the Debtors do not owe any outstanding 401(k) Matching Contributions or Profit Sharing Contributions.

    iii.    **Workers' Compensation:** The Debtors maintain workers' compensation insurance as required by applicable state laws (the "Workers' Compensation Program"). The Debtors pay a premium every ten months in connection with the Workers' Compensation Program of approximately $126,000. The Debtors pay this premium pursuant to a monthly payment plan. As of the Petition Date, the Debtors estimate that they owe approximately $13,000 for the monthly premium payment in connection with the Workers' Compensation Program.

    iv.    **Insurance Coverage:** The Debtors provide life insurance, accidental death and dismemberment insurance, and long- and short-term disability insurance coverage to eligible Employees through The Hartford ("Insurance Coverage"), on an Employee-paid basis. The average annual cost of the Insurance Coverage is approximately $180,000 excluding voluntary products. As of the Petition Date, the Debtors estimate that they owe approximately $15,000 in connection with Insurance Coverage.

    v.    **Paid Leave:** The Debtors offer paid leave to regular-full time employees for holidays, bereavement, sick leave, jury duty and witness duty. As of the

53446928.5

Petition Date, the Debtors do not believe they have any outstanding obligations under the leave programs, however, the Debtors seek to honor such programs in the ordinary course going forward.

vi. **Employee Discounts:** The Debtors offer full-time Employees an employee discount of the lesser of (i) 50% off the retail price of products or (ii) the maximum discount offered to the Debtors' direct market retailers for products purchased through the Debtors.  Invoice amounts for products purchased with an employee discount are forwarded to the Debtors' Human Resources department for immediate posting and the appropriate deduction is taken in the next payroll.  All employee discount purchases are non-returnable.  The Debtors request authority to continue to honor the employee discount purchase policy in the ordinary course

125. Independent Contractors.  The Debtors also employ approximately 40 independent contractors in the ordinary course of business.  The independent contractors provide a variety of services to the Debtors, including, marketing, tax, programming, and sales.  In particular, Debtor DST, employs approximately 37 independent contractors who provide freelance work, including sculpting, painting and drawing DST's products. The Debtors' independent contractors are typically paid on a per-project basis with monthly payments fluctuating depending on the Debtors' current projects.  As of the Petition Date, the Debtors owe the independent contractors in the aggregate $70,000 (the "Contractor Obligations", and together with the Employee Obligations, the "Workforce Obligations"), all of which will become due and owing during the Interim Period.  The Debtors seek authority, but not direction, to satisfy the prepetition Contractor Obligations in the ordinary course of business.

126. I believe that the relief requested in the Wages Motion is crucial to ensuring the Debtors have as smooth a transition into bankruptcy as possible.  The Debtors' business depends upon their Employees and independent contractors.  Honoring the Workforce Obligations and Employee Programs is essential to ensure continued reliability and loyalty among the Debtors' workforce.  I am also informed and believe that without the relief requested in the Wages Motion, Employees will likely seek alternative employment opportunities.  Such a development would

42

deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and maximize the value of their estates during this chapter 11 process. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on administering a value-maximizing chapter 11 process. Accordingly, based on the foregoing and those additional reasons set forth in the Wages Motion, I believe that the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

### K.    Critical Vendor Motion

127.    The Debtors have filed a motion (the "Critical Vendor Motion") seeking entry of interim and final orders: (i) authorizing, but not directing, the Debtors to pay prepetition claims of certain vendors that provide critical goods and services (the "Critical Vendors," and their prepetition claims, the "Critical Vendor Claims") in a total amount not to exceed $4,000,000 on an interim basis and $7,000,000 on a final basis; and (ii) granting related relief.

128.    Debtor DCD does not manufacture the goods it distributes, and thus relies on a network of Critical Vendors to provide it with inventory and other associated services. These Critical Vendors are, by and large, the sole source or limited source for certain goods and services. Certain Critical Vendors provide the Debtors with goods and services that carry brand names for which there is no alternative purchasing option, and these brands represent a key component of customer demand. Moreover, without these Critical Vendors, the Debtors could not maintain inventory and merchandise at levels necessary to satisfy current customer demands and attract new customers. The Debtors' customers expect the Debtors to satisfy purchase orders in a timely manner due to the need to place newly-released products in stores and maintain customers' stock

of certain products. The Debtors' responsiveness to their customers requires uninterrupted goods and services from the Critical Vendors. Uninterrupted supply of these goods and services is essential to the Debtors' continued operations, and the Debtors would be highly disadvantaged within the industry without access to the good and services provided by the Critical Vendors.

129.    Further, I understand that certain Critical Vendors have extensive discretion, pursuant to their respective agreements with the Debtors, regarding the allocation of products to the Debtors. Historically, the Debtors have received a favorable allocation of products from their Critical Vendors, allowing the Debtors to capitalize on newly-released products with high customer and, by extension, consumer demand. However, the Debtors believe that absent the relief requested in this Motion the Critical Vendors may modify the Debtors' allocation percentage, in accordance with the terms of their agreements, resulting in a decrease of the Debtors' inventory to the detriment of the Debtors, their estates and their creditors. An unfavorable change in allocation under the Critical Vendor agreements could irreparably damage the Debtors' business by disrupting or cutting off the supply of the goods in the highest demand, at exactly the time the Debtors need them most. To maintain continued favorable allocation of product, the Debtors believe that they need the discretion to pay prepetition amounts due to the Critical Vendors.

130.    Certain Critical Vendors are located outside the United States, including in Japan and Germany (the "Foreign Critical Vendors"). In addition to the Debtors' concerns noted above, the Debtors believe there is a significant risk that the nonpayment of any invoices to Foreign Critical Vendors could cause a Foreign Critical Vendor to stop shipping goods to the Debtors on a timely basis or to sever completely its business relationship with the Debtors. Foreign Critical Vendors may have skeptical reactions to the United States bankruptcy process because many of them are unfamiliar with the unique debtor-in-possession mechanism in chapter 11 proceedings.

Short of severing their contractual relationships with the Debtors, nonpayment of prepetition claims may cause Foreign Critical Vendors to delay shipments until more certainty develops with respect to the Debtors' reorganization. The Debtors cannot afford delays of the key products manufactured by the Foreign Critical Vendors.

131. More fundamentally, the Foreign Critical Vendors could simply refuse to do business with the Debtors. Because the Foreign Critical Vendors generally have no or *de minimis* assets or operations in the United States that would be subject to the jurisdiction of this Court, the Debtors have no workable enforcement mechanism against these parties. The cumulative effect of the Foreign Critical Vendors' breach of their contracts with the Debtors could be detrimental to the Debtors' operations and their ability to reorganize. Without timely deliveries from their Foreign Critical Vendors, the Debtors' operations would suffer—to the detriment of the Debtors and their stakeholders. The Debtors cannot risk delay or disruption in maintaining their inventory and receiving newly-released products as such products are launched.

132. For the foregoing reasons, the Debtors believe it is necessary to maintain positive business relationships with the Critical Vendors. Indeed, the Debtors believe that the amount of the Critical Vendor Claims pales in comparison to the potential damage to the Debtors' business if the Debtors' operations were to experience significant disruption. Therefore, the Debtors and their stakeholders would benefit from the relief requested herein.

L.       **Shippers & Freight Forwarders Motion**

133.     The Debtors have filed a motion (the "Shippers & Freight Forwarders Motion") seeking entry of interim and final orders: (i) authorizing, but not directing, the Debtors to pay certain prepetition claims of Shippers and Freight Forwarders (as defined below) in an amount not to exceed $565,000 on an interim basis and $585,000 on a final basis; (ii) authorizing, but not directing, the Debtors to continue to honor obligations to Shippers and Freight Forwarders on a postpetition basis in the ordinary course of business and consistent with historical practice; and (iii) granting related relief.

134.     In the normal course of operations, the Debtors heavily rely on a variety of shippers, delivery companies, and similar service providers (collectively, the "Shippers") to deliver inbound products from their vendors, and to deliver outbound orders to their customers.  The Debtors also rely on certain freight forwarders to manage shipments (collectively, the "Freight Forwarders"). This distribution system is critical to meeting customer orders that are time-sensitive based on the need to place newly-released products in stores and maintain customers' stock of key products. Failure to maintain a functioning and reliable delivery network will negatively impact customer goodwill and cause customers to switch to competitors, thus harming the Debtors' operations and the value of their assets.

135.     The Debtors expect that, as of the Petition Date, certain Shippers and Freight Forwarders may hold claims against the Debtors (collectively, the "Shipping Claims").  Some of the Debtors' Shippers and Freight Forwarders may also functionally act as warehousemen, to the extent that a particular Shipper warehouses the Debtors' products in its trucks or at its facilities.

136.     The Debtors' distribution system is an integrated network that is dependent upon the continued use of their existing Shippers and Freight Forwarders.  Because the Debtors'

business depends on the constant supply of both inbound products and outbound orders to customers through Shippers and Freight Forwarders, even minor disruptions to the supply of products could be detrimental to the going concern value of the Debtors' business.

137.    I understand that, under some nonbankruptcy laws, Shippers or Freight Forwarders may have a lien, or may be able to assert liens, on the goods in their possession to secure payment of the charges or expenses incurred in connection with the Shipping Claims.  In the event these Shipping Claims remain unpaid, the Shippers and Freight Forwarders could attempt to assert liens or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed

138.    The Debtors anticipate that some Shippers & Freight Forwarders will demand immediate payment from the Debtors.  Even absent a valid lien, a Shipper's or Freight Forwarder's mere possession (and retention) of the Debtors' products could severely disrupt, and potentially cripple, the Debtors' operations because of the time sensitive nature of the delivery timeline to the Debtors' customers.

139.    The Debtors believe that the cost of replacing or reconstructing their existing supply chain network far exceeds the amount of Shipping Claims outstanding as of the Petition Date.  If the Shippers or Freight Forwarders were to assert liens or refuse to deliver products, the cost of this disruption to the Debtors' estates would likely far outweigh the outstanding Shipping Claims. Moreover, in most cases, the Debtors do not believe that there are viable timely alternatives to the Shippers and Freight Forwarders that are to be paid pursuant to this Motion.

140.    Accordingly, the Debtors seek to prevent the breakdown of their delivery network by requesting authority to pay certain prepetition Shipping Claims, as they become due and payable, that the Debtors determine are necessary or appropriate to: (a) obtain release of critical or

47

valuable products that may be subject to liens; (b) maintain a reliable, efficient, and smooth distribution system; and (c) induce critical Shippers and Freight Forwarders to continue to carry products and to make timely delivery. The Debtors shall only pay undisputed prepetition Shipping Claims that the Debtors have determined, in their business judgment, (i) are necessary or appropriate and (ii) provide a benefit to the Debtors' estates and creditors that exceeds the costs to commence an action to compel turnover of such products and the associated delays of such action.

141.    For the foregoing reasons, I believe the relief sought in the Shippers & Freight Forwarders Motion is in the best interest of the Debtors, their estates, creditors and parties in interest.

**M.    DIP Motion**

142.    The Debtors have filed a motion (the "DIP Motion") seeking entry of interim and final orders:

    i.    authorizing the Debtors to obtain secured postpetition financing in the form of a superpriority senior secured revolving credit facility (the "DIP Facility"), pursuant to which revolving loans (the "DIP Loans") in a maximum amount not to exceed $41,000,000 (the "Maximum DIP Facility Amount"), of which the maximum amount available to be drawn under the interim DIP Facility (the "Interim Facility") shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations (as defined below) from the Petition Date through the entry of the Final Order in excess of $5,500,000, subject to the terms and conditions of the Interim Order, Final Order and the senior secured Debtor-in-Possession Credit Agreement by and among the Debtor Diamond Comic Distributors, Inc. ("Diamond Comic"), as borrower, JPMorgan Chase Bank, N.A. (in such capacity, the "DIP Lender"), as lender, and the following guarantors (collectively, the "DIP Entity Guarantors"): Debtor Comic Exporters, Inc., Debtor Comic Holdings, Inc., Debtor Diamond Select Toys & Collectibles, LLC, and non-debtor affiliates Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales, Rosebud Entertainment, LLC, Renegade Games, LLC, and Game Consolidator, LLC, substantially in the form attached to the Interim Order as Exhibit 1 (the "DIP Credit Agreement," and together with the schedules and exhibits attached hereto, and all agreements, documents, and

instruments executed and delivered in connection therewith, the "<u>DIP Loan Documents</u>");

ii.    authorizing the Debtors to execute, enter into and deliver the DIP Loan Documents, including without limitation, definitive pledge and security agreements granting first priority liens in substantially all the Debtors' assets to secure the obligations under the DIP Credit Agreement, and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

iii.    granting the DIP Lender fully-perfected, priming, first priority security interests in the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, subject to the Carve-Out and Permitted Priority Liens (each as defined below);

iv.    granting the DIP Lender (i) superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) liens pursuant to sections 634(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Permitted Priority Liens, and (iii) priming liens pursuant to section 364(d) of the Bankruptcy Code, on the DIP Collateral and all proceeds thereof (including, upon entry of the Final Order, any Avoidance Actions/Proceeds (as defined below));

v.    authorizing the Debtors to continue to use Cash Collateral (as defined below) in which JPMorgan Chase Bank, N.A. (in such capacity, the "<u>Prepetition Lender</u>") has an interest in accordance with the terms and conditions of the Proposed Orders, and granting adequate protection, subject to the Carve-Out, to the Prepetition Lender to secure, *inter alia*, postpetition financing under the DIP Facility and the use of Cash Collateral;

vi.    upon entry of the Final Order, waiving the Debtors' right to surcharge the Prepetition Collateral or DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

vii.    upon entry of the Final Order, finding that neither the DIP Lender nor the Prepetition Lender, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

viii.    authorizing and directing the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Unused Line Fee and Success Fee, under and as defined in the DIP Credit Agreement), expenses and other amounts payable under the DIP Loan Documents, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, the Proposed Orders and the applicable DIP Loan Documents;

ix.  subject to the restrictions set forth in the DIP Loan Documents and the Proposed Orders, authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral in accordance with both the Budget (as defined below) and the DIP Loan Documents;

x.  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Proposed Orders and the DIP Loan Documents;

xi.  scheduling a final hearing to consider entry of the Final Order;

xii.  providing for the immediate effectiveness of the Interim Order and Final Order (upon entry) and waiving any applicable stay, including under Bankruptcy Rule 6004, to permit such immediate effectiveness; and

xiii.  granting related relief

143.  A summary of the material provisions of the DIP Credit Agreement and the interim DIP order may be found in the DIP Motion.

144.  The Debtors urgently need access to the proposed DIP Facility and use of cash collateral to continue to operate their business through the proposed postpetition sale process and fund administration of these chapter 11 cases.  Absent the relief requested in the DIP Motion, the Debtors will not have sufficient liquidity to continue their business operations, fund payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring.  All of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern.  Any delay in the Debtors' ability to access Cash Collateral would irreparably harm the Debtors and their estates.

145.  The Debtors have closely scrutinized the financing terms offered by the DIP Lender, including the economic terms, the impact on the Debtors' business, any restrictions on the use of proceeds and the collateral and security requested, and believe that the terms sought to be approved by the DIP Motion are necessary and appropriate.  Additionally, because the DIP Lender is the Debtors' prepetition secured lender, it is familiar with the Debtors, their business and their

50

capital structure.  This familiarity has enabled the parties to act more quickly and limit diligence risk, both of which are crucial in light of the Debtors' critical need for liquidity.

146.    I believe that the filing of these chapter 11 cases and the incurrence of indebtedness under the DIP Debt (as defined in the DIP Motion) offers the best available option for the Debtors, as the DIP Facility provides the necessary liquidity and forum for the Debtors to conduct value-maximizing sale process in these chapter 11 cases.  I also believe that the terms of the DIP Credit Agreement and the terms governing the Debtors' use of cash collateral were heavily negotiated in good faith, and at arm's length, and that the terms upon which the parties ultimately agreed are the most favorable terms the Debtors reasonably could have achieved under the circumstances. For these reasons, I submit that the relief sought in the DIP Motion is in the best interests of the Debtors' estates and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


 Dated: January 14, 2025                       Respectfully submitted,

                                               _/s/ Robert Gorin_____
                                               Robert Gorin
                                               Chief Restructuring Officer

51