IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**DECLARATION OF ALEC HAESLER IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED FINANCING AND THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Alec Haesler, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.  I am a Director at Raymond James & Associates, Inc. ("Raymond James"), which has its principal office at 880 Carillon Parkway, St. Petersburg, Florida 33716. I am authorized to make this declaration on behalf of Raymond James in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; and (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") [ECF No. 19].[2] Unless otherwise

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2] Capitalized terms used but not otherwise defined herein are defined in the DIP Motion.

stated in this declaration, I have personal knowledge of the facts set forth herein or provide this declaration based upon information provided to me by other Raymond James professionals.

## Qualifications

2. Raymond James is a subsidiary of Raymond James Financial, Inc. ("RJF"), a publicly traded (NYSE:RJF) full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and other service offerings to individual and institutional clients. RJF and its subsidiaries employ over 17,000 individuals in the United States alone, of which over 515 provide investment banking advisory services to firm clients. Since 2019, Raymond James has participated in 860 capital raises and completed more than 1,115 advisory assignments, including over 925 M&A buy-side or sell-side advisory assignments.

3. Raymond James has a dedicated restructuring investment banking group of more than 20 professionals with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, or bankruptcy proceedings. Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, reorganization, financing, financial opinion, and special advisory transactions.

4. Raymond James's professionals have considerable expertise and experience in providing investment banking services to financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out of court proceedings. Representative engagements that investment bankers at Raymond James have led in

prior chapter 11 cases and restructurings include: American Eagle Energy Corporation; American IronHorse Motorcycles, Inc.; ATLS Acquisition, LLC; BI-LO, LLC; BJ Services, LLC; Bluestem Brands, Inc.; Buccaneer Energy; Calpine Energy; CB Holding Corp.; CCNG Energy Partners; Clarus Therapeutics Holdings, Inc.; ColorSpot Holdings, Inc.; Dakota Plains Holdings, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Halt Medical, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; Hooper Holmes, Inc.; International; Garden Products, Inc.; Just One More Restaurant Corp.; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; LVI Intermediate Holdings, Inc.; Max & Erma's, Inc.; National Envelope Corporation; Novan, Inc.; Personal Communication Devices, LLC; Phoenix Payment Systems, Inc.; Proteus Digital Health, Inc.; Quanergy Systems, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.; SP Newsprint Holding LLC; Teligent, Inc.; and The Palm Restaurant Group, Inc.

5.  On September 30, 2024, the Debtors engaged Raymond James as investment banker to, among other things, assist the Debtors in pursuing strategic alternatives in the midst of an increasingly difficult liquidity situation, including to construct and commence a marketing process for the Debtors' assets.

6.  I am authorized to submit this Declaration on behalf of Raymond James. I am being compensated through payments received by Raymond James as the investment banker proposed to be retained by the Debtors in these cases, and I am not compensated separately for this testimony. Except as otherwise indicated herein, all the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other Raymond James professionals involved in advising the Debtors, or information provided to

me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis.

### The Debtors' Need for Access to a DIP Facility and Cash Collateral

7. The Debtors use cash on hand and cash-flow from operations to fund their working capital needs and other general corporate purposes. During these chapter 11 cases, the Debtors will need current liquidity to satisfy payroll, meet overhead obligations, satisfy the costs, fees, and expenses (including all professional fees and expenses) of administering these cases, and for the continued management, operation, and preservation of their business. The ability to satisfy these expenses as and when due is essential to the Debtors' successful operation of their businesses during these cases, and their restructuring efforts.

8. In consultation with their advisors, the Debtors reviewed and analyzed their projected cash flows to determine the requisite amount of DIP financing. Based on this analysis, the Debtors ultimately determined that they would require incremental liquidity of approximately $41.0 million to operate smoothly during the postpetition period.

9. The terms of the DIP Facility are detailed in the DIP Motion and the DIP Credit Agreement. The DIP Facility contemplates financing in the form of up to $41.0 million in senior secured revolving credit bearing interest at the Adjusted REVSOFR30 Rate (as defined in the Prepetition Credit Agreement) plus 4.50%.

10. As noted in the DIP Motion, the DIP Loans will be secured by senior secured superpriority liens on substantially all assets and property of the Debtors, subject to certain permitted exceptions, permitted senior liens, and a carve-out for professional expenses. The DIP Facility shall mature upon the scheduled maturity date and certain events as set forth in the DIP Credit Agreement.

**The Debtors' Prepetition DIP Marketing Efforts**

11. In the days leading up to these chapter 11 cases, Raymond James, on behalf of the Debtors, made inquiries into potential sources of DIP financing, including the Debtors' existing lender or affiliates of the existing lender, and solicited proposals from various lending institutions with experience in providing such financing. The Debtors, with the assistance of Raymond James, contacted eleven (11) potential lenders that Raymond James believed might be interested in providing DIP financing to the Debtors in an amount sufficient to fund the Debtors' operations in chapter 11.

12. With the exception of the DIP Lender, none of these potential lenders submitted formal proposals for a DIP facility and no additional lenders expressed interest in participating in a DIP facility. Ultimately, many of the parties contacted by Raymond James reported that they were unwilling to extend financing to the Debtors due to a number of factors including company performance and the size of the required DIP facility.

13. Several of the third-party lenders discussed preliminary terms that, even prior to their conducting due diligence, was inferior to those offered by the DIP Lender.

14. The only formal DIP proposal the Debtors received was from the Prepetition Lender (the "Existing Lender Proposal"). The Debtors were unable to obtain sufficient credit either (a) on an administrative priority basis, (b) secured by liens on unencumbered property, or (c) secured solely by junior liens on already encumbered property.

15. I believe that the marketing process used to determine the most viable DIP financing for the Debtors was appropriate under the circumstances, including, without limitation, in light of the Debtors' financial condition, timing concerns, and the existing capital structure.

16. As part of these marketing efforts, the Debtors, with the assistance of Raymond James, engaged in discussions with the DIP Lender regarding both their interest in providing DIP

financing as well as their willingness to consent to third-party DIP financing. I supervised these efforts on behalf of Raymond James and, along with individuals at Raymond James who report to me, directly interacted with these potential lenders.

**The DIP Facility Is the Best and Only Postpetition Financing Option for the Debtors**

17. Based on my experience with debtor-in-possession financing transactions as well as my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP Facility represents the best, and only, presently available financing option under the facts and circumstances of these chapter 11 cases.

18. First, as noted in the Motion, the proposed DIP Facility and the use of Cash Collateral are expected to provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently administer these chapter 11 cases.

19. Second, the terms of the proposed DIP Facility are the result of the negotiations and outreach efforts described above. As noted above, the Debtors, with the assistance of their advisors, solicited other sources of postpetition financing to determine whether the Debtors could obtain such postpetition financing on better terms. However, other than the DIP Lender, I am not aware of any party that was willing to provide any financing on an unsecured or junior basis and none of the prospective third-party financing sources referred to above seemed willing to engage in a priming fight. The DIP Facility, on the other hand, being extended by, and thus supported by the Prepetition Lender avoids any priming fight.

20. Third, I believe that the principal economic terms proposed under the DIP Facility, such as the contemplated pricing, fees, interest rate, and default rate are appropriate for the unique circumstances of these cases. In my view, based on the discussions I observed, such economic

terms were negotiated at arm's length and reflect the best terms available to the Debtors. It is my belief that the DIP Lender would not have agreed to provide the DIP Facility without these principal economic terms.

21. Finally, the adequate protection afforded to the Prepetition Lender in exchange for consensual use of cash collateral and priming of the DIP Facility is appropriate under the circumstances. As detailed in the DIP Motion, the Debtors have agreed to provide to the Prepetition Lender several forms of adequate protection to the extent of any diminution in the value of its interests in the prepetition collateral. Based on my experience as a restructuring professional, this proposed package is consistent with adequate protection packages provided to prepetition secured lenders in connection with consensual use of cash collateral.

## The DIP Facility Was Negotiated at Arm's Length

22. The negotiations among the Debtors and the DIP Lender with respect to the terms of the DIP Facility, including the interest rate and fees, in which I was closely involved, continued into the days immediately leading up to the Petition Date. In my view, based on the discussions I observed in the course of these negotiations, and my experience negotiating other debtor-in-possession financings, these negotiations were conducted at arm's length.

## Conclusion

23. In sum, I believe that, in light of the facts described above, the DIP Facility is the best financing option presently available to the Debtors under the circumstances. Additionally, I believe that the principal economic terms proposed under the DIP Facility (including the pricing, fees, and interest rate) are consistent with the circumstances of this case, were negotiated at arm's length, and are, in the aggregate, generally consistent with terms of DIP financings in comparable

circumstances. For each of the foregoing reasons, I believe that granting the relief requested in the Motion is in the best interests of the Debtors, their estates, and all parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 12, 2025                                By: */s/ Alec Haesler*
                                                                             Alec Haesler
                                                                             Raymond James & Associates, Inc.

53690601.1 01/14/2025