**Exhibit B**

**Engagement Letter**

Case 25-10308    Doc 67-2    Filed 01/17/25    Page 1 of 19

**RAYMOND JAMES®**

**CONFIDENTIAL**
September 30, 2024

Diamond Comic Distributors, Inc.
10150 York Road, Ste. 300
Hunt Valley, MD 21030
Attention: Robert Gorin, Chief Restructuring Officer

Ladies and Gentlemen:

This letter agreement (this "Agreement") confirms the terms pursuant to which Diamond Comic Distributors, Inc. (together with affiliate, and/or any special purpose entity formed or used by Diamond Comic Distributors, Inc.to effect or facilitate any Transaction (as defined below), and any successor to or assignee of all or a portion of its or any such entity's assets and/or businesses, the "Company" or "you") has retained Raymond James & Associates, Inc. (and including any of its affiliates assisting in executing this engagement, "Raymond James," "we" or "us," and together with the Company, each a "Party" and collectively, the "Parties") to provide the Company with Services as defined in Section 1(a) below, relating to any possible Transaction, including the terms of any such Services provided by Raymond James before the date of this Agreement. As used in this Agreement, the term "affiliate" means, as to any applicable person or entity, any person or entity that exists now or after the date of this Agreement which directly or indirectly controls, is under common control with, or is controlled by, the applicable person or entity.
As used in this Agreement, the term:

(a) "Business Combination Transaction" means (i) the possible sale or transfer (however effectuated) of any portion of the business, revenues, income, operations or assets (including the assignment of any executory contracts) of the Company outside the ordinary course of business to, the possible sale or transfer (however effectuated) of a majority voting or economic interest in the Company's securities or control of the Company to, or the merger of the Company with, one or more Interested Parties (including, without limitation, existing creditors, employees, affiliates and/or securityholders), or any other possible strategic transactions, joint ventures, combinations or undertakings between or involving the Company and one or more Interested Parties; and/or (ii) the acquisition, directly or indirectly by an Interested Party (as defined below) (or by one or more persons or entities acting together with an Interested Party pursuant to a written agreement or otherwise), in a single transaction or a series of transactions, of (A) any portion of the assets or operations of the Company or (B) any outstanding or newly-issued shares of the Company's equity securities (or any securities convertible into, or options, warrants or other rights to acquire such equity securities) (such equity securities and such other securities, options, warrants and other rights being collectively referred to as "Company Securities") that results in holders of shares of the Company's equity securities immediately prior thereto owning less than a majority voting or economic interest in the Company's securities or control of the Company immediately thereafter.

(b) "Financing Transaction" means any transactions, arrangements or undertakings (however effectuated) involving the issuance of debt, securities exchangeable or convertible into common or preferred stock, or equity or equity-linked securities (including royalties, profit sharing and other similar financing transactions) for or on behalf of the Company or securing loans or credit facilities for the Company (whether to raise funds, refinance outstanding securities or exchange securities or any combination thereof, provided that any such transaction involves the receipt by the Company of new cash consideration as opposed to the restructuring, renegotiation, forgiveness, or exchange with or by the holder of any outstanding debt obligations or equity securities of the Company, which

Diamond Comic Distributors, Inc
September 30, 2024
Page 2

would constitute a Business Combination Transaction or such other financing of any type committed to complete any other Transaction.

(c) "Interested Party" means any financial and/or strategic institutional investors or other investors or third parties who may be interested in participating in the particular Transaction.

(d) "Transaction" means any Business Combination Transaction or Financing Transaction.

(e) "Transaction Fee" means any Business Combination Transaction Fee (as defined below) or Financing Transaction Fee (as defined below).

1. **Investment Banking Advisory Services** –

    (a) The Company hereby engages Raymond James as its sole and exclusive investment banking advisor regarding a potential Transaction. During the Term (as defined below), Raymond James agrees to assist the Company, as reasonably requested by the Company to (i) review and analyze the Company's business, operations, properties, financial condition and Interested Parties, (ii) evaluate the Company's debt capacity, including by advising the Company generally as to available financing and assist in the determination of an appropriate capital structure, (iii) evaluate potential Transaction alternatives and strategies, (iv) prepare documentation within our area of expertise that is required in connection with a Transaction, (v) identify Interested Parties regarding one or more particular Transactions, (vi) contact Interested Parties on behalf of the Company and with prior written consent by the Company, which Raymond James, after consultation with the Company's management, believes meet certain industry, financial, and strategic criteria and assist the Company in negotiating and structuring a Transaction, and (vii) advise the Company as to potential Business Combination Transactions. Additionally, Raymond James will, as reasonably requested, (viii) advise the Company on tactics and strategies for negotiating with holders of the Company's debt or other claims of the Company ("Stakeholders"), and (ix) participate in the Company's board of directors meetings as determined by the Company to be appropriate, and, upon request, provide periodic status reports and advice to the board with respect to matters falling within the scope of Raymond James's retention (collectively, items (i) through (ix), the "Services"). The Company expressly acknowledges that Raymond James does not guarantee, warrant or otherwise provide assurance that the Company will be able to implement or consummate any Transaction or achieve any other result.

    (b) In the event the Company becomes a debtor in a case under the Bankruptcy Code, the Company shall file an application to retain Raymond James and use best efforts to have it heard at the "second day" hearing. Such application shall seek authorization from the bankruptcy court having jurisdiction over any Chapter 11 case commenced by the Company (the "Bankruptcy Court") to retain Raymond James pursuant to (and subject to the standard of review of) Section 328(a) of the Bankruptcy Code, *nunc pro tunc* to the date on which the Company files its bankruptcy case, in accordance with the terms hereof and Addendum A attached to this Agreement and not subject to any other standard or review under Section 330 of the Bankruptcy Code. The Company shall supply Raymond James with a draft of such application and any proposed order authorizing Raymond James's retention sufficiently in advance of their filing to enable Raymond James and its counsel to review and comment thereon. Services under this Agreement shall be subject to the entry of a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition (the "Retention Order") approving the retention of Raymond James and this Agreement under Section 328(a) of the Bankruptcy Code. In any event, the Retention Order must be acceptable to Raymond James in all respects. In addition, the Company must include, and obtain Bankruptcy Court approval of, a carveout from liens (including replacement liens) in all financing or cash collateral orders to pay any Transaction Fee(s) and

**RAYMOND JAMES®**

Diamond Comic Distributors, Inc
September 30, 2024
Page 3

Advisory Fees of Raymond James. If the Retention Order or carveout are not obtained (or is later terminated or set aside for any reason), Raymond James may terminate this Agreement and the Company shall reimburse Raymond James for all reasonable professional fees and out of pocket expenses reasonably incurred prior to such date of termination, unless prohibited from doing so by applicable law and/or the Bankruptcy Court.

(c) The Company will, as Raymond James may request, provide the necessary assistance, participation, and information reasonably required at all steps and will cause management to be reasonably available and furnish, and cause management to furnish, Raymond James such information, data and cooperation relating to the Company and any potential or actual Transaction, as Raymond James may reasonably request, including, but not limited to, providing assistance, participation and cooperation in disseminating Materials and participation in conference calls, meetings and other communications with the Interested Parties and their advisors and representatives. Further, Company will be available, upon request, to answer reasonable inquiries from Interested Parties. Without limiting the foregoing, (i) the Company will promptly furnish to Raymond James the names and contact information of all third parties with which the Company or, to the Company's knowledge, any of its securityholders, directors, managers, affiliates or officers, had during the twelve (12)-month period before the date of this Agreement or is continuing to have, discussions or contacts concerning a potential Transaction, including, to the extent available, copies of any proposed terms regarding a potential Transaction communicated by any such third party and (ii) if, during the Term, the Company or, to the Company's knowledge, any of its securityholders, directors, managers, affiliates or other advisors or representatives, receives any inquiry or offer from any third party concerning a potential Transaction, the Company will refer all such inquiries or offers to Raymond James and promptly provide Raymond James with the names and contact information of all inquirers or offerors.

(d) The Parties acknowledge and agree that (i) during the Term, the Company will not directly negotiate or consummate any Transaction without Raymond James's knowledge or involvement and (ii) in consideration of Raymond James's agreement to provide the Services set forth in this Agreement, Raymond James will be paid in accordance with and subject to the terms and conditions of Section 2 of this Agreement, regardless of whether the Company or Raymond James actually procured the Interested Party or the definitive written agreement regarding the Transaction (the "Definitive Agreement").

(e) Raymond James will not provide any legal, accounting, regulatory, appraisal or tax advice and will rely upon the Company and its other advisors for all such advice, nor will Raymond James render any formal opinion as to any Transaction. Without limiting the forgoing, if the Company requests assistance in negotiating non-disclosure agreements with Interested Parties, Raymond James will arrange for Ontra (d/b/a InCloudCounsel) to assist the Company, at the Company's expense. If the Company requests that Raymond James provide any services other than those expressly set out in Section 1(a), the Company and Raymond James will enter into an additional agreement that will set forth the nature and scope of such services, appropriate compensation and other customary matters, as mutually agreed between the Company and Raymond James.

(f) Anti-Money Laundering (AML) and Customer Due Diligence (CDD) Compliance – U.S. federal laws and regulations require Raymond James to collect certain identification elements and perform related screening (the "AML/CDD Search Process") before accepting an investment banking engagement. Accordingly, upon the Company's execution and delivery of this Agreement, the Company will deliver to Raymond James a completed and signed form, attached as Addendum B (the "AML/CDD Form"), together with all applicable supporting documentation requested in the form. After conducting the AML/CDD Search Process, Raymond James will promptly notify the Company in

**RAYMOND JAMES®**

Diamond Comic Distributors, Inc
September 30, 2024
Page 4

writing if Raymond James determines in its sole discretion that it cannot provide the Services. In such event, this Agreement and our engagement with the Company will be void and of no force or effect <u>ab initio</u>. The Parties acknowledge and agree that (i) the effectiveness of this Agreement is contingent upon Raymond James's receipt of the AML/CDD Form and Raymond James's satisfactory completion in its reasonable determination of the AML/CDD Search Process and (ii) Raymond James will not be responsible for any losses or damages (including, but not limited to, lost opportunities) that may result if this Agreement and our engagement hereunder are terminated for the Company's or its beneficial owners' failure to provide aforementioned AML/CDD Form or other required or information documentation upon request.

2. **Fees** - In consideration of Raymond James's agreement to provide the Services, the Company will pay Raymond James as set forth in this Section 2:

   (a) <u>Monthly Advisory Fee and Database Expense Amount</u> – The Company will pay Raymond James a non-refundable cash retainer (the "<u>Advisory Fee</u>") of $50,000 upon the Company's receipt of Raymond James's invoice for the Advisory Fee following the execution of this Agreement and $50,000 on the first business day of every month thereafter during the term of this Agreement. Additionally, the Company will pay Raymond James a flat expense charge of $5,000 for Raymond James's access to electronic financial databases pertinent to this engagement, upon the Company's signing of this Agreement.

   (b) <u>Financing Transaction Fee</u> –

   (i) If, during the Term or during the twelve (12) months following any termination of this Agreement (the "<u>Tail Period</u>"), any Financing Transaction is agreed upon and subsequently closes (the "<u>Financing Transaction Closing</u>"), regardless of when such Financing Transaction Closing occurs, whether on a stand-alone basis or to consummate any other Transaction, the Company will pay Raymond James immediately and directly out of the proceeds of the placement, at the Financing Transaction Closing of each Financing Transaction as a cost of sale of each Financing Transaction, a non-refundable cash transaction fee (the "<u>Financing Transaction Fee</u>") equal to the sum of (A) one and one-half percent (1.5%) of the Proceeds of any senior secured debt, (B) three percent (3.0%) of the Proceeds of all other debt, and (C) six percent (6.0%) of equity or equity-linked securities raised. In the event that the incumbent senior secured lender provides debtor-in-possession financing (the "<u>DIP Financing</u>"), the debtor-in-possession financing fee (the "<u>DIP Financing Fee</u>") shall equal $150,000, one-half of which shall be paid upon the closing of the DIP Financing and one-half of which shall be paid upon entry of a final order approving the DIP Financing and shall be fully credited against the Business Combination Transaction Fee. Provided, however, that to the extent the Financing Transaction includes an uncommitted accordion or similar credit feature, the Financing Transaction Fee for such accordion or similar feature shall be payable upon the commitment of such credit facility or its funding irrespective of the date of such commitment or funding.

   (ii) For the purposes of this Agreement:

   (A) A "<u>commitment</u>" shall occur if either (1) the Interested Party(ies) is contractually obligated to provide funds in connection with a Financing Transaction, or (2) the Interested Party(ies) assesses a commitment fee or loan fee in connection with a Financing Transaction.

   (B) "<u>Proceeds</u>" means the gross consideration, before the deduction of any fees (including



Diamond Comic Distributors, Inc
September 30, 2024
Page 5

    any Financing Transaction Fee), expenses (including any Expenses, as defined below) or other costs, received by, contributed to or invested in the Company, or the amounts of binding commitments (not based on the amount actually drawn or available at close) received for such Financing Transaction, in any form (including, but not limited to, cash or securities of any other party to such Financing Transaction, including the exercise price of any options or warrants received by or contributed to the Company). If such consideration is not in the form of cash then for the purpose of calculating the Proceeds, such consideration shall be valued at its then fair market value. For the avoidance of doubt, "Proceeds" shall include any subsequent increase in Proceeds received by or committed to the Company in an initial or secondary Financing Transaction, during the term of this Agreement and the Tail Period, whether pursuant to an amendment and/or any accordion, a replacement credit facility, or otherwise, in which any Interested Party participates.

(c)   Business Combination Transaction Fee –

    (i)   If, during the Term or during the Tail Period, any Business Combination Transaction is agreed upon and subsequently closes (the "Business Combination Closing" and together with any Financing Closing, each a "Closing"), regardless of when such Business Combination Closing occurs, the Company shall pay Raymond James immediately and directly out of the proceeds at the Business Combination Closing, as a cost of sale of such Business Combination Transaction, a non-refundable cash transaction fee (the "Business Combination Transaction Fee" and together with any Financing Fee, each a "Transaction Fee") based upon the "Transaction Value." The Business Combination Transaction Fee shall be equal to the greater of (i) $1,250,000 or (ii) the sum of (A) three and one-half percent (3.5%) of Transaction Value up to $35,000,000 and (B) five percent (5.0)% of Transaction Value greater than $35,000,000.

    (ii)   As used in this Agreement, the term "Transaction Value" means the total amount of cash and the fair market value of all securities or other property paid or payable, directly or indirectly, to you or to your equityholders in connection with a Business Combination Transaction that is consummated, including, without limitation and without duplication: (A) cash; (B) deferred or installment payments, notes or other debt obligations issued in the Business Combination Transaction and payable in installments or otherwise deferred, including amounts held in escrow; (C) equity securities (which, if publicly traded (including over-the-counter), will be valued at the 20-trading day average as of the last trading day prior to the Business Combination Closing) and other property; (D) the value of assumed, "cashed out" or substituted options, warrants or other rights to acquire capital stock (whether or not vested); (E) any indebtedness or other liabilities of the Company (1) assumed by a Interested Party in an acquisition of assets or which remains outstanding at the time of Business Combination Closing in all other cases or (2) decreased, repaid or extinguished in connection with or anticipation of a Business Combination Transaction; (F) future contingent payments, including those related to future earnings or operations; (G) amounts paid pursuant to retention, phantom equity, change of control or similar bonus or payment arrangements; (H) amounts paid expressly for non-competition agreements in excess of those arrangements currently in existence; and (I) amounts paid to the Company's equityholders in connection with a Transaction, but not in the ordinary course of business consistent with past practice, in the form of dividends, capital distributions, or partial or liquidating distributions. The value of all non-cash consideration, other than consideration in the form of equity securities, will be the fair market value thereof on the day before the Business Combination Closing. The value of equity securities that are publicly traded

Diamond Comic Distributors, Inc
September 30, 2024
Page 6

will be valued as set forth in clause (C) above, and the value of securities that are not publicly traded will be the fair market value on the day before the Business Combination Closing date. In the case of a Business Combination Transaction structured as a sale, transfer, exchange or purchase of equity securities, if less than 100% of the equity of the Company is transferred in the Business Combination Transaction, Transaction Value will include the value of any retained or rolled-over interest in the Company based on the value paid for or ascribed to the equity interests transferred in the Business Combination Transaction. In the case of a Business Combination Transaction structured as a sale, transfer, exchange or disposition of assets, if less than 100% of the assets of the Company are transferred in the Business Combination Transaction, Transaction Value will include the fair market value of any assets (including, without limitation, accounts receivable, inventory, investments, cash and cash equivalents) retained by the Company. In the case of a joint venture or similar transaction (a "Joint Venture"), the aggregate value of the proceeds, assets and other consideration contributed or to be contributed to such Joint Venture by the Company in connection with the Business Combination Transaction, including, without limitation, cash, notes, securities, intellectual property, licenses, marketing or distribution rights and other property and the amount of any liabilities of the type described in item (E) above assumed by such Joint Venture from the Company. The Company will pay Raymond James the Business Combination Transaction Fee corresponding to that portion of the Transaction Value subject to an escrow or other holdback upon the establishment of such escrow or other holdback. The Company will pay Raymond James the Business Combination Transaction Fee corresponding to that portion of the Transaction Value subject to an earn-out or contractual contingency (including future contingent payments, including those related to future earnings or operations) at the Business Combination Closing, based on the fair market value of such Future Contingent Payments as mutually agreed upon in writing by the Company and Raymond James. Transaction Value will not be reduced by the Transaction Fee or any other costs or expenses of the Company paid or payable in connection with a Business Combination Transaction, including, but not limited to, any expenses described in Section 3. If the Definitive Agreement provides that the Transaction Fee or any other costs or expenses of the Company paid or payable in connection with the Transaction are deducted from the purchase price, then such fees, costs or expenses will be added back to Transaction Value for purposes of calculating the Transaction Fee.

3. **Reimbursement of Expenses; Company's Professional Fees** – Regardless of whether a Transaction is consummated, the Company will reimburse Raymond James, upon the earlier of (a) thirty (30) days of from the Company's receipt of an invoice from Raymond James or (b) the Closing of any Transaction, by wire transfer of immediately available funds via wire transfer instructions set forth in Raymond James's invoice for such amounts to the Company, for all expenses (including, without limitation, the fees and disbursements of its outside legal counsel) reasonably incurred by Raymond James in connection with entering into and performing the services pursuant to this Agreement ("Expenses"). The Company will also bear all of its own costs it incurs in connection with any Transaction, including, without limitation, the Company's legal and accounting fees and disbursements, the costs of reproducing any marketing materials, and any due diligence data room fees or charges.

4. **Term** – The term of this Agreement will commence on the date of this Agreement and will continue (and will not terminate, expire or be deemed completed) until terminated by either Party upon thirty (30) days' prior written notice to the other Party (the "Term"). Sections 2 through 8 of this Agreement, and Addendum A attached to this Agreement will survive any termination of this Agreement. Additionally, if Raymond James has not been fully reimbursed for its undisputed Expenses pursuant to Section 3 of this Agreement

**RAYMOND JAMES®**

Diamond Comic Distributors, Inc
September 30, 2024
Page 7

as of the termination date, the Tail Period will be deemed extended and will continue until the date on which Raymond James is fully reimbursed for its undisputed Expenses.

5. **Indemnification** – In consideration of Raymond James signing this Agreement and agreeing to perform Services pursuant to this Agreement, the Company will execute and perform the obligations as provided in <u>Addendum A</u> attached to this Agreement.

6. **Confidentiality** – Raymond James agrees to use all confidential and proprietary information provided to it by or on behalf of the Company hereunder solely for the purpose of providing the Services that are the subject of this Agreement and to treat all such information confidentially; provided, however, that nothing herein will prevent Raymond James from (a) sharing such information with its directors, officers, employees, attorneys, or representatives of it or the Company who need to know such information in connection with a possible Transaction, or (b) disclosing such information pursuant to the order of any court or administrative agency, or pursuant to the order or request from any regulatory body with jurisdiction over Raymond James. Notwithstanding the foregoing, such confidential and proprietary information does not include any information: (i) that was already in the possession of Raymond James or any or its representatives, or was available to Raymond James or any of its representatives on a non-confidential basis, prior to the disclosure to Raymond James or such representatives; (ii) obtained by Raymond James or any of its representatives from a third party which, insofar as is known by Raymond James or such representatives, is not subject to any prohibition against disclosure; (iii) which was or is independently developed by Raymond James or any of its representatives without violating any confidentiality obligation under this paragraph; or (iv) which was or becomes generally available to the public through no fault of Raymond James. The provisions of this paragraph will automatically terminate one (1) year following the earlier of the completion of the Transaction or the termination of this Agreement. This Agreement supersedes any other agreement regarding confidentiality that may have been previously entered into between the Company and Raymond James.

7. **Publicity** – Following the Closing of a Transaction or public announcement or disclosure thereof in any initial press release or other similar announcement by the Company regarding such Transaction, Raymond James will have the right, at its expense, to publicize Raymond James's role as investment banking advisor to the Company with respect to such Transaction (including in customary "tombstone" announcements or other advertisements in financial and other newspapers and journals and marketing materials), and the Company agrees that Raymond James may use the Company's logo or other identifying marks in any such publicity. The Company will not publish, refer to, describe or characterize Raymond James's engagement under this Agreement or the terms of this Agreement, or the advice provided to the Company by Raymond James, without the prior written approval of Raymond James in each instance.

8. **Miscellaneous** –

    (a) The Company acknowledges that providing accurate and complete information to Interested Parties is essential to a successful engagement. Any information that the Company provides to Raymond James will not contain any misstatement or untrue statement of a material fact, or omit to state any material fact necessary to make such information not false or misleading. During the Term, the Company will continue to inform Raymond James of any material developments or matters that occur or come to the Company's attention with respect to the Company or the matters contemplated by this Agreement. The Company agrees that it will review any marketing materials prepared or distributed in connection with the Services, and will promptly inform Raymond James if the marketing materials contain any statement which is untrue or misleading or any omissions of material fact. The Company recognizes and confirms that Raymond James, in the performance of the Services: (i) may rely upon such information received from the Company, Interested Parties or their respective advisors, without

**RAYMOND JAMES®**

   independent verification by Raymond James; and (ii) does not assume responsibility for the accuracy or completeness of any publicly available information or such information received from the Company, Interested Parties or their respective advisors, whether or not Raymond James makes an independent verification of such information, and does not have any obligation to conduct any evaluation or appraisal of the assets or liabilities of the Company or any other party; and (iii) will assume that any financial projections or forecasts (including cost savings or synergies) that may be furnished to or discussed with the Company or its representatives have been reasonably prepared and reflect the best then currently available estimates and judgements of the Interested Parties management. The Company will inform Raymond James of the signing of any Definitive Agreement for a Transaction or Closing of any Transaction for which a Transaction Fee will be payable.

(b) The Company acknowledges and agrees that Raymond James has been engaged solely as an investment banking advisor to the Company with respect to a possible Transaction, and no fiduciary, agency or similar relationship has been created in respect of any Transaction or the Services provided to the Company or any other party, regardless of whether Raymond James or any of its affiliates has advised or is advising the Company on any other matters. In connection with this engagement, Raymond James is acting as an independent contractor, with the only rights and obligations between Raymond James and the Company as set forth in this Agreement. The Services provided by Raymond James are solely for the benefit of the Company and are not intended to, nor will they be deemed or construed to, create any duty toward or confer any rights upon any persons or entities not a Party (including, without limitation, securityholders (in their capacities as such), employees or creditors of the Company or any Interested Party) as against Raymond James or its affiliates or their respective directors, officers, agents and employees. All analyses, reports, and related materials (the "__Materials__") that Raymond James will provide under this Agreement are proprietary to Raymond James and for the exclusive use of the Company's board of directors (or persons performing in a similar governing capacity) for the sole purpose of evaluating a potential Transaction. Without the prior written consent of Raymond James, the Company may not disclose any Materials to any person other than the Company's management and board of directors (or persons performing in a similar governing capacity).

(c) If Raymond James is legally required or requested by the Company or its counsel to render services in any pending or threatened proceeding (including, but not limited to, producing documents, answering interrogatories or providing testimony), the Company will pay Raymond James's then current hourly rates for the persons involved for the time expended in rendering such services, including, but not limited to, time for meetings, conferences, preparation and travel, and all related reasonable out-of-pocket expenses (including, without limitation, the reasonable fees and expenses of Raymond James's outside legal counsel incurred in connection with such services).

(d) The Company acknowledges and agrees that Raymond James and its parent company and affiliated entities are a comprehensive, international financial services firm involved in a wide range of commercial banking, investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research) for their own account and otherwise. Raymond James and its affiliates may have interests that differ from the Company's interests. Raymond James and its affiliates have no duty to disclose to the Company, or use for the Company's benefit, any information acquired in the course of providing services to any other party, engaging in any transaction or carrying on any other businesses. Raymond James's employees, officers, partners and affiliates may at any time own the Company's securities or those of any other entity involved in any transaction contemplated by this Agreement. Raymond James recognizes its obligations under applicable securities laws in connection with the purchase and sale of such securities. The Company further acknowledges that, prior to the date of this Agreement, and in the ordinary course of business,

  Raymond James investment banking personnel (which may include investment banking personnel providing services to the Company under this Agreement) may have from time to time held discussions with and provided information to an Interested Party regarding various market and strategic matters, including a potential transaction with the Company, and that such information and the content of such discussions may be used or relied upon by an Interested Party in connection with its determinations in respect of a Transaction with the Company.

(e) This Agreement will be exclusively governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to conflicts of laws principles thereof or of any other jurisdiction that would require the application of the laws of another jurisdiction. All claims arising out of the interpretation, application or enforcement, or otherwise relating to the subject matter, of this Agreement, including, without limitation, any breach of this Agreement, will be settled by final and binding arbitration before a panel of three (3) arbitrators appointed by the American Arbitration Association, in accordance with the commercial rules then prevailing of the American Arbitration Association with all arbitration hearings to be held in New York County, New York. The decision of the arbitrators will be binding on Raymond James and the Company and may be entered and enforced in any court of competent jurisdiction by either Party. The arbitration will be pursued and brought to conclusion as rapidly as is possible. TO THE EXTENT PERMITTED BY LAW, EACH OF RAYMOND JAMES AND THE COMPANY VOLUNTARILY AND IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS AGREEMENT, THE ENGAGEMENT OF RAYMOND JAMES PURSUANT TO, OR THE PERFORMANCE BY RAYMOND JAMES OF, THE SERVICES. In any action, suit, or proceeding between the Company and Raymond James arising out of the interpretation, application or enforcement, or otherwise relating to the subject matter, of this Agreement, including, without limitation, any breach of this Agreement, the prevailing Party will be entitled to an award of reimbursement from the non-prevailing Party of the prevailing Party's reasonable attorneys' fees and costs, including fees and costs incurred by the prevailing Party in obtaining or enforcing an award or judgment.

(f) This Agreement (including any addenda or schedules attached to this Agreement) is binding upon and inures to the benefit of the Parties and their respective successors and permitted assigns. Without limiting the generality of the foregoing, following any Closing, the Company's obligations under this Agreement (including, without limitation, <u>Addendum A</u> attached to this Agreement) will become the obligations of any successor entity resulting from any Transaction. The Company agrees not to assign or delegate this Agreement in whole or in part without the prior written consent of Raymond James and any attempted assignment or delegation without Raymond James's prior written consent will be voidable at Raymond James's sole and absolute discretion. Raymond James, the other RJ Parties (as to Section 5 and <u>Addendum A</u>), and their respective successors and assigns are intended third-party beneficiaries and may directly enforce their rights under this Agreement (including any addenda or schedules attached to this Agreement) against Diamond Comic Distributors, Inc., any other person or entity that falls within the definition of "Company" and/or their respective successors and permitted assigns. This Agreement (and any addenda or schedules attached to this Agreement) constitute the entire agreement between the Parties regarding the subject matter of this Agreement and supersede any prior agreements or understandings, written or oral, between them. Any modification or amendment to this Agreement or any waiver of any rights or remedies by any Party must be set forth in writing, fully executed by the Parties and delivered to the other Party. Any notice must be sent to the respective Parties at the following addresses: If to the Company: Diamond Comic Distributors, Inc.; 10150 York Road, Ste. 300 Hunt Valley, MD 21030 Attention: Robert Gorin, Chief Restructuring Officer; email: rgorin@getzlerhenrich.com.. If to Raymond James: Raymond James &

Diamond Comic Distributors, Inc
September 30, 2024
Page 10

    Associates, Inc.; 880 Carillon Pkwy.; Saint Petersburg, FL 33716; Attn: Tom Donegan, General Counsel, Investment Banking – Global Equities and Investment Banking; email: tom.donegan@raymondjames.com.

(g)     This Agreement has been reviewed by the signatories hereto and their counsel. There will be no construction of any provision against Raymond James because this Agreement was drafted by Raymond James, and the Parties waive any statute or rule of law to such effect. If any provision of this Agreement is determined by a court or arbitration panel having jurisdiction to be unenforceable to any extent, the rest of that provision (if applicable) and the balance of this Agreement will remain enforceable to the fullest extent permitted by law.

(h)     All amounts payable under this Agreement are denominated in U.S. dollars, and will be paid in U.S. dollars via wire transfer of immediately available funds in accordance with instructions set forth in Raymond James's invoice. All amounts payable under this Agreement will be paid without set-off and without deduction for any withholding, value-added or other similar taxes, charges, fees or assessments. Without limiting any other provision of this Agreement, if any applicable Transaction Fee is not paid in full when due, then interest at the highest rate permissible under the applicable state law shall be due, earned and fully payable on the unpaid Transaction Fee beginning at the time that the Transaction Fee is due and continuing until such time as the Transaction Fee is paid in full.

(i)     In order to comply with its books and records requirements under applicable securities laws, rules and regulations (including FINRA rules), Raymond James may, subject to compliance with Applicable Law (as defined below), capture and retain copies of written communications with or by the Company (including mail, emails, texts or similar electronic communications, or documentation of meetings). The Company agrees that Raymond James may deliver copies of such written communications to any court or competent authority. Raymond James will keep or cause to be kept records in relation to the Services provided under these terms of business in accordance with Applicable Law. As used in this Agreement, the term "<u>Applicable Law</u>" means any applicable statutes, laws, ordinances, rules, regulations, supervisory guidance, codes, orders, common laws, judgments, authorizations, consents, practices or other requirements of any federal, state, local or foreign or political subdivision thereof, including the federal Telephone Consumer Protection Act of 1991 (47 U.S.C. § 227), as amended, and, if applicable, the Canada Anti-SPAM Legislation (S.C. 2010, c. 23), or any regulatory agency (including any self-regulatory organization) with jurisdiction over any Party hereto, or any arbitrator, court or tribunal of competent jurisdiction.

(j)     Each of the Company and Raymond James hereby represents to the other as follows: the execution and delivery of this Agreement and the performance by such Party of its obligations hereunder have been duly and validly authorized by such Party, and this Agreement has been duly executed and delivered by such Party, and constitutes the valid and legally binding agreement of such Party, enforceable against such Party in accordance with its terms.

**[Signature Page Follows]**



Agreed and accepted (this Agreement may be executed in one or more counterparts, and sent by facsimile or electronic transmission, and each such counterpart will be an original and all of which will together constitute one and the same instrument):

**RAYMOND JAMES & ASSOCIATES, INC.**

By: _____     10/2/24
Geoffrey Richards, Senior Managing Director and     Signature Date
Head of Capital Structure Advisory Group

**AGREED AND ACCEPTED:**

**DIAMOND COMIC DISTRIBUTORS, INC.**

By: _____     10/1/24
Robert Gorin, Chief Restructuring Officer     Signature Date

Attachments

**RAYMOND JAMES®**

Diamond Comic Distributors, Inc
September 30, 2024
Page 11

Agreed and accepted (this Agreement may be executed in one or more counterparts, and sent by facsimile or electronic transmission, and each such counterpart will be an original and all of which will together constitute one and the same instrument):

**RAYMOND JAMES & ASSOCIATES, INC.**

By: _____                    _____
      Geoffrey Richards, Senior Managing Director and                    Signature Date
      Head of Capital Structure Advisory Group

**AGREED AND ACCEPTED:**

**DIAMOND COMIC DISTRIBUTORS, INC.**

By: _____                    _____
      Robert Gorin, Chief Restructuring Officer                                    Signature Date

Attachments

Diamond Comic Distributors, Inc
September 30, 2024
Page 12

**ADDENDUM A**

*Pursuant to the foregoing letter agreement dated **September 30, 2024** (the "*<u>Agreement</u>*"), **Diamond Comic Distributors, Inc.** (as further described in the Agreement, the "*<u>Company</u>*"), will indemnify, defend and hold harmless Raymond James & Associates, Inc. and Raymond James Financial, Inc. (together, "*<u>Raymond James</u>*") and their respective affiliates, together with their and their affiliates' respective officers, directors, managers, members, partners, securityholders, employees and agents, and each Person (as defined below), if any, who controls Raymond James or any of its affiliates within the meaning of the U.S. Securities Act of 1933, as amended, or the U.S. Securities Exchange Act of 1934, as amended (all of the foregoing are referred to collectively as "*<u>RJ Parties</u>*" and individually as an "*<u>RJ Party</u>*"), from and against any and all (a) claims, actions (including securityholder claims or actions, derivative or otherwise), demands, investigations and proceedings of any kind or nature (collectively, "*<u>Proceedings</u>*") threatened, brought or established against any RJ Party by any party ("*<u>Person</u>*"), and (b) losses, claims, judgments, penalties, fines, charges, costs (including professional or legal fees and other costs of litigation or other proceedings), damages, taxes, liabilities of any kind or nature, whether joint or several (collectively, "*<u>Losses</u>*"), which such RJ Party may suffer or incur under any statute, common law, contract, tort or otherwise (including, without limitation, all such Losses suffered or incurred in considering, preparing for, responding to, disputing, or otherwise dealing with any actual or potential Proceedings, including any Proceeding brought in connection with any RJ Party's right to be indemnified pursuant to this <u>Addendum A</u>), directly or indirectly arising out of, relating to or in connection with (i) the Agreement, the services provided in connection with the Agreement, or the exercise of Raymond James's rights under the Agreement (including this <u>Addendum A</u>), (ii) any transaction referred to in the Agreement or any transaction arising out of the transactions contemplated by the Agreement (each an "*<u>Indemnified Claim</u>*"), except solely to the extent that any such Indemnified Claim is found, in a final, unappealable judgment by a court of competent jurisdiction, to have resulted solely and exclusively and as a direct and proximate cause from said RJ Party's willful misconduct or gross negligence (other than an action or failure to act undertaken or refrained from being undertaken at the written or express request of or with the written or express consent of the Company) (an "*<u>Excluded Act</u>*"). For the avoidance of doubt, an Indemnified Claim does not include an Excluded Act.*

*No Proceeding will be brought against any RJ Party to recover any Losses that the Company, its securityholders, officers, directors/managers or creditors, or any other Person in connection with any Indemnified Claim, may suffer or incur by reason of or in connection with any Indemnified Claim, and no RJ Party will have any liability to the Company, its securityholders, officers, directors/managers or creditors, or any other Person by reason of or in connection with any Indemnified Claim, whether such Loss arises under any statute, common law, contract, tort or otherwise, except solely to the extent that any such Losses or liability is found, in a final, unappealable judgment by a court of competent jurisdiction, to have resulted solely and exclusively and as a direct and proximate cause from said RJ Party's Excluded Act. Nothing in the Agreement (including this <u>Addendum A</u>) will be construed as rendering Raymond James or any other RJ Party liable, under any circumstances and under any theory of law, to the Company, the Company's securityholders, officers, directors/managers or creditors, or any other Person in respect of any indirect, incidental, special, consequential or punitive damages even if Raymond James or any other RJ Party have been advised as to the possibility thereof. Except with respect to an Excluded Act, the aggregate liability of all RJ Parties to the Company, the Company's securityholders, officers, directors/managers or creditors, and any other Person, under any statute, common law, contract, tort or otherwise, for any Loss suffered by such party arising from or in connection with the services provided under the Agreement, however the Loss is caused, will not exceed 50% of the amount of the Transaction Fee actually received by Raymond James.*

*If for any reason the foregoing indemnity is unavailable (except as a result of an Excluded Act) to an RJ Party or is insufficient to fully hold any RJ Party harmless, the Company will contribute to the amount paid or payable by such RJ Party as a result of such unavailability or insufficiency in such proportion as is appropriate to reflect the relative benefits received by and fault of the Company on the one hand, and the relative benefits received by and fault of the RJ Party on the other hand, as well as any relevant equitable considerations. The relative benefits to the Company on the one hand and an RJ Party on the other hand will be deemed to be in the same proportion as the total value paid or received or contemplated to be paid or received by the Company and its securityholders, as the case may be, whether or not the transaction contemplated by the Agreement closes, bears to the fees actually received by Raymond James pursuant to the Agreement, and the relative fault of the Company on the one hand and an RJ Party on the other hand will be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or incorrect opinion or conclusion or the omission or alleged omission to state a material fact related to information supplied by the Company or its agents, advisors or affiliates on the one hand or by the RJ Party on the other hand, as well as the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement, opinion, conclusion or omission. Notwithstanding anything in this <u>Addendum A</u> to the contrary  the aggregate contribution of all of the RJ Parties for all Indemnified Claims will not exceed*



Diamond Comic Distributors, Inc
September 30, 2024
Page 13

50% of the amount of the Transaction Fee actually received by Raymond James.

The Company will reimburse each RJ Party for all reasonable costs and expenses (including, without limitation, fees and expenses of outside counsel) incurred by the RJ Parties (including all such costs and expenses incurred to enforce the terms of this Addendum A) as they are incurred in connection with investigating, preparing, defending or settling or otherwise relating to any threatened or pending Proceeding for which indemnification or contribution has or could be sought by the RJ Party, whether or not in connection with a Proceeding in which any RJ Party is a named party.

The indemnity, contribution and expense reimbursement agreements and obligations set forth in this Addendum will be in addition to any other rights, remedies or indemnification as to which any RJ Party may have or be entitled at common law or otherwise, will survive any termination of the Agreement or completion of services under the Agreement, will remain operative and in full force and effect regardless of any investigation made by or on behalf of any RJ Party. The Company further agrees that the indemnification, contribution and reimbursement obligations set forth in this Addendum A will apply whether or not Raymond James or any other RJ Party is a formal party in any such Indemnified Claim.

The Company will not settle, compromise or consent to judgment, or participate in or otherwise facilitate any such settlement, compromise or consent, with respect to any Indemnified Claim without the prior consent of Raymond James or any RJ Party involved in such Indemnified Claim unless (i) there is no admission of wrongdoing, negligence or improper activity of any kind of or by Raymond James or such RJ Party in such settlement, compromise or consent and (ii) there is an unconditional release of all RJ Parties from all liability on claims that are the subject matter of or arise out of such Indemnified Claim.

This Addendum A will survive any termination or completion of the engagement provided by the Agreement.

Agreed and accepted (this Addendum may be executed in one or more counterparts, and sent by facsimile or electronic transmission, and each such counterpart will be an original and all of which will together constitute one and the same instrument):

| RAYMOND JAMES & ASSOCIATES, INC. | DIAMOND COMIC DISTRIBUTORS, INC. |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| Geoffrey Richards, Senior Managing Director and Head of Capital Structure Advisory Group | Robert Gorin, Chief Restructuring Officer |
| Signature Date: 10/2/24 | Signature Date: 10/1/24 |

**RAYMOND JAMES®**

50% of the amount of the Transaction Fee actually received by Raymond James.

The Company will reimburse each RJ Party for all reasonable costs and expenses (including, without limitation, fees and expenses of outside counsel) incurred by the RJ Parties (including all such costs and expenses incurred to enforce the terms of this <u>Addendum A</u>) as they are incurred in connection with investigating, preparing, defending or settling or otherwise relating to any threatened or pending Proceeding for which indemnification or contribution has or could be sought by the RJ Party, whether or not in connection with a Proceeding in which any RJ Party is a named party.

The indemnity, contribution and expense reimbursement agreements and obligations set forth in this Addendum will be in addition to any other rights, remedies or indemnification as to which any RJ Party may have or be entitled at common law or otherwise, will survive any termination of the Agreement or completion of services under the Agreement, will remain operative and in full force and effect regardless of any investigation made by or on behalf of any RJ Party. The Company further agrees that the indemnification, contribution and reimbursement obligations set forth in this <u>Addendum A</u> will apply whether or not Raymond James or any other RJ Party is a formal party in any such Indemnified Claim.

The Company will not settle, compromise or consent to judgment, or participate in or otherwise facilitate any such settlement, compromise or consent, with respect to any Indemnified Claim without the prior consent of Raymond James or any RJ Party involved in such Indemnified Claim unless (i) there is no admission of wrongdoing, negligence or improper activity of any kind of or by Raymond James or such RJ Party in such settlement, compromise or consent and (ii) there is an unconditional release of all RJ Parties from all liability on claims that are the subject matter of or arise out of such Indemnified Claim.

This <u>Addendum A</u> will survive any termination or completion of the engagement provided by the Agreement.

Agreed and accepted (this Addendum may be executed in one or more counterparts, and sent by facsimile or electronic transmission, and each such counterpart will be an original and all of which will together constitute one and the same instrument):

| **RAYMOND JAMES & ASSOCIATES, INC.** | **DIAMOND COMIC DISTRIBUTORS, INC.** |
|---|---|
| By: _____ <br>   Geoffrey Richards, Senior Managing Director and Head of Capital Structure Advisory Group <br><br> Signature Date: _____ | By: _____ <br>   Robert Gorin, Chief Restructuring Officer <br><br> Signature Date: _____ |

Diamond Comic Distributors, Inc
September 30, 2024
Page 14

# ADDENDUM B

# AML/CDD FORM

[PLEASE SEE ATTACHED]

# RAYMOND JAMES®

**CONFIDENTIAL**

January 5 2024

Diamond Comic Distributors, Inc.
Diamond Select Toys & Collectibles, LLC
10150 York Road, Ste. 300
Hunt Valley, MD 21030
Attention: Robert Gorin, Chief Restructuring Officer

Re: **Amendment of Engagement Letter**

Reference is made to that certain letter agreement dated September 27, 2024 (the "**Engagement Letter**") between *Diamond Comic Distributors, Inc.* (as further described in the Engagement Letter, "**Diamond Comic**") and *Raymond James & Associates, Inc.* ("**Raymond James**"), pursuant to which Raymond James agreed to provide investment banking services to Diamond Comic in connection with a range of potential transactions (as described in the Engagement Letter). Capitalized terms not defined herein shall have the meaning set forth in the Engagement Letter.

In consideration of the mutual promises and covenants between Raymond James and the undersigned, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this letter (this "**EL Amendment**") shall amend the Engagement Letter as, and only to the extent, provided below:

A. The first sentence of the Engagement Letter is hereby amended and restated in its entirety as follows:

> This letter agreement (this "**Agreement**") sets forth the terms pursuant to which *Diamond Comic Distributors, Inc.* and *Diamond Select Toys & Collectibles, LLC* (together with their respective affiliates and/or any special purpose entity(ies) formed or used by either to effect or facilitate any *Transaction* (as defined below) and any successor to or assignee of all or a portion of their or any such entity's(ies') assets and/or businesses, collectively, the "**Company**" or "**you**") has retained *Raymond James & Associates, Inc.* (and including any of its affiliates assisting in executing this engagement, "**Raymond James**", "**we**" or "**us**" and, together with the Company, each a "**Party**" and collectively, the "**Parties**") to provide the Company with *Services* as defined in Section 1(a) below, relating to any possible Transaction, including the terms of any such Services provided by Raymond James before the date of this Agreement.

B. All references in the Engagement Letter to "*Diamond Comic Distributors, Inc.*" shall now refer to "*Diamond Comic Distributors, Inc. and Diamond Select Toys & Collectibles, LLC*".

Other than as expressly amended by this EL Amendment (or as previously expressly amended in writing), all provisions, terms and conditions of the Engagement Letter, including, without limitation, Sections 2 through 8 thereof and Addendum A attached thereto, shall continue in full force and effect and shall continue to govern all aspects of the Engagement Letter, this EL Amendment and the engagement and transactions contemplated thereby and hereby.

**[Signature Page Follows]**

Diamond Comic Distributors, Inc.
Diamond Select Toys & Collectibles, LLC
January 5, 2025
Page 2

If this EL Amendment conforms to your understanding, please sign and return a copy to us.

Very truly yours,

**RAYMOND JAMES & ASSOCIATES, INC.**

By: _____          1/8/25
Geoffrey Richards, Senior Managing Director and          Signature Date
Head of Capital Structure Advisory Group

**AGREED AND ACCEPTED:**

**DIAMOND COMIC DISTRIBUTORS, INC.**
**DIAMOND SELECT TOYS & COLLECTIBLES, LLC**

By: _____          1/7/25
Robert Gorin, Chief Restructuring Officer          Signature Date

**RAYMOND JAMES®**