**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |
| | Related to D. I. 68 |

**DECLARATION OF GEOFFREY RICHARDS IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER, *INTER ALIA*, AUTHORIZING**
**AND APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL**
**OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

Pursuant to 28 U.S.C. § 1746, I, Geoffrey Richards, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Senior Managing Director and Head of the Capital Structure Advisory Group at Raymond James & Associates, Inc. ("Raymond James"), which has its principal office at 880 Carillon Parkway, St. Petersburg, Florida 33716.  I am authorized to make this declaration in support of *Debtors' Motion for an Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* (D.I. 68) (the "Bid Procedures Motion").[2]  Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein or

---

[1]    The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2]    Capitalized terms not otherwise defined herein shall have the meaning set forth in the Bid Procedures Motion.

provide this declaration based upon information provided to me by other Raymond James professionals.

2.      Raymond James is a subsidiary of Raymond James Financial, Inc. ("RJF"), a publicly traded (NYSE:RJF) full-service global investment banking firm offering investment banking, equity research, wealth management, institutional and private brokerage, and other service offerings to individual and institutional clients.  RJF and its subsidiaries employ over 17,000 individuals in the United States alone, of which over 515 provide investment banking advisory services to firm clients.  Since 2019, Raymond James has participated in 860 capital raises and completed more than 1,115 advisory assignments, including over 925 M&A buy-side or sell-side advisory assignments.

3.      Raymond James has a dedicated restructuring investment banking group of more than 20 professionals with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming or unsuitably capitalized businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, or bankruptcy proceedings.  Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, reorganization, financing, financial opinion, and special advisory transactions.

4.      Raymond James's professionals have considerable expertise and experience in providing investment banking services to financially distressed companies and to creditors, purchasers, bondholders, and other constituencies in chapter 11 as well as in out of court proceedings.  Representative engagements that investment bankers at Raymond James have led in prior chapter 11 cases and restructurings include:  American Eagle Energy Corporation; American

IronHorse Motorcycles, Inc.; ATLS Acquisition, LLC; BI-LO, LLC; BJ Services, LLC; Bluestem Brands, Inc.; Buccaneer Energy; Calpine Energy; CB Holding Corp.; CCNG Energy Partners; Clarus Therapeutics Holdings, Inc.; ColorSpot Holdings, Inc.; Dakota Plains Holdings, Inc.; Diamond Glass Companies, Inc.; Gateway Ethanol, LLC; Giordano's Enterprises, Inc.; Gulf Fleet Holdings, Inc.; Halt Medical, Inc.; Hipcricket, Inc.; HMX Acquisition Corp.; Hooper Holmes, Inc.; International;  Garden Products, Inc.; Just One More Restaurant Corp.; KeyLime Cove Waterpark, Inc.; Loehmann's, Inc.; LVI Intermediate Holdings, Inc.; Max & Erma's, Inc.; National Envelope Corporation; Novan, Inc.; Personal Communication Devices, LLC; Phoenix Payment Systems, Inc.; Proteus Digital Health, Inc.; Quanergy Systems, Inc.; Renew Energy, Inc.; Response Genetics, Inc.; Robbins Bros. Corporation; Santa Fe Gold Corporation; SynCardia Systems, Inc.; SP Newsprint Holding LLC; Teligent, Inc.; and The Palm Restaurant Group, Inc.

5.     I have more than 25 years of investment banking and restructuring experience. During my career, I have personally led an investment banking team or otherwise been involved in the sale of over 125 companies as a going concern, many of which had been experiencing financial distress. I have provided investment banking expertise and distressed mergers and acquisitions and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings.

6.     Prior to joining Raymond James, I was head of North America debt finance and restructuring at Canaccord Genuity Group Inc., head of special situations and restructuring at William Blair & Company, and a partner in the Kirkland & Ellis LLP restructuring practice. In each role, my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations.

7.      Since 2001, I have taught the class Corporate Restructuring at Northwestern Pritzker School of Law as an Adjunct Professor.

8.      On September 30, 2024, the Debtors engaged Raymond James as investment banker to, among other things, assist the Debtors in pursuing strategic alternatives in the midst of an increasingly difficult liquidity situation, including to construct and commence a marketing process for the Debtors' assets.

9.      I lead the Raymond James team assigned to this matter and the team includes Alec Haesler, one of the Directors in the Capital Structure Advisory Group.  The Raymond James team spent the early stages of the assignment gathering information from the Debtors' management and learning about the Debtors' assets and business.

10.     The Raymond James team then developed marketing materials, including a seven (7) page non-confidential investment overview, followed by a sixty-one (61) page confidential information memorandum (collectively, the "Investment Materials").

11.     Working with the Debtors' management, Raymond James populated a 2,145 document, 825-megabyte virtual data room ("VDR") for purposes of providing potential bidders with an opportunity to undertake due diligence.

12.     Prior to the Petition Date, the Raymond James team devised a marketing process, and solicited interest from potential financial and strategic investors for bids for all or substantially all the Debtors' assets on a going concern basis.  Beginning on or about October 7, 2024, Raymond James contacted over 110 prospective acquirers, of which approximately 31 executed non-disclosure agreements to access the VDR and review the Investment Materials.

13.     Multiple parties submitted indications of interest in the Debtors' assets.  After negotiating with these parties, including extensive, arm's-length negotiations regarding various

4

asset purchase agreements, the Debtors decided to proceed with Universal Distribution LLC ("Universal"), to serve as a stalking horse bidder for the Alliance Assets.

14.    I was personally involved in the negotiations with Universal.  I would describe those negotiations as hard-fought, at arms-length and conducted in good faith.

15.    To my knowledge, Universal and its owners, officers and principals are not in any way affiliated with the Debtors, their owners, officers or principals.

16.    The Debtors signed the Stalking Horse Agreement with Universal on January 13, 2025 and filed for bankruptcy the next day.

17.    Promptly after the Petition Date, Raymond James restimulated the market and solicited interest in substantially all of the Debtors' assets. Since the Petition Date, Raymond James has contacted 116 parties, 62 of which were previously contacted pre-petition and 54 of which are new post-petition outreaches.  37 of the 54 new parties contacted since the Petition Date stem from inbound expressions of interest. 22 parties have signed NDAs since the Petition Date.

18.    Raymond James has had numerous conversations with multiple parties in connection with the postpetition marketing efforts. Presently, nearly 30 parties are under NDA, a substantial number of which are active in the VDR and otherwise conducting diligence including site visits.

19.    I read the Bid Procedures Motion and am familiar with the proposed Bidding Procedures and the proposed sale timeline.

20.    The proposed Bidding Procedures and the timeline were developed by the Raymond James team together with the Debtors' other professionals.

21.    I would characterize the proposed Bidding Procedures as ordinary and customary for a section 363 sale.  They are designed to (a) solicit bids for the Debtors' assets, (b) promote a

competitive auction process and (c) lead to the highest and otherwise best bid or bids for the Debtors' assets.

22.    Among other dates, the proposed Bidding Procedures contemplate a bid deadline of March 19, 2025, followed by an auction on March 24, a proposed sale hearing on March 26 and closing of one or more sale transactions not later than April 10, 2025.

23.    In my view, and based upon my experience, the proposed sale timeline is reasonable and appropriate under the circumstances of the Debtors' chapter 11 cases.

24.    As part of the Stalking Horse Agreement, the Debtors agreed to seek Court approval of certain stalking horse protections for Universal, including a breakup fee of three percent (3%) of the Purchase Price and an expense reimbursement capped at one-half percent (0.5%) of the Purchase Price.

25.    Based on my experience, breakup fees and expense reimbursements in the range of three percent (3%) to five percent (5%) of the purchase price for a transaction of this size are typically approved.  Accordingly, I believe the Stalking Horse protections negotiated with Universal are within market.

26.    Based upon negotiations with Universal, it is my understanding that Universal is unwilling to move forward with the Stalking Horse Agreement without the Stalking Horse Protections.

27.    In my experience, and based upon the current Purchase Price, the existence of the Stalking Horse Protections should not be an impediment to other bidders submitting offers for the Debtors' assets.

28.    The Stalking Horse Agreement has and will provide a benefit to the Debtors' estates.  Having a signed purchase agreement in hand with a party willing to serve as a stalking

02/07/2025

horse is more favorable than proceeding without a stalking horse agreement. In addition to the positive message a stalking horse agreement sends to a debtor's customers, vendors and lenders, a stalking horse agreement sends a message to other potentially interested bidders that (a) the debtors' assets have meaningful value, (b) there is a floor for the value of those assets, and (c) parties must act quickly if they want an opportunity to bid on the debtors' assets.

29.    Absent the Stalking Horse Agreement, the Debtors are at risk of receiving "low ball" offers, including offers from bidders not interested in paying fair value for the Debtors' assets.

30.    For all the foregoing reasons, I respectfully encourage the Court to approve the Bid Procedures Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 7, 2025                    By: */s/ Geoffrey Richards*
                                           Geoffrey Richards
                                           Senior Managing Director and Head of the
                                           Capital Structure Advisory Group
                                           Raymond James & Associates, Inc.

02/07/2025