IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>Related to D. I. 68 |

### DECLARATION OF ROBERT GORIN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER, *INTER ALIA*, AUTHORIZING AND APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

I, Robert Gorin, hereby declare as follows:

1. I am the co-Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2] I have been engaged as CRO of Diamond Comic Distributors, Inc. ("DCD"), since July 17, 2024, and before that provided financial advisory services to DCD since March 7, 2024. I was more recently appointed Co-CRO of the other Debtors herein. Through such capacities, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I am a Managing Director at Getzler Henrich & Associates LLC ("Getzler Henrich") and lead Getzler Henrich's consumer products practice. I have more than thirty years of business strategy and turnaround experiences, as well as extensive experience advising insolvent

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2] I serve as co-CRO with my colleague, William H. Henrich, co-chairman of Getzler Henrich (as defined above).

53794025.1

companies in turnaround and crisis situations and navigating such companies through turnaround, process design and improvements, and merger and acquisition processes. I have frequently been involved in complex matters requiring expertise in corporate turnarounds and operational analysis.

3. Except as otherwise indicated, the statements set forth in this declaration are based upon my personal knowledge, information learned from my review of relevant documents, information supplied to me from other members of the Debtors' management or the Debtors' advisors, or my opinion based on my knowledge, experience and information concerning the Debtors' operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors. If called to testify, I could and would testify competently to the matters set forth in this declaration.

4. On January 14, 2025, I signed the *Declaration of Robert Gorin in Support of Chapter 11 Petitions and First Day Relief* (D.I. 20) (the "First Day Declaration"). The information contained in the First Day Declaration remains true and correct.

5. On January 21, 2025, the Debtors filed the *Debtors' Motion for an Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* (D.I. 68) (the "Bid Procedures Motion").[3]

6. I have read the Bid Procedures Motion and submit this Declaration in support of that motion.

---

[3] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Bid Procedures Motion.

7. As set forth in my First Day Declaration, prior to the Petition Date, the Debtors determined that pursuing a going concern section 363 sale in chapter 11 represents the best path forward to preserve and maximize value for the benefit of their stakeholders.

8. Before the Petition Date, the Debtors retained Raymond James & Associates, Inc. ("Raymond James"), a highly experienced and qualified investment banker, to commence and run a sales process for all or substantially all of the Debtors' assets.

9. As detailed in the Bid Procedures Motion, Raymond James spearheaded an all-inclusive marketing process, and solicited interest from potential financial and strategic investors for bids for all or substantially all the Debtors' assets, on a going concern basis.

10. After a diligent and widespread marketing process, six parties ultimately submitted indications of interest in the Debtors' assets. After negotiating with these parties, including extensive, arm's-length negotiations regarding various asset purchase agreements, the Debtors decided to proceed with Universal Distribution LLC ("Universal"), to serve as the Stalking Horse Bidder for the Alliance Assets.

11. On January 13, 2025, the Debtors signed the Stalking Horse Agreement with Universal, which provides for, among other things: (i) a purchase price of $39,000,000 (subject to adjustments) and (ii) the assumption of certain liabilities as described in the Stalking Horse Agreement.

12. While the negotiations with Universal included participation by the Debtors' professionals, I was personally involved in the negotiations.

13. I would characterize the negotiations with Universal as hard-fought, but done at arms-length and in good faith.

53794025.1

14. To my knowledge, Universal and its owners, officers and principals are not in any way affiliated with the Debtors, their owners, offices or principals.

15. I am familiar with the proposed Bidding Procedures set forth in the Motion. Those procedures were developed with input from the Debtors' professionals, including Raymond James.

16. Under the facts of this case, I believe the proposed sale timeline set forth in the Bidding Procedures and the Bidding Procedures themselves are fair, reasonable and appropriate for maximizing the value of the Debtors' assets.

17. As part of the Stalking Horse Agreement, the Debtors agreed to seek Court approval of certain stalking horse protections for Universal, including a breakup fee of three percent (3%) of the Purchase Price and an expense reimbursement capped at one half of a percent (0.5%) of the Purchase Price.

18. These stalking horse protections were agreed to as part of the give and take of the negotiations with Universal and agreeing to these provisions was an integral part of those negotiations and necessary to induce Universal to sign the Stalking Horse Agreement. Absent agreeing to the proposed stalking horse protections, it is my understanding that Universal would not have signed the Stalking Horse Agreement.

19. The Stalking Horse Agreement has and will provide a post-petition benefit to the Debtors' estates in several ways. First, the Stalking Horse Agreement demonstrated to the Debtors' lender a viable path for selling the Debtors' assets which helped induce the pre-petition lender to provide much needed debtor-in-possession financing and the consensual use of cash collateral. Second, the Stalking Horse Agreement has enabled the Debtors to communicate to their current customers and vendors that there is a plan and path in place to operate during these Chapter 11 cases and to permit the continued and uninterrupted operation of the Debtors' Alliance business.

Finally, the Stalking Horse Agreement sets a "floor" for the purchase of the Debtors' assets and should spur interest from other possible buyers and operators. As a result of the Stalking Horse Agreement, the Debtors have already experienced meaningful interest in the assets from other potential purchasers.

20. For all of the foregoing reasons, I believe the Debtors' decision to pursue a sale of its assets pursuant to the Bidding Procedures is a valid exercise of the Debtors' business judgment. I would encourage the Court to approve the Bid Procedures Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 7, 2025                           Respectfully submitted,

                                                  */s/ Robert Gorin*
                                                  Robert Gorin
                                                  Chief Restructuring Officer