UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
| Diamond Comic Distributors, | . |  |
| Inc., | . |  |
|  | . |  |
| Debtor. | . | Bankruptcy #25-10308 (DER) |

.........................................................

Baltimore, Maryland
January 15, 2025
1:32 p.m.

BEFORE THE HONORABLE DAVID E. RICE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


 TRANSCRIPT OF:

[2]  MOTION FOR JOINT ADMINISTRATION FILED BY DIAMOND COMIC
DISTRIBUTORS, INC.

[5]  DEBTORS MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE
DEBTORS TO (I) FILE (A) A CONSOLIDATED CREDITOR MATRIX AND (B)
A CONSOLIDATED LIST OF THE DEBTORS TOP THIRTY CREDITORS; (II)
REDACT INDIVIDUAL CUSTOMER INFORMATION; AND (III) PROVIDE
NOTICES FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[7]  MOTION TO EXTEND TIME WITHIN WHICH DEBTORS MUST FILE
THEIR SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF
FINANCIAL AFFAIRS FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[8]  DEBTORS APPLICATION TO APPOINT OMNI AGENT SOLUTIONS,
INC., AS CLAIMS AND NOTICING AGENT EFFECTIVE AS OF THE
PETITION DATE FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[10] DEBTORS MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING THE DEBTORS TO (A) CONTINUE INSURANCE POLICIES AND
AGREEMENTS RELATING THERETO, (B) HONOR CERTAIN PREPETITION
OBLIGATIONS IN RESPECT THEREOF, AND (C) RENEW, REVISE, EXTEND,
SUPPLEMENT OR ENTER INTO NEW INSURANCE COVERAGE, AND (II)
GRANTING RELATED RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS,
INC.

[11] DEBTORS MOTION FOR CONTINUATION OF UTILITY SERVICE AND APPROVAL OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY COMPANY UNDER SECTION 366(B) (I) APPROVING DEBTORS PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY COMPANIES, (II) ESTABLISHING PROCEDURES TO RESOLVE REQUESTS FOR ADDITIONAL ASSURANCE, AND (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE FILED BY DIAMOND COMIC DISTRIBUTORS, INC

[12] DEBTORS MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION TAXES AND FEES, AND (II) GRANTING RELATED RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[14] DEBTORS MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, AND BUSINESS FORMS AND PAYMENT OF RELATED PREPETITION OBLIGATIONS, (II) AUTHORIZING CONTINUATION OF ORDINARY COURSE INTERCOMPANY TRANSACTIONS, (III) EXTENDING TIME TO COMPLY WITH THE REQUIREMENTS OF 11 U.S.C. § 345(B), AND (IV) GRANTING RELATED RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[15] DEBTORS APPLICATION TO APPOINT OMNI AGENT SOLUTIONS, INC., AS CLAIMS AND NOTICING AGENT EFFECTIVE AS OF THE PETITION DATE FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[16] DEBTORS MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO ADMINISTER EXISTING CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS FILED BY DIAMOND COMIC DISTRIBUTORS, INC

[17] DEBTORS MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF SHIPPERS AND FREIGHT FORWARDERS, AND (II) GRANTING RELATED RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[18] DEBTORS MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY PREPETITION OBLIGATIONS OWED TO CRITICAL VENDORS, AND (II) GRANTING RELATED RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[19] DEBTORS MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED FINANCING AND THE USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS, INC.


APPEARANCES:

For The Debtor:                  Ashley N. Fellona, Esq.
                                 Saul Ewing, LLP
                                 1001 Fleet Street-9th Fl.
                                 Baltimore, MD 21202

                                 Paige Topper, Esq.
                                 Saul Ewing, LLP
                                 1001 Fleet Street-9th Fl.
                                 Baltimore, MD 21202

                                 Mark Minuti, Esq.
                                 Saul Ewing, LLP
                                 1001 Fleet Street-9th Fl.
                                 Baltimore, MD 21202

                                 Jeffrey C. Hampton, Esq.
                                 Saul Ewing, LLP
                                 1001 Fleet Street-9th Fl.
                                 Baltimore, MD 21202

                                 Adam H. Isenberg, Esq.
                                 Saul Ewing, LLP
                                 1001 Fleet Street-9th Fl.
                                 Baltimore, MD 21202

For Creditor, JPMorgan Chase     Jonathan W. Young, Esq.
Bank, NA:                        Troutman Pepper Locke, LLP
                                 701 8th St., NW, Ste. 500
                                 Washington, DC 20001

                                 David L. Ruediger, Esq.
                                 Troutman Pepper Locke, LLP
                                 701 8th St., NW, Ste. 500
                                 Washington, DC 20001

4

Toyja Kelley, Esq.
Troutman Pepper Locke, LLP
701 8th St., NW, Ste. 500
Washington, DC 20001

For U.S. Trustee's Office:    Hugh M. Bernstein, Esq.
Office of the U.S. Trustee
101 W. Lombard St.-Ste. 2625
Baltimore, MD 21201

Katherine Levin, Esq.
Office of the U.S. Trustee
101 W. Lombard St.-Ste. 2625
Baltimore, MD 21201

Omnia Shedid, Esq.
Office of the U.S. Trustee
101 W. Lombard St.-Ste. 2625
Baltimore, MD 21201

Audio Operator:          Cherita Scott

Transcribing Firm:       Writer's Cramp, Inc.
1027 Betty Lane
Ewing, NJ 08628
609-588-8043

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

5

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| **Witnesses For The Creditor:** | | | | | |

| **EXHIBITS:** | | **Marked** | **Received** |
|---|---|---|---|
| D-D | Declaration - Mr. Gorin | 9 | 10 |
| D-D | Declaration - Mr. Haesler | 9 | 10 |

**SUMMATION BY:**

1          THE CLERK:  All rise.  The United States Bankruptcy

2     Court for the District of Maryland is now in session.  The

3     Honorable Chief Judge David E. Rice presiding.  Please be

4     seated and come to order.  On the 1:30 Docket, calling the

5     case of Diamond Comic Distributors, Inc., case #25-10308.

6     Counsels, please identify yourselves and your clients for the

7     record.

8          MS. FELLONA:  Good afternoon, Your Honor.  Ashley

9     Fellona --

10         THE COURT:  Could you address the Court from the

11     podium, please?  That way we can be sure we can hear and

12     record the proceedings.  Thank you.

13         MS. FELLONA:  Absolutely.  Good afternoon, Your

14     Honor.  My name is Ashley Fellona of Saul Ewing.  I'm here on

15     behalf of the Debtors.

16         THE COURT:  Okay.

17         MS. FELLONA:  I'm here today as local counsel, and

18     I'm joined by my colleagues, Mark Minuti, Paige Topper,

19     Jeffrey Hampton, and Adam Isenberg.  Each of them Have Pro Hac

20     Vice Motions pending before the Court, and at this time, I

21     would move for their admission into the Court.  Pro Hac.

22         THE COURT:  I know there's been a number of Pro Hac

23     Motions filed, not just by the Debtor, but others.  I've taken

24     a preliminary review of those.  I wanted to wait to make sure

25     we were doing joint administration before entering any Orders.

1   I don't think there's going to be any issues, and I have no

2   problem with the participation in this hearing by anyone who's

3   the subject of one of those, not just your motions, but the

4   other counsel who may be here.

5           MS. FELLONA:  Understood.  Thank you, Your Honor.

6           THE COURT:  Who's going to be the lead speaker, if

7   you will, for the Debtor?

8           MS. FELLONA:  It will be --

9           MR. MINUTI:  It's me, Your Honor.  Mark Minuti.

10          THE COURT:  All right.  Thank you.

11          MR. BERNSTEIN:  And, good afternoon, Your Honor.

12  Hugh Bernstein on behalf of the United States Trustee.  And

13  with me today is my colleagues, Katherine Levin and Omnia

14  Shedid.  With respect to Ms. Shedid, I'd like to -- I'm happy

15  to -- I'll advise the Court that the next time you see her,

16  she probably will be a full-fledged member of this Bar.  So --

17          THE COURT:  Excellent.  Good afternoon to all of

18  you.

19          MR. YOUNG:  Good afternoon, Your Honor.  I'm

20  Jonathan Young.  I also have a Pro Hac Vice Motion pending

21  before you.  I'm here with my partners, David Ruediger and

22  Toyja Kelley.  We represent JPMorgan Chase Bank.

23          THE COURT:  Good afternoon.  No one else?  All

24  right.  Mr. Minuti?  Before we start, I wanted to just take

25  care of a preliminary matter.  Upon receiving these cases, I

1  reviewed the top 30 Unsecured Creditors' lists for each case.
2  On that list for the lead Debtor, Diamond Comic Distributors,
3  Inc., our Creditors, Disney Consumer Products, Inc., and
4  Microsoft Corporation.  Although my -- although any
5  involvement in this case by these Creditors is yet unknown,
6  yesterday I divested all my stock ownership in both Walt
7  Disney Company and Microsoft Corp., pursuant to Canon 3C(4) of
8  the Judicial Code of Conduct for United States Judges.  Due to
9  the size of both Disney and Microsoft, neither of my former
10  interests could be substantially affected by the outcome of
11  this proceeding.  Nevertheless, I decided to err on the side
12  of caution and to avoid any questions of impartiality due to
13  financial interests that could potentially arise.  Unless any
14  party present today has questions or concerns regarding this
15  disclosure, I'm prepared to proceed.  Or if anyone would like
16  to request a recess to discuss this disclosure, I'm happy to
17  do that.  I don't see any takers expressing concerns or
18  requests.  So, Mr. Minuti, let's proceed.
19        MR. MINUTI:  Very well, Your Honor.  Again, for the
20  record, Mark Minuti from Saul Ewing.  We are proposed counsel
21  to the Debtors, Diamond Comic Distributors, Inc., Comic
22  Exporters, Inc., Comic Holdings, Inc., and Diamond Select Toys
23  & Collectibles, LLC.  You were already introduced to my
24  colleagues in the case.  I want to make a couple other
25  introductions, Your Honor.  Sitting in the first row, Your

1  Honor, is Robert Gorin.  He is a Managing Director of Getzler

2  Henrich & Associates, LLC.  He was appointed as Co-CRO of the

3  Debtors prior to the bankruptcy and he is our proposed Co-CRO

4  in the case.  Also sitting next to him, Your Honor, is Alec

5  Haesler.  Mr. Haesler is a Director at Raymond James &

6  Associates, Incorporated.  That's the Debtors' investment

7  banker.  On the petition date, Your Honor, we filed

8  declarations of both Mr. Gorin in support of all the first day

9  relief.  That appears at Docket #20.  We also filed a direct

10  declaration from Mr. Haesler in support of the Motion for

11  Debtor-In-Possession Financing.  That appears at Docket #21.

12  If acceptable to the Court, we're going to rely upon those

13  declarations in support of the relief we're seeking today.  If

14  necessary, both Mr. Gorin and Mr. Haesler are in the courtroom

15  to supplement their testimony if necessary and they're

16  certainly available for cross examination.  I can certainly

17  move those declarations into evidence now or wait until we get

18  to the motions, whatever the Court's pleasure is.

19      (Debtor's Docket #20 previously marked for

20  identification)

21      (Debtor's Docket #21 previously marked for

22  identification)

23          THE COURT:  So, let me say a couple things.  I've

24  done my best to review all of the reading materials with my

25  law clerk, the folks that provided me.  There's a lot of it.

1    I've read those affidavits.  I'm fine with proceeding with

2    them as proffer of the direct testimony of the witnesses

3    subject to the cross examination by any party, if there's some

4    party who wishes to do so.  Is there any party in the court

5    who objects to that approach?  No.  So, you can offer them now

6    or later.  Just however you --

7              MR. MINUTI:  I would move the admission then into

8    evidence now, Your Honor.  Again, it's Docket #20 and Docket

9    #21.

10             THE COURT:  All right.  We'll consider Docket #20

11   and #21 as admitted into evidence.

12        (Debtor's Docket #20 admitted into evidence)

13        (Debtor's Docket #21 admitted into evidence)

14             MR. MINUTI:  And, Your Honor, I probably should have

15   started with this, so I apologize.  I do want to thank the

16   Court and its staff for hearing us on short notice and for

17   accommodating us today.  The Court has been most

18   accommodating.  We appreciate that, as you can appreciate it's

19   often fairly hectic leading up to a filing, and so any help we

20   get from anybody is appreciated.  So, we wanted to thank the

21   Court and its staff.  By way of procedural background, we

22   filed these cases on January 14th, 2025, and consistent with

23   local rules and those governing complex Chapter 11 cases, we

24   first contacted the United States Trustee's Office and the

25   Clerk's Office on December 30th, 2024 to advise of the

1    upcoming filings.  We then -- we -- since that time, we were

2    working with both the Trustee's Office and the Clerk's Office

3    to inform them along the way.  As is typical in a lot of these

4    cases, Your Honor, our filing date was a moving target.  We

5    did start sending drafts of the first day motions to the

6    United States Trustee's Office on a rolling basis on January

7    3rd, 2025.  We've continued to dialogue with the Trustee's

8    Office even up until literally before we -- Your Honor took

9    the bench this afternoon.  On, let's see, I think it was the

10   petition date, Your Honor, we served notice of our first day

11   hearing by e-mail, fax, and overnight mail on a number of

12   parties.  That notice appears at Docket #22.  Those parties

13   include the United States Trustee's Office, our 30 largest

14   Unsecured Creditors, counsel to our Prepetition Secured Lender

15   and our Postpetition Proposed Lender, JPMorgan Chase Bank N.A.

16   The non-Debtor loan parties are guarantors to the prepetition

17   and postpetition facilities, the relevant taxing authorities,

18   the United States attorneys for the districts in which the

19   Debtors -- I'm sorry, the United States attorney for the

20   District of Maryland, and the attorney generals for the states

21   in which we operate.  An Affidavit of Service was filed this

22   morning with regard to that service of the notice and the

23   motions, Your Honor.  That appears at Docket #29.

24        What I would propose to do today, Your Honor, is to

25   provide the Court with some case background.  Most of this

1    comes out of Mr. Gorin's declaration in terms of, you know,

2    who we are, how we got here, and where we think we're going.

3    I would then propose that we turn to the first day motions.

4    Ms. Topper is going to handle most of those, Your Honor.  I'll

5    be back to talk about the Debtor-In-Possession Financing

6    Motion.  And at the conclusion of the hearing, if it's

7    acceptable to the Court, we can then deal with further

8    scheduling.  Is that acceptable?

9              THE COURT:  Yes, of course.  Go ahead.

10             MR. MINUTI:  Thank you, Your Honor.  So, who are we

11   and how did we get here?  The Debtors are a leading

12   distributor of comics, graphic novels, toys, games, and other

13   pop culture related merchandise to retailers across the world.

14   The Debtors began operations in 1982, and at its inception, it

15   operated out of one warehouse and serviced 17 retail

16   customers.  Today, the Debtors operate out of five warehouses

17   comprising over a million square feet of distribution space to

18   -- and distributes products to over 6,000 customers worldwide.

19        So, let me describe each of the Debtors.  I'll start with

20   Diamond Comic Distributors, Incorporated.  That's the primary

21   operating Debtor that is before you today.  And that Debtor

22   operates or conducts its business through three unincorporated

23   divisions, as well as a separate but related foreign entity,

24   which I will describe.  Those three divisions I talked about

25   are Alliance Game Distributors or Alliance, Diamond Comic

1   Distributors, which I'll call Diamond, Collectible Grading
2   Authority, CGA, and the foreign entity is an entity called
3   Diamond Comic Distributors, UK.  That is an unlimited company
4   incorporated under the laws of England and Wales.  It is not a
5   Debtor before the Court.  It is a subsidiary, however, of the
6   Debtors I talked about earlier, which is Diamond Comic
7   Distributors -- I'm sorry, the two Debtors I talked about
8   earlier, which are, let me get back to my start page, Your
9   Honor, Comic Exporters, Inc. and Comic Holdings, Incorporated.
10      So, let me first talk about the Alliance Division.  The
11   Alliance Division is one of the oldest hobby game distributors
12   in the United States and is a primary distributor of
13   role-playing games, collectible card games, board games,
14   miniatures, and other gaming and hobby accessories.  Popular
15   products that are distributed by this particular division
16   include Dungeons & Dragons, Magic: The Gathering, Lord of the
17   Rings, Warhammer 40K, Cascadia, Pokemon, and Dragon Ball
18   trading cards.  Alliance distributes its products to a diverse
19   nationwide base of independent retail customers, including
20   large retailers and wholesalers like Barnes & Noble, Borders,
21   and Books-A-Million, but the majority of Alliance's customers
22   are local retail shop owners in the direct market.  Alliance
23   has distribution centers in Visalia, California, Austin,
24   Texas, Fort Wayne, Indiana, and Red Lion, Pennsylvania.  All
25   of those locations are leased.  It also maintains a storage

1    facility in Fort Wayne, Indiana, to store excess inventory and
2    inventory for its fulfillment customers and in return for
3    which it receives a fee.  In addition to its distribution
4    services, Alliance also offers product spotlights for
5    producers in its monthly trade publication called Game Trade
6    Magazine.
7        The Diamond division, Your Honor, focuses on the sale and
8    distribution of comic books, graphic novels, trade paperback
9    books, and other pop cultural books, toys, and merchandise.
10    Diamond is one of the largest international distributors of
11    English-language graphic novels, games, merchandise, with
12    operations that extend to more than 85 countries.  Among the
13    top publishers for the comic and graphic novels that Diamond
14    distributes include people or entities like Marvel Comics,
15    Image Comics, and Dark Horse, which I understand make up the
16    majority of the comic world in terms of publishers.  Popular
17    toys and collectibles that Diamond distributes include Funko
18    Pops and Star Wars statutes -- statues, excuse me.  Diamond
19    has three sales channels to mass market retailers, including
20    Walmart, Target, and Amazon, to specialty stores such as comic
21    bookshops and collectible stores, and also to bookstores,
22    including entities like Barnes & Noble.  Diamond distributes
23    products to over 4,000 mass market retailers and over 2,500
24    comic book and collectible stores.  It operates primarily out
25    of the distribution center in Olive Branch, Mississippi.

1        CGA is another division.  That division provides

2   professional evaluation, authentication, and grading of

3   vintage and modern toys, so they basically value it and

4   authenticate what those toys are.  It also provides acrylic

5   sleeves and cases for those things so people can display them

6   and it prevents them from getting damaged.  In addition to its

7   grading services, they offer a wide range of collectible

8   action figures, video games, LEGOs, comic books, and related

9   merchandise for purchase on its website.

10       Finally, I want to talk about Diamond UK in terms of the

11  operating entities, Your Honor.  It's a non-Debtor affiliate

12  of -- it's headquartered in Runcorn, Cheshire, England.  It is

13  a standalone business focused on serving the United Kingdom,

14  European, Middle Eastern, and Australian comic book

15  collectible and book market.  It serves over 300 United

16  Kingdom comic books and collectibles retailers and the like --

17  it's a Diamond Distribution -- Distributor, I'm sorry, it's

18  one of the dominant distributors for major publishers.  So,

19  that is Diamond Comic Distributors that we talked about.

20       Another Debtor before you is Diamond -- is Debtor Diamond

21  Select Toys & Collectibles, LLC.  As the name would imply,

22  Your Honor, this entity manufactures collectible toys and

23  animated style statues based on license of intellectual

24  property from entities like Disney or Marvel or Warner

25  Brothers.  It operates from a facility in Burbank, California,

1    where it employs people like sculptors, painters, and 3D print

2    technicians.  It distributes over 95% of its products through

3    Debtor DCD.  Finally, Your Honor, I mentioned the two hold

4    companies, CHI and CEI.  They are non-operating entities.

5    They are simply holding companies.  And what they essentially

6    hold is 50% of the equity interest in the UK entity that we

7    talked about just a minute ago.

8         In terms of the Debtor's business, a key component of

9    that business, Your Honor, is its relationship, both with its

10   customers as well as the publishers.  That's really the key

11   here.  You know, the many retail locations where you can buy

12   comic books and these sorts of collectibles are sort of like

13   social hubs where people meet and talk about the latest

14   products and the latest publications and so on and so forth.

15   And so, maintaining a strong relationship with those customers

16   is key to anybody in this business.  And the Debtor throughout

17   the years has been pretty successful in cultivating those

18   relationships so it has -- it had the primary distribution

19   channel for its products.

20        Another key aspect of the business was its long-standing

21   relationship with publishers, and the Debtor maintained strong

22   relationships with those key publishers.  And a key component

23   of that is getting access to product.  But one of the key

24   things is exclusive products or limited product runs because

25   that's what the public wants, that's what they want to get to,

1   and the Debtor's ability to get that based on these

2   relationships, supply it to its suppliers who then can supply

3   to customers.  That was a key.

4        On page 20 of Mr. Gorin's declaration that Your Honor

5   indicated he had a chance to look at, you -- there's a full

6   corporate chart.  I don't intend to go over that unless Your

7   Honor wants me to, but it's just the -- it's pretty much a

8   layout of who owns what and who the Debtors are before the

9   Court.  Again, it's in Paragraph 20, and you'll see all the

10  Debtors that we mentioned are in bold.  So, let me -- well,

11  let me pause now and ask the Court if it has any questions

12  about the background because I'm going to turn now and talk a

13  little bit about the debt structure.

14        THE COURT:  No questions.  Go ahead.  Thank you.

15        MR. MINUTI:  Thank you, Your Honor.  So, Debtor DCD

16  as borrower is a party to a May 16, 2019 Credit Agreement as

17  amended, modified, or supplemented with JPMorgan Chase Bank

18  N.A. as Lender.  Under that Credit Agreement, JPMorgan agreed

19  to extend to DCD a revolving line of credit in the maximum

20  amount of $40 million and a term loan for $3 million.  As we

21  sit here today, Your Honor, Debtor DCD's obligations under the

22  Credit Agreement are guaranteed by all of the Debtors before

23  you today.  Non-Debtor, the Diamond UK entity we talked about,

24  an entity called Rosebud Entertainment, LLC, Game

25  Consolidators LLC, and Renegade Games, LLC.  Mr. Stephen

1    Geppi, who's an Executive Officer of the Debtors, also
2    personally guaranteed the obligations under the Prepetition
3    Credit Agreement.
4        Pursuant to the Credit Agreement and related loan
5    documents, JPMorgan Chase holds a valid security interest in
6    substantially all of the Debtor's prepetition assets.
7    Moreover, as further security for the prepetition loan,
8    non-Debtors SG Resources, LLC and Stephen A. Geppi Revocable
9    Trust pledged to JPMorgan their interest in DCD and any
10   related distributions and proceeds.  Similarly, the holders of
11   all outstanding membership interest in non-Debtor affiliates
12   Rosebud, Consolidators, and Renegade have also pledged their
13   right, title, and interest in those entities to JPMorgan
14   Chase.  And, finally, the holders of all outstanding
15   membership interest in Debtors -- in Debtor DST pledged to JPM
16   their right, title, and interest in their respective interest
17   in DST and any proceeds and distribution.
18       As of the petition date, the total principal amount
19   outstanding under the Prepetition Credit Agreement is not less
20   than $32.6 million, plus accrued and unpaid interest with
21   respect thereto, and any additional fees, costs, and expenses
22   owed under or in connection with those loan documents.  Beyond
23   the secured debt that we just discussed, the Debtors estimate
24   that they owe approximately $40 million to vendors and other
25   parties in interest, Your Honor, as of the petition date.

1        And so, what happened to the Debtor and why are we before
2   you as Debtors in Chapter 11?  Well, since '19 or some --
3   excuse me, since 2019 and particularly during and after the
4   COVID-19 pandemic, the Debtors have experienced a decline in
5   sales of comic books and graphic novels through DCD's Diamond
6   division.  This was primarily a result of the loss of
7   Exclusive Distribution Agreements with major comic suppliers
8   like DC Entertainment, who does Superman, for example, and
9   Marvel Worldwide.  In addition, the Debtors also experienced
10  macroeconomic headwinds resulting in higher interest rates on
11  its secured debt and inflationary increase in wages and
12  freight-related expenses.  That period or those declines, Your
13  Honor, in revenue were in some respects -- or excuse me, those
14  declines in the business were, in some respects, offset by the
15  revenue growth in the Alliance Division, which went from 85.5
16  million in 2020 to 149.1 million in 2023.  However, Alliance
17  success was not enough to support the Debtors' long-term and
18  sustain the other business operation.  The impact from the
19  Debtors' recent sales decline has been compounded by the
20  rising operating expenses I mentioned a little bit ago.  And
21  by way of example, total operating expenses for the Debtors
22  have risen in recent years as a percentage of sales from 5.44%
23  in 2019 to 8.73% in 2023.
24       Finally, as -- and I already mentioned, there's inflation
25  and pressure from rising wages in recent years has also

1   resulted in unanticipated increased costs for the Debtors, and
2   these increased costs, Your Honor, have simply led to an
3   unsustainable liquidity position.  So, what did the Debtor do
4   to try to overcome that?  Well, one of the things that did,
5   Your Honor, was recognize its need to right the ship, and so
6   one of the first things it tried to do beginning in 2023 was
7   find a potential buyer for all or part of its business.  And
8   so, that process, Your Honor, went for a while, but
9   unfortunately, the Debtors were not able in the 2023 or early
10  2024 timeframe to find a buyer and couldn't close a traction
11  -- couldn't close a transaction based on certain structural
12  issues.
13       In March of 2024, the Debtors retained Getzler Henrich
14  first as their Financial Advisor and later appointed Mr. Gorin
15  as Co-CRO of DCD.  And when it became apparent that the
16  Debtors may have to consider a marketing and sale process in a
17  distressed scenario, that's when the Debtor engaged our firm
18  as restructuring counsel to assist it in assessing and
19  pursuing strategic alternatives, including a possible Chapter
20  11 case.  The Debtors also engaged Raymond James & Associates,
21  Inc. to serve as their investment banker to construct and
22  consummate a marketing process now in connection with a
23  distress situation and a likely Chapter 11 filing.
24       Finally, the DCD and DST's board also each appointed an
25  independent Restructuring Committee comprised of one

1   independent director, with that independent director having

2   responsibility for deciding things like filing a Chapter 11

3   case and dealing with issues related to Chapter 11.  Now,

4   after considering alternatives, the Debtors determined that

5   pursuit of a going concern sale inside of a Chapter 11 process

6   represented the best path forward to preserve and maximize

7   value for the benefit of their stakeholders.  So, beginning in

8   late September of 2023, when Raymond James was hired, they

9   began to initiate a marketing process for the Debtors' assets.

10  As you would expect, they developed marketing materials,

11  including a teaser and a Confidential Information Memorandum,

12  or a CIM, they set up a virtual data room with all the

13  information relevant to the Debtors that a buyer would want to

14  look at, they contacted over 110 parties, of which 28 executed

15  Nondisclosure Agreements to access the data room and review

16  the Confidential Information Memorandum.  Ultimately, six

17  parties submitted indication of interest in the Debtors'

18  assets.  After negotiating with several of those parties at

19  arm's length, Your Honor, ultimately the Debtors entered into

20  or signed an Asset Purchase Agreement with an entity called

21  Universal Distributors, Inc., to serve as a Stalking Horse

22  Purchaser pursuant to a 363 sale, all of which, of course, is

23  subject ultimately to Court approval, that being both the

24  procedures and the ultimate sale.

25       So, the Debtors filed for bankruptcy with the intent and

1    goal of conducting a competitive postpetition sale process to
2    maximize the value of their assets for Creditors and
3    stakeholders, with Universal serving as a Stalking Horse
4    Bidder.  The Debtor and Raymond James, Your Honor, intend to
5    launch the postpetition marketing process as soon as possible,
6    and we have prepared and will be filing shortly both a Sale
7    Motion as well as a Motion to Establish Bidding Procedures for
8    that sale.  Given the significant interest in the Debtors'
9    assets in connection with the prepetition marketing process,
10   and frankly just based upon the little bit of information that
11   was in the first day affidavits about the possibility of a
12   sale, folks have already begun to call the Debtors on a
13   postpetition basis and Raymond James on a postpetition basis.
14   So, based upon what happened prepetition and the number of
15   calls we're receiving postpetition, we do expect a robust and
16   competitive postpetition sale process.
17          In the interim and subject to Court approval, the Debtors
18   have secured funding for these cases through
19   Debtor-In-Possession financing and consensual use of cash
20   collateral with JPMorgan Chase.  That will ensure that the
21   Debtors can honor their postpetition obligations and continue
22   to operate during these Chapter 11 cases while it executes on
23   that sale process.  So, pursuant to the Sale Motion, the Bid
24   Procedures Motion to come, the DIP Motion which we will
25   discuss later today, the Debtors, again, hope to run a

1   competitive sale process and close on a going concern sale

2   roughly within 85 days of the petition date.  That's the

3   timeframe we will be seeking under the Bid Procedures Motion

4   when it's filed, Your Honor.  So, Your Honor, that gives you a

5   flavor for who we are, how we got here, and where we hope to

6   go.  I'm certainly open to any questions from the Court or we

7   can turn to the first day motions.

8            THE COURT:  I have no questions.  If you want to

9   proceed with the first day motions, go ahead.

10            MR. MINUTI:  I will, Your Honor.  And for that, I'm

11   going to cede the podium then to Ms. Topper.  Thank you.

12            THE COURT:  Very good.  Thank you.  Ms. Topper?

13            MS. TOPPER:  Good afternoon, Your Honor.

14            THE COURT:  Good afternoon.

15            MS. TOPPER:  For the record, Paige Topper with Saul

16   Ewing on behalf of the Debtors in these cases, Your Honor.

17   I'm going to handle the first day motions as they appear both

18   on the Docket and in the agenda that was filed.  So, we will

19   just take them in order if that works for the Court.

20            THE COURT:  Fine by me.  Go ahead.

21            MS. TOPPER:  Great.  So, turning first to the Joint

22   Administration Motion, Your Honor, that's at Docket item #2.

23   The Debtors are requesting entry of an order jointly

24   administering these cases for procedural purposes only.  The

25   Debtors are affiliates as that term is defined under Section

1    101(2) of the Bankruptcy Code.  And, finally, in accordance

2    with Local Bankruptcy Rule 1015-1, the first day declaration

3    does establish the joint administration in these cases is

4    warranted and will ease the administrative burden of the

5    Court.

6              THE COURT:  All right.  Is there anyone in court

7    today objecting to joint administration on the terms of the

8    motion?  There were no objections.  I've read the motion and

9    the Proposed Order, and it appears in order to me I will

10   approve the motion.

11             MS. TOPPER:  Thank you, Your Honor.  And I should

12   note that the -- that Proposed Order, we did submit a red line

13   just to include Your Honor's initials and the captions where

14   appropriate.

15             THE COURT:  Yes.  Red lines are very helpful.  And I

16   see, yes, that was the only change.  Go ahead.  Next.

17             MS. TOPPER:  Thank you.  Turning next, Your Honor,

18   to the Motion to File a Consolidated Creditor Matrix as well

19   as to Redact Individual Customer Information that's filed at

20   Docket item #5.  Your Honor, filing a Consolidated Creditor

21   Matrix and a consolidated list of the Debtors' largest 30

22   Unsecured Creditors is warranted in these cases.  The Debtors

23   do believe that consolidating both the matrix and the top 30

24   list will also alleviate administrative burdens on the Court

25   and the potential for any duplicative service.  The motion

1    also requests authority to redact the names and personal

2    addresses for the Debtors' individual customers pursuant to

3    Section 107 of the Bankruptcy Code.  We did receive -- Your

4    Honor, with respect to the Proposed Order, after filing with

5    the Court, we did receive a comment from the Clerk's Office.

6    So, that has been incorporated in the red line at Paragraph 5.

7    And their comment was to address how the redacted matrix would

8    be submitted with the Court.  So, unless the Court has any

9    questions, the Debtors request entry of the Order approving

10   the relief in that motion.

11           THE COURT:  I've read the motion, the Proposed

12   Order, and the -- I see the red line.  Is there anyone here

13   objecting to the Consolidated Matrix Motions?  There's no

14   objection.  The motion is granted.

15           MS. TOPPER:  Thank you, Your Honor.  Turning next to

16   the Motion to Extend the Deadline for the Debtors to File

17   Their Schedules of Assets and Liabilities and Statements of

18   Financial Affairs.  That's located at Docket item #7.  The

19   Debtors are requesting, in that motion, a brief extension to

20   file their Schedules and statements.  After filing the motion,

21   Your Honor, the Clerk's Office did schedule the 341 Meeting

22   for these cases for February 19th.  And the Debtors understand

23   that it is the Office of the United States Trustee's

24   preference to have Schedules and statements filed at least two

25   business days prior to that hearing.  The Debtors are happy to

1   accommodate that preference.  So, we have revised the red line

2   that isn't -- with Your Honor reflects changes to the Proposed

3   Order just to grant an extension for an additional 20 days so

4   that the Schedules and statements are due by February 17th.

5           THE COURT:  I see.  All right.  I have no questions

6   about that.  Is anyone objecting to this motion?  No?  The

7   motion is granted.

8           MS. TOPPER:  Thank you, Your Honor.  Next is the

9   Debtors Application to Retain Omni Agent Solutions as the

10  Claims and Noticing Agent for these cases.  Before retaining

11  Omni Agent Solutions as their claims and noticing agents, the

12  Debtors did reach out and receive proposals from three

13  qualified claims and noticing agents.  The Debtor reviewed all

14  those proposals and then selected Omni, in part, based on

15  their extensive experience serving in this capacity.  And the

16  Debtors do believe that Omni is capable of performing the

17  necessary tasks in these cases and connection and to the scope

18  set forth in Omni's retention application.  After we filed the

19  application, Your Honor, and the Proposed Order, the Debtors

20  did receive comments from the Clerk's Office.  Those are

21  addressed in the Revised Proposed Order that was submitted to

22  Your Honor at new Paragraphs 7, 8, 9, and 12.  And those

23  comments primarily focus on transitioning the claims duties

24  from the Clerk's Office to Omni and in connection with both

25  the claims register and then sort of receiving questions and

1    inquiries about it.  Your Honor, the Revised Order does also

2    address a U.S. Trustee's comment that Omni provide its

3    invoices to the Office of the United States Trustee and any

4    Creditors Committee appointed at the same time they send their

5    monthly invoices to the Debtors.

6         THE COURT:  All right.  I have no questions.  I've

7    reviewed the motion and the Proposed Order, including the red

8    line.  Is anyone objecting to this motion being granted on the

9    terms of the Revised Order?  No objections.  The motion is

10   granted.

11        MS. TOPPER:  Thank you, Your Honor.  Docket item #10

12   is the Debtors Insurance Motion.  The Debtor has maintained an

13   insurance program that provides coverage under various

14   policies in the ordinary course of their business.  The

15   Debtors do not believe right now that there are any amounts

16   outstanding on account of the insurance obligations, but we

17   did file the motion on -- out of an abundance of caution to

18   request authority to pay any prepetition insurance obligations

19   up to a capped amount of $75,000 on an interim basis.  And,

20   Your Honor, maintaining insurance coverage is required under

21   the Bankruptcy Code and is essential to preserving the value

22   of the Debtors' operations and assets, as it is critical to

23   the Debtors' continued operations that the insurance policies

24   and premiums and any fees associated therewith continue to get

25   paid.  The Debtors do request that the Court grant the relief

1    requested in the motion, and the U.S. Trustee provided

2    informal comments to this motion that have since been resolved

3    prior to the hearing.

4            THE COURT:  Did that necessitate any change to the

5    Interim Order?

6            MS. TOPPER:  That did not necessitate any change --

7            THE COURT:  Okay.

8            MS. TOPPER:  -- to the Interim Order.

9            THE COURT:  Is there any objection to granting this

10   motion on an interim basis?  All right.  There is none.  I

11   will do so.  The Order as submitted contains a blank calling

12   for a final hearing to be set on the motion.  I can't remember

13   -- I do not know if I had a chance to talk to my law clerk or

14   the courtroom deputy.  Have we discussed with you the Court's

15   notion that we might set a final hearing on February 5th at 10

16   a.m.?

17           MS. TOPPER:  We have not discussed that yet, Your

18   Honor.  I think we were looking at certainly that week for

19   February 5th, 6th, or 7th.  I'm only hesitating because we

20   need to file, in order to meet some of our debt milestones, a

21   retention application for Raymond James, as well as the Bid

22   Procedures Motion that needs to be set for '25 -- and, sorry,

23   excuse me, the milestone, the orders need to be entered within

24   25 days of the petition date.  So, I think I actually need a

25   -- maybe a hearing on the 6th or 7th that week to give us

1    tomorrow and Friday to potentially get those documents on file

2    so that we're giving adequate notice before the hearing.

3           THE COURT:  All right.  Well, I'm not sure what the

4    Court can accommodate.  Let's not throw ourselves off track

5    and we'll circle back and figure out what we're doing --

6           MS. TOPPER:  Understood, Your Honor.

7           THE COURT:  -- about the timing of the hearing --

8    final hearing, and the objection period for that.  Okay?  But

9    otherwise, the motion's granted.

10          MS. TOPPER:  Understood, Your Honor.  And when we do

11   select the final hearing date and the objection deadline,

12   would you like our office to just --

13          THE COURT:  I would like us to --

14          MS. TOPPER:  -- input the information?

15          THE COURT:  -- deal with that this afternoon.

16          MS. TOPPER:  Yes.

17          THE COURT:  Either on a recess or if it can't be

18   dealt with, then I have to make an executive decision saying

19   we're going to do it.  Regardless of your druthers on a

20   particular day and time, we'll do that.  But I don't want us

21   to leave court today without having that resolved.

22          MS. TOPPER:  No.  Understood, Your Honor.  I just

23   wanted to make sure, procedurally, would you like us to submit

24   Clean Orders or were you going to input the dates?

25          THE COURT:  Oh, I would want you to submit the Clean

1    Order.

2            MS. TOPPER:   Okay.   Understood.

3            THE COURT:   Okay.   I mean, I think it's important

4    based upon -- I haven't heard what objections are maybe to

5    further motions, but as of what I've heard so far, the Court

6    is going to want to try to accommodate what the Debtor's

7    trying to propose to do.   I don't know whether it will

8    ultimately be approved and what the objections might be, but,

9    you know, the Court's -- it's a busy court.   I'm not sure what

10   availability we have.   I have other commitments.   That's why

11   we were leaning towards the 5th.

12           MS. TOPPER:   Understood.

13           THE COURT:   It might be that -- just think about it,

14   it might be in the Court's mind, maybe it's worth just

15   sticking with the 5th and just filing a motion to shorten time

16   to object with the -- whatever applications or motions you're

17   filing would have to be heard that day, but let's go on to the

18   next item.

19           MS. TOPPER:   Understood, Your Honor.   The next item

20   for today's purpose is, Your Honor, is the Debtors' Utility

21   Motion.   That's at Docket item #11.   Your Honor, the Debtors

22   pay traditional utility services related to operating and

23   maintaining their business in the ordinary course.   Those

24   include paying utility service providers at their distribution

25   centers as well as their offices here in Maryland.

1    Uninterrupted utility services are essential to the continued
2    operation of the Debtors' business, and so the Debtors are
3    proposing adequate assurance to their utility companies in the
4    form of an adequate assurance deposit account.  The Debtors
5    propose to deposit $28,000 into that account within 20 days of
6    the petition date, and that $20,000 figure is equal to
7    approximately two weeks of utility services that are
8    calculated by averaging the monthly cost for the last 12 years
9    -- excuse me, 12 months, and then dividing that by two.  The
10   Debtors do believe that the adequate assurance deposit
11   constitutes sufficient adequate assurance of future payment
12   for each of the utility companies.  However, the Debtors are
13   proposing that certain procedures to allow utility companies
14   to come forward and request additional adequate assurance
15   should they feel that they need additional assurance.  The
16   U.S. Trustee's comments to the Proposed Order were
17   incorporated before we filed the cases, so we were able to
18   handle those prepetition, so there are no changes to the Order
19   that was filed with the Court.  Unless the Court has any
20   questions, the Debtors request entry of that Interim Order at
21   this time.
22             THE COURT:  All right.  I have no questions.  Is
23   anyone objecting to this motion being granted on an interim
24   basis?  There are no objections, so the motion will be
25   granted.  This is another one that we'll need to sort out

1    the --

2            MS. TOPPER:  Yes.

3            THE COURT:  -- scheduling for.

4            MS. TOPPER:  Yes.  Thank you, Your Honor.  Turning

5    next to the Debtors' Tax Motion, that is at Docket item #12.

6    The Debtors pay certain taxes and fees in the ordinary course

7    of their business.  This includes sales and use taxes,

8    business and occupation taxes, as well as property taxes.  The

9    Debtors are seeking authority through an Interim Order to pay

10   up to $290,000 for prepetition tax obligations that the

11   Debtors anticipate coming due during the interim period for

12   these cases.  Failure to pay may jeopardize the Debtors' good

13   standing with their taxing authorities and could cause the

14   taxing authorities to take adverse action against the Debtors,

15   including possibly asserting liens against the Debtors'

16   assets.  Unless the Court has any questions, the Debtors

17   request entry of the Interim Tax Order.

18           THE COURT:  All right.  I have no questions.  Is

19   there anyone objecting -- in court objecting to approval of

20   this motion on an interim basis?  No objections.  I reviewed

21   the motion.  It appears in order.  I will grant the motion on

22   an interim basis.  We will need to work out scheduling, but

23   we'll deal with that later.

24           MS. TOPPER:  Understood, Your Honor.  Thank you.

25   Next is the Debtors' Motion to Maintain their Cash Management

1  System.  Your Honor, that is at Docket item #14.  The Debtors'
2  cash management system includes 13 bank accounts, both at JPM
3  as well as the Bank of Montreal.  Each of these bank accounts
4  is described in further detail in the motion, but at a high
5  level, the funds from sales for Debtor Diamond Comic
6  Distributors flow into either one of the Debtors' cash
7  collection accounts or one of their operating accounts.  If
8  funds go into their operating accounts, they're sent --
9  manually transferred to the applicable collections account.
10 Throughout the day, funds received in the Debtors' collections
11 accounts are automatically swept into JPM's ABL account to pay
12 down the outstanding revolver amounts in accordance with the
13 Prepetition Credit Agreement.  Then the Debtors, to pay for
14 operating expenses as well as payroll, they submit requests to
15 JPM for loan advances to cover those expenses.  Separately,
16 Debtor Diamond Select Toys & Collectibles maintains a single
17 bank account at JPM, where receipts from its business
18 operations are deposited, and it also uses that bank account
19 to pay for its operating expenses.
20      The motion also seeks authority to continue certain
21 intercompany transactions in the ordinary course, and I will
22 note that with respect to the Proposed Order, the U.S. Trustee
23 -- we've come to an agreement with the U.S. Trustee, although
24 we need to add language to the Proposed Order, Your Honor,
25 that the two bank accounts that are at Bank of Montreal, the

1    Debtors have agreed to maintain balances under $100,000 each

2    for those accounts, so the Debtor will manually sweep those

3    accounts as needed to make sure that those balances stay under

4    that threshold, and that threshold is to -- is the insurance

5    threshold for -- under Canadian law, so we have agreed to that

6    with the U.S. Trustee, and we will add that -- a language to

7    that effect, Your Honor.

8              THE COURT:  All right.  So, is that your pitch for

9    approval of this motion?

10             MS. TOPPER:  That is my pitch for approval of this

11   motion.  We would request that the Court grant the relief.

12             THE COURT: Okay.  So, I've been you, I'm going to

13   ask this question.  Years ago, I was you, and I know these

14   things get divided up amongst various people, so if you're not

15   the person to answer this question, feel free to hand it off

16   to somebody else.  This Order makes reference to something

17   that I think is also referred to in the Financing Motion, an

18   irrevocable standby letter of credit number, et cetera, issued

19   by JPM for the account of the Debtor DCD in favor of B.C.

20   Industrial Exchange Portfolio to Master Tenant, LLC.  And it

21   seems like, from what I could glean from the other motion

22   papers, this is a million-dollar letter of credit that should

23   be collateralized by $1.3 million in cash, and I would -- can

24   I get some high-level explanation of what this is and why?

25             MS. TOPPER:  Yes.  Let me turn the lectern over to

1    Mr. Minuti.

2              THE COURT:  Okay.

3              MR. MINUTI:  Again, Your Honor, for the record, Mark

4    Minuti.  So BC Industrial Exchange Portfolio II is one of the

5    Debtor's landlords.  It's for the facility in Olive Branch,

6    Mississippi.  What we're proposing under the interim DIP order

7    is that essentially the letter of credit obligation that is in

8    the pre-petition credit facility become an obligation under

9    the post-petition credit facility, and then in the DIP

10   financing motion, we're also, as part of the interim relief,

11   asking for the ability to collateralize that obligation as

12   well as some additional obligations with the 1.3 million.  So

13   in this motion I think all we're really asking is to set up

14   the account.  Funding it and what it's for really is part of

15   the DIP motion, but that's what it's about.

16             THE COURT:  So this is to provide credit assurance

17   to a landlord --

18             MR. MINUTI:  Correct, this is -- I -- it's a --

19             THE COURT:  -- with respect to obligations under a

20   lease.

21             MR. MINUTI:  I believe it's an LC in lieu of like a

22   security deposit.  I think that's what it is.

23             THE COURT:  Okay.  All right.

24             MR. MINUTI:  Thank you, Your Honor.

25             THE COURT:  Thank you.  So you're back in the

1    batter's box, Ms. Topper.  I already asked, but there's no one

2    objecting in light of this further discussion?

3             ALL:   (No verbal response).

4             THE COURT:  No, okay.  I'm fine and I have no

5    questions.  I will enter an order granting this motion.  It's

6    also on an interim basis, so --

7             MS. TOPPER:  That's correct.

8             THE COURT:  -- we'll have to work out scheduling.

9             MS. TOPPER:  Correct.  Thank you, Your Honor.  Next

10   is the Debtor's wages motion, Your Honor.  That's at Docket

11   item #15.  Your Honor, the Debtor's employ approximately 490

12   employees, in addition to temporary staff provided by various

13   staffing agencies, as well as roughly 35 independent

14   contractors.  The Debtor's workforce and the uninterrupted

15   services that those employees and others provide is critical

16   to the Debtor's continued business operations, as well as the

17   effective administration of these Chapter 11 cases.  For that

18   reason, the Debtors are seeking authority to pay pre-petition

19   obligations related to the employee wages, benefits and other

20   compensation up to $1,235,500.  That breakdown for that

21   amount, Your Honor, among the various categories, is set forth

22   on pages 1 and 2 of the motion.  The Debtors, through the

23   motion, are also seeking authority to continue to pay and

24   maintain their employee benefits programs in the ordinary

25   course of business.  And then in discussions with the U.S.

1    Trustee regarding their office's informal comments, I agreed -
2    - we agreed that the Debtors would let the Court know that
3    with respect to the commercial credit cards that are disclosed
4    in connection with that wages, the names of the employees do
5    appear on those commercial credit cards.  And so among other
6    concerns for the failure to make that $135,000 pre-petition
7    payment, there was a concern of potential -- or there is a
8    concern of potential liability with respect to the individual
9    employees, and that's why that request is included in
10   connection with the wages motion.
11          THE COURT:  So the Debtor is concerned that even
12   though it's a Debtor commercial credit card, because an
13   individual employee has it and is using it and it's got the
14   employee's name on it, the individual employee might be
15   exposed to liability if the Debtor doesn't pay?
16          MS. TOPPER:  Yes, Your Honor, that is one of --
17          THE COURT:  Okay.
18          MS. TOPPER:  -- one of the concerns, yes.
19          THE COURT:  Okay.
20          MS. TOPPER:  Unless the Court has any other
21   questions, Your Honor, the Debtors request that the Court
22   grant the relief requested in that motion.
23          THE COURT:  All right.  I have no questions.  I have
24   reviewed the motion and the proposed order, it appears fine to
25   me and I am prepared to grant it unless there is some

1    objection from any party in the courtroom today.

2              ALL:   (No verbal response).

3              THE COURT:   There are none.  It's granted.  This is

4    one that's being entered on a final basis, correct?

5              MS. TOPPER:   That is correct.

6              THE COURT:   Okay.

7              MS. TOPPER:   Thank you, Your Honor.  Next is the

8    Debtor's motion to maintain certain customer programs that the

9    Debtors have in the ordinary course.  This is filed at Docket

10   item #16.  The Debtors provide certain accommodations to their

11   customers, both to attract new customers as well as maintain

12   positive business relationships with their existing customers.

13   These programs include, among other things, discounts, return

14   policies for damaged and unsold products, premium memberships,

15   which provide customers with special access to products as

16   well as other -- some of them provide certain customers, you

17   know, a 150-dollar membership fee provides a customer with $50

18   worth of merchandise, for example.  The Debtors believe that

19   their ability to continue the customer programs and to honor

20   any obligations under those programs in the ordinary course is

21   necessary for the Debtors to remain competitive in the

22   industry, as well as to retain their reputation that they've

23   earned in the industry.  The Debtors therefore request that

24   the Court grant the relief requested in this motion, and it

25   is on an interim basis at this point.

1          THE COURT:  All right, I have no questions.  I've

2     read the motion and the proposed order.  It appears fine to

3     me.  Is anyone objecting today to approval of this on an

4     interim basis?

5          ALL:  (No verbal response)..

6          THE COURT:  No objections.  Motion is granted on an

7     interim basis.  We'll need to work out scheduling.

8          MS. TOPPER:  Thank you, Your Honor.  Next is the

9     Debtor's shippers and freight forwarders' motion that is filed

10    at Docket item #17.  Your Honor, the Debtors are distributors,

11    as Mr. Minuti mentioned at the outset of today's hearing, and

12    thus they rely on a number of shippers and freight forwarders

13    to deliver their products from their vendors, as well as to

14    fulfill their customer orders.  The Debtor's distribution

15    system is critical to meeting the customer orders that may be

16    time sensitive based on a need, in certain situations, to

17    place newly released product onto their customer shelves, and

18    then also to maintain their customers' inventory at their

19    stores.  To avoid the shippers or freight forwarders from

20    taking any adverse action against the Debtors, either by

21    asserting liens or disrupting delivery of products, the

22    Debtors do request authority to make payments on account of

23    pre-petition obligations with respect to claims from the

24    shippers and freight forwarders up to $565,000 on an interim

25    basis.  Unless the Court has any questions, the Debtors would

1    request for the Court to enter this order on an interim basis
2    at this time.

3            THE COURT:  All right.  I have no questions.  Is
4    anyone objecting to approval of the motion on an interim
5    basis?

6            ALL:  (No verbal response)..

7            THE COURT:  No, all right.  The motion will be
8    granted on an interim basis.  We'll work out scheduling at the
9    conclusion of the hearing.

10           MS. TOPPER:  Thank you, Your Honor.  That brings me
11   to the last motion that I'm going to present today and that's
12   the Debtor's critical vendor motion, Your Honor, that's filed
13   at Docket item 18.  Your Honor, the Debtors request authority
14   to pay pre-petition claims of certain vendors which the
15   Debtors are -- have deemed critical, up to $4 million on an
16   interim basis, and then $7 million on a final basis.  The
17   Debtors do distribute -- distribution of products does rely on
18   certain vendors providing, as I mentioned, uninterrupted goods
19   and services from these critical vendors, and importantly, and
20   this is highlighted in the motion, Your Honor, certain
21   critical vendors do have discretion regarding the allocation
22   of products that they provide to the Debtors, and so absent
23   relief, there is a concern that critical vendors may modify
24   the Debtor's allocation percentages in accordance with the
25   terms of their underlying agreement, and that would be to not

1  only the Debtor's detriment, but also the detriment of the

2  estates and the creditors, which could lead to irreparable

3  harm as the Debtors are administering these Chapter 11 cases.

4  So unless the Court has any questions with respect to that

5  motion, Your Honor, the Debtors request that the Court enter

6  the interim order at this time.

7           THE COURT:  All right, is anyone objecting to

8  approval of this motion on an interim basis?

9           ALL:  (No verbal response).

10          THE COURT:  There are no objections.  Ms. Topper,

11 the -- if I read the motion correctly, it does not identify

12 any of the critical vendors or foreign critical vendors by

13 name, description, category --

14          MS. TOPPER:  That is correct.

15          THE COURT:  -- anything other than specifying, if

16 I'm remembering correctly, I think a $4 million cap on the

17 Debtor's authority.

18          MS. TOPPER:  There is a $4 million cap on an interim

19 basis, that's correct, Your Honor.

20          THE COURT:  Why is that?  Because that seems to vary

21 from what my experience has been with critical vendor motions.

22          MS. TOPPER:  Your Honor, the main reason for that is

23 we -- the Debtors have numerous vendors in these cases and

24 they operate with -- they have daily communications with

25 numerous vendors.  We are not proposing to pay all vendors in

1   full for pre-petition amounts, so we want to limit it.  It is

2   also not paying even for certain critical vendors; it is a

3   limited program, really, Your Honor, in that sense.  I will

4   say that the U.S. Trustee had the same question and we have

5   agreed to provide the list to the United States Trustee as

6   well as the Committee Professional, should a committee be

7   appointed in this case.

8           THE COURT:  All right.  Well, if there is a list and

9   it is being made available to the Committee and the U.S.

10  Trustee, then I think that addresses my concern.  So you're

11  proposing to enter -- have the Court enter -- approve the

12  motion and do so on the basis of the interim order that was

13  originally uploaded with the motion, correct?

14          MS. TOPPER:  That is correct.

15          THE COURT:  All right.  That's fine with me.  I'll

16  grant the motion on an interim basis.

17          MS. TOPPER:  Thank you, Your Honor.  With that, I

18  will turn the lectern back to Mr. Minuti for the DIP financing

19  motion.

20          THE COURT:  Okay, good.  Thank you.

21          MR. MINUTI:  Thank you, Your Honor.  Again for the

22  record, Mark Minuti.  Your Honor, I'm going to propose with

23  the Court's permission, or ask, I should say, if we could take

24  a break, and I'm saying this and I'm not being critical of

25  anyone in terms of timing, but obviously there is a lot of

1   information in the DIP financing motion.  We received late

2   yesterday from the United States Trustee's office a host of

3   questions and comments.  We didn't really have a chance to

4   talk with the proposed lender until right before we got to the

5   courtroom today.  We've come up with a number of compromises

6   to some of their issues, but we haven't had a chance to

7   communicate that to the Trustee's office.  So if you give us a

8   little bit of time, I don't think we're going to resolve all

9   the issues, but I think it will significantly narrow some of

10  the issues that we currently have outstanding.  Normally I

11  would say 15 minutes, but I would be lying if I thought that

12  could really get it done, so I'm thinking more like 30 to

13  communicate with the Trustee, come up with some language, and

14  then be able to come back before Your Honor and present it in

15  a cogent fashion.  So that would be my request.

16          THE COURT:  That seems like a reasonable approach.

17  Does the United States Trustee's counsel agree?

18          MR. BERNSTEIN:  Yes, Your Honor.

19          THE COURT:  All right, we'll take a recess.  Mr.

20  Minuti, we'll expect to hear a status report -- the Courtroom

21  Deputy will, on where things stand at a quarter to 3.

22          MR. MINUTI:  Very well.  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          THE CLERK:  All rise.  This Court is in recess.

25      (Recess)

1          THE CLERK:  Please remain seated and come to order.

2     The United States Bankruptcy Court for the District of

3     Maryland now resumes its regular session.

4          THE COURT:  All right, Mr. Minuti.

5          MR. MINUTI:  Again for the record, Mark Minuti on

6     behalf of the Debtors, Your Honor.  We very much appreciate

7     the Court giving us the time.  The time was very productive.

8     I think we were able to resolve all of the United States

9     Trustee's issues with the DIP order.  What it's going to

10    require, however, is for us to go back to our office and make

11    some changes to the order.  We propose to do that.  We will

12    then obviously upload that for Your Honor to see, but I will

13    describe some of the changes.  And obviously when Your Honor

14    gets the final version, if there are any additional questions,

15    we can reconvene if that's necessary, and hopefully respond to

16    those.

17         So Your Honor, by this motion the Debtor is seeking among

18    other relief approval of senior secured super priority post-

19    petition --

20         THE COURT:  Let me stop you while I have this

21    thought and before you go through your spiel.  If I

22    understand what the mileposts are that the lender has

23    specified, you need your financing order entered tomorrow,

24    right?

25         MR. MINUTI:  Correct.

1              THE COURT:  Okay, so --

2              MR. MINUTI:  Correct.  Our goal would be to get it

3    uploaded tonight.

4              THE COURT:  Okay.

5              MR. MINUTI:  And available for Your Honor to review

6    and sign hopefully tomorrow morning, if that's acceptable.

7              THE COURT:  We'll do the best we can.  I was just

8    puzzling over whether we would be able to reconvene, you know,

9    to accommodate some problem.  I don't anticipate there will be

10   a problem, but we've got to get this done tomorrow.

11             MR. MINUTI:  Understood, Your Honor.  Thank you.

12             THE COURT:  Yes, okay.

13             MR. MINUTI:  Thank you.  So what we're seeking here,

14   Your Honor, is senior secured super priority post-petition

15   financing in a maximum amount of $41 million, of which

16   approximately 5.5 million of new availability is going to be

17   made during the interim period.  We're proposing -- and the

18   proposed borrower here is Debtor Diamond Comic Distributors,

19   Inc.  The proposed guarantors are the other Debtors before the

20   Court, and the non-Debtors that had guaranteed the pre-

21   petition debt.  In return we're asking to provide JPMorgan

22   Chase with the liens, claims and protections set forth in the

23   motion, also seeking approval to use their cash collateral on

24   a consensual basis, in return for which we're asking to

25   provide them with adequate protection for any diminution in

1    the value of their pre-petition collateral.  The DIP loan and

2    the use of cash collateral are all consistent with the

3    proposed interim order and the budget attached to the proposed

4    interim order.  We are asking to modify the automatic stay to

5    allow us to implement the proposed financing and to enter into

6    any additional agreements necessary to do that.  And finally

7    we're asking to seek -- or asking for a final hearing on the

8    motion, which we've already discussed before, and this is all

9    as set forth in the motion.

10          Before I discuss the background, Your Honor, and the

11   terms, as part of the negotiation with the United States

12   Trustee's office, I have two additional points I need to

13   proffer from Mr. Gordon -- Gorin.  Again, he is in the

14   courtroom, Your Honor, and available to testify.  May I make a

15   proffer?

16          THE COURT:  Yes, of course.

17          MR. MINUTI:  Thank you, Your Honor.  These are two

18   brief points, but again, Mr. Goran is in the courtroom today.

19   If called to the stand to testify, he would testify as follows

20   with respect to the venue finding in the proposed interim

21   order.  He would testify that the Debtor's principal place of

22   business is Hunt Valley, Maryland, and the Debtor has been

23   there for much longer than six months.  That would qualify for

24   venue under the Code, or Your Honor, or under the United

25   States Code.  And also, Your Honor, in my presentation at the

1    outset of the hearing, I let Your Honor know that under the

2    pre-petition credit agreement, our lender was secured in

3    essentially all or substantially all of the Debtor's assets.

4    Mr. Goran would, in fact, testify to that fact if called to

5    the stand.  So those were the two additional proffers --

6            THE COURT:  Okay.

7            MR. MINUTI:  -- that we were asked to make, Your

8    Honor.  I've already provided the Court with a general

9    overview of the Debtor's pre-bankruptcy debt structure, which

10   included the pre-petition credit agreement.  As detailed in

11   the motion and the admitted declarations, the Debtors need

12   post-petition financing and the use of cash collateral to

13   execute on their plan for these Debtors and their operations.

14   As detailed in Mr. Haesler's declaration, Raymond James

15   approached 11 other potential lenders about providing needed

16   financing, but that was without success.  There were no other

17   party who offered terms that were equal to or better than that

18   that was going to be provided by JPMorgan, so the Debtors

19   turned to negotiate the package that's before Your Honor with

20   JPMorgan Chase.  As set forth in the -- Mr. Gorin's

21   declaration, he and the other members of this team worked with

22   the Debtors to develop the budget that's presented with the

23   motion, and with the help of the Debtor's professionals

24   negotiated in good faith with JPMorgan over the terms of the

25   financing and the use of cash collateral.  The proposed terms

1    and conditions of the financing and use of cash collateral are

2    set forth in the motion.  They are tied to the budget at

3    Exhibit-B of the proposed interim order.  The material terms

4    of the financing and the use of cash collateral are all set

5    forth in paragraph 1 of the motion itself.

6        I don't plan to repeat all of this Your Honor, but I will

7    hit some of the highlights.  The borrowers here and the

8    guarantors are the Debtors, the lender is JPMorgan Chase,

9    National Association.  The amount of the facility, Your Honor,

10   the way -- during the interim period there's $5.5 million

11   worth of new money.  As money comes in, it essentially pays

12   down the pre-petition debt and then it's advanced as part of

13   the interim financing.  The total amount when we get to the

14   final hearing is going to be $41 million.  The interest rate

15   that's charged to the DIP loan, Your Honor, is a formula.

16   That formula today -- and this is in the motion, but that

17   formula today works out to be a little less than 10%.  We are

18   proposing to provide our lender, which is pretty typical in an

19   ABL facility, an unused line fee.  There is also a success fee

20   proposed here for the lender, but that's tied to ultimate

21   proceeds from a sale, and we're only seeking, Your Honor, to

22   approve the success fee as part of the final order.

23       We talked about the letter of credit, Your Honor.  I'm

24   not going to repeat that again, but again, part of the interim

25   DIP is going to be used to turn the letter of credit to the

1    landlord into a post-petition obligation under the DIP, and
2    that's going to be collateralized as we talked about.  All of
3    the borrowing, Your Honor, as well as the use of cash
4    collateral is tied to the budget that's included.  There are
5    what I'll call normal and customary covenants, normal and
6    customary reporting, as you would expect to see in a loan of
7    this nature.  In terms of the protections we're asking to
8    provide our lenders with regard to the financing, we are going
9    to give them debtor-in-possession liens on substantially all
10   of the Debtor's assets.  That will include -- or our ask is
11   that that include avoidance actions and proceeds, but again,
12   we're not seeking that relief today, only at the final
13   hearing.  We're also asking to provide for the -- we're also
14   asking to provide our lender with a super priority claim with
15   respect to the DIP loan.  In terms of adequate protection,
16   Your Honor, for use of cash collateral, we are proposing
17   adequate protection liens that will be subject to the carve-
18   out as well as the DIP liens.  I should also have pointed out,
19   Your Honor, that the DIP liens and the DIP super priority
20   claim are subject to the carve-out which I'll describe in a
21   moment.  So we're going to provide adequate protection liens.
22   We also are going to provide, Your Honor, that -- +an adequate
23   protection super priority claim, and we're also proposing to
24   provide our lenders with adequate protection payments which
25   would be interest, fees, costs.  There also is -- this is also

1   tied to normal and customary reporting.  We have agreed with
2   the Trustee's office that the reporting that is provided to
3   the lender is also going to be provided to the Trustee's
4   office, as well as any committee, if one is appointed in these
5   cases.

6        As is fairly customary, and I'm sure Your Honor saw this,
7   at paragraph 5 -- I'm sorry, paragraph F of the interim order
8   we have a series of stipulations where essentially the Debtors
9   have stipulated on behalf of themselves and the estates to the
10   validity, amount, and priority of the pre-petition lender's
11   liens.  All of that, however, is subject to paragraph 21 which
12   includes a challenge period for the Committee or any party in
13   interest, and I'll discuss that in a moment.  The order,
14   proposed order, does provide for the modification of the
15   automatic stay, #1) to implement the terms of the interim
16   order, and #2) in the event of default, to allow our lender,
17   after notice and an opportunity for the Debtor or any party in
18   interest, to come in and ask the Court to stop it to exercise
19   their rights.  There is a -- at paragraph F6 and 19 of the
20   proposed interim order, we are providing for a release from
21   the Debtor and the estates of any claims related to the pre-
22   petition loan, but again, that is subject to the challenge
23   period in paragraph 21.  At the final hearing, we are going to
24   ask for a release in connection with the DIP loan, which I
25   believe is pretty standard.  At the final hearing, not today

1    but at the final hearing we're going to be seeking a waiver

2    under 506(c).  We are going to be seeking a waiver of any

3    right to marshaling, again, all at the final hearing.

4         The DIP loan comes with it, Your Honor, what I'll call

5    ordinary and customary conditions or events of default.  But

6    in addition to that, though, Your Honor, at paragraph 6L of

7    the interim order, we have a number of milestones that the

8    Debtors need to meet in order to satisfy and make sure that

9    we're on track with our sale and our sale process.  I'll

10   highlight those in a minute, but these are events of default

11   and obviously the burden is on the Debtor, not the Court, to

12   make these things happen.  Those milestones include, for

13   example, that we have to file a motion seeking the approval of

14   the DIP facility on an interim basis.  We obviously provided

15   for that.  It provides that within three business days after

16   the petition date we're going to have on file a motion to

17   retain Raymond James as our investment banker; that the

18   interim order needs to be entered within three days; within 25

19   days after the petition date, the --  we need to have the

20   Court enter the final order; within 25 days after the petition

21   date, we need an order in form and substance acceptable to the

22   DIP lenders for our bid procedures; no later than 25 days

23   after the petition date, the order approving Raymond James

24   needs to be entered; no later than 45 days after the petition

25   date, we need to file our schedules and statements; no later

1    than 45 days after the bidding procedures order, we would need

2    to have an auction if one is necessary; no later than seven

3    days after the conclusion of the auction, we would be asking

4    for the Court to approve the sale transaction, and then the

5    closing of that transaction would happen 15 days thereafter.

6         As I indicated, Your Honor, the liens and claims and so

7    on that we're seeking to provide our pre-petition lender and

8    our post-petition lender are all subject to the carve-out.

9    That is spelled out in the interim order at paragraph 16.

10   Including in that carve-out are the statutory fees for the

11   United States Trustee's office, the reasonable fees and costs

12   of our noticing agent, the professional fees for the Debtor's

13   and the Committee's professionals.  There is also a provision,

14   Your Honor, in a sort of a post-default world, where after we

15   get notice there is an additional amount of the carve-out of

16   $150,000 to do what is necessary in that environment.  The way

17   that the carve-out works with respect to the Debtor's

18   professionals and the Committee's professionals, is we're --

19   and this is all set forth in the order.  We're going to

20   establish an escrow account at our firm, and so when the

21   budget provides for weekly payments of those fees, those fees

22   will be funded into the escrow account at our firm, but the

23   escrow account will only be used and will only pay those fees

24   subject to the Court entering an order approving the fees, or

25   if we have a fee procedure in the case, when that fee

1    procedure is satisfied and folks can then take advantage and

2    ask Saul Ewing to pay those fees.

3        There's no cross-collateralization here.  I'm sure as

4    Your Honor did see at the final hearing we are going to be

5    asking for roll-up of whatever balance remains on the DIP

6    facility, but again, that waits 'til the final hearing.  I

7    talked about the challenge period, and that is at paragraph 21

8    of the interim order.  We've agreed with the Trustee to modify

9    that provision.  It is now going to be consistent with the

10   local rule and provide for, I think it's the later of 75 days

11   or 60 days from when a Committee is appointed.  And the way it

12   works for a Chapter 7 Trustee, if one were appointed, Your

13   Honor, they get the greater of the remaining challenge period

14   or 30 days from appointment.  I already talked about 506(c)

15   waiver, liens on avoidance actions, all of which will wait

16   'til the final hearing.  I don't need -- I don't think I need

17   to say anything more about the terms, Your Honor.

18       As detailed in Mr. Gorin and Mr. Haesler's declarations,

19   the negotiations with JPMorgan Chase were arms' length and

20   done in good faith.  We did our best to negotiate the best

21   deal possible.  The terms are what are required of JPMorgan in

22   order for us to obtain necessary financing, and the consensual

23   use of cash collateral.  As reflected in the budget and as set

24   forth in the declarations, the Debtors do have an immediate

25   need for financing and the use of cash collateral to operate

1    and execute on these Chapter 11 cases.  Absent the financing

2    and the use of cash collateral, we may be able to limp along a

3    little bit longer, Your Honor, but ultimately we would need to

4    shut down, lay off our employees, essentially turn over our

5    collateral to our pre-petition lenders.  That will result in

6    harm to the Debtors, our employees, our creditors, and we

7    believe the going concern value of the Debtor's assets and the

8    collateral value of those assets, Your Honor, because we

9    believe the collateral value alone exceeds the amount of the

10   pre-petition debt at this time.

11        As detailed in Mr. Haesler's declaration, and I mentioned

12   this a moment ago, the proposed DIP facility was shopped to 11

13   other parties.  What's before Your Honor are the best terms

14   for financing and the use of cash collateral that were able to

15   be obtained.  Under the circumstances, we believe those

16   proposed terms before the Court are fair, reasonable, adequate

17   for the Debtor's needs and necessary to preserve going

18   concern, a value necessary to implement the sale process we've

19   been discussing, and ultimately to operate during these

20   Chapter 11 cases.  Accordingly, Your Honor, the DIP financing

21   and the use of cash collateral should be approved, we believe,

22   on an emergency interim basis as a valid exercise of the

23   Debtor's business judgment, and we ask that the Court grant

24   the other relief that we are asking with respect to the

25   motion.

1      As I indicated, Your Honor, before we -- Your Honor took
2   the bench this afternoon, we did have a good amount of time
3   and we appreciate the Court for that, to talk to the United
4   States Trustee's office and that has resulted in a number of
5   changes to the proposed order.  I think in the interest of
6   time, I don't think I'm going to go through all those, but
7   I'll give Your Honor a flavor for the category of the type of
8   changes that you can expect when you see the mark-up of the
9   DIP order.  Paragraph (e) that talked about necessary
10  approvals, we're simply just going to remove that paragraph.
11  It's not necessary.  We are also going to, in many cases where
12  it said that the type of relief, for example the 506(c) or the
13  roll-up and so on was only was going to happen on the entry of
14  the final order, we're going to just add language to that to
15  emphasize that it's only on the entry of the final order.
16  We've come up with some language I think that everybody is in
17  agreement with to do that.  Let me just quickly -- as I
18  mentioned, Your Honor, with the reporting that's required in
19  the interim order, we also are going to add language to make
20  it clear that that reporting will go to the Trustee's office
21  as well as any committee that's appointed in these cases.  As
22  we talked about, there is an unused line fee.  There was some
23  concern that the unused line fee was not, I think, defined or
24  what it is, and so we're going to add language that says it's
25  consistent with the pre-petition credit agreement, because it

1    is.  The lender didn't try to gouge us and raise that, it's
2    going to be exactly what it was in the pre-petition agreement.
3    There is a provision on page 25 of the interim order that
4    talks about collateral access agreements being valid.  These
5    are like landlord liens and waivers and so on and so forth.
6    We are going to add a definition to the order, so on a stand-
7    alone basis that's going to be clear.  And paragraph 7 on page
8    26 of the interim order, the original paragraph talked about
9    all DIP charges being approved.  We're going to scale that
10   back, Your Honor, only to the interest rate and the unused
11   line fee, and that is acceptable to the Trustee's office.  You
12   know, again, there's -- we're adding some clarification
13   language, I think Your Honor is going to see that and
14   understand it.  I don't think there is any issue there; I've
15   proffered that.

16       A couple other places, Your Honor, where we need to add
17   definitions, which we will do, the -- on page 41 of the
18   proposed interim order there was a cap on the amount of money
19   the Committee could use to investigate the pre-petition
20   lender.  That cap in the draft order was $50,000.  At the
21   request of the United States Trustee's office, the lender has
22   graciously agreed to move that to $100,000.  On page 42, in
23   paragraph 7 of the interim order, where there's restrictions
24   on the use of funds, we're going to modify this section and
25   basically say that the Debtor can't use any proceeds of the

1    loan, Your Honor, unless it's in the budget, or pursuant to a

2    first-day order that the Court has entered.  I think that

3    takes care of the Trustee's issue and gets rid of a lot of

4    language that maybe wasn't necessary.  As I indicated, Your

5    Honor, we're going to modify the carve-out provision so it

6    does track specifically the provisions of the local rule.  Let

7    me just see what else.  And let me just look at my partner,

8    but I think that was it.  I think that was it, Your Honor.

9            THE COURT:  Okay.

10           MR. MINUTI:  So it was productive, it was a good

11   session.  We -- again, we appreciate the Trustee's -- the

12   United States Trustee's office's approach to this.  It was --

13   you know, it was collaborative, and I'm glad that we got where

14   we did.  I think there were maybe 40 issues that we walked

15   through, and so it would have been -- we would have been here

16   late arguing 40 points.  So I thank them and thank the Court

17   for the time, but that completes my presentation.  I'm

18   certainly happy to answer any questions the Court may have,

19   but we would ask that the Court approve the interim financing

20   on a -- well, approve the financing on an interim basis.

21   Thank you.

22           THE COURT:  All right.  I mean, I'm satisfied.  Does

23   the United States Trustee have anything to add to this?

24           MR. BERNSTEIN:  Not really, Your Honor.  I had come

25   in expecting to give lots of objections and arguments, but in

1   fact we were able to work out everything and I think -- I

2   agree with everything that counsel has said that adequately

3   describes what we've done.

4              THE COURT:  All right, I'll -- well, I'm satisfied,

5   then, that it would be appropriate to approve this on an

6   interim basis once the changes you've outlined have been made.

7   Please be sure you're uploading this with a -- or sending it

8   to chambers somehow, a redline version so we can see what the

9   changes are and don't have to look at the whole order line by

10  line, word by word to figure out what things are.

11             MR. MINUTI:  We absolutely will, Your Honor.

12             THE COURT:  Okay.

13             MR. MINUTI:  I think the only item remaining for us

14  to discuss is the final hearing date, and I know when we were

15  in the room, I think there was some discussion -- do we have

16  that?

17             MS. FELLONA:  Yes.  We have agreed that it's going

18  to be February 6th at 10:00 in the morning.

19             THE COURT:  Wonderful.  Okay.

20             MR. MINUTI:  So we'll modify the orders to that

21  effect as well.  So with that we appreciate the Court's time.

22  I know it's been a long hearing, it's been productive, so

23  again, we thank you and we thank your staff.

24             THE COURT:  All right, well, thank you.  I think

25   that concludes our business for the day.

59

1           MR. MINUTI:  Thank you, Your Honor.

2           ALL:  Thank you.

3           THE CLERK:  All rise.  This Court is adjourned.

4      (Court adjourned)

5

6                    CERTIFICATION
7  I, Lewis Parham, certify that the foregoing is a correct
8  transcript from the electronic sound recording of the
9  proceedings in the above-entitled matter.
10
11
12  *Lewis Parham*                        2/7/25
13
14  _____          _____
15  Signature of Transcriber                    Date