**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered)<br>Hearing Date: March 27, 2025 at 10:00 a.m. (ET)<br>Objection Deadline: March 20, 2025 |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
APPROVING KEY EMPLOYEE INCENTIVE PROGRAM
AND KEY EMPLOYEE RETENTION PROGRAM**

By this motion (this "Motion"), the above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, seek the entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105, 363(b) and 503 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the (i) the Debtors' proposed key employee incentive plan, as described herein (the "KEIP") and (ii) the Debtors' proposed key employee retention program, as set forth herein (the "KERP"), and granting related relief.  In support of the Motion, the Debtors rely on the *Declaration of Robert Gorin in Support of Debtors' Motion for Entry of an Order Approving Key Employee Incentive Program and Key Employee Retention Program*, a copy of which is attached hereto as **Exhibit B** (the "Gorin Declaration"), and respectfully represent as follows:

---

[1]  The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

53728885.6

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 363(b) and 503(b) of the Bankruptcy Code, as supplemented by Bankruptcy Rule 6004.

**BACKGROUND**

3. On January 14, 2025 (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On January 29, 2025, an official committee of unsecured creditors (the "Committee") was appointed in these cases.

4. A description of the Debtors' business, the reasons for commencing these cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Robert Gorin in Support of Chapter 11 Petitions and First Day Relief* [D.I. 20] (the "First Day Declaration") and incorporated herein by reference.

5. As explained in the First Day Declaration, a primary objective of these bankruptcy cases is to conduct a competitive postpetition sale process to maximize the value of the Debtors' estates, for the benefit of creditors and other stakeholders. To this end, on January 21, 2025, the Debtors filed a motion [D.I. 68] (the "Bid Procedures Motion") to establish bidding procedures in connection with one or more sales or dispositions (collectively, the "Sale") of substantially all of the assets used in the Debtors' Alliance Game Distributors business (the "Alliance Assets"),

2

substantially all other assets of Debtor Comic Distributors, Inc. (the "Other Diamond Assets"), all assets of Diamond Select Toys & Collectibles, LLC (the "DST Assets"), and all other assets of the others Debtors (with the Other Diamond Assets, the "Other Assets," and, collectively with the Alliance Assets, the Other Diamond Assets and the DST Assets, the "Assets").

6. As reflected in the Bid Procedures Motion, the Debtors have secured a stalking horse bid from Universal Distribution LLC (the "Stalking Horse Bidder") for the Alliance Assets (the "Alliance Sale"), subject to higher and better bids. The Debtors have proposed a tight but appropriate time frame to complete their marketing and sale process for these assets such that a Sale would close on or around April 10, 2025.

7. While the Debtors hope for a robust auction that results in higher and better bids for *all* their Assets, in the event there are no other bidders for the assets other than the Alliance Assets, the Debtors will take appropriate steps to monetize such assets, with the goal of maximizing recovery for their estates (the "Remaining Asset Sales"). During this time, while the Debtors pursue one or more Sales of substantially all their Assets in accordance with the Bidding Procedures, certain of the Debtors' employees have provided, and continue to provide, critical support. Specifically, such employees have undertaken significant efforts that have included, among other things, gathering substantial amounts of information in connection with the bankruptcy and sale processes, responding to numerous information and due diligence requests, identifying opportunities to maximize value and overseeing continued operations while facing all of the challenges attendant to being in bankruptcy, plus normal day-to-day tasks. The work of these employees ensures that the Debtors continue to operate in an effective and efficient manner so that there are no disruptions to customer service and maximum value can be attained.

8.      The Debtors have a legitimate need for the KEIP and KERP under the present circumstances. The dedicated assistance of the Debtors' executives, officers, and certain other key employees during the critical stages of these chapter 11 cases is and has been necessary to ensure the Debtors' efforts to maximize value. As described herein, the goals of the KEIP are: (i) to incentivize essential personnel throughout the critical stages of these chapter 11 cases; (ii) to consummate a successful Sale of the Assets; (iii) to reward essential employees for the successful completion of the Debtors' objectives in the chapter 11 cases; and (iv) to maximize the value of the Debtors' estates for the benefit of all stakeholders.

9.      Likewise, due to the employees' increased workload and the significant pressures and uncertainty attendant to the Debtors' businesses at this time, the Debtors have great concern regarding their ability to retain employees. As a result, the Debtors have crafted the KERP in an attempt to encourage certain employees to remain with the Debtors through the Sale(s) of the Debtors' Assets and, if applicable, the Remaining Asset Sale process.

10.     The proposed KEIP and KERP are further consistent with the Budget (as defined in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay and (V) Granting Related Relief* [D.I. 163] (the "Final DIP Order")).

## THE PROPOSED KEIP AND KERP

A.      **The Proposed KEIP**

11.     The Debtors have identified 17 employees—3 executives and 14 non-insider employees (collectively, the "KEIP Participants")—to receive payments under the KEIP. All of the KEIP Participants possess significant institutional knowledge and skills that are essential to

53728885.6

the Debtors' efforts in these chapter 11 cases.[2] The KEIP Participants include certain of the Debtors' executives and officers, various department heads, and certain employees in the Debtors' IT and customer service departments.

12. In addition to the responsibilities related to the Debtors' everyday business operations, the KEIP Participants have assumed, and will continue to assume, considerable added responsibilities in connection with the Sale(s) of the Debtors' Assets. Such responsibilities include stabilizing the Debtors' vendor base, reviewing executory contracts and leases in an effort to avoid unnecessary administrative expenses, facilitating and conducting management presentations for potential bidders, responding to bidder information requests, and otherwise taking whatever steps are necessary to maximize value for stakeholders while avoiding disruptions to operations.

13. Each Participant under the KEIP falls within one of three silos—Debtor Diamond Comics Distributors, Inc. ("DCD"), the Alliance Games Division ("AGD") of DCD, or Debtor Diamond Select Toys & Collectibles, LLC ("DST")—depending upon their particular role within the Debtors' organizational structure.

14. Each Participant under the KEIP may receive an incentive amount (for each KEIP Participant, the "Incentive Payment") that is (i) contingent upon a sale closing for the Assets either through a Sale or Remaining Asset Sale, and (ii) based on the *value* obtained for the sale or other disposition of the Assets, with the amount of the Incentive Payment depending upon where the purchase prices for the Assets fall within a specified range.

15. The minimum value that must be obtained through the Alliance Sale in order for KEIP Participants to receive an Incentive Payment is $30 million, with the maximum Incentive Payment to be paid if the purchase price for the Alliance Assets exceeds $40 million. The

---

[2] The KEIP is attached hereto as **Exhibit C**. The names, titles, and salaries of the KEIP Participants have been redacted and filed under seal in accordance with a motion to seal filed contemporaneously herewith.

53728885.6

minimum value that must be obtained through a sale of the DST Assets, either through the Debtors' court-approved sale process or a later Remaining Asset Sale, for the relevant KEIP Participant to receive an Incentive Payment is $1 million, with the maximum Incentive Payment to be paid if any such sale (or monetization of assets) exceeds $3 million.

16. For KEIP Participants that are expected play a critical role in the sale or disposition of the Other Assets *in addition to* the sale of the Alliance Assets, such participants may receive an additional percentage recovery in the event of a Sale (whether in connection with the purchase of the Alliance Assets or a separate sale) and/or disposition of the Other Assets so long as the consideration for such sale (or sales) exceeds $12 million (the "**Additional KEIP Recovery**"). This additional recovery would equate to approximately 5% of each applicable KEIP Participant's annual salary.

17. The Incentive Payment reflected for each KEIP Participant was determined by the Debtors, with consultation from the CRO and the Debtors' investment banker, based on the relative criticality of each KEIP Participant and their projected impact on the Debtors' restructuring goals. The sum of all potential Incentive Payments under the Plan ranges from $570,250 to $1,075,750, depending upon the sale proceeds recovered for the Assets.

18. Other KEIP Parameters: The KEIP Participants will only be eligible to be paid the Incentive Payments if the Debtors successfully achieve their restructuring goals noted above, which were based on the particular silo into which each KEIP Participant fits and designed to ensure the completion of the Debtors' objectives. Moreover, each KEIP Participant, in order to participate in the KEIP, must agree to the following conditions: (i) the KEIP Participant must execute a non-disclosure agreement; (ii) the KEIP Participant must waive all entitlement to a severance payment; and (iii) the KEIP Participant must remain an at-will employee of the Debtors.

No KEIP Payment shall be made if a KEIP Participant resigns or is terminated for cause prior to (i) closing on the applicable Sale, and, if applicable (ii) completion of the sale and/or disposition of the Other Assets; provided, however, that if, in connection with a Sale, a KEIP Participant is offered and accepts employment with the buyer, the KEIP Participant's termination from the applicable Debtor will be deemed without cause and such participant will remain eligible for the Incentive Payment (excluding the Additional KEIP Recovery).

19. The Debtors respectfully submit that the KEIP is necessary to incentivize these key employees to go "above and beyond" in working to achieve maximum value for the Assets and to perform their duties in an optimal manner for the benefit of all stakeholders and reward them for their significant efforts during the chapter 11 cases.

**B.     The Proposed KERP**

20. The Debtors have identified twenty-three (23) key non-insider employees (the "KERP Participants") whose institutional knowledge and skills are essential to maximizing the value of the Debtors' estates during the sale process. The current KERP Participants are identified on the schedule attached hereto as **Exhibit D**.[3] The KERP would authorize the Debtors to provide retention payments to the KERP Participants, in an aggregate amount of up to $276,900.

21. Each KERP Participant's retention payment (the "Retention Payment") shall be paid only if the KERP Participant is still employed by the Debtors through the Alliance Sale and/or the Remaining Asset Sales as applicable, or is terminated without cause by the Debtors before such date. Specifically, for KERP Participants whose services are needed only through the closing of the Alliance Sale, the Retention Payment shall be made as soon as practicable following the closing of such sale. For KERP Participants whose services are critical both for the Alliance Sale and for

---

[3] The names, titles, and salaries of the KERP Participants have been redacted and filed under seal in accordance with a motion to seal filed contemporaneously herewith.

53728885.6

the sale and/or other disposition of the Other Assets, the Retention Payment shall be made on the *earlier* of (i) the date on which the sale and/or disposition of substantially all of the Other Assets is complete, (ii) the date on which the KERP Participant is terminated without cause, or (iii) August 31, 2025.

22. In exchange for a KERP payment, a participant must waive any other claims that he or she may maintain against the Debtors' estates. In addition, any KERP Participant that voluntarily resigns (other than in connection with accepting an offer from a successful bidder in the Sale process) or is terminated for cause before the applicable trigger date will forfeit his or her right to receive a Retention Payment.

23. While certain of the KERP Participants have titles that include word "manager" or "director," which may suggest officer status, none of these KERP Participants were or are, in reality, insiders. Although such KERP Participants are important to the Debtors' businesses and are particularly vital in connection with the sale and bankruptcy processes, they do not have access to strategic inside information, enjoy special privileges within the Debtors' corporate hierarchy or have the ability to influence the direction of the Debtors' business operations. Given each KERP Participant's limited scope of authority, and without diminishing the crucial services that these employees provide to the Debtors, the Debtors do not believe that these individuals should be considered insiders vis-à-vis the Debtors.

24. The KERP program is modest, with the average amount of potential pay-outs being $10,500 and individual pay-outs ranging from only $5,000 to $22,000, with all such pay-outs equating to approximately 10–11% of each KERP Participant's base salary.

**C.      Development of the KEIP and KERP**

25.     The proposed KEIP and KERP were designed by Robert Gorin and William Henrich of Getzler Henrich & Associates LLC ("Getzler Henrich"), the Debtors' co-Chief Restructuring Officers (together, the "CRO"), in consultation with the Debtors' professionals, including their investment banker. Getzler Henrich has significant experience in chapter 11 restructurings and is well-suited to provide input on the Debtors' executive and employee incentive and retention plans. Getzler Henrich, relying on its considerable experience, assisted the Debtors in designing the KEIP and KERP, keeping in mind the Debtors' dual goals of maximizing value during the Sale and Remaining Asset Sale processes while ensuring that operations continue without disruption.

26.     The KEIP and KERP were designed in a reasonable, cost-effective way to promote the appropriate incentives under the circumstances of these chapter 11 cases. The KEIP has and will continue to incentivize KEIP Participants in connection with the Sale(s) of the Debtors' Assets and, to the extent required, the Remaining Asset Sales. Likewise, the KERP was designed to ensure the commitment and continued retention of key personnel essential to the Debtors' operations and to the Debtors' restructuring process.

27.     The KEIP and KERP Participants were carefully selected and deemed necessary to the Debtors' ability to maximize value for the benefit of all interested parties. Without the payments contemplated by the KEIP, the Debtors believe that the KEIP Participants will not be incentivized to undertake the additional tasks required to consummate and drive value for the Assets. Likewise, without the payments contemplated by the KERP, the Debtors believe that the KERP Participants may pursue alternative employment, harming the value of the estates and affecting the implementation and successful consummation of the sale and other asset

9

monetization processes. For these reasons, and the reasons described below, the proposed KEIP and KERP are necessary and appropriate under the circumstances of these cases.

## RELIEF REQUESTED

28. By this Motion, the Debtors seek entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, approving the proposed KEIP and KERP and granting related relief.

## BASIS FOR RELIEF REQUESTED

**A.   Implementation of the KEIP and KERP as Provided Herein is a Sound Exercise of the Debtors' Business Judgment**

29. Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession may enter into transactions, including the use, sale, or lease of property in the ordinary course of business, without notice or a hearing. 11 U.S.C. § 363(c)(1). In the alternative, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted) (affirming bankruptcy court approval of various employee incentive programs and requiring only that the debtor "show that a sound business purpose" justifies the proposed use of property); *see also Grochal v. Baltimore Marine Indus., Inc.*, No. WDQ-07-0028, 2007 WL 9780497, at *3 (D. Md. July 3, 2007) (approving the debtor's business judgment that executing severance agreements was necessary). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see*

*also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

30. Courts have recognized that a debtor's implementation of incentive-based programs, such as the KEIP, is a valid exercise of business judgment. *See In re Glob. Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *see also In re ESCO*, Ltd., No. 23-12237 (DER) [D.I. 213] (Bankr. D. Md. May 16, 2023) (approving key employee incentive plan and key employee retention plan).

31. When determining whether a compensation proposal satisfies the sound business judgment test, courts have used a number of non-exhaustive factors: (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities, and earning potential; (iii) whether the scope of the plan is fair and reasonable; (iv) whether the plan is consistent with industry standards; (v) what due diligence efforts the debtor made in investigating the need for a plan; and (vi) whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation. *See In re Glob. Home Prods., LLC*, 369 B.R. at 786 (citing *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006)); *see also In re Mattress Discounters Corp.*, No. 08-21642-TJC, 2008 WL 4542989, at *5 (Bankr. D. Md. Oct. 10, 2008) (quoting *In re Dana Corp.*, 358 B.R. at 576).

32. The Debtors respectfully represent that the KEIP meets the requirements for sound business judgment, including, without limitation, satisfying the factors listed above. First, the KEIP is calibrated to achieve the desired performance, which is to achieve the Debtors' restructuring objectives of: (i) the consummation of the Alliance Sale; (ii) the sale of the Other

Assets or DST Assets, either as going concern sales or through the Remaining Asset Sales; and (iii) ensuring smooth and continuous operations throughout the process. Under the KEIP, the KEIP Participants can only obtain an Incentive Payment upon achievement of the particular restructuring goal applicable to such KEIP Participant. These targets are directly aligned with the Debtors' objectives in these chapter 11 cases. Thus, the KEIP Participants have been, and will continue to be, incentivized to achieve the desired performance under the KEIP.

33. Second, the cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential because the payouts under the proposed KEIP are minimal compared to the correlative gains the estates will realize upon the completion of a successful sale.

34. Third, the scope of the KEIP is fair and reasonable because it applies to only a limited subset of the Debtors' most critical employees in positions most integral to the Debtors' restructuring and sale efforts. As noted above, the KEIP Participants play vital roles in both overall operations but also in promoting a successful sale process and/or asset disposition process. Given the nexus between the diligent efforts of the KEIP Participants and the Debtors' ability to promote a successful sale process, it is reasonable, fair and otherwise appropriate to incentivize the KEIP Participants through the KEIP.

35. Finally, the KEIP is consistent with industry standards and is the product of the Debtors' due diligence and consultation with counsel and other advisors. Accordingly, the KEIP is a sound exercise of Debtors' business judgment pursuant to section 363 of the Bankruptcy Code.

36. The KERP likewise represents a sound business purpose and satisfies the business judgment rule. The Debtors' CRO engaged in a careful process to identify the KERP Participants as key contributors to the Debtors and these chapter 11 cases. Implementing the KERP as proposed will facilitate the ongoing sale processes by incentivizing, retaining, and protecting crucial

employees to ensure that regular business operations continue and sale proceeds are maximized. These goals cannot be met if skilled key employees depart prematurely or if key employees are not incentivized.

37. In addition, the KERP offers non-insider employees with security and a reward for remaining loyal to the Debtors during this critical period. The harm to the value of the Debtors' estates, which will occur if key employees are not retained and incentivized during the sale and asset disposition process, cannot be overstated. Approval of the KERP is therefore in the best interests of the Debtors' estates, creditors, and all parties in interest and should be granted.

**B.      The KEIP is an Incentive Plan Not Governed or Prohibited by Sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code.**

38. Section 503(c) of the Bankruptcy Code places limitations on a debtor's transfers to or obligations incurred for the benefit of insider employees. 11 U.S.C. § 503(c). Specifically, section 503(c)(1) places a general prohibition on retention plans for insiders, and places stringent requirements on debtors attempting to overcome that prohibition. Section 503(c)(2), on the other hand, limits severance payments, and section 503(c)(3) governs other transfers to managers that take place outside the ordinary course of business. *Id.*

39. Because, by its plain language, section 503(c)(1) pertains only to retention plans and section 503(c)(2) pertains only to severance payments, neither section applies to an incentive-based compensation plan such as the KEIP. *See In re Residential Capital, LLC*, 491 B.R. 73, 83 (Bankr. S.D.N.Y. 2013) ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)."). In addition, courts have further narrowed the scope of section 503(c)(1) to include a materiality requirement. *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("Thus, the Court reads section 503(c)(1) to mean 'a transfer made to . . . an insider of the debtor

for the [primary] purpose of inducing such person to remain with the debtor's business.'"). In other words, incidental retentive effects do not subject an incentive plan to the stringent requirements of section 503(c)(1); retention must be the *primary* purpose to bring a plan within the purview of section 503(c)(1). *In re Dana Corp.*, 358 B.R. at 571 ("[M]erely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature."); *In re Glob. Home Prods., LLC*, 369 B.R. at 786 (noting that "all compensation has a retentive element" and still finding the compensation plan "primarily incentivizing and only coincidentally retentive").

40. Here, although the KEIP may have some retentive effects, the primary goal is to incentivize the KEIP Participants to meet certain performance objectives that will maximize recoveries for the estates and parties in interest. Consequently, because the KEIP is an incentive-based plan and not a retention plan, sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the KEIP. The KEIP, therefore, falls within the purview of section 503(c)(3) of the Bankruptcy Code.

### C. The KERP Does Not Include Insiders and Thus Sections 503(c)(1) and (2) Do Not Apply

41. The KERP provides payments to non-insider employees and is therefore not subject to the requirements of section 503(c)(1) or (2) of the Bankruptcy Code, which apply only to retention or severance payments to insiders. Section 101(31)(B) of the Bankruptcy Code defines an "insider" as any director, officer, person in control of the debtor, partnership where the debtor is a general partner, general partner of the debtor, or relative of a general partner, director, officer, or person in control of the debtor. *See* 11 U.S.C. § 101(31)(B). None of the KERP Participants meet this definition.

42. Courts have held that any person holding an officer's title is presumptively an officer and thus an insider, but also that "[j]ust as there may be non-statutory insiders that fall within the definition of an insider but are outside of the enumerated categories, there may be persons that fall within the enumerated categories but do not meet the definition of the category." *In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009); *see also Off. of U.S. Tr. v. Fieldstone Mortg. Co.*, No. CCB-08-755, 2008 WL 4826291, at *5 (D. Md. Nov. 5, 2008) ("[w]here ... the defendant's status as a director or officer is disputed, some inquiry beyond the defendant's title will ordinarily be required.") (quoting *In re Pub. Access Technology.Com, Inc.*, 307 B.R. 500, 506, n.5 (E.D. Va. 2004)). In addition, in *Foothills Texas*, the Court held that "[a] party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the [enumerated title] in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." *Id.* at 574–75.

43. In the present case, none of the KERP Participants participate in corporate governance, and the majority of the KERP Participants report to intermediate managers or the CRO. *See In re Global Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (finding that director-level employees were not "officers" because none of them were members of board, participated in corporate governance, attended board meetings or reported to board); *see also Schubert v. Lucent Tech. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 396 (3d Cir. 2009) (explaining that "actual control (or its close equivalent) is necessary for a person or entity to constitute an insider under § 101(31)'s 'person in control' language").

44. Moreover, many of the KERP Participants' duties are limited to support functions or are restricted to a particular division, and courts have declined to find insider status where the scope of authority is quite limited. *See In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr.

15

S.D.N.Y. 2011) (finding employees were not insiders because none of them had authority to implement company policy, did not report to board of directors and were subordinate to actual officers).

45. The titles the KERP Participants have been given reflect the employees' individual functions and roles, but do not reflect status as an officer. *See In re NMI Sys., Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995) (finding that vice president was not insider because he was conferred title "for purposes of marketing" only and was not "in the inner circle making the company's critical financial decisions.").

46. While certain of the KERP Participants have the word "manager" or "director" in their titles, these employees, while extremely valuable to the Debtors, are not in the "inner circle" in making the company's critical decisions so as to warrant treatment as an officer. Moreover, post-Petition Date, all critical decisions regarding the sale process are being made by the CRO. For these reasons, none of the KERP Participants is an "insider" so as to be precluded from participating in the KERP.

**D.    The KEIP and KERP Satisfy the Requirements of Section 503(c)(3) of the Bankruptcy Code**

47. The Debtors' implementation of the KEIP and KERP is authorized under section 503(c)(3), which precludes payment as an administrative expense of "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Because the language of section 503(c)(3) closely mirrors that of section 363(b) of the Bankruptcy Code, courts have applied the same business judgment standard when analyzing cases under section 503(c)(3). *In re Glob. Home Prods., LLC*, 369 B.R. at 783 (providing that plans that are primarily incentive, rather than retentive, are analyzed under "the more liberal business judgment review under § 363" of the Bankruptcy Code).

48. As set forth above, the KEIP and KERP satisfy the requirements of section 363(b) of the Bankruptcy Code and, therefore, the KEIP and KERP similarly satisfy section 503(c)(3) of the Bankruptcy Code as a proper exercise of Debtors' business judgment that is justified by the facts and circumstances of these chapter 11 cases.

## RESERVATION OF RIGHTS

49. Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  If this Court grants the relief requested in this Motion, any Court-authorized payment is not an admission of the validity of any claim or a waiver of the Debtors' or any other party's rights to subsequently dispute such claim. In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtors to pay such claims.

## WAIVER OF MEMORANDUM OF LAW

50. Pursuant to Local Bankruptcy Rule 9013-2, the Debtors state that, in lieu of submitting a memorandum in support of this Motion, the Debtors will rely on the grounds and authorities set forth herein.

## WAIVER OF BANKRUPTCY RULE 6004(h)

51. To implement the relief requested herein successfully, the Debtors respectfully request a waiver of the fourteen (14) day stay of effectiveness imposed by Bankruptcy Rule 6004(h) so that the relief requested herein can take effect immediately upon entry of an order approving this Motion.

## NOTICE

52. Notice of this Motion will be given to the following parties, or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Maryland; (ii) the

Committee; (iii) counsel to JPMorgan Chase Bank, N.A.; (iv) the United States Attorney for the District of Maryland; (v) the offices of the attorneys general for the states in which the Debtors operate; (vi) the Internal Revenue Service; (vii) the United States Attorney general; (viii) the civil process clerk for the United States Attorney for the District of Maryland; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

[remainder of page left intentionally blank]

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, in substantially the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Dated: March 6, 2025　　　　　　　　　**SAUL EWING LLP**

By: */s/ Jordan D. Rosenfeld*
　　Jordan D. Rosenfeld (MD Bar No. 13964)
　　1001 Fleet Street, 9th Floor
　　Baltimore, MD 21202
　　Telephone: (410) 332-8600
　　Email: jordan.rosenfeld@saul.com

　　-and-

　　Jeffrey C. Hampton (admitted *pro hac vice*)
　　Adam H. Isenberg (admitted *pro hac vice*)
　　Turner N. Falk (admitted *pro hac vice*)
　　1500 Market Street, 38th Floor
　　Philadelphia, PA 19102
　　Telephone: (215) 972-7777
　　Email: jeffrey.hampton@saul.com
　　　　　adam.isenberg@saul.com
　　　　　turner.falk@saul.com

　　-and-

　　Mark Minuti (admitted *pro hac vice*)
　　Paige N. Topper (admitted *pro hac vice*)
　　Nicholas Smargiassi (admitted *pro hac vice*)
　　1201 N. Market Street, Suite 2300
　　Wilmington, DE 19801
　　Telephone: (302) 421-6800
　　Email: mark.minuti@saul.com
　　　　　paige.topper@saul.com
　　　　　nicholas.smargiassi@saul.com

　　*Counsel for Debtors and Debtors in Possession*

53728885.6