# EXHIBIT B

# Gorin Declaration

53728885.6 03/06/2025

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF ROBERT GORIN IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**APPROVING KEY EMPLOYEE INCENTIVE PROGRAM**
**AND KEY EMPLOYEE RETENTION PROGRAM**

I, Robert Gorin, hereby declare as follows:

1. I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  I have been engaged as the Debtors' CRO since July 17, 2024, and before that provided financial advisory services to the Debtors since March 7, 2024.  Through such capacities, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I am a Managing Director at Getzler Henrich & Associates LLC ("Getzler Henrich") and lead Getzler Henrich's consumer products practice.  I have more than thirty years of business strategy and turnaround experience, as well as extensive experience advising insolvent companies in turnaround and crisis situations and navigating such companies through turnaround, process design and improvements, and merger and acquisition processes.  I have frequently been involved in complex matters requiring expertise in corporate turnarounds and operational analysis.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

3. Since my retention, I, and my firm Getzler Henrich, have been significantly involved with the Debtors' businesses and the many operational and business issues that arise following a chapter 11 filing.

4. I submit this Declaration in support of the *Debtors' Motion for Order Approving Key Employee Incentive Program and Key Employee Retention Program* (the "<u>KEIP/KERP Motion</u>" or the "<u>Motion</u>").[2] Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

A. **The KEIP**

5. The Debtors have identified 17 employees—3 executives and 14 non-insider employees (collectively, the "<u>KEIP Participants</u>")—to receive payments under the KEIP. All of the KEIP Participants possess significant institutional knowledge and skills that are essential to the Debtors' efforts in these chapter 11 cases. The KEIP Participants include certain of the Debtors' executives and officers, various department heads, and certain employees in the Debtors' IT and customer service departments.

6. In addition to the responsibilities related to the Debtors' everyday business operations, the KEIP Participants have assumed, and will continue to assume, considerable added responsibilities in connection with the preparation for, and the filing and prosecution of, these chapter 11 cases and the Sale of the Debtors' Assets. Such responsibilities include stabilizing the Debtors' vendor base, reviewing executory contracts and leases in an effort to avoid unnecessary

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

administrative expenses, facilitating and conducting management presentations for potential bidders, responding to bidder information requests, and otherwise taking whatever steps are necessary to maximize value for stakeholders while avoiding disruptions to operations.

7. Each Participant under the KEIP falls within one of three silos—Debtor Diamond Comics Division ("DCD"), the Alliance Games Division ("AGD") of DCD or Debtor Diamond Select Toys & Collectibles, LLC ("DST")—depending upon their particular role within the Debtors' organizational structure.

8. Each Participant under the KEIP may receive an incentive amount (for each KEIP Participant, the "Incentive Payment") that is (i) contingent upon a sale closing for the Assets either through a Sale or Remaining Asset Sale, and (ii) based on the *value* obtained for the sale or other disposition of the Assets, with the amount of the Incentive Payment depending upon where the purchase prices for the Assets fall within a specified range.

9. The minimum value that must be obtained through the Alliance Sale in order for KEIP Participants to receive an Incentive Payment is $30 million, with the maximum Incentive Payment to be paid if the purchase price for the Alliance Assets exceeds $40 million. The minimum value that must be obtained through a Sale of the DST Assets, either through the Debtors' court-approved sale process or a later Remaining Asset Sale, for the relevant KEIP Participant to receive an Incentive Payment is $1 million, with the maximum Incentive Payment to be paid if any such sale (or monetization of assets) exceeds $3 million.

10. For KEIP Participants that are expected play a critical role in the sale or disposition of the Other Assets *in addition to* the sale of the Alliance Assets, such participants may receive an additional percentage recovery in the event of a Sale (whether in connection with the purchase of the Alliance Assets or a separate Sale) and/or disposition of the Other Assets so long as the

consideration for such sale (or sales) exceeds $12 million (the "Additional KEIP Recovery"). This additional recovery would equate to approximately 5% of each applicable KEIP Participant's annual salary.

11. The Incentive Payment reflected for each KEIP Participant was determined by the Debtors, with consultation from the CRO and the Debtors' investment banker, based on the relative criticality of each KEIP Participant and their projected impact on the Debtors' restructuring goals. The sum of all potential Incentive Payments under the Plan ranges from $570,250 to $1,075,750, depending upon the sale proceeds recovered for the Assets.

12. Other KEIP Parameters: The KEIP Participants will only be eligible to be paid the Incentive Payments if the Debtors successfully achieve their restructuring goals noted above, which were based on the particular silo into which each KEIP Participant fits and designed to ensure the completion of the Debtors' objectives. Moreover, each KEIP Participant, in order to participate in the KEIP, must agree to the following conditions: (i) the KEIP Participant must execute a non-disclosure agreement; (ii) the KEIP Participant must waive all entitlement to a severance payment; and (iii) the KEIP Participant must remain an at-will employee of the Debtors. No KEIP Payment shall be made if a KEIP Participant resigns or is terminated for cause prior to (i) closing on the applicable Sale, and, if applicable (ii) completion of the sale and/or disposition of the Other Assets; provided, however, that if, in connection with a Sale, a KEIP Participant is offered and accepts employment with the buyer, the KEIP Participant's termination from the applicable Debtor will be deemed without cause and such participant will remain eligible for the Incentive Payment (excluding the Additional KEIP Recovery).

**B.     The KERP**

13.     The Debtors have identified twenty-three (23) key non-insider employees (the "KERP Participants") whose institutional knowledge and skills are essential to maximizing the value of the Debtors' estates during the sale process.  The current KERP Participants are identified on the schedule attached to the Motion as **Exhibit D**.  The KERP would authorize the Debtors to provide retention payments to the KERP Participants in an aggregate amount of up to $276,900.

14.     Each KERP Participant's retention payment (the "Retention Payment") shall be paid only if the KERP Participant is still employed by the Debtors through the Alliance Sale and/or the Remaining Asset Sales as applicable, or is terminated without cause by the Debtors before such date.  Specifically, for KERP Participants whose services are needed only through the closing of the Alliance Sale, the Retention Payment shall be made as soon as practicable following the closing of such sale.  For KERP Participants whose services are critical both for the Alliance Sale and for the sale and/or disposition of the Other Assets, the Retention Payment shall be made on the *earlier* of (i) the date on which the sale and/or other disposition of substantially all of the Other Assets is complete, (ii) the date on which the KERP Participant is terminated without cause, or (iii) August 31, 2025.

15.     In exchange for a KERP payment, a participant must waive any other claims that he or she may maintain against the Debtors' estates.  In addition, any KERP Participant that voluntarily resigns (other than in connection with accepting an offer from a successful bidder in the Sale process) or is terminated for cause before the applicable trigger date will forfeit his or her right to receive a Retention Payment.

16.     While certain of the KERP Participants have titles that include word "manager" or "director," which may suggest officer status, none of these KERP Participants were or are, in

reality, insiders. Although such KERP Participants are important to the Debtors' businesses and are particularly vital in connection with the sale and bankruptcy processes, they do not have access to strategic inside information, enjoy special privileges within the Debtors' corporate hierarchy or have the ability to influence the direction of the Debtors' business operations. Given each KERP Participant's limited scope of authority, and without diminishing the crucial services that these employees provide to the Debtors, the Debtors do not believe that these individuals should be considered insiders vis-à-vis the Debtors.

17. The KERP program is modest, with the average amount of potential pay-outs being $10,500 and individual pay-outs ranging from only $5,000 to $22,000, with all such pay-outs equating to approximately 10–11% of each KERP Participant's base salary.

C. **Development of the KEIP and KERP**

18. The proposed KEIP and KERP were designed by me and William Henrich of Getzler Henrich & Associates LLC ("Getzler Henrich"), as the Debtors' co-Chief Restructuring Officers (together, the "CRO"). Getzler Henrich has significant experience in chapter 11 restructurings and is well-suited to provide input on the Debtors' executive and employee incentive and retention plans. Getzler Henrich, relying on its considerable experience, assisted the Debtors in designing the KEIP and KERP, keeping in mind the Debtors' dual goals of maximizing value during the Sale and Remaining Asset Sale processes, while ensuring that operations continue without disruption.

19. I believe that the KEIP and KERP were designed in a reasonable, cost-effective way to promote the appropriate incentives under the circumstances of these chapter 11 cases. The KEIP has and will continue to incentivize KEIP Participants in connection with the Sale(s) of the Debtors' Assets and, to the extent required, the Remaining Asset Sales. Likewise, the KERP was

6

designed to ensure the commitment and continued retention of key personnel essential to the Debtors' operations and to the Debtors' restructuring process. The KEIP and KERP Participants were carefully selected and deemed necessary to the Debtors' ability to maximize value for the benefit of all interested parties. I also believe that the costs of the KEIP and KERP are consistent with the Budget (as defined in the Final DIP Order).

**D.     The Necessity of the KEIP**

20.     In my experience and business judgment, I believe that if the KEIP is not approved, then there is a significant risk that the KEIP Participants will not be incentivized to perform and take on the extraordinary tasks necessary to promote the successful completion of the Debtors' restructuring goals of maximizing value for creditors through the sale and/or other disposition of the Assets. The KEIP Participants provide critical services to the Debtors, and the deterioration of their performance would materially and adversely affect the successful implementation of the Debtors' restructuring goals.

21.     The KEIP is calibrated to achieve the desired performance, which is to achieve the Debtors' restructuring objectives of: (i) the consummation of the Alliance Sale; (ii) the sale of the Other Assets or DST Assets as going concern sales and/or Remaining Asset Sales; and (iii) ensuring smooth and continuous operations throughout the process. Under the KEIP, the KEIP Participants can only obtain an Incentive Payment upon achievement of the particular restructuring goal applicable to such Participant. These targets are directly aligned with the Debtors' objectives. Thus, the KEIP Participants have been, and will continue to be incentivized to achieve the desired performance under the KEIP.

22.     Next, I believe that the cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earning potential because the payouts under the proposed KEIP are minimal

compared to the correlative gains the estates will realize upon the completion of a successful sale process.

23. I also believe that the scope of the KEIP is fair and reasonable because it applies to only a limited subset of the Debtors' most critical employees in positions most integral to the Debtors' restructuring efforts. The KEIP Participants play vital roles in both overall operations and in promoting a successful sale process. Given the nexus between the diligent efforts of the KEIP Participants and the Debtors' ability to promote a successful sale process, I believe it is reasonable, fair and otherwise appropriate to incentivize the KEIP Participants through the KEIP.

24. Finally, the KEIP is consistent with industry standards and is the product of the Debtors' due diligence and consultation with counsel and other advisors. In consultation with the Debtors' legal counsel, I reviewed a number of court-approved key employee incentive plans and used such information, along with feedback from Debtors' counsel and investment banker and discussions with employees at the company, to model the plan proposed in the present case.

25. Although the KEIP may have some retentive effects, the primary goal is to incentivize the KEIP Participants to meet certain performance objectives that will maximize recoveries for the estates and parties in interest. For all of these reasons, I believe that the KEIP is a sound exercise of the Debtors' business judgment, is necessary and in the best interest of the Debtors and their estates, and the Motion should be approved.

E.   **Necessity of the KERP**

26. For similar reasons, I believe that the proposed KERP is necessary and appropriate under the circumstances of these cases. In addition to maintaining most of their normal responsibilities, the KERP Participants have assumed and will continue to assume significantly greater responsibilities due to the demands of these chapter 11 cases. I submit that the payments

made under the KERP are necessary to ensure that key employees remain with the Debtors and focus their efforts on maximizing estate value, ultimately enabling the Debtors to consummate their sale efforts. Without the incentive provided by the KERP, I believe that essential team members will resign, harming the value of the estates and affecting the efficiency of the Debtors' efforts.

27. In formulating the KERP, I limited the program to only those employees who would be difficult or impossible to replace, and I fixed the proposed amounts based upon my experience and my view as to an appropriate amount necessary to incentivize the particular employee to remain with the Debtors through the sale process. The KERP has been designed in a reasonable, cost-effective way to ensure the commitment of those key personnel that will be essential to the Debtors achieving their goal of maximizing value.

28. While certain KERP Participants have titles that include words such as "manager" or "director" in their titles, none of the KERP Participants are, in my view, insiders. Although the KERP Participants are important to the Debtors' business and will be particularly vital in connection with the sale process, they are not in the "inner circle" in making the company's critical decisions so as to warrant treatment as an officer and do not have the ability to influence the direction of the Debtors' business operations. None of the KERP Participants participate in corporate governance, and the majority of the KERP Participants report to intermediate managers or to me. Many of the KERP Participants' duties are limited to support functions or are restricted to a particular division and, in each case, the KERP Participants' scope of authority is limited. As a result, I do not believe that these individuals are insiders.

9

53728885.6 03/06/2025

29. For these reasons, and the reasons described in the Motion, I believe that the KERP is critical in motivating key employees to remain with the Debtors during the critical stages of these chapter 11 cases and should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated: March 6, 2025                                     */s/ Robert Gorin*
                                                        Robert Gorin
                                                        Co-Chief Restructuring Officer