# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

|  |  |
|---|---|
| In Re<br><br>**DIAMOND COMIC DISTRIBUTORS,** *et al*.<br><br>Debtors. | Bankruptcy Case: 25-10308-DER<br><br>Chapter 11<br>(Jointly Administered) |

## THE UNITED STATES TRUSTEE'S OPPOSITION TO DEBTORS' MOTIONS FOR ENTRY OF ORDERS (a) APPROVING KEY EMPLOYEE INCENTIVE PROGRAM AND KEY EMPLOYEE RETENTION PROGRAM AND (b) AUTHORIZING THE DEBTORS TO FILE UNDER SEAL CERTAIN UNREDACTED EXHIBITS TO THE SAME

Matthew W. Cheney, Acting United States Trustee for Region Four, which includes the District of Maryland, Baltimore Division (the "United States Trustee"), pursuant to 11 U.S.C. §§ 107 and 503, files this Opposition to:

(a)   Debtors' Motion for Entry of an Order Approving Key Employee Incentive Program and Key Employee Retention Program (the "Bonus Motion"); and

(b)   Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Unredacted Exhibits to the Debtors' Motion for Entry of an Order Approving Key Employee Incentive Program and Key Employee Retention Program (the "Sealing Motion").

## INTRODUCTION

Debtors filed these cases to effectuate a sale of all their assets. They obtained a stalking horse agreement for the majority of those assets to start the bidding which closes on March 19, 2025, and which is scheduled for auction on March 24, 2025. In the Bonus Motion, which Debtors

filed on March 6, 2025, and set for a hearing on March 27, 2025 (three days after the auction and the same day as the hearing to approve the sale), Debtors ask the Court to approve two bonus programs, a Key Employee Incentive Program (the "KEIP") and a Key Employee Retention Program (the "KERP").

Through the KEIP, Debtors seek to pay bonuses to key employees, including insiders, purportedly to incentive them to work toward increasing the sale price. However, as just noted, the hearing on this alleged incentive program does not even occur until after the auction and after the sale price is set. Moreover, the sale price in the stalking horse agreement is already more than the threshold for achieving most of the bonus and even one bid would solidify entitlement to all of the bonus. In other words, the KEIP is not really an incentive bonus; it is a bonus to funnel money away from creditors and to certain favored key employees. The KEIP violates the requirements of Section 503 and is not justified by the facts and circumstances of this case.

The KERP too is unjustified. It proposes to pay 23 key employees a bonus equaling approximately 10% of their annual salaries to remain on the job for just two more weeks. This is so without any evidence that a single proposed recipient has a job offer or any plans to leave in the next two weeks.

On top of this, Debtors seek to hide from the public and most of the creditors the information necessary to analyze these bonus programs. Debtors seek to redact from public view, with access by only a select few, the names, job titles and base salaries, of every bonus recipient. Without such information it is impossible to analyze whether recipients are insiders, whether their job duties render the bonuses necessary or reasonable, and how such a bonus compares to the recipients' normal salaries.

For the reasons stated above and described more fully below, the Court should deny both

the Bonus Motion and the Sealing Motion.

## **FACTS AND BACKGROUND**

Debtors filed these cases to pursue a sale of all of their assets as a going concern. (First Day Dec., Doc. 20 at ¶ 30-31.) Debtors have already marketed themselves extensively, obtained a stalking horse purchase agreement for the bulk of Debtor's assets (known as the "Alliance Assets"), and obtained approval of bidding procedures which set a bidding deadline of March 19, 2025, and an auction scheduled for March 24, 2025. (First Day Dec., Doc. 20 at ¶ 31; Bid Procedures Motion, Doc. 68; Notice of Sale and Bid Procedures, Doc. 159 at 2.)

The purchase price of the Alliance Assets in the stalking horse agreement is $35 million with various adjustments. (*See* Doc. Stalking Horse Agreement, 68-3 at 13.) While it is impossible to determine the exact stalking horse purchase price due to the instability of the adjustments, it is clear that Debtors anticipate that the stalking horse purchase price after adjustments will be approximately $39 million. This is clear from the bidding requirements that require any bid to be at least $40,865,000, which includes the Stalking Horse bid, a $500,000 minimum overbid, a $1,170,000 breakup fee equivalent to 3% to the purchase price,[1] and a $195,000 expense reimbursement equivalent to 0.5% of the purchase price.[2] (*See* Bid Proc. Motion, Doc. 68 at 7, 9.)

On March 6, 2025, Debtors filed the Bonus Motion and the Sealing Motion. (*See* Docs. 196, 197.) The Motions had objection deadlines of March 20, 2025 (after the bidding deadline) and a hearing deadline of March 27, 2025 (after the auction deadline and the same day as the hearing to approve the sale.)

---

[1] $1,170,000 is 3% of $39,000,000.

[2] $195,000 is 0.5% of $39,000,000.

The Bonus Motion contains two bonus programs: a Key Employee Incentive Program (the "KEIP") and a Key Employee Retention Program (the "KERP"). The KEIP proposes to pay 16 key employees bonuses if the purchase price of the Alliance Assets exceeds certain threshold amounts, to pay six of those key employees additional bonuses if certain other "Non-Alliance Assets" are sold for more than a threshold amount, and to pay one key employee a bonus if the purchase price of another set of assets (known as the "DST Assets") exceeds certain thresholds. (*See* Doc. 196-4).

With respect to the Alliance Assets, the KEIP would pay a total of $560,250 to 16 key employees if the Alliance Assets sell for between $30 million and $35 million, $739,500 to those 16 key employees if the Alliance Assets sell for between $35 million and $40 million,[3] and $1,009,500 if the Alliance Assets sell for more than $40 million. (*See* Doc. 196-4.) In the Bonus Motion, Debtors assert (without explanation or support) that only three of the proposed recipients of the KEIP are insiders, although which three is not identified. (*See* Doc. 196.) However, the unredacted version of the KEIP provided to the United States Trustee reflects four Bonus Recipients whose title includes the term "president," five whose title includes the term "vice president," three whose title is "chief _____ officer," and five whose title is "director" of something. Thus, it appears from the limited information provided in the Bonus Motion that the KEIP may apply to more than simply three insiders.

The KERP applies to 23 key employees. Under the KERP, these 23 employees would receive bonuses totaling $241,900 if they remain employed by Debtors until April 10, 2025, and seven of the key employees would receive a second bonus, totaling $35,000 for all seven, if they remain employed through the sale of all of the Debtors' assets, which Debtors estimate will be

---

[3] It is unclear which amount applies if the Alliance Assets sell for exactly $35 million.

approximately August 31, 2025. (*See* Doc. 196-5.)

In the Bonus Motion, Debtors redacted the names, job titles and base salary of all the Bonus Recipients.  Thus, an interested party reviewing the Bonus Motion on file can see only  the amount of the bonus with no understanding of who such a bonus is being paid to, what that person does in relation to the requirements to receive the bonus, or how that bonus compares to the recipients' normal compensation.   (*See* Docs. 196-4, 196-5.)   In the Sealing Motion, Debtors request permission to keep this information redacted.  (*See* Doc. 197.)   Debtors provided unredacted copies to the Court, the United States Trustee and the Creditors Committee, and if a request is made, Debtors will also provide an unredacted copy to the DIP Lender.  (*See* Doc. 197 at ¶ 12.)

## ARGUMENT

### A.    The Sealing Motion should be denied.

Bankruptcy Rule 5001(b) provides, in pertinent part: "All trials and hearings shall be conducted in open court and so far as convenient in a regular court room."  *See In re Global Crossing Ltd.*, 295 B.R. 720, 723-24 (Bankr. S.D.N.Y. 2003); *see also Brown v. Williamson Tobacco Corp. v. Federal Trade Comm'n*, 710 F.2d 1165, 1178 (6th Cir. 1983) (holding that the "open courtroom has been a fundamental feature of the American judicial system").  Thus, parties seeking to deny public access to court documents must overcome a strong presumption.  *Neal v. The Kansas City Star* (*In re Neal*), 461 F.3d 1048, 1053 (8th Cir. 2006); *Gitto v. Worcester Telegram & Gazette Corp.* (*In re Gitto Global Corp.*), 422 F.3d 1, 6 (1st Cir. 2005).

In the bankruptcy context, the general rule of open access is set forth in Section 107(a) of the Bankruptcy Code, which provides that, subject to certain limited exceptions, "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a).  *See In re Food*

*Management Group, LLC,* 359 B.R. 543, 553-555 (Bankr. S.D.N.Y. 2007) (holding section 107 reflects Congress's intent to favor public access to papers filed with the bankruptcy court).

Section 107 reflects the strong public policy in favor of papers filed in the bankruptcy courts remaining open and available to the public for review:

> (a)    Except as provided in subsections (b) and (c) of this section and subject to section 112,[4] a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge.

11 U.S.C. §107(a).  The court may protect documents in only three narrow circumstances.  The exceptions in subsection (b) permit the court to protect entities "with respect to a trade secret or confidential research, development, or commercial information" and to "protect a person with respect to scandalous or defamatory matter contained in a paper filed" in a bankruptcy case. 11 U.S.C. § 107(b).  The exception in subsection (c) permits the court to prevent disclosure of "means of identification" or similar information that "would create undue risk of identity theft or other unlawful injury to the individual or the individual's property."  11 U.S.C. § 107(c).

Although the Fourth Circuit has not considered the parameters of Section 107 in detail, at least four other courts of appeal have.  They agree that Section 107 abrogates the common law rule giving courts general discretion to create exceptions to the right of public access for "compelling reasons."  *See Father M v. Various Tort Claimants* (*In re Roman Catholic Archbishop of Portland*), 661 F.3d 417, 430-31 (9th Cir. 2011); *Neal, supra*; *Gitto, supra; In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994).  Accordingly, the plain text of Section 107 "limits the discretion of courts regarding public access to papers filed in a bankruptcy case ... unless material contained therein falls within one of the statutory exceptions."  *Gitto*, 422 F.3d at 11.

---

[4] 11 U.S.C. § 112 is a prohibition on the disclosure of the names of minor children and is not relevant here.

A "court's ability to limit the public's right to access remains an extraordinary measure that is warranted only under rare circumstances as public monitoring is an essential feature of democratic control." *Togut v. Deutsche Bank AG (In re Anthracite Capital, Inc.),* 492 B.R. 162, 171 (Bankr. S.D.N.Y. 2013) (internal quotation omitted); *see Gitto*, 422 F.3d at 11 (requiring "something more" than potential "detrimental impact on an interested party's reputation"). In evaluating a motion to seal, courts must "carefully and skeptically review" the motion and underlying documents to ensure that "compelling or extraordinary circumstances exist." *Orion Pictures*, 21 F.3d at 27; *see, e.g.*, *In re Nunn*, 49 B.R. 963, 964 (Bankr. E.D.Va. 1985) (sealing documents should "be the exception rather than the rule"); *In re Epic Associates V,* 54 B.R. 445, 448 (Bankr. E.D.Va. 1985) ("[i]t is a highly unusual and extraordinary remedy for the Court to seal the records in any case").

Debtors do not even attempt to argue that the names, positions and salaries of the Bonus Recipients meet any of the criteria of Section 107(b). That is not surprising. Such information is certainly not a trade secret, confidential research, development, or commercial information (*see* Section A.1 below regarding "commercial information"). Names, positions and salaries are not "scandalous" or defamatory. As for Section 107(c), such disclosure does not put anyone at any undue risk of identity theft or other "unlawful injury" (*see* Section A.2 below regarding "undue risk" of identity theft or injury).

Instead, Debtors argue (without any real explanation) that disclosure "would have material adverse effects on the Debtors' sale efforts and overall restructuring objectives" and that disclosure would be "very damaging to the Debtors' businesses and to the proposed participants themselves." (Doc. 197 at ¶ 10.) Debtors then assert that disclosure would somehow lower employee morale "disrupting the Debtors' ordinary course business operations and efforts to pursue a value

maximizing transaction" and the fear that the information could be used by competitors to lure away employees by "offering enhanced compensation and benefits."  (Doc. 197 at ¶ 11.)

In addition to not meeting any of the criteria of Section 107, those arguments are without merit.  First, this is a sale case, not a restructuring.  The deadline for submitting bids is March 19, 2025 – the day before objections to the Bonus Motion are due.  The Auction is taking place March 24, 2024 – three days before the hearing on the Bonus Motion.  There is nothing left for the Bonus Recipients to do with respect to sale efforts at this point.  Disclosing names, titles and salary would have no impact on the sale.  Indeed, although the United States Trustee does not have access to the information provided to potential bidders, it seems likely that payroll information and the identity of employees was included in that information.  Thus, it is unclear how disclosure could affect the bidding.

As to the ability of competitors to try to lure away employees with better compensation packages, that is part of the normal business world.  Indeed, most of these employees likely have Linked-In pages and similar social media that advertise their positions with Debtors.  It is not the role of the bankruptcy court to try to restrict employees from seeking the best compensation package available to them.

1.    **The Sealing Motion Fails to Allege Any "Confidential Commercial Information" That Would Trigger the Statutory Exception to Public Disclosure.**

"Commercial information" under section 107(b)(1) is "information which would cause an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Orion*, 21 F.3d at 27 (citations omitted).  Information protected under this exception has typically included information that would result in a "direct and adverse" impact on a party,

such as (a) the terms of a licensing agreement that would have impaired a party's ability to conduct contract negotiations; (b) a copy of a confidential customer list that the debtor previously sold to a creditor; and (c) documents that detailed a hedge fund's investment strategy. *Id.*; *In re A.G. Fin. Serv. Ctr.*, 395 F.3d 410, 415-16 (7th Cir. 2005); *In re Dreier LLP*, 485 B.R. 821, 823 (Bankr. S.D.N.Y. 2013). In contrast, courts have not protected information such as settlement agreements and general information about organizational structure. *Dreier*, 485 B.R. at 823; *In re Oldco M Corp.*, 466 B.R. 234, 238 (Bankr. S.D.N.Y. 2012).

In the instant case, Debtors seek to conceal information essential to determination of the Bonus Motion. Specifically, Debtors do not wish to disclose the Bonus Recipients'' names, titles and base salaries. Without such information, parties in interest will be deprived of the opportunity to ascertain whether the payments are reasonable or warranted under the circumstances of these Chapter 11 cases.

Debtors have failed to show that the Bonus Recipients' names and titles constitute "a trade secret or other confidential research, development, or commercial information," nor have they alleged a direct and adverse impact that any disclosure would cause.

**2.      The Sealing Motion Does Not Allege Any Undue Risk of Identity Theft or Unlawful Injury to the Bonus Recipients Sufficient to Warrant The Sealing of Their Identities, Titles and Compensation Amounts.**

Section 107(c) permits the bankruptcy court to "protect an individual" from the disclosure of "means of identification" that, if disclosed, would "create undue risk of identity theft or other unlawful injury to the individual or the individual's property." 11 U.S.C. § 107(c). The only "means of identification" under the identify theft statute, 18 U.S.C. § 1028(d), included in the exhibits filed under seal are the Bonus Recipients' names. The United States Trustee agrees that the names of employees are "means of identification" as that term is used in Section 107; however,

there is no allegation that the disclosure of employees' names subjects them or their property to an "undue risk of identity theft or other unlawful injury" as required by the statute.  Indeed, a number of other employee names, along with addresses, were already disclosed by Debtors in their Schedules E and F.

Most importantly, without job titles, it is impossible for creditors to determine what, if any, relationship the Bonus Recipients have to the KEIP metrics and, without disclosure of base compensation, it is impossible for creditors to analyze the reasonableness of the proposed bonuses. Accordingly, the Sealing Motion should be denied.

### B.      The Bonus Plans Should Be Disallowed.

The KEIP is actually a disguised KERP.  Thus, neither Bonus Plan should be available to insiders pursuant to 11 U.S.C. § 503(c)(1).  With respect to non-insiders, the Bonus Plans should be rejected because they are unnecessary and not commercially reasonable and not justified by the facts and circumstances of the case as required by 11 U.S.C. § 503(c)(3).

### 1.      Congress Has Severely Limited Key Employee Bonus Plans.

The Bankruptcy Code classifies expenses of the bankruptcy estate as "administrative expenses," which are paid in full before any distribution is made to unsecured creditors. *See* 11 U.S.C. §§ 503(b), 507.  Section 503(b) provides, in relevant part, that "there shall be allowed administrative expenses ... including ... (1)(a)(i) wages, salaries and commissions for services rendered after the commencement of the case...."   This includes employee compensation and bonuses.  *Adventure Resources, Inc. v. Holland*, 137 F.3d 786, 793 (4th Cir. 1998); *In re American Plumbing & Mech., Inc.*, 323 B.R. 442, 462 (Bankr. W.D. Tex. 2005).

- 10 -

Section 503(c) was enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") to respond to "glaring abuses of the bankruptcy system by the executives of giant companies like Enron Corp, and WorldCom Inc. and Polaroid Corporation, who lined their own pockets but left thousands of employees and retirees out in the cold." (Floor Statement, quoted in *In re Dana Corp.,* 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2006)).  The abuses at which the provision is aimed regularly manifest themselves in the guise of insider retention plans, often referred to as Key Employee Retention Plans. *See* 3 COLLIER ON BANKRUPTCY ¶ 503.17[1] at 503-105 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013) (section 503(c)'s "purpose was to limit the scope of … programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor").

As one Court has previously explained:

> All too often [insider retention plans] have been used to lavishly reward -- at the expense of the creditor body -- the very executives whose bad decisions or lack of foresight were responsible for the debtor's financial plight. But even where external circumstances rather than the executives are to blame, there is something inherently unseemly in the effort to insulate executives from the financial risks all other stakeholders face in the bankruptcy process.

*In re U.S. Airways, Inc*., 329 B.R. 793, 797 (Bankr. E.D. Va. 2005).  Congress determined that section 503(c) was necessary "to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case."  *In re Pilgrim's Pride Corp*., 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009).

KERPs for the benefit of insiders are governed by 11 U.S.C. § 503(c)(1), which precludes the paying of bonuses to insiders "for the purpose of inducing such person to remain with the debtors' business" unless the strict conditions set out in subsections 503(c)(1)(A), (B), and (C) are met.  11 U.S.C. § 503(c)(1).  These conditions require: (1) the insider have a bona fide job offer elsewhere, (2) the insider's services must be "essential" to the debtor, and (3) the payment must

be under certain monetary limits.  *Id.*

KERPs for the benefit of non-insiders are governed by 11 U.S.C. § 503(c)(3).  *GT Advanced Tech., Inc. v. Harrington*, No. 15-069, 2015 WL 4459502 at *6 (D.N.H. July 21, 2015); 4 *Collier,* ¶ 503.18 (16 ed. 2025).  Section 503(c) prohibits such bonuses unless they are "justified by the facts and circumstances of the case...."  11 U.S.C. § 503(c).  To determine whether a compensation plan is "justified by the facts and circumstances of the case," 11 U.S.C. § 503(c)(3), courts typically consider what have come to be known as the *Dana* factors:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*GT Advanced Techs.*, 2015 WL 4459502 at *8; *see also Patriot Coal*, 492 B.R. at 531 (quoting *Dana II*, 358 B.R. at 576–77) (emphasis omitted); *In re Residential Capital*, 491 B.R. 73, 84–85 (Bankr. S.D.N.Y. 2013) (employing the *Dana* factors to determine whether to approve retention plan for non-insider employees); *Global Aviation*, 478 B.R. at 150–51 (same).

### a.    It Appears There Are More Insiders Than Disclosed.

As an initial matter, it is unclear to what extent the KEIP applies to insiders.  Section

101(31)(B) defines the insider of a corporation as "including" a director, an officer, or a person in control of the corporation.  Although Debtors claim that the KEIP applies only to three insiders, the unredacted version of the KEIP provided to the United States Trustee reflects four Bonus Recipients whose title includes the term "president," five whose title includes the term "vice president," three whose title is "chief _____ officer," and five whose title is "director" of something.   Thus, it appears from the limited information provided in the Bonus Motion that the KEIP may apply to more than simply three insiders.

### b.      The KEIP is a Disguised KERP and, as Such, Any Insiders Are Ineligible.

Simply labelling a bonus payment plan as an "incentive" plan or KEIP is insufficient to avoid court inquiry into whether the plan is prohibited under section 503(c)(1).   *In re Velo Holdings Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012).[5]  Thus, the Court must look behind the name of the plan to determine whether the bonuses are being paid to incentivize the insider or simply to retain the insider.

"Incentive" is defined as "something that incites or has a tendency to incite to determination or action." *Id.* at 211 (citing WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 608 (9th ed. 1984)). Thus, an "incentive" bonus is one that would incite an employee to work harder or achieve a particular goal.  Accordingly, in reviewing proposed insider incentive bonus plans, courts consider the difficulty of achieving the proposed target goals.  *See,*

---

[5] Careful judicial review of proposed incentive plans for disguised retention plans is consistent with the clear congressional mandate to prevent insolvent companies from rewarding its insiders with retention bonuses.  *See Grassley Probes DOJ for Policies on KERPs*, 31-2 AM. BANKR. INST. J. 8 (March 2012) (in response to *Wall Street Journal* report that companies in chapter 11  continue to pay bonuses to top executives in form of "incentive" plans, Senator Grassley, chief Senate sponsor of the Reform Act, looks into whether companies are "masking retention plans under the guise of incentive plans, in conflict with Congressional intent").

*e.g, In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (S.D.N.Y. 2012) (court must determine whether proposed targets "are designed to motivate insiders to rise to a challenge or merely report to work"). Where targets of incentive plans have been deemed to be too easily attainable, such plans have been held to be retention plans in disguise. *See id*. at 313-15 (denying KEIP as disguised retention plan where lowest incentivizing levels were "well within reach").

Moreover, nothing in the statute limits the bankruptcy court's review to just the objective features of the proposed plan. The bankruptcy court has discretion to view other evidence, including testimony of debtor's witnesses, to determine whether a debtor proposed a bonus payment plan for the purpose of inducing its insiders to remain with the debtor. *Id.*at 314. In *Hawker Beechcraft*, the debtor's chief executive officer had testified that without the proposed incentive plan, his senior management "could seek alternative employment opportunities" which would undermine their attempt to restructure under chapter 11. *Id.* The court found that this testimony "confirmed the retentive purpose" of the proposed incentive plan. *Id*.

The proponent of a purported "incentive" plan bears the burden of proving that the proposed plan is not a retention plan governed by section 503(c)(1). *Id.* at 313. If Debtors fail to meet that burden, and the conditions under section 503(c)(1) are not met, the KEIP cannot be approved.

Here, the evidence will show that the performance metrics are insufficiently meaningful to constitute a true KEIP and that the KEIP is really a disguised KERP governed by 11 U.S.C. § 503(c)(1). The only performance metric in the KEIP is the sale price of assets. Bonuses are awarded if the Alliance Assets sell for over $30 Million. The bonus is enhanced if the sale price is between $35 million and $40 million and enhanced again if the sale price is more than $40 million. That means the enhanced bonus is already virtually guaranteed regardless of anything

any of the Bonus Recipients do other than remain employed and the second enhancement is met if there is even one bid above the current stalking horse bid.

The stalking horse bid is already $39 Million.  The minimum first bid must be $40,865,000 Given that the stalking horse bid is already above the first two thresholds and nearly at the highest threshold, and given that the sale price of the Alliance Assets will be determined before the hearing on Bonus Motion, it is unclear what any of the Bonus Recipients could do that would impact the sale price of the Alliance Assets.  Thus, as long as the Bonus Recipients stick around, they are already entitled to the bonus.  That is not an incentive plan; it is a retention plan.  Courts have made it clear that triggering bonus awards solely on the basis of a sale transaction are not sufficient to shift consideration of a bonus plan providing payments to insiders from section 503(c)(1) to section 503(c)(3).  *In re Residential Capital, LLC*, 478 B.R. 154, 171 (Bankr. S.D.N.Y. 2012).

### c.    The KEIP Bonuses Are Not Justified by the Facts and Circumstances of This Case.

Even if the KEIP is not a disguised KERP, and even with respect to non-insiders, the Court must also consider whether the payments are permissible under Section 503(c)(3).  *Dana Corp.*, 358 B.R. at 576.  The KEIP is not, as Debtors argue, governed by Section 363 and the business judgment rule.  The plain meaning of the statutory language of section 503(c)(3) is clear. "[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."  *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004).  Section 503(c) mandates that "there shall neither be allowed, nor paid," transfers or obligations that are (1) "outside the ordinary course of business" and (2) "not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3).  The

statutory text squarely places a duty on the bankruptcy court to determine whether a proposed transfer constituting an administrative expense is justified by the case's facts and circumstances.

The text of section 503(c)(3) places a fact-finding duty upon the bankruptcy court to determine whether a payment outside the ordinary course of business was justified. Prior to 2005, executive bonuses that were outside the ordinary course of business were approved pursuant to the more permissive standard of section 363(b). *See, e.g., Montgomery Ward Holding Corp.*, 242 B.R. at 152-53. The statutory language of section 363(b) provides in relevant part: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1) (emphasis added).

In adopting section 503(c), Congress expressly moved away from the general permissive standard of section 363(b) towards a more specific statutory prohibition of bonus payments absent factual findings of justification by the bankruptcy court. 11 U.S.C. §503(c)(3). The Supreme Court has held that it is a "well established canon of statutory interpretation" that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-2071 (2012) (citations omitted). This canon may be applied to statutes where "a general authorization and a more limited, specific authorization exist side-by-side." *Id*. This canon of statutory interpretation avoids "the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* (citations omitted).

To continue to apply the section 363(b) "business judgment" standard to "outside the ordinary course" bonus payment plans after Congress adopted the BAPCPA would improperly render section 503(c) meaningless. *Pilgrim's Pride*, 401 B.R. at 236-37. "Congress is presumed to intend that independent sections of the Code will have independent, differing impacts." *Id*.

(citing *BFP v. Resolution Trust, Corp.*, 511 U.S. 531, 537 (1994)).  "To read section 503(c)(3) as requiring nothing not already required by section 363(b)(1) would violate this principle of construction." *Id.*; 4 COLLIER ON BANKRUPTCY ¶ 503.17[4] at 503-112 (finding persuasive the *Pilgrim's Pride* court's "sound reasons" for imposing a stricter standard under section 503(c)(3) than section 363(b)(1)).

Thus, it is clear that Section 503(c) is "intended to give the judge a greater role: even if a good business reason can be articulated for a transaction, the court must still determine that the proposed transfer or obligation is justified in the case before it."  *Pilgrims' Pride*, 401 B.R. at 237. The evidence will also show the bonuses provided by the KEIP cannot be justified by the facts and circumstances of this case as required by Section 503(c)(3).

As discussed above, the thresholds Debtors have set for the bonuses in the KEIP are essentially a *fait accompli.*  There is no reason to pay bonuses at this point other than to funnel money that could be available for creditors to key employees.  That is anathema to the Bankruptcy Code.  By the time this Bonus Motion is ruled upon, the auction for the Alliance Assets will be over and the sale price set.   There is simply no justification under the facts and circumstances of this case to pay anyone a bonus for an event that has already occurred. [6]

### 2.      The KERP Should Also be Denied.

Admittedly, the KERP provides a far more modest bonus proposal than the KEIP. However, even to the extent the KERP recipients are not insiders (and the United States Trustee

---

[6] The United States Trustee is not necessarily opposed to the proposed bonuses for the sale of the Non-Alliance Assets or the DST Assets, (a) to the extent the bonus is going to non-insiders, and (b) those assets are not sold at the March 24, 2025 auction.  Based on the job titles of the six key employees eligible to receive a bonus related to the Non-Alliance and DST Assets, the United States Trustee believes most if not all six are insiders.

remains unconvinced that none of the KERP recipients are insiders) the KERP does not appear to be justified by the facts and circumstances of the case.

Again, timing is key.  For the 23 bonuses in the first tier of the KERP, these key employees are being given a bonus of roughly 10% of their salary to remain with the Debtor for approximately two weeks after the hearing on the Bonus Motion.  While Debtors assert that the KERP is limited to "only those employees who would be difficult or impossible to replace," Debtor provided no evidence, other than an unsupported "belief" that any of the KERP bonus recipients would actually leave in that two-week period.  (*See* Doc. 196-3 at ¶¶ 26-27.)  Given the hearing is March 27, 2025, it seems highly unlikely that any employee who does not have another job offer pending at that time would leave prior to April 10, 2025.  Again, this seems to be little more than an attempt to funnel money that could otherwise be going to creditors, to key employees.[7]

## **CONCLUSION**

For the reasons stated above, the Court should deny the Bonus Motion and the Sealing Motion.

---

[7] With respect to the second tier of the KERP, where Debtors propose to pay seven key employees $5,000 each to remain until August 31, 2025, the United States Trustee believes that appears, at least on its face, to be reasonable and justified under the circumstances of this case.

Dated: March 20, 2025

Respectfully submitted,

Matthew W. Cheney,
Acting United States Trustee for Region Four

By: _/s/ Hugh M. Bernstein_____
Hugh M. Bernstein
Fed. Bar No.: 23489
United State Department of Justice
101 West Lombard Street
Baltimore, Maryland 21201
(410) 962-4300
E-mail: hugh.m.bernstein@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY FURTHER CERTIFY** that, on this 20th day of March, 2025, according to the Court's ECF records, electronic notice of this opposition should be provided to the following persons:

- **Hugh M. (UST) Bernstein**    hugh.m.bernstein@usdoj.gov
- **Daniel Jack Blum**    jack.blum@polsinelli.com, lsuprum@polsinelli.com;delawaredocketing@polsinelli.com
- **Laura Skowronski Bouyea**    lsbouyea@venable.com, dmdierdorff@venable.com
- **Thomas K. Bredar**    thomas.bredar@wilmerhale.com, andrew.goldman@wilmerhale.com;benjamin.loveland@wilmerhale.com;yolande.thompson@wilmerhale.com
- **Andrew Brown**    abrown@klestadt.com
- **Richard L. Costella**    rcostella@tydings.com, scalloway@tydings.com
- **David W.T. Daniels**    ddaniels@perkinscoie.com, docketnyc@perkinscoie.com;nvargas@perkinscoie.com;KMcClure@perkinscoie.com
- **Turner Falk**    turner.falk@saul.com, tnfalk@recap.email;Veronica.Marchiondo@saul.com
- **Justin Philip Fasano**    jfasano@mhlawyers.com, jfasano@ecf.courtdrive.com;tmackey@mhlawyers.com;hleaphart@mhlawyers.com;cmartin@mhlawyers.com;Fasano.JustinR92003@notify.bestcase.com
- **Ashley N Fellona**    ashley.fellona@saul.com, janice.mast@saul.com
- **Gianfranco Finizio**    gfinizio@lowenstein.com
- **Chelsea R Frankel**    cfrankel@lowenstein.com
- **Stephen B. Gerald**    sgerald@tydings.com
- **Christopher J. Giaimo**    christopher.giaimo@squirepb.com, christopher.giaimo@squirepb.com;christopher-j-giaimo-6409@ecf.pacerpro.com
- **Zvi Guttman**    zvi@zviguttman.com, zviguttman@gmail.com,zviguttman@outlook.com
- **Jeffrey C. Hampton**    jeffrey.hampton@saul.com
- **Adam H Isenberg**    adam.isenberg@saul.com
- **C. Kevin Kobbe**    kevin.kobbe@us.dlapiper.com, docketing-baltimore-0421@ecf.pacerpro.com
- **Eric George Korphage**    korphagee@whiteandwilliams.com
- **Jung Yong Lee**    jlee@tydings.com, mhickman@tydings.com
- **Gary H. Leibowitz**    gleibowitz@coleschotz.com, pratkowiak@coleschotz.com;bankruptcy@coleschotz.com;lmorton@coleschotz.com
- **Mark Minuti**    mark.minuti@saul.com, robyn.warren@saul.com
- **Bruce S. Nathan**    bnathan@lowenstein.com
- **Michael Papandrea**    mpapandrea@lowenstein.com
- **Steven Gregory Polard**    steven.polard@ropers.com
- **Jordan Rosenfeld**    jordan.rosenfeld@saul.com

- **Nikolaus F. Schandlbauer    nick.schandlbauer@arlaw.com,**
  **lianna.sarasola@arlaw.com**
- **Dennis J. Shaffer    dshaffer@tydings.com,**
  **scalloway@tydings.com;mhickman@tydings.com;jlee@tydings.com**
- **Indira Kavita Sharma    indira.sharma@troutman.com,**
  **katherine.culbertson@troutman.com;jonathan.young@troutman.com;david.ruedig**
  **er@troutman.com;errol.chapman@troutman.com;toyja.kelley@troutman.com**
- **Nicholas Smargiassi    nicholas.smargiassi@saul.com**
- **Brent C. Strickland    bstrickland@wtplaw.com, mbaum@wtplaw.com;brent-**
  **strickland-3227@ecf.pacerpro.com**
- **Paige Noelle Topper    paige.topper@saul.com**
- **US Trustee - Baltimore    USTPRegion04.BA.ECF@USDOJ.GOV**

And that further notice is being provided to all required parties by Omni Agent Solutions, Inc.

/s/ *Hugh M. Bernstein*
Hugh M. Bernstein