**EXHIBIT A**

# AGREEMENT

THIS AGREEMENT (the "Agreement") entered into as April \_\_\_, 2024 between Image Comics, Inc., a California corporation having an office and place of business at 215 SE 9th Avenue Suite 108 Portland, OR 97214 ("Image"), and Diamond Comic Distributors, Inc., a Maryland corporation having an office and place of business at 10150 York Road, Suite 300, Hunt Valley, Maryland 21030 ("Diamond").

## WITNESSETH:

WHEREAS, Image is engaged in publishing, selling, and distributing Image comic books, graphic novels and related products such as posters, statues and other merchandise customarily sold by Image to book market retailers; and

WHEREAS, Diamond has heretofore acted as an exclusive distributor of the English- language version of Image's comic books, collections, original graphic novels, and related products such as posters, statues and other merchandise customarily sold by Image to book market retailers ; and

WHEREAS, Diamond desires to continue to act as exclusive agent for Image in connection with Image's sale of collections and original graphic novels ("Products") to book market retailers worldwide, excluding the United States, Canada, and Mexico (the "Territory"), all in accordance with the terms and conditions of this Agreement.

WHEREAS, Diamond desires to use consigned Products to facilitate sales to non-exclusive (i.e., comic book specialty retail customers, "direct market" or "direct sales," of the Products) US customers of Image that Diamond would otherwise purchase from Image's exclusive US distributor.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the parties hereby agree as follows:

1. BOOK MARKET.

The terms and provisions of this Section shall apply only to sales of Products to Book Sellers, where Accounts purchase Products under Image's returnable trade terms.

    1.1    Diamond Appointment; Exclusivity.

        (a)    Image and Diamond agree that effective as of the Agreement's Commencement Date, January 1st, 2024, Diamond is appointed Image's exclusive agent to perform the services of selling, billing, warehousing, shipping, collecting, returns handling, and other customary customer services for distribution of Image's Products in the Territory to Book Sellers. "Book Sellers" are defined as chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; warehouse clubs, book clubs, libraries, and schools; online retailers; and the wholesalers who service those accounts, but not including sales of content in digital form only via the Internet.

(b) Notwithstanding anything to the contrary set forth herein, the appointment of Diamond to serve as Image's exclusive agent set forth above shall apply to all Image titles published under the Image "I" trademark during the Term (as hereinafter defined) of this Agreement, provided, however, this subsection (b) shall not (i) apply to "cross-over" books (unless Image is the designated publisher or such "cross-over" book), "tour" books and "incentive" books (as such terms are commonly understood in the comic book industry), provided, however that nothing contained in this subsection (ii) require Image to publish any particular title (and Image does not guarantee the availability of any title) or (iii) apply to products sold by Todd McFarlane Productions, or (iv) apply to any Image Products where Image has a preexisting exclusive distribution agreement within a country within the Territory for a particular title or author

1.2     Diamond's Services on Behalf of Image. During the Term of this Agreement, with respect to Image's sales of Products to Book Sellers in the Territory, Diamond shall perform Basic Book Market Services with respect to sales of Image Products to. Book Sellers in the Territory, at its sole expense (subject to the fees provided for herein), each and all of the distribution and marketing services specified in Exhibit A hereto, which shall be defined as the "Basic Services." From time to time, Diamond may elect to offer new or additional services not specified in Exhibit A hereto, which services shall be defined as "Additional Services".

1.3     Diamond's Services to Non-Book Seller Customers.  Upon Image's request, and Diamond's reasonable consent, Diamond shall provide any or all of the services described in Exhibit A to Non-Book Seller Customers in the Territory, which Image may require in connection with Image's sales to customers other than Book Sellers (who shall thereupon become "Non-Book Seller Customers"), on either an exclusive or non-exclusive basis and under such other terms as Image may determine consistent with the terms of this Agreement and Image's preexisting other contracts. Image agrees to consult periodically with Diamond about opportunities for Diamond to become Image's agent to prospective Non-Book Seller Customers, and to entertain in good faith any suggestions Diamond may have in this regard. Book Sellers and Non-Book Seller Customers shall be referred to collectively herein as "Accounts".

1.4     Payment and Fees

(a) Diamond will render a statement of account on a per title basis to Image for each Fiscal Month and will render such statement not later than 30 days following the end of such Fiscal Month. Diamond will remit payment (as defined below) to Image for each Fiscal Month not later than 90 days after the end of such Fiscal Month. A "Fiscal Month" is defined as ending on the final Sunday of each calendar month, and beginning on the following day.

(b) Diamond's payment to Image shall be on a per title basis in an amount equal to Diamond's "Net Billings" from the sales of Products in the Territory during that calendar month, less the following: (i) credits for actual returns of Products; (ii) Documented Deductions (as defined herein) from Accounts; (iii) Diamond's fulfillment and sales fees as provided in Section 1.4(d); (iv) actual freight charges incurred by Diamond in shipping Products to customers, except insofar as such charges are billed to customers net of any aggregate shipping discounts; (vi) Diamond's Returns Processing Charge (as defined below); and (vii) any charges for Additional Services agreed to in writing in advance. As used herein, "Documented Deductions" from customers means any amounts deducted from remittances to Diamond by customers approved by Image, whether related to Products, credits for advertising or any other deduction related to conducting business on behalf of Image, that are documented by such customers, including ISBNs that allow these deductions to be identified as Products. Documented Deductions will be

provided to Image by Diamond in such electronic and printed form and format as may be mutually agreed by Diamond and Image. Diamond will adhere to a regular accounting process of "taking" Documented Deductions and reconciling them to actual returns or shortages according to a plan mutually agreed upon in advance of its implementation or the making of any changes to such plan by Diamond and Image. As used in this Agreement, "Net Billings" is defined as the value of Gross Billings invoiced by Diamond to customers on behalf of Image in connection with fulfillment of orders for Products, less the value of Returns, exclusive of any prepaid transportation, insurance, and taxes included on customer invoices. As used herein, Diamond's "Returns Processing Charge" shall equal of 1% of the retail value of returns, provided, however, no Returns Processing Charge shall be applicable to

(a) returns disposed of and not returned to inventory (including Affidavit Returns), and

(b) full case returns to inventory.

(c) Payments due from Diamond under this Section 1.4 shall be remitted to Image by ACH. In all cases, Diamond shall make payments to Image in U.S. Dollars.

(d) Diamond shall receive fees equal to 12.5% (the "Base Book Fee Percentage") of the value of Net Billings of Products as previously defined, shipped to the warehouse, retail store, or freight forwarder of a Book Seller.

(e) For Book Market sales serviced from Diamond's United Kingdom facility, Diamond will conduct business on a buy/sell returnable basis at a discount of 65% off the retail price.

(f) Diamond will be permitted to return Product purchased from Image for the U.K. Book Market on a yearly (i.e., 12-month periods ending the day before the anniversary date from Effective Date) basis after Notification in writing to Image. Image agrees that Diamond will issue the Certificate of Destruction for the Product being returned and will not physically return Product unless requested to do so by Image at Image's expense within a reasonable time of receipt of the Notification. Image agrees that the Diamond's return allowance on U.K. Book Market purchases shall be 10% of the gross sales achieved during the relevant year (i.e., 12-month period). The 10% cap on return facility available to Diamond shall not take into account (i) any return of withdrawn Product from the market initiated at the behest of Image; (ii) any damaged or imperfect Product returned by Diamond to Image; and (iii) any Product given by Image to Diamond for sales promotion on a returnable basis.

(g) Notwithstanding anything to the contrary set forth herein, the fee to be paid by Image for any Product sold to a Book Market Account by Diamond hereunder (including any Product sold at a discount) shall in no event be less than $0.40 for all Products.

(h) For Products Diamond utilizes to service sales to non-exclusive US customers that Diamond would otherwise purchase from Image's exclusive US distributor, Diamond will report those Products to both Image (for informational purposes) and Image's exclusive US distributor, and pay for such Products directly to Image's exclusive US distributor based on the pricing and terms provided by Image's exclusive US distributor.

1.5     Negative Accountings. If Image receives from Diamond any statement of account showing "Negative Net Proceeds" (defined as any amount by which the combined fees, charges and deductions described in clauses 1.4(b)(i) through 1.4(b)(vii) exceed Net Billings in any particular monthly accounting period) on a per title basis, then Image shall pay to Diamond the amount of Negative Net Proceeds shown

4856-2450-3186.2                                                3

on such statement within thirty business days after its receipt of such statement. Notwithstanding anything to the contrary set forth herein, Negative Net Proceeds for any particular monthly accounting period shall be capped at $10,000 (ten thousand dollars) only to the extent of deductions taken that were more than 90 days after the original deduction was reported by Customers. If such cap is applied, the resulting difference in the negative accounting will carry forward until such negative amount has been fully applied to future accountings.

    1.6    Returns; Receipt; Shipping.

    (a)    Diamond will process returns in an expeditious manner. Returns that are deemed salable by Diamond will be returned to stock.

    (b)    Image agrees to allow the continuation of the practice of processing Return Credits from Book Sellers in the Territory based on a Certificate of Destruction ("Affidavit Returns"). Image may terminate its consent to such practice for any future shipment of Products only after giving 6 months' notice of such change to Diamond and Customers. In such instances, Image acknowledges that Product will not physically be returned. Diamond will make every reasonable effort to advise Image of returns in advance so, upon notification, Image may request the physical return of product, which may be at Image's expense.

    (c)    Subject to retailer and wholesaler routing guides and the availability of Products, Diamond will ship orders received in accordance with normal industry standards as in effect from time to time.

2.    TERM OF AGREEMENT; TERMINATION.

    2.1    Term. This Agreement will have a term of three (3) years from the Commencement Date (the "Term") and shall be automatically renewable at the end of such period for additional one year-periods (each, a "Renewal Term"), unless terminated by either party with six (6) months prior written notice. As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

    2.2    Image Termination Rights.

    (a)    Image shall have the right to terminate the Agreement upon the occurrence of a material breach of the Agreement by Diamond, provided that (i) the materiality of any breach arising from the provision of Basic Services or Additional Services by Diamond under the Agreement shall be measured in the context of the totality of services provided by Diamond to Image under the Agreement during the prior ninety (90) days, and (ii) Diamond has been given notice of such material breach and a period of 30 days to cure.

    (b)    In addition to the termination rights set forth in Section 2.2(a), above, Image shall have the right to terminate the Agreement upon 90-days' written notice to Diamond in the event of a "Change in Control" (as hereinafter defined) of Diamond, provided that Image gives such notice to Diamond during the 90-day period following the date upon which Image obtains actual knowledge that Diamond shall have undergone a Change in Control. As used herein, "Change in Control" shall mean (A) the combination of Diamond with another unaffiliated entity by means of any transaction

4856-2450-3186.2    4

or series of transactions (including, without limitation, any reorganization, merger or consolidation); or (B) a sale of all or substantially all of the assets of Diamond, unless Diamond's shareholders of record, as constituted immediately prior to such combination or sale, will, immediately after such combination or sale (by virtue of securities issued as consideration for Diamond's acquisition or sale or otherwise) hold at least 50% of the voting power of the surviving or acquiring entity.

(c) Upon the occurrence of a termination of the Agreement by Image due to a breach by Diamond, Image shall have the right, in addition to its rights hereunder, to exercise all legal and equitable remedies, including rights to monetary damages and an injunction.

2.3   Diamond Termination Rights

(a) Diamond shall have the right to terminate the Agreement upon the occurrence of a material breach of the Agreement by Image, provided that (i) the materiality of any breach under the Agreement by Image shall be measured in the context of the totality of Image's performance under the Agreement during the previous ninety (90) days, and (ii) no such termination shall occur until Image has been provided with notice of such material breach and a period of 30 days to cure.

(b) Upon the occurrence of a termination of the Agreement by Diamond, Diamond shall have the right to exercise all legal and equitable remedies, including rights to monetary damages and an injunction.

(c) Diamond will agree that following a termination of the Agreement by Diamond, Diamond will cooperate with Image for a period of six months by continuing to distribute Image's Products on the terms set forth in the Agreement.

(d) In the event that the Agreement is declared null and void, or enforcement of the Agreement is materially restrained or prevented, the Agreement shall be terminated and of no further force and effect.

2.4   Procedures for Termination.

(a) In the event of termination of this Agreement for any reason, the parties agree to execute the termination to ensure an orderly transition, preserving the goodwill and reputation of both parties, which obligation shall be satisfied in the case of Diamond through the performance of Basic Services as set forth herein, for a period of six (6) months following notice of termination. In addition: (x) each party shall remain liable to the other party for all obligations incurred prior to the date of termination; subject to the other provisions of this Agreement, Diamond shall forward to Image, or otherwise dispose of, its inventory of Products on the date of termination and all returns received thereafter, in accordance with Image's commercially reasonable written instructions; (y) each party shall have the right to approve any statement(s) issued to the public by the other party regarding the termination, except as may otherwise be required pursuant to any statute, rule of law, or regulation; and (z) each party shall retain all rights at law or equity arising from the termination, including all rights to monetary damages and/or injunctive relief.

(b) Promptly upon termination of this Agreement, Image will remove at its own expense the inventory of the Products from Diamond distribution centers. If Image fails to remove such

inventory within six (6) months after the termination of this Agreement, Diamond shall have the right either to dispose of such inventory in such manner as it deems appropriate or to destroy such inventory, so long as Diamond is not distributing Image's Products to other markets under separate agreement(s) with Image.

(c) In the event of termination of this Agreement by either party, Diamond shall accept returns of Products for 90 days following the effective date of termination (the "Returns Period"). Such returns shall be processed by Diamond at the same charge set forth in Section 1.4(b)(vi), above (sorted into manifested saleable and into manifested non-saleable pallets) and shipped at Image's cost to Image's successor fulfillment agent or otherwise as directed by Image. In no event shall Diamond have any obligation to accept any returns after the Returns Period; provided, however, that Image shall be responsible to pay Diamond any amounts which any customer refuses to pay to Diamond on account of Products shipped to such customer by Diamond due to any offset claimed by such customer for returns which such customer makes after the Returns Period or in connection with any dispute over the customer's right to return any Products after the Returns Period, but only to the extent that Diamond has not been able to recoup such amount from Image through a credit against amounts due to Image from Diamond. Returns shall be charged to Image at the amount credited to the customer.

3. AGREEMENTS, WARRANTIES AND REPRESENTATIONS

3.1 Each of Image and Diamond covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

3.2 Image represents and warrants to Diamond that the execution and performance of this Agreement does not violate any other contract or agreement to which Image is a party.

3.3 Diamond represents and warrants to Image that the execution and performance of this Agreement does not violate any other contract or agreement to which Diamond is a party.

3.4 Image shall indemnify and hold harmless Diamond, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein. If claims are asserted against Diamond with respect to which Diamond is entitled to indemnification hereunder, Image shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Diamond's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Diamond shall cooperate with Image in the defense thereof. Image and Diamond shall each promptly notify the other of any such claims, demand, actions or proceedings, and Image shall fully cooperate with Diamond in the defense thereof.

3.5 The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

CONFIDENTIALITY. Except as required by law, neither Image nor its representatives will disclose or use any Confidential Information (as defined below), whether already furnished or to be furnished in the

4856-2450-3186.2                                    6

future to Image or its representatives, in any manner other than in connection with the evaluation, negotiation or performance of this Agreement. Similarly, except as required by law, neither Diamond nor its representatives will disclose or use any Confidential Information, whether already furnished or to be furnished in the future to Diamond or its representatives, in any manner other than in connection with the performance of this Agreement. For purposes of this Agreement, "Confidential Information" means any information regarding Diamond or Image furnished to the other, including the terms of this agreement as well as the content of any discussions between Image and Diamond with respect to any transactions between them. Confidential Information does not include information that Image or Diamond can demonstrate (i) is generally available to or known by the public other than as a result of improper disclosure, (ii) is obtained by the disclosing party from a source other than the other party or its representatives, provided that such source was not bound by a duty of confidentiality with respect to such information, or (iii) is required to be disclosed by operation of law or by order of a court or administrative body of competent jurisdiction. Upon the written request of either party, the other party will promptly return any Confidential Information in its possession or in the possession of its representatives. The covenants set forth in this Section shall remain in full force and effect following the termination of this Agreement. Image understands and hereby acknowledges and agrees that it shall not have access to any confidential commercial information regarding other publishers or suppliers doing business with Diamond, and shall observe any procedures Diamond implements to protect against the inadvertent disclosure of such information to Image.

4.  PUBLICITY. Each of the parties will consult with each other and reach mutual agreement before issuing any press release or otherwise making any public statement with respect to this Agreement; provided, however, that each party will be permitted to make, without the agreement of the other, such disclosures to the public or to governmental entities as that party's counsel reasonably deems necessary to maintain compliance with federal or state laws.

5.  CREDIT DECISIONS.

    (a)  Diamond shall make all required credit decisions with respect to Accounts hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Accounts and the extent of credit to be granted. Diamond shall have the right to sue any delinquent Account to seek recovery of amounts owed and shall have the right to enter into any settlement with such delinquent Account in its reasonable discretion.

    (b)  With respect to Book Sellers and Non-Book Sellers, Diamond will assume responsibility for the bad debt risk associated with Image Products once the Image Products have been received by Book Market Accounts but only to the extent of Image's estimated actual cost of the Products, which will be deemed to be 10% of the retail value of the amount of the bad debt. To the extent Image has been paid for Products sold to a Book Market Accounts who eventually are unable to pay Diamond for those Products, Image will reimburse Diamond for the difference between Image's deemed costs for any such bad debt and the invoice value related to Image's Products included in the bad debt.

    (c)  For any Account with respect to which Diamond declines to extend credit, Image may elect, in its sole discretion, to assume that Account's credit risks by providing Diamond with written notice of such election.

6.	TITLE AND RISK OF LOSS; INVENTORY

(a)	Image shall retain title to Products until such title transfers to Image's Account in accordance with Image's Terms of Sale. Diamond shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal inventory shrinkage of, any Product during such time, provided that Image is not responsible for, and Diamond may insure against, any inventory shrinkage of any Product as a result of Diamond's negligence or any other damage to or destruction of any Product as a result of Diamond's negligence. Subject to the foregoing, Diamond shall, at Diamond's expense until the termination of the Agreement, add Image as an "additional insured" on its existing comprehensive property insurance. Notwithstanding the foregoing, Diamond shall be responsible for reduction in inventory due to normal inventory shrinkage, loss, or damage to the Products while in the custody or control of Diamond (i.e., excluding any damages reported by Accounts), in excess of the "Inventory Shrinkage Threshold" (as hereinafter defined), as calculated for each calendar year that this Agreement remains in effect. As used herein, "Inventory Shrinkage Threshold" means 2% of "Total Calendar Units" for such calendar year, provided, however, that (i) in calculating the Inventory Shrinkage Threshold, shortages shall be netted against overages of each Product, and (ii) units of Products missing for less than 45 days shall not be counted. As used herein, Total Calendar Units shall mean the total number of units of all Image Products held in inventory by Diamond at the start of the applicable calendar year plus the total number of units of all Image Products received by Diamond during such calendar year. In the event that it has been determined that the Inventory Shrinkage Percentage has been exceeded in any calendar year, Image shall receive a refund equal to (i) the number of "Short Units" (as hereinafter defined) multiplied by an amount equal to 10% of "Average Unit Retail Price" (as hereinafter defined). As used herein "Short Units" shall equal the number of units by which the Inventory Shrinkage Percentage has been exceeded in the applicable calendar year. As used herein, "Average Unit Retail Price" shall mean the average retail price of Total Calendar Units for the applicable calendar year.

(b)	Image shall be responsible for all personal property, inventory and other taxes associated with Products distributed by Diamond under this Agreement.

(c)	Diamond shall provide Image with reasonable access to perpetual inventory reports of Products stored in Diamond's Distribution Facilities.

(d)	Diamond will cooperate with Image in the execution of any financing statements or continuations or amendments to financing statements Image reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Diamond as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Image to file such financing statements in all filing offices Image reasonably deems appropriate, provided that Image provides Diamond with reasonable advance notice and copies of all such filings.

(e)	Diamond shall pick up from any Image supplier or printer located in the northeastern United States or southeastern Canada, and provided that Image gives Diamond at least fourteen (14) days prior notice.

(f)	Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect:

4856-2450-3186.2                                         8

(g)     Image will deliver to Diamond's distribution centers sufficient Products to meet the demand as estimated by Image from time to time after consultation with Diamond.

(h)     Diamond will not maintain in inventory books deemed as "hurts" and unsaleable in the normal course of business. Hurt books will be sold by Diamond at a price to be jointly agreed by Diamond and Image with the proceeds from such sale paid 60% to Image and 40% to Diamond.

(i)     Diamond will cooperate with Image in the execution of any financing statements or continuations or amendments to financing statements Image reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Diamond as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Image to file such financing statements in all filing offices Image reasonably deems appropriate, provided that Image provides Diamond with reasonable advance notice and copies of all such filings.

7.     BOOKS AND RECORDS, FINANCIAL INFORMATION. Diamond agrees to keep and maintain, at its executive offices, such full and accurate records (including books of account) as are reasonably necessary to determine rebates, discounts and other amounts which are contractually provided for hereunder. Diamond agrees to retain all such records for a period of two years after the end of the calendar year to which such records relate (the "Record Retention Period"). Once each year during the Term of the Agreement, Image or its authorized representative shall have the right to review such records for the previous year and to copy such records, provided, however, that any such review shall be undertaken solely for the purpose of verifying the accuracy of fee and other payment calculations by Diamond hereunder. Any such review shall require not less than 10 business days' notice to Diamond, shall be conducted at Diamond's executive offices during normal business hours, and shall be undertaken in such manner as to not disrupt or interfere with Diamond's normal business operations. Image hereby knowingly and intelligently waives its right to make any claim hereunder with respect payments made to, or services provided by, Diamond, for any year after the Record Retention Period for such year expires. Notwithstanding anything to the contrary set forth herein, Diamond shall not be required to provide to Image (i) any information in a form or manner that would require that Diamond breach a confidentiality agreement with a third party or; (ii) any information the disclosure of which to Image would violate any applicable law.

8.     ARTWORK. All artwork relating to Image and/or the Products to be used by Diamond in its catalogue, order form or any other marketing materials, shall be provided by Image in accordance with Exhibit A, Diamond shall affix on all such materials copyright and trademark notices provided by Image. Image hereby grants to Diamond a non-exclusive right, not subject to sublicense, assignment (subject to Diamond's rights to assign this Agreement to an affiliate of Diamond as set forth in Section 11 hereof) or transfer, to use such materials solely for promoting or marketing Image and/or the Products and Diamond's use thereof shall be for the benefit of Image. Diamond shall not have the right to prepare or commission any artwork using Image's characters, copyrights, trademarks, and/or Products, nor shall Diamond have the right to use Image's artwork, characters, copyrights and trademarks in any manner other than as expressly provided herein.

9.     NOTICES. All notices required to be sent pursuant to this Agreement shall be in writing and deemed given when sent by prepaid certified mail return receipt requested, or by other form of prepaid

4856-2450-3186.2                                      9

receipted delivery, to the respective parties at the following addresses (or at such other address as a party may specify by notice to the other):

>Image Comics, Inc.
>215 SE 9th Avenue, Suite 108
>Portland OR 97214
>Attention: Eric Stephenson, Publisher
>
>Diamond Comic Distributors, Inc.
>10150 York Road, Suite 300
>Hunt Valley, MD 21030
>Attention: Charles Parker, President

10.   ASSIGNMENT. The Agreement shall be binding on Image and any successors to the business of Image. Subject to Image's right to terminate following a Change in Control, Diamond shall have the right to assign the Agreement to any successor to Diamond, and the Agreement shall be binding on any successor to the common stock. Diamond shall also have the right to assign the Agreement to any affiliate of Diamond (i.e., an entity controlled by, controlling or under common control with, Diamond) organized for the purpose of performing distribution activities which succeeds to substantially all of the operating distribution personnel, property, rights and assets of Diamond related to its distribution operations and any such assignment shall not constitute a Change in Control hereunder.

11.   ENTIRE AGREEMENT; HEADINGS; MODIFICATION. This instrument constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes all other prior oral and written representations, agreements, or understandings between them. All Section headings are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. This Agreement may not be modified, altered or changed except by an instrument in writing signed by both parties.

12.   WAIVER. No waiver of any term or condition of this Agreement, or of any breach of this Agreement or of any part thereof shall be deemed a waiver of any other terms or conditions of the Agreement, or of any later breach of the Agreement or of any part thereof. No such waiver shall be effective unless in writing signed by the waiving party. The failure of either party to enforce any of its rights under this Agreement at any time or for any period of time shall not be construed as a waiver of such rights or any other rights.

13.   APPLICABLE LAW. This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein.

14.   COUNTERPARTS. This Agreement may be executed in separate counterparts, none of which need contain the signatures of all parties, each of which shall be deemed to be an original, and all of which taken together constitute one and the same instrument. Telecopied or facsimile signatures shall be deemed to have the same effect as an original.

**IN WITNESS WHEREOF,** Diamond and Image have executed this Agreement as of the day and year first above-written.

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

    Name: CHARLES PARKER

    Title: President

IMAGE COMICS, INC.

By: _____

    Name:

    Title:

ERIC STEPHENSON
PUBLISHER / CCO

EXHIBIT A

SERVICES - BOOK MARKET

Diamond agrees to exercise its best efforts in the performance of the following services in the Book Market on behalf of Image during the term of the Agreement. Unless otherwise specified in the Agreement or herein, (a) all terms used herein to describe services shall have the meaning customarily ascribed to them in the business of distributing Products to Book Sellers; and (b) Diamond shall receive no fee or other compensation for any such Services. Diamond acknowledges that the following list of services is intended to cover the principal services provided by Diamond to Image but is not intended to be exhaustive. Diamond agrees to continue providing any incidental services currently provided by Diamond to Image except as may otherwise be specified in this Agreement.

SERVICES

1. Diamond will provide Image with confidential web access to daily updated data maintained by Diamond with respect to Image sales, inventory and returns data by units and by dollars, and will provide Image with a blank data field for its use. The data will include but is not limited to: current sales by title by ISBN; sales by customer; and inventory and back order reports, and shall be updated daily and provided in formats reasonably approved by Image.

2. Diamond will employ such sales representatives which, in Diamond's sole discretion, are necessary and who are knowledgeable and experienced in the wholesale and retail sales of books, and who shall be the employees and agents of Diamond, and not of Image.

3. Based on directions from Image, Diamond will provide guidance to Image on key selected new titles, including sales, marketing, and promotion support.

4. Notwithstanding anything to the contrary set forth in this Exhibit A to the extent that the distribution of marketing and related materials in a digital format becomes customary in connection with sales to Book Sellers in the Territory, Diamond shall have the right to distribute any marketing or related materials provided for hereunder in a digital format, provided, that the Basic Book Market Services set forth herein are provided to Image to the extent reasonably practicable in such digital format.