IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.¹ | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 196, 197, 198, 245** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF (A) DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING KEY EMPLOYEE INCENTIVE PROGRAM AND KEY EMPLOYEE RETENTION PROGRAM AND (B) DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO FILE UNDER SEAL CERTAIN UNREDACTED EXHIBITS TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING KEY EMPLOYEE INCENTIVE PROGRAM AND KEY <u>EMPLOYEE RETENTION PROGRAM</u>**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by and through their undersigned counsel, submit this omnibus reply (the "<u>Reply</u>") in support of *Debtors' Motion for Entry of an Order Approving Key Employee Incentive Program and Key Employee Retention Program* [D.I. 196] (the "<u>KEIP/KERP Motion</u>") and *Debtors' Motion for Entry of an Order Authorizing the Debtors to File Under Seal Certain Unredacted Exhibits to the Debtors' Motion for Entry of an Order Approving Key Employee Incentive Program and Key Employee Retention Program* [D.I. 197] (the "<u>Sealing Motion</u>")² and in response to the United States Trustee's (the "<u>U.S. Trustee</u>") objection thereto (the "<u>Objection</u>") [D.I. 245].

---

¹ The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

² Capitalized terms not defined herein shall have the same meaning as ascribed to them in the KEIP/KERP Motion or Sealing Motion

55291424.3

In further support of the KEIP/KERP Motion and Sealing Motion, the Debtors submit the Supplemental Declaration of Robert Gorin (the "Supplemental Gorin Declaration") filed contemporaneously herewith, and respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Debtors readily acknowledge that matters of increased compensation and public access are, rightly, areas of focus for the U.S. Trustee and the Official Committee of Unsecured Creditors (the "Committee"). The Debtors are happy to report that they have reached an agreement to resolve the Committee's concerns via modifications to the KEIP, as set forth in **Exhibit A** attached hereto.

2. The KEIP, as now modified, has been a vital tool to incentivize the KEIP Participants to take on the heavy lift of a bankruptcy marketing and sale process in addition to their regular duties. The Objection to the KEIP flows from a misunderstanding of the triggering thresholds. The incentive thresholds in the KEIP are by no means guaranteed to occur, but the diligent efforts of KEIP Participants have given the Debtors the best chance for a value-maximizing sale and, in fact, have resulted in a value-maximizing sale for the Debtors' estates.

3. Further, the KEIP and KERP Participants knew about, and relied upon, the programs for months leading up to the filing of the KEIP/KERP Motion. Notably, the Debtors have lost other top employees, but none targeted by the KERP, which is having its intended retentive effect. The Debtors must retain the KERP Participants through closing on the sale to the successful purchaser(s) of assets, and to wind down and liquidate any remaining assets.

4. In addition, the primary relief sought in the Sealing Motion is warranted: the KEIP and KERP Participants' names, titles and base salaries are confidential commercial information. Disclosure of this information would assist competitors during the sensitive sale process, and even

the limited information disclosed has already caused distraction and lowered employee morale among the existing employees. For these reasons, the relief requested in the KEIP/KERP Motion and Sealing Motion is appropriate and warranted in these chapter 11 cases.

**REPLY**

I. **The Sealing Motion Must Be Granted**

    A. **The Sealing Motion Seeks to Redact Confidential Commercial Information to Prevent Poaching and Employee Distraction**

5. The Sealing Motion requests that the names, titles and salaries of the KEIP and KERP Participants be redacted. This is confidential commercial information, and must remain confidential during the pendency of this bankruptcy to protect the privacy of the employees and the Debtors against poaching from competitors and from distracting non-Participant employees from their ordinary job duties. Disclosure of the KEIP and KERP Participants' names, titles and salaries provides competitors with the exact roadmap needed to provide an incentivizing employment offer to the Debtors' key employees. Outside the context of a bankruptcy case, the Debtors would never publicly disclose the compensation details for their key employees. The relief requested in the Sealing Motion protects the Debtors from competitors using the information in the KEIP/KERP Motion to poach key employees during the pending sale process.

6. In a company the size of the Debtors, job titles are easily traced to an employee's name, so disclosure of either is akin to disclosure of both names and titles. The redactions requested in the Sealing Motion are reasonable and consistent with the information typically redacted or kept out of the public record in similar motions. *See In re ESCO, Ltd.*, Case No. 23-12237 (DER) (Bankr. D. Md. May 16, 2023) [D.I. 213] (approving a KERP where the underlying motion noted only the average individual KERP award and not the names, salaries or job titles of recipients); *In re Conn's, Inc.*, Case No. 24-33357 (ARP) (Bankr. S.D. Tex. Oct. 6, 2024) [D.I.

3

457, 777] (approving a KEIP where all KEIP information was filed under seal); *In re Exactech, Inc.*, Case No. 24-12441 (Bankr. D. Del. Jan. 29, 2025) [D.I. 507] (order authorizing debtors to redact all information about a KEIP except participant job titles); *In re Edgio, Inc.*, Case No. 24-11985-KBO (Bankr. D. Del. Oct. 28, 2024) [D.I. 310] (order authorizing debtors to redact names and bonus amounts for KEIP and KERP participants); *In re Gritsone Bio, Inc.*, Case No. 24-12305-KBO (Bankr. D. Del. Nov. 12, 2024) [D.I. 149] (order authorizing debtors to file all KEIP information under seal).

7. Even the limited information disclosed thus far has led to the Debtors' employees trying to reverse-engineer the incentive payments to determine who is a KEIP or KERP Participant and created frustration and angst among the Debtors' workforce. Public disclosure of all the details relating to KEIP and KERP will lead to further distraction and even more decline in employee morale at a time when the Debtors need their employees focused on operating the business through the sale closing date and working to ensure a smooth transition to the successful purchaser.

8. The courts referenced above accurately recognize that names, job titles and bonus amounts are confidential commercial information and that public disclosure of that information can harm a bankruptcy debtor. These other courts—and the Debtors in these case—seek to strike an appropriate balance by keeping this information out of the public record but providing it to the relevant parties in interest.

B. **The Sealing Motion Reasonably Restricts Information to the Relevant Parties-in-Interest**

9. The Debtors never sought to restrict access of the redacted information from all other parties. The Debtors shared the unredacted versions of the KEIP and KERP with the primary constituents in these cases: the Committee, the DIP lender, the Court and the U.S. Trustee.

55291424.3

10. The Objection alleges that the redacted information should be public because employee names were listed on the schedules. Disclosure of employees' names on the schedules is very different from disclosure of a select group of KEIP and KERP Participants and their respective salaries.

11. The Debtors have not received comments or questions about the KEIP/KERP Motion from any parties-in-interest that did not receive unredacted information, demonstrating that no other parties wish to oppose the motion.

12. The parties with the most direct interest in the propriety of the KEIP and KERP have not questioned the basis of the KEIP or KERP because of the identities of the parties, or the amount of their base salary.

13. Moreover, the key information regarding the KEIP and KERP plans, the proposed payment amounts and milestones, are available to all interested parties.

II. **The KEIP/KERP Motion is Vital to an Orderly Disposition of the Debtors' Property**

    A. **Proposed KEIP Modifications**

14. Subject to the Court's approval, and by agreement with the Committee, the Debtors' proposed KEIP has been modified to the form set forth in **Exhibit A** hereto.

    B. **Employees Relied on the Promise of the KEIP/KERP Motion During the Sale Process**

15. The Objection alleges the KEIP/KERP Motion was filed too late. Courts have recognized that employees may rely on the promise of a KEIP or KERP even if the conduct to be incentivized occurs prior to the approval of the KEIP or KERP. In *In re Legacy EJY, Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. Sept. 26, 2022), the U.S. Trustee objected to a key employee incentive plan in part because the plan included a triggering payment arising from an already-

completed sale. That court rejected the U.S. Trustee's argument, holding that the challenged "KEIP award incentivized the participation to obtain a hundred-percent payout for creditors." *Id.* at [D.I. 471], Hr'g Tr. at 70:4–8.

16. Here, the KEIP and KERP Participants were informed, and knew that the Debtors would seek approval of these plans long before the KEIP/KERP Motion was filed, and relied on that knowledge.

17. While the Debtors and their professionals were tailoring the KEIP and KERP to maximize their efficacy for the estates, the KEIP Participants were doing significantly more than merely sticking around. These employees were selected out of a total of 487 employees because they were taking on meaningful additional tasks to drive the sale process and maximize value accordingly.

18. These employees were instrumental in the stalking horse APA coming together in the first place. Though the Debtors did not file the KEIP/KERP Motion until later in the case, these employees were identified early on and assured that the Debtors would seek approval of incentive bonuses. Without such assurance, and without these incentives, these parties would not have been willing to take on the significant additional burdens of gathering information, addressing diligence requests, and other tasks necessary to drive the sale effort.

19. Many of these employees continue to receive other employment offers, so their commitment to assist with the sale process and drive value, even with a stalking horse offer on the table, is not a given. This is supported by some recent employee departures resulting from the uncertainty of the bankruptcy process.

20. Likewise, the KERP Participants were carefully selected to include the employees necessary to close on any sale and to liquidate inventory and wind down any divisions of the

55291424.3

Debtors that are not sold via the pending sale process. The KERP Participants were assured that relief substantially like the Debtors' proposed KERP would be forthcoming. The KERP Participants thus relied on the KEIP/KERP Motion even before it was filed.

21. The Objection questions whether the KEIP/KERP Motion was filed too late, but the KEIP and KERP structures were known, and relied upon, by the affected employees for months. It was only by discussing these structures that the Debtors incentivized the KEIP Participants to perform the extraordinary work of the value-maximizing sale process, and retained the most crucial employees for the sale process and a potential wind-down.

C. **Only Three KEIP or KERP Participants are Insiders**

22. The Objection alleges that there are more insiders slated to receive compensation under the KEIP/KERP Motion than the three acknowledged insiders. This is not so; other employees merely have insider-like job titles.

23. Any person holding an officer's title is presumptively an officer and thus an insider, but "[j]ust as there may be non-statutory insiders that fall within the definition of an insider but are outside of the enumerated categories, there may be persons that fall within the enumerated categories but do not meet the definition of the category." *In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009); *see also Off. of U.S. Tr. v. Fieldstone Mortg. Co.*, No. CCB-08-755, 2008 WL 4826291, at *5 (D. Md. Nov. 5, 2008) ("[w]here ... the defendant's status as a director or officer is disputed, some inquiry beyond the defendant's title will ordinarily be required.") (*quoting In re Pub. Access Technology.Com, Inc.*, 307 B.R. 500, 506, n.5 (E.D. Va. 2004)). In addition, in *Foothills Texas*, the Court held that "[a] party seeking to rebut that presumption must present evidence sufficient to establish that the person holds the [enumerated

55291424.3

title] in name only and, in fact, does not meet the substantive definition of the same, i.e., he or she is not taking part in the management of the debtor." *Id.* at 574–75.

24. First, the Objection refers to individuals who have C-suite and "vice president" titles. As stated in the Gorin Declaration attached to the KEIP/KERP Motion, the KERP participants with insider-like job titles "do not have access to strategic inside information, enjoy special privileges within the Debtors' corporate hierarchy or have the ability to influence the direction of the Debtors' business operations. Given each KERP Participant's limited scope of authority, and without diminishing the crucial services that these employees provide to the Debtors, the Debtors do not believe that these individuals should be considered insiders vis-à-vis the Debtors." Gorin Declaration ¶ 16. As non-insiders, the KERP Participants are all permitted to participate in the KERP.

25. Second, the true insiders are KEIP Participants and not KERP Participants. Insiders may participate in the KEIP if, as here, the KEIP is justified under the facts and circumstances of the case.

   **D.**  **The KEIP Incentivizes Value-Maximizing Sales**

26. The Objection alleges that the KEIP targets will be easily met, so it does not have an incentivizing effect.

27. A KEIP may be proper if it incentivizes consideration in excess of a stalking horse bid. *See In re CST Indus. Holdings Inc.*, No. 17-11292 (BLS) (Bankr. D. Del. Oct. 13, 2017) [D.I. 629] (approving a KEIP with a threshold payment set at the total consideration of the stalking horse bid); *In re RadioShack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Mar. 4, 2015) [D.I. 811] (same).

28. "Whether incentive targets require management to 'stretch' to meet performance goals is fundamentally a factual question." *In re Velo Holdings Inc.*, 472 B.R. 201, 207 (Bankr. S.D.N.Y. 2012) (holding that the KEIP was appropriate based on the evidence because the DIP budget and sales targets required all key employees to "stretch" to achieve the targets).

29. The Objection misapprehends the triggering targets. The KEIP targets are based on net cash values in the sale—a number that does not include break-up fees or expense reimbursements for the stalking horse. The net cash from the sale is subject to significant adjustments, including deductions for average net working capital, cure amounts paid by the purchaser, and accounts payable to critical vendors as of the closing date. Given these adjustments, the stalking horse bid may not trigger any of the KEIP targets.

30. In connection with the Debtors' sale process, the Debtors received, and qualified, several bids after the bid deadline. Ultimately, the stalking horse bid was not the successful bid at the Debtors' auction. *See Notice of Designation of Successful Bidder and Back-Up Bidder* [D.I. 270]. Accordingly, the Debtors submit that the qualified bids produced a higher and better offer than the stalking horse bid, demonstrating that the efforts of the Debtors' employees—including the KEIP Participants—contributed to a value-maximizing sale process.

31. The KEIP targets include incentives for sales of assets outside the Alliance division, if the net proceeds of those sales exceed certain amounts. The stalking horse bid is for the Alliance assets only. Payment of incentives on account of the non-Alliance assets is the exact opposite of a done deal; if the sale with the successful bidder closes and these assets are sold, then it will be due to the hard work of the KEIP Participants.

32. The sale of Debtors' assets represents the culmination of a months-long sale process during which time the KEIP Participants labored on additional tasks such as working to gather

information needed in response to numerous information requests from various bidders, responding to due diligence requests, preparing materials and analyses requested by various potential bidders, working with the Debtors' counsel and other professionals to complete APA schedules, and meeting with representatives from potentially interested parties, all while continuing to perform their ordinary job responsibilities.

33. Notably, the U.S. Trustee's Objection does not allege that the KEIP is inappropriate or excessive given the KEIP Participants' responsibilities or current salaries. The entire Objection rests on the idea that the KEIP targets are easy to meet, so the KEIP has no incentivizing effect and is only a disguised retention plan.

34. Instead, the KEIP and the inherent uncertainties of such a complex sale process have the opposite effect: the only way that KEIP Participants can ensure they receive the maximum payout under the KEIP is to run the business and sale process to generate as high a sale price as possible, to ensure that the net cash exceeds the highest KEIP threshold.

35. The KEIP's primary effect is to incentivize value-maximizing work, and the KEIP thresholds represent millions of incremental dollars in sale proceeds for the Debtors' estates. The KEIP is appropriate under the circumstances and must be approved.

E. **The KERP is Necessary to Retain Employees**

36. The Objection alleges that the KERP seeks to retain the KERP Participants for only a short time. As discussed above, the KERP Participants have relied on a forthcoming KERP for months and have remained with the Debtors through this bankruptcy because of it.

37. Further, the Debtors have a need to retain the KERP Participants through the sale closing, not just the auction. These employees were selected because their knowledge and experience with the Debtors was necessary to get to and accomplish a successful closing. If these

employees depart, even in the anticipated short window between a hearing on the KEIP/KERP Motion and the anticipated closing, the departure could have serious negative impacts on the Debtors' business.

38. In fact, the Debtors have lost three important employees since the filing of the KEIP/KERP Motion—none of whom were KERP Participants. This demonstrates that the Debtors' employees are indeed taking other jobs and leaving the Debtors on short notice. It also shows that the KERP is having its intended effect in retaining the employees the Debtors simply cannot afford to lose.

39. The Debtors have additional concerns, as they know that some employees are currently interviewing with other potential employers. Further, there is no reason why crucial employees might not leave without another offer, given the inherent short-term nature of their current employment.

40. The time for which the Debtors seek to incentivize these employees is not just the time between the filing of the KEIP/KERP Motion and the closing on any sale, but is rather the time leading up to the chapter 11 filing and the negotiation of the stalking horse APA, through the closing on the sale of assets. Without assurances that the Debtors would seek approval of a KERP, the KERP Participants might leave the Debtors' employ.

41. The KERP is appropriate and necessary under the circumstances to retain the KERP Participants and ensure continuity of the Debtors' operations through the closing on a sale. The KERP must be approved.

55291424.3

**Conclusion**

WHEREFORE, the Debtors respectfully request the entry of a revised Proposed Order, approving the KEIP, as modified herein, and approving the KERP, and granting the Sealing Motion, and for such further relief as is just and proper.

Dated: March 26, 2025                            **SAUL EWING LLP**

                                                   By: */s/ Jordan D. Rosenfeld*
                                                       Jordan D. Rosenfeld (MD Bar No. 13964)
                                                       1001 Fleet Street, 9th Floor
                                                       Baltimore, MD 21202
                                                       Telephone: (410) 332-8600
                                                       Email: jordan.rosenfeld@saul.com

                                                       -and-

                                                       Jeffrey C. Hampton (admitted *pro hac vice*)
                                                       Adam H. Isenberg (admitted *pro hac vice*)
                                                       Turner N. Falk (admitted *pro hac vice*)
                                                       1500 Market Street, 38th Floor
                                                       Philadelphia, PA 19102
                                                       Telephone: (215) 972-7777
                                                       Email: jeffrey.hampton@saul.com
                                                                      adam.isenberg@saul.com
                                                                      turner.falk@saul.com

                                                       -and-

                                                       Mark Minuti (admitted *pro hac vice*)
                                                       Paige N. Topper (admitted *pro hac vice*)
                                                       Nicholas Smargiassi (admitted *pro hac vice*)
                                                       1201 N. Market Street, Suite 2300
                                                       Wilmington, DE 19801
                                                       Telephone: (302) 421-6800
                                                       Email: mark.minuti@saul.com
                                                                     paige.topper@saul.com
                                                                     nicholas.smargiassi@saul.com

                                                       *Counsel for Debtors and Debtors in Possession*

55291424.3