**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 196** |

**SUPPLEMENTAL DECLARATION OF ROBERT GORIN IN**
**SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**APPROVING KEY EMPLOYEE INCENTIVE PROGRAM**
**AND KEY EMPLOYEE RETENTION PROGRAM**

I, Robert Gorin, hereby declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have been engaged as the Debtors' CRO since July 17, 2024, and before that provided financial advisory services to the Debtors since March 7, 2024. Through such capacities, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      On March 6, 2025, I signed and submitted a *Declaration of Robert Gorin in Support of Debtors' Motion for Entry of an Order Approving Key Employee Incentive Program and Key Employee Retention Program* (the "Original Declaration").

3.      To the best of my knowledge, the information contained in my Original Declaration remains true and correct.

---

[1]   The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

4.     I submit this Supplemental Declaration in further support of the *Debtors' Motion for Order Approving Key Employee Incentive Program and Key Employee Retention Program* (the "KEIP/KERP Motion").[2]   Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, and my personal knowledge and experience.  If I were called upon to testify, I could and would testify to each of the facts set forth below.

5.     Based upon discussions and negotiations with the Official Committee of Unsecured Creditors (the "Committee"), the proposed KEIP was revised in several ways.  First, certain of the proposed payments to several of the KEIP participants were lowered, such that total payments under the proposed KEIP, if earned, range from $547,750 to $1,098,250 and individual participant payments under the proposed KEIP range from $5,000 to $272,250.

6.     Second, an additional payment and milestone was added for five KEIP participants tied to the closing of a sale of the Non-Alliance assets at a price of $15 million or more.

7.     Further, language has been added to the proposed order approving the KEIP/KERP Motion to make clear that (a) two employees, who would otherwise be entitled to similar bonuses under employment contracts if such contracts were assumed and assigned, cannot "double-dip" and receive two incentive payments if their employment contracts are assumed and assigned to a buyer; (b) the Debtors, in their discretion, may reallocate forfeited incentive/retention payments under either plan to other participants, after consultation with the Committee; (c) the bonus milestones in the KEIP are tied to the "net" cash value received by the Debtors after any deductions for the sale or other disposition of the Debtors' assets; (d) plan participants must waive entitlement

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

to receive severance, if any, in order to receive payments under either plan; and (e) the Debtors will notify the Committee of payments made under either plan.

8.    Based upon the above changes, it is my understanding that the Committee does not object to, and supports, both the KEIP and the KERP.

9.    I read the *United States Trustee's Opposition to Debtors' Motions for Entry of Orders (A) Approving Key Employee Incentive Program and Key Employee Retention Program and (B) Authorizing the Debtors to File Under Seal Certain Unredacted Exhibits to the Same* [D. I. 245] (the "UST Objection") and, respectfully, disagree with the positions and arguments set forth in the UST Objection.

10.    First, and while I am not a lawyer, only three of the participants in the KEIP are "insiders" as I understand that term.  To my knowledge, the balance of the KEIP participants and all of the KERP participants are not board members, do not participate in corporate governance, do not attend board meetings or report to the board.  Most participants in either plan report to intermediate managers and perform duties limited to specific divisions of the Debtors.  Other than the three insiders who are noted, none of the plan participants are involved in the strategy or direction of the Debtors' Chapter 11 Cases.

11.    I disagree with the United States Trustee's (the "UST") argument that the "KEIP is actually a disguised KERP."  *See* Objection, p. 10.  In designing the KEIP, our goal was to develop a plan that would incentivize key employees to go "above and beyond" to maintain the operations of the Debtors' businesses and, at the same time, help maximize value through the sale process. For these reasons, the proposed milestones in the KEIP are tied to achieving the highest and best value for the Debtors' assets.

55315862.2

12.    The UST is wrong to suggest that the milestones in the KEIP were or are "virtually guaranteed" or that payments under the plan are a "*fait accompli*." *See* Objection, pp. 14 and 17. First, the KEIP milestones are tied to the net cash proceeds received from sales of the Debtors' assets, not the gross purchase price. Further, the Stalking Horse Agreement with Universal Distribution, Inc., was subject to adjustment. Moreover, KEIP plan participants will only receive plan payments if the Debtors close on the sale of their assets.

13.    The outside closing date for the sale of the Debtors' assets is April 10, 2025, subject to extension by mutual agreement. The continued efforts and support of the KEIP plan participants is needed to get to a closing by April 10, 2025 or later.

14.    I began to discuss and formulate both the KEIP and KERP in late October, early November of 2024. At or about this time, affected employees were informed, generally, that the Debtors would finalize and seek Court approval of such plans. By February of 2025, the plan participants were notified of the proposed terms of the plans.

15.    Each of the employees under the plans were selected because they are critical to the Debtors' operations and the Debtors' sale process. The plans cover only 40 of the Debtors' 487 employees.

16.    Given the challenges facing the Debtors' businesses, the time needed to devote to the various tasks inherent in the Chapter 11 process and the attention needed to the sale process, the Debtors were simply unable to file the KEIP/KERP Motion until early March. The plan participants should not be penalized by the timing of the filing of the motion.

17.    Based upon my own observations, actual and threatened employee departures and discussions with the plan participants and other members of the Debtors' management, I believe that the plan participants relied upon the Debtors' commitment to pursue Court approval of the

plans and there is no doubt in my mind that the KEIP incentivized participants to make the sale process for the Debtors' assets a success and, in the case of the KERP, helped to retain those critical employees. Given the outstanding results of the Debtors' Auction and sale process, there is no question in my mind that the plans achieved their desired goals and have and will provide tremendous benefit to the Debtors' estates.

18.    Finally, I disagree with the UST's suggestion that the KERP is designed to "funnel money that could otherwise be going to creditors, to key employees." *See* Objection at p. 18. Again, the KERP was specifically designed to retain the employees that were critical to maximizing value through the Debtors' sale process. The outstanding result of the Auction is the best evidence that the KERP will be money well spent when the sale closes.

19.    For these reasons, and the reasons described in the KEIP/KERP Motion, I believe that the KEIP and KERP, as modified based upon discussions with the Committee, represent a valid exercise of the Debtors' business judgment and I would encourage the Court to approve the KEIP/KERP Motion.

20.    I further believe that the names, titles and salaries for the individual KEIP and KERP Participants should remain redacted. In particular, I disagree with the UST's position that such information should be publicly disclosed. This information is confidential commercial information that if disclosed would provide competitors with all the necessary information to poach the Debtors' employees. The Debtors operate in an industry that is built on vendor and customer relationships. Disclosing the names, titles and salaries for the KEIP and KERP Participants would provide competitors with the identities of the Debtors' key personnel as well as a roadmap for the compensation and benefits needed to entice the employees to resign from their positions with the Debtors during a critical time in these chapter 11 cases. Notably, given

5

the size of the industry and the Debtors' prominence in the industry, disclosure of the KEIP and KERP Participants' titles is equivalent to disclosing the names of the individuals.

21.    The U.S. Trustee is incorrect in stating that "[d]isclosing names, title and salary would have no impact on the sale."  Objection at p. 8.  The KEIP and KERP Participants are essential to the Debtors' operations through the sale closing and will be integral in ensuring the smooth transition of the Debtors' businesses.  If the KEIP and KERP Participants were to resign as a result of their information being disclosed, then the Debtors' ordinary course business operations would be disrupted.  The Debtors' vendor relationships may also suffer should the Debtors' key employees that maintain those relationships resign.  I believe disclosure of the KEIP and KERP Participants' names, titles and salaries would be detrimental to the Debtors' estates and could result in material adverse effects on the Debtors' sale process.

22.    In addition, I believe that disclosing the names, titles and salaries for the individual KEIP and KERP Participants will result in a significant decline of employee morale, which could further disrupt the Debtors' business operations to the detriment of the estates and creditors.  The Debtors' employees have legitimate privacy interests with respect to the redacted information, and I believe that the disclosures as requested by the U.S. Trustee are directly at odds with the employees' interests. Even with the redactions to the KEIP and KERP, many employees were upset with the disclosure of the Incentive Payments in the KEIP/KERP Motion,  believing that the disclosures made were sufficient to disclose the employee's identity.  Several employees expressed their frustration and angst to the Debtors.  Based on the response to the KEIP/KERP Motion in its redacted form, I believe that disclosure of the KEIP and KERP in their entirety may result in key employees resigning immediately.

55315862.2

23.     For the foregoing reasons, I believe that the names, titles and salaries for the KEIP and KERP Participants should remain redacted, and I would request the Court approve the Debtors' motion to seal the KEIP/KERP Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated: March 26, 2025                           */s/ Robert Gorin*_____
                                                Robert Gorin
                                                Co-Chief Restructuring Officer