**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF PAUL NAVID IN SUPPORT OF SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO ALLIANCE ENTERTAINMENT, LLC

Paul Navid, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a partner of Province, LLC ("Province"), investment bankers to Alliance Entertainment, LLC ("AENT"). I submit this Declaration in support of the sale of substantially all assets of the Debtors' to AENT.

2.      Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge, information learned from my review of relevant documents, information supplied to me from other partners or employees of Province, AENT or its advisors, professionals representing the Debtors in these cases, or my opinion based on my knowledge, experience and information concerning AENT, the Debtors, or the Debtors' cases. I am authorized to submit this Declaration on behalf of AENT. If called to testify, I could and would testify competently to the matters set forth in this Declaration.

3.      I have served as an investment banker or financial advisor to purchasers, debtors and creditors' committee in over 50 chapter 11 cases throughout the United States. I received a B.S.B.A. degree with a concentration in finance from the University of Southern California Marshall School of Business. Prior to joining Province, I worked as an investment banker for The

---

[1]     The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

Spartan Group LLC, and Breakwater Management LP, and was a financial director for RookMedia.

4.       Attached hereto as **Exhibit A** is a true and correct copy of AENT's asset purchase agreement (the "AENT APA"). The AENT APA represents AENT's bid for substantially all of the Debtors' assets, as revised to meet the demands of the Debtors made after the Auction concluded.

5.       The AENT APA underwent several revisions since the conclusion of the auction conducted by the Debtors on March 24-25, 2025 (the "Auction"). Substantially all revisions to the AENT APA were made in response to various demands by the Debtors since the Auction concluded. The AENT APA satisfies every demand made by the Debtors. The chart attached hereto as **Exhibit B** describes each of the Debtors' post-Auction demands and how they are satisfied in the AENT APA.

6.       As detailed below, the AENT APA has a total consideration value to the Debtors' estates of roughly $85.37 million, of which, $61.61 million is estimated to be in cash at closing.

| Calculation of the Purchase Price - Based on 3/14 BBC | | | $ |
|---|---|---|---|
| **Alliance Gaming Business Assets** | | | |
| (i) the Alliance Gaming Purchase Price | | $ | 36,865,000 |
| minus (ii) Average Net Working Capital | | $ | (6,770,735) |
| plus (iii) the Closing Inventory Value @ 90% | | $ | 9,047,810 |
| plus (iv) the Closing A/R Value @ 90% | | $ | 3,144,875 |
| minus (v) Cures | | $ | (5,968,538) |
| **Alliance Gaming Business Assets Total** | (Cash) | $ | **36,318,412** |
| **Lot B Structure** | | | |
| Cash Consideration | (Cash) | $ | 21,000,000 |
| Incentive Payment (Est.) | | $ | 9,000,000 |
| **Lot B Total** | | $ | **30,000,000** |
| **Alliance + Lot B Total** | | $ | **66,318,412** |
| Plus: Assumed Liabilities | | $ | 5,968,538 |
| Less: Bid Protections to Stalking Horse | | $ | (1,365,000) |
| Additional Liabilities - DCD Open Orders | | $ | 4,990,955 |
| Additional Liabilities - AGD Open Orders | | $ | 5,160,252 |
| Prepaid Inventory (As of 3/7) - AGD @ 90% | (Cash) | $ | 4,294,897 |
| **Total Consideration** | | $ | **85,368,053** |
| **Cash At Closing** | | $ | **61,613,309** |

7.      The Court should be aware that the total value of the AENT APA increased by $14,400,000 since the Auction concluded, as a result of the Debtors' demands that AENT include additional economic terms that were neither a part of AENT's original bid nor discussed on the record at the Auction.

8.      I believe the AENT APA maximizes the value of the Debtors' assets for the benefit of their estates and creditors, and is the highest and best bid for the Debtors' assets. I respectfully submit that the Court should approve the sale of the Debtors' assets to AENT on the terms set forth in the AENT APA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 4, 2025                                    *Navid*

                                                        Paul Navid

-3-

13069266 v3

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 4th day of April 2025, notice of filing the

Declaration of Paul Navid in Support of Sale of Substantially All of the Debtors' Assets to

Alliance Entertainment, LLC was served by CM/ECF to those parties listed on the docket as

being entitled to such electronic notices, which parties are identified on the attached service list.


        /s/ Jonathan A. Grasso
Jonathan A. Grasso

**The following parties received CM/ECF notice of the filing:**

Jan Berlage, Esquire
(jberlage@ghsllp.com)
Counsel for Katherine Govier
Gohn, Hankey & Berlage, LLP
201 North Charles Street, Suite 2101
Baltimore, Maryland  21201

Hugh M. Bernstein, Esquire
(hugh.m.bernstein@usdoj.gov)
Office of U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Daniel Jack Blum, Esquire
(jack.blum@polsinelli.com)
Counsel for Basic Fun, Inc.
Polsinelli PC
1401 I Street NW, Suite 800
Washington, D.C.  20005

Laura Skowronski Bouyea, Esquire
(lsbouyea@venable.com)
Counsel for AIREIT Olive Branch DC LLC
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland  21202

Thomas K. Bredar, Esquire
(thomas.bredar@wilmerhale.com)
Counsel for Disney and Marvel
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center, 250 Greenwich St.
New York, New York  10007

Andrew Brown, Esquire
(abrown@klestadt.com)
Counsel for NECA, LLC
Klestadt Winters Jureller Southard &
Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York  10036-7203

Richard L. Costella, Esquire
(rcostella@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

David W.T. Daniels, Esquire
(ddaniels@perkinscoie.com)
Counsel for The Pokemon Company
Perkins Coie LLP
700 13th St NW, Suite 600
Washington, D.C.  20005

Turner Falk, Esquire
(turner.falk@saul.com)
Counsel for Debtors
Saul Ewing LLP
1500 Market Street
Center Square West, 38th Floor
Philadelphia, Pennsylvania 19102

Justin Philip Fasano, Esquire
(jfasano@mhlawyers.com)
Counsel for Dynamic Forces, Inc.
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  22070

Ashley N. Fellona, Esquire
(ashley.fellona@saul.com)
Counsel for Debtors
Saul Ewing LLP
1001 Fleet Street, 9th Floor
Baltimore, Maryland  21202-4359

Gianfranco Finizio, Esquire
(gfinizio@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York  10020

Adam Fletcher, Esquire
(afletcher@bakerlaw.com)
Counsel for Image Comics, Inc.
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio  44114-1214

Chelsea R. Frankel, Esquire
(cfrankel@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler LLP
1271 Avenue of the Americas
New York, New York  10020

Stephen B. Gerald, Esquire
(sgerald@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
200 Continental Drive, Suite 401
Newark, Delaware  19713

Christopher J. Giaimo, Esquire
(christopher.giaimo@squirepb.com)
Counsel for Blue Yonder, Inc.
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, D.C.  20037

Jonathan A. Grasso, Esquire
(jgrasso@yvslaw.com)
Counsel for Alliance Entertainment, LLC
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Zvi Guttman, Esquire
(zvi@zviguttman.com)
Counsel for NECA, LLC
The Law Offices of Zvi Guttman, P.A.
P. O. Box 32308
Baltimore, Maryland  21282

Jeffrey C. Hampton I, Esquire
(jeffrey.hampton@saul.com)
Counsel for Debtors
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102

Adam H. Isenberg, Esquire
(adam.isenberg@saul.com)
Counsel for Debtors
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102

Toyja E. Kelley, Sr., Esquire
(toyja.kelley@lockelord.com)
Counsel for JPMorgan Chase Bank, N.A.
Troutman Pepper Locke LLP
701 8th Street N.W., Suite 500
Washington, D.C.  20001

C. Kevin Kobbe, Esquire
(kevin.kobbe@us.dlapiper.com)
Counsel for Renegade Games, et al.
DLA Piper LLP (US)
650 South Exeter Street, Suite 1100
Baltimore, Maryland  21202

Eric George Korphage, Esquire
(korphagee@whiteandwilliams.com)
Counsel for Fright Rigs, Inc.
White and Williams, LLP
600 Washington Avenue, Suite 303
Towson, Maryland  21204

Jung Yong Lee, Esquire
(jlee@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Gary H. Leibowitz, Esquire
(gleibowitz@coleschotz.com)
Counsel for Bandai Namco Toys
Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, Maryland  21231

Mark Minuti, Esquire
(mark.minuti@saul.com)
Counsel for Debtor
Saul Ewing LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware  19899

Bruce S. Nathan, Esquire
(bnathan@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler
65 Livingston Avenue
Roseland, New Jersey  07068

Michael Papandrea, Esquire
(mpapandrea@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler
One Lowenstein Drive
Roseland, New Jersey  07068

Jordan Rosenfeld, Esquire
(jordan.rosenfeld@saul.com)
Counsel for Debtors
Saul Ewing LLP
1001 Fleet Street, 9th Floor
Baltimore, Maryland  21202-4359

Dennis J. Shaffer, Esquire
(dshaffer@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Brent C. Strickland, Esquire
(bstrickland@wtplaw.com)
Counsel for Universal Distribution LLC
Whiteford Taylor & Preston L.L.P.
8830 Stanford Boulevard, Suite 400
Columbia, Maryland  21045

Steven Gregory Polard, Esquire
(steven.polard@ropers.com)
Counsel for Bandai Namco Toys
Ropers Majeski PC
801 South Figueroa Street, Suite 2100
Los Angeles, California  90017

Nikolaus F. Schandlbauer, Esquire
(nick.schandlbauer@arlaw.com)
Counsel for Action Figure Authority, Inc.
Adams and Reese LLP
20 F Street NW, Suite 500
Washington, D.C.  20001

Indira Kavita Sharma, Esquire
(indira.sharma@troutman.com)
Counsel for JPMorgan Chase Bank, N.A.
Troutman Pepper Locke LLP
401 9th Street NW, Suite 1000
Washington, D.C.  20004

Paige Noelle Topper, Esquire
(paige.topper@saul.com)
Counsel for Debtors
Saul Ewing LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware  19801

Scott Prince, Esquire
(sprince@bakerlaw.com)
Counsel for Image Comics, Inc.
Baker & Hostetler LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114

Elizabeth Anne Scully, Esquire
(escully@bakerlaw.com)
Counsel for Image Comics, Inc.
Baker & Hostetler LLP
1050 Connecticut Ave, NW, Suite 1100
Washington, D.C.  20036

Nicholas Smargiassi, Esquire
(nicholas.smargiassi@saul.com)
Counsel for Debtors
Saul Ewing LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware  19801

U.S. Trustee – Baltimore
(ustpregion04.ba.ecf@usdoj.gov)
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

**<u>EXHIBIT A</u>**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of [•], 2025 (the "**Effective Date**"), by and among Diamond Comic Distributors, Inc., a Maryland corporation ("**DCD**"), Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("**Diamond Select**"), and Alliance Entertainment, LLC, a Delaware limited liability company ("**Purchaser**"). DCD and Diamond Select shall each be referred to herein as a "**Seller**" and collectively as "**Seller**".

<u>RECITALS</u>

WHEREAS, Seller is a distributor of tabletop games, board games, card games, miniatures, role playing games, accessories, pop-culture merchandise, comic books, gaming products, collectibles, accessors, and graphic novels with (a) three (3) primary operating divisions, namely, (i) the Alliance Game Distributors division (through which Seller distributes board games, card games, miniatures, role playing games, and accessories in the United States) (the "**Alliance Gaming Business**"); (ii) the Diamond Comic Distributors division (through which Seller distributes comic books, graphic novels, and related merchandise) (the "**DCD Business**"); and (iii) the Collectible Grading Authority division (through which Seller provides grading and authentication services for collectibles, including comic books and trading cards) (the "**CGA Business**"); and (b) an ancillary operating division, the Diamond Select Toys division (though which Seller manufactures collectible toys and statues) (the "**Diamond Select Toys Business**", and together with the Alliance Gaming Business, the DCD Business, and the CGA Business, the "**Business**").

WHEREAS, Seller desires to sell all or substantially all of the assets of the Business to Purchaser pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase and acquire such assets from Seller.

WHEREAS, DCD and Diamond Select have filed a petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**") on or about January 14, 2025 (the actual date of such filing, the "**Petition Date**" and the resulting case, the "**Chapter 11 Case**"), seeking relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**").

WHEREAS, in connection with the Chapter 11 case, Seller continues in the possession and control of its assets and properties in accordance with §§1107 and 1108 of the Bankruptcy Code.

NOW, THEREFORE, in exchange for the Purchase Price and the other mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, Purchaser hereby agrees to buy, and Seller hereby agrees to sell the Acquired Assets, upon the terms and conditions set forth in this Agreement.

1.    **DEFINITIONS.** As used herein, the following terms shall have the following meanings:

"**Accounts Receivable**" shall mean all Seller's accounts receivable from or related to the Business in existence as of the Closing Date (whether or not billed), excluding intercompany affiliated entities.

"**Acquired Assets**" shall have the meaning ascribed thereto in <u>Section 2.1</u> of this Agreement.

"**Affiliate**" or "**Affiliates**" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting

securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"**Alliance Gaming Base Purchase Price**" means $36,865,000.

"**Alliance Gaming Business Assets**" means all of Seller's assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal used in connection with the Alliance Gaming Business.

"**Allocation Methodology**" shall have the meaning ascribed thereto in Section 6.9(b) of this Agreement.

"**Ancillary Agreements**" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"**Approval Order**" shall have the meaning ascribed thereto in Section 6.6 of this Agreement.

"**A/R Value**" means, (a) with respect to Accounts Receivable included in the Acquired Assets aged over ninety (90) days and ineligible Accounts Receivable as detailed in the Seller's Borrowing Base Certificate at Closing, a value equal to $0, and (b) with respect to all other Accounts Receivable included in the Acquired Assets, a value equal to ninety percent (90%) of such Accounts Receivable.

"**Assigned Contracts**" means those Contracts of Seller in connection with the Business which Purchaser has agreed to assume pursuant to this Agreement and all of which are identified on Schedule 2.1(c), to the extent assignable pursuant to applicable law.

"**Average Net Working Capital**" means $6,770,735.

"**Avoidance Actions**" means all avoidance claims under sections 547, 548 and/or 550 the Bankruptcy Code (including, without limitation, claims to avoid, or set aside, transfers of property by any debtor that may be avoidable under by Chapter 5 of the Bankruptcy Code).

"**Bankruptcy Court**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Bankruptcy Code**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Bankruptcy Petition**" means a voluntary bankruptcy petition to be filed by Seller with the Bankruptcy Court on the Petition Date.

"**Bidding Procedures**" means the bidding procedures attached to the Bidding Procedures Order.

"**Bidding Procedures Order**" means the order (Docket No. 136) entered by the Bankruptcy Court in the Chapter 11 Case approving, among other things, the Bidding Procedures.

"**Bid Protections**" shall have the meaning ascribed thereto in Section 6.5 of this Agreement.

"**Borrowing Base Certificate**" shall have the meaning as the certificate prepared by Seller for J.P. Morgan on a weekly basis.

"**Break-up Fee**" shall have the meaning given in the Bidding Procedures Order.

"**Business**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

2

"**Business Assets**" means, collectively, the Alliance Gaming Business Assets, the DCD Business Assets, and the CGA Business Assets.

"**Business Day**" means a day, based on U.S. Eastern Time, other than a Saturday, Sunday, or U.S. federal holiday or any day in which banking institutions in the State of Maryland are authorized or required by law or other governmental action to be closed.

"**Causes of Action**" means any and all causes of action, defenses, counterclaims and/or other claims of any nature whatsoever, known or unknown, whether or not apparent or yet to be discovered, accruing to Seller or that is property of the Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date, and shall include, without limitation, (i) with respect to Go-Forward Vendors only, claims against past and present vendors or customers of Seller, and (ii) claims regarding or related in any way to any collective bargaining agreement(s). Causes of Action shall not include Avoidance Actions.

"**CGA Business Assets**" means all of Seller's assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal used in connection with the CGA Business and Diamond Select Toys Business.

"**Chapter 11 Case**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Claims**" shall have the meaning ascribed thereto in Section 6.6(b)(ii) of this Agreement.

"**Closing A/R Value**" means the A/R Value as of the Effective Time, as finally determined pursuant to Section 2.6(c)-(f).

"**Closing Date**" shall have the meaning ascribed thereto in Section 3.1 of this Agreement.

"**Closing Eligible Amount**" means the sum of (w) ninety percent (90%) of Eligible Accounts, (x) *plus* ninety percent (90%) of Eligible Foreign Accounts, (y) *plus* ninety percent (90%) of Net Eligible COD Accounts, plus (z) forty-two percent (42%) of Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis.

"**Closing Inventory Value**" means the Inventory Value as of the Effective Time, as finally determined pursuant to Section 2.6(c)-(f).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commercial Tort Claims**" shall have the meaning ascribed to it in Section 9-102(13) of the Uniform Commercial Code as in effect in the State of Maryland.

"**Confidentiality Agreement**" shall have the meaning ascribed thereto in Section 9.16 of this Agreement.

"**Contemplated Leases**" means the Leases for the following Leased Real Property: (i) 10150 York Road, Cockeysville, MD, (ii) 7485 Polk Lane, Olive Branch, MS, (iii) 2251 Picadilly Drive, Round Rock, Texas, (iv) 207 Redco Avenue, Red Lion, Pennsylvania, (v) 7950 W. Doe Street, Visalia, California, (vi) 3102 Brooklyn Avenue, Fort Wayne, Indiana, (vii) 1546 Victory Boulevard, Glendale, CA 91201, and (viii) 1965 Evergreen Boulevard, Building 300, Suite 100, Duluth, GA 30096.

"**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings,

3

indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral, other than Employee Benefit Plans.

"**Cure Amounts**" means all amounts, costs, and expenses required by the Bankruptcy Court to be paid to cure any defaults under the Assigned Contracts or the Assigned Leases so that they may be assumed and assigned to Purchaser pursuant to §§363 and 365 of the Bankruptcy Code.

"**DCD Business Assets**" means all of Seller's assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal used in connection with the DCD Business.

"**Deposit**" means the amount of $3,600,000 delivered to Seller pursuant to the Bidding Procedures Order.

"**Diamond UK Parent Shares**" means, collectively, all of the issued and outstanding equity interests of Comic Holdings, Inc., a Maryland corporation, and Comic Exporters, Inc., a Maryland corporation, as held by DCD.

"**Disclosure Schedules**" means the disclosure schedules attached to this Agreement and incorporated herein, which contain and set forth additional information corresponding to the Section of this Agreement referenced thereon.

"**Effective Time**" means 11:59 p.m. Eastern Time on the Closing Date.

"**Eligible Account**" means, in respect of the Lot B Business only, any Account (as defined in the UCC) transferred to Purchaser on the Closing Date, and which as of the Closing Date, would constitute an "Eligible Account" pursuant to the JPM Agreement.

"**Eligible Foreign Account**" means, in respect of the Lot B Business only, any Account (as defined in the UCC) transferred to Purchaser on the Closing Date which as of the Closing Date would constitute an "Eligible Foreign Account" pursuant to the JPM Agreement.

"**Eligible Inventory**" means, in respect of the Lot B Business only, any Inventory transferred to Purchaser on the Closing Date, which as of the Closing Date would constitute Eligible Inventory (as defined in the JPM Agreement) pursuant to the JPM Agreement, but excluding any Prepaid Inventory.

"**Employment Liability**" means any claim or Liability asserted against Seller or its property under any Law (or common law) arising from or relating to the former, current or future employment of a Person by Seller, whether pursuant to a contract, labor agreement, at-will arrangement or otherwise, as well as any claim asserting healthcare, pension, or other employment-related benefits, whether asserted by an employee or former employee, a retiree or future retiree, any of the aforementioned Person's agent, assigns, custodians, heirs, or representatives, a collective bargaining unit or union, any pension and/or retirement fund, or any other agent thereof.

"**Employee**" means an individual who, as of the applicable date, is employed by, or engaged to provide services to, Seller in connection with the Business.

"**Employee Benefit Plans**" or "**Benefit Plans**" means (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred

compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of Seller.

"**Environmental Law**" means any applicable Law, and any governmental order or binding agreement with any Governmental Body: (a) relating to pollution or the protection of natural resources, endangered or threatened species, human health or safety, or the environment; or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any hazardous materials. "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Permit**" means any permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"**Escrow Agent**" shall mean Omni Agent Solutions, Inc.

"**Estate**" means the estate of Seller to be created by §541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition.

"**Excluded Contracts**" shall have the meaning ascribed thereto in Section 2.2(c) of this Agreement.

"**Excluded Liabilities**" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"**Expense Reimbursement**" shall have the meaning ascribed thereto in the Bidding Procedures Order.

"**Final Order**" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such Order, as long as such motion has not actually

been filed.

"**Foreign Critical Vendors**" means foreign vendors providing goods or services to the Business identified in the Approval Order as critical vendors.

"**GAAP**" means generally accepted accounting principles generally accepted in the United States of America consistently applied, as of the date of the applicable financial report.

"**Go-Forward Vendors**" means, excluding "insiders" (as such term is defined in the Bankruptcy Code) and Affiliates of Seller, those vendors (a) specified by Purchaser in writing to Seller at the end of the Designation Period, and (b) that Purchaser elects to do business with on a go-forward basis after the Closing.

"**Governmental Authorization**" means any consent, franchise, license, registration, permit, order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"**Governmental Body**" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

"**Holdback Amount**" shall have the meaning ascribed thereto in Section 6.6(b)(ix) of this Agreement.

"**Incentive Amount**" means the greater of (x) the Incentive Base Amount, and (y) an amount, as of the close of business on December 31, 2025, equal to (i) fifty percent (50%) of the lesser of the (A) Realized Amount, and (B) the Closing Eligible Amount, *plus* (ii) thirty percent (30%) of the positive amount, if any, by which the Realized Amount exceeds the Closing Eligible Amount, and *plus* (iii) thirty percent (30%) of the cost of the Lot B Prepaid Inventory that is actually sold prior to December 31, 2025.

"**Incentive Amount Notice**" shall have the meaning ascribed thereto in Section 2.8(b) of this Agreement.

"**Incentive Base Amount**" means $5,000,000.

"**Income Tax**" means any Tax imposed on or determined in whole or in part with reference to income, gross receipts, profits or similar measure, including any interest, penalty or other addition with respect thereto.

"**Initial Overbid**" shall have the meaning ascribed thereto in the Bidding Procedures Order.

"**Intellectual Property**" shall have the meaning ascribed thereto in Section 2.1(i) of this Agreement.

"**Inventory**" means all inventory, inventory in transit paid for by Seller, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories of the Business, provided that such inventory is legally permitted to be sold by Purchaser, but excluding any Prepaid Inventory. For

purposes of clarification, goods held on consignment by or on behalf of Seller shall not be considered Inventory for purposes of the Agreement.

"**Inventory Value**" means, (a) with respect to inventory included in the ineligible inventory as detailed in the Seller's Borrowing Base Certificate at Closing, a value equal to $0, and (b) (i) with respect to all other Inventory included in the Acquired Assets, ninety percent (90%) of the Eligible Inventory value of such Inventory (as set forth in the Seller's Borrowing Base Certificate at Closing), as set forth on the Estimated Value Statement and (ii) with respect to Prepaid Inventory, ninety percent (90%) of such inventory's value, calculated at cost.

"**JPM Agreement**" means that certain Debtor-in-Possession Credit Agreement, dated as of January 16, 2025 among Diamond Comic Distributors, Inc., the Loan Parties named therein, Stephen Geppi and JPMorgan Chase Bank, NA., as amended. To the extent that as to any definition from the JPM Agreement which is incorporated herein by reference and to the extent that the Lender (as defined in the JPM Agreement) thereunder may exercise discretion in making any determination, Purchaser shall have the same right to exercise such discretion to the same extent as the Lender may exercise such discretion in making such determination.

"**Law**" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"**Leased Real Property**" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) the premises to the extent designated by Purchaser within thirty (30) days after the Closing.

"**Leasehold Improvements**" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"**Leases**" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"**Liability**" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"**Lien**" means any mortgage, deed of trust, lien, claim, Liability, Employment Liability, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind.

"**Lot B Business**" means, collectively, the DCD Business, the CGA Business, and the Diamond Select Toys Business.

"**Lot B Business Assets**" means, collectively, the DCD Business Assets and the CGA Business Assets.

"**Material Adverse Change**" means any change, event, occurrence, fact, waste, circumstance, or effect as shall have arisen after the date of this Agreement and prior to the Closing that would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on (i) the Business or the Acquired Assets, including, without limitation, the results of operations or the condition (financial or otherwise) of the Acquired Assets, (ii) the value of the Acquired Assets, or (iii) the ability of the parties to consummate the transactions contemplated hereby on a timely basis; provided, however, that any change, circumstance, or effect that arises out of, results from or relates to the commencement or conduct of the Chapter 11 Case shall not be considered in determining whether a Material Adverse Change has occurred or any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Purchaser; (vi) any changes in applicable Laws or accounting rules, including GAAP; (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement; or (viii) any natural or man-made disasters or acts of God; provided further, however, that any event, occurrence, fact, condition or change referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Change has occurred or could reasonably be expected to occur if such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Net Eligible COD Account**" means, in respect of the Lot B Business only, any Account (as defined in the UCC) transferred to Purchaser on the Closing Date which as of the Closing Date would constitute "Net Eligible COD Account" pursuant to the JPM Agreement.

"**Person**" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"**Petition Date**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Prepaid Inventory**" means inventory which was ordered and paid for pursuant to the invoices set forth in Schedule B (to be provided by Seller on or before the Closing Date), but which, as of the Closing Date, has not been delivered, and is not otherwise included as Eligible Inventory pursuant to the JPM Agreement.

"**Purchase Price**" shall have the meaning ascribed thereto in Section 2.6 of this Agreement.

"**Qualifying Bidder**" shall have the meaning ascribed thereto in the Bidding Procedures Order.

"**Qualifying Bid**" shall have the meaning ascribed thereto in the Bidding Procedures Order and shall include, without limitation, a bona fide, binding, and duly executed written offer to purchase all of the Acquired Assets and assume all of the Assumed Liabilities, received on or before the bid deadline set forth in the Bidding Procedures Order, and which: (i) is accompanied by a redline that shows the differences between the asset purchase agreement proposed by such offer and this Agreement; (ii) is irrevocable until the conclusion of the sale hearing in the Chapter 11 Case; (iii) is accompanied by evidence reasonably acceptable to Seller demonstrating the proposed bidder's ability to close the proposed transaction; (iv) sets forth total consideration in an amount greater than the total consideration provided by this Agreement, plus the Bid Protections in this Agreement; (v) is not subject to any breakup fee, transaction fee, termination fee, or similar type of payment or reimbursement, unless subject to court approval; and (vi) has no financing or due diligence contingencies.

"**Realized Amount**" means, in respect of the Lot B Business only, as of the close of business on December 31, 2025 (x) the amount actually collected by Purchaser with respect to all Accounts Receivable acquired by Purchaser hereunder on the Closing Date, net of all costs of collection related thereto and (y) the Net Sales of all Inventory acquired by Purchaser on the Closing Date.

"**Segregated Lockbox Account**" shall have the meaning ascribed thereto in Section 2.8(a).

"**Tax" or "Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, unclaimed property, escheat, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any Governmental Body responsible for imposition of any such tax (domestic or foreign).

"**Tax Clearance Certificate**" shall have the meaning ascribed thereto in Section 6.9(c) of this Agreement.

"**Tax Purchase Price**" shall have the meaning ascribed thereto in Section 6.9(b) of this Agreement.

"**Transactions**" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"**Transfer Tax**" means any sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees (excluding vehicle registration fees), notarial fees and other similar costs provided, however, that the term "Transfer Tax" shall not include any Income Tax.

Undefined terms used in this Agreement shall have the meaning ascribed to them under 11 U.S.C § 101 of the United States Bankruptcy Code.

2. **SALE AND PURCHASE OF ASSETS.**

2.1 **Acquired Assets.** On the terms and subject to the conditions set forth in this Agreement, on the Closing Date (defined below), Purchaser shall purchase from Seller, and Seller shall sell, assign, transfer, convey and deliver to Purchaser, all of Seller's right, title and interest in and to all of the Business Assets, wherever located, whether owned or leased (except for the Excluded Assets (defined below)), free and clear of any Liens (collectively, the "**Acquired Assets**"). Without limiting the foregoing, the Business Assets sold, assigned, transferred, conveyed and delivered by Seller shall include all of Seller's right, title and interest in and to the following:

(a) All Accounts Receivable;

(b) all Inventory;

(c) all Assigned Contracts set forth on Schedule 2.1(c) of the Disclosure Schedules but solely to the extent designated by Purchaser pursuant to Section 2.3 hereof;

(d) all benefits, proceeds or any other amounts payable under any policy of insurance maintained by Seller with respect to the destruction of, damage to or loss of use of any of the Acquired Assets;

9

(e)     Subject to <u>Section 2.3</u>, the Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) the Leased Real Property, together with all amendments, extensions, rights of renewal, other agreements with respect thereto, security and other deposits related thereto, prepaid rent, and appurtenances thereto and associated therewith, but solely to the extent designated by Purchaser pursuant to <u>Section 2.3</u> hereof (collectively, the "**Assigned Leases**");

(f)     all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assigned Leases (the "**Assigned Leased Real Property**");

(g)     all (i) equipment (including without limitation warehouse racks and equipment), machinery, furniture, fixtures and improvements, shelving and cabinets, forklifts, tooling and spare parts, vehicles, office and computer equipment, and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases owned or leased by Seller in connection with the Business and/or the Acquired Assets (the "**FF&E**"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the FF&E (collectively, the "**Tangible Personal Property**");

(h)     all Causes of Action, including without limitation all Avoidance Actions against Go-Forward Vendors;

(i)     all intellectual property interests of Seller related to the Business including, without limitation: (i) Seller's patents, patent applications, patent disclosures and improvements thereto; (ii) Seller's trademarks, service marks, trade dress, brands, logos, slogans, jingles, trade names, website domain names, social media sites and accounts, and URLs, e-commerce websites (such as Amazon accounts) and all content and data thereon or relating thereto; together with any licenses to use such names or parts thereof insofar and to the extent that they are used in connection with Seller's Business; (iii) Seller's copyrights and registrations, to the extent assignable by Seller, and applications for registration thereof; (iv) Seller's mask works and registrations and applications for registration thereof; (v) Seller's computer software data and documentation, software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology networks and systems (including telecommunications networks and systems for voice, data, and video) owned, leased, licensed, or used (including through cloud-based or other third-party service providers); (vi) Seller's data management system data, with respect to customers of Seller's Business, and (vii) all claims and causes of action with respect to the foregoing (collectively, the "**Intellectual Property**");

(j)     all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Acquired Assets;

(k)     originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, supplier and publisher agreements, services agreements, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any Governmental Body, sales material and records, strategic plans and marketing, and promotional surveys, material, and research related to the Business ("**Books and Records**"); provided, however, that Purchaser shall make the Books and Records available to Seller to the extent necessary to prosecute the Chapter 11 Case;

(l)       all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities or trading card or collectible authentication, grading or certification organizations (collectively, "**Permits**") which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Acquired Assets;

(m)       all prepaid expenses, credits, advance payments, claims, security deposits under the Assigned Leases, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (excluding any such item relating to the payment of Taxes) (collectively, the "**Prepaid Amounts)**"); and

(n)       all goodwill and the going concern value of the Acquired Assets and the Business.

2.2       <u>**Excluded Assets**</u>. The following assets, properties, rights, interests, benefits and privileges of Seller are not included in the Acquired Assets (collectively, the "**Excluded Assets**"):

(a)       all related party accounts including accounts receivable - related parties, loans receivable - related parties, accounts payable - related companies, and loans payable - related companies;

(b)       all cash, bank deposits, securities and cash equivalents, including for this purpose (i) all cash and cash equivalents if credited to Seller's bank account(s) prior to the Closing Date, (ii) all deposits arising outside of the ordinary course of the Business, including without limitation all such amounts held by Seller's attorneys, accountants, investment bankers, restructuring advisors, notice and claims agents, public relations advisors, and other professional advisors, and (iii) all financial investments;

(c)       all Contracts of Seller, other than any Assigned Contracts (the "**Excluded Contracts**");

(d)       all current assets of Seller, other than Inventory, Accounts Receivable, and prepaid expenses, credits, advance payments, security deposits under the Assigned Leases, rights of refunds, and similar prepaid items constituting current assets;

(e)       Seller's related party Accounts Receivable and notes receivable;

(f)       Seller's insurance policies, and related claims and refunds;

(g)       all of Seller's rights with respect to Employee Benefit Plans and all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders and the rights associated therewith, other than the Assigned Contracts and Assigned Leases;

(h)       any accounting records, tax records, financial records and any books, records or other information related solely and exclusively to the other Excluded Assets and all of Seller's accounting records, tax records, financial records and any books, records or other information, unless required for the preparation of audited financials and compliance with filing requirements of a Governmental Authority for the Acquired Assets;

(i)       all records that Seller is required by Law to retain;

(j)     all rights to receive mail and other communications addressed to Seller that do not relate to the Acquired Assets or the Assumed Liabilities;

(k)     all property, rights and assets relating to an Excluded Asset or arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities which are not Assumed Liabilities;

(l)     all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of Seller's operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date;

(m)     all rights of Seller arising under this Agreement, the Ancillary Agreements, and under any other agreement between Seller and Purchaser entered into in connection with this Agreement;

(n)     the Diamond UK Parent shares; and

(o)     all Avoidance Actions against any person other than a Go-Forward Vendor.

2.3     **Assumed Liabilities.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall only assume and shall only be required to perform and discharge in accordance with their respective terms the following: (a) all Liabilities with respect to the Assigned Contracts after the Closing; provided, however, that Assumed Liabilities shall not include any Liabilities arising out of any breach, default, misconduct, negligence, failure to comply with any applicable Law, or other form of non-compliance by Seller thereunder at or prior to the Closing, (b) all Liabilities (including for any Tax) that arise after Closing with respect to Purchaser's ownership or operation of the Acquired Assets after the Closing, (c) all amounts due with respect to open purchase orders for Inventory ordered after the Closing, and (d) all amounts due with respect to open purchase orders for Inventory ordered after the Petition Date and not delivered prior to the Closing Date (collectively, the "**Assumed Liabilities**"). From and after the Closing Date until the date that is thirty (30) days from the Closing Date (the "**Designation Deadline**" and the period from the Closing Date to the Designation Deadline, the "**Designation Period**"), Purchaser may, in its sole discretion, designate any Assigned Contracts for assignment and assumption to Purchaser, effective as of the Closing Date.  During the Designation Period, Purchaser shall pay or cause to be paid Seller's actual costs under any Contemplated Leases. Notwithstanding anything to the contrary herein, in the event Seller reasonably anticipates incurring any out-of-pocket costs or expenses post Closing and during the Designation Period in connection with any Assigned Contract not yet designated for assumption by Purchaser, Seller shall promptly notify Purchaser in writing of such anticipated costs. Purchaser shall have twenty-four (24) hours following receipt of such notice to notify Seller in writing whether Purchaser elects to assume responsibility for such costs. If Purchaser does not timely notify Seller of its election to assume such costs, then Seller shall have the right, in its sole discretion, to reject such Assigned Contract or otherwise avoid incurring such expense. Furthermore, with respect to any Assigned Lease or lease of a Leased Facility, Purchaser shall be solely responsible for, and shall pay or cause to be paid, all rent and other lease-related expenses incurred during the Designation Period, regardless of whether such Assigned Lease or Leased Facility is ultimately designated for assumption by Purchaser. Notwithstanding anything to the contrary herein, during the Designation Period, Purchaser shall have the right, in its sole discretion, to remove any Assigned Contract from Schedule 2.1(c), thereby relieving Purchaser of any obligation to assume such contract and any associated Liabilities thereunder. For the avoidance of doubt, the Purchaser shall not have the right to add any additional contracts to the list of Assigned Contracts during the Designation Period, and no contract or agreement that was not included on Schedule 2.1(c) shall be eligible to be designated as an Assigned

12

Contract thereafter.

2.4 **Excluded Liabilities.** Notwithstanding anything to the contrary contained in any other provision of this Agreement, Purchaser, by its execution and delivery of this Agreement and any Ancillary Agreements, and its performance of the transactions contemplated by this Agreement and any Ancillary Agreements (collectively, the "**Transactions**"), shall not assume, pay or otherwise be responsible for any Liability other than the Assumed Liabilities (the "**Excluded Liabilities**"). The Excluded Liabilities shall be the sole responsibility of Seller. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a) any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Agreements and the Transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b) any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Acquired Assets or the Assumed Liabilities for any pre-Closing Tax period; (ii) Taxes that arise out of the consummation of the Transactions contemplated hereby or that are the responsibility of Seller pursuant to this Agreement; or (iii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Purchaser under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c) any Liabilities relating to or arising out of the Excluded Assets;

(d) any Liabilities in respect of any pending or threatened Causes of Action arising out of, relating to or otherwise in respect of the operation of the Business or the Acquired Assets to the extent such Causes of Action relate to such operation on or prior to the Closing Date;

(e) any Liabilities of Seller arising under or in connection with any Employee Benefit Plan providing benefits to any present or former employee of Seller;

(f) any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(g) any environmental claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(h) any trade accounts payable of Seller, including, without limitation, any Foreign Critical Vendor accounts payable;

(i) any Liabilities of the Business relating to or arising from unfulfilled commitments, quotations, restricted inventory, non-transferable rights, purchase orders, customer orders or work orders;

13

(j)    any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(k)    any Liabilities under the Excluded Contracts or any other Contracts not constituting the Assigned Contracts or the Assigned Leases;

(l)    any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions; and

(m)    any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or governmental order.

2.5    [**Reserved**].

2.6    **Purchase Price.**

(a)

(i)    <u>Calculation of the Alliance Gaming Purchase Price</u>. The aggregate consideration payable to Seller for the sale and transfer of the Alliance Gaming Business Assets shall be the sum of the following items: (i) the Alliance Gaming Base Purchase Price, *minus* (ii) Average Net Working Capital; *plus* (iii) the Closing Inventory Value associated with Alliance Gaming Business Assets (which, for the avoidance of doubt, includes ninety percent (90%) of the cost of all Prepaid Inventory associated with the Alliance Gaming Business Assets), *plus* (iv) the Closing A/R Value associated with Alliance Gaming Business Assets (the "**Alliance Gaming Purchase Price**"), and the assumption by Purchaser of the Assumed Liabilities associated with the Alliance Gaming Business.

(ii)    <u>Calculation of the Lot B Purchase Price</u>. Subject to the adjustment contemplated by Section 2.8(b) below, the aggregate consideration payable to Seller for the sale and transfer of the Lot B Business Assets shall be the sum of the following items: (A) Twenty One Million Dollars ($21,000,000), *plus* (B) the Incentive Amount, if any; *minus* (C) any amounts paid by Purchaser as Cure Amounts with respect to the Lot B Business (the "**Lot B Purchase Price**", and together with the Alliance Gaming Purchase Price, the "**Purchase Price**"), and the assumption by Purchaser of the Assumed Liabilities associated with the Lot B Business.

(b)    <u>Payment of Purchase Price</u>.

(i)    As of the Effective Date, Purchaser shall pay, or cause to be paid, to the Escrow Agent, by wire transfer of immediately available funds to one or more accounts designated in writing by the Escrow Agent, the Deposit.

(ii)

(A)    At the Closing, Purchaser shall pay, or cause to be paid, to Seller, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller, an amount equal to the (1) the Alliance Gaming Purchase Price *minus* (2) the Deposit, *minus* (3) the Holdback Amount.

(B)    At the Closing, Purchaser shall pay, or cause to be paid, to Seller, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller, an

14

amount equal to the the Lot B Purchase Price, excluding the Incentive Amount (which shall be payable in accordance with Section 2.8).

(c)    Estimated Value Statement. At least two (2) Business Days prior to the Closing and solely with respect to the Alliance Gaming Business Assets, Seller shall deliver to Purchaser a statement in the form attached hereto as Exhibit E (the "**Estimated Value Statement**"), setting forth a good faith calculation, together with reasonably detailed supporting documentation, of the estimated Inventory Value at Closing (the "**Estimated Inventory Value**"), and the estimated A/R Value at Closing (the "**Estimated A/R Value**").

(d)    Closing Value Statement. Within the ten (10) Business Day period after the Closing Date (or such reasonable extension thereof as approved by Seller, such approval not to be unreasonably withheld, conditioned or delayed), Purchaser shall deliver, or cause to be delivered, to Seller a statement (the "**Closing Value Statement**") setting forth Purchaser's objections, if any, to the calculations set forth in the Estimated Value Statement, together with reasonably detailed supporting documentation to substantiate any such objections.  The Closing Value Statement and the calculations thereunder shall be prepared and calculated by Purchaser in good faith.  Notwithstanding anything set forth herein, Purchaser shall have the right to revise the Closing Value Statement and Purchaser's calculations, if any, to the calculations set forth in the Estimated Value Statement in all respects based on fraud, willful misconduct or intentional misrepresentation discovered by Purchaser at any time prior to the determination of the Closing Inventory Value or Closing A/R Value in accordance with this Agreement.

(e)    Disputes. If Seller disputes any of Purchaser's objections to the Estimated Value Statement as set forth in the Closing Value Statement, then, within fifteen (15) days after the delivery to Seller of the Closing Value Statement (the "**Dispute Period**"), Seller shall deliver to Purchaser a written notice (a "**Dispute Notice**") describing in reasonable detail Seller's dispute of any of Purchaser's objections to the Estimated Value Statement set forth in such Closing Value Statement.  If Seller does not deliver a Dispute Notice to Purchaser during the Dispute Period, then Purchaser's objections set forth in the Closing Value Statement shall be binding and conclusive on the parties hereto and Purchaser's calculations of the value of Inventory and Accounts Receivable acquired at the Closing shall be (and deemed to be) the "Closing Inventory Value" and "Closing A/R Value", respectively. If Seller delivers a Dispute Notice to Purchaser during the Dispute Period, then the parties hereto shall negotiate to resolve such disputes. To the extent that the parties hereto are unable to resolve such disputes, such disputes shall be resolved exclusively by the Bankruptcy Court.

(f)    Post-Closing Adjustment Payment. If the Closing Inventory Value and/or the Closing A/R Value are less than the Estimated Inventory Value and/or the Estimated A/R Value, respectively, Purchaser and Seller shall promptly (but in any event within two (2) Business Days after the determination of Closing Inventory Value and Closing A/R Value) deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to (i) pay to Purchaser the absolute value of such difference, if any (such difference, the "**Shortfall Amount**") from the escrow account established with the Escrow Agent (the "**Escrow Account**"), by wire transfer of immediately available funds to one (1) or more accounts designated by Purchaser, and (ii) release any excess funds in the Escrow Account to Seller.  In the event the funds in the Escrow Account are less than the amount of the Shortfall Amount, Seller shall promptly (but in any event within two (2) Business Days after the determination of Closing Inventory Value and Closing A/R Value) pay to Purchaser the absolute value of such difference. Purchaser shall have an administrative expense claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Chapter 11 case for the absolute value of such difference.

2.7    **Structure of Sale.** Notwithstanding any provision in the Agreement, nothing herein shall impair the Parties' right and ability to agree to an alternative structure to the transaction as contemplated

herein, provided that any alternative transaction shall be subject to the agreement of the Parties in their sole and absolute discretion and shall not reduce the Purchase Price to be received by Seller, which must be paid in full at Closing.

2.8     **Payment of Incentive Amount.**

(a)     In respect of the Lot B Business only, the Purchaser shall, promptly following the Closing, deliver written notice to each account debtor of the Lot B Business Accounts Receivable acquired at the Closing instructing them that all payments with respect to such Lot B Business Accounts Receivable shall be made to a segregated lockbox account designated solely for the receipt of such Lot B Business Accounts Receivable and payment of the invoices contemplated by the next sentence (the "**Segregated Lockbox Account**"), which shall, in addition, be subject to such additional terms and conditions as may be required by Purchaser's lenders and agreed to, in writing, by Seller. In addition, to the extent that Lot B Business Inventory acquired at the Closing and/or Lot B Business Prepaid Inventory is separately invoiced to a customer from any other sales by the Purchaser to such customer, the Purchaser will use commercially reasonable efforts to require the applicable customer to pay all invoices with respect to any such Lot B Business Inventory acquired at the Closing or such Lot B Business Prepaid Inventory to be payable into the Segregated Lockbox Account. The obligation to have payments made to the Segregated Lockbox Account shall expire on December 31, 2025; provided, that amounts in the Segregated Lockbox Account as of December 31, 2025 shall remain subject to the terms and conditions of this Section 2.8.

(b)     Within fifteen (15) days after the end of each calendar month, commencing with June of 2025 and ending on December of 2025, the Purchaser shall deliver to Seller a reasonably detailed calculation of the Incentive Amount as of the end of such calendar month (but for all months, other than December 2025, without reference to the Incentive Base Amount), with such backup documentation to show invoice-level information with respect to Lot B Business Accounts Receivables, Net Sales of Lot B Business Inventory and sales of Lot B Business Prepaid Inventory, in each case which was acquired by the Purchaser at the Closing pursuant to this Agreement (each, a "**Incentive Amount Notice**"). In the event that Seller has any objection to the Incentive Amount set forth in a Incentive Amount Notice, it shall provide written notice to the Purchaser not more than fifteen (15) days after delivery of the Incentive Amount Notice, or if with respect to the December 2025 Incentive Amount Notice, then not more than thirty (30) days after delivery of the Incentive Amount Notice. If no timely objection is received, or if Seller delivers written notice of its agreement to the Incentive Amount as contained in the applicable Incentive Amount Notice, the Purchaser shall pay (x) the Incentive Amount then due (which prior to the payment with respect to the Incentive Amount Notice delivered for December 2025 shall be calculated and paid without reference to the Incentive Base Amount), if any, minus (y) any prior payments with respect to the Incentive Amount made prior thereto, to the Seller not more than two Business Days after the earlier of (x) delivery of written notice of Seller to Purchaser accepting the calculation of the Incentive Amount and (y) the expiration of the fifteen (15) day period or thirty (30) day period for Seller to object to the calculation of the Incentive Amount, as applicable. If the Seller disputes the calculation of the Incentive Amount, a final determination of the Incentive Amount shall be made by the Bankruptcy Court, pursuant to procedures determined by the Bankruptcy Court.

(c)     Purchaser and Seller shall negotiate in good faith with Purchaser's lenders to establish a mutually agreeable control agreement that provides that any amounts in the Segregated Lockbox Account, in excess of 105% of the amount of the portion of the Incentive Amount then owing may be subject to a weekly sweep mechanism to accounts specified by the Purchaser or its lenders. Promptly following any such sweep of cash from the Segregated Lockbox Account so permitted, Purchaser shall provide notice thereof, including Purchaser's short form calculation of the portion of the Incentive Amount then owing.

16

(d)    At least two (2) Business Days prior to the Closing, Seller shall deliver to Purchaser a statement setting forth Seller's calculation of the Lot B Purchase Price (excluding the Incentive Amount). If Purchaser disagrees with Seller's calculation of the Purchase Price, the parties will negotiate to resolve any disputes in advance of Closing.

## 3.    CLOSING; CONDITIONS TO CLOSING.

3.1    **Closing.** Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place at a time, place, and manner specified in the Approval Order. The time and date upon which the Closing occurs is referred to herein as the "**Closing Date**". Transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place. Seller, Purchaser and their attorneys need not be physically present at any Closing and they may deliver documents to the Escrow Agent in escrow by electronic delivery, overnight air courier or other means.

3.2    **Court Approval Required.** Purchaser and Seller acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party. Purchaser acknowledges that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and/or otherwise best offer possible for the Acquired Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting an auction.

3.3    **Conditions to Obligations of Purchaser.** The obligation of Purchaser to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by Purchaser in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Seller set forth in Section 4 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Seller shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(c)    Consents. All consents, authorizations, or approvals required to be obtained from any Governmental Body shall have been obtained and be in full force and effect.

(d)    No Material Adverse Change. A Material Adverse Change shall not have occurred with respect to the Business or the Acquired Assets (taken as a whole).  [*redacted language removed*]

(e)    Break-Up Fee and Expense Reimbursement. Both the Break-Up Fee and the Expense Reimbursement shall have been approved by the Bankruptcy Court by Final Order.

(f)    Bidding Procedures. The Bidding Procedures as approved by the Bankruptcy Court have been complied with in all material respects.

(g)    Approval Order. The Bankruptcy Court shall have entered the Approval Order which shall be reasonably satisfactory to Purchaser and contain certain findings and rulings including,

17

without limitation, the following: (i) approving the sale of the Acquired Assets to Purchaser free and clear of all Liens and Claims, (ii) approving the assumption and assignment of the Assigned Contracts to Purchaser, (iii) providing for the waiver of the fourteen (14) day automatic stay contained in Federal Rule of Bankruptcy Procedure 6004(h), (iv) finding that Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms-length purchaser, (v) finding that the Purchase Price is fair and reasonable; (vi) finding that this Agreement was negotiated at arms-length; and (vii) finding that the sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and the Approval Order shall have become a Final Order.

3.4    **Conditions to Obligations of Seller.** The obligation of Seller to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by any Seller in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Purchaser set forth in Section 5 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)    Consents. All consents, authorizations, or approvals required to be obtained from any Governmental Body shall have been obtained and be in full force.

(d)    Approval Order.  The Bankruptcy Court shall have entered the Approval Order.

3.5    **Closing Obligations.**  In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a)    Seller Deliverables. Seller shall deliver to Purchaser:

(i)    The Estimated Value Statement (which shall have been delivered in accordance with Section 2.6(c).

(ii)    An Assignment, Bill of Sale and Conveyance Agreement (the "**Master Assignment**") for the Acquired Assets in the form set forth on Exhibit A executed by Seller;

(iii)    such bills of sale, assignments, certificates of title, documents, and instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Seller; and

(iv)    a certified copy of the Approval Order entered on the docket in the Chapter 11 Case.

(b)    Purchaser Deliverables. Purchaser shall deliver, or cause to be delivered:

18

(i)        to each of the recipients specified in <u>Section 2.6(b)(ii)</u>, all of the amounts payable to such recipients pursuant to <u>Section 2.6(b)(ii)</u>;

(ii)        to Seller, a countersigned original of the Master Assignment; and

(iii)        to Seller, the Deposit.

3.6        **Delivery of Possession of Assets.** Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing. Seller shall bear all risk of loss with respect to the Acquired Assets prior to Closing. Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

4.        **REPRESENTATIONS AND WARRANTIES OF SELLER.** Each Seller represents and warrants to Purchaser that the statements contained in this <u>Section 4</u> are true and correct as of the date hereof and will be true and correct through the Closing Date.

4.1        **Organization, Good Standing and Power.** Each Seller is legally formed and in good standing under the laws of the State of its incorporation. Subject to the applicable provisions of the Bankruptcy Code, each Seller has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

4.2        **Authority Relative to this Agreement; Execution and Binding Effect.** Each Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code including entry of the Approval Order, to consummate the Transactions applicable to Seller. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the independent director and restructuring committee of each Seller, and, except for Bankruptcy Court approval, no other proceedings or approvals on the part of each Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by each Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Seller, enforceable against each Seller in accordance with their terms.

4.3        **Title and Ownership.**  Except as would not have a Material Adverse Change, each Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.  At the Closing, each Seller will have the right to transfer the Acquired Assets to Purchaser free and clear of all Liens, other than Liens included in the Assumed Liabilities to the extent specifically set forth in <u>Schedule 4.3</u> of the Disclosure Schedules. Neither Comic Exporters, Inc., a Maryland corporation, nor Comic Holdings, Inc., a Maryland corporation, own any assets other than their respective right, title and interest in and to the Diamond UK Parent Shares.

4.4        **Contracts and Leases.**  As of the Effective Date, other than as set forth on <u>Schedule 4.4</u> of the Disclosure Schedules, no Seller nor, to Seller's actual knowledge, any other party to any of the Assigned Contracts or Assigned Leases has commenced any action against any of the parties to such Assigned Contracts or Assigned Leases or given or received any written notice of any material default or violation under any Assigned Contract or Assigned Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Approval Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assigned Contracts and Assigned Leases).  Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assigned Contracts and Assigned Leases is, or will be at the Closing, valid, binding and in full

19

force and effect against Seller, except as otherwise set forth on <u>Schedule 4.4</u>.

4.5 **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code (including, without limitation, pursuant to §§363 and 365 of the Bankruptcy Code), no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body is required in connection with the execution and delivery by each Seller of this Agreement and the Ancillary Agreements and/or the consummation of the Transactions, including without limitation, the assignment of the Assigned Assets.

4.6 **No Brokers.** Except as to the entities set forth in <u>Schedule 4.6</u> hereto, each Seller has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of such Seller, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by such Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

4.7 **Taxes.** After giving effect to the Approval Order and upon the Closing, there are no Tax related Liens (i) affecting or attached to the Acquired Assets, (ii) threatened in writing that could attach to or affect the Acquired Assets, or (iii) to the knowledge of each Seller, otherwise threatened that are reasonably likely to attach to or affect the Acquired Assets. The Approval Order shall contain customary provisions that provide that the Acquired Assets will be transferred to Purchaser free and clear of all Tax related Liens.

4.8 **Proceedings**. As of the date hereof, except as would not have a Material Adverse Change, there is no action, suit, investigation or proceeding pending against, or to the knowledge of each Seller, threatened against or affecting, any Seller.

5. **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

Purchaser represents and warrants to Seller that the statements contained in this <u>Section 5</u> are true and correct as of the date hereof and will be true and correct on the Closing Date.

5.1 **Organization, Good Standing and Power.** Purchaser is legally formed and in good standing under the laws of the State of its incorporation or formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

5.2 **Authority Relative to this Agreement; Execution and Binding Effect.** Purchaser has full power and authority to execute and deliver this Agreement and any Ancillary Agreements and to consummate the Transactions. The execution and delivery of this Agreement and any Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder or otherwise) on the part of Purchaser are necessary to approve this Agreement and any Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by Seller, this Agreement constitutes, and each of any Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3     **No Defaults.** The execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the material breach of or constitute a material default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or materially violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (b) violate the articles of incorporation or bylaws of Purchaser.

5.4     **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code and any bulk sales filings to be made by Purchaser, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

5.5     **Financial Ability.** Purchaser has cash available that is sufficient to enable it to pay the Deposit and the Purchase Price, as well as all other amounts otherwise payable to consummate the Transactions pursuant to and in accordance with this Agreement.

5.6     **No Brokers.** Except for Province LLC and Think Equity Inc., Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

6.     **COVENANTS.**

6.1     **Operation of Business.** Subject to the requirements of, and the obligations imposed upon, Seller as debtor-in-possession and pursuant to the Bankruptcy Code and except as otherwise contemplated by this Agreement or the Bidding Procedures Order or as required to comply with debtor-in-possession financing obtained by Seller, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, Seller shall operate the Business in the ordinary course (relative to that in effect immediately prior to the execution of the Agreement) and, consistent with such operation and the budget set forth in Seller's debtor-in-possession credit agreement, and consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers of the Business. Without limiting the generality of the foregoing, from and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller shall not (except as consented to in writing by Purchaser) do any of the following with respect to the Business: (a) hire any employees or terminate the services of any existing employees, increase, accelerate or provide for additional compensation, benefits (fringe or otherwise) or other rights to any current or former employee, or agree to do any of the foregoing, except in the ordinary course of business or as required by applicable law, (b) materially modify, change, renew, extend or terminate any Contract or relationship with any customer of the Business, other than renewals or extensions in the ordinary course of business; (c) dispose of or transfer any Acquired Asset; (d) grant any rights with respect to or otherwise disposing of or transferring any right in any Acquired Asset; or (e) terminate, amend, or modify the terms of any Acquired Asset. Prior to Closing, Seller shall have paid all amounts due to any Foreign Critical Vendors.

6.2     **Bidding Procedures Order.** The purchase and sale of the Acquired Assets will be subject to competitive bidding in accordance with (and only in accordance with) the terms of the Bidding Procedures Order and the Bidding Procedures.

6.3     [**Reserved**].

6.4     [**Reserved**].

6.5     [**Reserved**].

6.6     **Approval Order.**

(a)     Seller shall diligently prosecute the approval of this Agreement. Purchaser agrees that it will take such actions as are reasonably requested by Seller to assist in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)     Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Seller shall use their commercially reasonable efforts to obtain entry of an order or orders by the Bankruptcy Court pursuant to §§363 and 365 of the Bankruptcy Code (the "**Approval Order**"), in form and substance reasonably acceptable to the parties which shall approve this Agreement and the Transactions. Such Approval Order shall contain the provisions set forth below (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

(i)     Approval of the sale, transfer and assignment by Seller of the applicable Acquired Assets and assumption and assignment of any applicable Assigned Contracts to Purchaser pursuant to this Agreement and Bankruptcy Code §§105, 363 and 365, as applicable;

(ii)     The transfers of the Acquired Assets by Seller to Purchaser (A) vest or will vest Purchaser with all right, title and interest of Seller in and to the Acquired Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all Liens and claims (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or untiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Seller filed their voluntary petitions under Chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise (collectively, "**Claims**") , with any such Liens and Claims to attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Acquired Assets prior to Closing, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware. For the avoidance of doubt and without limiting the foregoing, the transfer of the Acquired Assets to Purchaser shall be free and clear of any Claims or Causes of Action relating to or in connection

22

with (i) any Employee Benefit Plan or pension plans contributed to or maintained by Seller, or multi-employer plan participated in by Seller prior to the or subsequent to the Petition Date; (ii) the Worker Adjustment and Retraining Notification Act of 1988, (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; (iv) any collective bargaining agreement(s) to which Seller is a party or otherwise obligated under; or (v) the Seller's current or former employees;

         (iii)     The sale and transfer of the Acquired Assets to Purchaser or Purchaser's occupation and use of the Acquired Assets will not subject Purchaser to any liability (including successor liability) with respect to the operation of Seller's business or Acquired Assets prior to Closing or by reason of such transfer.  Purchaser is not holding itself out to the public as a continuation of Seller, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and Seller. The Transactions do not amount to a consolidation, merger, or *de facto* merger of Purchaser and Seller and/or Seller's bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between Seller and Purchaser. Purchaser is not a mere continuation of Seller or its bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to Seller or its bankruptcy estates.  Purchaser is not a successor to Seller or its bankruptcy estates by reason of any theory of law or equity;

         (iv)     The Transactions are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

         (v)     This Agreement was negotiated at arms-length;

         (vi)     The sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code;

         (vii)     a determination that selling the Acquired Assets free and clear of all Liens is in the best interest of Seller's Estate;

         (viii)     that Purchaser shall not assume or have any responsibility or liability whatsoever for any of the Excluded Liabilities; and

         (ix)     that a portion of the Purchase Price in the amount of ten percent (10%) of the amount of the Estimated A/R Value and the Estimated Inventory Value, solely with respect to the Alliance Gaming Business (the "**Holdback Amount**") shall be paid into escrow with the Escrow Agent at Closing and which shall be released in accordance with <u>Section 2.6(f)</u>.

         (c)     If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code.

        6.7     **Access to Facilities Personnel, and Information**. Prior to the Closing, Seller shall permit during normal business hours and in a manner that does not unreasonably interfere with ordinary business operations, representatives of Purchaser to have access to all premises, property, books, records (excluding Tax records), Contracts, and documents of or pertaining to the Business or any of the Acquired Assets which are under Seller's control (provided that any representatives of Purchaser shall be subject to the

confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder).

6.8 **Further Assurances.** Purchaser and Seller agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the Transactions contemplated by this Agreement, any Ancillary Agreements, and further secure to each party the rights intended to be conferred hereby and thereby.

6.9 **Tax Matters.**

(a) All Transfer Taxes incurred in connection with the purchase and sale of the Acquired Assets shall be borne equally by Purchaser and Seller in each case when due. Purchaser shall file, to the extent required by applicable Law, all necessary Tax returns and other documentation with respect to all such Transfer Taxes. To the extent required by applicable Law, Purchaser will join in the execution of any such Tax returns or other documentation.

(b) Purchaser and Seller agree that the Purchase Price and the assumption of any Assumed Liabilities (together with any other amounts treated as consideration for Income Tax purposes) (the "**Tax Purchase Price**") shall be allocated among the Acquired Assets in a manner that is in accordance with the allocation methodology set forth on Exhibit D hereto and Section 1060 of the Code and the Treasury Regulations promulgated thereunder (collectively, the "**Allocation Methodology**"). Purchaser and Seller shall negotiate in good faith, on or prior to the Closing Date, an allocation of the Tax Purchase Price among the Acquired Assets in accordance with the Allocation Methodology. Purchaser and Seller shall each file all Tax returns (and RS Form 8594, if applicable) on the basis of such agreed upon allocation set forth in the Allocation Schedule, and no party shall thereafter take a Tax return position inconsistent with such Allocation Schedule unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the Internal Revenue Service or other Governmental Body responsible for Taxes. Any adjustments to the Purchase Price pursuant to this Agreement shall be allocated in a manner consistent with the Allocation Schedule. Notwithstanding such allocation of the Tax Purchase Price, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any proceeding in the Chapter 11 Case that may be proposed. Seller reserves the right on its behalf and on behalf of its estate, to the extent not prohibited by applicable law and accounting rules, for purposes of any proceeding in connection with the Chapter 11 Case, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to Seller in the event of, or in order to resolve, creditor disputes in the Chapter 11 Case.

(c) If requested by Purchaser, Seller shall notify all of the Taxing authorities in the jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax returns in connection with the Transactions in the form and manner required by such Taxing authorities, if the failure to make such notifications or receive any available tax clearance certificate (a "**Tax Clearance Certificate**") could subject Purchaser to any Taxes of Seller. If any Taxing authority asserts that Seller is liable for any Tax, Seller shall promptly pay or in good faith contest any and all such amounts and shall provide evidence to Purchaser that such liabilities have been paid in full or otherwise satisfied or contested.

6.10 **Public Announcements.** Purchaser nor Seller shall make any public announcements or statements concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (which consent may not be unreasonably withheld, condition or delayed), except as may be required by Law or stock exchange rules, in which case the party required to publish such public announcement or statement shall use reasonable best efforts to provide the other party a reasonable opportunity to comment on such public announcement or statement in advance of such publication; provided that the foregoing shall not apply to any public announcement or statement so long as any

24

statements contained therein concerning the Transactions are consistent with previous public announcements or statements made by such party in compliance with this <u>Section 6.10</u>. Notwithstanding anything contained in this Agreement or in the Confidentiality Agreement to the contrary, Purchaser acknowledges and agrees that (i) Seller may provide copies of this Agreement to parties in interest in the Chapter 11 Case and to those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Acquired Assets or as otherwise necessary or desirable in connection with the Chapter 11 Case; and (ii) Seller shall also be entitled to file copies with the Bankruptcy Court or as otherwise required by applicable Law and shall be entitled to publish notice of the transactions contemplated by this Agreement in any newspaper selected by Seller.

7.     **EMPLOYEES.**  Purchaser intends to offer continued employment to most employees of the Business on the same or similar terms as their current terms of employment; provided, however, that Purchaser is not obligated to offer continuing employment to any Seller employees, including, without limitation, senior management or executives. Purchaser, in its sole and absolute discretion, will identify those Seller employees that Purchaser chooses not to offer continued employment to prior  to the Closing Date. Purchaser shall have no liability for any pay, benefits, severance, or other claims of any Seller employees earned, accrued, or otherwise relating to the period prior to the Closing Date, and all such liabilities shall constitute Excluded Liabilities, and shall remain the sole responsibility of Seller and its Affiliates, as applicable. Purchaser shall have no obligation to provide any severance, payments, or benefits to any current or former employees or independent contractors of Seller or its Affiliates earned or accrued on or prior to the Closing Date. Seller shall be responsible for providing any notice required pursuant to the WARN Act or any similar Law that is triggered by any action that occurs on or prior to the Closing Date. Seller and Purchaser acknowledge and agree that all provisions contained in this <u>Section 7</u>, with respect to current or former Employees are included for the sole benefit of Seller and Purchaser, and that nothing herein, whether express or implied, shall create any third-party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of Seller, any participant in any Employee Benefit Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Purchaser.

8.     **TERMINATION; EFFECT OF TERMINATION.**

8.1     Termination. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)     by mutual, written consent of Purchaser and Seller;

(b)     by Purchaser in the event the Closing has not occurred (other than through failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before eighty (80) days after the Petition Date (the "**Outside Closing Date**");

(c)     [reserved]

(d)     by Purchaser if (i) Seller shall file a motion to sell all or part of the Acquired Assets to a third party other than Purchaser and shall thereafter consummate such sale, or (ii) Seller's Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code;

(e)     by Purchaser if any term of the Approval Order is not reasonably acceptable to Purchaser in any manner that is materially adverse to Purchaser; or

(f)     by the non-breaching party upon a material breach of any provision of this Agreement, provided that such breach has not been waived by the non-breaching party and has continued

after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement which breach is not cured).

8.2 **Effect of Termination.** If this Agreement is terminated pursuant to Section 8.1(a) of this Agreement or terminated by Purchaser pursuant to Section 8.1(b), (d), (e) or (f) of this Agreement, Purchaser and its Affiliates shall not have any Liability or obligations under this Agreement and the Escrow Agent shall promptly return the Deposit to Purchaser, unless Seller terminates pursuant to Section 8.1(f). If Purchaser is not the prevailing purchaser or Back-Up Bidder, this Agreement will terminate, Purchaser and its Affiliates shall not have any Liability under this Agreement, and the Escrow Agent shall promptly return the Deposit to Purchaser; provided that the Bid Protections shall not be affected by the termination. If this Agreement is terminated by Seller pursuant to Section 8.1(f) of this Agreement, Seller shall be paid the Deposit by the Escrow Agent and Purchaser and its Affiliates shall be released from any further Liability under this Agreement and this Agreement shall otherwise be deemed null and void and of no further force and effect. Seller and Purchaser shall promptly (but in any event within two (2) Business Days after the termination of this Agreement) deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to return or pay the Deposit in accordance with this Section 8.2.

8.3 **Injunctive Relief.** Each Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement. Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief. The rights set forth in this Section 8.3 shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.

9. **GENERAL PROVISIONS.**

9.1 **"As Is", "Where Is", and "With All Faults" Transaction.** PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN SECTION 4 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING (A) FINANCIAL PROJECTIONS, REVENUES, PROFITS OR INCOME TO BE DERIVED OR COSTS OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, (B) THE PHYSICAL CONDITION OF ANY ACQUIRED ASSETS, (C) THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE LEASED REAL PROPERTY OCCUPIED BY SELLER, (D) THE ZONING OF THE LEASED REAL PROPERTY OCCUPIED BY SELLER, (E) THE VALUE OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (F) THE TRANSFERABILITY OF THE ACQUIRED ASSETS, (G) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, (H) TITLE TO ANY OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (I) THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF FOR ANY PARTICULAR PURPOSE, OR (J) ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND

26

WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 4</u> OF THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 4</u> OF THIS AGREEMENT, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

9.2 **Transaction Expenses.** Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the Transactions are consummated.

9.3 **Certain Interpretive Matters and Definitions.** Unless the context requires, references to the plural include the singular and references to the singular include the plural; references to any gender includes the other gender; the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation"; the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; and all references to Sections, Articles, or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

9.4 **Termination of Representations and Warranties.** The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

9.5 **Amendment.** Any provision of this Agreement may be amended if, but only if, such amendment is in writing and is signed by Seller and Purchaser (or by any successor to such Party)

9.6 **Waiver; Remedies Cumulative.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

9.7 **Notices.** All notices, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be given when hand delivered (or, if hand delivery is refused, on the date such delivery was attempted) or the date of delivery or refusal if sent by a nationally recognized overnight courier for next Business Day delivery to the addresses set forth below. A copy of all notices also shall be provided on the same Business Day.

Seller:    Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, MD 21030
Attention: Charles Parker
Email: pchuck@diamondcomics.com

And

27

Robert Gorin
c/o Getzler Henrich & Associates LLC
295 Madison Avenue
20th Floor
New York, NY 10017
Email: rgorin@getzlerhenrich.com

Copy to:     Saul Ewing, LLP
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Attention: Jeffrey C. Hampton; Adam H. Isenberg
Email: jeffrey.hampton@saul.com; adam.isenberg@saul.com

Purchaser:    Alliance Entertainment, LLC
c/o Alliance Entertainment Holding Corporation
8201 Peters Road, Suite 1000
Plantation, FL 33324
Attention: Bruce Ogilvie and Jeffrey Walker
Email: Bruce.Ogilvie@aent.com and jeffw@SDCD.com

Copy:        Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, NJ 07102
Attention: William L. Wilkins
Email: wwilkins@sillscummis.com

A party may designate another address by giving notice in accordance with this Section.

9.8    **Jurisdiction.** The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof; provided that in the event the Chapter 11 Case has concluded or been dismissed or the Bankruptcy Court declines to exercise jurisdiction or lacks jurisdiction, in each instance with respect to any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof, then exclusive jurisdiction shall be in the federal or state courts for the State of Maryland.

9.9    **Governing Law.** To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

9.10    **Damages.** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

9.11    **Time is of the Essence.** Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

9.12    **Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such

12963871 v28

provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

9.13    **Titles and Headings.** Titles and headings of Sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

9.14    **Assignment; Successors and Assigns.** This Agreement and the rights, duties and obligations hereunder may not be assigned by any Seller without the prior written consent of Purchaser, and any attempted assignment without consent shall be void. Subject to this paragraph, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns. Notwithstanding the foregoing, this Agreement may be assigned by Purchaser to an Affiliate, provided that such Affiliate assumes all of the obligations of Purchaser under this Agreement; provided further that Purchaser shall not be released of its obligations under this Agreement such that Purchaser and its Affiliate shall be jointly and severally liable for the performance of the obligations of Purchaser hereunder.

9.15    **No Third-Party Rights.** The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

9.16    **Confidentiality Agreement.** The parties acknowledge that the Confidentiality Agreement dated October 18, 2024 between DCD (through Raymond James & Associates, Inc., as DCD's Representative) and Alliance Entertainment Holding Corporation, a Delaware corporation (the "**Confidentiality Agreement**") shall remain in full force and effect during the term specified therein.

9.17    **Entire Agreement.** This Agreement, any Ancillary Agreements, and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, any Ancillary Agreements, or the Confidentiality Agreement.

9.18    **Prevailing Party.** If any litigation or other court action, arbitration or similar adjudicatory proceeding is sought, taken, instituted or brought by Seller or Purchaser to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing party in such action, suit or proceeding shall be borne by the party against whose interest the judgment or decision is rendered.  This Section 9.18 shall survive and the Closing.  Seller agrees that any amounts awarded to Purchaser pursuant to this Section 9.18 shall be payable as administrative expenses pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

9.19    **Execution of this Agreement.** This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

9.20    **Survival.** None of the representations or warranties of the Parties set forth in this Agreement, or any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.  Other than the requirements of further assurances and actions specifically identified to be taken post-Closing, all other covenants of the Parties shall expire upon Closing. This Section 9.20 shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing.  The obligations, limitations and rights provided for under this Section 9  shall survive any termination of this Agreement.

9.21.   **WAIVER OF JURY**.  EACH PARTY HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF OR ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[*Signature page follows*]

12963871 v28

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the Effective Date.

**SELLER**:

DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation

By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

DIAMOND SELECT TOYS & COLLECTIBLES, LLC

By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

**PURCHASER**:
ALLIANCE ENTERTAINMENT, LLC
a Delaware limited liability company,

By:_____
Name:  Bruce Ogilvie
Title: Chairman

31

### Exhibit A - Master Assignment

This **ASSIGNMENT, BILL OF SALE AND CONVEYANCE AGREEMENT** (this "**Agreement**"), dated as of [•], 2025 (the "**Effective Date**"), is made and entered into by and between Diamond Comic Distributors, Inc., a Maryland corporation ("**DCD**"), Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("**Diamond Select**") and Alliance Entertainment, LLC, a Delaware limited liability company ("**Purchaser**") (each a "**Party**" and collectively, the "**Parties**"). DCD and Diamond Select shall each be referred to herein as a "**Seller**" and collectively as "**Seller**".

<u>RECITALS</u>

WHEREAS, Purchaser and Seller are parties to that certain Asset Purchase Agreement, dated as of [•], 2025 (the "**Purchase Agreement**").

WHEREAS, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, the Parties are executing and delivering this Agreement pursuant to Section 3.5 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1. **Sale and Transfer of Acquired Assets**. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to, and subject to the terms and conditions of, the Purchase Agreement and that certain Order (A) Authorizing and Approving the Sale of Substantially All the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Establishing a Designation Period and Deadlines for the Assumption and Assignment Or Novation of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief entered on [•], 2025 [**NTD: Conform to caption of Final Order**] by the United States Bankruptcy Court for the District of Maryland in Case [_____] (the "**Approval Order**"), effective as of the Effective Date, Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser, and Purchaser hereby accepts, purchases, acquires, assumes and takes delivery of, all of Seller's right, title and interest in and to the Acquired Assets, free and clear of all Liens to the extent provided in the Approval Order. For the avoidance of doubt, Seller is not selling, conveying, assigning, transferring, or delivering to Purchaser any of the Excluded Assets, and all right, title, and interest in and to such Excluded Assets are hereby and shall be retained by Seller. Seller agrees to execute, acknowledge (where appropriate), and deliver such bills of sale, assignments, certificates of title, and other instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement or the Purchase Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Seller.

2. **Liabilities**. Subject to the terms and conditions of the Purchase Agreement, Purchaser does not and shall not assume and does not agree to pay, perform, fulfill or discharge, and shall not be responsible to pay, perform, fulfill or discharge any of Seller's Liabilities other than the Assumed Liabilities, except as may be provided otherwise in the Approval Order and Purchaser shall be responsible for the Cure Amounts. Subject to the terms and conditions of the Purchase Agreement, Purchaser shall be liable for all Liabilities arising in connection with the Acquired Assets, in each case solely to the extent arising after the Effective Date.

32

3.     **Entire Agreement**. This Agreement, together with the Approval Order, the Purchase Agreement, and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

4.     **Amendment and Waiver**. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

5.     **Terms of the Purchase Agreement**. This Agreement is entered into pursuant to, and subject to all of the terms and conditions of, the Purchase Agreement and the Approval Order. Nothing contained in this Agreement shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser contained in the Purchase Agreement or any provision of the Approval Order. In the event of any conflict or inconsistency between this Agreement and the Purchase Agreement and/or the Approval Order, the terms of the Purchase Agreement and Approval Order shall prevail.

6.     **Cooperation**.  Seller, for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Purchaser, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers and conveyances as may be reasonably requested by Purchaser in order to assign, transfer, convey and confirm unto and vest in Purchaser, its successors and assigns, title to the assets sold, conveyed and transferred by this Agreement.

7.     **Governing Law**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

8.     **Binding Effect**. This Agreement is being executed by Seller and Purchaser and shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns, for the uses and purposes above set forth and referred to, and shall be effective as of the Effective Date. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

9.     **Counterparts**. This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law.

10.     **Headings**. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

33

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the Effective Date.

**SELLER**:

DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation

By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

DIAMOND SELECT TOYS & COLLECTIBLES, LLC

By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

**PURCHASER**:
ALLIANCE ENTERTAINMENT, LLC
a Delaware limited liability company,

By:_____
Name:  Bruce Ogilvie
Title: Chairman

35

**Exhibit B**

**\*\*Not applicable to this APA\*\***

12963871 v28

**Exhibit C**

**\*\*Not applicable to this APA\*\***

12963871 v28

**Exhibit D - Tax Purchase Price Allocation**

**[To be agreed upon by Purchaser and Seller]**

**Exhibit E - Estimated Value Statement**

**[To be provided two (2) Business Days prior to the Closing]**

**Schedule A - Critical Vendor List**

**\*\*Not applicable to this APA\*\***

## Schedule 2.1(c) - Assigned Contracts

| Cure Contracts Name | Asset | Cure |
|---|---|---|
| 74850, INC. | Diamond Select Toys & Collectibles | $ - |
| accessiBe Ltd. | Diamond Select Toys & Collectibles | $ - |
| Arcane Tinmen ApS | Alliance Game Distributors | $ 136,967 |
| Ares Games, Srl | Alliance Game Distributors | $ 10,699 |
| Card Department, A Department of Bandai Co., LTD. | Alliance Game Distributors | $ 3,122,733 |
| Chessex MFG | ****[Missing Contract] | $ - |
| Comic-Con 2025 | Diamond Comic Distributors | $ - |
| Creative Mind Energy | Diamond Comic Distributors | $ 12,879 |
| Cryptozoic Entertainment | Diamond Comic Distributors | $ 352 |
| da Vinci Editrice S.r.l. d/b/a DV Giochi or DV Games | Alliance Game Distributors | $ 19,018 |
| Dire Wolf Digital, LLC Games, Inc. | Alliance Game Distributors | $ 303,645 |
| Fanroll | ****[Missing Contract] | $ - |
| Flat River Group | ****[Missing Contract] | $ - |
| Goodman Games LLC | Diamond Comic Distributors | $ 160,974 |
| GREEN RONIN PUBLISHING | Diamond Comic Distributors | $ 6,361 |
| Gut Bustin' Games, LLC | Alliance Game Distributors | $ - |
| Hasbro Consumer Products Licensing Limited | Diamond Select Toys & Collectibles | $ - |
| Imagine Fulfillment Services, LLC | Diamond Select Toys & Collectibles | $ 4,839 |
| Jasco Games LLC dba UVS Games | Alliance Game Distributors | $ 14,450 |
| Konami Digital Entertainment, Inc. | Alliance Game Distributors | $ 26,400 |
| Leder Games | ****[Missing Contract] | $ - |
| Lions Gate Ancillary LLC | Diamond Select Toys & Collectibles | $ - |
| Monster Fight Club | Alliance Game Distributors | $ 30,194 |
| Neca | ****[Missing Contract] | $ - |
| Netflix CPX, LLC and Netflix CPX International, B.V. | Diamond Select Toys & Collectibles | $ - |
| PAIZO INC | Alliance Game Distributors | $ 139,446 |
| Publisher Services, Inc (PSI) | Alliance Game Distributors | $ 377,611 |
| Ravensburger North America Inc. | Alliance Game Distributors | $ 11,373 |
| Renegade Games, Inc. | Alliance Game Distributors | $ 164,968 |
| Sirius Dice | ****[Missing Contract] | $ - |
| Skybound, LLC (Invincible) | Diamond Select Toys & Collectibles | $ - |
| Skybound, LLC (TWD) | Diamond Select Toys & Collectibles | $ - |
| Skyscraper Studios, Inc. d/b/a Roll for Combat | Alliance Game Distributors | $ 4,782 |
| Spin Master Ltd. | Diamond Comic Distributors | $ 93,688 |
| Synthesis Entertainment | Diamond Select Toys & Collectibles | $ - |
| Tee Turtle LLC | Alliance Game Distributors | $ 73,173 |
| The Army Painter | Alliance Game Distributors | $ 598,974 |
| The Pokémon Company International, Inc. | Alliance Game Distributors | $ 283,802 |
| The Upper Deck Company | Alliance Game Distributors | $ 1,820 |
| Toho International Inc. | Diamond Select Toys & Collectibles | $ - |
| Toho International Inc. and Legendary Licensince, LLC | Diamond Select Toys & Collectibles | $ 20,000 |
| Ultra Pro International LLC | Alliance Game Distributors | $ 51,302 |
| USAOPOLY, Inc. | Alliance Game Distributors | $ 29,782 |
| VIZ Media LLC | Diamond Comic Distributors | $ 268,308 |
| Wizards of the Coast | Alliance Game Distributors | $ - |
| **Total** | | **$ 5,968,538** |

12963871 v28

**Schedule 2.3 - Assumed Liabilities**

**\*\*Not applicable to this APA\*\***

**Schedule 3.3(c) – Assigned Contracts (Requiring Consent)**

**\*\*Not applicable to this APA\*\***

**Schedule 4.3 - Liens**

**None.**

**Schedule 4.4 - Contracts and Leases**

**None.**

**Schedule 4.6 – Seller Broker**

**None.**

**EXHIBIT B**

| Debtors' Post-Auction Demand for Additional/New Terms | AENT Satisfied Every Post-Auction Demand for Terms Issued by Debtors |
|---|---|
| As the Basic Fun! Lot B bid contained a $5,000,000 baseline bid, and AENT agreed to mimic Basic Fun!'s Lot B bid, the AENT APA needs to be revised to incorporate a $5,000,000 baseline bid for the Lot B assets.<br><br>Source: March 31, 2025 (12:23 pm ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-1**. | See Section 2.6(a)(ii) of the AENT APA.<br><br>The "baseline bid" for the Lot B Business Assets (i.e. the purchase price being paid for the Lot B Business Assets *in addition to* the Incentive Amount) was increased from $5,000,000 (as reflected in the Basic Fun! Lot B bid) to $21,000,000. |
| As the Basic Fun! Lot B bid did not provide for the Incentive Base Amount to be credited against the Incentive Amount, and AENT agreed to mimic Basic Fun!'s Lot B bid, no such credit should be applicable.<br><br>Source: March 31, 2025 (12:23 pm ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-1**. | See Section 2.8(b) of the AENT APA.<br><br>AENT accepted Debtors' strike of the related credit language. |
| As the Basic Fun! Lot B bid did not provide for a working capital adjustment with respect to the Lot B Purchase Price, and AENT agreed to mimic Basic Fun!'s Lot B bid, no such working capital adjustment should be applicable.<br><br>Source: March 31, 2025 (12:23 pm ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-1**. | See Section 2.6(a)(ii) of the AENT APA.<br><br>AENT accepted Debtors' strike of the related working capital adjustment language. |
| As the Basic Fun! Lot B bid did not provide for a holdback with respect to the Lot B Purchase Price, and AENT agreed to mimic Basic Fun!'s Lot B bid, no such holdback should be applicable.<br><br>Source: March 31, 2025 (12:23 pm ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-1**. | See Section 6.6(b)(ix) of the AENT APA.<br><br>AENT accepted Debtors' strike of the related holdback language. |
| The AENT APA needs to be revised to include the payment for Prepaid Inventory associated with the Alliance Gaming Business, otherwise (in Debtors' view) AENT's bid is inconsistent with the business deal that was agreed upon on the record during the auction. | See the definition of "Inventory Value" contained in the AENT APA.<br><br>AENT accepted Debtors' inserted language expanding "Inventory Value" to mean, with respect to Prepaid Inventory, 90% of such inventory's value. |

| | |
|---|---|
| <u>Source</u>: March 31, 2025 (12:23 pm ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-1**. | |
| The AENT APA needs be revised to include the assumption of open purchase orders for Inventory ordered after the Petition Date and not delivered prior to the Closing Date, otherwise (in Debtors' view) AENT's bid is inconsistent with the business deal that was agreed upon on the record during the auction.<br><br><u>Source</u>: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See Section 2.3 of the AENT APA.<br><br>AENT accepted Debtors' insertion of the related assumed liability language. |
| The AENT APA needs to be revised to limit claims against past and present vendors and customers of Seller to Go-Forward Vendors only.<br><br><u>Source</u>: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See the definition of "Causes of Action" in the AENT APA.<br><br>AENT made the revisions requested by Debtors' counsel. |
| The AENT APA needs to revised to remove claims against the administrative agent, lender, secured party, etc. from the definition of Causes of Action.<br><br><u>Source</u>: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See the definition of "Causes of Action" in the AENT APA.<br><br>AENT made the revisions requested by Debtors' counsel. |
| The AENT APA needs to be revised to remove "insiders" and "related parties" from the definition of Go-Forward Vendors.<br><br><u>Source</u>: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See the definition of "Go-Forward Vendors" in the AENT APA.<br><br>AENT made the revisions requested by Debtors' counsel. |
| The AENT APA needs to be revised to limit Go-Forward Vendors to parties that Purchaser does business with.<br><br><u>Source</u>: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See the definition of "Go-Forward Vendors" in the AENT APA.<br><br>AENT made the revisions requested by Debtors' counsel. |

| | |
|---|---|
| The AENT APA needs to be revised to remove certain intellectual property assets from the definition of Acquired Assets.<br><br>Source: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See Section 2.1(i) of the AENT APA.<br><br>AENT accepted Debtors' strike of the related intellectual property asset language. |
| The AENT APA needs to be revised to include "all Avoidance Actions against any person other than a Go-Forward Vendor".<br><br>Source: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See Section 2.2(o) of the AENT APA.<br><br>AENT accepted Debtors' insertion of the requested language. |
| The AENT APA needs to be revised to provider Seller with a consent right over the conditions required by Purchaser's lender regarding the Segregated Lockbox.<br><br>Source: April 1, 2025 (12:29 am ET) email from Jeffrey Hampton (Debtors' Counsel) to Jason Teele (AENT's Counsel). *See* **Exhibit B-2**. | See Section 2.8(a) of the AENT APA.<br><br>AENT accepted Debtors' insertion of the requested language. |

-3-

**<u>EXHIBIT B-1</u>**

**Jason Teele**

| | |
|---|---|
| **From:** | Hampton, Jeffrey C. <jeffrey.hampton@saul.com> |
| **Sent:** | Monday, March 31, 2025 12:23 PM |
| **To:** | Jason Teele |
| **Cc:** | Minuti, Mark; Isenberg, Adam H. |
| **Subject:** | Diamond Comics |



**\*\*\* External Email \*\*\***

---

**SETTLEMENT COMMUNICATION
SUBJECT TO FRE 408**

Jason:

I am following up in response to the initial APA AENT's that AENT circulated on March 26th as well as the slightly revised form of APA AENT's that AENT circulated on March 28th.  Putting aside several other drafting points that will need to be resolved and addressed in the documents, there are material inconsistencies between the economic terms of these agreements and AENT's last bid at the auction.  Specifically:

1. ***Base Purchase Price*** – The Basic Fun Lot B bid, which AENT agreed to 'mimic" as stated during the auction, provided for a baseline bid of $5.0 million.  AENT's APAs do not include such baseline bid.
2. ***Incentive Base Amount*** – AENT's APAs provide that the $5 million Incentive Base Amount is to be credited (as a reduction) against the Incentive Amount. Section 2.8(b) of AENT APA.  This is not consistent with the terms of the Basic Fun B Lot Bid that was to be mimicked per AENT's statement on the record during the March 24, 25 auction.
3. ***Purchase Price Working Capital True Up*** –The APAs that we received from AENT's counsel provide that for the calculation of the Lot B Purchase Price there is to be included a working capital adjustment/true up.  Section 2.6(a)(ii) of AENT APA.  This is not consistent with the terms of the Basic Fun Lot B Bid that was to be mimicked per AENT's statement on the record during the March 24, 25 auction.
4. **Holdback Amount -** AENT's APAs provide for a 10% Holdback for the Lot B Purchase Price.  Section 6.6((b)(ix) of AENT APA.  This is not consistent with the terms of the Basic Fun Lot B Bid that was to be mimicked per AENT's statement during the March 24, 25 auction.
5. ***Prepaid Inventory*** – The AENT APAs exclude prepaid inventory for purposes of calculating the purchase price for the Alliance Gaming Business Assets.  This is not consistent with the bid valuations that AENT placed on the record during the auction and the discussions with AENT's representatives that preceded the auction.

The inconsistencies summarized above reduce the value of Alliance Entertainment's bid to an amount less than stated on the record by AENT at the conclusion of the auction.  We corrected these inconsistencies in the mark-up of the APA that was sent to you on March 27th.  Rather than accept Diamond's corrections, AENT rejected and reversed the revisions in the draft returned on March 28th.

Unless Alliance Entertainment confirms in writing and provides a further revised APA, no later than 4:00 p.m. E.T. today (March 31), consistent with the economic terms of the bid as stated by AENT during the auction (as provided above), the Debtors will conclude that AENT is not intending to proceed with its bid as stated on the record during the March 24, 25 auction.  The Debtors reserve all rights.  Thank you.

Jeffrey



**Jeffrey C. Hampton**
Partner
(215) 972-7118    (215) 479-5290
jeffrey.hampton@saul.com
Read my bio >>

**SAUL EWING** LLP

Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186

CA • DE • FL • IL • MA • MD • MN • NJ • NY • PA • DC

"Saul Ewing LLP (saul.com)" has made the following annotations:
+~~~~~~~~~~~~~~~~~~~~~~~+
This e-mail may contain privileged, confidential, copyrighted, or other legally protected information. If you are not the intended recipient (even if the e-mail address is yours), you may not use, copy, or retransmit it. If you have received this by mistake please notify us by return e-mail, then delete.
+~~~~~~~~~~~~~~~~~~~~~~~+

**<u>EXHIBIT B-2</u>**

**Jason Teele**

| | |
|---|---|
| **From:** | Hampton, Jeffrey C. <jeffrey.hampton@saul.com> |
| **Sent:** | Tuesday, April 1, 2025 12:29 AM |
| **To:** | William L. Wilkins |
| **Cc:** | Jason Teele; Paul Navid; Hunter Thompson; Isabella Zeng; Project Gem; Robert Gorin; William Henrich; Aly, Ramy; Aly, Waleed; Isenberg, Adam H.; Minuti, Mark |
| **Subject:** | RE: Diamond Comic Distributors \| Alliance Entertainment |

# *** External Email ***

Thank you for the updated APA draft.  Notwithstanding our previous markup of the APA (in response to which you rejected almost all our comments), our email earlier on Monday, and our conversation Monday evening, the revised draft APA still fails to provide for the purchase (for value) of Prepaid Inventory and fails to include open purchase orders as a Purchaser assumed liability.  As a result, the APA is still inconsistent with the economic terms of the bid as stated by AENT during the auction. In addition, the Debtors note the following comments to the revised APA draft below.   The Debtors reserve all rights.  Thank you.

1.  **Definition of "Causes of Action" -**  (i) claims against past and present vendors and customers of Seller should be limited to Go Forward Vendors only.

2.  **Definition of "Causes of Action" –** (iii) claims against the administrative agent, lender, secured party, etc. should be removed from this definition.

3.  **Definition of Go Forward Vendors -** This definition should be modified to exclude insiders (as defined in the Bankruptcy Code) and related parties.

4.  **Definition of Go Forward Vendors -** This definition should be limited solely to parties that Purchaser does business with (there should not be an ability for carte blanch designation).

5.  **Section 2.1(i)(vi) –** This section should be removed because the listed items are Excluded Assets.

6.  **Section 2.2(p) –** This section (all Avoidance Actions against any person other than a Go-Forward Vendor) should not have been removed as it is an Excluded Asset.

7.  **Section 2.8(a) –** The conditions required by Purchaser's lender regarding the Segregated Lockbox should be subject to Seller's prior consent.

Jeffrey