# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc. *et al.*, | Chapter 11 |
| Debtors. | (Jointly Administered) |
| Alliance Entertainment, LLC, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ |
| Diamond Comic Distributors, Inc.; Comic Holdings, Inc.; Comic Exporters, Inc.; and Diamond Select Toys & Collectibles, LLC, | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiff Alliance Entertainment, LLC ("Plaintiff" or "AENT"), by its attorneys, as and for its Complaint against Defendants Diamond Comic Distributors, Inc. ("DCD"), Comic Holdings, Inc. ("CHI"), Comic Exporters, Inc. ("CEI"), and Diamond Select Toys & Collectibles, LLC ("DST" together with DCD, CHI, CEI, "Defendants" or "Debtors"), allege as follows:

## NATURE OF THE ACTION

1. This action arises from Debtors' inexplicable refusal to seek this Court's approval of, and to consummate, the sale of their assets to the successful bidder at an auction they conducted, with the approval of the Court, on March 24-25, 2025 (the "Auction"). AENT strictly complied with the Bid Procedures Order (defined below), attended the Auction, and submitted the highest and best bid for substantially all assets of Debtors thereby receiving designation as the Successful Bidder (defined below) by Debtors and Consultation Parties (defined below).

2. Debtors, on the other hand, violated the Bid Procedures Order, conducted the Auction in a manner that was unfair to any party other than their preferred purchaser, and—despite having designated AENT as the Successful Bidder—acted with extreme bad faith in the period following the Auction. Debtors' bad faith is illustrated by their: (i) demand that AENT include new economic terms in its winning bid that were not included in AENT's bid and not addressed at the Auction; (ii) refusal to engage in any negotiations over the terms of AENT's asset purchase agreement (the "AENT APA"); and (iii) tersely advising AENT that they intend to seek Court approval of the Backup Bidders' (as defined below) inferior bid.

3. Nevertheless, AENT remains ready, willing, and able to close the sale transaction upon receiving Court approval. Debtors' refusal to follow the procedures they proposed and the Court approved, as well as Debtors' anticipatory violations and breaches of the Bid Procedures Order, has and is causing irreparable harm to AENT. This Adversary Proceeding is being filed to remedy that harm by enjoining Debtors from seeking Court approval to consummate a sale of substantially all of their assets with any party other than AENT.

## PARTIES

4. Plaintiff AENT is a Delaware Limited Liability Company and the highest bidder at the Auction.

5. Defendant DCD is a Maryland Corporation, a Debtor in these cases, and a Seller under the AENT APA.

6. Defendant CHI is a Maryland Corporation a Debtor in these cases, and a Seller under the AENT APA.

7. Defendant CEI is a Maryland Corporation a Debtor in these cases, and a Seller under the AENT APA.

8. Defendant DST is a Maryland Limited Liability Company a Debtor in these cases, and a Seller under the AENT APA.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the action and the parties pursuant to 28 U.S.C. § 1334 and Article XIII of the Bidding Procedures Order.

10. The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

**I.     Bankruptcy Petition**

12. Debtors are distributors of tabletop games, board games, card games, miniatures, role playing games, accessories, pop-culture merchandise, comic books, gaming products, collectibles, accessors, and graphic novels, with four operating divisions, namely the: (1) Alliance Game Distributors division (through which Seller distributes board games, card games, miniatures, role playing games, and accessories in the United States) (the "Alliance Gaming Business"); (2) Diamond Comic Distributors division (through which Seller distributes comic books, graphic novels, and related merchandise) (the "DCD Business"); (3) Collectible Grading Authority division (through which Seller provides grading and authentication services for collectibles, including comic books and trading cards) (the "CGA Business"); and (4) Diamond Select Toys division (though which Seller manufactures collectible toys and statues) (the "Diamond Select Toys Business").

13. On January 14, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

14. Debtors continue in the possession and control of their assets and properties in accordance with sections 1107 and 1108 of the Bankruptcy Code.

## II. Stalking Horse Bid

15. Prior to the Petition Date, Debtors retained Raymond James & Associates, Inc ("Raymond James") to commence a sale process for all or substantially all of Debtors' assets. Raymond James prepared investment materials and marketed Debtors' assets, contacting over 110 prospective purchasers. After negotiating with those parties that executed a non-disclosure agreement, Debtors decided to proceed with Universal (defined below) as the stalking horse bidder for the Alliance Gaming Business assets and substantially all of the assets and certain liabilities of Diamond Comic Distributors UK, an indirect subsidiary of Defendant DCD.

16. On January 13, 2025, Universal Distributors, Inc. ("Universal" or the "Stalking Horse Purchaser") executed an asset purchase agreement with DCD (the "Stalking Horse Agreement") for a purchase price of $39,000,000, subject to certain adjustments, and the assumption of certain liabilities described therein ("Stalking Horse Bid").

## III. Court Order Approving Sale of Debtors' Assets

17. With the Stalking Horse Agreement in place, on January 21, 2025, Debtors filed the Bid Procedures Motion. Subsequently on February 21, 2025, Debtors filed their *Motion for Entry of an Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (Docket No. 168) (the "Sale Motion").

18. On February 11, 2025, the Court entered the Bid Procedures Order. The Bid Procedures Order, among other things, ordered that "[t]he Auction, if held, is necessary to determine . . . the highest or otherwise best bid for Debtors' Assets." Thus, the Court-ordered

purpose of the Auction was to identify the highest and best bid for Debtors' assets. Debtors, however, never feeling bound by the Bid Procedures Order, used the Auction to steer the sale of their assets to the Stalking Horse Purchaser. In pursuit of their illicit goal, Debtors concealed material information from bidders (other than the Stalking Horse Purchaser) at the Auction and changed the rules of the Auction after it began in order to ensure that the Stalking Horse Purchaser emerged as the party with the highest and best offer. Their efforts failed miserably when the Stalking Horse Purchaser—who, at the start of the Auction was secretly teamed up with another bidder, Ad Populum LLC ("Ad Populum"), to increase the Stalking Horse Purchaser's financial clout—affirmatively dropped out of the bidding, leaving AENT's offer as the highest and best bid. Having failed in their attempt to influence the outcome, Debtors were constrained to declare AENT the Successful Bidder at the conclusion of the Auction. Indeed, even after Debtors declared AENT the Successful Bidder, Debtors spoke to Universal of the record, before finally announcing what was obvious to all in attendance, that AENT was the winner of the Auction.

19. The Bid Procedures Order also set the bid deadline for March 19, 2025, at 5:00 p.m. by which all Qualifying Bids (as defined therein) must be received by Debtors (the "Bid Deadline"). The Bid Procedures Order also provided that, by March 21, 2025, at 1:00 p.m., Debtors must notify all Qualifying Bidders (as defined therein) whether their bids have been determined to be a Qualifying Bid, and which of the bids is the highest or best bid for constituting the opening bid of the Auction ("Baseline Bid"). The Bid Procedures Order scheduled an Auction, if necessary, for March 24, 2025, at 10:00 a.m., at the offices of Raymond James, and a hearing to approve the sale of Debtors' assets (the "Sale Hearing") for March 27, 2025, at 10:00 a.m.

20. The Order also stated in CAPITAL LETTERS that "the successful bid(s) and back-up bid(s) shall constitute an irrevocable offer and be binding on the successful bidder(s) and the back-up bidders, respectively, from the time the bid is submitted until two (2) business days after

5

the sale has closed." Notwithstanding the clear terms of the Bid Procedures Order, and unphased that their behavior at the Auction did not rig the sale in favor of the illicit bidding group comprised of the Stalking Horse Purchaser and Ad Populum, Debtors continued to engage in improper behavior following the Auction, in an effort to rescue their failed attempt to steer the sale transaction to their preferred purchaser.

### IV.     **AENT is Declared a Qualified Bidder**

21. In advance of the Bid Deadline, AENT submitted an offer to purchase substantially all of Debtors' assets for $51,559,450, which included the assumption of certain liabilities but excluded certain adjustments. AENT also wired an earnest money deposit of $3,600,000, as required by the Bid procedures Order.

22. On March 21, 2025, prior to bidding deadline, Raymond James notified AENT that it was conditionally approved as a Qualified Bidder, but that the AENT APA did not meet certain requirements and could not be approved. Upon information and belief, five (5) other bidders received an identical message. Debtors extended the deadline by which they would have to notify parties whether they had been designated as a Qualified Bidder from March 21 to March 23, 2025 at 1:00 p.m.

23. After extensive discussions and revisions to AENT's bid, on March 23, 2025, Debtors notified AENT that that it was a Qualified Bidder. In an email at 1:06 p.m.., Raymond James stated "[f]ollowing consultation with the Consultation Parties, Debtors confirm that you have been deemed a Qualifying Bidder for Asset Lots C and D (as defined below) based on your most recent APA submission. Furthermore, Debtors, after consultation with the Consultation Parties, have selected which of the Qualifying Bids is the Baseline Bid for each of Asset lots."

24. Lot C was a bid for the Alliance Game Business. The Baseline Bid was $35,600,00 and was submitted by Universal. The March 23, 2025, email from Raymond James contained a

note that "[c]ertain bids received from other Qualifying Bidders include Lot C as a component bid with the amount of such Qualifying Bid exceeding the Baseline Bid for this Lot." All qualified bids for Lot D included "prepaid inventory" as an acquired asset, with no additional consideration paid for such asset.

25. Lot D was a bid for the whole company (*i.e.*, substantially all assets of Debtors) including the Alliance Gaming Business, DCD Business, CGA Business, and Diamond Select Toys Business. The Baseline Bid was $50,000,000 and was submitted by Basic Fun! All qualified bids for Lot D included "prepaid inventory" as an acquired asset, with no additional consideration paid for such asset.

V.     **AENT is Declared the Successful Bidder at the Auction**

26. The Auction was held as scheduled on March 24, 2025, where Debtors took over eight hours to start the Auction. There were three sets of bidders for the whole company assets (Lot D), AENT, Basic Fun!, and Universal/ Ad Populum. After the Auction began, but before bidding commenced, Debtors announced, to the shock of AENT, that they had arranged for Universal and Ad Populum to bid as a group. Ad Populum was interested in purchasing only certain assets of Debtors, and allowing the two bidders to collude with one another increased their financial wherewithal to outbid AENT and Basic Fun!. Debtors believed this would further their goal of steering the sale to Universal, their preferred purchaser, without regard to the interests of the estates or creditors.

27. By the end of the Auction, AENT's bid for $72,245,000 (inclusive of stalking horse protections) was determined to be the highest and best bid. Angelo Exarhakos on behalf of Universal/Ad Populum group then stated, "we're out," indicating they would not counter with another bid. At this point, the Debtors stopped the Auction and met privately with Universal. The details of that discussions were never disclosed. Upon resuming the Auction, Raymond James

proceeded to declare AENT was the successful bidder and Universal/Ad Populum as the back-up bidder, stating "*[t[he Debtors in consultation with the consultation parties have reviewed the bids with respect to Lot D. And we're pleased to announce, obviously, the winner is [AENT] for Lot D*. Thank you very much. The backup bidder is the B group of Universal and Ad Populum. Lot D is now closed. *So there's no bidding on Lot D*."

28. Closing the Auction did not stop Debtors from soliciting new bids. In the days following the Auction, Debtors negotiated in secret with Universal/Ad Populum. *See* Declaration of Robert Gorin (Docket No. 297) ("Following the Auction, the Debtors have continued to negotiate in good faith and at arm's-length with Alliance Entertainment and Universal/AP with respect to their respective transactions."). As discussed below, Debtors never engaged in "good faith" or "arm's length" negotiations with AENT.

VI. **Debtors Secretly Solicit Bids After the Auction and Abruptly Terminate the Sale to AENT**

29. On March 26, 2025, at 5:55 p.m., following the Auction, counsel for AENT sent a revised AENT APA to Debtors conforming the agreement to the verbal modifications made on the record at the Auction. Debtors' failure to respond made it inevitable that the sale hearing on March 27, 2025, would be adjourned.

30. On March 27, 2025, Raymond James requested that AENT's investment banker, Province LLC ("Province") "confirm that the [AENT March 26 Draft] will be amended to reflect an addition $5,000,000 of cash consideration." Raymond James claimed that the additional consideration was included in the baseline bid of BasicFun! for the Lot B assets. Province asked for clarification of the request for the additional consideration and requested a copy of the Basic Fun! Agreement so AENT could review and adopt the relevant provisions surrounding the payment of another $5 million. Raymond James did not respond.

8

31. On March 27, 2025, at 5:28 p.m., Debtors' counsel transmitted to AENT's counsel a redline of the AENT APA. The redline included proposed revisions that deviated from the agreements stated on the record at the Auction and that were accepted by Debtors. AENT's counsel responded on March 27, 2025, at 9:15 p.m., with a counter-proposed redline agreement noting Debtors' proposed changes that were not discussed at the Auction or which deviated from the agreements made on the record at the Auction. At this point, Debtors ceased all communications with AENT and refused to respond to the last version of the agreement transmitted by AENT's counsel.

32. Additionally, AENT arranged for their accountants to meet with Raymond James on March 27, 2025 to discuss the possibility of creating audited financials since Debtors had stopped preparing such financials in or around 2023. Raymond James abruptly cancelled the meeting on the morning of March 27, without any explanation or attempt to reschedule.

33. On March 31, 2025, at 9:08 a.m., AENT's counsel sent an email to Debtors' counsel asking for a response to the agreement last transmitted by AENT. Nearly three hours later, at 12:23 p.m., Debtors' counsel sent an email outlining five alleged inconsistencies between the March 28 version of the AENT APA and to the agreement placed on the record at the Auction. In an email sent on March 31, 2025, at 1:35 p.m., AENT acquiesced to four of the five points raised by Debtors' counsel and explained that the fifth point was a significant new economic term that was not included in any bid made by AENT up to that point nor discussed at the Auction. In that same email, and in subsequent emails sent around the same time, AENT's counsel requested a telephone conference with Debtors' professionals to discuss their points. A call was held at 6:00 p.m. that evening, following which, at 8:54 p.m., AENT's counsel sent a further revised agreement adopting four of the five additional points requested by Debtors, but not incorporating Debtors' new economic ask.

34. The next day, April 1, 2025, at 12:29 p.m., Debtors' counsel sent an email outlining seven additional revisions to the last version of the agreement. AENT agreed to each of the seven new points in the interest of finalizing the agreement so Court approval could be sought at the hearing, which had been adjourned to April 2, 2025. Debtors ignored this communication, and several follow-up communications requesting a response.

35. Then, at 3:57 p.m. on April 1, 2025, Debtors' counsel notified AENT that Debtors would seek approval to sell substantially all assets to Universal/Ad Populum. The notice from Debtors' counsel abruptly stated, " . . . ***the Debtors, after consultation with the Consultation Parties, will be seeking approval of the sale at tomorrow's hearing to the backup bidders***."

36. Later that same day, Debtors filed with the Court Mr. Gorin's declaration (Docket No. 297), in which he states, at paragraph 23: "[f]ollowing the Auction, Debtors have continued to negotiate in good faith and at arm's-length with Alliance Entertainment and Universal/AP with respect to their respective transactions." For the first time, AENT learned that Debtors were secretly soliciting additional offers from Universal/Ad Populum.

37. In the time between when the Auction concluded on March 24, 2025, and April 1, 2025, Debtors failed and refused to engage in good faith negotiations with AENT, while secretly and inappropriately (in violation of the Bid Procedures Order) soliciting new bids. Ultimately, on April 5, 2025, the Debtors filed with the Court new agreements with Universal and Ad Populum. The transactions described in those agreements have a lesser value than that of the AENT APA and, notably, do not include the revisions the Debtors demanded of AENT following the Auction.

38. At no time has AENT breached its promise to consummate the purchase of Debtors' assets. In fact, AENT increased the total value of its bid following the Auction in response to Debtors' demands. The total additional value of AENT's offer as a result of Debtors' demands exceeds $14,400,000.

39. AENT stands ready, willing, and able to close the transaction on April 10, 2025.

40. The Debtors did not engage in negotiations over the form of the AENT APA since the Auction, let alone good faith, arm's length negotiations. Nor have the Debtors addressed the risks from two buyers having to close the same transaction, with distinct purchase agreements and no liability if one buyer unilaterally decides not to purchase Debtors' assets. Section 3 of the Universal Purchase Agreement (Docket No. 314-1) provides that "the Backup Bidder consists of two distinct and separate entities, namely Purchaser and Ad Populum" and that "each Purchaser Party shall be solely responsible for its own obligations." Section 3 further provides that "Purchaser shall not have any liability whatsoever under the Ad Populum APA if closing fails to occur under the Purchase Agreement as a result of Ad Populum's failure to proceed to closing under the Ad Populum APA." In short, the risk of negotiating and closing the sale of Debtors' assets involving two purchasers is greater than if Debtors sell their assets to AENT.

41. Ad Populum does not have the financial wherewithal to close the transaction in the Ad Populum APA. It does not have audited financial statements, and it has assigned its rights under the Ad Populum APA to a third party, who was not a bidder at the Auction and is not qualified to bid under the Bid procedures Order.

**FIRST CAUSE OF ACTION**
**(Specific Performance)**

42. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 41 as if fully set forth herein.

43. There is a valid and binding contract between the Plaintiff and Defendants. Section IX of the Bid Procedures approved by the Court provides in capital letters that "the successful bid(s) and back-up bid(s) shall constitute an ***irrevocable offer and be binding on the successful bidder(s)*** and the back-up bidders, respectively, from the time the bid is submitted until two (2) business days after the sale has closed." Section IX further provides that if the successful bidder

11

fails to close by April 10, 2025, only then will the back-up bidder be deemed the successful bidder, which has not happened here. Moreover, at the Auction, Debtors accepted AENT's bid of $70,880,000 (net of Stalking Horse Protections), stating that "***[t[he Debtors in consultation with the consultation parties have reviewed the bids with respect to Lot D. And we're pleased to announce, obviously, the winner is [AENT] for Lot D***."

44. AENT has acquiesced to substantially all of Debtors' post-Auction demands, increasing the total consideration to Debtors' estates to approximately $85.37 million.

45. On April 1, 2025, Debtors abruptly terminated the AENT APA and stated they would proceed with the back-up bidder.

46. Defendants defaulted under the terms of the Order, which required Debtors to proceed with the Sale Hearing to approve the sale of Debtors' assets to the successful bidder.

47. Defendants further defaulted under the agreement wherein Debtors accepted AENT's bid and declared AENT the winner of the Auction, and therefore, the successful bidder.

48. AENT is ready, willing, and able to close the AENT APA, in the form submitted to the Court at Docket No. 308, which incorporates *all* of the demands made by Debtors since the Auction.

49. Section 8.3 of the AENT APA, which Debtors accepted when declaring AENT a Qualified Bidder, provides that "[e]ach Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement."

50. Plaintiff seeks an order requiring such specific performance and compelling Debtors to seek the Court's approval to consummate the transaction with AENT.

## SECOND CAUSE OF ACTION
**(Declaratory Judgment)**

51. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 50 as if fully set forth herein.

52. 28 U.S.C. § 2201 provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

53. There is a valid and binding contract between AENT and Debtors.

54. AENT was the successful bidder at the Auction and Debtors accepted AENT's bid of $70,880,000 (net of stalking horse protections), stating "[t[he Debtors in consultation with the consultation parties have reviewed the bids with respect to Lot D. And we're pleased to announce, obviously, the winner is [AENT] for Lot D."

55. AENT acquiesced to Debtors' every post-Auction demand, increasing the total consideration to Debtors' estates to a total of approximately $85.37 million.

56. Debtors improperly terminated the AENT APA and intend to seek confirmation of the sale of Debtors' assets to the back-up bidder, whose final bid was only $69,130,000.

57. There is an actual controversy between Plaintiff and Defendants over Debtors' obligations to sell their assets to AENT as the successful bidder from the Auction.

58. Therefore, Plaintiff is entitled to a declaration that Debtors must maximize the value of their estates and sell their assets to AENT, as the successful bidder.

## THIRD CAUSE OF ACTION
### (Breach of Contract)

59. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 58 as if fully set forth herein.

60. There is a valid and binding contract between the parties. Section IX of the Bid Procedures approved by the Court provides in capital letters that "the successful bid(s) and back-up bid(s) shall constitute an irrevocable offer and be binding on the successful bidder(s) and the back-up bidders, respectively, from the time the bid is submitted until two (2) business days after the sale has closed." Section IX further provides that if the successful bidder fails to close by April 10, 2025, only then will the back-up bidder be deemed the successful bidder, which has not happened here. Moreover, at the Auction, Debtors accepted AENT's bid of $70,880,000 (net of Stalking Horse Protections), stating that "[t]he Debtors in consultation with the consultation parties have reviewed the bids with respect to Lot D. And we're pleased to announce, obviously, the winner is [AENT] for Lot D."

61. AENT has acquiesced to substantially all of Debtors' post-Auction demands, increasing the total consideration to Debtors' estate to approximately $85.37 million.

62. On April 1, 2025, Debtors abruptly terminated the AENT APA and stated they would proceed with the back-up bidder.

63. Defendants defaulted under the terms of the Order, which required Debtors to proceed with the Sale Hearing to approve the sale of Debtors assets to the successful bidder.

64. Defendants further defaulted under the agreement wherein Debtors accepted AENT's bid and declared AENT the winner of the Auction, and therefore, the successful bidder.

65. As a result of Debtors' breach of the Order and their agreement with AENT, AENT has incurred and will continue to incur significant damages.

66. Accordingly, Plaintiff is entitled to and seek damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Injunctive Relief)

67. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 66 as if fully set forth herein.

68. There is a valid and binding contract between the parties. Section IX of the Bid Procedures approved by the Court provides in capital letters that "the successful bid(s) and back-up bid(s) shall constitute an irrevocable offer and be binding on the successful bidder(s) and the back-up bidders, respectively, from the time the bid is submitted until two (2) business days after the sale has closed." Section IX further provides that if the successful bidder fails to close by April 10, 2025, only then will the back-up bidder be deemed the successful bidder, which has not happened here. Moreover, at the Auction, Debtors accepted AENT's bid of $70,880,000 (net of Stalking Horse Protections), stating that "[t]he Debtors in consultation with the consultation parties have reviewed the bids with respect to Lot D. And we're pleased to announce, obviously, the winner is [AENT] for Lot D."

69. AENT has performed all of its obligation to Debtors as required under the Order.

70. On April 1, 2025, Debtors abruptly terminated the AENT APA and stated they would proceed with the back-up bidder.

71. Defendants defaulted under the terms of the Order, which required Debtors to proceed with the Sale Hearing to approve the sale of Debtors' assets to the successful bidder.

72. Defendants further defaulted under the agreement wherein Debtors accepted AENT's bid and declared AENT the winner of the Auction, and therefore, the successful bidder.

73. At the April 2, 2025 Sales Hearing, adjourned to April 7, 2025, at 10:00 A.M., Debtors stated that they will proceed to sell their assets to the back-up bidder, Universal/Ad Populum.

74. Universal/Ad Populum's final bid of $69,130,000 is lower than AENT's bid of $70,880,000 and lower than the increased consideration of approximately $85.37 million.

75. Section 8.3 of the AENT APA, which Debtors accepted when declaring AENT a Qualified Bidder, provides that "[e]ach Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach."

76. AENT, therefore, seeks to restrain and enjoin Debtors from selling their assets to any persons other than AENT, the successful bidder at the Auction.

77. Plaintiff lacks an adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants and issue an order as follows:

1. Compelling Debtors to sell their assets to the successful bidder from the Auction, AENT, and execute the AENT APA in the form submitted to the Court at Docket No. 308.

2. Declaring that Debtors must sell their assets to AENT, the successful bidder at the Auction,

3. Preliminarily enjoining and restraining Debtors from selling their assets to any persons other than AENT, the successful bidder at the Auction.

4. Permanently enjoining and restraining Debtors from selling their assets to any persons other than AENT, the Successful Bidder at the Auction.

5. Awarding Plaintiff its reasonable attorneys' fees, costs and other expenses incurred in this action; and

6. Awarding Plaintiff such other and further relief as the Court deems just and proper.


Dated: April 6, 2025

/s/ *Jonathan A. Grasso*
Jonathan A. Grasso, 19278
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401
(443) 569-5972
jgrasso@yvslaw.com

-and-

S. Jason Teele (Admitted Pro Hac Vice)
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-4779
steele@sillscummis.com

*Counsel for Alliance Entertainment, LLC*

17

## **VERIFICATION**

Bruce Ogilvie, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Executive Chairman of Alliance Entertainment Holding Corporation d/b/a Alliance Entertainment LLC (collectively, "AENT").

2. On behalf of AENT, I have reviewed the Verified Complaint, and that the facts contained therein are true and correct to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

                        Alliance Entertainment, LLC


                        By: _____Bruce Ogilvie_____
                        Name: Bruce Ogilvie
                        Title: Executive Chairman