UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

```
                         .
 IN RE:                  .     Chapter 11
                         .
 Diamond Comic Distributors,  .
 Inc.,                   .
                         .
          Debtor.        .     Bankruptcy #25-10308 (DER)
```
.........................................................

Baltimore, Maryland
April 2, 2025
2:00 p.m.

BEFORE THE HONORABLE DAVID E. RICE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


TRANSCRIPT OF:

[68]  MOTION FOR MISCELLANEOUS RELIEF FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.,

[160] NOTICE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.,

[168]  MOTION TO SELL FREE AND CLEAR OF LIENS AND NOTICE OF MOTION FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.

[194]  NOTICE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.,

[196]  MOTION FOR MISCELLANEOUS RELIEF FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.,

[197]  MOTION TO SEAL FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.

[211]  MOTION TO SEAL FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.

[215]  OBJECTION FILED BY INTERESTED PARTY AIREIT OLIVE BRANCH DC LLC, INTERESTED PARTY ANSON LOGISTICS ASSETS LLC

[216]  RESPONSE FILED BY CREDITOR THE POKEMON COMPANY INTERNATIONAL, INC.

[217]  RESPONSE FILED BY CREDITOR DYNAMIC FORCES, INC.

[245]  OBJECTION FILED BY U.S. TRUSTEE US TRUSTEE – BALTIMORE

[249]  OBJECTION FILED BY CREDITOR COMMITTEE UNSECURED
CREDITORS COMMITTEE

[251]  OBJECTION FILED BY CREDITOR JPMORGAN CHASE BANK, N.A

[262]  RESPONSE FILED BY CREDITOR COMMITTEE UNSECURED
CREDITORS COMMITTEE

[264]  OBJECTION FILED BY INTERESTED PARTY AIREIT OLIVE BRANCH
DC LLC, INTERESTED PARTY ANSON LOGISTICS ASSETS LLC

[269]  RESPONSE FILED BY CREDITOR THE POKEMON COMPANY
INTERNATIONAL, INC.

[270]  NOTICE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.

[271]  OBJECTION FILED BY CREDITOR IMAGE COMICS, INC.

[277]  RESPONSE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS,
INC.

[280]  DECLARATION FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS,
INC.


 APPEARANCES:

 For The Debtor:                    Mark Minuti, Esq.
                                    Saul Ewing, LLP
                                    1201 North Market St.-Ste. 2300
                                    Wilmington, DE 19899

                                    Paige N. Topper, Esq.
                                    Saul Ewing, LLP
                                    1001 Fleet Street-9th Fl.
                                    Baltimore, MD 21202

                                    Ashley N. Fellona, Esq.
                                    Saul Ewing, LLP
                                    1001 Fleet Street-9th Fl.
                                    Baltimore, MD 21202

 For Unsecured Creditor's           Dennis J. Shaffer, Esq.
 Committee:                         Tydings & Rosenberg
                                    1 E. Pratt St.-Ste. 901
                                    Baltimore, MD 21202

```
                                    Gianfranco Finizio, Esq.
                                    Lowenstein Sangler, LLP
                                    1251 Ave. Of the Americas
                                    New York, NY 10020

                                    Michael Papandrea, Esq.
                                    Lowenstein Sangler, LLP
                                    One Lowenstein Drive
                                    Roseland, NJ 07068

For AIREIT Olive Branch             Laura S. Bouyea, Esq.
DC, LLC and Anson Logistic          Venable, LLP
Assets, LLC:                        750 Pratt St.-Ste. 900
                                    Baltimore, MD 21202

                                    Deborah Perry, Esq.
                                    Munsch Hardt Kopf & Harr, PC
                                    500 N.Akard St.-Ste. 4000
                                    Dallas, TX 75201

For Alliance                        Jonathan A. Grasso, Esq.
Entertainment, LLC:                 YVS Law, LLC
                                    Ste. 130
                                    185 Admiral Cochrane Drive
                                    Annapolis, MD 21401

                                    S. Jason Teele, Esq.
                                    YVS Law, LLC
                                    Ste. 130
                                    185 Admiral Cochrane Drive
                                    Annapolis, MD 21401

For Creditor, JPMorgan Chase        Jonathan W. Young, Esq.
Bank, NA:                           Troutman Pepper Locke, LLP
                                    701 8th St., NW, Ste. 500
                                    Washington, DC 20001

                                    Katherine Culbertson, Esq.
                                    Troutman Pepper Locke, LLP
                                    701 8th St., NW, Ste. 500
                                    Washington, DC 20001

For The Pokemon Company             Junior Dufort, Esq.
International, LLC:                  Perkins Coie, LLP
                                    700 Thirteenth St., NW-Ste. 800
                                    Washington, DC 20005
```

4

For Universal Distribution,        Brent C. Strickland, Esq.
LLC:                               Whiteford Taylor & Preston, LLP
                                   8830 Stanford Blvd.-Ste. 400
                                   Columbia, MD 21045

For U.S. Trustee's Office:         Hugh M. Bernstein, Esq.
                                   Office of the U.S. Trustee
                                   101 W. Lombard St.-Ste. 2625
                                   Baltimore, MD 21201

Audio Operator:                    Cherita Scott

Transcribing Firm:                 Writer's Cramp, Inc.
                                   1027 Betty Lane
                                   Ewing, NJ 08628
                                   609-588-8043


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

5

## Index

|                              | Direct | Cross | Redirect | Recross | Further Redirect |
|------------------------------|--------|-------|----------|---------|------------------|
| **Witnesses For The Debtor:** |        |       |          |         |                  |
| Mr. Gorin                    | 33     | 49    |          |         |                  |
| **Witnesses For The Trustee:** |      |       |          |         |                  |

| EXHIBITS: | | Marked | Received |
|-----------|--|--------|----------|
| UST-1 | Robert Gorin's Declaration | 51 | 52 |
| UST-1 | Officers of Diamond Select Toys | 53 | |

**SUMMATION BY:**

| Mr. Minuti | 68 |
|------------|----|
| Mr. Bernstein | 78 |

Rebuttal
| Mr. Minuti | 87 |
|------------|----|

| THE COURT: Finding | 88 |
|--------------------|----|

6

1          THE CLERK:  All rise.  The United States Bankruptcy
2   Court for the District of Maryland is now in session, the
3   Honorable Chief Judge David E. Rice presiding.  Please be
4   seated and come to order.  On the 2:00 o'clock Docket, calling
5   the case of Diamond Comic Distributors, Inc., Case #25-10308.
6   Counsels, please step to the podium, identify yourselves and
7   your clients for the record.
8          MR. MINUTI:  Good aftrnoon, Your Honor.  Mark Minuti
9   from Saul Ewing.  I'm here today on behalf of the Debtor.
10  With me at counsel table are my colleagues, Paige Topper and
11  Ashley Fellona.  There's a cast of thousands in the back, Your
12  Honor, but I just want to make one introduction.  Also in the
13  courtroom is Robert Gorin, he's the managing director of
14  Getzler Henrich, and the co-CRO of the Debtors.
15         THE COURT:  Good afternoon.
16         MR. FINIZIO:  Good afternoon, Your Honor.
17  Gianfranco Finizio, Lowenstein Sandler, counsel to the
18  Creditors Committee.  I'm joined by my colleague, Mike
19  Papandrea, and our local counsel from the Tydings Firm, Dennis
20  Shaffer.
21         THE COURT:  Good afternoon to all of you.
22         MR. YOUNG:  Good afternoon, Judge.  Jonathan Young
23  from Troutman Pepper Locke, along with my colleague Katherine
24  Culbertson.  We represent JPMorgan as DIP lender.
25         THE COURT:  Good afternoon.

1              MR. GRASSO:  Good afternoon, Your Honor.  Jonathan

2    Grasso, counsel for Alliance Entertainment, LLC.  With me

3    today as lead counsel for Alliance Entertainment is Jason

4    Teele.  An order approving Mr. Teele's pro hac application was

5    entered just a couple of days ago at Docket 283, and as this

6    was Mr. Teele's first opportunity to appear in front of you, I

7    wanted just to take a moment to introduce him.  Also with us

8    today is Bruce Ogilvie, the chairman for Alliance

9    Entertainment, and Hunter Thompson, an associate at Province,

10   LLC, which is the investment bankers for Alliance

11   Entertainment.  Thank you.

12             THE COURT:  Good afternoon.

13             MS. BOUYEA:  Good morning, Your Honor.  Laura Bouyea

14   and Venable on behalf of AIREIT Olive Branch DC LLC and Anson

15   Logistics Assets LLC, two contract parties.  And with me on

16   the phone on the listen-only line is Deborah Perry.

17             THE COURT:  Good afternoon.

18             MR. DUFORT:  Good afternoon, Your Honor.  Junior

19   Dufort of Perkins Coie on behalf of Pokemon Company

20   International, Incorporated.

21             THE COURT:  Good afternoon.

22             MR. STRICKLAND:  Your Honor, good afternoon.  Brent

23   Strickland for Universal Distribution LLC.

24             THE COURT:  Good afternoon to you.  Mr. Bernstein,

25   you're taking up your usual last man in the batting order.

8

1          MR. BERNSTEIN:  Yes, I like to be last.  Good

2    afternoon, Your Honor.  Hugh Bernstein on behalf of the United

3    States Trustee.

4          THE COURT:  Good afternoon.  Well, we're here

5    assembled today for a lengthy set of matters related to this

6    case, including the proposed sale of the Debtor's assets.  I'm

7    going to turn the proceedings over to you, Mr. Minuti, to see

8    where we are and where we're going, but do let me say first, I

9    don't know how many people the courtroom deputy has on the

10   listen-only telephone line, but in the event, which seems

11   likely from what I'm hearing, that witnesses are called, we

12   will be terminating the telephone call during the testimony of

13   any witnesses.  So go ahead.

14         MR. MINUTI:  Thank you, Your Honor.  Again, for the

15   record, Mark Minuti from Saul Ewing on behalf of the Debtors.

16   We have two matters really on the calendar today, Your Honor,

17   one of which is the Debtor's Motion to Approve a Key Employee

18   Incentive Plan, and a Key Employee Retention Plan.  The other

19   matter that was on today and was likely to take up most of the

20   proceedings was our sale motion.  I'm going to explain to Your

21   Honor where we are, but sort of by way of spoiler alert, we're

22   here today to ask the Court for a continuance of the sale

23   motion, and it will become clear in a moment why that is.

24         When I was last before the Court on March 27, we asked

25   for a brief continuance of the sale so we could document our

9

1    auction results, finalize our Asset Purchase Agreement with

2    our winning bidder, and return with what I would hope -- what

3    I hoped would be a better prepared and more streamlined

4    presentation.  Unfortunately, due to circumstances beyond our

5    control, that did not happen.  At last week's hearing I

6    reported that an auction was held at the offices of Raymond

7    James in New York beginning on Monday, April 24, and ended

8    shortly after midnight into Tuesday on April 25.  The good

9    news, Your Honor, is the auction was very successful.  The

10   Court will recall that our stalking horse bidder, Universal

11   Distributors Incorporated, had submitted a stalking horse bid

12   for the Alliance Division assets only, that was valued at $39

13   million.  At the end of the auction, the auction concluded

14   with a final bid from an entity called Alliance Entertainment,

15   Inc. -- I'm sorry, Alliance Entertainment LLC.  That bid was

16   valued at 72,245,000.  The second highest bid was a combined

17   bid of Universal Distributions, LLC, again our stalking horse,

18   and an entity called Ad Populum, LLC, with a bid valued at 69

19   thousand one hundred -- $69,130,000.  As we attempted to

20   document Alliance Entertainment's bid by way of an Asset

21   Purchase Agreement over the last week, it became clear, Your

22   Honor, that the parties were not in agreement as to the value

23   of the bid submitted by Alliance Entertainment at the auction.

24   As we traded Asset Purchase Agreements over the last week, we

25   realized that there were significant economic differences,

1  broken down into five separate buckets, Your Honor, for lack
2  of a better term, that we disagreed with Alliance on with
3  respect to their Asset Purchase Agreement.
4      Now over the course of the last week, Alliance backed
5  down on four of the five, but of course, Your Honor, time is
6  not our friend, given some of the milestones in these cases
7  and our DIP loan, and there remained a significant
8  disagreement related to whether or not Alliance
9  Entertainment's bid included payment for the Debtor's -- to
10  the Debtors for prepaid inventory.  And what I mean by prepaid
11  inventory, Your Honor, is the inventory the Debtor paid for
12  but would likely not arrive until post-closing.  That prepaid
13  inventory had a value estimated at approximately $4.3 million.
14  Alliance Entertainment was adamant that its bid never included
15  the prepay -- payment for prepaid inventory.  The Debtors are
16  equally adamant, Your Honor, that the bid did include a
17  payment for prepaid inventory, and frankly, we could take
18  today and maybe even all of tomorrow with witnesses and
19  exhibits and debating who was right and who was wrong.  But at
20  -- by end of the day, Your Honor, I submit that that debate
21  really is not relevant to today's hearing, or the ultimate
22  hearing on the sale, I should say.  Because regardless of
23  whose understanding was correct, the bottom line is that as of
24  yesterday at 4 o'clock the parties were not in agreement, and
25  absent inclusion of the prepaid inventory, the Alliance

1    Entertainment bid was less than the backup bid submitted by

2    Universal and Ad Populum by approximately $2.5 million.  This

3    really cannot be disputed, Your Honor.  So after consulting

4    with the Committee and JPMorgan Chase, the Debtors informed

5    Alliance Entertainment that they were going to pivot and go

6    forward with the backup bidders.  As soon as that decision was

7    made, and it was made late yesterday, we did try to inform

8    Chambers as to what had happened.  Of course the Debtors have

9    a fiduciary duty, Your Honor, to maximize value in this case,

10   given it's a sale case, and the Debtors have determined in the

11   exercise of their business judgment that value will be

12   maximized through the Universal and Ad Populum APA.  We

13   consulted with our consultation parties and all were in

14   agreement, Your Honor, that the Debtors should proceed to seek

15   court approval to enter into the Universal and Ad Populum

16   Asset Purchase Agreements.  About an hour after informing

17   Alliance that the Debtors were proceeding with the backup bid,

18   we heard from counsel for Alliance that it would change its

19   Asset Purchase Agreement now to include the prepaid inventory,

20   and they followed up with a further markup of the Asset

21   Purchase Agreement that provided as such.  But in the Debtor's

22   business judgment, Your Honor, it was and is too little, too

23   late.  Again, the Debtors have exercised their business

24   judgment.  We are moving forward with Universal and Ad Populum

25   as the highest and otherwise best bid for the assets.  When we

1   appear for the sale hearing, we will be prepared to put on

2   evidence to show why that business judgment, Your Honor, makes

3   sense, and why it is you should confirm the sale to Ad Populum

4   and Universal.  We've been working hard, Your Honor, over the

5   last couple days trying to finalize the Asset Purchase

6   Agreements and the sale orders with our -- now our highest and

7   best bidders.  We are there conceptually on both.  Literally I

8   -- we -- I received an email minutes before Your Honor took

9   the bench that a couple of last minute items have now been

10  ironed out, but of course we haven't been able to file Asset

11  Purchase Agreements, we haven't been able to file any forms of

12  Sale Order, so no one has really had an opportunity to look at

13  those.

14       So in our judgment, Your Honor, and obviously you'll make

15  the ultimate call, but in our judgment we're not prepared to

16  go forward today.  We'd like to button up those few items.  We

17  do have an omnibus hearing scheduled for Monday.  What we're

18  proposing is we move the sale hearing to Monday.  And look, to

19  be clear, obviously Alliance Entertainment, Your Honor, now

20  the jilted bidder, has a much different view of what happened

21  here.  We do anticipate that they're going to press an

22  objection.  I think Monday will give everybody an opportunity

23  to prepare for that, to prepare for the sale hearing.  And so

24  the bottom line is we're not prepared to go forward today.

25  I'm highly confident we will be able to on Monday, we just

1    need a little more time.  And I wish the story was different,

2    because I did tell Your Honor last week that today was going

3    to be much smoother.  That did not turn out to be the case, so

4    for that I apologize.  But again, it couldn't be helped.  So

5    that's the request and that's where we stand with the sale

6    hearing.

7                THE COURT:  Okay.  Let me hear from others.

8                MR. FINIZIO:  Your Honor, for the record, Gianfranco

9    Finizio, Lowenstein Sandler, counsel to the Committee.  We're

10   in agreement with the Debtor's position here.  The process

11   worked.  The bidding procedures and the sale process resulted

12   in a totally successful auction.  We are also on board for

13   maximizing value, but not at the expense of due process,

14   appropriate notice, having an opportunity for not only the

15   Committee, which has been kept in the loop throughout the

16   whole process, but for other parties, too, contract counter-

17   parties, and other parties that may be affected by the sale.

18   For those reasons, we believe that extending the deadline for

19   the hearing 'til Monday will give those parties -- and

20   including the Committee -- an opportunity to review the APA.

21   There's actually two APAs, so the more time is definitely

22   needed there, and the Sale Order and other related documents.

23   So for those reasons, Your Honor, the Committee, while we're -

24   - we feel like we're on the two-yard line, I think a little

25   bit more time will help get us there and button up what has

1   otherwise been a really successful sale process.

2          THE COURT:  So when you say two APAs, there's an

3   Asset Purchase Agreement for each of Universal and Ad Populum,

4   is that what you mean?

5          MR. FINIZIO:  That's correct, Your Honor.

6          THE COURT:  Okay.

7          MR. FINIZIO:  They're buying different business

8   divisions.

9          THE COURT:  Right, so each has their own separate

10  agreement.  Okay.

11         MR. FINIZIO:  That's right, Your Honor.

12         THE COURT:  All right.  I understand.  Thank you.

13  Mr. Young?

14         MR. YOUNG:  Thank you, Your Honor.  Jonathan Young

15  again for JPMorgan Chase.  We likewise support the Debtor's

16  exercise of business judgment in moving forward to approve the

17  backup bid.  We likewise support the request to adjourn the

18  hearing to Monday, at which time we will hopefully have our

19  filed APAs and agreed form of Sale Order.  The only thing I

20  would add to the comments from the Debtors and from the

21  Committee is that there is really also a need for speed and

22  certainty of closing here.  This has been a case that's

23  required a substantial funding commitment from the DIP lender.

24  We were in here a short time ago, Your Honor, on a slight

25  increase to the facility, and I think everybody has put a lot

1  of time and effort into bridging this case and bridging this
2  operation to a successful sale.  We concur with Mr. Finizio,
3  this was a successful auction, and we think the best thing to
4  do now is to get it tee'd up before Your Honor and approved in
5  as short order as possible.  So we thank you for your
6  consideration and we're in favor of the requested relief.
7          THE COURT:  Okay.  Thank you.  Yes, sir.
8          MR. TEELE:  Good afternoon, Your Honor.  For the
9  record, I'm Jason Teele with Sills Cummis & Gross, and I
10  represent Alliance Entertainment, LLC, the successful bidder
11  from the auction last week.  You might be surprised, or maybe
12  you won't be surprised to learn, that we disagree that the
13  process worked.  There's an important timeline concerning the
14  auction process that has not been disclosed or revealed to the
15  Court to date.  The stated purpose of any bankruptcy auction,
16  as Your Honor is well aware, is to create a level playing
17  field for qualified bidders to bid on the assets for sale, and
18  that did not happen in this case.  Instead of calling the
19  various qualified bidders to the auction last week to put
20  their best foot forward and conclusively identify the highest
21  and best bid for these assets, the Debtors treated the auction
22  as a jumping off point to identify the two high bidders, and
23  then to conduct negotiations privately outside of the purview
24  of the other bidders, off the record, in order to attempt to
25  improve the bids.  In other words, bidding continued well

1   after the auction.  As a result of that process, as you'll

2   hear in a second, my client, the successful bidder at the

3   auction, acquiesced to the Debtor's various demands and

4   improved its offer, which was the high offer at the auction,

5   by more than $14 million total consideration.  Of the five

6   buckets of categories of disputed -- disputes in the Asset

7   Purchase Agreement that Mr. Minuti spoke about, initially my

8   client agreed to all four of those as the Debtors had

9   demanded.  Late in the day, or late in the week this week, we

10  acquiesced to the fifth demand.  So we had met all of the

11  requirements of their subsequent bidding that they put in our

12  way.  The problem, however, was during the auction -- which

13  I'll talk about in a second -- and since the auction, the

14  Debtors have refused to engage with Alliance at -- on any

15  meaningful level, starting the day after the auction when we

16  were expected to deliver an Asset Purchase Agreement that

17  reflected the results of the auction, which we did.  Which we

18  did not receive a single response to for days.  In fact, we

19  received our first response to that evening before the last

20  hearing, which is when it became clear that the Debtors were

21  going to need to come here to Court and ask Your Honor to

22  adjourn that hearing 'til today.  We have now turned several

23  versions of the Asset Purchase Agreement, all in response to

24  the Debtor's demands.  There is not a single demand that the

25  Debtors made since the auction that we have not met in the

1  Asset Purchase Agreement.  The last Asset Purchase Agreement

2  that we sent to them yesterday late afternoon or early evening

3  acquiesced to the fifth disputed item, precisely as the

4  Debtors had insisted that we do.  And the response to that

5  simply was a terse email that says we're still going to

6  proceed with the backup bidder.  A backup bidder who has not

7  produced an Asset Purchase Agreement, who was combined with

8  the other party as part of the backup bidder at the auction,

9  unbeknownst to anybody participating in the auction.  When the

10  parties walked into the room, it was simply announced that

11  these two were now bidding together as a team against the

12  other bidders.  Notwithstanding that, my client still

13  submitted the highest and best bidder, as I don't think

14  anybody in this courtroom would refute, and as the Notice of

15  Successful Bidder filed on the docket would reflect.  Our bid,

16  as it stands as of last night, which we still have not

17  received a response to other than to say they're continuing to

18  proceed with closing to the backup bidder, remains the highest

19  and best offer.  We have an Asset Purchase Agreement that is

20  ready to go.  My client -- the chairman of my client is

21  sitting in the courtroom, ready, willing and able to testify

22  as to any aspect of this sale process, any aspect of his

23  company, his financial wherewithal to close, et cetera, to

24  satisfy the Court of its ability and desire to close.

25  Alliance remains today ready, willing and able to close next

1    week, on April 10th, which was the date set forth in the

2    stalking horse bid for the outside closing date, which the

3    Debtors insisted all of the bidders meet in their competing

4    bids.

5        Our bid at the auction has improved by virtue of these

6    off-the-record post-auction bidding from $70,880,000 net, to

7    $81 million.  There's no indication on the record or otherwise

8    that the backup bidder's offer has improved that.  In addition

9    to that, and there's no information since the auction

10   available to anybody, including the Court, but at the auction

11   and it's on the record, the -- at the record of the auction --

12   the two backup bidders' bids were contingent if one bidder

13   didn't close, then the other bidder had the right but not the

14   obligation to purchase that non-closing bidder's assets.  But

15   there could be a result where one of the two bidders fails to

16   close.  And having seen no APA -- there wasn't one at the

17   auction, there wasn't one after the auction, Mr. Minuti just

18   confirmed for the Court that they don't have one today that

19   they're ready to show anybody -- that risk is significant to

20   this bankruptcy estate.  And my client is sitting here ready,

21   willing and able to pay total consideration of greater than

22   $81 million to close this thing on April 10th.  So we do

23   intend to object on Monday.  We will be filing papers to the

24   extent necessary.  We did file earlier today an exhibit list

25   and a witness list which we may amend, we certainly reserve

1   the right to do so based on how things develop over the next

2   couple of days, but we will be here on Monday.  We will press

3   this objection.  I think we will show Your Honor that -- if

4   you've heard the expression the fix was in, the fix was

5   definitely in on this auction.  And the result is unfair.

6   It's unfair to the Creditors of this estate, and it's

7   certainly unfair to all of the parties that showed up to bid

8   in good faith and who were met with a cold shoulder from

9   virtually every professional on the Debtor's side.  So with

10  that I'll leave it to Your Honor.  I'm happy to answer any

11  questions, I'm happy to put my client on the witness stand to

12  answer any questions your client -- that Your Honor has, but

13  we will see you on Monday if Your Honor adjourns 'til then.

14          THE COURT:  All right, thank you very much.  Anyone

15  else?  Mr. Bernstein?

16          MR. BERNSTEIN:  Thank you, Your Honor.  I don't

17  really have anything to add.  I kind of learned about this

18  when I came into the courtroom today.  I don't know much about

19  what happened at the auction or anything like that.  I don't

20  have any objection to adjourning if that's what the Court

21  wants to do.

22          THE COURT:  All right, thank you.  Anything further

23  from you, Mr. Minuti?

24          MR. MINUTI:  Your Honor, just for the record, and it

25  should be clear, obviously we disagree with almost everything

1    that Mr. Teele said.  The one thing Mr. Teele did not say that

2    I don't think he can deny is that the bid that he says is

3    valued at $80 million was withdrawn by them yesterday.  So as

4    far as we understand, their position is they have no bid

5    currently pending.  But we'll sort all that out on Monday in

6    the event that Your Honor is prepared to continue the hearing

7    from today.  Thank you.

8           THE COURT:  Mr. Teele?

9           MR. TEELE:  If I may just -- excuse me.  Your Honor,

10    Jason Teele again.  If I may just clarify that.  Our bid was

11    not withdrawn.  There was a subsequent APA that was sent late

12    yesterday in response to a demand by the Debtors which they

13    clearly did not accept because they announced to us by email

14    shortly afterwards that they're continuing to proceed with the

15    backup bidder.  Our email advising them what we were

16    withdrawing said very clearly that we were going back to the

17    bid -- to the APA that we presented to them earlier yesterday.

18    There is a bid still out there, it is still valued at $81

19    million total consideration, exactly as I just represented to

20    Your Honor.  I just want to make that clear for the record.

21           THE COURT:  All right.  No one else?

22           ALL:  (No verbal response).

23           THE COURT:  All right.  Under the circumstances, I'm

24    going to adjourn the hearing to Monday at 10 a.m. as requested

25    by the Debtor.  I expect everyone to be here and ready to go.

1   It sounds like it will definitely be a contested hearing that

2   requires the testimony of witnesses and exhibits, and we'll

3   see what develops at that point.  Now, what further, Mr.

4   Minuti?

5           MR. MINUTI:  Thank you very much, Your Honor.  I

6   think we had the omnibus hearing at 11, is that right?  I

7   think it's at 11.  We're happy to be here at 10 if that's --

8           THE COURT:  We're adjourning to 10 on Monday.

9           MR. MINUTI:  Thank you, Your Honor.  Your Honor,

10  that then brings us to the other matter that was on for today,

11  the Key Employee Retention Plan and the Key Employee --

12          THE COURT:  Well, there were multiple issues related

13  to I think like lease or contract assignments.  Are those

14  considered to be related to the sale and --

15          MR. MINUTI:  They are, Your Honor.

16          THE COURT:  So we're adjourning those to Monday

17  also?

18          MR. MINUTI:  We are.

19          THE COURT:  Okay.  Go ahead.

20          MR. MINUTI:  All right, very well.  Yeah, anything

21  related to the sale, Your Honor, our view is to adjourn 'til

22  Monday.  I think the good news is that most of the objections

23  that we did receive are either going to be resolved

24  consentually.  Pure claims, I think our plan would be, if

25  there's still a dispute, to buy some more time to try to

1    resolve those and come back.  And then adequate assurance, we

2    are having our -- the bidders talk to the contract parties and

3    we're hopeful that resolutions will be reached before then.

4    But certainly the idea is not to prejudice anybody today;

5    we're not going forward today.

6              THE COURT:  All right.

7              MR. MINUTI:  Thank you.  So moving to the other

8    matter that's on today, Your Honor.  On March 6th, 2025, the

9    Debtor served and filed its motion for entry of an order

10   approving a Key Employee Incentive Plan -- Program, and a Key

11   Employee Retention Program.  That appears at Docket #196.

12   That was supported by the Declaration of Robert Gorin, the

13   Debtor's co-CRO, that was attached to the motion.  On that

14   same day, the Debtor filed a Motion to Seal related to that

15   motion.  The Seal Motion appears at Docket 197, and

16   specifically attached to the Program Motion was the proposed

17   payment schedule for the plan, the unredacted copy of which

18   includes both the -- includes the names, the job titles, and

19   the salary information of the participants in the plan.  By

20   the Seal Motion we're asking the Court to keep this

21   information sealed.  The unredacted programs themselves, Your

22   Honor, were provided to the Court, the United States Trustee's

23   Office, our lenders, and the Committee.  The objection

24   deadline for both the Seal Motion and the Program Motion was

25   March 20.  The deadline was extended to the Committee to March

1   24.  I'm happy to report that based upon discussions with the

2   Committee, changes to the program, and changes to the order

3   which I will outline for the Court, we were able to resolve

4   the Committee's concerns.  We did receive one objection to

5   both motions, and that was the objection that was timely filed

6   by the United States Trustee's Office.  That appears at Docket

7   #245.

8        On March 25 -- I'm sorry, on March 26th we filed a reply

9   in further support of the motion that appears at Docket #277.

10  We updated the Keep Under Seal, which includes the changes we

11  agreed to with the Committee.  Again, the unsealed version of

12  that was shared with the Court, the Trustee's Office, the

13  Committee, and our lender, JPMorgan Chase.  We also filed a

14  Supplemental Declaration of Mr. Gorin.  That appears at Docket

15  #280.  That Declaration addresses both the plans themselves

16  and the need to seal.  In support of both the Seal Motion and

17  the Programs Motion, I propose to offer the testimony of Mr.

18  Gorin.  I would propose to do that by admitting the two

19  Declarations, Your Honor, as his direct testimony.  I did talk

20  to Mr. Bernstein prior to the hearing.  I don't believe he has

21  any objection to that.  Mr. Gorin is obviously here in the

22  courtroom and available for cross examination.  I suspect that

23  Mr. Bernstein does want to cross-examine him.  So that would

24  be my suggestion.  I guess my request is to allow the

25  Declaration to serve as the direct and he can be available for

1    cross.

2           THE COURT:  Okay, thank you.  Is there anyone else

3    wishing to be heard on these two matters, other than the

4    United States Trustee?

5           ALL:  (No verbal response).

6           THE COURT:  Let the record -- oh, Committee?

7           MR. FINIZIO:  For the record, Gianfranco Finizio,

8    Lowenstein Sandler, counsel to the Committee.  Maybe I'll save

9    my remarks for after Mr. Minuti discusses the adjustments to

10   the Key Employee Incentive Plan.  But I guess just to preview,

11   Your Honor, we did have several discussions with the Debtors

12   about the plan after it was filed.  Those discussions resulted

13   in modifications to the order that the Committee is now

14   comfortable with.  We believe that the employees that are part

15   of both the KEIP and the KERP are mission critical to the

16   business.  I think that's reflected a) in the home-run results

17   that we had at the auction last week, and also I'd emphasize,

18   Your Honor, that we are not closed yet.  The closing for the

19   sale is April 10th, maybe a little bit longer, depending on

20   how the next couple of days play out.  So again, those

21   employees are going to be absolutely necessary to really get

22   us over the finish line, and we think that the KEIP, as we had

23   modified with the Debtors, will accomplish that while also

24   staying within the lines of the requirements of the Bankruptcy

25   Code.

1       As to the Seal Motion, it is our understanding and as

2    it's set forth in the Declaration from Mr. Gorin, that if

3    these redactions are lifted, certain employees may resign, and

4    it is the Committee's request or desire that none of these

5    employees flee the employ of the Debtors during this

6    absolutely critical time that we are in the middle of a sale

7    process, and again, as I said, right on the two-yard line of -

8    - to getting to a close.

9            THE COURT:  All right.

10           MR. FINIZIO:  Happy to answer any questions, Your

11   Honor.

12           THE COURT:  No questions, thank you.  Mr. Bernstein,

13   what's the U.S. Trustee's position?

14           MR. BERNSTEIN:  Thank you, Your Honor.  We remain

15   opposed to both the Motion to Seal and the motion for the

16   employee bonus programs, both the KEIP and the KERP.  I don't

17   want to -- I mean, the arguments are set forth in the papers,

18   and I will obviously deal with those in the closing after the

19   evidence.  I don't want to extend an opening statement too

20   much.  The only issue I need to raise -- and when Mr. Minuti

21   said -- talked about the way the evidence was to be presented,

22   we did talk about that, and he is correct that we'll want to

23   cross-examine Mr. Gorin.  My concern that I have is I'm going

24   to obviously going to have to cross-examine Mr. Gorin over --

25   about documents that are under seal so we may need to clear

1    the courtroom for the cross-examination portion of that.  But

2    beyond that, I don't think there's any really opening

3    statement that I want to add to.

4              THE COURT:  So what fact is in dispute as opposed to

5    some argument or legal issue?

6              MR. BERNSTEIN:  Factually there is a question of who

7    are insiders.  I think there is still a question of that.

8    Factually there is a question of whether these metrics are

9    actually metrics that were incentivizing or whether this was

10   just an issue of retention, these were retention payments.

11   And then there are a lot of, obviously, mostly, I think, legal

12   issues which, as you say, the question of what the proper

13   standard is going to be, is this a reasonable incentive.  And

14   there -- oh, factually, is any -- who is going to be -- who is

15   threatening to leave, who has job offers, that kind of thing.

16             THE COURT:  Okay.

17             MR. BERNSTEIN:  Thank you, Your Honor.

18             MR. MINUTI:  Again for the record, Mark Minuti.

19   Before we get to the cross-examination and the evidence, maybe

20   I --

21             THE COURT:  Well, I haven't decided to accept the

22   proffer yet.

23             MR. MINUTI:  Oh, I'm -- understood.

24             THE COURT:  Do you have anything else you wanted me

25   to hear?

1          MR. MINUTI:  Well, what I was going to say, Your

2     Honor, is maybe I should set the table and talk a little bit

3     about the programs and how we've changed them in light of the

4     Committee's comments, at least so Your Honor would be up to

5     speed on where we are.  We did file the new programs, we did

6     file the order, so if Your Honor has had a chance to look at

7     that, I was simply going to describe those.

8          THE COURT:  Go ahead.

9          MR, MINUTI:  Very well.  Bear with me one moment,

10    Your Honor.  So by the motion the Debtors seek approval of a

11    proposed Key Employee Incentive Plan and a Key Employee

12    Retention Plan.  The plans were developed by Mr. Gorin and his

13    co-CRO, Mr. Henrich.  The KEIP or the -- yeah, the KEIP plan,

14    Your Honor, proposes to cover 17 employees.  Three of those

15    employees are executives, or insiders, 14 are non-insiders.

16    All were chosen because of their significant institutional

17    knowledge, and because they're critical to the sale efforts.

18    Each participant under the KEIP falls within one of thee

19    silos, either the Debtor's Diamond Comic Distributor's

20    business, the Alliance gaming division, or the Debtor's

21    Diamond Select and toy collectibles business.  The proposed

22    payments under the KEIP are contingent upon a sale closing,

23    and they're based upon the net value to the estate of the

24    ultimate sales.  The minimum value that must be obtained

25    through the Alliance sale in order for the KEIP participants

1   to receive incentive payments is $30 million, with a maximum

2   incentive payment to be paid if the purchase price for the

3   Alliance assets -- again, the net purchase price exceeds 40

4   million.  One plan participant to be paid incentive payments

5   is based upon the sale of the Diamond Select toy assets, and

6   those milestones are if they are sold for one to two million,

7   that employee would get $5,000, two to three million, $7,500,

8   and over three million, $10,000.  Five KEIP participants

9   expect to play a critical role in the sale or disposition of

10   other assets.  They're entitled to an additional bonus which

11   essentially equals 5% of their applicable annual salary.  The

12   incentive payments reflected for each participant was

13   determined based upon the relative critical need for those

14   participants to participate in the sale process and help

15   maximize value.  The benchmarks, Your Honor, in the plan were

16   originally set before the Debtors had a stalking horse bidder,

17   and based upon discussions with the Committee, the KEIP plan

18   was changed to do the following:  lower the bonuses for five

19   participants as to the sale of the Alliance assets only.  We

20   added a new benchmark for those employees if the sale of the

21   non-Alliance assets exceeded $15 million.

22       Other changes based upon discussions with the Committee

23   are as follows:  Language has been added to the proposed order

24   approving the motion to make clear that #1) incentive payments

25   and additional -- the additional KEIP recovery thresholds are

1   based upon the net cash proceeds, as I indicated.  If the
2   stalking horse bid was the only qualified bid for the Alliance
3   assets, the incentive payments amounts payable to the first
4   two participants in the plan for the Alliance gaming division
5   would be limited or capped at $166,375.  To receive either
6   payments under the KEIP or the KERP plan, the participants
7   must waive any right to severance that they may have.  If a
8   participant has an incentive payment built into their
9   employment agreement and that agreement is ultimately assigned
10  to a buyer, that KEIP payment gets reduced dollar for dollar
11  by anything the buyer were to pay, in other words these
12  employees cannot double dip.  And I believe that only applies
13  to potentially two employees, Your Honor.  The Debtors in
14  their discretion may reallocate forfeited incentive retention
15  payments under either plan to other participants after
16  consultation with the Committee and JPMorgan Chase, and once
17  payments are made, the Debtors will notify the Committee's
18  counsel of such payments as they're made.
19      The other KEIP parameters, Your Honor, are that the
20  participants will only be eligible for the payments if they --
21  if the Debtors successfully achieve their restructuring goals,
22  which is close a sale or sales.  Each participant, in order to
23  participate, must agree to the following conditions:  The KEIP
24  participants must execute a non-disclosure agreement.  They
25  must remain at will employees of the Debtor.  No KEIP payments

1    shall be made if a KEIP participant resides or is terminated

2    for cause prior to the closing of the applicable sale or

3    completion of the sale and/or disposition of other assets, and

4    provided, however, that if in connection with a sale a KEIP

5    participant is offered and accepts employment with the buyer,

6    the KEIP participant's termination from the applicable Debtor

7    to go with the buyer is not going to rule out their

8    entitlement to a payment.

9         With regard to the KERP plan, Your Honor, no changes were

10    made based on conversations with the Committee.  I would

11    submit the KERP plan itself is relatively modest.  It's only

12    23 employees, Your Honor.  As indicated, it is a retention

13    plan.  The goal is to keep the ship operating until we can

14    close on the sales.  The entire plan, Your Honor, if paid, is

15    $276,900.  The KEIP -- sorry, the KERP participants are only

16    going to be paid if they're still employed by the Debtors

17    through the Alliance sale and/or the remaining asset sales as

18    applicable.  They need to not be, obviously, terminated, or if

19    they're terminated without cause, excuse me.  In exchange for

20    the payment, the participant again must waive any other claims

21    he or she may have against the Debtor's estate, and in

22    addition they must -- if they voluntarily resign or they're

23    terminated for cause, they're not going to receive the

24    payment.

25         I think that's all I have, Your Honor, by way of

1    summarizing the plans before we get into argument.  And again,

2    at this point --

3              THE COURT:  I think we're a long ways from argument.

4              MR. MINUTI:  Understood, Your Honor.

5              THE COURT:  We haven't got past whether the Court is

6    accepting the proffer.  I understood you'd be explaining to

7    the Committee what changes were made.

8              MR. MINUTI:  Yeah, I wanted to get on the record the

9    changes that were made.  So at this point, Your Honor, I think

10   we're ready to put on evidence again.  We can put Mr. Gorin on

11   the stand and I can walk him through everything, or we can

12   accept his proffers and move to cross-examination.  I'm really

13   at the Court's pleasure.

14             THE COURT:  I think we should call the witness, and

15   I think we should take up as much of this as we can without

16   reference to -- I mean, if you want to take up the Motion to

17   Seal first, we can do that, but otherwise I would suggest we

18   handle his examination, cross-examination, see if we can do it

19   without any need for direct reference to the sealed documents

20   on the record, or clearing the courtroom.

21             MR. MINUTI:  Very well.  Since the testimony, Your

22   Honor, also is going -- also goes to the need for sealing, I

23   think we ought to go to the witnesses first, or the witness

24   first.

25             THE COURT:  Right, I think that's what I just said.

1    Why don't we --

2              MR. MINUTI:  I'm sorry, I thought you asked if you

3    wanted to go to the Seal Motion first.

4              THE COURT:  I was -- oh, I did say that.  Right.  I

5    mean, if you want to take up the Motion to Seal first, we can

6    do that.

7              MR. MINUTI:  Okay.

8              THE COURT:  Is that what you want to do?

9              MR. MINUTI:  Well, my preference would be just to do

10   it together, but --

11             THE COURT:  That's what I was saying.

12             MR. MINUTI:  Yeah, okay.

13             THE COURT:  Okay.

14             MR. MINUTI:  I think we're on -- sorry, Your Honor,

15   I think we're on the same page.

16             THE COURT:  I think we are.

17             MR. MINUTI:  And with that, I'd call Mr. Gorin to

18   the stand.

19             THE COURT:  All right, before he testifies, let's

20   take a short recess.  Five minutes.

21             THE CLERK:  All rise.  This Court is in recess.

22        (Recess)

23             THE CLERK:  Come to order.  The United States

24   Bankruptcy Court for the District of Maryland now resumes its

25   regular session.

1          THE COURT:  All right, Mr. Minuti, I think you were

2     about to call a witness.

3          MR. MINUTI:  Thank you, Your Honor.  I would call

4     Mr. Robert Gorin to the stand.

5          THE COURT:  Please come forward, sir.  Make your way

6     to the witness stand.  Before having a seat, please raise your

7     right hand and the Clerk will administer the oath.

8            ROBERT GORIN, DEBTOR'S WITNESS, SWORN

9          THE CLERK:  Please be seated.  Please state your

10    full name and address for the record.

11         MR. GORIN:  Robert Gorin.  Do you want my full --

12         THE CLERK:  Business.

13         MR. GORIN:  -- my business address?

14         THE CLERK:  Correct.

15         MR. GORIN:  Okay, 295 Madison Avenue, 20th Floor,

16    New York, New York 10017.

17         THE CLERK:  Thank you.  Your witness, Mr. Minuti.

18         MR. MINUTI:  Thank you.

19                    DIRECT EXAMINATION

20    BY MR. MINUTI:

21    Q.  Good afternoon, Mr. Gorin.

22    A.  Good afternoon.

23    Q.  Briefly, if you could, describe your educational

24    background.

25    A.  I have a business degree, an undergraduate business degree

1  in entrepreneurial management from the Wharton Business School

2  at University of Pennsylvania, as well as a NBA -- as well as

3  an NBA also from the Wharton School.

4  Q.  And briefly describe for the Court your work history.

5  A.  I spent a number of years in traditional strategic and

6  operational consulting.  I spent about six years working for a

7  bank on the -- in lending and the consumer side, and then have

8  spent -- sorry, I built and ran a company in the medical

9  products space, and then have spent the last 18 years in the

10  turnaround restructuring space.

11  Q.  Okay.  Give me an idea, what kind of work do you do in the

12  turnaround restructuring space?

13  A.  We work with companies that are on a spectrum of distress.

14  Could be anything from distressed light to I can't make

15  payroll tomorrow, and we do a number of things.  We help with

16  their -- we help them operationally, we help their cost.  We

17  almost always develop a 13-week cash flow, and typically

18  there's one of three ultimate resolutions as I believe The

19  Honor knows from his experience, but it's a -- it's fix up the

20  company and hand it back, and bring comfort to the lender that

21  everything is working the way it should be and all debts can

22  be addressed and paid.  Sometimes we have to fix it up and

23  engage in some kind of sale of some or all of the assets, or

24  in unfortunate times when we don't have that luxury, we have

25  to design a soft landing for all of the constituents, which

1  often results in some kind of wind-down of the assets.

2  Q.  Where are you currently employed?

3  A.  I work for Getzler Henrich & Associates, a Hilco Company.

4  Q.  Okay, and you're the current co-Chief Restructuring

5  Officer to the Debtors, is that correct?

6  A.  Yes, sir.

7  Q.  And how long have you held that position?

8  A.  We have been -- since July.

9  Q.  And how long have you been on site at the Debtor's

10 facility?

11 A.  Since May.

12 Q.  And can you give the Court an idea of the kind of work

13 you've been doing for the Debtor?

14 A.  Absolutely.  We started as a financial advisor, so we were

15 hired by the company to help them with the 13 cash flow to

16 help with their operations, to help improve how they did

17 business, to shore up their finances, and to help in finding a

18 way to refinance or improve the liquidity situation with

19 lenders.  After a period of time we were asked to assume the

20 role of Chief Restructuring Officer, at which point we assumed

21 that role and we have been involved in the day-to-day

22 operations of the company, as well as helping with the sale

23 process, so the marketing of the company, and as well as the

24 day-to-day workings of the bankruptcy process.

25 Q.  Now we're here today to ask the Court to approve both the

1   Key Employee Incentive Plan and the Key Employee Retention

2   Plan.  What role if any did you have in developing those

3   plans?

4   A.  I had a significant role.  It fell under my auspices to

5   determine how the plan would be structured, who would be

6   involved, and I undertook a number of steps to do so.  I

7   consulted with other professionals, both at my firm, within

8   our law -- you know, our law firm partners as well as the

9   investment bank.  I did some research of other current case --

10   of recent cases, I should say.  I spoke to the participants,

11   the people who actually ended up being participants in the

12   program, and I spoke to other company management to understand

13   who were the key employees, who were really mission critical

14   to driving the success of the company.  This is a -- you know,

15   as a distributor, it's very much a relationship-driven

16   business.  We don't make anything; we sell other people's

17   products.  And so it's the relationships that the company has

18   with its vendors and suppliers and its customers, mostly

19   retailers, is -- that is the critical piece of the puzzle.

20   Some would call it the secret sauce.  And so to really

21   understand how that all worked, who those relationships sat

22   with so that I could determine who those critical people were,

23   and then to determine are they people that should be part of

24   the incentive program, or people that should be part of a

25   retention program.

1   Q.  And tell me, how many total employees did the company have

2   when you developed the programs?

3   A.  It was just shy of 490.

4   Q.  Okay, and both programs total, how many people are in both

5   programs you're seeking approval of today?

6   A.  40 people.

7   Q.  Okay, so 40 out of 490?

8           THE COURT:  You have to say yes or no, sir.

9   A.  Oh, I'm sorry, yes.  Yes.  If you want to do the math,

10  it's about 8%.

11  BY MR. MINUTI:

12  Q.  Eight, okay.  And sticking with the Key Employee Incentive

13  Plan, that's 17 employees, correct?

14  A.  Yes, sir.

15  Q.  Okay, three of whom are insiders, to your understanding?

16  A.  Yes.

17  Q.  Okay.

18  A.  Yes.

19  Q.  And tell me, how did you pick those 17 particular

20  employees?

21  A.  These are people that, for lack of a better phrase, help

22  drive the bus.  So they determine strategy, they determine --

23  they help determine policy, they in some, you know, way report

24  up through to the Board and play a mission-critical role in

25  the sale process as well as the day-to-day implementation of

1   the bankruptcy process.

2   Q.  And with regard to those 17 employees, can you give me a

3   sense for what sort of, if any, extra burden or extra work was

4   put upon them relative to the bankruptcy case and the sale

5   process?

6   A.  It's been pretty significant, as you can imagine.  They

7   have their day jobs which is, you know, maintaining the day-

8   to-day value of the company, making sure that, you know,

9   product continues to flow, working with the suppliers and the

10  vendors and the customers and the marketing, et cetera, of the

11  company.  On top of that, they have been asked to do a number

12  of things.  One is within the auspices of the sale process,

13  they have met with multiple potential buyers.  They have given

14  tours, they have sat through meetings both in person and, you

15  know, through video.  They have supplied data, some of which

16  had to be -- I'll say constructed, because it didn't exist in

17  our -- in the systems the way that the potential bidder wanted

18  it to, so they had to actually create spreadsheets and what

19  have you.  And I think, most importantly, they were critical.

20  Aside from maintaining the relationships, which are the

21  lifeblood of a company, they had to explain to the potential

22  bidders not just what makes the company valuable and special

23  today, but what other opportunities that were out there.  How

24  could we -- how could the company grow?  What is the true

25  future value of the company?  And I think if we were to look

1    at the way the auction ended, right, where we started at

2    approximately 39 million, depending on the add-backs and

3    reductions, and we end up in the 70s, I think they did a

4    really special job of conveying not just what makes the

5    company great today but what it could be and why there is a

6    lot more value than there might seem at first blush.

7    Q.  And you touched on this a few minutes ago, but you tied

8    the incentives to consideration in connection with a sale.

9    When did you develop that structure?

10   A.  So we started working on this, I would say late October

11   '24, early November, which was obviously well before we had a

12   stalking horse, to under -- you know, start to really put

13   together where we thought we could go.  We had had a process

14   previous which was not as successful as the process we've had

15   here with our current investment banker.  That process fell

16   apart for a number of reasons, and so we had some sense of

17   where value might be.  And so using that, we were -- we

18   crafted what we -- what in my business judgment was a fair

19   stretch, but a fair stretch that would help create value for

20   the estate, for all of the constituents, and well -- as well

21   as, you know, reward these people for the extra time and the -

22   - you know, really have them focused on the same things that

23   we were focused in, which was raising value of the company.

24   So they had skin in the game.  The more that they could help

25   increase the value of the company, the better off they did as

1    well, not just all of the external constituents.

2    Q.  Okay.  And turning to the Key Employee Retention Plan,

3    there it's 23 employees, and the plan itself is tied to

4    retention.  How did you select those employees?  Or better

5    question would be why did you select those employees out of

6    the 490?

7    A . Again, it was very much in conversation now with the

8    managers that those people reported to, who are maintaining --

9    who helped maintain the day-to-day work flow, who was critical

10   to the day-to-day operations of the business, and that we

11   require to kind of really stay in, be motivated, and get their

12   jobs done in the way that they always have, and to stay

13   motivated to, you know, make sure they're doing the best job

14   that they could.  So it was -- some of it was from my own

15   observation.  Some of it was through kind of my experience

16   over the years of dealing with other companies and how to

17   motivate people, as well as conversations with other people

18   within the organization.

19   Q.  Now you touched on this a minute ago.  The -- when -- if

20   we look at the Key Employee Incentive Plan, you know, the

21   payments are tied to net consideration from a sale, correct?

22   A.  Yes, sir.

23   Q.  And the first tier would be a sale at 30 million to 35

24   million, correct?

25   A.  Yes, sir.

1  Q.  All right, and you said a minute ago that the value that

2  was placed on the stalking horse bid was approximately 39

3  million, do I have that right?

4  A.  That's correct.

5  Q.  So why is it that it wasn't a lay-up, so to speak, in

6  terms of the first tier?  Why do you believe that?

7  A.  Because I don't -- when you -- when one looks at the way

8  the purchase price is calculated, there are -- there is a

9  true-up that has to happen at any given point in time, and

10  that includes such things as accounts receivable, accounts

11  payable, inventory, assumed liabilities, cure amounts, et

12  cetera, and those all have an impact on the price.  And that

13  has varied over time.  And so I know the day that we picked to

14  build the model, it was 39 -- you know, the model was $39

15  million.  Not long after that, if you had done it a week

16  later, it would have been 36 because some payments -- you

17  know, some accounts payable had been approved -- had been

18  incurred.  So it was very much about -- it wasn't a slam dunk,

19  and even though the number was 39, you had -- we really didn't

20  know where that was going to end up at the end of the day.

21  Q.  And when you chose the benchmarks, the first benchmark

22  being 30 million to 35 million, did you have a stalking horse

23  agreement?

24  A.  Not at that time, no.

25  Q.  And what did you have in terms of offers or expressions of

1    interest for the company, at that time?

2    A.   The only thing we had at that time were, you know, some

3    thoughts on where we thought it might go, but more importantly

4    we had had a previous process that as I --

5    Q.   Well, let me stop you there.  Why don't you explain to the

6    Judge the previous process.

7    A.   Prior to Getzler Henrich becoming the Chief Restructuring

8    Officer, the company had hired a different investment bank to

9    run through a process.  They had -- and they had gone through

10   a process, I'm told, over the course of 12+ months, and that

11   resulted in I guess what we would call an expression of

12   interest.  That was well below -- I think it was about -- it

13   was in that kind of -- it was high 20's, low 30's, before any

14   adjustments.  And so that's where we were starting from.

15   That's the only data point that we had actually related to the

16   company.  And again, that was not even -- that was not an

17   actual offer as much as it was an expression of interest.  But

18   that gave us a pretty good sense of kind of where the company

19   at that point in time was being valued.

20   Q.   And when did you first start to communicate the

21   possibility of these plans or the existence of these plans to

22   the affected employees?

23   A.   So we always knew that we were going to have to have a

24   plan like this because it's very common in these cases, and we

25   -- you know, as we started to kind of put it together and I

1   started to have the conversations, it became very clear that

2   the employees were becoming extremely nervous.  I was getting,

3   you know, I was getting questioned by employees, I was getting

4   questioned by managers that their team is getting very nervous

5   and should they stay, should they not.  And so that happened

6   almost immediately, so let's call it late October, early

7   November, where it became clear that we had to tell people we

8   were going to put a plan together, we were going to bring it

9   to the Court, and we were going to do the best that we could

10  so to have it be approved, so that it was something that they

11  could rely on.  Or I think the better way to say it is it

12  became something that they relied on as they chose to stay,

13  because they knew it was out there.  And many of them -- as I

14  said, I had had conversations with them so that I could

15  understand their jobs and I could understand, you know, their

16  personal motivations and their relationships and their

17  criticality to the business.  So they knew it was there.  I

18  looked them in the eye, I said we're going to do the best that

19  we can to get you what we can, because, you know, they pointed

20  out to me that we're going to be doing a lot more work.  And

21  that's okay, but, you know, we can't just do a lot more work

22  and then find out we have no job, you know.  I need -- I have

23  a family to take care of, they were saying to me, I need

24  something a little bit more concrete.

25  Q.  Now obviously we sit here today, we have bidders, right,

1   that are in the 70-million range, right?

2   A.  Yes.

3   Q.  Why do you need the plan if in fact the employees have

4   already done what was necessary to get us to this point where

5   we have these bids?  Or I should say plans.

6   A.  Yes.  I think that the -- I think the answer is, not to be

7   cute, but I think the answer is somewhat in the question.  I

8   think the fact that we did so well that it was such a success

9   at auction, and that nobody associated with the plan has left,

10  indicates 1) that they did rely on, you know, what we were

11  saying to them, and indicates that they were able to help us

12  create value.  I think you see that in the result, in the

13  result of the auction.  And I think -- it doesn't -- yes, I

14  know we're close, but we shouldn't disregard the level of work

15  that was required to get us here.  And I know we're talking

16  about this, you know, now, but there was significant amount of

17  work to get us here, and frankly -- and I know as was said by

18  Committee counsel, we're on the two-yard line, but we're not

19  in the end zone.  We haven't finished yet.  We've got to

20  close.  And I think especially kind of some of what's going on

21  around the case right now, given how closely this is being

22  followed by the industry press, I think it's more important

23  than ever to let them know that this is going to be there and

24  that if the work isn't done, we need to still finish.  We've

25  got to close this.

Gorin - Direct                    45

1   Q.  Now did you have an opportunity to read the United States

2   Trustee's Office objection to the plans?

3   A.  I did.

4   Q.  Okay.  At paragraph -- or page ten of the objection, the

5   United States Trustee argues that the Key Employee Retention

6   Plan is actually a disguised Key Employee Retention Plan.  Do

7   you agree or disagree with that statement?

8   A.  I disagree.

9   Q.  And why is that?

10  A.  I think it comes down to a few things.  I think -- first

11  of all, I think it comes down to your definition -- to the

12  definition of insider as I understand it.  Again, I know I was

13  colloquial, but I -- it's the person that's driving the bus,

14  it's the person that's setting strategy, et cetera.  And I

15  think that we needed people to stay.  These programs always

16  have a retention aspect to it, retentive aspect to it, but at

17  the end of the day we needed them to stay and we needed them

18  to help drive value.  And I think we can see that they've done

19  that, and that the way this company had been operate -- had

20  operated, and the way it had been formed, there were not as

21  many insiders as we might expect of a company of this size.

22  It was very centralized.  And that's why I think you see three

23  insiders, versus these other people who had important day-to-

24  day jobs.  I don't want to give the impression that they

25  weren't critical to the company, because they were, but they

1    didn't fit the definition as I saw it of people that we needed

2    to incent, to keep -- to -- you know, and who were defined as

3    insiders.

4    Q.  So you mentioned that both plans may have a retentive

5    effect, but was the primary goal of the incentive plan to

6    incentivize?

7    A.  Yes, it was to drive value, as I said.  This was all about

8    maximizing value.  We needed these people motivated, we needed

9    these people energized, and we needed them to explain to

10   potential bidders that to go beyond the numbers on the

11   spreadsheet, to truly bring home what made this company

12   special and what kind of value the company had and could

13   create, and that's why we tied it into those -- to

14   consideration.  As I said, I'm a big believer and you've tied

15   desire -- compensation to behavior, and we wanted them to act

16   like they had a true stake in how high, depending -- in how

17   high the company sold for.  And again, I think we achieved

18   that as the results show.

19   Q.  At the United States Trustee's objection at page 18, the

20   Trustee suggested that the Key Employee Retention Plan is

21   designed to {quote} "funnel money that could otherwise be

22   going to Creditors, to key employees."  Do you agree or

23   disagree with that statement?

24   A.  I disagree with that statement.

25   Q.  And why?

1    A.  And I'll say a couple reasons why.  First of all, we

2    consulted with the Creditors Committee.  They're on board.

3    They had some changes, we accepted those changes, we discussed

4    why they felt those changes were appropriate, and we adopted

5    those changes.  And the people that would -- that are

6    basically -- some of where that money is coming from,

7    obviously as you understand it, it's the Creditors.  And so it

8    was important because we all, again, saw that you're driving

9    value.  And if you look at something in the mid -- let's call

10   it the mid 30's to the low 70's, and the total, 1.3 million,

11   that's not, in my mind, a huge price to pay to close to double

12   where you work in terms of valuation, and add value for all of

13   the Creditors.  So, you know, we -- obviously we want to pay

14   off the secured lender and we want as much money as possible

15   to go to the other Creditors.  And I think we accomplished

16   that.

17   Q.  I'm going to switch gears and talk about the Seal Motion

18   for a minute.  Are you familiar with the Motion to Seal?

19   A.  I am.

20   Q.  Okay, and do you understand what information we're asking

21   the Court to seal?

22   A.  I do.

23   Q.  And what is that information?

24   A.  It is names, it is titles, it is salaries.

25   Q.  And why is it -- why do you believe that it's important to

1  keep that information sealed?

2  A.  I think there's a business aspect to that answer, and a

3  humanistic answer.  So I'll start with the business answer.

4  Again we're in a very competitive industry.  Distributors are

5  based on the relationships more than -- probably maybe more

6  than any other type of organization.  These people own that.

7  If we start publishing names, titles and salaries, we're

8  giving people, at a time when we're -- things are obviously

9  ambiguous, and people tend to not love ambiguity, at a time

10  when things are ambiguous, we're giving competitors a road map

11  of how to go and poach our best people.  And how -- you know,

12  what -- how -- what they would need to change jobs.  And I

13  think in that -- in this time of unrest, I think that was very

14  dangerous.  I think that would be detrimental to value

15  creation, and I think that it would be -- I think on the human

16  side, as I said, there is a lot of industry reporting on this

17  case.  Within the comic book and collectors community this is

18  a very significant deal.  And I think protecting the personal

19  privacy of these people is important.  I had a lot of

20  complaints, a lot of concern just when we initially filed this

21  with the redaction.  A lot of people felt if you understood

22  the company, you could still figure out who to.  And they were

23  very concerned and very upset about that.  And I did not want

24  and I do not want, now more than ever, I don't want someone to

25  be so upset that they say -- that they lose their motivation,

1   the morale or their vested interest in seeing this through to

2   the very end.

3          MR. MINUTI:  Your Honor, may I have one moment?

4          THE COURT:  Yes.

5          MR. MINUTI:  Your Honor, with that I'm going to pass

6   the witness.  Thank you.

7          THE COURT:  All right, thank you.  Mr. Bernstein?

8          MR. BERNSTEIN:  Thank you, Your Honor.  I will --

9   per your instruction before, I will try to go as far as I can

10  without disclosing anything on the -- that's sealed, but I'm

11  not sure I can get through everything without doing that at

12  this --

13         THE COURT:  Well, let me say this.  I haven't heard

14  anything so far that makes me think that going into the

15  redacted information is necessary.  You may be able to develop

16  that on cross examination, but --

17         MR. BERNSTEIN:  Certainly.

18         THE COURT:  -- go ahead.

19                    CROSS EXAMINATION

20  BY MR. BERNSTEIN:

21  Q.  So, good afternoon, Mr. Gorin.  It's good to see you

22  again.

23  A.  Good to see you too.  May I ask you a question before?

24  Q.  Of course.

25  A.  Can I just get some water?

1          THE CLERK:  Yeah, we're --

2    A.  Thank you.

3    Q.  Certainly.  So, I think you had just said you -- the key

4    employee -- well, if I refer to the Key Employee Incentive

5    Plan --

6    A.  Thank you.

7    Q.  -- as a KEIP and the Key Employee Retention Plan as a

8    KERP, well, is that okay with you with that?

9    A.  Absolutely.

10   Q.  Okay.  I think you said you developed these Plans back in

11   October, you started?  So, are some of these --

12   A.  That was when we started.

13   Q.  Sure.  And some of the -- at least the incentive payments

14   based on work that was done prepetition?

15   A.  I'm sorry, could you repeat the question?

16   Q.  Sure.  Some of the work that's -- the Incentive Plan that

17   we're paying these bonuses for, that was done prepetition?

18   A.  If you're asking did I start to ask questions and did I

19   start to inquire of people, you know, to who should be

20   involved and what it should look like, did it start

21   prepetition?  Absolutely.

22   Q.  But what I mean is the work that they're getting these

23   bonuses for.  Are we looking at prepetition work, postpetition

24   work, or some combination?

25   A.  No.  This is work associated with the sale process.

1   Right.

2   Q.  And on the day that this case was filed, there was already

3   a stalking horse bidder, right?

4   A.  Yes, sir.

5   Q.  So, there was already a sale process started?

6   A.  Yes, sir.

7   Q.  Okay.  So, some of this work is prepetition?

8   A.  Yes.

9   Q.  Okay.  If you could, in front of you, turn to UST

10  Exhibit-5.

11      (U.S. Trustee's Exhibit-5 previously marked for

12  identification)

13  A.  Yes, sir.

14  Q.  Okay.  Do you recognize that?

15  A.  I do.

16  Q.  And what is Exhibit-5?

17  A.  It is my declaration in support of the two programs.

18          MR. BERNSTEIN:  Thank you.  Your Honor, I move to

19  admit UST Exhibit-5.

20          THE COURT:  So, we've gone through this.  You want

21  the --

22          MR. BERNSTEIN:  It was just to make it easier to --

23  for -- it's not a big deal if you prefer.

24          THE COURT:  I -- no, I hear no objection, so I'm

25  going to admit Exhibit-5.  There's been a lot of paper filed

1   in this case.  I've read almost all of it.  A lot of it was

2   some time ago.  A lot of it was -- some of it was yesterday.

3   I may or may not remember what I read yesterday all that well.

4   You can talk with Ms. Ellis (phonetic) about that.  One reason

5   I wanted to hear the witness' testimony is I find that,

6   especially when there's something that's going to be

7   contested, and if it involves credibility and business

8   judgment, I find it best to hear these things directly from

9   the witness rather than read them off a piece of paper that

10  the attorneys have drafted with the witness' assistance.  So,

11  you may have some reason for wanting it in.  That's fine.  If

12  you want me to focus on something this witness knows that is

13  evidence, ask him the question.

14        (U.S. Trustee's Exhibit-5 admitted into evidence)

15            MR. BERNSTEIN:  That's what I'm getting, Your Honor.

16  Thank you.

17  BY MR. BERNSTEIN:

18  Q.  In Paragraph 5 of Exhibit-5, you say that in the KEIP,

19  there are three executives and 14 non-insider employees.  Do

20  you see that?

21  A.  Yes, sir.

22  Q.  Okay.  And you talked a little bit about that before, but

23  I'm not sure the wording that you said in your direct was

24  exactly same, so I'm going to focus on that.  So, how are you

25  defining executive for this purpose?

1   A.  So, I believe the way I'm defining it as it's used here is

2   as an insider, people who are driving the bus, people who are

3   setting policy, people who are involved in the strategy,

4   people who are involved in the day-to-day implementation of

5   the bankruptcy process.

6   Q.  Okay.  And then, as with respect to non-insiders, how do

7   you define that?  Is that just the opposite?

8   A.  I think that's right.  But it's still critical people, but

9   not -- I keep coming back to the phrase, "drive the bus,"

10  right?  But not people who are setting policy, but are still

11  just as critical to the company in their own way.

12  Q.  Okay.  Could you turn to Exhibit-1 -- UST Exhibit-1?  I

13  guess we're going to do this by counting from the top.

14      (U.S. Trustee's Exhibit-1 previously marked for

15  identification)

16  A.  Great.

17  Q.  You've said a couple of times that you believe there's

18  three insiders.  I've never seen anybody -- a description of

19  who those are.  Can you give me, I guess, by line number?

20  A.  Sure.  One, two, and three.

21  Q.  Okay.  So, if we go down to the very bottom, there's one

22  employee related to Diamond Select Toys.

23  A.  Yes.

24  Q.  Your position is that person is not an insider of Diamond

25  Select Toys?

1    A.  No.  Because he's not in control of his own finances.

2    Q.  In control of his own finances, I -- what do you mean by

3    that?

4    A.  If he wants -- when -- he is dependent in many ways upon

5    the other division from where most of his work -- 95, vast

6    majority of his sales come from the other sales, the sales to

7    Diamond.

8    Q.  Okay.

9    A.  Okay.  So, at the end of the day, he's designing toys and

10   collectibles, which is a lot more important than it sounds,

11   but he's designing toys and collectibles that he knows his --

12   constantly his -- basically, his customer is going to

13   purchase.  So, at the end of the day, he's being driven by

14   different people.

15   Q.  Okay.  Sticking with that person, so the very last line on

16   Exhibit-1.  Is he an -- is that person an officer of Diamond

17   Select Toys?

18   A.  Actually, you know what?  At the end of the day, I don't

19   remember.  I don't know.

20   Q.  Okay.  You have a basic understanding of who officers of

21   the --

22   A.  Yes.

23   Q.  -- of the corporation are.  I'm just looking at that

24   title, which I don't want to say out loud.

25   A.  No, I understand.

1  Q.  Is that -- is it not your understanding that that title --
2  that person is an officer?
3  A.  He has a title that I understand why we would say that,
4  right?  But at the end of the day, he is reporting to somebody
5  else.  He is reporting to one of the top three that we talked
6  about, the first three lines.  He does not report to a board.
7  He does not sit on a board.  He does -- and he reports to an
8  interim person, right?
9  Q.  Sure.
10  A.  And at the end of the day, to make significant decisions
11  about anything associated with that company, he has to get
12  sign-off and approval from others.
13  Q.  Okay.  Diamond Select Toys is itself a separate
14  corporation from Diamond Comics Distributors, correct?
15  A.  Yes.
16  Q.  And does -- okay.  So, let me ask you this.  Looking at --
17  and Diamond Comics, the top green line on Exhibit-1 says --
18  just says Diamond Comics.  But is that referring to Diamond
19  Comics Distributors?
20  A.  So, it's a little -- it is a little confusing because the
21  parent and one of the operating divisions have the same name.
22  So, there is a holding company that is Diamond Comic
23  Distributors, and there is a division that is also Diamond
24  Comics.  So, this is relating to these -- those top three
25  people.  They -- while they sit at the Diamond Comic side,

1    they also sit -- they sit at the Diamond -- we call it

2    internally for just this reason, Diamond Diamond, just to give

3    you some sense.  So, there are two main operating divisions,

4    right?  Diamond Diamond and Alliance.  And so, this relates

5    more to Diamond Diamond, but many of those -- but many of the

6    five, if not all of the five, they play a role across the

7    broader organization.

8    Q.  Do you understand -- is it your understanding that every

9    corporation has its own set of officers?

10   A.  Yes.

11   Q.  So, there must be some officers of Diamond Select Toys,

12   correct?

13   A.  I would assume so.

14   Q.  Do you know who they are?

15   A.  Sitting here, I can't.  I can't.  I can't answer that

16   question, but other than to say I focused on how the job works

17   in implementation, not necessarily just the title.

18   Q.  Sure.  Let's look -- going back to the top, we've covered

19   the first three, or you mentioned -- you believe the first

20   three are insiders?

21   A.  Uhm-hum.

22   Q.  You also believe them to be officers?

23   A.  Yes.

24   Q.  Okay.  Let's look at number four.  Is that an officer?

25   A.  No.

1  Q.  Number five?

2  A.  No.

3  Q.  Okay.  Let's go to Alliance Game Distributors, the top two

4  people, and they seem to have the same title.

5  A.  Uhm-hum.  They do.

6  Q.  Can you explain why that is?

7  A.  Why they have the same title?

8  Q.  Yeah.

9  A.  Again, that is -- from a legal construct, there is one

10  organization, Diamond Comic.  Operationally, they --

11  internally, they have different divisions.  They have these

12  two divisions that operate.  These two people, in tandem,

13  operate the -- they operate at -- they operate the Alliance

14  Game Operating Division, which is not also -- which is not a

15  legal entity.

16  Q.  Okay.  And so, is the first person under the Alliance Game

17  Distributors, is he an officer?

18  A.  No.

19  Q.  And how about the second person?

20  A.  No.

21  Q.  Third?

22  A.  No.

23  Q.  Okay.  And if I run down this, you believe there are no

24  officers -- none of the people on this list are officers?

25  A.  Other than the top ones that we talked about, no, sir.

1    Q.  Okay.  Let's start with the fourth person down from the

2    top, and don't -- please don't read his title out loud.

3    A.  No, I won't.  I'm sorry, are we talking about from the

4    very top or under?

5    Q.  From the very top.

6    A.  Okay.  Thank you.

7    Q.  Yeah.  Please don't read his title out loud.

8    A.  Agreed.

9    Q.  Who granted him that title?

10   A.  I don't know that that title existed, but it predates me.

11   Q.  Okay.

12   A.  It predates my involvement with the company.

13   Q.  Do you know what that person does?

14   A.  I do.

15   Q.  What does he do?

16   A.  He --

17            MR. MINUTI:  Your Honor, if I may, I'm just going to

18   caution the witness.  The whole idea was to keep some of this

19   information sealed, so if the witness could generally be

20   responsive, but I'm fearful we're giving too much specific

21   information to reveal.  We need the information sealed.  I

22   would also point out, Your Honor, that I'm talking about a Key

23   Employee Incentive Program, and so whether they're officers or

24   not officers, it doesn't matter.  503(c), as it relates to

25   insiders, only applies if you're talking about a Retention

1    Plan.

2              MR. BERNSTEIN:  In response to that, Your Honor, I'd

3    say two things.  First, one of the arguments which we have

4    made is that we believe the Key Employee Incentive Program is

5    actually a disguised Key Employee Retention Plan.  The second

6    is I don't understand how we can possibly analyze the

7    reasonableness, the properness, how -- whether this is

8    justified under the facts and circumstances, we don't know

9    what these people do.

10             THE COURT:  Well, I guess that's not really an

11   objection.  Let me put it to you this way, Mr. Bernstein.

12   You're prosecuting an objection.  It's a judge trial.  You're

13   trying to convince me.  All of the time spent hammering away

14   on this one individual at Diamond Select Toys was completely

15   unpersuasive.  Okay?  And I am not sure that I think going

16   through this line by line is necessarily going to be

17   productive.  Is there some way to approach this without

18   getting into the areas that Mr. Minuti is concerned about?

19             MR. BERNSTEIN:  I will certainly try.  Let me skip

20   to something else for now.

21   BY MR. BERNSTEIN:

22   Q.  The initial stalking horse bid was only for the Alliance

23   assets, correct?

24   A.  Yes, sir.

25   Q.  And the auction price -- well, let me go back because we

1   didn't have -- we didn't talk too much about the auction

2   today.  The final sale price, and I know it's not been

3   determined, but the bid that you're looking at these days, did

4   that divide up the Alliance assets from another -- from the

5   other portions?

6   A.  Yes.

7   Q.  Okay.  In either of the original winning bid or the backup

8   bid that we're now possibly looking at from Monday, what was

9   the price in those two bids for the Alliance assets?

10  A.  The -- so it would have been -- I think it would have been

11  around 50 million.

12  Q.  Okay.  So, under any of the -- and under the KEIP Plan

13  that we're looking at, it's only the third column of the Plan

14  that we're looking at because we can agree --

15  A.  Today, that's right.

16  Q.  -- as of today?

17  A.  As of today.

18  Q.  Right.

19  A.  That's correct.

20  Q.  And you --

21  A.  We didn't -- I'm sorry.

22  Q.  Oh, no.

23  A.  We did not -- I don't mean to talk over you.  We didn't

24  know that at the time when we put this together.  And, again,

25  I want to say that that's why this is such a -- this program,

1    I believe, was such a huge success.

2    Q.  Sure.  And as of the date of filing, though, as you said

3    before, you had the stalking horse bid, correct?

4    A.  On the date of filing.

5    Q.  Yes.  Okay.  As of today, when we're looking at the third

6    column for the Alliance assets, assuming that sale -- one of

7    the two top bids closes, they -- these people enlisted on this

8    Plan will get this money regardless of whether they do a

9    single thing more, right?

10   A.  No.

11   Q.  What do they still have to do?

12   A.  They have to close the deal.  This company has to

13   function.  It has to keep -- it has to maintain its current

14   value.  They have to continue to keep their staff.  They have

15   to keep their relationships in the marketplace, the retailers,

16   and our vendors and suppliers.  They have to keep them at the

17   table.  They have to keep them working with us so that we can

18   maintain value.  And they have to help close this.  And

19   without -- if that value starts to decrease, if these people

20   start to leave, if they no longer have their heart in it and

21   morale starts to denigrate, we have a valuation problem.  We

22   have a value of the company problem that could very well -- it

23   could impact how the company is valued and the total dollars

24   that are received that will then be used to pay the Secured

25   Lender as well as the Creditor Committee.

1    Q.  So, between now and the closing, which is scheduled for

2    the 10th.  Is that correct?

3    A.  I believe tentatively, yes.

4    Q.  The bid price could go below $40 million?

5    A.  We could lose critical vendors.  We are a distributor.  At

6    the end of the day, if the top two, you know, suppliers say,

7    "The guy I was friendly with left," or, "I am so nervous about

8    what I am now seeing at this, I am not comfortable doing

9    business with you anymore," what are they buying, right?  What

10   -- so they're -- so at least in one of them, it could be a

11   material change to the operations of the business, which

12   allows them, as I understand it, I'm not a lawyer, but as I

13   understand it, it allows them to change their bid and/or walk

14   away.  So, again, we have to finish what we've started and

15   there is a significant amount of work still to be done to get

16   across those two yards to continue the analogy.  But, again,

17   we can't forget, nor should we marginalize all the work that

18   was done to get here, the nights, the weekends, the missed --

19   you know, the missed dinners, the lack of family time, so that

20   they could help drive the value up until this -- up to the 70

21   -- in the $70 million range.  It's not just about the next two

22   weeks, which are mission critical.  We've got to finish this.

23   You don't get points for stopping on the two-yard line.  We've

24   got to close.  But the reason we're on the two-yard line is

25   because of all the work they've already done with the

1   expectation that we would come here to the court and do

2   everything in our power to get the work that they, at the

3   time, were going to do, and I get it, a lot of it has been

4   done already, to get that recognized and compensated for so

5   that they don't leave.

6   Q.  The purchaser bought the assets, correct?  Not the

7   relationships.

8   A.  If you don't have the relationships, right, you don't --

9   not every -- in business, not every asset is an asset that you

10  ascribe into a spreadsheet.  That's what I was saying earlier.

11  These people were able to explain to the bidders the true

12  value of this company, and it's those relationships.  Because

13  if you don't have those relationships, you don't get the

14  product, you don't sell, you don't get the AR, you don't have

15  the inventory.  You don't have anything because you don't make

16  anything.  You just distribute.

17  Q.  So, what you're saying is these relationships follow these

18  employees, correct?

19  A.  In many cases, yes.

20  Q.  So, if the purchaser wants these relationships, they need

21  to get these employees, correct?

22  A.  In many cases, you want those employees to stay, yes.

23  Q.  So, why do you need to pay them to stay on if the

24  purchaser is going to need them?

25  A.  Because they don't need them until after they've bought

1   the company.  What happens after they've bought the company

2   and what they negotiate going forward, that's up to them.

3   It's between those two.  That has nothing to do with us.  I

4   just need them to stay.  We need them to stay.  The Creditors

5   Committee and the Lender, the Secured Lender, we need them to

6   stay to get that done.

7   Q.  And that could all fall apart, you believe, between the

8   bidding and the 10th?

9   A.  I do.  I do.  Particularly given some of the tumult, as my

10  family would say.

11  Q.  Do any of the employees on Exhibit-1 have a current job

12  offer from somebody else?

13  A.  I don't know the answer to that.  I can tell you that they

14  have -- that there are employees who have told -- who have

15  indicated that they have employees that are leaving or that

16  they have offers for interviews.

17  Q.  Which ones on this list are either saying they're leaving

18  or have offers?

19  A.  First of all, I'll answer your question, but it goes

20  beyond just this list.  It's also the people that report to

21  them, right?  And they look to their manager to stay.  That's

22  how it works, right?  Just as if the people that report to

23  you, if you were to take a different job, they might then view

24  their employment differently, right?  Because part of --

25  whether we like it or not, part of the loyalty is to the

1    organization, part of the loyalty is to the person I report

2    to, right?  That's true for all of us.  That's human nature.

3    But there are -- if you start at row three, okay, and you go

4    down 1, 2, 3, 4, 5, just as a beginning point, they've all

5    indicated to me that they have other options that they could

6    pursue.

7    Q.  Everyone from five down or five below the three, so eight

8    down?

9    A.  I'm sorry, you start at line three, line four, line five,

10   line six, line seven.

11            THE COURT:  So, three through seven?

12   A.  Yes, Sir.

13   BY MR. BERNSTEIN:

14   Q.  Okay.

15   A.  Sorry if I wasn't clear.

16   Q.  I do have -- I'm almost done.  I have a question about the

17   -- there's two -- we talked about the Alliance Game

18   Distributors, the top two underneath Alliance Game

19   Distributors.

20   A.  Yes, sir.

21   Q.  You have a little star next to it.  It says some

22   incentives are based on Employment Agreements?

23   A.  Yes, sir.

24   Q.  All right.  So, is -- I'm just a little bit confused.  Is

25   the amount of money they're getting under this Plan based on

1   some Employment Agreement they have or is it based on this

2   Plan?

3   A.   While we were putting this Plan together, these critical

4   people who were the previous owners of that division which was

5   purchased by Diamond, who are the face of the company, right,

6   and who the -- they have the relationships in the marketplace.

7   The marketplace, as much as they're doing business with the

8   name on a -- of a corporation, they're doing business with

9   these two -- you know, with these two.  So, they did not have

10  Employment Agreements, and we thought to maintain and create

11  future value, we should lock these people into agreements

12  because it was important for value to the constituents.  They

13  expressed that it was important to them because they could go

14  and do this somewhere else.  They had nothing stopping them

15  from doing that.  And so, we negotiated back in October.  We

16  negotiated, and as part of that, this -- that -- it's driven

17  by an incentive program that is written into their contract.

18  Q.   So, is the number of the bonus -- I don't think that's --

19  I believe that's not sealed, so the $272,250.  Is that in

20  their contract or is that --

21  A.   That is part of the incentive portion of their contract,

22  yes.

23          MR. BERNSTEIN:  Okay.  Just one moment, Your Honor.

24  I think I'm -- that's all I have, Your Honor.

25          THE COURT:  Okay.  Thank you.  Mr. Minuti?  Well,

1    anyone else wishing to cross examine the witness?  No takers.

2    Mr. Minuti?

3             MR. MINUTI:  No further or no redirect, Your Honor.

4             THE COURT:  Okay.  Thank you.

5             MR. MINUTI:  Thank you.

6             THE COURT:  Thank you for your testimony, sir.

7    A.  Thank you.

8         (Witness excused)

9             THE COURT:  Any other evidence?

10            MR. MINUTI:  No.  No further evidence, Your Honor,

11   from the Debtor.

12            THE COURT:  All right.  Thank you.  Mr. Bernstein,

13   evidence?

14            MR. BERNSTEIN:  None, Your Honor.

15            THE COURT:  Okay.  So, argument, Mr. Minuti?

16   Closing argument?  Maybe we take a recess before we do that.

17            MR. MINUTI:  Thank you, Your Honor.

18            THE CLERK:  All rise.  This court is in recess.

19        (Recess)

20        (Back on record)

21            THE CLERK:  Order.  The United States Bankruptcy

22   Court for the District of Maryland now resumes its regular

23   session.

24            THE COURT:  All right.  Mr. Minuti, you proceed.

25            MR. MINUTI:  Thank you, Your Honor.  Again, for the

1  record, Mark Minuti.  I'm going to start with the Seal Motion,

2  Your Honor.

3          THE COURT:  Okay.

4          MR. MINUTI:  The Court is authorized to issue orders

5  protecting the disclosure of confidential information pursuant

6  to Section 107(b) of the Bankruptcy Code and Bankruptcy Rule

7  9018.  Here, we submit the cause exists to grant the Seal

8  Motion to seal the names, titles, and salary information of

9  the employees proposed to be subject to the Plans.  First, the

10  key information related to the proposed Plans, for example,

11  the number of employees in each Plan, the targets, the

12  milestones, the payments, all have been disclosed.  What has

13  not been disclosed are the names, titles, and salaries of the

14  participants.  This, we believe, Your Honor, and submit is

15  sensitive commercial information.  Public disclosure of this

16  information will be harmful to both the Estate and the

17  employees.  Most employees, understandably, would not want

18  their information, particularly their salaries, made public,

19  and further disclosure of such information would essentially

20  be a roadmap for the Debtor's competitors to target and

21  attempt to poach the Debtor's most critical and employee --

22  and important employees.

23      By disclosing this information, Creditors will know or

24  competitors will know who we consider critical based upon the

25  job titles they can figure out what they do, and most

1    critically, they can figure out how much we pay them and what

2    would be needed to poach those employees away.  On that point,

3    Your Honor, Mr. Gorin's testimony was quite clear and

4    unrebutted.  This type of information has been sealed in many

5    other cases, including cases here in Maryland.  I submit that

6    no party will be prejudiced, Your Honor, if the Court grants

7    the Sealing Motion.  As I already mentioned, the confidential

8    information has already been provided to the key case

9    constituents.  No one else has requested the information.  No

10   one else has objected to the Seal Motion, and we submit that's

11   because the key terms of the programs are fully set forth in

12   the motion.

13        The Trustee argues that the names, job titles, and

14   salaries of the affected employees are not commercial

15   information, and in doing so, they -- he cites the cases that

16   stand for the proposition that things like customer lists or

17   investment strategy is critical commercial information.  And

18   while that is true, and we don't debate that, Your Honor,

19   there's no case cited by the Trustee that stands for the

20   proposition that the information we seek to seal by our motion

21   is not sensitive commercial information.  The United States

22   Trustee cites the Orion Pictures case, and in that case, the

23   court defined commercial information as, {quote}, "information

24   which would cause an unfair advantage to competitors by

25   providing them with information as to the commercial

1    operations of the Debtor," {close quote}.

2        As we discussed at the outset of this case and as set

3    forth in Mr. Gorin's testimony, the Debtor's business is based

4    in large part on relationships with customers and vendors.

5    There's no doubt that our competitors would love to know who

6    these key employees are, who have these relationships, what

7    they do, how much they need to offer them to try to lure them

8    away.  While it may not be true in every case, Your Honor,

9    certainly in this case, the sensitive information we seek to

10   seal is sensitive commercial information.  We believe Mr.

11   Gorin's testimony on these points was clear and unrebutted,

12   and for all of those reasons, Your Honor, we would submit that

13   the Motion to Seal should be granted.  Would you like me to

14   move on to the motion itself?

15           THE COURT:  Please.

16           MR. MINUTI:  Thank you, Your Honor.  The Debtors

17   have moved for approval of the Proposed Key Employee Incentive

18   Plan under Section 363(b) or (c) of the Bankruptcy Code.  Most

19   courts have concluded that when analyzing Plans of whether

20   under 363 or 503(c), the business judgment standard applies.

21   That standard is basically, was a decision to adopt the Plan

22   or Plans valid -- a valid exercise of business judgment given

23   the facts and circumstances of the case?  In making the

24   determination, courts typically consider a number of factors,

25   and I'm going to walk through those factors now.  Factor #1,

1  is there a relationship between the Plan goals to be -- the

2  plan and the goals to be achieved?  Again, on this point, Mr.

3  Gorin's testimony was unrebutted.  The Plans were designed to

4  achieve the restructuring objectives, including, in the case

5  of the KEIP, consummating the sale of the assets and

6  maximizing value through the sale process, which was

7  critically -- and these employees were critically needed.  The

8  key goal of the Retention Plan was obviously to retain these

9  employees who were, again, critical to both maintaining the

10  operations of the Debtor and helping us with the sale process

11  and ultimately getting to a closing.

12       Under the KEIP, the participants only receive those

13  payments if the sales close and the targets are achieved.  The

14  targets are specifically aligned with the Debtor's goal of

15  selling their assets and maximizing value.  Accordingly, the

16  participants are incentivized to achieve the desired

17  performance under the Plan, and I think Mr. Gorin's testimony,

18  again, on this point was unrebutted.  He wanted to incentivize

19  these people to work with the bidders, to unlock the hidden

20  value, to show them the roadmap as to how the -- these assets

21  were maybe even more valuable than they appeared on paper.

22  They were successful in doing that.  We have two successful

23  bids for the company.  The goals were achieved.  We submit

24  that the Plan and the goals are aligned.  In the case of the

25  KERP, it was designed to retain those necessary to maintain

1   value for the Debtors through the closing, and at least as of

2   today, we've achieved those goals.

3       Factor #2 is whether the cost of the Plan is reasonable

4   in the context of this case.  With regard to the KEIP, Your

5   Honor, the total payments range from $547,750 to $1,096,000.

6   Individual KEIP payments range from a low of 5,000 to a high

7   of potentially $272,625.  The total payments under the Key

8   Employee Retention Plan are only 276,000 -- I'm sorry, yes,

9   $276,900 for individual payments ranging from 5,000 to 2,300

10  -- $23,000, all again tied to the sale proceeds at this point,

11  Your Honor, at the higher end of the milestones.  So, we think

12  the cost of the Plans are reasonable in the context of this

13  case and the results achieved at the auction.

14      Factor #3 is whether the scope of the Plan is fair and

15  reasonable.  Again, the testimony is unrebutted.  We're

16  talking about a total of 40 employees out of 490.  As Mr.

17  Gorin corrected or pointed out, 8%.  That's the number of

18  employees that were selected.  They were carefully selected

19  based on the criteria that Mr. Gorin testified to in

20  consultation with professionals, other people at the company,

21  his own observations, and so on.

22      Factor four is whether the Plan is consistent with

23  industry standard.  Mr. Gorin testified that he did look at

24  other recent Plans in other cases in developing the current

25  Plan, and obviously they relied upon their own experience and

1   what was necessary in this case.  Look, nobody wants to give

2   money away that's unnecessary, and so what you try to do is

3   figure out what's the least amount you can pay to achieve the

4   desired goal, and that was -- that's what was done here.

5       Factor five is the due diligence regarding the need for

6   the Plan.  Again, the testimony is unrebutted.  Mr. Gorin and

7   others looked at the extraordinary demands upon the Plan

8   participants in addition to the normal day-to-day job duties.

9   They determined who was key.  Again, only 40 out of 490

10  people.  Who was key to the Chapter 11 goals?  The need for

11  the participants to be engaged, motivated, responsive, go

12  above and beyond.  In the case of the KERP, we looked at those

13  that we needed to incentivize to stay.  Finally, did the

14  Debtors receive independent counsel regarding the Plan?  The

15  answer is the -- that Mr. Gorin testified he worked with

16  management, the professionals, Raymond James, and ultimately,

17  Your Honor took input from the Committee and adopted that

18  input in terms of the Plan that's before you today.

19      As indicated, the United States Trustee's Office is the

20  only party that has objected to the motion.  With respect to

21  the KEIP, the Trustee argues that the KEIP is a designed --

22  excuse me, disguised Retention Plan because the incentive

23  milestones are essentially a layup, and as to the insiders,

24  that the Plan violates 503(c)(1).  They -- he argues that the

25  Plan, or the Trustee argues that the Plan was not needed

1  because the hearing today, Your Honor, is well after the work

2  the employees needed to do in order to get us to a sale.

3  Well, first, Your Honor, the milestones were set before we had

4  a stalking horse bidder, and as Mr. Gorin testified, they were

5  really based upon prior expressions of interest that were in

6  the 20s, and so we did not believe they were a layup, and

7  certainly at the time the Plan was communicated to employees.

8     Second, the milestones were not layups.  We have to close

9  these transactions before any payments are going to be made.

10  While we are confident we're going to be before you next

11  Monday and ask for approval of a transaction, we still have to

12  get to the closing.  These employees remain critical to get to

13  the closing, Your Honor, and therefore we think the milestones

14  are far from a layup, and we need these people motivated,

15  working, and helping to drive value to these Estates.

16     Third, even with respect to the stalking horse bidder, as

17  Mr. Gorin testified, Your Honor, we value the bid at the time

18  of the stalking horse about $39 million, but again, there are

19  variables and adjustments that can be made under the Asset

20  Purchase Agreement, and again, the payments are based upon the

21  net to be received by the Estates.  At the time the Plan was

22  established, it's important to point out that there were no

23  assurances that other bids would be received for the other

24  aspects of the company.  Remember, the stalking horse bid was

25  only for the Alliance division.  The bids we did receive, Your

1    Honor, were a result of the efforts of those in the Plans by

2    way of facility tours, responding to requests for information,

3    again, showing bidders where the true value here may lie and

4    everything that Mr. Gorin testified to.  The Trustee's Office

5    suggests that the bonuses are locked in as of today, but

6    again, the outside closing date is April 10.  That is subject

7    to extension, Your Honor, by agreement of both parties.  We're

8    certainly pushing to get it done by April 10, but a lot of

9    work needs to be done before we get there, and therefore, the

10   Plans are still necessary and will bring about the desired

11   effect.

12        Respectfully, Your Honor, the Trustee is also wrong to

13   suggest that the Plan is not necessary because, again, they've

14   performed their work through today.  I've already covered

15   that, but again, more work is necessary and people need to

16   continue to do what they're doing to maximize value.  As Mr.

17   Gorin testified, Your Honor, the Plans were disclosed and

18   discussed with employees well before the stalking horse bidder

19   was signed up.  Those employees relied upon the pursuit of

20   this motion.  Obviously, it's ultimately up to the Court

21   whether the motion is approved or not, but Mr. Gorin was quite

22   clear that he let these employees know that Debtors would do

23   whatever they could to try to get these Plans approved, and we

24   believe the results of the Plans, Your Honor, are in the bids

25   -- the tremendous bids we received.  At the end of the day, we

1  know these Plans work.  The Incentive Plan worked.  We stand

2  here, Your Honor, on the eve of getting approval to bids in

3  the $70 million range, Your Honor, which was not thought of or

4  contemplated at the time these Plans went into existence.

5      The United States Trustee's argument that the KEIP Plan

6  violates 503(c)(1) should be overruled.  First, 503(c)(1) only

7  applies to insiders.  We only have three, Your Honor.  But

8  further, 503(c) does place restrictions on Retention Plans,

9  but when looking at the Plans and determining whether we're

10 dealing with an Incentive Plan or a Retention Plan, the courts

11 have been clear that, you know, that all of these Plans have

12 some retentive effect.  The question really becomes whether

13 the primary goal of the Plan was incentivizing behavior.  And,

14 again, on this point, I think Mr. Gorin's testimony was

15 unrebutted.  He certainly acknowledged that he was hoping and

16 it was likely that the Plans would have a retentive effect.

17 What he was really trying to do was incentivize behavior to

18 drive value to ultimately get to the bids we received.

19     Turning to the KERP, the United States Trustee questions

20 whether the KERP includes insiders, and thus is contrary to

21 506 -- 503(c)(1).  On this point, again, Mr. Gorin testified

22 that none of these folks, to use his language, Your Honor,

23 drive the bus.  They don't report to the board.  They don't

24 meet with the board.  They report to other folks up the chain.

25 And none of them hold positions, Your Honor, within the

1    meaning of the insiders as defined under the Bankruptcy Code.
2    None of them are in a position of control.  And, again, most
3    duties are limited to specific divisions.
4         Finally, the United States Trustee argues that both Plans
5    should be denied under 503(c)(3) as not necessarily, not
6    commercially reasonable, and not justified under the facts and
7    circumstances of the case.  I'm going to cut my argument short
8    here, Your Honor, and simply rely on Mr. Gorin's testimony
9    which I think was quite credible and unrebutted as to why we
10   need these Plans, how they were effective, how they drove
11   value, and how we're poised to close the transaction at
12   significant value.  So, for all these reasons, Your Honor, we
13   would ask that the Court overrule the United States Trustee's
14   objection, both to the Seal Motion and the Plan Motion, and
15   we'd ask that the Court approve the Plans as modified based on
16   input on the -- of the Unsecured Creditors Committee.  Thank
17   you, Your Honor.
18        THE COURT:  Thank you.  It looks like the Committee
19   wishes to be heard first.
20        MR. FINIZIO:  Thank you, Your Honor.  I'll be brief.
21   Gianfranco Finizio, Lowenstein Sandler, counsel to the
22   Committee.  I just want to make abundantly clear that the
23   Committee, which represents approximately 40 to 45, maybe $50
24   million in unsecured claims, supports both the Seal Motion and
25   the KEIP and the KERP Motion as has been revised.  As we've

1   heard at length here, the auction results speak for

2   themselves.  We started the case with one bidder for

3   approximately $39 million, sixty days later or so, we have two

4   bidders that are in the $70 million range.  That is in large

5   part due to the hard work of the KEIP and KERP participants.

6        During the cross examination, the U.S. Trustee asked Mr.

7   Gorin, assuming the deal closes, the KEIP participants will

8   get the amounts in the third column.  Well, that's the point.

9   We can't make that assumption.  The Committee is not willing

10  to make that $70 million assumption.  There is a lot of work

11  that needs to be done between now and the closing.  And for

12  those reasons, Your Honor, the Creditors Committee supports

13  the KEIP and the KERP as has been revised in consultation with

14  the Debtors.

15        THE COURT:  All right.  Thank you.  Now, Mr.

16  Bernstein?

17        MR. BERNSTEIN:  Thank you, Your Honor.  I will

18  address the Sealing Motion first.  I think that probably makes

19  the most sense since that was the order we went in before.

20        THE COURT:  Okay.

21        MR. BERNSTEIN:  As the Court's aware, certainly

22  Bankruptcy Courts are not secret courts that operate behind

23  closed doors and outside of the public scrutiny.  To the

24  contrary, bankruptcy proceedings are meant to be open, and the

25  documents are -- in the cases are meant to be publicly

1   available.   Indeed, the fundamental principle and the mantra

2   of practice in bankruptcy is always disclose, disclose,

3   disclose.   And it's not simply so that interested parties can

4   protect their own interests.   Obviously, that's a big, big

5   part of it.   It's also so that the public can scrutinize the

6   court's actions.   But proceeding in secret is exactly what the

7   Debtors are asking the Court to do today.

8           The Debtors are asking the Court to approve bonuses to

9   certain handpicked employees without providing any information

10   at all about what these employees do or who they are.   We

11   can't -- I mean, obviously I can, a select few of us can, but

12   most people can't know who are getting the bonuses.   We can't

13   know what the recipient did to receive such a bonus.   We can't

14   know what the recipient's compensation is to compare it to the

15   bonus.   And as followed, there's simply no way for anyone

16   outside of the select few who were privy to the non-redacted

17   versions to evaluate the propriety of the bonuses.   So, if the

18   Court allows the Debtors to proceed in secret like this, it

19   not only harms the interested parties who cannot protect their

20   rights, but it undermines public confidence in the workings of

21   the Court.

22           Now, of course, there's obviously times that, you know,

23   the need for secrecy outweighs the public interest in

24   disclosure and openness, but no such circumstances exist here.

25   Section 107, which sets out the strong public policy in favor

1    of openness, provides only three very narrow exceptions.  One,

2    to protect trade secrets, confidential research, development,

3    or commercial information.  Contrary to what Mr. Minuti had

4    argued, I believe employee names, positions, and salaries just

5    don't fall into that category, and there has been no case that

6    says there was.  Obviously, we're not -- though I didn't have

7    a case that said there wasn't, there's also no case that says

8    there is.

9        The second thing it does is protection from scandalous

10   and defamatory matter.  Again, employee names, positions, and

11   salaries are not scandalous or defamatory matter.  And the

12   third category is to prevent disclosure of means of

13   identification that would create an undue risk of identity

14   theft or unlawful injury to the individual or the individual's

15   property.  And once again, employee names, positions, and

16   salaries don't fall into that category.  Obviously, the names

17   and job titles would be means of identification, but

18   disclosures of those would not put the employees at undue risk

19   of identity theft or other kinds of unlawful injury.

20       Frankly, the Debtors didn't really seriously argue that

21   any of this falls into those categories.  What they're really

22   arguing is that this somehow will adversely affect, and I'm

23   quoting from the motion, {quote}, "the sale efforts and

24   overall restructuring efforts."  In addition to not being any

25   of the criteria set out in Section 107, this is not a

1    restructuring case, and the sale has already occurred or at

2    least basically occurred.

3            THE COURT:  It hasn't occurred.  It has not

4    occurred.  Have you -- were you present today?

5            MR. BERNSTEIN:  I was.

6            THE COURT:  It's not even clear that it's going to

7    happen.

8            MR. BERNSTEIN:  Well, you're correct, Your Honor.

9    But the -- we're already through the bidding.  We already have

10   the offers that are well above, more than one offer.  It is --

11   certainly everything could fall apart.  I get it, Your Honor.

12   But do we really think everything is going to fall apart?  And

13   if they do, is this secrecy motion going to change that?  The

14   Debtors also argue that, you know, competitors might try to

15   lure their employees away.  I have a couple of responses.  A,

16   that's really just business.  And, B, it still doesn't meet

17   any of the criteria of 107.  The disclosure doesn't put these

18   employees at risk.  The disclosure doesn't disclose any trade

19   secrets.  It really just does nothing but keep information

20   secret that some people want to keep secret.  And that's not

21   the way the Code works.  And so, there's no legal basis for

22   sealing this information.  The Court really should deny the

23   Motion to Seal.  So, with that, Your Honor, that would be my

24   argument with respect to the Motion to Seal.  I'd move on to

25   the KERP and KEIP Motion, unless you have a question.

1           THE COURT:  Go ahead.

2           MR. BERNSTEIN:  As noted in my objection, it's our

3   position that the KEIP is really disguised KERP and that there

4   are no meaningful incentives.  And, second, that the bonuses

5   aren't justified by the facts and circumstances of the cases

6   required by Section 503(c)(3).  Because all that KEIP does is

7   give bonuses to people for work that's already been done.  And

8   that might be fine outside of bankruptcy.  But in bankruptcy,

9   Debtors have a fiduciary duty to the Creditors and an

10  obligation to maximize the benefit to the Creditors and these

11  payments could be going to Creditors.  We already had the

12  auction last week.  The assets went for maybe at 70 million,

13  maybe at 69 million.  I've even heard 81 million today.

14  Nothing that any of these KEIP or KERP recipients does at this

15  point is going to impact that.  The metrics have all

16  essentially been met.  And they were also all basically met

17  before the case even started.  And that's retentive.  It's not

18  incentive.  Even before the auction, when the motion was

19  filed, the metrics were basically there.  The stalking horse

20  offer all but guaranteed the Alliance assets were going for 30

21  million -- $39 million.  Indeed, we heard earlier today, and

22  no one's disputed that the original ones were -- the original

23  offer was going to be $30 million.  That means two of the

24  levels of the bonus were already met.  And the story we've

25  always heard from the Debtors was that the expectation would

1   be that there was going to be robust bidding for these assets,
2   and there was.  And the Debtors were right about that.  And
3   so, the metrics the Debtors knew would be met before they even
4   filed this.  And I get it, there's some adjustments that
5   prevent totally accurate calculation of the stalking horse
6   bid.  But as the Bid Procedures Motion and all the statements
7   we've heard, the Debtors were always working on the assumption
8   that this was a $39 million deal.  But that doesn't even
9   matter because sitting here today before any KERP or KEIP is
10   approved, all the metrics are essentially met.  I get it.  The
11   deal could fall apart.  You're right.  It could.  But the
12   likeliness of that -- and what is any employee going to do to
13   change that?  If this deal falls apart, it's because there's
14   fighting between the bidders.  There's nothing left for the
15   employees to do on this front.  And that's with -- I think the
16   problem that we have here.
17       Now, the next part I want to deal with is the insider
18   issue.  The insider issue addresses if, in fact, the KEIP is a
19   disguised KERP, then none of the insiders would be eligible
20   for it.  I don't think in the KERP Plan there's really
21   insiders that we have to deal with.  The Debtors contend there
22   are three insiders, and we heard who they were today.  I'm not
23   going to name them, but they were the top three lines, I guess
24   that was.  But quite simply, the Code defines an insider as
25   including any officer of the Debtor, whether or not they have

1    any control of any sort.  Control isn't the issue.  And if

2    someone is an officer of the Debtor, they're an insider

3    regardless of whether they have any specific level of control.

4    Judge Blake made that very clear in the Fieldstone case, which

5    was 2008 WL 4826291.  So, if someone's an officer, then by

6    statute they're an insider.  And if you look at the unredacted

7    KEIP, which is UST Exhibit-1, I mean, again, I don't want to

8    name them, but you argued with me about the one I spent too

9    much time on.  He's the president of a Debtor, right?  If that

10   is not an officer, I don't know what is.  Under any definition

11   I'm aware of, that's an officer.

12          THE COURT:  All right.  Mr. Bernstein, we were

13   staying away from describing people's titles, number one.

14          MR. BERNSTEIN:  I apologize, Your Honor.

15          THE COURT:  And number two, I've looked at this same

16   chart, and I completely understand the witness' testimony, and

17   I don't agree.

18          MR. BERNSTEIN:  Okay.

19          THE COURT:  There are lots of people in lots of

20   companies that have titles, and they're not officers.  And I

21   am not convinced in any way that the witness is wrong about

22   this.  I don't think any of these other people, yes, they have

23   titles, might sound like they're officers, but I understand

24   his testimony, and I don't believe they are.

25          MR. BERNSTEIN:  Okay.  Then I won't belabor that

1    argument anymore, Your Honor.  I would just go back to what I

2    was saying before with respect to the event that the -- we

3    have to look at the facts, whether this is reasonable in the

4    facts and circumstance to the case.  And what more does

5    anybody have to do to get this money?  At this point, if we --

6    if the -- if all the employees left today, you know, what else

7    is there to do?  The lawyers negotiate this closing that's

8    going to happen?

9           THE COURT:  Doesn't the evidence indicate if all

10   these employees left today, the buyers would conclude there's

11   a going concern value to this business, if you will, that's --

12   they're buying a package of things.  It's just not a bunch of

13   Comic books out on the shelf in a warehouse.  And if

14   particularly these two individuals who were pointed out, if

15   they left because they're -- let's say the Court disapproved

16   this arrangement today.  If they left tomorrow, yes, I think

17   there would be an adverse effect, and I think it would be

18   pretty darn dramatic.

19          MR. BERNSTEIN:  Okay.  Well, I won't belabor that

20   point either, Your Honor.  I mean, again, you may disagree,

21   but it seems to me these metrics were, as Mr. Minuti said

22   several times, they were layups.  I mean, he didn't say they

23   were layups.  He said, I'm arguing they're layups.  I agree

24   with that.  You may disagree.  But because of that, I think

25   that under these circumstances, the Court -- these bonuses

1    just aren't justified and therefore the Court should deny this

2    motion.

3            THE COURT:  So, explain to me -- I want to go back

4    to the Sealing Motion.  You knocked down everything as not

5    falling within Section 107(b), right?

6            MR. BERNSTEIN:  Correct.

7            THE COURT:  And that says --

8            MR. BERNSTEIN:  Let me get there.

9            THE COURT:  -- "On request of a party in interest,

10   the Bankruptcy Court shall, and on the Bankruptcy Court's own

11   motion, the court -- Bankruptcy Court may, one, protect an

12   entity with respect to a trade secret, or confidential

13   research, development, or commercial information."  How is

14   this limited redaction of the names and titles and salaries

15   paid to these employees not confidential commercial

16   information?

17           MR. BERNSTEIN:  That would be under my definition of

18   commercial information.  Simply someone's name, someone's

19   salary, and their title is not commercial.  I look at

20   commercial information as, you know, a customer list, a

21   product plan, a development plan.  How is just what we paid

22   somebody, you know, or what their title is, I don't see how

23   that is commercial information under any definition I

24   understand.

25           THE COURT:  Okay.

1        MR. BERNSTEIN:  Do you have -- just -- I mean, I'm
2   here for additional questions if you'd like, but other than
3   that, that is --
4        THE COURT:  No.
5        MR. BERNSTEIN:  Okay.  Thank you, Your Honor.
6        THE COURT:  All right.  Thank you.  Mr.  Minuti, you
7   can have the last word.
8        MR. MINUTI:  Thank you, Your Honor.  I'll start with
9   the last issue in Your Honor's question.  When I gave my
10  argument, I focused on the exception in 107, confidential
11  commercial information.  And the real argument here is, based
12  on the testimony, given the sensitive nature and the
13  relationship-driven nature of this business, our view is that
14  that is confidential information if the information is going
15  to allow competitors to hone in on who the key people are,
16  what they do, and so on.  And so, I'm not saying that would
17  apply to every case.  I think it's a case-by-case basis.  But
18  here, based on the testimony, I would submit we're dealing
19  with confidential commercial information, and Your Honor is
20  certainly within his power to seal that under 107.
21       You heard a lot from me today, Your Honor, and so I'm not
22  going to belabor the point.  The only point I did want to
23  respond to on the Key Employee Incentive Plan was the
24  following.  Talk about this idea that, hey, the numbers were
25  locked in.  It was a layup.  You knew you were going to get

1    the first benchmark, and so, therefore, it's a Key Employee

2    Retention Plan.  You really need to focus on the testimony

3    because what the testimony was is that the benchmark was

4    developed back in October.  Before there was a stalking horse

5    bidder, there was a pre-bankruptcy sale process run by another

6    investment banker where the value came in significantly less.

7    And Mr. Gorin's testimony was they thought the first benchmark

8    was a stretch.  And so, it's not correct to say, "Hey, we knew

9    it was a layup.  We didn't need to incentivize behavior."  I

10   just wanted to, again, refocus the Court on the testimony.

11   Again, it's been a long day.  I appreciate the Court hearing

12   us.  So, again, we'd ask the Court to approve both the Seal

13   Motion and the Program Motion.  Thank you.

14        THE COURT:  Thank you.  I've considered the evidence

15   and the arguments, and I'm prepared to rule on the matter.

16   The U.S. Trustee's objections are overruled.  I will grant the

17   Motion to Seal and approve both the KEIP and KERP as amended.

18   I am satisfied, based upon the testimony, that it's

19   appropriate in this case to do that.  I find the testimony of

20   Mr. Gorin to be very credible, and I thought that hearing from

21   him live and in person on the witness stand was extremely

22   helpful and effective in making the case for the Debtors here

23   today.

24        I'm satisfied that this is commercial -- sensitive

25   commercial information.  I think it's been reasonably

1    designed.  The costs are reasonable.  It's fair.  I don't know

2    that I can say any more.  I think that the U.S. Trustee's

3    focus of the witness on cross examination on U.S. Trustee

4    Exhibit-1, on the three individuals, convinced me that the

5    motion should be approved.  Though -- that examination largely

6    focused on the last person on the list, who I would point out,

7    is if in the third column the asset sale comes in over $40

8    million, the person, as I understand the chart, is to receive

9    compensation of $10,000.  That's the lowest amount on this

10    chart.  That's focusing a lot of attention on the least

11    significant person in this list.  It might be that the U.S.

12    Trustee thought, well, this is a got you moment because this

13    person had a title that might convince the Court that they

14    were an officer and an insider, and, therefore, the whole

15    thing was flawed, but it had the opposite effect.  As I

16    indicated earlier, I'm satisfied from the witness' explanation

17    that these other individuals are not officers within the

18    meaning of the standard the Court should consider.

19        And the other two are the individuals who, in that same

20    column, would receive $272,250.  The witness' testimony

21    absolutely convinces me that their role in this company is

22    critical.  It's one of the most critical roles.  That if those

23    employees left this afternoon because the Court disapproved

24    this KERP and KEIP, that there's a high likelihood that this

25    whole process could fail, because they are an integral part of

1   what makes this business in the first place.  So, the U.S.

2   Trustee's objections are overruled, and I will grant the

3   Motion to Seal and the Motion to Approve the KEIP and the

4   KERP.

5        Mr. Minuti, if you would upload orders consistent with

6   the ruling.  I know there may be Orders floating around, but I

7   would like to make sure that the Orders make clear that there

8   was a hearing, there was evidence, including testimony of the

9   witness, and that no one came forward today to object to these

10  motions other than the United States Trustee.  No one.  In my

11  mind, this is material.  While I get what the Trustee -- U.S.

12  Trustee is saying about secret proceedings, no one else has

13  come forward in connection with this case to suggest that this

14  is information that they need in order to make a judgment

15  about whether the Court should and how the Court should act on

16  these motions.  So, that's my ruling.  Objections are

17  overruled, and the motions are granted.  Thank you.

18           THE CLERK:  All rise.

19           MR. MINUTI:  Thank you, Your Honor.

20           THE CLERK:  This court is adjourned.

21       (Court adjourned)

22

23
24
25
26
27
28

```
 1                        CERTIFICATION
 2   I, Lewis Parham, certify that the foregoing is a correct
 3   transcript from the electronic sound recording of the
 4   proceedings in the above-entitled matter.
 5
 6
 7
 8
 9   _____    _____
10   Signature of Transcriber                 Date
```

4/7/25