**<u>Exhibit A</u>**

**Revised Proposed Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I.  68, 136, 168** |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT
AMONG DIAMOND COMIC DISTRIBUTORS, INC., DIAMOND SELECT
TOYS & COLLECTIBLES, LLC AND ALLIANCE ENTERTAINMENT, LLC;
(II) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
OTHER INTERESTS; (III) APPROVING ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") seeking entry of an order (this "Order") authorizing and approving:

(a) the proposed sale of substantially all of the Debtors' assets free and clear of all liens, claims,

encumbrances, and other interests other than any assumed liabilities; (b) the assumption of the

executory contracts (the "Assigned Contracts") of the Debtors identified in the Asset Purchase

---

[1]   The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2]   Capitalized terms used but not defined herein are defined in the Motion.

Agreement (defined below) and assignment and sale of the Assigned Contracts to Alliance Entertainment, LLC (the "Purchaser"); and (c) granting related relief, and the Court having entered an order (D.I. 136) (the "Bidding Procedures Order") approving, among other things, the bidding procedures (the "Bidding Procedures"), the proposed form of notice of the Sale Hearing, and Universal Distribution LLC, as the Stalking Horse Bidder for certain of the Debtors' assets; after an extensive marketing process, an Auction was held and conducted pursuant to the terms of the Bidding Procedures Order on March 24 and 25, 2025, the Debtors having identified that certain asset purchase agreement, dated April 10, 2025, by and among Diamond Comic Distributors, Inc., a Maryland corporation ("DCD") and Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("Diamond Select" and, together with DCD, the "Seller"), and Purchaser (including all exhibits, schedules, and ancillary documents related thereto, the "APA") as the highest or otherwise best bid for substantially all of the Seller's assets  as more particularly described in the APA (the "Assets"), and the Court having conducted a hearing on the Motion commencing on April 7, 2025 (the "Sale Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having (a) reviewed and considered the Motion, all relief related thereto, any objections thereto and statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Motion at the Sale Hearing, and (b) found that, after an appropriate marketing process by the Debtors under the facts and circumstances of these cases, Purchaser has submitted the highest or otherwise best bid for the Assets; and adequate and sufficient notice of the Bidding Procedures, the APA, and all transactions contemplated thereunder and in this Order were given pursuant to and consistent with the Bidding Procedures Order; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and it further appearing

55403263.8

that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.  **Jurisdiction and Venue**.  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.  **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and the applicable requirements of the local rules of the Court.

C.  **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

D.  **Notice**. Notice of the Motion, the time and place of the Auction, the time and place of the Sale Hearing and the time for filing objections to the Motion (the "Sale Notice") was reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Auction, and the Sale Hearing.

E.  As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, Sale Hearing, Sale and transactions contemplated thereby, has been provided in accordance with the Bidding Procedures Order,

sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008. The Debtors have complied with all obligations to provide notice of the Motion as set forth in the Bidding Procedures Order. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, Auction, or Sale Hearing is or shall be required. The disclosures made by the Debtors concerning the Motion, the Auction, and Sale Hearing were good, complete, and adequate.

F.      **Compliance with Bidding Procedures Order**.  As demonstrated by evidence proffered or adduced, and the representations of counsel at the Sale Hearing, the Debtors have conducted a thorough marketing process and a fair and open sale process in compliance with the Bidding Procedures Order. The Bidding Procedures were non-collusive, substantively and procedurally fair to all parties, were the result of arm's-length negotiations, and afforded a full, fair, and reasonable opportunity for any interested party to obtain necessary due diligence information and to submit the materials required under the Bidding Procedures Order by the Bid Deadline. Through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors: (i) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Assets; (ii) provided potential purchasers sufficient information to enable them to make an informed judgment on whether to bid on the Assets; and (iii) considered any bids submitted on or before the Bid Deadline.  Based upon the circumstances and record of these chapter 11 cases, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

G.      In accordance with the Bidding Procedures Order, the Debtors have served notices of potential assumption and assignment [Docket Nos. 160 and 194] (collectively, the "Contract

Notice"), which identifies the amount that the Debtors believe is required to be paid to cure any defaults arising under the contract pursuant to section 365(b)(1) of the Bankruptcy Code (the "Cure Amount"), upon each non-Debtor counterparty to an Assigned Contract. The service and provision of the Contract Notice was good, sufficient, and appropriate under the circumstances and, except as may be provided herein, no further notice need be given in respect of assumption, assignment and sale of the Assigned Contracts or establishing a Cure Amount for the respective Assigned Contract. Non-Debtor counterparties to the Assigned Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contract and the Cure Amount set forth in the Contract Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). The deadline to file an objection to the stated Cure Amount, to the proposed assumption, assignment, or transfer of an Assigned Contract, and adequate assurance of future performance provided by the Purchaser (a "Contract Objection") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any such party did not timely file a Contract Objection, such party shall be deemed to have consented to (i) the assumption, assignment and sale of the Assigned Contract to the Purchaser and (ii) the proposed Cure Amount set forth on the Contract Notice.

      H.      **Corporate Authority**.  Subject to the entry of this Order, each Debtor (i) has the requisite corporate power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby, and has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery

55403263.8

and performance of its obligations under the APA and to consummate the Sale, including as required by its organizational documents, and upon execution thereof, the APA and the related documents were or will be duly executed and delivered by each Debtor and enforceable against such Debtor in accordance with their terms and, assuming due authorization, execution and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of each Debtor. No government, regulatory, or other consents other than those expressly provided for in the APA were required for the execution, delivery and performance by the Debtors of the APA or the consummation of the Sale contemplated thereby. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Sale.

I.      The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither the Debtors nor the Purchaser is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

J.      The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Assets are subject to first priority security interests and liens (the "DIP Liens") granted to JPMorgan Chase Bank, N.A. (the "DIP Lender") under and subject to the Final Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief [Docket No. 163] (as amended by the Order Approving Stipulation Between Debtors and JPMorgan Chase Bank, N.A. Amending

55403263.8

DIP Credit Agreement, Docket No. 243, the "Final DIP Order"). The transfers of the Assets by Debtors to Purchaser (a) vest or will vest Purchaser with all right, title and interest of the Debtors in and to the Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all liens, claims and encumbrances (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or untiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Encumbrances"), with any such Encumbrances to attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Assets prior to Sale closing, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.  For the avoidance of doubt and without limiting the foregoing, the transfer of the Assets to Purchaser shall be free and clear of any Encumbrances relating to or in connection with (i) any Employee Benefit Plan or pension plans

55403263.8

contributed to or maintained by the Debtors, or multiemployer plan participated in by the Debtors prior or subsequent to the Petition Date; (ii) the Worker Adjustment and Retraining Notification Act of 1988; (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; or (iv) any collective bargaining agreement(s) to which Debtors are a party or otherwise obligated under.

K.    **Sale in Best Interests of the Debtors' Estates**.  Good and sufficient reasons for approval of the APA and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization, in that, among other things, immediate consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

L.    The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale. Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price (as defined in the APA) the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

M.    The consummation of the Sale and the assumption, assignment and sale of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

-8-

N.  **Good Faith of Purchaser and Sellers**.  The APA was negotiated, proposed, and entered into by the Debtors and Purchaser without collusion, in good faith, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties. Based on the record in these cases and at the Hearing on this Motion, neither any of the Debtors, nor Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code section 363(n) or otherwise. Specifically, Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders. The Debtors and Purchaser have fully disclosed the identities of each entity participating in Purchaser's bid. Purchaser is purchasing the Assets, in accordance with the APA, in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by such provision, and otherwise has proceeded in good faith in all respects in connection with the Debtors' chapter 11 cases. As demonstrated by (i) evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, appropriate marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order and, among other things: (a) the Debtors, the Consultation Parties and Purchaser complied with the provisions in the Bidding Procedures Order; (b) Purchaser was determined by the Debtors in consultation with the Consultation Parties to be the Successful Bidder at the conclusion of the Auction; and (c) all payments made and to be made by Purchaser in connection with the Sale have been disclosed.

O.  **Highest or Otherwise Best Offer**. The Debtors conducted the Auction in accordance with, and have otherwise complied in all material respects with, the Bidding Procedures Order.  The procedures established in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer

to purchase the Assets. The Bidding Procedures and the opportunity to submit a higher or otherwise better bid were duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher or otherwise better offer for the Assets in accordance with the terms of the Bidding Procedures. The APA constitutes the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination, after consulting with the Consultation Parties, that the APA constitutes the highest or otherwise best offer for the Assets is a valid and sound exercise of their fiduciary duties and constitutes a valid and sound exercise of the Debtors' business judgment.

P.    **Consideration**.  The consideration provided by Purchaser pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formally the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession, or the District of Columbia. No other person or entity or group of entities has offered to purchase the Assets for greater value to the Debtors' estates than Purchaser.

Q.    **Legal, Valid, and Binding Transfer**.  The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The transfer of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets and, except as provided in the APA or this Order, will vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of all Encumbrances, unless specifically assumed by the Purchaser pursuant to the APA, in accordance

-10-

with section 363(f) of the Bankruptcy Code. The APA is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable according to its terms.

R.    **No Merger**. Purchaser is not holding itself out to the public as a continuation of the Debtors, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and the Debtors. The Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser and Debtors and/or Debtors' bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between the Debtors and Purchaser. Purchaser is not a mere continuation of the Debtors or their bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to the Debtors or their bankruptcy estates.

S.    **No Successor**. Except for the contractual commitments of Purchaser under the Assumed Liabilities (as defined in the APA), Purchaser is not, and shall not be considered or deemed, as result of any action taken in connection with the Sale, to be a successor in interest of the Debtors or their estates for any purpose, including but not limited to under any federal, state, or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine and Purchaser and its affiliates shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "WARN Act"), 929 U.S.C. §§ 210 et seq., or the Comprehensive Environmental Response Compensation and Liability Act, and shall not be deemed to be a "successor employer" for purposes

of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act and/or the Fair Labor Standards Act. Except for the Assumed Liabilities, the (i) transfer of the Assets to Purchaser and (ii) assumption, assignment and sale to Purchaser of the Assigned Contracts do not and will not subject Purchaser to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date (as such term is defined in the APA) or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including any theory of antitrust or successor or transferee liability. For the avoidance of doubt, with respect to the Assigned Contracts, any contractual warranty claims under the Assigned Contracts and claims by counterparties to the Assigned Contracts for contribution toward third-party injury, damage, or loss are not limited, waived, released, or disclaimed and are affirmatively assumed by Purchaser to the extent provided in the Assigned Contracts.

T.    **Free and Clear**.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any Encumbrances, other than the Assumed Liabilities, to the fullest extent permitted by applicable law. Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale to Purchaser was not free and clear of all Encumbrances other than the Assumed Liabilities.  The Debtors may sell the Assets free and clear of any Encumbrances

-12-

of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Each entity with any Encumbrances of any kind on the Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Without limiting the generality of the foregoing, the DIP Lender has consented to the sale of the Assets, free and clear of the DIP Liens, conditioned and in express reliance upon the proceeds of sale being remitted at closing to the DIP Lender in accordance with a closing statement acceptable to the DIP Lender. All Encumbrances attach to any cash proceeds received by the Debtors that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances with the same validity, force, and effect, and in the same order of priority, which such holders of Encumbrances now have against the Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

U.     **Not a _Sub Rosa_ Plan**.  The APA and Sale do not constitute an impermissible _sub rosa_ chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

V.     **Cure and Adequate Assurance**.  Notice of the Debtors' assumption, assignment and sale to the Purchaser of the Assigned Contracts has been provided to each non-Debtor counterparty to an Assigned Contract, together with the Cure Amount, if any, to be paid to such non-Debtor counterparty to cure any defaults under, and to otherwise comply with the requirements of section 365(b) of the Bankruptcy Code with respect to each Assigned Contract.

As to each Assigned Contract, payment of the Cure Amount listed on Exhibit 1 to the Contract Notice (or such other Cure Amount as agreed, in writing, by the Purchaser, the Debtors, and the counterparty to the applicable Assigned Contract or ordered by this Court) is sufficient for the Debtors to comply fully with the requirements of section 365(b) of the Bankruptcy Code. In addition, Purchaser has provided adequate assurance of its ability to perform its obligations under each of the Assigned Contracts within the meaning of section 365 of the Bankruptcy Code. All other requirements and conditions under the Bankruptcy Code for the assumption by the Debtors and assignment and sale to Purchaser of the Assigned Contracts have been satisfied. Therefore, subject to the terms of this Order, the Assigned Contracts may be assumed by the Debtors and assigned and sold to Purchaser.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      Any objections or reservation of rights filed or asserted in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein or on the record at the Sale Hearing, are hereby overruled on the merits in their entirety with prejudice, other than objections on account of a Cure Dispute that are presently subject to the cure resolution process.

3.      The APA, and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved in all respects. The Debtors are authorized and directed to comply with, and execute, all obligations arising under the APA, and to reasonably cooperate with Purchaser to consummate the transactions contemplated by the APA. The APA is attached hereto as **Exhibit 1**.

4.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are hereby authorized without the need of further approval from this Court to (a) execute any

-14-

additional instruments or documents that may be reasonably necessary or appropriate to implement the APA, *provided* that such additional documents do not materially change the APA's terms adversely as to the Debtors' estates; (b) consummate the Sale in accordance with the terms and conditions of the APA and the instruments to the APA contemplated thereby; and (c) execute and deliver, perform under, consummate, implement, and close fully the transactions contemplated by the APA, including the assumption, assignment and sale to Purchaser (in accordance with the APA) of the Assigned Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale. Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order, *provided, however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

5.      This Order and terms and provisions of the APA shall be binding in all respects upon the Debtors, and all their successors and assigns, the Debtors' estates, all creditors of, and holders of equity interests in, the Debtors, any holders of Encumbrances in, against, or on all or any portion of the Assets (whether known or unknown), Purchaser and all successors and assigns of Purchaser, the Assets, and any trustees subsequently appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases. This Order and the APA shall inure to the benefit of the Debtors, their estates, Purchaser, and the respective successors and assigns of each of the foregoing. The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustee, examiner, or receiver. Any trustee appointed in these chapter 11 cases shall be and are hereby

authorized to operate the business of the Debtors to the fullest extent necessary to perform compliance with the terms of this Sale Order and the APA.

6.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.      The Sale of the Assets to Purchaser pursuant to the APA and the consummation of the transactions contemplated thereby do not require any consents other than as specifically required in the APA.  Each and every federal, state and local government agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the APA.  A certified copy of this Order may be filed with the appropriate clerk or recorded with any recorder of any state, county or local authority to act to cancel any Encumbrances.

8.      **Transfer of Assets Free and Clear of Encumbrances**.  Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Assets to Purchaser in accordance with the APA and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets. Such transfer of the Assets shall vest Purchaser with title in and to the Assets and, other than the Assumed Liabilities, Purchaser shall take title to and possession of the Assets free and clear of all Encumbrances (other than the Assumed Liabilities) of any kind or nature whatsoever, including but not limited to successor or successor in interest liability and claims in respect of the Excluded Liabilities, with all such Encumbrances to attach to the sale proceeds, if any, with the same validity, force and effect, and in the same order of priority, which such Encumbrance had prior to the Sale, subject to any rights, claims and defenses of the Debtors or their estates in connection therewith.  Without limiting the generality of the foregoing, sale proceeds sufficient to satisfy the obligations owned to the DIP

Lender in full shall be remitted to the DIP Lender in accordance with and subject to the Final DIP Order and consistent with a closing statement acceptable to the DIP Lender.

9.      Unless otherwise expressly included in the Assigned Contracts or Assumed Liabilities in the APA, Purchaser shall not be responsible for any Encumbrances, including, but not limited to, in respect of the following: (a) any mortgages, deeds of trust, and security interests; (b) any claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the WARN Act, (vii) the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act, (ix) the Family Medical Leave Act, (x) the Labor Management Relations Act, (xi) the Comprehensive Environmental Response Compensation and Liability Act, (xii) other federal or state environmental laws, (xiii) state discrimination laws, (xiv) state unemployment compensation laws or any other similar state laws, or (xv) any other state or federal benefits or claims relating to any employment with the Debtors or any of its respective predecessors; (c) any bulk sales or similar law; (d) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, or any state or local tax laws; (e) any escheat or unclaimed property laws; (f) to the extent not included in the foregoing, any of the Excluded Liabilities under the APA; and (g) any theories of successor or transferee liability as a result of any action taken in connection with the Sale.

10.      On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances or other interests in the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

11.     If any person or entity which has filed statements or other documents or agreements evidencing Encumbrances on, against, or in, all or any portion of the Assets (other than statements or documents with respect to the Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances of any kind or other interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets.

12.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to Purchaser of the Debtors' interests in the Acquired Assets.  This Order is and shall be effective as a determination that, on the Closing Date, all Encumbrances or other interest of any kind or nature whatsoever existing as to the Assets prior to the Closing Date, other than the Assumed Liabilities, shall have been unconditionally released, discharged, and terminated to the fullest extent permitted by applicable law, and that the conveyances described herein have been effected.  This Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or

-18-

55403263.8

state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Encumbrances and other interests of record except those assumed as Assumed Liabilities.

13.    All persons or entities that are presently, or on the Closing Date may be, in possession of some or all of the Assets to be sold, transferred, or conveyed (wherever located) to Purchaser pursuant to the APA are hereby authorized and directed to surrender possession of the Assets to Purchaser on the Closing Date or at such later time as Purchaser reasonably requests. Subject to the terms, conditions and provisions of this Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Assets to Purchaser in accordance with the terms of the APA.

14.    To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets to the extent transferred in the APA, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to Purchaser as of the Closing Date. To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may revoke or suspend any grant, permit, or license relating to the operation of the Assets sold, transferred, assigned, or conveyed to Purchaser or its Affiliates on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale. Each and every federal, state, and local governmental agency or

department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale set forth in the APA.

15.    **Prohibition of Actions Against Purchaser**.  Except for the Assumed Liabilities and any rights or obligations set forth in the Assigned Contracts, Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Assets. Without limiting the generality of the foregoing, and as expressly permitted in the APA, Purchaser shall not be liable for any Encumbrances (other than the Assumed Liabilities) including, but not limited to, for any liabilities, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date.

16.    Except with respect to the Assumed Liabilities and any rights and obligations as set forth in the Assigned Contracts, or as otherwise expressly provided for in this Order or the APA, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances of any kind or nature whatsoever against  or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Assets to Purchaser in accordance with the APA, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, its property, or the Assets, such persons' or entities'

Encumbrances in and to the Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors, assets, or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its successors, assets or properties; (c) creating, perfecting, or enforcing any Encumbrances of any kind whatsoever or any other interest against Purchaser, its successors, assets, or properties; (d) asserting any setoff or right of subrogation of any kind against any obligation due Purchaser or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Assets or conduct the business operated with the Assets.

17.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to Purchaser in accordance with the terms of the APA, and this Order.

18.    Notwithstanding the foregoing, nothing herein shall prevent (a) the Debtors from pursuing an action against Purchaser arising under the APA or the related documents, or (b) any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state, and local officials from properly exercising their police and regulatory powers.

19.    **Assumption, Assignment and Sale of Contracts**.    The Debtors are hereby authorized, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, to (a) assume, assign and sell to Purchaser, in accordance with the APA, effective upon the Closing Date, the Assigned Contracts free and clear of all Encumbrances and other interests of any kind or nature

whatsoever (other than the Assumed Liabilities) and (b) execute and deliver to Purchaser such documents or other instruments as Purchaser deems reasonably necessary to assign and transfer the Assigned Contracts and the Assumed Liabilities to Purchaser in accordance with the APA.

20.      The Purchaser has provided, or will provide, adequate assurance of future performance under the Assigned Contracts within the meaning of section 365 of the Bankruptcy Code.

21.      Effective as of the Closing Date, in accordance with the terms and provisions of the APA, including without limitation Section 2.3 thereof, the Assigned Contracts shall be assumed by the Debtors and assigned and sold to Purchaser, notwithstanding any provision in any such Assigned Contract or applicable law (including those of the type described in sections 365(b)(2), 365(c), and 365(f) of the Bankruptcy Code) that directly or indirectly prohibits, restricts, or conditions such assignment or transfer, and following the Closing Date shall remain in full force and effect for the benefit of Purchaser, in accordance with the APA, and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by Purchaser in accordance with the APA; and upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all rights, title, and interest of each Assigned Contract.  If and to the extent Purchaser designates any of the Assigned Contracts for assumption and assignment to Purchaser pursuant to Section 2.3 of the APA, Seller shall promptly provide notice to the affected non-Debtor counterparty and file such notice with the Court.

22.      All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured

-22-

on the Closing Date or as soon thereafter as practicable by payment of the Cure Amount by Purchaser. To the extent that any counterparty to an Assigned Contract did not object to its Cure Amount by the Contract Objection Deadline, such counterparty is deemed to have consented to such Cure Amount and the assumption, assignment and sale of its respective Assigned Contract(s) to Purchaser in accordance with the APA. Purchaser shall have no liability arising or accruing under the Assigned Contracts on or prior to the Closing, except as otherwise expressly provided in the APA, the Assigned Contracts or this Order. The non-Debtor counterparties to the Assigned Contracts are barred from asserting against the Debtors, their estates, Purchaser, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Assigned Contracts arising or incurred prior to the Closing, other than the Cure Amount set forth on the Contract Notice or such other Cure Amount as agreed to by the Debtors (with the consent of Purchaser) or as determined by the Court.

23.     Unless otherwise represented by the Debtors in a separate notice, on the record at the Sale Hearing, or pursuant to a contract or lease amendment entered into by the Debtors, Purchaser, and the appropriate counterparty (any such amendment being deemed approved by this Order), the Contract Notice reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment and sale to Purchaser of the Assigned Contracts in accordance with the APA.

24.     Except for the Assumed Liabilities, upon the Debtors' assignment and sale of the Assigned Contracts to Purchaser under the provisions of this Order and any additional orders of this Court and payment of any Cure Amount, no default shall exist under any Assigned Contract,

-23-

and no counterparty to any Assigned Contract shall be permitted (a) to declare a default by Purchaser under such Assigned Contract or (b) otherwise take action against Purchaser as a result of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under the relevant Assigned Contract.  Except for the Assumed Liabilities, each non-Debtor party to an Assigned Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Purchaser, or the property of any of them, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities or, against Purchaser, any counterclaim, defense, setoff, recoupment or any other claim asserted or assertable against the Debtors; and (ii) imposing or charging against Purchaser any rent accelerations, assignment fees, increases, or any other fees as a result of the Debtors' assumption, assignment and sale to Purchaser of any Assigned Contract in accordance with the APA.  The validity of such assumption, assignment and sale of each Assigned Contract shall not be affected by any dispute between the Debtors and any non-Debtors party to an Assigned Contract.

25.     Except as provided in the APA or this Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such Assumed Liabilities of any kind whatsoever are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, their property, or their assets or estates.  The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition of the Assigned Contracts.

26.     Notwithstanding anything to the contrary in this Order or the Contract Notice, with respect to the Assigned Contracts for which the non-Debtor counterparties thereto filed timely

Contract Objections that have not been resolved as of the entry of this Order, these Contract Objections are adjourned (collectively, the "Adjourned Contract Objections").  The Cure Amount of any Assigned Contract subject to an Adjourned Contract Objection shall be fixed at the amounts agreed to in writing by the Purchaser and such counterparties, or if no such agreement is reached, fixed at the amounts ordered by this Court after a hearing at a date and time reasonably determined by the Debtors in consultation with Purchaser (or otherwise scheduled by this Court).  Pending the parties' consensual resolution of the Adjourned Contract Objection or the Court's adjudication of such amounts:  (i) any Assigned Contract that is the subject of an Adjourned Contract Objection solely with respect to Cure Amount may be assumed by the Debtors and assigned and sold to Purchaser, provided that the Purchaser segregates the Cure Amount the non-Debtor counterparty asserts in the Adjourned Contract Objection is required to be paid (or such lower amounts as agreed to by Purchaser and the counterparty) with proof thereof to the counterparty; and (ii) Purchaser may elect to re-designate any Assigned Contract to exclude such contract.  Upon the Cure Amount subject to an Adjourned Contract Objection becoming fixed as provided for in this paragraph:  (a) such fixed amount shall be the "Cure Amount" for the Assigned Contract for all purposes under this Order; (b) the Purchaser may  elect to re-designate the related Assigned Contract to exclude such contract; and (c) if the Assigned Contract is not re-designated and was not previously assumed by the Debtors and assigned and sold to Purchaser, such Assigned Contract shall be promptly assumed by the Debtors and assigned and sold to Purchaser.

27.     Notwithstanding anything herein to the contrary, and subject to the provisions of the APA, including without limitation Section 2.3 thereof, Purchaser may remove any contract or lease from the applicable Schedule of the APA (and thereby exclude such Contract from the definition of Assigned Contracts).  The Debtors shall file a schedule of the Assigned Contracts

reasonably promptly after the expiration of the Designation Period (as such term is defined in the APA) Closing Date, and shall supplement such schedule from time to time as necessary to reflect the resolution of Adjourned Contract Objections.  For the avoidance of doubt, nothing in this paragraph affects Purchaser's right to re-designate an Assigned Contract to exclude such contract following any resolution of an Adjourned Contract Objection with respect to the Assigned Contract, whether such resolution occurs before or after the Closing Date.

28.    **No Successor Liability**.  Purchaser and its successors and assigns shall not be deemed, as a result of any action taken in connection with the transfer of the Assets, (i) to be a successor to the Debtors or their estates, (ii) to have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates, (iii) to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, (iv) to have a common identity with the Debtors, (v) to have acquired the trade or business of any of the Debtors for any purpose under applicable U.S. federal law (including the Bankruptcy Code and the Internal Revenue Code of 1986, as amended), or (vi) to be held out to the public as a continuation of the Debtors or the Debtors' trade or business, and Purchaser shall have no successor, transferee, or vicarious liability of any kind or character, including, but not limited to, under any theory of foreign, federal, state, or local antitrust, environmental, successor, tax, ERISA, assignee, or transferee liability, labor, product liability, employment, de facto merger, substantial continuity, or other law, rule, or regulation, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date. Except as otherwise provided herein or in the APA, the transfer of the Assets to Purchaser pursuant to the APA shall not result in Purchaser or the Assets having any liability or responsibility for, or being required to satisfy in any

-26-

manner, whether in law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any claim against the Debtors or against any insider of the Debtors or any liens, claims, interests, or encumbrances.

29.    **Consideration**.    The consideration provided by Purchaser under the APA constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable Laws of the United States, any state, territory or possession thereof, or the District of Columbia.  The consideration provided by Purchaser for the Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

30.    **Good Faith**.    The transactions contemplated by the APA are undertaken by Purchaser without collusion and in "good faith," as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption, assignment and sale of the Assigned Contracts) with Purchaser, unless such authorization is duly stayed pending such appeal.  Purchaser is a good faith purchaser of the Purchased Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

31.    **Books and Records**.    Notwithstanding anything to the contrary in the APA, following the closing date for the Sale, Purchaser shall grant the Debtors and their respective representatives, including any trustee or fiduciary appointed to act on behalf of the Debtors or as a successor to the Debtors (a "Trustee"), reasonable access to any books and records transferred

to Purchaser pursuant to the APA during regular business hours and upon reasonable notice for the purpose of allowing the Debtors and their successors, the Trustee and/or their representatives to perform the duties necessary to administer the Debtors' estates.  The Purchaser and its successors and assigns shall preserve and maintain all books, records, documents, files, electronic data, in whatever format, including native format, wherever stored, that are transferred from Seller pursuant to the APA (collectively, the "Books and Records"), and shall not destroy, abandon, transfer, or otherwise render unavailable such Books and Records within three (3) years following the Closing Date without providing counsel to the Sellers, any Trustee, the Committee, and any successor to the Debtors, at least sixty (60) days' advance written notice and an opportunity to take possession of the Books and Records or otherwise object and be heard by this Court.

32.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety; *provided*, *however*, that this Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall control.

33.    **Non-Material Modifications**.  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

-28-

34. **Subsequent Plan Provisions**. Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of any of these cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall alter, conflict with, or derogate from, the provisions of the APA or this Order. To the extent of any such conflict or derogation, the terms of the APA or this Order, as applicable, shall govern.

35. **No Third-Party Beneficiaries**. Except as expressly set forth in this Order or in the APA, nothing in this Order or the APA shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a party to the APA.

36. **No Stay of Order**. Notwithstanding the provisions of Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d), and pursuant to Bankruptcy Rules 7062 and 9014, this Order shall be effective and enforceable immediately upon its entry.

37. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned and sold by the Debtors to Purchaser in accordance with the APA, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) interpret, implement and enforce the provisions of this Order and the APA; (b) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale; (c) protect Purchaser against any Encumbrances or other interests in the Debtors or the Assets of any kind or nature whatsoever,

55403263.8

attaching to the proceeds of the Sale; and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

38.    **Pokémon.**    Nothing contained in this Order, the Contract Notice, including the stated Cure Amounts, the APA, and/or the Schedules, Exhibits, or other attachments to the APA shall be deemed to authorize the assignment of any of the Debtors' agreement(s) with The Pokémon Company International, Inc. ("Pokémon") to Purchaser without further 10 calendar days' notice of an opportunity to file an opposition thereto and with a hearing thereon to be held at least five calendar days after the filing any such an opposition, and all rights of Pokémon with respect to any assignment of such agreement(s) to Purchaser are reserved.

39.    **Releases**.

   a.   By its signature below, Purchaser, on behalf of itself and its successors, assigns, parent companies, subsidiaries, affiliated corporations, past and present officers, directors, agents, executors, administrators, shareholders, employees and attorneys fully, finally and forever release and discharges the Debtors any of their successors, assigns, parent companies, estate representatives (including the Committee, its advisors and its members (but solely in their capacity as such)), subsidiaries, divisions, guarantors, past and present officers (including without limitation Chief Restructuring Officers), directors, agents, executors, administrators, shareholders, employees, attorneys and advisors, including without limitation Raymond James & Associates, Inc. and Getzler Henrich & Associates LLC (collectively, the "Debtor Released Parties") of and from any and all manner of action or actions, cause or causes of actions, in law or in equity, suits

-30-

debts, license, security interests, contracts (oral and/or written), agreements, promises, liabilities, guarantees, claims, demands, damages, losses, costs or expenses or any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, which Purchaser anytime heretofore has had, owned or held, or now has, own or holds or hereinafter could, shall or may have, own or hold against any of the Debtor Released Parties by reason of any matter, cause, fact, thing, act or omission whatsoever arising out of, based upon, or relating to any matter or event concerning the Bidding Procedures Order, the Sale Motion, the Auction (as defined in the Bidding Procedures Order), all versions of the APA, all versions of any backup bids, any proposed orders approving same, and/or the Sale Hearing, through the date of this Order.

b.  By its signature below, the Debtors, on behalf of themselves and their successors, assigns, subsidiaries, past and present officers, directors, agents, executors, administrators, shareholders, employees and attorneys fully, finally and forever release and discharge Purchaser and any of its successors, assigns, parent companies, subsidiaries, divisions, guarantors, past and present officers, directors, agents, executors, administrators, shareholders, employees, attorneys and advisors, including without limitation Province, LLC (collectively, the "Purchaser Released Parties") of and from any and all manner of action or actions, cause or causes of actions, in law or in equity, suits debts, license, security interests, contracts (oral and/or written), agreements, promises, liabilities, guarantees, claims,

55403263.8

demands, damages, losses, costs or expenses or any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, which Debtors anytime heretofore has had, owned or held, or now has, own or holds or hereinafter could, shall or may have, own or hold against any of the Purchaser Released Parties by reason of any matter, cause, fact, thing, act or omission whatsoever arising out of, based upon, or relating to any matter or event concerning the Bidding Procedures Order, the Sale Motion, the Auction, all versions of the APA, all versions of any backup bids, any proposed orders approving same, and/or the Sale Hearing, through the date of this Order.

c.  The releases set forth in this paragraph 39 shall be effective as of the Closing Date.

d.  For the avoidance of doubt, notwithstanding anything to the contrary contained in the releases set forth in this paragraph 39, the Seller and the Purchaser shall retain all rights under the APA and this Order.

40.  **Withdrawal of Adversary Proceeding and Motions**.  Within two (2) business days of the entry of this Order, Purchaser shall cause to be withdrawn, with prejudice, (i) its *Verified Complaint* (captioned *Alliance Entertainment, LLC v. Diamond Comic Distributors, Inc., Comic Holdings, Inc., Comic Exporters, Inc. and Diamond Select Toys & Collectibles, LLC*) and (ii) its *Motion for Preliminary Injunction With Temporary Restraining Order* [Docket No. 2], both as filed in this Court on or about April 6, 2025, in Adversary Proceeding No. 25-00089-DER.

41.  **Payment of DIP Lender and Termination of DIP Facility.**  Upon the Closing Date and in accordance with the terms and provisions of the Final DIP Order, all obligations

55403263.8

(including without limitation principal, interest, charges, attorneys' fees and the DIP Facility Fee) owing and outstanding to the DIP Lender thereunder and under the DIP Credit Agreement (regardless of whether such obligations of the Debtors to DIP Lender accrued or were incurred prior to, on or after the Petition Date, pursuant to the Final DIP Order or otherwise) shall be indefeasibly repaid in full in accordance with a customary payoff letter in form and amount acceptable to the DIP Lender and reasonably acceptable to the Debtors, in consultation with the Committee (the "Closing DIP Lender Payoff").  The closing statement shall include, and the DIP Lender shall be paid, a $100,000 reserve for reasonable post-closing attorneys' fees and costs incurred by the DIP Lender's professionals (the "DIP Lender's Fee Reserve").  The DIP Lender will provide subsequent documentation to substantiate any draws made on the DIP Lender's Fee Reserve.   Notwithstanding the Closing DIP Lender Payoff, the DIP Lender shall retain all rights and claims to indemnity and reimbursement provided under the Final DIP Order and DIP Credit Agreement, including without limitation the right to indemnity and reimbursement in connection with the LCs (as hereinafter defined) and Commercial Card Program and related Cash Collateral, as well as the DIP Lender's right to be reimbursed for its professionals' reasonable fees and costs. Also upon the Closing Date, the DIP Facility and all related lending commitments shall be terminated, and the DIP Lender shall have no further obligation to make loans or advances to the Debtors, whether under the Final DIP Order and DIP Credit Agreement or otherwise (the "DIP Facility Termination"). Notwithstanding the DIP Facility Termination, (i) the DIP Lender shall continue to maintain the letter of credit in favor of BC Industrial Exchange Portfolio II in the amount of $1,000,000 securing the lease obligations at the Olive Branch facility and the letter of credit in the amount of $200,000 on account of a surety bond provided in connection with the Debtors' obligations regarding customs duties and/or import taxes (collectively, the "LCs"); (ii)

-33-

the Commercial Card program shall be terminated, but the DIP Lender shall continue to perform all reconciliations and account adjustments pertaining to pre-termination activity under this program, (iii) the DIP Lender shall continue to maintain the Debtors' deposit accounts in accordance with the applicable bank account and treasury service agreements and this Court's Cash Management Order applicable to those accounts.

42.    Also effective upon the Closing Date, all Challenge Rights under the Final DIP Order shall be deemed to have been waived and terminated.  Neither the Debtors, the Committee, nor any other individual, entity or party shall be entitled to bring or maintain a Challenge against the Prepetition Lender, the DIP lender or otherwise, and the Debtors' stipulations in the Final DIP Order shall be deemed binding and enforceable against the Debtors, the Committee, and all other creditors and parties in interest.

43.    Upon and after the Closing Date, the DIP Lender shall continue to hold and retain the (i) $1,260,000 of Cash Collateral granted to the DIP Lender as Cash Collateral securing the DIP Lender's reimbursement and indemnity claims in connection with the LCs and Commercial Card program, and (ii) the DIP Lender's Fee Reserve.  Upon the cancellation or expiration of the LCs, and assuming no intervening draw has been made under the LCs, the DIP Lender shall remit any unused portion of the $1,260,000 in Cash Collateral, less any unpaid, fees, costs and expenses, to DCD or its successor. Following the entry of this Sale Order, if there are any subsequent draws under the LCs, the DIP Lender retains its right to withdraw Cash Collateral to reimburse the DIP Lender for such additional draws without further order of the Court as and when reimbursement or other amounts are owing to the DIP Lender in connection with the LCs or the Commercial Card program.

-34-

44.    Effective as of the Closing Date, the Debtors' commercial credit card programs under the terms and conditions of those programs shall be terminated. Notwithstanding the foregoing, after the Closing Date, the DIP Lender shall continue to hold the LC and Commercial Card Collateral Account (as defined in the Final DIP Order), and is authorized to retain the $250,000 of Cash Collateral the DIP Lender currently holds for any post-closing charge backs, fees for maintaining bank accounts and processing wires, additional legal fees, reimbursement or other amounts owing to the DIP Lender, for a period of 120 days following the Closing Date.  Any unused amounts remaining after 120 days (or such earlier date as may be reasonably acceptable and practicable for the DIP Lender) shall be remitted to the Debtors.  Also on the 120th day following the Closing Date, the DIP Lender shall return to the Debtors any unused portion of the DIP Lender's Fee Reserve.

45.    Upon entry of this Sale Order, and pursuant to the terms of the DIP Credit Agreement, the DIP Lender shall continue to hold and maintain the Debtors' deposit accounts (including collection accounts) for a period of 150 days, or such later date as agreed to by the DIP Lender in its reasonable discretion, but in no event shall JPMorgan Chase Bank, N.A., or any of its affiliates be obligated to extend credit facilities (including but not limited to accommodations in connection with foreign exchange (f/x) programs) or to provide any related overdraft protection in connection with these deposit accounts. For the avoidance of doubt, none of the Debtors' deposit accounts will be assigned to Purchaser at closing, and all of these deposit accounts (and any collections or proceeds deposited therein) will continue to be subject in all respects to the applicable bank account and treasury service agreements and to this Court's Cash Management Order applicable to those accounts.

*AGREED AND STIPULATED FOR PURPOSE OF PARAGRAPH 39*

| DEBTORS: | ALLIANCE ENTERTAINMENT, LLC |
|---|---|
| Diamond Comic Distributors, Inc.<br>Diamond Select Toys & Collectibles, LLC<br>Comic Holdings, Inc.<br>Comic Exporters, Inc.<br><br>By: *Robert Gen*<br>Robert Gorin<br>Chief Restructuring Officer | <br><br><br><br>By: _____<br>Bruce Ogilvie, Chairman |

**END OF ORDER**

*[Stipulation Signature Page to Sale Order for Purpose of Paragraph 39]*

*AGREED AND STIPULATED FOR PURPOSE OF PARAGRAPH 39*

| DEBTORS: | ALLIANCE ENTERTAINMENT, LLC |
|---|---|
| Diamond Comic Distributors, Inc.<br>Diamond Select Toys & Collectibles, LLC<br>Comic Holdings, Inc.<br>Comic Exporters, Inc.<br><br>By: _____<br>    Robert Gorin<br>    Chief Restructuring Officer | By: _____<br>    Bruce Ogilvie, Chairman |

**END OF ORDER**

*[Stipulation Signature Page to Sale Order for Purpose of Paragraph 39]*

## **EXHIBIT 1**

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of April 10, 2025 (the "**Effective Date**"), by and among Diamond Comic Distributors, Inc., a Maryland corporation ("**DCD**"), Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("**Diamond Select**"), and Alliance Entertainment, LLC, a Delaware limited liability company ("**Purchaser**"). DCD and Diamond Select shall each be referred to herein as a "**Seller**" and collectively as "**Seller**".

<u>RECITALS</u>

WHEREAS, Seller is a distributor of tabletop games, board games, card games, miniatures, role playing games, accessories, pop-culture merchandise, comic books, gaming products, collectibles, accessors, and graphic novels with (a) three (3) primary operating divisions, namely, (i) the Alliance Game Distributors division (through which Seller distributes board games, card games, miniatures, role playing games, and accessories in the United States) (the "**Alliance Gaming Business**"); (ii) the Diamond Comic Distributors division (through which Seller distributes comic books, graphic novels, and related merchandise) (the "**DCD Business**"); and (iii) the Collectible Grading Authority division (through which Seller provides grading and authentication services for collectibles, including comic books and trading cards) (the "**CGA Business**"); and (b) an ancillary operating division, the Diamond Select Toys division (though which Seller manufactures collectible toys and statues) (the "**Diamond Select Toys Business**", and together with the Alliance Gaming Business, the DCD Business, and the CGA Business, the "**Business**").

WHEREAS, Seller desires to sell all or substantially all of the assets of the Business to Purchaser pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase and acquire such assets from Seller.

WHEREAS, DCD and Diamond Select have filed a petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**") on or about January 14, 2025 (the actual date of such filing, the "**Petition Date**" and the resulting case, the "**Chapter 11 Case**"), seeking relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**").

WHEREAS, in connection with the Chapter 11 case, Seller continues in the possession and control of its assets and properties in accordance with §§1107 and 1108 of the Bankruptcy Code.

NOW, THEREFORE, in exchange for the Purchase Price and the other mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, Purchaser hereby agrees to buy, and Seller hereby agrees to sell the Acquired Assets, upon the terms and conditions set forth in this Agreement.

1. **DEFINITIONS.** As used herein, the following terms shall have the following meanings:

"**Accounts Receivable**" shall mean all Seller's accounts receivable from or related to the Business in existence as of the Closing Date (whether or not billed), excluding intercompany affiliated entities.

"**Acquired Assets**" shall have the meaning ascribed thereto in <u>Section 2.1</u> of this Agreement.

"**Affiliate**" or "**Affiliates**" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"**Alliance Gaming Base Purchase Price**" means $36,865,000.

"**Alliance Gaming Business Assets**" means all of Seller's assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal used in connection with the Alliance Gaming Business.

"**Allocation Methodology**" shall have the meaning ascribed thereto in Section 6.9(b) of this Agreement.

"**Ancillary Agreements**" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"**Approval Order**" shall have the meaning ascribed thereto in Section 6.6 of this Agreement.

"**A/R Value**" means, (a) with respect to Accounts Receivable included in the Acquired Assets aged over ninety (90) days and ineligible Accounts Receivable as detailed in the Seller's Borrowing Base Certificate at Closing, a value equal to $0, and (b) with respect to all other Accounts Receivable included in the Acquired Assets, a value equal to ninety percent (90%) of such Accounts Receivable.

"**Assigned Contracts**" means those Contracts of Seller in connection with the Business which Purchaser has agreed to assume pursuant to this Agreement and all of which are identified on Schedule 2.1(c), to the extent assignable pursuant to applicable law.

"**Average Net Working Capital**" means $6,770,735.

"**Avoidance Actions**" means all avoidance claims under sections 547, 548 and/or 550 the Bankruptcy Code (including, without limitation, claims to avoid, or set aside, transfers of property by any debtor that may be avoidable under by Chapter 5 of the Bankruptcy Code).

"**Bankruptcy Court**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Bankruptcy Code**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Bankruptcy Petition**" means a voluntary bankruptcy petition to be filed by Seller with the Bankruptcy Court on the Petition Date.

"**Bidding Procedures**" means the bidding procedures attached to the Bidding Procedures Order.

"**Bidding Procedures Order**" means the order (Docket No. 136) entered by the Bankruptcy Court in the Chapter 11 Case approving, among other things, the Bidding Procedures.

"**Bid Protections**" shall have the meaning ascribed thereto in Section 6.5 of this Agreement.

"**Borrowing Base Certificate**" shall have the meaning as the certificate prepared by Seller for J.P. Morgan on a weekly basis.

"**Break-up Fee**" shall have the meaning given in the Bidding Procedures Order.

"**Business**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Business Assets**" means, collectively, the Alliance Gaming Business Assets, the DCD Business Assets, and the CGA Business Assets.

"**Business Day**" means a day, based on U.S. Eastern Time, other than a Saturday, Sunday, or U.S. federal holiday or any day in which banking institutions in the State of Maryland are authorized or required by law or other governmental action to be closed.

"**Causes of Action**" means any and all causes of action, defenses, counterclaims and/or other claims of any nature whatsoever, known or unknown, whether or not apparent or yet to be discovered, accruing to Seller or that is property of the Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date, and shall include, without limitation, (i) with respect to Go-Forward Vendors only, claims against past and present vendors or customers of Seller, and (ii) claims regarding or related in any way to any collective bargaining agreement(s). Notwithstanding anything to the contrary herein, Causes of Action shall not include Avoidance Actions or claims under Section 544 of the Bankruptcy Code (except, in each case, as such actions relate to Go-Forward Vendors), Commercial Tort Claims, or any claims or causes of action against the past or present directors, officers, or other insiders or Affiliates of Seller.

"**CGA Business Assets**" means all of Seller's assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal used in connection with the CGA Business and Diamond Select Toys Business.

"**Chapter 11 Case**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Claims**" shall have the meaning ascribed thereto in Section 6.6(b)(ii) of this Agreement.

"**Closing A/R Value**" means the A/R Value as of the Effective Time, as finally determined pursuant to Section 2.6(c)-(f).

"**Closing Date**" shall have the meaning ascribed thereto in Section 3.1 of this Agreement.

"**Closing Eligible Amount**" means the sum of (w) ninety percent (90%) of Eligible Accounts, (x) *plus* ninety percent (90%) of Eligible Foreign Accounts, (y) *plus* ninety percent (90%) of Net Eligible COD Accounts, plus (z) forty-two percent (42%) of Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis.

"**Closing Inventory Value**" means the Inventory Value as of the Effective Time, as finally determined pursuant to Section 2.6(c)-(f).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commercial Tort Claims**" shall have the meaning ascribed to it in Section 9-102(13) of the Uniform Commercial Code as in effect in the State of Maryland.

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case.

"**Confidentiality Agreement**" shall have the meaning ascribed thereto in Section 9.16 of this Agreement.

"**Contemplated Leases**" means the Leases for the following Leased Real Property: (i) 10150 York Road, Cockeysville, MD, (ii) 7485 Polk Lane, Olive Branch, MS, (iii) 2251 Picadilly Drive, Round Rock, Texas, (iv) 207 Redco Avenue, Red Lion, Pennsylvania, (v) 7950 W. Doe Street, Visalia, California, (vi) 3102 Brooklyn Avenue, Fort Wayne, Indiana, (vii) 1546 Victory Boulevard, Glendale, CA 91201, and (viii) 1965 Evergreen Boulevard, Building 300, Suite 100, Duluth, GA 30096.

"**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral, other than Employee Benefit Plans.

"**Cure Amounts**" means all amounts, costs, and expenses required by the Bankruptcy Court to be paid to cure any defaults under the Assigned Contracts or the Assigned Leases so that they may be assumed and assigned to Purchaser pursuant to §§363 and 365 of the Bankruptcy Code.

"**DCD Business Assets**" means all of Seller's assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal used in connection with the DCD Business.

"**Deposit**" means the amount of $8,500,000 delivered to Seller pursuant to the Bidding Procedures Order and by mutual agreement of Seller and Purchaser.

"**Diamond UK Parent Shares**" means, collectively, all of the issued and outstanding equity interests of Comic Holdings, Inc., a Maryland corporation, and Comic Exporters, Inc., a Maryland corporation, as held by DCD.

"**Disclosure Schedules**" means the disclosure schedules attached to this Agreement and incorporated herein, which contain and set forth additional information corresponding to the Section of this Agreement referenced thereon.

"**Effective Time**" means 11:59 p.m. Eastern Time on the Closing Date.

"**Eligible Account**" means, in respect of the Lot B Business only, any Account (as defined in the UCC) transferred to Purchaser on the Closing Date, and which as of the Closing Date, would constitute an "Eligible Account" pursuant to the JPM Agreement.

"**Eligible Foreign Account**" means, in respect of the Lot B Business only, any Account (as defined in the UCC) transferred to Purchaser on the Closing Date which as of the Closing Date would constitute an "Eligible Foreign Account" pursuant to the JPM Agreement.

"**Eligible Inventory**" means, in respect of the Lot B Business only, any Inventory transferred to Purchaser on the Closing Date, which as of the Closing Date would constitute Eligible Inventory (as defined in the JPM Agreement) pursuant to the JPM Agreement, but excluding any Prepaid Inventory.

"**Employment Liability**" means any claim or Liability asserted against Seller or its property under any Law (or common law) arising from or relating to the former, current or future employment of a Person by Seller, whether pursuant to a contract, labor agreement, at-will arrangement or otherwise, as well as any claim asserting healthcare, pension, or other employment-related benefits, whether asserted by an employee or former employee, a retiree or future retiree, any of the aforementioned Person's agent, assigns, custodians, heirs, or representatives, a collective bargaining unit or union, any pension and/or retirement fund, or any other agent thereof.

4

"**Employee**" means an individual who, as of the applicable date, is employed by, or engaged to provide services to, Seller in connection with the Business.

"**Employee Benefit Plans**" or "**Benefit Plans**" means (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of Seller.

"**Environmental Law**" means any applicable Law, and any governmental order or binding agreement with any Governmental Body: (a) relating to pollution or the protection of natural resources, endangered or threatened species, human health or safety, or the environment; or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any hazardous materials. "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Permit**" means any permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"**Escrow Agent**" shall mean Omni Agent Solutions, Inc.

"**Estate**" means the estate of Seller to be created by §541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition.

"**Excluded Contracts**" shall have the meaning ascribed thereto in <u>Section 2.2(c)</u> of this Agreement.

"**Excluded Liabilities**" shall have the meaning ascribed thereto in <u>Section 2.4</u> of this Agreement.

"**Expense Reimbursement**" shall have the meaning ascribed thereto in the Bidding Procedures

Order.

"**Final Order**" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such Order, as long as such motion has not actually been filed.

"**Foreign Critical Vendors**" means foreign vendors providing goods or services to the Business identified in the Approval Order as critical vendors.

"**GAAP**" means generally accepted accounting principles generally accepted in the United States of America consistently applied, as of the date of the applicable financial report.

"**Go-Forward Vendors**" means, excluding "insiders" (as such term is defined in the Bankruptcy Code) and Affiliates of Seller, those vendors specified by Purchaser in writing to Seller (with a copy to the Committee) at the end of the Designation Period that Purchaser: (a) elects in good faith to do business with on a go-forward basis after the Closing; and (b) confirms to Seller (with a copy to the Committee) in writing sixty (60) days after the Designation Period that it is doing business with.

"**Governmental Authorization**" means any consent, franchise, license, registration, permit, order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"**Governmental Body**" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

"**Holdback Amount**" shall have the meaning ascribed thereto in Section 6.6(b)(ix) of this Agreement.

"**Incentive Amount**" means the greater of (x) the Incentive Base Amount, and (y) an amount, as of the close of business on December 31, 2025, equal to (i) fifty percent (50%) of the lesser of the (A) Realized Amount, and (B) the Closing Eligible Amount, *plus* (ii) thirty percent (30%) of the positive amount, if any, by which the Realized Amount exceeds the Closing Eligible Amount, and *plus* (iii) thirty percent (30%) of the cost of the Lot B Prepaid Inventory that is actually sold prior to December 31, 2025.

"**Incentive Amount Notice**" shall have the meaning ascribed thereto in Section 2.8(a) of this Agreement.

"**Incentive Base Amount**" means $5,000,000.

"**Income Tax**" means any Tax imposed on or determined in whole or in part with reference to income, gross receipts, profits or similar measure, including any interest, penalty or other addition with respect thereto.

"**Initial Overbid**" shall have the meaning ascribed thereto in the Bidding Procedures Order.

"**Intellectual Property**" shall have the meaning ascribed thereto in <u>Section 2.1(i)</u> of this Agreement.

"**Inventory**" means all inventory, inventory in transit paid for by Seller, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories of the Business, provided that such inventory is legally permitted to be sold by Purchaser, but excluding any Prepaid Inventory. For purposes of clarification, goods held on consignment by or on behalf of Seller shall not be considered Inventory for purposes of the Agreement.

"**Inventory Value**" means, (a) with respect to inventory included in the ineligible inventory as detailed in the Seller's Borrowing Base Certificate at Closing, a value equal to $0, and (b) (i) with respect to all other Inventory included in the Acquired Assets, ninety percent (90%) of the Eligible Inventory value of such Inventory (as set forth in the Seller's Borrowing Base Certificate at Closing), as set forth on the Estimated Value Statement and (ii) with respect to Prepaid Inventory, ninety percent (90%) of such inventory's value, calculated at cost.

"**JPM Agreement**" means that certain Debtor-in-Possession Credit Agreement, dated as of January 16, 2025, among Diamond Comic Distributors, Inc., the Loan Parties named therein, Stephen Geppi and JPMorgan Chase Bank, NA., as amended. To the extent that as to any definition from the JPM Agreement which is incorporated herein by reference and to the extent that the Lender (as defined in the JPM Agreement) thereunder may exercise discretion in making any determination, Purchaser shall have the same right to exercise such discretion to the same extent as the Lender may exercise such discretion in making such determination.

"**Law**" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"**Leased Real Property**" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) the premises to the extent designated by Purchaser within thirty (30) days after the Closing.

"**Leasehold Improvements**" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"**Leases**" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"**Liability**" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"**Lien**" means any mortgage, deed of trust, lien, claim, Liability, Employment Liability, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind.

"**Lot B Business**" means, collectively, the DCD Business, the CGA Business, and the Diamond Select Toys Business.

"**Lot B Business Assets**" means, collectively, the DCD Business Assets and the CGA Business Assets.

"**Material Adverse Change**" means any change, event, occurrence, fact, waste, circumstance, or effect as shall have arisen after the date of this Agreement and prior to the Closing that would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on (i) the Business or the Acquired Assets, including, without limitation, the results of operations or the condition (financial or otherwise) of the Acquired Assets, (ii) the value of the Acquired Assets, or (iii) the ability of the parties to consummate the transactions contemplated hereby on a timely basis; provided, however, that any change, circumstance, or effect that arises out of, results from or relates to the commencement or conduct of the Chapter 11 Case shall not be considered in determining whether a Material Adverse Change has occurred or any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Purchaser; (vi) any changes in applicable Laws or accounting rules, including GAAP; (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement; or (viii) any natural or man-made disasters or acts of God; provided further, however, that any event, occurrence, fact, condition or change referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Change has occurred or could reasonably be expected to occur if such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Net Eligible COD Account**" means, in respect of the Lot B Business only, any Account (as defined in the UCC) transferred to Purchaser on the Closing Date which as of the Closing Date would constitute "Net Eligible COD Account" pursuant to the JPM Agreement.

"**Person**" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"**Petition Date**" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"**Prepaid Inventory**" means inventory which was ordered and paid for pursuant to the invoices set forth in Schedule B (to be provided by Seller on or before the Closing Date), but which, as of the Closing Date, has not been delivered, and is not otherwise included as Eligible Inventory pursuant to the JPM Agreement.

"**Purchase Price**" shall have the meaning ascribed thereto in Section 2.6 of this Agreement.

"**Qualifying Bidder**" shall have the meaning ascribed thereto in the Bidding Procedures Order.

"**Qualifying Bid**" shall have the meaning ascribed thereto in the Bidding Procedures Order and shall include, without limitation, a bona fide, binding, and duly executed written offer to purchase all of the Acquired Assets and assume all of the Assumed Liabilities, received on or before the bid deadline set forth in the Bidding Procedures Order, and which: (i) is accompanied by a redline that shows the differences between the asset purchase agreement proposed by such offer and this Agreement; (ii) is irrevocable until the conclusion of the sale hearing in the Chapter 11 Case; (iii) is accompanied by evidence reasonably acceptable to Seller demonstrating the proposed bidder's ability to close the proposed transaction; (iv) sets forth total consideration in an amount greater than the total consideration provided by this Agreement, plus the Bid Protections in this Agreement; (v) is not subject to any breakup fee, transaction fee, termination fee, or similar type of payment or reimbursement, unless subject to court approval; and (vi) has no financing or due diligence contingencies.

"**Realized Amount**" means, in respect of the Lot B Business only, as of the close of business on December 31, 2025 (x) the amount actually collected by Purchaser with respect to all Accounts Receivable acquired by Purchaser hereunder on the Closing Date, net of all costs of collection related thereto and (y) the Net Sales of all Inventory acquired by Purchaser on the Closing Date.

"**Tax**" or "**Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, unclaimed property, escheat, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any Governmental Body responsible for imposition of any such tax (domestic or foreign).

"**Tax Clearance Certificate**" shall have the meaning ascribed thereto in Section 6.9(c) of this Agreement.

"**Tax Purchase Price**" shall have the meaning ascribed thereto in Section 6.9(b) of this Agreement.

"**Transactions**" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"**Transfer Tax**" means any sales, use, transfer, stamp, conveyance, value added, or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees (excluding vehicle registration fees), notarial fees and other similar costs provided, however, that the term "Transfer Tax" shall not include any Income Tax.

Undefined terms used in this Agreement shall have the meaning ascribed to them under 11 U.S.C. § 101 of the United States Bankruptcy Code.

2.    **SALE AND PURCHASE OF ASSETS.**

2.1    **Acquired Assets.** On the terms and subject to the conditions set forth in this Agreement, on the Closing Date (defined below), Purchaser shall purchase from Seller, and Seller shall sell, assign, transfer, convey and deliver to Purchaser, all of Seller's right, title and interest in and to all of the Business Assets, wherever located, whether owned or leased (except for the Excluded Assets (defined below)), free and clear of any Liens (collectively, the "**Acquired Assets**"). Without limiting the foregoing, the Business Assets sold, assigned, transferred, conveyed and delivered by Seller shall include all of Seller's right, title and interest in and to the following:

(a)    All Accounts Receivable;

(b)      all Inventory;

(c)      all Assigned Contracts set forth on <u>Schedule 2.1(c)</u> of the Disclosure Schedules but solely to the extent designated by Purchaser pursuant to <u>Section 2.3</u> hereof;

(d)      all benefits, proceeds or any other amounts payable under any policy of insurance maintained by Seller with respect to the destruction of, damage to or loss of use of any of the Acquired Assets;

(e)      Subject to <u>Section 2.3</u>, the Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) the Leased Real Property, together with all amendments, extensions, rights of renewal, other agreements with respect thereto, security and other deposits related thereto, prepaid rent, and appurtenances thereto and associated therewith, but solely to the extent designated by Purchaser pursuant to <u>Section 2.3</u> hereof (collectively, the "**Assigned Leases**");

(f)      all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assigned Leases (the "**Assigned Leased Real Property**");

(g)      all (i) equipment (including without limitation warehouse racks and equipment), machinery, furniture, fixtures and improvements, shelving and cabinets, forklifts, tooling and spare parts, vehicles, office and computer equipment, and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases owned or leased by Seller in connection with the Business and/or the Acquired Assets (the "**FF&E**"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the FF&E (collectively, the "**Tangible Personal Property**");

(h)      all Causes of Action, including without limitation all Avoidance Actions against Go-Forward Vendors and claims under Section 544 of the Bankruptcy Code against Go-Forward Vendors, *provided*, *that*, all Avoidance Actions against Go-Forward Vendors and claims under Section 544 of the Bankruptcy Code against Go-Forward Vendors shall be deemed released, waived, and forever relinquished in all respects;

(i)      all intellectual property interests of Seller related to the Business including, without limitation: (i) Seller's patents, patent applications, patent disclosures and improvements thereto; (ii) Seller's trademarks, service marks, trade dress, brands, logos, slogans, jingles, trade names, website domain names, social media sites and accounts, and URLs, e-commerce websites (such as Amazon accounts) and all content and data thereon or relating thereto; together with any licenses to use such names or parts thereof insofar and to the extent that they are used in connection with Seller's Business; (iii) Seller's copyrights and registrations, to the extent assignable by Seller, and applications for registration thereof; (iv) Seller's mask works and registrations and applications for registration thereof; (v) Seller's computer software data and documentation, software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology networks and systems (including telecommunications networks and systems for voice, data, and video) owned, leased, licensed, or used (including through cloud-based or other third-party service providers); (vi) Seller's data management system data, with respect to customers of Seller's Business, and (vii) all claims and causes of action with respect to the foregoing (collectively, the "**Intellectual Property**");

(j)       all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Acquired Assets;

(k)       originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, supplier and publisher agreements, services agreements, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any Governmental Body, sales material and records, strategic plans and marketing, and promotional surveys, material, and research related to the Business ("**Books and Records**"); provided, however, that Purchaser shall make the Books and Records available to Seller to the extent necessary to prosecute the Chapter 11 Case;

(l)       all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities or trading card or collectible authentication, grading or certification organizations (collectively, "**Permits**") which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Acquired Assets;

(m)      all prepaid expenses, credits, advance payments, claims, security deposits under the Assigned Leases, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (excluding any such item relating to the payment of Taxes) (collectively, the "**Prepaid Amounts")**; and

(n)       all goodwill and the going concern value of the Acquired Assets and the Business.

2.2    **Excluded Assets**. The following assets, properties, rights, interests, benefits and privileges of Seller are not included in the Acquired Assets (collectively, the "**Excluded Assets**"):

(a)       all related party accounts including accounts receivable - related parties, loans receivable - related parties, accounts payable - related companies, and loans payable - related companies;

(b)       all cash, bank deposits, securities and cash equivalents, including for this purpose (i) all cash and cash equivalents if credited to Seller's bank account(s) prior to the Closing Date, (ii) all deposits arising outside of the ordinary course of the Business, including without limitation all such amounts held by Seller's attorneys, accountants, investment bankers, restructuring advisors, notice and claims agents, public relations advisors, and other professional advisors, and (iii) all financial investments;

(c)       all Contracts of Seller, other than any Assigned Contracts (the "**Excluded Contracts**");

(d)       all current assets of Seller, other than Inventory, Accounts Receivable, and prepaid expenses, credits, advance payments, security deposits under the Assigned Leases, rights of refunds, and similar prepaid items constituting current assets;

(e)       Seller's related party Accounts Receivable and notes receivable;

(f)       Seller's insurance policies, and related claims and refunds;

11

(g)     all of Seller's rights with respect to Employee Benefit Plans and all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders and the rights associated therewith, other than the Assigned Contracts and Assigned Leases;

(h)     any accounting records, tax records, financial records and any books, records or other information related solely and exclusively to the other Excluded Assets and all of Seller's accounting records, tax records, financial records and any books, records or other information, unless required for the preparation of audited financials and compliance with filing requirements of a Governmental Authority for the Acquired Assets;

(i)     all records that Seller is required by Law to retain;

(j)     all rights to receive mail and other communications addressed to Seller that do not relate to the Acquired Assets or the Assumed Liabilities;

(k)     all property, rights and assets relating to an Excluded Asset or arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities which are not Assumed Liabilities;

(l)     all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of Seller's operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date;

(m)     all rights of Seller arising under this Agreement, the Ancillary Agreements, and under any other agreement between Seller and Purchaser entered into in connection with this Agreement;

(n)     the Diamond UK Parent shares; and

(o)     all Avoidance Actions against any person other than a Go-Forward Vendor and all claims under Section 544 of the Bankruptcy Code (except as such actions relate to Go-Forward Vendors), Commercial Tort Claims, or any claims or causes of action against the past or present directors, officers, or other insiders or Affiliates of Seller.

2.3     **Assumed Liabilities.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall only assume and shall only be required to perform and discharge in accordance with their respective terms the following: (a) all Liabilities with respect to the Assigned Contracts after the Closing; provided, however, that Assumed Liabilities shall not include any Liabilities arising out of any breach, default, misconduct, negligence, failure to comply with any applicable Law, or other form of non-compliance by Seller thereunder at or prior to the Closing, (b) all Liabilities (including for any Tax) that arise after Closing with respect to Purchaser's ownership or operation of the Acquired Assets after the Closing, (c) all amounts due with respect to open purchase orders for Inventory ordered after the Closing, (d) all amounts due with respect to open purchase orders for Inventory ordered after the Petition Date and not delivered prior to the Closing Date, and (e) all Cure Amounts (collectively, the "**Assumed Liabilities**").  From and after the Closing Date until the date that is thirty (30) days from the Closing Date (the "**Designation Deadline**" and the period from the Closing Date to the Designation Deadline, the "**Designation Period**"), Purchaser may, in its sole discretion, designate any Assigned Contracts for assignment and assumption to Purchaser, effective as of the Closing Date.  During the Designation Period, Purchaser shall pay or cause to be paid Seller's actual costs under any Contemplated Leases. Notwithstanding anything to the contrary herein, in the event Seller reasonably anticipates incurring

any out-of-pocket costs or expenses post Closing and during the Designation Period in connection with any Assigned Contract not yet designated for assumption by Purchaser, Seller shall promptly notify Purchaser in writing of such anticipated costs. Purchaser shall have twenty-four (24) hours following receipt of such notice to notify Seller in writing whether Purchaser elects to assume responsibility for such costs. If Purchaser does not timely notify Seller of its election to assume such costs, then Seller shall have the right, in its sole discretion, to reject such Assigned Contract or otherwise avoid incurring such expense. Furthermore, with respect to any Assigned Lease or lease of a Leased Facility, Purchaser shall be solely responsible for, and shall pay or cause to be paid, all rent and other lease-related expenses incurred during the Designation Period, regardless of whether such Assigned Lease or Leased Facility is ultimately designated for assumption by Purchaser. Notwithstanding anything to the contrary herein, during the Designation Period, Purchaser shall have the right, in its sole discretion, to remove any Assigned Contract from Schedule 2.1(c), thereby relieving Purchaser of any obligation to assume such contract and any associated Liabilities thereunder. For the avoidance of doubt, the Purchaser shall not have the right to add any additional contracts to the list of Assigned Contracts during the Designation Period, and no contract or agreement that was not included on Schedule 2.1(c) shall be eligible to be designated as an Assigned Contract thereafter.

2.4    **Excluded Liabilities.** Notwithstanding anything to the contrary contained in any other provision of this Agreement, Purchaser, by its execution and delivery of this Agreement and any Ancillary Agreements, and its performance of the transactions contemplated by this Agreement and any Ancillary Agreements (collectively, the "**Transactions**"), shall not assume, pay or otherwise be responsible for any Liability other than the Assumed Liabilities (the "**Excluded Liabilities**"). The Excluded Liabilities shall be the sole responsibility of Seller. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Agreements and the Transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Acquired Assets or the Assumed Liabilities for any pre-Closing Tax period; (ii) Taxes that arise out of the consummation of the Transactions contemplated hereby or that are the responsibility of Seller pursuant to this Agreement; or (iii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Purchaser under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)    any Liabilities relating to or arising out of the Excluded Assets;

(d)    any Liabilities in respect of any pending or threatened Causes of Action arising out of, relating to or otherwise in respect of the operation of the Business or the Acquired Assets to the extent such Causes of Action relate to such operation on or prior to the Closing Date;

(e)    any Liabilities of Seller arising under or in connection with any Employee Benefit Plan providing benefits to any present or former employee of Seller;

(f)    any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any

Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(g)     any environmental claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(h)     any trade accounts payable of Seller, including, without limitation, any Foreign Critical Vendor accounts payable;

(i)     any Liabilities of the Business relating to or arising from unfulfilled commitments, quotations, restricted inventory, non-transferable rights, purchase orders, customer orders or work orders;

(j)     any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(k)     any Liabilities under the Excluded Contracts or any other Contracts not constituting the Assigned Contracts or the Assigned Leases;

(l)     any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions; and

(m)     any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or governmental order.

2.5     [**Reserved**].

2.6     **Purchase Price.**

(a)

(i)     <u>Calculation of the Alliance Gaming Purchase Price</u>. The aggregate consideration payable to Seller for the sale and transfer of the Alliance Gaming Business Assets shall be the sum of the following items: (i) the Alliance Gaming Base Purchase Price, *minus* (ii) Average Net Working Capital; *plus* (iii) the Closing Inventory Value associated with Alliance Gaming Business Assets (which, for the avoidance of doubt, includes ninety percent (90%) of the cost of all Prepaid Inventory associated with the Alliance Gaming Business Assets), *plus* (iv) the Closing A/R Value associated with Alliance Gaming Business Assets, *minus* (v) any amounts paid by Purchaser as Cure Amounts with respect to the Alliance Gaming Business (the "**Alliance Gaming Purchase Price**"), and the assumption by Purchaser of the Assumed Liabilities associated with the Alliance Gaming Business.

(ii)     <u>Calculation of the Lot B Purchase Price</u>. Subject to the adjustment contemplated by <u>Section 2.8(a)</u> below, the aggregate consideration payable to Seller for the sale and transfer of the Lot B Business Assets shall be the sum of the following items: (A) Twenty One Million Dollars ($21,000,000), *plus* (B) the Incentive Amount, if any; *minus* (C) any amounts paid by Purchaser as Cure Amounts with respect to the Lot B Business (the "**Lot B Purchase Price**", and together with the Alliance Gaming Purchase Price, the "**Purchase Price**"), and the assumption by Purchaser of the Assumed Liabilities associated with the Lot B Business.

(b)    <u>Payment of Purchase Price</u>.

(i)    As of the Effective Date, Purchaser shall pay, or cause to be paid, to the Escrow Agent, by wire transfer of immediately available funds to one or more accounts designated in writing by the Escrow Agent, the Deposit.

(ii)

(A)    At the Closing, Purchaser shall pay, or cause to be paid, to Seller, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller, an amount equal to the (1) the Alliance Gaming Purchase Price *minus* (2) the Deposit, *minus* (3) the Holdback Amount.

(B)    At the Closing, Purchaser shall pay, or cause to be paid, to Seller, by wire transfer of immediately available funds to one or more accounts designated in writing by Seller, an amount equal to the the Lot B Purchase Price, excluding the Incentive Amount (which shall be payable in accordance with <u>Section 2.8</u>).

(c)    <u>Estimated Value Statement</u>. At least two (2) Business Days prior to the Closing and solely with respect to the Alliance Gaming Business Assets, Seller shall deliver to Purchaser a statement in the form attached hereto as <u>Exhibit E</u> (the "**Estimated Value Statement**"), setting forth a good faith calculation, together with reasonably detailed supporting documentation, of the estimated Inventory Value at Closing (the "**Estimated Inventory Value**"), and the estimated A/R Value at Closing (the "**Estimated A/R Value**").

(d)    <u>Closing Value Statement</u>.  Within the ten (10) Business Day period after the Closing Date (or such reasonable extension thereof as approved by Seller, such approval not to be unreasonably withheld, conditioned or delayed), Purchaser shall deliver, or cause to be delivered, to Seller a statement (the "**Closing Value Statement**") setting forth Purchaser's objections, if any, to the calculations set forth in the Estimated Value Statement, together with reasonably detailed supporting documentation to substantiate any such objections.  The Closing Value Statement and the calculations thereunder shall be prepared and calculated by Purchaser in good faith.  Notwithstanding anything set forth herein, Purchaser shall have the right to revise the Closing Value Statement and Purchaser's objections, if any, to the calculations set forth in the Estimated Value Statement in all respects based on fraud, willful misconduct or intentional misrepresentation discovered by Purchaser at any time prior to the determination of the Closing Inventory Value or Closing A/R Value in accordance with this Agreement.

(e)    <u>Disputes</u>. If Seller disputes any of Purchaser's objections to the Estimated Value Statement as set forth in the Closing Value Statement, then, within fifteen (15) days after the delivery to Seller of the Closing Value Statement (the "**Dispute Period**"), Seller shall deliver to Purchaser a written notice (a "**Dispute Notice**") describing in reasonable detail Seller's dispute of any of Purchaser's objections to the Estimated Value Statement set forth in such Closing Value Statement.  If Seller does not deliver a Dispute Notice to Purchaser during the Dispute Period, then Purchaser's objections set forth in the Closing Value Statement shall be binding and conclusive on the parties hereto and Purchaser's calculations of the value of Inventory and Accounts Receivable acquired at the Closing shall be (and be deemed to be) the "Closing Inventory Value" and "Closing A/R Value", respectively. If Seller delivers a Dispute Notice to Purchaser during the Dispute Period, then the parties hereto shall negotiate to resolve such disputes. To the extent that the parties hereto are unable to resolve such disputes, such disputes shall be resolved exclusively by the Bankruptcy Court.

(f)    <u>Post-Closing Adjustment Payment</u>. If the Closing Inventory Value and/or the

Closing A/R Value are less than the Estimated Inventory Value and/or the Estimated A/R Value, respectively, Purchaser and Seller shall promptly (but in any event within two (2) Business Days after the determination of Closing Inventory Value and Closing A/R Value) deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to (i) pay to Purchaser the absolute value of such difference, if any (such difference, the "**Shortfall Amount**") from the escrow account established with the Escrow Agent (the "**Escrow Account**"), by wire transfer of immediately available funds to one (1) or more accounts designated by Purchaser, and (ii) release any excess funds in the Escrow Account to Seller. In the event the funds in the Escrow Account are less than the amount of the Shortfall Amount, Seller shall promptly (but in any event within two (2) Business Days after the determination of Closing Inventory Value and Closing A/R Value) pay to Purchaser the absolute value of such difference. Purchaser shall have an administrative expense claim pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Chapter 11 case for the absolute value of such difference.

2.7    **Structure of Sale.** Notwithstanding any provision in the Agreement, nothing herein shall impair the Parties' right and ability to agree to an alternative structure to the transaction as contemplated herein, provided that any alternative transaction shall be subject to the agreement of the Parties in their sole and absolute discretion and shall not reduce the Purchase Price to be received by Seller, which must be paid in full at Closing.

2.8    **Payment of Incentive Amount.**

(a)    Within fifteen (15) days after the end of each calendar month, commencing with June of 2025 and ending on December of 2025, the Purchaser shall deliver to Seller (or its successor, including, without limitation, any liquidating or litigation trust) and the Committee a reasonably detailed calculation of the Incentive Amount as of the end of such calendar month (but for all months, other than December 2025, without reference to the Incentive Base Amount), with such backup documentation to show invoice-level information with respect to Lot B Business Accounts Receivables, Net Sales of Lot B Business Inventory and sales of Lot B Business Prepaid Inventory, in each case which was acquired by the Purchaser at the Closing pursuant to this Agreement (each, a "**Incentive Amount Notice**"). In the event that Seller (or its successor) has any objection to the Incentive Amount set forth in an Incentive Amount Notice, it shall provide written notice to the Purchaser not more than fifteen (15) days after delivery of the Incentive Amount Notice, or if with respect to the December 2025 Incentive Amount Notice, then not more than thirty (30) days after delivery of the Incentive Amount Notice. If no timely objection is received, or if Seller (or its successor) delivers written notice of its agreement to the Incentive Amount as contained in the applicable Incentive Amount Notice, the Purchaser shall pay (x) the Incentive Amount then due (which prior to the payment with respect to the Incentive Amount Notice delivered for December 2025 shall be calculated and paid without reference to the Incentive Base Amount), if any, minus (y) any prior payments with respect to the Incentive Amount made prior thereto (each such payment being referred to as an "**IA Payment**"), to the Seller (or its successor) not more than two Business Days after the earlier of (x) delivery of written notice of Seller to Purchaser accepting the calculation of the Incentive Amount and (y) the expiration of the fifteen (15) day period or thirty (30) day period for Seller to object to the calculation of the Incentive Amount, as applicable. If the Seller (or its successor) disputes the calculation of the Incentive Amount, a final determination of the Incentive Amount shall be made by the Bankruptcy Court, pursuant to procedures determined by the Bankruptcy Court. In the event that Purchaser fails to pay any IA Payment in accordance with this Section 2.8(a) when due (any such payment being referred to as a "**Defaulted IA Payment**"), Section 2.8(b) shall apply.

(b)    To secure Purchaser's obligations to pay the IA Payment in accordance with Section 2.8(a), Purchaser shall, on or prior to the Closing Date, deliver to DCD an irrevocable and unconditional letter of credit issued by Bank of America, National Association, in the original amount of $4,500,000, pursuant to which DCD (or its successor) is the intended and sole beneficiary, which shall have

a term of twelve (12) months from the date of the Closing Date and be in a form reasonably acceptable to DCD and the Committee (the "**Letter of Credit**"). In the event that Purchaser fails to pay the full amount of any IA Payment due in accordance with Section 2.8(a), Seller (or its successor) shall have the right to draw down on the full amount of the Letter of Credit. A draw on the Letter of Credit by DCD shall not preclude Seller from exercising rights against Purchaser with respect to any then currently outstanding or any future Defaulted IA Payments. Notwithstanding anything contained herein, in the event Purchaser has made IA Payments in an aggregate amount exceeding $4,500,000, Purchaser shall, at any time thereafter, have the right to reduce the amount of the Letter of Credit to an amount equal to (a) $9,000,000, *less* (b) the aggregate amount of IA Payments made by Purchaser at the time of such reduction.

(c)    At least two (2) Business Days prior to the Closing, Seller shall deliver to Purchaser and the Committee a statement setting forth Seller's calculation of the Lot B Purchase Price (excluding the Incentive Amount). If Purchaser disagrees with Seller's calculation of the Purchase Price, the parties will negotiate to resolve any disputes in advance of Closing.

3.    **CLOSING; CONDITIONS TO CLOSING.**

3.1    **Closing.** Subject to the terms and conditions of this Agreement, the closing (the "**Closing**") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place no later than 5:00 P.M. E.T. on April 25, 2025, or such later date as mutually agreed in writing by Seller and Purchaser at a, place, and manner as agreed by the Seller and Purchaser. The time and date upon which the Closing occurs is referred to herein as the "**Closing Date**". Transactions at the Closing shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place. Seller, Purchaser and their attorneys need not be physically present at any Closing and they may deliver documents to the Escrow Agent in escrow by electronic delivery, overnight air courier or other means.

3.2    **Court Approval Required.** Purchaser and Seller acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party. Purchaser acknowledges that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and/or otherwise best offer possible for the Acquired Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting an auction.

3.3    **Conditions to Obligations of Purchaser.** The obligation of Purchaser to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by Purchaser in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Seller set forth in Section 4 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Seller shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

17

(c)     Consents. All consents, authorizations, or approvals required to be obtained from any Governmental Body shall have been obtained and be in full force and effect.

(d)     No Material Adverse Change. A Material Adverse Change shall not have occurred with respect to the Business or the Acquired Assets (taken as a whole). [*redacted language removed*]

(e)     Break-Up Fee and Expense Reimbursement. Both the Break-Up Fee and the Expense Reimbursement shall have been approved by the Bankruptcy Court by Final Order.

(f)     Bidding Procedures. The Bidding Procedures as approved by the Bankruptcy Court have been complied with in all material respects.

(g)     Approval Order. The Bankruptcy Court shall have entered the Approval Order which shall be reasonably satisfactory to Purchaser and contain certain findings and rulings including, without limitation, the following: (i) approving the sale of the Acquired Assets to Purchaser free and clear of all Liens and Claims, (ii) approving the assumption and assignment of the Assigned Contracts to Purchaser, (iii) providing for the waiver of the fourteen (14) day automatic stay contained in Federal Rule of Bankruptcy Procedure 6004(h), (iv) finding that Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms-length purchaser, (v) finding that the Purchase Price is fair and reasonable; (vi) finding that this Agreement was negotiated at arms-length; and (vii) finding that the sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code, and the Approval Order shall have become a Final Order.

3.4     **Conditions to Obligations of Seller.** The obligation of Seller to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by any Seller in its sole discretion:

(a)     Representations and Warranties. The representations and warranties of Purchaser set forth in Section 5 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)     Agreements and Covenants. Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)     Consents. All consents, authorizations, or approvals required to be obtained from any Governmental Body shall have been obtained and be in full force.

(d)     Approval Order.  The Bankruptcy Court shall have entered the Approval Order.

3.5     **Closing Obligations.**  In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a)     Seller Deliverables. Seller shall deliver to Purchaser:

(i)     The Estimated Value Statement (which shall have been delivered in accordance with Section 2.6(c).

(ii)     An Assignment, Bill of Sale and Conveyance Agreement (the "**Master Assignment**") for the Acquired Assets in the form set forth on <u>Exhibit A</u> executed by Seller;

(iii)     such bills of sale, assignments, certificates of title, documents, and instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Seller; and

(iv)     a certified copy of the Approval Order entered on the docket in the Chapter 11 Case.

(b)     Purchaser Deliverables. Purchaser shall deliver, or cause to be delivered:

(i)     to each of the recipients specified in <u>Section 2.6(b)(ii)</u>, all of the amounts payable to such recipients pursuant to <u>Section 2.6(b)(ii)</u>;

(ii)     to Seller, a countersigned original of the Master Assignment; and

(iii)     to Seller, the Deposit.

3.6     **Delivery of Possession of Assets.** Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing. Seller shall bear all risk of loss with respect to the Acquired Assets prior to Closing. Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

4.     **REPRESENTATIONS AND WARRANTIES OF SELLER.** Each Seller represents and warrants to Purchaser that the statements contained in this <u>Section 4</u> are true and correct as of the date hereof and will be true and correct through the Closing Date.

4.1     **Organization, Good Standing and Power.** Each Seller is legally formed and in good standing under the laws of the State of its incorporation. Subject to the applicable provisions of the Bankruptcy Code, each Seller has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

4.2     **Authority Relative to this Agreement; Execution and Binding Effect.** Each Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code including entry of the Approval Order, to consummate the Transactions applicable to Seller. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the independent director and restructuring committee of each Seller, and, except for Bankruptcy Court approval, no other proceedings or approvals on the part of each Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by each Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Seller, enforceable against each Seller in accordance with their terms.

4.3     **Title and Ownership.**  Except as would not have a Material Adverse Change, each Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.  At the Closing, each Seller will have the right to transfer the Acquired Assets to Purchaser free and clear of all Liens, other than Liens included in the Assumed Liabilities to the extent specifically set forth in <u>Schedule 4.3</u> of the

Disclosure Schedules. Neither Comic Exporters, Inc., a Maryland corporation, nor Comic Holdings, Inc., a Maryland corporation, own any assets other than their respective right, title and interest in and to the Diamond UK Parent Shares.

4.4     **Contracts and Leases.**  As of the Effective Date, other than as set forth on <u>Schedule 4.4</u> of the Disclosure Schedules, no Seller nor, to Seller's actual knowledge, any other party to any of the Assigned Contracts or Assigned Leases has commenced any action against any of the parties to such Assigned Contracts or Assigned Leases or given or received any written notice of any material default or violation under any Assigned Contract or Assigned Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Approval Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assigned Contracts and Assigned Leases).  Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assigned Contracts and Assigned Leases is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on <u>Schedule 4.4</u>.

4.5     **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code (including, without limitation, pursuant to §§363 and 365 of the Bankruptcy Code), no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body is required in connection with the execution and delivery by each Seller of this Agreement and the Ancillary Agreements and/or the consummation of the Transactions, including without limitation, the assignment of the Assigned Assets.

4.6     **No Brokers.** Except as to the entities set forth in <u>Schedule 4.6</u> hereto, each Seller has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of such Seller, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by such Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

4.7     **Taxes.**  After giving effect to the Approval Order and upon the Closing, there are no Tax related Liens (i) affecting or attached to the Acquired Assets, (ii) threatened in writing that could attach to or affect the Acquired Assets, or (iii) to the knowledge of each Seller, otherwise threatened that are reasonably likely to attach to or affect the Acquired Assets.  The Approval Order shall contain customary provisions that provide that the Acquired Assets will be transferred to Purchaser free and clear of all Tax related Liens.

4.8     **Proceedings**. As of the date hereof, except as would not have a Material Adverse Change, there is no action, suit, investigation or proceeding pending against, or to the knowledge of each Seller, threatened against or affecting, any Seller.

5.     **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

Purchaser represents and warrants to Seller that the statements contained in this <u>Section 5</u> are true and correct as of the date hereof and will be true and correct on the Closing Date.

5.1     **Organization, Good Standing and Power.** Purchaser is legally formed and in good standing under the laws of the State of its incorporation or formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

5.2 **Authority Relative to this Agreement; Execution and Binding Effect.** Purchaser has full power and authority to execute and deliver this Agreement and any Ancillary Agreements and to consummate the Transactions. The execution and delivery of this Agreement and any Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder or otherwise) on the part of Purchaser are necessary to approve this Agreement and any Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by Seller, this Agreement constitutes, and each of any Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3 **No Defaults.** The execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the material breach of or constitute a material default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or materially violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (b) violate the articles of incorporation or bylaws of Purchaser.

5.4 **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code and any bulk sales filings to be made by Purchaser, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

5.5 **Financial Ability.** Purchaser has cash available that is sufficient to enable it to pay the Deposit and the Purchase Price, as well as all other amounts otherwise payable to consummate the Transactions pursuant to and in accordance with this Agreement.

5.6 **No Brokers.** Except for Province LLC and Think Equity Inc., Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

6. **COVENANTS.**

6.1 **Operation of Business.** Subject to the requirements of, and the obligations imposed upon, Seller as debtor-in-possession and pursuant to the Bankruptcy Code and except as otherwise contemplated by this Agreement or the Bidding Procedures Order or as required to comply with debtor-in-possession financing obtained by Seller, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, Seller shall operate the Business in the ordinary course (relative to that in effect immediately prior to the execution of the Agreement) and, consistent with such operation and the budget set forth in Seller's debtor-in-possession credit agreement, and consistent with acting as a debtor-

in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers of the Business. Without limiting the generality of the foregoing, from and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller shall not (except as consented to in writing by Purchaser) do any of the following with respect to the Business: (a) hire any employees or terminate the services of any existing employees, increase, accelerate or provide for additional compensation, benefits (fringe or otherwise) or other rights to any current or former employee, or agree to do any of the foregoing, except in the ordinary course of business or as required by applicable law, (b) materially modify, change, renew, extend or terminate any Contract or relationship with any customer of the Business, other than renewals or extensions in the ordinary course of business; (c) dispose of or transfer any Acquired Asset; (d) grant any rights with respect to or otherwise disposing of or transferring any right in any Acquired Asset; or (e) terminate, amend, or modify the terms of any Acquired Asset. Prior to Closing, Seller shall have paid all amounts due to any Foreign Critical Vendors.

6.2     **Bidding Procedures Order.** The purchase and sale of the Acquired Assets will be subject to competitive bidding in accordance with (and only in accordance with) the terms of the Bidding Procedures Order and the Bidding Procedures.

6.3     **Seller Transition Cooperation**. During the time period commencing on the Effective Date and ending on the Closing Date, Seller, for itself, its successors and assigns, hereby covenants and agrees to employ commercially reasonable efforts to cooperate with Purchaser in order to effectuate the orderly transition of the operation and administration of the Business from Seller to Purchaser by the Closing Date. Without limiting the generality of the foregoing, Seller, for itself, its successors and assigns, hereby covenants and agrees to execute and deliver, or cause to be executed and delivered, all such documents, instruments, and information and shall take, or cause to be taken, all such further or other actions, and shall provide, or cause to be provided, all such further or other cooperation, in each case as Purchaser may reasonably deem necessary or desirable in order to effect the orderly transition of the operation and administration of the Business from Seller to Purchaser by the Closing Date.

6.4     **Purchaser Transition Cooperation**. During the time period commencing on the Effective Date and ending on the Closing Date, Purchaser, for itself, its successors and assigns, hereby covenants and agrees to employ commercially reasonable efforts to cooperate with Seller in order to effectuate the orderly transition of the operation and administration of the Business from Seller to Purchaser by the Closing Date. Without limiting the generality of the foregoing, Purchaser, for itself, its successors and assigns, hereby covenants and agrees to execute and deliver, or cause to be executed and delivered, all such documents, instruments, and information and shall take, or cause to be taken, all such further or other actions, and shall provide, or cause to be provided, all such further or other cooperation, in each case as Seller may reasonably deem necessary or desirable in order to effect the orderly transition of the operation and administration of the Business from Seller to Purchaser by the Closing Date.

6.5     [**Reserved**].

6.6     **Approval Order.**

(a)     Seller shall diligently prosecute the approval of this Agreement. Purchaser agrees that it will take such actions as are reasonably requested by Seller to assist in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(b)        Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Seller shall use their commercially reasonable efforts to obtain entry of an order or orders by the Bankruptcy Court pursuant to §§363 and 365 of the Bankruptcy Code (the "**Approval Order**"), in form and substance reasonably acceptable to the parties which shall approve this Agreement and the Transactions.  Such Approval Order shall contain the provisions set forth below (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

(i)        Approval of the sale, transfer and assignment by Seller of the applicable Acquired Assets and assumption and assignment of any applicable Assigned Contracts to Purchaser pursuant to this Agreement and Bankruptcy Code §§105, 363 and 365, as applicable;

(ii)        The transfers of the Acquired Assets by Seller to Purchaser (A) vest or will vest Purchaser with all right, title and interest of Seller in and to the Acquired Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all Liens and claims (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets,  rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or untiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Seller filed their voluntary petitions under Chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise (collectively, "**Claims**") , with any such Liens and Claims to attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Acquired Assets prior to Closing, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware.  For the avoidance of doubt and without limiting the foregoing, the transfer of the Acquired Assets to Purchaser shall be free and clear of any Claims or Causes of Action relating to or in connection with (i) any Employee Benefit Plan or pension plans contributed to or maintained by Seller, or multi-employer plan participated in by Seller prior to the or subsequent to the Petition Date; (ii) the Worker Adjustment and Retraining Notification Act of 1988, (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; (iv) any collective bargaining agreement(s) to which Seller is a party or otherwise obligated under; or (v) the Seller's current or former employees;

(iii)        The sale and transfer of the Acquired Assets to Purchaser or Purchaser's occupation and use of the Acquired Assets will not subject Purchaser to any liability (including successor liability) with respect to the operation of Seller's business or Acquired Assets prior to Closing or by reason of such transfer.  Purchaser is not holding itself out to the public as a continuation of Seller, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and Seller. The Transactions do not amount to a consolidation, merger, or *de facto* merger of Purchaser and Seller and/or Seller's bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between Seller and Purchaser. Purchaser is not a mere continuation of Seller or its bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to Seller or its bankruptcy estates.  Purchaser is not a successor to Seller or its bankruptcy estates by reason of any theory of law or equity;

(iv)     The Transactions are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(v)     This Agreement was negotiated at arms-length;

(vi)     The sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code;

(vii)     a determination that selling the Acquired Assets free and clear of all Liens is in the best interest of Seller's Estate;

(viii)     that Purchaser shall not assume or have any responsibility or liability whatsoever for any of the Excluded Liabilities; and

(ix)     that a portion of the Purchase Price in the amount of ten percent (10%) of the amount of the Estimated A/R Value and the Estimated Inventory Value, solely with respect to the Alliance Gaming Business (the "**Holdback Amount**") shall be paid into escrow with the Escrow Agent at Closing and which shall be released in accordance with Section 2.6(f).

(c)     If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code.

6.7     **Access to Facilities Personnel, and Information**. Prior to the Closing, Seller shall permit during normal business hours and in a manner that does not unreasonably interfere with ordinary business operations, representatives of Purchaser to have access to all premises, property, books, records (excluding Tax records), Contracts, and documents of or pertaining to the Business or any of the Acquired Assets which are under Seller's control (provided that any representatives of Purchaser shall be subject to the confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder). Purchaser shall not contact any of Seller's customers, vendors, and employees (current and former) without Seller's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

6.8     **Further Assurances.** Purchaser and Seller agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the Transactions contemplated by this Agreement, any Ancillary Agreements, and further secure to each party the rights intended to be conferred hereby and thereby.

6.9     **Tax Matters.**

(a)     All Transfer Taxes incurred in connection with the purchase and sale of the Acquired Assets shall be borne equally by Purchaser and Seller in each case when due. Purchaser shall file, to the extent required by applicable Law, all necessary Tax returns and other documentation with respect to all such Transfer Taxes. To the extent required by applicable Law, Purchaser will join in the execution of any such Tax returns or other documentation.

(b)    Purchaser and Seller agree that the Purchase Price and the assumption of any Assumed Liabilities (together with any other amounts treated as consideration for Income Tax purposes) (the "**Tax Purchase Price**") shall be allocated among the Acquired Assets in a manner that is in accordance with the allocation methodology set forth on <u>Exhibit D</u> hereto and Section 1060 of the Code and the Treasury Regulations promulgated thereunder (collectively, the "**Allocation Methodology**"). Purchaser and Seller shall negotiate in good faith, on or prior to the Closing Date, an allocation of the Tax Purchase Price among the Acquired Assets in accordance with the Allocation Methodology. Purchaser and Seller shall each file all Tax returns (and RS Form 8594, if applicable) on the basis of such agreed upon allocation set forth in the Allocation Schedule, and no party shall thereafter take a Tax return position inconsistent with such Allocation Schedule unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the Internal Revenue Service or other Governmental Body responsible for Taxes. Any adjustments to the Purchase Price pursuant to this Agreement shall be allocated in a manner consistent with the Allocation Schedule. Notwithstanding such allocation of the Tax Purchase Price, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any proceeding in the Chapter 11 Case that may be proposed. Seller reserves the right on its behalf and on behalf of its estate, to the extent not prohibited by applicable law and accounting rules, for purposes of any proceeding in connection with the Chapter 11 Case, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to Seller in the event of, or in order to resolve, creditor disputes in the Chapter 11 Case.

(c)    If requested by Purchaser, Seller shall notify all of the Taxing authorities in the jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax returns in connection with the Transactions in the form and manner required by such Taxing authorities, if the failure to make such notifications or receive any available tax clearance certificate (a "**Tax Clearance Certificate**") could subject Purchaser to any Taxes of Seller. If any Taxing authority asserts that Seller is liable for any Tax, Seller shall promptly pay or in good faith contest any and all such amounts and shall provide evidence to Purchaser that such liabilities have been paid in full or otherwise satisfied or contested.

6.10    **Public Announcements.** Purchaser nor Seller shall make any public announcements or statements concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (which consent may not be unreasonably withheld, condition or delayed), except as may be required by Law or stock exchange rules, in which case the party required to publish such public announcement or statement shall use reasonable best efforts to provide the other party a reasonable opportunity to comment on such public announcement or statement in advance of such publication; provided that the foregoing shall not apply to any public announcement or statement so long as any statements contained therein concerning the Transactions are consistent with previous public announcements or statements made by such party in compliance with this <u>Section 6.10</u>. Notwithstanding anything contained in this Agreement or in the Confidentiality Agreement to the contrary, Purchaser acknowledges and agrees that (i) Seller may provide copies of this Agreement to parties in interest in the Chapter 11 Case and to those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Acquired Assets or as otherwise necessary or desirable in connection with the Chapter 11 Case; and (ii) Seller shall also be entitled to file copies with the Bankruptcy Court or as otherwise required by applicable Law and shall be entitled to publish notice of the transactions contemplated by this Agreement in any newspaper selected by Seller.

7.    **EMPLOYEES.** Purchaser intends to offer continued employment to most employees of the Business on the same or similar terms as their current terms of employment; provided, however, that Purchaser is not obligated to offer continuing employment to any Seller employees, including, without limitation, senior management or executives. Purchaser, in its sole and absolute discretion, will identify those Seller employees that Purchaser chooses not to offer continued employment to prior to the Closing Date. Purchaser shall have no liability for any pay, benefits, severance, or other claims of any Seller

employees earned, accrued, or otherwise relating to the period prior to the Closing Date, and all such liabilities shall constitute Excluded Liabilities, and shall remain the sole responsibility of Seller and its Affiliates, as applicable. Purchaser shall have no obligation to provide any severance, payments, or benefits to any current or former employees or independent contractors of Seller or its Affiliates earned or accrued on or prior to the Closing Date. Seller shall be responsible for providing any notice required pursuant to the WARN Act or any similar Law that is triggered by any action that occurs on or prior to the Closing Date. Seller and Purchaser acknowledge and agree that all provisions contained in this <u>Section 7</u>, with respect to current or former Employees are included for the sole benefit of Seller and Purchaser, and that nothing herein, whether express or implied, shall create any third-party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of Seller, any participant in any Employee Benefit Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Purchaser.

8.    **TERMINATION; EFFECT OF TERMINATION.**

8.1    Termination. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by mutual, written consent of Purchaser and Seller;

(b)    by Purchaser in the event the Closing has not occurred (other than through failure of Purchaser to comply fully with its obligations under this Agreement) on or before April 25, 2025 (as such date may be extended by mutual agreement by Purchaser and Seller in writing, the "**Outside Closing Date**");

(c)    by Seller in the event the Closing has not occurred (other than through failure of Seller to comply fully with its obligations under this Agreement (including, but not limited to, the obligations set forth at <u>Section 6.3</u>)) on or before the Outside Closing Date;

(d)    by Purchaser if (i) Seller shall file a motion to sell all or part of the Acquired Assets to a third party other than Purchaser and shall thereafter consummate such sale, or (ii) Seller's Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code;

(e)    by Purchaser if any term of the Approval Order is not reasonably acceptable to Purchaser in any manner that is materially adverse to Purchaser; or

(f)    by the non-breaching party upon a material breach of any provision of this Agreement, provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement which breach is not cured).

8.2    **Effect of Termination.** If this Agreement is terminated pursuant to <u>Section 8.1(a)</u> of this Agreement or terminated by Purchaser pursuant to <u>Section 8.1(b), (d), (e) or (f)</u> of this Agreement, Purchaser and its Affiliates shall not have any Liability or obligations under this Agreement and the Escrow Agent shall promptly return the Deposit to Purchaser, unless Seller terminates pursuant to <u>Section 8.1(f)</u>. If Purchaser is not the prevailing purchaser or Back-Up Bidder, this Agreement will terminate, Purchaser and its Affiliates shall not have any Liability under this Agreement, and the Escrow Agent shall promptly return the Deposit to Purchaser; provided that the Bid Protections shall not be affected by the termination.  If this Agreement is terminated by Seller pursuant to <u>Section 8.1(f)</u> or <u>Section 8.1(c)</u> of this Agreement, Seller shall be paid the Deposit by the Escrow Agent and Purchaser and its Affiliates shall be released from any

further Liability under this Agreement and this Agreement shall otherwise be deemed null and void and of no further force and effect. Seller and Purchaser shall promptly (but in any event within two (2) Business Days after the termination of this Agreement) deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to return or pay the Deposit in accordance with this Section 8.2.

8.3    **Injunctive Relief.**  Each Party agrees that any breach of this Agreement would constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement.  Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief.  The rights set forth in this Section 8.3 shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.

9.    **GENERAL PROVISIONS.**

9.1    **"As Is", "Where Is", and "With All Faults" Transaction.** PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN SECTION 4 OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING (A) FINANCIAL PROJECTIONS, REVENUES, PROFITS OR INCOME TO BE DERIVED OR COSTS OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, (B) THE PHYSICAL CONDITION OF ANY ACQUIRED ASSETS, (C) THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE LEASED REAL PROPERTY OCCUPIED BY SELLER, (D) THE ZONING OF THE LEASED REAL PROPERTY OCCUPIED BY SELLER, (E) THE VALUE OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (F) THE TRANSFERABILITY OF THE ACQUIRED ASSETS, (G) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, (H) TITLE TO ANY OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (I) THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF FOR ANY PARTICULAR PURPOSE, OR (J) ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 4 OF THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 4 OF THIS AGREEMENT, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

9.2    **Transaction Expenses.** Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the Transactions are consummated.

9.3    **Certain Interpretive Matters and Definitions.** Unless the context requires, references to the plural include the singular and references to the singular include the plural; references to any gender

includes the other gender; the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation"; the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; and all references to Sections, Articles, or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

9.4     **Termination of Representations and Warranties.** The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

9.5     **Amendment.** Any provision of this Agreement may be amended if, but only if, such amendment is in writing and is signed by Seller and Purchaser (or by any successor to such Party)

9.6     **Waiver; Remedies Cumulative.** The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

9.7     **Notices.** All notices, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be given when hand delivered (or, if hand delivery is refused, on the date such delivery was attempted) or the date of delivery or refusal if sent by a nationally recognized overnight courier for next Business Day delivery to the addresses set forth below. A copy of all notices also shall be provided on the same Business Day.

Seller:      Diamond Comic Distributors, Inc.
             10150 York Road, Suite 300
             Hunt Valley, MD 21030
             Attention:  Charles Parker
             Email: pchuck@diamondcomics.com

             And

             Robert Gorin
             c/o Getzler Henrich & Associates LLC
             295 Madison Avenue
             20th Floor
             New York, NY 10017
             Email: rgorin@getzlerhenrich.com

Copy to:     Saul Ewing, LLP
             1500 Market Street, 38th Floor
             Philadelphia, PA 19102
             Attention: Jeffrey C. Hampton; Adam H. Isenberg
             Email: jeffrey.hampton@saul.com; adam.isenberg@saul.com

| | |
|---|---|
| Purchaser: | Alliance Entertainment, LLC<br>c/o Alliance Entertainment Holding Corporation<br>8201 Peters Road, Suite 1000<br>Plantation, FL 33324<br>Attention: Bruce Ogilvie and Jeffrey Walker<br>Email: Bruce.Ogilvie@aent.com and jeffw@SDCD.com |
| Copy: | Sills Cummis & Gross P.C.<br>One Riverfront Plaza<br>Newark, NJ 07102<br>Attention: William L. Wilkins<br>Email: wwilkins@sillscummis.com |

A party may designate another address by giving notice in accordance with this Section.

9.8     **Jurisdiction.** The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof; provided that in the event the Chapter 11 Case has concluded or been dismissed or the Bankruptcy Court declines to exercise jurisdiction or lacks jurisdiction, in each instance with respect to any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof, then exclusive jurisdiction shall be in the federal or state courts for the State of Maryland.

9.9     **Governing Law.** To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

9.10     **Damages.** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

9.11     **Time is of the Essence.** Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

9.12     **Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

9.13     **Titles and Headings.** Titles and headings of Sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

9.14     **Assignment; Successors and Assigns.** This Agreement and the rights, duties and obligations hereunder may not be assigned by any Seller without the prior written consent of Purchaser, and any attempted assignment without consent shall be void. Subject to this paragraph, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns. Notwithstanding the foregoing, this Agreement may be assigned by Purchaser to an Affiliate, provided that such Affiliate assumes all of the obligations of Purchaser under this Agreement; provided further that

Purchaser shall not be released of its obligations under this Agreement such that Purchaser and its Affiliate shall be jointly and severally liable for the performance of the obligations of Purchaser hereunder.

9.15    **No Third-Party Rights.** The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

9.16    **Confidentiality Agreement.** The parties acknowledge that the Confidentiality Agreement dated October 18, 2024 between DCD (through Raymond James & Associates, Inc., as DCD's Representative) and Alliance Entertainment Holding Corporation, a Delaware corporation (the "**Confidentiality Agreement**") shall remain in full force and effect during the term specified therein.

9.17    **Entire Agreement.**  This Agreement, any Ancillary Agreements, and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, any Ancillary Agreements, or the Confidentiality Agreement.

9.18    **Prevailing Party.**  If any litigation or other court action, arbitration or similar adjudicatory proceeding is sought, taken, instituted or brought by Seller or Purchaser to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing party in such action, suit or proceeding shall be borne by the party against whose interest the judgment or decision is rendered.  This Section 9.18 shall survive and the Closing.  Seller agrees that any amounts awarded to Purchaser pursuant to this Section 9.18 shall be payable as administrative expenses pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

9.19    **Execution of this Agreement**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

9.20    **Survival**. None of the representations or warranties of the Parties set forth in this Agreement, or any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing.  Other than the requirements of further assurances and actions specifically identified to be taken post-Closing, all other covenants of the Parties shall expire upon Closing. This Section 9.20 shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing.  The obligations, limitations and rights provided for under this Section 9 shall survive any termination of this Agreement.

9.21    **Lot B Business Inventory Treatment.**  Purchaser shall sell the Lot B Business Inventory in the ordinary course of the Business consistent with past practice (i.e. as operated by Seller prior to the Closing) unless such Inventory is aged or obsolete.  Items contained in the Lot B Business Inventory shall be sold by Purchaser prior to Purchaser's sale of like inventory acquired by Purchaser on or after the Closing Date other than pursuant to this Agreement.

9.22.    **WAIVER OF JURY**.  EACH PARTY HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF OR ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR

ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

[*Signature page follows*]

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the Effective Date.

**SELLER**:

DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation

By: _____
Name: Robert Gorin
Title: Chief Restructuring Officer


DIAMOND SELECT TOYS & COLLECTIBLES, LLC

By: _____
Name: Robert Gorin
Title: Chief Restructuring Officer


**PURCHASER**:
ALLIANCE ENTERTAINMENT, LLC
a Delaware limited liability company,


By: _____
Name:  Bruce Ogilvie
Title: Chairman

-35-

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the Effective Date.

**SELLER**:

DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation

By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

DIAMOND SELECT TOYS & COLLECTIBLES, LLC

By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

**PURCHASER**:
ALLIANCE ENTERTAINMENT, LLC
a Delaware limited liability company,

By:_____
Name:  Bruce Ogilvie
Title: Chairman

**Exhibit A - Master Assignment**

This **ASSIGNMENT, BILL OF SALE AND CONVEYANCE AGREEMENT** (this "**Agreement**"), dated as of [•], 2025 (the "**Effective Date**"), is made and entered into by and between Diamond Comic Distributors, Inc., a Maryland corporation ("**DCD**"), Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("**Diamond Select**") and Alliance Entertainment, LLC, a Delaware limited liability company ("**Purchaser**") (each a "**Party**" and collectively, the "**Parties**"). DCD and Diamond Select shall each be referred to herein as a "**Seller**" and collectively as "**Seller**".

<u>RECITALS</u>

WHEREAS, Purchaser and Seller are parties to that certain Asset Purchase Agreement, dated as of April 10, 2025 (the "**Purchase Agreement**").

WHEREAS, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, the Parties are executing and delivering this Agreement pursuant to Section 3.5 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Sale and Transfer of Acquired Assets**. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to, and subject to the terms and conditions of, the Purchase Agreement and that certain Order (A) Authorizing and Approving the Sale of Substantially All the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Establishing a Designation Period and Deadlines for the Assumption and Assignment Or Novation of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief entered on [•], 2025 [**NTD: Conform to caption of Final Order**] by the United States Bankruptcy Court for the District of Maryland in Case [_____] (the "**Approval Order**"), effective as of the Effective Date, Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser, and Purchaser hereby accepts, purchases, acquires, assumes and takes delivery of, all of Seller's right, title and interest in and to the Acquired Assets, free and clear of all Liens to the extent provided in the Approval Order. For the avoidance of doubt, Seller is not selling, conveying, assigning, transferring, or delivering to Purchaser any of the Excluded Assets, and all right, title, and interest in and to such Excluded Assets are hereby and shall be retained by Seller. Seller agrees to execute, acknowledge (where appropriate), and deliver such bills of sale, assignments, certificates of title, and other instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement or the Purchase Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Seller.

2.    **Liabilities**. Subject to the terms and conditions of the Purchase Agreement, Purchaser does not and shall not assume and does not agree to pay, perform, fulfill or discharge, and shall not be responsible to pay, perform, fulfill or discharge any of Seller's Liabilities other than the Assumed Liabilities, except as may be provided otherwise in the Approval Order and Purchaser shall be responsible for the Cure Amounts. Subject to the terms and conditions of the Purchase Agreement, Purchaser shall be liable for all Liabilities arising in connection with the Acquired Assets, in each case solely to the extent arising after the Effective Date.

3.     **Entire Agreement**. This Agreement, together with the Approval Order, the Purchase Agreement, and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

4.     **Amendment and Waiver**. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

5.     **Terms of the Purchase Agreement**. This Agreement is entered into pursuant to, and subject to all of the terms and conditions of, the Purchase Agreement and the Approval Order. Nothing contained in this Agreement shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser contained in the Purchase Agreement or any provision of the Approval Order. In the event of any conflict or inconsistency between this Agreement and the Purchase Agreement and/or the Approval Order, the terms of the Purchase Agreement and Approval Order shall prevail.

6.     **Cooperation**.  Seller, for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Purchaser, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers and conveyances as may be reasonably requested by Purchaser in order to assign, transfer, convey and confirm unto and vest in Purchaser, its successors and assigns, title to the assets sold, conveyed and transferred by this Agreement.

7.     **Governing Law**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

8.     **Binding Effect**. This Agreement is being executed by Seller and Purchaser and shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns, for the uses and purposes above set forth and referred to, and shall be effective as of the Effective Date. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

9.     **Counterparts**. This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution," signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law.

10.     **Headings**. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the Effective Date.

<b>SELLER</b>:

DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation


By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer


DIAMOND SELECT TOYS & COLLECTIBLES, LLC


By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer


**PURCHASER**:
ALLIANCE ENTERTAINMENT, LLC
a Delaware limited liability company,


By:_____
Name:  Bruce Ogilvie
Title: Chairman

**Execution Version**

**<u>Exhibit B</u>**

**\*\*Not applicable to this APA\*\***

**Execution Version**

## **Exhibit C**

**\*\*Not applicable to this APA\*\***

**Execution Version**

### Exhibit D - Tax Purchase Price Allocation

**[To be agreed upon by Purchaser and Seller]**

**Execution Version**

**Exhibit E - Estimated Value Statement**

**[To be provided two (2) Business Days prior to the Closing]**

**Execution Version**

**Schedule A - Critical Vendor List**

**\*\*Not applicable to this APA\*\***

## Schedule 2.1(c) - Assigned Contracts

| Cure Contracts Name | Asset | Cure |
|---|---|---|
| 74850, INC. | Diamond Select Toys & Collectibles | $ - |
| accessiBe Ltd. | Diamond Select Toys & Collectibles | $ - |
| Arcane Tinmen ApS | Alliance Game Distributors | $ 136,967 |
| Ares Games, Srl | Alliance Game Distributors | $ 10,699 |
| Card Department, A Department of Bandai Co., LTD. | Alliance Game Distributors | $ 3,122,733 |
| Chessex MFG | ****[Missing Contract] | $ - |
| Comic-Con 2025 | Diamond Comic Distributors | $ - |
| Creative Mind Energy | Diamond Comic Distributors | $ 12,879 |
| Cryptozoic Entertainment | Diamond Comic Distributors | $ 352 |
| da Vinci Editrice S.r.l. d/b/a DV Giochi or DV Games | Alliance Game Distributors | $ 19,018 |
| Dire Wolf Digital, LLC Games, Inc. | Alliance Game Distributors | $ 303,645 |
| Fanroll | ****[Missing Contract] | $ - |
| Flat River Group | ****[Missing Contract] | $ - |
| Goodman Games LLC | Diamond Comic Distributors | $ 160,974 |
| GREEN RONIN PUBLISHING | Diamond Comic Distributors | $ 6,361 |
| Gut Bustin' Games, LLC | Alliance Game Distributors | $ - |
| Hasbro Consumer Products Licensing Limited | Diamond Select Toys & Collectibles | $ - |
| Imagine Fulfillment Services, LLC | Diamond Select Toys & Collectibles | $ 4,839 |
| Jasco Games LLC dba UVS Games | Alliance Game Distributors | $ 14,450 |
| Konami Digital Entertainment, Inc. | Alliance Game Distributors | $ 26,400 |
| Leder Games | ****[Missing Contract] | $ - |
| Lions Gate Ancillary LLC | Diamond Select Toys & Collectibles | $ - |
| Monster Fight Club | Alliance Game Distributors | $ 30,194 |
| Neca | ****[Missing Contract] | $ - |
| Netflix CPX, LLC and Netflix CPX International, B.V. | Diamond Select Toys & Collectibles | $ - |
| PAIZO INC | Alliance Game Distributors | $ 139,446 |
| Publisher Services, Inc (PSI) | Alliance Game Distributors | $ 377,611 |
| Ravensburger North America Inc. | Alliance Game Distributors | $ 11,373 |
| Renegade Games, Inc. | Alliance Game Distributors | $ 164,968 |
| Sirius Dice | ****[Missing Contract] | $ - |
| Skybound, LLC (Invincible) | Diamond Select Toys & Collectibles | $ - |
| Skybound, LLC (TWD) | Diamond Select Toys & Collectibles | $ - |
| Skyscraper Studios, Inc. d/b/a Roll for Combat | Alliance Game Distributors | $ 4,782 |
| Spin Master Ltd. | Diamond Comic Distributors | $ 93,688 |
| Synthesis Entertainment | Diamond Select Toys & Collectibles | $ - |
| Tee Turtle LLC | Alliance Game Distributors | $ 73,173 |
| The Army Painter | Alliance Game Distributors | $ 598,974 |
| The Pokémon Company International, Inc. | Alliance Game Distributors | $ 283,802 |
| The Upper Deck Company | Alliance Game Distributors | $ 1,820 |
| Toho International Inc. | Diamond Select Toys & Collectibles | $ - |
| Toho International Inc. and Legendary Licensince, LLC | Diamond Select Toys & Collectibles | $ 20,000 |
| Ultra Pro International LLC | Alliance Game Distributors | $ 51,302 |
| USAOPOLY, Inc. | Alliance Game Distributors | $ 29,782 |
| VIZ Media LLC | Diamond Comic Distributors | $ 268,308 |
| Wizards of the Coast | Alliance Game Distributors | $ - |
| **Total** | | **$ 5,968,538** |

**Schedule 2.3 - Assumed Liabilities**

**\*\*Not applicable to this APA\*\***

**Schedule 3.3(c) – Assigned Contracts (Requiring Consent)**

**\*\*Not applicable to this APA\*\***

**Schedule 4.3 - Liens**

**None.**

**Schedule 4.4 - Contracts and Leases**

**None.**

**Schedule 4.6 – Seller Broker**

**None.**