UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

```
                            .
 IN RE:                     .        Chapter 11
                            .
 Diamond Comic Distributors,.
 Inc.,                      .
                            .
          Debtor.           .        Bankruptcy #25-10308 (DER)
.............................................................
```

Baltimore, Maryland
April 7, 2025
10:04 a.m.

BEFORE THE HONORABLE DAVID E. RICE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


TRANSCRIPT OF:

[160]  NOTICE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS,
INC.,

[168]  MOTION TO SELL FREE AND CLEAR OF LIENS AND NOTICE OF
MOTION FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.

[194]  NOTICE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS,
INC.,

[211]  MOTION TO SEAL FILED BY DEBTOR DIAMOND COMIC
DISTRIBUTORS, INC.

[215]  OBJECTION FILED BY INTERESTED PARTY AIREIT OLIVE BRANCH
DC LLC, INTERESTED PARTY ANSON LOGISTICS ASSETS LLC

[216]  RESPONSE FILED BY CREDITOR THE POKEMON COMPANY
INTERNATIONAL, INC.

[217]  RESPONSE FILED BY CREDITOR DYNAMIC FORCES, INC.

[249]  OBJECTION FILED BY CREDITOR COMMITTEE UNSECURED
CREDITORS COMMITTEE

[251]  OBJECTION FILED BY CREDITOR JPMORGAN CHASE BANK, N.A

[264]  OBJECTION FILED BY INTERESTED PARTY AIREIT OLIVE BRANCH DC LLC, INTERESTED PARTY ANSON LOGISTICS ASSETS LLC

[269]  RESPONSE FILED BY CREDITOR THE POKEMON COMPANY INTERNATIONAL, INC.

[270]  NOTICE FILED BY DEBTOR DIAMOND COMIC DISTRIBUTORS, INC.

[271]  OBJECTION FILED BY CREDITOR IMAGE COMICS, INC.

[306]  OBJECTION FILED BY CREDITOR BANDAI NAMCO TOYS & COLLECTIBLES AMERICA, INC, AND BANDAI CO., LTD.

[308]  DECLARATION FILED BY INTERESTED PARTY ALLIANCE ENTERTAINMENT, LLC

[309]  OBJECTION FILED BY INTERESTED PARTY SKYRUSH MARKETING, INC.

[312]  OBJECTION FILED BY INTERESTED PARTY AIREIT OLIVE BRANCH DC LLC, INTERESTED PARTY ANSON LOGISTICS ASSETS LLC


 APPEARANCES:

 For The Debtor:              Mark Minuti, Esq.
                              Saul Ewing, LLP
                              1201 North Market St.-Ste. 2300
                              Wilmington, DE 19899

                              Paige N. Topper, Esq.
                              Saul Ewing, LLP
                              1001 Fleet Street-9th Fl.
                              Baltimore, MD 21202

                              Jeffrey C. Hampton, Esq.
                              Saul Ewing, LLP
                              Centre Square West
                              1500 Market St.-38th Fl.
                              Philadelphia, PA 19102

                              Adam H. Isenberg, Esq.
                              Saul Ewing, LLP
                              Centre Square West
                              1500 Market St.-38th Fl.
                              Philadelphia, PA 19102

| | |
|---|---|
| For Unsecured Creditor's Committee: | Dennis J. Shaffer, Esq.<br>Tydings & Rosenberg<br>1 E. Pratt St.-Ste. 901<br>Baltimore, MD 21202 |
| | Stephen B. Gerald, Esq.<br>Tydings & Rosenberg<br>200 Continental Srive-Ste. 401<br>Newark, DE 19713 |
| | Gianfranco Finizio, Esq.<br>Lowenstein Sangler, LLP<br>1251 Ave. Of the Americas<br>New York, NY 10020 |
| | Michael Papandrea, Esq.<br>Lowenstein Sangler, LLP<br>One Lowenstein Drive<br>Roseland, NJ 07068 |
| For AIREIT Olive Branch DC, LLC and Anson Logistic Assets, LLC: | Laura S. Bouyea, Esq.<br>Venable, LLP<br>750 Pratt St.-Ste. 900<br>Baltimore, MD 21202 |
| For Alliance Entertainment, LLC: | Jonathan A. Grasso, Esq.<br>YVS Law, LLC<br>Ste. 130<br>185 Admiral Cochrane Drive<br>Annapolis, MD 21401 |
| | S. Jason Teele, Esq.<br>Sills Cummis & Gross<br>The Legal Center<br>One Riverfront Plaza<br>Newark, NJ 07102 |
| For Creditor, JPMorgan Chase Bank, NA: | David L. Ruediger, Esq.<br>Troutman Pepper Locke, LLP<br>111 Huntington Ave.-9th Fl.<br>Boston, MA 02199 |
| | Katherine Culbertson, Esq.<br>Troutman Pepper Locke, LLP<br>701 8th St., NW, Ste. 500<br>Washington, DC 20001 |

4

| For The Pokemon Company International, LLC: | Junior Dufort, Esq.<br>Perkins Coie, LLP<br>700 Thirteenth St., NW-Ste. 800<br>Washington, DC 20005 |
| For Bandai Namco Toys & Collectibles America, Inc. and Bandai Co., Ltd.: | Gary H. Leibowitz, Esq.<br>Cole Schotz, PC<br>1201 Wills Street-Ste. 320<br>Baltimore, MD 21231 |
| For U.S. Trustee's Office: | Hugh M. Bernstein, Esq.<br>Office of the U.S. Trustee<br>101 W. Lombard St.-Ste. 2625<br>Baltimore, MD 21201 |
| Audio Operator: | Cherita Scott |
| Transcribing Firm: | Writer's Cramp, Inc.<br>1027 Betty Lane<br>Ewing, NJ 08628<br>609-588-8043 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

5

## Index

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Haesler | 40 | 87 | | | |
| Mr. Richards | 93 | 99 | | | |
| Mr. Gorin | 103 | 131 | 147 | | |
| **Witnesses For Alliance:** | | | | | |
| Mr. Navid | 152 | 176 | 209 | | |
| Mr. Ogilvie | 215 | 219 | | | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| A-06 | Asset Purchase Agreement | 138 | |
| A-A | Bid Calculation | 163 | |
| A-6 | Declarationof Bruce Ogilvie | 198 | |
| A-8 | Declaration of Paul Navid | 161 | 228 |
| D-A | Alliance Final Bid | 64 | 52 |
| D-1 | Declaration of Alec Haesler | 41 | |
| D-3 | Asset Purchase Agreement | 42 | 83 |
| D-4 | Transcript of Auction | 60 | |
| D-5 | Nondisclosure Agreement | 124 | 151 |
| D-7 | Purchase Price Calculator | 52 | 82 |
| D-8 | APA Draft From Alliance (3/26/25) | 64 | 84 |
| D-9 | Alliance APA - Redline (3/27/25) | 65 | 84 |
| D-10 | Alliance APA - Redline (3/27/25 | 67 | 85 |
| D-11 | Alliance APA - Redline (3/28/25) | 68 | 85 |
| D-12 | Alliance APA - Redline (3/31/25) | 69 | 85 |
| D-14 | Alliance APA - Redline (4/1/25) | 70 | 85 |
| D-17 | E-mail | 118 | 119 |
| D-18 | Document | 73 | 86 |
| D-19 | Sparkle POP - APA | 71 | 86 |
| D-20 | Reconciliation Bid | 74 | |

1          THE CLERK:  All rise.  The United States Bankruptcy

2   Court for the District of Maryland is now in session, the

3   Honorable Chief Judge David E. Rice presiding.  Please be

4   seated and come to order.  On the 10:00 o'clock Docket,

5   calling the case of Diamond Comic Distributors, Inc., Case

6   #25-10308.  Counsels, please step to the podium, identify

7   yourselves and your clients for the record.

8          MR. MINUTI:  Good morning, Your Honor.  Mark Minuti

9   from Saul Ewing.  I'm here today with the debtors.  At counsel

10  table with me are my colleagues, Jeffrey Hampton, Paige Topper

11  and Adam Isenberg.  Also in the courtroom, Your Honor, I will

12  point out is Robert Gorin.  He's the master director of

13  Getzler Henrich and are co-CRO.  Also in the courtroom today,

14  Your Honor, is Alec Haesler of Raymond James, our

15  court-approved investment banker.  Than you.

16          THE COURT:  Good morning to all of you.

17          MR. TEELE:  Good morning, Your Honor.  I'm Jason

18  Teele, Sills Cummis and Gross, and I'm representing Alliance

19  Entertainment, LLC.  And with me this morning, Your Honor, is

20  Jonathan Grasso, our Baltimore counsel in this case.  And

21  toward the back of the courtroom is Bruce Ogilvie who's the

22  Chairman of the Board of Alliance Entertainment and Paul Navid

23  of the Province firm who's Alliance's investment banker.

24          THE COURT:  Good morning to all of you.

25          MR. GRASSO:  Good morning.

1          MR. FINIZIO:  Good morning, Your Honor.  For the
2    record, Gianfranco Finizio, Lowenstein Sandler, counsel to the
3    Creditors' Committee.  I'm joined by my colleague, Mike
4    Papandrea, as well as our Baltimore counsel from the Tydings'
5    firm, Steve Gerald and Dennis Shaffer.
6          THE COURT:  Good morning.
7          MR. BERNSTEIN:  And good morning, Your Honor.  Hugh
8    Bernstein on behalf of the United States Trustee.
9          THE COURT:  Good morning to you.
10          MS. CULBERTSON:  Good morning, Your Honor.
11    Katherine Culbertson of Troutman Pepper Locke and I'm here on
12    behalf of JPMorgan, the DIP lender.  And in the back are my
13    colleague, David Ruediger.
14          THE COURT:  Good morning to both of you.
15          MR. DUFORT:  Good morning, Your Honor.  Junior
16    Dufort of Perkins Coie and I'm representing Pokemon Company
17    International, Incorporated.
18          THE COURT:  Good morning, sir.
19          MS. BOUYEA:  Good morning, Your Honor.  Laura Bouyea
20    and Venable on behalf of AIREIT Olive Branch DC, LLC and Anson
21    Logistics Assets, LLC.
22          THE COURT:  Good morning.  One more.
23          MR. LEIBOWITZ:  Good morning, Your Honor.  Gary
24    Leibowitz of Cole Schotz on behalf of Bandai Namco.
25          THE COURT:  Good morning to you.

1          MR. LEIBOWITZ:  Thank you.

2          THE COURT:  Well, Mr. Minuti, you have us gathered

3    here for the debtor's motion to approve the sale.  I'll turn

4    the proceedings over to you.

5          MR. MINUTI:  Thank you very much, Your Honor.

6    Again, for the record, Mark Minuti of Saul Ewing on behalf of

7    the debtors.  Notwithstanding the weather, Your Honor, it's a

8    great day to be here in Baltimore today to seek Court approval

9    of our proposed sale of substantially all of the debtor's

10   assets.  When I was before Your Honor last week, I reported

11   that the auction in this case was very successful.  As the

12   Court will recall, we had a stalking horse bid that was valued

13   at 39 million dollars.  At the end of the auction, Your Honor,

14   the highest bid was presented by an entity known as Alliance

15   Entertainment, LLC.  That bid was valued at $72,245,000.  The

16   second highest bid was provided by a combined bid of two

17   companies, Universal Distribution, LLC and Ad Populum, LLC

18   with a bid value of $69,130,000.

19       As I also reported last week, Your Honor, as we tendered

20   the document on Alliance Entertainment's bid by way of an

21   asset purchase agreement, it became clear that the parties

22   were not in agreement as to the value of the bid submitted by

23   Alliance Entertainment at the auction.  As we traded asset

24   purchase agreements, Alliance Entertainment ultimately made a

25   number of changes to align certain provisions of its asset

1   purchase agreement with its bid but by April 1 there remained
2   a significant disagreement related to whether or not the APA
3   that was ultimately submitted complied with their bid and
4   specifically included payment for what we call "prepaid
5   inventory".  That would be the inventory that the debtors paid
6   for that would likely not arrive until post-closing.  And that
7   issue, Your Honor, is a 4.3 million dollar issue.
8       Now, there's a lot of back and forth and I suspect we're
9   going to get into some of that today, Your Honor, but as I
10  said last week, at the end of the day I don't really believe
11  it's ultimately relevant to the Court's decision today.
12  Regardless of whose understanding of the bid was correct, the
13  bottom line is that by 4:00 p.m., the day before last week's
14  hearing, the parties were not in agreement and the bid
15  submitted by Alliance Entertainment was lower, it was not the
16  highest bid.  Absent inclusion of the prepaid inventory, Your
17  Honor, it was a lower bid.  This really can't be disputed.
18      Now, the debtors have a duty, Your Honor, a fiduciary
19  duty to maximize value.  So about an hour so the debtors
20  ultimately informed Alliance at that time that they were going
21  to move forward with the backup bidders and present that --
22  those bids for approval at the hearing last week.  About an
23  hour after informing Alliance that the debtors were proceeding
24  with the backup bidder, we heard from counsel for Alliance
25  Entertainment that it would change its APA to include prepaid

1    inventory and they followed up with a further markup of the

2    asset purchase agreement.

3        Now, on Friday, Your Honor, Alliance Entertainment filed

4    an affidavit of Mr. Navid which contains yet another version

5    of the asset purchase agreement.  But in the debtor's business

6    judgment, it was too late -- too little too late, Your Honor.

7    The debtors in the exercise of their business judgment have

8    determined that the combined bid of Universal and Ad Populum

9    is the highest and best bid to move forward today.  Remember,

10   the standard is not just highest, it's highest and best.  We

11   believe the backup bid is the highest and best bid and we're

12   prepared to put on evidence to show why the debtors reached

13   that conclusion today.

14       At the outset, Your Honor, I do want to talk about

15   Alliance Entertainment's standing to appear today.  As we sit

16   here today, Your Honor, we do not understand that Alliance

17   Entertainment is a creditor of these estates.  Further, to our

18   knowledge, Alliance Entertainment has not filed a formal

19   objection to today's -- to the sale motion or today's hearing.

20   As the Court is well aware, Section 1109(b) of the Bankruptcy

21   Code confer standing on a number of parties, including parties

22   in interest, but that is defined, Your Honor, as the debtor, a

23   couple of other enumerated parties, but parties in interest.

24   We submit they're not a party in interest.  The caselaw is

25   clear that a frustrated bidder, like Alliance Entertainment,

1   does not have standing to oppose the debtor's sale of assets.

2   And I would cite for the Court In Re John Keim, 212 B.R. 493.

3   That's a decision out of the United States Bankruptcy Court

4   for the District of Maryland and that appears at Footnote

5   Number 3.  In that case the Court cited In Re Nepsco, Inc.,

6   36 B.R. 25, for the proposition that the statutory scheme

7   makes clear that the rules governing 363 sales are designed to

8   protect and provide flexibility to the debtors.  And the Court

9   ultimately concluded that nothing in the statutory scheme is

10  there to indicate that prospective purchasers are within the

11  zone of interest intended to be protected by the statutory

12  scheme.

13       In candor to the Court there are some cases outside of

14  the Fourth Circuit that we were able to find where there is an

15  exception to that rule for an unsuccessful bidder if that

16  unsuccessful bidder is challenging the intrinsic structure of

17  the sale because it was tainted by fraud, mistake or

18  unfairness.  See, for example, Moran versus Moran, 566 F.3d

19  676.  That's a Sixth Circuit case from 2009.  However, we

20  could not find any opinions in the Fourth Circuit adopting

21  that exception; and therefore, Your Honor, we don't believe

22  Alliance Entertainment has standing to challenge the sale and

23  we would ask that the Court deny them standing today and allow

24  us to proceed.

25            THE COURT:  Okay.  I understand your position.  Is

1    anyone else here today wishing to be heard in support of the

2    motion?  Mr. Finizio?

3            MR. FINIZIO:  Good morning, Your Honor.  Well,

4    notwithstanding the success of the auction, the committee

5    finds itself in a very, very unusual position and that's

6    putting aside the adversary proceeding and related pleadings

7    that were filed by Alliance late last night.  That position is

8    that the debtors are determined to move forward with the

9    backup bids rather than Alliance's bid which was designated,

10   as you heard, as the successful bid at the auction.  To say

11   that this is an uncommon posture is probably an

12   understatement.  Thus as both the consultation party and the

13   fulcrum creditor class, the committee has spent the last

14   several days trying to understand the debtor's rationale for

15   moving forward with the backup bids instead of Alliance's bid.

16       Now, while Alliance's bid is higher in terms of cash

17   consideration to the estate -- and I trust we'll hear evidence

18   on that -- the question is whether Alliance's bid is the

19   highest and best bid.  And in that latest phrasing, whether it

20   is the best bid is where the debtors and the committee do have

21   concerns.  For example, you'll hear today that the debtors

22   will cite the execution risk and the potential inability to

23   close as a reason for going with the backup bids.  Now if

24   that's true -- and we'll wait for the evidence on that point

25   -- that is of course a valid concern.  However, the committee,

1   in speaking with Alliance's representatives, they state quite
2   adamantly that there is no such risk as an ability to close.
3        Basically, what the committee has uncovered in the last
4   couple of days is that for every point the debtors have raised
5   in support of moving forward with the backup bid, Alliance has
6   a very different and oftentimes conflicting position with the
7   debtors.  As a result, unsecured creditors are caught in a
8   crossfire between the debtors and an aggrieved bidder.
9   Meanwhile, estate resources are whittling away, professional
10  fees are racking up, and a process that's geared towards
11  maximizing value is turning into one that is maximizing
12  litigation.  The committee has endeavored to play the role of
13  honest broker here to see if the debtor's concern regarding
14  Alliance and its bid could be addressed before today's
15  hearing.  Unfortunately, the filing of the adversary
16  proceeding and the TRO that were filed late last night changed
17  everything.

18       Amidst all this uncertainty, Your Honor, there is one
19  thing that is crystal clear to the committee.  We need to
20  bring this process to a close.  The sale hearing was admitted
21  twice already.  This business is fragile.  We heard as much at
22  the Keep (phonetic) hearing last week and we are in bankruptcy
23  with limited DIP funding and impending DIP milestones.  Simply
24  put, the estate and its creditors cannot afford the risks
25  associated with this rock fight.  Otherwise, tens of millions

1   of dollars in claims, including approximately 45 to 50 million

2   dollars of unsecured claims could end up as collateral damage.

3        Your Honor, this is not the first time that an aggrieved

4   or losing bidder has taken issues with the results of a sale

5   and I trust it won't be the last.  But if the sale motion

6   doesn't go forward today, everyone will lose in one way or

7   another.  So for those reasons, Your Honor, we believe the

8   Court should hear the evidence from all sides as to the sale

9   motion and adjudicate that motion once and for all.  For the

10  committee's part and given the he-said-she-said as between

11  Alliance and the debtors, we too are interested in hearing the

12  evidence, the testimony under oath, and understanding whether

13  it is prudent to move forward with the backup bids.  It may

14  very well be but we believe that process should go forward

15  today.  And as I noted, while the math says that Alliance's

16  bid is higher in terms of cash, the litigious posture that has

17  taken -- that Alliance has taken and the overall friction

18  between the debtors and Alliance suggest that it may not be

19  the best bid for the estate.  Keep in mind that both bids,

20  Alliance's bid and the bid of the backup bidders, require the

21  debtors and the estate to continue to partner with those

22  parties for eight months post-closing.  So if these parties --

23  and I'm speaking as to specifically Alliance -- if Alliance

24  and the debtors have an inability to cooperate and get to yes

25  on some basic fundamental issues with respect to their bid,

1  who knows what the next eight months will hold with respect to

2  important components of their bid, specifically an incentive

3  amount that is projected to result in approximately 10 million

4  dollars in proceeds.  And those 10 million dollars are likely

5  -- a lion's share of those proceeds are likely recoveries for

6  unsecured creditors.

7       Really briefly regarding the adversary proceeding, Your

8  Honor, that really left us scratching our head.  We're not

9  sure how an aggrieved bidder can file a TRO and request a

10  declaratory judgment stating that it is the winning bidder.

11  That seems to undercut not only this sale process but any

12  sales process.  And it clearly attempts to strip the debtors

13  of their ability to exercise their business judgment.  One

14  final point, Your Honor.  Sometime over the weekend -- the

15  days are honestly blurring together -- the debtors filed a

16  sale -- a proposed sale order and APAs.  The committee is

17  still in the process of reviewing those.  So however this

18  process shakes out today, I just want to make clear for the

19  record that the committee reserves its rights on commenting on

20  those documents, especially the proposed sale order that was

21  filed over the weekend.  I'm happy to answer any questions,

22  Your Honor.

23          THE COURT:  Well let me ask you this because it's

24  something I noticed in what was filed last night and per your

25  prediction I'm sure the debtor and Alliance will have

1    conflicting versions of their interpretation of the facts and

2    what the Court should find.  Paragraph 41 of the complaint

3    says:  "Ad Populum does not have the financial wherewithal to

4    close a transaction in the Ad Populum APA.  It does not have

5    audited financial statements.  It has assigned its rights

6    under the Ad Populum APA to a third party who is not a bidder

7    at the auction and does not qualify to bid under the bid

8    procedures order."  Does the committee have a view on what the

9    evidence is likely to show on that allegation?

10           MR. FINIZIO:  So Your Honor, we do have a view.  I'm

11   not aware of there being any lack of wherewithal with respect

12   to Ad Populum.  If there was, I'm confident that the debtors

13   would have raised that point at the auction prior to

14   designating them the backup bidder.  Ad Populum has provided

15   evidence of their ability to close.  And if there were issues

16   with that, again, I'm confident that would have been raised at

17   the auction.  With respect to Ad Populum assigning their

18   rights to a third party, as far as I'm aware, this alleged

19   third party is just an entity that was created by Ad Populum

20   for purposes of consummating the sale transaction which is

21   quite typical in processes of this type.  So I don't think it

22   was assigned to some third party but rather there was a

23   holding company or something to that nature, an SPV, that was

24   created to separate this business from Ad Populum's other

25   businesses.

1        THE COURT:  All right.  Thank you.  Anyone else

2   before I turn to Alliance?

3        MS. CULBERTSON:  Good morning, Your Honor.  Again,

4   Katherine Culbertson of Troutman Pepper Locke on behalf of

5   JPMorgan Chase, the DIP lender.  JPMorgan -- on behalf of

6   JPMorgan, we are supportive of the debtor's business judgment

7   in selecting the highest and best bid, with the goal of

8   getting a transaction closed as quickly as possible.  As Your

9   Honor is aware, the debtor's liquidating needs in this case

10  have been substantial and the loan balance owing from JPMorgan

11  has increased slightly from more than 30 million at the

12  beginning of the proceeding to close to 45 million now.

13  Indeed Your Honor will recall, the parties came before you

14  quite recently to seek a final increase to the maximum DIP

15  facility amount so that we could make sure the debtor had the

16  liquidity needs to bridge to closing of a transaction.  These

17  liquidity and timing issues are critical importance in

18  evaluating how to select a highest and best bid and to proceed

19  to closing of a sale transaction.  Simply stated, in order to

20  manage liquidity and comply with the milestones in the final

21  DIP order, the debtors need to conclude and close this

22  transaction as quickly as possible and simply cannot afford to

23  be wrong in choosing the bidder or bidders to be the winning

24  bid.  A party that fails to close timely or pay the full

25  purchase price contracted for will do substantial damage to

1    this bankruptcy estate and all of its stakeholders.

2        The bidding procedures approved by this court grant the

3    debtors, in consultation with the committee and the DIP

4    lender, substantial discretion to choose the highest and best

5    bid in this auction process.  Those bidding procedures also

6    expressly permit the debtors to consider execution risks and

7    certainty of closing in choosing the winning bidder.  Our

8    understanding is that the debtor and their professionals have

9    considered precisely those issues in designating Universal and

10   Ad Populum as the highest and best bid.  By this designation

11   the debtors have formed a view that Universal and Ad Populum

12   are the parties best position to close this transaction in a

13   quick and efficient manner.  JPMorgan defers to the debtor's

14   business judgment on this issue and supports the debtor's

15   choice of Universal and Ad Populum as the highest and best

16   bid.

17       We understand that Alliance Entertainment has objected to

18   this designation and takes the position that Alliance is

19   offering more consideration and should therefore be approved

20   as the highest and best bidder.  But that position assumes

21   that the only factor in this analysis is the amount of

22   consideration offered.  The debtors will offer evidence and

23   argument as to the difference in purchase price, if any,

24   offered by these two bidders.  But as we noted a moment ago,

25   there is more to this analysis than the gross amount of the

1    purchase price.  The debtors must also consider execution

2    risks and certainty of closing and Alliance fails to

3    sufficiently address and explain the concerns about their bid

4    on this floor.  We also note that there have been multiple

5    disputes between Alliance and the debtor since the auction

6    with multiple iterations of the APA exchange.  While Alliance

7    ultimately acquiesce in the debtor's position on virtually all

8    of these issues, the repeated disagreements and ultimatums

9    raise serious concerns that this contentious behavior will

10   continue through this hearing and to the closing.  Alliance

11   has not refuted that these disagreements occurred, only that

12   it has now accepted the debtor's position and is ready to

13   close.

14        As of last night, Alliance has now filed a lawsuit to

15   require the debtors to accept the Alliance bid and enjoin the

16   debtors from moving forward with other bidders.  This lawsuit

17   is fundamentally flawed given that first, the bidding

18   procedures give the debtors broad discretion to pick the

19   highest and best bid.  Second, the bidding procedures make

20   bids irrevocable but the process of turning a bid into a

21   closed transaction remains subject to the debtor and court

22   approval.  And third, Alliance is a mere offeror and does not

23   have a binding contract eligible for specific performance,

24   declaratory or injunctive relief.  But apart from its legal

25   and factual deficiencies, the lawsuit demonstrates that

1    Alliance is approaching this transaction in a contentious

2    matter [sic] which raises real questions as to the timing and

3    certainty of closing.  Under these circumstances, it's an

4    entirely appropriate exercise of the debtor's business

5    judgment to select Universal and Ad Populum as the winning

6    bidders, owing to the apparently much higher confidence that

7    these parties will close a transaction quickly and cleanly.

8         For all of these reasons, Your Honor, we ask that the

9    sale motion be granted, the objections be overruled and the

10    sale of the purchased assets to Universal and Ad Populum be

11    approved.  The auction has been a tremendous success for the

12    debtors and their bankruptcy estates and the debtors stand

13    ready to exit the DIP facility, transfer the going concern of

14    their businesses with related preservation of jobs and fund a

15    meaningful distribution to unsecured creditors.  A quick and

16    clean closing of a transaction is the crucial next step in

17    realizing the value that has been achieved through the

18    successful process.  And we are hopeful that Your Honor's

19    disposition of the sale motion will facilitate that quick and

20    clean closing.  Thank you, Your Honor, we appreciate your

21    attention to these matters.

22              THE COURT:  Thank you.  Anyone else before I turn to

23    Mr. Teele?

24              ALL:  (No verbal response).

25              THE COURT:  No.  Okay.  Mr. Teele?

1           MR. TEELE:  Thank you, Your Honor, and good morning

2      again.  And for the record, I'm Jason Teele of Sills Cummis

3      and Gross on behalf of Alliance Entertainment, LLC.  Your

4      Honor, last week I stood before you at this podium and I said

5      that the sale process in this case was rigged in the beginning

6      to favor the debtor's preferred buyer.  The proof of this is

7      evident in the proposed agreements that the debtors filed late

8      on Saturday afternoon.  The Universal agreement, for example,

9      is devoid of several of the economic demands that were made of

10     Alliance after the auction had concluded and Alliance had been

11     designated the successful bidder which have a material impact

12     on the total consideration paid to the estate.  Ad Populum, as

13     we know, was never a bidder -- I'm sorry -- was no longer a

14     party to the sale.  Instead, a new bidder, who was not even

15     present at the auction, who was not a qualified bidder at the

16     auction, is now apparently the buyer.  Never before late

17     Saturday afternoon's filing did the debtors or anybody else in

18     this case, to my knowledge, even utter the name Sparkle Pop.

19          On the other hand, however, the debtors did file at

20     Docket 270, a Notice of Successful Bidder which designates

21     Alliance as a successful bidder at the end of the auction.

22     And it does not mention Sparkle Pop or even an assignee of Ad

23     Populum who's APA was never made available to any of the

24     parties at the auction.  Further, the declaration of

25     Mr. Haesler, from Raymond James, filed at Docket Number 296,

1   confirmed that Alliance was the successful bidder at the

2   auction and also did not mention a bidder named Sparkle Pop or

3   the fact that Ad Populum could or was going to assign its

4   rights under any agreement that it had reached to a third

5   party.  The declaration of Mr. Gorin, the debtor's CRO or

6   co-CRO, filed at Docket Number 270, also confirms that

7   Alliance was the successful bidder at the auction and also

8   does not mention Sparkle Pop or an assignee of Ad Populum or

9   the ability of Ad Populum to assign whatever rights it has at

10   the -- following the auction.

11      Sparkle Pop or an assignee of Ad Populum was not

12   mentioned in any of the objections to the sale or in the

13   reservations of rights filed by the creditors' committee or

14   various counterparties in this case.  Information concerning

15   Sparkle Pop, who it is, what is does and its financial

16   condition, is not publicly available or available by reference

17   to the docket and not available to the Court or anybody else

18   in these cases, except perhaps the debtors who have had

19   private conversations with representatives of that entity.

20   What's troubling here, Your Honor, is that the auction, which

21   was designed to identify the highest and best bid, which it

22   did, did not end at the conclusion of the auction when

23   Alliance was designated as the successful bidder.  We learned

24   for the first time, when Mr. Gorin's declaration was filed on

25   April 1st of this year, that the debtors were privately

1    soliciting bids after the auction and only from their

2    preferred purchasers, Universal and Ad Populum.

3        We learned on Saturday that the debtors had expanded that

4    to solicit bids from this new bidder or this assignee of some

5    bidder which raised some serious concerns regarding how the

6    bidding occurred, the conduct of the auction, and what

7    happened after the auction.  In combination with the debtor's

8    conduct at the auction and in the days immediately following

9    the auction, these facts call into question the very integrity

10   of the sale process in this case.  And it has to give the

11   Court pause to consider whether the debtors have acted in good

12   faith and in the best interest of the debtor's estates.  You

13   won't be surprised to hear that I submit they have not acted

14   in good faith or in the best interest of the debtor's estates.

15   I submit further that debtors -- that the debtor's violations

16   of the Court-approved bid procedures rise to the level of bad

17   faith that is rarely seen in complex Chapter 11 cases of this

18   kind.  So what did the debtors do at the auction that causes

19   me to say that the integrity of the process has been

20   threatened.  I'll tell you a couple of facts that I think are

21   of note for the Court's consideration.

22       First, while the auction was scheduled to begin on March

23   24th at 10:00 a.m. Eastern Time, it didn't actually begin

24   until nearly seven hours later.  That in and of itself is not

25   concerning.  However, once the auction did begin, we learned

1   along with the other participants in the auction that the

2   reason for that significant delay was because the debtors had

3   privately been meeting with Universal and Ad Populum to allow

4   those debtors [sic] to combine their bids and bid as one

5   entity.

6        Later, in the auction process, one of the other qualified

7   bidders, an entity called Basic Fund, requested permission on

8   the record of the auction to discuss potentially submitting a

9   combined bid with Alliance, ala the treatment that was given

10  to Universal and Ad Populum before the auction even began.

11  But the debtors denied that request without any meaningful

12  explanation on the record or off the record.  Then, after the

13  Universal and Ad Populum group dropped out of the auction, in

14  light of Alliance's higher bid, the debtors took a break off

15  the record -- which was lengthy -- and conducted a private

16  meeting with the Universal representatives.  We don't know

17  what was discussed, we know that they met.  And we submit,

18  based on the evidence that's available to us -- and we will

19  present evidence on this point -- that the parties were

20  discussing whether Universal could or would continue bidding.

21  And in the absence of the inability to pay more than

22  Alliance's last bid on the record for the Diamond Comic's

23  assets, that the parties concocted a scheme to continue to

24  negotiate the Universal and Ad Populum bid after the auction,

25  which is precisely what they did -- and they're not even

1    hiding that anymore.

2        When they returned to the auction room after those
3    private discussions, the debtors announced on the record that
4    Alliance was the successful bidder.  After that, the debtors
5    declared an intent to hold a separate auction or at least have
6    further discussions with interested bidders for the sale of
7    the assets of the debtor's UK business, United Kingdom
8    business, despite the fact that Alliance's winning bid
9    included the assets of the two-debtor entities that own the
10   equity of Diamond UK.  No discussions were auctioned for the
11   Diamond UK assets ever occurred.  But it was revealed in
12   Saturday's late afternoon filing that the debtors were
13   actually having private discussions to sell the UK to
14   Universal.  Never before disclosed.  The debtor's secret
15   meetings and behavior did not change very much after the
16   auction concluded.  They refused to engage in any
17   negotiations, let alone good-faith negotiations with Alliance.
18   When Alliance sent a revised APA, revised to conform the
19   document to the bidding at the auction, the debtors responded
20   with a take-it or leave-it redline of the agreement and
21   refused to discuss any of their proposed changes, although
22   most of their proposed changes were new economic asks that
23   were never discussed as part of Alliance's bid prior to the
24   auction, Alliance's bidding at the auction or a part of
25   Alliance's winning bid at the auction.

1          Nevertheless, Alliance decided to meet all but one of the

2     debtor's new demands and sent revised agreements which were

3     met with even more demands from the debtors.  Those demands

4     came not in the form of a redline agreement -- which would

5     have been helpful -- but in the form of a short email with

6     several bullet points of what Alliance needs to do to its

7     agreement to make the agreement acceptable.  Alliance finally

8     managed to get the debtor's professionals to meet on a Zoom

9     meeting on the evening immediately before a first-scheduled

10    sale hearing.  This call was not productive because the

11    debtors conducted the call in a deposition-like fashion where

12    they asked primarily Paul Navid from Province to confirm or

13    deny various provisions in the Alliance APA.  There was no

14    meaningful back and forth on that call.  Following that call

15    and the adjournment of the sale hearing -- even though

16    Alliance consented to and agreed to all of the debtor's new

17    demands, including what you heard about before concerning the

18    prepaid inventory -- which is approximately a 4.3 million

19    dollar issue -- which, as a footnote, is not defined in or

20    accounted for in the Universal agreement that's filed on the

21    docket late Saturday -- we still received a terse one-sentence

22    email from debtor's counsel stating simply without explanation

23    that the debtors were going to proceed to seek court-approval

24    of a sale to Alliance -- I'm sorry -- to Universal and Ad

25    Populum.  Why?  We were there.  We had met all of their

1   post-auction demands.  We could have backed away and said the

2   additional 14 and a half million dollars that you demanded we

3   add to our bid, our winning bid, we could have said no but we

4   ultimately said yes.  So why did they turn that down and say

5   tersely without explanation that they were going to seek to

6   close with Universal and Ad Populum.  Well, we'll never know

7   because they operated in total secrecy and in private.

8       However, we did learn in the days that followed, not from

9   the debtors, however, who refused to engage, but thirdhand

10   from counsel for the creditors' committee, that the debtors

11   had stated some vague, inchoate concerns about Alliance's

12   ability to close.  It was almost laughable because Alliance is

13   a large, publicly traded company that has been a leader in its

14   industry since the early 1990s.  In fact the company was

15   founded right around 1990.  Prior to the auction and to the

16   committee counsel's to meet their request, Alliance documented

17   its financial capacity to close this transaction.  Alliance

18   has not made a single statement or taken a single position,

19   privately or in court or otherwise, deviating from its desire

20   or ability to consummate the transaction set forth in the

21   agreement.

22       In short, Alliance has done everything possible,

23   including filing a lawsuit late last night out of frustration

24   that the debtors were embarking on a path that was

25   inappropriate under the bidding procedures and contrary to the

1   record, that we want to close this transaction and that
2   Alliance can close this transaction.  Sitting right back there
3   is the Chairman of the Board of Alliance Entertainment who has
4   a pen in his pocket who is willing and ready and able to close
5   this transaction immediately after, if Your Honor enters an
6   order approving the sale to Alliance and the debtors sign the
7   agreement.  Once those two things are done, Alliance is ready,
8   willing and able to close, which could happen as early as
9   tomorrow, depending on when an order can be entered and the
10  debtors can sign the agreement.  You heard from Mr. Minuti and
11  from others that the legal standard that Your Honor needs to
12  consider is which bid is higher and better.  Okay.  Well, even
13  a cursory glance at Alliance's agreement versus a detailed
14  review of the Universal and Sparkle and Pop agreements shows
15  that the Alliance bid -- for lack of a better word -- is
16  materially higher in terms of dollars.  It's 85.3 million
17  dollars of total consideration to the debtor's estates versus
18  84.4 total consideration under the combined Universal/Sparkle
19  and Pop agreement.
20      Under the Alliance bid, the debtors will net, at closing
21  -- which could be tomorrow -- 61.6 million dollars in cash
22  under the Alliance agreement versus 59.4 under the combined
23  Universal and Sparkle and Pop agreements.  And, I should point
24  out, that the Universal agreement, the closing date under the
25  Universal agreement is not entirely clear in the document;

1    however, it's not to occur for at least another 14 days.  And

2    under the Sparkle and Pop agreement, it's to occur on or

3    before April 30th versus my client's proposal -- which you

4    will hear in testimony today from the chairman of the board --

5    that they are ready, willing and able to close the moment Your

6    Honor enters an order and the debtors sign an agreement.  So

7    the delta or the difference in cash consideration to the

8    estate under those two agreements is 2.1 or so million

9    dollars.  Clearly it's a higher offer.  And I submit that it

10   is a better offer also because of the certainty of closing.

11        There is no risk, zero percent chance, that Alliance

12   won't close.  My client will stay in this courtroom with Your

13   Honor and with the debtors signing the agreements and

14   arranging the wires.  He will not fly home -- he lives on the

15   West Coast -- he will not fly home until this deal is closed

16   should Your Honor approve a sale to Alliance.  That is how

17   certain that closing is.  With respect to the evidence, we do

18   have two witnesses in court.  Mr. Navid, Province, who's

19   Alliance's investment banker will testify to the values of the

20   relative offers, as well as to the statements I made to inform

21   Your Honor a little bit more about how the auction was

22   conducted and the post-auction conduct of the parties.  And

23   then obviously, Mr. Ogilvie, the chairman of the board of

24   Alliance, would testify to the company's, Alliance's,

25   financial wherewithal, as well as to the fact that, like I

1   just said, Alliance is ready, willing and able to close.  He's
2   here to close.  He showed up in person to do this and to
3   assure Your Honor that there is zero risk of closing.
4   Absolute, 100 percent certainty.  And I will note, this is one
5   of those interesting cases where the debtors and the committee
6   have a bird in the hand but they also have two in the bush.
7   And what I mean by that is you have a successful bidder whose
8   post-auction conduct -- which I say was in bad faith -- but to
9   their credit, improved the overall value of the Alliance bid
10  -- inappropriately but nevertheless -- by 14.4 million dollars
11  just since March 25th, which now puts -- which has Alliance in
12  the pole position.  And you have a backup bidder.  I guess you
13  have two backup bidders who, under Your Honor's bidding
14  procedures order, are obligated to close if Alliance does not.
15        And I will tell you this, Your Honor, and Mr. Ogilvie
16  will tell you this too under oath, that if Alliance does not
17  close within two or three days of getting an order, at most --
18  we're saying immediately -- but if lightning strikes and the
19  banks go on strike and we can't wire money, then we'll back
20  out and you could sell to the backup bidders and you'll still
21  net a significant recovery for the bankruptcy estate, as well
22  as forensic of credit [sic].  So there is absolutely no risk
23  in proceeding with Alliance -- which everybody agreed -- all
24  of the consultation parties agreed -- obviously Alliance
25  agreed -- was the successful bidder at the auction and there

1    is no doubt, as the testimony will show, that standing here

2    today Alliance's offer is higher than and better than the two

3    competing offers, one of which is by a person -- a company

4    that was never a bidder.

5        If I could just conclude by addressing a couple of the

6    points that Mr. Minuti made in his presentation to the Court.

7    Alliance is not a frustrated bidder or an unsuccessful bidder.

8    Alliance is the successful bidder.  Alliance was designated by

9    the consultation parties -- which includes the debtors, the

10   lender and the creditors' committee -- I believe that's all

11   three -- all of them -- that we were the successful bidder.

12   They filed a pleading.  They filed two declarations.  They

13   stood up in court on two separate occasions and told Your

14   Honor it was a great auction, it was a fantastic auction, it

15   was a highly successful auction.  Alliance won.  So we're not

16   the jilted bidder who's angry that we couldn't keep bidding

17   and then we finally found some more money to close -- which is

18   what Ad Populum did.  We were the winning bidder from the very

19   beginning.  Alliance is also a creditor who has an unsecured

20   claim in this case of approximately half a million dollars and

21   also an administrative creditor in this case to the tune of

22   its deposit that it laid down in this case.  So if we're not

23   the successful bidder to whom the Court approve or with whom

24   the Court approves the debtors to close, and we don't close,

25   then we lose that money.  We are absolutely a creditor.  The

1   debtors and the other consultation parties have made us a

2   party in interest by virtue of the fact that they designated

3   us as the successful bidder.  We have every right and reason

4   to stand here today and press these issues in order to get the

5   sale back on track so that we can close.  We're losing

6   daylight but we could close immediately.  Thank you, Your

7   Honor.

8             THE COURT:  All right.  Thank you.

9             MR. TEELE:  I'm happy to answer any questions.

10             THE COURT:  Thank you.  Mr. Minuti, I'll give you a

11   final word here, not because I think the debtor gets a final

12   word in opening statements but you made a motion to bar this

13   party from participating in the hearing on the grounds of

14   standing.  And if you want to get the last word on the

15   standing question, I'd be happy to hear from you on that.

16             MR. MINUTI:  Thank you, Your Honor.  Again, for the

17   record, Mark Minuti on behalf of Saul Ewing.  Your Honor,

18   again, as we stand here today, there has not been an objection

19   filed by Alliance Entertainment to the proposed sale.  And

20   look, we heard a lot from Mr. Teele at the podium, Your Honor.

21   That's obviously not evidence.  We're anxious to get to the

22   evidence.  Obviously I disagree with almost everything

23   Mr. Teele said.  I think the evidence is going to bear that

24   out; but again, we don't believe they have standing.  So I

25   would ask the Court to -- I would say strike their objection

1   but they don't have an objection -- deny them standing to
2   appear today.  Thank you, Your Honor.
3           MR. TEELE:  Your Honor?
4           THE COURT:  Mr. Teele?
5           MR. TEELE:  I'm sorry, just very, very quickly, Your
6   Honor.  We did submit a declaration in support of our position
7   here, which I believe Your Honor could place form over
8   substance, conform the pleading to the proof, et cetera, and
9   accept that as an expression of our objection to the sale
10  being approved to Universal/Sparkle Pop.  Thank you.
11          THE COURT:  I'm going to defer a ruling on the
12  question of standing until the Court's had an opportunity to
13  hear the evidence.  This is an unusual case.  I've been a
14  bankruptcy trustee, both in Chapter 11 and Chapter 7, and had
15  to make decisions about what is highest and best and have been
16  in the position of having to defend, having chosen something
17  that was ostensibly less money as a better offer.  I
18  understand that concept.  But in this case, the party who's in
19  court complaining as the one who was designated as a
20  successful bidder at the auction, to me that makes it very
21  different from the disgruntled bidder cases that Counsel's
22  referred me to.  I definitely think I should hear the evidence
23  on the matter because of that reason.  And also, the counsels
24  argue that the evidence is going to show that Alliance is a
25  creditor which would undercut the debtor's standing issue.

1     And lastly -- and focus on the declaration that Mr. Teele

2    referred to -- but it's very clear to me that Alliance has

3    been at hearings before this court and has stated on the

4    record that it objects.  And to me that's sufficient, at least

5    for now.  So we will take up standing after the Court hears

6    the evidence.  Are you ready to proceed, Mr. Minuti?

7             MR. MINUTI:  I am, Your Honor.

8             THE COURT:  Perhaps we should take a five-minute

9    recess before we start the evidence.

10            MR. MINUTI:  That makes sense to me, Your Honor.

11   Before we get to the evidence, Your Honor, my suggestion would

12   be to address some of the other objections because I think

13   some folks are in the courtroom -- to get to the punchline, so

14   to speak, we're not really going forward on anything contested

15   as to anybody else.  So if Your Honor will allow me to run

16   through those, just to make a record so people can be

17   satisfied that their issues are not going to be dealt with

18   today, I think that would make some sense but I'm at Your

19   Honor's pleasure.

20            THE COURT:  Okay.  You can do that and we'll see

21   where that goes.  I don't know what the Court's view will be

22   but I'll hear what you have to say.  Go ahead.

23            MR. MINUTI:  Okay, thank you, Your Honor.  So the

24   objection deadline for the motion, Your Honor, was March 14.

25   We did extend that objection deadline for a few people but I

1   just want to run through quickly the other objections that
2   have been filed.  At Docket Number 211 was an objection of
3   Katherine Govier.  I think it's pronounced Goviyay.  That was
4   a cure claim objection related to a contract.  None of the
5   bidders, Your Honor, are taking that contract so that
6   objection is moot.
7       Next we have at Docket Numbers 215, 264 and 312, the
8   objection of Anson Logistics Assets, LLC and AIREIT Olive
9   Branch DC, LLC.  These are landlords, Your Honor.  They
10  objected on cure and adequate assurance bases.  We understand
11  that the landlords are speaking -- have spoken or are in the
12  process of speaking to all the bidders.  We are not going
13  forward on a contested basis today, Your Honor, on cure or
14  adequate assurance so that'll be another day, if necessary.
15  Docket Number 216 and 269 is the objection of Pokemon Company
16  International, Inc.  They are a contract party.  We believe
17  we've added language to the sale order to resolve their issue.
18  So again, not going forward on a contested basis.  Docket
19  Number 217 was an objection from Dynamic Forces, Incorporated.
20  That's a party to a distribution agreement.  We're not going
21  forward on the basis -- on any contested basis today with
22  regard to that objection.  Docket Number 249 was the limited
23  objection and reservation of rights of the committee.  You've
24  already heard from the committee, Your Honor.  Obviously
25  they've reserved to see how the evidence comes out but I

1    believe at the end of the day that's not going to be an issue.

2    Docket Number 251 was the reservation of rights of JPMorgan

3    Chase.  Again, that was a reservation of rights.  We believe

4    they're onboard with the debtor and that's not going to be an

5    issue for today.  Docket Number 271 was the objection of Image

6    Comics, Incorporated.  That was a contract-related objection.

7    None of the potential bidders are taking that contract so that

8    objection is moot.

9         We next have at Docket Number 306 the objection of Bandai

10   Namco.  That was basically a reservation of rights.  As I

11   understand it, Your Honor, if Universal is the successful

12   winning bidder, there are no issues.  If that's not the case,

13   that will be addressed on another day.  At Docket Number 309,

14   Your Honor, is a pro se objection filed by an entity called

15   Skyrush Marketing, Incorporated.  That's really -- their

16   objection really is a fundamental misunderstanding, Your

17   Honor.  They bid on one of the -- only one of the lots of the

18   debtor's assets.  And while on an individual basis, they were

19   the highest bidder at auction for that lot.  Obviously when we

20   looked at the individual bids for the individual lots and

21   compared it to the whole company bids, the Lot D (phonetic)

22   bids, it was not the winning bidder at the end of the day.

23   And so we believe it's simply a misunderstanding.

24        We did contact, Your Honor, three separate lawyers who we

25   were told represented Skyrush.  We had conversations with

1    them, we served -- we gave them copies of the transcript of

2    the auction, which I believe clearly explained that.

3    Eventually all three essentially told us that they were not

4    representing Skyrush in connection with this matter.  The

5    objection that was filed was signed by Skyrush's -- its

6    objection, it's really the one page -- it looks more like a

7    letter to me but it was signed by its president, Andrew

8    Aiello.  There's no indication that he's a lawyer.  The cover

9    letter makes clear that they're appearing pro se and they

10   don't plan to appear today otherwise.

11        I would point out to Your Honor that Local Rule

12   9010(1)(a) makes it clear that only individuals may appear pro

13   se.  And so, Your Honor, for all those reasons we would ask

14   that the Court strike that objection and we don't believe that

15   it's well-founded in any event.  And I'm not aware that

16   anybody from Skyrush is here today, Your Honor.

17             THE COURT:  So the debtor believes that the Court

18   could reach a conclusion on the sale without consideration of

19   these matters that you're saying we're going to defer?

20             MR. MINUTI:  Well what I'm saying, Your Honor, is

21   you can certainly hear evidence on what happened at the

22   auction.  That's going to come out today.  But in terms of the

23   pro se objection on behalf of the business entity, I don't

24   believe that under the Local Rule that's appropriate.

25             THE COURT:  It may not be.  I'm talking about from a

1   much bigger picture.  You've rattled off multiple, multiple

2   objections to various issues and I'm asking you, you're

3   comfortable, the debtor's comfortable that we're not going to

4   find ourselves in a bind because it turns out that one of

5   these issues is keyed to resolving the sale?

6           MR. MINUTI:  I am, Your Honor.

7           THE COURT:  Okay.  Is there anyone here in court

8   today who wishes to be heard on the debtor's suggestion that

9   we defer consideration of those matters to another day?

10         ALL:  (No verbal response).

11         THE COURT:  Is the committee comfortable with this

12   approach?

13         MR. FINIZIO:  For the record, Gianfranco Finizio,

14   Lowenstein Sandler, for the committee.  Yes, we think this

15   approach makes sense.  We understand.  I think the sale issues

16   that you've heard about are a gating issue and we don't need

17   to hear the objections as to -- that Mr. Minuti recited in

18   connection with those matters.

19         THE COURT:  All right.  How about the DIP lender?

20   And Ms. Culbertson, it makes me a little nervous but everybody

21   thinks this is a way to go.  Perhaps so.  Is the lender

22   onboard with this idea?

23         MS. CULBERTSON:  Katherine Culbertson on behalf of

24   JPMorgan, DIP lender.  We're comfortable continuing the

25   contract objections until a later date.

1           THE COURT:  Okay.  None of these parties who are in

2      the courtroom are concerned about this approach.  No one has

3      come forward.  It's a public proceeding.  They can choose to

4      stay or go, it's up to them.  We'll proceed in that fashion,

5      Mr. Minuti, as the debtor suggests.  Thank you.  We'll take a

6      five-minute recess.

7           THE CLERK:  All rise.  This court is in recess.

8           (A recess is taken from 10:58 a.m. to 11:06 a.m.)

9           THE CLERK:  Please remain seated and come to order.

10     The United States Bankruptcy court for the District of

11     Maryland now resumes its regular session.

12          THE COURT:  All right.  Mr. Minuti, are you ready to

13     proceed?

14          MR. MINUTI:  I am, Your Honor.  I'd like to call my

15     first witness.

16          THE COURT:  All right.

17          MR. MINUTI:  I call to the stand Alec Haesler.

18          THE COURT:  Come forward, sir.  Find your way to the

19     witness stand.  Before taking your seat, raise your right hand

20     and the clerk will hopefully be able to administer the oath.

21           ALEC HAESLER, DEBTOR'S WITNESS, SWORN

22          THE CLERK:  Please be seated.  Please state your

23     full name and address for the record.

24          MR. HAESLER:  Full name is Alec Haesler.  The

25     official address of Raymond James is 880 Carillon Parkway,

1    St. Petersburg, Florida 33716.

2              THE CLERK:  Thank you.

3              THE COURT:  Your witness, Mr. Minuti.

4              MR. MINUTI:  Thank you.  Let me ask.  Does Your

5    Honor have a copy of the exhibit binders?

6              THE COURT:  I do.  I have two binders here on the

7    bench.  So I say confidently I do.

8              MR. MINUTI:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. MINUTI:

11   Q.  And, Mr. Haesler, do you have the exhibit binders in front

12   of you?

13   A.  I do.

14   Q.  Okay.  Please state your full name for the record.

15   A.  Full name is Alec Jeffrey Haesler.

16   Q.  And briefly describe your educational background.

17   A.  I graduated from the University of Virginia in 2011 with a

18   Bachelor of Science in Commerce with concentrations in Finance

19   and Accounting.

20   Q.  And can you briefly describe your work history?

21   A.  My work history, I started at WC in the Transaction

22   Services Group for several years.  Then I served for about a

23   decade at two middle-market restructuring advisory firms

24   before joining Raymond James just under three years ago.

25   Q.  Okay.  And what do you do at Raymond James?

1   A.   Raymond James, I am a Director in the Capital Structure

2   Advisory Group.  So we support everything from held to

3   capital-raise transactions for companies in various industries

4   all the way through anything that would be considered a

5   distressed M&A or distressed capital-raise transaction and

6   that could be in or out of court.

7   Q.   Okay.  And how many years did you say you were working at

8   Raymond James?

9   A.   Just under three years.  It will be three years in June.

10  Q.   Okay.  And Raymond James is the Court-approved investment

11  banker in this case?

12  A.   It is.

13  Q.   And can you tell the Court just generally, what has

14  Raymond James and what have you personally been doing for the

15  Debtor?

16  A.   Sure.  Raymond James was retained by the company in

17  September -- September 30th of 2024.  Prepetition we supported

18  a prepetition marketing process which ultimately yielding the

19  stalking horse bid and then on a post-petition basis, we've

20  retained as the company's investment banking representative to

21  facilitate the post-petition marketing process as well.

22  Q.   Okay.  And if you could turn to the Debtor's binder and

23  turn to Exhibit 1.

24       (Debtor's Exhibit-1 previously markd for identification)

25  A.   Sure.

1   Q.  And tell me if you recognize that document.

2   A.  I do.

3   Q.  And what is that document?

4   A.  It's the declaration of Alec Haesler in support of the

5   motion for the entry of the order, the sale order.

6   Q.  Okay.  And did you sign that document?

7   A.  I did.

8   Q.  And to your knowledge, are the facts and information

9   contained in that declaration true and correct?

10  A.  They are.

11  Q.  Okay.  Any changes since that declaration was signed?

12  A.  Not that I'm aware of, no.

13  Q.  And that declaration essentially takes us up until the

14  auction, correct?

15  A.  That's correct.

16  Q.  Okay.  Now, if you would, turn to Debtor's Exhibit 3.

17      (Debtor's Exhbit-3 preiously marked foriedntification)

18  A.  Sure.

19  Q.  Tell me if you recognize that document.

20  A.  I do.  It's the Stalking Horse Agreement.

21  Q.  Okay.  And can you explain what the Stalking Horse

22  Agreement is?

23  A.  It is the Asset Purchase Agreement for Universal

24  Distribution to acquire the assets of Alliance Games.

25  Q.  And did you and the Raymond James team put a value on that

1   Stalking Horse Agreement?

2   A.  At -- can you specify at which point in time?

3   Q.  This is the filed version.  At the time of the --

4   A.  Yes, correct.

5   Q.  -- filed version, did you put a value on the Stalking

6   Horse Agreement?

7   A.  Approximately $39 million.

8   Q.  Okay.  And can you just generally describe how you got

9   there?

10  A.  Sure.  There's various components to the purchase price.

11  That includes the base consideration of $35 million.  There's

12  working capital adjustments.  There's a negative credit for

13  historical working capital balances of the business.  And then

14  there's a cash consideration paid at closing for both the

15  inventory and accounts receivable on hand as of the closing

16  date.  That is primarily the cash components and then there is

17  purchase-price reductions for the stalking horse's assumption

18  of prepetition accounts payable for certain critical vendors

19  as well as for any cure contract that the stalking horse would

20  agree to take on.

21  Q.  Now, are you familiar with the term "prepaid inventory"?

22  A.  I am.

23  Q.  And tell the Court, what is prepaid inventory?

24  A.  Generally speaking, it's inventory where the company is

25  paying for it in advance of taking physical receipt of the

1    inventory itself.

2    Q.  And when we talk about prepaid inventory in the context of

3    the Stalking Horse Agreement, that would be inventory the

4    Debtor paid for but might arrive post-closing?  Is that the

5    idea?

6    A.  Post-closing at any other point in time before it's --

7    yeah, they paid for it advance of receipt of the actual goods.

8    Q.  Okay.  And under the Stalking Horse Agreement, was

9    Alliance -- well, strike that.  And the Stalking Horse

10   Agreement only related to the Debtor's Alliance business,

11   correct?

12   A.  Correct.

13   Q.  All right.  So it's $39 million just for Alliance?

14   A.  Correct.

15   Q.  Okay.  And did the Stalking Horse Agreement include

16   Alliance -- I'm sorry -- include Universal paying for prepaid

17   inventory?

18   A.  It did.

19   Q.  All right.  And can you point out to the judge in the

20   document where that appears?

21   A.  Sure.  So in the definition of "inventory," it includes

22   inventory in transit paid for by the seller.

23   Q.  What page is that?

24   A.  It is Page 5.  And then in the purchase-price component,

25   the definition of inventory flows through as part of the

1  purchase where there's an amount paid at closing net of the

2  10-percent haircut for the value of -- the book value of that

3  inventory.

4  Q.  All right.

5          MR. MINUTI:  Your Honor, are you with us?

6          THE COURT:  I found the definition of "inventory"

7  and then I got confused about that last sentence that he was

8  talking about the 10-percent haircut, where that came from.

9  A.  So in the purchase price which is Section 2.6 --

10  BY MR. MINUTI:

11  Q.  Which page?

12  A.  Page 12.  There is an addition for inventory acquired on

13  the closing date and it is included in that inventory balance

14  for the component of payment for the balance as of the

15  closing.  There is further down a definition to say that there

16  is the value of inventory -- I think it's Item 2 -- is

17  adjusted for a reserve of 10 percent.  So when we're thinking

18  about the balance, it's the book value of that inventory less

19  a 10-percent -- I'll call it "haircut" -- is what that

20  purchase price consideration is.

21  Q.  And the anticipated closing date under the Stalking Horse

22  Agreement was April 10, correct?

23  A.  It was, yes.

24  Q.  And what was the estimated amount of prepaid inventory

25  that will exist on the closing date for those assets?

1    A.  As of the March 7th report provided by the company, the

2    Alliance prepaid inventory is roughly $4.7 million.  In

3    conversations with the company, it's been determined that

4    that's a rough approximation of what might be on hand as of

5    the closing although, again, it's subject to change because

6    the company continued to operate and balances change.

7    Q.  Okay.  And you said $4.7 million but then there's this

8    10-percent haircut?

9    A.  Correct.  After the haircut, it would be roughly $4.3

10   million.

11   Q.  Okay.  Now, with respect to the bids that were ultimately

12   received pursuant to the Court-approved bid procedures, who on

13   behalf of the Debtors valued each of those bids?

14   A.  It was the Raymond James team with myself and support from

15   the rest of the Debtor advisors and in consultation with the

16   consultation parties.

17   Q.  Now, at Paragraph 23 of your declaration, which is --

18   which we've marked as Debtor's Exhibit 1, you indicated that

19   you needed to make some changes and/or clarify certain bids

20   received in order to qualify those bids.  Is that accurate?

21   A.  That is accurate.

22   Q.  And tell me, did you have any such conversations or

23   communications with anyone at Alliance Entertainment?

24   A.  We did on a number of occasions.

25   Q.  And who did you speak with?

1  A.  Primarily myself communicating with Paul Navid, the

2  investment banking representative for Alliance Entertainment.

3  Q.  Okay.  And tell me, when did you speak with Mr. Navid?

4  A.  There's a number of conversations, the first of which was

5  after the Alliance Entertainment team submitted their initial

6  red-line of the APA and that was on March 18th.

7  Q.  Okay.  And tell the Court, what was discussed on March 18

8  with Mr. Navid?

9  A.  Sure.  On March 18 --

10         MR. TEELE:  Objection, Your Honor.  He's -- when he

11  says he's asking for statements by Mr. Navid, it's just that

12  those are hearsay statements.

13         MR. MINUTI:  These are admissions, Your Honor, of

14  the objector.

15         THE COURT:  Not to mention that the witness is also

16  in the courtroom.  Overruled.

17  BY MR. MINUTI:

18  Q.  You can continue.  What did you discuss with Mr. Navid?

19  A.  Sure.  We had a verbal conversation about the red-line of

20  the APA as well as an Excel file that was provided to Raymond

21  James, among other items where we discussed the calculation of

22  the overbid increments and some other aspects of the bid

23  itself.  Part of what we discussed was the valuation of

24  inventory and that the calculation was missing that of the

25  prepaid inventory.

1  Q.  Okay.  Now, at Paragraph 24 of your declaration, you

2  stated that you qualified seven bids and informed the

3  qualified bidders of the baseline bid for specific assets.

4  How did you do that?

5           THE COURT:  What declaration are you referring to?

6           MR. MINUTI:  Exhibit -- it's Exhibit 1 in the

7  binder, Your Honor.

8           THE COURT:  Paragraph 24?

9           MR. MINUTI:  Bear with me.

10          THE COURT:  Which is -- this is an odd way to do

11 things but, anyway, my Paragraph 24 says, "Consistent with the

12 bidding procedures and the bidding procedures order, the

13 Debtor convened the auction," et cetera.

14          MR. MINUTI:  I may have the wrong paragraph.  Bear

15 with me for a moment.

16          THE COURT:  I was confused by the last paragraph you

17 referred to.  I mean, the witness is on the witness stand.  I

18 don't know why we need the declaration.  Maybe it helps him to

19 remember things perhaps.  I'm not criticizing that but let's

20 at least refer to the correct paragraph.

21          MR. MINUTI:  I'll do it without the declaration,

22 Your Honor.  I apologize.

23 BY MR. MINUTI:

24 Q.  When you originally received bids from the different

25 bidders, what, if any, steps did you need to take to clarify

1    those or make changes to those bids?

2    A.   Each of the bids submitted required clarification with

3    regards to both the economic and structural and legal points

4    to the document.  We continued to have conversations with all

5    the bidders to get from a condition qualification to a point

6    where we were at least comfortable with all final bids in

7    advance of the auction.

8    Q.   All right.  Now, when you testified of your conversations

9    with Mr. Navid at or about March 18, is that what you were

10   doing?

11   A.   Yeah.  To the extent that we were having conversations

12   about the economic points as well as the structural points of

13   the document, that was part of the qualification effort.

14   Q.   All right.  And did you provide each of the bidders with

15   the bids that were selected as the baseline bid?

16   A.   We did.  On March 23rd, we notified all the bidders of

17   their qualification and in that email that we sent, we

18   included the baseline bid, the value of that baseline bid

19   estimated, the baseline bidder itself as well as attaching the

20   specific APAs for those baseline bids for each of the four

21   lots of assets that we identified.

22   Q.   All right.  And are you familiar with a company named

23   "Basic Fun, LLC"?

24   A.   I am.

25   Q.   And who is Basic Fun, LLC?

1  A.  It's a toy company.  It's a -- I wouldn't call it a

2  competitor but they do certain overlapping aspects of business

3  related to the toy merchandise business on the Diamond side of

4  the house -- the Diamond side of the business.

5  Q.  And did Basic Fun submit a bid for any assets?

6  A.  It submitted two bids, one for the Lot B and one for the

7  Lot D.

8  Q.  Okay.  And why don't you explain to the Court the

9  different lots, how you divided the assets?

10  A.  Sure.  So various bids were focused on various assets of

11  the business.  The Lot A is focused on the assets of what

12  we'll call "Collectible Radiant Party" which is, for context,

13  if you have a -- we'll call it a Star Wars figurine from the

14  1970s, you'd like to have that graded for quality and put in

15  the trophy case with a rating on it.  That's what CJA does.

16  It's for collectors.  Then Lot B is what we'll call the assets

17  of the Diamond business which includes comic books, graphic

18  novels, toys and merchandise, things like that, distribution

19  to the comic industry and things of that nature.  Lot C are

20  the assets of Alliance Games which are tabletop games and card

21  games.  And then Lot D is what I will consider the combination

22  of A, B and C, so inclusive of all three of those other lots.

23  Q.  And did Basic Fun -- was their -- were any of their bids

24  determined to be a baseline bid for any of the assets?

25  A.  It was determined to be the baseline bid for both Lot B

1    and Lot D.

2    Q.  And did -- was a --

3            THE COURT:  So -- I'm sorry to interrupt your

4    examination but you're using the terminology "baseline bid"

5    and I'm not sure it's clear to me what you mean by that and I

6    don't think it's been explained by the witness' testimony.

7    A.  As of the qualification date, it was estimated to be the

8    highest bid for each of those assets as of the time.  So

9    identifying it as of the qualification date, it was the --

10   what would be potentially the opening bid at the auction.

11           THE COURT:  Okay.

12   BY MR. MINUTI:

13   Q.  And what documentation sort of made up the baseline bid?

14   A.  The Asset Purchase Agreement provided by each.

15   Q.  And was Alliance Entertainment provided with a copy of the

16   Basic Fun baseline bid?

17   A.  It was.

18   Q.  So they were provided with a copy of Basic Fun's Asset

19   Purchase Agreement?

20   A.  Correct.

21   Q.  Now, was the structure of Alliance Entertainment's bid as

22   it relates to Lot B the same as Basic Fun's bid?

23   A.  No, not for the lot of the assets, no.

24   Q.  And how did it differ?

25   A.  So Basic Fun Lot B bid included an upfront cash purchase

1    price of $5 million.  It included an incentive fee that would

2    be earned out through the remainder of 2025.  That was

3    estimated to be worth somewhere in the range of 9 to $10

4    million and it had a purchase price reduction for certain cure

5    amounts.  And we estimated that value to be roughly $14

6    million whereas the Lot B component of the Alliance

7    Entertainment bid had an upfront cash consideration of, I

8    believe, $6 million.  It had a working capital adjustment

9    which, if you use the March 7th borrowing base as an estimate

10   for closing borrowing base, would be a purchase price

11   reduction to that $6 million.  And then it also had a holdback

12   amount for the calculation of that working capital.

13   Q.  If you could, turn to in the Debtor's binder what we've

14   marked as Exhibit 7 and tell me if you recognize that

15   document.

16       (Debtor's Exhibit-7 previously marked for identification)

17   A.  I do.

18   Q.  And what is that document?

19   A.  That's a purchase-price calculation provided by Province

20   to Raymond James on March 18.

21   Q.  All right.  And behind the --

22            THE COURT:  Okay.  Counsel, I'm sorry.  We're going

23   to have to take a short recess.

24            THE CLERK:  All rise.  This court is in recess.

25       (A recess is taken from 11:21 a.m. to 11:23 a.m.)

1           THE CLERK:  Please remain seated and come to order.

2    The United States Bankruptcy court for the District of

3    Maryland now resumes its regular session.

4           THE COURT:  All right.  Mr. Minuti, I think we were

5    about to address Debtor's 7.

6           MR. MINUTI:  Yes, let me start over, Your Honor.

7           THE COURT:  Okay.

8                DIRECT EXAMINATION (CONT'D)

9    BY MR. MINUTI:

10   Q.  Mr. Haesler, if you could turn to the Debtor's exhibit

11   binder and look at Debtor's Exhibit 7 and tell the Court, what

12   are the documents attached to that?

13   A.  I see a calculation of the purchase price of the Alliance

14   Entertainment assets.

15   Q.  And who prepared that document, to your knowledge?

16   A.  The -- I believe the team at Province although it was sent

17   to me by Province.  I don't actually know who specifically

18   compiled it.

19   Q.  Okay.  And the other documents that are Exhibit 7?

20   A.  It's the Asset Purchase Agreement from Alliance

21   Entertainment.

22   Q.  So this is their bid --

23   A.  Yes.

24   Q.  -- correct?  Okay.  And were both of these documents part

25   of the bid package that you received from Alliance

1   Entertainment?

2   A.   The Excel file was not part of the original bid package.

3   It was submitted once Paul -- myself and Paul Navid started

4   having a verbal conversation.  It was sent to me thereafter.

5   Q.   Okay.  I want to focus on the Asset Purchase Agreement for

6   a moment.  And you talk a little bit about how the Alliance

7   bid or APA differed from the Basic Fun bid.  Can you just

8   focus us in the document where those changes are?

9   A.   Sure.  So in the --

10  Q.   Let's move slowly so we can follow along.

11  A.   Yes.  Okay.  So I'll go to this first.  So primarily in

12  the -- in Section 2.6, Page 13 at the purchase price, the

13  Alliance Entertainment has components where what we'll call

14  "Lot B" which are the Alliance Games assets as well as Lot D

15  which is the Diamond assets.  It has a Diamond which they call

16  the "DCD Purchase Price" of $5 million and various other

17  components for the CJA assets and the Diamond Select Toy

18  assets that add up to roughly $6 million in total.  It then

19  also includes a working capital adjustment which is noted at

20  the end of that section which is predicated on, not to get too

21  technical, but the movements in the working capital of the

22  Diamond assets.  You have the borrowing days from the end of

23  December or the middle of December through the end of

24  February, I believe, and comparing that to the working capital

25  balance at the closing.  And then that is adjusted for

1    whatever the eligible accounts receivable and inventory is as

2    of the closing date as a percentage of the sale price.

3        So, for instance, if -- and I believe there's specific

4    math in the actual agreement itself but if the eligible

5    inventory in AR for Diamond ECD is 30 million, the purchase

6    price is 5 million, then the working capital adjustment is

7    adjusted at 16.5 percent or whatever that working capital

8    adjustment is estimated to be prior to the pro rata

9    adjustment.

10   Q.  Okay.  If you could turn to Page 27 of the Alliance

11   Entertainment Asset Purchase Agreement, I would focus you on

12   Section 9.14.

13   A.  Sure.

14   Q.  This section is titled, "Assigned Successors" and a time.

15   Do you see that?

16   A.  I do.

17   Q.  If you could read the list at the end of that paragraph.

18   A.  Sure.  "Provided further that the purchaser shall not be

19   released of its obligation under this agreement such that

20   purchaser and its affiliate shall be jointly and severally

21   liable for performance of the obligations of purchaser

22   hereunder."

23   Q.  Start with the word "Notwithstanding."

24   A.  Yes, sir.  "Notwithstanding the foregoing, the agreement

25   may be assigned by purchaser to an affiliate provided that

1  such affiliate assumes all the obligations of the purchaser

2  under this agreement.  It's provided further that the

3  purchaser shall not be released of its obligations under the

4  agreement such as the purchaser and its affiliate shall be

5  jointly and severally liable for the performance and

6  obligations of purchaser hereunder."

7  Q.  So under the Alliance bid, they were reserving the right

8  to assign the agreement to affiliate, correct?

9  A.  Correct.

10 Q.  In your experience, is that an unusual provision?

11 A.  No.

12 Q.  Now, what value did you place on Alliance Entertainment's

13 bid, the document we've marked as Exhibit 7 as it related to

14 the Lot B assets?

15 A.  Approximately $4.9 million.

16 Q.  And what value, again, did you place on Basic Fun's bid

17 for the same assets?

18 A.  The Lot B bid for Basic Fun we placed $14 million value.

19 Q.  Now, who attended the auction on behalf of Alliance

20 Entertainment?

21 A.  I believe their representatives of their investment

22 banking advisor at Province as well as their legal counsel,

23 Sills Cummis, as well as representatives from the company

24 itself.

25 Q.  Okay.  Mr. Ogilvie was there, correct?

1   A.  I believe he was via Zoom.

2   Q.  Okay.  And what, if any, discussions did you have with

3   Alliance Entertainment's representatives regarding the bids at

4   the auction?

5   A.  We continued to have a number of conversations regarding

6   the bid into the auction itself.  We had conversations about

7   them potentially removing certain executory contracts in their

8   list of contracts to the tune of $1 million or so.  And then

9   subsequent to the initiation of bidding, they placed a bid

10  mimicking that of the Basic Fun Lot B bid.  We had

11  conversations about that as well.

12  Q.  All right.  And you mentioned that you had conversations

13  about removing two contracts.  How, if at all, does that

14  impact the bid?

15  A.  So the way we were valuing the cash consideration of the

16  bid, the assumption of the cure contract to the purchase-price

17  reduction and so if you remove the contract, the obligation,

18  the cash consideration goes up accordingly.  So 10 million of

19  purchase price less 1 million of cure contract, the cash

20  consideration is 9.  You remove the cure contract at 1, the

21  cash consideration is 10.

22  Q.  And how does removing a contract from the assumption list

23  affect total consideration if you're including assumed

24  liability?

25  A.  If you're including assumed liabilities, it would be net

1  neutral because, again, using that same example, you would

2  have 10 minus 1 and then adding back the assumed liability of

3  1 that they taking on.  So you get back to 10.  And if you

4  remove the contract, you're at 10 less zero less zero, still

5  10.  So under the assumption of total, you're including the

6  assumption of liabilities.  It's net neutral.

7  Q.  And I think you said this but in terms of value you placed

8  on Alliance Entertainment's bid at the auction, what, if any,

9  additional value did you provide to them based on the removal

10  of those contracts?

11  A.  I believe those two contracts were valued in excess of

12  $1 million and so, accordingly, with the removal of those

13  contracts, the bid value went up by approximately $1 million.

14  Q.  Now, Ad Populum, LLC also submitted a qualified bid for

15  the Lot B assets, correct?

16  A.  It did.

17  Q.  And did you have discussions with Ad Populum regarding

18  their Lot B bid?

19  A.  We did.

20  Q.  And can you tell the Court about those discussions?

21  A.  Sure.  The Ad Populum representative at the onset

22  indicated that rather than continuing with their existing APA,

23  they would prefer to adopt in full the APA of the Lot B

24  baseline bid of Basic Fun essentially stepping into the shoes,

25  more or less, in terms of the economic terms.

1  Q.  And I think you said this already but Alliance

2  Entertainment also agreed to adopt at least the economic terms

3  of the Basic Fun bid?

4  A.  I believe they used they used a term limit but, yes.

5  Q.  Okay.  And what additional value did you describe to

6  Alliance Entertainment's bid based on their statements that

7  they would mimic Basic Fun's bid?

8  A.  The value of the Lot B bid was increased from the 4.9

9  million ascribed previously to roughly the 14 million that was

10  ascribed to Lot B bid of Basic Fun.

11  Q.  And would the same hold true for Ad Populum?

12  A.  Correct.

13  Q.  Okay.  And when did the -- what time did the actual

14  auction begin?

15  A.  I believe roughly 7:00 p.m. Eastern.

16  Q.  Thank you.  Tell the Court, what was your role at the

17  auction?

18  A.  Served in various roles.  I was communicating with the

19  various bidders.  I was helping support the calculation of the

20  bid value.  Then at various points in time, I was also helping

21  facilitate the auction itself.

22  Q.  And what, if any, clarifications were put on the record

23  regarding Alliance Entertainment and Ad Populum's adopting of

24  the Basic Fun bid or mimicking the Basic Fun bid?

25  A.  I believe starting with Ad Populum, it was stated on the

1    record that Ad Populum would be adopting the Basic Fun Lot B

2    APA and would have value of $14 million.  And then I believe

3    the Alliance Entertainment team did mimic that of the Lot B

4    bid for Basic Fun also providing a value of $14 million for

5    those assets.

6    Q.  Okay.  If you could now turn to the Debtors' Exhibit

7    Number 4.

8        (Debtor's Exhibit-4 previously marked for identification)

9    A.  Sure.

10   Q.  This is the transcript of the auction.  It's in two parts.

11   I'm going to ask you turn to the second part.

12   A.  Okay.

13   Q.  And if you could turn to Page 11.

14   Q.  Okay.

15   Q.  Are you there?

16   A.  I'm there.

17   Q.  Turn to your list.  So if you could -- begin reading, if

18   you would, at Line 14 and go through Page 12 at Line 3.

19   A.  Sure.  This is Mr. Richards speaking.

20   Q.  Who is Mr. Richards?

21   A.  My colleague Jeff Richards.

22   Q.  Okay.

23   A.  "Thank you.  Okay" --

24           MR. TEELE:  Your Honor, I'm going to object on the

25   same grounds that it's hearsay and I'd like to note that

1   Mr. Richards is sitting in the courtroom and I feel like that

2   using a transcript to give testimony is inappropriate.

3              MR. MINUTI:  Your Honor, I think that the key here

4   is what was said at the auction and what was put on the

5   record.  This is the Official Transcript, number one.  Number

6   two, they've identified the transcript as one of their

7   exhibits for introduction today.  And so I think it's

8   appropriate to move the transcript into evidence but even if

9   it's not in evidence, I think I'm allowed to ask him questions

10  about it.

11             MR. TEELE:  The declarant of the statement that he's

12  offering as evidence, their official witness is sitting in the

13  first row of the courtroom.  I think it would be appropriate

14  to elicit the testimony directly from --

15             THE COURT:  Sustained.

16             MR. TEELE:  -- the witness rather than relying on

17  the hearsay.

18             THE COURT:  Sustained.

19             MR. MINUTI:  Bear with me for one moment, Your

20  Honor.

21        (Pause in proceedings)

22  BY MR. MINUTI:

23  Q.  Now, at the auction itself, were you valuing the bids to

24  include assumed liabilities?

25  A.  No.

1    Q.  And why not?

2    A.  Our primary focus is cash consideration to the estate for

3    the benefit of the broader creditor pool as well as the fact

4    that assumed liabilities are difficult to measure.  So there

5    are certain aspects that are, one, a moving target, two,

6    post-closing assumption of liabilities and then, three, other

7    parties would be indicating that they'd potentially be going

8    out and negotiating with certain vendors and selling certain

9    obligations outside of the APA.  And so from that perspective,

10   it became a difficult concept to measure and our focus

11   primarily was cash proceeds to the estate.

12   Q.  And if you had included the assumed liabilities in the way

13   you were valuing the bids, would it have been appropriate to

14   add a million dollars to the Alliance Entertainment bid?

15   A.  No.

16   Q.  And did you add assumed liabilities when you were valuing

17   any of the other bidders' bids at the auction?

18   A.  No.

19   Q.  Did any of the other bidders at the auction object because

20   the value of assumed liabilities was not being added to the

21   value of their bids for purposes of the auction?

22   A.  No, not that I'm aware of.

23   Q.  Did Alliance Entertainment ever object?

24   A.  No, not that I'm aware of.

25   Q.  Okay.  Now, at one point, Alliance Entertainment indicated

1    that the gross amount of its bid at that time was $56,245,000.

2    Do you recall that?

3    A.  I do.

4    Q.  And did you understand that bid to include assumed

5    liabilities?

6    A.  No.

7    Q.  And why not?

8    A.  Consistent with how we've treated things throughout the

9    auction process, the ability to increase the bid with the

10    increased consideration as a result of removing those

11    contracts and consistent with how we approached it with other

12    parties as well in a similar manner with the understanding

13    that was excluding assumed liabilities in total consideration.

14    Q.  All right.  And is there any way to get to a value of

15    $56,245,000 without having additional consideration for

16    prepaid inventory?

17    A.  No, that I'm aware of.

18    Q.  Okay.  Now, you understood the highest bid to be made at

19    the auction was from Alliance Entertainment, correct?

20    A.  That's correct.

21    Q.  And that bid was for $72,245,000?

22    A.  Correct.

23    Q.  All right.  And once we get rid of the -- or once we pay

24    the breakup fee and the expense reimbursement, that comes to a

25    net of $70,880,000, correct?

1   A.   That's correct.

2   Q.   And Universal and Ad Populum together was determined to

3   have submitted the second highest bid at the auction, correct?

4   A.   Correct.

5   Q.   And their bid was $69,130,000?

6   A.   Correct.

7   Q.   Right?  But, obviously, they don't -- there's no need to

8   net out the breakup fee and the expense reimbursement in that

9   scenario, right?

10  A.   Because Universal is the stalking horse bidder.  So there

11  is no breakup fee, correct.

12  Q.   Okay.  And after the auction, were draft Asset Purchase

13  Agreements exchanged with Alliance Entertainment?

14  A.   They were.

15  Q.   If you could turn to what we've marked as Debtor's Exhibit

16  Number 8.  Do you recognize this document?

17       (Debtor's Exhibit-8 previously marked for identification)

18  A.   I do.

19  Q.   And what is this document?

20  A.   This is the draft APA from Alliance Entertainment dated

21  March 26th at 5:55 p.m.

22  Q.   And is the document we've marked as Debtor's Exhibit A

23  consistent with Alliance Entertainment's final bid at the

24  auction?

25       (Debtor's Exhibit-A previously marked for identification)

1   A.  No.

2   Q.  And how is it different?  And, again, if you could walk us

3   slowly through.

4   A.  Focusing on the economic points, there's components of

5   both Lot B and Lot C that are inconsistent with the values

6   described at auction.  Within the Lot B, there's no base

7   purchase price of $5 million.  That is the base purchase price

8   that the Basic Fun Lot B assets are Lot B APA included.  So

9   that is absent and that would be a purchase price reduction of

10  5 million versus what was described at auction.  The Lot B

11  component is still including working capital adjustment which

12  using the purchase price that Alliance Entertainment has

13  included here would be assuming the March 7th borrowing base

14  or roughly a 2 million-dollar purchase price reduction versus

15  the Lot B assets, so the value of the Lot B Basic Fun did.

16      There's also a holdback component for the Lot B assets

17  that while isn't an impact to overall consideration, it is an

18  impact to cash at closing.  None of those are consistent with

19  the Lot B Basic Fun APA.  And then with regards to Lot C, the

20  Alliance Games' assets, it's missing prepaid inventory which

21  is specifically defined out the APA, among other things.

22  Q.  Okay.  And if you could turn now to Debtor's Exhibit

23  Number 9 and tell us if you recognize that document.

24      (Debtor's Exhibit-9 previously marked for identification)

25  A.  I do.

1  Q.  And what is that document?

2  A.  That is a red-line of the APA provided by Debtor's counsel

3  to counsel for Alliance Entertainment dated March 27th at 5:28

4  p.m.

5  Q.  All right.  So we heard about this idea that the Debtor

6  ghosted Alliance Entertainment but a day later, the Debtor

7  sent a markup of the APA that was sent by Alliance

8  Entertainment, correct?

9  A.  Correct.

10  Q.  Okay.  And what was different about that markup, if you

11  could explain that to the judge?

12  A.  The red-line provided by the Debtors marked up the APA to

13  reflect the economic points and the other various points

14  consistent with the values described at auction.

15  Q.  Okay.  And what was the value swing from what we've marked

16  as Debtor's Exhibit 8 to Debtor's Exhibit 9, if you can say?

17  A.  Using round numbers, 5 million for the purchase price, 2

18  million for the working capital adjustment and 4.3 for the

19  prepaid inventory and so 11.10 -- 11.3, excuse me.

20  Q.  And if the Debtors had accepted what was marked as

21  Debtor's Exhibit Number 8 and just said, okay, we're done,

22  we'll sign that agreement, was that the highest bid at the

23  auction?

24  A.  Yes.

25  Q.  No, I'm talking about Exhibit Number 8.

1  A.  Oh, I'm sorry.  Exhibit Number 8, no.

2  Q.  It was not the highest?

3  A.  It was not, no.

4  Q.  Okay.  Now, if you would turn to Debtor's Exhibit Number

5  10.  And do you recognize this document?

6      (Debtor's Exhibit-10 previously marked for

7  identification)

8  A.  I do.

9  Q.  And what is this document?

10 A.  This is a further red-line provided by legal counsel to

11 Alliance Entertainment sent to legal counsel for the Debtors

12 at March 27th at 9:15 p.m.

13 Q.  Okay.  And if we look at the cover email -- all right.

14 The cover email says, "Geoffrey, please find a revised draft

15 of the APA attached along with the red-line against your

16 previously circulated draft" --

17          MR.  TEELE:  I'm going to object again, Your Honor,

18 on the same basis as before, that if he's offering the

19 substance of this email to which -- or on which the witness

20 was not copied and was addressed counsel to counsel that it is

21 hearsay to the extent it's being offered for the matters

22 asserted in that email.

23          MR. MINUTI:  Well, first, is Mr. Teele denying that

24 his partner sent the email?  I don't understand what the

25 controversy is, Your Honor.

1          THE COURT:  The objection is sustained.

2   BY MR. MINUTI:

3   Q.  Explain to the Court, if you will, what changes were made

4   by Alliance Entertainment in what was marked as Debtor's

5   Exhibit Number 10.

6   A.  Generally speaking, it reversed all the economic points

7   that were red-lined by the Debtors in the previous term of the

8   APA.

9   Q.  Okay.  And essentially the economics to what we've marked

10  as Debtor's Exhibit Number 8?

11  A.  That is correct.

12  Q.  And now, if you could, turn to Exhibit Number 11.

13          (Debtor's Exhibit-11 previously marked for

14  identification)

15  A.  Sure.

16  Q.  And ignoring the email cover, tell me if you recognize the

17  document that's attached.

18  A.  I do.  It's the APA provided the next day by the Alliance

19  Entertainment legal counsel.

20  Q.  And how did the document we've marked as Debtor's Exhibit

21  Number 11 differ from Debtor's Exhibit Number 10?

22  A.  I believe there was one minor clarifying point that no

23  changes to the economic points stated by Alliance

24  Entertainment.

25  Q.  And so -- and the date of Debtor's Exhibit Number 11 is

1    March 28, 2025, correct?

2    A.  That's correct.

3    Q.  Okay.  And so as of March 28, was Alliance Entertainment's

4    Asset Purchase Agreement consistent with your understanding of

5    its bid at the auction?

6    A.  No.

7    Q.  If you can now turn to Exhibit Number 12.

8        (Debtor's Exhibit-12 previously marked for

9    identification)

10   A.  Sure.

11   Q.  And tell me if you recognize that document.

12   A.  I do.  It's a red-line draft provided by Alliance

13   Entertainment regarding the APA dated March 31st, 2025.

14   Q.  Okay.  And what changes did Alliance Entertainment make in

15   what we've marked as Debtor's Exhibit Number 12?

16   A.  I believe in terms of the economic points, they adopted

17   certain of the components of the Lot D assets but other points

18   such as prepaid merchandise, prepaid inventory remained

19   outstanding.

20   Q.  And what -- tell the Court.  What happened between the

21   sending of Debtor's Exhibit 11 and the sending of Debtor's

22   Exhibit 12?

23   A.  In terms of conversations, the Debtors were consulting

24   with the consultation parties trying to figure out a path

25   forward but generally speaking, that was the approach.

1  Q.  Now, in terms of the -- in terms of Debtor's Exhibit

2  Number 12, what would be the cash value of that bid?

3  A.  Going back to the same math versus the value ascribed at

4  auction, it would settle the 5 million and the 2 million but

5  it would leave the 4.3 million outstanding, the difference

6  between the two bids, the value of the bid at auction versus

7  this form of the APA.

8  Q.  All right.  And did there come a time when the Debtor

9  notified Alliance Entertainment that it was going to switch to

10  the backup bidder?

11  A.  I believe that was done on April 1st.

12  Q.  Okay.  And what happened after Alliance Entertainment was

13  informed that the Debtors were moving forward with Universal

14  and Ad Populum?

15  A.  The Alliance Entertainment team subsequently submitted an

16  APA addressing the Debtor's red-line revisions and then I

17  believe subsequently thereafter withdrew it.

18  Q.  Okay.  So if you could turn to what's marked as Exhibit

19  Number 14.  And, again, if you could ignore the email cover

20  but look at the Asset Purchase Agreement.  Do you recognize

21  that document?

22      (Debtor's Exhibit-14 previously marked for

23  identification)

24  A.  I do.

25  Q.  And what is that document?

1  A.  It's a red-line APA provided by counsel to Alliance

2  Entertainment to the Debtor advisors on April 1st, 2025.

3  Q.  All right.  And how does that document differ in terms of

4  economic impact and the prior versions of the Asset Purchase

5  Agreement you've been discussing?

6  A.  I believe it addresses the prepaid inventory in terms of

7  the purchase-price component.

8  Q.  So after the Debtors informed Alliance Entertainment that

9  they were moving on to the backup bidder, then and only then

10  did Alliance Entertainment agree to include payment for

11  prepaid inventory?

12  A.  That's right.

13  Q.  Okay.  And did the Debtors accept this Asset Purchase

14  Agreement?

15  A.  They did not.

16  Q.  And why not?

17  A.  At that point in time, the Debtors had been working and

18  informed the party -- informed Alliance Entertainment that

19  they had been moving to the backup bid and proceeding forward.

20  Q.  All right.  If you could turn to now what we've marked as

21  Exhibit Number 19.

22      (Debtor's Exhibit-19 previously marked for

23  identification)

24  A.  Sure.

25  Q.  Do you recognize that document?

1   A.   I do.

2   Q.   And what is that document?

3   A.   This is an APA between what is called "Sparkle Pop."  It's

4   Ad Populum and the Debtors for the purchase of the Lot B

5   assets.

6   Q.   All right.  And let me clarify that.  So who do you

7   understand Sparkle Pop, LLC to be?

8   A.   Ad Populum.

9   Q.   Okay.  And did Ad Populum have a similar provision in

10  their bids that they could assign to an affiliate?

11  A.   I believe so.

12  Q.   All right.  And is the document that we've marked as

13  Exhibit 19 consistent with the bid that Ad Populum placed at

14  the auction?

15  A.   Generally, yes.

16  Q.   Okay.  And let me be more specific so the record is clear.

17  A.   Yeah.

18  Q.   Their final bid, is it consistent?

19  A.   Yes.

20  Q.   Okay.  And if you could, let me ask you to turn to Tab 18.

21  A.   Sure.

22  Q.   And do you recognize this document?

23  A.   Yes.

24  Q.   And what is this document?

25  A.   This is the APA between Universal Distribution and the

1    Debtor for the acquisition of Alliance Games dated April 5th,

2    2025.

3    Q.  All right.  So this is essentially Universal's Asset

4    Purchase Agreement, correct?

5    A.  Correct.

6    Q.  All right.  And am I correct, if you look about halfway

7    through the document, right, what Universal did was

8    essentially create (inaudible) for the Stalking Horse

9    Agreement?

10   A.  That's correct.

11   Q.  All right.  And that made the bid -- or that made the

12   document consistent with the bid; is that correct?

13   A.  Yes.

14   Q.  All right.  And taken as a whole, is what we've marked as

15   Debtor's Exhibit 18 consistent with the final bid of Universal

16   at the auction?

17       (Debtor's Exhibit-18 previously marked for

18   identification)

19   A.  Yes.

20   Q.  Now, along the way, did you have conversations or did the

21   Debtors have conversations with the bidders to make any other

22   changes in the Asset Purchase Agreements?

23   A.  There were, as typical, slight modifications to certain

24   Asset Purchase Agreements.

25   Q.  Okay.  And is that -- in your experience, is that unusual?

1  A.  In my experience and in conversation with the experience

2  of Raymond James and the rest of the Debtor advisors, yes.

3  It's not unusual.

4  Q.  It's not unusual.  Okay.  All right.  If you could now

5  turn to what we've marked as Exhibit Number 20.

6      (Debtor's Exhibit-20 previously marked for

7  identification)

8  A.  Yep.

9  Q.  Let me make sure the judge is with us.  Do you recognize

10  this document?

11  A.  I do.

12  Q.  And what is this document?

13  A.  This is a reconciliation of the bid as valued by the Navid

14  declaration for the Alliance Entertainment bid as compared to

15  the value of the combined bid.

16  Q.  Okay.  So Mr. Navid on behalf of Alliance Entertainment

17  had submitted last week a declaration, correct?

18  A.  That is correct.

19  Q.  And in that declaration, he calculates the value of the

20  Alliance Entertainment April 1st bid, correct?

21  A.  That's correct.

22  Q.  All right.  And so who put this document together?

23  A.  Myself with the support of the Raymond James team.

24  Q.  Okay.  And if I look at the -- sort of the second column,

25  right, it says, "AENT Navid Declaration."  What is the

1    information in that second column?

2    A.  That is the calculation of the value and the purchase

3    price of the bid as stated by the exhibit including the Navid

4    declaration itself --

5    Q.  Okay.

6    A.  -- for Alliance Entertainment's APA as it currently

7    stands.

8    Q.  And all the way over on the right, the column reads,

9    "Combined Bid."  What is that?

10   A.  It's an estimate of the value of the combined bids

11   consistent with what was ascribed at auction and then

12   additionally the existing APAs in their current form.

13   Q.  And you just, if you could, walk me through this exhibit

14   and tell me what it shows.

15   A.  Sure.  So working down from the top, there's the

16   components of the Lot C purchase price which is the cash

17   purchase price between the two bids.  They're valued

18   differently because there's certain value ascribed between the

19   combined bids and the Alliance Entertainment bid with regard

20   to the split between Lot C and Lot B.  But otherwise, it's the

21   cash purchase price less the

22   networking capital adjustment which is a negative reduction to

23   the purchase price.  It then adds back the closing value of

24   inventory at 90 percent, the closing accounts receivable value

25   at 90 percent.  Then it deducts the cure amounts for the

1   purchase-price reduction for those assets as stated based on
2   which parties are assuming which assets -- or assuming which
3   contracts.  I would note that the combined bid has a split
4   between cure amounts which are executory contracts here
5   they're assuming as well as certain critical vendors that
6   they've identified that they would cover the prepetition
7   accounts payable of those vendors regardless of whether that
8   vendor had an executory contract or not.
9        And so between the two bids, there's a difference in
10  the credit for the cures and critical vendors being assumed.
11  That has an impact on cash consideration, again, as we
12  discussed in terms of if you consider total consideration to
13  be assumed liabilities as well, again, that neutral impact.
14  Below that is an estimate of the cash consideration, the
15  incentive amounts and the cures for the Lot B assets.  So,
16  again, the value differential between the two bids is because
17  each bidder placed different values on the various lots.  But
18  otherwise, there is a cash consideration component, an
19  incentive payment component which, for clarification, the
20  Debtor valued the incentive component consistent across the
21  bids at roughly $10 million.  The Navid calculation has 9
22  million.  So that's just a differential between the two as
23  what was put on the declaration and then a reduction for the
24  cure amounts.  I would note that the -- there's cures for both
25  the Lot B and Lot C assets which we've allocated in our

1    analysis of the combined bid but not for the Navid

2    declaration.  Below that is an estimate of the add-back for

3    assumed liabilities as calculated in the Navid declaration, a

4    reduction for the bid productions and then there are three

5    additional items highlighted in yellow.  I would note that the

6    Navid declaration identified two components called "ECD Open

7    Orders" and "AGD Open Orders."  In conversations with the

8    company, we were able to reconcile those to a -- to two

9    reports that the company issues on a weekly basis that are

10   called the "Unvouchered PO Reports."  I believe what they are

11   weighting to is this is for open purchase orders for inventory

12   in transit.

13        The reality is that report is actually for unvouchered

14   purchase orders that the company has received where they've

15   actually received the physical inventory already but have not

16   received an invoice for it or have not reconciled the invoice.

17   So in stating that those are liabilities to be assumed, that

18   $10 million is actually inventory already received where an

19   invoice has not yet been issued or not yet been reconciled.

20   It's inconsistent with the assumed liability of open purchase

21   orders for liability -- or for inventory in transit.  So I

22   just wanted to say for the record that I don't believe that

23   these liabilities actually reflect the value of the

24   liabilities for inventory in transit.  Then below that is the

25   value of the prepaid inventory of roughly $4.3 million after

1    you adjust for the 10-percent haircut.

2    Q.  All right.  But using Mr. Navid's math and using his term

3    of total consideration, right, and then correcting for the

4    differences you've just described, what is the difference

5    between the April -- I'm sorry -- yes, the April 1st bid --

6    well, I'm sorry.  Let me just take that back -- the bid for

7    the calculation that's in Mr. Navid's declaration and the

8    combined bid at auction?

9    A.  Net of the adjustments that we're talking about or some of

10   the inconsistencies, roughly $1.7 million.

11   Q.  All right.  And is that essentially where you were at the

12   auction?

13   A.  Correct.

14   Q.  Okay.  Now, at last week's hearing, Mr. Teele stated that

15   Debtors "treated the auction as a jumping-off point" and that

16   "bidding continued well after the auction."  Do you agree with

17   that statement?

18   A.  No.

19   Q.  And why not?

20   A.  I believe the approach was taken by the Debtors to bring

21   the bid from -- the APTA from Alliance Entertainment in line

22   with the value ascribed at auction and there were no material

23   economic changes to the APAs for that of being combined.

24   Q.  Now, did you personally interact with Universal and Ad

25   Populum during the sale process, the auction and

1    documentation?

2    A.   I did.

3    Q.   Okay.  And how would you characterize Universal's and

4    Ad Populum's participation in those processes?

5    A.   Commercial, arm's length.

6    Q.   To your knowledge, did Universal or Ad Populum fully

7    comply with the bidding procedures?

8    A.   To my knowledge, yes.

9    Q.   Okay.  To your knowledge, are you aware of any facts that

10   suggest that the bid submitted by Universal, Ad Populum were

11   the product of bad faith or collusion among bidders?

12   A.   No, not to my knowledge.

13   Q.   You were in the courtroom earlier when the judge raised

14   the question about Paragraph 41 of the complaint that was

15   filed last night by Alliance Entertainment?

16   A.   Yes.

17   Q.   And I'm just going to read it to you.  Paragraph 41 says,

18   "Ad Populum does not have the financial wherewithal to close

19   the transaction in the Ad Populum APA."  Are you aware of any

20   facts that suggest they don't have the financial wherewithal

21   to close?

22   A.   No.

23   Q.   It goes on to say, "It does not have audited financial

24   statements and it has assigned its rights under the Ad Populum

25   to a third party who was not a bidder at the auction and is

1    not qualified to bid under the bid procedures order."  Do you

2    agree with that statement?

3    A.  No.

4    Q.  Any why not?

5    A.  Consistent with the language in terms of assignment to

6    affiliates, I think it's a fairly common approach including

7    what was included in the Alliance Entertainment APA.

8              MR. MINUTI:  Your Honor, may I have one moment?

9              THE COURT:  Yes.

10        (Pause in proceedings)

11             MR. MINUTI:  Did -- I'm sorry.  May I continue, Your

12    Honor?

13             THE COURT:  Yes.

14    BY MR. MINUTI:

15    Q.  Mr. Haesler, did Ad Populum submit information to the

16    Debtors regarding its financial wherewithal?

17    A.  It did.

18    Q.  And did you analyze that information?

19    A.  We did.

20    Q.  And did you rely on that information to conclude that they

21    would have the ability to close?

22    A.  Yes.

23    Q.  Okay.  And bear with me for a second.  And you were in the

24    courtroom earlier today when Mr. Teele talked about this idea

25    of combining both the Ad Populum bid and the bid of Universal?

1    A.   Yes.

2    Q.   Can you explain to the Court how that happened?

3    A.   So the Universal bid was for the Lot C assets.  The Ad

4    Populum bid for was for the Lot D assets.  There's no overlap

5    between the two bids.  At the onset of conversation, the Ad

6    Populum team approached the Debtor advisors to see if there

7    was an interest in allowing them to pair up with the Universal

8    team and at which point in consultation with the consultation

9    parties, given the fact that there was no overlap between

10   those two bids, it would be helpful to have a third Lot D

11   bidder.  And so the decision was made to permit that

12   conversation.

13   Q.   Okay.  You also heard Mr. Teele say that Alliance wanted

14   the ability to speak to Basic Fun and that request was denied,

15   correct?

16   A.   I believe Basic Fun raised the question to Alliance but,

17   yes.

18   Q.   Okay.  And the Debtor did not allow that -- those

19   conversations to take place, correct?

20   A.   Correct.

21   Q.   And why is that?

22   A.   There was active bidding going on the Lot D bids to which

23   both parties were still active -- actively bidding.

24   Q.   And so was your concern that the conversation would

25   actually chill the bidding?

1    A.  Correct.

2    Q.  Okay.  And if we could just go back to Exhibit Number 20

3    again.  Here, obviously, we're comparing the Asset Purchase

4    Agreement and the map as set forth in Mr. Navid's declaration

5    with the combined bid at the auction.  What would the

6    differences have been between the combined bid at the auction

7    and what we pointed to Debtor's Exhibit 8 which was Alliance

8    Entertainment's March 26 version of the Asset Purchase

9    Agreement?

10   A.  Again, roughly from a cash-consideration perspective,

11   $11.3 million less than what is indicated here.

12   Q.  What about from a total consideration perspective

13   including assumed liabilities?

14   A.  Additionally, same -- the same impact.

15            MR. MINUTI:  Your Honor, I think I'm done with the

16   witness.  What I would like to do is move into evidence some

17   exhibits.

18            THE COURT:  Okay.

19            MR. MINUTI:  I would like to move into evidence

20   Exhibit Number 7, Exhibit Number 3 which is the Stalking Horse

21   Agreement.

22            THE COURT:  Let's take them one at a time.  Is there

23   any objection?  I hear none.  Exhibit 7 is admitted.

24      (Debtor's Exhibit-7 admitted into evidence)

25            MR. MINUTI:  Exhibit Number 3, Your Honor, which is

1    the Stalking Horse Agreement.

2              THE CLERK:  Can you move the mike closer to you so

3    we --

4              MR. TEELE:  Your Honor, I did have an objection to

5    admitting Exhibit --

6              THE COURT:  Three?

7              MR. TEELE:  Seven.  I believe Your Honor just --

8              THE COURT:  Seven.

9              MR. TEELE:  -- said -- excuse me.  I believe Your

10   Honor just said Exhibit 7 is admitted?

11             THE COURT:  I did.

12             MR. TEELE:  This is a document that was prepared not

13   by the witness and I believe there's no foundation for at

14   least the first page of that document.  The rest of the

15   exhibit we have no issues.

16             THE COURT:  Overruled.  It's admitted.

17             MR. MINUTI:  Your Honor, I would move Exhibit 3 into

18   evidence which is the Stalking Horse Agreement.

19             THE COURT:  There being no objection, Exhibit 3 is

20   admitted.

21        (Debtor's Exhibit-3 admitted into evidence)

22             MR. MINUTI:  Your Honor, I would move into evidence

23   Debtor's Exhibit Number 8 which is the March 26, 2025 Asset

24   Purchase Agreement of Alliance Entertainment.

25             MR. TEELE:  All right.  Your Honor, no objections to

1    the exhibit other than the cover e-mail which is hearsay.

2             THE COURT:  This is an e-mail from one of your

3    partners?

4             MR. TEELE:  That's correct, Your Honor.

5             THE COURT:  On which you were included?

6             MR. TEELE:  That is correct, Your Honor.  But the

7    witness is not and it is a hearsay statement.  So to the

8    extent it is coming in as evidence proving anything that's

9    stated in the cover email, I object.  The rest of the exhibit

10   I have no objection to.

11            THE COURT:  What's the purpose of admitting the

12   transmittal email?

13            MR. MINUTI:  Just to establish, Your Honor, that it

14   came from Alliance Entertainment.

15            THE COURT:  The objection is overruled and the

16   exhibit is admitted.

17       (Debtor's Exhibit-8 admitted into evidence)

18            MR. MINUTI:  Your Honor, next I would move the

19   admission of Exhibit Number 9.

20            THE COURT:  There's no objection.  Exhibit 9 is

21   admitted.

22       (Debtor's Exhibit-9 admitted into evidence)

23            MR. MINUTI:  I would move the admission of Exhibit

24   Number 10.

25            MR. TEELE:  Your Honor, same objection unless

1  Mr. Minuti can clarify that he's offering the cover email from

2  that exhibit just to show when it came in or when it was

3  transmitted.  The rest of the exhibit I have no issue with.

4            MR. MINUTI:  That's acceptable, Your Honor.

5            THE COURT:  Then with that caveat, 10 is admitted.

6       (Debtor's Exhibit-10 admitted into evidence)

7            MR. MINUTI:  I would move the admission of Exhibit

8  Number 11.

9            MR. TEELE:  Same objection with the same caveat,

10  Your Honor.

11            MR. MINUTI:  Agree.

12            THE COURT:  Well, on those terms, 11 is admitted.

13       (Debtor's Exhibit-11 admitted into evidence)

14            MR. MINUTI:  I would move the admission of Exhibit

15  Number 12.

16            THE COURT:  No objection, 12 is admitted.

17       (Debtor's Exhibit-12 admitted into evidence)

18            MR. MINUTI:  I would move the admission of Exhibit

19  Number 14.

20            MR. TEELE:  Same objection with the same caveat,

21  Your Honor.

22            THE COURT:  Mr. Minuti?

23            MR. MINUTI:  Agree.

24            THE COURT:  On those terms, 14 is admitted.

25       (Debtor's Exhibit-14 admitted into evidence)

1          MR. MINUTI:  I would move for the admission of

2     Exhibit Number 18.  This is the Universal Distribution Asset

3     Purchase Agreement and Amendment.

4          THE COURT:  No objection, 18 is admitted.

5        (Debtor's Exhibit-18 admitted into evidence)

6          MR. MINUTI:  I would move the exhibit (sic) of --

7     Exhibit Number -- Debtor's Exhibit Number 19.  This is the

8     Asset Purchase Agreement from Sparkle Pop, LLC.

9          THE COURT:  No objection, 19 is admitted.

10        (Debtor's Exhibit-19 admitted into evidence)

11          MR. MINUTI:  I would move the admission of Exhibit

12     Number 20 which is the bid comparison.

13          MR. TEELE:  Your Honor, I don't necessarily have an

14     objection to admitting Exhibit 20 although I would request

15     that Your Honor defer ruling on whether to admit that or not

16     until after cross examination and after the witness is able to

17     testify.  We'll be able to show some problems with the

18     exhibit.

19          THE COURT:  Mr. Minuti?

20          MR. MINUTI:  Your Honor, whether they're able to

21     demonstrate there are problems or not, it's a document that

22     was prepared by this witness.  He testified that he prepared

23     it.  So the fact that they may be able to rebut it or point

24     out inconsistencies isn't a basis to keep it out.  So I would

25     renew our request that it be admitted.

1           THE COURT:  I'm going to defer ruling on the

2    admission of this document.  And let me tell you, Mr. Minuti.

3    I listened carefully to your witness' explanation of this

4    document and I don't really understand what it proves.

5    Perhaps I'm inexperienced or dense but I'm pretty familiar

6    with accounting in these kinds of matters and I don't

7    understand this document.  So I look forward to other

8    testimony about it or cross examination and redirect.  And

9    we'll take up then whether it should be admitted.

10          MR. MINUTI:  Thank you, Your Honor.  And with that,

11   I'll pass the witness, Your Honor.  Thank you.

12          THE COURT:  Okay, thank you.  Cross examination?

13          MR. TEELE:  Yes, Your Honor.

14                     CROSS EXAMINATION

15   BY MR. TEELE:

16   Q.  Good afternoon, Mr. Haesler.

17   A.  Good afternoon.

18   Q.  We've met.  I'm Jason Teele.  I represent Alliance

19   Entertainment.  I have a couple of questions for you.

20   A.  Sure.

21   Q.  Do you still have the binder of the Debtor's exhibits?

22   A.  I do.

23   Q.  And could you please turn to Exhibit 3 which is, I believe

24   you testified, the Stalking Horse Agreement of Universal

25   Distribution?

1    A.  Yep.

2    Q.  Would you please --

3            THE COURT:  You need to say "Yes" or "No," sir, for

4    the record.

5    A.  Yes.  Sorry, sorry.  Yes.

6    BY MR. TEELE:

7    Q.  And would you please turn to Page 5 of that Stalking Horse

8    Agreement?

9    A.  Yes.

10   Q.  And would you please -- at the very bottom on Page 5,

11   would you please read for the record the definition of the

12   defined term "inventory"?

13   A.  Sure.  "Inventory means all inventory, inventory in

14   transit paid for by the seller, finished goods, raw materials,

15   work in process, packaging supplies, parts and other

16   inventories of the business."

17   Q.  Thank you.  And then could you also turn to Exhibit 18

18   which I believe you testified was the filed version of the

19   final Universal agreement; is that correct?

20   A.  Yes.

21   Q.  Would you also turn to Page 5 of that exhibit and at the

22   bottom of Page 5 also read the definition of the word

23   "inventory"?

24   A.  Sure.  "Inventory means all inventory, inventory in

25   transit paid for by the seller, finished goods, raw materials,

1   work in progress, packaging supplies, parts and other

2   inventories of the business."

3   Q.  Thank you.  And you attended the auction personally,

4   correct?

5   A.  I did.

6   Q.  And at the end of that auction, Alliance was designated

7   the successful bidder; wasn't it?

8   A.  Yes.

9   Q.  And since the auction concluded -- well, strike that.

10          MR. TEELE:  I take that back, Your Honor.

11  Q.  From the day after the auction concluded, which would be

12  March 26 -- do you agree?

13  A.  Yes.

14  Q.  -- through today, have you had or participated in

15  discussions with professionals representing or businesspersons

16  on behalf of Universal Distribution?

17  A.  In what context?

18  Q.  In the context --

19  A.  Generally?

20  Q.  -- in any context.

21  A.  In conversations in terms of updating further backup bid,

22  we've had conversations with Universal.

23  Q.  And the same question with regard to Ad Populum.

24  A.  Similar answer.

25  Q.  And are the -- and the same question with regard to

1   Sparkle Pop.

2   A.  Again, understanding is that that is an entity affiliated

3   with Ad Populum and same answer.

4   Q.  So if I followed your testimony -- and I'm referring to

5   Debtor's Exhibit 9 which I believe you testified -- correct me

6   if I'm wrong -- I apologize -- Debtor's Exhibit 8 which I

7   believe you testified was the Alliance Asset Purchase

8   Agreement that was transmitted after the auction; is that

9   correct?

10  A.  On March 26th?

11  Q.  Correct.

12  A.  Yes.

13  Q.  And then if you turn to Exhibit 9, you can see -- and I

14  believe you testified to this as well but, again, correct me

15  if I'm wrong -- the Debtor's sent a red-line back to Alliance;

16  is that correct?

17  A.  That is correct.

18  Q.  Now, if I look at Exhibit 10, that is a further updated

19  red-lined Alliance Entertainment Asset Purchase Agreement; is

20  that correct?

21  A.  Yes.

22  Q.  And then when I look at Exhibit 11, that is another

23  further updated red-line of an Alliance Asset Purchase

24  Agreement that was transmitted by Alliance to the Debtors; is

25  that correct?

1    A.  For a minor clarifying point, yes -- language point.

2    Q.  And in between Exhibit D-9 where the Debtors provided a

3    red-line of the agreement back to Alliance, there is nothing

4    in the Debtor's evidence that you testified to wherein the

5    Debtors provided any further red-lines to Alliance; is that

6    correct?

7    A.  I believe that the last red-line provided by the Alliance

8    Entertainment team struck all of the red-lines of the Debtors

9    materially and --

10   Q.  There was no response to that?

11   A.  I believe that there was from a red-line perspective no

12   exceptions, no acknowledgment of the material gap, nothing of

13   that nature.

14   Q.  Thank you.

15           MR. TEELE:  That's all the questions I have, Your

16   Honor.  I do reserve the right to recall Mr. Haesler on my

17   direct case but at this time, I have no questions.  It's

18   unlikely I'm going to do that, Your Honor.  I'm reserving that

19   right but at this time, I don't have any further on --

20   anything further on cross examination.

21           THE COURT:  All right, thank you.  Redirect?

22           MR. MINUTI:  I need one moment, Your Honor.

23       (Pause in proceedings)

24           THE COURT:  Nothing further with this witness, Your

25   Honor.

1          THE COURT:  All right.  I have no questions for the

2    witness.  Thank you, sir.  You may step down.

3        (Witness steps down)

4          THE COURT:  Are you calling another witness?

5          MR. MINUTI:  I am, Your Honor.  May I impose a

6    five-minute recess?

7            THE COURT:  Yes.

8            MR. MINUTI:  Thank you.

9            THE CLERK:  All rise.  This court is in recess.

10      (A recess is taken from 12:15 p.m. to 12:25 p.m.)

11          THE CLERK:  Please remain seated and come to order.

12   The United States Bankruptcy court for the District of

13   Maryland now resumes its regular session.

14          THE COURT:  All right.  Mr. Minuti, next witness.

15          MR. MINUTI:  Your Honor, I would call to the stand

16   Jeff Richards.

17            THE COURT:  All right.

18            JEFF RICHARDS, DEBTOR'S WITNESS, SWORN

19            THE CLERK:  Please be seated.

20            MR. MINUTI:  Good afternoon, Mr. Richards.

21          THE CLERK:  Please state your full name and address

22   for the record.

23          MR. RICHARDS:  Geoffrey Richards and my address is

24   880 Carillon Way in St. Petersburg, Florida.

25            THE COURT:  And the zip?

1           MR. RICHARDS:  I don't recall the zip, ma'am.  I'm

2     sorry.

3           THE CLERK:  Okay.  Thank you.  Your witness,

4     Mr. Minuti.

5           MR. MINUTI:  Thank you.

6                     DIRECT EXAMINATION

7     BY MR. MINUTI:

8     Q.  Good afternoon, Mr. Richards.

9     A.  Good afternoon.

10    Q.  Could you please provide the Court with your background?

11    A.  Yes, sir.  Good afternoon.  I started out my career as a

12    lawyer.  I started my career at a law firm of Katten Muchin

13    and Zavis in Chicago.  I then joined the law firm of Kirkland

14    & Ellis in the restructuring practice.  I was a partner at

15    Kirkland & Ellis and then moved to investment banking.

16          I was a partner at a Chicago headquartered investment

17    bank William Blair.  And then I joined a Canadian-based

18    investment bank called Canaccord Genuity to lead their North

19    American debt finance and restructuring practice.  And in

20    2017, I joined Raymond James to head our capital structure

21    advisory practice and I guess, Mr. Minuti, in my spare time, I

22    teach a class, Corporate Restructuring, at Northwestern Law

23    School in Chicago which I have done for the better part of now

24    about 20 years.

25    Q.  And could you tell the Court what, if any, experience you

Richards - Direct                        94

1  have with sales under Section 363 of the Bankruptcy Code?

2  A.  Yes, sir.  Both as a practicing lawyer and as a banker,

3  I've probably advised on and participated in well over 130

4  363-sales over the course of my career.

5  Q.  And what specifically was your role with respect to the

6  sale of the Debtor's assets?

7  A.  My role with respect to the Debtor's assets was working

8  with my colleague Mr. Haesler and in this instance, helping

9  him oversee and run the auction.

10 Q.  And you were in the courtroom earlier when Mr. Haesler

11 testified, correct?

12 A.  Yes, sir.

13 Q.  All right.  And there was some significant delay before

14 the official auction started on the day of the auction,

15 correct?

16 A.  Yes, sir.  We -- the auction was called to start at 10:00

17 a.m.  We went on the record at the auction -- I think it was

18 about an hour and a half or so after they called for a start

19 time.  And during that first session on the record, we

20 identified who all the participants were.  We established or

21 read the auction rules and established some additional auction

22 rules on the record, asked parties to confirm all of that.

23 And then we took a break and then resumed the auction later.

24 Q.  Okay.  And when you say you resumed the auction later,

25 about what time did it start?

1    A.  It started around 7:00 p.m.

2    Q.  All right.  And during that break or during that period of

3    time, tell the Court what was -- what you were doing.

4    A.  Yes, sir.  During that time, myself, other colleagues from

5    Raymond James, other members of the Debtor's professionals

6    were engaged in discussions with different bidders to discuss

7    their bids and to understand components of their bids and as

8    Mr. Haesler also testified, based on an approach that was made

9    to us by Ad Populum after consultation with the consultation

10   parties exploring the possibility of creating a joint bid

11   between Ad Populum and Universal such that we could have

12   three, what I'll call "whole lot" or "Lot D" bidders.

13   Q.  And why did you do that?

14   A.  Well, sir, we did that because we were looking to

15   stimulate competition for the Debtor's assets to try to drive

16   value for the Debtor's assets so that we could increase credit

17   recoveries in these cases, sir.

18   Q.  And during that break, did you have conversations with

19   anybody on behalf of Alliance Entertainment?

20   A.  Yes, sir, we did.  We did speak with Alliance

21   Entertainment and Alliance Entertainment's representatives at

22   length.  We also had discussions with Basic Fun and Basic

23   Fun's representatives also at length during that break.

24   Q.  Did you treat any of the bidders differently?

25   A.  Differently?  No, sir.

1  Q.  All right.  And during the actual auction itself, what was

2  specifically your role?

3  A.  During the auction, my role and that of Raymond James was

4  to help facilitate bidding during the auction and to maximize

5  value for the estate.

6  Q.  Okay.  Did you -- and you said earlier you stated at the

7  auction what the rules of the auction were?

8  A.  Yes, sir.  At the outset of the auction, we -- I read into

9  the record what the auction rules are which was a subset of

10  the bid procedures that the Court had previously approved.

11  And during that, we asked the participants in the auction to

12  confirm their understanding of the bid roles and the auction

13  procedures on the record.

14  Q.  Now, during the auction itself, did you place any

15  clarifications on the record with respect to any of the bids?

16  A.  Yes, sir.  There were a number of clarifications placed on

17  the record.

18  Q.  And can you be more specific?  What clarifications do you

19  recall?

20  A.  The one that immediately comes to mind is in connection

21  with Alliance Entertainment's bid whereby they said they were

22  going to mimic the Lot B bid of Basic Fun.  I asked Alliance

23  Entertainment to clarify what they meant by the word "mimic"

24  because they had not revised their APA in advance of making

25  their revised bid on the record.

1   Q.  What, if any, clarifications were made on the record
2   regarding how dropping executory contract assumption would be
3   treated?
4   A.  With respect to removing executory contracts that it would
5   -- I believe I identified that it would increase the
6   consideration to the estate.
7   Q.  Increase the purchase price, correct?
8   A.  Yes, sir, the purchase price.
9   Q.  Okay.  And in terms of the bids at the auction and how you
10  were valuing them, were you including assumed liabilities?
11  A.  Assumed liabilities were not really part of the equation,
12  I think, as Mr. Haesler had also testified.
13  Q.  Right.  And did you make any change -- or did you may any
14  changes to how you valued Alliance Entertainment's bid based
15  on the fact that they were dropping executory contracts?
16  A.  I need to go back to review the transcript but I believe
17  -- and I might be confusing the two bids but I believe that
18  they had dropped two contracts that resulted in an increase in
19  purchase price.  I might be confusing them with another bid.
20  Q.  Okay.  And you were in the courtroom when Mr. Teele
21  addressed the Court, correct?
22  A.  Yes, sir.
23  Q.  All right.  And you heard Mr. Teele talk about this idea
24  that there was some secret meeting with Universal after the
25  bidding was completed?

1   A.   I did hear him say that.

2   Q.   Okay.  And was there such a secret meeting?

3   A.   Absolutely not.

4   Q.   Okay.  And did you meet with Universal after the bidding

5   and before the auction was concluded?

6   A.   No, sir.  There was a point in time at the auction where I

7   believe the words from Universal were sort of -- paraphrasing

8   -- we're done at which point I asked for us to take a break in

9   the auction.  And we consulted -- "we" meaning Raymond James

10  and the Debtor's professionals consulted with the other

11  consultation parties during that break.  And there was no

12  discussion that took place with Universal during that break

13  and I believe I so stated that on the record at the resumption

14  of the auction.

15  Q.   Okay.  Bear with me for one moment.

16       (Pause in proceedings)

17  Q.   So, Mr. Richards, once you were successful in combining Ad

18  Populum and Universal, did you alert the other bidders that

19  that was the case?

20  A.   Yes, sir, we did.  On the record at the auction, we

21  identified, again, that we had been approached by Ad Populum

22  to request whether or not the Debtors would entertain

23  exploring a conversation between Ad Populum and Universal to

24  form a joint bid.  We discussed that with the consultation

25  parties.  The consultation parties agreed with that approach

1    and we permitted that conversation to take place.  And we

2    disclosed on the record that that, in fact, had transpired and

3    I believe that's exactly how I described it on the auction

4    transcript.

5    Q.  And during the auction, did you alert all of the bidders

6    that the Debtors would be having individual conversations with

7    each of the bidders?

8    A.  Yes, sir.  I believe as part of that first part of the

9    auction where I identified the auction rules as a subset of

10   the bid procedures on the record, I believe towards the

11   conclusion of that part of the auction, I identified that we

12   would be having discussions with different parties and did so

13   state that on the auction transcript record.

14   Q.  Okay.

15              MR. MINUTI:  No further questions of this witness,

16   Your Honor.

17              THE COURT:  Cross examination?

18              MR. TEELE:  Thank you, Your Honor.  I have a couple

19   of -- just a couple of questions for Mr. Richards.

20                        CROSS EXAMINATION

21   BY MR. TEELE:

22   Q.  Mr. Richards, good afternoon.  I'm Jason Teele.  I

23   represent Alliance.

24   A.  Good afternoon, sir.

25   Q.  Hi.  You were present at the auction, correct?

1   A.  Yes, sir.

2   Q.  And at the end of the auction, Alliance was designated as

3   the successful bidder, correct?

4   A.  They were designated the successful bidder, yes, sir.

5   Q.  Since the auction concluded through today, did you

6   participate in any conversations of any kind with any

7   representative of Universal Distribution?

8   A.  I don't believe I did.  I believe Mr. Haesler had those

9   conversations.

10  Q.  Did you send or receive any emails to or from any

11  representative of Universal Distribution?

12  A.  I don't recall sending any emails to Universal.  I may

13  have received them as being one of the parties on an email

14  that was received by other parties including myself.

15  Q.  And how many emails did you receive approximately?

16  A.  I'm sorry, Your Honor.  I don't recall how many emails I

17  might have received during that time period.

18  Q.  And same questions with respect to Ad Populum.  Have you

19  -- did you participate in any phone calls of any kind with any

20  representatives of Ad Populum since the auction concluded

21  through today?

22  A.  Yes, sir.  I believe I participated in several

23  conversations involving Ad Populum's counsel.

24  Q.  And did you send or receive any emails from or to any

25  representative of Ad Populum since the auction concluded

1   through today?

2   A.  I don't recall sending any emails to Ad Populum

3   representatives.  I believe I was copied on some emails from

4   or involving Ad Populum that were sent either by Ad Populum or

5   perhaps by Mr. Haesler or other Debtor representatives.

6   Q.  And you just testified -- I'm going to paraphrase.  So

7   correct me if I get it wrong -- that Ad Populum made a request

8   made a request to the consultation parties or to the Debtors

9   to talk to Universal about potentially submitting a combined

10  bid; is that correct?

11  A.  Yes, sir.

12  Q.  And at what point in the auction process did Ad Populum

13  make that request?  Was it prior to going on the record the

14  first time that you testified about or was it subsequent to

15  that?

16  A.  I believe that request was made during the break between

17  the first part of the auction transcript and the second part

18  of the auction transcript.

19  Q.  Would you be able to quantify, even as an estimate, at

20  approximately what time of day that was?

21  A.  It was between the conclusion of the first part of the

22  auction and the initiation of the second part which was likely

23  between sometime around noon and 7:00 p.m.

24  Q.  Thank you.

25          MR. TEELE:  I have no further questions, Your Honor.

1              THE COURT:  Redirect?

2              MR. MINUTI:  No further questions, Your Honor.

3              THE COURT:  All right.  Thank you for your

4      testimony, sir.  You may step down.

5      A.  Thank you.

6          (Witness steps down)

7              THE COURT:  Mr. Minuti, are you calling another

8      witness?

9              MR. MINUTI:  I am, Your Honor.

10             THE COURT:  I think that would be a good time to

11     take a break for lunch at this point before we call and get

12     another witness on the witness stand and have to take a break

13     with them on the witness stand.  We'll resume at -- it's now

14     by the courtroom clock 20 minutes of 1:00 -- 1:30.

15             MR. MINUTI:  Thank you, Your Honor.

16             THE CLERK:  All rise.  Court is in recess until

17     1:30.

18         (A recess is taken from 12:40 p.m. to 1:31 p.m.)

19             THE CLERK:  All rise.  The United States Bankruptcy

20     Court for the District of Maryland is now in session, the

21     Honorable Chief Judge David E. Rice, Presiding.  Please be

22     seated and come to order.

23             THE COURT:  All right.  Mr. Minuti, I think you

24     were about to call another witness.

25             MR. MINUTI:  Thank you, Your Honor.  The Debtors

1   would call Robert Gorin to the stand.

2        (Pause in proceedings)

3              ROBERT GORIN, DEBTOR'S WITNESS, SWORN

4              THE CLERK:  Please be seated.  Please state your

5   full name and address for the record.

6              MR. GORIN:  Robert Gorin, 295 Madison Avenue,

7   Twentieth Floor, New York, New York, 10017.

8              THE CLERK:  Thank you.  Your witness, Mr. Minuti.

9              MR. MINUTI:  Thank you.  Good afternoon, Mr. Gorin.

10             MR. GORIN:  Good afternoon.

11                       DIRECT EXAMINATION

12  BY MR. MINUTI:

13  Q.  Could you just remind the Court of your sort of employment

14  background?

15  A.  Absolutely.  I've worked a number of jobs in consulting.

16  I spent about six years in banking.  I have built, ran, and

17  sold a hundred million dollar company that focused in medical

18  products.  And I have spent the last 18 years with Getzler

19  Henrich working on turnaround assignments.

20  Q.  Okay.  And you are one of the co-chief restructuring

21  officers of the Debtor.

22  A.  I am.

23  Q.  And when were you first employed by the Debtor?

24  A.  As CRO was in July.

25  Q.  And were you there before July?

1    A.  Yes.  We were financial advisors I believe starting in
2    May.
3    Q.  Okay.  So May of 2024, correct?
4    A.  Four, yes, sir.
5    Q.  Okay.  And if you could -- you have the exhibit binders in
6    front of you?
7    A.  Yes.
8    Q.  Okay.  If you could turn to the Debtor's exhibit binder.
9    A.  Yes, sir.
10   Q.  And go to tab two.  Just tell me if you recognize --
11   A.  Yeah.  Hold on one --
12   Q.  -- this document.
13   A.  -- second.  I don't have a whole lot of room here.  Okay.
14   Q.  Okay.  Just going to ask you one question about this
15   because it was brought up by the Alliance Entertainment folks.
16   If you look at paragraph 23.
17   A.  Okay.
18   Q.  And take a second to read that and then let me know when
19   you finished.
20   A.  Okay.
21   Q.  All right.  So is it true that you were having
22   negotiations with all of the bidders subsequent to the
23   auction?
24   A.  Yes.  Conversations were continuing at that point.
25   Q.  And what did you mean by negotiations?

1   A.  We were taking -- the Basic Fun APA had been adopted by

2   both sets of bidders and had to be worked into their bids.  So

3   we were finalizing that, working through that.  There were no

4   economic changes from the bids as we understood them but

5   rather just making sure that all the terms and, for lack of a

6   better word, I'll say legalese was true and accurate and up to

7   date.

8   Q.  Okay.  And you're asking the Court today to approve the

9   proposed sale to Universal and Ad Populum and not Alliance

10  Entertainment, correct?

11  A.  Yes, sir.

12  Q.  Why did you decide to seek Court approval of the asset

13  purchase agreements with Universal and Ad Populum as opposed

14  to Alliance Entertainment?

15  A.  It really I think gets down to ultimately to business

16  judgment and behavior that we were experiencing with Alliance

17  Entertainment post-auction.  So we have the auction, and we're

18  very excited.  It is a huge success.  It is a -- it's a great

19  event.  We did very well for all constituents we felt, and

20  we're happy to move forward.  We were supposed to have a

21  hearing, a sale hearing I guess a couple days later.  We

22  weren't able to do that, in part because we could not get a

23  copy of the APA from Alliance.  So we had to push.  Then we

24  get that APA and that elation quickly deflates because it is

25  dramatically off on the economic terms from what I understood

1    was happening at the auction and what was being bid at the

2    auction.  When I think we've heard a lot of what was going on

3    there and what was driving those -- that change, that

4    difference.  We sent the markup with that -- that brought the

5    APA into line with the bid that was agreed to at auction.  We

6    received it back from Alliance with substantially all of our

7    changes backed out, eliminated again.

8         There were a number of APAs going back and forth trying

9    to get to the -- trying to understand and get to the bid that

10   was valued at the auction.  Ultimately we have a meeting --

11   well, I guess I'll call it an all hands meeting, advisors and

12   lawyers and investment bankers, etcetera, to go over -- to

13   kind of understand where we are, continue to explain why we

14   think the -- you know, they -- the bid and the APAs need to

15   come into line and they need to sync up because they hadn't.

16   At that point I think part of the -- you know, there was a

17   bunch of back and forth about what both parties said.

18        There was a suggestion about from Alliance that perhaps

19   we should split to two APAs rather than one APA for the two

20   different pieces.  That didn't seem to make sense from my

21   perspective given how far along we already were with the one

22   APA.  And so we -- you know, there was a lot went on.  And I

23   think we kind of agreed to let's all kind of regroup on our

24   sides and let's get back together or let's get back together

25   later, or let's talk some more later.  We got an APA that then

1    -- from Alliance that agreed to substantially all but not all.

2    And I think the one that we have heard at that point was still

3    the prepaid inventory, which is a four plus million dollar

4    issue, so that's significant for the estate.  And when -- then

5    we -- then there was a notice sent over that we're going to go

6    with the backup bidders.  And then we get an APA that says,

7    okay, we'll agree to everything.

8        And I think as has been said, it was a little -- too

9    little, too late.  What's going on aside from -- so the

10    lawyers are talking and they're working on that.  And there

11    are a number of things going on that are causing issues and

12    concern and that impact ones business judgment.

13        So the day after the auction ends, that very next day

14    chairman of Alliance goes on a video on YouTube for a

15    transaction that's not yet papered and starts talking about

16    plans of what's going to happen.  That created a lot of

17    problems -- as an operator, that created a lot of issues based

18    on the messages that were interpreted, that were heard, that

19    were said on that call.  One was a conversation about

20    consolidating warehouses.  So the current organization has

21    five warehouses, and there was a conversation about -- with

22    the chairman about consolidating warehouses.  As you can

23    imagine, the calls started to come in from employees:  am I

24    out of work, do I not have a job, I don't understand, I'm very

25    concerned, I thought this was a good thing.

1      And so now at a time when the company is very vulnerable
2  and we've got to -- we're trying desperately to keep this
3  thing together, we're really continuing to kind of almost duct
4  tape the airplane while we're flying it, if you will, now we
5  have a lot of noise that we got to deal with.  Retailers are
6  calling the company and saying, well, hold on, you know I got
7  to get my stuff within a certain period of time, I need it in
8  24 to 48 hours upon my order.  If you're going to consolidate,
9  how are you going to get it to me that quickly.  And so it
10  created that issues.  And then vendors wanted to know, are you
11  still doing business with me, you're consolidating, the video
12  was unclear about our comic, are you moving forward in the
13  comic book world and what -- I guess what we call floppies.
14  And, you know, with that the employees in the -- on the print
15  side want to know, do I have a job.  And it's -- you know,
16  it's a really tough conversation when you're trying to
17  convince somebody to continue to work, to be motivated, that
18  this is ultimately a very good thing.
19      And they're seeing this externally and they're saying, I
20  don't even know if I'm going to have a job.  What am I
21  supposed to do now?  Should I immediately go out and start to
22  look for a job?  And so it created a lot of distraction,
23  heartache, and I'll call it lack of focus within the
24  organization.
25  Q.  All right.  Let me break that down a little bit.  So first

1    let's focus on the back and forth with the asset purchase

2    agreements.

3    A.  Yes, sir.

4    Q.  What, if any, effect did the back and forth on the asset

5    purchase agreements have on your view of Alliance

6    Entertainment?

7    A.  Based on what I heard at the auction, what I saw, I left

8    the auction, as I said, elated, very convinced we had a deal.

9    And then I get -- well, first, we couldn't get an APA.  But

10   then we get an APA and it does not come close to matching.

11   It's significantly off by, you know, double digit millions.

12   And so that's a real problem.  And I don't -- you know, I

13   don't understand that level of disconnect.  That creates real

14   concern for me.

15   Q.  Okay.  And you talk about this all hands call where they

16   talked about switching, going to two separate APAs.  When did

17   that all hands call occur?

18   A.  Believe that's March 31st.

19   Q.  Okay.  And tell the judge who was on that call?

20   A.  That was -- it was the co-CROs, it was Raymond James, it

21   was Saul Ewing, it was Province, it was Alliance's counsel.

22   I'm sure I'm missing some people.  There were a lot of people

23   on that call, 20 plus people I think.

24   Q.  And the purpose of that call was to try to reach agreement

25   on documenting the APA; is that correct?

1  A.  There was still a divide between -- from my perspective

2  and my belief there was a divide between the bid, final bid

3  and what the APA was stating.  And that call, as had all of

4  our previous communications since the auction, was really

5  focused on how do we bridge this gap, how do we get there so

6  that we can move forward quickly and efficiently?

7  Q.  You talked about some interview.  Who is Mr. Bruce

8  Ogilvie?

9  A.  He's chairman of Alliance Entertainment.

10  Q.  Okay.  And what, if any, interview are you talking about?

11  A.  He went -- there was -- it's an interview on a YouTube

12  channel called Industry of Comics.

13  Q.  And when did that occur?

14  A.  So that occurred the next day after the auction, so I

15  believe it was the 25th, Tuesday, the 25th.

16  Q.  All right.  And how was this brought to your attention?

17  A.  An employee found it.  This is a YouTube channel and a

18  show that is -- has some prominence and standing within the

19  comic book world and the collectible world, and an employee

20  found it and brought it to the attention of senior management

21  of the company, and they brought it to me and were very

22  concerned.  And then as you can imagine, news starts to

23  spread, people start to watch, and it just the cacophony that

24  day was -- is really very difficult.

25  Q.  And you watched the video?

1    A.  I did.

2    Q.  Okay.  And what issues, if any, did the Debtor have with

3    Mr. Ogilvie the day after the auction giving this interview?

4    A.  First of all, we don't have an agreement papered, right?

5    We don't even have a draft.  At that point we don't even have

6    a draft APA.  Second of all, there were -- there was

7    conversation about what went on in the auction that was not

8    necessarily public information that I don't know needed to be

9    shared.  And there were -- the chairman started to give

10   opinions of what he thought was going to happen, even though

11   saying I'm not very familiar with comics, I'm -- that's not

12   something I'm well-versed in, I -- you know, I don't know the

13   company very well but I know there's -- clearly they're not

14   doing it right because look where they are.  And he began to

15   give opinions about, for instance, the warehouses.  He talked

16   about price points and mentioned, you know, we don't really

17   want to deal in five-dollar price points.  Most comic books

18   are under $5 so that created an atmosphere of, well that means

19   he's not going to do comic books.  If he doesn't want to --

20   you know, if he wants 15, $20 price points and above, he's not

21   really interested in doing comic books, that's a big -- that's

22   a fair piece of our business --

23            MR. TEELE:  Your Honor, at this point I'm going to

24   object.  I tried to let it go to see where these questions and

25   answers were going.  But it's clear that they're attempting to

1    introduce statements outside of court, not made by the person

2    on the witness stand, and offering them for the truth that

3    they're asserting.  And that is classic hearsay.  If they want

4    to ask these questions they can do so with Mr. Ogilvie, who's

5    sitting in the courtroom.  But as these statements are coming

6    through this witness, they're nothing but hearsay.

7            MR. MINUTI:  Your Honor, this is the party opponent.

8    This is Alliance Entertainment's chairman who gives an

9    interview the day after the auction.  And ultimately at the

10   end of the day you're going to -- Your Honor's going to be

11   asked to determine whether Mr. Gorin correctly exercised his

12   business judgment.  So I think he should be allowed to talk

13   about what he heard and how it impacted his view of whether he

14   should move forward with Alliance Entertainment.  They can put

15   Mr. Ogilvie on the stand and he can deny if Mr. Gorin says

16   something he thinks was incorrect.  But this is an absolute

17   admission.  It's an exception to the hearsay rule.  And he

18   should be allowed to testify to it.

19           THE COURT:  The objection's overruled.

20           MR. MINUTI:  Thank you.

21   BY MR. MINUTI:

22   Q.  What, if anything, did Mr. Ogilvie say on the interview

23   about having to "muscle his way into the auction?"

24           MR. TEELE:  Same objection, Your Honor.

25           THE COURT:  Overruled.

1   A.   He indicated that he had to muscle his way in, he did --

2   that he called Raymond James, Raymond James didn't call him.

3   My understanding is that dozens of interested parties reached

4   out to Raymond James before Raymond James had a chance to

5   reach out to them.   They were obviously all considered and

6   included.   And happily, right?   The more interested parties we

7   can get at the table, the better it is for the estate.   So we

8   welcomed all of those incoming calls just as much as we did

9   calls that Raymond James made going outward.

10  Q.   What, if any, statements did Mr. Ogilvie make in this

11  interview regarding the collectible grading business?

12  A.   He talked about the collectible grading business.   He said

13  he didn't really know a lot about it.   He said that they

14  didn't visit that site, and that he had read that they had --

15  that the basic message -- I don't remember the exact words,

16  Your Honor.   But the basic message was that they had messed up

17  the grading business somehow.   And that was -- the general

18  indication was that there was a real problem there, but

19  indicating that he hadn't spent a lot of time on it.

20  Q.   What, if anything, did Mr. Ogilvie say about -- well, let

21  me strike that.   What is free comic book day?

22  A.   So free comic book day is a day, it happens the first

23  Saturday in May.   And it is a -- the concept is to get new

24  people who don't typically collect comic books into the comic

25  book store.   And they actually will hand out -- you walk in,

1   you actually will get free comic book days -- free comic

2   books, I'm sorry.  And the concept is that we'll -- that, you

3   know, you're in the store, maybe you'll buy some stuff so that

4   the free comic books more than make up for themselves.

5   Classic kind of loss-winner type strategy.  And that if you're

6   hooked over time, you start to come back again and again and

7   again, and you become a regular customer.

8       And now you're reading comic books which are serial and

9   nature, as I think everybody knows, and so you have created --

10  you've created an additional revenue stream.  And free comic

11  book day is an event started in part by Diamond Comics a

12  number of years ago, and the concept owned by Diamond.  And

13  they run it every year.  And everybody in the industry pitches

14  in.  And the whole goal is to just generate interest,

15  excitement, and future revenue for that -- for the comic book

16  and collectible industry.

17  Q.  And what is the importance of free comic book day to the

18  retailers?

19  A.  So the retailers will tell you that it has significant

20  impact on them because, yes, there is an outlay of cash on

21  that day.  But as stated actually in that same video, you

22  know, they get a lot of their money back on that same day, and

23  they create that revenue stream because now the person comes

24  back multiple times.  You know, hopefully -- the comic books

25  are released, so hopefully they're coming back every week, but

1   at least multiple times a month.  And so from a revenue

2   perspective, it's really important.  And the retailers, you

3   know, everything that I understand, both in this position as

4   CRO and, quite frankly, Your Honor, as a long-time comic book

5   collector, it's a big day.  You wait in line, you go, and you

6   wait and line.  And there are literally, depending on what

7   store you're going to, there could be, you know, a couple

8   hundred people in line.  And it's an exciting day.  And I

9   think retailers are really coming to -- have come to value it

10  significantly.  And that's one of the biggest questions we've

11  received since this whole thing started:  what about free

12  comic book day?  Are we going to -- that's going to continue,

13  right?  I mean, that's one of the biggest questions we've

14  received.

15  Q.  During this interview that Mr. Ogilvie gave the day after

16  the auction that was now broadcast publicly what, if anything,

17  did he say about free comic book day?

18  A.  He indicates that it hasn't been -- and he says that it

19  clearly hasn't been monetized correctly, you haven't made any

20  money of it -- on it.  I believe there's a statement along the

21  line of there's no free CD or free record album day or

22  something, so something along the line that that caused both

23  the staff that work on free comic book days, what was the

24  retailers, to really become concerned that this was not part

25  of the future, that that -- that this would not continue.

1  And so, again, when we're talking about the noise and the

2  angst and what have you that was coming into the company at

3  this critical time, a lot of it was around this one -- that

4  one event.

5  Q.  What, if anything, did Mr. Ogilvie say during this

6  interview about consolidating warehouses?

7  A.  He -- using -- he used Amazon as an example and talked

8  about how you want to have one big warehouse rather than

9  having multiple small warehouses, and the scale and scope and

10  benefit that that gives you.  Well, at the current time we

11  have five warehouses spread across the country.  And they're

12  spread strategically so that when an order is received,

13  particularly on the Alliance game side, any order can be

14  delivered to any retailer within 48 hours, 24 to 48 hours.

15      And so the concept of now consolidating warehouses into

16  potentially one large warehouse had the retailers concerned

17  because now retailers closer to where the warehouse is

18  situated have an advantage over other -- you know, potential

19  advantage over other retailers.  And can I still get my

20  product in 24 to 48 hours?  I count on that.  So --

21  Q.  So -- okay.  So if Mr. Ogilvie went on this YouTube

22  channel and gave this interview -- by the way, how long was

23  the interview?

24  A.  It was well over an hour.  It was well over, but could

25  even been over 90 minutes, I think.

1  Q.   Okay.  So if he went on this YouTube channel and gave this

2  90-minute interview the day after the auction and talked about

3  all these things and about changes he wanted to make to the

4  business and so on, why does it matter to the Debtor?

5  A.   It matters to the Debtor because we have to keep the

6  company functioning.  We have a responsibility to maintain

7  business in the normal course so that we're handing over a

8  functional going concern to whoever the buyer is.  It created

9  -- it creates concern because now employees are wondering if

10  they should stay.  And that became a very loud topic within

11  the company.  Do I stay?  Do I leave?  You know, I have to

12  take care of my family.  If I don't have a job, you know,

13  within a few weeks, I need to do something about that.  It

14  created concern with vendors saying, well, I can't really tell

15  what your business model's going to be going forward.  Maybe

16  you're not -- maybe it's not a good idea for me to continue

17  selling you product, which makes it difficult to then supply

18  product to the retailer.

19       So it created a lot of noise and, like I said, a lot of

20  distraction at a time when we're trying to be hyper-focused,

21  we're trying to keep this organization running as best we can,

22  and get to a close so that, you know, the next version of the

23  organization can blossom.  Created concern for me that

24  perhaps, you know, other bidders might -- backup bidders might

25  say, well, I don't know, you've now had loss of value, your

1    sales -- you know, your sales could be potentially down, or

2    you don't have the same relationships I think is, you know, as

3    I think we've talked about this business, because they're

4    wholesalers -- because they're distributors, excuse me,

5    because they're distributors, there's selling relationships.

6    And now all of those relationships are in flux because people

7    are not sure, they can't have a fulsome conversation with the

8    relationships on the other side, with third parties.  It was a

9    difficult few days from an operational perspective.

10   Q.  What, if anything, did the Debtor do in response to this

11   interview?

12   A.  I believe there was an initial reach-out to the financial

13   advisor at Alliance.  And then counsel sent a letter.

14   Q.  Okay.

15   A.  An email, excuse me, an email by -- an email indicating

16   our concerns.

17   Q.  If you could turn in the Debtor's exhibit binder to

18   Exhibit 17.

19       (Debtor's Exhibit-17 previously marked for

20   identification)

21       (Pause in proceedings)

22   A.  Seventeen, you say?

23           MR. TEELE:  Your Honor, before we get started with

24   this exhibit, I'm going to state the same objection that I've

25   stated to prior email exchanges, particularly in this case.

1   It's pure hearsay.  The witness was not copied on this email,

2   on the face of it.  I think that this needs to be excluded as

3   hearsay evidence.

4           THE COURT:  Mr. Minuti.

5           MR. MINUTI:  Your Honor, I can ask the witness if he

6   received a copy.  I can do that.  Mr. Hampton is here.  If I

7   have to call him to the stand to confirm that he sent the

8   email, I can do that.

9           THE COURT:  Well, for what purpose is this being

10  offered?

11          MR. MINUTI:  The purpose for it being offered, Your

12  Honor, is that there was contemporaneous notification to

13  Alliance that we were concerned about the video.  It simply

14  supports the testimony of the witness at this point of the

15  concerns that were raised and felt throughout the company

16  based on this 90-minute interview.

17          THE COURT:  All right.  If that's the purpose for

18  which it is offered, which is to say notice was given of

19  concern, then the objection is overruled and the exhibit is

20  admitted.  Or, I'm sorry, it's not -- you haven't moved for

21  its admission.  The objection is overruled.

22          MR. TEELE:  If I may, further to that objection,

23  Your Honor, I think Mr. Minuti does need to ask the witness if

24  he's received a copy of this before I will -- or I would need

25  to renew my objection.

1          THE COURT:  Okay.  Mr. Minuti.

2    BY MR. MINUTI:

3    Q.  Mr. Gorin, have you seen this email before?

4    A.  Yes.

5    Q.  Okay.  Did you receive a copy of this email?

6    A.  I did.

7    Q.  Did you receive it contemporaneous to when it was sent?

8    A.  I did.

9    Q.  And what is your understanding of when it was sent?

10   A.  It was sent on Wednesday evening, late in the evening

11   about ten of 9:00.  And I received it a few minutes later.

12   Q.  Okay.  And was the email sent at your direction?

13   A.  It was conversation we had with -- I had with counsel and

14   expressing my concern.  The impact of the --

15   Q.  I don't want you to get into what you talked to --

16   A.  Yes.

17   Q.  -- counsel about.  Was it sent --

18   A.  Yes, sir.

19   Q.  -- at your direction?

20   A.  Yes, sir.

21          MR. MINUTI:  Your Honor, I would move into evidence

22   Debtor's Exhibit Number 17.

23          THE COURT:  It's admitted.

24      (Debtor's Exhibit-17 admitted into evidence)

25   BY MR. MINUTI:

1  Q.  Can you tell the Court what, if anything else, happened

2  after the auction that caused you to start losing faith in

3  Alliance Entertainment as a purchaser of the Debtor's assets?

4  A.  There was also a meeting between Alliance Entertainment

5  and retailers to discuss, as I -- to discuss based on -- to

6  discuss strategy and their plans coming into the market.  It

7  was with my understanding comic book retailers and collectible

8  retailers.

9  Q.  Okay.  And what did you understand was said during those

10  or during that meeting?  Excuse me.

11  A.  It was said that within three to four months of closing,

12  the primary collectible and comic book warehouse was going to

13  be closed.  And there was -- they were going to move that

14  product elsewhere.

15  Q.  And you may have testified this -- as to this already, but

16  what impact does -- did that have on the Debtor, or why is

17  that a concern to the Debtor?

18  A.  So I think it's -- there's two main issues that this

19  raised from our perspective.  One, as talked about earlier,

20  now we have people -- we have 150 people in this warehouse

21  saying -- you know, saying, okay, well, this warehouse is

22  closing, you know, perhaps I should immediately start go

23  looking for a job.  And managers calling, asking for some kind

24  of clarification so that it -- so that there'd be some comfort

25  among the staff.  Additionally, there is a -- there's a tail

1    on this, as has been discussed, where a significant amount of

2    product has to be sold, you know, has to be tracked, sold,

3    invoiced, and collected.  And it has to -- you know, it starts

4    immediately.  And if for the first three or four months there

5    the buyer is going to be closing that and moving tens of

6    millions of dollars of inventory out of this 600 -- I think

7    it's 600,000 square foot facility, how do they do that and

8    also track and sell and collect.

9        And a big part of the estate is collecting on that.  I

10   believe we heard it's like in the ten million dollar range.

11   And that's a big part of the return to the various

12   constituents.  And it creates significant concern of can we do

13   that in a way that is -- that can be tracked, that can be

14   verified, and that we -- and that the product can be sold at a

15   market -- you know, at a normal market price and collected in

16   a reasonable time.  And product that has to be moved, I mean,

17   it's quite -- when you're moving 600,000 square feet, it's

18   quite a undertaking to make sure that specific pieces of it

19   don't get lost in the -- and meshed into the rest of the

20   inventory.

21       So it created real concern about the value and the

22   collectability on that I guess what we're calling the

23   incentive payment.

24   Q.  Were there any other concerns that you had based on events

25   that occurred after the auction that caused you to lose faith

1    in Alliance Entertainment as a bidder?

2    A.  I think, as I said, the back and forth, the steadfastness,

3    and not making the adjustments to align with the bid.  I found

4    it concerning that we received no communications of which I'm

5    aware that relayed or involved with the transition, right?

6    There's payroll and employee benefits and IT systems and all

7    of these things that you don't flip a switch and then it's

8    over, it's fixed and transitioned.  It takes time, it takes

9    planning.  And I was not seeing what I would typically expect

10   in that scenario that here is -- let's start talking about

11   here's a transition checklist, let's -- you know, if we're

12   going to get there, let's start talking about these things as

13   well, because they take time.  And as I think we've talked

14   about quite a bit, time was not something we had on our side.

15   Q.  You testified earlier about some contact between Alliance

16   Entertainment and an employee.  Can --

17   A.  Yes.

18   Q.  -- you expand upon that?  What happened?

19   A.  So there was a call I guess -- there was a call between

20   the chairman, Diamond's president, and professionals on the

21   call.  And after that call ended, the chairman of Alliance

22   reached out to the president directly, against the -- you

23   know, the kind of the rules of conduct and interaction that

24   we'd all agreed to, and to talk to him.  And, you know,

25   ostensibly he wasn't getting what he wanted and thought I

1   needed to talk to him without chaperons on the phone and to

2   get what I needed.  And so he had a very lengthy conversation

3   unsupervised from company's professionals with the president

4   of Diamond to I guess get whatever information he was

5   searching for.

6   Q.  Okay.  Anything else raise your concerns -- Again,

7   post-auction -- with Alliance Entertainment?

8   A.  I think we've covered most of what I can --

9   Q.  And so all of the things you mentioned -- well, strike

10  that.  If you could turn to Exhibit 5 in the binder; do you

11  recognize this document?

12      (Debtor's Exhibit-5 previously marked for identification)

13      (Pause in proceedings)

14  A.  Yes.  This is -- yeah.  This appears to be the

15  nondisclosure agreement, confidentiality agreement.

16  Q.  Okay.  That's the confidentiality agreement signed by

17  Alliance Entertainment, correct, related to this transaction,

18  right?

19  A.  Yes, sir.

20  Q.  And what is the date of that document?

21  A.  October 18th, 2024.

22  Q.  And the interview we talked about that appeared on

23  YouTube, when did that occur again?

24  A.  March 25th, 2025.

25  Q.  And the reach out to the employee we talked about, did

1  that occur after October 18 of 2024?

2  A.  Yes, sir.  Back in March, this March.

3  Q.  And the meeting they arranged with the retailers, did that

4  occur after October 18?

5  A.  Yes, sir.

6  Q.  Okay.  If you look at paragraph number one of what we've

7  marked as Exhibit 5, it says, you shall use the evaluation

8  materials solely for purposes of evaluating transaction, and

9  you shall keep the evaluation materials confidential, except

10  that you may disclose the evaluation materials or portions

11  thereof to those of your directors, so on, and so forth; do

12  you see that?

13  A.  Yes, sir.

14  Q.  Okay.  And if you look at paragraph four on page two, it

15  says without the prior consent of the company, you shall not

16  and shall direct your representatives not to disclose to any

17  person or entity, "A," that the investigations, discussions,

18  or negotiations are taking place concerning a possible

19  transaction, that you have requested or received any

20  evaluation material or the existence and terms of the

21  agreement or, "C," any of the terms, conditions, or other

22  facts with respect to the transaction, including the status

23  thereof.  Did the company give Alliance Entertainment

24  permission to give this interview?

25  A.  No, sir.

1  Q.  Did the company give Alliance Entertainment permission to

2  reach out to its own employees?

3  A.  To -- no, to Diamond's employees, no.

4  Q.  I'm sorry, to Diamond's employees.

5  A.  No.

6          MR. MINUTI:  Let me rephrase that question.

7  A.  Thank you.

8  BY MR. MINUTI:

9  Q.  Did the company, the Debtors, give Alliance Entertainment

10  to reach out directly to the Debtor's employees?

11  A.  No.

12  Q.  Did the Debtors give Alliance Entertainment permission to

13  reach out directly to its retailers?

14  A.  No.

15  Q.  Okay.  And if you can look at --

16  A.  It's --

17  Q.  If you look at paragraph five, same agreement.

18  A.  Yes.

19  Q.  Until the consummation of the transaction by you or a

20  third party, you shall not initiate or maintain contact with

21  any officers, directors, employees, agents, customers, so on

22  and so forth; did I read that correctly?

23  A.  Yes, sir.

24  Q.  Okay.  And so did you have a view as to whether the events

25  you've spoken about violate this NDA?

Gorin - Direct                    127

1    A.  I believe they do.

2              MR. TEELE:  Objection, Your Honor.  Calls for a

3    legal conclusion.  And I don't think the witness is a lawyer.

4              MR. MINUTI:  I just asked him for his opinion, Your

5    Honor.

6              MR. TEELE:  I'm not sure the -- that the witness has

7    been qualified as an expert to give his opinion, Your Honor.

8              THE COURT:  Sustained.

9    BY MR. MINUTI:

10   Q.  If you could turn now to --

11   A.  I did -- if I could, I did -- this reading of that reminds

12   me of two other points --

13             THE COURT:  No.

14   A.  -- from the video.  Okay.

15             THE COURT:  Questions have been asked and answered.

16   Next question.

17   A.  Sorry, Your Honor.

18        (Pause in proceedings)

19   BY MR. MINUTI:

20   Q.  So what was the ultimate result of all of the concerns

21   you've been testifying about with respect to how the Debtors

22   viewed both the bids received by Alliance Entertainment and

23   the bids received by Universal and Ad Populum?

24   A.  At the end of the day, I was asked to use my best business

25   judgment to, one, think about and decide the most likely

1    scenario to close, as well as the operations and the -- as per

2    the incentive program to sell the product, and where I

3    thought, you know, from a business perspective we had the best

4    opportunity to monetize the assets for the benefit of the

5    estate and the -- all the associated constituents.  And when I

6    add up all of these things that we've talked about, and when I

7    add up kind of all of the behavior and, you know, put that all

8    together, it created for me in my business judgment

9    significant concern about the ability to close, as well as the

10   ability to monetize those assets, to sell, track them, sell

11   them, and collect on them.  And that's where I ended up.  And

12   that was the concern that I had about moving forward with

13   Alliance.

14   Q.  Now, before making that decision, did you consult with

15   JPMorgan Chase and the committee?

16   A.  I absolutely did.  I -- all the -- with both of those

17   parties, as well as my own team and our advisors and our

18   lawyers and our investment bankers.  It was -- there was

19   significant consultation about the best path to move forward.

20   Q.  Well, when you say significant, give me a sense for what

21   happened?

22   A.  There were discussions internally, as I said, with

23   counsel, with Raymond James, within my own group, and

24   conversations with the consultative parties.  You know,

25   multiple calls and meetings to discuss these topics and to

1  arrive where we did, and to explain.  I mean, and, you know,

2  to the consultation parties' credit, they prodded and poked

3  and asked a lot of appropriate questions to make sure that

4  they understood the decision and how we got to this business

5  judgment.  And so I saw it as a very -- you know, very good,

6  free-flowing exchange of conversation and questions and with

7  healthy skepticism to make sure we were making the best

8  possible decision we could.

9  Q.  And how would you characterize making that decision; easy,

10  hard --

11  A.  Oh, it was --

12  Q.  -- something else?

13  A.  -- very difficult.  It was very difficult, right.  I mean,

14  at the end of the day, look, the very -- at the end of the

15  day, there are a lot of people depending on this decision.  I

16  get that.  And it's a significant decision.  And it's jobs,

17  and it's jobs that filter out well beyond Diamond and Alliance

18  Games.  It filters out into the marketplace, it filters out

19  into an industry which is in a fragile state.  And I want to

20  do right by all the parties.  And I -- you know, all -- my

21  only goal was to do the best that I could with the information

22  that I had at hand.  That's what I was trying to do.  It was

23  difficult.  It was at times frustrating, confusing, and

24  definitely very hard.

25  Q.  Okay.  And just so to sum up, do you have a view as to

1    whether or not the Universal and Ad Populum asset purchase

2    agreements which are before the Court represent the highest

3    and best price available for the Debtor's assets?

4    A.   I do.

5    Q.   And what is the basis of that view?

6    A.   It's my personal business judgment that they are the most

7    likely to close in a -- most likely to close and most likely

8    to work in concert to monetize the assets for the incentive

9    program, the incentive piece of the purchase price.

10   Q.   Now, you were in the courtroom earlier today when

11   Mr. Teele told the judge that Alliance's chairman is here,

12   he's got his checkbook, he's ready to close as soon as

13   possible.  Did that change your decision or sway your decision

14   in any way?

15   A.   It didn't because I don't know how that happens.  As I

16   talked about, all of the things that have to transition, I

17   don't see the path to making that happen; certainly not

18   within, you know, the next couple of days.  And on top of that

19   I just -- I need to know how they're going to -- how we're

20   going to monetize.  And saying that they're going to close in

21   a -- you know, within a day or two still doesn't talk -- still

22   doesn't address kind of what's already been out -- put out

23   there in terms of consolidation and how that's going to impact

24   the ability to monetize the product that we already have.

25              MR. MINUTI:  Okay.  May I have just a moment, Your

1    Honor?

2         (Pause from 2:15 p.m. to 2:16 p.m.)

3         THE COURT:  Mr. Minuti, I think I'm going to have to

4    ask you to break up your committee meeting and move on with

5    your examination, sir.

6         (Laughter)

7         MR. MINUTI:  Very well, Your Honor.  I just have a

8    few more questions.

9    BY MR. MINUTI:

10   Q.  At the time that Mr. Ogilvie gave this interview that

11   you've been testifying about, did you have a signed APA from

12   Alliance Entertainment?

13   A.  We did not.

14   Q.  Okay.  And at the time the interview was broadcast, had

15   you had -- yet had time to talk to the employees about what

16   happened at the auction?

17   A.  I had not.

18   Q.  And when is free comic book day scheduled for 2025?

19   A.  It's the first Saturday in May.  I believe it's the 3rd,

20   May 3rd.

21        MR. MINUTI:  Okay.  All right.  I have no further

22   questions, Your Honor.  Thank you.

23        THE COURT:  Cross examination.

24                     CROSS EXAMINATION

25   BY MR. TEELE:

1  Q.  Good afternoon, Mr. Gorin.  Jason Teele, I represent

2  Alliance Entertainment.  I think we've met before.

3  A.  We have.

4  Q.  You said that following this podcast you heard from

5  retailers; is that right?

6  A.  Yes.  We heard from retailers.

7  Q.  Which retailers did you hear from?

8  A.  I don't have a list of the names.  I'm relying on my -- on

9  the customer service team.

10  Q.  How many retailers did you hear from?

11  A.  Enough that it caused them to raise the issues and --

12  Q.  Did you --

13  A.  -- bring it to me.

14  Q.  Did you personally hear from any retailers?

15  A.  No, sir.

16  Q.  Which vendors did you hear from?

17  A.  Again, we heard from -- our purchasing department heard

18  from multiple vendors.  And they are the ones that brough it

19  to my attention.

20  Q.  Who in the purchasing department heard from these vendors?

21  A.  Multiple people across.  Ultimately they brought that up

22  through their managers, and it made its way up through the

23  organization to me.

24  Q.  Which manager reported it to you?

25  A.  Ultimately it came to me through Chuck Parker.

1   Q.  How many vendors did Mr. Barker report to you contacted

2   the company?

3   A.  Again, I don't have a number.  But I know it was enough to

4   raise it as an issue.

5   Q.  Are you satisfied that the Debtors served notice of the

6   filing of the bankruptcy to the Debtor's retailers and

7   vendors?

8   A.  Sorry, I don't understand the question.

9   Q.  Are you satisfied that the Debtors served notice of the

10  filing of the bankruptcy petitions to the Debtor's retailers

11  and vendors?

12  A.  Which petitions?  I'm just not following --

13  Q.  The bankruptcy petitions.

14  A.  -- I'm not trying to be difficult.

15          THE COURT:  I don't understand the question either.

16  BY MR. TEELE:

17  Q.  Do you know --

18          THE COURT:  Who cares whether he's satisfied about

19  the notice?  I don't understand the question.

20  BY MR. TEELE:

21  Q.  Do you know whether, or if, vendors of the Debtors were

22  provided with notice that the Debtors had filed bankruptcy?

23  A.  Did we communicate with vendors that we were -- that we

24  had filed bankruptcy?

25  Q.  Yes.

1    A.  Yes.

2    Q.  Did you communicate with retailers that you had filed

3    bankruptcy?

4    A.  The organization did, yes.

5    Q.  Did the Debtors serve or sending notice to retailers of

6    the filing of the sale motion?

7    A.  I don't believe so.

8    Q.  Did you serve vendors with a notice of the filing of the

9    sale motion?

10   A.  I don't believe so.

11   Q.  How many employees expressed their concerns to you over

12   the comments allegedly made on this podcast?

13   A.  Again, much of this came to me through channels, through

14   management.  We did ultimately have townhall sessions.  And it

15   was very clear that they were concerned about the impact and

16   the messages that they were hearing.

17   Q.  Did the employees know the company was in bankruptcy

18   before that, before the podcast?

19   A.  Yes.

20   Q.  Did the employees know that the company's assets were

21   being offered for sale in a bankruptcy process before the

22   podcast?

23   A.  Yes.

24   Q.  Did you review the original stalking horse bid submitted

25   by Universal Distribution?

1    A.  Yes.

2    Q.  Do you recall what that stalking horse bid said about

3    employees?

4    A.  I do not.

5    Q.  If you have in front of you the binder of the Debtor's

6    exhibits, --

7    A.  Yes, sir.

8    Q.  -- and if you could please turn to -- one second.  I

9    believe it's Exhibit 18.  I apologize.  My question is not to

10   the original stalking horse bid.  It's to the asset purchase

11   agreement dated April 5th, which appears as Exhibit Number 18.

12   Have you reviewed that document before?

13   A.  Yes, sir.

14          MR. TEELE:  And if you could turn to page 27 of that

15   document, I believe.  I apologize.  That reference is

16   incorrect.  Your Honor, let me just have one moment to find

17   the reference that I'm -- I thought that I had made a note of

18   but I obviously did not.  Okay.  Page 22 of Exhibit 18, excuse

19   me.

20          THE COURT:  So what's the -- this is -- we're

21   talking about the Asset Purchase Agreement.  It's got a date

22   stamp from the court.  It was filed on April 5th.

23          MR. TEELE:  That's correct, Your Honor.

24          THE COURT:  And it's an asset purchase agreement

25   dated 13th day of January, 2025.  Are we all looking at the

1   same thing?

2              MR. TEELE:  That is correct, Your Honor.  And it's

3   Debtor's Exhibit 18 in the binder.

4              THE COURT:  You're directing the witness to page 22

5   of that document.

6              MR. TEELE:  That's correct.

7              THE COURT:  You mean page 22 as stated at the bottom

8   of the page?

9              MR. TEELE:  Yes, it is.

10             THE COURT:  Okay.  Go ahead.

11  BY MR. TEELE:

12  Q.  And at the top of that page 22, Mr. Gorin, it says seven,

13  and then it says employees; do you see that?

14  A.  Yes, sir.

15  Q.  Could you read the first sentence of that paragraph?

16  A.  Purchaser intends to offer continued employment to most

17  employees of the business on the same or similar terms as

18  their current terms of employment.

19  Q.  Now could you please turn to Exhibit 8 in that binder, and

20  page 26, as indicated at the bottom of that exhibit?

21  A.  I'm sorry, what page?  I apologize.

22  Q.  Twenty-six.

23          (Pause in proceedings)

24  A.  Okay.

25  Q.  And do you see about a little bit more than halfway down

1   that page another paragraph seven, titled employees?

2   A.  I do.

3   Q.  And could you read that first sentence as well, please?

4   A.  Purchaser intends to offer continued employment to most

5   employees of the business on the same or similar terms as

6   their current terms of employment.

7   Q.  And, excuse me, turning to the very first page of that

8   exhibit, this is the asset purchase agreement that was

9   submitted by Alliance to the Debtors following the auction; do

10  you agree with that?  If you turn to the first page of Exhibit

11  8.

12  A.  I'm sorry, are you saying the first page of the document

13  or of the email?

14  Q.  The first page of Exhibit 8.  You'll find the Exhibit 8

15  tab --

16          THE COURT:  First page of the exhibit is the email.

17  A.  Right.

18  BY MR. TEELE:

19  Q.  And I'm asking whether you agree that this Exhibit 8 is

20  the asset purchase agreement redline sent by Alliance to the

21  Debtors following the auction.

22  A.  On March 26th, yes.

23  Q.  Do you agree with that?

24  A.  On March 26th, yes.

25  Q.  Yes.  Okay.  And did you show this section seven on page

1   26 to any of the employees that expressed concern about the

2   future of their employment at the company?

3   A.  I didn't have this on the initial day that that was

4   happening because the interview was on the 25th.

5   Q.  All right.  Do you recall whether that same provision was

6   in the bid draft asset purchase agreements submitted by the

7   bidders at the auction?

8   A.  I can't tell you that I can off the top of my head, no.

9        (Pause in proceedings)

10  Q.  Do you have this binder in front of you, the Alliance

11  Entertainment binder?

12  A.  Is that this one?

13  Q.  Yes.

14  A.  Okay.

15            MR. TEELE:  Your Honor, do you have Alliance's --

16            THE COURT:  I do.

17            MR. TEELE:  So I'm going to refer the witness, Your

18  Honor, to Exhibit A-06.

19       (Alliance's Exhibit-06 previously marked for

20  identification)

21  A.  I don't know what that's -- I don't have letters.  I have

22  numbers.

23            MR. TEELE:  It's number six.

24            THE COURT:  Number six.

25            MR. TEELE:  It's tab number six.

1   A.  Yes, thank you.

2            MR. TEELE:  And I'll give you a second to look

3   through it, especially the first couple of pages, before I ask

4   you a question.

5        (Pause from 2:26 p.m. to 2:27 p.m.)

6   A.  Okay.

7            MR. TEELE:  You ready?

8   A.  I think so.

9   BY MR. TEELE:

10  Q.  Do you recall seeing this version of the asset purchase

11  agreement prior to or at the auction that commenced on March

12  24th?

13  A.  Yes.

14  Q.  Would you please turn to page 23 of that exhibit?

15           THE COURT:  Referring to 23 at the bottom of the --

16           MR. TEELE:  Yes, Your Honor.  It's --

17           THE COURT:  -- attached document.

18           MR. TEELE:  Yes, Your Honor.  It's tab six.  There's

19  a document with page numbers, and it's page number 23.

20           THE COURT:  Yes.  It's not the twenty-third page of

21  the exhibit, it's the twenty-third page of the document --

22           MR. TEELE:  That is correct.

23           THE COURT:  -- at the bottom.

24           MR. TEELE:  That is correct.

25           THE COURT:  The one with paragraph seven that says

1    employees; are you there, sir?

2    A.  I am.  Thank you, Your Honor.

3            MR. TEELE:  That is where --

4            THE COURT:  Okay.  Go ahead.

5            MR. TEELE:  -- I'd like you to be.

6    BY MR. TEELE:

7    Q.  Could you read the first sentence of that paragraph seven?

8    A.  Purchaser intends to offer continued employment to most

9    employees of the business on the same or similar terms as

10   their current terms of employment.

11   Q.  Did you show that to any of the employees who expressed

12   concern about the future of their employment with the company

13   as a result of this podcast?

14   A.  No, sir.

15   Q.  Why not?

16   A.  You're asking me to show legalese at a moment that is very

17   raw for the employees.  They've just heard from their likely

18   new owner and boss.  They've heard some plans that are being

19   seriously considered, and they're very concerned.  And I am

20   doing all that I can to comfort them and tell them that I

21   don't -- I am hopeful that their jobs are not in jeopardy and

22   that -- you know, that initially everybody is saying that,

23   yes, they want to keep the employees.  So I am referencing it

24   in my conversation.  But I did not believe showing a legal

25   document would give anybody comfort at that moment.  So I was

1   talking about it and I was sharing the basic message.  But the

2   point is that the -- is that, you know, the toothpaste was out

3   of the tube a little bit, if you will, and that they heard

4   what they heard, they saw it firsthand.  It's an emotional

5   thing.  It's very hard to talk to somebody who's like, I think

6   I'm going to lose my job, as I'm sure you can imagine.  And I

7   was doing the best I can to comfort them and give them some

8   surety that, you know, their job was not in jeopardy.  But

9   there's only so much I can do at that point.

10  Q.  So you did tell them, you did attempt to give them some

11  surety --

12  A.  I did.

13  Q.  -- that their job was not in jeopardy.  And you did tell

14  them, am I correct, that the purchaser's agreements contain

15  similar provisions regarding retention of employees; is that

16  correct?

17  A.  Yes.  And they wanted to know why we then --

18         MR. TEELE:  It was a yes or no question, sir.

19  A.  They wanted to know why then --

20         MR. TEELE:  That was a yes or no question, sir.

21  Yeah, I got my answer.

22  A.  -- that he was on --

23         THE COURT:  Is the answer yes or no?

24  A.  -- a video -- okay.  Yes.

25  BY MR. TEELE:

1  Q.  What was the -- now, you testified that retailers and

2  vendors were worried about free comic book day ending as a

3  result of Mr. Ogilvie's interview on this podcast, correct?

4  A.  Yes, sir.

5  Q.  And what's the basis for you saying that?

6  A.  The -- there was an agreed that -- an admittance that --

7  an admitting that he did not know a lot about comic books,

8  that there's no -- I believe the way -- I don't remember the

9  exact words but the concept was there's no such thing as a

10  free CD day or a free album day.  And that created -- that was

11  translated in the marketplace to free comic book day was at

12  risk.

13  Q.  So which retailers did you hear from that expressed that

14  concern?

15  A.  Again, that came to me through the team.  I don't have

16  names.

17  Q.  So it's your testimony that a retailer called a team

18  member and expressed a very specific concern.

19  A.  About free comic book day?

20  Q.  Uh-huh.

21  A.  Yes.  There are articles about it in the industry.

22  Q.  About it ending?

23  A.  About it being at risk, yes, sir.

24  Q.  Under the asset purchase agreement that was accepted as

25  the highest bid at the auction of Alliance, what is your

1   understanding of the closing date under that agreement?

2   A.   The --

3   Q.   When would the closing occur, in other words?

4   A.   I believe it's on or about the 10th of this month.

5   Q.   Would it -- would you agree with me that that asset

6   purchase agreement contained a date that was discussed at the

7   auction because there was a typographical error in the

8   stalking horse APA which other folks had copied over that said

9   that the outside closing date would be 70 parentheses seven --

10  or, I'm sorry, eight, zero, close parentheses days after the

11  petition date; does that -- do you recall that?

12  A.   I'm sorry, I do not.

13          MR. TEELE:   Okay.  Would you turn to again the

14  Debtor's exhibit binder?

15  A.   Back to the other binder?

16          MR. TEELE:   The black -- yes, the other one, yes,

17  sir.  And would you please turn to -- again to D-8 -- I'm

18  sorry, Exhibit 8.

19  A.   Okay.

20          MR. TEELE:   And now the document that has page

21  numbers at the bottom, --

22  A.   Okay.

23          MR. TEELE:   -- would you please turn to page 27?

24  A.   I'm sorry, twenty?

25          MR. TEELE:   Seven, 27.

1              MR. MINUTI:  I'm sorry, what exhibit is this?

2              MR. TEELE:  Eight.

3              MR. MINUTI:  In Debtor's?

4              MR. TEELE:  In your -- in the Debtor's, yes.

5    BY MR. TEELE:

6    Q.  And at the top of that -- I'm sorry, are you on page 27?

7    A.  I am.

8    Q.  Thank you.  At the top of that page is Section 8.1, called

9    termination.  And can you read -- I'm sorry.  Could you please

10   read the first sentence of that 8.1 prior to the "A" in

11   parentheses?

12   A.  The one that says by mutual?

13   Q.  No.  It says termination period, --

14   A.  Okay.

15   Q.  -- and then it has the sentence.

16   A.  This agreement made by notice given prior to or at the

17   closing be terminated.

18   Q.  And then could you read subsection "B" of that, please?

19   A.  By purchaser in the event the closing has not occurred,

20   other than through failure of any party seeking to terminate

21   this agreement to comply fully with its obligations under such

22   agreement on or before 80 days after the petition date.

23   Q.  Okay.  Does that refresh your recollection at all as to

24   when the closing date was anticipated to occur?

25   A.  Yes.

1   Q.  And by your calculations the closing date was discussed as

2   being sometime around April 10th; did I get that right?

3   A.  Yes.

4   Q.  So from the perspective of the end of the auction, which

5   concluded when, in the morning hours of March 25th?

6   A.  March 25th, yeah.

7   Q.  Between March 25th and an outside closing date of April

8   10th, you became so concerned over the future of this

9   business, notwithstanding the fact that you had an offer in

10  hand, that you made a business judgment that Alliance could

11  not close or would not close based on the statements made on a

12  podcast; is that correct?

13  A.  No.

14  Q.  Well then correct me because I heard something different.

15  A.  Clearly I said that I thought -- and let me be clear,

16  first of all, the behavior predates -- some of the items that

17  I talked about predate the auction.  And when you look at all

18  these individually, okay, things happen.  But when you start

19  to add them all up, you get a feeling.  I never said they

20  could not or would not.  I said that in my best business

21  judgment, adding all of those things together, the best

22  opportunity to close, the most likely to close, was the backup

23  bidder.  I -- that was what I said.

24  Q.  Okay.  So as a result of this podcast how many employees

25  quit?

1    A.  I don't have numbers from HR.  I don't know.

2    Q.  As a result of the podcast how many retailers stopped --

3    A.  I don't know.

4    Q.  -- selling Diamond Comics products?

5    A.  I don't know.

6    Q.  Did any?

7    A.  I don't know.  I just know that it created -- at a time

8    where things were tenuous and ambiguous and there was a lot of

9    angst in the marketplace and within the company, it created

10   additional noise that we had to deal with above and beyond the

11   day-to-day running of the company.  And already holding

12   everything together with the concerns that were out there, it

13   magnified the concerns.  That's what I know and that's what we

14   had to deal with.

15   Q.  But you don't know if any employees quit because of that.

16   And you also don't know if any retailers stopped selling their

17   products because of that.

18   A.  No.

19   Q.  How many vendors stopped doing business with you because

20   of that?  With the Debtors because of that.

21   A.  I don't know.

22           MR. TEELE:  So you don't know.  Okay.

23   Q.  How long -- now, the podcast you testified was broadcast

24   where; on YouTube, you said?

25   A.  Yes.

1    Q.  How long did the podcast remain live on YouTube?

2    A.  I don't know.

3    Q.  How many subscribers of the YouTube channel are there for

4    that podcast?

5    A.  I don't know.

6    Q.  Since the podcast aired, for lack of a better word -- I

7    don't know what podcasts do -- has the total value of any of

8    the current bids -- and when I say current bids, I'm referring

9    to, you know, Alliance Entertainment bid, I'm referring to the

10   Universal Distribution bid, and I'm referring to the Ad

11   Populum/Sparkle Pop bid, just so we're clear.  But since the

12   podcast aired, has the value of any of those bids decreased as

13   a result of that podcast?

14   A.  I don't believe so.

15            MR. TEELE:  Thank you.  I have no further questions,

16   Your Honor.

17            THE COURT:  Redirect.

18            MR. MINUTI:  Thank you, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. MINUTI:

21   Q.  So, Mr. Gorin, Mr. Teele asked you a bunch of questions

22   about the impact of the 90-minute interview that was given the

23   day after the auction.  That was done, again, before you

24   received a signed APA, correct?

25   A.  Correct.

1   Q.  Okay.  And but I think you testified it wasn't just the

2   video that caused these concerns.

3   A.  Correct.

4   Q.  Okay.  And he took you through the asset purchase

5   agreements and he showed you section seven of the Alliance

6   Entertainment asset purchase agreement that talks about them

7   offering employment to employees, correct?

8   A.  Correct.

9   Q.  All right.  And when you talked about the video and you

10  talked about the reach out to the employees, right, as I

11  understand it there was discussion about consolidating

12  warehouses, right?

13  A.  Yes.

14  Q.  And how many are we talking about?  How many warehouses

15  were being consolidated?

16  A.  There are five warehouses currently.

17  Q.  Okay.  And how many employees of the Debtor are in those

18  warehouses?

19  A.  Well over 200, 250.

20  Q.  All right.  And I think in one -- I can't remember if it

21  was the video or the discussion, they said they were going to

22  do that in about three to four months, right?

23  A.  Three to four months, yes, sir.

24  Q.  Okay.  So even if on the closing date they offered

25  employment to substantially all the employees, right, by

1   communicating that they're going to close these warehouses,

2   there's no doubt that employees understand their jobs could be

3   eliminated, correct?

4   A.  Correct.

5   Q.  Okay.  He also wanted to ask you about, you know, how many

6   people subscribed to the podcast.  And I think you answered

7   you didn't know.

8   A.  I don't.

9   Q.  Right.  But are you only concerned about the people that

10  subscribe to the podcast?

11  A.  No.  A couple of outgrowths from that as well.  First of

12  all, there were articles published about that.  People

13  download the podcast so I -- you know, and pieces of it were

14  being shared.  There were summaries that were being shared,

15  you know, people who were watching it and sending around key,

16  you know, salient points that they thought were critical for

17  various employees or etcetera to understand that was being

18  shared.  So the damage was well beyond the number of people

19  who watched the podcast.  It was the sharing of that

20  information.  You know, I tell two friends and they tell two

21  friends and so on.  That was what was causing the

22  disruption --

23            MR. TEELE:  Your Honor, --

24  A.  -- to the workforce.

25            MR. TEELE:  -- do object.  The witness is merely

1   speculating that the podcast was passed on from so and so to

2   so and so and so and so.  He has -- he testified that he

3   didn't know.  Now he's just merely guessing or speculating on

4   redirect as to whether people actually did this.  Nobody

5   knows, including the witness.

6                THE COURT:  Overruled.

7   BY MR. MINUTI:

8   Q.  Now, you were quite candid in response to some of the

9   questions about whether you lost vendors, whether you lost

10  employees, and so on.  Did -- in response to the video, in

11  response to the reach out to employees, in response to the

12  reach out from Alliance Entertainment to vendors, did you take

13  proactive steps to try to calm these folks down and make sure

14  they stayed with the company?

15  A.  Absolutely, yes.

16  Q.  Tell me what proactive steps you took.

17  A.  We talked to key managers about messages to deliver about,

18  you know, that people needed to take a deep breath, they

19  shouldn't -- try not to -- even though it's a very emotional

20  topic, and it's scary, and change is hard, and ambiguity is

21  difficult for most people, to take a deep breath.  Let's let

22  things play out.  We are -- we still remain hopeful that this

23  will be in the best interest of most people, and that at the

24  moment we are still -- you know, it is still business as usual

25  and people should not get too concerned at this moment.

1    Look, when asked for promises of the future, I was -- we were

2    very clear.  We can't make you promises but we're doing all

3    that we can to have your back and protect you.

4              MR. MINUTI:  No further questions, Your Honor.

5              THE COURT:  All right.  Thank you.  I have no

6    questions for the witness.  You may step down, sir.  Thank you

7    for your testimony.

8    A.  Thank you, Your Honor.

9       (Witness steps down)

10             THE COURT:  Are you calling another witness,

11   Mr. Minuti?

12             MR. MINUTI:  Your Honor, what I'd like to do is I

13   did talk with Mr. Gorin about Debtor's Exhibit Number 5.  That

14   was the nondisclosure agreement signed by Alliance

15   Entertainment.  I would like to move that document into

16   evidence.

17             THE COURT:  Five is admitted.

18       (Debtor's Exhibit-5 admitted into evidence)

19             MR. MINUTI:  Thank you, Your Honor.  With that, Your

20   Honor, the Debtor rests.

21             THE COURT:  All right.  Thank you.

22             THEn, Mr. Teele, I assume you have a case to

23   present.

24             MR. TEELE:  I do, Your Honor.  I have two witnesses

25   on direct.  I don't believe that it will go beyond the usual

1    time the Court ends.  However, I would ask for a five-minute

2    break before we commence.

3              THE COURT:  All right.  That sounds like a good

4    idea.  Five-minute recess.

5              THE CLERK:  All rise.  This Court is in recess.

6         (A recess was taken from 2:44 p.m. to 2:57 p.m.)

7              THE CLERK:  Please remain seated and come to order.

8    The United States Bankruptcy Court for the District of

9    Maryland now resumes its regular session.

10             THE COURT:  All right.  Mr. Teele.

11             MR. TEELE:  Thank you, Your Honor.  at this time

12   Alliance would like to call as part of its direct case Paul

13   Navid of Province, LLC.

14             THE COURT:  Okay.

15        (Pause in proceedings)

16              PAUL NAVID, ALLIANCE'S WITNESS, SWORN

17             THE CLERK:  Please be seated.  Please state your

18   full name and address for the record.

19             MR. NAVID:  Paul Navid, 1111 Santa Monica, Los

20   Angeles, California 90025.

21             THE CLERK:  Thank you.  Your witness.

22             MR. TEELE:  May I proceed, Your Honor?

23             THE COURT:  Please.

24             MR. TEELE:  Mr. Navid, good afternoon.

25                        DIRECT EXAMINATION

1  BY MR. TEELE:

2  Q.  By whom are you employed?

3  A.  Province, LLC.

4  Q.  And could you please describe for the Court your

5  educational history, starting with college?

6  A.  Yeah.  I went to USC Marshall School of Business, studied

7  finance and business.

8  Q.  And could you please describe for the Court your

9  professional or employment history since college?

10  A.  Yeah.  So since college I owned a business which I exited.

11  After that I worked for Breakwater Investment.  After that I

12  worked for RookMedia on the merger with the main sponsor.

13  After that I worked for Spartan Group, a boutique investment

14  bank.  And then Province, and I've been at Province for about

15  seven years.

16  Q.  And what is your role in this bankruptcy case?

17  A.  So I'm advising Alliance Entertainment to evaluate

18  (indisccern.) in detail.  We have helped them prepare

19  financial models, merger model.  We've helped them talk with

20  their lender, who's a large institution, White Oak, to do

21  their underwriting.  We have helped them with their investment

22  bank who's raising equity for them, bank equity, and as part

23  of the sale process in the bankruptcy.

24  Q.  And have you testified before any bankruptcy courts in the

25  past?

1    A.  Yes.

2    Q.  How many times approximately?

3    A.  Close to a handful of time.

4    Q.  And have you ever been qualified by a Bankruptcy Court as

5    an expert witness in a bankruptcy case?

6    A.  Yes.  In valuation specifically.

7    Q.  And how many times have you qualified as an expert?

8    A.  Twice.

9    Q.  Twice.  Were you personally involved in formulating the

10   Alliance offer for the Debtor's assets in this case?

11   A.  I was.

12   Q.  And could you please describe that involvement?

13   A.  So we valuated all the assets that exist at different

14   divisions of the business, which has been discussed on the

15   record:  the Alliance side, Alliance Gaming specifically, the

16   Diamond side, the collectible, grading side, the select toys

17   business to formulate an offer.

18   Q.  Thank you.  And did you personally participate in

19   formulating or preparing Alliance Entertainment's original bid

20   submission prior to the auction on March 24th?

21   A.  I did.

22   Q.  And are you familiar with that bid?

23   A.  I am.

24   Q.  And could you please describe that original bid that was

25   submitted --

1  A.  Yeah.

2  Q.  -- prior to the auction?

3  A.  So we structured the bid in a similar format as the

4  stalking horse bid because we were told to do that.  We put an

5  offer of about 37 million for Alliance Gaming.  We put an

6  offer which included working capital adjustment that was

7  provided by the Debtors which would also include us acquiring

8  the inventory and account receivable at a percentage which,

9  again, was consistent with the stalking horse bidder.  And

10 then paying for the different businesses which was required by

11 the bid procedure to be valued in different buckets.  So the

12 DCD, which is the Diamond business, we put a offer of about

13 five million.  And then the other divisions combined we put an

14 offer about a million.

15 Q.  And did you personally attend the auction that commenced

16 on March 24th?

17 A.  I did.

18 Q.  And what was your role, if any, at that auction?

19 A.  I spoke on behalf of the client.  I formulated the

20 calculation to explain to them what the bid value was, what

21 the cash calculation was, what the assumed liabilities are,

22 and how it was modified during the auction.

23 Q.  Would it be fair to say that you were involved in all

24 aspects of the auction for Alliance Entertainment?

25 A.  Yes.

1   Q.  Could you please describe from the events that you

2   witnessed during the auction what the -- how the auction

3   process commenced and proceeded?

4   A.  Yeah.  And I want to start by saying majority of the work

5   that I do in bankruptcy is to represent creditors, mainly

6   committees and vendors.  And about 25 to 30 percent is

7   representing other folks like the seller; in this case the

8   buyer.  This was probably one of the most unorganized auctions

9   I've attended to.  And I've attended over a dozen.  It started

10  about seven hours from the starting time, which was supposed

11  to be about 10:00 a.m.  But it started closer to 5:00 p.m.,

12  which was just a general intro.  And then after that the --

13  and during that seven-hour time they -- nobody talked to us;

14  not a single conversation with the Debtor advisors or anybody

15  else.  We had to catch their attention in the hallway.  After

16  the introduction was made, there was a couple more hour of

17  break which then they came back on the record.

18       Around 7:00 p.m. they disclosed that they've combined two

19  bids to be able to I guess prepare a higher bid compared to

20  the bids that were placed when we were notified the day before

21  the auction, which was odd because, in my opinion, there were

22  two bidders that were willing to purchase the entire asset at

23  the auction.  It was Alliance, my client, and Basic Fun.  Even

24  after they disclosed the two bidders being combined, we asked

25  if they can provide us the detail of the non-cash portion of

1   the bid.  They refused to provide it.  We asked multiple times

2   and communicated that if you can provide us the details of the

3   non-cash, we would be willing to both increase our offer on a

4   cash basis but also on a non-cash basis.  But they forced us

5   to only bid on the cash basis after the formulation of the Ad

6   Populum non-cash portion.  And they said they would not

7   consider any other non-cash increases during the auction.

8        So -- and to be able to compete on a similar structure,

9   we basically incorporated the incentive amount on the record,

10  saying we would mimic -- my exact words -- the incentive

11  amount that's incorporated in the Ad Populum bid structure.

12  And on the record I specifically noted which definitions,

13  which is in the transcript, that we would incorporate within

14  our APA.  We made it clear that we're going to keep our APA

15  and all the other clauses that we have and only incorporate

16  the incentive definitions related to that non-cash portion.

17  Q.  And so from the beginning of the bidding at the auction

18  until the end of the auction, did Alliance's bid change as a

19  result of bidding?

20  A.  Yes.  We continuously increased our bid from my

21  recollection about two million of -- two million increments.

22  I believe it was over nine rounds that we kept increasing by

23  two million increments.  And as we increased our offer we were

24  told that during the hearing, that during the auction we were

25  told that Basic Fun wants to talk to us to formulate a similar

1   bid, similar to what Universal and Ad Populum did.  But the

2   Debtor refused to do it and which didn't make sense because

3   they've already agreed to it for Ad Populum and Universal.

4   And it would only increase the total consideration to this bid

5   if you have two parties willing to put more cash up front.

6   But they declined to allow us to talk to them, even when we

7   told them you could be in presence when we talk to them.  But

8   they basically declined it and didn't really provide a reason

9   for it.

10  Q.  Thank you.  And at the conclusion of the auction, who was

11  designated as the successful bidder for substantially all of

12  the Debtor's assets or, as you might have heard earlier,

13  what's called Lot D?

14  A.  It was my client, Alliance Entertainment.

15  Q.  And what was the total consideration under that final bid,

16  if you recall?

17  A.  Yeah.  Net of the bid protection fee is it was about 70.9

18  million.

19  Q.  Seventy point nine million net --

20  A.  Yeah.

21  Q.  -- of the stalking horse protections.

22  A.  Correct.

23  Q.  And what was the next highest bid?

24  A.  I believe it was about 69 million.

25  Q.  And prior to the Debtors announcing that Alliance was the

1    successful bidder, there was a break in the auction; is that

2    correct?

3    A.   Yeah.   So --

4    Q.   And could you --

5    A.   Yeah.

6    Q.   Yes or no?

7    A.   Yes.

8    Q.   And during that break could you please describe what, if

9    anything, you witnessed?

10   A.   Yeah.  So the two things occurred before we were announced

11   the winning bidder.  One is as the Universal bid were

12   increasing their bid, we asked them if they can give us the

13   detail of the increase in bids, so by which assets they're

14   increasing the bid.  And the Debtor declined to tell us that

15   so we didn't know exactly what category of assets they were

16   increasing for us to be able to compete.

17        So we just kept increasing the cash which then again

18   didn't allow the parties to know how to bid on different

19   buckets.  But also once the Universal buyers and Ad Populum

20   combined said they were done bidding, and their exact words

21   was, you know, we're done, and they congratulate me, which for

22   some reason is not on the record, the Debtor advisors ask if

23   they can speak with Universal before they were out.  And it

24   didn't make sense to us because they spent over nine hours

25   with Universal and less than 30 seconds with us.  And they

1   wanted to continue favoring them and helping them to stay in

2   the auction, even though they said they were done.  After I

3   raised that objection, which is in the transcript, the Debtors

4   said they're going to go talk among themself.  But it was very

5   obvious that, you know, they spoke with Universal and Ad

6   Populum in the hallway.  We saw them go in separate rooms and

7   continue talking for probably 45 minutes, then came back on

8   the record to say we were the winning bidder.

9   Q.  And did the Debtors disclose on the record or off the

10  record what they discussed during that break?

11  A.  They didn't, not to my recollection.

12  Q.  And going back to something you just said, and to be fair,

13  the Debtors -- it was your testimony the Debtors spent several

14  hours with Universal Ad Populum side and less than 30 seconds

15  with Alliance.  They spent more than 30 seconds with Alliance,

16  isn't that right?

17  A.  Yeah.  They -- most of it was -- I would say at most it

18  was few minutes.  And even when they spent that few minutes

19  with us, they were supposed to come back to talk to us

20  because, you know, they were going to give us the calculation

21  of the bids.  But they completely ignored that.  And they

22  started the auction actually without.  And they didn't invite

23  us back to the auction.  We only found out because one of the

24  participants was on Zoom and they told us, hey, the auction's

25  starting, why aren't you guys back in?

1    They didn't invite us because we were in a separate room and

2    back in the hallway, which it's typical in an auction you go

3    tell all the bidders, hey, we're starting the auction, we'd

4    like you back -- invite you back in.  We were not invited back

5    in.

6    Q.  And do you recall which participant was on Zoom that

7    alerted you to the fact that the auction was starting?

8    A.  Yeah.  It was the chairman of Alliance Entertainment, my

9    client.

10   Q.  Thank you.  Would you -- do you have this binder in front

11   of you?  It's the Alliance exhibit binder.

12   A.  Yes.

13   Q.  Could you please open that up to Exhibit 8, tab eight?  Do

14   you have it open, sir?

15       (Alliance's Exhibit-8 previously marked for

16   identification)

17   A.  Yes.

18   Q.  Okay.  Have you seen this document before?

19   A.  Yes.

20   Q.  And what is this document?

21   A.  This is my declaration that I worked with yourself to

22   prepare.

23   Q.  And did you review this before you signed it?

24   A.  Yes.

25   Q.  And, in fact, I'm sorry, if you turn to the page three as

1    indicated at the bottom of that sheet, there's a signature

2    there that says Navid; is that your signature?

3    A.  Yes.

4    Q.  Okay.  And you did review this before you signed it,

5    right?

6    A.  Yes.

7    Q.  Okay.  And are you familiar with the statements that are

8    in this declaration?

9    A.  Yes.

10   Q.  And the declaration refers to -- in paragraph five that

11   the Alliance agreement underwent several revisions since the

12   conclusion of the auction; do you see that in paragraph five?

13   A.  Yes.

14   Q.  Could you please describe what activity, if any, occurred

15   following the auction that resulted in the Alliance agreement

16   being revised?

17   A.  Yeah.  So similar to the auction, you know, the

18   post-auction process was a bit off and ambiguous because we

19   kept communicating on could we start talking with management

20   in terms of transition to closing, in terms of getting

21   accounting on the same team to start the transition, not -- we

22   weren't getting response.  Every response we're getting were

23   like 12 hours later, eight hours later.  Or the fact that we

24   couldn't ask a lot of questions, you know, during this period,

25   which didn't make sense.  And immediately, you know, I would

1    say within the Debtor's asking for an extension of the

2    hearing, which wasn't requested by us, it was their request,

3    we sent them our APA, which was exactly in the same form as we

4    submitted and in the same definition as the Ad Populum

5    incentive amount how it was stated on the record.

6    Q.  So as a result of any changes to the Alliance asset

7    purchase agreement after the auction had concluded, did the

8    value of the Alliance agreement increase or decrease since the

9    auction?

10   A.  It increased by about 14 and a half million based on the

11   schedules that we reviewed; although I understand there's

12   different open order schedules which might be, you know,

13   slightly less than what we've been -- what we've seen.  But in

14   our view it increased by about 14.4 million.

15   Q.  And if you look at Exhibit A to your declaration, do you

16   recognize that document?

17        (Alliance's Exhibit-A previously marked for

18   identification)

19   A.  Exhibit on page two?

20   Q.  Yes.  It starts on the prior page but, yes.

21   A.  Yes.

22   Q.  And what is that document?

23   A.  That's the calculation of our bid based on the barring

24   dates of --

25   Q.  No, I'm sorry.  I'm talking about exhibit --

1    A.   Exhibit A, got it.  That's the --

2    Q.   Exhibit A to your declaration, yes.

3    A.   That's the asset purchase agreement that we -- I believe

4    we sent to the Debtors.

5    Q.   And could you describe the terms -- in general terms can

6    you describe the terms or the structure of this asset purchase

7    agreement versus the asset purchase agreement or the final bid

8    at the auction?

9    A.   We kept all the definitions of the Alliance APA that we

10   originally submitted similar because that portion of the

11   business, it didn't increase during the auction in terms of

12   value.  We then modified to include the I would say Lot B

13   calculation within our APA with the definitions of the

14   incentive amount which was copy, pasted word-by-word from the

15   APA of Lot B.

16   Q.   Now I'm going back to your declaration on page two.  At

17   the bottom of page two there's a table; do you see that?

18   A.   Yes.

19   Q.   Could you please first tell us what this table depicts?

20   And then I'm going to ask you a question about it or some

21   questions about it.

22   A.   Sure.  So this is the way we calculated the Alliance bid

23   and the Lot B bid based on what was said on the record and

24   what was submitted in our APA.

25   Q.   And --

1    A.   The Alliance portion of it was actually sent way in

2    advance of the auction, on March 18, to the Debtor advisors,

3    which included the exact calculation and supporting schedules

4    and the inventories that we're purchasing with the math that's

5    defined in the APA, which is about 90 percent of the value of

6    AR and inventory.

7    Q.   Okay.  And could you please walk or describe for the Court

8    each of the different categories in this table, beginning as

9    Alliance Gaming business assets, and then it has the Lot B

10   structure, and has Alliance plus Lot B total; could you please

11   explain to the Court what these numbers represent and why

12   they're relevant to looking at the total value of the Alliance

13   bid?

14   A.   Sure.  So the Alliance Gaming business asset, we kept the

15   structure exactly as the stalking horse bid.  We only increase

16   the cash purchase price, which is the first row that says the

17   Alliance Gaming purchase price.  And then all the adjustments

18   and the calculation of inventory and AR is consistent with the

19   stalking horse bid.  And then the cures were schedules that we

20   provided the Debtors in advance of the auction and then

21   slightly modified during the auction, which was noted on the

22   record, that would be a reduction to total cash purchase

23   price, which ended the Alliance Gaming business asset purchase

24   price which would been cash for about 36.3 million.

25        And then the Lot B was a cash consideration of 21 million

1  plus nine million of incentive payment which was estimated by

2  the Debtors at the auction because the Lot B was estimated to

3  be five million in cash and nine million in incentive amount.

4  And that was the proposed value of Lot B.  When it was started

5  the -- at the start of the auction and the cash portion we

6  increase during the auction from five million to 21 million,

7  which out of the --

8  Q.  So --

9  A.  Go ahead.

10  Q.  I'm sorry.  Before you move on, so the -- so looking under

11  the Lot B structure in the middle of your table, where it says

12  cash 21 million, that increased at the auction from five

13  million to 21 million.

14  A.  Correct.

15  Q.  Okay.  And the $9 million incentive payment estimate, that

16  number was supplied by the Debtors, or did Province or

17  Alliance calculate that?

18  A.  That number was supplied by Debtors.  At the auction, they

19  said that the value of Lot B was five million in cash plus

20  nine million in incentive amounts, which equated to 14

21  million.  Again, I asked the Debtors if they can provide us

22  the detail how they evaluate the incentive amount so we can

23  compete on a both cash and non-cash basis.  But they refuse to

24  do so.

25  Q.  Okay.  And continuing on for the --

1    A.  Yeah.  And then the rest of the rows which is assumed

2    liabilities, which is again the same cure schedule that we

3    provided to the Debtor, and then the bid protection fee which

4    is a deduction since we have to pay those to the stalking

5    horse bid.  And the next three line items, which is additional

6    liabilities for DCD open orders, and then additional

7    liabilities for AGD open orders, plus the prepaid inventory

8    that this entire issue is being discussed on, that was added

9    to our bid, which is an increase of 14,400,000 increase from

10   the start of the auction.

11   Q.  So under this APA that's attached as Exhibit A to your

12   declaration, the total consideration as reflected in your

13   table is -- well, could you please tell me what the total

14   consideration is?

15   A.  Yeah.  The total consideration which I view from the 50

16   plus bankruptcies that I've been a part of, is the value that

17   you're giving to the estate.  And it's actually defined in the

18   same Raymond James actually retention app as highly value

19   consideration, which is if I'm assuming liabilities from the

20   Debtors, and Debtor -- the Debtor does not have to pay it,

21   that's still consideration to the estate.  So we calculated

22   the consideration of 85 million, which includes about 61

23   million of cash at closing, about nine million of incentive

24   payment, and then additional assumed liabilities that the

25   Debtors don't have to pay anymore that Alliance Entertainment,

1    my client, would be obligated for.

2    Q.   And so the total cash that would be paid or wire

3    transferred at a closing with Alliance, should one happen,

4    would be the $61,613,309 number.

5    A.   Correct.  That's based on the inventory schedule that's

6    dated March 14, which was the latest barring dates, which

7    included the detail schedule of inventory and AR.  If there

8    was inventory and AR would change, then this cash at closing

9    would as well.  But assuming everything stays consistent,

10   which it should, it would be 61 million and 600,000 roughly.

11   Q.   Okay.  So am I correct in -- as a nonfinancial person, am

12   I correct in taking from your testimony that this table

13   demonstrates the total value of the Alliance bid both in cash

14   and in total and how that value was calculated?

15   A.   Correct.

16   Q.   Okay.  Do you have in front of you the other binder of the

17   Debtor's exhibits?  I think it's --

18   A.   I do.

19   Q.   Okay.  Could you please open that and turn to Exhibit 20?

20   A.   Yes.

21   Q.   And this Exhibit 20 to a certain extent looks very similar

22   to the table in your declaration.  Could you please explain

23   whether the portion of the column that says AENT Navid

24   Declaration, is that taken directly from your declaration or

25   are there any deviances that you need to note?

1    A.   I'm going through it now.  It appears to be they've

2    included another line item which they called, corrective cash

3    at closing net of stalking horse bid protection excludes

4    holdback.  In my view, cash at closing is a total cash

5    consideration you have to write, although some of it might be

6    in escrow.  The 61.6 million is the cash at closing.

7    Q.   And what is the escrow you just referenced?

8    A.   It's an escrow that's controlled -- actually was put

9    together by the Debtors that we have to put a portion of the

10   inventory and the AR that we're aquieting [sic] about 10 ten

11   percent of that into an escrow to make sure that the inventory

12   and AR we're getting is consistent with books and records

13   within two weeks after we close.

14   Q.   And if the AR and inventory is consistent with books and

15   records, what happens to the money in that escrow?

16   A.   The Debtors get that cash.

17   Q.   And if it is not, then --

18   A.   There needs to be an adjustment.

19   Q.   Okay.

20   A.   Similar to the stalking horse bid, they have the exact

21   same structure.

22   Q.   Okay.  And if you could look at the far right column of

23   Exhibit 20, it says combined bid at the top.  Could you

24   explain what you see here in terms of how the Debtors compared

25   the values of the combined bid versus the Alliance bid?

1  A.   Yeah.   There are really two -- three calculations that

2  jump out to me which, in my opinion, significantly reduces

3  their cash consideration.   One, if you look at I would say

4  it's the line item that says minus cures, ours is negative

5  5.9.   That's the reduction to cash purchase price.   If you

6  look at the combined bid, it's 2.3 million.   But the following

7  line item is another reduction, which is critical vendor

8  payments.   We have zero.   We're not reducing any amounts

9  there.   The combined bid reduces about 7.6 million --

10  Q.   Before you move on, could you explain that you -- that

11  when you just said, we have zero under critical vendor

12  payments, could you explain what that means?

13  A.   That means we're not going to reduce that balance from or

14  assume it from cash consideration for Alliance Gaming

15  business.

16  Q.   Okay.   I'm sorry.   Please continue.

17  A.   And I want to note that the schedule and the cure is a

18  deviation from the schedule and the cure that was provided at

19  the auction.   This is not consistent with what we've seen

20  before.   So the amounts have changed.

21  Q.   How so?

22  A.   Well, it increased.   At the auction, I believe it was

23  around seven million.   Now they've added another two line

24  items which is, you know, 2.3 million for cures, plus another

25  7.6, which adds up to roughly another, you know, 10.8 million

1    of reduction in their cash purchase price.

2    Q.  In their cash purchase price being whom, Alliance or

3    Universal?

4    A.  The combined bid of Universal and Ad Populum.

5    Q.  Okay.

6    A.  It's a reduction of about 10.8 million.

7    Q.  Thank you.  And --

8    Q.  So they had to increase the consideration which was not

9    defined during the auction in terms of categories of how

10   they're adding value to different buckets versus what was said

11   on -- at the hearing.  This is a deviation from the hearing --

12   from the auction.

13   Q.  And so -- I'm sorry, were you finished?

14   A.  Yes.  But there's another line item which I don't

15   understand why there's a difference.  There's an incentive

16   payment two rows below that which for us it's nine million,

17   which is the exact estimate that the Debtors gave us at the

18   auction.  But they've given the combined bid of Universal and

19   Ad Populum a value of ten million.  And it's unclear because

20   we're using the exact same calculation and definition which

21   was copied from Ad Populum.  And it's a deviation again from

22   the auction which they told us, and it's in the transcript,

23   that they valued it at nine million.  So they now have given

24   the Ad Populum and Universal bid an increase in one million

25   consideration, which is another deviation from the auction.

1   Q.  So if the parties -- because I just asked you about that

2   nine million and I asked you where you got that $9 million

3   number from, and you said you got it from the Debtor's side.

4   A.  Yes.

5   Q.  So if we're being ascribed or if -- I'm sorry, excuse me.

6   If Alliance is being ascribed $9 million for incentive

7   payments and the combined bid is being ascribed slightly more

8   than $10 million, is it your view that our number should

9   increase and their number should decrease, or what is your

10  view with respect to those two numbers?

11  A.  I think all the numbers should stay consistent with what

12  was said at the auction, which is the nine million that was

13  stated on the record and that was emailed to all the parties

14  in terms of the bid calculation.

15  Q.  I don't want to make you do math in your head.  But if the

16  Alliance bid was given in the incentive payment line was given

17  credit for $10 million, what net effect would that have on the

18  total consideration of the Alliance bid?

19  A.  Then our consideration would go up by a million.

20  Q.  The total consideration would --

21  A.  Would go up by --

22  Q.  -- go up by one million.

23  A.  -- a million, yes.

24  Q.  So instead of being 85 million three sixty-eight, it would

25  be 86 million three sixty-eight.

1    A.   Yeah.  Well, it's a million, a thousand, $883 to be exact.

2    Q.   Yes.  Okay.  I think I cut you off but if I didn't --

3    A.   The rest of it is fairly consistent except, you know,

4    they're now putting different numbers for the open orders

5    which, again, if the value of the open orders change, which

6    they do on a daily basis, it's on how the business is putting

7    more orders in; where if they're making additional prepaid

8    inventory, those numbers, you know, might have slightly

9    changed, but they're at least consistent between the two bids.

10   Q.   And when you say they're at least consistent between the

11   two bids, I don't understand that because if you look at the

12   total consideration in the blue line, it says under the

13   Alliance bid, per your declaration, it's 85 million three

14   sixty-eight, zero, fifty-three, right?

15   A.   Uh-huh.

16   Q.   And under the combined bid it's higher.  It's 88 million,

17   nine-oh-nine, four ninety-eight.  So what specifically

18   accounts for that?

19   A.   Well, one is they -- for some reason they deviated

20   incentive calculation from the auction period or they gave

21   them additional credit for unknown reasons of about a million.

22   And then, two, the cure schedule, which was stated on the

23   record during the auction, has now increased by roughly 2.3,

24   2.4 million from the auction, which is again another deviation

25   from what was said at the auction.  So they're giving themself

1    additional consideration, which was in my opinion a new bid

2    since the auction.

3    Q.  And -- I'm sorry, were you --

4    A.  No, I was done.  I think the entire combined bid in my

5    view is a complete new bid since the auction.

6    Q.  Okay.  And the total cash at closing that the whoever is

7    the purchaser would have to pay to the Debtors at closing,

8    comparatively speaking, which one on this chart is greater or

9    lesser?

10   A.  Well, our -- Alliance Entertainment cash consideration is

11   61.6 million.  The combined bid is 57.9 million, which is a

12   big delta.

13   Q.  In your experience representing Alliance in this

14   transaction, have you conducted any diligence into the

15   question of whether your client, Alliance, could close a

16   transaction at this level?

17   A.  Yes.  Before --

18   Q.  And --

19   A.  -- we got hired they did just to make sure they can close

20   a transaction.  The -- our client, Alliance Entertainment, is

21   a publicly traded company, so all their financials is public.

22   Based on the last 12 months of public financials, they did

23   about 25 million on EBITDA.  They've been profitable and have

24   been a leader in the space.  They have a line of credit of

25   about 160 million, which has been an increase from a lot --

1   from White Oak, which is a large institution that does a lot
2   of the financing in the space.  And both of the founders,
3   which hold about 94 percent of the shares have additional
4   capital that they could put on the table.  In addition, we've
5   received equity, investment offers, binding offers from
6   parties that we're more than happy to show that could provide,
7   you know, additional 30, 40 million in liquidity if we need
8   to.  Our preferred way is to use cash and the financing we're
9   getting from Vital.
10  Q.  And from the diligence you conducted, are you satisfied
11  that Alliance could close the transaction according to the
12  Agreement that's Exhibit-8 to your Declaration?
13  A.  Yes.
14  Q.  Without any contingencies or financing contingencies
15  whatsoever?
16  A.  None.
17  Q.  Thank you.  And do you -- have you had any chance to
18  diligence or consider when Alliance would be able to close
19  this transaction if the Bankruptcy Court were to enter an
20  Order approving the sale to Alliance?
21  A.  Yeah, I mean, besides just, you know, wiring time and
22  moving funds around, they would be able to close immediately.
23  White Oak, we had a call with them actually right before the
24  break, you know, where they said, do we need to move funds
25  around today?  We told them, hold on.  So White Oak is ready

1    to move.  I can show you the call that I had with them.  And

2    the founder -- and the chairman is sitting in the back and he

3    has funds that he can put in place.  We have an equity sponsor

4    that's willing to put -- infuse equity into the business

5    that's willing to put the consideration if needed immediately.

6    So I have no doubt that they can close as soon as reasonable

7    Q.  And as soon as reasonable, would that be as soon as

8    possible after the Order -- an Order is entered?

9    A.  Yeah, I think if we really have to, we can do it by the

10   current closing date, which I believe is end of this week in a

11   couple of days.

12          MR. TEELE:  Thank you.  Your Honor, may I just have

13   one minute to confer?

14          THE COURT:  Sure.

15          MR. TEELE:  One moment.  Your Honor, I'll reserve

16   the right to redirect if necessary, but at this time I have no

17   further questions on direct for Mr. Navid.

18          THE COURT:  All right.  Thank you.  Cross

19   examination, Mr. Minuti.

20          MR. MINUTI:  Thank you, Your Honor.

21                   CROSS EXAMINATION

22   BY MR. MINUTI:

23   Q.  Good afternoon, Mr. Navid.

24   A.  Good afternoon.

25   Q.  So do you have your Declaration in front of you?

1   A.  Let me bring it up.

2   Q.  It's Exhibit-8 in the Alliance Entertainment Binder.

3   A.  I do now.

4   Q.  I'm sorry.  You do -- you have it in front of you?

5   A.  You said Exhibit-8?

6   Q.  Correct.  It's in the Alliance Entertainment Binder.

7   A.  Exhibit-8 is the APA.  Oh, sorry.  Never mind.  It is.  Go

8   ahead.  I have my Declaration.

9   Q.  Okay.  If you could turn to Paragraph 6 of your

10  Declaration.  Tell me when you're there.

11  A.  I'm there.

12  Q.  All right.  And just to be clear, this is an analysis of

13  the bid or the Asset Purchase Agreement that's attached to

14  your Declaration, correct?

15  A.  Correct.

16  Q.  Okay.  It's not an analysis of the Asset Purchase

17  Agreement that Alliance Entertainment said on March 26th,

18  right?

19  A.  What Asset Purchase Agreement?

20  Q.  Okay.  Well, if you'll turn --

21  A.  What March 26th?  I don't follow what date.

22  Q.  The first Asset Purchase Agreement draft that was sent

23  after the auction.  This analysis doesn't relate to that,

24  correct?

25  A.  The first draft that we sent would've been the same

1   calculation.  It might have been different understanding of

2   the definitions, but it's the same calculation except the

3   prepaid inventory and the open Orders.

4   Q.  But I thought you testified that between the auction and

5   what we now see, based on the Asset Purchase Agreement of

6   April 1, your bid went up $14 million.  Is that not correct?

7   A.  Correct.

8   Q.  Okay.  So where would we subtract the $14 million to get

9   to where you were at the auction?

10  A.  The definition of prepaid inventory was not defined in

11  either our APA or the Stalking Horse bid APA and the

12  definition of additional liabilities that the Debtors asked us

13  to assume after the auction was not defined and the APA was

14  submitted before the auction and at the auction.

15  Q.  Okay.  So these changes were made to increase the bid that

16  appears in your Paragraph 6 after the auction?

17  A.  Correct.

18  Q.  Right?  So what would've been the total cash of your bid

19  at the auction?

20  A.  My understanding of the total cash would've been close to

21  57 million.

22  Q.  57 million.  Okay.  And what would the total consideration

23  have been at the auction, including assumed liabilities?

24  A.  70.9 million.

25  Q.  Okay.  70.9 million.  Well, how do you -- well, help me

1    understand --

2    A.  So you --

3    Q.  How do we go up by $14 million if you were at 70 million

4    at the auction?

5    A.  So the increase is 6 million of assumed liabilities plus

6    57, and the 9 million of incentive.  That gets you exactly an

7    increase to the 70.9 million, which I shared the calculation

8    with the Debtors after the auction.

9    Q.  Okay.  And in terms of the net bid at the auction of $70

10   million, 70.9 million, right?

11   A.  Roughly.

12   Q.  That's what it was?

13   A.  Roughly.

14   Q.  Let me make sure I have the right number.  Yeah, the $70.9

15   million.  That included -- did that include the payment for

16   prepaid inventory?

17   A.  It was not understanding that prepaid inventory was part

18   of the purchase price.  It was a definition of an acquired

19   asset, but it was not a definition of inventory.

20   Q.  All right.  That wasn't my question.  My question is, does

21   your $70.9 million number bid, does that include paying for

22   prepaid inventory?

23   A.  It does not.

24   Q.  It does not.  Okay.  And how much are we talking about in

25   prepaid inventory?

1   A.   It's about 4.7 million of prepaid inventory, but the

2   amount that we would pay for it, it's roughly 4.3 million.

3   Q.   Okay.  And is that part of the change between the auction

4   bid and where we wind up in your Paragraph 6?

5   A.   Yes.

6   Q.   Okay.  And you said at the outset of your direct testimony

7   that you were told to bid on cash, right?

8   A.   Yes.

9   Q.   Okay.  And there's no way, right, you can get to a bid of

10  $70.9 million at the auction if you're bidding just based on

11  cash, right?

12  A.   That doesn't make sense.  I could.

13  Q.   Well, if you don't include assumed liabilities, tell me

14  how you get to 70.9 and if you could just tell me what

15  portions do we see in Paragraph 6 that adds up to the $70.9

16  million?

17  A.   Again, the assumed liability is a consideration to the

18  Estate.  So we did include --

19  Q.   I understand that --

20  A.   -- it as part of our calculation.

21  Q.   -- but you understood you were bidding on cash.  So I'm

22  asking you, how do you account for cash to get to $70.9

23  million?

24  A.   At the auction we did bid on cash and assumed liability at

25  the beginning.  Anything after that was not allowed, which was

1  a non-cash payment, not a non-assumed liability.  We could

2  have assumed more liability, which would've been a reduction

3  -- excuse me, a reduction in cash consideration.  But we were

4  allowed to modify Assumed Liability Schedule.

5  Q.  Okay.  So in other words, you believe that at the

6  beginning of the auction, your bid included assumed

7  liabilities, and then just after the beginning you were only

8  bidding on cash?

9  A.  So I think you misunderstanding the assumed liabilities

10 and the non-cash.  There's an incentive amount that's a

11 non-cash portion, which is coming in as an earn out.  It's

12 coming all -- on a monthly basis all the way through December.

13 Q.  Understood.

14 A.  That amount is nine million.  We were not allowed to use a

15 similar structure as an earn out, if you will, or an incentive

16 amount during the auction.  We could have assumed more

17 liabilities.  That's not the argument here.  The argument is

18 they did not allow us to use a similar earn out, which you

19 allowed at populum, which is called an incentive payment here.

20 That additional changes in incentive amount was not allowed to

21 us, but it was allowed to ad populum.

22 Q.  Now, sticking with this idea of your bids, including

23 assumed liabilities, you never stated on the record at the

24 auction that your view of total consideration included assumed

25 liabilities?  Correct?

1    A.   I've submitted to you my Schedule of Assumed Liabilities

2    Q.   That wasn't my question.  My question was, you didn't

3    state on the record at the auction that when you were bidding,

4    you were including assumed liabilities, correct?

5    A.   At the auction I was bidding only on cash.

6    Q.   That wasn't my question.  Did you state on the record that

7    your view of total consideration included assumed liabilities?

8    It's an easy question.

9    A.   That exact definition, I didn't mention on the record.

10   No.

11   Q.   Okay.

12   A.   Nobody else did that.

13   Q.   And if we're looking at total consideration, right, if you

14   drop a contract, right?  It doesn't change total

15   consideration, correct?

16   A.   It doesn't change total consideration.

17   Q.   Okay.  But isn't it true, sir, that at the auction,

18   Alliance Entertainment dropped two contracts and the Debtor

19   improved their bid or valued their bid at over a million

20   dollars more?

21   A.   It increases cash consideration, but the consideration

22   stays the same.  I asked the Debtors to give me their Schedule

23   of how they're calculating the bid.  They refused to do so.

24   Q.   Well --

25   A.   We were not on the same page from beginning.

1    Q.  -- that wasn't my question.  My question is, if you're

2    getting value at the auction for dropping a contracts, you're

3    bidding on cash, correct?

4    A.  We --

5    Q.  You're not counting assumed liability, right?

6    A.  Our total consideration didn't change.  The cash increased

7    because it was not --

8    Q.  It would really help if you answer my questions.

9    A.  I'm trying.

10   Q.  Okay.  So here's my question.  If you're bidding based on

11   total consideration, which includes cash and assumed

12   liabilities, can you agree that dropping a contract wouldn't

13   change the total consideration?

14   A.  Correct.

15   Q.  Okay.  And yet you got -- Alliance Entertainment got a

16   million dollars more by dropping those two contracts, right?

17   A.  Million in cash more.

18   Q.  Well, no.  A million-dollar value added to the bid,

19   correct?

20   A.  I don't think that was the exact words.  It was a million

21   of cash more.

22   Q.  Okay.  So --

23   A.  I think it was a million and a half, but yeah.

24   Q.  And the Alliance Entertainment assumed liabilities are

25   cure claims, correct?

1   A.  Correct.

2   Q.  Okay.  And as we discussed, if the way the Asset Purchase

3   Agreement works, or way the bid worked, right, is that if you

4   assume a contract and pay the cure claim, it gets deducted

5   from the cash portion, right?

6   A.  Correct.

7   Q.  Okay.  And so -- and I think you just said this a minute

8   ago, but when we remove those two contracts, how much did it

9   increase Alliance Entertainment's bid?

10  A.  I believe the same amounts of those cure amounts, which we

11  we're estimating right now is about a million.  I don't have

12  the Schedules in front of me to tell you exactly what those

13  were valued, but we had to increase -- we had to pay in cash

14  once you remove the contract.

15  Q.  All right.  And you'll agree that when those contracts

16  were removed, that increased the value of Alliance

17  Entertainment's bid at the auction, correct?

18  A.  That increased the cash value.

19  Q.  Well, didn't they qualify your bid at a higher number?

20  A.  That increased the cash value.

21  Q.  That's not my question.  They gave you a million plus of

22  value on your bid and counted that as your bid, right?

23  A.  Right.

24  Q.  They didn't distinguish between cash, right?

25  A.  Right.

1   Q.   Okay.  So you got a benefit, right?  By dropping those

2   contracts, it was over $1 million worth of benefit?

3   A.   Correct.

4   Q.   Right.  So you knew during the auction that all the

5   bidders were bidding on cash, right?

6   A.   That's what the structure was, yes.

7   Q.   Right.  And not assumed liabilities, right?

8   A.   Well, assumed liability would've reduced the cash.  If you

9   had additional cures, you would've had --

10  Q.   That wasn't my question, whether it reduced the cash.  You

11  understood everybody was bidding on cash, right?

12  A.   They could have assumed additional liabilities.

13  Q.   That's not my question.  You understood, sir --

14  A.   Yes.

15  Q.   -- that at the auction when you were bidding and other

16  bidders were bidding, and Raymond James was counting the bids,

17  we were dealing with cash, right?

18  A.   Correct.

19  Q.   Okay.  Thank you.  And nobody from Alliance Entertainment,

20  to your knowledge, objected on the record to say that assumed

21  liabilities should be included in how the bids were being

22  valued at the auction, correct?

23  A.   We were not given the details of the consideration, so we

24  couldn't.  I asked for the details of the consideration so we

25  can evaluate how they're valuing everyone's bid, but no one

1  objected that we were not getting it because they said, "No

2  other party has received it."

3  Q.  That wasn't my question.  You didn't object on the record

4  to that bids being valued without consideration of assumed

5  liabilities, correct?

6  A.  I didn't object to that.

7  Q.  Okay.  Thank you.  And you had -- heading into the

8  auction, you had the baseline bids, correct?

9  A.  We had it, yes.

10 Q.  Okay.  So you had, for example, basic funds bid?

11 A.  We had basic fund bid, which I believe was two bids, but

12 yes.

13 Q.  Okay.  So if we were, and if I'm correct, right, at the

14 end of the day, the highest and best bid that you put on the

15 record, right, was the $70.9 million, right?

16 A.  Correct.

17 Q.  Right.  But you were including assumed liabilities in that

18 number, correct?

19 A.  That's how I interpreted the consideration.

20 Q.  Okay.  So notwithstanding the fact that you knew everyone

21 was bidding cash, you, when you said $70.9 million, you were

22 excluding assumed liabilities, right?

23 A.  Because I interpreted the auction going that way.  Yes.

24 Q.  Okay.  So in your mind you're bidding, including assumed

25 liabilities, but if we take those assumed liabilities off, and

1  we're only focused on the cash, what's the value of your bid?

2  A.  57 million roughly.

3  Q.  Okay.  And that's less than the backup bid, correct?

4  A.  I didn't have their backup bid calculation.

5  Q.  Well, you were at the auction, right?

6  A.  Yeah, but I didn't have --

7  Q.  Okay.  You know at the auction, the backup bidder bid

8  $69,130,000?

9  A.  Yes.  But that included --

10  Q.  Okay.  And you understood that everybody was bidding on

11  cash, right?

12  A.  Correct.

13  Q.  Right.  So -- but your bid included assumed liabilities.

14  So if you remove those, your bid for Alliance Entertainment is

15  lower, right?

16  A.  We didn't have the structure of the bids.  I wouldn't

17  know.  I don't think it was at the time.  I didn't think it

18  was --

19  Q.  But you didn't know, you just said you knew we were

20  bidding cash.

21  A.  Correct.

22  Q.  But when you said 70.9, you were including assumed

23  liabilities.  So if we take out your assumed liabilities, we

24  know as we sit here today, you weren't the highest bid, right?

25  A.  I don't know your calculation again.  If -- the way I

1   calculated the bids at the auction --

2   Q.  Okay.

3   A.  -- it included everybody being equal, including our cash,

4   and we were higher.  And we kept bidding in cash from the

5   start of the auction, which was what?  Increments of two

6   million.  And we would've continued bidding if we had to,

7   which we -- you know, I think every increment bid that we did

8   was two million, where the backup bidder was 250,000.  So our

9   consideration going and winning the auction was that we were

10  the highest cash and consideration.  If there was

11  misunderstanding in the definitions, we understood that after

12  the auction.

13  Q.  Okay.  But -- so you, at the auction, when you were

14  placing the bids on the record, you were bidding on cash and

15  assumed liabilities, right?

16  A.  Uhm-hum.

17  Q.  Okay.  Even though you were told to bid on cash, right?

18  And everybody else was bidding on cash, and then later there

19  was a discovered that there was a misunderstanding, right?

20  A.  No.  We -- our initial assumed liability was from the

21  start of the auction.  We didn't bid assume liabilities in

22  middle of the auction.  Every round that we had to bid was

23  except when we gave you the final cure, which we formed the

24  same way as the backup bidder.  We modified as they did.

25  Every bit after that we bid cash.  But the initial

1    consideration, which included our cure Schedule, which we

2    provided to you the night before, and we provided you, how we

3    evaluated our consideration was consistent.

4    Q.  Okay.  But again, when we dropped those contracts at the

5    auction, you took the million dollar credit, right?

6    A.  In cash.

7    Q.  In cash.  Right.  And that wouldn't change total

8    consideration of bid, right?

9    A.  Correct.

10   Q.  Okay.  But it upped the value of the bid, right?

11   A.  It upped the cash value.

12   Q.  Right.  And you knew everybody was bidding on cash, but

13   your final bid was cash and assumed liabilities.  Right?

14   A.  My final bid stayed consistent from the night before.  I

15   did --

16   Q.  That wasn't my question, whether it stayed consistent.  My

17   question was, when you said on the record $70.9 million, you

18   were -- in your mind it was cash and assumed liabilities?

19   A.  Yes.

20   Q.  Okay.  And you never clarified on the record that the way

21   you got to 70.9, included the assumed liabilities, right?

22   A.  I did ask on the record if the Debtors can explain the

23   details (indiscern.) --

24   Q.  I'm not asking you what you asked the Debtor to explain.

25   I'm asking what you explained.  What did you explain on the

1   record as to the components of your bid?  You never said, it

2   included assumed liabilities, right?

3   A.  I stayed consistent with the Debtor structure, which they

4   didn't provide the details of the bid, and I didn't either.  I

5   asked the Debtors, "What does the bid conform, what is the

6   structure?  What is each component of the bid?"  And it wasn't

7   provided to us.

8   Q.  Thank you.  Again, my question was, when you bid 70.9, you

9   didn't say it's this much cash and this much assumed

10  liabilities.  That never happened, right?

11  A.  No, we bid an increment of two million.

12  Q.  Okay.  No.  Thank you.  So what happened was, right, so

13  after the auction is you're declared the winner at 70.9,

14  Alliance Entertainment then sends an Asset Purchase Agreement

15  that is not consistent with a cash bid in the $70.9 million

16  range, right?

17  A.  In our view, it was.

18  Q.  Consistent with cash?

19  A.  Well, consistent with the cash portion we viewed at the

20  auction and the additional consideration, which included

21  incentive amount and assumed liability.

22  Q.  Okay.  So it was consistent with your understanding of

23  your bid that wasn't clarified on the record, that's what

24  you're saying, right?

25  A.  Correct.

1  Q.  Okay.  And so, you can understand that when the Debtor got

2  your Asset Purchase Agreement, they didn't understand why it

3  was so low, right?

4  A.  I can understand why there's misunderstandings, yes.

5  Q.  Okay.  Perfect.  And it's -- and we can agree, can't we,

6  that if there was that misunderstanding, the Alliance

7  Entertainment bid was not the highest and best bid at that

8  time, right?

9  A.  I can agree.

10  Q.  You can agree.  Okay.  So on March 26th, right?  Your bid

11  is not the highest and best bid because of this

12  misunderstanding, and then for the next week, right, the

13  Debtor says, here's what we thought, here's what your bid

14  should be.  And it took between the 26th and April 1st for

15  ultimately Alliance Entertainment to make all the changes,

16  right, consistent with bid -- what the bid should have been,

17  correct?

18  A.  It deviated from the APA that was filed both for the

19  Stalking Horse bid and ours, which was given to the Debtors

20  way in advance of the auction, which in our view felt like

21  we're paying significantly more than what we agreed to.

22  Q.  Right.  Because you were under a misunderstanding, right?

23  A.  Correct.  But we corrected it.

24  Q.  Okay.

25  A.  Which I think taking five days was not too long, even

1    though we responded every time within your request within

2    hours, and you responded 12 hours later.

3    Q.  Well, let's be clear about that, right?  So Alliance

4    Entertainment sent this APA on the 26th, right?  Less than a

5    day later, the Debtor sent it back, right, with changes.  And

6    then what happened?  Alliance Entertainment reversed every

7    change the Debtor made, right?  Correct?

8    A.  It was significant deviation from what was filed for the

9    APA of the Stalking Horse bid and ours.  We didn't understand

10   why we were being forced to change definitions, which was,

11   again, filed in the Stalking Horse bid and ours, including

12   additional changes which were misunderstanding and were not

13   given to us in detail why we should change those.

14   Q.  Okay.  All right.  So in your words, there was this

15   misunderstanding.  The Debtor made the changes and said,

16   "Here's what the bid should be.  Here's how we understood it."

17   Right?  And then what happened was Alliance Entertainment

18   didn't take one of those changes and send it back and said,

19   "Here's our deal."  Right?

20   A.  I think we provided footnote for every reason, for every

21   --

22   Q.  It wasn't my question whether you provided footnotes.  You

23   sent it back and said, "That's not our deal."  Right?

24   A.  Well, you could've asked me for 100 million.  I would've

25   said, no.  We gave you reasons why we declined every change

1    you said.

2    Q.  I understand, but there was a misunderstanding.

3    A.  Yeah.

4    Q.  And the Debtor said, here's what you need to do to be the

5    highest and best, right?

6    A.  Right.

7    Q.  Okay.  And you sent back an APA and it didn't include any

8    of those changes, so you weren't the highest and best, right?

9    A.  It was a deviation from the auction.

10   Q.  I'm not asking you if it was a deviation.  Was it highest

11   and best?

12   A.  It was in our view, because if it's consistent with the

13   backup bidder APA, it was in our view.  Our APA was consistent

14   with the Stalking Horse bidder and the ad populum.  Every

15   word, every definition was consistent.

16   Q.  But that -- when you sent that back, right, you didn't

17   make the changes consistent with the basic fund bid, you

18   didn't add payment for prepaid inventory.  You didn't include

19   any of that, right?  You erased all of the Debtor's changes

20   and said, "That's not how we viewed our bid at the auction."

21   Right?

22   A.  Prepaid inventory is not included in the backup bid even

23   today.

24   Q.  That wasn't my question.  My question is, you erased all

25   those changes, you took out all those -- that consideration

1   and said, "No, no, no.  You misunderstood our bid."  Right?

2   That's what you said.

3   A.  I -- you misunderstood what's on the record.  Yes.

4   Q.  Okay.  And so -- and you weren't the highest and best bid,

5   right?  With all -- moving all those -- removing all those

6   changes as we sit here today, right?  That wasn't the highest

7   bid, right?

8   A.  No.  Apple to apple, we were.  If you kept -- if you

9   looked at the two APA, we were consistent with the ad populum

10  and universal.  But you've asked us to make modifications in

11  our APA to include prepaid, which is still not included in the

12  universal bid that you've submitted as of last night, I

13  believe, or two nights ago.  There are significant changes

14  that you made within our APA that's not even included in the

15  backup bid APA, which both structurally and financially

16  changed the outcome of the bid.

17  Q.  So your question is, or your state -- your testimony is

18  that even though you removed every change the Debtor made,

19  your bid was higher and better.  That's what you believe?

20  A.  Correct.  Because it was higher than what was filed for

21  the Stalking Horse bid and ad populum.

22  Q.  Yeah.  But that bid changed at the auction for Alliance.

23  A.  The structure.  The structure had not changed.

24  Q.  The value changed.  The value went up.

25  A.  The cash value, we changed simultaneously.

1    Q.   The value -- I'm sorry, I don't mean to talk over you.

2    A.   No.  The cash value, we changed.

3    Q.   The value went up to $69,130,000, right?

4    A.   Yeah.

5    Q.   Okay.

6    A.   I'm -- which we increased from five million of the cash

7    purchase price for Lot B from five to 21 million.  That's the

8    only piece of the auction that changed.  The Alliance bid

9    didn't change.

10   Q.   Okay.  But can we agree that when Alliance Entertainment

11   sent their bid back and released all the -- erased all the

12   Debtor's changes, that bid on a cash basis was less than

13   $69,130,000?

14           MR. TEELE:  Your Honor, at this point -- at this

15   point, Your Honor, I have to object.  I've let it go without

16   objecting six or seven times.  This question has been asked

17   and answered at least six or seven times.  I think enough is

18   enough.

19   A.   Can I make a statement?

20           THE COURT:  No.

21   A.   Sorry.

22           THE COURT:  Mr. Minuti?

23           MR. MINUTI:  Your Honor, the witness is being

24   argumentative.  If he would answer my questions directly, we

25   can move on.  I'm trying --

1              THE COURT:  Let me --

2              MR. MINUTI:  I'm sorry.

3              THE COURT:  This is a judge trial.  You're trying to

4     convince me of the evidence to support your client's position.

5     You've argued with this witness for the last 15 minutes to my

6     exasperation.  I sympathize with the witness.  I don't

7     understand the point that you're trying to make, and you're

8     only reinforcing the idea that maybe this witness's testimony

9     is more credible than your attack.  So you need to try

10    something else.

11             MR. MINUTI:  Thank you, Your Honor.

12             THE COURT:  Sustained.

13             MR. MINUTI:  Thank you.

14    BY MR. MINUTI:

15    Q.  So do you -- again, do you have your Declaration in front

16    of you?

17    A.  I do.

18    Q.  Okay.  And if we look at Exhibit-B to your Declaration.

19    Right?

20    A.  What page is it on?

21    Q.  That --

22             MR. MINUTI:  I'm sorry.

23    A.  What page is it on?  I'm sorry.

24             THE COURT:  There's no page number.

25    BY MR. MINUTI:

1  Q.  If you look at the top, like the blue.  Do you have a blue

2  version?

3  A.  I don't.  I have a black and white version.

4         THE COURT:  I'm sorry, what -- which -- you're

5  looking at Debtor's eight?

6         MR. MINUTI:  I -- I'm looking at debt -- I'm sorry.

7  I'm looking at the Alliance Entertainment 8, which is the

8  witness's Declaration.

9         THE COURT:  Right.  So there's a Declaration that

10 contains three pages.  There's a service list, there's an

11 Asset Purchase Agreement, which is Exhibit-A.  Finding

12 Exhibit-B is quite a challenge.

13        MR. MINUTI:  It's page eight, Your Honor.  Page

14 eight, which is the Asset Purchase Agreement.  And it's

15 Exhibit-A.  Excuse me.

16        THE COURT:  Okay.  So we're looking at Exhibit-A,

17 which is the affidavit, Exhibit-A to the affidavit, which is

18 the Asset Purchase Agreement page eight of that, right?

19        MR. MINUTI:  Correct.  Is the witness --

20        THE COURT:  First definition of the top of that page

21 is material adverse change.  You all in the same place?

22 A.  I'm on the same page as you.

23        MR. MINUTI:  No, no.  Your Honor, I'm at Exhibit-A.

24 I'm at the title page Asset Purchase Agreement.

25        THE COURT:  Yeah.  The first page of

1    bit-A is his Declaration.

2            MR. MINUTI:  Understood, Your Honor.  So, 1, 2, 3,

3    4, 5, 6, 7.  It's the eight page -- eighth page of the

4    exhibit, which begins with the Asset Purchase Agreement.

5            THE COURT:  So you're on page one of the Asset

6    Purchase Agreement?

7            MR. MINUTI:  Yes.

8            THE COURT:  Okay.  Now we know where you are.

9    BY MR. MINUTI:

10   Q.  Now, at Paragraph 6 of your Declaration, right, you value

11   the prepaid inventory at $4.3 million, correct?

12   A.  Yes, based on the Schedules provided.

13   Q.  Okay.  And the first time that Alliance Entertainment

14   offered to pay for prepaid inventory was in page eight of

15   what's been marked as Alliance Entertainment's Exhibit-6,

16   right?  Your Declaration?

17       (Alliance's Exhibit-6 previously marked for

18   identification)

19   A.  First time.  Yeah.  I don't understand.

20   Q.  I'm sorry, A.  I beg your pardon.

21   A.  If this is the APA we gave, which included it, then I

22   believe it is.  I have to go through the entire APA to

23   confirm.

24   Q.  Okay.  All right.  And when was that APA submitted?

25   A.  We submitted this, if I'm not mistaken, Thursday night.

1   The final APA?

2   Q.  Correct.

3   A.  I believe it was Thursday of the auction, the Thursday

4   after the auction.

5   Q.  Okay.  And that -- but that was withdrawn, correct?

6   A.  Well, because once we sent it, you -- we said, "Will you

7   accept it?"  And you said, "We're still going with the backup

8   bidder."  So we said, "We don't understand why we're being

9   forced to pay additional 4.3 million, and you're still going

10  with the backup bidder.  So if you're not going to take it, we

11  would like to be able to understand why.  So we're going to

12  withdraw it."

13  Q.  Okay.  So you withdrew it?

14  A.  Withdrew the modification, not our bid.

15  Q.  Okay.  You mean the changes that were made?

16  A.  Correct.

17  Q.  Correct.  Okay.  Just so we're on the same page.  And now

18  you've attached the Agreement again to your Declaration,

19  correct?

20  A.  I've attached, yes.  The same Agreement, which includes

21  the prepaid.  Yes.

22  Q.  Okay.  And this was the Agreement that was withdrawn,

23  right?

24  A.  Correct.

25  Q.  Okay.  And this is the Agreement that you're asking the

1   Court to approve, correct?

2   A.  Correct.

3   Q.  All right.  And again, my question was, this is really the

4   first time you've included the prepaid inventory of $4.3

5   million, right?

6   A.  Well, second time.  Right.

7   Q.  Well, second time after the withdrawal, right?

8   A.  Because it was never defined in anyone's APA, but yes.

9   Q.  Okay.

10  A.  It's not -- it's still not defined in the backup bidder

11  APA.  I reviewed that in detail.

12  Q.  All right.  And am I right that the form of Asset Purchase

13  Agreement that's attached at page eight of your Declaration,

14  that's incorrect, right?

15  A.  Are you asking me to make a legal opinion?

16  Q.  No.  I'm asking you whether what --

17          THE COURT:  I don't understand what you're saying.

18          MR. MINUTI:  I'll take him through it, your Honor.

19  BY MR. MINUTI:

20  Q.  All right.  In your calculation of the bid, right, at

21  Paragraph 6 of your Declaration.  You subtract from the

22  purchase price, right, the cash -- the cure claims, correct?

23  A.  Correct.

24  Q.  And that -- and you subtract it at the top right?  Under

25  the Alliance portion of the purchase, correct?

1    A.  Correct.

2    Q.  Okay.  But the Asset Purchase Agreement that's attached

3    doesn't do that?

4    A.  I think there's been different versions where we've made

5    it clear that if there's a -- there needs to be a correction.

6    I believe there was an e-mail sent following that, that if we

7    need to modify that, so it's consistent with my Declaration,

8    we will do that.

9    Q.  Okay.

10   A.  If there is a definition or a word missing, we're happy to

11   place it back in.  There's been so many draft and changes and

12   demands since the auction.

13   Q.  Okay.  And it was the Debtor that brought that to your

14   attention, correct?

15   A.  It was actually the Committee.

16   Q.  Well, did the Debtor not send a detailed valuation of the

17   bid?

18   A.  The Debtors -- the night before the last hearing, if I'm

19   not mistaken, or sometimes over the weekend, sent us a

20   calculation exhibit, which included a zero for the assumed

21   liabilities.  We didn't understand why it was a zero, because

22   we've given you a Schedule that it would be 5.9 million.

23   Q.  But I'm talking about after the Debtor received your

24   Declaration.  Did the Debtor not send a detailed analysis of

25   the value of that bid and ask for clarification?

1  A.  No.  You sent it before my Declaration.

2  Q.  Okay.  And it was after that clarification was sent that

3  the -- that Alliance Entertainment indicated that they would

4  modify the Asset Purchase Agreement, correct?

5  A.  It was after a conversation I had with the Committee that

6  there was a misunderstanding with our calculation of our APA,

7  which they took the time to call us to tell us how they

8  reviewed APA.  We didn't get a call from the Debtors.  We just

9  got a Schedule of calculation without any detail of how

10  they're calculating it.

11  Q.  Okay.  But -- and -- but that Schedule that the Debtor

12  sent is inconsistent with deducting those cure claims, right?

13  A.  The Schedule is consistent.  The numbers are inconsistent.

14  You will see less assumed liabilities, but for some reason you

15  put zero.  Now, if our APA as stated in an e-mail, and again,

16  needs to be modified to be consistent with my Declaration, it

17  will be.  I think there was a belief that there was a word

18  missing, which is minus, but the assumed liability or the cure

19  Schedules are there.  It was in the Schedules.  You know, from

20  the beginning of this, there's been a lot of changes that

21  maybe one word got deleted from the auction since that

22  modifications, a lot of modifications were made.

23  Q.  Okay.  And you testified earlier -- well, let's look at

24  this.  Let's look at Debtor's Exhibit-20.  That's in the other

25  binder, I think.

1    A.  The comparison?

2    Q.  Correct.

3    A.  Yes.

4              MR. MINUTI:  Judge, do you have it in front of you?

5              THE COURT:  You're talking about Exhibit-20?

6              MR. MINUTI:  Exhibit-20,

7              THE COURT:  Yes.  I've been focused on Exhibit-20

8    for hours.  Go ahead.

9              MR. MINUTI:  Okay.  Thank you.

10   BY MR. MINUTI:

11   Q.  And so you'll see what appears on Exhibit-20 is three

12   columns, right?  The second column is the Alliance

13   Entertainment evaluation based on your Declaration, correct?

14   A.  That's based on the calculation we provided, yes.

15   Q.  Okay.  And I think you testified that the numbers that

16   appear on this exhibit that was prepared by Mr. Haesler, those

17   numbers as it relates to the numbers in your Declaration is

18   consistent, correct?

19   A.  The numbers are consistent for our column.

20   Q.  Correct.

21   A.  Correct.

22   Q.  Okay.  That was my point.

23   A.  For the Alliance Entertainment bid column.

24   Q.  Okay.  And so obviously we didn't want to change what you

25   had done because that's the whole idea of the exhibit, but I

1  think you took issue with the incentive payment amount, why

2  it's different on both, right?

3            THE COURT:  Yes.

4  A.  Yes.

5            THE COURT:  Next question.

6  BY MR. MINUTI:

7  Q.  Okay.  And if we look down in Paragraph Number 3 -- or

8  excuse me, Footnote Number 3, it says, Navid Declaration not

9  adjusted for increased incentive fee value, $1 million or

10  increased cure obligations, lease cure obligations of

11  $500,000.  You see that?

12  A.  Footnote Number 3?  Yes.

13  Q.  Okay.  So the intent here, and I apologize if this was not

14  clear, was to not change your numbers, but to point out where

15  your numbers may be incorrect.

16  A.  That doesn't make sense.  Why would the lease obligation

17  change my incentive amount?

18  Q.  Well, because -- well, the reason --

19  A.  We've agreed to pay for all the leases with --

20  Q.  Yeah, but you're missing an assumed lease, are you not for

21  $500,000?

22  A.  We've given you the exact Schedule and we've said we're

23  not modifying our Schedule.  That 5.9 is not changing.  Again,

24  if they're misunderstanding, you could have called us and we

25  would've clarified it.  We are not changing the 5.9 million.

1   Q.  Okay.  Understood.

2   A.  We are not reducing our cash consideration more than what

3   was given to you.  There's been a lot of misunderstanding,

4   which was never communicated to us.

5   Q.  Okay.  What I'm trying to understand though, is we talked

6   about the misunderstanding that occurred after the auction,

7   what you thought you bid versus where we are today.  And I'm

8   trying to understand if we go back to where we -- you thought

9   we bid -- or excuse.  Let me rephrase that.  I apologize.  If

10  we go back to what you thought you bid at the auction, I'd

11  like you to walk me through and tell me how your numbers here

12  would change in your column.

13  A.  How my -- the three highlighted yellow rows, which is

14  additional liabilities DCD open Orders, additional liabilities

15  AGD open Orders, prepaid inventory as of March 7th.  Those

16  three are new changes since the auction.

17  Q.  Okay.  And that adds up to?

18  A.  Roughly 14.4 million.

19  Q.  14.4 million, right?

20  A.  Yes.

21  Q.  Okay.  And so that would reduce your total consideration

22  number to what?

23  A.  To exactly 70.9 million, which was stated at the auction.

24  Q.  Okay.  And then any other changes that would need to be

25  made here with respect to what you believed you bid at the

1  auction versus where you are today?

2  A.  Not that I know of.  If there are changes that need to be

3  made, we could discuss, but not that I know of.

4  Q.  What about the assumed liabilities?  Wasn't it your

5  testimony that you weren't taking the assumed liabilities?

6  A.  We are.  The cure, the 5.9?

7  Q.  No.  Let me be clear.  I'm talking about the difference

8  between what you thought you bid at the auction and where we

9  are today.

10  A.  Assumed liabilities consideration has not changed.  We're

11  still taking that.

12  Q.  What about the prepaid inventory?

13  A.  That's not a liability.  Are we talking about a new?

14  Q.  I'm talking about -- at the auction, right, you weren't

15  agreeing to pay for prepaid inventory?

16  A.  At the auction, it was not defined in anyone's APA.  We

17  kept the Stalking Horse bit of APA consistent, which did not

18  include paying for prepaid inventory.

19  Q.  Okay.  And so -- but in the bid you've now submitted,

20  which is reflected here in the Navid Declaration column, that

21  money is in there, right?

22  A.  Correct.

23  Q.  Okay.  And so how much would that change your bid between

24  --

25  A.  4.3 million.

1  Q.  4.3 million.  So if we remove the 4.3 million and we

2  remove the 14.4 million --

3  A.  No, you're double counting.  The 14.4 includes the

4  prepaid.

5  Q.  I beg your pardon.  Okay.  So if we remove the 14.4

6  million, how would that change your total cash at closing?

7  A.  My total cash would go down from the 61.6 minus the 4.3.

8  Q.  Okay.  And how would that change your total consideration?

9  A.  My 85 million consideration would go down to 81.  But

10  you're skipping these additional liabilities that we did agree

11  to take immediately, because those were misunderstanding in

12  our APA, which were included in the backup bid APA --

13  Q.  I'm just talking about the difference between your bid at

14  the auction --

15  A.  Yeah.

16  Q.  -- and where we are today.  Right.

17  A.  Well, there two other line items, which is the additional

18  liabilities.  These are the open Orders.

19  Q.  Right.

20  A.  They're not cures; they're open Orders.

21  Q.  Understood.  But you didn't understand you were paying for

22  those at the auction, did you?

23  A.  It was not in our APA.

24  Q.  Okay.  Like I --

25  A.  Yeah.  We didn't understand we're paying for them.

1  Q.  Right.  I'm just trying to make sure that we're on the

2  same page --

3  A.  Yeah.

4  Q.  -- in terms of what you thought you bid and where you

5  wound up.  So other than a four -- 14.4 reduction, would that

6  change it in any other way?

7  A.  Not economically.

8  Q.  Okay.  So same cash difference?

9  A.  Compared to what?

10  Q.  What you thought you bid at the auction versus where we

11  are today.

12  A.  Well, the cash has increased by 4.3 million.

13  Q.  I don't think you're following.

14  A.  You asked me if my cash consideration since the auction

15  has changed.  It has.  At the auction we thought it's 57

16  million.

17  Q.  Understood.  But what I'm saying is, if we remove that,

18  right?

19  A.  Yes.

20  Q.  Okay.  You told me if we took out -- you told me if we

21  take out the 14.4, that's where you think we were at the

22  auction, right?

23  A.  Correct.

24  Q.  Okay.  Is there anything else -- any other change to get

25  back to where you were at the auction?

1    A.   No.

2    Q.   That's really my question.

3    A.   No.

4            MR. MINUTI:  Okay.  So it's 14.4.  Bear with me for

5    one moment, Your Honor.  No further cross, Your Honor.  Thank

6    you.  Thank you, Mr. Navid.

7    A.   You're welcome.  Thank you.

8            THE COURT:  Redirect?

9            MR. TEELE:  I have very, very brief redirect, Your

10   Honor, if I may.

11           THE COURT:  Yes.

12                      REDIRECT EXAMINATION

13   BY MR. TEELE:

14   Q.   Mr. Navid, looking at the Debtor's Exhibit-20 that you

15   were just talking about with Mr. Minuti.

16   A.   Yes.

17   Q.   The right column combined bid reflecting or summarizing

18   the bid of universal and ad populum, that does not reflect the

19   value of their bid at the end of the auction, does it?

20   A.   It does not.  And I think one of the biggest deviation is

21   the cure Schedule, the critical vendor payment, which is not

22   consistent what was provided at the auction, and also the 10

23   million incentive payment valuation at the auction.  On the

24   transcript, they said it's at Lot B, which is an incentive

25   amount.  They valued it at nine million on the record in the

1   transcript.  But now they're giving the combined bid a value

2   of 10 million.

3   Q.  But they're still using your number of nine million from

4   the auction?

5   A.  Yeah.  For some reason they've given the discount, which

6   they're saying it's tied to leases we're curing that has

7   nothing to do with incentives or paying for the leases.

8   Q.  And to clarify the Asset Purchase Agreement, excuse me,

9   that is attached to your Declaration as Exhibit-A.  That we

10  just talked about with Mr. Minuti.

11  A.  Yes.

12  Q.  That is the latest/final version of the Agreement that

13  exist for Alliance.  Is that right?

14  A.  It's the final.  I think there's the word missing, which

15  is minus (indiscern.).

16  Q.  But that is the latest version, yes?

17  A.  Correct.  Yes.

18  Q.  Okay.  And does that latest version of the Alliance Asset

19  Purchase Agreement include or not include the prepaid

20  inventory?

21  A.  It includes.

22  Q.  And how does it include it?  Does that mean that the

23  consideration has increased by that for -- by that for that

24  reason?

25  A.  It includes it, yes.  Both in the definition for inventory

1    and in the purchase price calculation word by word in detail,

2    which is not in the back of bidder APA.

3              MR. TEELE:  Thank you, Your Honor.  Thank you Mr.

4    Navid.  No further questions, Your Honor.

5              THE COURT:  All right.  Mr. Navid, Exhibit-20 --

6    A.  Yes, Your Honor.

7              THE COURT:  -- middle column, AENT Navid

8    Declaration.  Am I understanding that that is a calculation

9    from your client's perspective of the offer that the CEO of

10   the company's in the back of the courtroom prepared to sign

11   and write a check for?

12   A.  Correct, Your Honor.

13             THE COURT:  And the column, the last column, the one

14   on the farthest right.  Is what you understand you're -- the

15   Debtor's proposing to accept and is asking the Court to

16   approve today?

17   A.  Correct.  With errors in my view.

18             THE COURT:  I understand that, but you're

19   attempting --

20   A.  Correct.

21             THE COURT:  -- to compare --

22   A.  Yeah.

23             THE COURT:  -- the Alliance -- what Alliance is

24   prepared to do in the second column with what you understand

25   --

Navid - Redirect                212

1   A.  Correct, Your Honor,

2           THE COURT:  -- the other proposed sale contract

3   would be, right?

4   A.  Correct, Your Honor.

5           MR. TEELE:  If I may just point out, Your Honor.

6   Exhibit-20 was not prepared by Mr. Navid.  It was prepared by

7   the Debtors.

8           THE COURT:  Thank you.  I'll ask my own questions

9   and you will have an opportunity to follow up and clarify.

10          MR. TEELE:  Thank you, Your Honor.

11          THE COURT:  So far, clarity hasn't been highly on

12  offer here today, at least in terms of what gets through to my

13  thick skull.  All right.  So the auction was conducted and my

14  understanding is the idea was that we wanted to get apples to

15  apple's comparison.  So what we are interested in is cash at

16  closing?

17  A.  Correct.

18          THE COURT:  Okay.  What can you do to up that?

19  A.  The 61.6 million?

20          THE COURT:  That they were asking the bidders

21  increase the cash portion of your price, right?

22  A.  Correct.

23          THE COURT:  Okay.  So I look at this chart and every

24  place that there's a comparison, the cash number for Alliance

25  is higher than the so-called combined bid that the Debtor's

1   proposing.  Isn't that right?

2   A.  That's right, Your Honor.

3       THE COURT:  Okay.  And if the -- if Alliance were to

4   get credit for the incentive payment, then each of those cash

5   numbers would increase by $1 million, actually $1,001,803?

6   A.  Not at closing because the incentive amount is paid until

7   December.  It's paid monthly, but it is a cash that would be

8   paid over time and it should be consistent with our bid

9   versus anybody else.

10      THE COURT:  Right.  It's the same deal.

11  A.  It's the same formula.

12      THE COURT:  Right.  Okay.  So to compare apples to

13  apples, those numbers then have to be the same?

14  A.  Correct.

15      THE COURT:  Right.  So that leaves -- they're

16  quibbling over $500,000 of suppose in Footnote 3 of lease

17  obligations.  It apparently is different between your

18  client's bid and the combined bid, right?

19  A.  Yeah.  I don't know how they got to nine versus 10.

20  Yeah.  They're saying it's leases, but the incentive formula

21  has nothing to do with leases.  Our bid is higher, roughly by

22  two million in cash.

23      THE COURT:  And it would go up by a million.  And

24  even if they had their way, it would go down by 500, so it

25  would still go up by 500,000.

1   A.  Correct.  Eventually, yes.

2           THE COURT:  Right.

3   A.  Through the incentive math.

4           THE COURT:  Right.  All right.  I think that answers

5   my questions.  Does anyone wish to examine this witness

6   further based upon the Court's questions?

7           MR. MINUTI:  No, Your Honor.

8           THE COURT:  No?  Thank you for your testimony, sir.

9   You may step down.

10  A.  Thank you, Your Honor.

11      (Paul Navid steps down from the stand)

12          MR. TEELE:  Your Honor, we have one more -- well,

13  one final witness who I believe will be much briefer than Mr.

14  Navid's testimony.  May I ask for another five-minute recess

15  for a restroom break?

16          THE COURT:  Sure.  Okay.  Thank you.  Five minutes.

17          THE CLERK:  All rise.  This court is in recess.

18          MR. TEELE:  Thank you.

19      (Recess)

20          THE CLERK:  Please remain seated and come to order.

21  The United States Bankruptcy Court for the District of

22  Maryland now resumes its regular session.

23          THE COURT:  All right.  Mr. Teele?

24          MR. TEELE:  Thank you, Your Honor, and thank you for

25  that short break.  We would -- Alliance would call on direct

1    Mr. Bruce Ogilvie to the witness stand.

2              THE COURT:  All right.  Come forward, sir.  Make

3    your way to the witness box.  Raise your right hand and the

4    clerk will administer the oath.

5              MR. OGILVIE:  Okay.

6         (Bruce Ogilvie coming to stand)

7                 BRUCE OGILVIE, ALLAINCE'S WITNESS, SWORN

8              THE CLERK:  Please be seated.  Please state your

9    full name and address for the record.

10             MR. OGILVIE:  Bruce A. Ogilvie Junior.  104A5

11   Northeast 6th Street, Apartment 2929, Bellevue, Washington,

12   98004.

13             THE CLERK:  Your witness, Mr. Teele.

14             MR. TEELE:  Thank you, ma'am.

15                      DIRECT EXAMINATION

16   BY MR. TEELE:

17   Q.  Mr. Ogilvie, by whom are you employed?

18   A.  Alliance Entertainment Holding Corporation.

19   Q.  And what is your position there?

20   A.  I'm the chairman.

21   Q.  Of the board?

22   A.  Chairman of the company, and as well as chairman of the

23   board.

24   Q.  Thank you.  Could you please describe for the Court your,

25   excuse me, your professional background starting since you

1  graduated from college?

2  A.  Okay.  Never graduated from college.  Tried to do that

3  for five years.  Started one of my first businesses and then

4  started another business called Abbey Road Distributors in

5  1980, which was a distributor of back then LPs, A-tracks and

6  cassettes.  Built that up and had a liquidity event in 1994.

7  Worked for the company that bought me for a year, remembered

8  all the reasons why I forgot.  I started my business and

9  decided I wanted to get back out on my own.  Was on a

10  sabbatical.  I was brought into Warehouse Records.  They were

11  in -- had filed for bankruptcy and the Creditors had voted to

12  liquidate the chain.

13      They brought me in because I was somebody who they

14  trusted and felt I would look out for their interest as well

15  as the whole industry.  So then I was able -- I was brought

16  in, got them out of bankruptcy, and the plan confirmed.

17  Eventually I left that operation and continued with a couple

18  other startups, which are still in business today.  And then

19  in 2001 I joined with Super D.  I joined my partner Jeff

20  Walker.  And from there, Jeff and I grew it from $18 million

21  in revenue to about 1.4 billion during the peak of COVID.

22  Q.  And could you describe briefly the business of Alliance

23  Entertainment?

24  A.  We are a distributor, a small partial retailer, online

25  retailer of entertainment products consisting of movies,

1   music, video games, and collectibles.

2   Q.  Thank you.  And have you been personally involved in the

3   Alliance bid for the Debtor's assets to date?

4   A.  Yes.

5   Q.  What has your involvement been?

6   A.  Soup to nuts.  Start all the way at the bottom of just

7   learning about it.  Trying to learn much about the company,

8   engaging with Raymond James, who are running the process,

9   learning what path we should take with Raymond James.

10  Working with our lawyers to advise us, which led us to

11  bankruptcy counsel, which led us to hiring out an outside

12  professional to represent the company and talking with

13  Raymond James, who was running the process.  As far as

14  dealing with our lender and putting together some type of

15  analysis of what it would it mean, combining both companies.

16  Looking at all the numbers and information in the data room

17  that's provided by the Debtor.

18      There's many, many documents that fly across each day or

19  every hour.  And I was personally reviewing every document

20  that came through into the data room.  Anything that I

21  couldn't understand or was not in agreement with or had a

22  question, I would feed those questions out.  I was kind of

23  acting as the quarterback, just feeding that information to

24  the rest of my team members where I needed help.

25      Having Providence Paul Navid, who testified earlier, and

1   his team was a great help in an asset in analyzing that

2   because it's a very complicated company, the way they're run.

3   And with all that, the systems are run on two different

4   platforms.  So it was challenging.  There was not consistency

5   in dealing with the data, but we did the best we could to

6   understand and make sure we were making the right decision

7   and the decision to make economic sense.  And it was

8   something that would be beneficial for all involved.

9   Q.  Thank you.  And you participated by Zoom in the auction

10  for the Debtor's assets that began on March 24th.  Is that

11  right?

12  A.  Yes, I did.

13  Q.  And it's your understanding that at the conclusion of

14  that auction, Alliance Entertainment was designated as the

15  successful bidder?

16  A.  Yes.  Yes, I did.

17  Q.  And since then, do you understand that or do you know if

18  Alliance's offer has changed since the date of the auction?

19  A.  We were asked to improve our offer and we did.

20  Q.  And -- excuse me, I'm sorry.

21  A.  And we did.  And the final APA that we provided over the

22  weekend -- well, it's pretty close to the one we provided a

23  week before, the one we pulled back when we were not told

24  that we would not be the -- they would endorse our offer.

25  Q.  And you were in the courtroom when Mr. Navid was

1    testifying, were you?

2    A.  Yes, I was.

3    Q.  And did you hear his testimony that total consideration

4    under the Alliance Agreement is 85,368,053?

5    A.  Yes, I did.

6    Q.  And do you agree with that testimony?

7    A.  Yes, I do.

8    Q.  And did you hear Mr. Navid's testimony that the cash that

9    Alliance will pay at closing under that Agreement is

10   $61,613,309?

11   A.  Yes, I did.

12   Q.  And do you agree with that testimony?

13   A.  Yes, I do.

14   Q.  Sitting here today, can Alliance pay $61,613,309 in cash

15   at closing?

16   A.  Absolutely.

17   Q.  And how soon could Alliance close under that APA?

18   A.  As soon as this Plan is confirmed, the Judge signs it and

19   it's so ordered.

20             MR. TEELE:  I have no further questions, Your Honor,

21             THE COURT:  Cross examination?

22             MR. MINUTI:  Yes, Your Honor.  Thank you.

23                      CROSS EXAMINATION

24   BY MR. MINUTI:

25   Q.  Good afternoon.

1  A.  Good afternoon.

2  Q.  If you could turn, you have two binders in front of you.

3  One is labeled the Debtor's Exhibits.  Let me know if you

4  have that.

5  A.  I've got this one here.

6  Q.  Correct.  You can turn to Exhibit Number-5.  Tell me if

7  you recognize that document.

8  A.  Yes, I do.

9  Q.  And what is that document?

10  A.  This would be a NDA.

11  Q.  Okay.  Non-disclosure agreement, correct?

12  A.  Yes, sir.

13  Q.  And you signed this document, correct, on behalf of

14  Alliance Entertainment?

15  A.  Yes, I did.

16  Q.  Okay.  And you understood -- well, let me ask you this

17  question.  What is your understanding of the meaning of this

18  NDA?

19  A.  Well, generally not to disclose any confidential

20  information about the company that I learned in my

21  discussions and anything I learned must be kept to myself.

22  And if I'd share this with anybody, it would be a violation

23  of the NDA.

24  Q.  Okay.  And if you had the desire or you wanted to share

25  that information, you needed the Debtor's consent.  Is that

1  fair?

2  A.  Absolutely.

3  Q.  Okay.  And if you could now turn to Exhibit-7 in the same

4  tab.  And I represent to you that beginning on the second

5  page is the original Asset Purchase Agreement Alliance

6  Entertainment sent in with its bid.  Are you familiar with

7  that document?

8  A.  This is coming from what was filed Saturday afternoon,

9  just to confirm?

10  Q.  No, this was actually the bid that was submitted in

11  connection with the bid procedures.

12  A.  Oh, before -- that's Sunday before the auction you're

13  referring to?

14  Q.  Correct.

15  A.  Okay.  If you say that, let me confirm that.  Every

16  document looks exactly the same.  You have to kind of look

17  for little key words to make sure we're on the same one.  I

18  am referring to the purchase price section is what I'm

19  looking for to help me.  Yes.  This looks like it.

20  Q.  Could you turn to page 23?  And I'm going to draw your

21  attention to 6.10?

22  A.  Yes, I see that.

23  Q.  Okay.  And make sure the microphone picks me up here.  It

24  says, purchaser nor seller shall make any public

25  announcements or statements concerning the transactions

1  contemplated by this Agreement without the prior written

2  consent of the other party.  Did I read that correctly?

3  A.  Yes, I believe you did.

4  Q.  Okay.  And this was -- and this provision has stayed

5  consistent in all of the asset draft -- Asset Purchase

6  Agreements that you've submitted, correct?

7  A.  Yes, I would agree with you.

8  Q. Okay.  And you were in the courtroom earlier today when

9  Mr. Gorin testified?

10  A.  Yes, I was.

11  Q.  And you're familiar with the podcast called The Industry

12  of Comics?

13  A.  I am now.

14  Q.  All right.  Well, when you say you are now, you didn't

15  give an interview?

16  A.  No, I'm saying I wasn't familiar with it before, but I am

17  now.  And essentially after I gave my interview the Tuesday

18  after the auction.

19  Q.  Okay.  So let's just make sure we're both on the same

20  page.  So you did give an interview to the Industry of

21  Comics, correct?

22  A.  Yes.  They reached out.  Obviously, the comic book

23  industry, as Mr. Gorin had stated, it's a very close-knit

24  industry.  Certainly, I can relate to it from all the

25  independent music stores that I've serviced for the last 30

1    years.  So, I can understand why they were reaching out and

2    wanted to understand, you know, how is this going to affect

3    them as customers.

4    Q.  All right.  And you didn't ask the Debtor's permission to

5    have that interview, correct?

6    A.  I did not.

7    Q.  Okay.  And you were in the courtroom when Mr. Gorin

8    described some of the comments were made on that interview?

9    A.  Yes, I heard what he said.

10   Q.  Okay.  And you understood that that interview was going

11   to be broadcast publicly, correct?

12   A.  Yes, I was aware of that.

13   Q.  Okay.  And you gave that interview after you signed your

14   Non-disclosure Agreement, correct?

15   A.  Well, the NDA was signed on October 18th and this

16   interview was done sometime after that.  Yes.

17   Q.  And you gave that interview after you submitted the Asset

18   Purchase Agreement that we've identified as Debtor's Exhibit

19   Number-7, correct?

20   A.  Yes.

21   Q.  All right.  And do you know whether anyone at Alliance

22   reached out to any of the Debtor's vendors after the auction?

23   A.  I'm not aware of that.

24   Q.  Okay.  But you heard Mr. Gorin testify to that?

25   A.  I heard him testify and that was the first I heard of

1    that, yes.

2    Q.  Okay.  Do you have any reason to believe he's not telling

3    the truth?

4    A.  I don't know what you -- can you define what reach out

5    means and what conversation there was because I have no idea

6    what he's talking about.

7    Q.  Okay.  Well, I guess I'm going to let his testimony

8    stand, but do you have any reason to believe the testimony is

9    inaccurate?

10   A.  I don't believe he stated who it was and what they even

11   talked about.  I mean, it is true that Alliance has a lot of

12   common vendors today that we do business with and we're in

13   the collectibles business.  They go to Toy Fair, they talk

14   all the time, but I have no idea what the conversation was

15   because I wasn't there and nobody has told me about it.

16   Q.  So you're not aware of anybody at Alliance Entertainment

17   reaching out to any of the retailers?

18   A.  If you can help me with who it is, that might help me,

19   but I'm not aware of anything.

20   Q.  How about Jeff Walker, who is Mr. Walker?

21   A.  Oh, Jeff Walker is my business partner, yes.

22   Q.  Okay.  And what positions does he hold?

23   A.  He's the CEO and CFO of the company.

24   Q.  Okay.  Are you aware that Mr. Walker spoke with any of

25   the Debtor's retailers?

1   A.  Well, when you say Debtor's retailers, who in particular

2   are we talking about?

3   Q.  Any of the Debtor's retailers?

4   A.  I'm not aware of any of them that they've talked to.

5   Q.  All right.  So that hasn't been brought to your

6   attention?

7   A.  Not that I can remember.

8   Q.  All right.  So as you sit here today, you don't remember

9   that?

10  A.  Well, I don't know anything about it and I can't say I

11  don't -- I can't remember something -- I can't say I remember

12  -- don't remember something that I don't know anything about.

13  Q.  Bear with me for one moment.

14         THE COURT:  Mr. Minuti, are you sure that was Mr.

15  Gorin's testimony.  I mean, I don't know what the

16  transcript's going to show, but there was a lot of discussion

17  about the interview setting off a lot of controversy and

18  whatnot in the comic book community.  And I have to say,

19  sitting here right now, I had the impression that that word

20  got to store owners, vendors and that kind of thing, not

21  necessarily somebody from this company contacted them.

22         MR. MINUTI:  I believe Mr. Gorin also testified that

23  somebody from Alliance Entertainment had reached out directly

24  to retailers and talked specifically about the consolidation

25  of the warehouses.  That's my recollection of the testimony,

1    Your Honor.

2              THE COURT:  Okay.  Well, it's not -- I can't say I

3    recall it that way, but --

4              MR. MINUTI:  Very well.

5              THE COURT:  -- the transcript would show.

6              MR. MINUTI:  Very well.  I have no further questions

7    of this witness, Your Honor.

8              THE COURT:  All right.

9              MR. MINUTI:  Thank you.

10             THE COURT:  Go ahead.

11             MR. FINIZIO:  Really brief, Your Honor.  Good

12   afternoon.  I'm Gianfranco Finizio, I represent the Creditors

13   Committee.

14   BY MR. FINIZIO:

15   Q.  Just a couple of questions for you, Mr. Ogilvie.  Mr.

16   Teele asked you before about the timing of paying cash on

17   closing.  Do you recall that?

18   A.  Yes.

19   Q.  And the cash on closing was the $61.6 million number.  Is

20   that correct?

21   A.  That's correct.

22   Q.  And you answered that you'd be able to pay when a Plan is

23   confirmed.  I think you meant when an Order is entered by

24   this Court approving the sale.  Is that correct?

25   A.  Yes, sir.

1  Q.  So if an Order were to be entered by Thursday, April

2  10th, you would be able to pay cash on closing shortly

3  thereafter?

4  A.  Absolutely.

5          MR. FINIZIO:  No further questions.  Thank you.

6          THE COURT:  Okay.  Redirect?

7          MR. TEELE:  Not redirect, Your Honor.  It's just I

8  failed to move an exhibit into evidence at the conclusion of

9  Mr. Navid's testimony, but I can wait until we're there.

10         THE COURT:  Okay.  I'm not sure where there is.  You

11 don't have any further questions for this witness?

12         MR. TEELE:  No.

13         THE COURT:  All right.  I have no questions for the

14 witness.  Thank you for your testimony, sir.  You may step

15 down.

16 A.  Thank you.

17    (Witness leaves the stand)

18         THE COURT:  Okay.

19         MR. TEELE:  Your Honor, just very briefly.  I

20 neglected to move Alliance Exhibit-8, which is the

21 Declaration of Mr. Navid into evidence as the conclusion of

22 his testimony.  And I would like to do so now.

23         MR. MINUTI:  Your Honor, just for the same reasons

24 that the Debtor's Declarations were (indiscern.), I would

25 object.  Mr. Navid testified his testimony on the stand.

1          THE COURT:  Why do we need his affidavit?

2          MR. TEELE:  Because Exhibit-A to his Declaration is

3     the current form of the Asset Purchase Agreement, which has

4     been featured boldly in this hearing on both sides.  And I do

5     believe it is properly before the court and should be

6     admitted as evidence, at least for that purpose.

7          THE COURT:  All right.  I'm going to overrule the

8     objection and admit the exhibit.

9        (Alliance's Exhibit-8 admitted into evidence)

10         MR. TEELE:  Thank you, Your Honor.

11         THE COURT:  Any other evidence?

12         MR. TEELE:  Not on the Alliance side, Your Honor.

13    Thank you.

14         THE COURT:  Okay.  Anyone else wishing to present

15    evidence before I turn back to Mr. Minuti?

16         ALL:   (No verbal response).

17         THE COURT:  All right.  No takers.  Mr. Minuti, is

18    the Debtor putting on any sort of rebuttal case?

19         MR. MINUTI:  If I could just have literally one

20    second, Your Honor.  No, Your Honor.

21         THE COURT:  All right.  So I think that would bring

22    us to closing argument.  It's been a long and tiring day.

23    Court's cleared its Docket for tomorrow.  We could resume at

24    10:00 and hear closing argument.  I think I'd be in a better

25    frame of mind to consider the arguments and my decision at

229

1    that time, rather than try to press onto the -- into the

2    evening tonight.  So see you tomorrow at 10:00 A.M.

3            MR. MINUTI:  Thank you, Your Honor.

4            THE COURT:  Thank you.

5            THE CLERK:  All rise.  This court is adjourned.

6        (Court adjourned)

7

8                        CERTIFICATION
9    I, Lewis Parham, certify that the foregoing is a correct
10    transcript from the electronic sound recording of the
11    proceedings in the above-entitled matter.
12
13
14    _____          4/11/25
15
16    _____          _____
17    Signature of Transcriber              Date