**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc. *et al.*, | Chapter 11 |
| Debtors. | (Jointly Administered) |
| Alliance Entertainment, LLC, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ |
| Diamond Comic Distributors, Inc.; Comic Holdings, Inc.; Comic Exporters, Inc.; Diamond Select Toys & Collectibles, LLC, Raymond James & Associates, Inc., Getzler Henrich & Associates LLC, Robert Gorin, Charlie Tyson, and Dan Hirsch, | |
| Defendants. | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Alliance Entertainment, LLC ("Plaintiff" or "AENT"), by its attorneys, as and for its Complaint against Defendants Diamond Comic Distributors, Inc. ("DCD"), Comic Holdings, Inc. ("CHI"), Comic Exporters, Inc. ("CEI"), Diamond Select Toys & Collectibles, LLC ("DST," and together with DCD, CHI, CEI, the "Debtors"), Raymond James & Associates, Inc. ("Raymond James"), Getzler Henrich & Associates LLC ("Getzler Henrich"), Robert Gorin ("Gorin"), Charlie Tyson ("Tyson"), and Dan Hirsch ("Hirsch," and together with the Debtors, Raymond James, Getzler Henrich, Gorin, and Tyson, the "Defendants"), alleges as follows:

1

## NATURE OF THE ACTION

1.      Defendants fraudulently misrepresented the status of the Debtors' relationship with Wizards of the West Coast LLC ("WOTC"), the Debtors' largest vendor accounting for approximately 25% of the Debtors' Alliance Gaming Business revenue, as part of an intentional scheme to induce Plaintiff to purchase the Debtors' assets for tens of millions more than the true valuation of those assets.  On March 6, 2025 and April 9, 2025, Defendants repeatedly and intentionally represented that Debtors' relationship with WOTC remained strong and in good standing.  Defendants knew this was false.  As Plaintiff recently learned, in December 2024, prior to the Petition Date (defined below), WOTC decided that they would not renew the Distribution Agreement (defined below) beyond the December 31, 2024 termination date, thus reducing the Debtors' Alliance Gaming Business revenue by at least 25%, other than a short 90-day extension as an accommodation to assist the Debtors in their upcoming bankruptcy case and to induce the Debtors to grant WOTC critical vendor status upon the Debtors' receipt of authority to grant such status to certain vendors. Upon information and belief, the Debtors were aware of WOTC's decision in December 2024.

2.      Defendants kept this closely guarded secret from Plaintiff, all other bidders in the Auction (defined below), and the Court.  For example, Defendants redacted the termination dates from the WOTC agreements that were disclosed to Plaintiff (and, presumably, other bidders).  A sliver of truth came to light on April 12, 2025, only after the execution of the AENT APA (defined below) and entry of the Sale Approval Order (defined below), when the Debtors, for the very first time, provided Plaintiff with an unredacted copy of the Distribution Agreement and its amendment, revealing the imminent termination of the WOTC relationship.  The Debtors then waited another

five days before revealing, for the first time, on April 17, 2025, that WOTC would not renew the Distribution Agreement.

3.      Far from confessing to their deception, on April 17, 2025, Defendants feigned outrage, calling the termination "shocking," "coming out of nowhere," and a "slap in the face," given the Debtors' twenty-five-year relationship with WOTC.  Defendants' falsehoods were finally laid bare on April 21, 2025, in a video conference involving WOTC, AENT, and the Debtors.  WOTC revealed that its decision to terminate the Distribution Agreement was made— and the Debtors were aware of the decision—in December 2024, because the Debtors' business with WOTC had declined by more than 8% over the last four years, during which period each of WOTC's other four distributors had significantly increased their sales.  Importantly, Debtors did not refute WOTC's characterization on the video conference.

4.      After this revealing call, AENT tried to salvage the WOTC relationship by proposing to pay WOTC a fixed sum and agreeing to minimum purchase commitments, in exchange for WOTC extending the Distribution Agreement through December 31, 2025.  WOTC rejected the proposal.

5.      AENT still sought to move forward with closing the AENT APA transaction, subject to an adjustment in the purchase price to reflect the loss of the WOTC relationship, but the Debtors refused to engage in those discussions.  Left with no other option, AENT issued a Notice of Material Adverse Change on April 23, 2025 and terminated the AENT APA on April 24, 2025, as was its right to do pursuant to section 8.1(f) of the AENT APA, based on a Material Adverse Change in Debtors' operations.  A little more than a day later, the Debtors announced that they were moving forward with the sale of Debtors' assets to another party, the identity of which has not been disclosed.

6.      In addition to defrauding Plaintiff, costing it millions in fees and expenses since its initial bid submission, the Debtors now refuse to return AENT's earnest money deposit of $8.5 million, providing no reasonable justification for doing so.

## PARTIES

7.      Plaintiff AENT is a Delaware Limited Liability Company and the Purchaser under the AENT APA.

8.      Defendant DCD is a Maryland Corporation, a Debtor in these cases, and a Seller under the AENT APA.

9.      Defendant DST is a Maryland Limited Liability Company, a Debtor in these cases, and a Seller under the AENT APA.

10.     Defendant CHI is a Maryland Corporation and a Debtor in these cases.

11.     Defendant CEI is a Maryland Corporation and a Debtor in these cases.

12.     Defendant Raymond James is a Florida Corporation and provides investment banking services to the Debtors, including in connection with the AENT APA.

13.     Defendant Getzler Henrich is headquartered in New York and provides restructuring services to Debtors, including after the Petition Date.

14.     Defendant Gorin is a resident of the State of Florida, a Managing Director at Getzler Henrich, and is the Debtors' co-Chief Restructuring Officer.  Mr. Gorin is the architect of the Debtors' fraud against AENT, as detailed herein.

15.     Defendant Tyson is a resident of the State of Pennsylvania and at all relevant times was the Debtors' co-Chief Executive Officer.

16.     Defendant Hirsch is a resident of the State of Florida and at all relevant times was the Debtors' co-Chief Executive Officer.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the action and the parties pursuant to 28 U.S.C. § 1334 and Section 37 of the Sale Approval Order.  The claims asserted herein constitute a "core" proceeding under 28 U.S.C. § 157(b).

18.     The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

20.     Pursuant to Rule 7012-1 of the Local Bankruptcy Rules for the District of Maryland, Plaintiff consents to entry of final orders and/or judgments in this matter by the Bankruptcy Court.

## FACTUAL BACKGROUND

### I.     Bankruptcy Petition

21.     The Debtors are distributors of tabletop games, board games, card games, miniatures, role-playing games, accessories, pop-culture merchandise, comic books, gaming products, collectibles, accessors, and graphic novels, with four operating divisions, namely, the: (1) Alliance Game Distributors division (through which Seller distributes board games, card games, miniatures, role-playing games, and accessories in the United States), its most profitable division ("Alliance Gaming Business"); (2) Diamond Comic Distributors division (through which Seller distributes comic books, graphic novels, and related merchandise); (3) Collectible Grading Authority division (through which Seller provides grading and authentication services for collectibles); and (4) Diamond Select Toys division (though which Seller manufactures collectible toys and statues).

22.     On January 14, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

23.     The Debtors continue in the possession and control of their assets and properties in accordance with sections 1107 and 1108 of the Bankruptcy Code.

24.     Prior to the Petition Date, on July 12, 2024, the Debtors retained the services of Getzler Henrich to provide restructuring services and Chapter 11 planning and execution services. Getzler Henrich is a middle-market corporate turnaround and restructuring firm that provides strategic financial services in restructuring transactions, including turnarounds, workouts, crisis management, interim management, corporate restructuring, bankruptcy advisory, Lean-Six Sigma analysis and implementation, and distressed mergers and acquisitions.

25.     Among other things, the Debtors retained Getzler Henrich to (i) review management's current revenue generation, cost reduction and working capital management initiatives; identify and implement additional revenue enhancement and expense control initiatives as appropriate; (ii) facilitate the Debtors' communication and negotiation with other parties-in-interest, including other retained parties, secured lender, and vendors; (iii) oversee a section 363 sale process; (iv) assist with compliance with the reporting requirements of the Bankruptcy Code, Bankruptcy Rules and local rules, including reports, monthly operating statements, and schedules; and (v) provide other services as included in an engagement letter ("Getzler Henrich Services"). The Debtors were required to provide Getzler Henrich with full access to their financial and operational information and data, personnel, books, and records, and other information as requested.

26.     Defendant Gorin was appointed as Chief Restructuring Officer and would be responsible for fulfilling the Getzler Henrich Services. Defendant Gorin is a Managing Director

of Getzler Henrich with over 30 years of experience in business strategy and turnaround consulting and leads Getzler Henrich's consumer products practice. After the Petition Date, the Court approved Defendant Gorin as co-Chief Restructuring Officer, along with William Henrich, co-chairman of Getzler Henrich (Dkt. 200). Defendant Gorin executed the First Day Declaration (Dkt. 20) and was primarily responsible for managing the Debtors' operations during the relevant period.

27.     Similarly, prior to the Petition Date, on September 30, 2024, the Debtors retained Defendant Raymond James to provide investment banking advisory services. Among other things, Defendant Raymond James was retained to (i) review and analyze the Debtors' business, operations, properties, financial condition, and Interested Parties, (ii) evaluate potential transaction alternatives and strategies; (iii) participate in Debtors' board of directors' meetings as determined by the Debtors to be appropriate; and (iv) provide various other services. Defendants Debtors and Raymond James also agreed that, during the terms of its engagement, the Debtors will not directly negotiate or consummate any Transaction without Defendant Raymond James's knowledge or involvement. As a result of their work together, Defendant Raymond James became fully acquainted with the Debtors' business operations and financial affairs. After the Petition Date, the Court approved Defendant Raymond James' retention as Debtors investment banker (Dkt. 126).

## II.     **Defendants' Fraudulent Misrepresentations**

28.     On February 11, 2025, the Court entered an order (the "Bid Procedures Order"), which, among other things, established certain deadlines for submitting bids and an auction (the "Auction") for the sale of Debtors' Assets. The Bid Procedures Order set the bid deadline for March 19, 2025, at 5:00 p.m., by which all Qualifying Bids (as defined therein) must be received by the Debtors (the "Bid Deadline").

29.     As part of its due diligence prior to submitting a bid, on March 1, 2025, Plaintiff asked Raymond James and Getzler Henrich about current customer and vendor relationships across all of the Debtors' businesses.   Instead of providing a straightforward response, a representative from Raymond James responded that Debtors would not speak about specific customers or vendors at that phase of the process.

30.     On March 6, 2025, AENT (through its Chairman, Bruce Ogilvie ("Ogilvie"), Chief Executive Officer, Jeff Walker ("Walker"), and six other AENT employees); AENT's financial advisor, Province, LLC ("Province") (through Paul Navid ("Navid") and three other representatives)) met by video conference with Defendant Debtors (through Defendants Tyson and Hirsch, along with four other representatives); Getzler Henrich (through Defendant Gorin) and Raymond James (through Alex Haesler and others).   AENT inquired as to the status of the Debtors' relationships with their key vendors.   Each of Defendants Tyson, Hirsch, and Gorin falsely represented that Debtors' relationships with their key vendors were strong and stable and the Debtors remained in good standing with them.   When AENT asked Debtors about specific vendors, including WOTC, Defendants Raymond James and Gorin prevented Debtors from answering those questions.

31.     On March 16, 2025, the Debtors uploaded redacted contracts with certain large vendors, including a Distributor Agreement, effective December 8, 2021, by and between WOTC and Alliance Game Distributors d/b/a DCD (the "Distribution Agreement"), and a second amendment, effective as of January 1, 2025 (the "Second Amendment").   The expiration dates of the Distribution Agreement and Second Amendment were redacted.

32.     WOTC is a family of studios that specialize in building role-playing games, trading card games, and digital games.   Under the terms of the Distribution Agreement, Debtors are non-

exclusive distributors of certain of WOTC's products. The Debtors' relationship with WOTC represents approximately 25% of Debtors' Alliance Gaming Business revenue and is the Debtors' most critical relationship.

33. Based on these representations, in advance of the Bid Deadline, AENT submitted an offer to purchase substantially all of Debtors' assets for $51,559,450, which included the assumption of certain liabilities but excluded certain adjustments. AENT also wired an earnest money deposit of $3,600,000, as required by the Bid procedures Order. On March 21, 2025, prior to Bid Deadline, Defendant Raymond James notified AENT that it was conditionally approved as a Qualified Bidder, but that AENT's asset purchase agreement (the "AENT APA") did not meet certain requirements and could not be approved. After extensive discussions and revisions to AENT's bid, on March 23, 2025, the Debtors notified AENT that it was a Qualified Bidder.

34. The Auction for Debtors' Assets was held over two days on March 24-25, 2025 at the office of Defendant Raymond James. By the end of the Auction, AENT's bid for $72,245,000 (inclusive of stalking horse protections) was determined to be the highest and best bid. Upon execution of the AENT APA, Plaintiff sent Debtors an additional deposit of $4,900,000, for a total of $8,500,000, including the initial deposit.

35. On March 25, 2025, after it was declared the highest bidder, AENT, through its financial advisor, Mr. Navid of Province, requested an opportunity to communicate directly with the Debtors' customers and vendors to confirm the status of each of those relationships. Defendant Raymond James denied the request.

36. After the Auction, it came to light that the Debtors were soliciting new bids and secretly negotiating with their preferred purchaser, a combination of Universal Distributors, Inc. and Ad Populum LLC ("Universal/Ad Populum"), who had submitted an inferior bid at the

Auction.  The Debtors attempted to steer the sale to Universal/Ad Populum and announced that it would seek approval of the sale of Debtors' assets to them.  AENT promptly filed an adversary proceeding (Adv. Pro. No. 25-00089) and a motion for preliminary injunction to stop the sale to Universal/Ad Populum, and objected to the Debtors' efforts to obtain Court-approval to sell their assets to Universal/Ad Populum.  That challenge was successful and AENT was declared the Successful Bidder. *See* Sale Approval Order (Dkt. 335).

37.     On April 9, 2025, AENT, through Ogilvie and Walker, again met with the Defendant Debtors (through Defendants Tyson, Hirsch, and Gorin) at the Debtors' offices, and inquired as to the status of the Debtors' vendor relationships, including WOTC.  Each of Defendants Tyson, Hirsch, and Gorin again falsely represented that the Debtors' relationships with their key vendors were strong and stable and that Debtors remained in good standing with them.  Defendants Tyson, Hirsch, and Gorin knew these statements were false when made, yet intentionally made them anyway.

38.     Based on these representations (including identical representations made on March 6 and April 9), AENT executed the AENT APA with the Debtors on April 10, 2025.

**III.     <u>AENT APA</u>**

39.     Section 2.6 of the AENT APA provides for the calculation of the Purchase Price, which totals $85,368,053, with $61,613,309 in cash due at closing.

40.     Section 3.1 of the AENT APA further provides that closing of the sale of the Debtors' assets "shall take place no later than 5:00 P.M. ET on April 25, 2025."  However, Section 3.3(d) provides that AENT's obligation to consummate the purchase of Debtors' assets is conditioned on the fact that, among other things, "No Material Adverse Change" shall "have occurred with respect to the Business or the Acquired Assets (taken as a whole)."

41.     Section 1 of the AENT APA defines a "Material Adverse Change" as "any change, event, occurrence, fact, waste, circumstance, or effect as shall have arisen after the date of this Agreement and prior to the Closing" and that "would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on (i) the Business or the Acquired Assets, including, without limitation, the results of operations or the condition (financial or otherwise) of the Acquired Assets, (ii) the value of the Acquired Assets, or (iii) the ability of the parties to consummate the transactions contemplated hereby on a timely basis."  It excludes "any change, circumstance, or effect that arises out of, results from or relates to the commencement or conduct of the Chapter 11 Case," as well as certain other conditions not applicable here.

42.     Section 3.3(g) also provides that AENT's obligation to consummate the purchase of Debtors' assets is further conditioned on the Court entering an order, reasonably satisfactory to AENT, among other things outlined therein, "approving the sale of the Acquired Assets to Purchaser free and clear of all Liens and Claims," "finding that Purchaser is a 'good faith purchaser' within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms-length purchaser," and "finding that the sale of the Acquired Assets hereunder was conducted in a 'non-collusive manner' within the meaning of Section 363(n) of the Bankruptcy Code, and the Approval Order shall have become a Final Order." The Court entered the Sale Approval Order on April 11, 2025.

43.     Section 8.1(f) further provides that the AENT APA may be terminated by notice given prior to closing "by the non-breaching party upon a material breach of any provision" of the AENT APA, "provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days."  The non-breaching party "shall have an immediate right to terminate

if the breaching party has willfully breached any provision of this Agreement which breach is not cured." Within two business days of termination of the AENT APA under Section 8.1(f), AENT and the Debtors shall "deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to return or pay the Deposit in accordance with this Section 8.2."

44.     Section 8.2 of the AENT APA also provides that, upon AENT's termination of the AENT APA pursuant to Section 8.1(f), AENT "shall not have any Liability or obligations under this Agreement and the Escrow Agent shall promptly return the Deposit to Purchaser."

45.     AENT terminated the AENT APA, pursuant to Section 8.1(f), on April 24, 2025, due to the occurrence of a Material Adverse Change, specifically, the surprise revelation that a contract representing 25% of the Debtors' Alliance Gaming Business revenue would terminate on April 30, 2025 (i.e., five (5) days after the consummation of the AENT APA).

**IV.     The Truth Emerges That WOTC Decided Not to Renew the Distribution Agreement Prior to the Petition Date, and the Defendants Knew of that Decision**

46.     Unbeknownst to Plaintiff, the various representations that the Defendants made to induce Plaintiff to execute the AENT APA were false. The Defendants knew those representations were false when made or were recklessly indifferent to the truth of the matter. In fact, at the time such representations were made, the Defendants actively concealed facts in their possession contradicting those representations. Defendants intended that Plaintiff would rely on such representations as to secure tens of millions of dollars above what the Debtors' assets would otherwise be worth. Plaintiff justifiably relied on those representations and suffered significant damages because of such reliance.

47.     On April 12, 2025, two days after the execution date of the AENT APA and one day after the Court entered the Sale Approval Order, the Debtors uploaded unredacted versions of the Distribution Agreement and Second Amendment. These unredacted documents revealed, for

the very first time, that the Distribution Agreement expired on December 31, 2024, and the Second Amendment extended the relationship by 90 days, to March 31, 2025.  This was the first time that the Debtors shared these unredacted documents with AENT.

48.     On the morning of April 15, 2025, AENT received a calendar invite, from WOTC, for a video conference between AENT, the Debtors, and WOTC to discuss the status of the relationship between WOTC and the Debtors during an April 17, 2025, 12:00 P.M. PST video conference.  On April 17, 2025, at 11:49 A.M., without explanation, WOTC cancelled the video conference.

49.     At 4:36 P.M. on April 17, 2025, Debtors' counsel called AENT's counsel and stated that the WOTC Distribution Agreement was set to expire on April 30, 2025 and that WOTC had communicated that they did not intend to renew the agreement.  This was the first admission from the Debtors that their relationship with WOTC was not in good standing, contrary to their previous representations.  Realizing the impact that this revelation would have on employee morale and the ability of the Debtors to continue operations, the Debtors implored AENT to not raise this issue on the daily "all-hands" conference calls scheduled for 5:00 P.M. each day.

50.     That same day at 10:15 P.M., AENT met with the Debtors, including Defendant Gorin, but excluding Defendants Tyson and Hirsch, to discuss the status of the WOTC relationship.  Defendant Gorin represented that WOTC gave no prior indications that the Distribution Agreement was in jeopardy and that WOTC had stated that the Debtors were their preferred vendors.  He feigned outrage, calling the termination "shocking," "coming out of nowhere," and a "slap in the face" to the Debtors given their long-standing relationship.  Defendant Gorin also explained that the Distribution Agreement had been extended from March 31, 2025 to April 30, 2025, but provided no evidence of such extension.  The parties also agreed to reconvene on April

18, 2025 to hear from Defendants Tyson and Hirsch regarding their understanding of the WOTC relationship.

51.     On April 18, 2025, at 12:00 P.M., AENT met with the Debtors, including Defendants Gorin, Tyson, and Hirsch, by video conference to discuss the WOTC relationship. Defendants Tyson and Hirsch both reiterated Defendant Gorin's previous assertions that WOTC gave no prior indications that the Distribution Agreement was in jeopardy and that WOTC had stated that the Debtors were their preferred vendors.  When questioned as to why WOTC only granted a 90-day extension of the Distribution Agreement through the Second Amendment, Tyson explained that WOTC stated it was only granting 90-day extensions to all of its distributors, so the Debtors did not believe the limited extension was a concern.  This statement was false when made, and Defendant Tyson knew it was false.

52.     On April 21, 2025, at 2:00 P.M., by video conference, AENT and the Debtors, including Defendants Gorin, Hirsch and Tyson, met with WOTC, including its President John Hight and Vice President of Global Revenue and Wizards Play Network, Brian Trunk ("Trunk"), to discuss the relationship between WOTC and the Debtors.  The truth finally emerged.  WOTC refuted the Debtors' and Defendant Gorin's previous assertions that its decision to terminate the Distribution Agreement was only made on April 17, 2025.  In fact, Trunk explained that WOTC made its decision to terminate the Distribution Agreement in December 2024, prior to the Petition Date.

53.     Trunk further explained that WOTC's decision to terminate the Distribution Agreement did not "come out of nowhere," but rather the decision was made because the Debtors' business with WOTC had declined by more than 8% over the last four years, during which period each of WOTC's other distributors had significantly increased their sales.  Trunk also explained

14

that WOTC had granted small subsequent extensions of the termination date as an accommodation to assist the Debtors in their upcoming bankruptcy case and to induce the Debtors to grant WOTC critical vendor status upon the Debtors' receipt of authority to grant such status to certain vendors. The Debtors did not refute or even challenge any of WOTC's statements regarding termination of the Distribution Agreement.  Upon information and belief, the Debtors were aware of WOTC's decision in December 2024.

**V.      Plaintiff is Forced to Terminate the AENT APA After the Debtors Refuse to Meaningfully Engage in Discussions Regarding a Downward Adjustment of the <u>Purchase Price to Reflect an Updated Valuation</u>**

54.      AENT tried to salvage the purchase of the Debtors' assets under the AENT APA, despite the Defendants' deception, to no avail.  On April 22, 2025, at 12:46 A.M., AENT submitted a proposed agreement to WOTC whereby AENT would pay WOTC a fixed sum and agree to minimum purchase commitments, in exchange for WOTC extending the Distribution Agreement through December 31, 2025.  Understanding the significance of the WOTC relationship, the Debtors agreed to allow AENT to reduce the purchase price by that fixed sum if WOTC accepted the proposal.  At 8:02 P.M. later that day, WOTC rejected the proposal by email and confirmed that the term of the Distribution Agreement would expire on April 30, 2025.

55.      At 8:07 P.M. that same day, AENT's financial advisor, through Navid, and Geoffrey Richards of Defendant Raymond James held a telephone conversation, in which Mr. Richards conceded that the loss of the WOTC revenue warranted a downward adjustment of the AENT APA purchase price in the range of $14-$16 million.  AENT's financial advisor countered that loss of the WOTC revenue warranted a downward adjustment of the AENT APA purchase price in the range of $18-$25 million.

56.     On April 23, 2025, at 11:00 A.M., AENT met with the Debtors, Defendant Getzler Henrich, Defendant Raymond James, and Debtors' counsel by video conference, to discuss the impact of WOTC's termination of the Distribution Agreement on the Debtors' business.  The Debtors opened the call by stating they intended to "listen only" and were not prepared to engage in meaningful discussions.  AENT presented evidence that the loss of the WOTC relationship reflected an approximate 25% reduction in the Debtors' Alliance Gaming Business revenue. Plaintiff also discussed delaying the closing of the AENT APA transaction by one week to allow the Debtors to seek approval of a downward adjustment of the purchase price.  AENT also raised the fact that, after the Petition Date, the Debtors' accounts payables had increased by approximately $16 million and inquired as to the Debtors' plan for these increasing account payables and how the Debtors intended to pay them.  As the Debtors stated at the top of the call, they were not prepared to engage in meaningful discussions and the parties agreed to reconvene at 3:30 P.M. that day.

57.     At 12:17 P.M., the Debtors informed AENT by email that they would not be ready by 3:30 P.M.  At 5:30 P.M., the Debtors indicated they were still not prepared to engage in discussions but agreed to have a discussion at 7:00 P.M. after prodding by AENT.  At 6:56 P.M., the Debtors' counsel cancelled the upcoming meeting, purportedly because of conflicts on unrelated matters.

58.     Left without a choice, at 8:30 P.M., AENT's counsel sent a "Notice of Material Adverse Change," in which AENT explained that the recent revelation about the loss of the WOTC revenue was a critical loss that would have a significant adverse impact on the financial performance and operational viability of the Debtors.  AENT estimated that the termination of the Distribution Agreement would lead to approximately 25% reduction in the Debtors' Alliance

Gaming Business revenue, *i.e.*, $39.88M out of $161.3M, fundamentally altering the Debtors' economic projections and ability to sustain their operations.   AENT requested immediate discussions on the impact on closing and necessary amendments to the AENT APA.   AENT also stated that, absent a resolution on a purchase price adjustment, Plaintiff would terminate the AENT APA effective April 24, 2025, at 4:00 P.M.

59.    On April 24, 2025, at 10:34 A.M., Defendant Gorin emailed AENT's financial advisor to set up a conference call with Defendants Getzler Henrich and Defendant Raymond James, but without AENT's principals and the Debtors' or AENT's counsel.   AENT's financial advisor agreed to participate in the call and asked for time slots in which Defendant Gorin was available.   There was no further response from any of the Defendants.

60.    The Debtors did not engage in any discussion with AENT on April 24, 2025.   Thus, at 4:57 P.M., AENT's counsel sent a Notice of Termination, effective immediately.   The Notice of Termination stated that the Debtors' breach was incurable, the condition precedent of No Material Adverse Change had not been satisfied, and the Debtors fraudulently induced Plaintiff to execute the AENT APA.   A copy of the Notice of Termination is annexed hereto as **Exhibit A**.

61.    At 8:14 P.M., AENT's counsel emailed Debtors' counsel joint written instructions for the release of the earnest money deposit of $8.5 million owed to AENT and requested that the Debtors execute and return the instructions promptly.   The Debtors did not respond.

62.    That same day, the Debtors, for the first time, provided AENT with a copy of the Third Amendment to the Distribution Agreement ("Third Amendment"), which reflected the extension of the expiration date of the WOTC Distribution Agreement to April 30, 2025.   This provided even more damning evidence of the Defendants' efforts to tacitly conceal the loss of the

Distribution Agreement from AENT, as the Third Amendment was signed by the Debtors on March 12, 2025 and by WOTC on April 1, 2025.

63.     Despite being forced to terminate the AENT APA because of Defendants' unwillingness to engage in meaningful discussions regarding a downward adjustment of the purchase price of the Debtors' assets or agree to a one-week extension of the closing date, AENT remains ready, willing, and able to close the purchase of the Debtors' assets at a reduced valuation, as agreed by AENT and the Debtors, to reflect the loss of revenue represented by the terminated WOTC Distribution Agreement.

## FIRST CAUSE OF ACTION
### (Breach of Contract)
### (Against Debtors)

64.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 63 as if fully set forth herein.

65.     The AENT APA is a valid and binding contract between AENT and the Debtors, effective as of April 10, 2025.

66.     Section 3.2 provides that AENT's obligation to consummate the purchase of the Debtors' assets is conditioned on the fact that, among other things, "No Material Adverse Change" shall "have occurred with respect to the Business or the Acquired Assets (taken as a whole)."

67.     Section 8.1(f) provides that Plaintiff may immediately terminate the AENT APA upon a material breach by the Debtors.  It further provides that "the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement which breach is not cured" and that within two business days of termination of the AENT APA under Section 8.1(f), AENT and the Debtors shall "deliver joint written instructions

to the Escrow Agent instructing the Escrow Agent to return or pay the Deposit" to the non-breaching party.

68.    AENT served a Notice of a Material Adverse Change on April 23, 2025 and served a Notice of Termination on April 24, 2025.  On April 24, 2025, AENT also served the Debtors with joint written instructions for them to sign, so AENT's earnest money deposit could be promptly returned.

69.    Plaintiff satisfied its obligations under the AENT APA.

70.    Debtors breached their obligations by failing to execute the joint written instruction, allowing the escrow agent to return AENT's earnest money deposit.

71.    Accordingly, AENT is entitled to and seeks damages of $8.5 million, plus accrued interest.

### SECOND CAUSE OF ACTION
**(Fraud)**
**(Against Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch)**

72.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 71 as if fully set forth herein.

73.    On March 6, 2025, AENT (through Ogilvie, Walker, and others) and Province (through Navid and others) met by video conference with Defendants Debtors (through Defendants Tyson and Hirsch), Getzler Henrich (through Defendant Gorin), Raymond James (through Haesler and others) and inquired as to the status of the Debtors' key vendor relationships.  Each of Defendants Tyson, Hirsch, and Gorin falsely represented that the Debtors' relationships with their key vendors were strong and stable and that the Debtors remained in good standing with them.

74.    On March 16, 2025, the Debtors uploaded a copy of the Distribution Agreement and Second Amendment concealing the expiration date of those agreements.

75.     On April 9, 2025, AENT (through Ogilvie and Walker), again met with the Debtors (through Defendants Tyson, Hirsch, and Gorin), at the Debtors' offices, and inquired as to the status of the Debtors' vendor relationships, including WOTC.  Each of Defendants Tyson, Hirsch, and Gorin again falsely represented that the Debtors' relationships with their key vendors were strong and stable and the Debtors remained in good standing with them.

76.     Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch knew these representations were false.  In fact, at the time they were made, the Debtors had unredacted copies of the Distribution Agreement, Second Amendment, and Third Amendment stating that the Distribution Agreement would expire by April 30, 2025.  Additionally, WOTC had decided in December 2024, prior to the Petition Date, that it would not renew the Distribution Agreement, other than for 90 days, as an accommodation to assist the Debtors in their upcoming bankruptcy case and to induce the Debtors to grant WOTC critical vendor status upon the Debtors' receipt of authority to grant such status to certain vendors.  Upon information and belief, the Debtors were aware of WOTC's decision in December 2024.

77.     Even after the Debtors uploaded an unredacted version of the Distribution and Second Amendment, Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch continued to misrepresent when they first knew that WOTC would not renew the Distribution Agreement.

78.     Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch intended that Plaintiff would rely on those false representations.

79.     It was reasonable for Plaintiff to rely on the representations made by Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch.

80.     Based on these representations, Plaintiff submitted an initial Bid for the Debtors' assets, participated in the Auction, successfully challenged the Debtors' attempt to sell their assets

to a backup bidder, and executed the AENT APA. But for the representations made by Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch, Plaintiff would not have undertaken these actions.

81.     Plaintiff has been damaged because of these misrepresentations, including millions in fees and expenses incurred from the time of its bid submission to the termination of the AENT APA.

82.     Accordingly, AENT is entitled to and seeks damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**(Aiding and Abetting Fraud)**
**(Against Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch)**

83.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 82 as if fully set forth herein.

84.     On July 12, 2024, the Debtors retained Getzler Henrich to provide the Getzler Henrich Services, and Defendant Gorin was appointed as the Debtors' Chief Restructuring Officer. Defendant Gorin's statements and conduct, as a managing director of Getzler Henrich, is attributable to Getzler Henrich.

85.     As a condition of its retention of Getzler Henrich, the Debtors provided Getzler Henrich with full access to their financial and operational information, including the status of various vendors.

86.     On September 30, 2024, the Debtors retained Defendant Raymond James to provide investment banking advisory services, including a full review of the Debtors' business, operations, properties, and financial condition. Defendant Raymond James also managed bid submissions and the Auction, and engaged in meetings with AENT.

87.    Defendant Tyson was the Debtors' co-Chief Executive Officer at all relevant times.

88.    Defendant Hirsch was the Debtors' co-Chief Executive Officer at all relevant times.

89.    Defendants Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch had unique knowledge of the Debtors' operations and actively concealed that information from AENT.

90.    On March 6, 2025 and April 9, 2025, the Debtors, including Defendant Gorin, falsely represented that the Debtors' relationships with their key vendors were strong and the Debtors remained in good standing with them.  Defendants Raymond James and Getzler Henrich were included in virtually all communications with the Debtors.

91.    After execution of the AENT APA, Defendants Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch continued to conceal the Debtors' and their knowledge of the status of the WOTC relationship.

92.    Defendants Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch actions substantially assisted the Debtors in perpetuating fraud perpetuated against AENT.

93.    Plaintiff has been damaged because of Defendants Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch's assistance in perpetuating fraud against AENT, including millions in fees and expenses incurred from the time of its bid submission to termination of the AENT APA.

94.    Accordingly, AENT is entitled to and seeks damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
#### (Negligent Misrepresentation)
#### (Against Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch)

95.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

96.     Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch had a pecuniary duty to provide accurate information to AENT in connection with its bid to purchase the Debtors' assets.

97.     On March 6, 2025, AENT (through Ogilvie, Walker, and others) and Province (through Navid and others) met by video conference with Defendants Debtors (through Defendants Tyson and Hirsch), Getzler Henrich (through Defendant Gorin), Raymond James (through Haesler and others), and inquired as to the status of the Debtors' key vendor relationships.  Each of Defendants Tyson, Hirsch, and Gorin falsely represented that the Debtors' relationships with their key vendors were strong and stable and the Debtors remained in good standing with them.

98.     On April 9, 2025, AENT (through Ogilvie and Walker) again met with the Debtors (through Defendants Tyson, Hirsch, and Gorin), at the Debtors' offices, and inquired as to the status of the Debtors' vendor relationships, including WOTC.  Each of Defendants Tyson, Hirsch, and Gorin again falsely represented that the Debtors' relationships with their key vendors were strong and stable and the Debtors remained in good standing with them.

99.     Defendant Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch did not exercise reasonable care in obtaining and communicating this false information to Plaintiff.

100.    Plaintiff discovered on April 17, 2025 that WOTC, the Debtors largest vendor, did not intend to renew the Distribution Agreement.  This non-renewal would reduce the Debtors' Alliance Gaming Business total revenue by, at least, 25%.

101.    It was reasonable for Plaintiff to rely on representations made by Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch.

102.    Based on its reliance on these false representations, Plaintiff submitted an initial Bid for the Debtors' assets, participated in the Auction, successfully challenged the Debtors'

attempt to sell their assets to a backup bidder, and executed the AENT APA.  But for the representations of Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch, Plaintiff would not have undertaken these actions.

103.    Plaintiff has been damaged because of these representations, including millions in fees and expenses incurred from the time of its bid submission to the termination of the AENT APA.

104.    Accordingly, AENT is entitled to and seeks damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against Debtors)**

105.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 104 as if fully set forth herein.

106.    The AENT APA is a valid and binding contract between AENT and the Debtors, effective as of April 10, 2025.

107.    Implicit in the AENT APA is that the Debtors correctly represented the status of their operations and relationships with vendors.

108.    Debtors breached that implicit obligation by failing to disclose that their largest vendor, accounting for approximately 25% of their Alliance Gaming Business revenue, would not renew the Distribution Agreement beyond April 30, 2025, 5 days after the AENT APA was expected to close.

109.    Plaintiff has been damaged because of the Debtors' breach of this implicit obligation, including incurring millions in fees and expenses from the time of its bid submission to termination of the AENT APA.

110.    Accordingly, AENT is entitled to and seeks damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendants and issue an order as follows:

1. Compelling the Debtors to return AENT's earnest money deposit of $8.5 million, plus accrued interest;

2. Entering judgment against Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch for fraud perpetuated against AENT;

3. Entering judgment against Defendants Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch for aiding and abetting fraud perpetuated against AENT;

4. Entering judgment against Defendants Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch for their negligent misrepresentations made to AENT;

5. Entering judgment against the Debtors for the breach of their implied covenant of good faith and fair dealing to correctly represent the status of their operations and relationships with vendors;

6. Compelling Defendants Raymond James, Getzler Henrich, and Gorin to disgorge all fees paid to them after the Petition Date;

7. Awarding Plaintiff damages against Defendants in an amount to be determined at trial.

8. Awarding Plaintiff its reasonable attorneys' fees, costs and other expenses incurred in this action; and

9. Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: April 29, 2025

/s/ *Jonathan A. Grasso*
Jonathan A. Grasso, 19278
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland 21401
(443) 569-5972
jgrasso@yvslaw.com

-and-

S. Jason Teele (Admitted Pro Hac Vice)
Sills Cummis & Gross P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-4779
steele@sillscummis.com

*Counsel for Alliance Entertainment, LLC*

## <u>VERIFICATION</u>

Bruce Ogilvie, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am the Executive Chairman of Alliance Entertainment Holding Corporation d/b/a Alliance Entertainment LLC (collectively, "<u>AENT</u>").

2.     On behalf of AENT, I have reviewed the Verified Complaint, and that the facts contained therein are true and correct to the best of his knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Alliance Entertainment, LLC


By:_____/s/ Bruce Ogilvie_____
         Name: Bruce Ogilvie
         Title: Executive Chairman