# EXHIBIT A



April 24, 2025

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, MD 21030
Attention: Charles Parker
Email: pchuck@diamondcomics.com

Robert Gorin
c/o Getzler Henrich & Associates LLC
295 Madison Avenue
20th Floor
New York, NY 10017
Email: rgorin@getzlerhenrich.com

Re:   Notice of Termination of Asset Purchase Agreement

Dear Messrs. Parker and Gorin:

Reference is hereby made to that certain Asset Purchase Agreement (the "**Purchase Agreement**") dated April 10, 2025 by and among Diamond Comic Distributors, Inc., a Maryland corporation ("**DCD**"), Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("**DST**", and together with DCD, "**Seller**"), and Alliance Entertainment, LLC, a Delaware limited liability company ("**Purchaser**"). Capitalized terms used herein, but not otherwise defined herein, shall have the definitions ascribed to such terms in the Purchase Agreement. **This letter serves as formal written notice of Purchaser's termination of the Purchase Agreement in accordance with Section 8.1(f) of the Purchase Agreement, effective immediately, as a result of the occurrence of a Material Adverse Change and Seller's material breach of the Purchase Agreement**.

Reference is hereby made to that certain Notice of Material Adverse Change dated April 23, 2025 that was issued by Purchaser to you (the "**Notice of MAC**"). In the Notice of MAC, Purchaser provided Seller with written notice that a Material Adverse Change has occurred as a result of the decision made by Wizards of the Coast LLC ("**WOTC**") (*the top vender of the Business*) to not renew that certain Distributor Agreement effective as of December 8, 2021 by and between WOTC and Alliance Game Distributors (the tradename of DCD) (the "**Distribution Agreement**"), which termination will likely lead to an approximate twenty five percent (25%) reduction in revenue for the Alliance Gaming Business (i.e. $39.88M out of $161.3M), fundamentally altering the economic projections of the Business and the Business' ability to sustain current operations.

Seller's Concealment of WOTC's Termination

To recount Seller's transgressions on this issue, on March 16, 2025, Seller uploaded redacted versions of the Distribution Agreement and that certain Amendment 2 to Distributor

13113100 v1

Agreement effective as of January 1, 2024 (the "**Second Amendment**"). Based on such redactions, Purchaser was unable to determine the expiration date of the Distribution Agreement. Unredacted versions of the Distribution Agreement and Second Amendment were not provided by Seller until April 12, 2025 (*i.e. after the Purchase Agreement was executed and the Sale Order in connection with the Chapter 11 Case was entered*). The unredacted versions of the Distribution Agreement and the Second Amendment revealed that the Distribution Agreement was set to expire on March 31, 2025 (which Seller eventually explained had been further extended to April 30, 2025 (*evidence of such further extension was only provided by Seller as of the date of this notice*). It is clear now that Seller concealed the expiration date of the Distribution Agreement in an effort to fraudulently induce Purchaser to enter into the Purchase Agreement. This fraudulent inducement is evidenced by the fact that on several occasions, Seller represented to Purchaser that there were no issues or concerns with any vendor of the Business, including WOTC, inferring that such vendor relationships (including WOTC's) were intact and would remain that way for the foreseeable future. This fraudulent inducement is further evidenced by the fact that despite numerous requests by Purchaser to speak with Seller's vendors (including WOTC) with Seller present, Seller denied such requests.

Seller was only made aware of WOTC's decision not to renew the Distribution Agreement on April 17, 2025 when counsel to Seller contacted counsel to Purchaser and informed him of such decision (indicating that such decision had only been made on April 17, 2025). This communication led to conference calls with representatives of Purchaser and Seller on April 17, 2025 and April 18, 2025 to discuss the issue and the status of the WOTC vendor relationship. During each call, Seller representatives vehemently represented that the decision by WOTC "came out of nowhere", had only just been made and communicated to Seller, and that Seller was "shocked" and blindsided", as WOTC had always communicated to them that they are their preferred distributor. Seller representatives further represented that the only reason why a long-term distribution agreement with WOTC was not entered into in January 2025 was because WOTC told them that they were only entering into short-term extensions with all of their distributors.

After Seller finally acquiesced to granting Purchaser an audience with WOTC, a conference call was held on April 21, 2025 between representatives of each of Seller, Purchaser and WOTC. The purpose of the conference call was for Purchaser to get clarity on why WOTC was terminating what was represented to Purchaser (by Seller) as a positive and longstanding relationship. The WOTC representatives immediately refuted the representations previously made by the Seller representatives. As explained by the WOTC representatives, WOTC's decision did not "come out of nowhere", but was based on the fact that Seller's business with WOTC had declined by more than eight percent (8%) over the last four (4) years, during which time period each of WOTC's other distributors had significantly increased their sales. Additionally, WOTC explained that their decision to discontinue doing business with Seller was made and communicated to Seller in December 2024 (i.e. prior to the Petition Date), and that they merely entered into the subsequent extensions granted pursuant to the Second Amendment as an accommodation to Seller to assist them through the Chapter 11 Case. Alarmingly, at no time did any representative of Seller ever refute, contest or even mildly challenge any of the statements made by the WOTC representatives (either during or after the conference call).

13113100 v1

<u>WOTC's Termination of its Relationship with Seller Constitutes a Material Adverse Change</u>

Due to Seller's concealment (which impacted when Purchaser became aware of WOTC's decision to not renew the Distribution Agreement), such decision constitutes a change, event, occurrence, or circumstance that has arisen after the date of the Purchase Agreement and prior to the Closing that is reasonably expected to have a materially adverse effect on the Business or the Acquired Assets, including, without limitation, the results of operations or the condition (financial or otherwise) of the Acquired Assets, and the value of the Acquired Assets. Additionally, WOTC's decision to not renew the Distribution Agreement: (a) did not arise out of, result from or relate to the commencement or conduct of the Chapter 11 Case, and (b) did not arise out of, and is not attributable to any of the circumstances set forth in definition of "Material Adverse Change" set forth in the Purchase Agreement that would preclude such decision from constituting a Material Adverse Change. The material nature of WOTC's decision to not renew the Distribution Agreement is illustrated by Seller's persistent requests that Purchaser not discuss such decision during the parties' daily all-hands conference calls (which include middle management personnel of Seller and Purchaser) because Seller knew that such knowledge would signal to such personnel that the Business' ability to sustain current operations was in serious jeopardy.

<u>Purchaser Attempted to Resolve the Material Adverse Change</u>

After Purchaser's proposal to remit a "transfer fee" payment to WOTC in exchange for WOTC extending the Distribution Agreement until December 31, 2025 (in which event Seller would have cured the Material Adverse Change) was rejected by WOTC on April 22, 2025, the financial advisors for each of Seller and Purchaser (i.e. Raymond James and Province, respectively) met via conference call to discuss a potential path forward. During such conference call, Raymond James communicated that they believed the loss of the WOTC vendor relationship warranted a downward Purchase Price adjustment in the range of $14,000,000-$16,000,000, and Province responded that they believed the loss of the WOTC vendor relationship warranted a downward Purchase Price adjustment in the range of $18,000,000-$25,000,000.

Following such discussion, representatives of Purchaser and Seller met via conference call on April 23, 2025 to discuss the foregoing. During such call, Raymond James confirmed its proposed Purchase Price adjustment (subject to the caveat that such figures constituted their "back of the napkin" math), and Purchaser proposed a compromised $19,000,000 downward Purchase Price adjustment. In response to such proposal, counsel for Purchaser interjected and communicated that Seller was unable to respond to such proposal, and Seller's representatives suggested that the parties reconvene later that day to engage in a meaningful discussion regarding same. Two (2) separate conference calls were scheduled later that day, and in each instance, such conference calls were cancelled by Seller. Despite numerous requests by Purchaser, as of the time of issuance of this notice, Seller has refused to speak with or engage with Purchaser in an effort to resolve this issue.

<u>Seller is in Material Breach of the Purchase Agreement</u>

Pursuant to Section 3.3(d) of the Purchase Agreement, Seller was required to satisfy the condition precedent to Closing that "[a] Material Adverse Change shall not have occurred with respect to the Business or the Acquired Assets." As stated herein, given the irrefutable occurrence of a Material Adverse Change, Seller is unable to satisfy such condition precedent and is therefore in breach of the Purchase Agreement. As a result of such breach, pursuant to Section 8.1(f) of the Purchase Agreement, Purchaser hereby terminates the Purchase Agreement effective immediately. Given the fact that (a) Seller's breach is incurable, and (b) Seller fraudulently induced Purchaser and made material misrepresentations to Purchaser in an effort to conceal the Material Adverse Change, no cure period is applicable to Seller's breach.

<u>Purchaser is Entitled to the Return of its Deposit</u>

Pursuant to Section 8.2 of the Purchase Agreement, Purchaser is entitled to the return of the Deposit, which was placed in escrow upon execution of the Purchaser Agreement. We therefore demand that you immediately execute joint written instructions to the Escrow Agent, directing the release of the Deposit to Purchaser.

Purchaser expressly reserves all rights, remedies, and defenses available under the Purchase Agreement and applicable law.

Very truly yours,

ALLIANCE ENTERTAINMENT, LLC

By: *Bruce Ogilvie* (DocuSigned, 9A88FFD48B90497...)
Name: Bruce Ogilvie
Title: Chairman


cc:  Saul Ewing, LLP
     1500 Market Street, 38th Floor
     Philadelphia, PA 19102
     Attention: Jeffrey C. Hampton; Adam H. Isenberg
     Email: jeffrey.hampton@saul.com ; adam.isenberg@saul.com