UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IN RE: | . | Chapter 11 |
|  | . |  |
| Diamond Comic Distributors, | . |  |
| Inc., | . |  |
|  | . |  |
| Debtor. | . | Bankruptcy #25-10308 (DER) |

...........................................................

Baltimore, Maryland
April 30, 2025
10:36 a.m.

BEFORE THE HONORABLE DAVID E. RICE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


TRANSCRIPT OF:

[335]  ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AMONG
DIAMOND COMIC DISTRIBUTORS, INC., DIAMOND SELECT TOYS &
COLLECTIBLES, LLC AND ALLIANCE ENTERTAINMENT, LLC;(II)
APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS; (III) APPROVING ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV)
GRANTING RELATED RELIEF

[345]  ORDER APPROVING SECOND STIPULATION BETWEEN DEBTORS AND
JPMORGAN CHASE BANK, N.A., AMENDING DIP CREDIT AGREEMENT

[385]  MOTION DEBTORS' MOTION FOR ENTRY OF ORDERS AUTHORIZING
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO THE
BACK-UP BIDDERS PURSUANT TO THE BIDDING PROCEDURES ORDER FILED
BY DIAMOND COMIC DISTRIBUTORS, INC.

[386]  MOTION TO SHORTEN TIME FOR NOTICE OF DEBTORS' MOTION
FOR ENTRY OF ORDERS AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS TO THE BACK-UP BIDDERS PURSUANT TO THE
BIDDING PROCEDURES ORDER FILED BY DIAMOND COMIC DISTRIBUTORS,
INC

[387]   MOTION TO APPROVE STIPULATION/SETTLEMENT DEBTORS MOTION FOR ENTRY OF AN ORDER APPROVING THIRD STIPULATION BETWEEN DEBTORS AND JPMORGAN CHASE BANK, N.A., AMENDING DIP CREDIT AGREEMENT FILED BY DIAMOND COMIC DISTRIBUTORS, INC

[388]   MOTION TO SHORTEN TIME DEBTORS MOTION TO SHORTEN NOTICE OF THE DEBTORS MOTION FOR ENTRY OF ORDER APPROVING THIRD STIPULATION BETWEEN DEBTORS AND JPMORGAN CHASE BANK, N.A., AMENDING DIP CREDIT AGREEMENT FILED BY DIAMOND COMIC DISTRIBUTORS, INC

[390]   OBJECTION ON BEHALF OF ALLIANCE ENTERTAINMENT, LLC FILED BY JONATHAN A. GRASSO

APPEARANCES:

| For The Debtor: | Mark Minuti, Esq.<br>Saul Ewing, LLP<br>1201 North Market St.-Ste. 2300<br>Wilmington, DE 19899 |
|---|---|
| | Paige N. Topper, Esq.<br>Saul Ewing, LLP<br>1001 Fleet Street-9th Fl.<br>Baltimore, MD 21202 |
| | Jeffrey C. Hampton, Esq.<br>Saul Ewing, LLP<br>Centre Square West<br>1500 Market St.-38th Fl.<br>Philadelphia, PA 19102 |
| For Unsecured Creditor's Committee: | Dennis J. Shaffer, Esq.<br>Tydings & Rosenberg<br>1 E. Pratt St.-Ste. 901<br>Baltimore, MD 21202 |
| | Stephen B. Gerald, Esq.<br>Tydings & Rosenberg<br>200 Continental Srive-Ste. 401<br>Newark, DE 19713 |
| | Gianfranco Finizio, Esq.<br>Lowenstein Sangler, LLP<br>1251 Ave. Of the Americas<br>New York, NY 10020 |

| | |
|---|---|
| For Creditor, JPMorgan Chase Bank, NA: | David L. Ruediger, Esq. Troutman Pepper Locke, LLP 111 Huntington Ave.-9th Fl. Boston, MA 02199 |
| | Jonathan Young, Esq. Troutman Pepper Locke, LLP 701 8th St., NW, Ste. 500 Washington, DC 20001 |
| For Universal Distribution, LLC: | Brent C. Strickland, Esq. Whiteford Taylor & Preston, LLP 8830 Stanford Blvd.-Ste. 400 Columbia, MD 21045 |
| For Alliance Entertainment, LLC: | Jonathan A. Grasso, Esq. YVS Law, LLC Ste. 130 185 Admiral Cochrane Drive Annapolis, MD 21401 |
| | S. Jason Teele, Esq. Sills Cummis & Gross The Legal Center One Riverfront Plaza Newark, NJ 07102 |
| For Bandai Namco Toys & Collectibles America, Inc. and Bandai Co., Ltd.: | Gary H. Leibowitz, Esq. Cole Schotz, PC 1201 Wills Street-Ste. 320 Baltimore, MD 21231 |
| For U.S. Trustee's Office: | Gerard Vetter, Esq. Office of the U.S. Trustee 101 W. Lombard St.-Ste. 2625 Baltimore, MD 21201 |
| Audio Operator: | Cherita Scott |
| Transcribing Firm: | Writer's Cramp, Inc. 1027 Betty Lane Ewing, NJ 08628 609-588-8043 |

**Proceedings recorded by electronic sound recording, transcript produced by transcription service.**

4

## Index

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Debtor:** | | | | | |
| Mr. Gorin | 28 | | | | |
| **Witnesses For The Trustee:** | | | | | |

| EXHIBITS: | | | Marked | Received |
|---|---|---|---|---|
| D-1 | Asset Purchase Agreement-Ad Populum | | 37 | 38 |
| D-2 | Asset Purchase Agreement-Universal | | 38 | 40 |

| SUMMATION BY: | |
|---|---|
| Mr. Minuti | 46 |
| Mr. Finizio | 50 |
| Mr. Young | 51 |

| THE COURT: Finding | 52 |
|---|---|

1          THE CLERK:  All rise.  The United States Bankruptcy

2    Court for the District of Maryland is now in session, the

3    Honorable Chief Judge David E. Rice presiding.  Please be

4    seated and come to order.  On the 10:30 Docket, calling the

5    case of Diamond Comic Distributors, Inc., case #25-10308.

6    Counsels, please identify yourselves and your clients for the

7    record.

8          MR. MINUTI:  Good morning, Your Honor.  Mark Minuti

9    from Saul Ewing.  I'm here today for the Debtors.  At counsel

10   table with me as always, Your Honor, are my colleagues,

11   Jeffrey Hampton and Paige Topper.  Good to see you, Your

12   Honor.

13         THE COURT:  Good morning.  Good to see you.

14         MR. FINIZIO:  Good morning, Your Honor.  Gianfranco

15   Finizio, Lowenstein Sandler, counsel to the Committee.  I'm

16   joined by the Tydings firm, Steve Gerald, Dennis Shaffer.

17   Nice to see you.

18         THE COURT:  Good morning.

19         UNIDENTIFIED SPEAKER:  Good morning.

20         MR. YOUNG:  Good morning, Your Honor.  Jonathan

21   Young, Troutman Pepper Locke, joined by my partner, David

22   Ruediger.  We represent the DIP Lender, JPMorgan Chase.

23         THE COURT:  Good morning.

24         MR. STRICKLAND:  Your Honor, good morning.  Brent

25   Strickland for Universal Distribution, LLC.  Judge, we're one

1    of the backup bidders.

2         THE COURT:  Good morning.

3         MR. VETTER:  Good morning, Your Honor.  Gerard

4    Vetter on behalf of the United States Trustee.

5         THE COURT:  Good morning.

6         MR. TEELE:  Good morning, Your Honor.  Jason Teele,

7    Sills Cummis & Gross, on behalf of Alliance Entertainment,

8    LLC, and I'm joined today by our Maryland counsel, Jon Grasso.

9         THE COURT:  Good morning to you.

10        MR. LEIBOWITZ:  Bringing up the rear.  Gary

11   Leibowitz of Cole Schotz on behalf of a Creditor, Bandai, and

12   they're a Critical Vendor as well.

13        THE COURT:  Good morning to you.  Well, Mr. Minuti,

14   let me turn to you.

15        MR. MINUTI:  Thank you, Your Honor.  Again, for the

16   record, Mark Minuti, on behalf of the Debtors.  We appreciate

17   the Court scheduling this Status Conference for this morning.

18   A lot has been happening in the case, Your Honor, and

19   unfortunately, most of what's happening has not been good.

20        By way of background, on February 11, the Debtors -- the

21   Court had entered an Order approving bid procedures for the

22   sale of substantially all of the Debtors assets to a stalking

23   horse bidder, Universal Distribution, LLC.  That was subject

24   to higher and better bids.  Those procedures included a

25   process for soliciting bids, conducting an auction, and so on.

1          On February 2nd, the Debtors filed their Motion to

2     Approve the Sale, and on March 24 and 25, the Debtors held an

3     auction in New York City at the office of Raymond and James.

4     On March 25, 2025, we filed a notice, Your Honor, identifying

5     Alliance Entertainment, LLC, as the successful bidder and

6     Universal Distribution, LLC, and Ad Populum, LLC, as the

7     backup bidders.

8          Following disagreements with Alliance Entertainment and

9     the documentation of its Asset Purchase Agreement, on April 5,

10    the Debtors filed an updated notice putting parties on notice

11    that it was now moving forward with the proposed sale of their

12    assets to Universal and Ad Populum and its affiliate, Sparkle

13    Pop.  Attached to that notice, Your Honor, was proposed Sale

14    Orders and the operative Asset Purchase Agreements.

15         Now, as the Court will recall, followed a contested sale

16    hearing on April 7, 2025.  The Debtors, with the support of

17    the Committee and the Lenders, switched bidders and moved

18    forward and asked Your Honor to approve the sale to Alliance

19    Entertainment, LLC, and that's exactly what happened.  The

20    Court entered an Order on April 11, 2025, authorizing the sale

21    of the Debtor's assets to Alliance Entertainment.  Attached to

22    that Order was the -- as Exhibit-1 was the fully signed Asset

23    Purchase Agreement.  That Purchase Agreement, Your Honor,

24    provided for an outside closing date of April 25, 2025.  Now,

25    at the hearing, Your Honor, where we announced to the Court

1    that we were switching bidders, that was on April 8, the

2    parties committed on the record to working cooperatively

3    together toward a closing, and that's exactly what happened.

4         Now, Section 3.3 of the Asset Purchase Agreement with

5    Alliance Entertainment contained a number of conditions to

6    closing, including its Section 3.3(d) that there be no

7    material adverse change to the business or the acquired

8    assets.  The Debtors learned on April 17, 2025, that one of

9    the Debtor's suppliers would not extend its distribution

10   agreement beyond April.  The Debtors immediately alerted

11   Alliance Entertainment of the supplier's communications.  They

12   then engaged in efforts to try to get the supplier to agree to

13   extend that agreement.  Those efforts were ultimately

14   unsuccessful.

15        As a result of the supplier's decision, Your Honor,

16   Alliance Entertainment asserted that a material adverse change

17   had occurred under the Asset Purchase Agreement.  They sent a

18   letter to the Debtor on April 23 titled "Notice of Material

19   Adverse Change."  They sent a follow-up letter on April 24,

20   2025, purporting to terminate the Asset Purchase Agreement.

21   And on April 25, Your Honor, Alliance issued an 8K -- it's a

22   public company -- they issued an 8K dealing that they had

23   terminated the Asset Purchase Agreement, and clearly, there

24   was no closing, Your Honor, by the outside date of April 25,

25   2025.

1      Now, the Debtors responded to Alliance Entertainment's

2   position, Your Honor, including in a letter of April 27,

3   reserving all rights and disputing, your Honor, both the

4   existence of material adverse change as well as any other --

5   as well as allegations asserted by Alliance Entertainment.

6   And as the Court may be aware, on Tuesday of this week,

7   Alliance Entertainment filed an Adversary Proceeding against

8   the Debtors, Mr. Gorin, the Debtor's CRO personally, two of

9   the Debtor's employees, and Raymond James, essentially

10   asserting, Your Honor, that it was fraud in the process.

11      The issues that are raised in that complaint, Your Honor,

12   are not issues to be addressed today, I would submit.  And

13   while I'm happy certainly to respond to any questions that the

14   Court has, I don't plan to respond to the complaint today,

15   other than to say the allegations of the complaint are wholly

16   denied, and the Debtors very much look forward to having the

17   Court decide those issues in the context of the Adversary

18   Proceeding.

19      But given Alliance Entertainment's actions, the Debtors

20   pivoted to their backup bidders, Universal and Ad Populum,

21   engaged in further good-faith negotiations.  As you would have

22   expected, Your Honor, those bidders had essentially moved on.

23   There was no way we were going to close the transaction by the

24   outside closing date in those documents.  And therefore, Your

25   Honor, we had to do further negotiations to bring them back to

1   the table.

2       I'm happy to report, and pleased to report that those

3   efforts were successful, and that resulted in original changes

4   to the Asset Purchase Agreements with both Universal and Ad

5   Populum.  Among those changes, Your Honor, with Universal,

6   there is -- we entered into a second amendment to that Asset

7   Purchase Agreement.  And the long and short of it, Your Honor,

8   is that there has been a 7.6 deduction in the purchase price

9   of the sale to Universal Entertainment, and we now have a new

10  closing date of May 14.

11      With regard to Ad Populum, Your Honor, and its affiliate,

12  Sparkle Pop, there's been an approximate 5.5 deduction in the

13  asset purchase price.  And so the bottom line, Your Honor, the

14  total transaction value of the two APAs that we filed with the

15  Court late last night is now $72.3 million.  Throughout this

16  entire process, Your Honor, the Debtors were in constant

17  communication with the Committee and JPMorgan Chase.

18      I'll put on the record, Your Honor, we certainly

19  appreciate their input and our working relationship with both

20  of those parties.  But make no mistake, Your Honor.  Both The

21  Committee and JPMorgan Chase have been frustrated with what's

22  happened here.  We certainly don't blame them.  We are doing

23  our best, Your Honor, in real time.  As I indicated, this all

24  really unfolded at the latter part of last week.  So we were

25  doing our best, Your Honor, in real time, to keep them updated

1   to negotiate with our backup bidders.  And given those intense

2   negotiations, Your Honor, we may not have been able to respond

3   to some of the requests for information as quickly as we would

4   have liked to, but again, we were doing the best we can.

5        Now, we appreciate that things, obviously, have changed

6   dramatically over the last few days.  We had a phone call late

7   last night with JPMorgan Chase, Your Honor.  I know that

8   counsel for JPMorgan Chase will speak for themselves, Your

9   Honor.  But my understanding is they are supportive of

10  extending the maturity date of the Debtor-in-Possession

11  financing loan, which otherwise expires today to May 31.  They

12  are otherwise obtaining internal approvals.  We expect to have

13  those today, Your Honor.  And again, I know JPMorgan Chase

14  will address you on that.  But that will give us the runway,

15  Your Honor, to get to a closing of -- on May 14.  And again,

16  that's really the only change in the DIP loan is extending the

17  maturity date.

18       Now, yesterday, Your Honor, the Debtors did file a Motion

19  to Approve the Sales to Universal and Ad Populum and Sparkle

20  Pop.  That appears at Docket #385.  Attached to that, Your

21  Honor, is the updated Asset Purchase Agreement for Ad Populum,

22  including a red line.  And we've attached the amendment that I

23  mentioned for the Universal agreement as well as forms of

24  order.  We filed a Motion for Expedited Consideration.  And as

25  I mentioned a moment ago, Your Honor, we also filed -- I guess

1    it was early this morning -- a Motion to Modify the DIP,

2    again, simply to extend the maturity date to May 30th.

3        We would ask the Court today to consider both the Motion

4    for the Sale and the Motion to Extend the Maturity Date.  And

5    we are certainly mindful of due process in this case, but

6    under the circumstances, we believe it is appropriate to move

7    forward today for a number of reasons.  As to the DIP

8    amendment, Your Honor, again, the only change is extending the

9    maturity date.  Frankly, I was surprised to learn that that

10   flexibility was not already built into the documents without

11   having to come back before Your Honor.  But it's not, and

12   therefore, we're asking for that limited change again to give

13   us the runway to get to a closing.

14       As to the sales, there are a number of reasons why moving

15   forward today is necessary and appropriate.  First, Universal

16   was our stalking horse bidder.  The world has been on notice

17   of a possible transaction with Universal since we filed the

18   Bid Procedures Motion back on January 21, 2025.  Second,

19   leading up to the sale hearing, as I indicated, we put the

20   world on notice that we were proceeding with a transaction

21   with both Universal and Ad Populum.  That notice went out, and

22   with the exception of Alliance Entertainment, Your Honor,

23   there were no other substantive objections to the sales

24   themselves.

25       I should point out that the Court approved bidding

1    procedures made clear that the Debtors could move to the

2    backup bidders if the winning bidders failed to close.  That -

3    - the bidding procedures and the Order itself allowed us to do

4    that without having to come back before Your Honor.  But we've

5    chosen to come back before Your Honor for two reasons.  Number

6    one, we need Orders for our new buyers, number one.  And

7    number two, obviously, a lot has been happening.  We wanted to

8    give as much notice as we could under the circumstances, and

9    that's what we've tried to do.  But again, the point is, Your

10   Honor, the world was on notice that if there was a failure to

11   close, we could move to our backup bidders.

12       Fourth, and while we appreciate that the purchase price

13   for the transaction with these buyers has changed, no one

14   opposed the original stalking horse agreement, Your Honor,

15   which was valued at $39 million.  We're clearly doing much

16   better here in this transaction.  And, Mr. Gorin, Your Honor,

17   if we move forward today, if you'll allow us to do that, he

18   will testify that the current sale price with our backup

19   bidders is much better than any of the alternatives, Your

20   Honor.  And we did consider going back out to market, and we

21   did consider, frankly, simply shutting the company down and

22   doing litigation.

23       Fifth, we're -- Your Honor, we're not seeking any relief

24   today as to any contract parties or lease parties that

25   objected.  Most of these issues have been resolved or will be

1    resolved.  But otherwise, Your Honor, anybody who objected,

2    we're reserving their rights.  Obviously, switching the

3    bidders implicates some adequate assurance issues.  And the

4    cure issues that are out there, that's going to be for another

5    day.

6         And then finally, Your Honor, we don't have the luxury of

7    time.  Mr. Gorin will testify that the burn rate in these

8    cases is approximately $1.2 million a week.  The Lender's

9    patience, Your Honor, here is wearing thin.  If we can't get

10   these sales approved and get to a closing by May 14, these

11   cases, I fear, Your Honor, will face meaningful challenges.

12   Finally, Your Honor, I will comment because I was told this

13   morning and had a chance to look at it on my phone that

14   Alliance Entertainment had filed an objection this morning to

15   moving forward.

16             THE COURT:  I'm aware of it.

17             MR. MINUTI:  Thank you, Your Honor.  As I read that

18   objection, Your Honor, they're indicating that more time is

19   necessary for them to analyze the current bids on the table.

20   I assume, Your Honor, with the idea that if they think the bid

21   is too low, they would make a higher and better bid.  To that,

22   I would respond as follows, Your Honor.

23        I would repeat my argument that they don't have standing

24   to challenge the sale today.  They don't have standing because

25   they now are a disgruntled bidder at best.  Yes, we do have a

1    deposit that they provided, Your Honor, of $8 million or $8

2    million and change.  But, Your Honor, they have filed an

3    Adversary Proceeding to get that back.  Clearly, they have

4    standing in the Adversary Proceeding.  Clearly, those issues

5    are going to be addressed in the Adversary Proceeding, but

6    they don't have standing to oppose the sale to another bidder

7    today.

8        And the reason I say that, Your Honor, is because they

9    declared a MAC.  It was their decision.  They terminated their

10   agreement.  They put out an 8K that said they were done.

11   They're not a buyer.  And they've sued not only the Debtor but

12   the principals, Your Honor, the Debtors did what they had to

13   do, and the only choice they had was to pivot to other

14   bidders.

15       So, Your Honor, my request is -- I'm sorry for all that

16   background, but there's a lot here.  Our request is that we be

17   permitted to move forward today, Your Honor, because the case

18   needs these sales to get approved.  And so I'd like to move

19   forward with that case and put Mr. Gorin on the stand.  So

20   thank you.

21           THE COURT:  All right, thank you.  Before we

22   consider even doing that, I'd like to hear from the parties

23   about the Debtor's request to proceed on the merits of these

24   matters today.  Let me start with the Committee.  Mr. Finizio.

25           MR. FINIZIO:  Good morning, Your Honor.  For the

1  record, Gianfranco Finizio, Lowenstein Sandler, for the

2  Committee.  To answer your question directly, we support

3  moving forward with the sales on an expedited time frame at

4  today's hearing.  I won't belabor the background, Your Honor,

5  but we're as surprised as any party.

6      The last time we were here to move forward with the

7  successful bidder, who was Alliance, it was stated on the

8  record that there was a zero percent chance that they won't

9  close.  Those were the words from Alliance's counsel.  They

10  have not closed.  We now find ourselves pivoting to the backup

11  bidders.  They've been, unfortunately, opportunistic.  You've

12  heard Mr. Minuti describe the value degradation in the bids.

13  But we don't have a backup to the backup bidder.  We don't

14  have the luxury of time to go out and market these assets.

15  The Committee thinks that we need to stop the bleed

16  immediately, whether that's the bleed of finding a new buyer,

17  the $1.2 million burn that Mr. Minuti referenced.  We need to

18  stop the bleed, and we believe that we begin that process by

19  moving forward with these bids.

20      One other point I would touch on is the Committee is

21  going to be hyperfocused on what the Estate looks like

22  following the closing of those sales, whether the Estate is

23  administratively solvent.  These sales in this case should not

24  be run for the sole benefit of JPM.  You know, two weeks ago,

25  we were in a very different scenario where we were in the

1    money, and there was excess proceeds.  But now, a lot has

2    changed, and this sale cannot be just for the sole benefit of

3    paying JPMorgan down and leaving administrative Creditors

4    exposed on substantial claims.  So while we do support moving

5    forward today with the sales -- we think that is in the best

6    interest of the Estate -- we are hyperfocused on what the

7    Estate looks like after the sale.

8         And on that point, Your Honor, the Committee has not been

9    in the loop as much as we would have liked to be in on what a

10   post-sale budget looks like.  I appreciate Mr. Minuti's

11   comments that the Debtors were dealing with a lot, and they

12   did their best to keep us up to speed.  But we almost have --

13   it's as clear as mud to us on what the post-sale Estate looks

14   like.  So that will be challenging.  But we're here today and

15   support moving forward with the sales on an expedited time

16   frame.  I'm happy to answer any questions, Your Honor.

17         THE COURT:  I have no questions, thank you.  Mr.

18   Young.

19         MR. YOUNG:  Thank you, Your Honor.  Again, Jonathan

20   Young, Troutman Pepper Locke for JPMorgan Chase.  Well, Mr.

21   Finizio is right.  This is both surprising and concerning and

22   a very difficult situation.  I want to preface my remarks by

23   saying that this is happening in real time and quickly enough.

24   I'm still awaiting some final approvals from JPMorgan, so I

25   hope and expect to have those in the next hour to 90 minutes.

1      So everything I say is subject to those final approvals.

2          But having noted that, Your Honor, I think the first

3      thing to point out, as Mr. Minuti said, is that time is of the

4      essence, that the burn rate is significant, that the need to

5      monetize these valuable operating assets is substantial.  And

6      while Mr. Finizio is correct that the numbers are a lot less

7      favorable than what he and I were looking at a couple of weeks

8      ago, there's still very meaningful value to be monetized here

9      and I think a real potential of damage to everybody if the

10     sale is allowed to linger because the longer it takes to get

11     to a monetization event, the greater the burn, the more my

12     client has to consider lending, and the less distributable

13     value for everyone.

14         With regard to the -- I'll call it the "process

15     objection" by Alliance Entertainment, I echo Mr. Minuti's

16     view.  We don't understand how they have standing, and we

17     think that the termination of the APA, in addition to

18     everything else, amounted to an election of remedies.  They

19     have essentially disclaimed their interest in the assets by

20     proceeding on this path.  And by filing an Adversary, it seems

21     clear they're proceeding to a money damages remedy.

22         So my understanding is the Estate is fully reserving all

23     rights.  And as Mr. Minuti said, those issues are not before

24     us here today.  But we certainly think there's ample ground to

25     go forward with regard to the Sale Motion.  And in terms of

1    the merits of switching back to Universal and Ad Populum, I'll

2    note, Your Honor, that we were initially supportive of the

3    Universal bid at the last round where we had that whole

4    contested hearing because we were worried about execution

5    risk.

6         And the question was asked at the last hearing, "Why

7    wouldn't you be supporting the facially highest bidder?"  The

8    reason, quite simply, was we had less confidence they would

9    close.  And believe me.  We derived no pleasure from that

10   having turned out in that way.  But we can't allow history to

11   repeat itself, Your Honor.  The Debtors will put on their

12   case.  Mr. Gorin will testify, you'll make a decision.  But no

13   benefit to anybody from letting this linger.  And if, as we

14   suspect, subject to our final approvals from our client, the

15   Universal/Ad Populum bids, even in their diminished state, are

16   the highest and best and most achievable outcome, we think

17   it's the right thing to do to monetize those assets and to

18   close that transaction.

19        Now, with regard to the DIP, Your Honor, you know, we do,

20   subject to our approvals, think we need a bit more runway to

21   get to a closing.  That's sort of the back half of the issue I

22   was just discussing.  In order to close on May 14th, they've

23   got to continue operating to May 14th.  It's just a very

24   difficult situation for my client, Your Honor, because in

25   prior appearances, you've heard me talk about we are bridging

1   to a closing.  And up until literally days ago, that was

2   represented and was indeed shown to be a closing that exited

3   us at closing at par.

4       Now, we are in a position where we're not going to get

5   fully out.  There's going to need to be some provision, as Mr.

6   Finizio says, for the remainder of the case and how it's

7   funded and what our pay downs are and how the DIP liens work,

8   and, you know, the whole three-way interaction between Debtor,

9   Committee, and DIP Lender as approved by Your Honor.

10      And in terms of what we can accomplish today, Your Honor,

11  given the speed of all of this and the need for approvals and

12  the need to really build out that budget for the rest of the

13  case, we really think we need to proceed in two stages.  And

14  our hope today, assuming we go forward and assuming the

15  transaction targets a May 14th closing, and assuming we're

16  going to try to bridge to that transaction, I think the relief

17  we'll be supporting is that maturity extension and an initial

18  funding tranche to get us to closing.

19      And then Mr. Finizio is right.  We need to figure out

20  what the rest of the case looks like.  And we are certainly

21  not as pessimistic as he is that the value is not there to fit

22  the pieces together, but it's just a longer conversation and

23  more wood than we can chop today.  So again, we want to see

24  the Debtors get lined up toward a closing.  We want to see the

25  maturity extension that lets them get there.  We want to put

1   in place the terms of another amendment to the facility that

2   memorializes the terms and conditions of that.  And I mean,

3   it'll be fairly straightforward, Your Honor.

4       There'll be a budget, there'll be some terms governing

5   allocation of proceeds, and then there'll be arrangement for

6   us to finish budgeting the rest of the case, and then we move

7   forward.  So we appreciate your time on short notice, Your

8   Honor, and we'll close where we started.  It's a really

9   frustrating, terrible situation, but there's just too much

10  value here to, at this point, conclude we're better off

11  putting it in a Chapter 7.

12      And if we're unable to reach agreement on these further

13  funding issues, if we can't get to a budget, if we can't sort

14  out those mechanics, maybe that changes the conclusion.  But

15  the history of this case thus far is there's been a fair

16  amount of cooperative and good functioning between Debtor,

17  Committee, and DIP Lender.  We're certainly going to do our

18  part to keep working toward trying to get to a closing and to

19  realizing that value that we hope will occur if we can close

20  on May 14th.

21            THE COURT:  Thank you.

22            MR. YOUNG:  Thanks.

23            THE COURT:  Mr. Vetter.

24            MR. VETTER:  Thank you, Your Honor.  The U.S.

25  Trustee is mostly here to observe today's proceedings.  There

1    have been some concerning allegations regarding what's been

2    happening in the case, but we're not going to take a position

3    on whether or not the sale should or should not go forward to

4    the backup bidders.  And obviously, if the DIP is extended, we

5    certainly don't have any opposition to that.

6              THE COURT:  All right, thank you.

7              MR. VETTER:  Thank you.

8              THE COURT:  Mr. Teele.

9              MR. TEELE:  Thank you, Your Honor.  Jason Teele,

10   Sills Cummis & Gross on behalf of Alliance Entertainment, and

11   I will be brief.  To the extent Your Honor is inclined to

12   grant the Order -- the Motion for an Order Shortening Time and

13   take up a hearing on the new Sale Motion today, I would only

14   suggest that notice is not appropriate.  The motion was filed

15   after 10:00 p.m. last night for a hearing today at 10:30.  So

16   we're talking less than 12 hours notice.  I doubt Creditors

17   have been served even with the motion which evidences new

18   terms in the form of the third amendment.

19        And I would suggest that to the extent you take up the

20   new Sale Motion today, that there are two points that Your

21   Honor should be very concerned about in terms of the evidence

22   and the argument that you hear.  First, as you just heard from

23   Mr. Minuti, the purchase price under the new Sale Agreement

24   has been reduced by an aggregate of approximately 13 or so

25   million dollars, which is almost precisely the same amount

1  that Raymond James, the Debtors investment bankers suggested
2  to Alliance's investment bankers would be an appropriate
3  reduction in the purchase price given the loss of the Debtor's
4  largest vendor contract had the Debtors negotiated that issue
5  with Alliance in good faith, which, of course, they did not.
6  So it's very curious that a reduction in price on the same --
7  of the same magnitude that was called for a upon discovery of
8  this material adverse change is exactly the reduction in
9  purchase price offered to the backup bidder.

10      Secondly, Your Honor, it's concerning to Alliance, and I
11  suggest it should be concerning to the Court, that the
12  provision of the Universal Asset Purchase Agreement discussing
13  material adverse changes and what can and can't be done in the
14  event of a material adverse change is redacted.  And to my
15  knowledge, there's not an Order on the Docket authorizing such
16  redactions, but that might be a side point.  So what do those
17  redactions or unredacted version of that paragraph actually
18  disclose?  We don't know.  I have theories, but those are just
19  theories and speculation.  But I think it's very important for
20  that to come out in Court before Your Honor grants a Motion to
21  Sell to the backup bidders under those terms.

22      And then finally, Your Honor, I want to point out that at
23  the last hearing, I did say, and you did Hear testimony from
24  Mr. Ogilvie, Alliance's chairman, that Alliance was ready,
25  willing, and able to close and that there was no risk to

1    closing.  That was a true statement then.  It is a true

2    statement now.  However, there was no accounting for the fraud

3    that we encountered as part of the closing process.  That is

4    the subject -- one of the subjects of the Adversary Proceeding

5    that I expect will be fully heard by the Court in due course.

6    But I just want to point out that but for the discovery of

7    that information, which had been concealed from at least

8    Alliance, perhaps other bidders as well, we would have closed

9    last Friday.

10        As to standing, I suggest that Alliance does have

11   standing.  I'm not going to introduce evidence today.  I'm not

12   going to introduce or make arguments to the Court beyond this

13   opening statement.  But I suggest that Alliance does have

14   standing, not only as a prepetition Creditor holding a small

15   dollar claim, but also as a postpetition Creditor to the

16   extent of the $8.5 million deposit, which the Debtors have

17   unreasonably refused to refund, notwithstanding termination of

18   the APA based on a material adverse change.

19        But even more importantly, as Mr. Minuti stated and as

20   there is evidence to suggest to support this, that the Debtors

21   and the Creditors Committee have denied Alliance's assertion

22   of a material adverse change, meaning, in their view, Alliance

23   didn't have the ability to terminate, so we're still the buyer

24   under an Asset Purchase Agreement.  So I suggest we do have

25   standing to make those statements.

1      Like I said, I'm not going to be introducing evidence or

2  otherwise arguing today, so that might also be a side issue

3  that Your Honor doesn't need to take up.  But if you did, I

4  think there is ample grounds for Your Honor to find that

5  Alliance has standing.  So, with that, I'll leave Your Honor

6  to conduct the hearing as you see fit, and thank you very

7  much.

8      THE COURT:  Thank you.  Anyone else here today wish

9  to be heard on the question of whether the Court should

10  proceed on the merits as the Debtor requests?

11      ALL:  (No verbal response).

12      THE COURT:  No one's volunteering for that

13  opportunity.  All right.  I'm satisfied that under all of the

14  circumstances of this case, and I'm familiar with them from

15  the beginning of the filing of the case, that the Court should

16  grant the request to shorten time and take up the merits of

17  the motions today as requested by the Debtors.

18      I don't think, at this stage -- I think that there's

19  compelling force.  I'm not ruling on the question, but I think

20  there's compelling force to the Debtor's arguments about the

21  standing of the now terminating bidder to be heard on these

22  matters.  I'm not going to prohibit their participation in

23  today's hearing, but I'm reserving on the issue of whether the

24  Court -- will they have standing at the end of the

25  proceedings?  Mr. Minuti, perhaps we take a five-minute recess

1   before you proceed with presenting evidence.  But if you have

2   anything else you wish to say before we do that, I'm happy to

3   hear it.

4          MR. MINUTI:  Your Honor, I was going to make the

5   same suggestion.  So yes, we could benefit by five minutes.  I

6   appreciate that.

7          THE COURT:  We'll take a recess.

8          MR. MINUTI:  Thank you.

9          THE CLERK:  All rise.  This Court is in recess.

10     (Recess)

11         THE CLERK:  Please remain seated and come to order.

12  The United States Bankruptcy Court for the District of

13  Maryland now resumes it's regular session.

14         THE COURT:  All right.  Mr. Minuti, I think you were

15  about to call a witness.  Before you do that, could we just

16  clarify one thing because I have this page that was being

17  referred to as a redaction.  Is this --

18         MR. MINUTI:  Okay.

19         THE COURT:  -- is this intended as a redaction, or

20  is it something different?

21         MR. MINUTI:  It is intended as a redaction, Your

22  Honor.

23         THE COURT:  Okay.  But there hasn't been any kind of

24  motion filed with respect to that?

25         MR. MINUTI:  It's -- correct, correct.  I will cover

1    that with Mr. Gorin's testimony.

2            THE COURT:  Mighty fine.

3            MR. MINUTI:  Your Honor, the only thing -- before I

4    start, two things, Your Honor.  Number one, when Mr. Teele was

5    at the podium, he talked about a conversation with Raymond

6    James.  I'm not going to belabor that other than to say that

7    we disagree with that characterization.  And I believe Mr.

8    Teele wanted to address the Court before we begin.

9            THE COURT:  Okay.

10           MR. MINUTI:  So I'll cede the podium.

11           THE COURT:  Mr. Teele.

12           MR. TEELE:  Your Honor, sorry to interrupt the

13   proceeding.  But as I said before, I'm not going to be

14   introducing evidence or further arguing with respect to the

15   new Sale Motion, to the extent the Court takes it up today.

16   And with that, I don't believe that my client has an interest

17   in participating in the hearing any further.  So with Your

18   Honor's permission, Mr. Grasso and I will quietly exit the

19   Courtroom once the evidentiary portion of the hearing gets

20   started.

21           THE COURT:  Okay.  That's fine with me.  It's

22   entirely up to you if you --

23           MR. TEELE:  Thank you.

24           THE COURT:  You can take -- I don't know what's

25   going to happen in the hearing.  So, if you leave, you're not

1  here, and your interest won't be represented, but --

2            MR. TEELE:  Exactly, thank you.

3            THE COURT:  Mr. Minuti.

4            MR. MINUTI:  Very well, Your Honor.  I'll call Mr.

5  Gorin to the stand, if I may.

6            THE COURT:  You certainly may, Mr. Gorin.

7            THE CLERK:  Please be advised that pursuant to the

8  judge's instructions, the "listen live" line is now being

9  terminated.

10           OPERATOR:  Goodbye.

11       (Laughter)

12            ROBERT GORIN, DEBTOR'S WITNESS, SWORN

13           THE CLERK:  Please be seated.  Please state your

14  full name and address for the record.

15           MR. GORIN:  Robert Gorin, 295 Madison Avenue, New

16  York, New York, 10017.

17           THE CLERK:  Thank you.  Your witness, Mr. Minuti.

18           MR. MINUTI:  Thank you very much.

19                      DIRECT EXAMINATION

20  BY MR. MINUTI:

21  Q.  Good morning, Mr. Gorin.

22  A.  Good morning.

23  Q.  Mr. Gorin, I'm going -- because we've done this a couple

24  of times now, I'm going to skip your educational background

25  and your employment background.  But you are the -- one of the

1    Debtor's co-CROs, is that correct?

2    A.   It is.

3    Q.   And can you just remind the Court of what your job duties

4    are as chief restructuring officer for these Debtors?

5    A.   Absolutely.  We help with sale process.  We liaise with

6    the company and the investment banker.  We supply the data.

7    We help run the company in terms of dealing with the vendors

8    and dealing with the customers, making sure accounts payable

9    or collected accounts receivable -- I'm sorry, accounts

10   payable are paid and accounts receivable are collected and the

11   daily operations of the organization.

12   Q.   All right.  And can you tell the judge or give the judge

13   an idea of what was your role -- or what has your role been in

14   connection with the sale process?

15   A.   Absolutely.  I've been very involved in terms of working -

16   - talking with the potential buyers, helping them collect

17   data, running analysis, setting up management meetings,

18   participating in those meetings towards facility, towards --

19   and running down and removing any obstacle that there might be

20   to those -- to the sale process and just helping everything go

21   smoothly and provide insight and analysis when requested.

22   Q.   When did you decide to pursue a 363 Sale process in these

23   cases?

24   A.   Back at the start we looked at various ways that we could

25   help restructure the company.  It became clear early on that

1    there was a major liquidity problem, that it would be

2    difficult to in any way -- in a timely way, we actually --

3    from a -- restructure the company from a business perspective,

4    and that the best way to generate value and the best way to

5    maximize that value was through a sale process.

6    Q.  And as you sit here today, do you continue to believe that

7    the sale of assets under 363 is the best way to maximize value

8    for the Debtors?

9    A.  I do.

10   Q.  Now you're aware, are you not, that the Court entered a

11   sale order on April 11, authorizing the Debtors to sell their

12   assets, other than their UK assets, to Alliance Entertainment,

13   LLC, correct?

14   A.  Correct.

15   Q.  And what was the outside date of the -- or outside closing

16   date under that transaction, do you recall?

17   A.  Yes, April 25th.

18   Q.  Now at the hearing on April 8, the parties had committed

19   to working cooperatively toward a closing.  Did that happen?

20   A.  It absolutely did.  We held the daily transition call

21   every day at 5 o'clock, all hands, all professionals, both

22   companies, all department heads.  I think there were 50+

23   people on those calls.  We had various work streams by the

24   department, so one for finance, one for IT, one for human

25   resources, and so on.  We responded to multiple myriad

1   requests for data and analysis and to -- you know, to arrange

2   really whatever the buyers needed.  We did everything in our

3   power to help them get to a close.

4   Q.  And as the parties worked towards a closing by the closing

5   date of April 25, what if anything happened on April 17, 2025?

6   A.  On April 17th we got an unexpected email from a vendor, an

7   important vendor that said they were not going to renew their

8   contract with the company.

9   Q.  And when was that contract expiring?

10  A.  That was at the -- would have been at the end of April.

11  Q.  And did you share that notice or that information with

12  Alliance Entertainment?

13  A.  We did.  We shared it the same day.

14  Q.  Okay.  And was this notice that the supplier was

15  terminating the agreement?

16  A.  No, sir, it was that they were not going to renew, that

17  they had decided that they were not going to renew, but it was

18  not a termination.

19  Q.  And when was the first time the Debtors were informed by

20  this supplier that it did not intend or it was not going to

21  extend the agreement?

22  A.  As I said, it really did come out of the blue.  It was

23  that letter.  That was the first time we had heard anything

24  that they -- anything indicating they weren't going to move

25  forward.

1   Q.  And what was the Debtor's response to receiving this

2   notice?

3   A.  Obviously we were concerned.  We have a 25-year-plus

4   relationship with this vendor.  We were working with the

5   vendor up until the day before on a very important release

6   that was due to come out in June, so we had been interacting

7   on that basis.  We had regular orders that were being

8   discussed and placed with the vendor.  But upon -- so as soon

9   as we knew, we did notify the buyer.  We asked the vendor

10  repeatedly to meet.  There was supposed to be a meeting that

11  had been set up with the vendor and the buyer and the Debtor.

12  We asked for that -- we asked to use that time to talk to the

13  vendor to understand and see if there was a way we could

14  rectify the situation.  It was a very brief, a very terse

15  meeting where the vendor just basically said they were not

16  interested in renewing, they were not interested in moving

17  forward, and they were not interested in talking anymore.  And

18  so that ended, and then as soon as that happened we notified

19  the appropriate -- we notified the bidder.  We had a meeting

20  later that night to discuss it and to strategize and to plan,

21  and I and others spent many, many hours, late into the night,

22  looking for connections and relationships so that we could get

23  some kind of audience to just talk it through.  We wanted them

24  to meet the bidder; they had not yet met them.  We thought it

25  was important that the vendor meet the buyer so they could

1   explain their plans going forward and how much they were going

2   to invest and why this was going to be so beneficial for

3   everybody.  And, you know, up to that point, the people that

4   we had been talking to at the vendor said no, so we were

5   looking for a higher level contact.  We asked the bidder to do

6   the same.  The bidder had told us during the process that they

7   weren't overly concerned about this relationship because they

8   had a relationship with the parent company and they thought

9   that would help carry the day.  When we asked -- at this --

10  and when this happened, we got that letter on the 17th, they

11  indicated that their relationships are really kind of in the

12  sales and marketing department, lower level, and they didn't

13  think they knew anybody that could help facilitate this

14  meeting that we thought was so important -- we all thought was

15  so important.  Ultimately a very senior person in my parent

16  company had a relationship with a very senior person at the

17  parent company of the vendor, and through that we got

18  introduced to the president of the vendor, whom we did not

19  have a relationship with, and he agreed to have a

20  conversation.  That took many, many man hours just to find the

21  connection and then to make it happen, and then a few days

22  later we had that meeting with the vendor, the bidder, and us.

23  Q.  Was that meeting in person?

24  A.  It was over video.  It was a video conference.

25  Q.  Okay.  And was that meeting successful in getting the

1    vendor to change its position?

2    A.   Unfortunately, you know, at the end of the meeting they

3    said they would consider it.  The meeting had some ups and

4    downs, but they said they would consider it, and ultimately

5    they came back the next day in writing and said they had not -

6    - you know, they were not going to change their mind.

7    Q.   And in light of the vendor's decision, what did Alliance

8    Entertainment do?

9    A.   We had conversations with Alliance about how this -- how

10   they saw it impacting valuation, how they saw it impacting the

11   company, and how they felt it would impact their bid, and so

12   we had a number of conversations along those topics.

13   Q.   Okay.  But they ultimately sent a letter, right, declaring

14   a material adverse change, correct?

15   A.   After that, yes.  We -- they sent a letter declaring a

16   MAC.  I believe that was on the 23rd of April.  The next day

17   they sent a letter terminating the -- their APA, and then not

18   long after that they filed a suit against the companies and

19   professionals and the principals.

20   Q.   Okay, and who -- what principals were sued?

21   A.   There were three.  It was myself, and then it was the two

22   co-CEOs of the game division of the Debtor.

23   Q.   Now during this process, did the Debtors communicate to

24   Alliance Entertainment regarding whether there was or was not

25   a material adverse change?

1   A.   We did.  We sent a letter, or I guess an email, that we

2   did not feel there was a material adverse change.  We were --

3   it was our expectation that they were as -- and as the -- as

4   it said in the SIM, as it said in the bidding letter and as it

5   said in the APA, it was our assumption that they were relying

6   on their own investigation, their own due diligence, which

7   they had claimed was -- which they had said was complete when

8   we were in Court at that time, and that they were ready to

9   close, one day I think it was -- two days, maybe, as lightning

10  strikes, if I recall.  And so we were relying on that and as

11  we saw it, because of those statements, because of what we had

12  agreed to, because I was not getting any specific questions

13  about this topic, we felt that no MAC had happened.

14  Q.   Okay.  So after Alliance Entertainment sent the letter

15  terminating the agreement, what did the Debtors do?

16  A.   Well, we pivoted to the backup bidders that -- we still

17  had a responsibility to maximize the value of the assets, and

18  given that Alliance had terminated the -- their APA, we felt

19  we had no choice but to pivot and have conversations with the

20  backup bidders.

21  Q.   And who was involved in that process on behalf of the

22  Debtors?

23  A.   Certainly Raymond James, myself, members of the company,

24  it was an all-hands-on-deck situation.  We didn't have a lot

25  of time and we had to -- you know, as has been stated, we were

1    burning cash.  We had, you know, vendors that were getting

2    antsy, we had a lender that was getting antsy, we had

3    employees getting very nervous, 480 families we're trying to

4    take care of at the end of the day, and so it really was all

5    of the key folks that had been involved previously.

6    Q.   And you said Raymond James.  Who is Raymond James?

7    A.   Raymond James is the investment bank that we had hired to

8    help us with the sale, the 363 sale of the assets.

9    Q.   Okay.  And what were the results of the rekindled

10   discussions with Ad Populum and Universal?

11   A.   We ultimately came to agreement.  Both parties had -- you

12   know, look, both parties had some leverage; they took

13   advantage of that leverage and were able to exact concessions.

14   Those were hard fought.  The concessions that we ended up with

15   were, I believe, significantly -- I know, significantly less

16   than what they initially asked for.  They were arms' length

17   and ultimately an agreement that still, at the end of the day,

18   optimized the value of the assets but also allowed up to move

19   as quickly as possible to get to a closing.

20   Q.   Now throughout this process, did you have discussions with

21   the Committee or JPMorgan Chase?

22   A.   Absolutely, and I should have mentioned that earlier, but

23   yes.  We were talking to the best of, you know, as much as

24   time allowed, we were absolutely talking.  We kept them as

25   informed as humanly possible, both parties.

1  Q.  All right, you should have two exhibits in front of you --

2           MR. MINUTI:  And I believe, Your Honor, you have the

3  two exhibits.

4           THE COURT:  I do.

5  BY MR. MINUTI:

6  Q.  If you could take a look at the exhibit we've marked as

7  Debtor's Exhibit #1.  Do you have that?

8     (Debtor's Exhibit-1 previously marked for identification)

9  A.  I do, yes.

10 Q.  Can you identify that document for me?

11 A.  Yes, this is the Asset Purchase Agreement with Ad Populum.

12 Q.  And in terms of the Asset Purchase Agreement with Ad

13 Populum, can you tell the Judge generally what the changes

14 were from the original Asset Purchase Agreement that they had

15 submitted?

16 A.  Yeah, the primary economic changes after -- at the end of

17 the negotiations were about a $3 million price reduction on

18 the up-front piece, the cash at closing, as well as there is

19 an incentive piece of AR and inventory that's going to be sold

20 that they would collect on behalf and then pay back to the

21 seller, and that was reduced about -- I think it was about 2.6

22 million.

23 Q.  Okay, so total --

24 A.  Total about 5.6.

25 Q.  I'm sorry, say that again.

1   A.  I'm sorry, total about 5.6 million.

2            MR. MINUTI:  With that, Your Honor, I'd move the

3   Debtor's Exhibit-1 into evidence.

4            THE COURT:  Hearing no objection, Debtor's 1 is

5   admitted.

6        (Debtor's Exhibit-1 admitted into evidence)

7   BY MR. MINUTI:

8   Q.  If you could now turn to what we've marked as Debtor's

9   Exhibit #2.  Do you recognize that document?

10       (Debtor's Exhibit-2 previously marked for identification)

11  A.  I do.  This is the APA with Universal.

12  Q.  Okay.  And if you could turn to the back of the document -

13  - I'll give you the right page.  So it's -- let's see, it

14  looks like it's maybe three pages from the back.  It's titled

15  Second Amendment to Asset Purchase Agreement.  Do you see

16  that?

17  A.  Yes.

18  Q.  Okay.  And this is -- so unlike Ad Populum where there was

19  a new Asset Purchase Agreement, the way you dealt with the

20  changes for the Purchase Agreement with Universal was to do an

21  amendment, is that correct?

22  A.  That's correct.

23  Q.  Okay.  And can you tell the Judge what the -- generally

24  what the economic changes were to the Universal Asset Purchase

25  Agreement by way of this amendment?

1   A.   Yes.  Again, at the end of the negotiations, the change in

2   purchase price was about 7 and change, 7 million and change.

3   Q.   Okay.  And so overall, between the two transactions, what

4   was -- what -- do you know what the ultimate -- sort of the

5   overall value is of the transactions you're asking the Court

6   to approve today, if they close?

7   A.   It's about $13 million, I think, less than the original,

8   the 69 million that we had, so I guess 56 million.

9   Q.   Okay.  And if you could, again, with Debtor's Exhibit #2,

10  if you could turn to -- this is the Asset Purchase Agreement

11  itself.  If you could turn to page 13.  13 at the bottom.

12  A.   Got it.  Okay.

13  Q.   And you'll see ¶3.3  Let me know if you're with me.

14  A.   I am with you.

15  Q.   Okay.

16          MR. MINUTI:  Judge, are you there?

17          THE COURT:  I am.

18          MR. MINUTI:  Okay.

19  BY MR. MINUTI:

20  Q.   And this section is titled Conditions to the Obligation of

21  Purchaser, correct?

22  A.   Yes.

23  Q.   All right.  And so these are the conditions for the

24  purchaser here, in this case Universal, to close on the

25  transaction.

1   A,  Yes.

2   Q.  Okay.  And you'll see that under ¶3.3(d), there are, looks

3   to me like a number of sentences that have been redacted.

4   A.  Correct.

5   Q.  And those redactions, right, were in the original

6   agreement that was filed with the Court when we first moved

7   forward with the transaction, correct?

8   A.  You're asking me if the same redaction is --

9   Q.  Yeah.

10  A.  Yes.

11  Q.  Okay.  And I don't want you to be specific here, because

12  it's redacted for a reason, but can you tell the Judge

13  generally what's been redacted?

14  A.  Yes, these are the names of four vendor contracts that we

15  had discussed with the buyer.

16          MR. MINUTI:  Your Honor, with that I'd move Debtor's

17  Exhibit #2 into evidence.

18          THE COURT:  Hearing no objection, Debtor's 2 is

19  admitted.

20      (Debtor's Exhibit-2 admitted into evidence)

21          MR. MINUTI:  Thank you.

22  BY MR. MINUTI:

23  Q.  Now I know we're here obviously today to ask the Judge to

24  approve the transactions with both Universal and Ad Populum,

25  but let me ask, did you give any -- when I say you, I mean the

1   Debtors.  Did the Debtors give any thought to re-opening the

2   market process to others?

3   A.  We did.  We did think about it, we discussed it.  The

4   reality is it's as -- I think as everybody has said, not to be

5   repetitive, but time is not our friend here.  We are burning

6   cash.  We felt that our investment bank had done a very good

7   job of going out and taking stock of the marketplace.  We had

8   talked to most of the people that would be interested and that

9   we had covered the market, and that opening it up would cause

10  -- would create time that we just didn't have, given the cash

11  burn and the concerns of the marketplace and how this was all

12  playing out in the marketplace, particularly given some of the

13  recent news stories around the -- Alliance's adverse suit and

14  some of the other things that had been filed with the Court.

15  Q.  Okay, and you mentioned the burn rate.  What is -- what do

16  you mean by burn rate?

17  A.  That's cash that -- cash that's going out the door that

18  we're not taking -- we're not covering with our sales and our

19  profit margin, so we're actually working through cash that we

20  are not replacing, and that was about 1.2 plus.  There were a

21  few other expenses that are not included in that.  So call it

22  1.2, 1.3 million a week, that's cash burned that we were not

23  regenerating, we were not renewing.  It was literally a cost

24  to run the business as is right now.

25  Q.  And did the Debtor -- did the -- I'm sorry.  Did the

1    Debtor ever give any thought to simply shutting down the

2    business and liquidating the inventory or the other assets

3    that were there?

4    A.  We did, and we also had these conversations with the

5    consultation parties as well, and our liquidation analysis

6    shows it's significantly lower recovery to liquidate than to

7    sell.

8    Q.  Did you personally interact with representatives of

9    Universal and Ad Populum and Sparkle Pop during the sale

10   process?

11   A.  I did.  I did.

12   Q.  And how would you characterize their participation in this

13   process?

14   A.  I -- look, I would say that they followed the bidding --

15   they followed all the procedures.  We had conversations that

16   were, you know, clearly hard fought but arms' length, and they

17   were eager and earnest in closing and in wanting to close.

18   Q.  To your knowledge did Universal or Ad Populum and Sparkle

19   Pop fully comply with the bidding procedures?

20   A.  They did, to my knowledge.

21   Q.  Are you -- as you sit here today, are you aware of any

22   facts that suggest that the bids submitted or the Asset

23   Purchase Agreements that you've identified at Debtor's Exhibit

24   #1 and 2, that they were the product of bad faith or collusion

25   among bidders?

1    A.   I am not.

2    Q.   As we -- as you sit here today, do you have a view as to

3    whether or not the Asset Purchase Agreements that we've

4    identified as Debtor's Exhibit #1 and Debtor's Exhibit #2

5    represent the highest and best price available for the

6    Debtor's assets under the circumstances?

7    A.   I do.

8    Q.   And do you believe the Court should approve the sale

9    motion today and authorize the Debtor to consummate the

10   transactions --

11   A.   Absolutely.

12   Q.   -- outlined in these exhibits?

13   A.   I absolutely do.

14   Q.   And why is that?

15   A.   As we just said, you know, in my business judgment, this

16   is the best way to optimize asset recovery right now.  We have

17   to get to a close.  We are -- our runway is very, very short.

18   As I said, we are dealing with a lender who is losing

19   patience.  We are dealing with vendors that are very concerned

20   about interacting with the company, and if we start to lose

21   those vendors, we start to lose value.  As I said earlier, we

22   have just shy of 500 families that I've come to care quite a

23   bit about and that I really want to find a home for, so I

24   really do think that we need to close and we need to do it

25   quickly.

1  Q.  I want to switch, because the other matter on for today is

2  the asking Court approval of a stipulation with JPMorgan Chase

3  to extend the maturity date.  Are you familiar with that --

4  A.  I am.

5  Q.  -- motion?  Okay.  What is the change that's being -- or

6  the proposed change being made to the Debtor-in-Possession

7  financing?

8  A.  We're asking for an extension of that agreement.

9  Q.  The maturity date, correct?

10  A.  Maturity date, I'm sorry, yes.

11  Q.  Okay.

12  A.  We're asking for an extension of the maturity date.

13  Q.  And the extension we're asking for is through May 31, I

14  guess?

15  A.  End of the month, yeah, end of May.

16  Q.  Okay, and why is that extension necessary?

17  A.  We need access to funds so that we can get to a closing

18  and to operate the company in the ordinary course, as is

19  required by the APAs, and to keep the company moving forward

20  so that they're buying what they bid on.  And as I said

21  earlier, it's just time is not our friend.

22  Q.  Okay, and you sort of just answered this, but I'll

23  conclude with why do you believe an amendment to the DIP

24  facility to extend the maturity date is in the best interest

25  of the Debtor's Estates?

1   A.  I will -- not -- again, not to be repetitive, but we need

2   to keep running the company in the ordinary course, we need to

3   be able to make payroll, we need to be able to pay our vendors

4   and keep the plane -- keep the airplane flying.  As I keep

5   telling everybody, we're trying to hold the airplane together

6   while we're flying, and that is what we're trying to do.  And

7   we need the lender's help to do that.

8   Q.  Thank you.

9            MR. MINUTI : Your Honor, I have no further

10  questions.

11           THE COURT:  All right, very well.  Cross

12  examination, anyone?

13           ALL:   (No verbal response).

14           THE COURT:  All right, no one wishes to cross

15  examine.  I have no questions for the witness.  Thank you for

16  your testimony, sir.  You may step down.

17           MR. GORIN:  Thank you, Your Honor.

18      (Witness steps down)

19           THE COURT:  Mr. Minuti, anything else?

20           MR. MINUTI:  Your Honor, no further evidence.

21           THE COURT:  Okay.

22           MR. MINUTI:  Thank you.

23           THE COURT:  Thank you.  Mr. Finizio, does the

24  Committee wish to present any evidence?

25           MR. FINIZIO:  No, Your Honor, we don't have

Closing Argument - Mr. Minuti          46

1    anything.

2              THE COURT:  Okay.  Mr. Young?

3              MR. YOUNG:  Nothing for JPMorgan, Your Honor.

4              THE COURT:  Okay.  Anyone else?

5              ALL:  (No verbal response).

6              THE COURT:  No interest.  All right.  So I'll hear

7    argument on why the Court should approve these motions as the

8    Debtor has requested, but let's take a five-minute recess

9    before we do that.

10             THE CLERK:  All rise.  This Court is in recess.

11         (Recess)

12             THE CLERK:  Please remain seated and come to order.

13   The United States Bankruptcy Court for the District of

14   Maryland now resumes its regular session.

15             THE COURT:  All right, Mr. Minuti, I'll hear your

16   argument.

17             MR. MINUTI:  Thank you, Your Honor.  Again, for the

18   record, Mark Minuti on behalf of the Debtors.  By the sale

19   motion before the Court today, the Debtors are seeking

20   authority under ¶105(a), 363(b) and 365, Bankruptcy Rules

21   2002, 6004, 6006 and 9014, to sell substantially all of their

22   assets, not including their UK assets, free and clear of

23   liens, claims and encumbrances.

24        Case law holds that a Debtor's decision to sell assets

25   outside the ordinary course should be approved if the sale is

1   based upon sound business judgment of the Debtors.  In

2   determining whether the Debtor has correctly exercised its

3   business judgment, Courts typically look to four factors to

4   determine whether or not to approve the sale.  Factor 1 is

5   whether a sound business justification exists for the sale.

6   On this point I would submit the record is clear and

7   unrebutted.  The Debtors are losing money.  They can't afford

8   to continue to operate their businesses.  The best and highest

9   value to be obtained here is through the sale.  The sale

10  before Your Honor -- the two sales before Your Honors are

11  significantly greater than the liquidation value that could be

12  achieved.  That was the testimony; again, that was unrebutted.

13  A full marketing process was run, the results of which will

14  bring in higher value to the Estate, continuation of the

15  business, continuation of employment for most of the

16  employees, a continued customer for many of our vendors and

17  suppliers, and clearly avoids a shut down which is in no one's

18  best interest.  So we believe that prong is satisfied.

19      Factor #2 is whether adequate notice of the sale was

20  given to interested parties.  For the reasons I previously

21  stated, Your Honor, notice here was broad and sufficient,

22  again under the circumstances there are declaration of service

23  that appear on the docket.  Your Honor will recall that we did

24  publish notice of the sale and the sale process in the Wall

25  Street Journal, the Baltimore Sun, and the papers of local

1    distribution where our facilities were located.  That
2    ultimately resulted in seven qualified bids, it ultimately led
3    to a spirited auction, significant increase in purchase price,
4    some twists and turns since then, but ultimately that led us
5    here today, Your Honor, with the Asset Purchase Agreements
6    before the Court.
7         As I previously indicated, all parties were on notice of
8    the stalking horse Asset Purchase Agreement, the original
9    Asset Purchase Agreements and Sale Orders with Universal and
10   Ad Populum, and the fact that we switched to Alliance
11   Entertainment, but that Universal and Ad Populum remained
12   backup bidders.  The bid procedures made clear that if the
13   winning bidder failed to close, the Debtors could pivot to the
14   backup bidders.  That's essentially what happened here, or is
15   exactly what happened here, Your Honor, and I would remind the
16   Court that there really were no substantive objections to the
17   sale per se, other than Alliance Entertainment.  We did have
18   some contracts, sort of lease objections, but as I indicated,
19   Your Honor, those issues are for another day for those
20   objecting parties, to the extent those issues have not already
21   been worked out.
22        So under the circumstances, Your Honor, we believe that
23   notice is appropriate.  As I indicated at the outset, we were
24   mindful of due process, but for all those reasons, we believe
25   Your Honor can enter the orders today, and we believe that

1    factor is satisfied.

2          Factor #3 is whether the sale would produce -- will

3    produce a fair and reasonable price for the assets being sold.

4    This factor is satisfied based on the record before the Court.

5    There was really no reason to go back out to the market, and

6    again, the Debtors could not afford to do so.  The prices

7    before the Court today are much better than liquidation value,

8    and in the exercise of the Debtor's judgment, the transactions

9    before the Court today are the highest and best under the

10   circumstance, and therefore we believe we satisfy that factor.

11          The final factor is whether Universal and Ad Populum

12   Sparkle Pop have acted in good faith.  On this point again,

13   the record is unrebutted.  Mr. Gorin and Mr. Haesler both

14   testified at the prior hearing, and Mr. Gorin testified here

15   that Universal and Ad Pop have operated in good faith

16   throughout the process.  There's no evidence either a bid or

17   Asset Purchase Agreement was the product of collusion among

18   other bidders.  At all times the evidence was clear, our

19   winning bidders today have acted in good faith, and there is

20   no evidence, again, that the bids were controlled in any way

21   by collusion.

22          So for all those reasons, Your Honor, we'd ask that the

23   Court approve the sales.  It's a valid exercise of the

24   Debtor's business judgment.  We believe it's in the best

25   interest of the Debtor's Estates that we move forward, Your

1    Honor, once those sales are approved, and therefore we'd ask

2    that Your Honor approve the motion.

3         During the break, Your Honor, one thing that was brought

4    to our attention, in the rush of getting all this done, we had

5    built some protections in for JPMorgan Chase, and the ultimate

6    order that the Court entered with regard to Alliance

7    Entertainment.  It was our intent to include those in the

8    orders here and it just -- by mistake it didn't happen.  So if

9    Your Honor is inclined to approve the motions, we will need to

10   submit revised orders, which we will do very quickly to get

11   those before Your Honor.  So unless Your Honor has questions

12   of me, we'd ask that the Court approve the motion.

13            THE COURT:  All right, thank you.  I have no

14   questions for you, Mr. Minuti.  Thank you.

15            MR. MINUTI:  Thank you.

16            THE COURT:  Mr. Finizio?

17            MR. FINIZIO:  For the record, Gianfranco Finizio,

18   Lowenstein Sandler, counsel to the Committee.  Our position

19   hasn't changed since the outset of the hearing, Your Honor.

20   We believe that the sales to the back-up bidder should be

21   closed.  I think this is an excellent textbook example of why

22   it's important to have back-up bidders in place, and I think

23   the Estate and its various professionals have done the best

24   that they could do to keep the value of those backup bidders

25   as high as possible under the circumstances.  With those

1  backup bidders in place, we think it makes good sense to close

2  on those sales, and as I said in my opening remarks, the

3  Committee will remain laser-focused on ensuring that the

4  Estate is solvent post-sale and to ensure that there are no

5  exposed Administrative Creditors that are not accounted for in

6  the process going forward after the sales close on May 14th.

7          THE COURT:  All right, thank you.  Mr. Young?

8          MR. YOUNG:  Thank you, Your Honor.  We likewise

9  support the approval of the sale transaction to Universal and

10  to Ad Populum and Sparkle Pop, for all the reasons stated.  We

11  think it's the best way to monetize the operating assets and

12  create a fund for distribution to pay off the first lien

13  creditor and hopefully generate some additional recoveries

14  once JPMorgan is paid off.  We're grateful to Mr. Minuti for

15  addressing the issue in the order.  For the record, the

16  language was just to assure that liens would not be released

17  until proceeds were paid to JPMorgan in accordance with an

18  agreed payoff letter.  So we'll await seeing the final version

19  of that order, and I agree, that can come over to you very

20  quickly, Your Honor.

21          With regard to Mr. Finizio's comments, I think we need to

22  have a three-way discussion between the Debtors and the

23  Committee and JPMorgan as to how to budget the remainder of

24  this case, and we will stand ready to participate diligently

25  in that discussion and hopefully come to a place where we're

1    all in agreement.  But for now and for today, we think we are

2    united in the view that proceeding with this transaction as

3    quickly as possible is the right thing to do, and we therefore

4    are in agreement that the maturity date should be extended,

5    these bids should be approved, and we should get to closing

6    just as quickly as we can.  Thank you, Your Honor.

7              THE COURT:  All right, thank you.  Mr. Vetter?

8              MR. VETTER:  Thank you, Your Honor.  The U.S.

9    Trustee has no further comment on the matters before you this

10   morning.

11             THE COURT:  Okay.

12             MR. VETTER:  Thank you.

13             THE COURT:  Thank you.  Let the record reflect I

14   would call on Mr. Teele at this point, but good -- a man good

15   of his word, he indicated he intended to depart and he appears

16   to have done so.  Anyone else wish to be heard?

17             ALL:  (No verbal response).

18             THE COURT:  No, okay.  Well, I have considered the

19   argument and the evidence, and I find that the motions -- the

20   motion to sell should be approved, and the extension of the

21   JPMorgan Debtor-in-Possession financing facility should be

22   approved, and I will entertain orders as soon as the Debtors

23   can get them to me.  I think all of it represents a sound

24   exercise of the business judgment by the Debtors.  The

25   evidence that Mr. Gorin is convincing to me on that and is

53

1    unrebutted.  I've considered the applicable standards and I

2    think approval is appropriate.  It's been a difficult process,

3    it's an unusual course of events that led us to today, but I

4    think that that fact, that it's been a little bit difficult

5    and has led us over the course of some back-and-forth to today

6    is the reason why approving these matters today in the way

7    that they came down is really necessary to protect the value

8    of this Estate.  So I will enter orders doing so.  I will

9    await your orders, Mr. Minuti.  Thank you.

10          MR. MINUTI:  Thank you, Your Honor.

11          THE CLERK:  All rise.  This Court is adjourned.

12      (Court adjourned)

13

14                    CERTIFICATION
15   I, Lewis Parham, certify that the foregoing is a correct
16   transcript from the electronic sound recording of the
17   proceedings in the above-entitled matter.
18
19
20   *Lewis Parham*                      4/30/25
21
22   _____        _____
23   Signature of Transcriber              Date