UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

```
                              .
   IN RE:                     .      Chapter 11
                              .
   Diamond Comic Distributors, .
   Inc.,                      .
                              .
           Debtor.           .      Bankruptcy #25-10308 (DER)
   ..............................................................
```

Baltimore, Maryland
June 30, 2025
11:07 a.m.

BEFORE THE HONORABLE DAVID E. RICE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TRANSCRIPT OF:

[527]  MOTION TO APPROVE STIPULATION/SETTLEMENT DEBTORS'
MOTION FOR ENTRY OF AN ORDER APPROVING FIFTH STIPULATION
BETWEEN DEBTORS AND JPMORGAN CHASE BANK, N.A., AMENDING DIP
CREDIT AGREEMENT FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[528]  MOTION TO SHORTEN TIME DEBTORS' MOTION TO SHORTEN
NOTICE OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING
FIFTH STIPULATION BETWEEN DEBTORS AND JPMORGAN CHASE BANK,
N.A., AMENDING DIP CREDIT AGREEMENT FILED BY DIAMOND COMIC
DISTRIBUTORS, INC.

APPEARANCES:

| | |
|---|---|
| For The Debtor: | Paige Noelle Topper, Esq.<br>Saul Ewing, LLP<br>1201 North Market St.-Ste. 2300<br>Wilmington, DE 19899 |
| For Unsecured Creditor's Committee: | Dennis J. Shaffer, Esq.<br>Tydings & Rosenberg<br>1 E. Pratt St.-Ste. 901<br>Baltimore, MD 21202 |

2

```
For Creditor, JPMorgan Chase   Jonathan W. Young, Esq.
Bank:                          Troutman Pepper Locke, LLP
                               701 8th St., NW, Ste. 500
                               Washington, DC 20001

Audio Operator:                Cherita Scott

Transcribing Firm:             Writer's Cramp, Inc.
                               1027 Betty Lane
                               Ewing, NJ 08628
                               609-588-8043
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  The United States Bankruptcy Court for

2    the District of Maryland is now in session, the Honorable

3    Chief Judge David E. Rice presiding.  Please be seated and

4    come to order.  On the 11 o'clock Docket, calling the case of

5    Diamond Comic Distributors, Inc., case #25-10308.  Counsel,

6    please identify yourselves and your clients for the record.

7          MS. TOPPER:  Good morning, Your Honor.  Paige Topper

8    with Saul Ewing on behalf of the Debtors in these cases.  With

9    me in the courtroom today, Your Honor, is Ramy Aly.  He's a

10   Senior Director at Getzler Henrich and works under the

11   direction of the Co-Chief Restructuring Officer is Mr. Robert

12   Gorin, Mr. William Henrich, in these cases.

13         THE COURT:  All right.  Good morning.

14         MR. YOUNG:  Your Honor, good morning.  Jonathan

15   Young from Troutman Pepper Locke.  I represent JPMorgan, the

16   DIP Lender.

17         THE COURT:  Good morning to you.

18         MR. SHAFFER:  Good morning, Your Honor.  Dennis

19   Shaffer of Tydings & Rosenberg on behalf of the Official

20   Committee of Unsecured Creditors.

21         THE COURT:  Good morning to you.  All right.  Ms.

22   Topper, we're here on Debtors' motion.  Before we take that

23   up, housekeeping matter, there was a motion filed by the

24   Debtors to establish sale procedures for consigned inventory.

25         MS. TOPPER:  That is correct.

1          THE COURT:  There was a notice that the Debtors

2    docketed on the 26th of June.  I haven't seen a Certificate of

3    Service on that.  Has that been served?

4          MS. TOPPER:  Yes.  That motion has been served, but

5    we will make sure a Certificate of Service is docketed.

6          THE COURT:  Okay.  I want to make sure there's good,

7    timely service.

8          MS. TOPPER:  Absolutely.

9          THE COURT:  There's a lot of parties with interests

10   in the inventory, and so I'll be looking forward to seeing

11   that.

12         MS. TOPPER:  Understood, Your Honor.  I will

13   communicate with the Debtors' claims agent to make sure that

14   is docketed shortly.

15         THE COURT:  Okay.  Good.  Go ahead.

16         MS. TOPPER:  Thank you, Sir.  I probably want to

17   start, Your Honor, by taking an opportunity to thank the Court

18   for scheduling this hearing today.  We are here on short

19   notice.  We are here going forward on one matter, and that's

20   the Debtors' Motion to Approve the Stipulation with the

21   Debtors' DIP Lender.

22         THE COURT:  Just a minute.  I don't think we're here

23   on short notice.

24         MS. TOPPER:  I believe we filed the motion last

25   Tuesday, Your Honor.  So, we filed a related Motion to

1   Shorten with it.

2          THE COURT:  Yes.  Yes.  We didn't rule on the Motion

3   to Shorten Time.  It's set for hearing today.

4          MS. TOPPER:  Okay.

5          THE COURT:  So, I'm going to need to hear from you

6   on that.

7          MS. TOPPER:  On the motion?

8          THE COURT:  This is the second motion the Debtors

9   have filed.  I understand the Cash Collateral Order says that

10  it can be done on consent notice to the Lender and the

11  Committee.  This is the second time the Debtor has filed a

12  motion saying we need an extension of time with respect to

13  financing, and we don't have the deal, we're working on it.

14  And I just didn't feel it was appropriate to shorten the time

15  because I had no idea what was going on.  And it's not the

16  case that we have shortened time.  We have set the hearing

17  today on the motion and the Motion to Shorten Time.  And it's

18  not a given that the Court's going to shorten the time, but

19  I'll hear what you have to say.  Okay?

20          MS. TOPPER:  Understood, Your Honor.

21          THE COURT:  All right.

22          MS. TOPPER:  So, I'll take the Motion to Shorten

23  Notice first since that's a gating issue.  We filed a Motion

24  to Shorten Notice with respect to the underlying Motion to

25  Approve the Fifth Stipulation between the Debtors and JPMorgan

1    Chase Bank, the Debtor's DIP Lender in these cases.  That

2    stipulation is to amend the DIP Credit Agreement.  And the

3    amendment, the critical amendment there, Your Honor, is to

4    extend the maturity date for the DIP facility by eight weeks

5    to August 23rd.  We filed a related Motion to Shorten Notice

6    so that this -- the underlying Motion to Approve the

7    Stipulation, Your Honor, could be heard given sort of the

8    pending maturity date under the current -- you know, under the

9    current DIP Credit Agreement.

10            THE COURT:  The current maturity date is today,

11    isn't it?

12            MS. TOPPER:  The current maturity date was in fact

13    June 28th, I believe, Your Honor.  So, we've been in

14    discussions with the bank and bank's counsel, and the bank has

15    agreed, you know, provided that the Court enters the Order

16    today to approve the further stipulation that the debt -- that

17    the bank would work with the Debtors to allow the facility to

18    continue going forward pursuant to a budget.

19            THE COURT:  Okay.

20            MS. TOPPER:  I'm happy to pause there with respect

21    to the Motion to Shorten Notice.

22            THE COURT:  I think I need to hear the merits of the

23    Motion to Continue the DIP Financing, and I need to hear from

24    the Creditors Committee in particular about its views on all

25    of this before I rule on anything.  Okay.  So, you go ahead

1    with your presentation on the motion regarding financing.

2            MS. TOPPER:  Understood, Your Honor.  So, as I

3    mentioned, we are here today on the Debtors' Motion to Approve

4    the Fifth Stipulation.  We are here today, just for the

5    record, with the consent of both the DIP Lender and the

6    Committee.  The Debtors aren't aware of any objections to

7    either the underlying Motion to Approve the Stipulation or the

8    related Motion to Shorten Notice.  The Motion to Approve the

9    Stipulation, as I mentioned, requests authority for the

10   Debtors to enter into that fifth stipulation to amend the DIP

11   Credit Agreement to extend the maturity date to August 23rd.

12   As the Court will recall, on February 19th of this year, the

13   Court approved on a final basis Debtor-In-Possession financing

14   from JPMorgan Chase Bank, and that final DIP Order appears on

15   the Docket at Docket item 163.  The original maturity date of

16   the DIP loan was June 30th.  That date has been subsequently

17   modified a few times pursuant to prior amendments to the DIP

18   Credit Agreement.  The Debtors were last before this Court on

19   an amendment to the DIP Credit Agreement on May 29th.  At that

20   time, my colleague, Mark Minuti, had informed the Court that

21   the sales to both Universal and Sparkle Pop had closed and

22   that the Debtors had entered into and were performing under

23   Transition Services Agreements with each buyer.  Since then,

24   the Debtors have been performing under those TSAs.

25       The Debtors have also been engaging in extensive

1    good-faith negotiations with the DIP Lender as well as the

2    Committee regarding the extension of the DIP facility's

3    maturity date to allow the Debtors to continue to administer

4    their Estates and to monetize the remaining assets.  To that

5    end, the Debtors and the DIP Lender have agreed to amend the

6    DIP Credit Agreement to extend the maturity date of that DIP

7    loan.  If the Court does approve the underlying Motion to

8    Amend the DIP Credit Agreement, then the Debtors intend to

9    submit a Revised Order that would attach a fifth stipulation.

10   That stipulation will look substantially similar to the last

11   stipulation Your Honor approved back at the end of May.  We'll

12   just, of course, change the date of the maturity provision.

13   The stipulation will provide that the Debtors will separately

14   file on the Docket the further amendment to the DIP Credit

15   Agreement.  I believe it's the seventh amendment at this time,

16   which will attach a revised budget that has been negotiated

17   with the DIP Lender and the Committee.  And not to hide the

18   ball, Your Honor, the budget was approved by JPM this morning

19   and I have handed a copy up to the Court.

20            THE COURT:  Right.  I have it.

21            MS. TOPPER:  Excellent.  Mr. Aly is here to address

22   any questions that the Court or other parties may have in

23   connection with the budget.  Your Honor, with respect to the

24   underlying Motion to Approve the Stipulation, the Debtors'

25   decision in this case to amend a prior approved DIP credit

1  facility is governed by the business judgment rule.  The case

2  law supports the approval of such financing if justified by a

3  sound business purpose.  Under the circumstances, the Debtors

4  would submit that the amendment is in the best interest of the

5  Debtors' Estates and is a sound exercise of the Debtors'

6  business judgment.  The extension of the maturity date will

7  permit the Debtors to wind down their Estates, as well as

8  pursue the collection of various remaining proceeds for the

9  remaining assets.  You will also see in the budget, Your

10  Honor, that the extension of the maturity date permits the

11  Debtors to make the previously approved KEIP and KERP

12  payments, and it will also provide the Debtors with time to

13  accrue proceeds, as I mentioned, from the sale of remaining

14  assets and then to monetize on certain claims and causes of

15  action, which will both maximize value to the benefit of the

16  Debtors' Estates, as well as their Creditors.  To the extent

17  the Court has any questions, I'm happy to address them at this

18  time.  Otherwise, the Debtors would respectfully request that

19  the Court approve the Debtors' entry into a fifth stipulation

20  to amend the DIP Credit Agreement.

21          THE COURT:  So, this budget is by the week, and the

22  date is the Saturday at the end of the week?  Is that the way

23  this is working?

24          MS. TOPPER:  That's correct, Your Honor.

25          THE COURT:  Yes.  Okay.

1          MS. TOPPER:  It's an extension -- It's an eight-week

2     extension of the current budget.

3          THE COURT:  So, let me try again.  Forecast, week

4     #1, the week ending 7/5/2025.  So, that's the last day of the

5     period, correct?

6          MS. TOPPER:  Correct.

7          THE COURT:  And it's going to, if the Court approves

8     it, through week eight, the last day of that period is August

9     23rd, and that's when you refer to as an extension through

10    August 23rd, right?

11         MS. TOPPER:  That is correct, Your Honor.

12         THE COURT:  Okay.  Now, this provides for {quote}

13    "accrued final payroll to be paid in the week ending July

14    12th."  So, that's two -- I guess, three weeks, whatever it

15    is.  It's July 12th.  So, the -- there's not going to be any

16    employees after that time period?

17         MS. TOPPER:  Can I have one moment, Your Honor?

18    Your Honor, it's the Debtors' expectation that as of the week

19    ending July 12th, that all of the employees would, at that

20    time, transition over to their respective purchasers.

21    However, the Debtors would, to the extent needed, I guess,

22    sort of employ employees on an independent contractor basis to

23    assist in the wind-down and the remaining work to be done in

24    connection with administering the Debtors' Estates.

25         THE COURT:  Okay.  Was there a line item that

1   provides for that?  You have bank fees, claims agent --

2              MS. TOPPER:  It would be under the line item for

3   operating expenses, Your Honor.

4              THE COURT:  Well, there's no line item for operating

5   expenses after the week ending 7/12/25.

6              MS. TOPPER:  My apologies, Your Honor.  I misspoke.

7   It's the miscellaneous expense line item which has 50,000

8   allocated for each week of this extended budget.

9              THE COURT:  Okay.  And, I mean, what is going to

10  happen after the week of July 12th?  Because, I mean, I look

11  at this budget and it looks like, to me, it substantially

12  consumes, you know, professional fees.  What is going to

13  happen in these out weeks beyond 7/12/25?

14             MS. TOPPER:  Your Honor, the Debtors continue to

15  work with JPM, the DIP Lender, in these cases.  There are

16  ongoing amounts that are expected to come in after this budget

17  period in connection with the ad populum incentive fee that's

18  contemplated in -- actually, excuse me, Sparkle Pop's

19  incentive fee that's contemplated in connection with their

20  Asset Purchase Agreement.  It is also contemplated in

21  connection with the Consignment Procedures Sale Motion that

22  there would potentially be sale proceeds following this

23  eight-week budget.  And Debtors plan to use the time during

24  this extended budget to continue to negotiate with the bank

25  and provide further analyses going forward.  But it is

1   anticipated that there would be remaining assets to monetize

2   following this eight-week period.

3          THE COURT:  Okay.  Anything else?

4          MS. TOPPER:  Not unless the Court has any questions

5   at this time.

6          THE COURT:  Not at this time.  Thank you.  Mr.

7   Shaffer?

8          MR. SHAFFER:  Your Honor, the Committee shares some

9   of the concerns that I think Your Honor has expressed this

10   morning.  We have been in constant contact with the Debtor and

11   with the to try to get to a place where we all feel

12   comfortable.  I think with respect to the Motion to Shorten,

13   although it's not ideal, we saw the final version of the

14   budget about an hour before the hearing this morning, even

15   though we had exchanged our comments thereto over the course

16   of time and including, you know, last week -- late last week.

17   I think not having the hearing this morning would cause harm

18   if the bank is not willing to fund under this budget.  And

19   that harm could be very considerable because if there's no

20   funding, then we're likely at a conversion.  You know, this is

21   not perfect.  But we don't oppose the budget as proposed or

22   the extension of the DIP facility with that budget.  It is

23   uncertain at this time whether the Estates would be

24   administratively solvent as we move forward.  But we do

25   believe the Committee believes that it is in the best interest

1  of the Estates and the Unsecured Creditors that we remain in

2  Chapter 11 at this time.  The bank has agreed to fund

3  significant Estate expenses over the next eight weeks under

4  this budget, at the end of which period, I know Your Honor's

5  concerned with that, we hope to have a clearer picture as to a

6  possible exit strategy for these Debtors and what may be

7  available for funding, both to pay allowed administrative

8  expense claims and hopefully leave something left over for

9  Unsecured Creditors at the end of the day.  And in the event

10  that the Estates are not administratively solvent, at the end

11  of the day, the Committee is trying to make sure that all

12  Creditors with allowed administrative expense claims are

13  treated fairly and will receive pro rata treatment so that one

14  Creditor or one group of Administrative Creditors are not

15  funding these cases more than others.  This is imperfect for

16  sure, but we think the better course forward at this point is

17  to go under what has been a heavily negotiated budget to pay

18  significant expenses that the bank is willing to fund to get

19  us through the next eight weeks, which the Committee believes

20  is better than the alternative of likely conversion.  Happy to

21  answer any other questions Your Honor may have.

22          THE COURT:  So, why are we funding these substantial

23  professional fees in these out weeks?

24          MR. SHAFFER:  I think the --

25          THE COURT:  Administrative solvency is uncertain.

1            MR. SHAFFER:  -- the way I view it, Your Honor, and
2    this is a discussion that we've certainly had, is under the
3    budget, the willing -- the bank is willing to pay certain
4    expenses.  That doesn't mean that that's all that's going to
5    get paid.  It's simply an allocation under the budget as to
6    where the bank is willing for its funding to go.  Even with
7    these numbers, I can tell you the Committee's professional
8    fees will be well underfunded through this time period.  I'm
9    not sure about where the Debtors will stand, but the Committee
10   is looking at this from the whole perspective of when we get
11   to the end of the day, we get to the end of the case, we have
12   a pool of allowed administrative claims that they're treated
13   pro rata so that even if somebody got paid a little bit more
14   under a budget, it doesn't mean that they're necessarily going
15   to get to keep it and reserving their rights.  We understand
16   that this is, you know, an issue, but we view the budget
17   getting forward the next eight weeks versus allowed
18   administrative expense claims at the end of the day that would
19   have to go through the fee application process, et cetera.
20   Those two, you know, are not necessarily in lockstep and
21   that's, you know, we will be obviously looking at end --
22   looking at all of the administrative claims at the end of the
23   day to make sure that everybody is pro rata or as close to
24   that as we can get it if we are administratively insolvent.
25   But the alternative is today, if the bank is not going to

1   fund, the next few weeks are not going to look good and a

2   conversion in this case would certainly leave a lot of folks

3   on the outside looking in at this point who would have gotten

4   paid under this budget something over the next eight weeks.

5        THE COURT:  Well, it's troublesome to me and I've

6   given thought, this is the first I've heard voicing on the

7   record that there's some concern about the administrative

8   solvency of this Estate and so I think that's the case.  I

9   have some trepidation about the continued allowance and

10  payment of professional fees.  It just troubles me that we're

11  going to borrow several million dollars to pay professional

12  fees when -- why is that necessary?  Why not just wait and see

13  where we are?  You know --

14        MR. SHAFFER:  I --

15        THE COURT:  -- if we get out here eight weeks and we

16  have a better picture for where we are, I mean, why borrow and

17  pay professional fees if we could conserve cash and see --

18  always at the start of bankruptcy, cash is king -- and see

19  where we are with professionals, you know, when we get to the

20  end of August, and where we are in administrative solvency.

21        MR. SHAFFER:  Your Honor, we're -- again, we're

22  trying to look long term and make sure that everybody is pro

23  rata at the end of the day.  If Your Honor think that that's,

24  you know, the best way to go, then certainly we would do that.

25  I think -- you know, I don't know where parties stand at this

1    point as -- in terms of what is a potential allowed

2    administrative claim percentage wise, what each party will

3    have been paid.  I think that some thought was given with

4    respect to that, with respect to this budget, but, you know,

5    certainly not everybody is made whole by this budget and we

6    are -- you know, not to be negative about it, but we are

7    constrained with respect to what can be borrowed at this

8    point, what the bank is willing to do to keep us going for the

9    next eight weeks.

10            THE COURT:  Okay.  Anything else?

11            MR. SHAFFER:  Nothing for me, Your Honor.  Thank

12    you.

13            THE COURT:  All right.  Mr. Young?

14            MR. YOUNG:  Good morning again, Your Honor.  And

15    I'll join my colleagues in thanking you for hearing us today.

16            THE COURT:  Sure.

17            MR. YOUNG:  I think that your prior colloquy with my

18    colleagues on either side really illustrates why this has been

19    an ongoing discussion and somewhat of a difficult negotiation.

20    We're at a point in the case where all of the operating assets

21    have been sold, and what we're left with is what I would call

22    remaindered assets.  I'm a bit surprised to hear Mr. Shaffer

23    talk about administrative insolvency at this point because I

24    don't think we've yet seen analysis that would support a

25    conclusion one way or another.  What we have are some

1    remaindered assets of uncertain but potentially substantial

2    value.  I'll mention a couple of them.  There is a fairly

3    significant tranche of consigned goods, and you've seen the

4    Debtor's motion.  I understand there are competing rights and

5    claims, but there's value in that.  There are deposits and

6    pending litigation with Alliance Entertainment.  There is

7    value in that.  As Ms. Topper mentioned, there are payments

8    owing from our asset purchasers.  There's value in that.

9    There are other potential causes of action that the Estate may

10   have, and I believe there may be value in that.  And Your

11   Honor may recall the Debtors own a U.K. subsidiary that we

12   call DC Duk (phonetic).  I think it's Diamond Comics U.K., and

13   there's an ongoing sale process for that.  There's value in

14   that.

15        Certainly, from JPMorgan's perspective, we don't yet

16   know.  We don't know if the case is administratively solvent.

17   We don't know if there's sufficient value here to make a

18   distribution of Unsecured Creditors.  What we do believe is

19   that there are substantial assets yet to administer, and that

20   there may be value in those assets that could solve the

21   concerns about administrative claims and that could, if

22   everything goes to the benefit of the Estate, could result in

23   a distribution of Unsecured Creditors.  So, the reason this

24   has been a difficult negotiation with a lot of back and forth

25   is precisely because we've gone from an asset-based lending

1  facility, where you can see the receivable activity, see the

2  collateral value and loan against it, and we're now at a point

3  in the case where we've got potentially significant assets,

4  but assets that are uncertain in value.  So, I think what's

5  happened over the past several days, Your Honor, is the Debtor

6  came to us with a borrowing request.  We had, as you would

7  imagine, a bunch of questions.  We definitely involved the

8  Committee in those discussions, and we've had a lot of back

9  and forth.

10        From our perspective, we weren't burning to pay a bunch

11  of professional fees, but it was a negotiation, I might add a

12  three-way negotiation, in which Committee counsel was also

13  advocating for their accruals.  And I think from my

14  colleagues' perspective, without making their arguments,

15  there's work to be done, and, you know, they want to make sure

16  they have the liquidity to pay for the work they're doing.  My

17  view, Your Honor, is that there is value to proceeding

18  incrementally.  And part of why we're here on an eight-week

19  borrowing request, rather than a 12 or 16 or longer, we want

20  to see that incremental work done, we want to see how it goes.

21  And I think all of us, Your Honor being the most important

22  decider, all of us need to see where we are at the end of that

23  eight-week period.  Now, I think from our --

24        THE COURT:  So, at the end of this eight-week

25  period, the -- and this is a budget, and who knows what will

1   actually work out, but it's projecting a DIP loan balance of

2   $5.6 million in round numbers?

3          MR. YOUNG:  That's correct.

4          THE COURT:  So, I was going to say obvious, maybe

5   it's not obvious, but the bank assumes that the value in all

6   of these other things that you're talking about at least

7   exceeds that number?

8          MR. YOUNG:  That is our hope, Your Honor.  I think

9   because we're dealing with remaindered assets, we don't know.

10  So -- but that's a great illustration of the dynamic we're

11  talking about, Your Honor.  So, you'll see this budget pays

12  the KEIP and the KERP.  You'll see the budget pays the final

13  payroll.  That's not accretive to our client, but we believe

14  the Debtors requested it, and we believe it was the right

15  thing to include that in the budget for all the reasons we've

16  discussed.  You know, there's an accrual for sales tax.  I

17  mean, this is, Your Honor, we understand that to continue in

18  Chapter 11, this is a balance that has to be struck between

19  making appropriate decisions that are likely to generate the

20  highest possible value for all stakeholders and paying what

21  needs to be paid in the interim.  And I think your question is

22  a fair one, what needs to be -- you know, we need to carefully

23  consider what needs to be paid in the interim.  What you see

24  before you is the result of a pretty intensive negotiation

25  over the past several days between the Debtor, the Committee,

1    and my client, and this is where we've landed.

2         And I would also add, Your Honor, that we understand very

3    well this case could end up in a conversion.  And, you know,

4    of course, if we're in a Chapter 7, then we'll deal with the

5    Trustee and we'll proceed to liquidate these assets.  But I

6    think it needs to be emphasized that a conversion could also

7    have some value destruction, too, in terms of the Debtors'

8    ability to monetize some of these assets.  So, I agree with

9    Mr. Shaffer.  It's a very imperfect situation.  We were very

10   hopeful, whatever it was, six to eight weeks ago, that our

11   sale -- that the Debtors' sale of the operating assets would

12   take the Lender out completely and leave Mr. Shaffer and his

13   colleagues and the Debtors to try to monetize the rest.

14   There's been a lot of twists in the road since then, and that

15   will all get addressed in the pending litigation.  But right

16   now, I think all we can do is make the best decisions we can

17   with the facts that are in front of us.  And while my client

18   is not burning to loan more money when the operating assets

19   are gone, this budget represents an -- you know, an

20   incremental judgment as to what's appropriate for these

21   Estates to borrow and for us to advance in the next eight

22   weeks in an effort to try to realize value from those assets.

23   And I think we all need to look very closely over the next

24   couple of weeks and see how it's going.  And if at any point

25   in time I think it becomes a foregone conclusion that this is

1    administratively insolvent and the value is not there, these

2    cases should convert and we'll be front of the line saying

3    that that conversion should be ordered.  But right now, the

4    best answer I can give is we just don't know.  They are

5    potentially quite valuable assets that on paper could take us

6    out and create a, you know, not only administratively solvent

7    Estate, but a distribution for Unsecured Creditors.  But right

8    now, I think what we're required to do is make the best

9    judgment we can with the information available to us, and

10   that's what this budget reflects.

11             THE COURT:  All right.  Thank you.

12             MR. YOUNG:  Your Honor, thank you.

13             THE COURT:  Anything further from you, Ms. Topper?

14   You get the last word here.

15             MS. TOPPER:  Thank you, Your Honor.  For the record,

16   Paige Topper of Saul Ewing on behalf of the Debtors.  Your

17   Honor, I don't want to belabor the record today, but the

18   Debtors do agree with Mr. Young's comments on behalf of his

19   client, JPM, that there are valuable buckets of assets

20   remaining with the Debtors' Estates.  The Debtors do believe

21   that if these remaining assets are successfully monetized in

22   the upcoming weeks, then there will be sufficient funds to pay

23   administrative claims.  And the hope, of course, is that there

24   will be remaining funds for some type of distribution to the

25   General Unsecured Creditors.

1      The Debtors do, of course, recognize that there are
2  administrative claims.  And as Mr. Young highlighted, that is
3  why there are line items in this budget to pay employees'
4  final payroll.  There are -- there's a line item for sales
5  tax, and there is also a line item for the KEIP and the KERP.
6  This budget is the result of extensive hard-fought
7  negotiations, and it all culminated to get us here today with
8  the budget that's been presented to the Court.  So, all things
9  considered, the Debtors do believe that it's in the best
10  interest of their Estates and their Creditors to enter into
11  the stipulation to extend the maturity date.
12      THE COURT:  So, I've been listening carefully, and I
13  don't think I've heard, correct me if I'm wrong, the -- what
14  is being offered to the Court is the prospect that these -- I
15  think what Mr. Young referred to as remainder assets and
16  you're referring to as different buckets, the Court has no
17  information, analysis, projection, guesstimate as to what the
18  order of magnitude or the value of those assets is?
19      MS. TOPPER:  That's correct, Your Honor.  The
20  Debtors have not presented an analysis yet to the Court.  The
21  Debtors are in discussions with both the DIP Lender and the
22  Committee regarding the analyses of the various, I've been
23  calling -- referring to them as buckets of remaining assets,
24  but they are what Mr. Young sort of highlighted.  One of them
25  is before the Court in --

1        THE COURT:  If you don't know what they're worth,

2   then how do you make a judgment about whether this -- spending

3   all this additional money makes sense?

4        MS. TOPPER:  We have done analyses, Your Honor, and

5   the Debtors have provided them on a confidential basis to the

6   Committee and the DIP Lender and engaged in discussions with

7   both parties about those various assets to support sort of the

8   analyses for what the projections are anticipated to be.

9        THE COURT:  But you're not sharing that with the

10  Court?

11       MS. TOPPER:  Not at this time, Your Honor.  I mean,

12  if there's -- if the Court would prefer a further record on

13  those points, we'd be happy to submit something, a

14  supplemental declaration or something on the record with

15  respect to the budgets -- or excuse me, the extended budget.

16       THE COURT:  Why did you choose August 23rd?  Is

17  there some magic, I don't mean to sound flippant, is -- was

18  there some calculation as to why eight weeks was the right

19  time period?  Is there something that's expected to happen no

20  one way or the other by the end of August or is it just

21  arbitrary or what?

22       MS. TOPPER:  One moment, Your Honor.  To use your

23  terminology, Your Honor, there's not -- August 23rd isn't a

24  magic date in any sense.  It was discussed between the Debtors

25  and the DIP Lender.  Obviously, the Debtors, you know, would

1    have liked a longer extension on the maturity date.  I think

2    this is where the discussions ended up and the Debtors believe

3    that that's sufficient time to allow us to continue analyzing

4    the various remaining assets and to act on collecting and

5    pursuing those remaining assets.

6              THE COURT:  Okay.  Fair enough.  All right.  I'm

7    going to take a short recess.

8              THE COURT:  All rise.  This Court is in recess.

9         (Recess)

10             THE CLERK:  Please remain seated and come to order.

11   The United States Bankruptcy Court for the District of

12   Maryland now resumes its regular session.

13             THE COURT:  Hello again, everyone.  During the

14   recess, I've considered this matter and I'm prepared to rule

15   on both motions which are before the Court today.  I'm going

16   to grant both of them.  I think on the question of the

17   financing for the additional period through August 23rd, the

18   Court, while this is a difficult case and a difficult

19   situation, I think at this juncture, given that the Lender and

20   the Committee are supporting the Debtor's request, I think the

21   Court should defer to the Debtor's exercise of its business

22   judgment that borrowing on these terms is in the best interest

23   of the Estate.  And I will enter an Order approving the

24   stipulation once it's uploaded.  And I will grant the Motion

25   to Shorten the time with respect to the Financing Motion

25

1    that's on the Docket today.  I understand that Ms. Topper,

2    you've talked with the clerk and we have a day for -- if

3    there's a need for a hearing on further financing of August

4    18th at 11 a.m.  But we'll see where we are when we get there.

5    Thank you all.

6              MR. SHAFFER:  Thank you, Your Honor.

7              THE CLERK:  All rise.  This Court is adjourned.

8         (Court adjourned)

9

10                        CERTIFICATION
11   I, Lewis Parham, certify that the foregoing is a correct
12   transcript from the electronic sound recording of the
13   proceedings in the above-entitled matter.
14
15
16                                        7/2/25
17
18   _____        _____
19   Signature of Transcriber              Date