IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered) |

**AD HOC COMMITTEE OF CONSIGNORS' OBJECTION TO
DEBTORS' MOTION FOR ENTRY OF ORDER APPROVING
(I) PROCEDURES FOR SALE OR OTHER DISPOSITION OF CONSIGNED
INVENTORY, (II) APPROVING SALES OR OTHER DISPOSITION OF
CONSIGNED INVENTORY FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS OR ENCUMBRANCES AND (III) GRANTING RELATED RELIEF**

The *Ad Hoc* Committee of Consignors (the "Consignors"[2]) by and through its undersigned counsel, files its Objection to Debtors' Motion For Entry Of Order Approving (i) Procedures For Sale Or Other Disposition Of Consigned Inventory, (ii) Approving Sales Or Other Disposition Of Consigned Inventory Free And Clear Of Liens, Claims, Interests Or Encumbrances And (iii) Granting Related Relief, and in support thereof states as follows:

1. On June 25, 2025, the Debtors filed the Motion [Dkt. 531], seeking to sell all consigned "inventory" (the "Stock") free and clear of the Consignors' interests, which collectively has a resale value of several million dollars.

2. The Debtors claim that they have the "right to transfer title to this inventory free and clear of the consignor's interests." In support of this claim, the Debtors allege that the Stock is property of the Debtors' estate; is subject to a blanket lien of creditor JPMorgan Chase Bank N.A. (the "DIP Lender"); and the Stock is therefore subject to Article 9, which would permit the Debtor's proposed sale of the Stock in conjunction with Bankruptcy Code § 363(f).

3. The gist of the Debtors' Motion is that the Consignors have security interests in the Stock that are inferior to the DIP Lender's security interests, and thus the Debtors may sell the Stock in accordance with § 363(f).

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2] The Consignors are comprised of 11 different consignors. Upon information and belief, there may be other parties who sold stock to the Debtors on a consignment basis but who are represented by counsel other than the undersigned. The Consignors believe that this objection is in the best interest of all similarly-situated consignors.

4.      These claims are false.  The Debtors wrongly frame the context in which the Motion is made.  The Consignors do not have a competing security interest in the Stock; rather, the Consignors own the Stock and the DIP Lender's security interest has not attached in the Stock.   The Consignors intend to establish that the Stock at issue is titled to the Consignors in accordance with Article 9 and 2 of the Maryland Code Annotated Commercial Law Article and the Uniform Commercial Code, and other applicable bailment law.

5.      Because the Stock is not property of the Debtors' estates, the Consignors have alleged a *bona fide* dispute with respect to ownership of the Stock, and the Debtors are not permitted to sell the Stock for the benefit of the DIP Lender (or any other creditors other than the respective Consignors).

**I.      Factual Background**

6.      Each of the Consignors has delivered Stock to the Debtors, which Stock is comprised of a mix of periodical comic books, graphic novels, graphic art publications, and other similar publications and/or games and related merchandise.

7.      Each of the Consignors entered into an agreement with one or more of the Debtors (typically with Diamond Comic Distributors, Inc.) governing the terms of the Consignors' shipments of the Stock, the Debtors storage and sale of the Stock, and the payment terms governing the Debtors' obligations to pay the Consignors upon sale of the Stock.

8.      There appears to be no dispute that the Consignors made the Stock available to the Debtors on a consignment basis.  Each of the agreements contains terms providing that (i) title to the respective Stock does not pass to the Debtor until sold by the Debtor(s) to a third-party purchaser.  Importantly, title never passes to the Debtor(s) – it is retained by the Consignor until sold to the customer, and then it passes directly to the Debtor(s)' customers.  Specifically, the agreements each contain provisions similar to the provision set forth in the Distribution Agreement attached hereto as **Exhibit A**, which provides that

> *All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer.  Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with the Buyer's Terms of Sale.*

(Distribution Agreement, ¶8(a))

9. The Consignors also have continued to pay all personal property, inventory and other taxes on the Stock; and retained risk of loss, and can provide copies of annual reports filed with the pertinent taxing authorities confirming the value of the Stock and that the Consignors hold title thereto for purposes of tax assessments. (*See, i.e.,* Distribution Agreement, ¶¶ 8(b-c))

10. The Consignors' agreements appear to all be governed by the law of the State of Maryland. (*See, i.e.,* Distribution Agreement, ¶18)

11. None of the Consignors were granted a security interest in the Stock[3].

12. At least one Consignor, and possibly more, marked their Stock with placards/notices that unambiguously stated that the respective Stock was property of the respective Consignor, Herman and Geer Communications, Inc. d/b/a Hermes Press.

13. Many of the Consignors have terms included in their respective agreements that govern the use of various intellectual property rights. For example, the Debtor(s) are prohibited from "[doing] or caus[ing] to be done any act or thing contesting or impairing any part of such right, title, and interest" in the respective Consignor's intellectual property rights. (*See, i.e.,* Distribution Agreement, ¶9(b)).

14. Many of the Consignors have the right to terminate their respective agreements if the Debtor(s) fail to pay amounts owed to the Consignor within the time stated, upon sale of part of the stock delivered to the Debtor(s). (Id., ¶10(c)(ii)).

15. Furthermore, upon termination of the respective agreements, many of the Consignors have the right to demand return of the unsold Stock. (Id., ¶10(h)).

16. While the Consignors offer the Distribution Agreement as evidence of several of their agreements, some Consignors have other agreements with different terms. The Motion fails to identify which Stock of which Consignors is intended to be sold; thus, at this time, the Consignors do not intend to attach each and every one of their agreements to this Objection until such time that the Court requests this information and/or the Debtor identifies which Stock is included in the proposed sales.

---

[3] Counsel for the Consignors is still reviewing agreements but as of the filing of this Motion none of the agreements reviewed grant any security interests or contemplate that the respective Consignor would take back a security interest.

17. The majority of Consignors also agreed to appoint the Debtor(s) as the sole and exclusive distributor worldwide for the sale and distribution of the Stock, or portions of the Stock. (*See, i.e.,* Distribution Agreement, ¶1(a)). However, if the Debtor(s) decline to offer any of the Stock for sale, the majority of Consignors have the right to sell those items to other retailers without any involvement from the Debtor(s), meaning that the exclusivity provision terminates if Debtor(s) no longer offer the Stock for sale. (*See, i.e.,* Distribution Agreement, ¶1(d)).

18. The Consignors have claims not limited to the following:

   a. Claims arising from stock that was delivered to the Debtor(s) prepetition and sold prepetition;

   b. Claims arising from stock that was delivered to the Debtor(s) pre or post-petition, and sold postpetition; and

   c. Claims arising from the Stock that is still held at the Debtor(s)' warehouse or at another third-party location but not yet sold to a third party.

19. The DIP Lender is also the Debtors' prepetition lender. The DIP Lender post-petition financing is subject to the Debtor-in-Possession Credit Agreement (a copy of which is attached at Dkt. 19-1) (the "Credit Agreement"). The Credit Agreement explicitly excludes consigned goods from the borrowing base used to calculate the extent of funding available to the Debtors, stating unambiguously that "...Eligible Inventory shall not include any Inventory....(l) which is the subject of a consignment by the Borrower or Diamond Select as consignor..." (Id., Credit Agreement at pp. 151/163). A complete copy of the Debtors' post-petition financing motion, including the Credit Agreement, is attached hereto as **Exhibit B.**

20. The DIP Lender has not filed a claim in this case, nor have the Debtors attached the DIP Lender's prepetition loan documents to any pleading. However, the Debtors have acknowledged that "…the DIP Lender would essentially be loaning against the same accounts receivable and inventory that secure the loans made by the Prepetition Lender," meaning that the current Credit Agreement borrowing base that excludes consignments is likely the same language incorporated in the DIP Lender's prepetition loan documents. (DIP Financing Motion, Dkt. 19-1 at ¶. 28).

21. The Credit Agreement also contains a "Reporting Schedule," which is a single-spaced document more than two pages long, enumerating no fewer than eighteen highly-detailed reports and data obligations required to be produced by the Debtors to the DIP Lender, primarily from Diamond Comic Distributors, Inc. ("Diamond Distributor"), some on a weekly basis. (*Id.*, at pp. 154/163). One of the reports required to be provided on a weekly basis is the "Borrowing Base Certificate" and supporting information, as well as a detailed aging of *all* of the Borrower's Accounts, including invoices, aging report and other supporting documents. Importantly, the Diamond Distributor must also provide "a worksheet of calculations prepared by the Borrower to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory **excluded from Eligible Accounts and Eligible Inventory** and the reason for such exclusion…" (Id.). Thus, Diamond Distributor required to report to the DIP Lender each week which inventory is eligible for the borrowing base calculation as well as which "inventory" is excluded from the borrowing base and the Debtors must identify consigned goods since they are expressly excluded from the Eligible Inventory calculation.

22. Given the nature of the Debtors' business, as well as the extensive reporting that would have been required to be made by the Debtors to the DIP Lender with respect to prepetition inventory and operations, it is certain that the DIP Lender was aware that the majority of the Debtors' business involved consignment agreements with the Consignors. The Consignors are entitled to take discovery to confirm this fact, which is self-evident from the terms of the DIP Lender Credit Agreement and application of common sense.

**II.   Legal Argument**
A. <u>The Consignors' Stock is Not Subject to Article 9, Not Subject to the DIP Lender's Lien, and is Property of the Consignors.</u>

23.     The Uniform Commercial Code ("UCC") typically governs the law of consignments, and Maryland has codified the UCC provisions in its Commercial Law Article. Specifically, the Court's analysis must start under Article 9 and then if Article 9 does not apply, under Article 2. "The standard approach is first to go to section 9-102(a)(20), and if the transaction does not fit under this section, then go next to section 2-326; if the transaction does not fit under section 2-236, then the transaction falls entirely outside the Uniform Commercial Code, and the Court must then fall back on the common law of bailments and other traditional

practices." *Adkisson v. Simso*, No. FST-CV23-6060942-S, 2024 Conn. Super. LEXIS 2347, at *12 (Super. Ct. Nov. 5, 2024).

24. The Debtors bear the burden of proof with respect to establishing that the Stock falls under Article 9. *See Jacobs v. Kraken Inv. Ltd. (In re Salander-O'Reilly Galleries, LLC)*, 506 B.R. 600 609 (Bankr. S.D.N.Y 2014) ("[T]he burden of proof falls on the party claiming applicability of [§ 9-102(a)(20)].") *citing In re Morgansen's Ltd.*., 302 B.R. 784, 787 (Bankr. E.D.N.Y. 2003).

25. Section 9-102(a)(iii) of the UCC defines "consignment" as:
"A transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
   (A) the merchant:
      (i) deals in goods of that kind under a name other than the name of the person making the delivery;
      (ii) is not an auctioneer; and
      (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others.

   (B) with respect to each delivery, the aggregate value of the goods is $ 1,000 or more at the time of delivery;

   (C) the goods are not consumer goods immediately before delivery; and

   (D) the transaction does not create a security interest that secures an obligation.

(Uniform Commercial Code §9-102(a)(iii); (Md. Code Ann., Comm. Law, §9-102(a)(iii)

26. If a transaction fails to meet all three requirements detailed above, it is not governed by UCC Article 9, but instead UCC Article 2 or, if Article 2 does not apply, other applicable state law. This is true because "consignments intended for security" are excluded from the definition of "consignment" in §9-102 because they are not bailments but secured transactions, and are subject to all of the provisions of Article 9. *Excel Bank v. Nat'l Bank of Kan. City*, 290 S.W.3d 801, 805 (Mo. Ct. App. 2009). The corollary is also true: consignments *not* intended for security are excluded from Article 9, and thus not subject to § 9-319 or any other provision under Article 9.

27. The Debtors have failed to meet their burden in establishing each prong of § 9-102. Indeed, they have not made any factual development of any of these factors with respect to the Stock in question; it would be impossible for them to have done so in the Motion, because the Motion does not even identify the Stock or the respective consignor of each item of Stock. Nor does the Motion identify which Debtor is proposing to sell stock, instead moving collectively as all of the Debtors.

28. In reality, many of the prongs are not met with respect to the Consignors' Stock. First, the Stock is believed to be almost exclusively consumer goods. Second, the Consignors' Stock was not subject to an agreement demonstrating that the stock was intended for security. These factual issues are self-evident and the Debtors have not asserted otherwise. In addition, the Consignors can establish that the Debtors cannot satisfy prong three of § 9-102(a)(iii) because the DIP Lender knew that the Debtors were substantially engaged in selling the goods of others, particularly as to the Diamond Distributor, which appears to be the party to the Consignors' agreements that undersigned counsel has had an opportunity to review as of the filing of this Motion.

29. In order to satisfy the "generally known" portion of the two-prong test, the Consignors submit that they can provide either[4] (1) a majority of the consignee's creditors were aware that the Debtors were substantially engaged in selling the goods of others (*In re BRI Corp.*, 88 B.R. 71, 75 (Bankr. E.D. Pa. 1988)); or (2) that the specific creditor asserting a lien on the goods at issue had constructive or actual knowledge that the consignee was substantially engaged in selling the goods of others. *See Fariba v. Dealer Servs. Corp.*, 178 Cal. App. 4th 156, 169, 100 Cal. Rptr. 3d 219, 229 (2009) (holding that "construing sections 9-313 and 9-102 to provide an exception where creditors have actual knowledge of the consignment arrangement is consistent

---

[4] Historically, UCC § 2-326 governed the law of consignment. However, in a 2003 revision of the UCC, the relevant portion of UCC 2-326 was moved to UCC Article 9. A commentary to the current U.C.C. § 2-326, memorialized this, stating "[c]ertain true consignment transactions were dealt with in former Sections 2-326(3) and 9-114. These provisions have been deleted and have been replaced by new provisions in Article 9. See, e.g., Sections 9-109(a)(4); 9-103(d); 9-319." However, the historical analysis and case law regarding the phrase "generally known by its creditors to be substantially engaged in selling the goods of others" remains intact. The court in *In re Valley Media, Inc.*, 279 B.R. 105, 124 (Bankr. D. Del. 2002) held that "[w]hile the purpose of this test is different under former U.C.C. § 2-326(3) and revised U.C.C. § 9-102(a)(20), the effect of proving this proposition is the same under either provision."

with the purpose of the statute: It does not burden creditors with secret liens and avoids the absurd result of giving greater weight to imputed knowledge than actual knowledge.").

30. This reasoning was later adopted by the Bankruptcy Court for the District of Delaware, in a case where the prepetition lender had actual knowledge of the consignors' interests. *See TSA Stores, Inc. v. Wilmington Sav. Fund Soc., FSB (In re TSAWD Holdings, Inc.)*, 595 B.R. 676, 682 (Bankr. D. Del. 2018). While the *TSA Stores* case dealt with consignors who claimed a security interest in the goods and thus is not precisely on point, the analysis as to the factor regarding knowledge of the secured lender is still persuasive. In that case, the court "[agreed] with the analysis of those cases which conclude that actual knowledge of a consignor's interest will preclude a creditor from arguing that the consignor's interests are inferior to its interests. It truly would be absurd to bind a secured creditor to the constructive notice of a consignor's interest arising from a UCC-1 filing or from the fact that the debtor is "generally known" to be selling consigned goods but not bind a creditor who has actual knowledge of the consignor's interest in the goods when lending to the debtor.")

31. Like the lender in *TSA Stores*, the DIP Lender was aware that the Debtors dealt in consigned goods and in fact even required the Debtors to submit reports clarifying which of the goods held in its warehouses were consigned (and thus not Eligible Inventory that could be used to calculate the available borrowing base) and which were true inventory owned by the Debtors.

32. Even if this Court were to require a finding that the majority of the Debtors' creditors knew that the Stock was subject to the Consignors' agreements and not property of the Debtors (rather than requiring a finding only that the DIP Lender was aware), the Consignors are confident that discovery will confirm this was the case. There is ample caselaw establishing how the Consignors could prove that the majority of Debtors' creditors knew that the Debtors were engaged in selling the goods of others, *i.e.* the Consignors. First, the calculation of said majority is based upon the number of creditors, not the value of their claims. *See Steege v. Affiliated Bank/North Shore Nat'l (In re Alper-Richman Furs, Ltd.),* 147 B.R. 140,150; *In re Wicaco Mach. Corp.*, 49 B.R. at 344. Second, the Consignors are not the creditors who are intended to be protected by the UCC provisions, and thus should be excluded from the majority calculation. *See In re BRI Corp.*, 88 B.R. 71, 75; *In re Valley Media, Inc.,* 279 B.R. 105, 132. If the Court

excludes any consignors from the creditor count, then it must also exclude any creditors who "could not have been misled by the consignment of goods" in deciding whether to extend credit to the Debtors. *Leake v. Khaliq (In re Gregory)*, 1995 Bankr. LEXIS 1654, *4 (Oct. 20, 1995, Bankr. D. W.D. Va.)  And third, the proof must be somewhat specific as testimony as to the industry standard is "insufficient to prove knowledge by a majority of creditors," which confirms that the Consignors must be permitted discovery on these issues. *See Heller Fin. Inc. v. Samuel Schick, Inc. (In re Wedlo Fin.)*, 248 B.R. 336, 341.

33. Given that the Debtors dealt mostly in consigned stock and held themselves out as distributors of various comic book publications, graphic novels, graphic artwork and the like, rather than being a direct seller of these goods, the Consignors will easily prove that the majority of creditors knew that the Debtors dealt in consigned stock.  The Consignors are entitled to take discovery on this issue prior to the Court ruling on the Motion, which right to discovery in this contested matter is in accordance with the applicable law.  (Fed. R. Bankr. Proc. 9014(c)(1); Local Rule 9014-2).  However, it is also apparent that given Diamond Comic Distributors, Inc. entity held itself out as a distributor, not a direct retail outfit that sold items directly to consumers.  The evidence is most likely to show that a significant percentage of the Debtors' creditors knew that the Debtors  (and in particular, the Diamond Distributor) were subject to the Consignors' consignment terms.

34. Because the Stock sold to the Debtors under the respective Consignors' agreements does not constitute a "consignment" in accordance with § 9-102, Article 9 does not apply and the Court must determine whether the Stock is owned by the Debtor or the Consignors in order to determine whether the DIP Lender's lien attached (and ultimately whether Bankruptcy Code § 363 permits the Debtors to sell the Stock).

B. Section 363 Does Not Authorize the Debtors to Sell the Stock because the Stock is Not Property of the Estates; a *Bona Fide* Dispute Exists as to Ownership of the Stock.

35. Because the Stock does not qualify as consigned goods under § 9-102, the Court must evaluate whether the Stock is property of the Debtor(s) estate(s) in accordance with Bankruptcy Code § 541.

36.     Where, as here, Article 9 does not govern the goods at issue, the Court must evaluate whether the goods are property of the Debtors' estates.  There exist many cases (including the TSA/Sports Authority cases cited *supra)* wherein the court found that Article 9 applied and thus it analyzed whether the consignors' interest would defeat the hypothetical lien creditor with respect to Bankruptcy Code § 544.  In this case, such an analysis is irrelevant because the Stock does not fall within the confines of Article 9.

37.     Rather, the transactions with the Consignors fall entirely outside of the UCC provisions.  This exact issue was decided on appeal from the United States Bankruptcy Court for the Middle District of Tennessee. *See In re Music City RV, LLC*, 304 S.W.3d 806, 808 (2010). There, the consignor consigned several recreational vehicles ("RVs") to the Debtor, and because the RVs were consumer goods they fell outside of Article 9. *Id.* at 809.  The Supreme Court of Tennessee held that because UCC § 2-326 no longer makes any reference to consignments; and because the debtor could not be a "buyer" under § 2-326 because title never passed to the debtor, § 2-326 could not apply and common law instead applied.  *Id.* at 812 ("Title must be delivered to a buyer, which is not what happens when goods pass from a consignor to a consignee'….consumer consignments are now governed, once again, by the common law.") *citing In re Haley & Steele, Inc.*, 20 Mass. L. Rep. 204 (2005).

38.     Applying Maryland common law confirms that the Consignors retained title of the Stock; that the DIP Lender's security interest did not attach to it; and that the Stock remains property of the Consignors and not property of the Debtors' estates.   In Maryland, the relationship between the Consignors and the Debtor is not one of bailment because the majority of Consignors did not have the right to demand the return of the Stock absent the Debtors' default under the terms of Distribution Agreement[5]. *See B. F. Sturtevant Co. v. Cumberland Dugan & Co.*, 106 Md. 587, 607, 68 A. 351, 352 (1907) (holding that a bailment typically requires the bailor to retain the right to demand the return of the bailment from the bailee at will). Maryland common law governing the passage of title confirms that the Consignors retained title of the Stock; that the DIP Lender's security interest did not attach to it; and that the Stock

---

[5] The Consignors reserve all rights to seek an order to compel Diamond Distributor and the other Debtors to reject or assume and cure their respective agreements.  Upon review as of this Objection, the Consignors appear to all have the right to demand payment in full of all amounts due, or to require the Debtor to terminate the respective agreements, which would enable them to recover the Stock from the Debtors in accordance with their distribution agreement terms.

remains property of the Consignors and not property of the Debtors estates. *See Blank v. Dubin*, 258 Md. 678, 681, 267 A.2d 165, 167 (1970) ("Where goods are delivered by one party to another, to sell for the party delivering them, it creates the relation of agency, and the title remains in the principal, and the factor or agent is liable to pay, not a price, but to account for the proceeds of the goods when sold.")

39. This analysis also comports with other holdings in cases where Article 9 applied, but there were other factors that justified a finding that the consigned goods were not property of the debtor estate. For example, the *Valley Media* holding is instructive. In that case, the court was called on to determine whether stock was property of the debtor's estate where the stock at issue was subject to consignment agreements that terminated prepetition. *See In re Valley Media, Inc.,* 279 B.R. at 142. The Bankruptcy Court for the District of Delaware held that because the consignment agreements terminated prepetition, the stock was not property of the debtor and thus could not be sold. *Id.* The Bankruptcy Court for the Southern District of New York has also clarified this decision, expanding it to hold that a secured lender's interest could not attach in consigned goods that fell outside of Article 9 because the Debtor did not own the goods at issue. *See Jacobs v. Kraken Inv. Ltd. (In re Salander-O'Reilly Galleries, LLC)*, 506 B.R. 600, 612 (Bankr. S.D.N.Y. 2014).

40. As to Stock delivered *postpetition*, this decision becomes even clearer. Once the Court determines that Article 9 does not apply, it must conclude that the postpetition Stock is not property of the estate in accordance with Bankruptcy Code § 552. Property that is not subject to UCC § 9-102 that is delivered postpetition is free not only from prepetition secured interests, but also free from the hypothetical judgment creditor interest of Bankruptcy Code § 544. *See Ellis v. IPC (USA), Inc. (In re Pettit Oil Co.)*, 2016 Bankr. LEXIS 2762 (Bankr. W.D. Wa. July 29, 2016) (Where the trustee argued that consigned goods delivered postpetition were subject to the § 544 hypothetical judgment lien creditor interest, the court rejected this argument and held "[a]s indicated previously, this argument fails to explain how the property becomes an estate asset in the absence of an intervening lien creditor. As between [the consignor] and the Debtor, this should be analyzed as a consignment agreement, not a security agreement." *Id. at 10-11;* "…the fuel delivered by IPC postpetition…is not property of the Debtor's estate, it is not necessary to

determine whether the estate's interest, if one existed, would extend to proceeds." *Id.* at 11). That court went on to suggest that imposition of a resulting or constructive trust would be appropriate even if the goods had been subject to the trustee's hypothetical judgment lien creditor interests. *Id.*

41. There exists a *bona fide* dispute not only as to whether the DIP Lender's lien attached to the Stock, but whether the Stock is even property of the Debtors' estates. For these reasons, the proposed sale must be denied pending additional development of these factual inquiries.

C. Other Grounds Exist for Denying the Motion.

42. There are other defects in the Motion and the proposed sale process that warrant denial of the Motion.

43. The Debtors contemplate that the "[s]ales may include private sales without competitive bidding." (Motion, ¶6) Without identifying which Stock is to be sold, and without any competitive bidding process, this proposal violates applicable law regarding proposed private sales. *In re Naron & Wagner, Chartered*, 88 B.R. 85, 90 (Bankr. D. Md. 1988). As this Court held previously, "…parties in interest are entitled to notice of that result from the proposed action so they may know to protect any interests they may have in the continuation of the business." *Id.* at 89. The Motion fails to describe the Stock in any way, such that the Consignors cannot even be sure as to what the Debtors are proposing to sell. If the Debtors are authorized to close on private sales without bidding, there is no notice to Consignors as to what is being sold or at what price.

44. This is particularly troubling as some of the Consignors are subject to mandatory royalty payments to other third parties regardless of the price at which the Stock is sold. Not only will this cause significant losses to the Consignors in addition to what they are already losing with respect to the Debtors' failure to pay for the Stock, but the unmitigated liquidation of the Stock will also likely depress the market value for other stock that the Consignors have or will sell, thus harming them twice: once when they fail to be paid for their own property that the Debtors now propose to sell, and again when the proposed sales depress the market for the Consignors' other goods.

45. Given that the Debtor seeks permission to sell some of the Stock (although exactly which Stock is not disclosed) for a purchase price less than $100,000.00 **without first providing notice of the sales**, this potential harm is even further amplified. (Motion, ¶51).

46. Additionally, some of the Consignors may seek a termination of the respective agreements through the appropriate channels in this case, in which case the Debtor(s) will be required to return the Stock to the Consignors. It is imprudent to authorize a sale of the Stock at this time, without understanding which Stock is actually proposed to be sold; which Stock may be subject to return after termination of the respective Consignor agreements; and as stated above, without a proper finding as to whether the Stock is property of the Debtors' estates.

47. To summarize, the Debtors are asking this Court to permit them to sell other parties' property, and to permit the sales to be conducted in a way that will harm the owners of the property beyond the value of just the property to be sold. This is not a permissible outcome in any case, much less a chapter 11 case that is to be governed by principles of equity and fairness.

WHEREFORE, the *Ad Hoc* Committee of Consignors respectfully requests that the Court deny the Motion; continue the proposed hearing to a date after which discovery may be taken in accordance with applicable rules governing contested matters; and for such other relief as this Court deems just and appropriate.

Dated: July 16, 2025                                  Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　/s/ Catherine Keller Hopkin
　　　　　　　　　　　　　　　　　　　　　Catherine Keller Hopkin (28257)
　　　　　　　　　　　　　　　　　　　　　YVS Law, LLC
　　　　　　　　　　　　　　　　　　　　　185 Admiral Cochrane Drive, Suite 130
　　　　　　　　　　　　　　　　　　　　　Annapolis, Maryland 21401
　　　　　　　　　　　　　　　　　　　　　(443) 569-0788
　　　　　　　　　　　　　　　　　　　　　chopkin@yvslaw.com

　　　　　　　　　　　　　　　　　　　　　*Counsel for the Ad Hoc Committee of Consignors*

- 14 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of July 2025, notice of filing the foregoing Objection was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list.

                                                              /s/ Catherine K. Hopkin
                                                              Catherine K. Hopkin

**The following parties received CM/ECF notice of the filing:**

Jan Berlage, Esquire
(jberlage@ghsllp.com)
Counsel for Katherine Govier
Gohn, Hankey & Berlage, LLP
201 North Charles Street, Suite 2101
Baltimore, Maryland  21201

Hugh M. Bernstein, Esquire
(hugh.m.bernstein@usdoj.gov)
Office of U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201

Daniel Jack Blum, Esquire
(jack.blum@polsinelli.com)
Counsel for Basic Fun, Inc.
Polsinelli PC
1401 I Street NW, Suite 800
Washington, D.C.  20005

Laura Skowronski Bouyea, Esquire
(lsbouyea@venable.com)
Counsel for AIREIT Olive Branch DC LLC
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland  21202

Thomas K. Bredar, Esquire
(thomas.bredar@wilmerhale.com)
Counsel for Disney and Marvel
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center, 250 Greenwich St.
New York, New York  10007

Andrew Brown, Esquire
(abrown@klestadt.com)
Counsel for NECA, LLC
Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York  10036-7203

Richard L. Costella, Esquire
(rcostella@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

David W.T. Daniels, Esquire
(ddaniels@perkinscoie.com)
Counsel for The Pokemon Company
Perkins Coie LLP
700 13th St NW, Suite 600
Washington, D.C.  20005

Emily Devan, Esquire
(edevan@milesstockbridge.com)
Counsel for Titan Publishing Group
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland  21202

Turner Falk, Esquire
(turner.falk@saul.com)
Counsel for Debtors
Saul Ewing LLP
1500 Market Street
Center Square West, 38th Floor
Philadelphia, Pennsylvania  19102

Justin Philip Fasano, Esquire
(jfasano@mhlawyers.com)
Counsel for Dynamic Forces, Inc.
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  22070

Ashley N. Fellona, Esquire
(ashley.fellona@saul.com)
Counsel for Debtors
Saul Ewing LLP
1001 Fleet Street, 9th Floor
Baltimore, Maryland  21202-4359

Gianfranco Finizio, Esquire
(gfinizio@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York  10020

Adam Fletcher, Esquire
(afletcher@bakerlaw.com)
Counsel for Image Comics, Inc.
Baker & Hostetler LLP
127 Public Square, Suite 2000
Cleveland, Ohio  44114-1214

Chelsea R. Frankel, Esquire
(cfrankel@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler LLP
1271 Avenue of the Americas
New York, New York  10020

Stephen B. Gerald, Esquire
(sgerald@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
200 Continental Drive, Suite 401
Newark, Delaware  19713

Christopher J. Giaimo, Esquire
(christopher.giaimo@squirepb.com)
Counsel for Blue Yonder, Inc.
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, D.C.  20037

Jonathan A. Grasso, Esquire
(jgrasso@yvslaw.com)
Counsel for Alliance Entertainment, LLC
YVS Law, LLC
185 Admiral Cochrane Drive, Suite 130
Annapolis, Maryland  21401

Zvi Guttman, Esquire
(zvi@zviguttman.com)
Counsel for NECA, LLC
The Law Offices of Zvi Guttman, P.A.
P. O. Box 32308
Baltimore, Maryland  21282

Jeffrey C. Hampton I, Esquire
(jeffrey.hampton@saul.com)
Counsel for Debtors
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102

Adam H. Isenberg, Esquire
(adam.isenberg@saul.com)
Counsel for Debtors
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102

Toyja E. Kelley, Sr., Esquire
(toyja.kelley@lockelord.com)
Counsel for JPMorgan Chase Bank, N.A.
Troutman Pepper Locke LLP
701 8th Street N.W., Suite 500
Washington, D.C.  20001

C. Kevin Kobbe, Esquire
(kevin.kobbe@us.dlapiper.com)
Counsel for Renegade Games, et al.
DLA Piper LLP (US)
650 South Exeter Street, Suite 1100
Baltimore, Maryland  21202

Eric George Korphage, Esquire
(korphagee@whiteandwilliams.com)
Counsel for Fright Rigs, Inc.
White and Williams, LLP
600 Washington Avenue, Suite 303
Towson, Maryland  21204

Jung Yong Lee, Esquire
(jlee@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Gary H. Leibowitz, Esquire
(gleibowitz@coleschotz.com)
Counsel for Bandai Namco Toys
Cole Schotz P.C.
1201 Wills Street, Suite 320
Baltimore, Maryland  21231

Mark Minuti, Esquire
(mark.minuti@saul.com)
Counsel for Debtor
Saul Ewing LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware  19899

Bruce S. Nathan, Esquire
(bnathan@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler
65 Livingston Avenue
Roseland, New Jersey  07068

Michael Papandrea, Esquire
(mpapandrea@lowenstein.com)
Counsel for Creditors Committee
Lowenstein Sandler
One Lowenstein Drive
Roseland, New Jersey  07068

Steven Gregory Polard, Esquire
(steven.polard@ropers.com)
Counsel for Bandai Namco Toys
Ropers Majeski PC
801 South Figueroa Street, Suite 2100
Los Angeles, California  90017

Scott Prince, Esquire
(sprince@bakerlaw.com)
Counsel for Image Comics, Inc.
Baker & Hostetler LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114

Jordan Rosenfeld, Esquire
(jordan.rosenfeld@saul.com)
Counsel for Debtors
Saul Ewing LLP
1001 Fleet Street, 9th Floor
Baltimore, Maryland  21202-4359

Nikolaus F. Schandlbauer, Esquire
(nick.schandlbauer@arlaw.com)
Counsel for Action Figure Authority, Inc.
Adams and Reese LLP
20 F Street NW, Suite 500
Washington, D.C.  20001

Elizabeth Anne Scully, Esquire
(escully@bakerlaw.com)
Counsel for Image Comics, Inc.
Baker & Hostetler LLP
1050 Connecticut Ave, NW, Suite 1100
Washington, D.C.  20036

Dennis J. Shaffer, Esquire
(dshaffer@tydings.com)
Counsel for Creditors Committee
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Indira Kavita Sharma, Esquire
(indira.sharma@troutman.com)
Counsel for JPMorgan Chase Bank, N.A.
Troutman Pepper Locke LLP
401 9th Street NW, Suite 1000
Washington, D.C.  20004

Nicholas Smargiassi, Esquire
(nicholas.smargiassi@saul.com)
Counsel for Debtors
Saul Ewing LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware  19801

Brent C. Strickland, Esquire
(bstrickland@wtplaw.com)
Counsel for Universal Distribution LLC
Whiteford Taylor & Preston L.L.P.
8830 Stanford Boulevard, Suite 400
Columbia, Maryland  21045

Paige Noelle Topper, Esquire
(paige.topper@saul.com)
Counsel for Debtors
Saul Ewing LLP
1201 North Market Street, Suite 2300
Wilmington, Delaware  19801

U.S. Trustee – Baltimore
(ustpregion04.ba.ecf@usdoj.gov)
101 West Lombard Street, Suite 2625
Baltimore, Maryland  21201