# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN SENIOR SECURED FINANCING AND THE USE
OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III)
GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A
FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

and through their undersigned proposed counsel, file this motion ("Motion") pursuant to sections

105, 361, 362, 363, 364, 503, 506, 507(b) and 552 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 4001, 6003, 6004(h), and 9014, of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 4001-5 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the District of Maryland (the "Local

Bankruptcy Rules") for entry of an interim order (the "Interim Order"), substantially in the form

attached hereto as **Exhibit A**, and a final order (the "Final Order" and together with the Interim

Order, the "Proposed Orders"), granting the following relief:

> i.    authorizing the Debtors to obtain secured postpetition financing in the form
>       of a superpriority senior secured revolving credit facility (the "DIP
>       Facility"), pursuant to which revolving loans (the "DIP Loans") in a
>       maximum amount not to exceed $41,000,000 (the "Maximum DIP Facility
>       Amount"), of which the maximum amount available to be drawn under the

---

[1]    The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification
numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc.
(7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York
Road, Suite 300, Hunt Valley, Maryland 21030.

interim DIP Facility (the "Interim Facility") shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations (as defined below) from the Petition Date through the entry of the Final Order in excess of $5,500,000, subject to the terms and conditions of the Interim Order, Final Order and the senior secured Debtor-in-Possession Credit Agreement by and among the Debtor Diamond Comic Distributors, Inc. ("Diamond Comic"), as borrower, JPMorgan Chase Bank, N.A. (in such capacity, the "DIP Lender"), as lender, and the following guarantors (collectively, the "DIP Entity Guarantors"): Debtor Comic Exporters, Inc., Debtor Comic Holdings, Inc., Debtor Diamond Select Toys & Collectibles, LLC, and non-debtor affiliates Diamond Comic Distributors UK, an unlimited liability company incorporated under the laws of England and Wales, Rosebud Entertainment, LLC, Renegade Games, LLC, and Game Consolidator, LLC, substantially in the form attached to the Interim Order as Exhibit 1 (the "DIP Credit Agreement," and together with the schedules and exhibits attached thereto, and all agreements, documents, and instruments executed and delivered in connection therewith, the "DIP Loan Documents");

ii.      authorizing the Debtors to execute, enter into and deliver the DIP Loan Documents, including without limitation, definitive pledge and security agreements granting first priority liens in substantially all the Debtors' assets to secure the obligations under the DIP Credit Agreement, and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

iii.     granting the DIP Lender fully-perfected, priming, first priority security interests in the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, subject to the Carve-Out and Permitted Priority Liens (each as defined below);

iv.      granting the DIP Lender (i) superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, (ii) liens pursuant to sections 634(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Permitted Priority Liens, and (iii) priming liens pursuant to section 364(d) of the Bankruptcy Code, on the DIP Collateral and all proceeds thereof (including, upon entry of the Final Order, any Avoidance Actions/Proceeds (as defined below));

v.       authorizing the Debtors to continue to use Cash Collateral (as defined below) in which JPMorgan Chase Bank, N.A. (in such capacity, the "Prepetition Lender") has an interest in accordance with the terms and conditions of the Proposed Orders, and granting adequate protection, subject to the Carve-Out, to the Prepetition Lender to secure, *inter alia*, postpetition financing under the DIP Facility and the use of Cash Collateral;

2

vi.     upon entry of the Final Order, waiving the Debtors' right to surcharge the Prepetition Collateral or DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

vii.    upon entry of the Final Order, finding that neither the DIP Lender nor the Prepetition Lender, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

viii.   authorizing and directing the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Unused Line Fee and Success Fee, under and as defined in the DIP Credit Agreement), expenses and other amounts payable under the DIP Loan Documents, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, the Proposed Orders and the applicable DIP Loan Documents;

ix.     subject to the restrictions set forth in the DIP Loan Documents and the Proposed Orders, authorizing the Debtors to use the proceeds of the DIP Facility and Cash Collateral in accordance with both the Budget (as defined below) and the DIP Loan Documents;

x.      modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Proposed Orders and the DIP Loan Documents;

xi.     scheduling a final hearing to consider entry of the Final Order;

xii.    providing for the immediate effectiveness of the Interim Order and Final Order (upon entry) and waiving any applicable stay, including under Bankruptcy Rule 6004, to permit such immediate effectiveness; and

xiii.   granting related relief.

In support of this Motion, the Debtors rely on and incorporate by reference the *Declaration of Robert Gorin in Support of First Day Motions for Relief* (the "First Day Declaration") and the *Declaration Alec Haesler in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final*

3

*Hearing; and (VI) Granting Related Relief* (the "Haesler Declaration"), and respectfully represent

as follows:

## Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-5 Concise Statement[2]

1.      Pursuant to Bankruptcy Rules 4001(b)(1) and (d) and Local Bankruptcy Rule 4001-

5, the Debtors submit the following concise statement of the material terms of the Interim Order:

| Summary of Material Terms | | Location |
|---|---|---|
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Debtor Diamond Comic Distributors, Inc. | Interim Order preamble<br><br>DIP Credit Agreement preamble |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Debtor Comic Exporters, Inc., Debtor Comic Holdings, Inc., Debtor Diamond Select Toys & Collectibles, LLC, and non-debtor affiliates Diamond Comic Distributors UK, an unlimited liability company incorporated under the laws of England and Wales, Rosebud Entertainment, LLC, Renegade Games, LLC, and Game Consolidator, LLC | Interim Order preamble<br><br>DIP Credit Agreement preamble |
| **DIP Lender**<br>*Bankruptcy Rule 4001(c)(1)(B)* | JPMorgan Chase Bank, N.A. | Interim Order preamble<br><br>DIP Credit Agreement preamble |
| **Amount and Facility**<br>*Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-5(a)(2)(A)* | The sum of (i) the maximum principal amount of the DIP Debt and (ii) the principal amount of the Prepetition Debt (including Allowable 506(b) Amounts) outstanding at any time shall not exceed the lesser of $41,000,000 and the Borrowing Base (as defined in the DIP Credit Agreement); provided that, until entry of the Final Order, the maximum amount available to be drawn under the Interim Facility shall be limited to an amount that shall not result in a total increase in the outstanding principal amount of Prepetition Debt and DIP Debt (collectively, the "Aggregate Credit Obligations") from the Petition Date through the date of entry of the Final Order in excess of $5,500,000. | Interim Order preamble & ¶ 6(a)<br><br>DIP Credit Agreement Section 2.01 |

---

[2]      Any summary of the terms of the Interim Order contained in this Motion is qualified in its entirety by reference to the provisions of the Interim Order. To the extent there is a conflict between the Motion and the Interim Order, the Interim Order shall control. The Debtors reserve the right to supplement the statements made herein.

| Summary of Material Terms | Location |
|---|---|
| | |
| **Interest Rate** *Local Bankruptcy Rule 4001-5(a)(2)(A)* | The DIP Debt shall bear interest at a per annum rate equal to the Adjusted REVSOFR30 Rate (as defined in the Prepetition Credit Agreement) plus 4.50%. Interest shall accrue on the principal balance of the DIP Debt, from time to time, based on a 365-day year and charged for the actual number of days outstanding. Interest shall accrue and be payable in cash monthly in arrears. | Interim Order ¶ 6(c)<br><br>DIP Credit Agreement Section 2.12 |
| **Fees** *Local Bankruptcy Rule 4001-5(a)(2)(A)* | <u>Unused Line Fee.</u> An unused line fee shall accrue at the rate of 0.25% per annum on the average daily amount by which (i) the Maximum DIP Facility Amount exceeds (ii) the outstanding principal amount of Aggregate Credit Obligations, and shall be payable in arrears on the first business day of each calendar month.<br><br><u>Success Fee.</u>  Subject to entry of the Final Order, a fee in an amount equal to the Applicable Success Fee Percentage (as defined below) of the Maximum DIP Facility Amount shall be due and payable on or before the sixtieth (60th) day following the Termination Date (the "<u>Success Fee Payment Date</u>"). The Applicable Success Fee Percentage shall equal: (i) 0% if the aggregate gross proceeds from the Sale Transaction and all other asset sales consummated prior to the Success Fee Payment Date (collectively, the "<u>Aggregate Sale Proceeds</u>") are less than $42,000,000, (ii) 1.50% if the Aggregate Sale Proceeds equal or exceed $42,000,000 but are less than $43,000,000, and (iii) 2.50% if the Aggregate Sale Proceeds are greater than $43,000,000. | Interim Order ¶ 6(d) & (e)<br><br>DIP Credit Agreement, Sections 2.11 (a) & (c) |
| **Letter of Credit and Commercial Credit Cards** *Local Bankruptcy Rule 4001-5(a)(2)(A)* | Upon entry of the Interim Order, (i) the letter of credit in favor of BC Industrial Exchange Portfolio II in the amount of $1,000,000 that is issued and outstanding under the Prepetition Credit Agreement shall be deemed issued under the DIP Credit Agreement, and (ii) the DIP Lender shall maintain the Debtors' commercial credit card programs under the terms and conditions of those programs.<br><br>Upon entry of the Final Order, the Borrower shall immediately borrow $1,300,000 under the DIP Credit Agreement, with such proceeds to be held by DIP Lender in a segregated blocked account maintained by and in the name of the DIP Lender as cash collateral to secure (A) the Borrower's reimbursement obligations in connection with any draws under the letter of credit, (B) the Borrower's payment obligations in connection with the commercial | Interim Order ¶ 6(f)<br><br>DIP Credit Agreement, Sections 2.05(g) & 2.11(b) |

| Summary of Material Terms | | Location |
|---|---|---|
| | credit card programs and (C) the Borrower's other obligations under the DIP Credit Agreement, including, but not limited to, the obligation to repay the Aggregate Credit Obligations in full. | |
| **DIP Budget and Related Covenants** *Bankruptcy Rule 4001(c)(1)(B)* | The DIP Facility is subject to the budget (the "Budget"), a copy of which is attached to the proposed Interim Order at Exhibit B, and the terms and conditions of the DIP Credit Documents and the Proposed Orders. | Interim Order ¶ 3(a)–(c)<br><br>DIP Credit Agreement preamble & Reporting Schedule |
| **Reporting** *Bankruptcy Rule 4001(c)(1)(B)* | The Proposed Orders require compliance with certain periodic reporting covenants that are usual and customary for debtor-in-possession financing like the DIP Facility. | Interim Order ¶¶ 3(d) & 11(d)<br><br>DIP Credit Agreement Reporting Schedule |
| **Security and Priority** *Bankruptcy Rule 4001(c)(1)(B)(i)* | In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, and 364(d) of the Bankruptcy Code, the DIP Lender shall be granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all of the Debtors' property, assets or interests in property or assets of the Debtors, including, without limitation, (i) subject to entry of the Final Order, claims and causes of action under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), (ii) all proceeds and products of any of the foregoing, and (iii) all other property and assets including cash collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and products of any of the collateral (the "DIP Collateral").<br><br>The DIP Liens securing the DIP Obligations shall be valid, automatically perfected, non-avoidable, senior in priority, and superior to any other security, mortgage, collateral interest, lien, or claim, except that the DIP Liens shall be | Interim Order ¶¶ 13 & 14 |

6

| Summary of Material Terms | | Location |
|---|---|---|
| | subject to the Carve-Out and the Permitted Priority Liens (each as defined in the Interim Order).<br><br>Subject to the Carve-Out, the DIP Obligations shall be entitled to superpriority administrative expense claim status, with priority over any and all administrative expense claims (the "DIP Superpriority Claims"). | |
| **Proposed Adequate Protection**<br>*Bankruptcy Rules 4001(b)(1)(B)(iv) & 4001(c)(1)(B)(ii)* | The Debtors propose the following (collectively, the "Adequate Protection Obligations") as adequate protection for the interests of the Prepetition Lender in the Prepetition Collateral (as defined in the Interim Order),<br><br>1. Subject only to the terms of the Interim Order, the Debtors shall be authorized to grant, and as of entry of the Interim Order shall be deemed to have granted, to the Prepetition Lender, solely to the extent of any diminution in value of the Prepetition Collateral, valid, binding, enforceable, non-avoidable, and automatically perfected, *nunc pro tunc* to the Petition Date, replacement liens on and security interests in (the "Adequate Protection Liens") the Prepetition Lender Collateral, with a priority subject and subordinate only to the DIP Liens, payment of the Carve-Out, and the Permitted Priority Liens.<br><br>2. Moreover, except as provided otherwise in the Interim Order, the Adequate Protection Liens shall not be subject or subordinate to or made *pari passu* with any lien or security interest granted in the chapter 11 cases or any Successor Cases (as defined in the Interim Order).<br><br>3. The Prepetition Lender shall be granted, subject only to the Carve-Out, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (the "Adequate Protection Superpriority Claims"), payable from and having recourse to all prepetition and postpetition property of the Debtors and the proceeds thereof. Subject only to the Carve-Out and the DIP Debt, the Adequate Protection Superpriority Claims granted to the Prepetition Lender will not be junior to any administrative expense claims and will have priority over all administrative expense claims against each of the Debtors, of any kind or nature whatsoever, | Interim Order ¶ 11 |

52349238.7 01/14/2025

| Summary of Material Terms | | Location |
|---|---|---|
| | including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

4. The Prepetition Lender shall receive from the Debtors the following payments (collectively, "Adequate Protection Payments"): the Debtors shall pay in cash, as and when such payments would have come due under the Prepetition Credit Agreement had the chapter 11 cases not been commenced, all interest, which shall accrue and be payable at the contract rate or, to the extent applicable and at the option of the Prepetition Lender, the default rate under the Prepetition Credit Agreement.

5. The Debtors shall pay the fees, costs and expenses of the Prepetition Lender in the manner set forth in paragraph 7 of the Interim Order.

6. The Debtors shall provide the Prepetition Lender and its advisors with (i) monthly financial reports within thirty (30) days after the end of each calendar month consistent with Section (b)(ii) of the Reporting Schedule attached to the Prepetition Credit Agreement, (ii) weekly Borrowing Base Certificates and related collateral reports consistent with Section (C) of the Reporting Schedule attached to the Prepetition Credit Agreement, (iii) such other information as may from time to time be requested by the Prepetition Lender consistent with Section (D) of the Reporting Schedule attached to the Prepetition Credit Agreement, and (iv) as well as the Budget and variance reporting described in paragraph 3 of the Interim Order. | |
| **Stipulations as to Prepetition Claims and Liens** *Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Interim Order contains provisions or findings of fact that bind the Debtors' estates and DIP Entity Guarantors with respect to the validity, perfection or amount of the Prepetition Lender's claims and includes a waiver of claims against the Prepetition Lender. | Interim Order ¶¶ F(i)–(viii) & 21 |
| **Automatic Stay Waiver/Modification** | Pursuant to the Interim Order, the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as | Interim Order ¶ 20 |

| Summary of Material Terms | | Location |
|---|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)(iv)* | necessary to permit the Debtors to perform their obligations, and to permit the DIP Lender to enforce its rights, in connection with the DIP Facility. | |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** *Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and Adequate Protection Liens, without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or Adequate Protection Liens, or to entitle the DIP Liens or Adequate Protection Liens to the priorities granted herein. | Interim Order ¶¶ 11(a) & 28 |
| **Releases** *Bankruptcy Rule 4001(c)(1)(B)(viii)* | The Debtors and their respective estates waive, discharge, and release any right to challenge any of the DIP Obligations, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Loan Documents, including, without limitation: (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender and the Prepetition Lender; *provided*, that such release with respect to the DIP Obligations and DIP Liens shall be effective upon entry of the Final Order. | Interim Order ¶¶ F(vi) & 19 DIP Credit Agreement, Section 8.20 |
| **506(c) Waiver** *Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to entry of the Final Order, the costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Cases shall not be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Lender, the Prepetition Lender or any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender. | Interim Order ¶ 23 |
| **Entities with an Interest in Cash Collateral** | The Prepetition Lender | Interim Order ¶ F |

| | | |
|---|---|---|
| *Bankruptcy Rule 4001(b)(1)(B)(i)* | | |
| **Purposes for Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii)* | All DIP Loan proceeds and Cash Collateral shall be used (i) for working capital and general corporate purposes, (ii) to pay fees and expenses incurred by the DIP Lender in connection with the DIP Loan Documents, (iii) to pay restructuring costs and Professional Fees (as defined below) relating solely to these Chapter 11 Cases, and (iv) for other purposes as provided in and subject to the terms of the DIP Credit Agreement, and subject to compliance with the Budget and Permitted Variances. | Interim Order ¶ G |
| **Material Terms of the Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | Subject to the terms and conditions of the Interim Order and Final Order, at the times and for the purposes set forth in the Budget, the Debtors are authorized to use Cash Collateral until five (5) business days' after written notice of an Event of Default, as described below. | Interim Order ¶ 20(b) |
| **Duration of Use of Cash Collateral/ Events of Default** *Bankruptcy Rules 4001(b)(1)(B)(iii) & 4001(c)(1)(B)* | The occurrence and continuance of any of the following events, unless such occurrence and continuance is waived in writing by the DIP Lender in its sole discretion, shall constitute an event of default (collectively, the "Events of Default"):<br><br>1.  The failure of any Debtor to perform, in any respect, any of the material terms, provisions, covenants, or obligations under the Interim Order; and<br><br>2.  The occurrence of an "Event of Default" under the DIP Credit Agreement. | Interim Order ¶ 20(a)<br><br>DIP Credit Agreement, Article VII |
| **Milestones** *Bankruptcy Rule 4001(c)(1)(B)* | 1.  On or within one (1) day after the Petition Date, the Borrower shall have filed: (i) a motion seeking approval of the DIP Facility, including the Interim Order; and (ii) other customary First Day Pleadings (including the Cash Management Order), all in form and substance reasonably acceptable to the DIP Lender;<br><br>2.  No later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;<br><br>3.  No later than three (3) Business Days after the Petition Date, the Debtors shall have filed an application, in form and substances reasonably acceptable to the DIP Lender, seeking approval of the | Interim Order ¶ 6(l)<br><br>DIP Credit Agreement Section 5.19 & Exhibit B |

52349238.7 01/14/2025

| | | |
|---|---|---|
| | Debtors' retention of Raymond James & Associates, Inc. ("<u>Raymond James</u>"), as investment banker to the Debtors; | |
| | 4.  No later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order; | |
| | 5.  No later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving (i) the Bidding Procedures and (ii) seeking approval of a stalking horse asset purchase agreement as the stalking horse bid for the purchase of the Debtors' assets, which asset purchase agreement shall be in form and substance reasonably acceptable to the DIP Lender (the "<u>Bidding Procedures Order</u>"); | |
| | 6.  No later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Debtors' retention of Raymond James; | |
| | 7.  No later than forty-five (45) days after the Petition Date, the Debtors shall have filed Schedules of Assets and Liabilities and Statements of Financial Affairs; | |
| | 8.  No later than forty-five (45) days after the entry of the Bidding Procedures Order, the Debtors shall have conducted an auction in accordance with the Bidding Procedures (the "<u>Auction</u>"); | |
| | 9.  No later than seven (7) days after conclusion of the Auction, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Sale Transaction; and | |
| | 10. No later than fifteen (15) days after the entry of the order of the Bankruptcy Court approving the Sale Transaction, the Debtors shall have consummated the Sale Transaction, and indefeasibly paid all amounts owing to the Lenders. | |
| **Carve-Out**<br>*Bankruptcy Rules*<br>*4001(b)(1)(B)(iii) &*<br>*4001(c)(1)(B)* | The DIP Liens, DIP Superpriority Claim, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject only to the right of | Interim Order<br>¶ 16 |

payment of the following expenses, to the extent provided in the Interim Order: (i) statutory fees payable to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) with respect to the Debtors (the "Case Administration Fees"); (ii) the reasonable fees and costs of the Debtors' claims and noticing agent; (iii) unpaid professional fees and expenses payable to any the Carveout Professionals[3] (collectively, the "Professional Fees") that are incurred or accrued prior to the date on which the DIP Lender provides written notice to the Debtors, Debtors' counsel, the U.S. Trustee and counsel to the Creditors' Committee (if any) of the occurrence of either an Event of Default or the Termination Date (such notice, the "Carve-Out Notice", and the date of a delivery of such notice, the "Carve-Out Effective Date"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date) to the extent allowed whether by interim order or procedural order and have been provided for in, and are consistent with, the Budget (subject to the Permitted Variances); and (iv) unpaid Professional Fees of the Debtors and the Creditors' Committee (if any), in each incurred or accrued on or after the Carve-Out Effective Date in an aggregate amount not to exceed $150,000 to the extent allowed at any time, whether by interim order or procedural order (clauses (i)–(iii), collectively, the "Carve-Out," and clause (iv) alone, the "Capped Carve-Out"). Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtors unless agreed to in writing by the DIP Lender.

The Debtors shall maintain a segregated account (the "Carve-Out Reserve Account") with Saul Ewing for the

---

[3]    "Carveout Professionals" means Professionals retained by the Debtors, including Saul Ewing LLP ("Saul Ewing"), as counsel for the Debtor, Getzler Henrich, as financial advisor to the Debtors, Stephenson Harwood LLP, as U.K. counsel to the Debtors, Raymond James & Associates, Inc. ("Raymond James"), as investment bank to the Debtors, any counsel and financial advisor that may be authorized by the Court to be retained by a Committee, and the U.S. Trustee (solely to the extent of fees required pursuant to 28 U.S.C. § 1930(a)). For the avoidance of doubt, no other investment bank or financial advisor of the Debtors other than Getzler Henrich and Raymond James shall be deemed a Carveout Professional or otherwise eligible to share in the Carveout.

payment of Professional Fees for Saul Ewing, Getzler Henrich, Stephenson Harwood, and any counsel and financial advisor that may be authorized by the Court to be retained by the Committee (the "Carve-Out Reserve Professionals"), which account shall be funded by the Debtors in accordance with the Budgets on a weekly basis, until the occurrence of the Carve-Out Effective Date. No funding shall be provided over and above the amounts set forth in the Budgets proposed by the Debtors and approved by the DIP Lender.  After the Carve-Out Effective Date, the Capped Carve-Out and all fees reflected in the Budget for the Carve-Out Reserve Professionals prior to the Carve-Out Effective Date, but not paid or funded by the Debtors as of that date, will be funded to the Carve-Out Reserve Account, but no further amounts shall be funded to this account.  From funds in the Carve-Out Reserve Account, Saul Ewing shall pay the Carve-Out Reserve Professionals in compliance with an interim compensation procedures and in the manner set forth in the Interim Order or the Final Order in accordance with the Budget; *provided, however*, that, prior to payment in full of the Prepetition Debt and termination of the Carve-Out, to the extent that Professional Fees for the Carve-Out Reserve Professionals that have accrued from the Petition Date through and including the Carve-Out Effective Date are less than the amounts funded into the Carve-Out Reserve Account, or to the extent that any portion of these Professional Fees are ultimately disallowed by the Bankruptcy Court by Final Order, then Saul Ewing shall immediately refund these excess monies to the DIP Lender. For the avoidance of doubt, (i) in making payments from the Carve-Out Reserve Account, Saul Ewing shall be entitled to conclusively rely upon written certifications of each Professional as to the amount due and owing to such Professional from the Carve-Out Reserve Account and in accordance with the Budget and shall have no liability to any party based upon its commercially reasonable reliance on such certifications; and (ii) in no circumstances shall Saul Ewing be obligated to pay any Professional other than from funds held in the Carve-Out Reserve Account.

52349238.7 01/14/2025

| Local Rule 4001-5 Concise Statements | | Location |
|---|---|---|
| **Cross Collateralization** *Local Rule 4001-5(a)(1)(A)* | The Interim Order does not provide for cross-collateralization, other than replacement liens and superpriority claims as adequate protection, because the Prepetition Lender has a blanket lien on substantially all the Debtors' assets. | N/A |
| **Challenge Period** *Local Rule 4001-5(a)(1)(B)* | The Interim Order contains provisions or findings of fact that bind the estates with respect to the validity, perfection or amount of the Prepetition Lender's claims and includes a waiver of claims against the Prepetition Lender.   The stipulations and admissions contained in the Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Committee (if any) or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless and to the extent that (a) a Committee (if any), a Trustee appointed prior to the Challenge Period Termination Date (as defined below), or any other party in interest (other than any Debtor), after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part any such stipulations, releases and admissions, including the Debtors' Stipulations, or has otherwise asserted an Estate Claim (each, a "Challenge") by no later than (i) the earlier of (1) the date upon which Sale Transaction is closed and (2) sixty (60)days from the appointment of a Creditors' Committee, and (ii) any such later date agreed to in writing by the Debtors and the Prepetition Lender (the time period established by the later of the foregoing clauses, the "Challenge Period" and the date of expiration of each Challenge Period being a "Challenge Period Termination Date"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding. | Interim Order ¶ 21 |
| **Section 506(c) Waiver** *Local Rule 4001-5(a)(1)(C)* | Subject to entry of the Final Order, the costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Cases shall not be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the DIP Lender, the Prepetition Lender or any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender. | Interim Order ¶ 23 |

| | | |
|---|---|---|
| **Prepetition Lender's Liens on Avoidance Actions** *Local Rule 4001-5(a)(1)(D)* | Subject to entry of the Final Order, the Prepetition Lender and DIP Lender shall have liens on the proceeds of and property received from such claims and causes of action, under chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (the "Avoidance Actions"). | Interim Order ¶ 11(a) |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** *Local Rule 4001-5(a)(1)(E)* | Upon Entry of the Final Order, the Debtors shall borrow DIP Loans sufficient to pay the full amount of the Prepetition Debt then due and owing under the Prepetition Facility as of the date the Court enters the Final Order.   The proceeds of such DIP Loans shall be remitted to the Prepetition Lender to pay down the Prepetition Facility (the "Roll-Up"). <br><br> The Roll-Up is part of a global negotiation of the DIP Facility terms.  Without the Roll-Up, the Debtors would not receive the DIP Loans that are necessary for the Debtors to maintain their operations and fund administrative expenses during these chapter 11 cases.  Accordingly, the Debtors believe that the Roll-Up of JPM's prepetition debt is necessary and reasonable under the circumstances. | Interim Order ¶ 6(b) |
| **Treatment of Professionals Under Carve-Out** *Local Rule 4001-5(a)(1)(F)* | While the Budget has separate line items for the Debtors' and the Committees' Professionals, the Interim Order contains no provision for different treatment for Committee professionals, if any, with respect to the Carve-Out. | N/A |
| **Non-Consensual Priming Liens** *Local Rule 4001-5(a)(1)(G)* | The Prepetition Lender consents to the DIP Liens priming the Prepetition Lender's validly attached and properly perfected Prepetition Liens (as defined below). | N/A |
| **Relief from Automatic Stay** *Local Rule 4001-5(a)(1)(H)* | Pursuant to the Interim Order, the automatic stay imposed by section 362 of the Bankruptcy Code shall be modified as necessary to permit the Debtors to perform their obligations, and to permit the DIP Lender to enforce its rights, in connection with the DIP Facility. | Interim Order ¶ 20 |

## Jurisdiction and Venue

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Background**

3.      On the date hereof (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

4.      A description of the Debtors' businesses, the reasons for commencing these cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declaration filed concurrently with this Motion and incorporated herein by reference.

**I.      The Debtors' Prepetition Secured Indebtedness**

5.      On May 16, 2019, Debtor Diamond Comic, as borrower, Debtor Comic Exporters, Debtor Comic Holdings, and non-debtor Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales ("DCDUK"), each as guarantors, and JPMorgan Chase Bank, N.A., as the Prepetition Lender, entered into that certain Credit Agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, pursuant to various amendments and letter agreements, including, without limitation, the most recent Fifteenth Amendment to Credit Agreement dated as of December 20, 2024, the "Prepetition Credit Agreement"), pursuant to which JPM agreed to extend to Diamond Comic a revolving line of credit in the maximum amount of $40,000,000 and a term loan for $3,000,000 (the "Prepetition Loan").  Debtor Diamond Select Toys & Collectibles, LLC ("DST"), and non-debtor affiliates Rosebud Entertainment, LLC ("Rosebud"), Game Consolidators, LLC ("Consolidators"), and Renegade Games, LLC ("Renegade"), subsequently joined as guarantors of the Credit Agreement

(collectively, the "Entity Guarantors").[4]  Stephen Geppi, an executive officer of the Debtors, executed a Personal Guaranty dated January 15, 2024.

6.      With the Credit Agreement, Diamond Comic, the Entity Guarantors, and JPM, entered into that certain Security Agreement, dated May 16, 2019 (as amended, the "Security Agreement").  The Security Agreement provides a first-priority, fully-perfected security interest and lien on Diamond Comic's and the Entity Guarantors' right, title, and interest in, to and under the "Collateral" as defined in the Security Agreement.

7.      Moreover, as further security for the Prepetition Loan, non-debtors SG Resource, LLC, and Stephen A. Geppi Revocable Trust pledged to JPM their right, title and interest in their respective interests in Diamond Comic and any related distributions and proceeds, pursuant to that certain Pledge Agreement, dated May 16, 2019.  On March 21, 2024, the holders of all outstanding membership interests in non-debtor affiliates Rosebud, Consolidators and Renegade pledged to JPM their right, title, and interest in their respective interests of Rosebud, Consolidators and Renegade and any related distributions and proceeds.  On September 13, 2024, the holders of all outstanding membership interests in Debtor DST pledged to JPM their right, title, and interest in their respective interests in DST and any related distributions and proceeds in exchange for access to certain funding under the Credit Agreement.

8.      As of the Petition Date, the total principal outstanding under the Prepetition Credit Agreement is approximately $32,600,000 plus accrued and unpaid interest with respect thereto and any additional fees, costs, and expenses owing under or in connection therewith (the "Prepetition Secured Obligations").

---

[4]       Debtor DST joined as guarantor under the Credit Agreement in late 2024 as a condition to a further amendment and forbearance agreement with JPM.

52349238.7 01/14/2025

**II.     The Debtors' Need for Post-Petition Financing and Access to Cash Collateral**

9.     As detailed in the First Day Declaration and Haesler Declaration, given the Debtors' liquidity constraints and financial struggles, the Debtors urgently need access to the debtor-in-possession financing and use of cash collateral to continue to operate their businesses, run the proposed postpetition sale process for all or substantially all the Debtors' assets pursuant to section 363 of the Bankruptcy Code, and fund the administration of these chapter 11 cases. Absent the relief requested herein, the Debtors likely will not have sufficient liquidity to continue to operate their business, fund payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring. All of the foregoing expenditures are necessary to preserve the value of the Debtors' estates as a going concern.

**III.    The Debtors' DIP Financing / Cash Collateral Negotiations**

10.     The Debtors have engaged in extensive, arm's-length negotiations with the DIP Lender about the terms of the postpetition financing and use of Cash Collateral. As a result of those negotiations, the Debtors and DIP Lender reached agreement on the terms of a DIP Facility and use of Cash Collateral, as set forth in the Proposed Orders. Ultimately, the DIP Facility proposed was the best and only actionable financing proposal available to the Debtors and provides necessary liquidity for the administration of these cases. In the sound exercise of their business judgment, the Debtors concluded that entering into the DIP Loan Documents is in the best interests of the Debtors, their estates and their creditors.

**IV.    The DIP Facility And Use Of Cash Collateral Are In the Best Interests of the Estates**

11.     The DIP Facility and continued use of Cash Collateral, as set forth in the Proposed Orders, will provide the liquidity needed to stabilize and fund the Debtors' operations during the

52349238.7 01/14/2025

course of these chapter 11 cases as the Debtors seek to preserve and maximize the value of their estates for the benefit of all parties in interest.  Moreover, the liquidity provided under the DIP Facility and use of Cash Collateral is necessary to facilitate the administration of these chapter 11 cases, fund postpetition operations and restructuring expenses, and ensure that the Debtors are able to pursue a sale of all or substantially all their assets.  The Debtors believe that approval of the DIP Facility and use of Cash Collateral is critical to assuring parties in interest of the Debtors' ability to maintain their operations during the proposed sale process for these chapter 11 cases.

12.     For these reasons and those set forth below, the Debtors believe that the DIP Facility will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the Interim Order and, as later applicable, the Final Order.

## Basis for Relief

**I.      The Debtors Should Be Authorized To Obtain Postpetition Financing On A Senior Secured And Superpriority Basis.**

**A.      The Debtors Exercised Sound And Reasonable Business Judgment In Deciding To Enter Into The DIP Facility.**

13.     Provided that an agreement to obtain postpetition credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("[Courts generally] defer to a debtor's own business judgment so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.")

(internal citation omitted); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

14.     Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (internal alterations and quotations omitted)); *In re Pittsburgh Sports Assocs. Holdings Co.*, 239 B.R. 75, 87 (Bankr. W.D. Pa. 1999).  Courts require only that the debtors "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).

15.     Under the circumstances, the Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment.  Most importantly, without access to the DIP Facility, the Debtors will not be able to pay expenses necessary to sustain their operations, which would irreparably impair the value of the Debtors' estates during these chapter 11 cases. The DIP Facility is the only available and viable source of liquidity to make such payments.  In addition, the Debtors negotiated the terms of the DIP Facility with the DIP Lender in good faith,

20

at arm's length, and with the assistance of the Debtors' advisors. Based on such negotiations, the Debtors believe the terms of the DIP Facility, as set forth in the DIP Loan Documents and Proposed Orders, are fair, reasonable, reflective of the market for financings of this type, offers a significant benefit to the Debtors' estates, and is the best financing available under the circumstances. Moreover, the milestones in the Proposed Orders are tailored to comport with the timeline of the sale process for all or substantially all of the Debtors' assets. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Meet The Conditions Necessary Under Section 364(d)(1) To Obtain Postpetition Financing On A Senior Secured And Superpriority Basis.**

16.      The Debtors propose to obtain financing under the DIP Facility by providing the DIP Lender the DIP Liens and DIP Superpriority Claims pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP Lender first priority DIP Liens on all DIP Collateral, together with any proceeds, products or profits of the DIP Collateral, whether arising under section 552(b) of the Bankruptcy Code or otherwise (subject in each case only to the Carve-Out and Permitted Priority Liens).

17.      The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate. *See, e.g.*, *In re Los Angeles Dodgers*, 457 B.R. at 312; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549-51 (Bankr. E.D. Pa. 1987); *see also Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *In re Ames Dep't Stores*, 115 B.R. at 37–40.

18.     Further, the Debtors meet the requirements for relief under section 364(d) of the Bankruptcy Code, which permits a debtor, with Court authorization, to obtain post-petition financing secured by liens that are senior to prepetition liens. Specifically, section 364(d) of the Bankruptcy Code provides as follows:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

22

11 U.S.C. § 364(d).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lender has consented or (b) the Prepetition Lender's interests in collateral are adequately protected.

19.    Here, the Debtors satisfy the necessary conditions under section 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Loan Documents.  Given the circumstances, the Debtors could not obtain credit on an unsecured, junior secured, or administrative expense basis.  Moreover, the Prepetition Lender has consented to the DIP Liens priming its respective Prepetition Liens.  For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Loan Documents pursuant to section 364(c) and (d) of the Bankruptcy Code.

        1.    <u>The Debtors are unable to obtain financing on more favorable terms than the DIP Facility.</u>

20.    In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *In re Pearl-Phil GMT (Far East Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c), to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders).  This is especially true where time is of the essence.  *See In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

21.     Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor on an unsecured or administrative priority basis, "it would be unrealistic or unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

22.     As detailed in the Haesler Declaration, the Debtors communicated with both the Prepetition Lender and various other parties about their willingness to provide sufficient financing, including financing on a junior basis.  However, none of these parties were willing to provide financing on an unsecured, non-superpriority or junior basis. As the Debtors' senior secured lender, the Prepetition Lender was the natural candidate to serve as the postpetition lender on a superpriority basis, while the other parties failed to present a financing option that was actionable. Among other issues, any alternative lender funding on a super-priority basis would have had to either (i) gain the consent of the Prepetition Lender to prime the Prepetition Obligations or (ii) attempt to undertake (or cause the Debtors to undertake) a priming fight at considerable cost and with little practical likelihood of success. In addition, given the circumstances facing the Debtors' businesses, the Debtors have not had any realistic prospects for raising alternative capital.

23.     After carefully evaluating their options in light of such circumstances, the Debtors engaged in extensive, good faith, and arm's-length negotiations with the Prepetition Lender to obtain the best financing terms available.  Because the DIP Facility provides the Debtors with the

liquidity they need at the lowest cost available, the Debtors have concluded that the DIP Facility represents the Debtors' best (and only) available post-petition financing option. For these reasons, the Debtors submit that they have met the standard for obtaining the proposed DIP financing.

2.     The DIP Facility is necessary to preserve the value of the Debtors' estates.

24.     The Debtors, as debtors in possession, have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The Debtors' access to postpetition financing is essential to their ability to effectively carry out that duty. Without the proceeds of the DIP Facility, the Debtors will be unable to fund critical payments in the ordinary course of business that are essential to the Debtors' continued operations, which would have irreparable consequences to the Debtors' estates and stakeholders. The DIP Facility will provide the Debtors with sufficient liquidity to fund their operations and maximize the value of their assets as they work toward a sale of all or substantially all the Debtors' assets.

3.     The terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.

25.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See Transcript of Record* at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [debtor-in-possession financing] pricing terms are, I find the provisions [of the financing] reasonable here and now.").

26.     Here, the terms of the DIP Facility set forth in the DIP Credit Agreement and Proposed Orders are fair, appropriate, reasonable, and adequate under the circumstances, and in the best interests of the Debtors, their estates and their creditors.  As set forth in the First Day Declaration, the covenants and milestones included in the Proposed Orders are reasonable and are not designed to make the Debtors disproportionately susceptible to a breach of such terms.  All terms regarding the DIP Facility were extensively negotiated by the Debtors and their advisors to ensure that the terms were as favorable to the Debtors as possible under the circumstances, and the Debtors believe that such terms represent fair consideration for the critical financing proposed to be provided by JPM.

27.     In particular, the Roll-Up is appropriate.  Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  The importance of roll-up features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Frank Parsons, Inc.*, No. 11-10338, 2011 WL 2750844, at *6 (Bankr. D. Md. Jan. 6, 2011) (where good cause and no more favorable available credit was shown, granting final authorization to the debtors to use DIP loan proceeds "to pay Agent and Lenders in respect of all Pre-Petition Obligations"); *In re Hedwin Corp.*, No. 14-15194, 2009 WL 10805962, at *6 (Bankr. D. Md. Dec. 30, 2009) (authorizing the Debtors to enter into a DIP Facility that included a roll up of the Debtors' prepetition revolving loans); *In re TVI Corp.*, No. 09-15677, 2009 WL 8189167, at *5 (Bankr. D. Md. May 4, 2009) (authorizing DIP lending providing for "the post-petition continuation and gradual "roll up" of the Debtors' pre-petition Revolving Loan").  This repayment is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility.  Without access to the additional liquidity provided under the DIP Facility, the

Debtors will be unable to fund the necessary administrative costs of these chapter 11 cases and the sale process. Accordingly, the Debtors submit that the terms of the DIP Facility, including the Roll-Up, are fair, appropriate, reasonable, and adequate under the circumstances, and in the bests interests of the Debtors, their estates and their creditors.

28.     The Roll-up is also well justified and appropriate because both the pre-petition facility and the proposed DIP facility are asset-based lending ("ABL") credit facilities. Therefore, the DIP Lender would essentially be loaning against the same accounts receivable and inventory that secure the loans made by the Prepetition Lender. Absent a Roll-up, the Prepetition Lender and the DIP Lender would need to split the collateral pool, and it would be difficult to provide sufficient availability to borrow under the DIP Facility while also adequately protecting the claims and liens of the Prepetition Lender. As the proposed stalking horse bid provides for a purchase price in excess of the amount owed to the Prepetition Lender, the Roll-up solves the immediate timing and liquidity needs of the Debtors' estates, and enhances (rather than erodes) the possibility of recovery for unsecured creditors.

29.     Moreover, the DIP Lender's ability to cash collateralize certain obligations upon entry of the Final Order is appropriate. In particular, Debtor DCD, upon entry of the Final Order, shall borrow $1,300,000 under the DIP Credit Agreement, with such proceeds to be held by the DIP Lender in a segregated blocked account maintained by and in the name of the DIP Lender (the "LC and Commercial Card Collateral Account"), to collateralize the Debtors' obligations to JPM with respect to the Debtors' commercial credit cards as well as reimbursement obligations in connection with the Irrevocable Standby Letter of Credit No. NUSCGS048065, issued by JPM for the account of Debtor DCD in favor of BC Industrial Exchange Portfolio II Master Tenant, LLC. The Debtors' funding of the LC and Commercial Card Collateral Account is part of a global

negotiation of the DIP Facility terms.  Absent this relief, the Debtors would not receive the DIP
Loans that are necessary for the Debtors to maintain their operations, including their commercial
credit cards, and fund administrative expenses during these chapter 11 cases.  Accordingly, the
Debtors believe that establishing and funding the LC and Commercial Card Collateral Account is
necessary and reasonable under the circumstances.

30.     The Debtors have further satisfied section 364(d) of the Bankruptcy Code.  When
priming of liens is sought under section 364(d) of the Bankruptcy Code, the courts also examine
whether prepetition secured creditors are being provided adequate protection for the value of their
liens.  *See In re Utah 7000, LLC*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah, July
3, 2008); *In re Beker Indus. Corp.*, 58 B.R. 725, 737 (Bankr. S.D.N.Y. 1986). The Bankruptcy
Code does not expressly define "adequate protection."  Section 361 of the Bankruptcy Code,
however, provides a non-exhaustive list of examples of adequate protection, specifically including
replacement liens.  *See* 11 U.S.C. § 361.  Section 361(3) of the Bankruptcy Code goes on to provide
the flexible concept that adequate protection may also take other forms, so long as the relief "will
result in the realization by [creditor] of the indubitable equivalent of such [creditor's] interest in
[cash collateral]."  *See* 11 U.S.C. § 361.

31.     Generally, courts decide what constitutes adequate protection on a case-by-case
basis.  *See, e.g.*, *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp.,
Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection
is made on a case by case basis."); *In re N.J. Affordable Homes Corp*, No. 05-60442, 2006 WL
2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be
a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2
(Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in

28

the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding") (internal citation omitted).

32.     As described above, the Prepetition Lender, to the extent applicable, has consented to the DIP Liens priming its respective Prepetition Liens.  Nonetheless, the Debtors propose to provide a variety of adequate protection—including, the Adequate Protection Liens, Adequate Protection Superpriority Claims, and Adequate Protection Payments—to protect the interests of the Prepetition Lender in the Debtors' property from any diminution in value of the Prepetition Lender Collateral resulting from the priming of the Prepetition Liens, use of the Cash Collateral and the imposition of automatic stay (the "Adequate Protection").  The Debtors submit that the Adequate Protection as described herein is sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## II.     The DIP Lender Should Be Afforded Good Faith Protection Under Section 364(e) of the Bankruptcy Code.

33.     Section 362(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) of the Bankruptcy Code provides as follows:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring

of such debt, or the granting of such priority or lien, were stayed
pending appeal.

*Id.*

34.     As described in detail above, the DIP financing is the result of (a) the Debtors'
reasonable and informed determination that the DIP Lender offers the most favorable terms on
which to obtain vital postpetition financing and (b) extensive arm's-length, good faith negotiations
between the Debtors and the DIP Lender.  The Debtors submit that the terms and conditions of the
DIP Facility, as set forth in the DIP Loan Documents and Proposed Orders, are reasonable and
appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for
purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that
the DIP financing has been extended by the DIP Lender in "good faith" within the meaning of
section 364(e) of the Bankruptcy Code and, therefore, the DIP Lender is entitled to the protections
afforded thereby.

**III.     The Debtors Should Be Authorized to Use the Cash Collateral**

35.     The Debtors should be permitted to use Cash Collateral pursuant to section
363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor "may not use,
sell, or lease cash collateral . . . unless: (A) each entity that has an interest in such cash collateral
consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in
accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the
Bankruptcy Code further provides that "on request of an entity that has an interest in property . . .
to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or
lease as is necessary to provide adequate protection of such interest."  *Id.* at § 363(e).

36.     The Adequate Protection, described above, is intended to protect the Prepetition
Lender from any diminution in value of its interests in the Prepetition Lender Collateral, resulting

from the Debtors' use thereof during the pendency of the chapter 11 cases. Without access to Cash Collateral, the Debtors will be unable to continue operating. The Debtors believe the Adequate Protection is necessary and sufficient for the Debtors to continue to use Cash Collateral.

37.     In light of the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Prepetition Lender is appropriate. The Debtors' proposed Adequate Protection is not only necessary to protect the Prepetition Lender against any diminution in value, but is also fair and appropriate on an interim basis under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral in the near term for the benefit of all parties in interest and their estates.

**IV.     The Scope of the Proposed Carve-Out is Reasonable and Appropriate**

38.     The DIP Facility and Interim Order subject the security interests and administrative expense claims under the DIP Facility to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See, e.g.*, *In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for payment of the Clerk of the Court and the U.S. Trustee fees, the fees and costs of the Debtors' claims and noticing agent, and Professional Fees.

**V.     The Automatic Stay Should Be Modified on a Limited Basis**

39.     The relief requested herein contemplates a modification of the automatic stay to (a) permit the Debtors to grant the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens

and Adequate Protection Superpriority Claims; (b) permit the Debtors to incur all liabilities and obligations to the DIP Lender and Prepetition Lender under the Proposed Orders; (c) subject to the Carve-Out, authorize the Debtors to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of the Proposed Orders; and (d) authorize the DIP Lender, subject to certain limitations in the Interim Order, to exercise remedies upon the occurrence and during the continuation of an event of default under the Interim Order. Stay modifications of this kind are ordinary and standard features for debtor in possession financing arrangements, and in the Debtors' business judgment, are reasonable and fair under the circumstances.

## VI.    Interim Relief Should Be Granted

40.    Bankruptcy Rule 4001 provides that a final hearing on a motion for authority to use cash collateral or obtain credit may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court is authorized to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral or obtain DIP financing to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. *See* Fed. R. Bankr. P. 4001(b)(2) & 4001(c)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).

41.    Pending the Final Hearing, the Debtors require immediate access to Cash Collateral and proceeds of the DIP Facility to satisfy the day-to-day needs of the Debtors' business operations. Access to liquidity will help to address any concerns of employees, vendors or customers regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases. The Debtors have an immediate need for liquidity to, among other things,

maintain business relationships with their vendors and suppliers, pay payroll and certain benefits, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. In addition, the Budget establishes that the Debtors' use of Cash Collateral and proceeds of the DIP Facility will not prejudice the DIP Lender or Prepetition Lender.

42.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b) & (c), the Debtors request an expedited hearing to consider the Motion and entry of the Interim Order.

### Bankruptcy Rule 4001(a)(4) Should Be Waived

43.    The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(4). Bankruptcy Rule 4001(a)(4) provides, "[u]nless the court orders otherwise, an order granting a motion for relief from the automatic stay under [Rule 4001(a)(1)] is stayed for 14 days after it is entered." Fed. R. Bankr. P. 4001(a)(4). As explained above and in the First Day Declaration, access to the DIP Facility and use of Cash Collateral is essential to prevent irreparable damage to the Debtors' operations. Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

44.    Bankruptcy Rule 6003 empowers the Court to issue an order, within the Interim Period, granting a motion to "use . . . property of the estate, including a motion to pay all or a part of a claim that arose before the petition was filed" if such requested relief "is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, entry of an interim order granting this Motion is integral to the Debtors' ability to successfully transition into chapter 11 and to avoid disruptions to the Debtors' operations, to the detriment of the Debtors'

52349238.7 01/14/2025

estates and creditors.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support the relief requested herein.

### **Waiver of Bankruptcy Rule 6004(h)**

45.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief requested in this Motion is necessary for the Debtors to preserve the value of their estates. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### **Notice**

46.     Notice of this Motion will be given to the following parties, or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Maryland; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to JPMorgan Chase Bank, N.A., (iv) the United States Attorney for the District of Maryland; (v) the offices of the attorneys general for the states in which the Debtors operate;  (vi) the Internal Revenue Service; and (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit the no other or further notice is necessary.


*[Remainder of Page Left Intentionally Blank]*

## Conclusion

WHEREFORE, the Debtors respectfully request the entry of the proposed Interim and Final Orders, granting the relief requested herein and such other and further relief as is just and proper.

Dated: January 14, 2025                    **SAUL EWING LLP**

By: */s/ Jordan D. Rosenfeld*
   Jordan D. Rosenfeld (MD Bar No. 13694)
   1001 Fleet Street, 9th Floor
   Baltimore, MD 21202
   Telephone: (410) 332-8600
   Email: jordan.rosenfeld@saul.com

   -and-

   Jeffrey C. Hampton (*pro hac vice* pending)
   Adam H. Isenberg (*pro hac vice* pending)
   Turner N. Falk (*pro hac vice* pending)
   1500 Market Street, 38th Floor
   Philadelphia, PA 19102
   Telephone: (215) 972-7777
   Email: jeffrey.hampton@saul.com
          adam.isenberg@saul.com
          turner.falk@saul.com

   -and-

   Mark Minuti (*pro hac vice* pending)
   Paige N. Topper (*pro hac vice* pending)
   Nicholas Smargiassi (*pro hac vice* pending)
   1201 N. Market Street, Suite 2300
   Wilmington, DE 19801
   Telephone: (302) 421-6800
   Email: mark.minuti@saul.com
          paige.topper@saul.com
          nicholas.smargiassi@saul.com

   *Proposed Counsel for Debtors and Debtors in Possession*

52349238.7 01/14/2025

**<u>Exhibit A</u>**

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

| | |
|---|---|
| In re: | Chapter 11 |
| DIAMOND COMIC DISTRIBUTORS, INC., *et al.*[1] | Case No. 25-10308 (DER) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
SENIOR SECURED FINANCING AND THE USE OF CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION; (III) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE
AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND
(VI) GRANTING RELATED RELIEF**

**THIS MATTER** having come before this Court (this "***Court***" or "***Bankruptcy Court***")

upon the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting*

*Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV)*

*Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief*

---

[1]   The Debtors in these chapter 11 cases and the last four (4) digits of each Debtor's federal taxpayer identification number are as follows: Diamond Comic Distributors, Inc. (3450), Comic Exporters, Inc (7457), Comic Holdings, Inc. (7458), and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

(the "***Motion***"), filed by the above-captioned debtors, as debtors-in-possession (the "***Debtors***") in the above-captioned cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rules 2002-1 and 4001-5 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "***Local Rules***"), seeking, among other things:

(a)     authorization for the Debtors to obtain senior secured postpetition financing on a superpriority basis in the form of a superpriority senior secured revolving credit facility (the "***DIP Facility***"), pursuant to which revolving loans (the "***DIP Loans***") in a maximum amount not to exceed $41,000,000 (the "***Maximum DIP Facility Amount***"), of which the maximum amount available to be drawn under the interim DIP Facility (the "***Interim Facility***") shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations (as defined below) from the Petition Date through the entry of the Final Order in excess of $5,500,000, shall be made available upon entry of this interim order (this "***Interim Order***") pursuant to the terms and conditions of this Interim Order, the Final Order (upon entry), and that certain senior secured Debtor-in-Possession Credit Agreement, dated as of January [   ], 2025 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***DIP Credit Agreement***"[2] together with the schedules and exhibits attached thereto, and all agreements, documents, and instruments executed and delivered in connection therewith, the "***DIP Loan Documents***") by and among Diamond Comic Distributors, Inc., a Maryland Corporation (the "***Borrower***" or "***Diamond Comic***"), and JPMorgan Chase Bank, N.A., as lender (the "***DIP Lender***"), and unconditionally guaranteed by Comic Exporters, Inc., a Maryland corporation ("***Comic Exporters***"), Comic Holdings, Inc., a Maryland Corporation ("***Comic Holdings***") and Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company (individually, "***Diamond Select***" and collectively, the "***Debtor Guarantors***"), and Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales ("***DCDUK***"), Rosebud Entertainment, LLC, a Maryland limited liability company ("***Rosebud***"), Renegade Games, LLC, a Delaware limited liability company ("***Renegade***"), and Game Consolidator, LLC, a Delaware limited liability company (individually, "***Consolidator***" and collectively with DCDUK, Rosebud and Renegade, the "***Non-Debtor Entity Guarantors***," and together with the Debtor Guarantors and Non-

---

[2]     Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in the DIP Credit Agreement.

Debtor Guarantors collectively referred to herein as the "***DIP Entity Guarantors***"), and individually guaranteed by Stephen A. Geppi (the "***Individual Guarantor***"), substantially in the form of **<u>Exhibit A</u>** attached hereto;

(b)     approval of the terms of, and authorization for the Debtors to execute, enter into and deliver the DIP Loan Documents, including without limitation, definitive pledge and security agreements granting first priority liens in substantially all of the Debtors' assets to secure the obligations under the DIP Credit Agreement (collectively, the "***Pledge and Security Agreement***"), and to perform such other acts as may be reasonably necessary, desirable, or appropriate in connection with the DIP Loan Documents;

(c)     subject to the Carve-Out (as defined below), granting to the DIP Lender fully-perfected, priming, first priority senior security interests in and liens on all assets that constitute the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents and this Interim Order (collectively, and including indebtedness or obligations of the Debtors to DIP Lender incurred on or after the Petition Date pursuant to this Interim Order or otherwise, including, without limitation, all Obligations and any advances made by the DIP Lender to pay the Carve-Out, the "***DIP Debt***"), which shall rank senior in priority to all other liens, claims and encumbrances, subject to Permitted Priority Liens (as defined below);

(d)     subject to the Carve-Out (as defined below), the granting of adequate protection to the Prepetition Lender (as defined below), in its capacity as lender under that certain Credit Agreement, dated as of May 16, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, pursuant to various amendments and letter agreements, including, without limitation, the most recent Fifteenth Amendment to Credit Agreement dated as of December 20, 2024 (as so amended, the "***Prepetition Credit Agreement***" and together with all related loan documents, as more specifically defined below, the "***Prepetition Loan Documents***", and the outstanding obligations under the Prepetition Credit Agreement and Prepetition Loan Documents shall be referred to collectively as the "***Prepetition Debt***"), among the borrowers thereto, the guarantors from time to time thereto, and JPMorgan Chase Bank, N.A., as lender (the "***Prepetition Lender***" and collectively with the DIP Lender, the "***Lenders***"), for any diminution in value of its interests in the applicable Prepetition Collateral (as defined below), including as a result of any or all of the imposition of the automatic stay and the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral (collectively, the "***Diminution in Value***");

(e)     subject to the restrictions, terms and conditions set forth in the DIP Loan Documents and this Interim Order, authorization for the Debtors to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which the Prepetition Lender has an interest and the granting of adequate

3

protection to the Prepetition Lender with respect to, *inter alia*, such use of Cash Collateral (as defined below) and the other Prepetition Collateral;

(f)     subject to the Carve-Out, the granting of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lender as well as liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, subject to the Permitted Priority Liens, and priming liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all DIP Collateral (as defined below) and all proceeds thereof (including, upon entry of the Final Order, any Avoidance Actions/Proceeds (as defined below)), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral) (collectively, and as more specifically defined below, "***Cash Collateral***");

(g)     upon entry of the Final Order, the waiver of the Debtors' right to surcharge the Prepetition Collateral or DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(h)     subject to entry of the Final Order, a finding that neither the DIP Lender nor the Prepetition Lender, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

(i)     authorization and direction for the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees (including, the Unused Line Fee and Success Fee, under and as defined in the DIP Credit Agreement), expenses and other amounts payable under the DIP Loan Documents, each as applicable, as such become due and payable, all to the extent provided in, and in accordance with, this Interim Order, the Final Order (upon entry) and the applicable DIP Loan Documents;

(j)     subject to the restrictions set forth in the DIP Loan Documents and this Interim Order, authorization for the Debtors to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) in accordance with both the Budget (as defined below) and the DIP Loan Documents;

(k)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order, the Final Order and the DIP Loan Documents;

(l)     setting the date for the hearing (the "***Final Hearing***") to consider, on a final basis, the Motion and the entry of a final order (the "***Final Order***" and together with the

4

Interim Order, the "**DIP Orders**"), authorizing and approving the transactions described in the foregoing clauses, which Final Order shall be in form and substance (including with respect to any subsequent modifications made in response to any objections or comments made by this Court) acceptable to the Debtors and the DIP Lender;

(m)    providing for the immediate effectiveness of this Interim Order and Final Order (upon entry) and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness; and

(n)    granting the Debtors such other and further relief as is just and proper.

The Court having considered the Motion, the exhibits attached thereto, the DIP Loan Documents, the *Declaration of Robert Gorin in Support of Debtors' Chapter 11 Petition and First Day Motions* (the "**First Day Declaration**"), and the evidence submitted at the interim hearing (the "**Interim Hearing**") held before this Court on January [   ], 2025; and adequate notice of the Motion and the Interim Hearing having been given under the circumstances and in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and Local Rules 2002-1, 4001-1 and 4001-5 and no further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is fair and reasonable and in the best interests of the Debtors, their respective estates, and their creditors and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets pending the Final Hearing; and any objections to the entry of this Interim Order having been withdrawn or overruled on the merits; and upon the record herein and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.    <u>Debtor-in-Possession Operation.</u> On January 14, 2025 (the "***Petition Date***"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland (Baltimore Division). The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue.</u> The Court has jurisdiction over the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and *Standing Order 2012-05* from the United States District Court for the District of Maryland. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceeding on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors have consented to the Court's entry of a final order regarding the Motion, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.    <u>Committee.</u> As of the date of the Interim Hearing, the United States Trustee for Region 4 (the "***U.S. Trustee***") has not yet appointed an official committee of unsecured creditors (a "***Committee***") in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

D.    <u>Notice.</u> Proper, timely, adequate and sufficient notice under the circumstances of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be

---

[3]    The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable.

required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 6003.

E.    <u>Necessary Approvals</u>. Upon entry of this Interim Order, the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Loan Documents as provided herein.

F.    <u>Debtors' and DIP Entity Guarantors' Stipulations</u>.  Without prejudice to the rights of parties in interest as set forth in paragraph 21 herein, the Debtors, on their behalf and on behalf of their estates, and the DIP Entity Guarantors, admit, acknowledge, agree and stipulate to the following, which stipulations shall be binding on the Debtors and their estates, the DIP Entity Guarantors, and all parties in interest (Paragraphs F(i) through F(viii) below are referred to, collectively, as the "***Stipulations***"):

(i)    <u>Prepetition Loan Documents</u>. Diamond Comic, as Borrower, is party to the following pre-bankruptcy agreements:  (a) the Prepetition Credit Agreement, by and among the Borrower, Comic Exporters, Comic Holdings, DCDUK, Rosebud, Consolidators, Renegade and Diamond Select, as joint and several guarantors (the "***Prepetition Entity Guarantors***"), and the Prepetition Lender; (b) the Security Agreement dated as of May 16, 2019, as amended, by and among the Borrower, the Prepetition Entity Guarantors, and the Prepetition Lender (the "***Prepetition Security Agreement***"); (c) the Pledge Agreement dated as of May 16, 2019, from the holders of all outstanding equity interests in the Borrower in favor of the Prepetition Lender (the "***Prepetition Borrower Equity Pledge Agreement***"); (d) the Charge Over Shares dated as of May 16, 2019, from the holders of all outstanding shares of equity issued by DCDUK in favor of the

Prepetition Lender (the "***DCDUK Share Charge***"); (e) the Personal Guaranty dated as of January 15, 2024, from the Individual Guarantor in favor of the Prepetition Lender (the "***Geppi Guaranty***"); (f) the Pledge Agreements dated as of March 21, 2024, from the holders of all outstanding membership interests in Rosebud, Consolidators and Renegade in favor of the Prepetition Lender (the "***Rosebud/Consolidators/Renegade Pledge Agreements***"); and (g) the Pledge Agreement dated as of September 13, 2024, from the holders of all outstanding membership interests in Diamond Select in favor of the Prepetition Lender (collectively with the Prepetition Credit Agreement, Prepetition Security Agreement, Prepetition Borrower Equity Pledge Agreement, DCDUK Share Charge, Geppi Guaranty, Rosebud/Consolidators/Renegade Pledge Agreements, and all other "Loan Documents" as such term is defined in the Prepetition Credit Agreement, as the same have been amended, restated, modified or supplemented from time to time prior to the date hereof, including all exhibits thereto, the "***Prepetition Loan Documents***").

(ii)     Prepetition Debt. Prior to the Petition Date and pursuant to the Prepetition Credit Agreement, the Debtors were indebted and liable to the Prepetition Lender with respect to the outstanding obligations under the Prepetition Credit Agreement, for loans advanced under the Prepetition Credit Agreement in an aggregate amount of approximately $32,600,000 (together with (a) all secured indebtedness or obligations under the Prepetition Loan Documents as of the Petition Date, including all "Secured Obligations" (as defined in the Prepetition Credit Agreement), and all fees, costs, interest, and expenses as and when due and payable pursuant to the Prepetition Loan Documents, plus (b) all Allowable 506(b) Amounts (defined below), collectively the "***Prepetition Debt***"). As used herein, "***Allowable 506(b) Amounts***" shall mean, to the extent allowable under Bankruptcy Code section 506(b), interest at the default rate of interest as set forth in Section 2.12(d) of the Prepetition Credit Agreement, all fees, costs, expenses, and other charges due or

coming due under the Prepetition Loan Documents (regardless of whether such fees, costs, interest and other charges are included in the Budget), and all costs and expenses at any time incurred by Prepetition Lender in connection with (a) the negotiation, preparation and submission of this Order and any other order or document related hereto, and (b) the representation of Prepetition Lender in the Chapter 11 Cases, including in defending any Challenge (as defined herein).

(iii)    Prepetition Liens and Prepetition Collateral.  As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Debtors granted to the Prepetition Lender a first priority security interest in, and continuing lien on, substantially all of their assets and personal property (subject only to the exceptions set forth in the Prepetition Loan Documents) (the "**Prepetition Liens**") and all proceeds, products, and accessions thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "**Prepetition Collateral**") to secure the Prepetition Debt, including the Debtors' respective obligations under the Prepetition Credit Agreement. Upon entry of this Interim Order, for purposes of sections 506(c) and 507(b) of the Bankruptcy Code and Bankruptcy Rule 3012, as of the Petition Date, the Prepetition Debt is fully secured by Prepetition Collateral with a value in excess of the Prepetition Debt; *provided, however,* that nothing herein shall prejudice Prepetition Lender's right to later assert that its interest in the Prepetition Collateral has not received or is not receiving sufficient adequate protection.

(iv)    Validity, Perfection and Priority of Prepetition Liens and Prepetition Debt. As of the Petition Date, (a) the Prepetition Liens on the Prepetition Collateral are valid, binding, enforceable, non-avoidable, and properly perfected; (b) were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value; (c) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, except in the case of the Permitted Priority Liens (as defined below); (d) the Prepetition Debt constitutes legal, valid,

9

binding, and non-avoidable obligations of the Borrower and the Prepetition Entity Guarantors enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Liens or Prepetition Debt exist, and no portion of the Prepetition Liens nor the Prepetition Debt is subject to any challenge or defense including, without limitation, impairment, set-off, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, subordination (whether equitable or otherwise), counterclaims, or cross-claims pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) each of the Debtors, and their respective estates, and the DIP Entity Guarantors, do not have any claims, objections, challenges, causes of action, and/or choses in action against the Prepetition Lender (solely in its capacity as such) or any of its affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees (in each case, solely, in such respective capacity) arising out of, based upon, or related to the Prepetition Loan Documents (the "***Estate Claims***"); and (f) the Prepetition Debt constitutes allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)      <u>Cash Collateral.</u>  As of the Petition Date, all or substantially all of the Debtors' cash and cash equivalents, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral, as such term is defined in section 363(a) of the Bankruptcy Code, of the Prepetition Lender under the Prepetition Loan Documents.  The Debtors have an immediate need to use Cash Collateral and to incur the DIP Debt as provided herein through the conclusion of the Final Hearing in order to prevent immediate and irreparable harm to the estates, minimize disruption to and avoid the termination of business operations, and to maintain the value of their assets and businesses and maximize return to all creditors.

(vi)    <u>Releases</u>.  Subject to entry of the Final Order, the Debtors, on behalf of themselves and their respective estates (including any successor, trustee, or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through, or under the Debtors or their estates) and the DIP Entity Guarantors by their execution of the DIP Credit Agreement, hereby forever, unconditionally, and irrevocably release, discharge, and acquit the Prepetition Lender (solely in its capacity as such) and its successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, agents, and professionals, and its heirs, predecessors, successors, and assigns (in each case, solely in such respective capacity) (collectively, the "***Released Parties***") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the Prepetition Documents, and/or the transactions contemplated hereunder or thereunder including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, and (b) any Estate Claims; *provided* that no party shall be released from any claims found in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from such party's actual fraud.

(vii)    <u>No affiliation</u>. The Debtors and the DIP Entity Guarantors by their execution of the DIP Credit Agreement acknowledge and agree that the Prepetition Lender is not directly or indirectly, through one or more intermediaries, nor will it be by operation of this Interim Order, controlling, controlled by or under common control with the Debtors and DIP Entity Guarantors.  As used herein, control shall mean possessing, directly or indirectly, the power to

11

direct or cause the direction of the management, policies and operations of the Debtors and DIP Entity Guarantors, whether through ownership of voting securities, by contract, or otherwise.

(viii) <u>DIP Liens and DIP Debt</u>. The liens and security interests granted to the DIP Lender pursuant to this Interim Order and the DIP Loan Documents shall be valid, binding, properly perfected, enforceable and non-avoidable liens against the Debtors. Until such time as all DIP Debt has been indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens and security interests provided to the DIP Lender by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (a) prior payment of the Carve-Out and (b) the Permitted Priority Liens. Until such time as all DIP Debt has been indefeasibly paid in full in cash, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against any Debtor of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, subject to the Carve-Out.

G. <u>Purpose and Necessity of Financing.</u> An immediate and ongoing need exists for the Debtors to obtain the DIP Loans to permit, among other things, the Debtors to fund their sale process and to meet their obligations arising during the Chapter 11 Cases. The Debtors require the DIP Loans (i) for working capital and general corporate purposes, (ii) to pay fees and expenses incurred by the DIP Lender in connection with the DIP Loan Documents as provided therein, (iii) to pay restructuring costs and Professional Fees (as defined below) relating solely to the Chapter 11 Cases, and (iv) for other purposes as provided in and subject to the terms of the DIP Credit

12

Agreement, and subject to compliance with the Budget and the Permitted Variances, as provided in the DIP Credit Agreement. If the Debtors do not obtain authorization to borrow under the DIP Credit Agreement, they will suffer immediate and irreparable harm. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Loan Documents, based on the totality of the circumstances. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Lender superpriority claims, liens, and security interests, pursuant to sections 364(c)(1), 364(c)(2) and 364(d)(1) of the Bankruptcy Code, as provided in this Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to it at this time.

H.    _Adequate Protection._ The Prepetition Lender is entitled to receive adequate protection on account of the Prepetition Debt for any Diminution in Value of its interests in the Prepetition Collateral from and after the Petition Date resulting from, among other things, the use of Cash Collateral, the imposition of priming liens on the Prepetition Collateral by the DIP Lender, the use, sale, lease, consumption, or disposition of Prepetition Collateral, or the imposition of the automatic stay pursuant to sections 361, 362, 363, 364, 503(b), and 507(b) of the Bankruptcy Code. Consequently, as adequate protection, and subject to the Carve-Out (i) the Prepetition Lender shall be granted the Adequate Protection Liens (as defined below) and the Adequate Protection Superpriority Claim (as defined below), and (ii) the Prepetition Lender shall receive the Adequate Protection Payments (as defined below). The adequate protection provided herein and other benefits and privileges contained herein are necessary to protect the Prepetition Lender from any

13

Diminution in Value of its interests in the Prepetition Collateral and to obtain the consents and agreements contained herein, including that the adequate protection provided herein is subject and subordinate to the Carve-Out (as defined below). As described in the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) were negotiated in good faith, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration.

I.      Good Cause Shown. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Bankruptcy Local Rule 4001-2(b). Good cause has been shown for entry of this Interim Order and authorization for: (i) the DIP Lender to provide the Debtors with the DIP Loans and (ii) the Debtors to accept, incur and undertake the DIP Debt pursuant to the DIP Credit Agreement as hereinafter provided. The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors. The liquidity to be provided under the DIP Loan Documents will enable the Debtors to continue to operate their businesses in the ordinary course, to preserve the value of the Debtors' assets, and to proceed with an orderly sale process. Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their stakeholders. Based on the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Credit Agreement, this Interim Order, and the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

J.      No Credit Available on More Favorable Terms.  Despite diligent efforts and a sufficient marketing process, the Debtors have been unable to obtain post-petition financing on terms more favorable than those offered by the DIP Lender under the DIP Loan Documents.

K.      Sections 506(c), 552(b) and Marshaling. In light of the DIP Lender's agreement to permit its DIP Liens and DIP Superpriority Claim (as defined below) to be subject to prior payment of the Carve-Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Facility, and in light of the Prepetition Lender's agreement to permit its Prepetition Liens to be subject to prior payment of the Carve-Out and the DIP Liens, subject to entry of the Final Order, the DIP Lender and the Prepetition Lender are each entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, a waiver of the provision of section 506(c) of the Bankruptcy Code, and a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the Prepetition Collateral, respectively, and the Debtors intend to seek in the Final Order a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, a waiver of the provisions of section 506(c) of the Bankruptcy Code, and a waiver of the "marshaling" doctrine with respect to the Aggregate Collateral (as defined below).

L.      Good Faith.

(i)      The DIP Lender has indicated a willingness to provide financing to the Debtors, but solely on the terms and conditions set forth in the DIP Loan Documents, including, without limitation: (a) entry of this Interim Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents, including, without limitation, the Debtors' ability to enter into such documents and to incur all of the obligations thereunder, and to confer upon the DIP Lender all rights, powers and remedies thereunder; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) findings by this Court that the DIP Facility and the

15

Debtor's use of the DIP Loans are essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Loan Documents and this Interim Order in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code. Accordingly, after considering all of their practical alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Loans to be provided by the DIP Lender, pursuant to the terms of the DIP Loan Documents, represent the best financing currently available to the Debtors.

(ii)    The terms of the DIP Loan Documents, including, without limitation, the interest rates and fees applicable, are more favorable to the Debtors than any available from alternative sources. Based upon the record before the Court, the DIP Loan Documents have been negotiated in good faith and at arm's-length among the Debtors and the DIP Lender. Any DIP Loans and other financial accommodations made to the Debtors by the DIP Lender pursuant to the DIP Loan Documents and this Interim Order shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Lender shall be entitled to all protections afforded thereby.

M.    <u>Fair Consideration and Reasonably Equivalent Value</u>. The Debtors have received and will receive fair and reasonable consideration in exchange for access to the DIP Loans and all other financial accommodations provided under the DIP Loan Documents and this Interim Order. The terms of the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

16

N.    <u>Third Party Consent.</u> To the extent consent is required, the Prepetition Lender has consented or is deemed to have consented to the DIP Loan Parties' entry into the DIP Loan Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Loan Documents.

O.    <u>Good Cause Shown; Best Interest</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Bankruptcy Local Rule 4001-2(b). Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful chapter 11 process.

P.    <u>Final Hearing</u>.  The Debtors will seek approval of the relief requested in the Motion on a final basis pursuant to a Final Order at the Final Hearing.

Based upon the foregoing findings, acknowledgements and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Motion Approved.</u> The Motion is granted as and to the extent set forth herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Credit Agreement, in substantially the form annexed hereto, and of all instruments, guaranties, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Lender (including but not limited to the Pledge and Security

Agreement), to give effect to the terms thereof and as will be drafted and executed as contemplated therein, each in final form and substance acceptable to the DIP Lender.

2.    <u>Objections Overruled.</u> Any objections, reservations of rights or other statements with respect to the Motion and entry of this Interim Order, to the extent not withdrawn or resolved, are overruled on the merits. This Interim Order shall become effective immediately upon its entry.

## **AUTHORIZATION FOR DIP FINANCING**

3.    <u>Authorization for DIP Financing Pursuant to Budget</u>.

(a)    The Debtors are hereby authorized to incur DIP Debt, subject to the terms of this Interim Order, the Budget (subject to the Permitted Variances) and the DIP Loan Documents, and also subject to any conditions and limitations on availability in the DIP Credit Agreement, plus all interest, fees and other charges payable in connection with such DIP Loans as provided in the DIP Credit Agreement and other DIP Loan Documents.

(b)    The Debtors have delivered to the DIP Lender a 13-week cashflow forecast of receipts and disbursements, and sources and uses of the Borrower, broken down by week, including the anticipated uses of the DIP Facility for such period (a "***Budget***"), in each case, in form and substance acceptable to the DIP Lender. The initial Budget is attached to this Interim Order as **<u>Exhibit B</u>**. The Debtors shall update the Budget monthly subject to the Borrower's month-end closing process, but no later than ten (10) calendar days after month-end. The Debtors shall update the Budget at the end of each two-week period and provide an updated Budget for the subsequent two-week period (which in each case must be satisfactory to the DIP Lender) extending and supplementing the Budget; *provided, however,* if a line item is not approved by the DIP Lender it shall be deemed excluded and disregarded. For the avoidance of doubt, Budget payments shall be funded through the issuance of DIP Debt and not through the use of Prepetition Lender's Cash

Collateral; for the further avoidance of doubt, no use of Prepetition Lender's Cash Collateral will be permitted without the Prepetition Lender's consent.

(c)    The Budget shall at all times be in form and substance acceptable to, and as approved by, the DIP Lender, in accordance with the DIP Credit Agreement. The Debtors shall deliver notice copies of each updated Budget to the DIP Lender.

(d)    Together with the delivery of each updated Budget, the Debtors shall also provide a bi-weekly report/reconciliation to the DIP Lender setting forth the immediately preceding two weeks, the actual and budgeted results for such week by line item in the Budget (the "***Budget Variance Report***"), as well as additional customary reporting to be agreed among the Debtors and the DIP Lender.

(e)    Funds borrowed under the DIP Credit Agreement shall be used by the Debtors in accordance with the Budget (subject to the Permitted Variances), the DIP Loan Documents and this Interim Order. The consent of the DIP Lender to any Budget shall not be construed as a commitment to provide DIP Loans after the occurrence of the Termination Date (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on the Budget have been expended.  If the DIP Lender advances monies to the Debtors and the Debtors use such monies other than in accordance with the terms or provisions of this Interim Order, such advances shall be considered DIP Debt for purposes of this Interim Order.

(f)    Any amendments, supplements or modifications to the Budget must be consented to in writing by the DIP Lender, in accordance with the DIP Credit Agreement, prior to the implementation thereof and shall not require further notice, hearing, or court order.

(g)    The DIP Lender (i) may assume the Debtors will comply with the Budget (subject to the Permitted Variances), (ii) shall have no duty to monitor such compliance, and (iii)

shall not be obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Budget. The DIP Lender may rely on the Debtors' representations that the amount of the DIP Debt requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the Budget, the DIP Loan Documents, the Bankruptcy Code and the Bankruptcy Rules.  All advances and extensions of credit shall be based upon the terms and conditions of the DIP Loan Documents, as the same may be adjusted from time to time.

(h)     Notwithstanding anything in this Interim Order to the contrary and upon the Termination Date, the DIP Lender's obligation to make loans under the DIP Loan Documents shall expire, and the DIP Loans made pursuant to this Interim Order and the DIP Loan Documents will mature, and together with all interest thereon and any other obligations accruing under the DIP Loan Documents, will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Interim Order by way of acceleration or otherwise).

4.     <u>Authority to Execute and Deliver Necessary Documents</u>.

(a)     The Debtors are authorized to negotiate, prepare, enter into, and deliver the DIP Loan Documents, in each case including any amendments thereto. The Debtors are further authorized to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, deposit account control agreements, mortgages or deeds of trust, or similar documents or agreements encumbering all of the DIP Collateral and securing all of the Debtors' Obligations under the DIP Loan Documents, each as may be provided for under the DIP Credit Agreement or as otherwise reasonably requested by the DIP Lender.

(b)     The Debtors are further authorized to (i) perform and incur all of their Obligations under the DIP Loan Documents, and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Loan Documents and this Interim Order.

(c)     The DIP Loan Documents and any amendments thereto may be executed and delivered on behalf of the Debtors by any officer, director or agent of the Debtors, who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents and amendments for and on behalf of the Debtors and the DIP Lender shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents and any amendments thereto as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Loan Documents or any amendments thereto by any such person on behalf of the Debtors shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company or other entity action (as applicable) of the Debtors.

5.     <u>Valid and Binding Obligations</u>.  All DIP Debt under the DIP Loan Documents shall constitute valid, binding, and nonavoidable obligations of the Debtors, enforceable against them and their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims,

21

defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity. Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by the DIP Lender to the Debtors or any of their affiliates against any of the DIP Debt without the prior written consent of the DIP Lender, and no such consent shall be implied by any action, inaction, or acquiescence by the DIP Lender.

6.    <u>Additional Terms of DIP Debt</u>.  The following terms shall apply to the DIP Debt:

(a)    <u>Maximum DIP Facility Amount</u>. The sum of (i) the maximum principal amount of the DIP Debt and (ii) the principal amount of the Prepetition Debt (including Allowable 506(b) Amounts) outstanding at any time shall not exceed the lesser of $41,000,000 (the "***Maximum DIP Facility Amount***") and the Borrowing Base (as defined in the DIP Credit Agreement); *provided* that, until entry of the Final Order, the maximum amount available to be drawn under the Interim Facility shall be limited to an amount that shall not result in a total increase in the outstanding principal amount of the Prepetition Debt and DIP Debt (collectively, the "***Aggregate Credit Obligations***") from the Petition Date through the date of entry of the Final Order in excess of $5,500,000.  All DIP Loans made under the Interim Facility shall be subject to (a) Availability, and (b) compliance with the terms, conditions and covenants set forth in the DIP Documents and the Interim Order (including compliance with the Budget).  All DIP Loans made under the Interim Facility shall be due and payable on the date that is the earlier of (a) twenty-five (25) days after the entry of the Interim Order, (the "***Interim Facility Maturity Date***") unless a Final Order shall have been entered on or before each such date (*provided, however*, that the Interim Facility Maturity Date may be extended from time to time by the prior written consent of the DIP Lender) and (b) the occurrence of an Event of Default. Upon the Bankruptcy Court's entry of the

22

Final Order (the date upon which the Final Order is entered, the "***Final Order Entry Date***"), the full Maximum DIP Facility Amount shall be available to the Debtors from time to time, subject to (a) Availability, and (b) compliance with the terms, conditions and covenants as set forth in the DIP Loan Documents and the Final Order (including compliance with the Budget).

(b)    <u>Roll-Up</u>.  Upon entry of the Final Order, the Borrower shall borrow DIP Loans sufficient to pay the full amount of the Prepetition Debt then due and owing under the Prepetition Facility as of the Final Order Entry Date.  The proceeds of such DIP Loans shall be remitted to the Prepetition Lender to pay down the Prepetition Facility (the "***Roll-Up***").  If for any reason the Roll-up is not approved or effectuated, the Maximum DIP Facility Amount shall be reduced by the portion of the Roll-up not approved or otherwise effectuated.

(c)    <u>Interest</u>.  The DIP Debt shall bear interest at a per annum rate equal to the Adjusted REVSOFR30 Rate (as defined in the Prepetition Credit Agreement) plus 4.50%.  Interest shall accrue on the principal balance of the DIP Debt, from time to time, based on a 365-day year and charged for the actual number of days outstanding. Interest shall accrue and be payable in cash monthly in arrears. Default interest shall be payable upon the DIP Lender's demand. Any fees or expenses required to be paid or reimbursed, as applicable, pursuant to the DIP Loan Documents shall be payable upon the DIP Lender's demand.

(d)    <u>Unused Line Fee</u>. An unused line fee shall accrue at the rate of 0.25% per annum on the average daily amount by which (i) the Maximum DIP Facility Amount exceeds (ii) the outstanding principal amount of the Aggregate Credit Obligations, and shall be payable in arrears on the first Business Day of each calendar month.

(e)    <u>Success Fee</u>. Subject to entry of the Final Order, a fee in an amount equal to the Applicable Success Fee Percentage (as defined below) of the Maximum DIP Facility

Amount shall be due and payable on or before the sixtieth (60th) day following the Termination Date (the "***Success Fee Payment Date***").  The Applicable Success Fee Percentage shall equal: (i) 0% if the aggregate gross proceeds from the Sale Transaction and all other asset sales consummated prior to the Success Fee Payment Date (collectively, the "***Aggregate Sale Proceeds***") are less than $42,000,000, (ii) 1.50% if the Aggregate Sale Proceeds equal or exceed $42,000,000 but are less than $43,000,000, and (iii) 2.50% if the Aggregate Sale Proceeds are greater than $43,000,000.

       (f)      <u>Letter of Credit and Commercial Credit Cards</u>.  Upon entry of the Interim Order, (i) the letter of credit in favor of BC Industrial Exchange Portfolio II in the amount of $1,000,000 that is issued and outstanding under the Prepetition Credit Agreement shall be deemed issued under the DIP Credit Agreement, and (ii) the DIP Lender shall maintain the Debtors' commercial credit card programs under the terms and conditions of those programs.  Upon entry of the Final Order, the Borrower shall immediately borrow $1,300,000 under the DIP Credit Agreement, with such proceeds to be held by DIP Lender in a segregated blocked account maintained by and in the name of the DIP Lender (the "***LC and Commercial Card Collateral Account***") as cash collateral to secure (A) the Borrower's reimbursement obligations in connection with any draws under the letter of credit, (B) the Borrower's payment obligations in connection with the commercial credit card programs and (C) the Borrower's other obligations under the DIP Credit Agreement, including, but not limited to, the obligation to repay the Aggregate Credit Obligations in full.

       (g)      <u>Maturity</u>.  The DIP Debt shall mature and be due and payable in full by the Borrower on the Termination Date.

(h)    <u>DIP Entity Guarantors</u>.  The DIP Entity Guarantors shall be guarantors of the DIP Debt and shall likewise reaffirm their prior guaranties of the Prepetition Debt. The joint and several nature of the obligations of the DIP Entity Guarantors as guarantors relating to the Prepetition Debt and all related security documents shall remain in full force and effect.  The DIP Entity Guarantors shall reaffirm, and be deemed to have reaffirmed, their joint and several liability under the Prepetition Loan Documents. The DIP Entity Guarantors shall be required to execute the DIP Credit Agreement and all applicable DIP Loan Documents.

(i)    <u>Collateral Access Agreements</u>.  All "Collateral Access Agreements" (as defined in the Prepetition Credit Agreement) relating to the Borrower and DIP Entity Guarantors in effect as of the Petition Date shall remain in full force and effect and in favor of both Prepetition Lender and DIP Lender, notwithstanding the entry of the Interim Order or any subsequent orders amending the Interim Order.

(j)    <u>Compliance with Budget</u>.  The Debtors shall be required to comply with the Budget (including any Permitted Variances as defined in the DIP Credit Agreement).

(k)    <u>Compliance with Availability Requirement</u>.  DIP Loans will be limited to Availability.

(l)    <u>Milestones</u>. The Debtors shall comply in all respects with the following milestones (the "***Milestones***"), which are also set forth in Exhibit B to the DIP Credit Agreement, and will likewise be set forth in the Final Order.  These Milestones may be extended in writing by the DIP Lender in its sole and absolute discretion.  Failure to comply fully and timely with these Milestones will be an Event of Default under the DIP Facility:

(a)    on or one (1) day after the Petition Date, the Borrower shall have filed: (i) a motion seeking approval of the DIP Facility, including the Interim Order; and (ii) other customary First Day Pleadings (including the cash management first day order), all in form and substance reasonably acceptable to the DIP Lender;

(b)    no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;

(c)    no later than three (3) Business Days after the Petition Date, the Debtors shall have filed an application, in form and substances reasonably acceptable to the DIP Lender, seeking approval of the Debtors' retention of Raymond James & Associates, Inc., as investment banker to the Debtors ("**Raymond James**");

(d)    no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;

(e)    no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving (i) the Bidding Procedures and (ii) seeking approval of a stalking horse asset purchase agreement as the stalking horse bid for the purchase of the Debtors' assets (the "**Sale Transaction**"), which asset purchase agreement shall be in form and substance reasonably acceptable to the DIP Lender (the "**Bidding Procedures Order**");

(f)    no later than twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Debtors' retention of Raymond James;

(g)    no later than forty-five (45) days after the Petition Date, the Debtors shall have filed Schedules of Assets and Liabilities and Statement of Financial Affairs;

(h)    no later than forty-five (45) days after entry of the Bidding Procedures Order, the Debtors shall have conducted an auction in accordance with the Bidding Procedures;

(i)    no later than seven (7) days after conclusion of the auction, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Sale Transaction; and

(j)    no later than fifteen (15) days after the entry of the order of the Bankruptcy Court approving the Sale Transaction, the Debtors shall have consummated the Sale Transaction, and indefeasibly paid all amounts owing to the Lenders.

7.    <u>DIP Charges</u>. All DIP Charges[4] are hereby approved and shall be promptly paid by the Debtors in accordance with this Interim Order and the DIP Loan Documents, without need for filing an application with the Court for approval or payment of the DIP Charges. Reasonable

---

[4]    The term "**DIP Charges**", as used herein and in the DIP Credit Agreement, shall mean interest at the applicable rate of interest under the DIP Credit Agreement and all fees, costs, and expenses provided for in the DIP Credit Agreement, including those incurred by DIP Lender in connection with the DIP Debt (regardless of whether any such fees, costs, interest and other charges are included in the Budget).

professional fees and expenses incurred by the Lenders in connection with the Chapter 11 Cases in their respective administration of the Prepetition Loan Documents and DIP Loan Documents shall be paid in each case within five (5) Business Days subsequent to the receipt by the Debtors, any Committee and the U.S. Trustee of summary form invoices (the "**_Invoiced Fees_**") which may be redacted for privileged information (the "**_Review Period_**"). The Debtors, the Committee and the U.S. Trustee may object to any portion of the Invoiced Fees (the "**_Disputed Invoiced Fees_**") within the Review Period. Any disputes regarding the professional fees shall be submitted to the Bankruptcy Court for resolution. The Debtors shall pay (i) any Invoiced Fees that are not Disputed Invoiced Fees promptly after expiration of the Review Period; and (ii) any Disputed Invoiced Fees that the Court approves in a final order requiring payment thereof within five (5) Business Days after entry of that order. The submission of such summary invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. The DIP Charges, including all professional fees and expenses, shall constitute a portion of the adequate protection required to be provided to the DIP Lender under the terms of this Interim Order.

8.     <u>Amendments, Consents, Waivers, and Modifications</u>. The Debtors, with the express written consent of the DIP Lender and in accordance with the DIP Credit Agreement, may enter into any non-material amendments, consents, waivers, or modifications to the DIP Loan Documents without the need for further notice and hearing or any order of this Court, it being further understood that further approval of this Court, upon notice and a hearing, shall be required for any such authorizations, amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that are material or that shorten the maturity of the

extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt, updates and supplements to the Budget required to be delivered under the DIP Loan Documents shall not be considered amendments or modifications to the Budget or the DIP Loan Documents; *provided further* that, the Debtors and the DIP Lender shall have the right to seek approval from the Court of material amendments, waivers, consents or other modifications on an expedited basis.

## CASH COLLATERAL AND ADEQUATE PROTECTION

9.      <u>Authorization to Use Cash Collateral</u>.  Upon entry of this Interim Order, the Debtors are authorized to use Cash Collateral solely in accordance with the terms and provisions of this Interim Order.

10.     <u>Procedure for Use of Cash Collateral</u>.

(a)      <u>Delivery of Cash Collateral to DIP Lender</u>. Debtors shall deposit all Cash Collateral now or hereafter in their possession or control into one or more Blocked Accounts (or otherwise deliver such Cash Collateral to the DIP Lender and the Prepetition Lender) promptly upon receipt thereof. As used herein, the "***Blocked Account***" shall mean the Lock Box or Collateral Deposit Account, in each case, as such term is defined in the DIP Credit Agreement.

(b)      <u>Cash Collateral in Lenders' Possession</u>.  The Lenders are authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into their possession or control that constitute Aggregate Collateral (defined below) or the proceeds thereof, and to apply such amounts in accordance with this Interim Order.

(c)      <u>Application of Cash Collateral</u>.  The Lenders are authorized to apply all Cash Collateral now or hereafter in their possession or control as follows: (i) first, to the payment

of all Prepetition Debt (including Allowable 506(b) Amounts); (ii) second, to payment of DIP Charges; and (iii) third, to payment of all other DIP Debt in accordance with the DIP Credit Agreement. All such applications to DIP Debt shall be final and not subject to challenge by any person, including any chapter 7 or chapter 11 trustee (the "***Trustee***") appointed or elected. All such applications to Prepetition Debt shall be final, subject only to the right of the parties in interest to assert a Challenge in accordance with paragraph 21 that such applications to other Prepetition Debt resulted in payment of an unsecured prepetition claim of Prepetition Lender. Any amounts disgorged in connection with any such objection or determination shall be first applied to reduce the DIP Debt, dollar-for-dollar. The Lenders shall have the right (but not the obligation) to apply Cash Collateral to amounts of the DIP Debt ahead of amounts of Prepetition Debt in their discretion.

(d)      Prohibition Against Use of Cash Collateral.  Except as provided for in this Interim Order, the Debtors will not use Cash Collateral, unless, in addition to the satisfaction of all requirements of section 363 of the Bankruptcy Code, the Lenders have consented to such use.

11.      Adequate Protection. The Prepetition Lender is entitled on account of the Prepetition Debt and the Prepetition Liens, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral (including Cash Collateral) (such adequate protection as set forth in clauses (a)–(e) below, the "***Adequate Protection Obligations***"). Accordingly, the Prepetition Lender is hereby granted, as applicable, the following liens, claims, rights and protections:

(a)      Adequate Protection Liens.  As adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral against any Diminution in Value of such interests, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are authorized to grant,

and as of entry of this Interim Order are deemed to have granted to the Prepetition Lender additional and replacement continuing valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens on (collectively, the "***Adequate Protection Liens***") all of each Debtor's presently owned or hereafter acquired property and assets (including, subject to entry of a Final Order, any proceeds of, or property recovered in connection with, any of the Debtors' Avoidance Actions), whether such property and assets were acquired by such Debtor before or after the Petition Date or were subject to a lien that was avoided pursuant to section 549 of the Bankruptcy Code, of any kind or nature, whether real or personal, tangible or intangible, wherever located, including, without limitation, all inventory, accounts receivable, general intangibles, chattel paper, contracts, owned real estate, real and personal property leaseholds, property, plants, fixtures and machinery and equipment, vehicles, vessels, deposit accounts, cash and any investment thereof, letter of credit rights, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and stock of subsidiaries of the Debtors, and the proceeds and products of the foregoing (collectively, together with the Prepetition Collateral and any Cash Collateral, the "***Collateral***"). The Adequate Protection Liens shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any Trustee or other estate representative appointed in these Chapter 11 Cases, or any Successor Cases.  Except as expressly provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any Trustee or other estate representative appointed in any of these Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of these Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to

section 510, 549, or 550 of the Bankruptcy Code and, subject to entry of the Final Order, the Adequate Protection Liens and the Collateral shall not be subject to surcharge under section 506(c) of the Bankruptcy Code. The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases. For the avoidance of doubt, the Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the Petition Date and without the necessity of the execution by the Debtors, or the filing of, as applicable, mortgages, security agreements, pledge agreements, financing statements, state or federal notices, recordings (including, without limitation, any recordings with the United States Patent and Trademark or Copyright Office), or other agreements, and without the necessity of taking possession or control of any Collateral. Except as otherwise expressly provided herein, under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party, no matter when arising. The Adequate Protection Liens granted to the Prepetition Lender hereunder shall be subject only to (i) the Carve-Out, (ii) the DIP Liens, and (iii) any existing liens in favor of third parties upon the Prepetition Collateral (including, without limitation, any purchase money security interests), which third-party liens, as of the Petition Date: (1) had priority under applicable law over the Prepetition Liens, (2) were not subordinated by agreement or applicable law, and (3) were non-avoidable, valid, properly perfected and enforceable as of the Petition Date, the "***Permitted Priority Liens***"), and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral. The Adequate Protection Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, control agreements, security agreements, pledge agreements, financing agreements, financing

31

statements or any other agreements or instruments, such that no additional actions need be taken by the Prepetition Lender to perfect such interests.

(b)     Adequate Protection Superpriority Claims.  As additional adequate protection, the Prepetition Lender shall be granted an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "*Adequate Protection Superpriority Claim*") to the extent of any Diminution in Value.  The Adequate Protection Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors and the proceeds thereof, but subject to the Carve-Out. Subject only to the Carve-Out and the DIP Debt, the Adequate Protection Superpriority Claim granted to the Prepetition Lender hereunder shall not be junior to any administrative expense claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment.

(c)     Adequate Protection Payments.  Current cash payments payable under the Prepetition Credit Agreement shall be made to the Prepetition Lender of all interest then due and owing under the applicable contract rate (or, to the extent applicable and at the option of the Prepetition Lender, the default rate under the Prepetition Credit Agreement), as well as all undisputed reasonable professional fees and expenses incurred by the Prepetition Lender in connection with the Chapter 11 Cases and in its administration of the Prepetition Loan Documents,

in each case subject to the procedures set forth in Paragraph 7 of this Interim Order (such payments, collectively, the "***Adequate Protection Payments***").

(d)     <u>Budget and Variance Reporting</u>.  The Borrower and the Debtor Entity Guarantors shall provide the Prepetition Lender and its advisors with (i) monthly financial reports within thirty (30) days after the end of each calendar month consistent with Section (B)(ii) of the Reporting Schedule attached to the Prepetition Credit Agreement, (ii) weekly Borrowing Base Certificates and related collateral reports consistent with Section (C) of the Reporting Schedule attached to the Prepetition Credit Agreement, (iii) such other information as may from time to time be requested by the DIP Lender consistent with Section (D) of the Reporting Schedule attached to the Prepetition Credit Agreement, and (iv) as well as the Budget and variance reporting described in Paragraph 3 hereof.

(e)     <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Lender to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

12.     <u>Prepayments</u>.  The DIP Facility may be prepaid in whole or in part without premium or penalty at any time.  The Debtors shall make the following mandatory prepayments of the outstanding Aggregate Credit Obligations:

(1)     <u>Asset Sales</u>:  Prepayments in the amount of all cash proceeds of the sale or other disposition of any property or assets of the Borrower or the DIP Entity Guarantors (pursuant to Bankruptcy Code section 363 or otherwise), net of payments of or reservations for required tax payments, the amount secured by valid and perfected liens, if any,  that are senior to the liens on such assets held by the Lenders, customary closing costs, and to the extent the

Bankruptcy Court enters an Order authorizing the retention of Raymond James as investment banker for the Debtors, payment of the following fees and reimbursement of the following expenses of Raymond James: (i) the Business Combination Transaction Fee described in Section 2(c)(i) of that certain Engagement Letter dated September 30, 2024 between Raymond James and the Borrower (as amended, the "***RJ Engagement Letter***"), and (ii) reimbursement of Expenses as provided for in Section 3 of the RJ Engagement Letter; *provided, however,* that no other amounts shall be permitted to be paid by the Borrower or the DIP Entity Guarantors to Raymond James without the prior written approval of the Lenders.

(2)     <u>Insurance Proceeds</u>: Prepayments in the amount of all cash proceeds of insurance on account of any loss of any property or assets of the DIP Loan Parties net of payments of or reservations for required tax payments and the amount secured by valid and perfected liens, if any, that are senior to the liens on such property or assets held by the Lenders.

(3)     <u>DIP Debt in Excess of Availability</u>: Prepayments to the extent that the DIP Debt outstanding at any time exceeds the lesser of (i) either (A) under the Interim Facility, the maximum amount that shall not result in an increase in the outstanding principal amount of the Aggregate Credit Obligations from the Petition Date through the entry of the Final Order in excess of $5,500,000, or (B) from and after the entry of the Final Order, the Maximum DIP Facility Amount, and (ii) the Borrowing Base.

(4)     All such prepayments shall be applied without penalty or premium, first, to outstanding Prepetition Debt, and second, to outstanding DIP Debt.

## DIP LIENS AND DIP SUPERPRIORITY CLAIMS

13.    <u>DIP Liens.</u>

(a)    To secure the DIP Debt, the DIP Lender is hereby granted (i) pursuant to section 364(c)(2), a fully-perfected, priming, first priority senior secured lien on the DIP Collateral, subject only to any Permitted Priority Liens and the Carve-Out, and (ii) pursuant to section 364(d)(1), a fully-perfected, priming, first priority senior secured lien on the DIP Collateral, which lien shall have priority over all other liens, including, for the avoidance of doubt, the Prepetition Liens and the Adequate Protection Liens and shall be junior only to any Permitted Priority Liens (the liens described in (i) and (ii) hereof, collectively, the "***DIP Liens***").

(b)    The DIP Liens shall attach to all of the property, assets or interests in property or assets of the Debtors, and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all the Debtors' now owned or hereafter acquired right, title, and interest in and to: (i) all of the property, assets or interests in property or assets of the Debtors and all "property of the estate" (other than Excluded Assets (as defined in the DIP Credit Agreement)), expressly including without limitation all of the Prepetition Collateral, and subject to entry of the Final Order, any and all claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "***Avoidance Actions***") and, to the extent any property, assets or interests of any Debtor is excluded from the DIP Collateral, the proceeds of such property, assets or interests; (ii) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale,

exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; and (iii) all other property and assets including, without limitation, cash collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively with (i)-(iv), the "*DIP Collateral*", and, together with the Prepetition Collateral, the "*Aggregate Collateral*"); subject only to (1) the Permitted Priority Liens, and (2) prior payment of the Carve-Out.

(c)     The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364 of the Bankruptcy Code or otherwise, other than (i) the Permitted Priority Liens as provided herein, and (ii) prior payment of the Carve-Out.

(d)     The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by any Debtor of mortgages, control agreements, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the DIP Lender to perfect such interests.

14.     <u>DIP Lender's Superpriority Claim.</u> The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "*DIP Superpriority Claim*") pursuant to section 364(c)(1) of the Bankruptcy Code in the Debtors' Chapter 11 Cases and in any successor case under the Bankruptcy Code (including any case under chapter 7 of the Bankruptcy Code, the "*Successor Case*") for all DIP Debt, having priority over any and all other administrative expenses of and unsecured claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or

arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c)(upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors, including all cash and cash equivalents, and all proceeds thereof including, without limitation, any Avoidance Actions Proceeds. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. Except as referenced in this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases or in any Successor Case. Other than the Adequate Protection Superpriority Claim, the DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in this Chapter 11 Case.

15.    <u>Survival of DIP Liens and DIP Superpriority Claim.</u> The DIP Liens, DIP Superpriority Claim and other rights and remedies granted under this Interim Order to the DIP Lender, shall continue in these cases and any Successor Cases and shall be valid and enforceable against any Trustee appointed in any Debtor's Chapter 11 Case and/or upon the dismissal of any Debtor's Chapter 11 Case or any Successor Case and such liens and security interests shall maintain their priority as provided in this Interim Order until all the DIP Debt has been indefeasibly paid in full in cash and the DIP Lender's commitments have been terminated in accordance with the DIP Loan Documents.

## CARVE-OUT; RESTRICTIONS ON USE OF FUNDS

16.    Carve-Out.

(a)    The Prepetition Liens, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall be subject and subordinate only to prior payment of: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Court as and when they are due without reference to the Budget (the "*Case Administration Fees*"); (ii) the allowed fees and costs of the Debtors' claims and noticing agent, (iii) unpaid professional fees and expenses payable to any the Carveout Professionals[5] (collectively, the "*Professional Fees*") that are incurred or accrued prior to the date on which the DIP Lender provides written notice to the Debtors, Debtors' counsel, the U.S. Trustee and counsel to the Committee (if any) of the occurrence of either an Event of Default or the Termination Date (such notice, the "*Carve-Out Notice*", and the date of a delivery of such notice, the "*Carve-Out Effective Date*"), but solely if, as and to the extent such Professional Fees (whenever incurred prior to the Carve-Out Effective Date), are allowed whether by interim order or procedural order, and have been provided for in, and are consistent with, the Budget (subject to the Permitted Variances), and (iv) unpaid Professional Fees of the Debtors and the  Committee (if any), in each case incurred or accrued on or after the Carve-Out Effective Date in an aggregate amount not to exceed $150,000 to the extent allowed at any time, whether by interim order or procedural order (clauses (i)—(iii), collectively, the "*Carve-Out*", and clause (iv) alone, the

---

[5]    "*Carveout Professionals*" means Professionals retained by the Debtors, including Saul Ewing LLP, as counsel for the Debtor ("*Saul Ewing*"), Getzler Henrich & Associates, LLC, as financial advisor to the Debtors ("*Getzler Henrich*"), Stephenson Harwood, LLP, as U.K. counsel to the Debtors ("*Stephenson Harwood*"), Raymond James, as investment banker to the Debtors, any counsel and financial advisor that may be authorized by the Court to be retained by a Committee, and the U.S. Trustee (solely to the extent of fees required pursuant to 28 U.S.C. § 1930(a)).  For the avoidance of doubt, no other investment bank or financial advisor of the Debtors other than Getzler Henrich and Raymond James shall be deemed a Carveout Professional or otherwise eligible to share in the Carveout.

38

"***Capped Carve-Out***"). Subject to the immediately preceding sentence, so long as the Carve-Out Effective Date has not occurred, the Debtors shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under the Bankruptcy Code as provided in the DIP Loan Documents and the Budget (subject to the Permitted Variances). Any payment of Carve-Out expenses incurred after the occurrence of the Carve-Out Effective Date, including any payment of Professional Fees, shall permanently reduce the Capped Carve-Out on a dollar-for-dollar basis. Without limiting the generality of the foregoing, the Carve-Out shall not include, apply to or be available for any success fee or similar payment to any professionals or other persons, including, without limitation, any such fee payable in connection with a restructuring or asset disposition with respect to the Debtors unless agreed to in writing by the DIP Lender.

(b)    The Debtors shall maintain a segregated account (the "***Carve-Out Reserve Account***") with Saul Ewing for the payment of Professional Fees for Saul Ewing, Getzler Henrich, Stephenson Harwood, and any counsel and financial advisor that may be authorized by the Court to be retained by the Committee (the "***Carve-Out Reserve Professionals***"), which account shall be funded by the Debtors  in accordance with the Budgets on a weekly basis, until the occurrence of the Carve-Out Effective Date.  No funding shall be provided over and above the amounts set forth in the Budgets proposed by the Debtors and approved by the DIP Lender.  After the Carve-Out Effective Date, the Capped Carve-Out and all fees reflected in the Budget for the Carve-Out Reserve Professionals prior to the Carve-Out Effective Date, but not paid or funded by the Debtors as of that date, will be funded to the Carve-Out Reserve Account, but no further amounts shall be funded to this account.  From funds in the Carve-Out Reserve Account, Saul Ewing shall pay the Carve-Out Reserve Professionals in compliance with an interim compensation procedures order and in the manner set forth in this Interim Order; *provided, however,* prior to payment in full of

39

the Prepetition Debt and termination of the Carve-Out, to the extent that Professional Fees for the Carve-Out Reserve Professionals that have accrued from the Petition Date through and including the Carve-Out Effective Date are less than the amounts funded into the Carve-Out Reserve Account, or to the extent that any portion of these Professional Fees are ultimately disallowed by the Bankruptcy Court by Final Order, then Saul Ewing shall immediately refund these excess monies to the DIP Lender. For the avoidance of doubt, (i) in making payments from the Carve-Out Reserve Account, Saul Ewing shall be entitled to conclusively rely upon written certifications of each Professional as to the amount due and owing to such Professional from the Carve-Out Reserve Account and in accordance with the Budget and shall have no liability to any party based upon its commercially reasonable reliance on such certifications; and (ii) in no circumstances shall Saul Ewing be obligated to pay any Professional other than from funds held in the Carve-Out Reserve Account.

(c)    <u>Carveout Usage</u>. No portion of the Carveout and no DIP Debt or Aggregate Collateral may be used to pay any fees or expenses incurred by any entity, including the Debtors, any Committee or the Carveout Professionals, in connection with claims or causes of action adverse to Lenders' interests in the Aggregate Collateral, including (i) preventing, hindering or delaying Lenders' enforcement or realization upon any of the Aggregate Collateral once an Event of Default has occurred; (ii) using or seeking to use Cash Collateral or incurring indebtedness in violation of the terms hereof, or selling any Aggregate Collateral outside the ordinary course of business without Lenders' consent; or (iii) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Aggregate Credit Obligations or any mortgages, liens or security interests with respect thereto or any other rights or interests of Lenders, or in asserting any claims or causes of action, including,

without limitation, any actions under chapter 5 of the Code, against Lenders; *provided, however,* that the foregoing shall not apply to costs and expenses, in an amount not to exceed $50,000, incurred by any Committee's professionals in connection with the investigation of a potential Challenge in accordance with Paragraph 21 of this Interim Order; provided, further, however, that the Carveout may be used to pay fees and expenses incurred by the Carveout Professionals in connection with the negotiation, preparation and entry of this Interim Order, the Final Order or any amendment hereto consented to by DIP Lender.

(d)     <u>Carveout Procedure</u>. The Debtors shall periodically, upon the request of the DIP Lender, provide to the DIP Lender a written report (the "***Carveout Report***"), in which the Debtors disclose their then-current, documented estimate of (i) the aggregate amount of unpaid professional fees, costs and expenses accrued or incurred by the Carveout Professionals, through the date of the Carveout Report and (ii) projected fees, costs and expenses of the Carveout Professionals for the two-week period following the date of such Carveout Report. Nothing herein shall be construed as consent by the DIP Lender or the Prepetition Lender to the allowance of any fees or expenses of the Carveout Professionals or shall affect the right of the DIP Lender or the Prepetition Lender to object to the allowance and payment of such fees, costs or expenses, or the right of the DIP Lender or the Prepetition Lender to the return of any portion of the Carve-Out that is funded with respect to fees and expenses for a Carveout Professional that are approved on an interim basis that are later denied on a final basis. For the avoidance of doubt, no Carveout Professional shall be entitled to any portion of the Carve-Out allocated for any other Carveout Professional in the Budget.

(e)     The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any professionals incurred in connection with the Chapter 11 Case or

any Successor Case under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way, to pay compensation to, or to reimburse expenses of, professionals retained by the Debtors or, if applicable, the Committee or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

17.    <u>Restrictions on Use of Funds.</u>

(a)    The Debtors are authorized to use the DIP Debt solely: (i) in accordance with the terms of this Interim Order, Final Order (upon entry) and the DIP Loan Documents; (ii) to fund the LC and Commercial Card Collateral Account; (iii) to pay those expenses in the amounts set forth in the Budget (including any Permitted Variance therefrom, solely as allowed under the DIP Credit Agreement), including funding of the Carve-Out, as and when such expenses become due and payable in accordance with the Budget; (iv) to pay Allowable 506(b) Amounts and the DIP Charges; and (v) upon entry of the Final Order, to repay the remaining outstanding amount of the Prepetition Debt.

(b)    Notwithstanding anything in this Interim Order or the DIP Loan Documents to the contrary, no portion of the DIP Facility, DIP Collateral, the Cash Collateral or any portion of the Carve-Out may be used in any manner to, and it shall constitute an Event of Default under the DIP Loan Documents if any DIP Proceeds are used to: (i) request authorization to obtain DIP Loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code or otherwise that are senior to or *pari passu* with the DIP Debt, the DIP Liens or the DIP Superpriority Claim, other than from the DIP Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Debt; (ii) pay any amount for any use not provided for in this Interim Order and/or the Final Order, as applicable, the DIP Credit Agreement and as set forth in the Budget (subject to the

Permitted Variances) or otherwise approved by the DIP Lender; (iii) without the prior written consent of the DIP Lender, to make any payment or distribution to or for the benefit of any non-Debtor affiliate or insider of the Debtors (other than ordinary course wages, payments made pursuant to employment agreements, or payments made in accordance with the Budget); (iv) make any payment, advance, intercompany advance or transfer, or any other remittance or transfer whatsoever that is not in accordance with the DIP Credit Agreement and Budget; (v) to finance in any way: (1) any adversary action, contested matter, suit, arbitration, proceeding, application, motion, objection or other litigation of any type adverse to the interests of any or all of the DIP Lender or the Prepetition Lender or their respective rights and remedies under DIP Loan Documents, the Interim Order, the Final Order or the Prepetition Loan Documents, or (2) any other action which with the giving of notice or passing of time would result in an Event of Default as defined under the DIP Loan Documents or the Prepetition Loan Documents; (vi) to make any distribution under a plan of reorganization in the Chapter 11 Cases without the prior written consent of the DIP Lender; (vii) pay any prepetition Claim of a Creditor (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lender; (viii) for any purpose that is prohibited under the Bankruptcy Code or this Interim Order; and/or (ix) to make any payment in excess of $50,000 in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender.

18.    <u>Prohibition on Granting of Additional Liens and Interests.</u> No liens, claims, interests or priority status, other than the Carve-Out or Permitted Priority Liens, having a lien or administrative priority superior to, *pari passu* with, or junior to that of the DIP Liens or the DIP Superpriority Claim granted by this Interim Order, shall be granted while any portion of the DIP

Debt remains outstanding, or any commitment under the DIP Loan Documents remains in effect, without the prior written consent of the DIP Lender.

19.    <u>Release.</u> The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph shall be deemed effective upon entry of the Final Order. The Debtors and the DIP Entity Guarantors, by their execution of the DIP Credit Agreement, on behalf of themselves and on behalf of their successors and assigns (collectively, "***Releasors***" and, individually, a "***Releasor***"), each hereby (a) releases, acquits, and forever discharges the DIP Lender, and any of its officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates or shareholders (the "***Releasees***") from any and all liabilities, claims, demands, actions or causes of action of every kind or nature (if any there be), whether absolute or contingent, due or to become due, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, that any Releasor now has, ever had or hereafter may have against the Releasees based on acts, transactions or circumstances that have occurred or been consummated on or before the closing of the DIP Credit Agreement and that arise out of or relate to (i) the DIP Facility or any other extension of credit by the DIP Lender to any Debtor including any equitable subordination or recharacterization claims or defenses; (ii) any of the DIP Loan Documents or DIP Collateral; (iii) any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents; or (iv) any aspect of the dealings or relationships between or among the Releasors, on the one hand, and the Releasees on the other hand, under or in connection with any of the DIP Loan Documents or any transaction, act or omission contemplated by or described in or concluded under any of the DIP Loan Documents (collectively, the "***Claims***"); and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority,

enforceability and non-avoidability of the DIP Debt and the DIP Liens. The provisions of this paragraph shall survive the termination of the DIP Facility and any other DIP Loan Documents and payment in full of any Obligations thereunder. Each of the Debtors and the DIP Entity Guarantors, by their execution of the DIP Credit Agreement, on behalf of themselves and on behalf of their successors, assigns and other legal representatives, hereby unconditionally and irrevocably agrees that such Releasor shall not sue any Releasee on the basis of any Claim released, remised and discharged pursuant to the foregoing provisions of this paragraph, and if any Releasor violates the foregoing covenant, such Releasor, for itself and its successors and assigns, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.  For the avoidance of doubt, nothing contained in this Interim Order shall be construed to release, discharge or acquit the DIP Lender from any of their Obligations hereunder or under the DIP Loan Documents.

## **REMEDIES; MODIFICATION OF AUTOMATIC STAY**

20. <u>Remedies and Stay Modification.</u>

(a) The occurrence of any of the following events, unless waived by the DIP Lender in writing and in accordance with the terms of the DIP Loan Documents, shall constitute an event of default (an "***Event of Default***") of this Interim Order: (i) the failure of any Debtor to perform, in any respect, any of the material terms, provisions, covenants, or obligations under this Interim Order, or (ii) the occurrence of an "Event of Default" under the DIP Credit Agreement.

(b) The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be

utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not an Event of Default under the DIP Loan Documents or a default by any Debtor of any of its obligations under this Interim Order has occurred, including without limitation: (i) to require all cash, checks or other collections or proceeds from DIP Collateral received by the Debtors to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender under the DIP Loan Documents in accordance with any requirements of the DIP Loan Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Loan Documents as provided therein; (iv) the right to give the Debtors any notice provided for in any of the DIP Loan Documents or this Interim Order; and (v) the right to declare (1) the termination, reduction or restriction of any further commitment under the DIP Loan Documents to the extent any such commitment remains unfunded; (2) all DIP Debt to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Debtors; and/or (3) the termination of the DIP Loan Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens on the DIP Collateral or the Obligations of the Debtors; *provided* that with respect to the enforcement of the DIP Liens on the DIP Collateral or the exercise of any other rights or remedies with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral), the DIP Lender shall file a written notice with the Court, which notice can be the same as the Carve-Out Notice (the "***Default Notice***") setting forth the Event of

46

Default(s) and, if a Default Notice is filed, shall serve such Default Notice upon the Debtors, their counsel, counsel to the Creditors' Committee (if any), counsel to the Prepetition Lender, and the U.S. Trustee.  Effective five (5) Business Days after the Default Notice (the "**Enforcement Notice Period**") is filed (and during which time the DIP Lender shall permit the Debtors to cure such Event of Default and use cash collateral in accordance with the Budget), the DIP Lender shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Debtors or any other interested party, to enforce the DIP Liens on the DIP Collateral or exercise any other rights or remedies with respect to the DIP Collateral (including rights to set-off or to apply any amounts in any bank accounts that are a part of the DIP Collateral).

(c)       During the Enforcement Notice Period, (i) the Debtors shall be prohibited from requesting any further draws under the DIP Facility and (ii) the only basis on which the Debtors shall be entitled to seek an emergency hearing within the Enforcement Notice Period with the Court shall be to contest whether an Event of Default has occurred and/or is continuing. The Enforcement Notice Period shall run concurrently with any notice period provided for under the DIP Loan Documents.

(d)       The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Committee (if any), any other party in interest and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of the Enforcement Notice Period.

(e)       If the DIP Lender is entitled, and has elected in accordance with the provisions hereof, to enforce the DIP Liens or exercise any other default-related remedies following

47

expiration of the Enforcement Notice Period, the Debtors shall cooperate with the DIP Lender in connection with such enforcement by, among other things, (i) providing at all reasonable times access to the Debtors' premises to representatives or agents of the DIP Lender (including any collateral liquidator or consultant), (ii) providing the DIP Lender and its representatives or agents, at all reasonable times access to the Debtors' non-privileged books and records and any information or documents requested by the DIP Lender or its representatives, (iii) performing all other Obligations set forth in the DIP Loan Documents, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Lender's enforcement of rights.

(f)    Upon the occurrence of the Termination Date, the DIP Lender shall have no further obligation to provide financing under the DIP Loan Documents; provided that the DIP Debt shall remain subject to the Carve-Out.

(g)    Unless extended by the Court upon written agreement of the DIP Lender, upon the Termination Date and without further notice or order of Court: (i) the Debtors' authorization to use Cash Collateral and incur DIP Debt hereunder will automatically terminate and (ii) at DIP Lender's election: (1) the DIP Debt shall immediately be due and payable and (2) DIP Lender shall be entitled to setoff any cash in DIP Lender or Prepetition Lender's possession or control and apply such cash to the Aggregate Credit Obligations.

## BAR OF CHALLENGES AND CLAIMS

21.    Reservation of Certain Committee and Third-Party Rights and Bar of Challenges and Claims.  The stipulations, releases, and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and

relinquished all Challenges (as defined below). The stipulations, releases, and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon all other parties-in-interest, including, without limitation, any Trustee appointed or elected for a Debtor or any Committee (if appointed), unless and to the extent that (a) a Committee (if any), a Trustee appointed prior to the Challenge Period Termination Date (as defined below), or any other party in interest (other than any Debtor), after obtaining requisite standing, has duly filed an adversary proceeding challenging in whole or part any such stipulations, releases and admissions, including the Debtors' Stipulations, or has otherwise asserted an Estate Claim (each, a "*Challenge*") by no later than (i) the earlier of (1) the date upon which a Sale Transaction is closed and (2) sixty (60) days following the date of appointment of a Committee, and (ii) any such later date agreed to in writing by the Debtors and the Prepetition Lender (the time period established by the later of the foregoing clauses, the "*Challenge Period*" and the date of expiration of each Challenge Period being a "*Challenge Period Termination Date*"), and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding. Notwithstanding the foregoing, if a Trustee is appointed or elected prior to the Challenge Period Termination Date, such Trustee shall have until the longer of (i) thirty (30) days after such appointment or election, and (ii) the remaining time under the Challenge Period to commence a Challenge.

22.    Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges shall be deemed to be forever waived, released, and barred; (b) the Prepetition Debt shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination,

49

recharacterization, defense, or avoidance for all purposes in the Debtors' Chapter 11 Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected first priority liens in the Prepetition Collateral, not subject to recharacterization, subordination, or avoidance; (d) all of the Debtors' stipulations and admissions contained in this Interim Order, including, without limitation, the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Debt and Prepetition Liens shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates, and all creditors, interest holders, and other parties-in-interest in these Chapter 11 Cases and any Successor Cases; and (e) all Estate Claims shall be waived.  If any such adversary proceeding is timely filed, the stipulations and admissions contained in this Interim Order, including the Stipulations, shall nonetheless remain binding and preclusive on the Debtors' estates, successors, any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee appointed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges, and an order of the Court conferring such standing on a Committee (if appointed) or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee (if appointed) or such other party-in-interest.

## **MISCELLANEOUS**

23.    Limitation on Section 506(c) Claims. Subject to entry of the Final Order, no costs or expenses of administration which have been or may be incurred in this Chapter 11 Case or any

Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against, the Lenders or any of their respective claims, the Carve-Out or the DIP Collateral or the Prepetition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Lenders. No action, inaction, or acquiescence by the Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the Lenders, any of their respective claims, the Carve-Out, the DIP Collateral or the Prepetition Collateral.

24.    <u>No Marshaling.</u> Subject to entry of the Final Order, the Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after an Event of Default under the DIP Loan Documents or termination or breach under the DIP Loan Documents, or of the Prepetition Collateral after an Event of Default under the Prepetition Loan Documents or termination or breach under the Prepetition Loan Documents.

25.    <u>Waiver of Right to Return/Consent to Setoff.</u> The Debtors shall not, without the prior written consent of the Lenders, exercise their rights: (a) to return any of the Aggregate Collateral pursuant to section 546(h) of the Bankruptcy Code; (b) to consent to any claims permitting any claims pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) to consent to setoff pursuant to section 553 of the Bankruptcy Code.

26.    <u>Indemnification</u>. The Debtors shall indemnify and hold harmless Lenders in accordance with the DIP Credit Agreement and the Prepetition Credit Agreement, as applicable.

27.    <u>Payments Free and Clear.</u> Any and all payments or proceeds remitted to DIP Lender or its counsel pursuant to the provisions of this Interim Order, the DIP Loan Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code whether asserted or assessed by, through, or on behalf of the Debtors.

28.    <u>Additional Perfection Measures.</u> The DIP Liens shall be perfected by operation of law immediately upon entry of this Interim Order. None of the Debtors nor the DIP Lender shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or any other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens.

(a)    If the DIP Lender chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments or to otherwise record or perfect such security interests and liens, the DIP Lender is hereby authorized, but not directed, to take such action or to request that the Debtors take such action on its behalf (and the Debtors are hereby authorized and directed to take such action), and

no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Lender may choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the Collateral and such filing by the DIP Lender shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

(c)    Upon entry of the Final Order, the DIP Lender shall establish the LC and Commercial Card Collateral Account referenced in paragraph 6(f), and such account and the monies deposited therein shall be deemed a portion of the DIP Collateral, and shall secure all of the DIP Obligations (as defined in the DIP Credit Agreement), including, but not limited to, the commercial credit card obligations and the letter of credit reimbursement obligations described in paragraph 6(f).  The DIP Lender's lien encumbering the LC and Commercial Card Collateral Account shall be deemed fully attached, valid, enforceable and perfected in accordance with the other terms of this Interim Order.

29.    <u>Delivery of Documentation.</u> The Debtors (and/or their legal or financial advisors) shall deliver to the DIP Lender and counsel to the DIP Lender, all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings and/or filings that are either (a) required to be provided (by the Debtors and/or their legal or financial advisors) to the DIP Lender pursuant to the DIP Loan Documents or (b) reasonably requested by the DIP Lender (or their legal and financial advisors), as the case may be.

30.     <u>Access to Books and Records.</u> The Debtors (and/or their legal and financial advisors) will (a) keep proper books, records and accounts in accordance with GAAP in which full, true, and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with and provide to the DIP Lender all such information as required or allowed under the DIP Loan Documents or the provisions of this Interim Order, (c) permit, consistent with the DIP Loan Documents, representatives of the DIP Lender to visit and inspect any of their respective properties (to the extent practicable, during customary business hours), to examine and make abstracts or copies from any of their non-privileged respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties (to the extent practicable, during customary business hours), and to discuss and be informed as to the Debtors' respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired, and (d) permit, consistent with the DIP Loan Documents, representatives of the DIP Lender to consult with and be informed by the Debtors' management on matters concerning the general status of the Debtors' businesses, financial condition and operations.

31.     <u>Lenders Not Responsible Persons; No Control.</u> In (a) making the decision to make the DIP Loans; (b) administering the DIP Loans; (c) extending other financial accommodations to the Debtors under the DIP Loan Documents; and (d) making the decision to collect the indebtedness and obligations of the Debtors, the DIP Lender shall not be considered to (i) owe any fiduciary obligation to any Debtor or any other party with respect to their exercise of any consent rights afforded them under the DIP Loan Documents or this Interim Order or (ii) be exercising control over the Debtors or their operations, have authority to determine the manner in which any

of the Debtors' operations are conducted, or acting in any way as a responsible person, a control person, insider or as an owner or operator of any Debtor or any of its affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, and/or the DIP Loan Documents, under any applicable law.

32.    <u>Successors and Assigns.</u> The DIP Loan Documents and the provisions of this Interim Order shall be binding upon each Debtor, the DIP Lender, and each of their respective successors and assigns, and shall inure to the benefit of each Debtor, the DIP Lender, and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code. The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders and all other parties in interest, including, but not limited to any Trustee appointed or elected.

33.    <u>DIP Credit Bid Rights.</u> The DIP Lender shall be entitled to credit bid up to the full amount of the outstanding DIP Debt, including, without limitation, any accrued interest and expenses, in any sale of any DIP Collateral, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding or otherwise, and the DIP Lender expressly reserves the right to credit bid up to the full amount of its outstanding DIP Debt including, without limitation, all principal, interest, fees, expenses, call and make-whole premiums, yield maintenance premiums and other fees and charges.

34.    <u>Prepetition Credit Bid Rights</u>. Subject to the consent of the DIP Lender, the Prepetition Lender shall be entitled to credit bid up to the full amount of the outstanding Prepetition Debt, including, without limitation, any accrued interest and expenses, in any sale of any

Prepetition Collateral, whether such sale is effectuated through section 363 of the Bankruptcy Code in a chapter 11 or chapter 7 proceeding, under section 1129 of the Bankruptcy Code in a chapter 11 proceeding, by a chapter 7 trustee in a chapter 7 proceeding or otherwise, and the Prepetition Lender expressly reserves the right to credit bid up to the full amount of its outstanding Prepetition Debt including, without limitation, all principal, interest, fees, expenses, call and make-whole premiums, yield maintenance premiums and other fees and charges.

35.    <u>Binding Nature of Agreement.</u> Each of the DIP Loan Documents to which any of the Debtors are or will become a party shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable in accordance with their terms. Unless otherwise consented to in writing, the rights, remedies, powers, privileges, liens and priorities of the DIP Lender provided for in this Interim Order, the DIP Loan Documents or otherwise shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any subsequent case under the Bankruptcy Code.

36.    <u>Subsequent Reversal or Modification</u>. This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), and the DIP Lender is accordingly entitled to all protections afforded by section 364(e) of the Bankruptcy Code with respect to all right, claims, liens and interests granted under this Interim Order.

37.    <u>Collateral Rights.</u> If any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Debt under the DIP Loan Documents and termination of the commitment in accordance with the DIP Loan Documents, such junior or subordinate lienholder shall be deemed