to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Lender and shall immediately turn over such proceeds for application by the DIP Lender, in accordance with the DIP Loan Documents to repay the DIP Debt in accordance with the DIP Loan Documents, and this Interim Order until indefeasibly paid in full in cash.

38.    <u>No Waiver.</u> This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Court.

39.    <u>No Discharge</u>.  None of the DIP Debt (unless paid in full in cash) shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in these Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such discharge.

40.    <u>Limits on Lender's Liability.</u> Nothing in this Interim Order or in any of the DIP Loan Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts, including the negotiation and entry into any agreements, or documents relating to the DIP Loans. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person; and all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

41.     <u>Priority of Terms; Inconsistencies.</u> To the extent of any conflict or inconsistencies between or among (a) the express terms or provisions of any of the DIP Loan Documents, the relief requested in the Motion, any other order of this Court or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Loan Documents (or words of similar import), the terms and provisions of this Interim Order shall govern and control.

42.     <u>No Third-Party Beneficiary.</u> Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

43.     <u>Survival.</u>

(a)     Upon the occurrence of any Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreement. Notwithstanding any order that may be entered dismissing any of these Chapter 11 Cases under section 1112 of the Bankruptcy Code: (i) the DIP Superpriority Claim, the DIP Liens, the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Debt shall have been paid in full (and that such DIP Superpriority Claim, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(b)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Debt incurred prior to the actual receipt of written notice by the DIP Lender, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Prior to the actual receipt of written notice by the DIP Lender of the effective date of any such reversal, modification, or vacatur of this Interim Order, the DIP Loans shall be governed in all respects by the original provisions of this Interim Order and the DIP Loan Documents, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in sections 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents with respect to the DIP Debt, and all DIP Loans under the DIP Loan Documents are deemed to have been made in reliance upon this Interim Order, and, therefore, the indebtedness resulting from such DIP Loans prior to the effective date of any modification or reversal of this Interim Order cannot as a result of any subsequent order the Debtor's Chapter 11 Case, or any Successor Case, (i) be subordinated or (ii) be deprived of the benefit or priority of the DIP Superpriority Claim or DIP Liens granted to the DIP Lender under this Interim Order or the DIP Loan Documents.

(c)    Except as otherwise provided herein, (i) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (1) dismissing these Chapter 11 Cases or (2) converting these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code; and (ii) the DIP Liens, the DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim continue to be valid and

enforceable in these Chapter 11 Cases, in any such successor case or after any such dismissal. Except as otherwise provided herein, the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim shall maintain their priorities as provided in this Interim Order and the DIP Loan Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Lender in accordance with the Interim Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of this Chapter 11 Case or by any other act or omission until all DIP Debt is indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents are terminated in accordance therewith.

44.    <u>Adequate Notice.</u> The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules and the Local Rules, such notice was sufficient under the particular circumstances, and no other or further notice of the request for relief granted at the Interim Hearing is required. The Debtors shall promptly mail copies of this Interim Order to any known party affected by the terms of this Interim Order and any other party requesting notice after the entry of this Interim Order.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing at 4:00 p.m. (Eastern) by the following: (a) proposed counsel to the Debtors, Saul Ewing LLP, (i) Centre Square West, 1500 Market Street, 38th Floor, Philadelphia, PA 19102, Attn:, Jeffrey C. Hampton and Adam H. Isenberg (jeffrey.hampton@saul.com and adam.isenberg@saul.com) and (ii) 1201 N. Market St., Suite 2300, Wilmington, DE 19801, Attn: Mark Minuti and Paige N. Topper (mark.minuti@saul.com) and (paige.topper@saul.com); (b) counsel to the DIP Lender and

Prepetition Lender, Troutman Pepper Locke, 701 8th Street, N.W., Suite 500, Washington DC 200001, Attn: Jonathan W. Young and Katherine Culbertson (Jonathan.young@troutman.com and katherine.culbertson@troutman.com); (e) the Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, Attn: Gerard R. Vetter (gerard.r.vetter@usdoj.gov); and (f) any Creditors' Committee appointed in these cases. The Court shall conduct a Final Hearing on the Motion commencing on [•], 2025 at [•] p.m. (Eastern).

45. _Immediate Binding Effect; Entry of Interim Order._ This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry. The Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in this Chapter 11 Case; there shall be no stay of execution or effectiveness of this Interim Order and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

46. _Headings._ Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

47. _Proofs of Claim._ Notwithstanding any order of this Court to the contrary, each of the DIP Lender and the Prepetition Lender are hereby relieved of any obligation or requirement to file proofs of claim or applications for administrative claims in this Chapter 11 Case with respect to any of the DIP Debt or the Prepetition Debt and any other claims or liens granted hereunder or created hereby.

48. _Retention of Jurisdiction._ This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

## EXHIBIT A

**DIP Credit Agreement**

Final Version
(Subject to Bankruptcy Court Approval)

## J.P.Morgan

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**


**dated as of**

**January __, 2025**

**among**

**DIAMOND COMIC DISTRIBUTORS, INC.,**

as Borrower,

**THE OTHER PERSONS PARTY HERETO,**

as Loan Parties,

**STEPHEN A. GEPPI**,

as Individual Guarantor,

and

**JPMORGAN CHASE BANK, N.A.,**

as DIP Lender


**ASSET BASED LENDING**

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS.................................................................................................2
    SECTION 1.01.   Defined Terms................................................................................2
    SECTION 1.02.   Classification of Loans and Borrowings.........................................2
    SECTION 1.03.   Terms Generally............................................................................2
    SECTION 1.04.   Accounting Terms; GAAP .............................................................3
    SECTION 1.05.   Interest Rates; SOFR Notifications................................................3
    SECTION 1.06.   Business Day Convention ..............................................................3
    SECTION 1.07.   Currency Matters...........................................................................4
    SECTION 1.08.   Divisions .......................................................................................4
ARTICLE II THE CREDITS.............................................................................................4
    SECTION 2.01.   Revolving Commitment.................................................................4
    SECTION 2.02.   Loans and Borrowings ..................................................................4
    SECTION 2.03.   Borrowing Procedures; Requests for Revolving Borrowings.........4
    SECTION 2.04.   Protective Advances ......................................................................5
    SECTION 2.05.   Prepetition Letter of Credit ...........................................................5
    SECTION 2.06.   Funding of Borrowings .................................................................7
    SECTION 2.07.   [Reserved]......................................................................................7
    SECTION 2.08.   Termination of Revolving Commitment..........................................7
    SECTION 2.09.   Repayment and Amortization of Loans; Collection and Application of
                    Collateral Proceeds; Evidence of Debt. ...................................8
    SECTION 2.10.   Prepayment of Loan. ......................................................................9
    SECTION 2.11.   Fee.................................................................................................10
    SECTION 2.12.   Interest..........................................................................................11
    SECTION 2.13.   Alternate Rate of Interest; Illegality .............................................11
    SECTION 2.14.   Increased Cost ...............................................................................13
    SECTION 2.15.   [Reserved]......................................................................................14
    SECTION 2.16.   Taxes. ............................................................................................14
    SECTION 2.17.   Payments Generally; Allocation of Proceed ..................................15
    SECTION 2.18.   Indemnity for Returned Payments .................................................16
ARTICLE III REPRESENTATIONS AND WARRANTIES ..............................................16
    SECTION 3.01.   Organization; Powers.....................................................................16
    SECTION 3.02.   Authorization; Enforceability .......................................................16

i

SECTION 3.03.    Governmental Approvals; No Conflicts...........................................17

SECTION 3.04.    Approved Budget ...................................................................17

SECTION 3.05.    Properties ..........................................................................17

SECTION 3.06.    Litigation and Environmental Matters .........................................17

SECTION 3.07.    Compliance with Laws and Agreements; No Default..................18

SECTION 3.08.    Investment Company Status ....................................................18

SECTION 3.09.    Taxes ................................................................................18

SECTION 3.10.    ERISA ...............................................................................18

SECTION 3.11.    Disclosure ..........................................................................18

SECTION 3.12.    [Reserved] ..........................................................................19

SECTION 3.13.    Solvency ............................................................................19

SECTION 3.14.    Insurance ...........................................................................19

SECTION 3.15.    Capitalization and Subsidiaries ...............................................19

SECTION 3.16.    Security Interest in Collateral. .................................................19

SECTION 3.17.    Employment Matters.............................................................20

SECTION 3.18.    Margin Regulations ..............................................................20

SECTION 3.19.    Use of Proceeds...................................................................20

SECTION 3.20.    No Burdensome Restrictions ...................................................20

SECTION 3.21.    Anti-Corruption Laws and Sanctions.........................................20

SECTION 3.22.    Affiliate Transactions ...........................................................20

SECTION 3.23.    Common Enterprise ..............................................................21

SECTION 3.24.    Plan Assets; Prohibited Transactions.........................................21

SECTION 3.25.    Interim Order; Final Financing Order..........................................21

ARTICLE IV CONDITIONS ........................................................................21

SECTION 4.01.    Effective Date .....................................................................21

SECTION 4.02.    Each Credit Event ................................................................22

ARTICLE V AFFIRMATIVE COVENANTS......................................................22

SECTION 5.01.    Financial Statements; Borrowing Base and Other Information .................22

SECTION 5.02.    Notices of Material Events......................................................23

SECTION 5.03.    Existence; Conduct of Business ...............................................23

SECTION 5.04.    Payment of Taxes and Certain Other Obligations.........................24

SECTION 5.05.    Maintenance of Properties ......................................................24

SECTION 5.06.    Books and Records; Inspection Rights .......................................24

SECTION 5.07.    Compliance with Laws and Material Contractual Obligations....................24

ii

SECTION 5.08.  Use of Proceeds..................................................................................24

SECTION 5.09.  Accuracy of Information.......................................................................25

SECTION 5.10.  Insurance...............................................................................................25

SECTION 5.11.  Casualty and Condemnation................................................................26

SECTION 5.12.  Appraisals..............................................................................................26

SECTION 5.13.  Depository Banks..................................................................................26

SECTION 5.14.  Additional Collateral; Further Assurances........................................26

SECTION 5.15.  Receivables...........................................................................................27

SECTION 5.16.  Inventory and Equipment.....................................................................28

SECTION 5.17.  Agency Goods Distribution Agreements.............................................28

SECTION 5.18.  Responsible Officer..............................................................................29

SECTION 5.19.  Milestones.............................................................................................29

SECTION 5.20.  Bankruptcy Matters..............................................................................29

ARTICLE VI NEGATIVE COVENANTS.......................................................................29

SECTION 6.01.  Indebtedness..........................................................................................29

SECTION 6.02.  Liens......................................................................................................30

SECTION 6.03.  Fundamental Changes...........................................................................30

SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions.....................31

SECTION 6.05.  Asset Sales............................................................................................31

SECTION 6.06.  Sale and Leaseback Transactions........................................................32

SECTION 6.07.  Swap Agreements.................................................................................32

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness...........................32

SECTION 6.09.  Transactions with Affiliates.................................................................32

SECTION 6.10.  Restrictive Agreements.........................................................................32

SECTION 6.11.  Amendment of Material Documents.....................................................33

SECTION 6.12.  Payments to Raymond James...............................................................33

SECTION 6.13.  Financing Order....................................................................................33

ARTICLE VII EVENTS OF DEFAULT ...........................................................................34

ARTICLE VIII MISCELLANEOUS..................................................................................37

SECTION 8.01.  Notices..................................................................................................37

SECTION 8.02.  Waivers; Amendments.........................................................................39

SECTION 8.03.  Expenses; Indemnity; Damage Waiver...............................................39

SECTION 8.04.  Successors and Assigns.........................................................................41

SECTION 8.05.  Survival.................................................................................................42

iii

SECTION 8.06.    Counterparts; Integration; Effectiveness; Electronic Execution ..................42

SECTION 8.07.    Severability ...................................................................................................43

SECTION 8.08.    Right of Setoff ...............................................................................................43

SECTION 8.09.    Governing Law; Jurisdiction; Consent to Service of Process.......................44

SECTION 8.10.    WAIVER OF JURY TRIAL ...........................................................................44

SECTION 8.11.    Headings ........................................................................................................45

SECTION 8.12.    Confidentiality ...............................................................................................45

SECTION 8.13.    Nonreliance; Violation of Law ......................................................................45

SECTION 8.14.    USA PATRIOT Act .......................................................................................45

SECTION 8.15.    Disclosure ......................................................................................................45

SECTION 8.16.    Interest Rate Limitation .................................................................................46

SECTION 8.17.    Marketing Consent .........................................................................................46

SECTION 8.18.    Termination ....................................................................................................46

SECTION 8.19.    No Fiduciary Duty, etc. ..................................................................................46

SECTION 8.20.    Release ...........................................................................................................47

ARTICLE IX LOAN GUARANTY ....................................................................................................48

SECTION 9.01.    Guaranty .........................................................................................................48

SECTION 9.02.    Guaranty of Payment. .....................................................................................48

SECTION 9.03.    No Discharge or Diminishment of Loan Guaranty. .......................................48

SECTION 9.04.    Defenses Waived ............................................................................................49

SECTION 9.05.    Rights of Subrogation .....................................................................................49

SECTION 9.06.    Reinstatement; Stay of Acceleration ..............................................................50

SECTION 9.07.    Information ......................................................................................................50

SECTION 9.08.    Termination ....................................................................................................50

SECTION 9.09.    Taxes ..............................................................................................................50

SECTION 9.10.    Maximum Liability .........................................................................................50

SECTION 9.11.    Contribution ....................................................................................................51

SECTION 9.12.    Liability Cumulative .......................................................................................51

iv

<u>SCHEDULES:</u>

Definitions Schedule
Borrowing Base Schedule
Reporting Schedule
Disclosure Schedule

<u>EXHIBITS:</u>

Exhibit A **-** Approved Budget
Exhibit B **-** Milestones

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of January [    ], 2025 (as it may be amended or modified from time to time, together with all Exhibits and Schedules annexed hereto from time to time, each of which is hereby incorporated herein and made a part hereof, this "DIP Credit Agreement") by and among debtor-in-possession DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation ("Diamond") as the "Borrower" hereunder (in such capacity, the "Borrower"), the other Loan Parties from time to time party hereto, STEPHEN A. GEPPI (the "Individual Guarantor"), and JPMORGAN CHASE BANK, N.A. as the "DIP Lender" hereunder (the "DIP Lender").

WHEREAS, on January 14, 2025 (the "Filing Date"), Diamond, Comic Exporters, Inc., a Maryland corporation ("Comic Exporters"), Comic Holdings, Inc., a Maryland corporation ("Comic Holdings"), and Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("Diamond Select"; collectively with Diamond, Comic Exporters and Comic Holdings, the "Debtors"; and each, individually, a "Debtor") filed voluntary petitions for relief that commenced cases under chapter 11 of the Bankruptcy Code that are jointly administered as Bankruptcy Case No. 25-10308 (DER) (the "Chapter 11 Cases") before the United Stated Bankruptcy Court for the District of Maryland (together with any other court having competent jurisdiction over the Chapter 11 Cases from time to time, the "Bankruptcy Court");

WHEREAS, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to that certain Credit Agreement, dated as of May 16, 2019 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Diamond as borrower (in such capacity, the "Prepetition Borrower"), the other Debtors, Diamond Comic Distributors, an unlimited liability company incorporated under the laws of England and Wales ("DCDUK"), Rosebud Entertainment, LLC, a Maryland limited liability company ("Rosebud"), Game Consolidators, LLC, a Delaware limited liability company ("Game Consolidators"), and Renegade Games, LLC, a Delaware limited liability company ("Renegade"), as loan guarantors (collectively, with the Prepetition Borrower, the "Prepetition Loan Parties"), and JPMorgan Chase Bank N.A. as lender (in such capacity, the "Prepetition Lender"), the Prepetition Lender made certain revolving loans and other financial accommodations to the Prepetition Borrower prior to the Filing Date on the terms and conditions set forth therein, which loans and other financial accommodations and all other Prepetition Obligations (as defined in the Definitions Schedule attached hereto) are secured by Liens on substantially all of the assets of the Prepetition Loan Parties;

WHEREAS, the Individual Guarantor also unconditionally guaranteed all of the Prepetition Obligations;

WHEREAS, as of the Filing Date, the outstanding principal amount of the Prepetition Obligations totaled approximately $32,600,000

WHEREAS, the Borrower has requested that the DIP Lender provide a secured revolving credit facility (the "DIP Facility") to the Borrower (i) to fund certain fees and expenses associated with the DIP Facility incurred during the Chapter 11 Cases, (ii) to finance the ongoing general corporate needs of the Borrower and the other Loan Parties in accordance with the Approved Budget (as defined in the Definitions Schedule attached hereto, and including any Permitted Variances as defined in the Definitions Schedule attached hereto), (iii) to pay for certain other administrative expenses incurred during the Chapter 11 Cases in accordance with the Approved Budget, (iv) to finance the LC and Commercial Card Collateral Amount (as defined below), (v) to provide for adequate protection in favor of the Prepetition Lender, and (vi) to pay the Prepetition Obligations (as defined in the Definitions Schedule attached hereto), all subject to the approval of the Bankruptcy Court; and

1

WHEREAS, each of the Loan Parties (including the Individual Guarantor) other than the Borrower has agreed to guaranty the DIP Obligations (as defined in the Definitions Schedule attached hereto); and

WHEREAS, the DIP Lender is willing to provide the DIP Facility on the terms and conditions set forth in this DIP Credit Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

SECTION 1.01. <u>Defined Terms</u>. As used in this DIP Credit Agreement, capitalized terms not otherwise defined herein shall have the meanings specified in the Definitions Schedule attached hereto.

SECTION 1.02. <u>Classification of Loans and Borrowings</u>. For purposes of this DIP Credit Agreement, Loans may be classified and referred to by Class (e.g., a "<u>Revolving Loan</u>") or by Type (e.g., a "<u>CBFR Loan</u>") or by Class and Type (e.g., a "<u>CBFR Revolving Loan</u>"). Borrowings also may be classified and referred to by Class (e.g., a "<u>Revolving Borrowing</u>") or by Type (e.g., a "<u>CBFR Borrowing</u>") or by Class and Type (e.g., a "<u>CBFR Revolving Borrowing</u>").

SECTION 1.03. <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this DIP Credit Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this DIP Credit Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

2

SECTION 1.04.  Accounting Terms; GAAP.

(a)     Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, notwithstanding the occurrence of any change after the date hereof in GAAP or in the application thereof on the operation of any provision hereof, such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective unless and until such provision is amended in accordance herewith.

(b)     Notwithstanding anything to the contrary contained in Section 1.04(a) or in the definition of "Capital Lease Obligations," any change in accounting for leases pursuant to GAAP resulting from the adoption of Financial Accounting Standards Board Accounting Standards Update No. 2016-02, Leases (Topic 842) ("FAS 842"), to the extent such adoption would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) would not have been required to be so treated under GAAP as in effect on December 31, 2019, such lease shall not be considered a capital lease, and all calculations and deliverables under this DIP Credit Agreement or any other DIP Loan Document shall be made or delivered, as applicable, in accordance therewith.

SECTION 1.05.  Interest Rates; SOFR Notifications. The interest rate on a Loan denominated in dollars may be derived from an interest rate benchmark that may be discontinued or is, or may in the future become, the subject of regulatory reform.  Upon the occurrence of a Benchmark Transition Event, Section 2.13(c) provides a mechanism for determining an alternative rate of interest.  The DIP Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, the administration, submission, performance or any other matter related to any interest rate used in this DIP Credit Agreement, or with respect to any alternative or successor rate thereto, or replacement rate thereof, including without limitation, whether the composition or characteristics of any such alternative, successor or replacement reference rate will be similar to, or produce the same value or economic equivalence of, the existing interest rate being replaced or have the same volume or liquidity as did any existing interest rate prior to its discontinuance or unavailability.  The DIP Lender and its affiliates and/or other related entities may engage in transactions that affect the calculation of any interest rate used in this DIP Credit Agreement or any alternative, successor or alternative rate (including any Alternate Rate) and/or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The DIP Lender may select information sources or services in its reasonable discretion to ascertain any interest rate used in this DIP Credit Agreement, any component thereof, or rates referenced in the definition thereof, in each of the cases pursuant to the terms of this DIP Credit Agreement, and shall have no liability to the Borrower or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION 1.06.  Business Day Convention. If any report, financial statement, certificate, notice or other communication required to be delivered under this DIP Credit Agreement or any other DIP Loan Document is due on a day that is not a Business Day (or if the last day such report, financial statement, certificate, notice or other communication may be delivered hereunder in accordance with the terms hereof is not a Business Day), then such report, financial statement, certificate or notice may be delivered on the next succeeding Business Day and if made on such Business Day shall be deemed to have been delivered in compliance with the terms hereof or thereof. If any Sale Milestone deadline or other deadline under this DIP Credit Agreement or any other DIP Loan Document falls on a day that is not a Business Day, then such Sale Milestone deadline or other deadline shall be extended until the next succeeding Business Day and if satisfied on such Business Day shall be deemed to have been satisfied in compliance with the terms hereof or thereof.

SECTION 1.07. <u>Currency Matters</u>.  Principal, interest, reimbursement obligations, fees, and all other amounts payable under this DIP Credit Agreement and the other DIP Loan Documents to the DIP Lender shall be payable in dollars.  Unless stated otherwise, all calculations, comparisons, measurements or determinations under this DIP Credit Agreement shall be made in dollars.  For the purpose of such calculations, comparisons, measurements or determinations, amounts or proceeds denominated in other currencies shall be converted to the Dollar Equivalent on the date of calculation, comparison, measurement or determination.  Unless expressly provided otherwise, where a reference is made to a dollar amount, the amount is to be considered as the amount in dollars and, therefore, each other currency shall be converted into the Dollar Equivalent.

SECTION 1.08. <u>Divisions</u>.  For all purposes under the DIP Loan Documents, in connection with any Division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE CREDITS

SECTION 2.01. <u>Revolving Commitment</u>. Subject to the terms and conditions set forth herein and the Financing Order, the DIP Lender agrees to make Revolving Loans to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (a) the sum of (i) the Revolving Exposure and (ii) the Prepetition Obligations outstanding at any time (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) (the sum of (a)(i) and (ii) being referred to herein as the "***Aggregate Credit Obligations***") exceeding (b) the lesser of (i) the Maximum DIP Facility Amount, and (y) the Borrowing Base, subject to the DIP Lender's authority, in its sole discretion, to make Protective Advances pursuant to the terms of Section 2.04. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.  Notwithstanding anything to the contrary set forth herein, the maximum amount of Revolving Loans available to be drawn under this DIP Credit Agreement prior to the entry of the Final Financing Order shall not result in an increase in the Aggregate Credit Obligations from the Petition Date through date of entry of the Final Financing Order in excess of the Maximum Interim Increase Amount.

SECTION 2.02. <u>Loans and Borrowings.</u>

(a)  Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type. Any Protective Advance shall be made in accordance with the procedures set forth in Section 2.04.

(b)  Subject to Section 2.13, each Borrowing, if applicable, shall be comprised entirely of CBFR Loans.

(c)  CBFR Borrowings may be in any amount. Borrowings of more than one Type and Class may be outstanding at the same time.

SECTION 2.03. <u>Borrowing Procedures; Requests for Revolving Borrowings</u>.  To request a Revolving Borrowing, the Borrower shall notify the DIP Lender of such request either in writing (delivered by hand, fax or other means acceptable to the DIP Lender) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower or through an Electronic System if arrangements for doing so have

4

been approved by the DIP Lender (or if an Extenuating Circumstance shall exist, by telephone) not later than noon, Chicago time, on the date of the proposed Borrowing; provided that any such notice of a CBFR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(c) may be given not later than 10:00 a.m., Chicago time, on the date of the proposed Borrowing.

Each such Borrowing Request shall be irrevocable and each such telephonic Borrowing Request, if permitted, shall be confirmed immediately upon cessation of the Extenuating Circumstance by hand delivery, facsimile or a communication through Electronic System to the DIP Lender of a written Borrowing Request in a form approved by the DIP Lender and signed by a Responsible Officer of the Borrower. Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information:

> (i)     the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing; and

> (ii)     the date of such Borrowing, which shall be a Business Day.

For the avoidance of doubt, the Borrower shall not request, and the DIP Lender shall have no obligation to make, any Revolving Loan (a) to the extent that a prepayment obligation exists or would arise under Section 2.10(b), or (b) if the proceeds thereof would be used for an expense not consistent with the Approved Budget (subject to the Permitted Variances) and otherwise in accordance with the Financing Order.

Upon the entry of the Final Financing Order, the Borrower shall be deemed to have made irrevocable Borrowing Requests for Revolving Loan Borrowings in the amount of (x) the LC and Commercial Card Collateral Amount (as defined in Section 2.05(g)) and (y) the then outstanding Prepetition Obligations (including any Reinstated Prepetition Obligations and Allowable 506(b) Amounts).

SECTION 2.04.  Protective Advances. Subject to the limitations set forth below, the DIP Lender is authorized by the Borrower, from time to time in the DIP Lender's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrower, which the DIP Lender, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and the other DIP Obligations or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this DIP Credit Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.03) and other sums payable under the DIP Loan Documents (any of such Loans are herein referred to as "Protective Advances"). Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied. The Protective Advances shall be secured by the Liens in favor of the DIP Lender in and to the Collateral and shall constitute DIP Obligations hereunder. All Protective Advances shall be CBFR Borrowings. The making of a Protective Advance on any one occasion shall not obligate the DIP Lender to make any Protective Advance on any other occasion.

SECTION 2.05.  Prepetition Letter of Credit.

> (a)     General. A portion of the Revolving Commitment equal to the LC Sublimit shall be available for the issuance and maintenance of the Prepetition Letter of Credit. Upon entry of the Interim Order, the Prepetition Letter of Credit shall be deemed issued by the DIP Lender and outstanding hereunder. In the event of any inconsistency between the terms and conditions of this DIP Credit Agreement and the terms and conditions of the documents governing the Prepetition Letter of Credit, the terms and conditions of this DIP Credit Agreement shall control. The DIP Lender shall have no obligation hereunder to issue, and shall not issue, and shall not permit to remain outstanding, any letter of credit other than the Prepetition Letter of Credit.

(b)    <u>Expiration Date</u>. The Prepetition Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the DIP Lender to the beneficiary thereof) on the date set forth in the Prepetition Letter of Credit.

(c)    <u>Reimbursement</u>. If the DIP Lender shall make any LC Disbursement in respect of the Prepetition Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the DIP Lender an amount equal to such LC Disbursement on the date that such LC Disbursement is made; provided that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 or 2.04 that such payment be financed with a CBFR Revolving Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting CBFR Revolving Borrowing.

(d)    <u>Obligations Absolute</u>. The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (c) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this DIP Credit Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of the Prepetition Letter of Credit, the documents governing the Prepetition Letter of Credit, or this DIP Credit Agreement, or any term or provision herein or therein, (ii) any draft or other document presented under the Prepetition Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) any payment by the DIP Lender under the Prepetition Letter of Credit against presentation of a draft or other document that does not comply with the terms of the Prepetition Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligation hereunder. Neither the DIP Lender nor any of its Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of the Prepetition Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to the Prepetition Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the DIP Lender; <u>provided</u> that the foregoing shall not be construed to excuse the DIP Lender from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the DIP Lender's failure to exercise care when determining whether drafts and other documents presented under the Prepetition Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the DIP Lender (as finally determined by a court of competent jurisdiction), the DIP Lender shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of the Prepetition Letter of Credit, the DIP Lender may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of the Prepetition Letter of Credit.

(e)    <u>Disbursement Procedures</u>. The DIP Lender shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under the Prepetition Letter of Credit. The DIP Lender shall promptly notify the Borrower by telephone (confirmed by fax or through Electronic Systems) of such demand for payment and whether the DIP Lender has made or will make an LC Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not

relieve the Borrower of its obligation to reimburse the DIP Lender with respect to any such LC Disbursement.

(f)     Interim Interest. If the DIP Lender shall make any LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to CBFR Revolving Loans and such interest shall be due and payable on the date when such reimbursement is payable; provided that, if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (c) of this Section, then Section 2.12(c) shall apply.

(g)     Cash Collateralization. Upon entry of the Final Financing Order, the Borrower shall promptly request a CBFR Borrowing in an amount equal to $1,300,000 (which amount (the "LC and Commercial Card Collateral Amount") is equal to (x) 105% the amount of the LC Exposure in respect of the Prepetition Letter of Credit and (y) $250,000 in respect of the Borrower's obligations for commercial credit cards provided by the DIP Lender), and shall remit the proceeds of such CBFR Borrower to the DIP Lender to be held in a deposit account maintained at the DIP Lender, in the name and for the benefit of the DIP Lender (the "LC and Commercial Card Collateral Account"). Such deposit and all other amounts from time to time deposited in the LC and Commercial Card Collateral Account shall be held by the DIP Lender as collateral for the payment and performance of the DIP Obligations. The DIP Lender shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC and Commercial Card Collateral Account and the Borrower hereby grants the DIP Lender a security interest in the LC and Commercial Card Collateral Account and all money or other assets on deposit therein or credited thereto. Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the DIP Lender and at the Borrower's risk and expense, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in the LC and Commercial Card Collateral Account. Moneys in the LC and Commercial Card Collateral Account shall be applied by the DIP Lender for LC Disbursements and obligations of the Borrower in respect of commercial credit cards provided by the DIP Lender for which the DIP Lender has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure and for obligations of the Borrower in respect of commercial credit cards provided by the DIP Lender at such time or, if the maturity of the Loans has been accelerated, shall be applied to satisfy other DIP Obligations.

SECTION 2.06.  Funding of Borrowings. The DIP Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrower by promptly crediting the amounts in immediately available funds to the Funding Account(s); provided that the proceeds of any CBFR Revolving Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(c), deemed requests for Borrowings under Section 2.17(c), and Protective Advances shall be retained by the DIP Lender.

SECTION 2.07.  **[Reserved].**

SECTION 2.08.  Termination of Revolving Commitment.

(a)     Unless previously terminated, the Revolving Commitment shall terminate on the Maturity Date.

(b)     The Borrower may at any time terminate the Revolving Commitment upon the Payment in Full of the Aggregate Credit Obligations.

(c)     The Borrower shall notify the DIP Lender of any election to terminate the Revolving Commitment under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination, specifying such election and the effective date thereof. Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the DIP Lender on or prior to the specified effective date) if such condition is not satisfied. Any termination of the Revolving Commitment shall be permanent.

SECTION 2.09.    Repayment and Amortization of Loans; Collection and Application of Collateral Proceeds; Evidence of Debt.

(a)     The Borrower hereby unconditionally, jointly and severally, promises to pay to the DIP Lender (i) the then unpaid Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) upon entry of the Final Financing Order, (ii) the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the DIP Lender and (iii) the unpaid Aggregate Credit Obligations on the Maturity Date.

(b)     The Debtors shall direct all of their Account Debtors to forward payments directly to Lock Boxes subject to Lock Box Agreements, except that the Borrower may direct Account Debtors located in, or organized under the laws of, Canada to forward payments to the BMO Deposit Accounts. The DIP Lender shall have sole access to the Lock Boxes at all times, and each Debtor shall take all actions necessary to grant the DIP Lender such sole access.  At no time shall any Debtor remove any item from a Lock Box or a Collateral Deposit Account without the DIP Lender's prior written consent.  If any Debtor shall refuse or neglect to notify any Account Debtor to forward payments directly to a Lock Box subject to a Lock Box Agreement after notice from the DIP Lender, the DIP Lender shall be entitled to make such notification directly to such Account Debtor.  All funds deposited into any Lock Box subject to a Lock Box Agreement or into a Collateral Deposit Account will be swept on a daily basis into a collection account maintained by the Borrower with the DIP Lender (the "Collection Account").  If notwithstanding the foregoing instructions, any Debtor receives any proceeds of any Receivables, such Debtor shall receive such payments as the DIP Lender's trustee, and shall immediately deposit all cash, checks or other similar payments related to or constituting payments made in respect of Receivables received by such Debtor into a Collateral Deposit Account (or, if such amounts are received from Account Debtors located in, or organized under the laws of, Canada, such amounts shall be immediately deposited into the BMO Deposit Accounts). The DIP Lender shall hold and apply funds received into the Collection Account as provided herein below. At all times during the continuance of an Event of Default, each Loan Party that is not a Debtor shall comply with all instructions of the DIP Lender with respect to the remittance and deposit of all collections and other payments in respect of Receivables and the disposition and application of all proceeds of Collateral.

(c)     From and after the Interim Order Date, if the aggregate amount in any BMO Deposit Account on any Business Day exceeds the BMO Deposit Account Threshold Amount, the Borrower shall cause all amounts in such BMO Deposit Account in excess of the BMO Deposit Account Threshold Amount to be swept into the Collection Account, provided that the Borrower shall not be obligated to cause any such excess amount to be swept in the Collection Amount unless and until such excess is equal to or greater than $10,000.  The Borrower shall cause any amounts in the BMO Deposit Accounts that are denominated in Canadian Dollars to be converted into US Dollars prior to effectuating any such sweep referred to in the preceding sentence, in each case, at the sole cost and expense of the Borrower.

(d)    All amounts deposited in the Collection Account shall be deemed received by the DIP Lender in accordance with Section 2.17. On each Business Day, the DIP Lender shall apply all immediately available funds credited to the Collection Account first to prepay any Protective Advances that may be outstanding, and second to prepay the Revolving Loans, except as otherwise set forth in the Financing Order, *provided* that, subject to the terms of the Financing Order, the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) will be Paid in Full before any payment is applied to the DIP Obligations (unless otherwise elected by the DIP Lender).

(e)    The DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the DIP Lender resulting from each Loan made by the DIP Lender, in which the DIP Lender shall record (i) the amount of each Loan made hereunder and the Class and Type thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the DIP Lender hereunder and (iii) the amount of any sum received by the DIP Lender hereunder. The entries made in such accounts shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of the DIP Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans and other DIP Obligations in accordance with the terms of this DIP Credit Agreement.

(f)    The DIP Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to the DIP Lender a promissory note payable to the DIP Lender (or, if requested by the DIP Lender, to the DIP Lender and its registered assigns) and in a form prepared by the DIP Lender. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form.

SECTION 2.10.  Prepayment of Loans.

(a)    Subject to the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and all Allowable 506(b) Amounts) having been Paid in Full (to the extent permitted under the Financing Order), the Borrower shall have the right at any time and from time to time to prepay any Loan in whole or in part, subject to prior notice in accordance with paragraph (e) of this Section and, if applicable, payment of any break funding expenses under Section 2.15.

(b)    In the event and on such occasion that the Aggregate Credit Obligations then outstanding exceed the lesser of (i) the Maximum DIP Facility Amount (or, prior to the entry of the Final Financing Order, the Maximum Interim Facility Amount), and (ii) the Borrowing Base at such time, the Borrower shall prepay the Prepetition Obligations (to the extent permitted under the Financing Order) or the Revolving Loans (if prepayment of the Prepetition Obligations is not permitted under the Financing Order), in an aggregate amount equal to such excess.

(c)    In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in respect of any Prepayment Event, the Borrower shall, immediately after such Net Proceeds are received by any Loan Party, prepay Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and Allowable 506(b) Amounts), and prepay the DIP Obligations in an aggregate amount equal to 100% of such Net Proceeds, in all cases in accordance with the terms of the Financing Order.

(d)    All such amounts pursuant to Section 2.10(c), shall be applied, first to prepay Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding and Allowable 506(b) Amounts), second, to prepay any Protective Advances that may be outstanding, third, to prepay the

Revolving Loans with a corresponding reduction in the Revolving Commitment, and fourth, to prepay any other DIP Obligations, in all cases in accordance with the terms of the Financing Order.

(e)      The Borrower shall notify the DIP Lender by telephone (confirmed by fax) or through Electronic System, if arrangements for doing so have been approved by the DIP Lender, of any prepayment hereunder not later than 10:00 a.m., Chicago time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitment as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the Chapter 11 Cases of an advance of a Borrowing of the same Type as provided in Section 2.02. Prepayments shall be accompanied by (i) accrued interest to the extent required by Section 2.12 and (ii) break funding payments pursuant to Section 2.15.

(f)      In the event that the Prepetition Lender is required to repay or disgorge to any Debtor, or any representatives of any Debtor's estate (as agents, with derivative standing or otherwise) all or any portion of the Prepetition Obligations authorized to be repaid pursuant to the Financing Order, or any payment on account of such Prepetition Obligations made to any Prepetition Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or any applicable state or provincial law, or any other similar provisions under any other state, federal or provincial statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, Borrower shall prepay the outstanding principal amount of the Revolving Loans, as applicable in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by the Borrower or any representative of the Borrower's estate, for application in accordance with Section 2.10(d) above.

SECTION 2.11.  Fees.

(a)      The Borrower agrees to pay to the DIP Lender an unused fee, which shall accrue at the Unused Fee Rate on the average daily amount of the Available Revolving Commitment during the period from and including the Effective Date to but excluding the date on which the Revolving Commitment terminates. Accrued unused fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates, commencing on the first such date to occur after the date hereof. All unused fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)      The Borrower agrees to pay (i) to the DIP Lender a letter of credit fee with respect to the Prepetition Letter of Credit, which shall accrue at the Applicable Margin on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Effective Date to but excluding the later of the date on which the Revolving Commitment terminates and the date on which the DIP Lender ceases to have any LC Exposure, and (ii) the DIP Lender's standard fees and commissions with respect to the issuance, amendment, cancellation, negotiation, transfer, presentment, renewal or extension of the Prepetition Letter of Credit or processing of drawings thereunder. Accrued letter of credit fees shall be payable in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand. Any other fees payable to the DIP Lender pursuant to this paragraph shall be payable within 10 days after demand. All letter of credit fees shall be computed on the basis of a year of 360 days

and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    Subject to the entry of the Final Financing Order, the Borrower agrees to pay to the DIP Lender on the Success Fee Payment Date, a success fee in an amount equal to the product of (x) the Success Fee Percentage multiplied by (y) the Maximum DIP Facility Amount.

(d)    The Borrower agrees to pay to the DIP Lender, a fee equal to the additional interest that the Borrower would have paid in respect of the Revolving Loans, at the CBFR plus the Applicable Margin, as if each uncollected check had not been received in the Collection Account and credited to the Borrower until the earlier of (i) the date that such check is actually collected and (ii) three Business Days after the Business Day that such check was actually received in the Collection Account. Such fee will be payable monthly in arrears on the first Business Day of each calendar month and on the date on which the Revolving Commitment terminates; provided that any such fees accruing after the date on which the Revolving Commitment terminates shall be payable on demand.

(e)    All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the DIP Lender. Fees paid shall not be refundable under any circumstances, subject only to the terms and conditions of the Financing Order.

SECTION 2.12.  Interest.

(a)    The Loans (other than Protective Advances) shall bear interest at the Adjusted REVSOFR30 Rate plus the Applicable Margin.

(b)    Each Protective Advance shall bear interest at the Adjusted REVSOFR30 Rate plus the Applicable Margin plus 2%.

(c)    Notwithstanding the foregoing, during the occurrence and continuance of a Default, the DIP Lender may, at its option, by notice to the Borrower, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder (including any unreimbursed LC Disbursement), such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(d)    Accrued interest on each Loan (accrued through the last day of the prior calendar month) shall be payable in arrears on each Interest Payment Date for such Loan and upon termination of the Revolving Commitment; provided that (i) interest accrued pursuant to paragraphs (c) and (d) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a CBFR Revolving Loan prior to the end of the Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)    All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Rate Indices shall be determined by the DIP Lender, and such determination shall be conclusive absent manifest error.

SECTION 2.13.  Alternate Rate of Interest; Illegality.

(a)    Subject to clause (c) of this Section 2.13, if:

11

(i)      the DIP Lender determines (which determination shall be conclusive and binding absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted REVSOFR30 Rate or the REVSOFR30 Rate, as applicable (including because the Term SOFR Reference Rate is not available or published on a current basis) for such Interest Period; or

(ii)      the DIP Lender determines the Adjusted REVSOFR30 Rate or the REVSOFR30 Rate, as applicable will not adequately and fairly reflect the cost to the DIP Lender of making or maintaining its Loans included in such Borrowing;

then the DIP Lender shall give notice thereof to the Borrower through Electronic System as provided in Section 8.01 as promptly as practicable thereafter and, until the DIP Lender notifies the Borrower that the circumstances giving rise to such notice no longer exist, all Loans and other DIP Obligations shall bear interest by reference to the CB Floating Rate.

(b)      If the DIP Lender determines that any Requirement of Law has made it unlawful, or if any Governmental Authority has asserted that it is unlawful, for the DIP Lender or its applicable lending office to make, maintain, fund or continue any Borrowing bearing interest by reference to the REVSOFR30 Rate, or any Governmental Authority has imposed material restrictions on the authority of the DIP Lender to purchase or sell, or to take deposits of, dollars in the interbank offering market, then, on notice thereof by the DIP Lender to the Borrower, any obligations of the DIP Lender to make, maintain, fund or continue Borrowings bearing interest by reference to the REVSOFR30 Rate will be suspended and all Loans and other DIP Obligations shall bear interest by reference to the CB Floating Rate until the DIP Lender notifies the Borrower that the circumstances giving rise to such determination no longer exist.

(c)      Notwithstanding anything to the contrary herein or in any other DIP Loan Document, if a Benchmark Transition Event occurs, the DIP Lender may, by written notice to the Borrower, amend this DIP Credit Agreement to establish an alternate rate of interest for the REVSOFR30 Rate that gives due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) the then-evolving or prevailing market convention for determining a rate of interest for business loans in Dollars at such time (the "Alternate Rate"); the Borrower acknowledges that the Alternate Rate may include a mathematical adjustment using any then-evolving or prevailing market convention or method for determining a spread adjustment for the replacement of the REVSOFR30 Rate (which may include, if the REVSOFR30 Rate already contains such a spread, adding that spread to the Alternate Rate). The DIP Lender may further amend this DIP Credit Agreement by such notice to the Borrower to make technical, administrative or operational changes (including, without limitation, changes to the definition of "CBFR", timing and frequency of determining rates and making payments of interest, the timing of prepayment or conversion notices, the length of lookback periods, the applicability of breakage provisions and other technical, administrative or operational matters) that the DIP Lender decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of the Alternate Rate. The Alternate Rate, together with all such technical, administrative and operational changes as specified in any notice, shall become effective at the later of (i) the fifth (5th) Business Day after the DIP Lender has provided notice (including without limitation for this purpose, by electronic means) to the Borrower (the "Objection Date") and (ii) a date specified by the DIP Lender in the notice, without any further action or consent of the Borrower, so long as the DIP Lender has not received, by 5:00 pm Eastern time on the Objection Date, written notice of objection to the Alternate Rate from the Borrower. If, on the date the REVSOFR30 Rate actually becomes permanently unavailable pursuant to a Benchmark Transition Event, an Alternate Rate has not been established in this manner, the Loans will, until an Alternate Rate is so established, bear interest by reference to the CB Floating Rate. In no event shall the Alternate Rate be less than the Floor.

(d)      All determinations by the DIP Lender under this Section 2.13 shall be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this DIP Credit Agreement or any other DIP Loan Document, except, in each case, as expressly required pursuant to this Section 2.13.

SECTION 2.14.  <u>Increased Costs.</u>

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, the DIP Lender (except any such reserve requirement reflected in the applicable Rate Indices);

(ii)      impose on the DIP Lender or the offshore interbank market any other condition, cost or expense (other than Taxes) affecting this DIP Credit Agreement or Loans hereunder or the Prepetition Letter of Credit; or

(iii)      subject the DIP Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clause (b) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the DIP Lender of making, continuing, converting into or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the DIP Lender of issuing or maintaining the Prepetition Letter of Credit or to reduce the amount of any sum received or receivable by the DIP Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to the DIP Lender such additional amount or amounts as will compensate the DIP Lender for such additional costs incurred or reduction suffered.

(b)      If the DIP Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the DIP Lender's capital or on the capital of the DIP Lender's holding company, if any, as a consequence of this DIP Credit Agreement or the Loans made by, or the Revolving Commitment of, the DIP Lender, or the Prepetition Letter of Credit, to a level below that which the DIP Lender or the DIP Lender's holding company could have achieved but for such Change in Law (taking into consideration the DIP Lender's policies and the policies of the DIP Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to the DIP Lender such additional amount or amounts as will compensate the DIP Lender or the DIP Lender's holding company for any such reduction suffered.

(c)      A certificate of the DIP Lender setting forth the amount or amounts necessary to compensate the DIP Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay the DIP Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)      Failure or delay on the part of the DIP Lender to demand compensation pursuant to this Section shall not constitute a waiver of the DIP Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate the DIP Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the DIP Lender notifies

13

the Borrower of the Change in Law giving rise to such increased costs or reductions and of the DIP Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15.  [Reserved].

SECTION 2.16.  Taxes.

(a)    Withholding of Taxes; Gross Up. Any and all payments by or on account of any obligation of any Loan Party under any DIP Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.16) the DIP Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Loan Parties. The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the DIP Lender timely reimburse it for, Other Taxes.

(c)    Evidence of Payment. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.16, such Loan Party shall deliver to the DIP Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Lender.

(d)    Indemnification by the Loan Parties. The Loan Parties shall jointly and severally indemnify the DIP Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the DIP Lender or required to be withheld or deducted from a payment to the DIP Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Loan Party by the DIP Lender shall be conclusive absent manifest error.

(e)    Treatment of Certain Refunds. If the DIP Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the DIP Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of the DIP Lender, shall repay to the DIP Lender the amount paid over pursuant to this Section 2.16(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the DIP Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything

to the contrary in this Section 2.16(e), in no event will the DIP Lender be required to pay any amount to an indemnifying party pursuant to this Section 2.16 the payment of which would place the DIP Lender in a less favorable net after-Tax position than the DIP Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.16(e) shall not be construed to require the DIP Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(f)     <u>Survival</u>. Each party's obligations under this Section shall survive the termination of the Revolving Commitment and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document (including the Payment in Full of the DIP Obligations).

(g)     <u>Defined Terms</u>. For purposes of this Section 2.16, the term "applicable law" includes FATCA.

SECTION 2.17.  <u>Payments Generally; Allocation of Proceeds.</u>

(a)     The Borrower shall make each payment required to be made by them hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 2.14 or 2.16, or otherwise) prior to 2:00 p.m., Chicago time, on the date when due, in immediately available funds, without setoff, recoupment or counterclaim. Any amounts received after such time on any date may, in the discretion of the DIP Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the DIP Lender at its offices at 10 South Dearborn Street, Floor L2, Chicago, Illinois. Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in dollars.

(b)     Subject to the terms of the Financing Order, any payments received by the DIP Lender (including from proceeds of Collateral) (i) not constituting either (A) a specific payment of principal, interest, fees or other sums payable under the DIP Loan Documents (which shall be applied as specified by the Borrower), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.10), or (C) amounts to be applied from the Collection Account (which shall be applied in accordance with Section 2.09(c)), shall be applied by the DIP Lender to the payment of the DIP Obligations in such order as the DIP Lender may elect in its sole discretion.  The DIP Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Prepetition Obligations (including any Reinstated Prepetition Obligations then outstanding) or the DIP Obligations.

(c)     At the election of the DIP Lender, all payments of principal, interest, LC Disbursements, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 8.03), and other sums chargeable to or required to be paid by the Borrower under the DIP Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of the Borrower maintained with the DIP Lender. The Borrower hereby irrevocably authorizes (i) the DIP Lender, even if the conditions precedent set forth in Section 4.02 have not been satisfied, to make a Borrowing for the purpose of paying

15

each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the DIP Loan Documents and agrees that all such amounts charged shall constitute Loans (but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses as described in Section 8.03) and that all such Borrowings shall be deemed to have been requested pursuant to Sections 2.03 or 2.04, as applicable and (ii) the DIP Lender to charge any deposit account of the Borrower maintained with the DIP Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the DIP Loan Documents.

(d)     The DIP Lender may from time to time provide the Borrower with account statements or invoices with respect to any of the DIP Obligations (the "Statements"). The DIP Lender is under no duty or obligation to provide Statements, which, if provided, will be solely for the Borrower's convenience. Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other DIP Obligations. If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the DIP Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the DIP Lender's right to receive payment in full at another time.

SECTION 2.18. Indemnity for Returned Payments. If after receipt of any payment which is applied to the payment of all or any part of the DIP Obligations (including a payment effected through exercise of a right of setoff), the DIP Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the DIP Lender in its discretion), then the DIP Obligations or part thereof intended to be satisfied shall be revived and continued and this DIP Credit Agreement shall continue in full force as if such payment or proceeds had not been received by the DIP Lender. The provisions of this Section 2.18 shall be and remain effective notwithstanding any contrary action which may have been taken by the DIP Lender in reliance upon such payment or application of proceeds. The provisions of this Section 2.18 shall survive the termination of this DIP Credit Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the DIP Lender that:

SECTION 3.01. Organization; Powers. Each Loan Party is duly organized, or formed, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.02. Authorization; Enforceability. Subject to entry by the Bankruptcy Court of the Financing Order, the Transactions are within each Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational actions and, if required, actions by equity holders. Subject to entry by the Bankruptcy Court of the Financing Order, each DIP Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting

16

creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.  <u>Governmental Approvals; No Conflicts</u>. Subject to entry by the Bankruptcy Court of the Financing Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except for filings necessary to perfect Liens created pursuant to the DIP Loan Documents, (b) will not violate any Requirement of Law applicable to any Loan Party, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or the assets of any Loan Party, or give rise to a right thereunder to require any payment to be made by any Loan Party, and (d) will not result in the creation or imposition of, or the requirement to create, any Lien on any asset of any Loan Party, except Liens created pursuant to the DIP Loan Documents.

SECTION 3.04.  <u>Approved Budget</u>.  The Approved Budget was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and presented, at the time of delivery, the Debtors' good faith estimate of future performance.

SECTION 3.05.  <u>Properties.</u>

(a)    As of the date of this DIP Credit Agreement, Section 3.05 of the Disclosure Schedule sets forth the address of each parcel of real property that is owned or leased by any Loan Party. Subject to the commencement of the Chapter 11 Cases, each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect against each applicable Loan Party, and to the knowledge of each applicable Loan Party, each third party that is a party thereto, and no default with respect to any such lease or sublease by any Loan Party, and to the knowledge of each Loan Party, by any third party that is a party thereto, exists. Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by Section 6.02.

(b)    Each Loan Party owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, and the use thereof by each Loan Party does not infringe in any material respect upon the rights of any other Person.

SECTION 3.06.  <u>Litigation and Environmental Matters.</u>

(a)    Other than the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any DIP Loan Document or the Transactions.

(b)    (i) Except for the Disclosed Matters, (i) no Loan Party has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

17

(c)    Since the Filing Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.  Compliance with Laws and Agreements; No Default.  Except where failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, each Loan Party is in compliance with (i) all Requirements of Law applicable to it or its property and (ii) except as directly caused by the filing of a petition for relief under the Bankruptcy Code, all indentures, agreements and other instruments binding upon it or its property. No Default has occurred and is continuing.

SECTION 3.08.  Investment Company Status. No Loan Party is an investment company as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.  Taxes. Except for Disclosed Matters, each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not be expected to result in a Material Adverse Effect. No Liens have been filed and no claims are being asserted with respect to any such Taxes.

SECTION 3.10.  ERISA. Except as a result of the Chapter 11 Cases and the effects thereof, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur could reasonably be expected to have a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87 or subsequent recodification thereof, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by more than the Threshold Amount and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by more than the Threshold Amount.

SECTION 3.11.  Disclosure.

(a)    The Loan Parties have disclosed to the DIP Lender all agreements, instruments and corporate or other restrictions to which any Loan Party is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the DIP Lender in connection with this DIP Credit Agreement or any other DIP Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

(b)    As of the Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to the Prepetition Lender in connection with the Prepetition Credit Agreement was and continues to be true and correct in all respects.

18

SECTION 3.12.  [Reserved].

SECTION 3.13.  Solvency. No Loan Party intends to, and no Loan Party believes that it will, incur debts from and after the Effective Date beyond its ability to pay such debts as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its Indebtedness or the Indebtedness.

SECTION 3.14.  Insurance. Section 3.14 of the Disclosure Schedule sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date. As of the Effective Date, all premiums in respect of such insurance have been paid. The Loan Parties maintain, and have caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar business operating in the same or similar locations.

SECTION 3.15.  Capitalization and Subsidiaries. Section 3.15 of the Disclosure Schedule sets forth (a) a correct and complete list of the name and relationship to the Borrower of each Loan Party and each Subsidiary that is not a Loan Party, (b) a true and complete listing of each class of each Loan Party's authorized Equity Interests, all of which issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified in Section 3.15 of the Disclosure Schedule, and (c) the type of entity of each Loan Party. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable. There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

SECTION 3.16.  Security Interest in Collateral.

(a)  Subject to entry by the Bankruptcy Court of the Financing Order, the provisions of this DIP Credit Agreement and the other DIP Loan Documents create legal and valid Liens on all of the Collateral in favor of the DIP Lender, for the benefit of the Secured Parties, and such Liens constitute perfected and continuing Liens on the Collateral, securing the DIP Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except in the case of "Permitted Priority Liens" (as defined in the Financing Order).

(b)  The entry of the Financing Order is effective to create in favor of the DIP Lender, for the benefit of the DIP Lender, as security for the DIP Obligations, (i) a valid first priority (other than with respect to the Permitted Priority Liens and the Carveout) Lien on all of the Collateral pursuant to Sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and (ii) an allowed administrative expense in the Chapter 11 Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code), subject only to the Permitted Priority Liens and the Carveout. Except for the Financing Order, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the pledge or grant by any Loan Party of the Liens purported to be created in favor of the DIP Lender pursuant to this DIP Credit Agreement or any of the DIP Loan Documents.

19

SECTION 3.17. <u>Employment Matters</u>. There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party.

SECTION 3.18. <u>Margin Regulations</u>. No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing or the Prepetition Letter of Credit extension hereunder will be used to buy or carry any Margin Stock. Following the application of the proceeds of each Borrowing or drawing under the Prepetition Letter of Credit, not more than 25% of the value of the assets (either of any Loan Party only or of the Loan Parties and their Subsidiaries on a consolidated basis) will be Margin Stock.

SECTION 3.19. <u>Use of Proceeds</u>. The proceeds of the Loans have been used and will be used, whether directly or indirectly, as set forth in Section 5.08.

SECTION 3.20. <u>No Burdensome Restrictions</u>. No Loan Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21. <u>Anti-Corruption Laws and Sanctions</u>. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and, to the knowledge of such Loan Party, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) the Loan Parties, or any of their respective directors, officers or, to the knowledge of any Loan Party, amu employees, or (b) to the knowledge of any such Loan Party, any agent of any Loan Party that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or the Prepetition Letter of Credit, use of proceeds, Transaction or other transaction contemplated by this DIP Credit Agreement or the other DIP Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22. <u>Affiliate Transactions</u>. Except as set forth on Section 3.22 of the Disclosure Schedule, as of the date of this DIP Credit Agreement, (a) there are no existing agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, directors, stockholders, or Affiliates (other than Subsidiaries) of any Loan Party, (b) to the knowledge of the Loan Parties, none of the foregoing Persons are directly or indirectly indebted to (i) any Affiliate of any Loan Party or (ii) any Person (other than any Affiliate of any Loan Party) with which any Loan Party has a business relationship or which competes with any Loan Party, and (c) to the knowledge of the Loan Parties, none of the foregoing Persons has any direct or indirect ownership, partnership, or voting interest in (i) any Affiliate of any Loan Party or (ii) any Person (other than any Affiliate of a Loan Party) with which any Loan Party has a business relationship or which competes with any Loan Party (excluding any Equity Interests owned by such Person in (but not exceeding 2.0% of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party).

SECTION 3.23.  Common Enterprise. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its stockholders or members, board of directors or other governing body, as applicable, have determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the DIP Lender to the Borrower hereunder, both in their separate capacities and as members of a commonly controlled, affiliated group of companies. Each Loan Party has determined that execution, delivery, and performance of this DIP Credit Agreement and any other DIP Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.24.  Plan Assets; Prohibited Transactions. No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery or performance of the transactions contemplated under this DIP Credit Agreement, including the making of any Loan or maintenance of the Prepetition Letter of Credit hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

SECTION 3.25.  Interim Order; Final Financing Order.  At all times prior to the entry of the Final Financing Order, the Interim Order has been entered by the Bankruptcy Court, is in full force and effect, has not been vacated, reversed, modified, amended or stayed, and is not subject to any pending appeal.  At all times from and after the entry of the Final Financing Order, the Final Financing Order has been entered by the Bankruptcy Court, is in full force and effect, has not been vacated, reversed, modified, amended or stayed, and is not subject to any pending appeal.

## ARTICLE IV
## CONDITIONS

SECTION 4.01.  Effective Date. The obligations of the DIP Lender to make Loans and to maintain the Prepetition Letter of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)      DIP Credit Agreement and DIP Loan Documents. The DIP Lender (or its counsel) shall have received (i) a counterpart of this DIP Credit Agreement signed on behalf of each party hereto or written evidence satisfactory to the DIP Lender (which may include facsimile or other electronic transmission of a signed signature page of this DIP Credit Agreement) that each such party has signed a counterpart of this DIP Credit Agreement, (ii) a counterpart of each other DIP Loan Document (each in form and substance reasonably satisfactory to the DIP Lender) signed on behalf of each party thereto or written evidence satisfactory to the DIP Lender (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such DIP Loan Document, (iii) such other certificates, documents, instruments and agreements as the DIP Lender shall reasonably request in connection with the Transactions, including all those documents and requirements listed in the Closing Conditions Schedule dated as of the date hereof and attached hereto, in each case in form and substance satisfactory to the DIP Lender, and (iv) evidence satisfactory to the DIP Lender as to the satisfaction of each of the items and requirements set forth in such Closing Conditions Schedule in a manner satisfactory to the DIP Lender.

(b)      Other Documents. The DIP Lender shall have received such other documents as the DIP Lender or its counsel may have reasonably requested.

    (c)    <u>Interim Order</u>.  The Interim Order shall be full force and effect and shall not subject to a pending appeal, motion for leave to appeal, or other proceeding to set aside such order and shall not have been reversed, modified, stayed or vacated absent the DIP Lender's written consent.

The DIP Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the DIP Lender to make Loans and to maintain the Prepetition Letter of Credit hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 8.02) at or prior to 2:00 p.m., Chicago time, on the 2nd Business Day following the date of this DIP Credit Agreement (and, in the event such conditions are not so satisfied or waived, the Revolving Commitment shall terminate at such time).

    SECTION 4.02.  <u>Each Credit Event</u>. The obligation of the DIP Lender to make a Loan on the occasion of any Borrowing, and to amend, renew or extend the Prepetition Letter of Credit, is subject to the satisfaction of the following conditions:

    (a)    The representations and warranties of the Loan Parties set forth in the DIP Loan Documents shall be true and correct with the same effect as though made on and as of the date of such Borrowing or the date of amendment, renewal or extension of the Prepetition Letter of Credit, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).

    (b)    At the time of and immediately after giving effect to such Borrowing or the amendment, renewal or extension of the Prepetition Letter of Credit, as applicable, (i) no Default or Event of Default shall have occurred and be continuing and (ii) no Protective Advance shall be outstanding.

    (c)    After giving effect to any Borrowing or the amendment, renewal or extension of the Prepetition Letter of Credit, Availability shall not be less than zero.

    (d)    With respect to any Loan made on or after the date that is twenty-five (25) days after the Filing Date (or such later date acceptable to the DIP Lender in its sole discretion), the Bankruptcy Court shall have entered the Final Financing Order, which Final Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

Each Borrowing and each amendment, renewal or extension of the Prepetition Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a), (b), (c) and (d) of this Section.

## ARTICLE V
## AFFIRMATIVE COVENANTS

    Until the Aggregate Credit Obligations shall have been Paid in Full, each Loan Party executing this DIP Credit Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the DIP Lender that:

    SECTION 5.01.  <u>Financial Statements; Borrowing Base and Other Information</u>. The Borrower will furnish to the DIP Lender the information required under the Reporting Schedule attached hereto within the applicable time periods set forth therein.

SECTION 5.02.  Notices of Material Events.  The Loan Parties will furnish to the DIP Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a)     the occurrence of any Default or Event of Default;

(b)     receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party that (i) seeks damages in excess of the Threshold Amount, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party in excess of the Threshold Amount, in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c)     any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)     any loss, damage, or destruction to the Collateral in an amount equal to or exceeding the Threshold Amount, whether or not covered by insurance;

(e)     within two Business Days of receipt thereof, any and all written default notices received under or with respect to any leased location or public warehouse where Collateral is located;

(f)     all material amendments to or termination of any Material Agreement, together with a copy of each such amendment;

(g)     any material change in accounting or financial reporting practices by any Loan Party;

(h)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding the Threshold Amount;

(i)     the filing of any claim under any insurance policy maintained by the Loan Parties (whether such claim is filed by a Loan Party or a third party insured) or notice of payment made or to be made thereunder;

(j)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect; and

(k)     any change in the information provided in the Beneficial Ownership Certification most recently delivered to the Prepetition Lender that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  Existence; Conduct of Business.  Each Loan Party will (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights,

23

qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04. <u>Payment of Taxes and Certain Other Obligations</u>. Each Loan Party will pay or discharge all Taxes attributable to periods or events from and after the Filing Date and all other material liabilities or obligations that if not paid when due may have priority over the DIP Obligations, in each case, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) the failure to make payment pending such contest could not reasonably be expected to result in aggregate liabilities in excess of the Threshold Amount and (d) such Tax liability or obligation need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code; provided, however, each Loan Party will remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05. <u>Maintenance of Properties</u>. Each Loan Party will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06. <u>Books and Records; Inspection Rights</u>. Each Loan Party will (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the DIP Lender (including employees of the DIP Lender, or any consultants, accountants, lawyers, agents and appraisers retained by the DIP Lender), upon reasonable prior written notice, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, and non-privileged books, records and other information, including examining and making extracts from its non-privileged books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested. Each Loan Party acknowledges that the DIP Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the DIP Lender. After the occurrence and during the continuance of any Event of Default, each Loan Party shall provide the DIP Lender with access to its suppliers.

SECTION 5.07. <u>Compliance with Laws and Material Contractual Obligations</u>. Each Loan Party will (i) comply in all material respects with each Requirement of Law applicable to it or its property (including without limitation Environmental Laws), and (ii) perform in all material respects its obligations under Material Agreements to which it is a party, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in aggregate liabilities in excess of the Threshold Amount. Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08. <u>Use of Proceeds.</u>

(a)     The proceeds of the Loans and the Prepetition Letter of Credit will be used only (i) to fund certain fees and expenses associated with the DIP Facility incurred during the Chapter 11 Cases, (ii) to pay for certain administrative expenses incurred during the Chapter 11 Cases in accordance with the

Approved Budget, (iii) to finance the ongoing general corporate needs of the Debtors in accordance with the Approved Budget, (iv) to finance the LC and Commercial Card Collateral Amount, (v) to provide for adequate protection in favor of the Prepetition Lender, and (vi) to pay the Prepetition Obligations, in each case, subject to the Financing Order and this DIP Credit Agreement. No part of the proceeds of any Loan will be used, whether directly or indirectly, (x) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X or (y) to make any Acquisition.

(b)    The Borrower shall not request any Borrowing, the Borrower shall not use, and the Borrower shall procure that none of the Loan Parties or any of its or their respective directors, officers, employees and agents shall use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws to the extent such activity, businesses or transactions would be prohibited by Sanctions, if conducted by a corporation incorporated in the United States or the European Union, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 5.09.  Accuracy of Information. The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the DIP Lender in connection with this DIP Credit Agreement or any other DIP Loan Document contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by each Loan Party on the date thereof as to the matters specified in this Section; provided that, with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 5.10.  Insurance.

(a)    Each Loan Party will maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the DIP Collateral Documents. The Loan Parties will furnish to the DIP Lender, upon request of the DIP Lender, but no less frequently than annually, information in reasonable detail as to the insurance so maintained.

(b)    In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", the applicable Loan Party shall purchase and maintain flood insurance on such Collateral (including any personal property which is located on any real property leased by such Loan Party within a "Special Flood Hazard Area"). The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Revolving Commitment or the total replacement cost value of the improvements.

(c)    All insurance policies required hereunder or under this Section 5.10 shall name the DIP Lender as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses or mortgagee clauses, through endorsements in form and substance satisfactory to the DIP Lender, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to

the DIP Lender; (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and lender loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least 30 days prior written notice given to the DIP Lender.

(d)    All premiums on such insurance shall be paid when due, and copies of the policies delivered to the DIP Lender. If a Loan Party fails to obtain any insurance as required by this Section, the DIP Lender may obtain such insurance at the Loan Parties' expense. By purchasing such insurance, the DIP Lender shall not be deemed to have waived any Default arising from the applicable Loan Party's failure to maintain such insurance or pay any premiums therefor.

SECTION 5.11.  Casualty and Condemnation. The Loan Parties will (a) furnish to the DIP Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with any applicable provisions of this DIP Credit Agreement and the DIP Collateral Documents.

SECTION 5.12.  Appraisals. At any time that the DIP Lender requests, each Loan Party will provide the DIP Lender with appraisals or updates thereof of its Inventory from an appraiser selected and engaged by the DIP Lender, and prepared on a basis satisfactory to the DIP Lender, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law.

SECTION 5.13.  Depository Banks. Each of the Loan Parties will maintain the DIP Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other Deposit Accounts for the conduct of its business; provided, that (i) the Borrower may continue to maintain the BMO Deposit Accounts subject to the provisions of Section 2.09(b), and (ii) DCDUK may continue to maintain Deposit Accounts at Barclays Bank PLC.

SECTION 5.14.  Additional Collateral; Further Assurances.

(a)    Each Loan Party will obtain the prior written consent of the DIP Lender (which will be provided in the DIP Lender's sole discretion) before acquiring, creating, or allowing to be created or acquired, any direct or indirect Subsidiary. Subject to applicable Requirements of Law and the DIP Lender's approval, each Loan Party will cause each Domestic Subsidiary formed or acquired after the date of this DIP Credit Agreement (other than any Domestic Subsidiary that is a direct Subsidiary of a Foreign Subsidiary), each Division Successor and any limited liability company formed pursuant to any Division to become a Loan Party by executing a joinder agreement in form satisfactory to the DIP Lender. Upon execution and delivery thereof, each such Person (i) shall automatically become a Loan Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the DIP Loan Documents and (ii) will grant Liens to the DIP Lender, for the benefit of the Secured Parties, in any property of such Loan Party which constitutes Collateral, including any parcel of real property located in the U.S. owned by any Loan Party.

(b)    Each Loan Party will cause (i) 100% of the issued and outstanding Equity Interests of each of its Domestic Subsidiaries (other than any Domestic Subsidiary that is a direct Subsidiary of a Foreign Subsidiary), (ii) 100% of the issued and outstanding Equity Interests of DCDUK, and (iii) 65% (or such greater percentage that could not reasonably be expected to cause material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the

26

meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary owned by such Loan Party (and each Domestic Subsidiary that is a direct Subsidiary of any such Foreign Subsidiary), in each case, to be subject at all times to a first priority, perfected Lien in favor of the DIP Lender, for the benefit of the Secured Parties, pursuant to the terms and conditions of the DIP Loan Documents or other security documents as the DIP Lender shall reasonably request.

(c)    Without limiting the foregoing, each Loan Party will, and will cause each Subsidiary to, execute and deliver, or cause to be executed and delivered, to the DIP Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the DIP Lender may, from time to time, reasonably request to carry out the terms and conditions of this DIP Credit Agreement and the other DIP Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the DIP Collateral Documents, all in form and substance reasonably satisfactory to the DIP Lender and all at the expense of the Loan Parties.

(d)    If any material assets (including any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Security Agreement that become subject to the Lien under the Security Agreement upon acquisition thereof), the Borrower will (i) notify the DIP Lender, and, if requested by the DIP Lender, cause such assets to be subjected to a Lien securing this DIP Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the DIP Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties.

(e)    Notwithstanding anything to the contrary herein, no Loan Party or any of its Subsidiaries shall be required to take any Excluded Perfection Action (as defined in the Security Agreement).

SECTION 5.15.  Receivables.

(a)    Certain Agreements on Receivables. No Loan Party will make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, prior to the occurrence of an Event of Default, the Loan Parties may reduce the amount of Accounts arising from the sale of Inventory in a manner consistent with their present policies and in the ordinary course of business.

(b)    Collection of Receivables. Except as otherwise provided in this DIP Credit Agreement or the Security Agreement, each Loan Party will collect and enforce, at the Loan Party's sole expense, all amounts due or hereafter due to such Loan Party under the Receivables.

(c)    Delivery of Invoices. At the DIP Lender's request, the Borrower will deliver to the DIP Lender alongside delivery to customers duplicate invoices with respect to each Account of the Loan Parties bearing such language of assignment as the DIP Lender shall specify.

(d)    Disclosure of Counterclaims on Receivables. If (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable of the Borrower exists or (ii) if, to the knowledge of the Borrower, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened in writing with respect to a Receivable of the Borrower, the Borrower will promptly disclose such fact to the DIP Lender on the Borrowing Base Certificate submitted by the

Borrower. The Borrower shall send the DIP Lender a copy of each credit memorandum where the discount, credit, agreement to make a rebate, dispute, setoff, claim, counterclaim or defense exceeds the Threshold Amount as soon as issued by the Borrower, and the Borrower shall promptly report each credit memo and each of the facts required to be disclosed to the DIP Lender in accordance with this Section 5.15(d) on the next and all subsequent Borrowing Base Certificates submitted by the Borrower.

SECTION 5.16.  Inventory and Equipment.

(a)  Maintenance of Goods. Each Loan Party will do all things necessary to maintain, preserve, protect and keep its Inventory and Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Loan Party's business and except for ordinary wear and tear in respect of its Equipment.

(b)  Returned Inventory. If an Account Debtor returns any Inventory to the Borrower or Diamond Select when no Event of Default exists, then the Borrower shall promptly determine the reason for such return and the Borrower or Diamond Select, as applicable, shall issue a credit memorandum to the Account Debtor in the appropriate amount.  The Borrower shall immediately report to the DIP Lender any return involving an amount in excess of the Threshold Amount.  Each such report shall indicate the reasons for the returns and the locations and condition of the returned Inventory.  In the event any Account Debtor returns Inventory to the Borrower or Diamond Select when an Event of Default exists, the Borrower or Diamond Select, as applicable, upon the request of the DIP Lender in its Permitted Discretion, shall: (i) hold the returned Inventory in trust for the DIP Lender; (ii) segregate all returned Inventory from all of its other property; (iii) dispose of the returned Inventory solely according to the DIP Lender's written instructions; and (iv) not issue any credits or allowances with respect thereto without the DIP Lender's prior written consent.  All returned Inventory (other than Inventory of DCDUK) shall be subject to the DIP Lender's Liens thereon.  Whenever any Inventory is returned, the related Account shall be deemed ineligible to the extent of the amount owing by the Account Debtor with respect to such returned Inventory and such returned Inventory shall not be Eligible Inventory.

(c)  Inventory Count; Perpetual Inventory System. Each Loan Party will conduct a physical count of the Inventory at least once per fiscal year, and after and during the continuation of an Event of Default, at such other times as the DIP Lender requests. Each Loan Party, at its own expense, shall deliver to the DIP Lender the results of each physical verification, which such Loan Party has made, or has caused any other Person to make on its behalf, of all or any portion of its Inventory. Unless waived by the DIP Lender, each Loan Party will maintain a perpetual inventory reporting system at all times.

(d)  Equipment. Each Loan Party shall promptly inform the DIP Lender of any additions to or deletions from the Equipment which individually or in the aggregate exceed the Threshold Amount.  Each Loan Party shall not permit any Equipment to become a fixture with respect to real property or to become an accession with respect to other personal property with respect to which real or personal property the DIP Lender does not have a Lien.  Each Loan Party will not, without the DIP Lender's prior written consent, alter or remove any identifying symbol or number on any of such Loan Party's Equipment constituting Collateral.

SECTION 5.17.  Agency Goods Distribution Agreements.  The Borrower shall promptly notify the DIP Lender (a) of any amendment, modification or extension of any Agency Goods Distribution Agreement (and promptly provide the DIP Lender with copies of such amendment, modification or extension), (b) of any termination or expiration of any Agency Goods Distribution Agreement, (c) if any Agency Supplier shall allege that the Borrower is in breach of any of the terms of any Agency Goods Distribution Agreement,

28

or (d) if any Agency Supplier or other supplier of Inventory to the Borrower on consignment shall contact any DCD Customer or take any action to collect any Accounts arising from the sale by the Borrower to any DCD Customer of any Agency Goods or any Inventory supplied to the Borrower on consignment.

SECTION 5.18.  Responsible Officer. The Borrower will (a) retain, at all times, a Responsible Officer satisfactory to the DIP Lender, and on terms and conditions satisfactory to the DIP Lender and (b) provide reasonable, direct access to such Responsible Officer for the DIP Lender, at the Borrower's expense.

SECTION 5.19.  Milestones. The Borrower will timely perform and deliver each of the actions and/or items set forth on **Exhibit B** attached hereto (each a "Milestone") on or before the dates specified therein (provided that any milestone deadline occurring on a day that is not a Business Day will automatically be extended to the following Business Day), or by such later date as agreed by the DIP Lender.

SECTION 5.20.  Bankruptcy Matters. The Borrower will: (a) contemporaneously with the filing thereof, deliver to the DIP Lender copies of all pleadings, motions, applications, financial information and other papers and documents filed by the Loan Parties in the Chapter 11 Cases, which copies of such papers and documents may be provided to or served on the DIP Lender's counsel, and (b) contemporaneously with the receipt thereof, deliver to the DIP Lender copies of all letters of intent, expressions of interest, offers to purchase or draft purchase agreements (together with subsequent drafts) with respect to any of the Collateral, or any other transactions requiring Bankruptcy Court approval.

## ARTICLE VI
## NEGATIVE COVENANTS

Until the Aggregate Credit Obligations shall have been Paid in Full, each Loan Party executing this DIP Credit Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the DIP Lender that:

SECTION 6.01.  Indebtedness. No Loan Party will create, incur or suffer to exist any Indebtedness, except:

(a)     the DIP Obligations and the Prepetition Obligations (including any Reinstated Prepetition Obligations and Allowable 506(b) Amounts);

(b)     Indebtedness existing on the Filing Date and set forth on Section 6.01 of the Disclosure Schedule;

(c)     Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(d)     Indebtedness of any Loan Party in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business; and

(e)     Indebtedness (i) resulting from a bank or other financial institution honoring a check, draft or similar instrument in the ordinary course of business or (ii) arising under or in connection with cash management services in the ordinary course of business.

SECTION 6.02.  Liens. No Loan Party will create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a)    Liens created pursuant to any DIP Loan Document or Prepetition Loan Document;

(b)    Permitted Encumbrances;

(c)    Permitted Priority Liens;

(d)    any Lien on any property or asset of the Borrower existing on the Filing Date and set forth in Section 6.02 of the Disclosure Schedule; and

(e)    Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon.

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than (x) those permitted under clause (a) of the definition of Permitted Encumbrances and (y) those permitted under clause (a) above, or (2) Inventory, other than (x) those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and (y) those permitted under clause (a) above.

SECTION 6.03.  Fundamental Changes.

(a)    Absent a confirmed chapter 11 plan of reorganization or an order approving a sale pursuant to 11 U.S.C § 363 in each of the Chapter 11 Cases containing terms and conditions thereof are satisfactory to the DIP Lender in its discretion, no Loan Party will merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, or otherwise Dispose of a material amount of its assets.

(b)    No Loan Party will consummate a Division as the Dividing Person, without the prior written consent of the DIP Lender. Without limiting the foregoing, if any Loan Party that is a limited liability company consummates a Division (with or without the prior consent of the DIP Lender as required above), each Division Successor shall be required to comply with the obligations set forth in Section 5.14 and the other further assurances obligations set forth in the DIP Loan Documents and become a Loan Party under this DIP Credit Agreement and the other DIP Loan Documents

(c)    No Loan Party will engage to any material extent in any business other than businesses of the type conducted by the Loan Parties on the date of hereof and businesses reasonably related thereto.

(d)    No Loan Party will change its fiscal year from the basis in effect on the Effective Date.

(e)    No Loan Party will change the accounting basis upon which its financial statements are prepared.

(f)    No Loan Party will change (i) the tax filing elections it has made under the Code, (ii) the type of entity that it is, (iii) its organization identification number, if any, issued by its state of incorporation or other organization, or (iv) its state of incorporation or organization.

30

SECTION 6.04.  <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>. No Loan Party will form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)    Permitted Investments of the Borrower subject to Control Agreements in favor of the DIP Lender or otherwise subject to a perfected security interest in favor of the DIP Lender;

(b)    (i) investments by the Borrower in the Equity Interests of Comic Exporters and Comic Holdings in existence on the date hereof and described in Section 6.04 of the Disclosure Schedule, provided that such Equity Interests shall be pledged to the DIP Lender pursuant to the Security Agreement, (ii) investments by Comic Exporters and Comic Holdings in the Equity Interests of DCDUK in existence on the date hereof and described in Section 6.04 of the Disclosure Schedule, provided that such Equity Interests shall be pledged to the DIP Lender pursuant to the DCDUK Share Pledge Agreement, (iii) loans and advances made to DCDUK by the Borrower prior to the Petition Date and described in Section 6.04 of the Disclosure Schedule; and (iv) loans and advances made to Affiliated Persons by the Borrower prior to the Petition Date and described in Section 6.04 of the Disclosure Schedule;

(c)    Guarantees constituting Indebtedness permitted by Section 6.01;

(d)    notes payable, or stock or other securities, issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices;

(e)    investments received in connection with the disposition of assets permitted by Section 6.05;

(f)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances; and

(g)    Investments consisting of the endorsement by the Borrower of negotiable instruments payable to such Person for deposit in the ordinary course of business.

SECTION 6.05.  <u>Asset Sales</u>. No Loan Party will sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will any Loan Party issue any additional Equity Interests, except:

(a)    sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business;

(b)    sales, transfers and dispositions of Accounts in connection with the compromise, settlement or collection thereof in the ordinary course of business;

(c)    dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party;

31

(d)      the Sale Transaction; or

(e)      such other sales, transfers and dispositions of assets as may be approved by the DIP Lender in writing;

provided that all sales, transfers, leases and other dispositions permitted hereby shall be made for fair value and for at least 75% cash consideration.

SECTION 6.06.  Sale and Leaseback Transactions. No Loan Party will enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction").

SECTION 6.07.  Swap Agreements. No Loan Party will enter into any Swap Agreement.

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness.

(a)      No Loan Party will declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, excluding Restricted Payments by a Loan Party to another Loan Party that are expressly set forth in the Approved Budget and permitted by the Financing Order.

(b)      No Loan Party will make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness without prior written consent of the DIP Lender and such payments must be in accordance with the Financing Order, except (i) payment of Indebtedness created under the DIP Loan Documents, (ii) payment of regularly scheduled interest and principal payments as and when due in respect of any Indebtedness permitted under Section 6.01 and paid in accordance with the Approved Budget and (iii) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of Section 6.05, paid in accordance with the Financing Order and any order of the Bankruptcy Court authorizing such sale or transfer.

SECTION 6.09.  Transactions with Affiliates. No Loan Party will sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions (including, without limitation, purchases of Inventory) that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among any two or more Loan Parties not involving any other Affiliate, (c) the payment of reasonable fees to directors of the Borrower who are not employees of any Loan Party, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Loan Parties to the extent set forth in the Approved Budget, (d) such other transactions involving Affiliates as to which the DIP Lender has consented in writing or (e) so long as it is expressly contemplated by the Approved Budget, with respect to any other transactions occurring on or after the Effective Date.

SECTION 6.10.  Restrictive Agreements. No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits,

restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Loan Party or to Guarantee Indebtedness of the Borrower or any other Loan Party; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law or by any DIP Loan Document, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this DIP Credit Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (iv) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11.  Amendment of Material Documents. No Loan Party will amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness or any other Indebtedness of a Loan Party to Affiliated Persons, (b) its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational or governing documents or (c) any Material Agreement.

SECTION 6.12.  Payments to Raymond James.  To the extent the Bankruptcy Court enters an order authorizing the retention of Raymond James as investment banker for the Debtors, subject to Bankruptcy Court Approval the Borrower shall be permitted to make payments to Raymond James of the following fees, and to reimburse Raymond James for the following expenses: (i) the Monthly Advisory Fees payable pursuant to Section 2(a) of the RJ Engagement Letter to the extent such Monthly Advisory Fees are included in the Approved Budget, (ii) upon entry of the Interim Order, the first half of the DIP Financing Fee payable pursuant to Section 2(b)(i) of the RJ Engagement Letter in an amount not exceeding $75,000 to the extent such first half of the DIP Financing Fee is included in the Approved Budget, (iii) upon entry of the Final Financing Order, the second half of the DIP Financing Fee payable pursuant to Section 2(b)(i) of the RJ Engagement Letter in an amount not exceeding $75,000 to the extent such second half of the DIP Financing Fee is included in the Approved Budget, (iv) upon consummation of the Sale Transaction, the Business Combination Transaction Fee described in Section 2(c)(i) of the RJ Engagement Letter, and (v) reimbursement of Expenses as provided for in Section 3 of the RJ Engagement Letter provided that such Expenses are included in the Approved Budget.  Except as expressly set forth above, until the Aggregate Credit Obligations shall have been Paid in Full, no Loan Party shall pay or reimburse Raymond James for any other amounts without the prior written approval of the DIP Lender.

SECTION 6.13.  Financing Order. Loan Parties will not:

(a)    seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Financing Order, except for modifications and amendments joined in or agreed to in writing by the DIP Lender;

(b)    seek the use of Cash Collateral in a manner inconsistent with the terms of the Financing Order without the prior written consent of the DIP Lender;

(c)    suffer to exist at any time a priority for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726 and 1114 of the Bankruptcy Code) or any super priority claim

33

which is equal or superior to the priority of the DIP Lender in respect of the DIP Obligations or the Prepetition Lender in respect of the Prepetition Obligations, except for the Carveout;

(d)     directly or indirectly seek, consent to, or allow to exist at any time after the Effective Date any Lien on any properties, assets or rights except for Permitted Liens; or

(e)     prior to the date on which the Prepetition Obligations (and any Reinstated Prepetition Obligations then outstanding) and the DIP Obligations have been paid in full, pay any administrative expenses or pre-petition claims other than (i) as provided for in the Approved Budget or (ii) otherwise consented to by the DIP Lender in writing.

## ARTICLE VII
## EVENTS OF DEFAULT

If any of the following events ("Events of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of any Loan, or any reimbursement obligation in respect of any LC Disbursement, any interest on any Loan, or any fee or other amount payable under this DIP Credit Agreement, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     any representation or warranty made or deemed made by or on behalf of any Loan Party in, or in connection with, this DIP Credit Agreement or any other DIP Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this DIP Credit Agreement or any other DIP Loan Document, shall prove to have been materially incorrect when made or deemed made;

(c)     any Loan Party shall fail to comply with, observe or perform any covenant, condition or agreement contained in this DIP Credit Agreement, the other DIP Loan Documents or the Financing Order;

(d)     any of the Milestones shall not have been timely satisfied or waived by the DIP Lender in its sole discretion;

(e)     any of the Chapter 11 Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(f)     a trustee, examiner or receiver with enlarged powers shall be appointed or designated in any of the Chapter 11 Cases without the consent of the DIP Lender;

(g)     except as expressly set forth in the Interim Order, the Final Financing Order or this DIP Credit Agreement, any Loan Party (i) incurs any additional Indebtedness, or (ii) grants or requests authority to grant any lien or security interest to secure any Indebtedness (other than the DIP Obligations) without the prior written consent of the DIP Lender;

(h)     any Financing Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or the Loan Parties shall apply for authority to do so) without the written consent of the DIP Lender or any Financing Order shall cease to be in full force and effect;

(i)     entry of the Final Financing Order shall not have occurred within twenty-five (25) days after the Filing Date;

34

(j)      the Loan Parties all take any action, including the filing of an application, in support of any of the events described in clauses (c) through (i) of this Article VII, or any person other than the Loan Parties shall do so and such application is not contested in good faith by the Loan Parties;

(k)      the Debtors shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition claim other than (x) as provided for in a "first day order" and included in the Approved Budget or (y) otherwise consented to by the DIP Lender in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of the Threshold Amount in the aggregate or to permit other actions that would have a Material Adverse Effect on the Loan Parties or the estates of the Debtors, or (iii) approving any settlement or other stipulation not approved by the DIP Lender and not included in the Approved Budget with any secured creditor of the Loan Parties providing for payments as adequate protection or otherwise to such secured creditor;

(l)      the filing or express written support by the Debtors of bidding procedures, sale processes, transactions, plans of liquidation or related disclosure statements that are not acceptable to the DIP Lender.

(m)     the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder of any security interest in any asset of the Debtor in which the Prepetition Lender or the DIP Lender holds a first priority security interest.

(n)      any material contract is rejected or otherwise terminated or any material property of the Debtors is sold, in each instance, without the prior written consent of the DIP Lender;

(o)      the Debtors file a motion in the Chapter 11 Cases without the express written consent of the DIP Lender, to obtain additional financing from a party other than the DIP Lender under Section 364(d) of the Bankruptcy Code or to use Cash Collateral under Section 363(c) of the Bankruptcy Code the proceeds of which additional financing or Cash Collateral use are insufficient to indefeasibly pay in full all DIP Obligations and all Prepetition Obligations immediately upon entry of an order approving such financing or Cash Collateral use;

(p)      entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of the Debtors to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender;

(q)      the Debtors shall support any other person's opposition of any motion made in the Bankruptcy Court by the DIP Lender seeking confirmation of the amount of the DIP Lender's claim or the validity and enforceability of the Liens in favor of the DIP Lender;

(r)      the Debtors shall seek to, shall support, acquiesce in, or not challenge (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of any Debtor) any other person's motion to disallow in whole or in part the DIP Lender's claims or to challenge the validity and enforceability of the liens in favor of the DIP Lender securing the DIP Obligations or contest any material provision of this Credit Agreement or any other DIP Loan Document, (ii) the liens in favor of the DIP Lender securing the Obligation or the DIP Lender's superpriority claims shall otherwise cease to be valid, perfected and/or enforceable in all respects, or (iii) any provision of any DIP Loan Document ceases to be effective;

35

(s)     any judgments that are in the aggregate in excess of the Threshold Amount as to any obligation of any of the Debtors incurred after the Filing Date shall be rendered against any Debtor and the enforcement thereof shall not be stayed;

(t)     (i) the Debtors or any of their affiliates shall file any pleading or proceeding that could reasonably be expected to result in an impairment of the rights or interests of the DIP Lender or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other person which results in such impairment of the rights or interests of the DIP Lender;

(u)     the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notice of lien or similar instrument or other document that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the DIP Lender;

(v)     the Debtors shall fail to pay at maturity, or within any applicable period of grace, any obligation for Indebtedness (other than the DIP Obligations) in excess of $100,000, or fail to observe or perform any material term, covenant or agreement (other than (i) in connection with or as a result of the Chapter 11 Cases or (ii) any such obligation with respect to which the Bankruptcy Code prohibits the Debtors from complying with such obligation or permits the Debtors not to comply with such obligation) contained in any agreement by which it is bound, evidencing or securing Indebtedness (other than the DIP Obligations) in excess of $100,000 for such period of time as would permit (assuming the lapse of time and/or giving of appropriate notice if required and assuming such breach has not been cured within the applicable grace period thereunder) the holder or holders thereof or of any obligations issued thereunder to accelerate the maturity thereof;

(w)     there shall occur any damage to, or loss, theft or destruction of, any Collateral in an amount greater than the Threshold Amount that is not covered by insurance;

(x)     any Loan Party or the Individual Guarantor shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Lender, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the Financing Order with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by any Loan Party or the Individual Guarantor that contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Lender created by the Financing Order;

(y)     Liens or superpriority claims with respect to the DIP Obligations shall at any time cease to be valid, perfected and enforceable in all respects with the priority described herein; or

(z)     any party, including, but not limited to, any Debtor, files a plan of reorganization or a motion to sell all or substantially all of the assets of the Borrower or any other Loan Party, in either case, without the express prior written consent of the DIP Lender except for any such plan that contemplates the indefeasible payment in full in cash of all the DIP Obligations and all Prepetition Obligations (other than contingent indemnification obligations);

then, and in every such event, and at any time thereafter during the continuance of such event, the DIP Lender may, by notice to the Borrower, take any or all of the following actions, at the same or different times, subject to the terms and conditions of the Financing Order: (i) terminate the Revolving Commitment, whereupon the Revolving Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, but ratably as among the Classes of Loans and the Loans of each Class at the time outstanding, in which case any principal not so declared to be due and

36

payable may thereafter be declared to be due and payable), whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other DIP Obligations of the Borrower accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender may increase the rate of interest applicable to the Loans and other DIP Obligations as set forth in this DIP Credit Agreement and exercise any rights and remedies provided to the DIP Lender under the DIP Loan Documents or at law or equity, including all remedies provided under the UCC.

## ARTICLE VIII
## MISCELLANEOUS

SECTION 8.01.  Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or sent by e-mail, to the Loan Parties and to the DIP Lender at the following addresses:

if to any Debtor, DCDUK or Game Consolidators, to the Borrower at:

> Diamond Comic Distributors, Inc.
> 10150 York Road, Suite 300
> Hunt Valley, MD 21030
> Attention:  Charles Parker
> Email: pchuck@diamondcomics.com

with copies (which shall not constitute notice) to:

> Robert Gorin and William Henrich, Chief Restructuring Officers
> of Diamond Comic Distributors, Inc.
> c/o Getzler Henrich & Associates LLC
> 295 Madison Avenue
> New York, NY 10017
> Email:  rgorin@getzlerhenrich.com and whenrich@getzlerhenrich.com

> Saul Ewing LLP
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102-2186
> Attention:  Jeffrey Hampton and Adam Isenberg
> Email:  Jeffrey.Hampton@saul.com and Adam.Isenberg@saul.com

if to Renegade, Rosebud, Game Consolidators or the Individual Guarantor:

> c/o Stephen A. Geppi
> 10150 York Road, Suite 300
> Hunt Valley, MD 21030
> Email: gsteve@diamondcomics.com

with copies (which shall not constitute notice) to:

    DLA Piper LLP (US)
    650 South Exeter Street, Suite 1100
    Baltimore, MD 21202
    Attn: C. Kevin Kobbe
    Email: kevin.kobbe@us.dlapiper.com

if to the DIP Lender, to:

    JPMorgan Chase Bank, N.A.
    3424 Peachtree Road NE, Floor 21
    Atlanta, GA 30326
    Attention:  Diamond Comic Account Representative
    Email:  angela.leake@jpmorgan.com

with copies (which shall not constitute notice) to:

    JPMorgan Chase Bank, N.A.
    250 Pehle Ave, Floor 001
    Saddle Brook, NJ 07663
    Attention:  Michael Fondacaro
    Email:  michael.a.fondacaro@chase.com

    Troutman Pepper Locke LLP
    111 Huntington Avenue
    Boston, MA 02199
    Attention:  David Ruediger and Jonathan Young
    Email: David.Ruediger@troutman.com and Jonathan.Young@troutman.com

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by e-mail shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.  Any notice or other communication to be given (A) to the Debtors, or any Debtor individually, or to DCDUK hereunder may be given to the Borrower on behalf of the Debtors, or any individual Debtor, or DCDUK, and (B) to Renegade, Rosebud, Game Consolidators or the Individual Guarantor, may be given to the Individual Guarantor on behalf of Renegade, Rosebud, Game Consolidators or the Individual Guarantor.

        (b)     Notices and other communications to the DIP Lender hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the DIP Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to item (c) of the Reporting Schedule attached hereto unless otherwise agreed by the DIP Lender. Each of the DIP Lender and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the DIP Lender otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail

or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)     Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

SECTION 8.02.  <u>Waivers; Amendments.</u>

(a)     No failure or delay by the DIP Lender in exercising any right or power hereunder or under any other DIP Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the DIP Lender hereunder and under any other DIP Loan Document are cumulative and are not exclusive of any rights or remedies that it would otherwise have. No waiver of any provision of any DIP Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the DIP Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this DIP Credit Agreement nor any other DIP Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this DIP Credit Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the DIP Lender, or (ii) in the case of any other DIP Loan Document, pursuant to an agreement or agreements in writing entered into by the DIP Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.  <u>Expenses; Indemnity; Damage Waiver.</u>

(a)     The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the DIP Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel (including, without limitation, local counsel) for the DIP Lender, in connection with the credit facilities provided for herein, the preparation and administration of the DIP Loan Documents and any amendments, modifications or waivers of the provisions of the DIP Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) reasonable out-of-pocket expenses incurred by the DIP Lender in connection with the issuance, amendment, renewal or extension of the Prepetition Letter of Credit or any demand for payment thereunder and (iii) out-of-pocket expenses incurred by the DIP Lender, including the fees, charges and disbursements of any counsel for the DIP Lender, in connection with the Chapter 11 Cases and/or the enforcement, collection or protection of its rights in connection with the DIP Loan Documents, including its rights under this Section, or in connection with the Loans made or the Prepetition Letter of Credit, including all such out-of-pocket expenses incurred in the Chapter 11 Cases and during any restructuring or negotiations in respect of such Loans or the Prepetition Letter of Credit. Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with: (A)

appraisals and insurance reviews; (B) field examinations and the preparation of Reports based on the fees charged by a third party retained by the DIP Lender or the internally allocated fees for each Person employed by the DIP Lender with respect to each field examination; (C) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the DIP Lender; (D) Taxes, fees and other charges for (1) lien and title searches and title insurance and (2) filing financing statements and continuations, recording any Mortgages, and other actions to perfect, protect, and continue the DIP Lender's Liens; (E) sums paid or incurred to take any action required of any Loan Party under the Financing Order or DIP Loan Documents that such Loan Party fails to pay or take; and (F) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral. All of the foregoing fees, costs and expenses may be charged to the Borrower as Revolving Loans or to another deposit account, all as described in Section 2.17(c).

(b)     The Loan Parties, jointly and severally, shall indemnify the DIP Lender, and each Related Party of the DIP Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the filing of the Chapter 11 Cases, (ii) the execution or delivery of the DIP Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iii) any Loan or the Prepetition Letter of Credit or the use of the proceeds therefrom (including any refusal by the DIP Lender to honor a demand for payment under the Prepetition Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of the Prepetition Letter of Credit), (iv) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (v) the failure of a Loan Party to deliver to the DIP Lender the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.16, or (vi) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)     To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this DIP Credit Agreement, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the Prepetition Letter of Credit or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

40

(d)    All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.04.  <u>Successors and Assigns.</u>

(a)    The provisions of this DIP Credit Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the DIP Lender), except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the DIP Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void). Nothing in this DIP Credit Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the DIP Lender) any legal or equitable right, remedy or claim under or by reason of this DIP Credit Agreement.

(b)    The DIP Lender may assign to one or more Persons all or a portion of its rights and obligations under this DIP Credit Agreement (including all or a portion of the Revolving Commitment and the Loans at the time outstanding hereunder). Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the DIP Lender under this DIP Credit Agreement, and the DIP Lender shall, to the extent of the interest assigned, be released from its obligations under this DIP Credit Agreement (and, in the case of an assignment covering all of the DIP Lender's rights and obligations under this DIP Credit Agreement, the DIP Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16 and 8.03). The Borrower and each other Loan Party hereto hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this DIP Credit Agreement to provide for multiple lenders and an administrative agent to act on behalf of such lenders. Any assignment or transfer by the DIP Lender of rights or obligations under this DIP Credit Agreement that does not comply with this paragraph shall be treated for purposes of this DIP Credit Agreement as a sale by the DIP Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(c)    The DIP Lender may, without the consent of, or notice to, the Borrower, sell participations to one or more banks or other entities (a "<u>Participant</u>") in all or a portion of the DIP Lender's rights and obligations under this DIP Credit Agreement (including all or a portion of the Revolving Commitment and/or the Loans outstanding hereunder); provided that (i) the DIP Lender's obligations under this DIP Credit Agreement shall remain unchanged, (ii) the DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the DIP Lender in connection with the DIP Lender's rights and obligations under this DIP Credit Agreement. Subject to paragraph (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14 and 2.16 (subject to the requirements and limitations therein) to the same extent as if it were the DIP Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14 or 2.16, with respect to any participation, than its participating the DIP Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were the DIP Lender. If the DIP Lender shall sell a participation, it shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in

the Loans or other obligations under this DIP Credit Agreement or any other DIP Loan Document (the "Participant Register"); provided that the DIP Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in the Revolving Commitment, the Loans, the Prepetition Letter of Credit or its other obligations under any DIP Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such interest in the Revolving Commitment, the Loans, the Prepetition Letter of Credit or other obligations is in registered form under Section 5f. 103-1 (c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and the DIP Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this DIP Credit Agreement notwithstanding any notice to the contrary.

(d)     The DIP Lender may at any time pledge or assign a security interest in all or any portion of its rights under this DIP Credit Agreement to secure obligations of the DIP Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the DIP Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the DIP Lender as a party hereto.

SECTION 8.05.  Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the DIP Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this DIP Credit Agreement or any other DIP Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the DIP Loan Documents and the making of any Loans and maintenance of the Prepetition Letter of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the DIP Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this DIP Credit Agreement is outstanding and unpaid or the Prepetition Letter of Credit is outstanding and so long as the Revolving Commitment has not expired or terminated. The provisions of Sections 2.14, 2.16 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Prepetition Letter of Credit and the Revolving Commitment or the termination of this DIP Credit Agreement or any other DIP Loan Document or any provision hereof or thereof.

SECTION 8.06.  Counterparts; Integration; Effectiveness; Electronic Execution.

(a)     This DIP Credit Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This DIP Credit Agreement, the other DIP Loan Documents and any separate letter agreements with respect to fees payable to the DIP Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this DIP Credit Agreement shall become effective when it shall have been executed by the DIP Lender and when the DIP Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. To the extent of any conflict between the terms of the Financing Order and the terms of this DIP Credit Agreement, the terms of the Financing Order shall govern and control.

(b)     Delivery of an executed counterpart of a signature page of (i) this DIP Credit Agreement, (ii) any other DIP Loan Document and/or (iii) any document, amendment, approval, consent,

information, notice (including, for the avoidance of doubt, any notice delivered pursuant to Section 8.01), certificate, request, statement, disclosure or authorization related to this DIP Credit Agreement, any other DIP Loan Document and/or the transactions contemplated hereby and/or thereby (each an "Ancillary Document") that is an Electronic Signature transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this DIP Credit Agreement, such other DIP Loan Document or such Ancillary Document, as applicable. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this DIP Credit Agreement, any other Loan Document and/or any Ancillary Document shall be deemed to include Electronic Signatures, deliveries or the keeping of records in any electronic form (including deliveries by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page), each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be; provided that nothing herein shall require the DIP Lender to accept Electronic Signatures in any form or format without its prior written consent and pursuant to procedures approved by it; provided, further, without limiting the foregoing, (A) to the extent the DIP Lender has agreed to accept any Electronic Signature, the DIP Lender shall be entitled to rely on such Electronic Signature purportedly given by or on behalf of any Loan Party without further verification thereof and without any obligation to review the appearance or form of any such Electronic Signature and (B) upon the request of the DIP Lender, any Electronic Signature shall be promptly followed by a manually executed counterpart. Without limiting the generality of the foregoing, each Loan Party hereby (w) agrees that, for all purposes, including without limitation, in connection with any workout, restructuring, enforcement of remedies, bankruptcy proceedings or litigation among the DIP Lender and the Loan Parties, Electronic Signatures transmitted by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page and/or any electronic images of this DIP Credit Agreement, any other DIP Loan Document and/or any Ancillary Document shall have the same legal effect, validity and enforceability as any paper original, (x) the DIP Lender may, at its option, create one or more copies of this DIP Credit Agreement, any other DIP Loan Document and/or any Ancillary Document in the form of an imaged electronic record in any format, which shall be deemed created in the ordinary course of its business, and destroy the original paper document (and all such electronic records shall be considered an original for all purposes and shall have the same legal effect, validity and enforceability as a paper record), (y) waives any argument, defense or right to contest the legal effect, validity or enforceability of this DIP Credit Agreement, any other DIP Loan Document and/or Ancillary Document based solely on the lack of paper original copies of this DIP Credit Agreement, such other DIP Loan Document and/or Ancillary Document, respectively, including with respect to any signature pages thereto and (z) waives any claim against any DIP Lender-Related Person for any Liabilities arising solely from the DIP Lender's reliance on or use of Electronic Signatures and/or transmission by facsimile, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page, including any Liabilities arising as a result of the failure of any Loan Party to use any available security measures in connection with the execution, delivery or transmission of any Electronic Signature.

SECTION 8.07.  Severability. Any provision of any DIP Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08.  Right of Setoff. Subject to the terms and conditions of the Financing Order, the DIP Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the DIP Lender or such Affiliate to or for the credit or the account of the Borrower or any Loan Guarantor against any and all of

the DIP Obligations held by the DIP Lender or such Affiliate, irrespective of whether or not the DIP Lender shall have made any demand under the DIP Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of the DIP Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness. The rights of the DIP Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the DIP Lender and its Affiliates may have.

SECTION 8.09.  Governing Law; Jurisdiction; Consent to Service of Process.

(a)      This DIP Credit Agreement and the other DIP Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the State of New York, but giving effect to federal laws applicable to national banks.

(b)      Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. federal or New York State court sitting in New York, New York and the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any DIP Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the DIP Lender or any of its Related Parties may only) be heard and determined in the courts of the State of New York or, to the extent permitted by law, in such federal court and each of the parties agrees to waive any rights it may have to object to adjudication by a judge of the Bankruptcy Court on the basis of a right to have matters adjudicated in front of an Article III judge. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this DIP Credit Agreement or any other DIP Loan Document shall affect any right that the DIP Lender may otherwise have to bring any action or proceeding relating to this DIP Credit Agreement or any other DIP Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)      Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this DIP Credit Agreement or any other DIP Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)      Each party to this DIP Credit Agreement irrevocably consents to service of process in the manner provided for notices in Section 8.01. Nothing in this DIP Credit Agreement or any other DIP Loan Document will affect the right of any party to this DIP Credit Agreement to serve process in any other manner permitted by law.

SECTION 8.10.  WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS DIP CREDIT AGREEMENT, ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY

44

WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS DIP CREDIT AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11.  Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this DIP Credit Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this DIP Credit Agreement.

SECTION 8.12.  Confidentiality. The DIP Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested or required by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners) having jurisdiction over the DIP Lender, (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this DIP Credit Agreement, (e) in connection with the Chapter 11 Cases, or the exercise of any remedies under this DIP Credit Agreement or any other DIP Loan Document or any suit, action or proceeding relating to this DIP Credit Agreement or any other DIP Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this DIP Credit Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower, (h) to holders of Equity Interests in the Borrower, (i) to any Person providing a Guarantee of all or any portion of the DIP Obligations or (j) to the extent such Information (i) becomes publicly available pursuant to the Chapter 11 Cases or otherwise than as a result of a breach of this Section or (ii) becomes available to the DIP Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available pursuant to the Chapter 11 Cases or is otherwise available to the DIP Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13.  Nonreliance; Violation of Law. The DIP Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein. Anything contained in this DIP Credit Agreement to the contrary notwithstanding, the DIP Lender shall not be obligated to extend credit to the Borrower in violation of any Requirement of Law.

SECTION 8.14.  USA PATRIOT Act. The DIP Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the DIP Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15.  Disclosure. Each Loan Party hereby acknowledges and agrees that the DIP Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.