**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re: | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors. | (Jointly Administered) |

**OBJECTION OF IMAGE COMICS, INC. TO DEBTORS' MOTION FOR ENTRY OF
AN ORDER APPROVING (I) PROCEDURES FOR SALE OR OTHER DISPOSITION
OF CONSIGNED INVENTORY, (II) APPROVING SALES OR OTHER DISPOSITION
OF CONSIGNED INVENTORY FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS OR ENCUMBRANCES AND (III) GRANTING RELATED RELIEF**

Image Comics, Inc. ("Image") files this objection (the "Objection") to the *Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 531] (the "Motion") filed by the above-captioned debtors and debtors in possession (the "Debtors"). In support of this Objection, Image submits the Declaration of Eric Stephenson (attached hereto as **Exhibit A**), and respectfully states as follows:

**Introduction**

1.      The Motion is a brazen attempt by the Debtors to misappropriate Image's inventory, which Diamond Comic Distributors, Inc. ("Diamond") holds as Image's agent.  For months the Debtors refused to engage in meaningful discussions with Image regarding return of the Image inventory Diamond holds (or even to provide contractually required reporting of Diamond's post-petition sales of that inventory) on the pretext that Image needed to wait and see if the contract

between Image and Diamond (the "<u>Agreement</u>") was designated for assumption and assignment as part of the Debtors' asset sale to Sparkle Pop. When Sparkle Pop did not designate the Agreement, without warning (and without even first moving to reject the Agreement), the Debtors filed the Motion seeking to sell Image's inventory in a fire sale auction (most likely to Sparkle Pop for pennies on the dollar, rather than the full cure and future performance required under 11 U.S.C. § 365) and use the proceeds to pay their creditors (presumably the Debtors' pre-petition secured lender turned DIP lender, JPMorgan Chase, since its loan has yet to be fully repaid). This Court should not countenance such flagrant circumvention of 11 U.S.C.§ 365 and outrageous violation of Diamond's fiduciary duties to Image.

2. The Motion is predicated on the erroneous contention that the relationship between Diamond and Image is a mere consignment that can be disregarded at Diamond's convenience because Image did not file a UCC-1 financing statement. Yet the Agreement only vaguely references the notion of consignment in an ambiguous and nonsensical provision that requires Diamond to "cooperate with Image in the execution" of UCC-1 financing statements if Image "reasonably deems [doing so] necessary to provide adequate notice of its rights as consignor hereunder."[1] No other provision of the Agreement—which discusses the mechanics of the parties'

---

[1] *See Agreement* dated April 2024 (attached hereto as **<u>Exhibit A-1</u>**), at § 6(d). The exact same language is inexplicably repeated verbatim at § 6(i). This provision makes no sense because nothing in the Uniform Commercial Code requires a debtor or consignee (nor a secured party or consignor for that matter) to "execute" a UCC-1 financing statement. Indeed, there is no place on a UCC-1 form *for* anyone *to* "execute" it. Moreover, the provision only addresses Diamond's required "cooperation" *if* Image "deem[ed] it necessary" to file a UCC-1 because Image was concerned the relationship could be viewed as a consignment. Given the repeated statements in the contract that the relationship was an agency, not a consignment, Image had no such concern and never filed a UCC-1. Any ambiguity regarding the scope and significance of this provision and its reference to consignment must be interpreted against Diamond because Diamond drafted the Agreement (*see* Exhibit A at ¶ 3) and there is no provision in the Agreement that alters the general rule that contractual ambiguities are interpreted against the drafter. *See, e.g.*, *Truck Ins. Exchange v. Marks Rentals, Inc.*, 288 Md. 428, 435 (1980).

dealings in great detail—describes the parties' relationship as a consignment, let alone unambiguously.

3.      Rather, the Agreement expressly and unambiguously provides *two separate times* that Diamond is "appointed" as Image's "exclusive ***agent***" tasked with "selling, billing, warehousing, shipping, collecting, returns handling, and other customary customer services for distribution of Image's Products" in specified channels of certain overseas markets.[2]   The Agreement makes crystal clear that while Diamond is holding inventory as Image's agent, "Image shall retain title…until such title transfers to Image's Account [*i.e.*, end-customers] in accordance with *Image's* Terms of Sale."[3]   Thus, title to the products passes *directly* from Image to end-customers, and never vests, even momentarily, in Diamond.

4.      That is consistent with the well-established rule that "title to the property remains in the…principal, and the…agent holds the property…for the owner's benefit."[4]   For that reason, the property of a principal does not become property of an agent's bankruptcy estate under Section 541(d) of the Bankruptcy Code.[5]   That is the applicable standard here.   There is no requirement in the Uniform Commercial Code, or elsewhere, that a principal must file a UCC-1 financing statement to preserve the principal's ownership interest in its property while held by its ***agent***.[6]

---

[2] *See* Exhibit A-1 at §§ 1.1(a) & 1.1(b) (emphasis added).

[3] *See* Exhibit A-1 at § 6(a) (emphasis added); *see also id.* at § 1.3 (providing that "Book Sellers and Non-Book Seller Customers shall be referred to collectively herein as 'Accounts'"). Moreover, the fact that the terms of sale which are to govern transactions with end-customer are Image's terms, not Diamond's terms, reinforces that sales of Image products were facilitated by Diamond solely as Image's agent and that Diamond itself was never the seller of those products.

[4] *In re Newpower*, 233 F.3d 922, 933 (6th Cir. 2000) (quoting COLLIER ON BANKRUPTCY ¶ 541.06[1][a] (15th ed.1999)).

[5] *See infra*, ¶ 18.

[6] Indeed, item 7 of the official UCC-1 form contains a checkbox by which the filer can indicate an "alternative designation" of a "consignee/consignor" relationship.   *See* www.oas.org/dil/esp/US-National%20Form.pdf.   No similar box exists to designate an "agent/principal" relationship because the UCC does not require a principal to file a UCC-1 regarding its property held by its agent.

5.      Moreover, even if the Court were to find that the Agreement created a consignment at common law, it was not a "consignment" within the meaning of Article 9 of the Uniform Commercial Code and, therefore, Image was not required to file a UCC-1 to give third parties notice of its consignment.  Upon information and belief, Diamond was "generally known by its creditors to be substantially engaged in selling the goods of others" within the meaning of UCC Section 9-102(a)(20).  As discussed in further detail below, that standard is satisfied if at least 20% of Diamond's total inventory on the petition date was inventory held as agent or consignee and a majority of Diamond's creditors were aware of that.[7]

6.      In the Motion, the Debtors baldly assert, without reference to any evidence or even specific numbers, that "most" of "the _Debtors'_ inventory" was purchased outright and not held on consignment.[8]  But the proportion of consigned inventory across _all_ the Debtors in the _aggregate_ is irrelevant because Image did not do business with all the Debtors, only Diamond, and the inquiry under UCC Section 9-102(a)(20) focuses on the percentage of consignment inventory held by the specific debtor with which the asserted "consignor" did business.  Image believes the imprecision of the Debtors' assertion in the Motion was meant to deliberately obfuscate the fact that a very large portion of _Diamond's_ inventory was held as agent or consignee, even if certain other Debtors may have purchased the majority of their inventory from vendors outright. Image intends to seek discovery from the Debtors under Bankruptcy Rules 7026 through 7037,[9] which Image believes will conclusively establish this.

---

[7] _See infra_, ¶ 22.

[8] _See_ Motion at ¶ 11 (emphasis added).

[9] The Debtors cannot accomplish their goal of stealing and then selling Image's inventory through a motion. Instead, the Debtors must initiate an adversary proceeding before stripping Image of its property rights. _See, e.g.,_ Fed. R. Bankr. P. 7001; _TSA Stores, Inc. v. MJ Soffe, LLC (In re TSAWD Holdings, Inc.)_, 565 B.R. 292, 295 (Bankr. D. Del. 2017) (stating that the court had previously refused to let the debtors sell consigned goods until the court could determine in adversary proceedings the competing interests in the consigned goods); _French Design Jewelry, Inc. v. Downey Creations, LLC (In re Down Creations, LLC)_, 414 B.R. 463, 465 (Bankr. S.D. Ind. 2009) (stating that the

4

7.    Likewise, as to the knowledge of Diamond's creditors, Diamond's bankruptcy schedules reflect a total of 548 creditors as of the petition date.[10] Assuming that the knowledge of certain types of creditors—who would not typically take security interests in inventory to secure the type of debts incurred to them—is even relevant (which, as discussed below, it should not be based on the policy underlying UCC Section 9-102(a)(20)), the list attached to the Motion includes 128 alleged "consignors" to the Debtors, the vast majority of whom appear among the creditors listed in Diamond's schedules and so they presumably knew that Diamond was substantially engaged in selling goods of others.  Given this evidence of Diamond's widespread practice of holding and selling goods as agent or consignee, Image believes that many other creditors were also aware of that practice, including (a) vendors who may have been listed as creditors on the schedules because they were owed money as of the petition date but who were not included on the consignor list in the Motion because Diamond no longer holds any of their inventory, as well as (b) end-customers with asserted claims against Diamond who may have been aware that the goods they were purchasing were held by Diamond as agent or consignee given that Diamond at least sometimes (based on the Agreement) utilized the principal or consignor's terms of sale in dealings with end-customers.  Again, Image intends to seek discovery from the Debtors and Diamond's creditors under Bankruptcy Rules 7001 and 7026 through 7037, which Image believes will conclusively establish this.

---

court previously instructed the parties to raise the issue of whether certain transactions were consignments under the UCC definition in an adversary proceeding because the dispute fell under Bankruptcy Rule 7001(2)) *In re Whitehall Jewelers Holdings, Inc.*, No. 08-11261, 2008 Bankr. LEXIS 2120, at *17–18 (Bankr. D. Del. July 28, 2008) (holding the debtors were required to file adversary proceedings to determine each alleged consignor's property rights prior to a sale and stating: "The Court recognizes the burden this decision places upon Debtors to initiate over 120 adversary proceedings, particularly given the short time available before the sale. Nonetheless, the law is clearly established that adversary proceedings are mandated and each Consignment Vendor is entitled to the protections of the law.").

[10] *See* D.I. 155 & 349.

5

8.      In addition, even if the Court were to find that the Agreement created a consignment that was not exempt under UCC Section 9-102(a)(20) from the requirement to file a UCC-1, a significant portion of the Image inventory held by Diamond on the petition date was never within the intended _scope_ of the Agreement at all and, thus, Diamond cannot sell *that* inventory even if it somehow avoids the alleged unperfected consignment created under the Agreement.

9.      Until 2023, Diamond was Image's exclusive agent in both certain overseas markets _and_ in the domestic U.S. market.[11] Diamond therefore held a large volume of Image inventory to meet the sales demands of both markets.[12] But in 2023, Image switched to Lunar Distribution ("Lunar") as its exclusive agent in the U.S. market. And, in April 2024, Diamond became Image's exclusive agent only in the overseas markets with the execution of the Agreement.[13]  Beginning in 2023 through the middle of 2024, Image directed Diamond to transfer possession of much of the Image inventory then held by Diamond to Lunar.[14]  Yet Diamond failed to transfer a large portion of that inventory without explanation.[15] Of the total $2,909,486.23 worth of Image inventory left at Diamond today, $1,231,783.92 (~42%) is inventory that Diamond failed to transfer to Lunar's possession per Image's direction.[16]  Diamond wrongfully remains in possession of that inventory despite clear prepetition instructions from Image.  Thus, that portion of the inventory Diamond now holds was never intended to be governed by the Agreement—no matter what relationship it is deemed to create—and Diamond has no right to sell that portion of the inventory even if it

---

[11] *See* Exhibit A at ¶ 2.

[12] *Id.* at ¶ 2.

[13] *See* Exhibit A at ¶ 3; *see also* Exhibit A-1 at § 1.1(a).

[14] *See* Exhibit A at ¶ 4; *see also* Exhibit A-2 (reflecting Image's instruction to Diamond to transfer certain of its inventory to Lunar).

[15] *See* Exhibit A at ¶ 5.

[16] *See* Exhibit A at ¶ 5; *see also* Exhibit A-3 (showing, on a title-by-title basis, the inventory that should have been transferred to Lunar but that remains in Diamond's possession today based on recent information available to Image from Diamond's vendor portal).

somehow obtains the right to sell inventory supposedly consigned to Diamond under the Agreement.

10.    Finally, the Debtors' request that they be permitted to sell Image's inventory now, even though there is a pending dispute whether Diamond has any right to do so, should be denied. For one thing, courts have held that 11 U.S.C. § 363(f) cannot be used to sell property when there is a dispute over whether another party _owns_ that property.[17]  In addition, while the Debtors appear to assert that if Image later succeeds on this Objection Image can simply take the proceeds obtained by the Debtors from the sale of Image's inventory, this ignores that the Debtors are not seeking to sell the inventory in the ordinary course of business at the type of retail prices that Image could obtain if it sold this inventory over time (itself or through another distributor like Lunar).  Rather, Debtors seek permission for a bulk fire sale (presumably to Sparkle Pop or another vulture firm that will buy it for a fraction of its retail sale value).  Image will then be doubly injured by receiving next to nothing on account of the wrongful sale of inventory that it owns (and could sell for far more) and then having to compete for sales in the market against that same inventory when it is resold (possibly at discounted prices) by whomever buys it at the proposed auction sale.  Debtors make no case why this inventory (much of which Diamond has held for many years) must be immediately liquidated to the extreme prejudice of Image, rather than waiting until this dispute has been resolved.

11.    For all these reasons, Image objects to the Motion and respectfully requests this Court deny the Debtors' attempt to effectively steal and then sell Image's property in violation of its fiduciary duties under the Agreement.

---

[17] _See infra_, ¶ 30.

## Background

### A. The Agreement establishes an agency relationship.

12.    Image and Diamond have had a business relationship for more than thirty years.[18] Between 1992 and 2023, Diamond served as Image's exclusive agent for both the U.S. and overseas sales of Image's products.[19]  As a result, Diamond held a large inventory of Image's products for sale to end customers.[20]

13.    But, in 2023, Image switched to Lunar as its exclusive U.S. agent.[21]  And, in April 2024, Image and Diamond executed the Agreement pursuant to which Diamond remained Image's "exclusive ***agent***" for the overseas market pursuant to the express terms of the Agreement.[22]  The Agreement also provides that title to Image's inventory <u>never</u> vests in Diamond at any point. Section 6(a) states that "Image shall retain title to Products until such title transfers to Image's Account in accordance with Image's Terms of Sale."[23] "Account" is defined as "Book Sellers and Non-Book Seller Customers" (*i.e.*, not Diamond).[24]

---

[18] *See* Exhibit A at ¶ 2.

[19] *Id.*

[20] *Id.*

[21] *Id.* at ¶ 3.

[22] *See* Exhibit A-1 at § 1.1(a) ("Image and Diamond agree that effective as of the Agreement's Commence Date, January 1st, 2024, Diamond is appointed Image's *exclusive agent*") (emphasis added); Exhibit A-1 at § 1.1(b) (emphasis added) ("Notwithstanding anything to the contrary set forth herein, the appointment of Diamond to serve as Image's *exclusive agent* set forth above shall apply to all Image titles published under the Image 'I' trademark during the Term") (emphasis added).

[23] Exhibit A-1 at § 6(a).

[24] "Book Sellers" is defined as "chain book retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandizers and their internet affiliates; warehouse clubs, book clubs, libraries, and schools; online retailers; and the wholesalers who service those accounts, but not including sales of content in digital form only via the Internet." Exhibit A-1 at § 1.1(a). "Non-Book Seller Customers" include non-book seller customers within the applicable territory. *See* Exhibit A-1 at § 1.3.

14.     Beginning in 2023 through the middle of 2024, Image directed Diamond to transfer possession of much of Image's inventory to Lunar.[25]  Diamond failed to transfer that inventory (the "Wrongfully Held Inventory") without any explanation in breach of Diamond's fiduciary duties as Image's agent under prior agreements and the new 2024 Agreement.[26]

**B.     The Motion seeks Court approval of Diamond's attempt to misappropriate and sell inventory that Diamond holds as Image's agent.**

15.     On June 25, 2025, the Debtors filed the Motion. Among other things, the Motion seeks authority to sell Image's inventory (including the Wrongfully Held Inventory) free and clear of Image's superior interests therein. The Motion incorrectly asserts that the strong-arm powers of 11 U.S.C. § 544(a) permit the Debtors to avoid Image's allegedly unperfected interest in the inventory because Image did not file a UCC-1 financing statement. The Debtors also request this Court to allow the potentially pennies-on-the-dollar sale of the inventory prior to the adjudication of this Objection (and any other objections); the Debtors seem to imply that Image's asserted rights as owner of the inventory will be preserved via the ability to obtain the pittance of proceeds obtained at that fire sale auction if Image succeeds on this Objection.

16.     As discussed below, the Debtors offer only vague statements to support their extreme request. For example, in an unconvincing attempt to prove that the alleged "consignments" do not fall within the exceptions of Article 9 of the UCC, the Motion broadly states—without evidence—that "most" of the Debtors' inventory (collectively, not Diamond specifically) was not held on consignment. The Motion ignores—most likely, intentionally so—how many creditors knew the Debtors sold on consignment as well as how many creditors knew *Diamond* specifically sold on consignment (which is one of the critical inquiries for purposes of

---

[25] *See* Exhibit A at ¶ 4; *see also* Exhibit A-2.
[26] *See* Exhibit A at ¶ 5.

this Objection).  And, most importantly, the Motion ignores entirely the repeated statements in the Agreement that Diamond is Image's "agent," a relation that is distinct from consignment, with fiduciary duties that prevent title to property from becoming part of the agent's bankruptcy estate regardless of whether a UCC-1 financing statement was or was not filed.

### Objection

17.    The Motion should be denied for four reasons. *First*, the Agreement unambiguously created an agency relationship, not a consignment, and a principal's property held by its agent never becomes property of agent's bankruptcy estate, regardless of whether a UCC-1 is filed. *Second*, even if the Court determines the Agreement created a consignment, it was not a "consignment" within the meaning of Article 9 of the UCC as to which Image was required to file a UCC-1 financing statement, and so there is no 'unperfected' consignment that the Debtors can avoid under the strongarm power of 11 U.S.C. § 544.  *Third*, even if the Court finds the Agreement created a consignment subject to Article 9, the Debtors cannot sell the Wrongfully Held Inventory because they have no legitimate interests—possessory or otherwise—in such inventory. Granting the Motion with respect to the Wrongfully Held Inventory would effectively sanction and reward the Debtors for their longstanding violation of express instructions from Image as principal to Diamond as agent to transfer the Wrongfully Held Inventory to Lunar beginning in 2023.  *Fourth*, the Debtors should not be allowed to sell the inventory free and clear while this dispute is pending. Such a sale will inevitably yield pennies-on-the-dollar proceeds to the detriment of Image. So, even if Image prevails on its Objection, Image would still lose most of the value of its inventory.

**A.    Diamond was Image's agent and so the inventory is not property of the estate.**

18.    The Motion should not be granted because the Image inventory is not property of the Debtors' estates under 11 U.S.C. § 541.  Case law is clear that property held by an agent does

not become part of the agent's bankruptcy estate.[27]  The Agreement unambiguously establishes an agency relationship with Image as principal and Diamond as agent. As cited above, the Agreement expressly characterizes the relationship as an agency *two separate times*.[28] And, while one other provision contains a vague reference to the notion of consignment, that reference is confusing and ambiguous, and merely affords Image the right to file a financing statement to the extent Image believes it necessary to protect its interest.[29] Of course, Image had no reason to believe such a filing was necessary because the Agreement clearly creates an agency relationship, agents do not take title to their principal's property, and nothing in the Uniform Commercial Code requires filing of a UCC-1 to perfect a principal's interest in its property in the hands of its agent.

19.     As principal, the inventory belonged (and continues to belong) exclusively to Image.  Property that is not property of the bankruptcy estate cannot be sold under any section of the Bankruptcy Code.  There is no reason to deviate from this longstanding principle in this case and the Debtors should not be permitted to sell Image's inventory in these bankruptcy proceedings. Accordingly, the Motion should be denied as to Image's inventory.

---

[27] *See, e.g.*, *Lubin v. Cincinnati Ins. Co.*, 677 F.3d 1039, 1042 (11th Cir. 2012) ("if property is in the debtor's hands as agent, the property or proceeds therefrom are not treated as property of the debtor's estate."); *In re Rine & Rine Auctioneers, Inc.*, 74 F.3d 854, 857 (8th Cir. 1996) (same); *In re Newpower*, 233 F.3d 922, 933 (6th Cir. 2000) (quoting COLLIER ON BANKRUPTCY ¶ 541.06[1][a] (15th ed.1999) ("[t]he title to the property remains in the ... principal, and the ... agent holds the property ... for the owner's benefit."); *In re Warde Elec. Contracting, Inc.*, 308 B.R. 659, 664 (S.D.N.Y. 2004), *citing* COLLIER ON BANKRUPTCY § 541.06 (15th Ed.2004) ("Property held by a debtor merely as…an agent for a third-party is not property of the estate within the meaning of § 541(a)(1)"); *accord Claybrook v. United States*, No. 10-734T, at p. 17 (Fed. Cl. April 18, 2012 ("[W]hen acting for a principal, an agent does 'not use property of the principal *for the agent's own purposes*.'") (citing RESTATEMENT (THIRD) OF AGENCY § 8.05, Rep. Note 6 (2006)) (emphasis in original); *In re Dameron*, 155 F.3d 718, 721–22 (4th Cir. 1998) ("Therefore, when a debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate' for purposes of the Bankruptcy Code.") (quotations omitted); *In re Douglas*, 623 B.R. 715, 736–37 (Bankr. D. Md. 2020) ("when a debtor does not hold the equitable interest in property it holds for another, that interest is not property of the estate for purposes of the Bankruptcy Code").

[28] *See supra* ¶ 3.

[29] *See supra* ¶ 2.

11

**B.  Even if the Agreement created a common law consignment, it was not a "consignment" within the meaning of Article 9 of the UCC.**

20.    Even if the Agreement created a common law consignment relationship (and it did not), Image was not required to file a financing statement because that relationship was not a "consignment" within the meaning of Section 9-102(a)(20) of the UCC.  The policy behind Section 9-102(a)(20) is to protect creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret competing interests on the consignee's inventory.[30]  In other words, the purpose of Section 9-102(a)(20) is to protect lenders that provide financing that is secured by a debtor's inventory against "secret" consignment interests in that same inventory.

21.    To that end, Section 9-102(a)(20) brings a consignment into the purview of the UCC and its notice filing perfection requirements if, among other things, the merchant-debtor "is not generally known by its creditors to be substantially engaged in selling the goods of others." UCC 9-102(a)(20).  Thus, Article 9 of the UCC does not apply if, as is the case here, the merchant is (a) generally known by its creditors (b) to be substantially engaged in selling the goods of others.

22.    To satisfy the "generally known" prong, an objecting vendor must prove that the majority of the debtor's creditors were aware that the debtor was substantially engaged in selling the goods of others.[31]  Importantly, the knowledge prong is also satisfied if a secured creditor has actual knowledge of the consignment interest.[32]  In order to satisfy the "substantially engaged"

---

[30] *See In re Valley Media, Inc.*, 279 B.R. 105, 121 (Bankr. D. Del. 2002); *see also Georgetown Steel Co., LLC v. Progress Rail Servs. Corp. (In re Georgetown Steel Co., LLC)*, 318 B.R. 352, 362 (Bankr. D. S.C. 2004).
[31] *See In re Valley Media, Inc.*, 279 B.R. 105, 125 (Bankr. D. Del. 2002).
[32] *See Liebzeit v. FVTS Acquisition Co. (In re Wolverine Fire Apparatus Co.)*, 465 B.R. 808, 822 (Bankr. E.D. Wis. 2012) (citing *Fariba v. Dealer Servs. Corp.*, 178 Cal. App. 4th 156, 160 (Cal. Ct. App. 4th 2009) (holding that where secured creditor had actual knowledge that consignee was engaged in such sales, it brought case within "generally known" exception and precluded subordination of consignor's interest).

12

prong, the debtor must hold not less than 20% of the value of its inventory on a consignment basis.[33]

23.    The Motion provides no *evidentiary* support (indeed, virtually no support of *any* kind) for the Debtors' convenient conclusion that the Agreement creates a consignment that is within the purview of Article 9 of the UCC.[34] And Bankruptcy Rule 7001 unambiguously provides that an adversary proceeding is required in this instance as the Debtors are attempting to strip Image of its property rights. As such, Image is entitled to discovery pursuant to the applicable discovery rules set forth in Bankruptcy Rules 7026 through 7037. Given the nature of the facts relevant to each prong of the inquiry, extensive discovery from both the Debtors and its other creditors (particularly its prepetition secured lender, JPMorgan Chase) is necessary.  For that reason alone, the Motion should not be adjudicated until such discovery is completed.

24.    Nonetheless, upon information and belief, Image believes both of the above prongs are satisfied. *First*, a majority of *Diamond's* creditors likely knew that *Diamond* was substantially engaged in selling the goods of others (this is the critical inquiry for purposes of this Objection, not merely whether creditors knew that the Debtors collectively were substantially engaged in selling the goods of others). Although Image currently lacks complete information without the benefit of discovery to which it is entitled under the Bankruptcy Rules, it is likely that most of Diamond's creditors knew it sold on consignment. Diamond's schedules reflect 548 creditors as of the petition date.[35] Most of the 128 alleged consignment vendors listed in the Motion are among

---

[33] *Valley Media*, 279 B.R. at 125.

[34] The burden rests on the Debtors to prove how many creditors knew (or did not know) that Diamond sold on consignment. *See, e.g., In re G.S. Distrib.*, 331 B.R. 552, 561 (Bankr. S.D.N.Y. 2005) ("A transaction must satisfy each element of the definition to be considered a consignment under § 9-102(a)(20), and the burden of proof falls on the party claiming applicability of the section. The Debtor has the burden of proof because it asserts that the transfer of jewelry was a consignment under § 9-102(a)(20).").

[35] *See* D.I. 155 & 349.

those 548 creditors.  Other creditors listed in the schedules may be consignment vendors who were owed money on the petition date but no longer have inventory with Diamond (and thus did not need to be listed in the Motion) or end-customers with claims against Diamond (who may also have known about Diamond selling as agent or consignee because the sale paperwork indicated the existence of that relationship).  And it is likely that a great many of the other creditors are not the type of creditors that section 9-102(a)(20) was designed to protect (such as lenders providing loans secured by Diamond's inventory) and should not be counted for purposes of this inquiry.[36]

25.    Moreover, the Motion seeks to misappropriate and then sell Image's inventory, presumably for the benefit of the Debtors' prepetition secured lender and DIP lender, JPMorgan Chase, which has yet to be repaid in full.  JPMorgan Chase is one of the largest banks in the world and is highly sophisticated.  Given Diamond's widespread practice of selling the goods of others, the extensive prepetition due diligence that sophisticated lenders typically conduct prior to issuing large loans secured by inventory would most likely have revealed the existence of Diamond's consignment relationships.  Again, discovery will be necessary, but if JPMorgan Chase's actual knowledge is established that also independently satisfies the first prong.[37]  The Debtors cannot utilize the strongarm power under 11 U.S.C. § 544 to avoid an agency or consignment relationship so that they can turn around and give the subject property or its proceeds to a secured lender that had prepetition knowledge of that relationship with the vendor and could never have independently obtained a superior interest in that property.[38]

---

[36] *See Leake v. Khaliq (In re Gregory)*, Adv. No. 5-95-48A, 1995 Bankr. LEXIS 1654, at *5 (Bankr. W.D. Va. Oct. 20, 1995) ("From the Official Comment [of the Virginia U.C.C.], it seems that the intent of the Code section is to protect creditors who might have been misled by the 'secret reservation.' It does not appear to this court that creditors who hold consumer debt could have been misled by the consignment of goods.").

[37] *See In re Wolverine Fire Apparatus Co.*, 465 B.R. at 822.

[38] *See, e.g., In re Pearson Indus., Inc.*, 178 B.R. 753, 764 (Bankr. C.D. Ill. 1995) (holding the trustee's avoidance powers cannot be used to benefit secured creditors); *Cong. Credit Corp. v. AJC Int'l*, 186 B.R. 555, 559 (D.P.R. 1995) (same); *In re Integrated Testing Prods. Corp.*, 69 B.R. 901, 905 (D.N.J. 1987) (same).

14

26.     Upon information and belief, the "substantially engaged" prong is also satisfied. Diamond's selling of goods as agent or on consignment was widespread, as evidenced by the fact that the list attached to the Motion included *128* alleged consignors. While that list does not provide estimated values of the alleged consigned goods, Image's inventory alone is worth nearly $3 million.[39]  Diamond's schedules list its personal property at $78 million.[40]  Thus, Image's inventory alone constitutes nearly 4% of the overall value of Diamond's inventory. Without the benefit of discovery, Image cannot be certain, but it is very reasonable to believe the inventory of the other *127 alleged consignors* is worth more than the remaining $12.6 million required to satisfy the 20% threshold.

27.     If both prongs of the test under UCC Section 9-102(a)(20) are satisfied, the Agreement falls outside the scope of Article 9 even if it did create a common law consignment. Until Image has had the opportunity to take the discovery it is entitled to under the Bankruptcy Rules applicable to adversary proceedings, the Motion should not be granted.

**C.     The Debtors cannot sell the Wrongfully Held Inventory because they hold no legitimate interest in such inventory.**

28.     Even if the Court determines the Agreement created a consignment subject to Article 9 that was unperfected and thus avoidable, the Debtors *still* cannot sell the Wrongfully Held Inventory.  As discussed, Diamond was Image's exclusive U.S. and overseas agent until Image appointed Lunar as its new U.S. agent in 2023. Beginning in 2023 through the middle of 2024, Image directed Diamond to transfer a substantial portion of the inventory Diamond was holding to Lunar.[41]  Diamond inexplicably failed to transfer much of that inventory to Lunar as directed

---

[39] *See* Exhibit A at ¶ 5.
[40] *See* D.I. 349 at Part 1.
[41] *See* Exhibit A at ¶ 5; *see also* Exhibit A-2.

and approximately 42% of the Image inventory currently held by Diamond consists of that Wrongfully Held Inventory that should not even be at Diamond.[42]

29.    The Wrongfully Held Inventory was <u>never</u> intended to be governed by the Agreement.  Thus, regardless of whether the Agreement created a consignment within the ambit of the Uniform Commercial Code that was never perfected and thus avoidable, Diamond simply had <u>no</u> right or interest in the Wrongfully Held Inventory on the petition date and the Debtors now have no right to sell it.[43] Therefore, the Court should deny the Motion at least with respect to the Wrongfully Held Inventory.

**D.    Diamond should not be allowed to sell the inventory free and clear while this dispute is pending.**

30.    Finally, the Debtors should not be permitted to sell Image's inventory free and clear while this dispute is pending. The Debtors contend they should be permitted to do so under 11 U.S.C. § 363(f)(4) because Image's asserted ownership intertest in the inventory is in bona fide dispute.  But when the non-estate interest in dispute is that of ownership of the property (as opposed to a lien or encumbrance on the property), courts have held that the subject property cannot be sold under 11 U.S.C. § 363(f) until the dispute over ownership of the property is resolved by the court.[44] This makes sense; to hold otherwise would transform 11 U.S.C. § 363(f) from a tool that allows quick sales of assets with entitlement to the proceeds to be determined later, into a license to steal.

---

[42] *See* Exhibit A at ¶ 5; *see also* Exhibit A-2 and Exhibit A-3.

[43] *See, e.g., Valley Media*, 279 B.R. at 142 (finding that debtor could not sell inventory when the underlying agreement giving the debtor the right to hold such inventory was terminated prepetition).

[44] *See, e.g., In re Sandia Tobacco Mfrs., Inc.*, No. 16-12335, 2019 Bankr. LEXIS 2361, at *13–14 (Bankr. D. N.M. July 26, 2019); *accord In re Silver Beach*, LLC, BAP No. NV-09-1049, 2009 Bankr. LEXIS 4587, 2009 WL 7809002, at *6-7 (9th Cir. BAP Nov. 3, 2009) (11 U.S.C. § 363(f) "cannot be used to transform property of others into property of the estate."); *In re Popp*, 323 B.R. 260, 266 and 268-71 (9th Cir. BAP 2005) ("even before one gets to Section 363(f), Section 363(b)…requires that the estate demonstrate that the property it proposes to sell is 'property of the estate.'"); 3 Collier on Bankruptcy ¶ 363.06 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[I]f the estate's ownership of the property is disputed, the court must determine who owns the property before it may authorize a sale free and clear.")

16

31.    Moreover, even when the disputed interest is not ownership of the property, before allowing a sale under 11 U.S.C. § 363(f), courts perform a "case-by-case consideration of the following: i) the procedural posture of the case; ii) the need to expedite the sale; and iii) the nature of the basis for determining that a dispute exists."[45]  Here, those factors militate against allowing the Debtors to sell Image's inventory now before resolving this dispute.

32.    The Debtors are moving to sell inventory that Image contends it owns (indeed, at baseline the Debtors do not even dispute that ownership, they only contend that they can override it).  Allowing the Debtors to sell that inventory now at auction will inevitably result in a sale price that is below what Image could otherwise sell its inventory for in the ordinary course through sales to end-customers (as opposed to a bulk sale at a discount to someone who wants to then conduct such sales itself).  Thus, if this Objection is ultimately successful and the proceeds of the Debtors' auction sale are handed over to Image, Image would _still_ be substantially harmed because those proceeds would be far short of the inventory's actual value to Image.  And, again, Image would suffer the additional injury of having to compete with its inventory that was sold in the fire sale auction when Image later sells the same comic titles out of its other inventory to end-customers.

33.    Accordingly, for all the above reasons, the Court should deny the Motion to the extent it seeks authority to sell Image's inventory while the dispute is ongoing.

[*remainder of page intentionally left blank*]

---

[45] *In re NJ Affordable Homes Corp.*, No. 05-60442, 2006 Bankr. LEXIS 4498, at *41–42 (Bankr. D. N.J. June 29, 2006).

4908-4923-3747.4

## Conclusion

34.     For the reasons set forth above, the Court should sustain this Objection and deny the Motion.

Dated: July 18, 2025                              Respectfully submitted,

                                                  */s/ Elizabeth A. Scully*
                                                  Elizabeth A. Scully (Md. Bar No. 27402)
                                                  Baker & Hostetler LLP
                                                  Washington Square, Suite 100
                                                  1050 Connecticut Avenue, NW
                                                  Washington, D.C. 20036-5304
                                                  Telephone: 202.861.1500
                                                  escully@bakerlaw.com

                                                  -and-

                                                  Adam L. Fletcher (admitted *pro hac vice*)
                                                  Scott E. Prince (admitted *pro hac vice*)
                                                  Baker & Hostetler LLP
                                                  Key Tower
                                                  127 Public Square, Suite 2000
                                                  Cleveland, Ohio 44114
                                                  Telephone: 216.621.0200
                                                  afletcher@bakerlaw.com
                                                  sprince@bakerlaw.com

                                                  *Counsel for Image Comics, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 18, 2025, the foregoing objection was served on the following via the Court's CM/ECF filing system:

- **Peter J Artese**    peter.artese@us.dlapiper.com
- **Jan Berlage**    JBerlage@GHSLLP.com, tcollins@ghsllp.com
- **Hugh M. (UST) Bernstein**    hugh.m.bernstein@usdoj.gov
- **Daniel Jack Blum**    jack.blum@polsinelli.com, lsuprum@polsinelli.com; delawaredocketing@polsinelli.com
- **Laura Skowronski Bouyea**    lsbouyea@venable.com, dmdierdorff@venable.com
- **Thomas K. Bredar**    thomas.bredar@wilmerhale.com, andrew.goldman@wilmerhale.com; benjamin.loveland@wilmerhale.com; yolande.thompson@wilmerhale.com
- **Andrew Brown**    abrown@klestadt.com
- **Richard L. Costella**    rcostella@tydings.com, scalloway@tydings.com; zjones@tydings.com; swilliams@tydings.com
- **David W.T. Daniels**    ddaniels@perkinscoie.com, docketnyc@perkinscoie.com; nvargas@perkinscoie.com; KMcClure@perkinscoie.com; rleibowitz@perkinscoie.com
- **G. David Dean**    ddean@coleschotz.com, PRatkowiak@coleschotz.com
- **Mark L Desgrosseilliers**    desgross@chipmanbrown.com, fusco@chipmanbrown.com
- **Emily Devan**    edevan@milesstockbridge.com
- **Ellen E. Dew**    ellen.dew@us.dlapiper.com
- **Turner Falk**    turner.falk@saul.com, tnfalk@recap.email; Veronica.Marchiondo@saul.com
- **Justin Philip Fasano**    jfasano@mhlawyers.com, jfasano@ecf.courtdrive.com; tmackey@mhlawyers.com; mevans@mhlawyers.com; cmartin@mhlawyers.com; Fasano.JustinR92003@notify.bestcase.com
- **Ashley N Fellona**    ashley.fellona@saul.com, janice.mast@saul.com
- **Gianfranco Finizio**    gfinizio@lowenstein.com
- **Adam Fletcher**    afletcher@bakerlaw.com
- **Chelsea R Frankel**    cfrankel@lowenstein.com
- **Stephen B. Gerald**    sgerald@tydings.com
- **Christopher J. Giaimo**    christopher.giaimo@squirepb.com, christopher.giaimo@squirepb.com; christopher-j-giaimo-6409@ecf.pacerpro.com
- **Jonathan A. Grasso**    jgrasso@yvslaw.com, pgomez@yvslaw.com; r39990@notify.bestcase.com
- **Zvi Guttman**    zvi@zviguttman.com, zviguttman@gmail.com, zviguttman@outlook.com, MD55@ecfcbis.com
- **Jeffrey C. Hampton**    jeffrey.hampton@saul.com
- **Catherine Keller Hopkin**    chopkin@yvslaw.com, pgomez@yvslaw.com; kreese@yvslaw.com; vmichaelides@yvslaw.com; yvslawcmecf@gmail.com; hopkincr39990@notify.bestcase.com
- **Adam H Isenberg**    adam.isenberg@saul.com

- **Harry Conrad Jones**   HJones@coleschotz.com, bankruptcy@coleschotz.com; pratkowiak@coleschotz.com
- **Toyja E. Kelley**   toyja.kelley@lockelord.com
- **C. Kevin Kobbe**   kevin.kobbe@us.dlapiper.com, docketing-baltimore-0421@ecf.pacerpro.com
- **Eric George Korphage**   korphagee@whiteandwilliams.com
- **Jung Yong Lee**   jlee@milesstockbridge.com, mhickman@tydings.com
- **Gary H. Leibowitz**   gleibowitz@coleschotz.com, pratkowiak@coleschotz.com; bankruptcy@coleschotz.com; lmorton@coleschotz.com
- **Mark Minuti**   mark.minuti@saul.com, robyn.warren@saul.com
- **Randy Moonan**   rmoonan@sillscummis.com
- **Bruce S. Nathan**   bnathan@lowenstein.com
- **Michael Papandrea**   mpapandrea@lowenstein.com
- **Steven Gregory Polard**   steven.polard@ropers.com, loriann.zullo@ropers.com; anthony.arriola@ropers.com
- **Scott Prince**   sprince@bakerlaw.com
- **Jonathan Gary Rose**   jonathan.rose@us.dlapiper.com
- **Jordan Rosenfeld**   jordan.rosenfeld@saul.com
- **Nikolaus F. Schandlbauer**   nick.schandlbauer@arlaw.com, lianna.sarasola@arlaw.com
- **Elizabeth Anne Scully**   escully@bakerlaw.com
- **Dennis J. Shaffer**   dshaffer@tydings.com, scalloway@tydings.com; mhickman@tydings.com; jlee@tydings.com
- **Indira Kavita Sharma**   indira.sharma@troutman.com, katherine.culbertson@troutman.com; jonathan.young@troutman.com; david.ruediger@troutman.com; errol.chapman@troutman.com; toyja.kelley@troutman.com
- **Nicholas Smargiassi**   nicholas.smargiassi@saul.com
- **Brent C. Strickland**   bstrickland@wtplaw.com, mbaum@wtplaw.com; brent-strickland-3227@ecf.pacerpro.com
- **Matthew G. Summers**   summersm@ballardspahr.com, branchd@ballardspahr.com; heilmanl@ballardspahr.com; ambroses@ballardspahr.com; zarnighiann@ballardspahr.com; carolod@ballardspahr.com; cromartie@ballardspahr.com; stammerk@ballardspahr.com
- **S. Jason Teele**   steele@sillscummis.com
- **Paige Noelle Topper**   paige.topper@saul.com
- **US Trustee - Baltimore**   USTPRegion04.BA.ECF@USDOJ.GOV

20

Via regular U.S. Mail:

Saul Ewing LLP
Attn: Jeffrey C. Hampton and Adam H.
Isenberg
1500 Market Street, 38th Floor
Philadelphia, PA  19102

Saul Ewing LLP
Attn: Paige N. Topper
1201 N. Market Street, Suite 2300
Wilmington, DE  19801

Troutman Pepper Locke LLP
Attn: Jonathan W. Young and David
Ruediger
111 Huntington Avenue, 9th Floor
Boston, MA  02199

Office of the United States Trustee
Attn: Gerard R. Vetter
101 West Lombard Street, Suite 2625
Baltimore, MD 21201

Lowenstein Sandler LLP
Attn: Bruce Nathan and Gianfranco Finizio
1251 Avenue of the Americas
New York, NY  10020

Tydings & Rosenberg LLP
Attn: Stephen B. Gerald and Dennis J
Shaffer
One E. Pratt Street, Suite 901
Baltimore, MD  21202

Whiteford, Taylor & Preston LLP
Attn: Brent C. Strickland
8830 Stanford Boulevard, Suite 400
Columbia, MD 21045

*/s/ Elizabeth A. Scully*
Elizabeth A. Scully

21

4908-4923-3747.4