**<u>Exhibit B</u>**

**Share Sale and Purchase Agreement**

**Private and Confidential**

**Share Sale and Purchase Agreement**

relating to the entire issued share capital of Diamond Comic Distributors

**Dated**     23 July     **2025**

**(1)**     **The Sellers**
**(2)**     **Diamond Distributors UK Ltd**

Stephenson Harwood LLP
1 Finsbury Circus, London EC2M 7SH
T +44 20 7329 4422  F +44 20 7329 7100
stephensonharwood.com



**Contents**

Page

1       Definitions and interpretation ......................................................................... 1

2       Sale and purchase ......................................................................................... 7

3       Conditions ..................................................................................................... 9

4       Consideration .............................................................................................. 10

5       Completion .................................................................................................. 11

6       Warranties .................................................................................................. 11

7       [intentionally omitted] ............................................................................... 12

8       Post-completion obligations ....................................................................... 12

9       Remedies and waivers ................................................................................ 13

10      Assignment ................................................................................................. 14

11      Severability ................................................................................................ 14

12      Costs and expenses .................................................................................... 14

13      Payments .................................................................................................... 14

14      Entire agreement ........................................................................................ 15

15      Variation ..................................................................................................... 15

16      Partnership ................................................................................................. 15

17      Further assurance ....................................................................................... 15

18      Confidentiality and announcements ........................................................... 16

19      Counterparts ............................................................................................... 17

20      Notices ........................................................................................................ 17

21      Rights of Third Parties ................................................................................ 19

22      Agreement survives Completion ................................................................. 19

23      Governing law and jurisdiction ................................................................... 19

Schedule 1      The Sellers and Shares .................................................................. 20

Schedule 2      The Company ................................................................................. 21

Schedule 3      Completion ..................................................................................... 22

**Share Sale and Purchase Agreement**

**Dated**  23 July  2025

**Between:**

(1)     The several persons whose names and addresses are set out in column (1) of Schedule 1 (*The Sellers and Shares*) (the "**Sellers**"); and

(2)     **Diamond Distributors UK Ltd** (registered in England and Wales with company number 16516174), whose registered office is at Kings House 9–10 Haymarket, London, England, SW1Y 4BP (the "**Buyer**").

**Background**

(A)     The Company is an unlimited liability private company incorporated in England and Wales having an issued share capital of £100 divided into 100 ordinary shares of £1 each.

(B)     The Sellers are the owners, and are able to procure the transfer, of the legal and beneficial title to the number of Shares in the Company set out opposite their respective names in column (2) of Schedule 1 (*The Sellers and Shares*).

(C)     The Sellers have agreed to sell and the Buyer has agreed to purchase the Shares on the terms and conditions set out in this Agreement.

(D)     The Sellers intend to submit a motion for approval of the Approval Order within two (2) Business Days of the date of this Agreement.

**It is agreed as follows:**

**1        Definitions and interpretation**

1.1      In this Agreement, the following words and expressions shall, unless otherwise specified, have the following meanings:

"**Act**" means the Companies Act 2006, as amended;

"**Affiliate**" means, in relation to any party, any subsidiary, subsidiary undertaking, parent undertaking or holding company of that party and any subsidiary or subsidiary undertaking of such holding company;

"**Approval Order**" means an order of the Bankruptcy Court approving this Agreement that has not been stayed, reversed, modified or amended, and containing the provisions set forth below:

(a)     approving the sale, transfer and assignment by the Sellers of the Shares to the Buyer pursuant to this Agreement and Bankruptcy Code §§ 105 and 363, as applicable;

(b)     providing that the transfer of the Shares by the Sellers to the Buyer (i) vest or will vest the Buyer with all right, title and interest of the Sellers in and to the Shares, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all Encumbrances and claims (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5)), with any such claims to

attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Shares prior to Completion, and (ii) constitutes transfers for reasonably equivalent value and fair consideration.  For the avoidance of doubt and without limiting the foregoing, the transfer of the Shares to the  Buyer shall be free and clear of any claims or causes of action relating to or in connection with (A) any Employee Benefit Plan  or pension plans contributed to or maintained by the Sellers, or multi-employer plan participated in by the Sellers prior to, or subsequent to, the Petition Date; (B) the Worker Adjustment and Retraining Notification Act of 1988; (C) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; (D) any collective bargaining agreement(s) to which the Sellers are a party or otherwise obligated under; or (E) the Sellers' current or former employees;

(c)      providing that the sale and transfer of the Shares to the Buyer will not subject the Buyer to any liability (including successor liability) with respect to the operation of either Seller's business or the Shares prior to Completion or by reason of such transfer.  The Buyer is not holding itself out to the public as a continuation of the Sellers, and no common identity of directors, stockholders, members, or other equity holders exists between the Buyer and the Sellers. The Transactions do not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Sellers and/or the Sellers' bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between the Sellers and the Buyer.  The Buyer is not a mere continuation of the Sellers or their bankruptcy estates, and the Buyer does not constitute an alter ego or a successor in interest to the Sellers or their bankruptcy estates.  The Buyer is not a successor to the Sellers or its bankruptcy estates by reason of any theory of law or equity;

(d)      the Transactions are undertaken by the Buyer and the Sellers at arms-length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(e)      this Agreement was negotiated at arms-length;

(f)      the sale of the Shares was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code; and

(g)      a determination that selling the Shares free and clear of all Encumbrances is in the best interest of the Sellers' estates;

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. § 101 *et seq*;

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Maryland;

"**Business**" means the business of distributing comic books, gaming products, collectibles and other ancillary products carried on by the Company immediately before the entry into this Agreement;

"**Business Day**" means a day (other than Saturday or Sunday) on which banks in London (United Kingdom) and New York (USA) are open for business;

"**Buyer's Account**" means:

Name: Diamond Distributors UK Limited USD Account;
Sort Code: 20-00-00
Account Number: 72820899;

"**Company**" means Diamond Comic Distributors, details of which are set out in Schedule 2 (*Details of the Company*);

"**Completion**" means completion of the sale and purchase of the Shares in accordance with clause 5;

"**Completion Date**" means the fifth (5th) Business Day after the date on which the Conditions have been fulfilled or such other time as shall be mutually agreed between the Parties;

"**Completion Payment**" has the meaning given to it in clause 4.1.1 (*Consideration*);

"**Conditions**" means:

1) the entry by the Bankruptcy Court of the Approval Order, which shall be reasonably satisfactory to the Buyer and the Sellers and contain certain findings and rulings including, without limitation, the following: (i) approving the sale of the Shares to the Buyer free and clear of all Encumbrances, (ii) providing for the waiver of the fourteen (14) day automatic stay contained in Federal Rule of Bankruptcy Procedure 6004(h), (iii) finding that Buyer is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms-length purchaser, (iv) finding that the Consideration is fair and reasonable; (v) finding that this Agreement was negotiated at arms-length; and (vi) finding that the sale of the Shares hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code; and

2) the confirmation by (or on behalf of) JPMorgan Chase Bank, N.A that each of the Deed of Release and Release Agreement is in a form that is acceptable to it;

"**Consideration**" has the meaning given to it in clause 4 (*Consideration*);

"**Deed of Release**" means the deed of release in respect of the Shares, in the agreed form (with any modifications to it as may be agreed between the Parties acting reasonably and without unreasonable delay), from JPMorgan Chase Bank, N.A in favour of the Sellers;

"**Diamond US Loan**" means the Debtor in Possession Credit Agreement, provided by JPMorgan Chase Bank, N.A. to Diamond Comic Distributors, Inc, et al., dated as of January 16, 2025, as amended;

"**Employee Benefit Plans**" or "**Benefit Plans**" means (i) all "employee benefit plans" (as defined in §3(3) of the Employee Retirement Income Security Act of 1974), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational

assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which any Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of any Seller;

"**Encumbrance**" means a mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, licence, third-party right or interest, other encumbrance or security interest of any kind, or another type of preferential arrangement (including without limitation a title transfer and retention arrangement) having similar effect, and "**unencumbered**" shall be construed accordingly;

"**Group**" means, in respect of the relevant Party, that Party and its Affiliates;

"**Guarantee**" means the agreement by the Company to be obligated with respect to the Diamond US Loan;

"**Guarantee Extension**" means any amendment or variation to (or extension of) the Guarantee;

"**Interim Period**" means the period from (and including) the date of this Agreement until (and including) the Completion Date or, if earlier, the date of termination of this Agreement in accordance with its terms;

"**Long Stop Date**" means 11.59pm on 22 August 2025 or such other time and date as determined in accordance with clause 3.3;

"**Parties**" means the parties to this Agreement, and "**Party**" means any one of them;

"**Petition Date**" means 14 January 2025;

"**Regulatory Authority**" means any person who has statutory or regulatory authority, whether supranational, international, national, federal, state or local government, including any court, tribunal, arbitration body, administrative agency or commission, any quasi-governmental body, and any person exercising any regulatory function in respect of Tax, antitrust or competition, aid, subsidies, or sanctions including the Competition and Markets Authority, the Information Commissioners Office, the European Commission, the Office of Financial Sanctions Implementation, and the Financial Conduct Authority;

"**Regulatory Requirement**" means any applicable requirement of law or regulation, or of any Regulatory Authority;

"**Release Agreement**" means the release, in the agreed form (with any modifications to it as may be agreed between the Parties acting reasonably and without unreasonable delay), of the guarantee given by the Company in respect of the Diamond US Loan;

"**Sellers' Solicitors' Account**" means:

> Account Name: Stephenson Harwood LLP Client
> Bank Name: The Royal Bank of Scotland plc
> Branch Address: (Chatham Shipping) Chatham Customer Service Centre,

Waterside Court, Chatham Maritime, Chatham, Kent, ME4 4RT

Account ID : STEHAR USD1

Sort Code: 16-01-01

SWIFT: RBOS GB2L

IBAN:GB65 RBOS 1663 0000 2191 38;

"**Sellers' Solicitors**" means Stephenson Harwood LLP of 1 Finsbury Circus, London EC2M 7SH;

"**Shares**" means all of the issued shares in the capital of the Company;

"**Tax**" means:

a)  all forms of taxation, charges, duties, imposts, contributions, levies, withholdings or liabilities imposed, assessed or enforced by any statutory, governmental, state, federal, local or municipal body or authority, whether of the UK or any other jurisdiction, and wherever chargeable; and

b)  any penalty, fine, surcharge, interest, charges or costs payable in connection with any taxation within paragraph (a) above;

"**Taxation Authority**" means any government, state or municipality or any local, state, federal or other fiscal, revenue, customs or excise authority, body or official competent to impose, administer, levy, assess or collect Tax in the United Kingdom or elsewhere;

"**Transactions**" means the transactions contemplated by this Agreement;

"**Transaction Documents**" means this Agreement and any other document stated in this Agreement to be in the agreed form;

"**US Bankruptcy Proceedings**" means the administratively consolidated cases of Diamond Comic Distributors, Inc., Diamond Select Toys & Collectibles, LLC, Comic Exporters, Inc. and Comic Holdings, Inc., pending in the Bankruptcy Court as case no. 25-10308 (DER); and

"**Warranties**" means the warranties set out in clause 6.1.

1.2  In this Agreement:

1.2.1  a reference to legislation or to any provision of legislation includes:

(a)  a reference to the same as it may have been, or may from time to time be, consolidated, re-enacted, amended, modified or replaced; and

(b)  any subordinate legislation made pursuant to it from time to time,

unless this would create, extend or increase a liability of any Party under this Agreement;

1.2.2  unless the context otherwise requires, references to legislation, enactments or regulations are to United Kingdom legislation, enactments or regulations;

1.2.3  references to the recitals, clauses and the Schedules are to the recitals, clauses of and the Schedules to this Agreement and any reference to a sub-clause or a

paragraph is to the relevant sub-clause or paragraph of the clause or Schedule in which it appears; the Schedules and recitals form part of this Agreement and shall have effect as if set out in full in the body of this Agreement and any reference to this Agreement includes the Schedules and the recitals;

1.2.4    a reference to "**this Agreement**" is a reference to this Agreement as varied or novated (in each case, other than in breach of the provisions of this Agreement) from time to time;

1.2.5    words in the singular shall include the plural and in the plural shall include the singular and a reference to one gender shall include a reference to the other genders;

1.2.6    a reference to a "**person**" includes a natural person, firm, company, corporation, body corporate, government, state or agency of the state, local or municipal authority or governmental body or any joint venture, association or partnership in each case (whether or not having separate legal personality);

1.2.7    a reference to the "Sellers" shall include a reference to each and either of them;

1.2.8    the table of contents and clause headings are included for the convenience of the Parties only and do not affect this Agreement's interpretation;

1.2.9    a reference to a document being in the "**agreed form**" or similar, will be construed to mean in a form agreed between the Parties (whether electronic or hard-copy), or on their behalf by their solicitors;

1.2.10    references to an English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or official body or any legal concept or thing shall, in respect of any jurisdiction other than England, be deemed to include what most closely approximates to the English legal term in that jurisdiction and references to any English statute shall be construed so as to include equivalent or analogous laws of any other jurisdiction;

1.2.11    references to a "**day**" (including the phrase "**Business Day**") shall mean a period of 24 hours running from midnight to midnight;

1.2.12    a reference to "**writing**" or "**written**" includes email;

1.2.13    references to time of day are to London, England time;

1.2.14    any reference to "**dollars**" or "**$**" is to United States Dollars or, if different, the lawful currency of the United States of America from time to time;

1.2.15    the rule known as the *ejusdem generis* rule shall not apply and accordingly:

(a)    general words introduced by the words "other", "including", "include" and "in particular" or similar expressions shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things; and

(b)    general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

1.2.16    a "**subsidiary**" or "**holding company**" means a subsidiary or a holding company (as the case may be) as defined in section 1159 of the Act and for the purposes of this definition, a company shall be treated, for the purposes of the membership requirement contained in sub-sections 1159(1)(b) and (c) only, as a member of another company even if its shares in that other company are registered in the name of: (i) another person (or its nominee), whether by way of security or in connection with the taking of security, or (ii) its nominee;

1.2.17    a reference to a "**subsidiary undertaking**" or "**parent undertaking**" means a subsidiary undertaking or a parent undertaking (as the case may be) as defined in section 1162 of the Act and, for the purposes of this definition, an undertaking shall be treated, for the purposes of the membership requirement contained in sub-sections 1162(2)(b) and (d) only, as a member of another undertaking even if the legal title to its shares or ownership interests in that other undertaking is registered in the name of or otherwise held by another person (or its nominee), whether by way of security or in connection with the taking of security;

1.2.18    the word "**company**", except where referring to the Company, shall include any company, corporation or other body corporate, wherever and however incorporated or established;

1.2.19    the expressions "**director**" and "**shadow director**" have the respective meanings given to them by sections 250 and 251 of the Act; and

1.2.20    references to losses, liabilities, costs or expenses (or similar expressions) incurred by a person shall not (for the purposes of any indemnity, reimbursement or similar provision in this agreement) include any amount in respect of VAT comprised in such losses, liabilities, costs or expenses for which either that person or, if relevant, any other member of the VAT group to which that person belongs, is entitled to credit as input tax.

## 2    Sale and purchase

2.1    On the terms of this Agreement, and subject to satisfaction of the Conditions and to the terms of the Approval Order, the Sellers shall sell the Shares (in the numbers set out opposite their respective names in column (2) of Schedule 1 (*The Sellers and Shares*)), together with all rights that attach (or may in the future attach) to the Shares including, in particular, the right to receive all dividends and distributions declared, made or paid on or after the date of this Agreement and the Buyer shall buy the Shares in the numbers set out opposite the Sellers' respective names in column (2) of Schedule 1 (*The Sellers and Shares*).

2.2    Neither the Buyer nor the Sellers shall be obliged to complete the sale and purchase of any of the Shares unless the purchase of all of the Shares is completed simultaneously.

2.3    Each Seller waives all rights of pre-emption over any of the Shares conferred upon such Seller by the articles of association of the Company or in any other way and undertakes to take all steps necessary to ensure that any rights of pre-emption of any person over any of the Shares are waived prior to Completion.

2.4    On the date of this Agreement:

2.4.1    the Sellers shall deliver to the Buyer a copy of the board minutes or resolutions passed by the board of directors of each of the Sellers authorising the execution by each Seller of this Agreement and all other deeds and documents ancillary to it or the transactions contemplated in it, and authorising the relevant signatory or signatories to execute this Agreement and all and any such other deeds and documents on its behalf; and

2.4.2    the Buyer shall deliver to the Sellers a copy of the board minutes or resolutions passed by the board of directors of the Buyer authorising the execution by the Buyer of this Agreement and all other deeds and documents ancillary to it or the transactions contemplated herein, and authorising the relevant signatory or signatories to execute this Agreement and any such other deeds and documents on its behalf.

2.5    At all times during the Interim Period, the Sellers shall, to the extent permitted by law:

2.5.1    provide such information regarding the businesses and affairs of the Company as the Buyer may reasonably require; and

2.5.2    save for in connection with any Guarantee Extension, not take any action to cause the Company (except with the written consent of the Buyer (such consent not to be unreasonably withheld, delayed or conditioned) to :

(a)    manage and operate the Business other than in a manner which is consistent with how it was managed and operated immediately prior to the date of this Agreement;

(b)    dispose of a material asset used or required for the operation of the Business;

(c)    allot any shares or other securities or repurchase, redeem or agree to repurchase or redeem any of its shares;

(d)    pass a resolution of its members;

(e)    appoint or remove any director or other officer of the Company;

(f)    declare or pay a dividend or make any other distribution of its assets;

(g)    enter into, modify or agree to terminate a contract of material importance to the Company or the Business;

(h)    incur any expenditure and/or borrow any sums outside the normal course of business;

(i)    make any loan or cancel, release or assign any indebtedness owed to it or any claims held by it;

(j)    enter into a lease, lease-hire or hire-purchase agreement or agreement for payment on deferred terms;

(k)    make any alterations to the terms of employment or engagement (including benefits) of any director, employee or worker or terminate any such employment or engagement;

(l)      amend any agreements or arrangements for the payment of pensions or other benefits on retirement to any of its current or former employees or directors (or any of their dependants);

(m)      provide any non-contractual benefit to any director, employee or worker (or any of their dependants);

(n)      create any Encumbrance over any of its assets or its undertaking;

(o)      give any guarantee, or any similar security or indemnity or allow it or any of its assets to be used as security including by the Sellers or any member of the Sellers' Group;

(p)      commence, settle or agree to settle any legal proceedings relating to the Business, or otherwise concerning the Company;

(q)      grant, modify, agree to terminate or permit the lapse of any of its intellectual property rights, or enter into any agreement relating to any such rights, used or enjoyed by the Company;

(r)      pay any management charge or reimburse any fees, costs and expenses to the Sellers (or any member of the Sellers' Group);

(s)      incur any liability to the Sellers (or any member of the Sellers' Group), other than trading liabilities incurred in the normal course of the Business;

(t)      make any material change to the accounting procedures, principles or policies by reference to which its accounts are drawn up; or

(u)      permit any of its insurance policies to lapse or do anything which would reduce the amount or scope of cover or make any of its insurance policies void or voidable.

## 3      Conditions

3.1      Completion of the sale and purchase of the Shares pursuant to this Agreement is conditional upon the Conditions being satisfied on or before the Long Stop Date.

3.2      The Sellers shall seek the submission and approval of the application for the Approval Order, together with any documents and information required, within two (2) Business Days of the date of this Agreement, and shall timely provide a complete copy thereof to the Buyer. Thereafter, the Sellers shall keep the Buyer informed of any material developments relating to the satisfaction of the Conditions and shall notify the Buyer in writing as soon as reasonably practicable of the satisfaction of the Conditions.

3.3      If the Conditions are not satisfied on or before the Long Stop Date then the Sellers may, in their absolute discretion, postpone the Long Stop Date by up to fifteen (15) Business Days (or longer, with the written consent of the Buyer which shall not unreasonably be withheld or delayed) (the "**Postponed Long Stop Date**").

3.4      If, in the circumstances set out in clause 3.3, either:

3.4.1      the Long Stop Date is not postponed; or

3.4.2    the Conditions remain to be satisfied by 11.59 p.m. on the Postponed Long Stop Date,

then, subject to clause 3.5, this Agreement shall be capable of termination by either the Buyer or the Sellers forthwith on written notice to the other.

3.5    If this Agreement terminates in accordance with clause 3.4, all obligations of the Parties under this Agreement shall end except for those expressly stated to continue (including the refund of the Deposit to the Buyer under clause 4) but (for the avoidance of doubt) all rights and liabilities of the Parties which have accrued before termination shall continue to exist.

## 4    Consideration

4.1    In consideration of the sale of the Shares in accordance with the terms of this Agreement, the Buyer shall pay to the Sellers $2,100,000 (the "**Consideration**") payable as follows:

4.1.1    $199,988 of the Consideration upon execution of this Agreement (the "**Deposit**") in accordance with clause 4.4; and

4.1.2    $1,900,012 of the Consideration shall be paid by the Buyer to the Sellers on Completion (the "**Completion Payment**"),

and such Consideration shall be apportioned between the Sellers in accordance with column (3) of the table in Schedule 1 (*The Sellers and Shares*).

4.2    The amounts of the Consideration referred to at clauses 4.1.1 and 4.1.2 shall be paid by the Buyer to the Sellers in dollars to the Sellers' Solicitors' Account in accordance with clause 14.

4.3    Each Seller agrees with the apportionment of the Consideration as set out in column (3) of the table in Schedule 1 (*The Sellers and Shares*).

4.4    The Buyer shall, on the date of this Agreement, pay the Deposit in dollars to the Sellers' Solicitors' Account (for the Sellers' Solicitors to hold as stakeholder for the Sellers and Buyer upon the terms of this Agreement) in accordance with clause 13.

4.5    All interest on the Deposit shall accrue for the benefit of the Party (or Parties, in the case of the Sellers) ultimately entitled to the Deposit pursuant to clause 4.6 or 4.7.

4.6    If this Agreement is terminated by the Sellers or the Buyer in accordance with clause 3.4 or 5.4, or by the Buyer in accordance with clause 6.1.1, then:

4.6.1    the Buyer and Sellers shall be deemed to have given an unconditional and irrevocable instruction to the Sellers' Solicitors to cease to hold the Deposit (and any accrued interest on the Deposit) as stakeholder and instead to hold the Deposit as agent for the Buyer; and

4.6.2    the Buyer shall, immediately following such termination, be deemed to have instructed the Sellers' Solicitors to transfer the Deposit (and all accrued interest on the Deposit) held by the Sellers' Solicitors to the Buyer's Account in accordance with clause 13 within two (2) Business Days of such instruction (and the Buyer and the Sellers irrevocably approve of any actions taken pursuant to this clause 4.6.2).

4.7     On Completion:

    4.7.1     the Buyer and the Sellers shall be deemed to have given an unconditional and irrevocable instruction to the Sellers' Solicitors to cease to hold the Deposit (and any accrued interest on the Deposit) as stakeholder and instead to hold the Deposit as agent for the Sellers; and

    4.7.2     the Sellers shall be entitled to instruct the Sellers' Solicitors to transfer the Deposit (and all accrued interest on the Deposit) held by the Sellers' Solicitors to the Sellers in accordance with clause 13 within two (2) Business Days of such instruction (and the Buyer and the Sellers irrevocably approve of any actions taken pursuant to this clause 4.7.2).

4.8     The Sellers shall take all reasonable steps within their respective control to procure compliance by the Sellers' Solicitors with clauses 4.4 to 4.7.

## 5     Completion

5.1     Completion shall take place on the Completion Date at the offices of the Sellers' Solicitors (or at such other place as shall be mutually agreed in writing between the Parties).

5.2     At Completion, the Sellers shall do those things listed in Schedule 3 (*Completion*) and the Buyer shall pay the Completion Payment in accordance with clauses 4.1.2 and 4.2.

5.3     Neither the Buyer nor the Sellers shall be obliged to complete this Agreement unless, in the case of the Buyer, the Sellers comply with its obligations under clause 5.2 and Schedule 3 (*Completion*) and, in the case of the Sellers, the Buyer complies with its obligations under clause 5.2.

5.4     If Completion does not take place on the Completion Date because a Party fails to comply with any of its obligations under clause 5.2, the Buyer (where a Seller is in default) or either Seller (where the Buyer is in default) may by written notice to the other Parties:

    5.4.1     defer Completion to a date not more than twenty (20) Business Days after the date set for Completion (so that the provisions of this clause 5 shall apply to Completion as so deferred); or

    5.4.2     proceed to Completion as far as practicable (without limiting its rights under this Agreement); or

    5.4.3     terminate this Agreement.

    If Completion is postponed to another date in accordance with clause 5.4.1, the provisions of this Agreement shall apply as if that other date is the date set for Completion.

5.5     If this Agreement terminates in accordance with clause 5.4, all obligations of the Parties under this Agreement shall end except for those expressly stated to continue (including the refund of the Deposit to the Buyer under clause 4) but (for the avoidance of doubt) all rights and liabilities of the Parties which have accrued before termination shall continue to exist.

5.6     No Party may rescind or terminate this Agreement after Completion.

## 6     Warranties

6.1    If at any time during the Interim Period the Sellers have materially breached any provision of clause 2.5.2, the Sellers shall have the opportunity to remedy the relevant breach to the reasonable satisfaction of the Buyer at any time prior to the Completion Date and, if the Seller does not do so (including where the relevant breach is not capable of remedy) Buyer may (at its sole discretion and without prejudice to any other rights or remedies it has, including the right to claim damages for breach of this Agreement):

6.1.1    terminate this Agreement by notice in writing to the Sellers (in which case clause 4.6 shall apply); or

6.1.2    subject to clause 3, proceed to Completion in accordance with clause 5.

6.2    The Buyer warrants to each Seller on the date of this Agreement and on the Completion Date that:

6.2.1    it has the power to execute and deliver this Agreement, and each of the other Transaction Documents to which it is or will be a party, and to perform its obligations under each of them and has taken all action necessary to authorise such execution and delivery and the performance of such obligations;

6.2.2    this Agreement constitutes, and each of the other Transaction Documents to which it is or will be a party will, when executed, constitute, legal, valid and binding obligations of the Buyer in accordance with its terms; and

6.2.3    the execution and delivery by the Buyer of this Agreement and of each of the other Transaction Documents to which it is or will be a party and the performance of the obligations of the Buyer under it and each of them do not and will not conflict with or constitute a default under any provision of:

(a)    any agreement or instrument to which the Buyer is a party;

(b)    the constitutional documents of the Buyer; or

(c)    any law, lien, lease, order, judgment, award, injunction, decree, ordinance or regulation or any other restriction of any kind or character by which the Buyer is bound.

## 7    [intentionally omitted]

## 8    Post–completion obligations

8.1    As long as any of the Sellers remains the registered holder of any of the Shares after Completion, that Seller will:

8.1.1    hold those Shares and all dividends or distributions (whether of income or capital) in respect of them, and all other rights arising out of or in connection with them, on trust for the Buyer; and

8.1.2    at all times deal with and dispose of those Shares, and all such dividends, distributions and rights, as the Buyer directs by written notice;

8.1.3    exercise all voting rights attached to the Shares in such manner as the Buyer shall direct; and

8.1.4    if required by the Buyer, execute all instruments of proxy or other documents as may be necessary to enable the Buyer to attend and vote at any meeting of the Company,

provided always that the Buyer shall indemnify the Sellers and each of its agents fully against all actions, proceedings, claims, costs, expenses and liabilities of every description arising from the exercise by the Buyer of any of its rights conferred by this clause 8.1 (including any costs incurred in enforcing this indemnity).

8.2    For a period of six years from Completion, the Buyer shall upon written request make available to each member of the Sellers' Group any notices, correspondence, orders, inquiries, books of account and other documents and all computer disks or tapes or other machine legible programs or other records (excluding software) of the Business (the "**Books and Records**") (or, if practicable, the relevant parts of those Books and Records) which are in the possession of the Buyer, not subject to legal privilege, and which are reasonably required by any member of the Sellers' Group for the purpose of dealing with its Taxation, accounting and insurance affairs and/or compliance with any regulatory or statutory duty and/or its obligations under the Transaction Documents and, accordingly, the Buyer shall, upon being given reasonable notice by the Sellers' Group and subject to the relevant member of the Sellers' Group giving such undertaking as to confidentiality as the Buyer shall reasonably require, procure that such Books and Records are made available to the relevant member of the Sellers' Group for inspection (during working hours) and copying (at the relevant member of the Sellers' Group's expense) for and only to the extent necessary for such purpose.

8.3    Until such time as the applicable Seller is wound up (or otherwise liquidated or dissolved, as appropriate), each Seller shall use its reasonable endeavours to make available to the Buyer any Books and Records (or, if practicable, the relevant parts of those Books and Records) which are in the possession of that Seller, not subject to legal privilege, and which are reasonably required by the Buyer for the purpose of dealing with its Taxation, accounting and insurance affairs and/or compliance with any regulatory or statutory duty and/or its obligations under the Transaction Documents and, accordingly, the applicable Seller shall, upon being given reasonable notice by the Buyer and subject to the Buyer giving such undertaking as to confidentiality as the relevant Seller shall reasonably require, use its reasonable endeavours to procure that such Books and Records are made available to the Buyer for inspection (during working hours) and copying (at the Buyer's expense) for and only to the extent necessary for such purpose.

**9    Remedies and waivers**

9.1    Any liability to any Party under this Agreement may be released, compounded or compromised in whole or in part without in any way prejudicing that Party's rights against any other Party under the same or like liability, whether joint and several or otherwise.

9.2    Any waiver of any right, power or remedy under this Agreement must be in writing and may be given subject to any conditions thought fit by the grantor. No such waiver will take effect if the person seeking the waiver has failed to disclose to the grantor every material fact or circumstance which (so far as the person seeking the waiver is aware) has a bearing on its subject matter. Unless otherwise expressly stated, any waiver will not be deemed to be a waiver of any subsequent breach and will be effective only for the purpose for which it is given.

9.3     No failure of any Party to exercise, nor delay in exercising, any right, power or remedy in connection with this Agreement ("**Right**") will operate as a waiver of that Right, nor will any single or partial exercise of any Right.

## 10      Assignment

10.1    Subject to clause 10.2, no Party will be entitled:

      10.1.1      to assign, transfer, charge or deal in any way with the benefit of, or any of its rights under or interest in, this Agreement; or

      10.1.2      to sub-contract any or all of its obligations under this Agreement,

without the prior written consent of: (a) in the event that the relevant action from sub-clause 10.1.1 or 10.1.2 is requested by the Buyer, the Sellers; and (b) in the event that the relevant action from sub-clause 10.1.1 or 10.1.2 is requested by either Seller, the Buyer.

10.2    All or any of a Seller's rights under this Agreement may be assigned or transferred by that Seller to, or made the subject of a trust created in favour of:

      10.2.1      any other member of the Sellers' Group (or by any such member to or in favour of any other member of the Sellers' Group) provided that if such assignee company leaves the Sellers' Group, such rights are assigned or transferred to or made the subject of a trust in favour of another member of the Seller's Group; or

      10.2.2      any person by way of security for any borrowings of the Sellers' Group.

10.3    Any attempted or purported assignment, transfer, declaration of trust, sub-contract or other transaction in violation of this clause 10.3 shall be void ab initio.

10.4    No Party shall have any liability to any assignee or transferee of any rights under this Agreement that is greater than the liability which that Party would have had to the Party which made the assignment or transfer.

## 11      Severability

If any provision of this Agreement is held to be illegal, invalid or unenforceable, in whole or in part, under any applicable law, such provision will to that extent be deemed not to form part of this Agreement but the legality, validity and enforceability of the remainder of this Agreement will not be affected.

## 12      Costs and expenses

12.1    Except as otherwise stated in this Agreement, each Party shall bear its own costs and expenses incurred in the negotiation, preparation, execution, implementation and enforcement of this Agreement except that this clause shall not prejudice the right of either Party to seek to recover its costs in any litigation or dispute resolution procedure which may arise out of this Agreement.

12.2    Notwithstanding clause 12.1, the Buyer shall pay all stamp, documentary, transaction and other like duties or taxes (if any) to which this Agreement and the Transaction Documents may be subject or may give rise.

## 13      Payments

13.1   Save for as otherwise provided in this Agreement or as required by law, all payments due under this Agreement will be made by electronic transfer of immediately available funds without any set-off, restriction or conditions and without any deduction or withholding whatsoever being made under or in respect of this Agreement or any Transaction Document.

13.2   If a deduction or withholding is required by law, the deduction or withholding will not exceed the minimum amount required by law and the payer will pay such additional amount as will ensure that the net amount received by the payee equals the full amount which it would have received had the deduction or withholding not been required.

## 14   Entire agreement

14.1   This Agreement, together with the documents referred to in it, contains the whole agreement between the Parties relating to its subject matter as at the date of its execution to the exclusion of any terms implied by law which may be excluded.

14.2   Each of the Parties acknowledges and agrees that it has not entered into this Agreement in reliance on any statement, arrangement, warranty or representation of any nature whatsoever of any person (whether a Party to this Agreement or not and whether or not in writing) other than as expressly incorporated in this Agreement or any other Transaction Document.

14.3   The Sellers unconditionally and irrevocably waive all and any rights and claims they may have against the Company or any person acting in their capacity as a present or former employee, agent or adviser of the Company on whom any of them may have relied in relation to the entering into of this Agreement, including in respect of any information that any such person has in any capacity supplied or omitted to supply to any Seller, and undertakes that they will not make any such claim against such persons except where the Sellers have been fraudulently misled by such person. Each of the Parties irrevocably and unconditionally waives any right or remedy it may have to claim damages and/or to rescind this Agreement by reason of any misrepresentation (other than a fraudulent misrepresentation) not contained in this Agreement or any other Transaction Document.

## 15   Variation

Except as otherwise permitted by this Agreement, no change to its terms shall be effective unless it is in writing and signed by or on behalf of each of the Parties.

## 16   Partnership

Nothing in this Agreement shall create or be deemed to create a partnership or joint venture of any kind or the relationship of principal and agent or employer and employee between the Parties and no Party shall be responsible for the acts or omissions of the employees or representatives of another Party.

## 17   Further assurance

Each Party will, from time to time on being required to do so by the other Party, promptly and at the cost and expense of the requesting Party do or procure the doing of all such acts and execute or procure the execution of all such documents in a form reasonably satisfactory to the requesting Party as the requesting Party may reasonably consider necessary for giving full effect to this Agreement (or to such parts of it as remain operative

after termination) and securing to the requesting Party the full benefit of the rights, powers and remedies conferred upon such Party in this Agreement, save for the payment of any stamp, transfer and registration taxes, duties and charges, and any stamp duty land tax (or its equivalents outside England) which shall be the responsibility of the Buyer.

## 18    Confidentiality and announcements

18.1    Subject to clauses 18.2 to 18.4 (inclusive), each Party undertakes that it will, and will procure that each other member of its Group will, keep confidential at all times after the date of this Agreement, and not directly or indirectly reveal, disclose or use for its own or any other purposes, any information received or obtained as a result of entering into or performing, or supplied by or on behalf of the other Party in the negotiations leading to, this Agreement and which relates to:

18.1.1    the negotiations relating to this Agreement;

18.1.2    the subject matter or provisions of this Agreement; or

18.1.3    the other Party's Group.

18.2    The prohibition in Clause 18.1 does not apply:

18.2.1    if the information was in the public domain before it was furnished to the relevant Party or, after it was received by the relevant Party, entered the public domain otherwise than as a result of (a) a breach by the relevant Party of this clause 18 or (b) a breach of a confidentiality obligation by the discloser, where the breach was known to the relevant Party;

18.2.2    to the extent that the disclosure of any information referred to in clause 18.1 is required:

(a)    by any Regulatory Requirement, provided that it will be disclosed only after consultation with the other Party (unless such consultation is prohibited by any Regulatory Requirement); or

(b)    in connection with any judicial proceedings (including, but not limited to, the US Bankruptcy Proceedings), it being understood and agreed, for the avoidance of doubt, that the Sellers are required to (i) file this Agreement, along with their motion seeking entry of the Approval Order, with the Bankruptcy Court, (ii) provide a copy of this Agreement, along with their motion seeking entry of the Approval Order, to certain creditors and parties in interest in the US Bankruptcy Proceedings, and (iii) discuss the Agreement with certain of the Sellers' creditors and the Bankruptcy Court,

18.2.3    to any disclosure made to a Taxation Authority;

18.2.4    to the extent the other Party has given prior written consent to the relevant disclosure;

18.2.5    to the extent the relevant disclosure is made by a Party to any of its directors, officers and/or employees, on a strictly confidential and need to know basis, provided that the disclosing Party ensures that each such person is made aware

of the restrictions imposed by this clause 18 and ensures that such person strictly complies with that Party's obligations under this clause 18 as if those obligations were directly imposed on that person;

18.2.6 to the extent the relevant disclosure is made by a Party to its professional advisers, auditors and/or bankers on a need to know basis and provided they have a duty to keep such information confidential; or

18.2.7 where the relevant disclosure is made by a Party to any other member of that Party's Group on a need to know basis,

provided that any such information disclosed pursuant to clause 18.2.2(a) shall be disclosed (save where giving notice to the other Party is prohibited by any Regulatory Requirement) only after notice of such disclosure has been given to the other Party of such requirement with a view to agreeing the content and timing of such disclosure.

18.3 Subject to clause 18.4, no Party will make any press release or other public disclosure or announcement in connection with the transactions contemplated by this Agreement except:

18.3.1 an announcement in the agreed form or in any other form agreed by the Buyer and the Sellers; or

18.3.2 any disclosure or announcement required by any Regulatory Requirement.

18.4 Nothing in this Agreement will prohibit the Buyer or the Sellers from making or sending any announcement (which complies with clause 18.3.1) after Completion to a customer, client or supplier of the Company informing it that the Buyer has purchased the Company.

## 19 Counterparts

This Agreement may be entered into in any number of counterparts, and by the Parties on separate counterparts, all of which when duly executed may be delivered by email in a pdf (or other readable electronic format) and when delivered will together constitute one and the same agreement. Delivery of an executed signature page of a counterpart in Portable Document Format (PDF) (or similar file format) sent by electronic mail shall take effect as delivery of an executed counterpart of this Agreement.

## 20 Notices

20.1 Any notice or other communication from one Party (the "**Sender**") to another Party (the "**Recipient**") under this Agreement must be in writing, signed on behalf of the Sender, and be addressed to the Recipient using the details below (and each Party will promptly notify the other in writing of any change to its details for service):

**Buyer**:

| For the attention of: | Mike Holman and Lee Thompson |
| --- | --- |
| Address | Canalside Warrington Road |
| | Manor Park |
| | Runcorn, Cheshire |

| | |
|---|---|
| | *WA7 1SN*<br><br>*England*<br><br>*Email:* *hmike@diamondcomics.co.uk* *and* *tlee@diamondcomics.co.uk* |
| *Copy to* | *TC Group*<br><br>*6th Floor, Kings House, 9–10 Haymarket, London SW1 4BPAttention: David Leigh and Steven Conybeare*<br><br>*Email:* *davidleigh@tc-group.com* *and*<br><br>*stevenconybeare@tc-group.com* |

**Sellers:**

| | |
|---|---|
| *For the attention of:* | *Robert Gorin and William Henrich* |
| *Address* | *295 Madison Ave, 20th Floor  New York, NY 10017Email:* *rgorin@getzlerhenrich.com* *and* whenrich@getzlerhenrich.com |
| *Copy to* | *Stephenson Harwood LLP*<br><br>*1 Finsbury Circus*<br><br>*London EC2M 7SH*<br><br>*Attention: Jonathan Bridcut and Tal Goldsmith*<br><br>*Email:* *jonathan.bridcut@stephensonharwood.com* *and* *Tal.Goldsmith@stephensonharwood.com*<br><br>*and*<br><br>*Saul Ewing LLP*<br><br>*Centre Square West*<br><br>*1500 Market Street, 38th Floor*<br><br>*Philadelphia, PA 19102-2186*<br><br>*Attention: Jeffrey C. Hampton and Adam H. Isenberg*<br><br>*Email:* *jeffrey.hampton@saul.com* *and* *adam.isenberg@saul.com* |

20.2    Notices must be delivered personally or sent by a reputable tracked delivery service with confirmation of receipt required.

20.3    Any notice will be deemed to have been served:

    20.3.1    if delivered personally, at the time and date of delivery shown on the delivery receipt kept by the Sender;

    20.3.2    if sent within the UK, 48 hours from the time of posting (such time as evidenced

by proof of postage kept by the Sender) or, if earlier, on receipt by the Recipient (where the Sender can evidence such receipt);

20.3.3    if sent outside the UK, at 9.00 am on the fifth Business Day from the date of posting (such date as evidenced by proof of postage kept by the Sender); and

20.3.4    if sent by email, when the Sender receives confirmation on its server that the message has been transmitted.

20.4    If the deemed time of receipt would occur outside the hours of 9.00 am to 5.30 pm on a Business Day, the notice will be deemed served at 9.00 am on the next Business Day.

20.5    This Clause 20 does not apply to the service of proceedings or other documents in any judicial proceeding.

20.6    References in this Clause 20 to times of the day are to those times in the location of receipt.

**21    Rights of Third Parties**

A person who is not a Party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

**22    Agreement survives Completion**

This Agreement (other than obligations that have already been fully performed) remains in full force after Completion.

**23    Governing law and jurisdiction**

23.1    This Agreement and any non-contractual rights and obligations arising out of or in connection with it will be governed by and construed in accordance with English law.

23.2    Each of the Parties irrevocably:

23.2.1    agrees that the English courts will have exclusive jurisdiction to settle any dispute which may arise out of or in connection with this Agreement (including any non-contractual rights and obligations) and the documents to be entered into pursuant to it and, accordingly, that proceedings arising out of or in connection with this Agreement will be brought in such courts; and

23.2.2    submits to the jurisdiction of such courts and waives any objection to proceedings being brought in any such court on the ground of venue or on the ground that the proceedings have been brought in an inconvenient forum.

This Agreement has been signed on the date first stated on page 1 above.

**Schedule 1        The Sellers and Shares**

| (1) | (2) | (3) |
|---|---|---|
| **Name and address of Seller** | **Number and class of Shares** | **Consideration** |
| Comic Holdings Inc. (ID No: DO3698545) 10150 YORK ROAD SUITE 300 HUNT VALLEY MD 21030–3344 | 50 ordinary shares of £1.00 each | $1,050,000 of the Completion Payment |
| Comic Exporters Inc. (ID No: DO3698537) 10150 YORK ROAD SUITE 300 HUNT VALLEY MD 21030–3344 | 50 ordinary shares of £1.00 each | $1,050,000 of the Completion Payment |
| **Total** | **100 ordinary shares of £1.00 each** | **$2,100,000** |

**Schedule 2          The Company**

**Details of the Company**

| | |
|---|---|
| Name | Diamond Comic Distributors |
| Country of incorporation | England and Wales |
| Company number | 01510986 |
| Date of incorporation | 5 August 1980 |
| Registered office | C/O TC Group 6th Floor Kings House, 9–10 Haymarket, London SW1Y 4BP |
| Issued share capital | 100 ordinary shares of £1.00 each fully paid |
| Shareholder(s) | No. and class of Shares | Registered holder |
| Comic Holdings Inc. | 50 Ordinary Shares of £1.00 | Comic Holdings Inc. |
| Comic Exporters Inc. | 50 Ordinary Shares of £1.00 | Comic Exporters Inc. |
| Directors | Stephen Andrew Geppi<br><br>Comic Exporters Inc.<br><br>Comic Holdings Inc. | |
| Secretary | Not applicable | |
| Auditors | Saffrey LLP | |
| Accounting reference date | 31 December | |
| Registered charges | None | |

**Schedule 3**
**Completion**

1        At Completion the Sellers shall jointly and severally:

    1.1        deliver, or procure the delivery of, to the Buyer:

        1.1.1        a certified copy of the Approval Order;

        1.1.2        a transfer in the agreed form in respect of their respective Shares duly executed in favour of the Buyer, accompanied by the share certificates relating to the Shares (or appropriate indemnities for any lost certificates, in the agreed form) together with any power of attorney or other authority under which the transfer has been executed;

        1.1.3        the Deed of Release, signed by the Sellers and JPMorgan Chase Bank, N.A;

        1.1.4        the letters executed as deeds, in the agreed form, from each of the directors resigning their respective office of the Company and waiving all and any claims they may have against the Company or any person acting in their capacity as an employee or worker of the Company (with effect from the Completion Date) (the "**Director Resignation Letters**");

        1.1.5        a copy of the minutes of the meeting, in the agreed form, referred to in paragraph 1.2 below;

        1.1.6        the Release Agreement, signed by the Sellers and JP Morgan Chase Bank, N.A; and

        1.1.7        the login details and any additional access information required for any online Tax account, portal or platform used or subscribed to by the Company as well as the Companies House authentication and e-filing codes (to the extent not already in the possession of the Buyer); and

    1.2        procure that a board meeting of the Company is held at which:

        1.2.1        it shall be resolved that each of the transfers relating to the Shares shall be approved for registration and (subject only to the transfers being duly stamped) the Buyer registered as the holder of the Shares concerned in the register of members;

        1.2.2        the Director Resignation Letters shall be tendered and accepted so as to take effect from the Completion Date;

        1.2.3        each of the persons nominated by the Buyer shall be appointed directors and/or secretary, as the Buyer shall direct, such appointments to take effect on the Completion Date; and

        1.2.4        all existing instructions and authorities to the bankers of the Company in respect of the Sellers are revoked with effect of the Completion Date.

**Signed** by __ Robert Gorin __ duly authorised for and on behalf of **Comic Holdings Inc.**

Signed by:

*Robert Gorin*

AEEBAC93416347E...

Authorised Signatory

**Signed** by __ Robert Gorin __ duly authorised for and on behalf of **Comic Exporters Inc.**

Signed by:

*Robert Gorin*

AEEBAC93416347E...

Authorised Signatory

**Signed** by _____ duly authorised for and on behalf of **Diamond Distributors UK Ltd**

Director

**Signed** by _____ duly authorised
for and on behalf of **Comic Holdings Inc.**

_____
Authorised Signatory


**Signed** by _____ duly authorised
for and on behalf of **Comic Exporters Inc.**

_____
Authorised Signatory


**Signed** by  Michael Holman  duly authorised
for and on behalf of **Diamond Distributors UK Ltd**

Signed by:

Michael Holman

CD3BE0857590492...
_____
Director