**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)**

| | |
|---|---|
| In re: | Chapter 11 |
| Diamond Comic Distributors, Inc., *et al.* | Case No. 25-10308 (DER) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 531, 578, 585, 586, 589, 595, 598, 601, 602, 603, 606, 612, 623, 674** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
JPMORGAN CHASE BANK, N.A.'S OMNIBUS REPLY (A) IN SUPPORT OF
DEBTORS' CONSIGNMENT SALE MOTION, AND (B) IN OPPOSITION TO
CONSIGNORS' OBJECTIONS**

### Table of Contents

INTRODUCTION .............................................................................................. 6

FACTUAL AND PROCEDURAL BACKGROUND ...................................... 7

    A.    The Bankruptcy Case ................................................................. 7

    B.    Debtors' Motion to Sell Consigned Inventory ......................... 8

    C.    Lender's Priority Prepetition Liens on Consigned Inventory ........................ 10

    D.    Lender's Priority DIP Lien on Consigned Inventory and Sale Proceeds ...... 11

LEGAL ARGUMENT ...................................................................................... 12

    A.    Article 9 of the Uniform Commercial Code Governs the Consignment Agreements ................................................................. 12

        i.    Consignment Vendors Failed to Perfect Their Purchase Money Security Interests Under the UCC ................................ 14

        ii.    Judicial Lien Creditors' Attachment and Priority Under the UCC .......... 15

    B.    Exception to the Applicability of the UCC to Consignments ........................... 16

        i.    The Burden of Proof Regarding the "Generally Known" Exception is on Consignment Vendors in The Fourth Circuit ................... 17

    C.    "Actual Knowledge" Is Not an Exception to Article 9's Treatment of Consignments ................................................................. 19

---

[1] The Debtors in these chapter 11 cases and the last four (4) digits of each Debtor's federal taxpayer identification number are as follows: Diamond Comic Distributors, Inc. (3450), Comic Exporters, Inc (7457), Comic Holdings, Inc. (7458), and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

1

|       | i.  | The Plain Meaning of § 9-102(A)(20) Renders A Secured Party's Actual Knowledge Irrelevant and Such Exception Has Been Explicitly Rejected by The UCC's Editorial Board | 20 |
|       | ii. | Maryland and Other Bankruptcy Courts in The Fourth Circuit Do Not Recognize an Actual Knowledge Exception to the UCC | 24 |
| D. | The Consignment Vendors Must Prove That Majority of Debtors' Creditors Generally Knew That Debtors Were Substantially Engaged In Sale Of Consigned Inventory | | 26 |
| E. | Article 2 of the UCC Does Not Apply to the Consignment Agreements | | 29 |
|    | i.  | Consignment Vendors' Purported Retention of Title Is Immaterial for Determining Whether Consignment Inventory Is Property of Estate | 31 |
| F. | The Debtors Are Permitted to Sell the Consigned Inventory Under 11 U.S.C. § 363 | | 32 |
|    | i.  | A "Bona Fide Dispute" Exists Regarding Consignors' Interests in the Consigned Inventory | 32 |
| CONCLUSION | | | 36 |

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bedford Square Assocs., L.P.*,
   247 B.R. 140 (Bankr. E.D. Pa. 2000) .................................................37

*In re BRI Corp.*,
   88 B.R. 71 (Bankr. E.D. Pa. 1988) .................................................28

*Clean Burn Fuel, LLC v. Purdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*,
   492 B.R. 445 (Bankr. M.D.N.C. 2013) .................................................34

*In re Collins*,
   180 B.R. 447 (Bankr. E.D. Va. 1995) .................................................37

*In re Downey Creations, LLC*,
   414 B.R. .................................................20

*In re DVI, Inc.*,
   306 B.R. 496 (Bankr. D. Del. 2004) .................................................37

*Ellis v. IPC (USA), Inc. (In re Pettit Oil Co.)*,
   917 F.3d 1130 (9th Cir. 2019) .................................................18, 34, 36

*Fariba v. Dealer Services Corp.*,
   100 Cal. Rptr. 3d 219 (Cal. Ct. App. 2009) .................................................22, 24, 25, 26

145780256v5

*French Design Jewelry, Inc. v. Downey Creations, LLC (In re Downey Creations, LLC),*
  414 B.R. 463 (2009)........................................................................................15, 28, 29

*In re G.S. Distrib.*,
  331 B.R. 552 (Bankr. S.D.N.Y. 2005) ................................................................19

*GBS Meat Indus. Pty. Ltd. v. Kress–Dobkin Co.*,
  474 F.Supp. 1357 (W.D. Pa. 1979) ...................................................................24

*In re Georgetown Steel Co., LLC*,
  No. 03-13156-W, 2004 Bankr. LEXIS 2393 (Bankr. D.S.C. Dec. 3, 2004) ..........................17

*Jacobs, v. Kraken Invs. Ltd. (In re Salander-O'Reilly Galleries, LLC),*
  506 B.R. 600 (Bankr. S.D.N.Y. 2014) ................................................................19

*In re L.L. Murphrey Co.*,
  No. 12-03837-8-JRL, 2013 WL 2451368 (Bankr. E.D.N.C. June 6, 2013) ..........................35

*In re Morgansen's Ltd..*,
  302 B.R. 784 (Bankr. E.D.N.Y. 2003)............................................................20, 33

*Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Fam. Corp.),*
  407 B.R. 65 (Bankr. D. Vt. 2009) .....................................................................34

*Nations Bank of D.C., N.A. v. Blier (In re Creative Goldsmiths of Wash., D.C.),*
  178 B.R. 87 (Bankr. D. Md. 1995) ....................................................20, 26, 27, 29

*In re Niblett*,
  441 B.R. 490 (Bankr. E.D. Va. 2009) .................................................................36

*In re Patriot Elec. & Mech., Inc.*,
  No. 13-15055-RAG, 2014 WL 1761928 (Bankr. D. Md. May 1, 2014) ................................17

*Quaker City Iron Works, Inc. v. Ganz (In re Wicaco Mach. Corp.),*
  49 B.R. 340 (E.D. Pa 1984) ...........................................................................28

*Rayfield Inv. Co. v. Kreps*,
  35 So. 3d 63 (Fla. Dist. Ct. App. 2010) ............................................................36

*Russell v. Mountain Nat'l Bank (In re Russell),*
  254 B.R. 138 (Bankr. W.D. Va. 2000) .............................................................20, 27

*In re Surplus Furniture Liquidators, Inc.*,
  199 B.R. 136 (Bankr. M.D.N.C. 1995).................................................................37

*TSA Stores Inc. v. M J Soffe, LLC (In re TSAWD Holdings, Inc.),*
  565 B.R. 292 (Bankr. D. Del. 2017) .......................................................... *passim*

3

*TSA Stores, Inc. v. M J Soffe, LLC (In re TSAWD Holdings, Inc.)*,
   No. 16-10527 (MFW), 2018 WL 6885922 (Bankr. D. Del. Nov. 26, 2018) ..........................23

*TSA Stores, Inc. v. Performance Apparel Corp.(In re TSAWD Holdings, Inc.)*,
   595 B.R. 676 (Bankr. D. Del. 2018) .............................................................................23, 24

*TSA Stores, Inc. v. Sport Dimension Inc. (In re TSAWD Holdings, Inc.)*,
   601 B.R. 599 (Bankr. D. Del. 2019) .........................................................................23, 24, 29

*In re Valley Media, Inc.*,
   279 B.R. 105 (Bankr. D. Del. 2002) ............................................................................ *passim*

**Statutes**

11 U.S.C. §§ 101, *et seq.* ....................................................................................................9

11 U.S.C. § 363(b), (c) ....................................................................................................34,35

11 U.S.C. § 363(f)(4) ......................................................................................................35, 37

11 U.S.C. § 363(p)(2) ......................................................................................................35, 37

11 U.S.C. § 544(a) ..........................................................................17, 18, 22, 30, 31, 35

11 U.S.C. § 1107 ..............................................................................................17, 30, 31

11 U.S.C. § 1108 ................................................................................................................9

Md. Code Ann., Com. Law, tit. 9 ....................................................................................13

Md. Code Ann., Com. Law § 1-201(b)(35) ......................................................................14

Md. Code Ann., Com. Law § 2–106(1) ............................................................................32

Md. Code Ann., Com. Law § 2–326(1), (3), cmt. 1, cmt. 4 ............................................32

Md. Code Ann., Com. Law § 2-401 ..................................................................................34

Md. Code Ann., Com. Law § 9-102(a)(20) .......................................................... *passim*

Md. Code Ann., Com. Law § 9-102(a)(20)(A)(iii) ............................................... *passim*

Md. Code Ann. Com. Law § 9-102(a)(53) ........................................................................17

Md. Code Ann., Com. Law § 9-103(d) ..............................................................................14

Md. Code Ann., Com. Law § 9-109(a)(4) .....................................................................31, 32

Md. Code Ann., Com. Law § 9-202 ..................................................................................34

Md. Code Ann., Com. Law § 9-315(a), (c)...................................................................14, 16

Md. Code Ann., Com. Law § 9-317(a)(1), (a)(2) .........................................................16, 17

Md. Code Ann., Com. Law § 9-322(a), (a)(2) .............................................................16, 18

Md. Code Ann., Com. Law, § 9-324(b) ...........................................................................16

U.C.C. §§ 9-102(a)(20), (A)(iii) .........................................................................18, 24, 26, 37

U.C.C. § 9-109 cmt. 6 ...................................................................................................16, 32

U.C.C. § 9-203, cmt. 6 .......................................................................................................15

UCC §§ 9-317(b), (c), (d), ..................................................................................................22

U.C.C. § 9-319(a), cmt. 2...........................................................................15, 18, 19, 26, 32

U.C.C. § 9-322 ...................................................................................................................16

UCC § 1-201(35) ...............................................................................................................14

UCC § 2–326(1), (3), cmt. 4 ..........................................................................20, 26, 27, 32

**Other Authorities**

U.C.C. PEB Commentary No. 20 .......................................................................................26

JPMorgan Chase Bank, N.A., as Prepetition Lender and DIP Lender (collectively, the "**Lender**"), by and through its undersigned counsel, hereby submits this *Memorandum of Points and Authorities* (this "**Memorandum**") in support of Lender's *Omnibus Reply (A) In Support of Debtors' Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances, and (III) Granting Related Relief; and (B) in Opposition to Consignors' Objections to Debtors' Motion to Sell Consigned Inventory* (the "**Reply**").

## <u>INTRODUCTION</u>

The Consignment Vendors miss the mark in seeking to block the sale of the Consigned Inventory pursuant to the Consignment Sale Motion.  As explained in detail below, the Consignment Vendors hold a defective position—their failure to file UCC-1 financing statements dooms their property interest in the Consigned Inventory.  It is the Debtors who now own the Consigned Inventory and, ultimately, the Lender who holds a first priority lien interest in these assets.  The Debtors have amply demonstrated a *bona fide* dispute as to ownership of these assets. That dispute, by itself, vests the Debtors with sufficient statutory authority to sell the Consigned Inventory.  The Consignment Vendors have the burden of proof under Maryland law to demonstrate an exception to the statutory UCC provisions relied upon by the Debtors and the Lender.  By failing to meet this burden of proof, and by relying upon unpersuasive and out-of-circuit authority, the Consignment Vendors have forfeited their opportunity to block the sale of the Consigned Inventory.  The Consignment Sale Motion should be granted.

145780256v5

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Bankruptcy Case

1.      On January 14, 2025 (the "***Petition Date***"), each of the Debtors commenced a case under chapter 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***"). The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On January 29, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "***Committee***").

2.      On February 19, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 163] (the "***Final DIP Order***"), pursuant to which, among other things, the Debtors were granted authority to obtain senior secured postpetition financing pursuant to the terms and conditions of the Final DIP Order and that certain senior secured Debtor-in-Possession Credit Agreement, dated as of January 16, 2025 (as amended from time to time, the "***DIP Credit Agreement***").[2]

3.      On June 24, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Fifth Stipulation between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Docket No. 527] (the "***DIP Amendment Motion***"). On July 3, 2025, the

---

[2] The DIP Credit Agreement was subsequently amended five times pursuant to this Court's Orders Approving Stipulations Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement [Docket Nos. 243, 345, 409, 470, & 569].

Bankruptcy Court entered the *Order Approving Fifth Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Docket No. 569], extending the maturity date of the DIP Credit Agreement to August 23, 2025. The Bankruptcy Court scheduled a continued hearing on the relief requested in the DIP Amendment Motion for August 18, 2025, at 11:00 a.m. (ET).

**B.**    **Debtors' Motion to Sell Consigned Inventory**

4.    On June 25, 2025, the Debtors filed the *Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances, and (III) Granting Related Relief* (the "**Consignment Sale Motion**"),[3] seeking, among other things, approval of (i) procedures to sell or otherwise dispose of consigned inventory; and (ii) the sales or dispositions of the consigned inventory, free and clear of all liens, claims, interests and encumbrances (collectively, the "**Consignment Sales**"). Attached to the Consignment Sale Motion is a list of the vendors (collectively, the "**Consignment Vendors**") that provided consigned inventory (the "**Consigned Inventory**") currently in the possession of the Debtors.

5.    In response to the Consignment Sale Motion, thirteen (13) objections were filed by the following Consignment Vendors: TwoMorrows Publishing ("**Two Morrows**") [Docket No. 578]; Molten Core Media, LLC ("**Molten**") [Docket No. 585]; Graphitti Designs, Inc. ("**Graphitti**") [Docket No. 586]; Abstract Studio, Inc. ("**Abstract**") [Docket No. 589]; NBM Publishing, Inc. ("**NBM Publishing**") [Docket No. 595]; Humanoids, Inc. ("**Humanoids**")[Docket

---

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Consignment Sale Motion.

No. 598]; the Ad Hoc Committee of Consignors[4] (the "**Ad Hoc Committee**") [Docket No. 601]; The Game Manufacturers Association, in conjunction with certain of its members including Skyscraper Studios, Inc. d/b/a Roll for Combat and Liminal Esports LLC d/b/a Snowbright Studio (collectively, "**GAMA**") [Docket No. 602], the Consignment Group[5] [Docket No. 603]; Cryptozoic Entertainment, LLC ("**Cryptozoic**") [Docket No. 606]; Image Comics, Inc. ("**Image**") [Docket No. 612]; William M. Gaines, Agent, Inc. ("**Gaines**") [Docket No. 623]; Zombie Love Studios ("**Zombie**") (collectively, the "**Consignor Objections**"). As of the date of this Reply, the objections of TwoMorrows, Molten, Graphitti, Abstract, NBM Publishing and Gaines have been stricken by the Court.

6.      On July 17, 2025, the Lender filed a *Reservation of Rights and Limited Objection* to the Consignment Sale Motion [Docket No. 611] reserving Lender's right to raise additional arguments or objections in connection with the Consignment Sale Motion.

7.      On July 24, 2025, the *Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances, and (III) Granting Related Relief* [Docket No. 649] (the "**Motion to Stay**") the Ad Hoc Committee of Consignors filed the Motion to Stay, and on

---

[4] The Ad Hoc Committee has not been designated as an official committee in this case, and is comprised the following thirteen (13) jointly represented consignors: Ablaze LLC; American Mythology Productions, LLC; Andrew Kafoury dba Battle Quest Comics; Avatar Press, Inc., Bryan Seaton dba Action Lab; Drawn & Quarterly Books Inc., Fantagraphics Books, Inc.; Green Ronin Publishing LLC; Herman & Geer Communications, Inc. dba Hermes Press; Living the Line LLC; Paizo Inc.; UDON Entertainment Inc.; and Zenescope Entertainment Inc. *See Rule 2019 Verified Statement of YVS, Law LLC Disclosing Representation of Multiple Parties in Chapter 11 Case* [Docket No. 658].

[5] The "Consignment Group" is comprised of the is comprised the following thirteen (13) jointly represented consignors: Aspen MLT, LLC /a/ka Aspen Comics; Black Mask Studios, LLC; DSTLRY Media, Inc.; Dynamic Forces, Inc. a/k/a Dynamite Entertainment; Heavy Metal International, LLC; MagneticPress, LLC; Massive Publishing, LLC; Oni-Lion Forge Publishing Group, LLC f/k/a Oni Press, LLC; Panini UK Ltd.; Punk Bot Comic Books, LLC a/k/a Alien Books; The Penn State University a/k/a Graphic Mundi; Titan Publishing Group, Ltd. and Vault Storyworks, LLC a/k/a Vault Comics f/k/a Creative Mind Energy.

August 12, 2025, the Ad Hoc Committee filed a *Line Filing Supplemental Cases Supporting Motion to Stay* [Docket No. 713]. Concurrently herewith, the Lender has filed an Opposition to the Motion to Stay.

8.      On August 1, 2025, the Ad Hoc Committee filed the *Motion for Seeking Entry of an Order Requiring the Debtors to Assume or Reject Executory Contracts with Members of Ad Hoc Committee of Consignors; and For Related Relief* [Docket No. 679] (the "**Motion to Compel**"). The Motion to Compel and Motion to Stay are currently set for an evidentiary hearing with the Consignment Sale Motion on August 18, 2025.

**C.      Lender's Priority Prepetition Liens on Consigned Inventory**

9.      Prior to the Petition Date, the Debtors granted to the Lender a first-priority security interest in, and continuing liens on (the "Prepetition Liens"), substantially all of their assets and personal property, and all proceeds, products, and accessions thereof, in each case whether then owned or existing or thereafter acquired or arising (the "Prepetition Collateral"). *See* Final DIP Order, § E(i)–(iii).

10.      The Lender is secured, pursuant to the terms of the Prepetition Credit Agreement and Prepetition Security Agreement, by a lien in favor of the Lender on "Collateral," including inventory. "Collateral" is defined to include

> "all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of, such Grantor … including … (x) all Inventory and (xvi) all accessions to, substitutions for and replacements, proceeds (including all dividends and distributions), … and products of the foregoing."

Prepetition Security Agreement, Art. II.

11.      The term "Inventory" is defined to have the meaning given to that term in the UCC. *See* Prepetition Credit Agreement, DS-13. In relevant part, the Borrowing Base Schedule defines the term "Eligible Inventory" is to expressly exclude "any Inventory… which is (f) goods held on

consignment." *See id*., BBS-5. The original borrowing base certificate does not reflect or specifically identify the consigned inventory.

12.     The Lender perfected its security interest in all of the Inventory of the Debtors by filing UCC-1 financing statements in 2019 and thereafter, continuation statements. *See* Consignment Sale Motion, at Ex. C.

### D.    Lender's Priority DIP Lien on Consigned Inventory and Sale Proceeds

13.     In accordance with the Final DIP Order, the Lender has valid, attached and binding, fully perfected priming first priority senior security interests and liens upon all of the Debtors' right, title, and interest in the Consigned Inventory and the proceeds resulting from any sale or disposition thereof. Further, pursuant to the Final DIP Order, any proceeds of the Consignment Sales must be applied first to the outstanding amounts owed on the Lender's secured claim until the Lender's outstanding lien is fully satisfied. *See* Final DIP Order, at ¶¶ 13, 14, & 15.

14.     Pursuant to the Final DIP Order, the Debtors granted to the Lender a fully perfected, priming, first priority senior secured DIP Lien on, in relevant part:

> all of the property, assets or interests in property or assets of the Debtors, and all "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all the Debtors' now owned or hereafter acquired right, title, and interest (i) all of the property, assets or interests in property or assets of the Debtors and all "property of the estate", expressly including without limitation all of the Prepetition Collateral …; (ii) the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any money or other tangible or intangible property resulting from the sale, exchange, collection or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof; and (iii) all other property and assets including, without limitation, cash collateral and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above.

*See* Final DIP Order, § 13(a).

## LEGAL ARGUMENT

**A.** **Article 9 of the Uniform Commercial Code Governs the Consignment Agreements**

15.    As an initial matter, all of the Consignment Agreements are governed by Maryland law and accordingly, Maryland law and Fourth Circuit precedent controls this dispute. Maryland has adopted the UCC. *See generally* Md. Code Ann., Com. Law, tit. 9. This Court's role, therefore, is to apply Maryland law and the UCC.

16.    Section 9-102 of the Uniform Commercial Code ("UCC") describes whether an arrangement is a "consignment" for Article 9 purposes. U.C.C. § 9-102. The Maryland version of the UCC provides that Article 9 of the UCC governs consignment transactions. A "consignment" is defined as a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

(A)    The merchant:
    (i)    deals in goods of that kind under a name other than the name of the person making delivery;
    (ii)    is not an auctioneer; and
    (iii)    is not generally known by its creditors to be substantially engaged in selling the goods of others;
(B)    with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
(C)    the goods are not consumer goods immediately before delivery; and
(D)    the transaction does not create a security interest that secures an obligation.

Md. Code Ann., Com. Law § 9-102(a)(20).

17.    Under UCC § 1-201(35), the consignor's interest in the goods is treated as a "security interest," which means that all consignors who are not explicitly excluded by the definition in UCC § 9-102(a)(20) hold security interests that are subject to subordination by lien creditors if their interests are unperfected. Md. Code Ann., Com. Law §1-201(b)(35)(defining "[s]ecurity interest" to include *any* interest of a consignor."). More specifically, the consignor is deemed to have a purchase-money security interest in inventory. Md. Code Ann., Com. Law § 9-

103(d). The consignor is also deemed to have a security interest in identifiable proceeds from the consigned goods. Md. Code Ann., Com. Law § 9-315(a).

18.     The "security interest" designation does not change the relationship between the consignor and consignee. *See* U.C.C. § 109, cmt. 6 ("For purposes of determining the rights and interests of third-party creditors of, and purchasers of the goods from, the consignee, but not for other purposes, such as remedies of the consignor, the consignee is deemed to acquire under this Article whatever rights and title the consignor had or had power to transfer."); *see also French Design Jewelry, Inc. v. Downey Creations, LLC (In re Downey Creations, LLC),* 414 B.R. 463, 473 (2009) ("Under Article 9, a consignment is a security interest "*only* for the purpose of protecting the consignee's creditors. It does not otherwise alter the contractual relationship between the consignor and consignee.").

19.     If the consignor's interest is not perfected then, for purposes of determining the rights of creditors of the consignee while the goods are in the possession of the consignee, the consignee is deemed to have the rights and title to the goods identical to those that the consignor had or had power to transfer. Specifically, Maryland UCC § 9-319 (Rights and Title of Consignee with Respect to Creditors and Purchasers) provides:

   (a)   Except as otherwise provided in subsection (b), for purposes of determining the rights of creditors of, and purchasers of value of goods from, a consignee, **while goods are in the possession of the consignee, the consignee is deemed to have rights and title identical to those the consignor had or had power to transfer**.

   (b)   For purposes of determining the rights of a creditor of a consignee, law other than this Article determines the rights and title of a consignee while goods are in the consignee's possession if under this part, a perfected security interest held by the consignor would have priority over the rights of the creditor.

Md. Code Ann., Com. Law § 9-319 (emphasis added).

13

20.     Even though as between the consignor and consignee the consignor remains the owner of the goods, section 9-319(a) grants the consignee the rights and title of the consignor to transfer interests in the goods to its creditors. Consequently, the consignee's creditors, such as Lender and judicial lien creditors (here, the Debtors), can attach judicial liens and security interests to consigned goods while the goods are in the possession of the consignee.[6]

21.     By deeming the consignee to have the consignor's rights and title to the consigned goods, Article 9's general provisions governing attachment, perfection, priority, and proceeds apply uniformly to consignors and competing creditors of the consignee, including lien creditors. *See* U.C.C. § 9-109 cmt. 6 ("[T]he rules pertaining to lien creditors, buyers, and attachment, perfection, and priority of competing security interests apply to consigned goods.").

### i.     Consignment Vendors Failed to Perfect Their Purchase Money Security Interests Under the UCC

22.     Consignors whose consignment agreements qualify as Article 9 consignments under 9-102(a)(20) must comply with Article 9 perfection and priority rules to prevail against competing secured parties that are creditors of the consignee. *See* Md. Code Ann., Com. Law § 9-317(a)(1) (providing that a security interest is subordinate to the rights of a security interest that is entitled to priority under U.C.C. § 322); Md. Code Ann., Com. Law § 9-322(a) (providing that conflicting security interests are ranked according to priority in time of filing or perfection).

23.     It is undisputed that none of the Consignment Vendors filed UCC-1 financing statements to evidence and perfect their interests in the Consigned Inventory. *See generally*

---

[6] *See* U.C.C. § 9-203, cmt. 6 ("A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach."); *see also* U.C.C. § 9-319, cmt. 2 ("The consignee acquires these rights even though, as between the parties, it purchases a limited interest in the goods (as would be the case in a true consignment, under which the consignee acquires only the interest of a bailee). As a consequence of this section, creditors of the consignee can acquire judicial liens and security interests in the goods while the goods are in the possession of the consignee.").

14

Consignor Objections; *see also* Md. Code Ann., Com. Law, §§ 9-322, 324(b).  It is not necessary to determine if Consignment Vendors even complied with the purchase-money security interest notice requirements set forth in § 9-324(b) because the Consignment Vendors did not file any UCC-1 financing statements to perfect their interests. Consequently, Consignment Vendors were not and cannot be perfected in the proceeds from the sale of Consigned Inventory. *See* Md. Code Ann., Com. Law § 9-315(c)("A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.").

ii.    **Judicial Lien Creditors' Attachment and Priority Under the UCC**

24.    Section 9-319(a) applies also to judicial lien creditors such as bankruptcy trustees, which can attach liens to consigned goods as hypothetical lien creditors pursuant to section 544(a)(1) of the Bankruptcy Code. 11 U.S.C. § 544(a)(1); *see* Md. Code Ann. § 9-102(a)(53)(defining "[l]ien creditor" to include "a trustee in bankruptcy from the date of the filing of the petition.").

25.    Pursuant to sections 544(a) and 1107 of the Bankruptcy Code, a debtor in possession has the rights and powers of a hypothetical judicial lien creditor as of the Petition Date. 11 U.S.C. §§ 544(a)(1), 1107. Section 9-317(a)(2) grants lien creditors such as bankruptcy trustees (or a debtor in possession imbued with the trustee's powers pursuant to 11 U.S.C. § 1107) priority over unperfected security interests, thereby allowing them to avoid a consignor's unperfected security interest. Md. Code Ann., Com. Law § 9-317(a)(2).

26.    By the terms of 11 U.S.C. § 544(a), the Debtors may assert the rights of a hypothetical lien creditor under UCC § 9-317(a)(2) and prevail over claimants whose interests are unperfected as of the petition date. *See In re Patriot Elec. & Mech., Inc.*, No. 13-15055-RAG, 2014 WL 1761928, at *3 (Bankr. D. Md. May 1, 2014)("[I]t is settled that, "[t]he trustee in bankruptcy

15

may avoid an unperfected security interest pursuant to 11 U.S.C. § 544(a) by ... standing in the shoes of the hypothetical lien creditor."); *see also In re Georgetown Steel Co., LLC*, No. 03-13156-W, 2004 Bankr. LEXIS 2393, at *36 (Bankr. D.S.C. Dec. 3, 2004)("[Consignor] failed to perfect its interest under the Agreement in the [consigned goods] because [Consignor] did not file a financing statement as required under the Uniform Commercial Code. Therefore, [Consignor]'s security interest in the [consigned goods] is an unperfected security interest, subject to the rights of creditors, avoidable by Debtor pursuant to its strong-arm powers under § 544, and recoverable for the benefit of Debtor's estate pursuant to § 550.").

27.     Debtors' interests, as a hypothetical judicial lien creditor under 11 U.S.C. § 544(a)(1), are superior to those of Consignment Vendors as to the Consignment Inventory and as to any proceeds arising from the further sale of the Consignment Inventory. *See* Md. Code Ann., Com. Law § 9-322(a)(2)("A perfected security interest…has priority over a conflicting unperfected security interest."); *see also Ellis v. IPC (USA), Inc. (In re Pettit Oil Co.)*, 917 F.3d 1130 (9th Cir. 2019)("[A] consignor loses priority in the proceeds when it fails to perfect its interest.").

## B.      Exception to the Applicability of the UCC to Consignments

28.     A consignor may prevent the application of sections 9-102(a)(20) and 9-319(a) by demonstrating the existence of one of the two following exceptions: (i) the consignor has perfected its security interest by filing a UCC-1 financing statement in compliance with Article 9 of the UCC, or (ii) the recipient of the delivered goods is generally known by its creditors to be substantially engaged in the selling the goods of others. Md. Code Ann., Com. Law § 9-102(a)(20)(A)(iii). If either of these exceptions are met, then UCC §§ 9-102(a)(20) and 9-319(a)

will not apply to the transaction and the consignee's creditors, including a judicial lien creditor, may not reach the Consigned Inventory in the Debtors' possession.

29.    It is undisputed that none of the Consignment Vendors perfected their security interests in the Consigned Inventory that are in the possession of the Debtors.  The Lender has a properly perfected, first-priority lien encumbering the Debtors' interest in the Consigned Inventory. *See* Consignment Sale Motion, Ex. C; Final DIP Order, at ¶¶ 13, 14, & 15.

30.    Consequently, unless the Consignment Vendors can demonstrate that one of the statutory exceptions is applicable here, the Debtors are deemed under the UCC to have rights and title in the Consigned Inventory identical to the Consignment Vendors. *See* UCC § 9-319, cmt. 2 ("Section 9-319(a) provides that, for purposes of determining the rights of certain third parties, the consignee is deemed to acquire all rights and title that the consignor had, if the consignor's security interest is unperfected.").

31.    Accordingly, the Consignment Vendor Agreements will not qualify as Article 9 consignments if it is generally known by the Debtors' creditors that Debtors were substantially engaged in the business of selling goods of others.

      **i.**    **The Burden of Proof Regarding the "Generally Known" Exception is on Consignment Vendors in The Fourth Circuit**

32.    The Lender acknowledges that it is a question of fact whether the Debtors were generally known by their creditors to be substantially engaged in selling the goods of others, but the Consignment Vendors misstate the controlling legal standard in this Court over the burden as to proving the applicability of Article 9. *See* Humanoids Obj., ¶ 11; Consignment Group Obj., ¶ 21, n. 1; Ad Hoc Committee Obj., ¶ 24; Image Obj., ¶ 23, n. 34; *but see* GAMA Obj., ¶ 17 (correctly stating burden of proof as consignors').

33.     Consignment Vendors have acknowledged that a few courts from other jurisdictions recognize the burden of proof is on the debtor-consignee; however, they fail to cite the applicable standard under controlling Maryland and Fourth Circuit authority. *See, e.g., Jacobs, v. Kraken Invs. Ltd. (In re Salander-O'Reilly Galleries, LLC)*, 506 B.R. 600, 609 (Bankr. S.D.N.Y. 2014)("[I]n the **Second Circuit**, the burden of proof falls on the party claiming applicability of § 9–102(a)(20) to show that each element of the definition is satisfied.")(emphasis added); *In re G.S. Distrib.*, 331 B.R. 552, 561 (Bankr. S.D.N.Y. 2005)("[T]he burden of proof falls on the party claiming applicability of [§ 9-102(a)(20)].")(emphasis added).

34.     Bankruptcy courts in the Fourth Circuit, including this Court, hold that consignors, such as Consignment Vendors, have the burden of proof to establish that their consignee is generally known by its creditors to be substantially engaged in the selling of goods of others. *See Nations Bank of D.C., N.A. v. Blier (In re Creative Goldsmiths of Washington, D.C.)*, 178 B.R. 87, 92 (Bankr. D. Md. 1995)("Defendant [consignor] bears the burden of proof to prove the existence of this exception."); *Russell v. Mountain Nat'l Bank (In re Russell)*, 254 B.R. 138, 140–41 (Bankr. W.D. Va. 2000)(holding that a bankruptcy trustee's rights in consigned inventory are superior to rights of any consignors who have not filed financing statements when those consignors did not prove the generally known/substantially engaged exception to former UCC § 2–326(3)).

35.     Other courts have likewise recognized that placing the burden on the consignor creates an incentive for it to file a financing statement, which promotes the purpose of the UCC to protect creditors of the debtor-consignee from apparent sales transactions in which an unpaid seller retains a "secret lien" in the consigned goods. *See In re Downey Creations, LLC*, 414 B.R. at 470–71 ("[I]f a consignor chooses not to file a financing statement, it must then bear the burden of proving that the transaction is not subject to Article 9 if and when a dispute arises."); *TSA Stores*

*Inc. v. M J Soffe, LLC (In re TSAWD Holdings, Inc.)*, 565 B.R. 292, 299 (Bankr. D. Del. 2017) (finding that the consignor must prove by a preponderance of the evidence that the consignment is not governed by Article 9); *In re Valley Media, Inc.*, 279 B.R. 105, 124 (Bankr. D. Del. 2002)("Proving that the deliveree is generally known by its creditors to be substantially engaged in the selling of goods of others is ultimately the burden of the consignor."); *In re Morgansen's Ltd.*, 302 B.R. 784, 788 (Bankr. E.D.N.Y. 2003)(in granting the debtor's sale motion, the court actually placed the burden on the consignors to prove that the transactions did not meet Article 9's definition of consignment: "[u]nder section (A)(iii), none of the objecting consignors put on any proof that the debtor 'was not generally known by its creditors to be substantially engaged in selling the goods of others.'").

### C.  "Actual Knowledge" Is Not an Exception to Article 9's Treatment of Consignments

36.    The Lender's knowledge is not relevant to whether the consignment agreements are excepted from Article 9. The only relevant point on that score is whether the Consignment Vendors can meet their burden of proving the Debtors were generally known to be substantially engaged in the business of selling goods of others.

37.    In a few of the Consignors' Objections, the Consignment Vendors have asserted that the "generally known" prong is satisfied if the specific creditor asserting a lien on the goods at issue had constructive or actual knowledge that the consignee was substantially engaged in selling the goods of others. *See* Ad Hoc Committee Obj., ¶ 29; Consignment Group Obj., ¶ 24 ("This factual inquiry would be relevant in the instant case as to the knowledge of the Debtor's secured creditor JPMorgan Chase Bank N.A., which would stand to benefit at the Consignment Group's expense if the Sale Motion were to be approved; Image Obj., ¶ 25 ("Again, discovery will

be necessary, but if JPMorgan Chase's actual knowledge is established that also independently satisfies the first prong.").

### i.    The Plain Meaning of § 9-102(A)(20) Renders A Secured Party's Actual Knowledge Irrelevant and Such Exception Has Been Explicitly Rejected by The UCC's Editorial Board

38.    Under the plain language of UCC § 9-102(A)(20) there is no actual knowledge exception as Consignment Vendors contend.[7] Language addressing subjective actual knowledge is conspicuously absent from the text.  The statutory test is not whether the secured party knows the debtor is selling consigned goods; rather it is whether the debtor is generally known by its creditors to be substantially engaged in selling the goods of others.

39.    Consignment Vendors rely on obsolete cases that have been abrogated by the revisions to the UCC, which have significantly restructured the treatment of consignments. Certain of the Consignment Vendors rely heavily on the case of *Fariba v. Dealer Services Corp.* and the authorities cited therein. 100 Cal. Rptr. 3d 219, 227–28 (Cal. Ct. App. 2009). In *Fariba*, the California Court of Appeals stated: "[s]ince the purpose of the notice exception is to 'protect creditors from the "hidden" claim of the consignor, it should follow that a creditor of a consignee who has *actual knowledge* that the consignee is a consignee cannot claim the protection thereof.'" *Id.* In *Fariba,* the court reasoned that if section 9-102(a)(20)(A)(iii) imputes knowledge to those creditors who could have reasonably obtained such knowledge, thereby holding them responsible as if they had actual knowledge, the standard should also be applied to hold responsible those creditors who have actual knowledge. *Id.* at 229 (citing *Europac Serv., Inc. v. Repub. Acceptance*

---

[7] The drafters of Article 9 were well aware of how to phrase a rule based on parties' subjective knowledge and did so in more than a dozen different provisions. *See* UCC §§ 9-317(b), (c), (d), 9-320(b), 9-321(a), 9-323(b), (d)-(g), 9-330(b), (d), 9-337(1), (2); *see also id.* §§ 9-320(a), 9-321(b), (c), 9-341(2) (each expressly treating a claimant's knowledge as irrelevant).

*Corp.*, 37 P.3d 447, 450–51 (Colo. App. 2000); *GBS Meat Indus. Pty. Ltd. v. Kress–Dobkin Co.*, 474 F.Supp. 1357, 1363 (W.D. Pa. 1979)).

40.     In addition to being obsolete, this authority is also facially inapplicable to the Consignment Sale Motion, which relies upon the rights and powers conferred upon the Debtors by the strong-arm powers codified at 11 U.S.C. §544. Since it is the *Debtors* who have asserted superior rights to the Consignment Vendors (with the Lender sharing in those rights pursuant to its DIP Liens), the Lender's knowledge is wholly irrelevant here.

41.     Consignment Vendors also rely on three decisions out of the Delaware bankruptcy court in the bankruptcy of *TSAWD Holdings, Inc.*, where the court dealt with priority disputes between the debtor's principal secured party with a perfected security interest in all of the debtor's inventory and vendors that had delivered goods to the debtor for sale. *See TSA Stores, Inc. v. Performance Apparel Corp. a/ka/ Hot Chilly's (In re TSAWD Holdings, Inc.)*, 595 B.R. 676 (Bankr. D. Del. 2018) ("***Performance Apparel***"); *TSA Stores, Inc. v. M J Soffe, LLC (In re TSAWD Holdings, Inc.)*, No. 16-10527 (MFW), 2018 WL 6885922 (Bankr. D. Del. Nov. 26, 2018)("***MJ Soffee***"); *TSA Stores, Inc. v. Sport Dimension Inc. a/k/a Body Glove (In re TSAWD Holdings, Inc.)*, 601 B.R. 599 (Bankr. D. Del. 2019)("***Sport Dimension***").

42.     In the *TSAWD Holdings* proceedings, the bankruptcy court recognized that actual knowledge of a consignor's interest will preclude a creditor from arguing that the consignor's interests are inferior to its interests. *See Performance Apparel*, 595 B.R. at 693; *MJ Soffee*, 2018 WL 6885922, at *4; *Sports Dimension*, 601 B.R. at 607.  In *Soffee*, the court found the lender did not have actual knowledge where the borrowing base certificate did not specifically identify the consignor and where the loan officer only had knowledge that borrower was engaged in consignments without knowing of each ***specific*** consignment. *MJ Soffee*, 2018 WL 6885922, at

145780256v5

*5. Further, the court held that actual knowledge is determined at the time of making the loan. *Id.* ("[Consignor must show that any knowledge of [consignor]'s consignment relationship was actually in [bank]'s mind at the time the Term Loan was incurred."). Accordingly, the bank's blanket security interest in the consigned goods had priority of the consignor. *Id.* at *7.

43.     *Performance Apparel* is readily distinguishable from the Consignment Vendors' position here because the consignor had filed a UCC-1 financing statement *prior* to the lender's loans with the debtors and provided notice of its interest to the lender at that time. *Performance Apparel*, 595 B.R. at 683. The court found that the consignor's failure to file a continuation statement was immaterial since the lender actually knew of the consignor's interest in the consigned goods at the time the loan was extended, the UCC did not determine their relative priority, and the rights of the consignor were paramount. *Id.* at 685.

44.     In *Sport Dimension*, the consignor argued that the "actual knowledge" test was satisfied when the lender has actual knowledge of "some" portion of the debtors' business deals with consignments. *Sports Dimension*, 601 B.R. at 607. The bankruptcy court was unpersuaded by the consignor's argument and held that the second prong of the exception requires that the lender have actual knowledge that the consignor *specifically* was dealing on a consignment basis with the debtors. *Id.* ("Sport Dimension's reliance on *Eurpac*, *Fariba* and *GBS Meat* is misplaced. All three cases involved actual knowledge of a *specific* consignor and/or substantial engagement and, therefore, contradict Sport Dimension's argument."). The bankruptcy court held that neither prong of the exception in section 9-102(a)(20) was satisfied because the lenders did not have actual knowledge of the specific consignment relationship between Debtors and Sport Dimension and the value of the consignment inventory did not reach the 20 percent threshold. *Id.* As such, the

22

court held that because the lender was properly perfected and the consignor was not, the lender unequivocally possessed a superior interest in the consigned goods under Article 9. *Id.*

45.     The *TSAWD Holdings* opinions and the earlier decisions the court relied on to read a specific knowledge exception to UCC 9-102(a)(20) are widely criticized. Neither the court in the *TSAWD Holdings* cases, nor the cases it relied on, established at what point in time it would be appropriate to test the secured party's knowledge per each consignor: (i) when the secured creditor acquired its security interest; (ii) when the secured party last gave value; or (iii) when the parties entered into the consignment transaction. The lack of this distinction creates an unworkable rule because certain Consignment Vendors attach Vendor Agreements entered by the Debtors at varying time periods before and after the Lender extended credit.

46.     The Permanent Editorial Board for the UCC's recent Commentary No. 20 on Consignments explicitly rejects the holdings of these cases that the actual knowledge of a creditor is determinative:

> "Some authorities have misconstrued the condition contained in § 9-102(a)(20)(A)(iii) by interpreting "generally known by its creditors" to mean "known by the competing claimant." Under this misinterpretation, a given transaction would be a consignment subject to Article 9's perfection and priority rules vis-à-vis creditors without knowledge that the person in possession is "substantially engaged in selling the goods of others" and would be excluded from Article 9 as to creditors with that knowledge. This anomalous result could lead to difficult priority disputes without promoting any Article 9 policy."

Permanent Editorial Board for the Uniform Commercial Code, Commentary No. 20: Consignments, at 5 (Jan. 24, 2019).

47.     In observing that some authorities have "misconstrued" § 9-102(a)(20), the commentary specifically cites *Fariba*, which was relied heavily upon by the *TSAWD Holdings* court. *Id.* at 5, n. 29. The Permanent Editorial Board explained that a "proper reading" of the UCC "does not allow for such a result and is consistent with the Article 9 policy that limits the role of knowledge in priority disputes. The priority between competing security interests in goods

23

(including purchase-money security interests) is not affected by what the competing claimants know." *Id.* The Permanent Editorial Board recognized that the knowledge of the competing claimant is relevant "[i]n determining whether the consignee is 'generally known by its creditors,' the competing creditor with knowledge would be included in the group of all creditors of the consignee." *Id.*

48.     The Official Commentary to the UCC expressly rejected that such "actual knowledge" exception exists in the UCC and provides:

> Under clause (iii) of subparagraph (A), a transaction is not an Article 9 "consignment" if the consignee is "generally known by its creditors to be substantially engaged in selling the goods of others." Clause (iii) ***does not apply solely because a particular competing claimant knows that the goods are held on consignment***. See PEB Commentary No. 20, dated January 24, 2019.

UCC § 9-102(A)(20), cmt. 14 (2019)(emphasis added).

49.     The Official Commentary to the UCC and the Permanent Editorial Board's commentary postdates all of the cases that Consignment Vendors cite in support of its "actual knowledge" arguments. *See* Ad Hoc Committee Obj., ¶ 29; Consignment Group Obj., ¶ 24; Image Obj., ¶ 25. Thus, it's uncertain that the actual knowledge exception recognized in *Fariba* and *TSAWD Holdings* remains good law in those jurisdictions.  In any event, those cases are wholly unpersuasive for the reasons articulated in the Official Commentary, and the court should be disinclined to apply such an exception here.

### ii.     Maryland and Other Bankruptcy Courts in The Fourth Circuit Do Not Recognize an Actual Knowledge Exception to the UCC

50.     Under Maryland precedent, a secured creditor's interest prevails even if it had actual knowledge that goods were held on consignment when its security interest was granted. In *Creative Goldsmiths*, the Maryland bankruptcy court found that a bank that held a properly perfected security interest in a consignee's inventory had priority under former Article 9 (formerly

24

UCC § 2–326(3) and now revised UCC §§ 9–102(a)(20) & 9–319(a)) over the unperfected interest of a consignor with respect to the consigned goods. *In re Creative Goldsmiths of Washington, D.C.*, 178 B.R. at 93. The court found that the bank's knowledge that the debtor engaged in consignment sales did not suffice to satisfy the requirement of general knowledge of creditors, even though the bank was the debtor's primary lender. The court rejected consignor's contention that the bank's knowledge was relevant to the application of Section 2-326, stating:

> This court's finding that [bank] had knowledge that Debtor was engaged in memorandum transactions is not inconsistent with its ruling on the § 2-326 issue. Section 2-326 requires that ***most of the creditors have knowledge that a substantial amount of the Debtor's business is selling goods of others. [Bank] represents only one of Debtor's creditors and therefore does not constitute "most" of the creditors***. This is true even though [Bank] represents the majority of Debtor's total indebtedness. In addition, there was no testimony concerning whether or not the amount of memorandum transactions was a substantial amount of the Debtor's business, which business included retail non-custom jewelry sales.

*Id.* at 94 n.7 (emphasis added).

51.     Other bankruptcy courts in the Fourth Circuit have likewise declined to permit consignors to avail themselves of such an exception. In *In re Russel*, a bank's actual knowledge of a consignment relationship alone was not enough to upset the priority rules to preclude it from asserting rights against the consignor when the bank did not engage "in any affirmative conduct to promote those arrangements or lull the consignors to fail to protect themselves." *Russell v. Mountain Nat'l Bank (In re Russell)*, 254 B.R. 138, 140–41 (Bankr. W.D. Va. 2000)(holding that a bankruptcy trustee's rights in consigned inventory are superior to rights of any consignors who have not filed financing statements when those consignors do not prove the generally known/substantially engaged exception to former UCC § 2–326(3)).

52.     Maryland's rejection of the "actual knowledge" exception is consistent with the statutory text of the UCC, the approach recommended by the Permanent Editorial Board for the UCC, and the UCC's Official Commentary. Consignment Vendors identify no Maryland authority

recognizing an actual knowledge exception to the UCC's priority rules in the context of consignment and this court should follow the controlling authority of *Creative Goldsmiths*.

53. The Lender represents only one of the Debtors' creditors with actual knowledge that the Debtors engaged in consignment transactions (although not alleged with specificity as to each Vendor agreement) and therefore is insufficient alone to prove that most of the Debtors' creditors were aware that Debtors were substantially engaged in selling the goods of others.

**D.** **The Consignment Vendors Must Prove That Majority of Debtors' Creditors Generally Knew That Debtors Were Substantially Engaged In Sale Of Consigned Inventory**

54. The Consignment Vendors can only defeat the priority of Lender's and Debtors' interests in the Consigned Inventory by proving by a preponderance of the evidence that: (1) is it "generally known" by the Debtors' creditors that Debtors were substantially engaged in selling the goods of others, and (2) the Debtors were substantially engaged in consignment sales. Consignment Vendors must establish both prongs.

55. To satisfy the "generally known" prong of the test, Consignment Vendors need to prove that a majority of Debtors' creditors were aware that Debtors' were substantially engaged in selling the goods of others on consignment. Majority is determined by the number of creditors, not by the amount of creditors' claims. *See In re Downey Creations, LLC,* 414 B.R. at 472 ("Plaintiffs must show that a majority of the 91 creditors listed on [debtor's] bankruptcy schedules knew that [debtor] was substantially engaged in selling the goods of others."); *In re BRI Corp.,* 88 B.R. 71, 75 (Bankr. E.D. Pa. 1988) (finding that evidence of 250 out of 600 suppliers knew the consignee was substantially engaged in the business of selling goods of other was not sufficient, requires more than 50% of creditors); *Quaker City Iron Works, Inc. v. Ganz (In re Wicaco Mach. Corp.)*, 49 B.R. 340, 344 (E.D. Pa 1984) (holding that 20% of creditors knowing of consignment

relationship does not satisfy general knowledge requirement, notwithstanding that such creditors represented 63% of claims against debtor).

56.     The appropriate inquiry before this Court is to determine what percentage of outside creditors were aware of the Debtors' consignment sale practices, exclusive of the Consignment Vendors' knowledge. *In re Valley Media, Inc*., 279 B.R. at 132 ("Case law also suggests that the Consignment Vendors are not the creditors who should be protected under the applicable UCC provisions and thus should be excluded from the calculation."); *In re Downey Creations, LLC*, 414 B.R. at 472 ("Even if a given creditor knew—by virtue of its own transactions with [the debtor]—that [the debtor] was engaged in selling the goods of others, it does not necessarily follow that the creditor knew that [the debtor] was substantially engaged in selling others' goods.").

57.     Contrary to Consignment Vendors' arguments, common knowledge of custom in the Debtors' industry is not determinative or probative of whether the majority of the Debtors' creditors were aware the Debtor was substantially involved in selling Consigned Inventory. *See* Consignment Group Obj., ¶ 4.; Cryptozoic, Obj. [D.I. 606].

58.     Bankruptcy courts, including this Court, have held that the general knowledge regarding custom in the industry *has not* been sufficient to satisfy the "generally known" test. *See In re Creative Goldsmiths*, 178 B.R. at 93 ("The evidence presented by [consignor] merely demonstrates that the [consignors] themselves knew that diamonds were usually transferred pursuant to a [] consignment agreement, as opposed to whether most of Debtor's creditors."); *In re Downey Creations, LLC,* 414 B.R. at 471 ("Testimony as to general knowledge in the industry is insufficient to prove knowledge by a majority of creditors.").

59.     To satisfy the "substantially engaged" prong of the test, courts typically recognize that consignees are not considered to be "substantially engaged" in selling the goods of others

unless they hold at minimum of 20% of the value of its inventory on a consignment basis. *In re TSAWD Holdings, Inc.,* 601 B.R. at 606 ("The minimum threshold for substantial engagement is 20% of consigned goods."); *In re Valley Media, Inc.,* 279 B.R. at 132 (holding that a debtor with 17.03% of its inventory sold on consignment does not qualify as being "substantially engaged" in selling the goods of others).

60.    *Valley Media* is instructive to this case. In *Valley Media*, the debtor moved the bankruptcy court to sell its inventory, including consignment inventory held by its wholly owned division ("<u>DNA</u>"), at auction. *In re Valley Media, Inc.,* 279 B.R. at 132–33. On the petition date, the Debtor had in its possession approximately $108 million of inventory of which consigned goods accounted for less than 15% of the debtor's total inventory base. *Id.* at 118. Debtor's DNA division had supplied approximately $26.3 million worth of debtor's inventory, which roughly $15.7 million (63%) of that $26.3 million of inventory was held on a consignment basis as of filing. *Id.* at 119. Various consignment vendors of DNA, who failed to file UCC financing statements to perfect their interests in consigned goods, objected to the sale motion and argued that for purposes of whether the "generally known/substantially engaged" test the percentage calculation should treat DNA as a separate entity. *Id.* at 126–29.

61.    The court disagreed and applied the exception as to the debtor's inventory base in its entirety. *Id.* 131. The court overruled the consignors' objections to the sale motion because they failed to show that a majority of the debtor's creditors, including trade creditors, equipment vendors, travel agents and insurance carriers and other creditors, knew of the consignment sales to debtor, and could not establish the 20% for substantially engagement. *Id.* 131–32. The court granted the debtor's motion to sell consignment inventory due to the debtor-in-possession's rights

as a hypothetical judicial lien creditor pursuant to 11 U.S.C. §§ 544(a)(1) and 1107(a). *Id.* at 132–33.

62.     Accordingly, the appropriate inquiry before this Court is (1) what percentage of all Debtors' inventory was comprised of consignment inventory, and (2) what percentage of outside creditors were aware of the Debtors' consignment sale practices. These calculations must be based on counting the Lender as one relevant creditor with knowledge (instead of declaring this prong is satisfied based on Lender's knowledge alone) and must likewise be exclusive of the Consignment Vendors' knowledge. Lender submits that Consignment Vendors will not be able to satisfy their threshold burden under the second prong of § 9-102(a)(20)(A)(iii).

### E.      Article 2 of the UCC Does Not Apply to the Consignment Agreements

63.     Consignment Vendors argue that, because ownership and title never passed to the Debtors, the Debtors have no right to sell the Consigned Inventory. *See* Consignment Group Obj., ¶ 1; Ad Hoc Committee Obj., ¶ 23; Humanoids Obj. [D.I. 598]. Consignment Vendors' factual allegations in their relative Objections on their face demonstrate that the Vendor Agreements are incompatible with Article 2 of the UCC's statutory requirements and likewise do not govern their interests in the Consignment Inventory. Section 9-109 provides that Article 9 applies to consignments. Md. Code Ann., Com. Law § 9-109(a)(4). The Maryland Comments to section 2-326 provides that "[c]ertain consignment transactions were dealt with in Sections 2-326(3) and 9-114. These provisions have been deleted and have been replaced by new provisions in Article 9. *See e.g.,* sections 9-109(a)(4); 9-103(b); 9-319." Md. Code Ann., Com. Law § 2–326(3), cmt. 4; *see also* UCC § 2–326(3), cmt. 4.

64.     Although both a consignment and a sale or return may allow for the return of delivered goods, the economic realities of the two transactions differ in ways that render them

mutually exclusive. A sale or return is a sale pursuant to which the ***buyer*** becomes the owner to whom ***title*** is transferred, despite its right to return the goods and to transfer ownership back to the seller. *See* Md. Code Ann., Com. Law § 2–106(1)("A 'sale' consists in the passing of title from the seller to the buyer for a price."). "In a "sale or return" transaction, the buyer becomes the owner of the goods, and the seller may obtain an enforceable security interest in the goods only by satisfying the requirements of Section 9-203." Md. Code Ann., Com. Law § 9-109, cmt. 6; *see also* Md. Code Ann., Com. Law § 2-326(1), cmt. 1 ("A sale or return is a present sale of goods which may be undone at the buyer's option.").

65.     In contrast, consignment transactions involve a type of bailment for the purpose of sale in which the goods are entrusted to the consignee for sale ***without*** transference of ***title*** and ownership.[8] Title in consigned goods passes to the customer upon sale. *See* U.C.C. § 9-320(a); *see also* U.C.C. § 9-319(a), cmt. 2 ("9-317, 9-315, and 9-310 determine whether a buyer takes free of the consignor's interest in consigned goods."). Here, the Consignment Agreements are no different, as Consignment Vendors not only acknowledge, but emphasize the transfer of title in their Objections.

66.     While most courts have treated consignments distinctly from "sale or return" transactions, as expressed in the UCC and Official Comments, certain Consignment Vendors cite as support the case of *In re Morgansen's Ltd.* 302 B.R. 784 (Bankr. E.D.N.Y. 2003). In *Morgansen's Ltd.,* a bankruptcy court found that a consignment transaction that did not qualify as an Article 9 consignment and should instead be subject to analysis under revised section 2-326. *Id.* at 789.

---

[8] See UCC § 2-326(1), cmt. 4 ("Transactions in which a non-buyer takes delivery of goods for the purpose of selling them are bailments called consignments and are not "sale on approval" or "sale or return" transactions.").

67.     The Permanent Editorial Board's commentary referenced *In re Morgansen* as a court "missing the essential point" in the revised UCC. *See* PEB Commentary No. 20, at 4. The PEB asserted that "[r]ather than applying the common law, the court erroneously turned to § 2-326 and concluded that "the goods consigned to the debtor clearly were delivered on a 'sale or return' basis." *Id.* at 4, n. 22. In sum, the statutory predicates of Article 9 do not turn a consignment agreement into a purchase and sale agreement. As the *Valley Media* court noted, the status granted to consignment transactions regarding the transfer of title is simply a fiction for determining the rights of the parties. *In re Valley Media*, 279 B.R. at 124.

### i.     Consignment Vendors' Purported Retention of Title Is Immaterial for Determining Whether Consignment Inventory Is Property of Estate

68.     Consignment Vendors asserted that because the Vendor Agreements provide for Consignment Vendors to retain title to the Consigned Inventory, the Consigned Inventory cannot be considered property of the Debtors' bankruptcy estate. Consignment Vendors' purported retention of ownership is simply immaterial to the outcome of their dispute with the Debtors' estate.

69.     First, the UCC makes clear that whenever a seller purports to retain title to goods delivered to the buyer, the retention of title will be disregarded and instead the seller's interest in the delivered goods will be deemed to be that of a security interest. Section 2-402(1) provides in relevant part:

> **Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest**. Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

Md. Code Ann., Com. Law § 2-401.

31

70.     Section 2-401 operates to convert any attempt by a seller to retain or reserve title in goods shipped or delivered into the reservation of a security interest as a matter of law. In other words, there is no legal significance to Consignment Vendors' purported retention of title. *See* Md. Code Ann., Com. Law § 9-202 (Title to Collateral Immaterial); *see also In re Pettit Oil Co.*, 917 F.3d at 1135–36 ("Retention of title affects the remedies [consignor] could employ to recover the goods in the event of default, but title is irrelevant to whether [consignor] or the Trustee has priority in the goods and proceeds.").

71.     Second, courts have refused to permit consignors' subjective characterization of transactions to subvert the mandate of commercial law. *See Clean Burn Fuel, LLC v. Purdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 492 B.R. 445, 459 (Bankr. M.D.N.C. 2013)("Even if the parties agreed by contract that title to the goods remains with the seller and the buyer had no interest in owning the goods, the most that a seller can retain in the delivered goods is a security interest."); *Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Fam. Corp.)*, 407 B.R. 65 (Bankr. D. Vt. 2009) ("The holdings in [bankruptcy] cases [discussing reservation of title] are uniform: pursuant to § 2-401, title passes to the buyer upon delivery of the goods, and the seller's interest is limited to a reservation of a security interest, notwithstanding any contractual agreement between the parties that the seller will retain title.").

**F.     The Debtors Are Permitted to Sell the Consigned Inventory Under 11 U.S.C. § 363**

     **i.     A "Bona Fide Dispute" Exists Regarding Consignors' Interests in the Consigned Inventory**

72.     Subsections (b) and (c) of Section 363 allow, subject to the provisions of Section 363, for sales by the Debtors of "property of the estate," free and clear of any interest in such property of any entity other than the estate. 11 U.S.C. § 363(b), (c). Section 363(f)(4) permits a sale free and clear of an interest if "such interest is in bona fide dispute." 11 U.S.C. § 363(f)(4).

Bankruptcy courts have held that the standard for determining if such a *bona fide* dispute exists is, whether "there is an objective basis for either a factual or a legal dispute as to the validity of the asserted interest." *In re L.L. Murphrey Co.*, No. 12-03837-8-JRL, 2013 WL 2451368, at *4 (Bankr. E.D.N.C. June 6, 2013). "T]he propriety of the lien does not necessarily have to be the subject of an immediate or concurrent adversary proceeding." *Id.* (citing *In re Collins*, 180 B.R. 447, 452, n. 8 (Bankr. E.D. Va. 1995)).

73.     As relied on by the Consignment Vendors, the *Valley Media* court specifically held that the rights of the debtors under Section 544 trumped the rights of the consignors: "the Objecting Vendors may not assert ownership rights in the Contested Inventory against the Debtor in Possession **as a hypothetical lien creditor of [the debtor]** pursuant to 11 U.S.C. §§ 544(a) & 1107(a)." *Id.* at 132 (emphasis added). Further, the court recognized that "[c]ourts concur that the consignor holds an unsecured claim against the Debtor as a result of the 11 U.S.C. § 544(a)(1) action, ***regardless of whether they consider that the inventory has become property of the estate***." *Id.* at 133, n. 58 (emphasis added). Thus, the consignment vendors were left with, at most, general unsecured claims of equal priority with the Debtors' other trade creditors.

74.     Pursuant to section 362(p)(2) of the Bankruptcy Code, the *Consignors* bear the burden of proving their alleged interest in the Consigned Inventory. 11 U.S.C. § 363(p)(2) ("In any hearing under this section . . . the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."). Even if the Debtors' rights in the Consigned Inventory under the consignment agreements and the UCC did not satisfy the "property of the estate" requirements of subsections (b) and (c) of Section 363, the Consigned Inventory may be sold free and clear of the Consignment Vendors' claimed interests because the

claimed interests of the Consignment Vendors in the Consigned Inventory are subject to challenge under state law and avoidable pursuant to 11 U.S.C. § 544 of the Bankruptcy Code.

75.     While the Consignment Vendors are certainly entitled to their day in court on the question of whether the Debtors were generally known by their creditors to be in the business of selling the goods of others, the Consignors have the burden of proof on that critical issue, and have yet to adduce anything close to sufficient competent evidence to carry that burden.  In short, the "generally known" issue is very much live and in dispute.

76.     The Lender firmly contends that, as a consequence of the Consignors' failure to comply with provisions of the UCC that provide for the protection of Article 9 consignors, their interests are relegated to that of an unsecured creditor. *See In re Niblett*, 441 B.R. 490, 492–93 (Bankr. E.D. Va. 2009) ("The trustee's rights are superior to those of the consignor. The trustee has the right to sell property consigned to a debtor and use the proceeds to pay creditors who file proofs of claims."); *In re Pettit Oil Co.*, 917 F.3d at 1135 ("The perfection and priority rules— which require that the consignor publicly announce its interest in the consigned goods or else go to the back of the line when the consignee goes bankrupt— serve to protect unwary creditors and prevent "secret liens" in the goods that might otherwise dissuade such lending.");  *Rayfield Inv. Co. v. Kreps*, 35 So. 3d 63 (Fla. Dist. Ct. App. 2010)("The rules for acquiring and enforcing security interests were not written to permit individualized justice and equity contrary to their requirements. It would not be much of a uniform code, for example, if legal rules on sales rights and remedies transformed themselves from case to case… or that priorities of security interests were adjustable depending on whose individual circumstance is more sympathetic.").

77.     Thus, the interest of the Lender and Debtors (as hypothetical lien creditor) in the Consigned Inventory is superior to the interest of the Consignment Vendors. Consignment

34

Vendors can only avoid this outcome by establishing that their purported interests in the Consigned Inventory fall under the exception under § 9-102(a)(20)(A)(iii).

78.    Whether the consignment agreements are governed by Article 9 and or Maryland common law presents an objective basis for both a factual and legal dispute as to the validity of the Consignment Vendors' interests as subordinate to the Debtors and Lender's. At a minimum, the facts and applicable law demonstrate that a *bona fide* dispute exists concerning the interests in the Consigned Inventory as reflected in the numerous objections filed by the Consignment Vendors. Thus, section 363(f)(4) of the Bankruptcy Code permits the Debtors to continue to sell the Consigned Inventory free and clear of any interests therein. *See e.g. In re Collins,* 180 B.R. at 452 (holding that court need not resolve the dispute, just determine its existence); *In re DVI, Inc*., 306 B.R. 496, 504 (Bankr. D. Del. 2004) (citing *In re Wells*, 296 B.R. 728, 734 (Bankr. E.D. Va. 2003) (holding that trustee could sell property free and clear of equitable interest in property with interest to attach to proceeds); *In re Bedford Square Assocs., L.P.*, 247 B.R. 140, 145 (Bankr. E.D. Pa. 2000) (permitting sale under § 363(f)(4) because debtor's asserted right to commence strong-arm proceeding to avoid interest created a bona fide dispute); *In re Surplus Furniture Liquidators, Inc.,* 199 B.R. 136, 145 (Bankr. M.D.N.C. 1995) (permitting sale under § 363(f)(4) where equitable lien was disputed).[9]

---

[9] Because there is nothing unique about the Consigned Inventory, and because the proceeds of the Consigned Inventory will be reduced to cash, the Consignment Vendors could assert their property rights against the proceeds, rather than the Consigned Inventory, itself.  It can therefore also be argued that the sale of such Consigned Inventory is authorized under 11 U.S.C. §363(f)(5).

## **CONCLUSION**

The Consignment Vendors' position cannot be squared with the revised UCC's determination that almost all consignment transactions are covered by Article 9.  The Consignors likewise largely rely on outdated and out-of-circuit authority. Setting aside these obsolete cases, there is one fact issue to be decided: whether the consignments qualify for the exception to Article 9 and are governed by Maryland common law (unless state law other than Article 9 applies). The Consignment Vendors bear the burden of proving that the validity of their interest is not subordinate to Lender's under 11 U.S.C. § 363(p)(2) and UCC § 9-102(a)(20)(A) (iii).  At a bare minimum, there are substantial and *bona fide* disputes that justify the sale of the consigned goods *now* pursuant to 11 U.S.C. §363(f)(4).

This is a case where there is an urgent need to monetize the Debtors' assets. The Debtors' liquidity needs in this case have been substantial.  The Debtors' operating assets have now been sold, so there is no longer consistent and predictable incoming revenue.  At the same time, these estates are accruing ongoing administrative expense liabilities.  Any further delay in monetizing the Consigned Inventory in dispute, coupled with ongoing costs associated with storing those goods, would only diminish the potential recovery to the Consignment Vendors.

**WHEREFORE**, Lender respectfully requests that the Court enter an order (i) granting the Debtors' Consignment Sale Motion; (ii) overruling each of the Consignment Vendors' Objections to the Consignment Sale Motion, and (iii) granting such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

DATED: August 14, 2025

/s/ *Toyja E. Kelley*
Jonathan W. Young (admitted *pro hac vice*)
Toyja E. Kelley (Bar No. 26949)
Indira K. Sharma (Bar No. 28269)
Katherine E. Culbertson (admitted *pro hac vice*)
**TROUTMAN PEPPER LOCKE LLP**
701 8th Street, N.W., Suite 500
Washington, D.C. 20001
Toyja.Kelley@troutman.com
Indira.Sharma@troutman.com
Jonathan.Young@troutman.com
Katherine.culbertson@troutman.com

## CERTIFICATE OF SERVICE

I, Toyja E. Kelley, hereby certify that, on the 14th day of August, 2025, I caused a true and correct copy of the foregoing *Memorandum of Points and Authorities* to be filed and served via CM/ECF on all parties who have registered for electronic service in these cases.

/s/ *Toyja E. Kelley*

145780256v5