**<u>Exhibit A</u>**

**August 5, 2025 Status Conference Transcript**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

IN RE:                              .        Chapter 11
                                    .
Diamond Comic Distributors,        .
Inc.,                               .
                                    .
            Debtor.                 .        Bankruptcy #25-10308 (DER)
.........................................................

Baltimore, Maryland
August 5, 2025
10:07 a.m.

BEFORE THE HONORABLE DAVID E. RICE
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

TRANSCRIPT OF:

[531]  DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING (I)
PROCEDURES FOR SALE OR OTHER DISPOSITION OF CONSIGNED
INVENTORY, (II) APPROVING SALES OR OTHER DISPOSITION OF
CONSIGNED INVENTORY FREE AND CLEAR OF LIENS, CLAIMS, INTEREST
OR ENCUMBRANCES AND (III) GRANTED RELATED RELIEF FILED BY
DIAMOND COMIC DISTRIBUTORS, INC..

[578]  OBJECTION ON BEHALF OF TWOMORROWS PUBLISHING FILED BY
TWOMORROWS PUBLISHING

[585]  OBJECTION FILED BY MOLTEN CORE MEDIA, LLC DBA MAGMA
COMIX

[586]  OBJECTION ON BEHALF OF GRAPHITTI DESIGNS FILED BY
GRAPHITTI DESIGNS

[589]  OBJECTION FILED BY ABSTRACT STUDIO, INC.

[590]  EXPEDITED MOTION DEBTORS EXPEDITED MOTION TO ADJOURN
THE JULY 21, 2025 HEARING ON DEBTORS MOTION FOR ENTRY OF AN
ORDER (I) APPROVING PROCEDURES FOR SALES OR OTHER DISPOSITION
OF CONSIGNED INVENTORY, (II) APPROVING THE SALES OR OTHER
DISPOSITION OF CONSIGNED INVENTORY, AND (III) GRANTING RELATED
RELIEF FILED BY DIAMOND COMIC DISTRIBUTORS, INC.

[592]  JOINDER OF IMAGE COMICS, INC. TO DEBTOR'S EXPEDITED MOTION TO ADJOURN THE HEARING ON DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING PROCEDURES FOR SALES OR OTHER DISPOSITION OF CONSIGNED INVENTORY, (II) APPROVING THE SALES OR OTHER DISPOSITION OF CONSIGNED INVENTORY, AND (III) GRANTING RELATED RELIEF ON BEHALF OF IMAGE COMICS, INC. FILED BY ELIZABETH ANNE SCULLY

[595]  OBJECTION FILED BY NBM PUBLISHING INC.

[596]  OBJECTION FILED BY WILLIAM M. GAINES, AGENT, INC

[598]  OBJECTION ON BEHALF OF HUMANOIDS, INC. FILED BY DAREK BUSHNAQ

[601]  OBJECTION ON BEHALF OF AD HOC COMMITTEE OF CONSIGNORS FILED BY CATHERINE KELLER HOPKIN

[602]  OBJECTION ON BEHALF OF THE GAME MANUFACTURERS ASSOCIATION AND CERTAIN MEMBERS FILED BY SAM ALBERTS

[603]  OBJECTION ON BEHALF OF VAULT STORYWORKS, LLC A/K/A VAULT COMICS F/K/A CREATIVE MIND ENERGY, TITAN PUBLISHING GROUP, LTD., THE PENN STATE UNIVERSITY A/K/A GRAPHIC MUNDI, PUNK BOT COMIC BOOKS, LLC A/K/A ALIEN BOOKS, PANINI UK, LTD., ONI-LION FORGE PUBLISHING GROUP, LLC F/K/A ONI PRESS, MASSIVE PUBLISHING, LLC, MAGNETIC PRESS, LLC, HEAVY METAL INTERNATIONAL, LLC, DYNAMIC FORCES, INC. A/K/A DYNAMITE ENTERTAINMENT, DSTLRY MEDIA, INC., BLACK MASK STUDIOS, LLC, ASPEN MLT, LLC /A/KA ASPEN COMICS FILED BY CRAIG PALIK

[604]  RESPONSE ON BEHALF OF ASPEN MLT, LLC /A/KA ASPEN COMICS, BLACK MASK STUDIOS, LLC, DSTLRY MEDIA, INC., DYNAMIC FORCES, INC. A/K/A DYNAMITE ENTERTAINMENT, HEAVY METAL INTERNATIONAL, LLC, MAGNETIC PRESS, LLC, MASSIVE PUBLISHING, LLC, ONI-LION FORGE PUBLISHING GROUP, LLC F/K/A ONI PRESS, PANINI UK, LTD., PUNK BOT COMIC BOOKS, LLC A/K/A ALIEN BOOKS, THE PENN STATE UNIVERSITY A/K/A GRAPHIC MUNDI, TITAN PUBLISHING GROUP, LTD., VAULT STORYWORKS, LLC A/K/A VAULT COMICS F/K/A CREATIVE MIND ENERGY FILED BY CRAIG PALIK

[606]  OBJECTION FILED BY CRYPTOZOIC ENTERTAINMENT, LLC

[611]  RESERVATION OF RIGHTS AND LIMITED OBJECTION ON BEHALF OF JPMORGAN CHASE BANK, N.A. FILED BY TOYJA E. KELLEY SR

[612]   OBJECTION ON BEHALF OF IMAGE COMICS, INC. FILED BY
ELIZABETH ANNE SCULLY

[623]   OBJECTION FILED BY WILLAIM M. GAINES, AGENT INC.

[653]   RESPONSE ON BEHALF OF UNSECURED CREDITORS COMMITTEE
FILED BY DENNIS J. SHAFFER

[674]   OBJECTION ON BEHALF OF CHRIS ROBINSON FILED BY CHRIS
ROBINSON

APPEARANCES:

| | |
|---|---|
| For The Debtor: | Paige N. Topper, Esq.<br>Saul Ewing, LLP<br>1201 North Market St.-Ste. 2300<br>Wilmington, DE 19899 |
| | Adam H. Isenberg, Esq.<br>Saul Ewing, LLP<br>Centre Square West<br>1500 Market St.-38th Fl.<br>Philadelphia, PA 19102 |
| | Ashley N. Fellona, Esq.<br>Saul Ewing, LLP<br>1001 Fleet St.-9th Fl.<br>Baltimor, MD 21202 |
| For Unsecured Creditor's Committee: | Dennis J. Shaffer, Esq.<br>Tydings & Rosenberg<br>1 E. Pratt St.-Ste. 901<br>Baltimore, MD 21202 |
| For Creditor, JPMorgan Chase Bank: | Jonathan W. Young, Esq.<br>Troutman Pepper Locke, LLP<br>701 8th St., NW, Ste. 500<br>Washington, DC 20001 |
| For Ad Hoc Committee of Consignors: | Catherine K. Kopkin, Esq.<br>YVS Law, LLC<br>185 Admiral Cochrane Dr.<br>Ste. 130<br>Annapolis, MD 21401 |

4

| | |
|---|---|
| For Game Manufacturers Association and certain of its members: | James Irving, Esq. 3500 PNC Tower 101 South Fifth Street Louisville, KY 40202 |
| For Heavy Metal International, LLC: | Craig Palik, Esq. McNamee Hosea 6404 Ivy Lane-Ste. 820 Greenbelt, MD 20770 |
| For Image Comics, Inc.: | Adam Fletcher, Esq. Baker & Hostetler LLP Key Tower 127 Public Square - Ste. 2000 Cleveland, OH 44114 |
| | Jason F. Hoffman, Esq. Baker & Hostetler LLP 1050 Connecticut Ave., NW Ste. 1100 Washington, DC 20036 |
| Audio Operator: | Cherita Scott |
| Transcribing Firm: | Writer's Cramp, Inc. 1027 Betty Lane Ewing, NJ 08628 609-588-8043 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1           THE CLERK:  The United States Bankruptcy Court for

2    the District of Maryland is now in session, the Honorable

3    Chief Judge David E. Rice presiding.  Please be seated and

4    come to order.  On the 10 o'clock Docket, calling the case of

5    Diamond Comic Distributors, Inc., case #25-10308.  Counsels,

6    please identify yourselves and your clients for the record.

7           MS. TOPPER:  Good morning, Your Honor.  For the

8    record, Paige Topper with Saul Ewing on behalf of the Debtors.

9    With me in the courtroom today are my colleagues, Adam

10   Eisenberg and Ashley Fellona, as well as the Debtor's Chief

11   Restructuring Officer, Mr. Robert Gorin.

12          THE COURT:  Good morning to all of you.

13          MR. YOUNG:  Good morning, Judge.  Jonathan Young

14   from Troutman Pepper Locke.  I represent JPMorgan, the DIP

15   Lender.

16          THE COURT:  Good morning.

17          MR. SHAFFER:  Good morning, Your Honor.  Dennis

18   Shaffer of Tydings & Rosenberg on behalf of the Official

19   Committee of Unsecured Creditors.

20          THE COURT:  Good morning to you.

21          MS. HOPKIN:  Good morning, Your Honor.  Catherine

22   Hopkin with YVS Law.  I represent the Ad Hoc Committee of

23   Consignors.

24          THE COURT:  Good morning.

25          MR. IRVING:  Good morning, Your Honor.  Jim Irving

1    of Dentons on behalf of the Game Manufacturers Association and

2    certain of its members.

3              THE COURT:  Good morning.

4              MR. FLETCHER:  Good morning, Your Honor.  Adam

5    Fletcher of Baker & Hostetler.  With me is my colleague, Jason

6    Hoffman, my local counsel, and we are here on behalf of Image

7    Comics.

8              THE COURT:  Good morning.

9              MR. HOFFMAN:  Good morning, Your Honor.

10   (Indiscern.).

11             MR. PALIK:  Good morning, Your Honor.  Craig Palik

12   on behalf of 14 Consignment Creditors.

13             THE COURT:  Good morning.  Well, we're here for a

14   status conference on the Debtor's Motion to, shall we just

15   refer to it as Sell Consignments Inventory generally.  Let me

16   turn first to you, Ms. Topper.  Has there been any progress in

17   trying to figure out how to schedule this matter?

18             MS. TOPPER:  Thank you, Your Honor.  For the record

19   again, Paige Topper on behalf of the Debtors.  And yes, I

20   would like to present the Court with sort of a brief overview

21   of where we've been and what we've been up to since the July

22   17th hearing.  So, we are here today, Your Honor, for a status

23   and scheduling conference, as you mentioned, regarding what

24   I'll refer to as the Debtor's Consignment Motion.  That

25   Consignment Motion was filed on June 25th.  So, a little over

1    a month ago at this point, the motion in particular seeks

2    Court approval of procedures relating to the sale and other

3    disposition of consigned inventory, as well as approval of the

4    ability for the Debtors to close on the ultimate sales of such

5    inventory.

6        The objection deadline for that motion was July 16th.

7    The Debtors received a number of objections, as the Court is

8    aware, to the Consignment Motion, both on and before the

9    objection deadline.  Recognizing around the time a few days

10   prior to the objection deadline, recognizing that more time to

11   address and potentially resolve the objections would be

12   beneficial to all parties, and in an attempt to accommodate

13   the requests of certain objecting parties, the Debtors filed a

14   Motion to Adjourn the original hearing scheduled for the

15   Consignment Motion.  So, on July 17th, my colleague Mark

16   Minuti and others were before this Court on that hearing with

17   respect to the Debtor's Motion to Adjourn.  Several Objectors

18   appeared at the hearing.  The hearing was conducted by Zoom.

19       At the hearing, none of the Objectors at that time argued

20   for an indefinite Stay of the Debtor's Consignment Motion.

21   Rather, what the Debtor -- what the Objectors, excuse me, were

22   arguing was that the Consignment Motion should be set for a

23   hearing at least 60 to 90 days out because they argued that

24   significant discovery needed to be done before the Court could

25   hear the motion.  In fact, counsel for the Ad Hoc Committee

1  recognized the need, and in her words, to scramble to try to
2  get discovery served out immediately.

3  In response at that hearing, my colleague Mr. Minuti
4  noted that the Debtors hoped that the parties could stipulate
5  to certain facts and that if discovery was necessary and the
6  Objectors did elect to serve such discovery, then the Debtors
7  would do their best to accommodate the discovery request as
8  quickly as possible during the adjournment period before the
9  hearing on the motion.  So, based on the Objectors' arguments,
10  the Court decided not to schedule the hearing on the
11  Consignment Motion as requested originally by the Debtors in
12  their Motion to Adjourn, but instead set today's status and
13  scheduling conference for the Debtors to provide an update as
14  well as for the parties to discuss with the Court when this
15  matter should be scheduled for a hearing and how the parties
16  anticipate that hearing to proceed.

17  So, where are the parties in terms of information
18  requests and discovery?  Since the July 17th hearing, despite
19  the statements made on the record at that hearing regarding
20  the need for significant discovery, none of the Objectors have
21  sought formal discovery in connection with the Debtors'
22  Consignment Motion.  What the Debtors have received are
23  informal information requests from certain Objectors,
24  including, among others, the Ad Hoc Committee.  And in
25  response to those information requests, the Debtors have

1   provided the requested information promptly.  This information

2   largely encompasses a number of things, but the point being,

3   Your Honor, that the Debtors are engaging with the Objectors

4   and have responded to the informal request, you know, as

5   promptly as possible.

6        In discussions with certain Objectors, the issue of

7   whether the Debtors are continuing to sell consigned inventory

8   today has been raised.  So, I want to be very clear for the

9   record that the Debtors are not currently selling consigned

10   inventory, and they have not sold any consigned inventory

11   since the closing date of the sales of substantially all

12   assets to the two purchasers, Universal and Sparkle Pop.  The

13   Debtors have become aware of the fact that Sparkle Pop, one of

14   the purchasers of some of the Debtors' assets, has been

15   selling consigned inventory on or after May 16th.  The Debtors

16   promptly notified Sparkle Pop, both the principals at Sparkle

17   Pop and Sparkle Pop's counsel, to immediately stop any sales

18   as to the consigned inventory because consigned inventory was

19   explicitly excluded from the acquired assets under that APA.

20        The Debtors have sent several written communications to

21   Sparkle Pop's counsel and have verbally informed both the

22   principals at Sparkle Pop and their counsel that they're not

23   to be selling the consigned inventory, that it's in violation

24   of the APA, and the Debtors have demanded that the proceeds of

25   any such sales be remitted back to the Estates.  Sparkle Pop

1   has yet to respond to the Debtors' various outreach.  However,

2   the Debtors are aware of the issue.  We're not hiding the ball

3   there.  The Debtors continue to raise this issue with Sparkle

4   Pop and will continue to take the appropriate action to

5   recover amounts realized by Sparkle Pop from the sale of any

6   inventory on or after May 16th.  So, this has been a topic in

7   the informal discussions.  The Debtors have provided

8   information on this topic as it has been requested to the

9   objection -- to -- as it has been requested by the objecting

10  parties.  So, we're aware of it.  We're working to resolve it.

11  We're providing the information relating to that issue as it's

12  requested.

13       In addition to responding to the information request that

14  the Debtors have been receiving, the Debtors have spent time

15  preparing a proposal for a potential resolution of the

16  objections to the Consignment Motion.  That proposal has been

17  shared with the significant Objectors, including, among

18  others, the four Objectors or groups of objecting parties that

19  are here in-person before the Court today.  And it includes

20  sort of two alternative proposals for a resolution.  I'm not

21  going to get into them in detail because they are the subject

22  of settlement discussions.  But the Debtors did invite the

23  parties to engage in those discussions, engage in discussions

24  related to the proposal.  No Objector has taken the Debtors up

25  on their offer in a substantive way.  We did receive a

1    response from one of the objecting parties, a counteroffer, if
2    you will, this morning at 9 a.m.  So, we are reviewing that
3    and we will continue to review that later today.

4         In response to certain of the objections, the Debtors
5    also undertook an analysis of their sales of consigned and
6    non-consigned product.  That analysis has likewise been
7    provided to certain Objectors and reflects that less than 20%
8    of the Debtors' sale of inventory is the sale of inventory on
9    consignment.  So, with all of the back and forth and the
10   discussions that have been had in the last two weeks, and
11   quite frankly, the fact that the Debtors have not received any
12   discovery requests in connection with the motion, at this
13   point, the Debtors are ready to proceed with a hearing on the
14   Consignment Motion.  The Debtors don't know exactly why the
15   Objectors have decided not to pursue discovery, especially
16   given the fact that the Objectors mentioned that it was
17   necessary with respect to the Consignment Motion.

18        For some of the Objectors, it may be a combination of
19   realizing that the discovery is either not necessary or is
20   cost-prohibitive in their case.  For other Objectors, like the
21   Ad Hoc Committee, it appears that certain Objectors have made
22   the decision to not pursue discovery in reliance on the legal
23   argument that the Consignment Motion is procedurally improper.
24   This strategy is sort of made clear in the Ad Hoc Committee's
25   Motion for Stay of the Consignment Motion, which is filed at

1    Docket item 649.  I want to briefly touch on it, Your Honor,

2    but I don't want to go into too much detail because that

3    motion is not before the Court today, but it is relevant in

4    discussing the scheduling for the Consignment Motion.

5         So, the Ad Hoc Committee filed a Motion to Stay the

6    Debtors' Consignment Motion on July 24th.  That's a month

7    after the Consignment Motion was filed and a week after the

8    Court scheduled today's status conference.  It hasn't been set

9    for a hearing, and for the most part, the Motion for Stay is a

10   repeat of the Ad Hoc Committee's objection to the Consignment

11   Motion.  The legal arguments that are raised in the Motion to

12   Stay can be considered at -- by the Court at the hearing on

13   the Consignment Motion.  The Debtors' position is that they're

14   con -- we're confident that Maryland's version of the UCC and

15   the case law that the Debtors have cited fully support the

16   relief requested in the Consignment Motion, including the fact

17   that an adversary proceeding is not necessary.  The

18   Consignment Objectors will have a full and fair opportunity to

19   argue otherwise at the hearing on the Consignment Motion.

20        If the consignment vendors have indeed decided to proceed

21   without discovery on the basis that they will prevail on this

22   legal argument, that is their call.  But the fact that the

23   Objectors made a strategic decision to not pursue discovery in

24   connection with the Consignment Motion should not be a basis

25   to delay scheduling a hearing on the Consignment Motion today

1  and shouldn't be a basis to delay a hearing, you know,

2  scheduled for a significant time from today.

3      Other Objectors, Your Honor, seem to be relying on a

4  separate legal argument that the Debtor has the burden of

5  proving the applicability of Article 9 and particularly

6  whether the requirements for the definition of consignment are

7  met under the UCC.  So, the Debtors speculate that perhaps

8  that's why those Objectors have not sought discovery here.

9  The Debtors, of course, disagree and again are confident in

10 prevailing on the issue of which party bears the burden of

11 proving the arrangement with each vendor and whether that

12 arrangement falls under Article 9 of Maryland's version of the

13 UCC.  This is yet another legal argument to be heard in

14 connection with the Consignment Motion and the parties'

15 decisions to not pursue discovery because they believe the

16 other has the burden of proof is a litigation strategy and

17 candidly a risk that should not hold up scheduling the motion

18 in the upcoming weeks.

19     So, to summarize, Your Honor, the argument that the

20 Debtor's motion needs to be scheduled sometime two months or

21 even three months away to accommodate discovery has been

22 proven false by the Objectors' own inaction over the last two

23 weeks.  The consignment vendors, for the most part, are

24 counting on prevailing on certain legal issues related to the

25 Consignment Motion, but these are legal issues and don't

1    require delaying the hearing on the Consignment Motion.  As

2    mentioned on July 17th by my colleague, Mr. Minuti, further

3    delay will prejudice the Debtors, their Estates, and their

4    Creditors.  The disposition of the consigned inventory, as the

5    Court is aware, is a significant part of the remaining steps

6    to be taken in these cases.  The volume of the consigned

7    inventory is significant.  Under the agreement with Sparkle

8    Pop, the Debtors are incurring storage costs associated with

9    storing the consigned inventory at the Olive Branch facility.

10   So, the sooner that the inventory is sold, the sooner the

11   Debtors can decrease the cost to the Estate.

12        As the Court is also aware, the DIP loan with JPMorgan,

13   the Debtor's DIP Lender in these cases, matures on August

14   23rd.  And one of the factors that will certainly play into

15   further negotiations with JPMorgan will be the outcome of the

16   Consignment Motion.  So, further delay is not needed, nor is

17   it necessary or appropriate under the circumstances.  The

18   Objectors are capable of presenting the legal arguments at

19   issue that they are now relying on to defeat the motion.  The

20   Objectors chose not to take discovery in connection with the

21   motion, and that's their prerogative.

22        So, the Debtors would request that the Court schedule a

23   Consignment Motion for the hearing scheduled already in these

24   cases on August 18th.  I believe that's scheduled to start at

25   11 a.m.  At this time, the Debtors intend to call one witness

1    in support of the motion, and that would be Mr. Gorin.  The

2    Debtors believe that their case-in-chief will take

3    approximately four hours.  And that calculates both direct and

4    cross examination of Mr. Gorin, as well as oral argument on

5    the motion.  And to streamline the arguments, I want to point

6    out that the Debtors do intend to file an omnibus reply to the

7    various objections to the Consignment Motion.  And we will

8    plan to file that reply a few days before the hearing on the

9    Consignment Motion.  The Debtors will also file -- plan to

10   file a few days before the hearing that is scheduled an agenda

11   that will reflect the various objections received.  And to the

12   extent that we have a further status update on any one

13   particular objection, we can reflect that in the agenda as

14   well.

15            THE COURT:  All right.  Thank you.

16            MS. TOPPER:  Yep.

17            THE COURT:  Mr. Shaffer, what's the Committee's

18   position on this?

19            MR. SHAFFER:  Good morning again, Your Honor.

20   Dennis Shaffer on behalf of the Committee. The Committee

21   supports, as we noted in our statement and reservation of

22   rights in response to the Debtors' motion, the most

23   expeditious and cost-effective path forward to bring these

24   issues to conclusion, while still providing and protecting the

25   rights of those involved to have fulsome discovery and a full

1   and fair opportunity to present its case.  We think that the
2   Debtors' proposal makes sense to decide the gating issue of
3   whether this needs to proceed by adversary proceeding or
4   contested matter, raised by the Ad Hoc Committee's Stay Motion
5   as well as their response to the Consignment Motion, that that
6   be held on August 18th.  That would keep things moving and put
7   the issue squarely before the Court as to how we're going to
8   move forward without expending an additional extensive amount
9   of time and money getting there.  We don't want the Estate to
10  expend more time and money on this issue than these goods are
11  worth to the Estate, and certainly we don't want to impinge
12  upon the rights of these Unsecured Creditors to have their day
13  in court and argue what they want to with respect to the
14  consigned goods.
15          THE COURT:  Well, Ms. Topper just indicated that the
16  volume of consignment inventory was substantial.  Do you have
17  any -- I mean, your concern about cost makes it seem like
18  maybe substantial is not so large a number.  Do you -- has the
19  Debtor shared with the Committee any evaluation for a quantity
20  information about how much inventory we're talking about?
21          MR. SHAFFER:  We have received some information,
22  Your Honor.  We do have some outstanding information requests
23  that we're waiting to get our arms around the full -- you
24  know, the full issue here as to what is that issue.  We're
25  pushing for that and we --

1            THE COURT:  Has the Debtor shared an analysis of --

2     assuming that the Debtor gets approval to do what it's asking,

3     has the Debtor shared any analysis of what the administrative

4     expense consequences of that would be?  I don't mean

5     professional expenses.  I mean administrative claims created

6     by the sale.

7            MR. SHAFFER:  Your Honor, I don't think we've

8     received that detail.  Ms. Topper can tell me if I'm wrong, if

9     it went to my co-counsel as opposed to me, but I think we're

10    still waiting for the full picture of how this completely

11    impacts the Estate.  The Committee's concern is that if we

12    were to proceed by adversary proceeding on every single one of

13    these, the cost would obviously be astronomical.  But we do

14    understand at the 30,000-foot level that there is a

15    significant amount of money here that would come to the Estate

16    if we could resolve the issues, get these goods sold, and get

17    some money into the Estate with respect to those sales.

18            THE COURT:  I see.  Okay.

19            MR. SHAFFER:  Thank you, Your Honor.

20            THE COURT:  Thank you.  Mr. Young?

21            MR. YOUNG:  Thank you, Your Honor.  JPMorgan is

22    supportive of the Debtor's proposal on scheduling.  I think we

23    appreciate that there are outstanding objections, and we

24    certainly understand our colleagues in the courtroom are

25    entitled to their day in court.  But it seems to us it's a

1    relatively compact set of issues.  There are some procedural

2    gating items, as has been stated.  And the fact questions

3    presented are relatively compact.  As Ms. Topper noted, we all

4    have concern about the impending maturity of the DIP facility,

5    the administrative burn on these Estates, and the need to

6    really administer the balance of this Estate as efficiently

7    and expeditiously as possible.  So, we think an early hearing

8    date accomplishes all of that.

9         Our colleagues in the courtroom can make their arguments.

10   The Debtors can put on their case.  Your Honor will make some

11   threshold rulings.  And I think to have all of that happen

12   before the DIP facility matures would be very useful for

13   everybody.  These are important issues for the remaining

14   administration of this case.  And from JPMorgan's perspective,

15   getting some guidance from the Court at the earliest possible

16   juncture would be very helpful for everybody concerned.

17        THE COURT:  Well, let me ask you this.  Long ago, I

18   was here in this courthouse as the law clerk to the Honorable

19   Harvey Lebowitz, who's overlooking the proceedings here from

20   the wall.  And at that time, it seemed like every other

21   hearing involved application of the Uniform Commercial Code.

22   And when I came back to the bench, I thought that that might

23   continue to be the case.  And to my surprise, I don't think

24   I've had to figure out the application of the Uniform

25   Commercial Code in 14 years and one more than one or two

1    cases.  So, I don't profess to be an expert.  But I'm puzzled

2    about how this Debtor, if the UCC, as I understand what it is,

3    as it applies to consignment, how this Debtor, which was, by

4    all accounts, a major and dominant player in the, let's just

5    call it comic book, industry, and it had 120, by the Debtor's

6    count, I believe, consignment vendors.  How can it be that

7    this Debtor was not known in the trade to be selling goods on

8    consignment from others?  And how could it be that the Lender

9    wasn't aware of that?  And why is this going to take a long

10   period of time to establish at trial?  Why do I need all this

11   evidence?

12          MR. YOUNG:  Well, Your Honor, I think you're

13   highlighting the central factual issue of this hearing, which

14   is whether or not the Debtor was generally known in the

15   industry to be selling consigned goods.  And I'll let Ms.

16   Topper and Mr. Isenberg speak to the Debtor's perspective.  My

17   understanding is Mr. Gorin, from the Debtor's perspective, is

18   the one who can offer evidence as to that -- the composition

19   of the vendor base, who the vendors were, who the Debtor did

20   business with, and so forth.  I would say in response to your

21   overall question, the Debtor had multiple divisions, did

22   business in multiple lines, and had a number of other vendors

23   and customers outside these consignment arrangements.  I would

24   also say to you from our client's perspective that these

25   consignment arrangements were not transparent to the market

1   from our perspective.  Were not open and notorious, and that

2   these were legal arrangements between the parties in the

3   courtroom and the Debtors.  There's no doubt the Debtors were

4   offering, you know, a wide variety of goods in the market.

5        And by the way, Your Honor, we should also note that for

6   purposes of this analysis, you don't just look at Diamond

7   Comics, you also have to look at the Alliance Gaming Division,

8   which I'm advised had virtually no consignment arrangements.

9   So, this is the key issue, factually, Your Honor.  But our

10  understanding is there needs to be a showing that a majority

11  of the Debtor's trading partners were aware of these

12  arrangements, and we don't believe that to be the case.

13  Obviously, the parties have to put on their respective cases,

14  but we understand there to be a substantial basis for finding

15  that the burden hasn't been met and everybody will offer law

16  on this, Your Honor.  But our understanding is it is the

17  consignor's burden and not the Debtor's burden.  Everybody

18  will offer evidence, but burden of proof will be one of the

19  determinations you will make.  And from everything we've seen

20  thus far, we don't believe the Debtor -- or we don't believe

21  the consignors will carry that burden.

22            THE COURT:  Okay.  I understand.

23            MR. YOUNG:  Your Honor, thank you.

24            THE COURT:  Thank you.  Ms. Hopkin?

25            MS. HOPKIN:  Thank you, Your Honor.  Again, on behalf

1   of the Ad Hoc Committee of Consignors.  Your Honor, you just
2   hit the nail on the head with respect to one of the biggest
3   problems with the pending Motion to Sell the Consigned Goods,
4   which is that motion was filed on behalf of all the Debtors.
5   The consigned goods were the party to the Distribution
6   Agreements governing the consigned goods that are the sole
7   property contemplating to be sold by the Debtors.  Those
8   agreements were only with Diamond Distributor, one Debtor.
9   And so, we're not here on factual evidentiary hearing.  But
10  all of this discussion about the, you know, analysis that
11  Debtors counsel did provide earlier this week, which was a
12  three-line analysis, is taking into account all of the
13  Debtor's business.  And yet the owner of the property that is
14  the subject of the Motion to Sell is one Debtor.  And that is
15  the Diamond Comic Distributor Debtor.  That is the party to
16  all of my clients' Distribution Agreements that govern those
17  consigned goods.  But there's a lot to unpack with Ms.
18  Topper's presentation.  We do agree with some of what she
19  said.  There are some inaccuracies with what she said.  But
20  before I get into responses which I'll try to keep succinct,
21  there is another motion that really hasn't been discussed
22  today.  And that is my clients' pending Motion to Compel the
23  Debtor to Assume or Reject their Distribution Agreements.
24  That's been filed at Docket 679.  Your Honor, the Distribution
25  Agreements with my clients and other similar consignors are

1    the only agreement that that permits the Debtor or any party

2    to sell these consigned goods.  So, irrespective of ownership,

3    which is going to be determined by UCC provisions, there is a

4    separate 365 argument here that needs to be decided before

5    anything happens to this property.

6          As we have just become aware since the last time we were

7    with Your Honor, we did ask for informal production of

8    discovery from the Debtor, which we got last week.  When we

9    received that information, it became apparent all of that

10   information only runs through May 15th, which is the day that

11   the sales to Sparkle Pop and Universal closed.  The Debtor has

12   not provided any information for any sales prior -- or

13   subsequent to May 15th, and yet we know there has been a

14   significant, significant amount of property sold by, we

15   believe, Sparkle Prop.  That the Debtor has not produced any

16   information.  Ms. Topper mentioned that there has been a

17   demand made.  Your Honor, when we reviewed the Sale Order and

18   the subsequent -- the Bid Procedures Order, as well as the

19   subsequent Sale Orders approving these sales, in particular to

20   Sparkle Pop, we confirmed that none of my clients' Consignment

21   Agreements had been assigned to any party.

22         So now, Your Honor, it is not true to say my clients have

23   decided not to propound discovery.  We now have a situation

24   where in the last two weeks we have more discovery that we are

25   ready to send out today, frankly, to figure out who is selling

1   my client's property and how they believe they have the
2   authority without it in Order from this Court to do so.
3   Obviously, Your Honor, if there was an assignment of any of
4   those contracts, there needed to be a cure of all amounts due
5   and payable, which did not happen.
6        So, Your Honor, it is my clients' contention that the
7   Motion to Compel Assumption or Rejection should be held first.
8   That's a relatively straightforward matter.  That's a 365
9   issue that really has nothing to do with the UCC issues
10  regarding ownership of the consigned goods.  We have argued in
11  that motion and Your Honor, we're not here today, so I will
12  keep my comments brief.  But we believe that the Debtor has
13  already taken the position in front of Your Honor in the past
14  that a rejection of the contracts, failing the ability to
15  assume and assign, would require a termination of the
16  contracts and return of all of the consigned goods that are
17  sitting in that warehouse.  So, Your Honor, it is our
18  contention that that motion should be resolved first.  That
19  will dictate what happens to this property and what the
20  Debtor's rights and the -- any subsequent third-party
21  assignees' rights are to sell this property.  So, I did want
22  to highlight that that is pending.  We just filed that on
23  Friday.  That should be ripe for decision in the coming weeks.
24       Your Honor, briefly, I will address a few things.  Ms.
25  Topper made much about a presumption that my clients do not

1    intend to take discovery.  Nothing could be further than the

2    truth.  We've been trying to work with the Debtor, given the

3    limited timeline on informal production of information.  As we

4    became aware of serious, significant issues in this case, we

5    have drafted and are ready to propound additional discovery.

6    We wanted to get through today's hearing to get some guidance

7    from the Court about how we should direct that discovery.

8    There are multiple contested matters, and we've suggested that

9    the Debtor also should be commencing an adversary proceeding.

10   And that's why we haven't propounded the discovery, Your

11   Honor, but we certainly intend to take it.  With respect to

12   the analysis that Ms. Topper provided --

13             THE COURT:  Well, you --

14             MS. HOPKIN:  -- on the consignment --

15             THE COURT:  -- I don't understand why you didn't do

16   it after the last hearing.  I mean, I thought there was some

17   questions at the time questioning your motivations and I think

18   I even said that, well, you have to defend the motion that you

19   -- you know, that's before the Court.  I can's --

20             MS. HOPKIN:  We did a meet --

21             THE COURT:  I don't understand why you didn't take

22   from that that you needed to propound your discovery

23   immediately.

24             MS. HOPKIN:  We did receive information from the

25   Debtor, Your Honor, that satisfied much of what we needed to

1   obtain.  We also reviewed the Schedules and the other

2   information in the case that we already had with respect to

3   establishing the consignment sale percentages.  So, Your

4   Honor, we have received the information we need to prove our

5   case-in-chief, and we do have some additional discovery.  We

6   did not hear from the Debtor, Your Honor, until late last week

7   regarding who was selling the property post May 15th.  We

8   really didn't know who that was.  And so, we couldn't serve

9   discovery.  We weren't sure who to serve the discovery on as

10  the Debtor had not responded.  But, Your Honor, we are

11  prepared to propound that now.

12          THE COURT:  Who was it going to be?  It was either

13  going to be the Debtor --

14          MS. HOPKIN:  It's --

15          THE COURT:  -- or these parties who purchased the

16  business from the Debtor.

17          MS. HOPKIN:  Well, Your Honor --

18          THE COURT:  Why wait?

19          MS. HOPKIN:  -- we didn't know who has control over

20  the inventory of the warehouse.  We now know we believe that

21  it's Sparkle Pop based on what the Debtors told us.

22          THE COURT:  Okay.

23          MS. HOPKIN:  And, Your Honor, we also wanted an

24  opportunity to review the assignment of the contracts because

25  that was an issue that had not been addressed prior to the

1    last hearing with Your Honor.  And so, that took some time to
2    wade through and figure out what the status of that was.  So,
3    with that, Your Honor, we do believe that the Motion to Assume
4    or Reject should be held first.  We would ask for Your Honor
5    to consider the Motion to Stay.  I think that Mr. Shaffer's
6    suggestion to hear that in August is a reasonable suggestion.
7    We have suggested that the Debtor should be required to file
8    an adversary proceeding.  My clients are 13 or 14 clients.
9    Mr. Palik represents quite a few.  But if there's 120
10   consignors, there are other owners of stock that are not in
11   this courtroom and that should be served with a complaint to
12   have an opportunity to protect their interests in this
13   property.  So, we do think that the Motion to Stay should also
14   be held first prior to scheduling a hearing on the Motion to
15   Sell.
16        And finally, Your Honor, with respect to the
17   administrative costs, my clients' inventory alone, I think the
18   wholesale value is something approaching $20 million.  This --
19   the cost of storing at a facility that the Debtor is already
20   maintaining and that the agreements provide that the cost of
21   storage is an obligation of the Debtor, the value of this
22   property far outweighs the minimal storage cost to get this
23   question right and to allow --
24        THE COURT:  You're saying that the wholesale value of
25   the collective inventory that you believe the Debtor is in

1   possession of is $20 million?

2          MS. HOPKIN:  Just for my client alone, Your Honor.

3   Now, there's different ways to slice that number based on

4   retail and what my clients' cut of that is.  But based on my

5   clients' figures, that's the number we're looking at.  And

6   that's just for my clients.  So, there is a significant amount

7   of money at stake, not just the value of that inventory, Your

8   Honor, but the damage to my clients if that inventory is sold

9   for pennies of the -- on the dollar, the negative impact that

10  would have on my client's ability to sell other similar stock

11  beyond just what's sitting in this warehouse.  So, we think

12  that the risk of getting this wrong and the value of what's at

13  stake here should not be sacrificed just to get this done

14  quickly.

15     And I would just say, Your Honor, there's also no

16  contract -- there's no sale contract that's been presented to

17  this Court.  So, there's no buyer waiting in the wings that's

18  going to close any day now.  The Debtors have proposed a

19  process to sell.  So, we don't even have a sale contract.  So,

20  I'm not sure, other than the storage cost, why would we need

21  to rush this?  Thank you, Your Honor.

22          THE COURT:  Thank you.  Mr. Irving?

23          MR. IRVING:  Thank you, Your Honor.

24          THE COURT:  Mr. Irving, before you begin, let me say

25  this.  I believe your local counsel is Sam Alberts?

1          MR. IRVING:  Yes, Your Honor.  There was a motion
2     submitted requesting he be approved -- your admission be --
3     pro hac be approved.

4          MR. IRVING:  Yeah.  Yes, Your Honor.

5          THE COURT:  That was granted.  That included a
6     request that Mr. Alberts be excused from any further hearings
7     in the case?

8          MR. IRVING:  Yes, Your Honor.

9          THE COURT:  That was, in my view, an extraordinary
10     request.  I've never granted such a request.  I've never seen
11     such a request made.  The Order that was entered decidedly did
12     not grant that relief.

13          MR. IRVING:  Yes, Your Honor.

14          THE COURT:  I find the presence and assistance of
15     local counsel very helpful in the processing of these cases
16     and the administration of them.  It makes things go more
17     smoothly if the parties really understand what the practice
18     and procedure of the Court is.  I'm not standing on ceremony
19     today and complaining that Mr. Alberts is not here.  I am just
20     making clear that that request was decidedly not granted.  And
21     if there's justification for it and for why a local counsel
22     should not be present at a particular hearing, there needs to
23     be a request made on a case-by-case, item-by-item,
24     time-by-time basis.

25          MR. IRVING:  Understood, Your Honor.

1          THE COURT:  Okay.

2          MR. IRVING:  I'll be here with Mr. Alberts in the

3     future.

4          THE COURT:  Okay.

5          MR. IRVING:  Mr. Alberts will be here.

6          THE COURT:  That's fine.

7          MR. IRVING:  Thank you, Your Honor.

8          THE COURT:  Go ahead.

9          MR. IRVING:  Your Honor, I represent the Game

10    Manufacturers Association and certain of its members.  We have

11    similar, not identical, but very similar positions.  Do you

12    have any concept of what the value of the consigned inventory

13    of your clients might be?

14         MR. IRVING:  The particular parties that we're

15    working with is significantly less.  It's probably a couple

16    hundred thousand dollars --

17         THE COURT:  Okay.

18         MR. IRVING:  -- in wholesale value of my -- of the

19    particular folks that I am working with.

20         THE COURT:  Okay.

21         MR. IRVING:  Some, one is just a few hundred

22    dollars, and that actually goes to one of my key points, Your

23    Honor.  We do think that adversary proceedings are necessary

24    because, as Your Honor has probably noted from the Docket,

25    many of these counterparties are not terribly sophisticated.

1   Some of them are out-of-the-garage type businesses.  There's
2   confusion about what's happening, how the process is working,
3   and I understand the administrative burden on that, but I
4   think that procedurally, under Bankruptcy Rule 7001, that this
5   is an area -- that this is really a question to determine the
6   validity, priority, or extent of a lien, but really are for
7   other interest in property.  As cited in our objection at
8   Docket #602, the Wilmington Savings Fund case, the Downey
9   Creations case, the Whitehall case, none of which are Fourth
10  Circuit.  They're not binding on this Court, but the proper
11  mechanism for determining whether or not consigned goods or
12  property of the Estate, whether or not the Uniform Commercial
13  Code even applies, is via adversary proceedings.
14          THE COURT:  Were those cases consignment goods
15  cases?
16          MR. IRVING:  Those were consignment goods cases.
17          THE COURT:  Okay.
18          MR. IRVING:  In fact, I think that some of them have
19  been cited even by the Debtors.  I know that the Debtors are
20  relying, I believe, on the Downey case for proposition about
21  the burden and who bears the burden in these kinds of
22  disputes.  I'd also note that the Debtor's motion talks about
23  363, and obviously a sale can happen even if there's a bona
24  fide dispute about lien priority.  But, Your Honor, I would
25  say that this is not about simply lien priority.  It's whether

1   or not the goods are property of the Estate.  And therefore,

2   it's not really a 363 issue.  It really is a 7001(2) gating

3   item for an adversary proceeding.  Your Honor, we were --

4   we're fortunate.  We were able to talk with Debtors' counsel

5   during this.  We did receive a settlement proposal on Friday

6   afternoon.  We received some other information that we really

7   were looking for about the percentage of goods that were sold

8   on consignment.  That has probably raised more questions.  It

9   answered some questions, but it raised others.

10       So, we would like to seek some limited discovery on those

11   areas.  We think that a 45-day period is probably more

12   appropriate to finalize the answers to those questions, either

13   through informal discovery, to continue settlement

14   discussions, because, at least for my clients, the amount in

15   controversy is less, and maybe it can be settled.  We noted in

16   our objection, Your Honor, the same issues with Section 365,

17   that we think that there should be clarity about whether these

18   consignment agreements are assumed, were they assumed and

19   assigned, are they being rejected.  So, we support the Ad Hoc

20   Committee's note that that's probably a gating item as well,

21   along with proceeding on adversary proceedings.  So, we would

22   suggest about 45 days before we have a final hearing that

23   would allow informal discovery, settlement conversations to

24   continue, and any formal kind of follow-up discovery to be

25   completed.

1          THE COURT:  Okay.

2          MR. IRVING:  Thank you, Your Honor.

3          THE COURT:  Thank you.  Mr. Fletcher?

4          MR. FLETCHER:  Thank you, Your Honor.  Adam Fletcher

5    for Image Comics.  I agree with a lot of what I just heard

6    from the Ad Hoc Committee and from the Game Distributors

7    Association, but my client, Image Comics, has, I think, some

8    unique issues that may or may not impact, from a legal

9    perspective, whether discovery is even necessary.  But I want

10   to take a step back and address something the Debtors' counsel

11   said, which is that no one has served discovery, at least from

12   my client's perspective, part of the reason we haven't served

13   discovery is because, as we argued in our papers, I'm not

14   convinced that we are in the right procedural posture right

15   now.  We cited cases, as the Ad Hoc Committee did, that an

16   adversary proceeding is absolutely necessary in a situation

17   like this to try and strip a Consignment Creditor of their

18   consignment interest.  And if that is the case, then we should

19   be proceeding under the discovery rules applicable to an

20   adversary proceeding, as opposed to the contested matter

21   rules, which are similar but not necessarily entirely the

22   same.

23          THE COURT:  How are they not the same?

24          MR. FLETCHER:  I think that the scope, potentially,

25   of who could be served and in what timelines are slightly

1    different under the adversary proceeding discovery rules.  I
2    think the other thing, Your Honor, that my client is cognizant
3    of from a discovery perspective is what kind of discovery
4    would truly be necessary.  And I know you heard from several
5    other people that that discovery could be limited, cordoned,
6    whatever.  I'm not sure I agree with that.  I mean, if the
7    standard here is whether or not they were generally known to
8    be engaged in consignment sales, unless the Debtors are going
9    to agree that their Creditors knew that, you know, discovery
10   into the knowledge of some Creditors, or potentially all
11   Creditors, is necessary.

12        So, before my client propounded discovery on potentially
13   548 Creditors of Diamond about their knowledge here, you know,
14   our position was we want to see what the procedural posture
15   here is going to be at this hearing or this status conference
16   that was scheduled, as well as whether or not the legal
17   arguments that do not necessarily require discovery carry the
18   day.  I think it's very, you know, burdensome to serve
19   discovery on Creditors associated with a motion that they're
20   not participating in necessarily.  And so, I didn't want to
21   just do that on uninvolved Creditors who may not appreciate
22   receiving discovery on something like that.  If necessary, we
23   absolutely will do so.  And I have some ideas about ways to do
24   that that might be less burdensome on some of those Creditors.
25        But as we also argued in our papers, there is case law

1   supportive of the idea that not necessarily every Creditor's
2   knowledge is even relevant.  Not every Creditor is designed to
3   be protected by the UCC requirements for filing a filing
4   statement, right?  I mean, the telephone company doesn't
5   generally take a security interest in inventory to secure its
6   telephone charges, et cetera.  And so, the fact that they may
7   or may not have known about a consignment may not be relevant
8   under the UCC's policy background.

9       I agree, I think, with a comment that was made by counsel
10  for the Ad Hoc Committee, I believe.  I'm not convinced that
11  JPMorgan, they profess that they did not know anything about
12  this consignment relationship.  That seems hard to believe.
13  And again, we may need discovery from JPMorgan as the DIP
14  Lender, the prior Senior Secured Creditor, because there's
15  case law to the effect that if the Senior Secured Creditor
16  knew about the consignment, that is as good as general
17  knowledge if they are the one whose lien is relevant here.
18  And again, there's case law also, Your Honor, that we cited to
19  the effect that an adversary proceeding to avoid under the
20  strong-arm power of 544 cannot be used for the benefit of the
21  Secured Lender or the DIP Lender to strip other parties of
22  their rights.  The 544 avoidance power, the strong-arm power,
23  is for the benefit of General Unsecured Creditors.  This Court
24  is not a mechanism to enhance the rights of secured Creditors
25  at the expense of other parties.

1      And we believe that JPMorgan was absolutely aware of

2  these consignment relationships.  They're a sophisticated

3  party.  We believe discovery from them and from the Debtors

4  will bear out that they had to have known about this and that

5  therefore they could have never gotten a senior secured lien

6  in consigned inventory prior to the petition date, and they

7  shouldn't be allowed to get one through the vehicles of the

8  DIP either.  But again, I think that the most important points

9  that I want to emphasize are the cases that indicate --

10      THE COURT:  So, I mean, if JPMorgan's knowledge is

11  such a potentially dispositive fact, why not immediately take

12  that discovery after the last hearing we had on this?

13      MR. FLETCHER:  Your Honor, I was actually not at

14  that hearing.  That was, as I understood it, a hearing on

15  whether or not the hearing should be pushed out.  I was out of

16  the country, unfortunately.  Again, we very well may propound

17  discovery on JPMorgan very shortly.  But again, sort of gating

18  issues here.  Number one, I think, is doesn't an adversary

19  proceeding need to be taken up before 363 becomes an issue?  I

20  think we cited cases in our papers, and I can pull them up if

21  that's helpful, but they're in our papers, that an adversary

22  proceeding is required in this circumstance, and as well as

23  cases where multiple courts have held that 363, as the Game

24  Associations counsel noted, 363 can be used to sell a piece of

25  property while there's a dispute about liens, about things

1   like encumbrances.  But if there's a true dispute over who
2   owns the property, is this property of the Estate or not, 363
3   is not a mechanism to override that dispute and just sell the
4   property out from under a potential owner of that property.
5   Multiple courts have held that.  I don't think that that's a
6   controversial position.
7          Otherwise, what's to stop a Debtor from asserting that
8   they own any piece of property, selling it, and then saying,
9   what's the harm?  I can give you the money.  In our instance
10  here, given the type of sale that's being proposed, the
11  fungible equivalent of the inventory is not the proceeds
12  because this inventory is not to be sold in a normal sale.
13  Our, my client at least, I don't know about the other
14  objecting parties, does not normally sell its, you know,
15  products in huge bulk sales at once.  They utilize
16  distributors like Diamond and others to sell it in a normal
17  stream of commerce, small sales directly to comic book shops,
18  et cetera, and, you know, they're getting a retail price for
19  that stuff.  There's been no indication that that's the type
20  of sales that Debtors intend to engage in.  Rather, they
21  propose to have one or a few auctions, presumably large
22  volumes, low prices.  And so, you know, if my client
23  ultimately is determined to still own this stuff, those sale
24  proceeds will not be equal to what my client thinks they can
25  get for this stuff if they continue to hold their inventory

1   and sell it over time.

2        Another thing that I wanted to address, Your Honor.  Yes,

3   we also received on Friday information purportedly showing the

4   volume of consignment versus non-consignment.  However, I

5   think there's several things going on that leads me to suspect

6   that that data is being manipulated.  In the original motion,

7   what we heard was the Debtors writ large, multiple entities,

8   the majority of their sales were non-consignment.  Well,

9   that's not the relevant inquiry, Your Honor.  If we were

10  outside of a Bankruptcy Court in a fight about whether or not

11  a consignment was perfected vis-a-vis a secured Creditor, we

12  would not be aggregating multiple entities unless they were

13  parties to the same contract, and they're not.  The only party

14  that my client did business with was Diamond.  Not Alliance,

15  not any of the other Debtors.  To try to loop in all the

16  Debtors and say, well, the Debtors aggregated together, most

17  of their business is not consignment.  That tells me nothing

18  about what Diamond's percentage of business was, as the Ad Hoc

19  counsel -- Committee's council noted.

20       Second, the information that we recently received, it's

21  three lines.  There's no analysis of how they got to those

22  numbers.  And it's not an analysis of the inventory held on

23  the petition date, consignment versus non-consignment, which

24  is the relevant inquiry as held by multiple courts.  Instead,

25  what we got was sales data, supposedly for 2024.  The volume

1   of sales that are and are not consignment in some given period

2   is not the analysis.  The analysis under the case law is how

3   much of the inventory that the Debtor held on the petition

4   date was consignment and how much was not.  If it's more than

5   20%, then you're substantially engaged in the sale of

6   consigned goods.  If it's less than 20%, you're not.  That's

7   the inquiry.  We haven't seen that information at all.  What

8   we've seen is sales data.  So, we are probably going to need

9   to take some immediate discovery from the Debtors on the

10  relevant question.

11       I don't know if they even have that information, Your

12  Honor.  We've been told multiple times that their books are a

13  mess, that they were trying to clean them up, but I have no

14  knowledge of how long it's going to take them to even provide

15  us the information.  So, we probably will get that discovery

16  out right away on the Debtors.  But again, I'm trying not to

17  burden potentially 548 Creditors with discovery that, you

18  know, they didn't ask for here if it's not relevant.  I think,

19  again, one other point why this may not be relevant from

20  Image's perspective to take discovery is, you know, again, I

21  haven't seen every 127 contracts of the consignors, but my

22  client's contract only uses the term "consignment" a very

23  strange provision that talks about cooperating in the

24  execution of UCC-1 filing statements.  Well, you don't sign a

25  UCC-1.  You haven't signed a UCC-1 for 20-something years.

1   So, that provision doesn't even make any sense.

2       But what my client's contract also says, and this

3   contract was drafted by Diamond on two separate occasions in

4   the contract, very clearly, it appoints Diamond as my client's

5   agent for distributing purposes, for marketing, selling, et

6   cetera, et cetera, et cetera.  And it states unequivocally

7   that at no point does title ever vest in Diamond, not for one

8   second.  Title under our contract goes directly from Image to

9   the end customer.  It never passes through Diamond's hands.

10  They are a facilitating agent only.  Nothing in the UCC

11  requires an agent -- I'm sorry, requires a principal to file a

12  UCC-1 against its agent over property held by the agent in its

13  capacity as agent.  Nothing.  Absolutely nothing.  There's not

14  even a place on the UCC-1 form to check that box.  There's a

15  consignor consignee check box to say this isn't a security

16  interest.  This is a consignment.  There's a lease box.

17  There's a trust box.  There's no agency box because it's not

18  necessary.  Everybody knows.  We've cited probably 10 cases in

19  here, all of which say the agent does not hold title to that

20  property.  It never becomes property of the Bankruptcy Estate

21  under 541, and I think that's also a gating issue.  Thank you,

22  Your Honor.

23          THE COURT:  All right.  Thank you.  Mr. Palik?

24          MR. PALIK:  Good morning, Your Honor.  Craig Palik

25  on behalf of 14 Consignment Creditors, I'll state them for the

1   record: Aspen MLT, LLC, Black Mass Studios, LLC, DSTLRY Media,

2   Inc., Dynamic Forces, Inc., Dark Horse Comics, LLC, Heavy

3   Metal International, LLC, Magnetic Press, LLC, Massive

4   Publishing, LLC, Only Forge Publishing Group, LLC, Panini UK

5   Limited, Punk Bot Comic Books, LLC, The Penn State University,

6   Titan Publishing Group Limited, and Vault Storyworks.  Your

7   Honor, I'll --

8             THE COURT:  Penn State University is in the -- this

9   business?

10            MR. PALIK:  Apparently, it's an educational program

11  they have, and they operate under the name Graphic Mundi.  But

12  they do publish material that was distributed by the Debtor in

13  this case.

14            THE COURT:  Interesting.  Okay.

15            MR. PALIK:  From what I understand, it's not a

16  terribly profitable business, but it's one that is

17  educational.  Your Honor, I'd like to sort of mirror the

18  comments that the Ad Hoc Committee, Ms. Hopkin, made and some

19  of the other Consignment Creditors here.  We were well aware

20  that the Court indicated, yes, this is an opportunity to take

21  discovery and to start that process.  And we did, shortly

22  after that hearing, undertake the drafting of the discovery,

23  and it's been circulated amongst my 14 clients.  We received

24  feedback.  I was in a position to serve it yesterday, with all

25  the feedback that I received, but I wanted to hold it until

1   this hearing today, until we understood what was happening

2   with scheduling before we sent anything out.

3        Similarly, we've also been concerned, because as we've

4   sent this discovery out to our clients, many, many of them are

5   concerned that their consignment goods are being sold

6   illegally at this point, without permission.  The concern was

7   whether the Debtor was doing it, whether Sparkle Pop was doing

8   that.  It appears that perhaps it's Sparkle Pop, based on the

9   representations today.  We received a representation in an

10  e-mail yesterday in response to an inquiry received that's

11  saying that neither Debtor nor Sparkle Pop was selling any of

12  these consigned goods, but many of my clients have received, I

13  believe, solid evidence of the fact that that's going on.  So,

14  that further complicated the ability to get the discovery

15  finished in light of trying to figure out, well, how do we

16  deal with this, and is that something that we need additional

17  discovery on as well?  But we are prepared to move forward

18  today, and we are prepared to serve that discovery.

19       It's also important to note, Your Honor, that in these

20  cases where these consignment goods have been sold, there are

21  cases that have sold them through either contested matter, and

22  they appear to be some of the older cases, or through an

23  adversary proceeding.  It appears that the common, more

24  current trend in the way that these types of assets are sold

25  is through an adversary proceeding, because that's what Rule

1    7001(2) requires.  Looking at some of the cases that argued,
2    well, maybe why was this done through contested matter
3    previously, I think it's with the development of certain other
4    cases within the various circuits that have indicated that
5    interest in property, to the extent that that's the interest
6    that needs to be determined, must be by adversary proceeding.
7    And the case for that proposition in this jurisdiction, the
8    Fourth Circuit, it's a Sean Penn case, Your Honor.  You can't
9    just simply override someone's property interest or say, well,
10   it's ours, and we presume that to be the case and to forego
11   the issue of -- the threshold issue of whether or not that is
12   in fact property that needs to be determined by an adversary
13   proceeding.

14        So, we would certainly agree that I think it makes sense
15   that an initial threshold proceeding at a minimum on that
16   issue is important.  To go down this road of a motion to only
17   have the Court later rule, well, this should have been brought
18   as an adversary proceeding, wastes more time than is
19   necessary.  And I think as far as we're concerned, that's
20   important.  It's also important to note that in all of these
21   cases, Your Honor, whether it was -- these motions were
22   brought either by adversary -- motions brought by -- as a
23   contested matter or by an adversary proceeding, these are not
24   matters where discovery was not afforded, where -- and the --
25   and all the cases seem to suggest that there was actually

1  substantial discovery involved in these types of proceedings

2  in order to sell goods when it relates to consigned sellers.

3       Your Honor, the factual issues are, as you indicated

4  before, whether or not the Debtor was substantially involved

5  in the business of selling consigned goods, which the case law

6  defines as 20% or greater.  I concur with other counsel that

7  have raised the issue that we've received some indication with

8  the Debtor's very cursory calculations indicating that it was

9  less than 20%, but there's no supporting documentation,

10  nothing that would justify other than just on its face that

11  that's the conclusion they reached, and certainly it requires

12  a deeper look.

13       And then it's the 50% generally known by its Creditors,

14  50% of the credit body, that is a substantial undertaking

15  discovery if we ever have to get to that point, and the hope

16  is that we would not have to.  But I think this -- the process

17  here is incremental.  First, it's discovery upon the Debtor.

18  It's discovery on JPMorgan, which, again, we've drafted and

19  we're prepared to serve.  Depending on how those responses

20  come back, it may be necessary for them to go out to the

21  larger Creditor body in order to determine whether they

22  generally knew, and that's a very, very hard process to

23  achieve and something that requires a tremendous amount of

24  energy and expense to do if we were to do that at this point.

25  Hoping that that's a process where we don't have to ever get

1   to, I'm concerned that an expedited schedule of 45 days or 60

2   days is too little at this point.  Again, I think if this was

3   properly brought, as we contend, in an adversary proceeding,

4   you're looking at a discovery period of at least 90 days

5   typically, as this Court orders, sometimes 120 days.  I think

6   that's a fairly standard procedure in this Court.  Why this

7   should be any different, I don't understand that, and to the

8   extent that there -- we're being sort of admonished for not

9   serving discovery at this point, a few days' difference in

10   terms of time periods that we're typically accustomed to

11   serving discovery, and again, to hold our discovery as it was

12   ready yesterday to go out until we had this hearing, we're

13   prepared to move forward immediately.  We're not trying to

14   delay anything.  We're just trying to be judicious about it.

15   We're trying to make sure that we understand the process, and

16   we don't want to expend more than we otherwise would have to

17   expend in the process doing that.

18        So, again, we believe that discovery is absolutely

19   necessary on the factual issues.  We think that more time is

20   appropriate.  A normal Scheduling Order, understanding that

21   the Debtor has concerns about timing, but it's -- again,

22   that's a typical way that these things are handled.  This is

23   an adversary proceeding and not a contested matter as we view

24   it based upon the case law.  So, I think as far as concluding

25   in terms of the suggestion, we would ask for at least a period

1    of no less than 60 days, preferably 90 days, to move forward

2    with discovery, and to the extent that the Court can decide

3    the threshold issue of whether or not this should be brought

4    as a contested matter or an adversary proceeding, I think is

5    absolutely critical to the process moving forward in order to

6    save resources and to determine whether or not this is even

7    the proper vehicle for reaching the relief requested by the

8    Debtor in this case.  So, that's --

9            THE COURT:  What is before the Court that raises the

10   issue of adversary proceeding versus contested matter?

11           MR. PALIK:  Simply the objections.  I mean, I

12   understand.  I mean, perhaps it would require the agreement of

13   the parties in order to be able to have that if the parties

14   would agree that that made sense, but I agree.  It's not been

15   teed up in a way that the Court has something to decide on

16   that issue without the parties raising it as an issue

17   otherwise.  I understand that.

18           THE COURT:  I mean, what's the alternative?  I mean,

19   let -- I'm concerned that the last hearing and recent hearings

20   that this -- the Debtor and these Estates are in potentially

21   administrative insolvency jeopardy, and I'm not sure whether

22   the Debtor and the Court have the luxury of waiting 90 days or

23   120 days for discovery.  I'm concerned that that circumstance

24   means that there needs to be a prompt decision.  I'm also

25   concerned that that means that it may be likely that this

1    motion fails because all these issues may be raised and the

2    Debtor may be unable to convince the Court that the sale

3    should be approved because of all the issues that have been

4    raised.  Why can't you get discovery between now and Ms.

5    Topper was asking the Court to set this for August 18th.

6    That's two weeks from today?

7            MR. PALIK:  I mean, a typical response time on

8    written discovery is 30 days, Your Honor, unless Your Honor is

9    willing to allow us to conduct discovery in the next

10   (indiscern.) basis.

11           THE COURT:  You think that if I set the hearing on

12   August 18th, that wouldn't be amenable to shorting discovery

13   if you had a bona fide reason to request discovery?

14           MR. PALIK:  Certainly, Your Honor.  I -- that would

15   be the request, and we -- like I said, we're prepared to send

16   it out today.  So -- and again, we've prepared discovery to be

17   propounded upon the Debtor and also on a subpoena with -- a

18   subpoena duces tecum with respect to JPMorgan.  So, those

19   things can go out today.  If we can have an expedited

20   turnaround time on that discovery, whether or not that

21   requires potentially taking a deposition of the Debtor

22   independently after receiving that discovery, I don't know,

23   but hopefully the documents will be enough.  And that's my

24   additional concern is that maybe a deposition may be needed as

25   well.

1          THE COURT:  Okay.  I understand.  Thank you.

2          MR. PALIK:  Thank you.  Ms. Topper, would you like

3     the last word here?

4          MS. TOPPER:  Thank you, Your Honor.  For the record,

5     Paige Topper on behalf of the Debtors in these cases.  Your

6     Honor, I'll be brief because I think we are getting a little

7     too far, quite frankly, into the merits of the arguments that

8     we will -- that the Court will hear ultimately on the hearing

9     with respect to the Consignment Motion.  But as you heard

10    from, I believe, every counsel for various consignment

11    vendors, there is a push for this issue of whether or not the

12    motion is procedurally proper, whether or not the relief

13    requested, essentially whether or not the Debtors can pursue a

14    Section 363 motion before they believe that the Court should

15    hear an adversary proceeding, a complaint should be filed,

16    that adversary proceeding should play out on whether or not

17    the consigned inventory is property of the Estates.

18         So, they continue to push that issue.  I think I touched

19    on this.  We don't think that issue should be delinked from

20    the rest of the relief requested in connection with the

21    Consignment Motion.  The Ad Hoc Committee, as well as the

22    other Objectors, have set this up as a gating issue.  The

23    Debtors are fine with this issue being heard first at a

24    hearing on the Consignment Motion.  But I want to be very

25    clear, you know, if the Ad Hoc Committee and the other

1    Objectors prevail on this argument, then the Debtors are
2    prepared to deal with those consequences if the Court were to
3    ultimately find that an adversary proceeding is appropriate.
4    The Debtors would have to handle that.  But in the flip side,
5    if the Debtors prevail, and if the Debtors are -- if the
6    motion is procedurally proper before the Court and the Court
7    makes that finding, then the hearing should continue that same
8    day with respect to the remaining relief that's set forth in
9    the Consignment Motion to piecemeal it and sort of have the
10   hearing.
11             THE COURT:  So, you really want to press forward
12   with a hearing on the -- you get your way.  The Court denies
13   the Motion to Reject and -- or doesn't rule in the Motion to
14   Reject, denies the Motion to Stay, holds that there's no
15   adversary proceeding.  In the midst of all this chaos going
16   on, discovery from multiple parties, the Debtor really wants
17   to press for a decision on the merits of this motion on the
18   18th?
19             MS. TOPPER:  Yes.  Yes, Your Honor.  Right now, the
20   Debtor feels strongly that it can carry what it believes its
21   burden is in connection with the issues raised in the
22   Consignment Motion.
23             THE COURT:  Why should the Debtor -- why should the
24   Court believe that the Debtor is going to be able to come
25   forward with this kind of discovery, detailed information,

1    when it appears to me from reviewing the Docket that the -- at

2    least Diamond Comic Distributors is months behind on the

3    filing of monthly operating reports?

4              MS. TOPPER:  Diamond Comic Distributors is, I

5    believe, two months behind on filing monthly operating

6    reports, Your Honor.  I believe we expect to file May today

7    with June to follow.

8              THE COURT:  Why can't these things be filed on time?

9    I mean, it just doesn't create an atmosphere of -- for the

10   parties of the Court feeling that there is transparency in

11   accounting here.

12             MS. TOPPER:  Understood, Your Honor.  And it is

13   raised frequently.  The Debtors have a situation where there

14   is one person responsible, really, for the bulk of the data.

15             THE COURT:  I mean, what can be more important in a

16   Chapter 11 bankruptcy case than the Creditors and the

17   constituents who are interested in this case and the Court

18   having confidence in the numbers?  The fundamental thing about

19   prosecution of a bankruptcy case, the first priority.  I don't

20   care about, yes, all these other things about the business,

21   they're important.  But if you can't convince the Court that

22   your numbers are accurate, you have nothing.

23             MS. TOPPER:  Understood, Your Honor.  I will say

24   that the Debtors believe that the monthly operating reports

25   that are submitted are reflecting numbers that are accurate.

1    Part of what takes time to file them, and apologies for the

2    delay.  We recognize that there is a delay.  But part of that

3    is confirming and double-checking that those numbers that are

4    ultimately filed in those reports are as accurate to the best

5    of the Debtor's knowledge and ability.  So --

6              THE COURT:  How productive is it going to be if we

7    have the hearing on the 18th?  There's been a lot of motion

8    regarding discovery.  It's incomplete.  Parties are

9    dissatisfied.  What's going to happen on the 18th?  I mean,

10   isn't the Court going to take that into account?  Oh, okay.

11   This is a really serious issue, and I'm not satisfied they've

12   really had a fair opportunity to take discovery, so your

13   motion is going to fail, maybe for that reason?

14             MS. TOPPER:  Well, Your Honor, in response to that,

15   look, I would say I appreciate the concerns raised today by

16   the various Consignors.  However, I want to be clear, the

17   objection deadline was roughly three weeks ago.  We're not in

18   the adversary proceeding world.  We're in a contested motion

19   that's before the Court.  The timing on discovery, we've all

20   done this before, the timing on discovery, you know, will be

21   expedited.  The discovery could have been issued as soon as

22   the objections were filed, if not when the motion was filed

23   back in, I believe, June 28th.  So, there have been weeks

24   where discovery could have been issued.  The decision was made

25   for various reasons that were stated on the record today to

1    not issue discovery.  That's the Objectors' prerogative.  They

2    believe for various reasons that they didn't need to do it

3    until now.  Look, the Debtors will -- well, obviously, if

4    discovery comes our way, we're going to respond as promptly as

5    possible to, you know, reasonable discovery requests.  If we

6    need to be back in front of the Court on the scope or on a

7    discovery dispute, we will do that promptly.

8              THE COURT:  Okay.

9              MS. TOPPER:  So, with that, Your Honor, I would just

10   repeat that the Debtors do believe that we should proceed on

11   the 18th with the fundamental, you know, gating issue of

12   whether or not we should go forward on the motion versus an

13   adversary proceeding.  But if the Debtors prevail on that, the

14   Debtors believe that we should pursue the remainder of the

15   relief requested in the Consignment Motion at that time.  I do

16   also want to note with respect to the Motion to Compel

17   Assumption or Rejection, the Debtors are looking at that

18   motion.  That motion was filed after hours on Friday, so it

19   just came in.  It's not before the Court today.  We also don't

20   believe that it should be linked, quite frankly, with the

21   Motion for Consignment, but we're reviewing it.

22             THE COURT:  Why not?

23             MS. TOPPER:  We're still reviewing that motion, Your

24   Honor.  There are factual statements made in that motion that

25   we need to get our arms around, and we will do so timely and

1  will be in connection.

2          THE COURT:  And why should it not be heard with the

3  Motion to Sell?

4          MS. TOPPER:  Well, I don't think a Motion to

5  Expedite Notice, quite frankly, Your Honor, has been filed in

6  connection with that motion.

7          THE COURT:  Well, we want a hearing on the 18th, 14

8  days to respond to a motion that was filed on the 1st is

9  before the 18th.

10          MS. TOPPER:  Okay.  The Debtors will be amenable to

11  having that heard also on the 18th if needed.

12          THE COURT:  Okay.  Anything else?

13          MS. TOPPER:  Not unless you have any other

14  questions, Your Honor.

15          THE COURT:  No.  Okay.

16          MS. TOPPER:  Thank you.

17          THE COURT:  All right.  I'm going to take a short

18  recess.

19          THE CLERK:  All rise.  This court is in recess.

20      (Recess)

21           THE CLERK:  Please remain seated and come to order,

22  the United States Bankruptcy Court for the District of

23  Maryland now resumes its regular session.

24          THE COURT:  All right.  During the recess, I've

25  considered the matter of what we should do about scheduling.

1   I appreciate everyone's attendance today.  I find it always
2   very helpful when I hear from experienced counsel about what
3   their views on cases are, and that was certainly the case
4   today.  I'm going to set a hearing on August 18th.  We
5   presently have the -- I'm not sure what else we have on that
6   date, but we have the proposed sale of the UK business.  I'm
7   going to reschedule that and these -- and the other items I'm
8   going to mention to 9:30 a.m. on that date.  The parties
9   should be aware that we will clear our Docket at least for the
10  morning of the 19th and the 20th.  So, if matters -- I don't
11  know how these things are going to come out, but if they
12  continue on because we take up the next issue, then it can at
13  least take place over the course of those two-and-a-half days.
14  So, we'll set the Motion to Sell the Consignment Inventory,
15  Docket #531, for hearing on that date and time, as well as the
16  Motion to Reject, which is Docket #679, and the Motion to
17  Stay, which is Docket #649.  And we'll take all those matters
18  up in that time at whatever -- in whatever order the Court
19  decides to proceed with them, given the circumstances as they
20  have developed between now and then.  And if counsel have
21  worked things out great or if there is a desire to proceed in
22  a particular order, I will be willing to consider that and
23  perhaps do that.  But we will have what will no doubt be an
24  eventful hearing beginning on the 18th at 9:30, and we'll see
25  you all at that time.  Thank you very much.

54

1             THE CLERK:  All rise.  This court is adjourned.

2         (Court adjourned)

3

4                         CERTIFICATION
5  I, Lewis Parham, certify that the foregoing is a correct
6  transcript from the electronic sound recording of the
7  proceedings in the above-entitled matter.
8
9
10                                          8/6/25
11
12  _____        _____
13  Signature of Transcriber                  Date