**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |

**STIPULATION REGARDING CERTAIN  FACTS AND AUTHENTICITY
OF EXHIBITS FOR HEARING SCHEDULED ON AUGUST 18, 2025**

The above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), JPMorgan Chase Bank, N.A ("<u>JPM</u>"), and the Consignment Group[2] (the "<u>Consignors</u>"), by and through their undersigned counsel, hereby stipulate to certain facts and authenticity of exhibits:

1. The Debtors stipulate and agree that with respect to each of the Consignors, with the exception of Panini UK, Ltd., the written agreements attached as Exhibits 1-13 herein (the "<u>Agreements</u>"), are true and accurate copies of the written contracts between the Debtors and the respective Consignors; that there are no further modifications or amendments to the Agreements; and that the Consignors are deemed to have established the authenticity of such Agreements for purposes of the hearing set on various motions pending in the Debtors' case on August 18, 2025 (the "<u>Hearing</u>").

---

[1]    The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585).  The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2]    The Consignors/Movants herein are: (i) Aspen MLT, LLC a/k/a Aspen Comics, (ii) Black Mask Studios, LLC, (iii) DSTLRY Media, Inc., (iv) Dynamic Forces, Inc. a/k/a Dynamite Entertainment, (v) Heavy Metal International, LLC, (vi) Magnetic Press, LLC, (vii) Massive Publishing, LLC, (viii) Oni-Lion Forge Publishing Group, LLC f/k/a Oni Press, LLC, (ix) Panini UK Ltd., (x) Punk Bot Comic Books, LLC a/k/a Alien Books, (xi) The Penn State University a/k/a Graphic Mundi, (xii) Titan Publishing Group, Ltd., (xiii) Vault Storyworks, LLC a/k/a Vault Comics f/k/a Creative Mind, and (xiv) Dark Horse Comics, LLC.

Notwithstanding anything herein, the Debtors reserve and do not waive any objections to the Agreements other than to authenticity.

2. The Debtors stipulate and agree that at all times during which any Agreement was in effect, the Consignors and not the Debtors were to pay all personal property taxes on the consigned stock that the Consignors delivered to the Debtors; and that the Debtors sent to the Consignors, on several different occasions, correspondence indicating that the Consignors were responsible for paying personal property taxes to the State of Mississippi and/or DeSoto County, Mississippi, because the Consignors owned the stock delivered to the Debtors.

3. JPM stipulates and agrees that it was aware of the fact that the Diamond Comic Distributors, Inc., debtor ("Distributor") dealt in consigned goods; and that it had actual knowledge of the Distributor's participation in consignment transactions during the period from its initial advance of funds to the Debtors through the present.

4. JPM stipulates and agrees that with regard to each and every loan document that it produces to the Consignors in accordance with the Subpoena issued in the above captioned case,  the respective loan document is a true and accurate copy of such document; that it has produced all modifications and amendments to the relevant credit agreements; and that the documents were kept in the ordinary course of JPM's business such that the Consignors will be deemed to have established the authenticity of the loan documents at the Hearing.  Notwithstanding anything herein, JPM reserves and does not waive any objections to the loan documents other than as to authenticity.

Respectfully submitted,

/s/ Craig M. Palik
Craig M. Palik, Esquire (Bar No 15254)
Justin P. Fasano, Esquire
Janet M. Nesse, Esquire
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
T: (301) 441-2420
cpalik@mhlawyers.com
jfasano@mhlawyers.com
jnesse@mhlawyers.com

Attorneys for Aspen MLT, LLC, a/k/a Aspen Comics,
Black Mask Studios, LLC,
Dark Horse Comics, Inc
DSTLRY Media, Inc.,
Dynamic Forces, Inc. a/k/a Dynamite Entertainment,
Heavy Metal International, LLC,
Magnetic Press, LLC,
Massive Publishing, LLC,
Oni-Lion Forge Publishing Group, LLC f/k/a Oni Press, LLC,
Panini UK Ltd.,
Punk Bot Comic Books, LLC a/k/a Alien Books,
The Penn State University a/k/a Graphic Mundi,
Titan Publishing Group, Ltd. and
Vault Storyworks, LLC a/k/a Vault Comics f/k/a Creative Mind Energy

-and-

**SAUL EWING LLP**

/s/ *Jordan D. Rosenfeld*
Jordan D. Rosenfeld (MD Bar No. 13694)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
Telephone: (410) 332-8600
jordan.rosenfeld@saul.com

-and-

Jeffrey C. Hampton (admitted *pro hac vice*)
Adam H. Isenberg (admitted *pro hac vice*)
Turner N. Falk (admitted *pro hac vice*)
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
jeffrey.hampton@saul.com
adam.isenberg@saul.com
turner.falk@saul.com

-and-

Mark Minuti (admitted *pro hac vice*)
Paige N. Topper (admitted *pro hac vice*)
Nicholas Smargiassi (admitted *pro hac vice*)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6800
mark.minuti@saul.com
paige.topper@saul.com
nicholas.smargiassi@saul.com

*Counsel for Debtors and Debtors in Possession*

Telephone: (410) 752-9700
dshaffer@tydings.com
sgerald@tydings.com

**TROUTMAN PEPPER LOCKE LLP**

/s/ *Jonathan W. Young*
Jonathan W. Young (admitted *pro hac vice*)
Toyja E. Kelley (Bar No. 26949)
Indira K. Sharma (Bar No. 28269)
701 8th St., N.W., Suite 500
Washington, D.C. 20001
Telephone: (202) 220-6900
Email: Toyja.Kelley@troutman.com
Indira.Sharma@troutman.com
Jonathan.Young@troutman.com

**EXHIBIT 1**

**Aspen MLT, LLC Agreement**

## SUPPLY AGREEMENT

This SUPPLY AGREEMENT ("Agreement") is made by and between ASPEN MLT, INC., a California corporation located at 1223 Glencoe #A200, Marina Del Rey, CA 90292 ("Seller"), and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 1966 Greenspring Drive, Timonium, Maryland 21093 ("Buyer") as of October 1, 2004 ("Effective Date").

WHEREAS, Seller is engaged in the business of creating, publishing, manufacturing, selling, and distributing comic books ("Comic Books"), including related graphic novels, trade paperback and hard-cover books and compilations of the Comic Books (collectively, "Graphic Novels"). Comic Books and Graphic Novels are collectively "Products"); and

WHEREAS, Buyer is engaged in the business of selling and distributing graphic novels, comic books, trade paperback books, and hard-cover books; and

WHEREAS, Seller desires to appoint Buyer to distribute English language versions of the Products in the markets set forth below; and

WHEREAS, Buyer desires to accept such appointment as distributor for Seller.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the parties hereby agree as follows:

1.    **Definitions.** For purposes of this Agreement, the following words and phrases shall have the following meanings:

(a)    "Book Market" shall mean retailers whose primary business is the sale of paper books and book related products (not including comic books and other periodicals) where such retailers typically purchase books on a returnable basis. The Book Market shall also include libraries, warehouse club stores with book departments such as Costco and Sam's Club, and mass merchandise stores with book departments such as Walmart and Target. The Book Market does not include electronic publishing in any form.

(b)    "Direct Market" shall mean retailers whose primary business is the sale of paper comic books and comic book related items where such products are generally not returnable to a distributor. The Direct Market does not include electronic publishing in any form.

2.    **Appointment.**

(a)    Pursuant to the terms and conditions of this Agreement, Seller hereby appoints Buyer as its sole and exclusive distributor in the United States and Canada, and its non-exclusive distributor for the remainder of the world for sales and distribution of English-language versions of the Comic Books and Graphic Novels to the Book Market and the Direct Market.

(b)    Buyer will use commercially reasonable efforts to promote the sales and distribution of Products. In that connection, Buyer will (i) actively market and promote the Products, (ii) feature the Products at all appropriate trade shows, (iii) periodically train its sales and marketing staff with respect to the Products, (iv) actively encourage its sales and marketing staff to promote sales of the Products, (v) regularly advertise the Products in appropriate industry publications, and (vi) fulfill the other obligations set forth in Section 6 below.

(c)     Except as expressly granted to Buyer above, Seller reserves all other right, title and interest in and to the Products, and no other rights are granted to Buyer by virtue of this Agreement, including but not limited to any rights to create, distribute or otherwise exploit the Products or any characters contained therein in any form, including, but not limited to, film, video, television, video games, computer games, 3D products, plush, figurines or any other mass merchandise.

(d)     Nothing herein prevents Seller from distributing the Products directly or indirectly to customers (i) at conventions and expositions featuring comic books and comic book related items; or (ii) through the Internet.

(e)     Seller specifically reserves the right to, in its sole discretion:  discontinue any Product; introduce new Products; and otherwise adjust its product offerings, as it determines in its sole discretion.

(f)     Seller will, to the best of its knowledge, provide Buyer with accurate information regarding the creation and subject matter of the Products.

3.     <u>Term</u>.  The term of the Agreement shall commence as of the Effective Date and shall expire two (2) years thereafter unless earlier terminated as set forth in Section 8 ("<u>Term</u>").

4.     <u>Supply and Purchase Orders</u>.

(a)     Subject to Sections 4(b) hereof, during the Term, Seller will use reasonable efforts to sell to Buyer, and Buyer hereby agrees to purchase from Seller, such amounts of the Products as are required to meet Buyer's reasonable distribution needs; provided that all amounts of Products for the Book Market and all amounts of Products for the Direct Market must be pre-approved by Seller in writing.  Notwithstanding the foregoing, Seller retains the right to reasonably control and adjust its production capacity and delivery schedule for the Products.

(b)     Buyer shall place consignment orders for Products in a form mutually acceptable to the parties (hereinafter "<u>Shipping Requests</u>").  Buyer shall deliver such Shipping Requests to Seller on a weekly basis both electronically and in writing to the address provided for notices to Seller in this Agreement.  Each Shipping Request shall clearly state the title and quantity of each Product requested.  Additionally, the weekly reports and/or Buyer's password protected website shall contain up-to-date information regarding the number of damaged and returned Products, including whether such damaged and returned Products originate from the Direct Market or the Book Market.

(c)     All Products shall be made available to Buyer at the premises of Seller's designated printer.   Buyer shall bear all risk of loss for the Products once they are collected by Buyer or Buyer's representative from Seller's designated printer.

(d)     Buyer shall warehouse the Products in a clean, dry, secure, and fire-protected facility and obtain insurance for all Products in its inventory naming Seller as an additional insured, at no charge to Seller.

5.     <u>Price and Payment</u>.

(a)     Seller shall provide the Products to Buyer at sixty-one percent (61%) off the actual retail cover price of the Products.  Seller shall provide Buyer a "<u>Freight Rebate</u>" of one percent (1%) of the total actual retail cover price of the Products Buyer picks up from Seller's designated printer

each week. Additionally, Seller shall provide Buyer with a "<u>Book Market Sales Fee</u>" of two and one half percent (2.5%) of the actual retail cover price of any Products sold to the Book Market.

    (b)    The "<u>Direct Market Weekly Payment Amount</u>" will be calculated as follows:

        (i)    Total retail value of all Products sold by Buyer to the Direct Market during such week;

        (ii)    Less the total retail value of damaged, claimed shorted or returned Products to Buyer from the Direct Market during such week;

        (iii)    Multiplied by thirty nine percent (39%).

    (c)    The "<u>Book Market Weekly Payment Amount</u>" will be calculated as follows:

        (i)    Total retail value of all Products sold by Buyer to the Book Market during such week;

        (ii)    Less the total retail value of damaged or returned of Products to Buyer from the Book Market during such week;

        (iii)    Multiplied by thirty nine percent (39%).

    (d)    The "<u>Total Weekly Payment Amount</u>" will be calculated by (i) summing the Direct Market Payment Amount and the Book Market Payment Amount and (ii) subtracting the Freight Rebate (if any); the Book Market Sales Fee, and the Book Market Service Fee as defined below, (if any).

    (e)    Buyer shall provide Seller with weekly reports stating the Direct Market Weekly Payment Amount, the Book Market Weekly Payment Amount, the Total Weekly Payment Amount, and containing sufficient information for Buyer to ascertain how such amounts were calculated. Buyer shall pay Seller all amounts due for a particular week within thirty (30) days after such week beginning on Buyer's unofficial "Street Date." If Buyer fails to make payment within forty five (45) days of the beginning of the applicable week, Seller shall have the right to offset the invoiced amount against any subsequent payments due by Seller. Additionally, Buyer shall pay Seller a late-fee of the lesser of ten percent (10%) per annum or the maximum permitted by law for any amounts more than thirty (30) days past due.

    (f)    Except as provided below, no amounts shall be deducted from the payment owing to Seller, including, but not limited to, uncollectible accounts, returns, or costs incurred in the advertising, sale or distribution of Products by Buyer.

    (g)    Products returned to Buyer will be returned to inventory in Buyer's warehouses.

    (h)    Seller will pay Buyer a "<u>Book Market Service Fee</u>" of eight percent (8%) of the total actual retail cover price on all returns of Products from the Book Market. In the event returns from the Book Market are in excess of thirty percent (30%) of total sales made to the Book Market, measured and calculated annually on the anniversary of the Effective Date, Seller will pay Buyer an additional three percent (3%) of the invoice value of all returns from the Book Market in excess of thirty percent (30%).

    (i)    In the event that Buyer provides Seller any Distribution Services or Additional Services requiring additional charges, as such terms are defined below, Buyer will send a monthly invoice

to Seller for the amount due. Seller shall pay such invoice within thirty (30) days of receipt of invoice. If Seller fails to make payment within forty five (45) days of receipt of invoice, Buyer shall have the right to offset the invoiced amount against any subsequent payments due by Buyer.

(j)    Buyer shall keep, maintain, and preserve (at Buyer's principal place of business) accurate books of account and records covering all transactions relating to this Agreement. Seller and/or its duly authorized representative shall have the right, upon no less than five (5) days written notice, but not more than one (1) time per year (provided Seller is not in breach of the Agreement) and at all reasonable hours of the day, to examine said books of account, records, and all other documents and material in the possession or under the control of Buyer with respect to the subject matter and terms of this Agreement. Seller, at Seller's sole expense, may copy any of the material referenced in this Section 5(j). Buyer shall keep all such books of account and records available for at least two (2) years after expiration or termination of the Agreement. If any audit discloses deficiencies greater than five percent (5%) of the total amount of returns improperly claimed by Buyer, the costs of the audit shall be paid by Buyer. In addition, Buyer shall immediately rectify such inconsistencies or mistakes discovered as a result of the audit and pay the appropriate monies, if any, to Seller with interest at the rate of ten percent (10%) per annum or the maximum permitted by law.

(k)    Buyer will furnish Seller with (i) monthly written reports showing (A) a list of all customers in the Book Market to which Buyer has distributed a Comic Book or Graphic Novel during such month, indicating the name, address and telephone number of the customers, and (B) the advertising and promotional expenditures by or on behalf of Buyer relating to the Comic Books or Graphic Novels, and details as to the activities supported by these expenditures to the extent such information is readily available to Buyer; and (ii) immediate written notification of any suspected, alleged or actual intellectual property infringements concerning the Products.

6.    <u>Distribution Services; Additional Services</u>.

(a)    Buyer shall perform each of the distribution and marketing services specified below (such services to be referred to herein as "<u>Distribution Services</u>").

(i)    Produce, publish and distribute a monthly catalog (currently known as Diamond Previews), suitable for consumers and retailers of comic books, trade paperback, graphic novels, and other merchandise offered by Buyer in the Direct Market. With respect to each such catalog, Buyer shall list the Products in the full color comic section each month during the Term.

(A)    Buyer shall provide Seller with three (3) full color pages in the full color section of such catalog each month for advertising purposes. Any page not used in a month may be carried over to any other month(s) during the Term.

(B)    Seller may purchase additional advertising space in the monthly catalog at a rate fifteen percent (15%) off Buyer's published advertising rates.

(ii)    Communicate applicable news information which has been approved by Seller in writing to Buyer's customers via a published newsletter distributed with shipments of the Products and, in addition, via as many other methods of communication as are both practicable and acceptable to both parties.

(iii)    To the extent Buyer produces a monthly "news magazine" for Buyer's customers, each such magazine shall include coverage of all significant Seller news at no charge to Seller. Buyer shall give Seller a reasonable amount of notice as to the publication deadlines of such a news

magazine so as to permit Seller to approve all information related to Buyer in writing prior to inclusion in the news magazine.

(iv)    Assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.  Buyer will also assign a sales representative to act as Seller's sales representative in the Book Market ("Sales Rep").  The Brand Manager and Sales Rep may be the same person.  Buyer shall make a reasonable effort to accommodate Seller's request for the person to act as the Sales Rep.

(v)    To the extent Buyer has a presence (e.g. erects a booth) at comic industry trade show events or book industry trade show events in North America (including but not limited to the San Diego Comic Con, Chicago Comic Con, American Library Association Conference, and the Book Expo America convention), the Sales Rep or another sales representative of Buyer shall attend and display and promote the Products as appropriate for the type of event.

(vi)    To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or at book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of space for the inclusion of editorial content to be provided by Seller.

(vii)    In addition to the items set forth above, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating customer feedback and market information to Seller.  In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming, and (ii) can reasonably be performed by the Brand Manager.

Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth above.

(b)    Buyer may also elect, in its sole discretion, to offer services not specified above ("Additional Services") to Seller.  Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.  The cost to Seller for such Additional Services shall be agreed upon in advance in writing by Seller and Buyer, but in no event shall the Additional Services be offered by Buyer to Seller exceed Buyer's direct cost for providing such Additional Service plus twenty percent (20%).

7.    Intellectual Property Rights.

(a)    Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products, including any copyrights, trademarks, service marks, and any registrations that have issued or may issue thereon, and any other intellectual property right therein ("Intellectual Property Rights") and will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title, and interest.  Buyer acknowledges that it shall not acquire any rights whatsoever in the Intellectual Property Rights as a result of Buyer's use thereof, and that all use of the Intellectual Property Rights by Buyer shall inure to the benefit of Seller.

(b)    Buyer shall not in any manner represent that Buyer has any ownership in the Intellectual Property Rights, or in any material supplied to or created by Seller pursuant to this Agreement.  Buyer agrees that Buyer shall not at any time attack the validity of this Agreement or apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Intellectual

Property Rights, including but not limited to adopting or using any word or mark which is identical or confusingly similar to the trademarks owned by Seller.

(c)    Buyer shall permanently affix the following notice, or other notice supplied by Seller, in a reasonably prominent position on all advertising, promotional, and display material incorporating or relating to the Products and/or their contents. Buyer shall modify the date in each such notice to accurately reflect the year of creation of such Product.

"© and ™ 2004 Aspen MLT, Inc. All Rights Reserved."

(d)    Buyer shall procure Seller's approval in advance of actual use copies of advertisements, promotions, brochures, manuals and other materials using the Trademarks; provided however, that this section shall not apply to materials created in-house by Buyer.

8.    Early Termination for Default.

(a)    Either party may terminate the Appointment prior to the expiration of the Term upon notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default within thirty (30) days of notice.

(b)    Notwithstanding the above Section 8(a), Seller may, but shall not be obligated to terminate this Agreement if:

(i)    Buyer fails to abide by the terms of Section 7;

(ii)    Buyer fails to pay amounts owed to Seller within the time stated in this Agreement and such failure to pay continues for more than fifteen (15) days after written notice that such payment is overdue;

(iii)    Buyer undergoes or enters into any of the following: (A) an agreement to merge or consolidate, or otherwise reorganize, with or into one or more entities other than an affiliate, as a result of which the outstanding securities of Buyer immediately prior to such merger or consolidation are, or are to be, converted (1) solely into cash or non-voting securities of the surviving or resulting entity, or (2) at least in part into voting securities of the surviving or resulting entity, but such voting securities will represent less than 50% of the outstanding voting securities of the surviving or resulting entity; (B) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all, or substantially all, of the assets of Buyer to a person or entity that is not an affiliate; or (C) a person or entity that was not a stockholder of Buyer (or an affiliate thereof) on the date hereof acquires directly or indirectly 50% or more of Buyer's outstanding voting securities; and

(iv)    Suspension of the usual business activities of Buyer or the complete or partial liquidation of Buyer's business;

(v)    (A) A court having jurisdiction in the premises shall enter a decree or order for relief in respect of Buyer in an involuntary case under Title 11 of the United States Code entitled "Bankruptcy" (as now and hereinafter in effect, or any successor thereto, the "Bankruptcy Code") or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; or (B) an involuntary case shall be commenced against Buyer under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having

similar powers over Buyer or over all or a substantial part of its property shall have been entered; or the involuntary appointment of an interim receiver, trustee or other custodian of Buyer for all or a substantial part of its property shall have occurred; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Buyer, and, in the case of any event described in this section, such event shall have continued for ninety (90) days unless dismissed, bonded or discharged; or

        (vi)     An order for relief shall be entered with respect to Buyer or Buyer shall commence a voluntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property, or Buyer shall make an assignment for the benefit of creditors; or Buyer shall admit in writing its inability to pay its debts as such debts become due; or the Board of Directors of Buyer shall adopt any resolution or otherwise authorize action to approve any of the foregoing.

    9.    <u>Effect of Termination or Expiration.</u>

      (a)    Upon expiration or earlier termination of the Agreement, all rights granted to Buyer hereunder shall immediately terminate and Buyer shall have no right to distribute any Products in its consigned inventory.

      (b)    Buyer shall pay Seller all outstanding payments due within ten (10) days of such expiration or termination.

      (c)    Buyer shall immediately deliver all Products within its possession to Seller at no expense to Seller and Seller shall have the right to enter the business premises of Buyer and take possession of them. Buyer, at Seller's option, may destroy such material and upon such destruction, furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

      (d)    Seller shall pay Buyer all outstanding fees due within ten (10) days of such expiration or termination.

      (e)    Sections 1, 2(c), 2(d), 2(e), 4 (as to fees due but not yet paid, as well as to Products in Buyer's possession), 5 (as to fees due but not yet paid), 7, 9, 11 and 12 shall survive the expiration or any termination of this Agreement. Neither party is liable to the other for damages of any sort resulting solely from terminating this Agreement in accordance with its terms.

    10.    <u>Warranty.</u> Seller hereby represents and warrants that (i) it owns or has a valid license for all intellectual property rights required for the distribution of the Products by Buyer, including all required trademarks (registered or unregistered) and copyrights (registered or unregistered); (ii) Buyer's distribution of the Products will not infringe the intellectual property rights of any third party; and (iii) the execution, delivery and performance of this Agreement by Seller will not breach or conflict with any agreement between Seller and any third party.

    11.    <u>LIMITATION OF LIABILITY.</u> NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EACH PARTY'S TOTAL LIABILITY FROM ANY AND ALL CAUSES ARISING OUT OF, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT EXCEED THE AMOUNTS PAID BY BUYER TO SELLER UNDER THIS AGREEMENT.

12.    Miscellaneous.

(a)    *Notices*.  All notices given to a party hereunder must be given in writing and are deemed given the day they are (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:
 Aspen MLT, Inc.
 1223 Glencoe #A200
 Marina Del Rey, California 90292
 Attention: Frank Mastromauro
 Cc: Michael Turner
 Email:  Frank@aspencomics.com
   Michael@aspencomics.com
 With a copy to:

 Preston Gates and Ellis LLP
 1900 Main Street, Suite 600
 Irvine, California  92614
 Attention:  Carrie S. Quintanar


If to Buyer:
 Diamond Comic Distributors, Inc.
 1966 Greenspring Avenue
 Timonium, Maryland 21093
 Attention:  Chief Operating Officer


or to such other address as either party shall have designated in a notice to the other party.

(b)    *Independent Contractors; No Third Party Rights*.  Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.  Nothing set forth herein shall constitute a joint venture, partnership, agency, franchise, or employment relationship between Buyer and Seller.  Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

(c)    *Force Majeure*.  Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the periods that such failure or delay is due to acts of God, public enemy, war, riot, embargoes, acts of civil or military authorities, terrorism, fires, flood, earthquake, strikes or labor disputes or any other cause beyond that party's control.  The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and the probable duration thereto, shall notify the party when the force majeure has ended and carry out the terms of this Agreement as promptly as practicable after such cause is terminated.

(d)    *Assignment; Binding Effect*.  Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of creating, publishing and/or distributing the Comic Books and the Graphic Novels.  Buyer may assign this Agreement to any affiliate of Buyer organized for

the purpose of conducting substantially all of Buyer's distribution activities. Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided, however, that Seller shall have the right to assign this Agreement or any portion thereof to (a) any entity with which Seller may merge or consolidate, (b) any entity which controls, is controlled by, or under common control with, Seller, and/or (c) any entity which acquires all or substantially all of the assets of Seller. Any purported assignment by a party in contravention of this section shall be void. All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

(e)    *Entire Agreement; Modification.*  This Agreement and any exhibits attached hereto which are incorporated by this reference constitute the entire agreement between the parties with respect to the subject matter hereof, and supersedes all other prior and contemporaneous oral and written representations, agreements, or understandings between them relating thereto. This Agreement and any exhibits attached hereto may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing, any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

(f)    *Applicable Law.*  This Agreement shall be deemed to have been entered into in the State of California and shall be interpreted and construed in accordance with the laws of the State of California applicable to agreements executed and to be fully performed therein. The parties consent to exclusive jurisdiction and venue in the federal and state courts sitting in Los Angeles County, California. In any action or suit to enforce any right or remedy under this Agreement or to interpret any provision of this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees, costs and other expenses.

(g)    *Severability.*  In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction, such provision, or portion thereof, shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement will continue in full force and effect.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

| ASPEN MLT, INC. | DIAMOND COMIC DISTRIBUTORS, INC. |
|---|---|
| By: | By: |
| Name: MICHAEL TURNER | Name: Larry R. Swenson |
| Title: PRESIDENT | Title: Treasurer |
| Date: 10-1-04 | Date: 10/12/04 |

9

**EXHIBIT 2**

**Black Mask Studios, LLC Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of January 15th, 2015, is made by and between Black Mask Studios LLC, a California LLC located at 2798 Sunset Blvd, Los Angeles, California   90026 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

## WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products.") All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  Appointment; Territory.

(a)  Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Graphic Novels in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market book merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass book merchandisers/retailers; and other book retailers; all of   which generally buy under returnable trade terms. Seller reserves the right to run and maintain a web site a component of which will include an e-commerce site where Seller will sell their products directly. Seller also reserves the right to sell their products directly at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues.

(b)  Seller hereby appoints Buyer as its preferred distributor worldwide for the sale and distribution of Products in the Comic Book Specialty Market.  "Comic Book Specialty

Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms. Seller reserves the right to run and maintain a web site a component of which will include an e-commerce site where Seller will sell their products directly. Seller also reserves the right to sell their products directly at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues.

(c)     Seller hereby appoints Buyer as its non-exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing, collectible card games and boxed games under Buyer's non-returnable trade terms. Seller reserves the right to run and maintain a web site a component of which will include an e-commerce site where Seller will sell their products directly. Seller also reserves the right to sell their products directly at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues.

(d)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer.

(e)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), l(b) and l(c) hereof (collectively, the "Appointments").

(f)     Notwithstanding anything to the contrary herein, Seller retains the right to sell any Products direct or through a third party of its choosing in the Book Market (except returnable Graphic Novels), Comic Book Specialty Market, Hobby Gaming Market, and at any other retailers not covered in this agreement such as Music Retailers, Lifestyle Retailers, Infoshops, Skateboarding/Sports Retailers, Indie Distros, Apparel Retailers, any accounts not serviced by Buyer, Seller's existing accounts such as Hot Topic and Urban Outfitters, and any direct accounts of Seller's past, current, or future partners including King's Road Merch and Epitaph Records.

2.     Term.     The initial term of this Agreement (the "Initial Term") is for two years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of July 1st, 2014, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     Supply.

(a)     Subject to Paragraph 3(e) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion. Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time. In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)     With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's Olive Branch, Mississippi distribution facility and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus twenty (20) percent.

(e)     Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)     Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's distributor set forth above (i) shall apply to all Seller's titles published under the Publisher Trademark Name TBD trademark during the Term (in accordance with Paragraph 2 herein) of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.     Distribution Services: Additional Services.

(a)     As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto (collectively, the "Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)     Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto (collectively, the "Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such Additional Service plus 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate

Card less 10.00%.

     5.    Price for Products.

(a) Seller shall sell Products to Buyer at a discount of 60.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 2.00% of the retail price (or a 4.00% of purchase price freight rebate if any Product is solicited on a net cost basis) for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or if Seller ships Products to each of Buyer's North American distribution centers, Seller will be responsible for all freight and delivery charges. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center.

(b) In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 2.50% of the retail price of all Products (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM customers that place orders after Buyer's sales representatives have solicited such customers (the "Book Market Sales Allowance"). For like sales in the UK, Seller shall provide Buyer an allowance of 4.50% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation, a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c) Subject to paragraph 1 (c), in addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers its Products through Buyer to Customers.

    6.    Payment Terms; Book Market Returns; Etc.

    (a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "Release Date" to the Direct Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). On a weekly basis and within 60 days after Buyer's unofficial weekly Release Date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount. The Weekly Payment Amount shall be equal to (i) the retail value of Net Products (as defined herein) sold to Customers (as

defined herein) multiplied by 40.00%   plus the net cost value of Net Products sold to Customers, less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) the Freight Rebate, less (vi) a Customer freight fee of 1.25% of retail for those customers who require free freight for deliveries by Buyer, less (vii) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C.   Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market customers, CBSM customers and Hobby Game Market customers. Products returned to Buyer from Book Market customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 8.00% of the retail price of such Book Market Return. In addition, if in any year of the Term of this Agreement Buyer processes Book Market Returns with a credited value in excess of 30.00% of sales made to the Book Market during such year (the "Trigger Amount"), Seller will pay to Buyer an additional fee of 4.00% of the invoices credited for Book Market Returns in excess of the Trigger Amount in such year (the "Book Market Returns Fee").

"Documented Deductions" shall mean any deduction taken by a Book Market customer whether on their remittance or through other means.   When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction").   Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting customer by (b) the total sales of all products Buyer sells to the deducting customer multiplied by (c) the Indirect Deduction.   Buyer will give 14 days' notice to seller of any new Documented Deductions.   Seller will have the option to instruct buyer to discontinue selling to the customer that is the source of the deduction if Seller so chooses.

(b)    In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement. This

examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(b). Buyer shall keep all such records available for at least one year following termination of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 3% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller.     If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)     In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market customers require that Buyer sell Products to them at a higher base discount (for example, a customer requires a 55% discount rather than a 52% discount),), Buyer shall notify Seller of such requirement. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer in writing of its election to either (i) have Buyer continue sales under this Agreement to such customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such customer.

7.     Credit Decisions.

(a)     Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)     Buyer shall have the right to sue any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)     With respect to Book Market customers Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 15.00% of the retail value of the amount of the bad debt.   To the extent Seller has been paid for Products sold to a Book Market customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's deemed costs for any such bad debt and the invoice value related to Seller's Products included in the bad debt.

(d)     For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.     Title And Risk Of Loss; Inventory.

(a)     All Products are to be held by Buyer on consignment, and remain the

property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

      (b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement. Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

      (c)    Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer shall maintain all insurance with respect thereto. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from normal shrinkage and deterioration shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds one and one-half percent (1.5%) of the total units of Products shipped to Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 10% of average retail price of units over the threshold so as to approximate direct manufacturing costs; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing and Seller was previously compensated and are therefore now, subject to a reimbursement payment to Buyer; if such products are found within 6 months of such time as they were determined to be missing. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the one and one-half percent (1.5%) threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed the printing costs associated with sum of (i) the printing costs associated with the Products that are lost or damaged and (ii) Seller's actual cost of shipping such Products to Buyer's distribution center.

      (d) Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail amount) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter   Distribution Amount").   Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to Products inventory at the end of a calendar month with a

Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $ 0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail amount) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)    Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(e)    Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(f)    If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller 15 per order, 2 per title and 0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of 20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.    Intellectual Property.

(a)    Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)    Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)    In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)    Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word



or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 2014 Black Mask Comics, All Rights Reserved."

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.     Termination.

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

     i.     Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

     ii.    Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

     iii.   A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

     iv.    Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights

Page 9 of 22

in Buyer; or

v. Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

(d) In the event that Seller consummates a transaction or series of related transactions which cause the current holders of the ownership (as of the date of this agreement) interests in Seller to sell a majority interest to an outside party wherein they would own less than fifty percent of the voting rights in Seller, Buyer will continue to distribute Seller's Products for a period not to exceed 8 months; at which time this Agreement shall terminate.

11.    Effect of Termination.

(a) Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b) If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller. Buyer is responsible for the cost of packing and shipping the existing inventory to a new facility to be named by the Seller.

(c) If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d) Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at

Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)    In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Sellers Products distributed to Book Market customers for ninety (90) days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)    Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)    Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer.    Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any customer refuses to pay to Buyer on account of Sellers Products shipped to such customer by Buyer due to any deduction claimed by such customer for returns which such customer makes after the Returns Period or in connection with any dispute over the customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.    If Buyer determines Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.

(g)    Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic hub distribution center, currently Olive Branch Mississippi for credit.   If Seller prefers this UK Product be destroyed, Buyer will do so at Seller's request and at Seller's sole cost and expense including credit for the original purchase price of Products

(h)    Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless

Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer. If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.    Notices.    All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

> Black Mask Comics
> 2798 Sunset Blvd
> Los Angeles, CA 90026
> Attn Pizzolo c/o Epitaph
> Publisher Phone: 323-285-5066
> Publisher Fax: na

If to Buyer:

> Diamond Comic Distributors, Inc.
> 10150 York Road, Suite 300
> Hunt Valley, Maryland    21093
> Attention: Chief Operating Officer
> Fax: (410) 683-7088

or to such other address as either party shall have designated in a notice to the other party. Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.    Release.    By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (c).    In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (c)).

14.    Independent Contractors; No Third Party Rights.    Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.    Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller. Nothing contained in this Agreement

shall give or is intended to give any rights of any nature to any third party.

15.    Force Majeure.    Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.    The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.    Assignment: Binding Effect. Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products. Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.    Notwithstanding the    foregoing,    this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.    All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.    Entire Agreement: Modification.    This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and    supersede    all    other prior    oral and written representations,    agreements,    or understandings between them relating thereto. This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.    Applicable Law.    This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party. In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator. Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction. In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    Survival. All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.



20.    Severability.  In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto. However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein.   If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof. Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(e)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    LIMITATION OF LIABILITY.    IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND    OR    NATURE,    INCLUDING    LOST    PROFITS,    ARISING OUT    OF    THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.



23.          Confidentiality.  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").    The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.   Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.          Headings and Construction.  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.    This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.          Counterparts: Facsimile Signature Pages.    This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*[Signatures appear on the following page]*



IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of February 2015 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

Black Mask Studios, LLC

By:

Date: 1/15/15

Name: Matt Pizzolo

Title: Authorized Representative

DIAMOND COMIC DISTRIBUTORS, INC.

By:

Date:

Name: Larry Swanson

Title: CFO

## EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.      Buyer shall perform the following marketing services:

(a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term. Additionally Seller will be granted two ad pages annually at no cost to Seller.

(b)      Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 10% off Buyer's published advertising rates.

2.      Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments. Buyer will also assign a sales representative to act as Seller's sales representative to the Book Market ("Sales Rep"). The Brand Manager and Sales Rep may be the same person. Buyer shall make a reasonable effort to accommodate Seller's request for the person to act as the Sales Rep.

3.      To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con, Chicago Comic Con, American Library Association Conference, Book Expo America Convention), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.      To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

5.      Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book



Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

6. The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.



## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Vendor in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Vendor shall be accepted by Vendor under the terms and conditions of this document.    These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Vendor by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Vendor shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Vendor notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.    Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Vendor a processing fee of $100.

Vendor shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped. At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the vendor, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the vendor) may be delayed up to three weeks. Vendor shall extend full return privileges to both DCD and Retailers on all items stickered by DCD. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed    Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Vendor solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.    Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.



In the event Vendor ships product to DCD which has not been ordered by DCD, Vendor assumes all risk for the product.   DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Vendor.
DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Vendor hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label.   Vendor further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Vendor of the warranties contained herein or any act or omission of Vendor or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.   In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Vendor breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Vendor for a full refund.   Vendor shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Vendors must be shipped "delivered duty paid (DDP)".   Should failure of Vendor to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Vendor shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Vendor hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Vendor shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.   Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Vendor, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Vendor have any questions as to the meaning of any terminology or phrasing used in



these Purchase Order Terms, Vendor shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.



# Exhibit C
# Black Mask Comics
# Summary of Key Deal Points

| | US & UK CBSM Market | | US Book Market | | UK Book Market |
|---|---|---|---|---|---|
| Product Category | All | | All | | All |
| Section 5 (a) Base Discount | 60.00% | | 60.00% | | 61.00% |
| Section 6 (a) Base    Days | 30 | | 60 | | 60 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | | n/a | | n/a |
| Section 6 (a) Early    Pay Days Seller's Option | n/a | | n/a | | n/a |
| Section 5 (a) Freight Rebate | 2.00% of retail | | 2.00% of retail | | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | | 2.50% | | 4.50% |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | | 8.00% | | 8.00% |
| Section 6 (a) Returns    Cap | n/a | | 30.00% | | 30.00% |
| Section 6 (a) Returns    Fees | n/a | | 4.00% | | 4.00% |



# BLACK MASK

### STUDIOS

**2798 SUNSET BLVD    LOS ANGELES CA 90026**
**p . 323 285 5066    f . 323 443 3768**

March 31, 2021

*Via e-mail*
*Via mail*

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland 21093

Attention: Tim Lenaghan

RE: DISTRIBUTION AGREEMENT - NOTICE OF TERMINATION


Dear Tim Lenaghan:

We refer to the Distribution Agreement between Diamond Comic Distributors, Inc. ("Diamond" "you") and Black Mask Studios LLC ("Black Mask"), dated January 15, 2015 and effective as of July 1, 2014 (the "Agreement").

The current Renewal Term expires on June 30, 2021. In accordance with Paragraph 10(a) of the Agreement, this letter is our 90-day prior written notice of our intent to terminate this Agreement upon the expiration of the current Renewal Term.

Please let us know if you have any questions.


Yours sincerely,

Matt Pizzolo
Authorized Representative
Black Mask Studios, LLC

## PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Vendor in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Vendor shall be accepted by Vendor under the terms and conditions of this document.  These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Vendor by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Vendor shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Vendor notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.  Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Vendor a processing fee of $100.

Vendor shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

Upon shipment of product, an invoice must be sent to:

> Diamond Comic Distributors, Inc.
> 1966 Greenspring Drive - Suite 300
> Timonium, MD  21093

(Invoices should not be included with shipments, as this will result in delay of payment.)

Notwithstanding orders for Themed  Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Vendor solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.  Any such reorders that do not ship within the above described time frame will be cancelled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event.  Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

In the event Vendor ships product to DCD which has not been ordered by DCD, Vendor assumes all risk for the product.  DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Vendor.  DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Vendor hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label.  Vendor further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Vendor of the warranties contained herein or any act or omission of Vendor or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.  In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Vendor breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either  receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Vendor for a full refund.  Vendor shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location(s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Vendors must be shipped "deliver duty paid (DDP)".

Should failure of Vendor to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Vendor shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.  In the event of any litigation arising out of the Purchase Order, Vendor hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms are held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Vendor shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.  Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Vendor, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Vendor have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Vendor shall get clarification from DCD.  DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

POTERMS-003 (06/04)

ACCEPTED BY:

Diamond Comic Distributors, Inc.
_____

_____
Name/Title

Title
_____

_____
Company

Date
_____

_____
Date

My signature indicates that I have read Diamond's three (3) page "PURCHASE ORDER TERMS" (POTERMS-003) and agree to be bound by all terms and conditions contained therein.  I also attest that I have made a true and exact copy for my records.

POTERMS-003 (06/04)

**Exhibit 3**

**Dark Horse Comics, LLC Agreement**

**DIAMOND COMIC DISTRIBUTORS, INC.**
STRICTLY PRIVATE AND CONFIDENTIAL

July 21, 1995

Mr. Mike Richardson, President
Dark Horse Comics, Inc.
10956 S. E. Main Street
Milwaukie, OR  97222 - 7644

Dear Mike:

Diamond Comic Distributors, Inc. ("Diamond") and Dark Horse Comics, Inc. ("Dark Horse") have been discussing the terms of an exclusive brokerage arrangement between Diamond and Dark Horse.  Diamond continues to believe that such an arrangement is in the best interests not only of the two companies but of comic book retailers and the comic book industry as well.  This letter agreement (the "Agreement") sets forth the terms on which Diamond and Dark Horse have agreed to enter into an exclusive brokerage arrangement.

      1.    <u>Diamond's Appointment; Exclusivity.</u>

      (a)    Dark Horse will appoint Diamond (and Diamond's sub-agents, subject to Section 1(b) hereof) as its exclusive agent in North America and, subject to the last sentence of this Section 1(a), in other countries worldwide (collectively, the "Territory") for direct or indirect sales of comic books, comic-related printed matter, trade paperbacks, graphic novels, ancillary comic-related products, and periodicals less than six months old (the "Products") to (i) comic book specialty retail customers and (ii) other retail customers presently served, or of the type presently served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry) (collectively, "Exclusive Customers").  Diamond's appointment will be effective with Products available for shipment as of November 1, 1995 (the "Commencement Date"), provided that during a transition period ending no later than December 31, 1995, Dark Horse may be required to furnish Products which have been the subject of solicitation materials released prior to the date hereof to third parties pursuant to contractual commitments existing as of the date hereof.  Notwithstanding anything to the contrary set forth herein, Dark Horse shall not be required to appoint Diamond as its exclusive agent in any country where such appointment would be prohibited by applicable law or where a contractual arrangement to which Dark Horse is a party would be breached by such appointment.

      (b)    The parties agree that Diamond may use as a sub-agent any person or entity with which Diamond or Capital City Distribution, Inc. has dealt during the five year period ending on the Commencement Date.  With respect to any other persons or entities which Diamond desires use as a sub-agent, Diamond shall consult with Dark Horse prior to agreeing to use such person or entity as a sub-agent.

20000066

(c)     Dark Horse also agrees to consult with Diamond regarding distribution opportunities in the direct market or otherwise with respect to any non-Product items that Dark Horse offers.  Commissions and payments for services for the distribution of such non-Product items will be negotiated in good faith between Diamond and Dark Horse.

2.    Diamond's Services; Additional Services; Brand Manager.

(a)     Diamond will perform each of the services specified in Exhibit A hereto with respect to Dark Horse's sales of Products to Exclusive Customers in the Territory (such services to be defined herein as the "Basic Services").

(b)     From time to time, Diamond may elect to offer new or additional services not specified in Exhibit A, which services will be referred to as "Additional Services".  If Diamond develops an Additional Service, Diamond will offer that Additional Service to Dark Horse, and may also offer it to other publishers.  Dark Horse also may request in writing that Diamond develop or offer a new or additional service to the Exclusive Customers, and Diamond may (in its reasonable discretion) elect to provide such service to Dark Horse.

(c)     Diamond will employ a brand manager, to be selected following consultation with Dark Horse and subject to Dark Horse's reasonable approval, who will act as a liaison between Dark Horse and all Diamond departments (the "Brand Manager").  The Brand Manager will represent no other Premier Comic Supplier (as defined in Section 4(a) hereof) and no more than two other non-comic Premier brands.  The Brand Manager's other brands will be assigned, where possible, to offer what are reasonably anticipated to be the greatest synergies with Dark Horse.

3.    Term of Agreement; Termination.

(a)     This Agreement will have an initial term of three years from the Commencement Date (the "Initial Term").  Following the Initial Term, Dark Horse will have the right to renew this Agreement for up to four additional two-year periods.

(b)     During the Initial Term and any renewal term, Dark Horse shall have the right to terminate this Agreement upon 120 days' prior written notice, with or without cause.

(c)     In addition to any and all other legal and equitable remedies available hereunder, this Agreement may be terminated by either party if the other party commits a material breach of this Agreement and fails to discontinue and to cure such violation within 45 days after the date of notice in writing from the terminating party specifying the violation; provided, however, that the cure period applicable to (i) a breach of either party's obligation to pay money to the other or (ii) Diamond's substantial, material failure to perform Basic Services and Additional Services as set forth herein

- 2 -

(other than any such failure arising from strikes, natural disasters, national emergencies or any other such circumstances beyond Diamond's control in which case the 45 day cure period shall apply), will be 5 days.

(d)    Notwithstanding any other provision of this Agreement, however, in the event that this Agreement is declared in a final judgment null and void or enforcement of this Agreement in a final judgment is materially restrained or prevented: (i) this Agreement will terminate immediately and will have no further force or effect other than with respect to the parties' mutual obligation to satisfy any and all prior-accrued obligations hereunder (to the extent permitted by applicable law) and with respect to its confidentiality provisions; and (ii) the loan contemplated in paragraph 13 of this Agreement will be immediately due and payable to Diamond.  In the event that enforcement of this Agreement is materially restrained or prevented in a non-final judgment (such as a temporary restraining order), the obligations of the parties hereunder shall be suspended until a final judgment with respect to such enforcement is obtained or efforts to reverse such non-final judgment are abandoned in the discretion of Dark Horse or Diamond.

4.    <u>Premier Status; Charter Period; Additional Premier Suppliers.</u>

(a)    Diamond will be establishing relationships with suppliers in each of several product categories (*i.e.* comics, games, trading cards) at three distinct and clearly differentiated levels, which Diamond currently anticipates will be denoted or labeled as "Premier", "Featured", and "Basic".  Comic book suppliers accorded "Premier" status shall be referred to herein as "Premier Comic Suppliers").  Beginning with the November 1995 shipping of Products, and continuing during the Initial Term and the first renewal term of this Agreement (if any), Diamond will accord Dark Horse "Premier Comic Supplier" status.  Thereafter, Dark Horse will retain its Premier Comic Supplier status if it maintains a 5% share of Diamond's total comic market for at least six months out of each successive 12-month period or, if a lower standard, Diamond's then-current lowest standard for maintaining Premier Comic Supplier status.  Notwithstanding the foregoing, in the event of a change in control of Diamond during the Initial Term or any renewal period, and if Dark Horse is a Premier Comic Supplier at the time of the change in control, Dark Horse will retain its status as a Premier Comic Supplier for the remainder of the term of this Agreement (including any renewal periods) regardless of its share of Diamond's total comic market.

(b)    For a 12-month period commencing on the Commencement Date (the "Charter Period"), Diamond will limit the number of comic suppliers who are given Premier Comic Supplier status to a group comprised of no more than four comic suppliers (the "Charter Premier Comic Suppliers").

(c)    After the Charter Period, Diamond may designate additional Premier Comic Suppliers, but only if they have achieved at least a 5% share of Diamond's

- 3 -

20000068

total comic market for at least three out of the prior six consecutive months, or, in Diamond's estimation, have the reasonable likelihood of achieving a 5% share in at least three out of the next six consecutive months following the date of designation (Diamond will not add more than one Premier Comic Supplier annually under the "reasonable likelihood" criterion described above, however). Premier Comic Suppliers (other than Charter Premier Comic Suppliers) will be required to maintain at least a 5% share of Diamond's total comic market for at least six months out of each 12-month period in order to remain eligible for Premier status.

     5.    <u>Premier Marketing Services; Calculating Pro Rata Share; Right of First Refusal</u>.

     (a)    Dark Horse will have the right to subscribe for a pro rata portion, based on its PCS Market Share (as defined below), relative to the PCS Market Share of the other Premier Comic Suppliers, of any marketing services reserved for Premier Comic Suppliers that, by their character, are limited in availability (such as covers, advertising space and the like; collectively "Limited Premier Services"). As used herein, the PCS Market Share of a Premier Comic Supplier shall be derived by dividing the total retail dollar value of the Premier Comic Supplier's Products that Diamond has invoiced to Exclusive Customers (the "Total Retail Dollar Amount") during the measurement period by the aggregate Total Retail Dollar Amount of all Premier Comic Suppliers' Products that Diamond has invoiced to Exclusive Customers during the measurement period.

     (b)    Beginning January 1, 1996 and continuing during calendar 1996, Dark Horse's PCS Market Share shall be deemed to be 15% notwithstanding its actual PCS Market Share during such period. Thereafter, Dark Horse's PCS Market Share relative to the other Premier Comic Suppliers will be calculated annually at the end of each calendar year, based on results for such calendar year, in the manner set forth in Section 5(a) above. Regardless of the actual calculation of Dark Horse's annual PCS Market Share, during the second and third years of the initial term of this Agreement and the first renewal period (if any), Dark Horse's annual PCS Market Share will be deemed to be no less than 10%. In addition, in the event of a change in control of Diamond during the term of this Agreement, Dark Horse will retain, at a minimum, the same percentage of Limited Premier Services as Dark Horse qualified to receive at the time of the change in control, with upward adjustment as merited by increases in Dark Horse's annual PCS Market Share during the remaining term of this Agreement.

     (c)    If Dark Horse or any other Premier Comic Supplier declines to accept or purchase its pro rata allocation of Limited Premier Services, then the other Premier suppliers will have a first right to obtain or purchase those services before they are offered to suppliers at the Featured or Basic levels. Any rights of first refusal will be allocated to Premier Comic Suppliers on a pro rata basis according to their average PCS Market Share (calculated as described above) during the three-month period preceding the allocation.

- 4 -

If the available Limited Premier Service is of such a type as may only be allocated to one Premier Comic Supplier, then each Premier Comic Supplier will have a proportionate chance of obtaining the available Limited Premier Service based on its three-month average PCS Market Share at the time of the drawing. In these situations, Limited Premier Services will be distributed by a simple drawing in which the current Premier Comic Suppliers will receive one chance for each 5% (rounded up or down to the next 5% level) of their average PCS Market Share (for example, a Premier Comic Supplier that has a 28% average PCS Market Share will have six chances in the drawing, while a Premier Comic Supplier with a 52% average PCS Market Share will have ten chances). The winner of the drawing will receive the right to purchase or obtain the Limited Premier Service, and thereafter will have one fewer chance than its then-current average PCS Market Share otherwise would entitle it to have entered in subsequent drawings, until each Premier Comic Supplier has won at least one drawing. When each Premier Comic Supplier has won at least one drawing, the Premier Comic Suppliers will receive their full number of chances in the next drawing, and subsequent drawings will follow the pattern described above.

6.    <u>Service Fee; Rebates</u>.

(a)    <u>Fees for Basic Services</u>. Diamond will perform Basic Services with respect to the Products on a brokerage basis and will receive a commission equal to 7.8% of the retail price of the Products, adjusted as follows:

(i)    If Diamond's Total Wholesale Sales (defined as the total wholesale dollar amount invoiced by Diamond on all sales of Products and all other publications and items sold by or on behalf of any party through Diamond, less only actual returns received in the amount for which credit was granted) exceeds $155,000,000 in any calendar year during the term of this Agreement (beginning January 1, 1996), then Dark Horse shall receive a rebate on Diamond's service fee in an amount equal to the total retail dollar amount of all Dark Horse Products invoiced by Diamond to customers during such calendar year multiplied by the decimal equivalent of the appropriate percentage set forth in the following chart:

| Diamond's Total Wholesale Sales (1996 dollars) | Rebate |
|---|---|
| $0 - 155,000,000 | 0.00% |
| $155,000,001-205,000,000 | 0.25% |
| $205,000,001 and above | 0.50% |

This rebate, if any, shall be payable to Dark Horse within 65 days after the end of the calendar year with respect to which Diamond's Total Wholesale Sales are measured. The sliding scale of Diamond's Total Wholesale Sales set forth above will be adjusted annually to reflect any change in the prior year's Consumer Price Index (defined as the

- 5 -

20000070

Washington, D.C., Standard Metropolitan Statistical Area Consumer Price Index, All-Items, All Urban Consumers, published by the United States Department of Labor, Bureau of Labor Statistics, or, if such index is no longer published or its method of computation is substantially modified, a substitute index published by the United States government or by a reputable publisher of financial or economic statistics that will fairly and reasonably reflect the same or substantially the same information as the discontinued or modified index).

(ii)    As an additional rebate, if the total wholesale dollar amount invoiced by Diamond on all sales of Dark Horse Products ("Dark Horse's Total Wholesale Sales") exceeds $21,000,000 in any calendar year during the term of this Agreement (beginning January 1, 1996), then Dark Horse shall receive an additional rebate on Diamond's service fee in an amount equal to the total retail dollar amount of all Dark Horse Products invoiced by Diamond to customers during such calendar year multiplied by the decimal equivalent of the appropriate percentage set forth in the following chart:

| Dark Horse's Total Wholesale Sales (1996 dollars) | Rebate |
| --- | --- |
| $0 - 21,000,000 | 0.00% |
| $21,000,001-26,000,000 | 0.15% |
| $26,000,001 and above | 0.30% |

This additional rebate, if any, shall be payable to Dark Horse within 65 days after the end of the calendar year with respect to which Dark Horse's Total Wholesale Sales are measured. The sliding scale of Dark Horse's Total Wholesale Sales set forth above will be adjusted annually to reflect any change in the prior year's Consumer Price Index.

(b)    Fees for Additional Services. Diamond's fees for any Additional Services will be Diamond's direct cost of providing the Additional Service plus 17%. If Dark Horse achieves an Overall Diamond Market Share (as defined herein) of at least 50% of the Overall Diamond Market Share of Diamond's Largest Supplier (as defined herein) in any calendar year during the term of this Agreement (beginning January 1, 1996), however, then Dark Horse's cost for Additional Services will be Diamond's direct cost of providing the Additional Services plus 15% for that calendar year, and Diamond will rebate the difference to Dark Horse within 65 days after the end of that calendar year. For purposes of this paragraph, "Overall Diamond Market Share" will be calculated by dividing the Dark Horse's Total Wholesale Sales of Products, or the total wholesale sales through Diamond of all publications and/or items of Diamond's Largest Supplier, by Diamond's Total Wholesale Sales for that calendar year. "Diamond's Largest Supplier" means the largest supplier of products, publications or other items to Diamond as of the Commencement Date.

- 6 -

(c)    Outreach Services. If Dark Horse and Diamond mutually agree, for an additional fee Diamond will work on Dark Horse's behalf to plan, execute and administer an outside and inside sales force (each of which will be subject to "finite" allocations, as outlined above in paragraph 5), an Industry Improvement Fund, or other such services as both companies may mutually agree.

7.    Rate Card Service Fees: Discount.

(a)    Certain marketing services offered by Diamond (including, without limitation, advertising) will be priced based on a rate card that Diamond publishes from time to time ("Rate Card Services"). Each calendar quarter, Dark Horse will be eligible to receive a discount on such Rate Card Services (a "Rate Card Discount") that will be calculated in accordance with the table set forth below based on the Total Retail Dollar Amount of Dark Horse Products invoiced by Diamond during such calendar quarter. Effective as of the Commencement Date, and continuing as long as Dark Horse remains a Premier Comic Supplier, the Rate Card Discount will be no lower than 10%. The Rate Card Discount will be calculated on a quarterly basis based on the Total Retail Dollar Amount of Dark Horse Products invoiced by Diamond during the prior calendar quarter:

| Dark Horse Quarterly Total Retail Dollar Amount | Discount |
|---|---|
| $0 - $5,000,000 | 0% |
| $5,000,001 - $10,000,000 | 5% |
| $10,000,001 - $20,000,000 | 10% |
| $20,000,001 - $30,000,000 | 15% |
| $30,000,001 - $40,000,000 | 20% |
| over $40,000,000 | 28% |

(b)    Dark Horse will receive an additional discount of 5% off the published prices for Rate Card Services for each calendar quarter in which Dark Horse maintains a dollar line average and on-time shipping performance within 90% of the levels it is achieving as of the Commencement Date.

8.    Payment Terms. Beginning on the Commencement Date, and continuing for six months, Diamond will pay the net amount (after deducting its fee for Basic Services) due to Dark Horse for each shipment of Products within three days of Diamond's receipt of the Products. Thereafter, Diamond's payment terms will increase by one day per week during the next 27 weeks, until Diamond's payment terms reach net 30 days. For the remaining term of this Agreement (and any renewal terms), Diamond will observe payment terms of net 30 days.

9.    Diamond's Invoices. Diamond will send invoices to Dark Horse for any amounts due to Diamond for incidental additional fees in connection with Basic Services and for any Additional Services performed, as applicable, promptly following Diamond's provision of the services. Dark Horse will pay Diamond any such amounts on payment

- 7 -

terms of net 30 days. Diamond will have the right to offset any invoiced amounts that Dark Horse has not paid within 45 days of the invoice therefor against amounts Diamond owes Dark Horse, provided, however, that Diamond shall have no right of offset with respect to invoiced amounts which Dark Horse has notified Diamond in writing it disputes in good faith.

10.    Information. Subject to Section 15 hereof, Diamond will provide Dark Horse with appropriate information regarding market conditions and retailer sales volumes so that Dark Horse can establish the discount levels applicable to various comic book specialty retailers and Exclusive Customers.

11.    Financial Ratios and Business Information.

(a)    Diamond will cause its outside accounting firm to furnish Dark Horse with calculations of its Current Ratio, Debt to Equity Ratio, Minimum Net Worth, and Cash Flow Coverage Ratio as at December 31, 1994, and will cause its outside accountant to provide Dark Horse with updated calculations of such ratios on a quarterly basis during the term of this Agreement.

(b)    Diamond warrants to Dark Horse that as of December 31, 1994 and as of the date hereof, (i) its Current Ratio was not and is not below 1.25 to 1; (ii) its Debt to Equity Ratio did not and does not exceed 2 to 1; (iii) its GAAP net worth was and is greater than $6,000,000; and (iv) its Cash Flow Coverage Ratio was not and is not below 2 to 1.

(c)    Diamond is presently planning a reorganization which will result in the separation of certain components of its business. Diamond covenants and agrees with Dark Horse that the entity which becomes the successor to Diamond's rights and obligations hereunder will satisfy each of the tests set forth in warranties (i) through (iv) in subparagraph (b) above as of the date such reorganization becomes effective.

(d)    Diamond agrees that Dark Horse shall have the right, on 30 days' written notice to Diamond, to terminate the Agreement in the event that hereafter (i) Diamond's current ratio falls below 1.25 to 1; (ii) its Debt to Equity Ratio exceeds 2 to 1 in 1995 or 1996 or 1 to 1 thereafter; (iii) its GAAP net worth falls below $6,000,000; or (iv) its Cash Flow Coverage Ratio falls below 2 to 1 in 1995 or 1996 or 3 to 1 thereafter.

(e)    To the extent permitted by applicable law, Diamond agrees to provide Dark Horse with information relevant to the mutual business of Diamond and Dark Horse, including gross sales figures, Dark Horse sales and inventory, direct costs of marketing and service levels. Annually, Diamond will provide Dark Horse or its designated outside accounting firm the limited right to audit Diamond's books and records for the sole purpose of verifying pricing matters set forth in this Agreement.

- 8 -

20000073

12.    <u>Legal Costs</u>.  Diamond will reimburse Dark Horse for 50% (up to an aggregate of $50,000) of legal costs and expenses actually incurred, including costs of settlement, arising from any lawsuit or other legal matter brought or threatened by any distributor arising directly from the establishment of the exclusive relationship contemplated by this Agreement.  Dark Horse will present Diamond with monthly invoices for Diamond's portion of such actual costs and expenses, if any, together with any back-up Diamond shall reasonably request, and Diamond will pay these amounts to Dark Horse within 15 days of receipt of each such invoice, subject to the restrictions of this paragraph.

13.    <u>Loan</u>.  On the Commencement Date, Diamond will loan Dark Horse $250,000, without interest, payable three years after the Commencement Date (the "Loan").  Dark Horse shall execute and deliver a promissory note in customary form to Diamond with respect to the Loan and shall use its best efforts to provide Diamond, as security for the Loan: (i) a security interest in Dark Horse's Product inventory and (ii) the right to offset loan payment amounts owing from Dark Horse to Diamond against any net amounts due from Diamond to Dark Horse hereunder.  In the event that Dark Horse is unable, due to existing commitments with lenders or other third-parties, to provide Diamond with the security set forth in clauses (i) and (ii) above, Diamond and Dark Horse shall negotiate in good faith with respect to the provision by Dark Horse of substantially equivalent substitute security with respect to the Loan.

14.    <u>Confidentiality</u>.  Except as required by law, neither Dark Horse nor its representatives will disclose or use any Confidential Information (as defined below), whether already furnished or to be furnished in the future to Dark Horse or its representatives, in any manner other than in connection with the performance of this Agreement.  Similarly, except as required by law, neither Diamond nor its representatives will disclose or use any Confidential Information, whether already furnished or to be furnished in the future to Diamond or its representatives, in any manner other than in connection with the performance of this Agreement.  For purposes of this Agreement, "Confidential Information" means any information about Diamond or Dark Horse furnished to the other, as well as the terms and provisions of this Agreement. Confidential Information does not include information that Dark Horse or Diamond can demonstrate (i) is generally available to or known by the public other than as a result of improper disclosure or (ii) is obtained by the disclosing party from a source other than the other party or its representatives, provided that such source was not bound by a duty of confidentiality with respect to such information.  Upon the written request of either party, the other party will promptly return any Confidential Information in its possession or in the possession of its representatives.

15.    <u>Confidentiality of Other Information</u>.  Dark Horse understands and hereby acknowledges and agrees that Diamond shall not supply, and Dark Horse shall not seek from Diamond, any confidential commercial information regarding other publishers or suppliers doing business with Diamond, and shall observe any procedures Diamond

- 9 -

implements to protect against the inadvertent disclosure of such information to Dark Horse.

16.    Publicity.  Each of the parties will consult with each other and reach mutual agreement before issuing any press release or otherwise making any public statement with respect to this Agreement or the transactions contemplated hereby; provided, however, that each party will be permitted to make, without the agreement of the other, such disclosures to the public or to governmental entities as that party's counsel reasonably deems necessary to maintain compliance with federal or state laws.

17.    Credit Decisions.

(a)    Diamond will make all required credit decisions with respect to Exclusive Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Exclusive Customers and the extent of credit to be granted.  Diamond shall extend credit to Exclusive Customers for shipping costs to the extent that it is either standard practice in the comics industry as of the date of this Agreement or thereafter becomes standard practice in the comics industry.

(b)    Because Diamond will make all required credit decisions, it shall assume responsibility for the bad debt risk associated with Products once the Products have been received by Exclusive Customers, and for credit extended for shipping costs, provided, however, that (i) Dark Horse shall assume bad debt responsibility and risk of credit extended for shipping costs in the preceding twelve-month period for all amounts in excess of the total fees paid to Diamond in that twelve-month period with respect to all Exclusive Customers; and (ii) during the first year of the Agreement the cap will be $2,000,000.  Diamond agrees that it will consult with Dark Horse before extending credit to any Dark Horse customer with anticipated purchases in excess of $100,000 per month and shall not extend credit to such customer without Dark Horse's consent, which consent shall not be unreasonably withheld.

18.    Title and Risk of Loss; Inventory.

(a)    Dark Horse will retain title to Products until such title transfers to Dark Horse's customer, and Diamond will have no obligation to insure against, nor to bear liability for, any loss due to damage to, destruction of, or normal inventory shrinkage of, any Product during such time, provided that Dark Horse is not responsible for, and Diamond may insure against, any inventory shrinkage of any Product as a result of Diamond's negligence or any other damage to or destruction of any Product as a result of Diamond's gross negligence.  Diamond will add Dark Horse as a named insured on its existing standard all-risk insurance.

(b)    Dark Horse will be responsible for all personal property, inventory and other taxes associated with Products distributed by Diamond under this Agreement.

- 10 -

19.    Agreements. Warranties and Representations.    Each of Dark Horse, Diamond, and Diamond's affiliates, subsidiaries, parents, and other related companies covenants, represents and warrants to the other that it has full power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

20.    Notices.  All notices required to be sent pursuant to this Agreement will be in writing and deemed given when sent by Federal Express or other reputable overnight carrier to the respective parties at the following addresses (or at such other address as a party may specify by notice to the other):

Notices addressed to Dark Horse will be sent to:

>       Dark Horse Comics, Inc.
>       10956 S. E. Main Street
>       Milwaukie, OR  97222 - 7644
>       Attention:  Mike Richardson, President

with a copy to:

>       Dark Horse Comics, Inc.
>       10956 S. E. Main Street
>       Milwaukie, OR  97222 - 7644
>       Attention:  General Counsel

Notices addressed to Diamond will be sent to:

>       Diamond Comic Distributors, Inc.
>       1966 Greenspring Drive
>       Timonium, MD  21093
>       Fax Number:  (410) 560-7151
>       Attention:  Stephen A. Geppi, President

with a copy to:

>       Piper & Marbury, L.L.P.
>       36 South Charles Street
>       Baltimore, MD  21201
>       Attention:  George P. Stamas, Esq.

21.    Assignment.  This Agreement, and the rights and obligations of each party hereto, may not be assigned without the prior written consent of the other party. Notwithstanding the foregoing, Diamond shall have the right to assign this Agreement to any affiliate organized for the purpose of conducting distribution activities (the "Diamond Distribution Entity") that succeeds to the operating distribution assets of Diamond and that employs Messrs. Geppi, Parker, Swanson, Schanes, Fletcher, Ms. Fornier and the

- 11 -

senior management team of Diamond, to the extent that such individuals continue to be employed by an affiliate of Diamond. In addition, Diamond may, with Dark Horse's consent, which consent may not be unreasonably withheld, assign this agreement to any other affiliate of Diamond. Any transfer of the assets of Diamond to a Diamond Distribution Entity shall not constitute a change in control of Diamond for purposes of this Agreement.

22.    Entire Agreement, Modification.  This instrument constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes all other prior oral and written representations, agreements, or understandings between them relating thereto. All paragraph headings are for reference purposes only and do not affect the meaning or interpretation of this Agreement. This Agreement may not be modified, altered or changed except by an instrument in writing signed by both parties.

23.    Applicable Law; Arbitration.

(a)    In view of the sale, transportation and storage activities to be conducted in the State of New York hereunder, this Agreement shall be governed by the laws of the State of New York, applicable to agreements executed and to be fully performed therein without giving effect to the principles of conflicts of law thereof. Subject to Section 23(b) hereof, each of the parties hereby irrevocably submits to the jurisdiction of the Federal District Court for the Southern District of New York for purposes of any controversy, claim or dispute arising out of or related to this Agreement and hereby waives any defense of an inconvenient forum and any right of jurisdiction on account of the place of residence or domicile.

(b)    Dark Horse and Diamond shall attempt, in good faith, through negotiation to settle any disagreements arising out of or relating to this Agreement. In the event Dark Horse and Diamond are unable so to agree within 20 days after delivery of written notice from either party to the other of any such disagreement, the specific matters of such disagreement shall be resolved by an arbitration conducted in New York, New York in accordance with the rules of the American Arbitration Association by an arbitrator mutually agreed to by Diamond and Dark Horse, who shall be an independent accountant affiliated with a nationally recognized firm of accountants, and who shall agree to render a written opinion with respect to such matters of disagreement (the "Arbitrator"). If the parties are unable to agree upon the identity of an Arbitrator, then an arbitration shall be conducted by three Arbitrators, one selected by Diamond, one selected by Dark Horse, and the third selected by the two so chosen, provided that if either party fails to select an Arbitrator within ten days of written notice by the other party that it has appointed an Arbitrator, then the arbitration shall be conducted by the Arbitrator selected by the party giving notice. Dark Horse and Diamond agree to be bound by the determination made in any arbitration conducted hereunder.

- 12 -                    20000077

24.    <u>Further Assurances</u>.  In addition to the actions required to be taken hereby, prior to and after the date hereof, without additional consideration, each of the parties hereto will execute, acknowledge and deliver any and all such other documents and instruments, and will take any and all such other actions, as may be reasonably necessary to complete and perfect the transactions contemplated by this Agreement.

25.    <u>Comic Book Publishing</u>.

(a)    Subject to the limitations set forth in the following sentence, (i) Diamond and (ii) Diamond's directors, officers, stockholders and Stephen A. Geppi ("Geppi") (the individuals set forth in clause (ii) of this first sentence of Section 25 to be referred to herein as "Diamond Affiliates") agree that during the term that this Agreement remains in effect they will not engage in the business of creating or publishing comic books in any format.  Notwithstanding the foregoing, Diamond and the Diamond Affiliates may at any time engage in the business of creating or publishing: (i) comics containing Disney characters; (ii) EC comics; or (iii) comic books containing historical or archival reprints or scholarly analysis (collectively, "Historical Products"), <u>provided, however</u>, that in the case of Historical Products, Dark Horse may notify Diamond in writing of any such Historical Products under concerted, active development by Dark Horse and, upon receipt of such notice, Diamond and the Diamond Affiliates shall discontinue efforts to develop any such product set forth in such notice until Dark Horse ceases concerted, active development of such product (the permitted activities set forth in clauses (i), (ii) and (iii) of this second sentence of Section 25(a) to be referred to as "Permitted Comic Book Activities").

(b)    The limitations set forth in this Section 25 shall not apply to any Diamond Affiliate, other than Geppi, after such person ceases to be an officer, director or stockholder of Diamond.  With respect to Geppi, in the event that Geppi ceases to be an officer, director or stockholder of Diamond (the date of such termination to be referred to as the "Geppi Termination Date") prior to the ninth anniversary of the Commencement Date, Geppi agrees that, for a period of one year following the Geppi Termination Date, he will not engage in any comic book publishing activities directly competitive with those conducted by Dark Horse as of the Geppi Termination Date, including conducting meetings with third parties with whom Dark Horse does business with respect to such competitive activities, provided that during such period, Geppi may engage in Permitted Comic Book Activities.  In the event that the Geppi Termination Date occurs after the ninth anniversary of the Commencement Date and before the tenth anniversary of the Commencement Date, the limitation on Geppi's activities set forth in the foregoing sentence shall only apply until the tenth anniversary of the Commencement Date.  The limitations on Geppi's post-Geppi Termination Date activities set forth in this Section 25(b) shall terminate and be of no further force and effect upon the earlier to occur of the tenth anniversary of the Commencement Date or the first anniversary of the termination of this Agreement.

- 13 -

20000078

26.    Purchase of Inventory. From the date hereof to the Commencement Date, Diamond and Dark Horse shall use their best efforts to manage Dark Horse inventory in the possession of Diamond such that the inventory is at the lowest practicable commercially reasonable level as of the Commencement Date. On the Commencement Date, Dark Horse will purchase from Diamond three weeks worth of Dark Horse comic book inventory then held by Diamond (other than terminated inventory) and all trade stock in the "Star" system (the "Purchased Inventory"). The terms for the purchase of the Purchased Inventory shall be Diamond's cost, provided that payment for any item of such Purchased Inventory shall not be due until Dark Horse has sold such Purchased Inventory. Any Purchased Inventory not sold by Dark Horse within two years of the Commencement Date (the "Sale Period") shall be returned to Diamond and Dark Horse shall have no obligation to Diamond with respect thereto. With respect to any sales of Products by Dark Horse during the Sale Period which are included in the Purchased Inventory ("Included Products"), any such sales shall be first out of the stock of such products included in the Purchased Inventory. Only after all stock of any Included Products in the Purchased Inventory have been sold shall Dark Horse sell such products out of its other stock.

27.    Counterparts, etc. This Agreement may be executed in separate counterparts, none of which need contain the signatures of all parties, each of which shall be deemed to be an original, and all of which taken together constitute one and the same instrument. Telecopied signatures shall be deemed to have the same effect as an original.

20000079

BALT01A:58325:5:07/21/95
18420-5

If you are in agreement with the foregoing, please execute the enclosed duplicate copy of this letter and return it to me.  I look forward to working with you to realize the tremendous potential offered by our new and strengthened relationship.

Sincerely,

Diamond Comic Distributors, Inc.

By: _____

Stephen A. Geppi
President

Accepted and Agreed:

Dark Horse Comics, Inc.

By: _____
Name: Mike Richardson
Title:   President
Date: July 21, 1995

- 15 -

20000080

## EXHIBIT A
## SERVICES

Diamond agrees to exercise its best efforts in the performance of the following brokerage and marketing services on behalf of Dark Horse during the initial term and subsequent terms of the Agreement. All defined terms used in this Exhibit A shall have the same meaning as defined in the letter Agreement, unless otherwise specified. Unless otherwise specified herein, (a) all terms used herein to describe brokerage and marketing services shall have the meaning customarily ascribed to them in the business of distributing comic books to Exclusive Customers; and (b) Diamond shall receive no fee or other compensation for any such Basic Services. Diamond acknowledges that the following list of brokerage and marketing services is intended to cover the principal services provided by Diamond to Dark Horse, but is not intended to be exhaustive. Diamond agrees to continue providing any incidental services currently provided by Diamond to Dark Horse except as may otherwise be specified in this Agreement. Dark Horse acknowledges that the implementation of this Agreement will require Diamond to make certain internal adjustments in order to fully provide certain of the Basic Services in the manner required hereunder. To the extent that any such adjustment is incapable of implementation prior to the Commencement Date, and provided that Diamond is diligently working toward such implementation, Diamond shall have an additional 90 days within which to complete any such internal adjustments.

## BROKERAGE SERVICES

As part of this agreement, Diamond will perform the following brokerage services:

1. Publish and distribute to all active customer accounts a monthly order form including all new releases that Dark Horse offers for sale and Dark Horse's prices for these items.

2. When requested by Dark Horse, "special solicit" orders on an accelerated basis for up to three new releases per month from all active customer accounts. In the event that such services exceed three new releases per month, a charge of $1,000 for each new title will be imposed.

3. Accept orders from all Diamond customer accounts in good standing.

4. Perform order processing in a fashion acceptable to Dark Horse, generating shipping instructions in a fashion acceptable to Dark Horse.

5. Suggest to Dark Horse the number of copies of each Product that should be printed in excess of the quantities needed to fill firm orders.

- 16 -

20000081

6.     Obtain valid evidence from each account of its status as a retail business, by obtaining resale certificates and other information about the customers' business as Dark Horse may reasonably direct from time to time.

7.     Share with Dark Horse any and all information gathered about the business of the accounts, except to the extent any such information is proprietary to a third party publisher or is otherwise precluded by law.

8.     (a)     Pick up or arrange for the shipment of items from Dark Horse's suppliers and printers to Diamond.

(b)     Ship items to accounts in the quantities ordered by accounts or in such other quantities as Dark Horse may request, subject to the returnable limitations outline in point 15, below.

(c)     Pick up from Dark Horse's "Primary Suppliers" (defined as suppliers providing 40% or more of Dark Horse's aggregate product in the continental U.S. and Canada), and from those suppliers located within a 50 mile radius of a Primary Supplier (provided that space is available and that schedules reasonably permit), shall be at no additional charge. Pick up from other Dark Horse suppliers shall be charged at no greater than Diamond's direct cost, plus 17%.

(d)     The cost of shipping to retailers from Diamond's distribution centers will be paid by retailers, in accordance with current trade terms.

9.     Perform services similar to those provided in points 1-8 above with regard to "reorders" and "backlist" including back orders for same and adjustments to orders.

10.     Set up and maintain a system which provides accounts with online order confirmation for the above via a toll free service in the U.S., Canada, and the UK.

11.     Provide each account with the opportunity to increase or decrease any order for Products during the period following the initial order and preceding shipment thereof. Any such order adjustment may be either in writing or by bona fide telephone call, provided that such adjustment is received by Diamond's commercially reasonable deadline and prior to the initial shipment made by Diamond. Diamond will charge Dark Horse a fee of $2.225 for each such transaction, whether made in writing or by telephone call, in which any order adjustments are made.

12.     Provide all accounts with effective reorder services, including a system of toll-free on-line order confirmation. For all reorders of Product(s) received and shipped by Diamond subsequent to the initial shipment of such Product(s), including with respect to backlist Products, Diamond shall charge Dark Horse an additional fee of 2.225% of cover price.

- 17 -

20000082

13.     Keep such inventory of items as Dark Horse elects to ship to Diamond on consignment (up to a limit of 20% of original orders) in order to create availability for point 9 above, for a maximum of 90 days after original ship date for comics, and for all graphic novels, trade paper backs and other non-comic items maintaining sales of $1,000 retail per month, and provide "destruction" or Dark Horse approved "liquidation" services for comics not sold after 90 days, and/or applicable non-comic items.

14.     Promptly communicate to all accounts all information as may be provided and so designated by Dark Horse, including solicitation information and subsequent changes in same, reorder or backlist availability, returnability, etc.

15.     In accordance with established late-shipping and/or mis-solicitation policies, and/or when requested by Dark Horse, process returnable or exchangeable items; this shall be limited to the lesser of: (i) six items per month; (ii) 10% of Dark Horse's total s.k.u.'s; or (iii) 5% of Dark Horse's total units shipped per month.  Dark Horse shall compensate Diamond 11% of retail for returns in excess of these quantities, up to a limit of $1.00 per unit returned, which fee shall be in lieu of any other fee provided herein.

Notwithstanding the foregoing, if the number of Products that are returned or exchanged exceeds six items, 10% of Dark Horse's total s.k.u.'s, or 5% of Dark Horse's total units shipped in any three consecutive months, or in any four out of six consecutive months, Diamond may elect to designate the processing of returnable or exchangeable Products that are in excess of these amounts as an Additional Service.

16.     At Dark Horse's request, assist Dark Horse in maintaining a "street date" for any Product.

### MARKETING SERVICES

As part of this agreement, Diamond will perform and/or provide the following Marketing Services:

17.     (a)     Produce, publish and distribute a monthly catalog, suitable for both consumers and retailers, of items offered for sale by Diamond.

(b)     Reserve at least 20 "Premier" pages in comic section of the catalog for Dark Horse, at no additional charge, as long as Dark Horse is a Premier Comic Supplier.  Dark Horse will be entitled to receive the same proportion of "Premier" pages as its market share represents to the total Premier Comic Supplier market share (but not less than 10% of the total number of pages devoted to illustrated product listings in the first five years, and not less than 20 pages total).

(c)     Dark Horse shall have the option of supplying, in color or black and white camera-ready, electronic format, printed bind-in or film form, all or part of its portion of the Premier comic section.

- 18 -

20000083

(d)      Include any and all additional pages of advertising provided by Dark Horse at fees according to Agreement paragraph 6(b).

(e)      Select at least one item of Dark Horse's choice as a most highly recommended item of the month (*i.e.*, Gem of the Month) among no more than six such recommendations for comics and/or graphic novels.

(f)      Reserve at least one cover spot per month (front, back, inside front, or inside back) for Dark Horse, including at least one front cover and one back cover per year, at fees according to Agreement paragraph 6(b).

(g)      Over the course of each year, on those front covers that Dark Horse does not have, Dark Horse will receive a total of:

      (1)      2 banner displays;

      (2)      2 corner displays; and

      (3)      12 bullet items.

(h)      Reserve an advertising page for Dark Horse opposite the catalog's Table of Contents each month at a cost not to exceed that of a standard "select" interior page, and at fees according to Agreement paragraph 6(b).

(i)      Include Dark Horse's most expensive catalog ad of the month at no additional charge.

(j)      Include a mutually-agreed-upon number of exclusive Dark Horse serialized comics as advertising pages in the catalog, and compensate Dark Horse the equivalent dollar amount for "creative charges".

(k)      With regard to the catalog's companion Retailer and Consumer Order Forms, reserve at least one cover spot per month (front, back, inside front, or inside back) for Dark Horse at fees according to Agreement paragraph 6(b), excepting two front covers and three back covers per year, which shall be provided at no additional charge.

(l)      Distribution or inpack of flyers or inserts with the monthly catalog as Dark Horse may provide (up to two per month) at no additional charge to Dark Horse.

(m)      For the first year of the Agreement, reserve advertising space on the monthly catalog pack outer envelope for Dark Horse at fees according to Agreement paragraph 6(b).

18.      (a)      Produce, publish and distribute a minimum of two backlist catalogs a year which will include 12 pages of listings and/or advertisements for Dark Horse's backlist items at no additional charge.

- 19 -

20000084

(b)    Reserve for Dark Horse at least one front cover if less than four backlist catalogs are produced per year, or one front and two back covers if four or more backlist catalogs are produced per year, at fees according to Agreement paragraph 6(b).

(c)    Any additional pages of advertising provided by Dark Horse at fees according to Agreement paragraph 6(b).

19.    (a)    Communicate via "Premier placement" such information as Dark Horse may direct to accounts weekly via a printed newsletter, which may be distributed via any method mutually acceptable to Dark Horse and Diamond (*e.g.*, computer online service, BBS, e-mail, etc.).

(b)    Reserve 2 of 8 "future new releases" on the front cover of said newsletter, and 2 of 12 "future new releases" on the back cover of said newsletter, for Dark Horse at no additional charge.

(c)    Any additional pages of advertising provided by Dark Horse at fees according to Agreement paragraph 6(b).

20.    (a)    Communicate to accounts at least monthly via a "news magazine" of a quality at least equal to any provided by a major comic distributor and/or publisher. Include "Premier placement" coverage of all significant Dark Horse news.

(b)    Reserve at least 3 back cover advertisements of said monthly for Dark Horse at fees according to Agreement paragraph 6(b).

(c)    Any additional pages of advertising provided by Dark Horse at fees according to Agreement paragraph 6(b).

21.    Prepare any and all printed or written communications issued by Dark Horse to its customer accounts which refer to Dark Horse or any Dark Horse product according to Dark Horse guidelines, and provide any such communications which fall outside normal day-to-day information to Dark Horse for its prior approval.

22.    "Suggestive sell" at least one item of Dark Horse's choosing to every account placing toll-free reorders to Diamond.

23.    At Dark Horse's direction, compile at least two "liquidation" lists per year of clearance items from Diamond and/or supplier inventories, at discounts to retailers to be determined by Dark Horse.

24.    Promptly pick up from Dark Horse's "Primary Suppliers" (and those within a 50 mile radius of the Primary Suppliers, provided that space is available and that schedules reasonably permit), and distribute to all Diamond accounts, Dark Horse materials which are solicitation, promotional, advertising, publicity, p.o.p., giveaway,

- 20 -

20000085

premium, incentive, dealer loaders, or the like, including a reasonable amount of materials (one per month) which Dark Horse is distributing to Diamond Accounts on behalf of Dark Horse advertisers, licensees or other corporate affiliations. [Weight and volume limitations to be agreed].

25. Conduct annual retailer seminar if jointly agreed by Diamond and Dark Horse in their reasonable discretion, at fees to be mutually agreed.

26. Conduct distributor promotional events such as warehouse open houses if jointly agreed by Diamond and Dark Horse in their reasonable discretion, with such services offered to Dark Horse at no more than Diamond's direct cost.

27. (a) Maintain a competitive presence at five major industry events in North America (the San Diego and Chicago Comic cons, or their future equivalents, for example) and give Dark Horse products prominent display at these events.

(b) Represent Dark Horse in like fashion at other such events as Dark Horse shall request or agree to at fees to be negotiated on a case-by-case basis, but not to exceed Diamond's direct cost plus 17%.

28. Process retailer reimbursement programs, as may be requested by Dark Horse, such as co-op advertising, and reimburse retailers for such programs and cooperate in any industry support programs as may be mutually agreed by Diamond and Dark Horse, at no additional charge. Diamond's services under this paragraph will be limited to the greater of (i) the level to which Diamond currently provides such services to Dark Horse; or (ii) the level of support that Diamond provides at no charge in the future to any publisher.

29. (a) Provide a wide range of marketing research services, including communicating retailer feedback and market information to Dark Horse, assisting Dark Horse in development of programs and products, etc.

(b) Work with Dark Horse in setting up system-to-system computer hookups for the purpose of transmitting information electronically.

(c) Annually, Diamond will provide to Dark Horse a list of Exclusive Customers who have purchased Dark Horse Products through Diamond during the prior year. This list will remain resident on the computer system of Diamond, will be deemed Confidential Information, and will remain the property of Diamond. Dark Horse must maintain the confidentiality of this list, and may not sell, rent or otherwise make the list available to any third party.

30. As directed by Dark Horse from time to time, solicit potential new customer accounts for exclusive or non-exclusive brokerage, or participate with Dark Horse in solicitation of non-exclusive accounts.

- 21 -

20000086

31.    In general, include Dark Horse products, with Dark Horse permission, in promotions/publicity/advertising of Diamond's services, products or corporate image, where comics are used as examples.

32.    Include Dark Horse products in any generic (non-customized) merchandising planograms which Diamond creates for retailers.

20000087



to. Diam
dist.
L le

**HOME OFFICES**
1966 Greenspring Drive
Timonium, MD 21093
(800) 783-2981  (410) 560-7100
FAX (410) 560-7148

Dear Retailer:

With Marvel's recent buyout of Heroes World, we here at Diamond thought it would be a good time to introduce ourselves, and to make you aware of the services we offer. It's too soon to tell how Marvel's acquisition will change Direct Market distribution, but we're confident that Diamond will be providing quality customer service to comic retailers for many years to come!

This catalog pack contains the latest edition of *Previews*, and its companion "retailer-friendly" order form. *Previews* lists products that are scheduled to ship two months in the future. Orders are due by the third Wednesday of the month, and a return envelope for the Diamond Distribution Center nearest you is enclosed for your convenience.

Details on discounts, ordering, and terms of sale are contained in the Previews Order Form. If you have any questions, just call me, toll-free at (800) 783-2981, and I'll be glad to help.

Also enclosed is an Account Application which should be mailed or faxed, along with all the required attachments, to Diamond's Home Office by the 10th of the month you intend to place your first order. (Note: as long as you have a history of good payment, we will generally match the terms you now receive from your current distributor.) Again, please call me with any questions.

Thanks you for this opportunity to briefly introduce myself and Diamond's services. When you choose Diamond as your distributor, you'll discover all the benefits Diamond delivers: from "Instant" coop advertising credit to our state-of-the-art reorder service (The Diamond Star System and The Reorder Universe). Above all, you'll discover that Diamond's friendly, knowledgeable employees - and their commitment to quality customer service - are what make Diamond "The Industry Leader."

Best wishes,

Joann Christopoulos
New Account Representative

Page 1 of 4



| ACCOUNT # _____ |
| TRU ID# _____ |
| DISTRIBUTION CENTER _____ |
| SHIPPING METHOD _____ |
| SOL # _____ |
| *(Office Use Only)* |

# Account Application

## DIAMOND COMIC DISTRIBUTORS, INC.

**1966 Greenspring Drive, Suite 300 • Timonium, Maryland  21093 • Phone: (410) 560-7100 • Fax (410) 560-7148**

THIS APPLICATION IS FOR:  ❑ New Account Status  ❑ Existing Account Update  ❑ New Branch

### GENERAL INFORMATION

**LEGAL BUSINESS NAME**                                        **TRADING AS**

**BILLING/MAILING ADDRESS:**                                  **SHIPPING ADDRESS (IF DIFFERENT):**

Mailing Addressee                                              Shipping Addressee

Street Address                                                Street Address or P.O. Box

City            State            Zip                          City            State            Zip

Store Phone          Office Phone                             Fax                     24 Hour Emergency Phone
(    )                (    )                                  (    )                  (    )

### BUSINESS OPERATIONS

Type of Ownership (✔ one) ❑ Corporation _____ - _____    (Date Incorporated) _____
                                         Federal ID #
    ❑ Individual Owner   ❑ Partnership

Type of Operation (✔ all that apply)  ❑ Retail Store ❑ Retail Chain ❑ Subscription ❑ Wholesale ❑ Other _____

How long in business _____ years.  This location _____ years.  How many stores do you operate? _____

Do you (✔ one) ❑ Own Building ❑ Lease Building (Lease expires on ____/____/____)  Monthly Rent or Mortgage $ _____

Product Lines Carried (✔ all that apply) ❑ Comics ❑ Graphic Novels ❑ Cards ❑ Games ❑ Other _____

I Intend To Order (✔ all that apply) ❑ Comics ❑ Graphic Novels ❑ Cards ❑ Games ❑ Other _____

Order Intentions (✔ one)    ❑ I intend to place an order form each month    ❑ I intend to purchase from stock, periodically.

I would like to begin ordering in the month of _____ Estimated Amount at Retail $ _____

How will you receive your orders? ❑ Pick-up at distribution center ❑ Diamond Delivery ❑ UPS ❑ Other _____

### OWNER INFORMATION   INCOMPLETE INFORMATION MAY RESULT IN DELAY OR NON-PROCESSING OF APPLICATION

- If corporation, complete information below for at least two officers.  Total number of shareholders _____
- If partnership, complete information below for all partners.  Total number of partners _____
- If individual owner, complete  information below for owner and spouse.

| Name | Title | Percent Ownership | Home Address(Street, City, State, Zip) | Home phone | Social Security# (Required) |
|------|-------|-------------------|----------------------------------------|------------|------------------------------|
|      |       |                   |                                        |            |                              |
|      |       |                   |                                        |            |                              |
|      |       |                   |                                        |            |                              |

**\*PLEASE ATTACH LEGIBLE PHOTOCOPIES OF DRIVERS LICENSES OR OTHER PHOTO I.D. FOR ALL PERSONS LISTED.**

CUST-783 (8/94)

**CREDIT INFORMATION** — Tax Returns and/or financial statements may be required for consideration of extended terms other than cash on delivery.

*BUSINESS REFERENCES-NO PERSONAL, CHARACTER OR PRE-PAY REFERENCES, PLEASE.*

| Company Name | Address | Telephone # | Account # |
|---|---|---|---|
| | | ( ) | |
| | | ( ) | |
| | | ( ) | |
| | | ( ) | |

*BANK REFERENCES*

| Bank | Branch Address | Telephone # | Account # | Account Type |
|---|---|---|---|---|
| | | ( ) | | ❑ Business or ❑ Personal  ❑ Savings or ❑ Checking |
| | | ( ) | | ❑ Business or ❑ Personal  ❑ Savings or ❑ Checking |

*LEASE REFERENCES*

| Landlord | Street Address | City, State, Zip | Telephone # |
|---|---|---|---|
| | | | ( ) |

---

# DIAMOND COMIC DISTRIBUTORS, INC.
## BLANKET CERTIFICATE OF RESALE

COUNTRY _____ STATE/PROVINCE _____ DATE _____

This is to certify that I am licensed to do business in the State/Province of _____ , and that all material, merchandise, and/or goods purchased by the undersigned from Diamond Comic Distributors, Inc. after _____ is purchased for the
DATE
purpose of resale as tangible personal property.

This certificate shall be considered a part of each order which we shall place.

| Purchaser's Name | Signature |
|---|---|
| Street Address | Title |
| City    State    Country    Zip | Purchaser's Sales Tax Registration No. |

---

Indicated by my signature below, is the authorization to conduct any business/personal investigation necessary in order to establish and maintain an account with your company.  I hereby certify that the information provided herein for the purpose of opening an account with your company is true and correct.  My signature also acknowledges that I have read and fully understand the Terms of Sale contained herein, and that I have made a true & exact copy for my records.  Further, I expressly extend my Personal Guaranty to Diamond Comic Distributors for all debts incurred, and expressly acknowledge and agree to be bound by the "Terms of Sale" section contained in this application. (I understand that orders cannot be cancelled or reduced, and product is purchased on a strictly non-returnable basis.)

| Applicant's Printed Name | Applicant's Signature (Do Not Use Title) | Date |
|---|---|---|
| Applicant's Printed Name | Applicant's Signature (Do Not Use Title) | Date |
| Applicant's Printed Name | Applicant's Signature (Do Not Use Title) | Date |

Please indicate the names of any additional individuals who are eligible and authorized to make purchases on your behalf.

| NAME | TITLE |
|---|---|
| | |
| | |

---

***PLEASE ATTACH LEGIBLE PHOTOCOPIES OF YOUR RETAIL SALES TAX LICENSE AND YOUR BUSINESS LICENSE/PERMIT.***

CUST-783 (8/94)

# TERMS OF SALE

## DIAMOND COMIC DISTRIBUTORS, INC.

### Opening An Account

Anyone interested in ordering from Diamond Comic Distributors, Inc. ("DCD") must first return a completed Account Application (along with copies of a Resale Certificate, Business License, and a Driver's License or other photo I.D.) to DCD's Home Office on or before the 10th day of the month in which they intend to place their first order. An order form will not be processed until the application has been approved and an account opened, a process which generally takes one to two weeks.

### Eligibility

By placing an order with DCD, the customer attests that he/she is of legal adult age and is legally authorized to open an account with DCD and to purchase the items which the customer is ordering.

Orders will not be accepted unless the customer is engaged in a legitimate business activity dealing with product lines carried by DCD and is purchasing products from DCD strictly for resale. Proof of such activity may be required for each order form submitted.

### Ordering Deadlines

PREVIEWS orders (complete with an authorized signature) must be received on or before the third Wednesday of each month, and should be mailed or express-mailed to the Distribution Center servicing the customer's account. (If the customer is unsure of which Distribution Center to place the customer's order with, call DCD's Home Office Customer Service Department at (800) 783-2981 or (410) 560-7100.) PREVIEWS orders may be faxed provided the original is delivered to DCD, but PREVIEWS orders are not accepted over the phone.

PREVIEWS orders received after the due date may be subject to a processing charge of not less than 1% of retail, or may be processed as reorders, (subject to an extra 5% of retail charge) and filled from extras, if available.

### Payment Terms/Credit Guidelines

All new customers will be notified in writing of their payment terms and credit guidelines by DCD's Credit Department.

Customer credit guidelines are reviewed on a case by case basis. Financial information as shown on Account Applications and other information are considered; however, decisions are made at DCD's sole and absolute discretion. If an existing customer exceeds its established credit guidelines, immediate cash payment may be required to reduce the account balance. DCD reserves the right to suspend the shipping of product if an account balance exceeds the established customer credit guideline.

Unless written authorization is granted, all domestic orders are shipped cash on delivery, and all international orders must be prepaid in full with PREVIEWS order form. Notwithstanding the foregoing, in some instances prepayment of domestic orders may also be required.

Customers receiving their shipments via UPS will have a COD tag attached to each box for a period of at least 3 months, or until a change in terms has been authorized by DCD.

Check writing privileges and extended terms are available, and may be obtained by submitting a written request, (an up-to-date Account Application, tax returns, financial statements, and other information as may be required by DCD) to DCD's Credit Department. Businesses lacking a significant credit history can earn check writing privileges and/or limited credit through a history of good payments to DCD and/or other suppliers, but should receive product from DCD for a minimum of 90 days before requesting a change in terms.

Customers are required to make payments within designated terms. Invoices not paid within terms will be subject to a late payment fee of 1.5% per month on the outstanding balance. Customers are also liable for any expenses, including but not limited to attorneys' or collection fees, which DCD incurs to collect past due amounts.

Checks returned to DCD for any reason are subject to a $25.00 service charge, and returned checks or any other failure to pay in part or in full, may, at DCD's sole and absolute discretion, result in the suspension or cancellation of shipments, loss of check writing privileges and/or extended terms, and/or the termination of the customer's Account Application and DCD's agreement to ship product to the customer.

Upon the consent of DCD, arrangements can be made to pay for purchases via Wire Transfer to DCD's bank (the preferred method for international customers) or via credit card (VISA or MasterCard only) or Western Union. Either method must be preapproved. Pricing is based on cash payments. Credit card transactions are billed at 2% less discount. Call DCD's Credit Department for additional details.

DCD reserves the right to reduce, reject or cancel orders from any customer due to insufficient credit history, delinquent payments, refusal to accept merchandise ordered, and other reasons as determined by DCD. Prepayment, deposit, and/or security for payment may also be required, at DCD's sole discretion.

### Shipping

Domestic shipments are generally available for pick-up, delivery, or shipment once or twice per week. Shipments will normally be held until a wholesale value of $35.00 has been reached, or two weeks have passed.

Customers can pick up their shipments at their local Distribution Center and incur no shipping charges, or select from a variety of options, including Diamond Delivery, (not available in all areas; customers should contact their local Distribution Center for details), UPS, bus, air-freight, common carrier (truck), or U.S. Mail. The customer's local Distribution Center will be happy to help the customer select a reliable and economical delivery method, but DCD does not guarantee the services of any particular shipping company, and is not liable for any damages or delays resulting from the use of any particular shipping company or method. (See "Damages" section below.)

Except as expressly agreed otherwise, customers will be liable for all shipping charges. DCD may prepay shipping charges and pass these costs on to customers on their following week's invoice to be paid on the same terms as on a customer's product order.

For additional details on shipping, customers should contact the Distribution Center servicing their account.

### Damages

Merchandise damaged in transit may be returned to the customer's local Distribution Center for replacement (or credit, if replacements are unavailable); provided that damages are reported to the customer's local Distribution Center within 24 hours of the customer's receipt of the shipment (at which time a return authorization number will be issued) and the damaged merchandise is returned within 7 days of the customer's receipt of the shipment, accompanied by a completed Returns Form (printed weekly in Diamond Dateline). Customers shall not deduct the cost of damaged merchandise from their payments. If replacement product is not available, a credit memo will be issued by the customer's Distribution Center.

Please note: Always check for visible damage and note any apparent problems before signing for a shipment, as this will enable DCD to recover the cost of damaged merchandise from the shipping company. DCD will reimburse the customer for the freight cost the customer incurs when returning damaged merchandise.

### Shortages and Overages

All shortages must be reported to the customer's local Distribution Center within 24 hours of the customer's receipt of a shipment. DCD will use all reasonable efforts to replace any shortages within 7 days (if replacements are available) or will issue a credit memo for any unfilled amounts. Do not reorder shorted merchandise, as this may result in duplicate replacement.

# TERMS OF SALE
## DIAMOND COMIC DISTRIBUTORS, INC.

Also, DCD appreciates the customer's honesty in reporting the receipt of any merchandise for which the customer is not billed, and will reimburse the customer for the freight costs incurred when returning such overages.

### Returns
The customer acknowledges and assumes the risk that due to the nature of the products purchased from DCD, variations in such products, including but not limited to, changes in the scheduled ship date, author, illustrator, publisher, character(s) and subject matter may occur. Despite such variations, all merchandise is sold by DCD on a non-returnable basis unless otherwise authorized in writing by DCD. Only those items appearing weekly in Diamond Dateline as returnable, shall be returnable. Returnable items must be accompanied by the Return Authorization Form in Dateline, and must be received at the customer's local Distribution Center before their designated deadline dates in order to be eligible for credit. DCD is not responsible for freight costs associated with returns.

### Allocations
If orders from customers exceed the amount of product made available to DCD by its suppliers, DCD reserves the right to allocate the available merchandise, at its sole discretion.

### Conditions of Sale
All orders by customers are binding upon acceptance by DCD and cannot thereafter be cancelled or modified by the customer. By submitting an order as provided herein, the customer agrees to be bound by the Terms of Sale.

In the event there is any discrepancy between these Terms of Sale and any purchase order, acknowledgement or other documentation issued by the customer, these Terms of Sale shall control.

Failure to accept or pay for merchandise ordered shall be deemed breach of contract which may, at DCD's sole discretion, result in legal action and/ or held shipments and/or cancellation of outstanding orders and/or loss of check writing privileges and/or loss of credit terms and/or the exercise of any other rights of DCD under these Terms of Sale and/or any other available remedy at law or in equity. In addition to any other remedy available to DCD, any DCD customer who refuses to accept ordered merchandise shall be liable to DCD for full value of said product as well as the full value of the remainder of all outstanding orders placed with DCD regardless of their status. Additionally, the DCD customer shall be liable for freight costs (refused UPS shipments which DCD reshipped are subject to a $10 per box service charge) and any other fees associated with all outstanding orders and/or the breach including, but not limited to, legal fees and court costs.

Customer further authorizes DCD, irrevocably, to appoint any attorney designated by DCD or clerk of any court of record to appear for the customer in said court, and confess judgment against the customer without process in favor of DCD for all sums owing including the value of all outstanding orders placed with DCD, costs of suit and reasonable attorneys' fees, hereby expressly waiving all benefit under the exemption laws of any state in which the customer operates and waives all errors in any said proceedings, and consents to immediate execution upon such judgment, hereby ratifying and confirming all that said attorney may do by virtue hereof. The authority and power to appear for and enter judgment against the customer shall not be exhausted by one or more exercise thereof, or by any imperfect exercise thereof, and shall not be extinguished by any judgment entered pursuant thereto.

### Liability Disclaimer
The information contained in DCD publications, including but not limited to prices, content, availability, suitability for nonmature readers, product safety, and release or shipment dates, is based solely on information DCD receives from the suppliers of the product. DCD makes no representation or warranty as to the accuracy of this information, and is not liable for any claims or losses resulting from any inaccuracies contained therein or the customer's sale of the product. All warranties, conditions, representations, indemnities and guaranties, whether express or implied, arising by custom, prior oral or written statement by DCD or otherwise (including, but not limited to, any warranty of merchantability or fitness for a particular purpose) are expressly excluded and disclaimed.

DCD reserves the right to cancel orders, at any time and from time to time, for any merchandise, without responsibility therefore, in whole or in part, for good cause including manufacturers' cancellation, unacceptable delays, poor quality, or insufficient orders. In the event that DCD does not receive merchandise from its vendor within 30 days of the last day of the anticipated ship month, any orders for such merchandise may, at DCD's sole discretion, either be (i) cancelled by DCD or (ii) shipped to the customer subject to return privileges, provided DCD's vendor offers such return privileges to DCD.

### Hold Harmless

The customer hereby agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries harmless from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of (i) breach by the customer of any warranties or agreements contained herein, (ii) any act or omission of the customer, (iii) any claim, cause of action or lawsuit arising from the sale, use, storage, transportation or handling of the merchandise sold hereunder, or (iv) any settlement, judgment or payment with respect to any of items (i), (ii) or (iii) hereof.

### Governing Law

All legal disputes arising as a result of or with respect to these Terms of Sale will be governed and settled by the laws of the State of Maryland, excluding the conflict of law rules of that state and the customer agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland including the United States District Court for the District of Maryland.

### Entire Agreement

These Terms of Sale are intended to be the final, exclusive and complete statement of the terms of the agreement between the customer and DCD. Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, purchase order or other documentation of the customer, nor course of prior dealing between the parties shall affect or modify these Terms of Sale. Upon receipt by DCD of the customer's order, these Terms of Sale shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by DCD. If any part, term, or provision of these Terms of Sale are held to be invalid or unenforceable, the validity of the remaining portions shall not be affected and the invalid provision shall be deemed excluded from these Terms of Sale.



# Diamond
## Comic Distributors, Inc.

**1966 GREENSPRING DRIVE, SUITE 300  TIMONIUM, MARYLAND  21093**
*IF YOU HAVE ANY QUESTIONS, PLEASE CALL DIAMOND'S NEW ACCOUNTS REPRESENTATIVES AT (800)783-2981 OR (410)560-7100*

CUST-783 (8/94)

**Exhibit 4**

**DSTLTY Media, Inc. Agreement**

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of June 14, 2024, is made by and between DSTLRY Media, Inc., a Delaware corporation located at 3680 Wilshire Blvd Ste P04 – 1420, Los Angeles CA 90010 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products.")   All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment; Territory.

(a)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of   which generally buy under Buyers returnable trade terms.

(b)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Comic Book Specialty Market. "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer. Seller reserves the right to run and maintain a web site, a component of which will include an e-commerce site where Seller will sell their products directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues (web site and trade shows and cons).

(d)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), 1(b) and l(c) hereof (collectively, the "Appointments").

2.     <u>Term.</u>  The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.   Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term"), unless either party notifies the other party of its intent not to renew thirty (30) days prior to the conclusion of the Initial Term or then current Renewal Term.   This Agreement is effective with Products available for shipment as of August 1st 2024, the "Commencement Date" contingent upon Seller's terminatation of conflict agreements in any markets.   As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     <u>Supply.</u>

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.   Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.   In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)     With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost including credit for the original purchase price of Products.

(e)     Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)     Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's distributor set forth above (i) shall apply to all Seller's titles published under the DSTLRY trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.     <u>Distribution Services: Additional Services.</u>

(a)     As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto in good faith ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)     Buyer may also elect, in its sole discretion, to offer services to Seller not specified on <u>Exhibit A</u> hereto ("Additional Services").  Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.   Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's cost for providing such services. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 15.00%.

(c)     In the event that at any time or from time to time during the Term, Seller offers Buyer an "Incentive Discount" related to Products or Customers (for example, Seller offers a 5% better discount on a select Product), Seller shall notify Buyer of such offer and Buyer will pass through the full amount of the incentive to its customer(s) for which the incentive applies.  Buyer, at Buyer's discretion, may (i) deduct such Incentive Discount from the Weekly Payment Amount otherwise payable, or (ii) invoice Seller for the Incentive Discount amount.

5.     <u>Price for Products.</u>

(a)     Seller shall sell Products to Buyer at a discount of 58.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall ship Products to Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges from Seller's Printer to Buyer.  If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

Products to Buyer's Plattsburgh or Olive Branch, MS distribution center.

(b)    In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 2.00% of the retail price of all Products (including a 0.00% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance").    For like sales in the UK, Seller shall provide Buyer an allowance of 7.00% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance").    Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)    Buyer and Seller agree that an alternative pricing structure, detailed in Appendix B, may be tested if mutually agreed upon.

(d)    In addition (i) Seller shall make best efforts not to make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer. For avoidance of doubt, direct-to-consumer products sold by Seller or agent of Seller are not included in 5.c. (e.g. Kickstarter offerings, sales on dstlry.co or other Seller entity.

6.    <u>Payment Terms; Book Market Returns; Etc.</u>

(a)    On a weekly basis and within 10 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).    On a weekly basis and within 30 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount.    The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 40.00% plus the net cost value of Net Products sold to Customers, <u>less</u> (ii) the Book Market Service Fee (as defined herein <u>less</u> (v) a Customer freight fee of 1.25% of retail for those Customers who require free freight for deliveries by Buyer, less (vi) Customer "Documented Deductions" (as defined herein).    Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C.    Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns, which credits shall not exceed more than fifteen percent (15%) of the total Products sold in any contract year.    "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers. Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 4.00% of the retail price of such Book Market Return, subject to the first sentence of this paragraph.

"Documented Deductions" shall mean any deduction taken by a Book Market Customer

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

whether on their remittance or through other means.   When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full.   When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction").   Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction.   Buyer will give      days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(b)   In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service.   Seller shall pay the undisputed portion of such invoice within 30 days of the date of the invoice.   If Seller fails to make payment of the undisputed portion of the invoice within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement.   Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement, or any other time Seller reasonably believes Buyer has committed a material breach of this Agreement. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d).   Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement.   If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer.   In addition, Buyer shall promptly pay the monies finally determined to be due Seller.   If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)   In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement.   Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(d)   In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer and Seller may mutually agree to allow Buyer to deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

to     .    % of sales of Products during, at the option of Buyer, either (i) the immediately preceding month period, or (ii) the immediately succeeding     month period based on reasonable forecasts

(e)        Superseding all other provisions and Buyer's remedies contained in this Agreement, Seller agrees to immediately pay to Buyer any amounts due to Buyer which become  5 days old or older resulting from negative Sales and or for services rendered to, for, or on behalf of Seller, or for any other reason(s).  Such demand for payment will be effected by written request (including email) from Buyer delivered to Seller.

(f)        For each calendar year during the Term of this Agreement, Seller shall be eligible to receive a purchase discount rebate (the "Rebate") calculated as set forth below.  For each calendar year during the Term in which DCD's cost of Net Products sold exceeds the levels outlined below, Seller shall receive a Rebate in an amount determine by multiplying the DCD cost of Net Products within each threshold range by the decimal equivalent of the appropriate percentage set forth in the following chart:

DCD's Total Product Purchased of Sellers products
Rebate

| | |
|---|---|
| $0 - 1,999,999 | 0.00% |
| $2,000,000-2,999,999 | 1.00% |

7.    Credit Decisions.

(a)        Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)        Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)        With respect to Book Market Customers, Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 15.00% of the extended SRP (the "Deemed Cost") of all unpaid invoice lines for Seller's Products that make up the amount of the bad debt.  To the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's Deemed Cost for any such bad debt and Buyer's cost of all unpaid invoice lines for Seller's Products included in the bad debt.

(d)        For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.    Title And Risk Of Loss; Inventory.

(a)        All Products are to be held by Buyer on consignment, and remain the property

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

of Seller until sold by Seller through Buyer.   Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's   erms of  Sale. Buyer  will  cooperate  with  Seller  in  the  execution  of  any  financing  statements  or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.   Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)    Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence, willful misconduct, violation of law or Buyer's breach of any of the terms or conditions of this Agreement and Buyer shall maintain all insurance with respect thereto.  Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time.  Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds 2.00% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold.  This reimbursement amount is calculated as 15.00% of trailing twelve month (TTM) average retail price of Seller's actual unit print cost units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer.  The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business.  All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed 10% of TTM average retail price of Seller's actual unit print units of Products that are lost or damaged.

(d)    Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four  uarter   Distribution Amount").  Provided that the "Calculated   alue" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

$0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records. Buyer will provide Seller free storage for the initial term of this Agreement.

(e)     Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business.  Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.     Intellectual Property.

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications   therefor (collectively, the "Intellectual Property"); provided, that, Buyer's exclusive remedy, and Seller's sole obligation, for any breach of this representation and warranty shall be Seller's indemnification obligations in Section 21(d).  The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit.  Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     Seller hereby grants Buyer a non-exclusive, worldwide, non-transferable, non-sublicensable right and license to use the Trademarks solely in connection with performing its obligations under this Agreement and solely as pre-approved by Seller.  In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

intellectual property.   At anytime at Seller's direction, Buyer agrees to take down, modify or cease any use of the Trademarks.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and     20XX DSTLRY Media, Inc. All Rights Reserved."

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)     Except to the license to the Trademarks granted herein, the obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.   Termination.

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

i.     Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

ii.     Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller

iii.     Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

iv. Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

v. Reserved

11.   Effect of Termination.

(a)   Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)   If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable.  Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.   Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)   If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts accrued prior to the effective date of termination owed to Buyer shall become immediately due and payable.  Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.  Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)   Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination.   Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller.  Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost.  Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

(e)    In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for 90 days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)    125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)    Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer. Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates. If Buyer reasonably believes Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed. Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

(g)    Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost including credit for the original purchase price of Products.

(h)    Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer. If

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.    <u>Notices.</u>  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, or emailed; provided, that, the recipient replies to such email and affirmatively confirms receipt, as follows:

If to Seller:

DSTLRY Media, Inc.
225 E Broadway
Suite 113
Glendale CA 91205

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland   21030
Attention: Chief Operating Officer
Fax: (410) 683-7088
Email: ltim@diamondcomics.com

Or to such other address as either party shall have designated in a notice to the other party.   Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.    Reserved

14.    <u>Independent Contractors; No Third Party Rights.</u>  Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.   Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.    <u>Force Majeure.</u>  Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.   The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.   The unaffected party may terminate this Agreement immediately in the event a force majeure event exceeds fifteen (15) business days.

16.    <u>Assignment: Binding Effect.</u>  Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

Agreement to any affiliate organized for the purpose of publishing the Products. Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities. Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided, that, Seller may assign its rights and obligations under this Agreement, without first needing to obtain Buyer's prior written consent, to (A) an affiliate, or (B) to the surviving entity of a merger, consolidation or sale of substantially all of the assets to which this Agreement relates. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement. All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17. <u>Entire Agreement: Modification.</u> This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto. This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18. <u>Applicable Law.</u> This Agreement shall be deemed to have been entered into in the State of Delaware and shall be interpreted and construed in accordance with the laws of the State of Delaware applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party. In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator. Such disputes will be submitted to the selected arbitrator and will take place in Wilmington, Delaware in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction. In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19. <u>Survival.</u> All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20. <u>Severability.</u> In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto. However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.     AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)     Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)     Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)     Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)     Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment in connection with a claim brought by a third party, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon any claim that the sale or distribution of any Product violates law, the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Buyer shall tender and Seller shall assume the complete defense and settlement thereof at its sole expense, by counsel of its choice, and Buyer shall cooperate with Seller in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(e)     Buyer shall indemnify and hold harmless Seller, its officers, directors, shareholders, employees, agents and representatives from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment in connection with a claim brought by a third party, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) unauthorized representations, warranties, commitments or statements regarding Seller of the Products, (ii) the breach of any agreement with a third party (including any Customer), (iii) the unauthorized use of the Trademarks, or (iv) Seller's gross negligence, willful misconduct or violation of applicable law. If claims are asserted against Seller with respect to which Seller is entitled to indemnification hereunder, Seller shall tender and Buyer shall assume the complete defense and settlement thereof at its sole expense, by counsel of its choice, and Seller shall cooperate with Buyer in the defense thereof.

(f)     The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.     <u>LIMITATION OF LIABILITY.</u>  EXCEPT AS IT PERTAINS TO AMOUNTS EITHER PARTY IS REQUIRED TO INDEMNIFY THE OTHER AGAINST UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR    NATURE,

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.  EXCEPT AS IT PERTAINS TO AMOUNTS EITHER PARTY IS REQUIRED TO INDEMNIFY THE OTHER AGAINST UNDER THIS AGREEMENT, NEIT ER PART 'S  IABI IT  FOR A    C AIMS ARISING UNDER T  IS AGREEMENT, IN THE AGGREGATE, SHALL EXCEED THE FEES PAID BY SELLER TO BUYER UNDER THIS AGREEMENT.

23.    Confidentiality.  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").  The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.  Each party agrees that it will use the Confidential Information of the other party solely to perform its obligations or exercise its rights under this Agreement.   Neither party will disclose, or permit to be disclosed, the other party's Confidential Information directly or indirectly, to any third party without the other party's prior written consent, except as otherwise permitted hereunder.  Each party will use reasonable measures to protect the confidentiality and value of the other party's Confidential Information.  Notwithstanding any provision of this Agreement, either party may disclose the other party's Confidential Information, in whole or in part (i) to its employees, officers, directors, consultants and professional advisers (e.g., attorneys, auditors, financial advisors, accountants and other professional representatives) who have a need to know and are legally bound to keep such Confidential Information confidential by confidentiality obligations or, in the case of professional advisors, are bound by ethical duties to keep such Confidential Information confidential consistent with the terms of this Agreement; and (ii) as required by law (in which case each party will provide the other with prior written notification thereof, will provide such party with the opportunity to contest such disclosure, and will use its reasonable efforts to minimize such disclosure to the extent permitted by applicable law).  Each party agrees to exercise due care in protecting the Confidential Information from unauthorized use and disclosure.   In the event of actual or threatened breach of the provisions of this Section, the non-breaching party will be entitled to seek immediate injunctive and other equitable relief, without waiving any other rights or remedies available to it. Each party will promptly notify the other in writing if it becomes aware of any violations of the confidentiality obligations set forth in this Agreement.

24.    Headings and Construction.  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    Counterparts: Facsimile Signature Pages.  This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

*{Signatures appear on the following page}*

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 14th day of June 2024 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

DSTLRY Media, Inc.

By: _Laurance C Mosher III_

Date: 6/14/2024

Name: Laurance C Mosher III

Title: CCO

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: 6/14/2024

Name: Larry Swanson

Title: CFO

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

## EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term.   All defined terms used in this <u>Exhibit A</u> shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein.   Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement.   In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller.   In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.      Buyer shall perform the following marketing services:

(a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM.  With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)      With respect to the publication referred to in Paragraph 1 (a) above, Buyer shall provide 25 pages for new product listings in the color section per month at no charge to Seller.

(c)      Seller will be granted 1 cover annually in Buyer's catalog at no charge to Seller. If a front or back cover of the publication referred to in Paragraph 1 above becomes available Seller will be offered the opportunity to purchase at rate card price less a 20% discount.Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 20% off Buyer's published advertising rates.

2.      Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments. Seller retains the right of refusal for an assigned Brand Manager.

3.      To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.      To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

5.     Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

6.     Seller may participate as a paid sponsor in Buyer organized CBSM industry events. Buyer will be entitled to Silver level pricing for Gold level sponsor ship for all events Seller participates.

7.     The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

8.     Beginning with Buyer's XXXXX 2024 (XXXX 2024 On-Sale) catalog, Seller will be listed as a Deluxe Vendor in all relevant Buyer Sales and Marketing materials. Specific details are listed in Appendix A.

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

## **Exhibit B**

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks.   Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD.   Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product.   DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller.   DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.   In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund.   Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)".   Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.  Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

# Exhibit C
# DSTLRY
# Summary of Key Deal Points

| | US & UK CBSM Market | | US Book Market | | UK Book Market |
|---|---|---|---|---|---|
| Product Category | All | | All | | All |
| Section 5 (a) Base Discount | 58.00% | | 58.00% | | 58.00% |
| Section 6 (a) Base Days | 10 | | 30 | | 30 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | | n/a | | n/a |
| Section 6 (a) Early Pay Days Seller's Option | n/a | | n/a | | n/a |
| Section 5 (a) Freight Rebate | n/a | | n/a | | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | | 2.00 | | 7.00 |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | | 4.00% | | 4.00% |
| Section 6 (a) Returns Cap | n/a | | n/a | | n/a |
| Section 6 (a) Returns Fees | n/a | | n/a | | n/a |

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

# Appendix A

- Preferred placement in PREVIEWS – immediately following the Premier vendor pages as it's own section in front of the "Green" Print section of catalog as it currently stands. Publisher order in this section will be established by annual revenue through Diamond.

- Preferred placement would also be reflected in digital marketing as well, with preferred status on both the Retailer Services Website as well as PREVIEWSworld.com

- Buyer will remove the 3% reorder fee on all of Seller's Collections

- Dedicated Retailer Email - One email per month

- Diamond Daily Sponsorship Ad One week flight  - Two per year

- Retailer Services Site Article - One per month

- Retailer Services Site Digital Ads One week flight - Two per year

- Featured article on PREVIEWSworld - One per year

- PREVIEWSworld E-newsletter Ad - One ad Twice per year

- Social Posts - One post per platform per quarter

- Digital Ad Placements - One, one-week flight per year

- 4 free ad pages in PREVIEWS with the option to purchase additional ad pages at a BOGO (buy one; get one) rate.

- Free speaking presentation at Buyer San Diego Comic Con lunch

  Diamond Book Distributors Marketing Benefits for term of contract
- Discounted ALA booth - $6,000 (down from $7700) YEARLY
- FREE SLJTeen Live booth - $3500 YEARLY
- FREE LibraryCon booth - $4000 YEARLY
- 4 FREE eblasts per year - $2000
- FREE Bookshelf back cover - $1500 YEARLY

DocuSign Envelope ID: ACC6E47A-8C32-4F7C-BFAF-150644225EC4

# Appendix B

<u>Fees for Basic Services and payments.</u>

(a)  Diamond will perform Basic Services with respect to the Products and will receive a commission equal to eighteen percent (18%) of the "Gross Billings" (as hereinafter defined) of Products in the Comic Book Specialty Market and twenty percent (20%) in the Book Market. In the event that any Products are sold without a retail price, an assumed retail price will be calculated by multiplying the sales price times two (2).

(b)  Notwithstanding anything to the contrary set forth herein, the fee to be paid by Seller for any Product sold to a Customer by Buyer hereunder (including any Product sold at a discount) shall in no event be less than $0.25 for single issue periodical comic books, and $0.50 for all Products other than single issue periodical comic books.

(c)  Notwithstanding anything to the contrary in this Agreement, Buyer's purchases of Products for Diamond UK for Accounts in the United Kingdom shall be on a buy/sell returnable basis at a discount of sixty percent (60%) off the retail price. Buyer will receive a commission equal to 1.5% of the Gross Billings of Seller's Products distributed to Diamond UK.

(d)  Buyer's payment to Seller shall be in an amount equal to Buyer's "Gross Billings" from the sales of Products during that sales week, less the following   (i) credits for actual returns of Products; (ii) Documented Deductions (as defined herein) from Buyer's customers; (iii) Buyer's fulfillment and sales fees as provided in Section 5; (iv) actual freight charges incurred by Buyer in shipping Products to customers, except insofar as such charges are billed to customers; and (v) any charges for Additional Services (Gross Billings, less the items set forth in Sections 5(d)(i) through 5(d)(v) to be collectively referred to herein as "Net Sales").   As used herein, "Documented Deductions" from customers means any amounts deducted from remittances to Buyer by customers, whether related to Products, credits for advertising or any other deduction related to conducting business on behalf of Seller, that are documented by such customers, including ISBNs that allow these deductions to be identified as Products.   Documented Deductions will be provided to Seller by Buyer in such electronic and printed form and format as may be mutually agreed by Buyer and Seller.   Diamond will adhere to a regular accounting process of "taking" Documented Deductions and reconciling them to actual returns or shortages according to a plan mutually agreed upon in advance of its implementation or the making of any changes to such plan by Buyer and Seller. As used in this Agreement, "Gross Billings" means the gross amount invoiced by Buyer to customers in connection with fulfillment of orders for Seller's Products, exclusive of any prepaid transportation, insurance, and taxes as defined herein included on customer invoices.

**Exhibit 5**

**Dynamic Forces, Inc. a/k/a Dynamite Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of October1st, 2015, is made by and between DYNAMIC FORCES, INC. a NJ corporation located at 113 Gaither Dr., Suite 205, Mt. Laurel, NJ 08054 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

## WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books, variant and/or alternative covers of comic books, as well as signed editions of previously published comic books ("Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books ("Graphic Novels"), (iii) science fiction, fantasy and horror novels ("Novels"), (iv) miniature, role playing and collectible card playing games ("Games"), and (v) related merchandise ("Merchandise"). Collectively, physical copies of English-language versions of the Comic Books, Graphic Novels, Novels, Games, and Merchandise are referred to herein as "Products"; and

WHEREAS, Buyer is engaged in the business of, *inter alia*, selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment; Territory.

(a)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of which generally buy under Buyer's returnable trade terms.

Seller shall retain the right to sell directly into the channels and account types listed in Exhibit D.

(b)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Comic Book Specialty Market. "Comic Book

Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyer's non-returnable trade terms.

(c)     Seller hereby appoints Buyer as its non-exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing games, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer.

(e)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a) and (b), and as Seller's non-exclusive distributor under Paragraph l(c) hereof (collectively, the "Appointments").

2.     <u>Term.</u>  The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for two one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of October 1, 2015, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Term(s).

3.     <u>Supply.</u>

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.  Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.   In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer represents and warrants that it will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)     With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products

may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) ("US Inventory Hub") and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyer's direct cost plus fifteen (15) percent including credit for the original purchase price of Products.

(e)    Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)    Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above

(i)    shall apply to all Seller's titles published during the Term of this Agreement under the Dynamic Forces or Dynamite Entertainment trade dress and identifying as the sole copyright owner either "Dynamic Forces, Inc." or "Dynamite Characters, LLC"

(ii)    shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion;

(iii)    shall not apply to licensed publications based on Seller's IP created through third party publishers; and

(iv)    shall not apply to publications created and sold to a third party for the purpose of being used as a promotional or bonus item free with purchase of an unrelated item.

4.    Distribution Services: Additional Services.

(a)    As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)    Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto ("Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such Additional Service plus fifteen percent (15%). Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less twenty percent (20%).

5.    Price for Products.

(a)    Seller shall sell Products to Buyer either at the discount specified in Paragraph 5(c), on a net cost basis, (i.e. Seller will notify Buyer at time of solicitation of Products as to what Buyer's unit cost will be for each specific item) or at sixty percent (60%) off the retail price if the Product type is not specified in Paragraph 5(c); and shall grant Buyer a freight rebate of one-quarter of one percent (0.25%) of the wholesale price for all Products received by Buyer in the Continental United States. (the "Freight Rebate").  If Seller produces Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's US Inventory Hub in addition to the assessment of the Freight Rebate.  If Seller engages Buyer in FOB international shipments, Buyer will take care of all transportation, duties, customs clearance and other costs associated with each shipment, and charge back Seller at exact cost plus fifteen percent (15%).

(b)    In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

(c)    The specific purchase discount referred to in Paragraph 5(a) above shall be determined in accordance with the following schedule. Each discount below is defined as the "Applicable Discount", and with respect to Trading Cards the net cost price offered by Seller to Buyer will be considered the retail price. Reorders on products which originally shipped FOB Hong Kong to Buyer will be purchased from Seller by Buyer at fifty percent (50%) off the retail price:

- Comic Books, alternative covers comic books, graphic novels, trade paperbacks, hard covers, limited edition hard cover books, posters - 60% off
- Signed books, Alternate Covers Comics in the Dynamic Forces section of Previews, lithographs, giclees, apparel - 50% off
- Trading cards (net cost per product) - 00% off
- Statues, banks, busts, dioramas, bookends, snow globes, action figures, wall scrolls, and other merchandise - 57% off

6.    Payment Terms; Book Market Returns; Etc.

(a)    On a weekly basis and within 10 days after Buyer's unofficial weekly "release date" to the Direct Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).  On a weekly basis and within 10 days after Buyer's unofficial weekly release date to the Book Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount.

(b)    Definitions.
(1)    The "Weekly Payment Amount" shall be equal to the retail value of Net Products sold to Customers multiplied by a percentage equal to 100% minus the Buyer's discount percentage as specified in Paragraph 5(c) [or 40.00% if the Product type is not specified in

Paragraph 5(c)] plus the net cost value of Net Products sold to Customers, less: (i) the Book Market Service Fee (as defined herein), and (ii) the Book Market Returns Fee (as defined herein), if applicable, and (iii) the Freight Rebate, and (iv) for those Customers who require free freight for deliveries by Buyer, a Customer freight fee of one percent (1%) of wholesale, and (v) any Customers' "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C. Buyer will provide Seller, included with each Weekly Payment Amount, a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

(2)    "Net Products" means the total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers. Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to two and one-quarter percent (2.25%) of the retail price of such Book Market Return.

(3)    "Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means. When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction"). Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction. Buyer will give 14 days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(c)    In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twenty-four (24) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twenty-four month period following the Agreement's anniversary date and is limited to the previous two anniversary years' activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods; or the Seller request is made for the sole purpose of satisfying requirements of a licensor audit and the requested records and reporting are readily available and easily obtainable. Seller, at Seller's sole

expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(d)    In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(e)    In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 50% of sales of Products subject to such a reserve during the immediately succeeding twelve (12) months period based on reasonable forecasts. Provided this deduction has been mutually agreed upon to protect both parties in the event of sales to high returns risk accounts. (Such as Walmart and Target.)

(f)    Seller will have the right to enter into manufacturer and printer Assignment agreements (See exhibit E) with Buyer to the extent that the balance of Assignment amounts still due from Seller to Buyer does not exceed $700,000. Assignment fees will be a flat charge of $125.00 per production run per item, plus an interest charge prorated based on the length of the assignment to reflect the "One Year" Libor rate plus Three percent (3%) per annum (rounded to the next highest one quarter of a percentage). For example, if the "One Year" Libor rate is .71%, the interest rate of the assignment would be 3.75%/12 = .3125% The assigned amount plus interest and fees will be withheld from the first weekly payment due to Seller subsequent to 10 days after Buyers initial billing date for the Products associated with the assignment.

All Assignment Balances must be paid in full prior to the expiration of the Initial Term of this agreement. The right to enter into manufacturer and Printer Assignments will expire with the Initial Term of this agreement and not survive into any renewal terms. Any assignment balances not paid in accordance with the terms of this Agreement shall begin to accrue interest at one percent (1%) for each month, or any portion thereof, the balance remains unpaid. For the purpose of clarity, the processing fee noted above is limited to one charge per Assignment agreement, and not one charge per payment.

7.    Credit Decisions.

(a)    Buyer shall make all required credit decisions with respect to Customers

hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)     Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)     With respect to Book Market Customers for which Buyer considers to be at additional credit risk, upon notification to Seller, beginning with the next sales transaction forward Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 20.00% of the retail value of the amount of the bad debt. Unless Seller notifies Buyer to cease selling Seller's Products to the at risk Book Market Customer; to the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's deemed costs for any such bad debt and the invoice value related to Seller's Products included in the bad debt. For Book Market Customers for which Buyer has not provided the aforementioned credit risk notification Buyer will assume all responsibility for bad debt without limit.

(d)     For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.     Title And Risk Of Loss; Inventory.

(a)     All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer.   Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)     Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.   Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)     Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer represents and warrants that Buyer shall maintain all insurance with respect thereto. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however,

that in the event that "normal shrinkage and deterioration" exceeds two percent (2%) of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as twenty percent (20%) of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer.   The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the two percent (2%) threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business.   All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed twenty percent (20%) of average retail price of units of Products that are lost or damaged.

(d)      Storage fees will be assessed on a monthly basis and deducted from the weekly payment amount based on the following rate schedules:

| Pieces of saleable Inventory | Storage Fee |
|---|---|
| 0 − 500,000 | $0 |
| 501,000 − 650,000 | $3,500 |
| 651,000 − 750,000 | $5,000 |
| 751,000 − 850,000 | $6,500 |
| 851,000 − 950,000 | $8,000 |

| Hurt Books Pallets | |
|---|---|
| Over 6 months old | $50 per pallet per month |
| Over 1 year old | $100 per pallet per month |
| Over 2 years old | $200 per pallet per month |
| Over 3 years old | Diamond will destroy |

(e)      Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer but no less than $1200.00 per pallet with the proceeds from this sale divided 55% to Seller and 45% to Buyer when Buyer makes the sale; or 90% to Seller and 10% to Buyer if Seller makes the sale, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 70% to Seller and 30% to Buyer when Buyer makes the sale; or 90% to Seller and 10% to Buyer if Seller makes the sale.   Or in such proportions as mutually agreed on a case by case basis.

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15.00 per order, $ 2.00 per title and $ 0.25 for each piece pick and case pick generated to fulfill the order. SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20.00 per hour for processing any direct to Seller returns which aren't included in No Cost Replacement shipments.

9.     Intellectual Property.

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and TM 20XX DYNAMIC FORCES, INC., All Rights Reserved, All Rights Reserved."  Or as otherwise directed by Dynamic Forces, Inc.

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to

time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.     <u>Termination.</u>

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

    i.     Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

    ii.     Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per Paragraph 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

    iii.     A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

    iv.     Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

    v.     Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

vi.   Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

11.   Effect of Termination.

(a)   Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)   If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to buyer from Seller otherwise due under this Agreement. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)   If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)   Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)   In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for ninety (90) days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Seller's Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to

serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)     125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)    Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer.   Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Seller's Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Seller's Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)     In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.  If Buyer feels Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.   Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

(g)     Upon termination of this Agreement and in accordance with Paragraph 3(d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's US Inventory Hub and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyer's direct cost plus ten (10) percent including credit for the original purchase price of Products.

(h)   Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer. If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.     Notices.  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt

requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

DYNAMIC FORCES, INC.
113 Gaither Dr., Suite 205
Mt. Laurel, NJ 08054
Nick Barrucci
856-312-1040
856-312-1050

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland   21093
Attention: Chief Operating Officer
Fax: (410) 683-7088

or to such other address as either party shall have designated in a notice to the other party. Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.  _Release._  By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with Paragraph 6(c).  In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in Paragraph 6(c))

14.  _Independent Contractors; No Third Party Rights._   Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.  Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller. Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.  _Force Majeure._      Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control. The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.  _Assignment: Binding Effect._ Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this

Agreement to any affiliate organized for the purpose of publishing the Products. Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities. Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement. All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17. <u>Entire Agreement: Modification.</u> This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto. This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18. <u>Applicable Law.</u> This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party. In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator. Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction. In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19. <u>Survival.</u> All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20. <u>Severability.</u> In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto. However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform all of their respective obligations under this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its affiliated companies, its officers, directors, shareholders, employees, agents and representatives, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein.  If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall fully cooperate with Seller in the defense thereof.  Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Buyer shall fully cooperate with Seller in the defense thereof.  The foregoing indemnification shall not apply to any Products which have been changed, altered, modified, tampered with or otherwise changed ("Alterations") in whole or in part by Buyer, its officers, employees, agents or representatives, to the extent such any claim, demand, suit, action, prosecution or proceeding would not have been brought but for such Alterations.

(e)    Buyer shall indemnify and hold harmless Seller, its affiliated companies and their respective officers, directors, shareholders, employees, agents and representatives, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) any breach of a representation or warranty set forth herein; or (ii) any breach of any covenant or agreement set forth herein.  If claims are asserted against Seller with respect to which Seller is entitled to indemnification hereunder, Buyer shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Seller's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Seller shall fully cooperate with Buyer in the defense thereof.  Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(f)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>    IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.

23.    <u>Confidentiality.</u>  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").   The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.   Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.    <u>Headings and Construction.</u>  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    <u>Counterparts: Facsimile Signature Pages.</u>   This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of October, 2015 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

DYNAMIC FORCES, INC.

By: _____

Date: _____9-22-15_____

Name: Nick Barrucci

Title: CEO

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Paragraph 2 below).

1.      Buyer shall perform the following marketing services:

(a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)      With respect to the publication referred to in Paragraph 1 (a) above, Buyer shall provide 21 pages for new product listings in the color section per month, 2 ad pages per month in the front section of the catalog starting with July 2015 previews catalog, 8 front gatefolds and 4 back gatefolds per year; all free of charge.   Seller shall also be given the right to purchase available Gatefold cover selections at a net cost per Gatefold of $2,250.  Seller may also purchase additional non-premium pages inside of Buyer's Previews catalog at a rate of $800.00 per page.  In addition, Seller shall have the right to design its own pages in Buyer's monthly Previews catalog.  In the event that Seller does not submit all solicitation materials and advertising within 24 hours of the stated monthly ad deadline; 4 of the free pages in Seller's section will be billed back to Seller at a flat rate of $800.00 per page.

(c)      In the event that Seller is able to achieve both a 4.0% market-share of direct market sales (as reported via Diamond's year end market share charts) and net sales through Diamond of no less than $9,000,000 per contract year, then Seller will be moved to the front of the Diamond Previews catalog (along with the other premier publishers). These thresholds will be reviewed at the end of each contract year and the change to premier status if earned will be taken into account no more than 90-days from the end of the contract year.   No other Seller with identical Appointments will be moved to the front of the catalog at levels less than those stated in this Paragraph.

(d)      Seller may purchase additional advertising space in the publication referred to in Paragraph 1(a) above at 20% off Buyer's published advertising rates.

(e)    Seller shall be given the opportunity to purchase either a Previews front cover (C1) or back cover (C4) if it becomes available once per contact year at the rate card less 20%.  In addition, Seller will be offered the first option on any open Previews Order form or Previews Short Order Form cover spots which aren't previously covered by existing agreements with Buyer's other clients. Seller shall also be given the option to buy any remnant Previews Short Order Form cover spots at a special rate of no more than $1,000 net (no additional discounts would apply).

(f)    Buyer will dedicate no less than two (2) of Seller's Products per month as a Featured Item inside of Buyer's catalog.

(g)    Buyer will grant to seller a flexible marketing allowance of $17,000 per quarter to be used to purchase marketing services and advertising outside of the previews catalog and order form book.   Services and advertising purchased using this marketing allowance will be applied at full rate card value.

(h)    To the extent that Buyer produces a daily web email blast (Diamond Daily) Buyer will grant seller 3 Diamond Daily stories per week at no cost to Seller.

(i)    Seller will be granted the right to include 2 full page ads inside each of Buyer's backlist catalogs which will be billed against the flexible marketing allowance. (assuming Seller has appropriate products and product selection to warrant 2 full pages for each of Buyer's backlist catalogs)

(j)    Solicitation of signed and numbered comics shall be limited to no more than 24 listings per catalog.

2.    Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.    Seller will be allowed to make a presentation to Buyer's customer service department when mutually agreed upon at no cost to Seller.

4.    Buyer will dedicate a minimum of 1 focused sales effort via Diamond's field reps per month at no cost to Seller.

5.    Buyer will dedicate a minimum of 1 focused sales effort via Diamond's inside telephone sales reps per month to be billed against the flexible marketing allowance.

6.    To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

7.    Buyer will supply to Seller reports based on the weekly and monthly sales efforts at no cost to Seller.

8.    To the extent Buyer produces a catalog or advertising booklet for distribution in

the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

9.      Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

10.      The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Vendor in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Vendor shall be accepted by Vendor under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("Diamond") shall place all orders with Vendor by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Vendor shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Vendor notifies the Diamond Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification Diamond will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, Diamond may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event Diamond accepts products on a returnable basis, Diamond reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Vendor a processing fee of $100.

Vendor shall include a packing list with each shipment to include title, Diamond item code, quantity shipped and Diamond's purchase order number.

A scannable bar code must be printed or stickered on all items shipped. At Diamond's sole discretion, items received without a valid scannable bar code may be either returned to the vendor, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the vendor) may be delayed up to three weeks. Vendor shall extend full return privileges to both Diamond and Retailers on all items stickered by Diamond. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Vendor solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

Diamond requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by Diamond in writing, accepted on a fully returnable basis.

Diamond requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, Diamond reserves the right to make the qualifying items returnable to its customers and to pass on the cost of those returns to the Vendor.

In the event Vendor ships product to Diamond which has not been ordered by Diamond, Vendor assumes all risk for the product.   Diamond shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Vendor.   Diamond shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting Diamond's Purchase Order, Vendor hereby warrants to Diamond that (i) it owns all rights to market and sell the products to Diamond as described in the Purchase Order; (ii) said products as delivered to Diamond will be of good and salable quality, and are free of all liens, claims and encumbrances; (iii) said products as delivered to Diamond conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products as delivered to Diamond are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label.   Vendor further agrees to indemnify and hold Diamond, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Vendor of the warranties contained herein or any act or omission of Vendor or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof; provided, however, that the foregoing indemnification shall not apply to any products which have been changed, altered, modified, tampered with or otherwise changed ("Alterations") in whole or in part by Diamond, its employees, agents or affiliates, to the extent such any claim, lawsuit or cause of action would not have been brought but for such Alterations.   In addition to and not in limitation of any rights Diamond may have under this paragraph, by law or statute, in the event a claim or allegation is made against Diamond regarding any of the above or if Vendor breaches the warranties contained herein, Diamond shall have the right, in its sole discretion, to either receive quantities Diamond ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Vendor for a full refund.   Vendor shall reimburse Diamond for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Vendors must be shipped "delivered duty paid (DDP)".   Should failure of Vendor to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Vendor shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Vendor hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Vendor shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein. Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Vendor, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Vendor have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Vendor shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# DYNAMIC FORCES
## Summary of Key Deal Points

| | US & UK CBSM Market | | US Book Market | | UK Book Market |
|---|---|---|---|---|---|
| Product Category | All Categories | | All Categories | | All Categories |
| Paragraph 5 (a) Base Discount | 60.00% / 50% / net /57% per Paragraph 5 (c) | | 60.00% / 50% / net /57% per Paragraph 5 (c) | | 60.00% / 50% / net /57% per Paragraph 5 (c) |
| Paragraph 6 (a) Base    Days | 10 | | 10 | | 10 |
| | | | | | |
| | | | | | |
| Paragraph 5 (a) Freight Rebate | .25% of wholesale | | .25% of wholesale | | .25% of wholesale |
| Paragraph 5 (b) Paragraph 6 (a) Book Market Sales Allowance | n/a | | .00% | | |
| Paragraph 6 (a) Book Market Service Fee (Retail) | n/a | | 2.25% | | 2.25% |
| Paragraph 6 (a) Returns    Cap | n/a | | .00% | | .00% |
| Paragraph 6 (a) Returns    Fees | n/a | | .00% | | .00% |

Exhibit D

List of Channels and Customers to whom Seller retains the right to sell direct.

- Book Clubs
- Book Fairs
- Scholastic Book Fairs
- Comic Themed Conventions
- Warehouse Clubs
- TV Shopping Programs
- Trading Card Distributors
- Action Figure and Statue Sellers as mutually agreed
- Sideshow Collectibles and sideshowtoy.com
- Custom Comics Buyers
- Art Galleries

[TODAY's DATE]                                      Assignment # - - -

**Exhibit E**
**ASSIGNMENT**

This agreement is made on the date shown above among/between Diamond Comic Distributors, Inc. ["Diamond"] of 10150 York Rd., Ste. 300, Hunt Valley, Maryland, 21030; DYNAMIC FORCES, INC. ("DYNAMIC"), of 113 Gaither Dr., Suite 205, Mt. Laurel, NJ  08054 and [Insert Name of Printer or Factory here] of [Insert Address of Printer or Factory here]

**BACKGROUND**

1. Diamond agrees to sell on consignment from DYNAMIC the materials ("Product") and quantities designated as Diamond Item Numbers [Insert Item Number and Product Description Here]  - [Insert Qty to be paid for here].

**THE PARTIES AGREE AS FOLLOWS:**

2.  "Assignment Amount" equals $[insert assignment dollar amount here]

2a. DYNAMIC hereby assigns to [Insert Name of Printer or Factory here] the Assignment Amount shown in Paragraph 2, which is some or all of the amount Diamond shall owe to DYNAMIC as payment for the purchase of consigned goods described in Paragraph 1.   Diamond hereby consents to the Assignment of this amount to [Insert Name of Printer or Factory here] and agrees to pay to [Insert Name of Printer or Factory here] the Assignment Amount by the agreed upon date of **mm/dd/yyyy**, provided that the product as described in Paragraph 1 is acceptable to both Diamond and DYNAMIC in terms of quantity, content and condition, and further provided that the product is made available to Diamond.

2b. DYNAMIC shall send its invoice to Diamond, in the amount of the Assignment Amount, clearly marked "Please remit payment to: [Insert Name of Printer or Factory here].

3. Should DYNAMIC owe any outstanding debt to Diamond, Diamond shall have the right to deduct that amount from the Assignment Amount, and remit only the remainder of the Assignment Amount to [Insert Name of Printer or Factory here].

4. Diamond shall have no duty to pay [Insert Name of Printer or Factory here] any amount other than the Assignment Amount, less any outstanding debt owed by DYNAMIC as described in Paragraph 3.

5. Once Diamond has paid the Assignment Amount to [Insert Name of Printer or Factory here] ,Diamond's obligation shall be considered complete in regards to both [Insert Name of Printer or Factory here], and DYNAMIC for the consignment purchase described in Paragraph 1, and its related Assignment.

5b. As the Assignment described in Paragraph 1 is for consigned goods with no established finite term of sale, Diamond shall deduct the Assignment Processing Fee and the Assignment Amount paid to [Insert Name of Printer or Factory here] from the next available payment due to DYNAMIC 30/60/90 days from issue of the Assignment Amount paid to [Insert Name of Printer or Factory here].

6. Diamond's consent to this Assignment does not relieve DYNAMIC of any liability or responsibility to [Insert Name of Printer or Factory here] under the contract between DYNAMIC and [Insert Name of Printer or Factory here] and DYNAMIC shall be responsible for any default or breach of such contract.

7. DYNAMIC warrants to Diamond that it has made no other Assignment(s) of any type or kind, to any other entity, respecting the products related to this Assignment, and further warrants to Diamond that it will not make any other Assignment(s) until performance of this Assignment is complete.

8. No delays or failure by Diamond to exercise any right under this Agreement or under applicable law, and no partial or single exercise of that right, shall constitute a waiver of that or any other right unless otherwise expressly provided herein.

9. It is agreed that all parties must affix their signatures to this agreement for it to be effective and it is agreed that signed copies of the agreement sent by telephone facsimile (fax) will serve as acceptable documents.

10. Diamond shall have no duty to DYNAMIC or [Insert Name of Printer or Factory here] other than as described above and herein.

11. No provision of this Agreement shall be deemed to change, alter, or modify any terms or conditions of the Purchase Order(s).

12. DYNAMIC shall indemnify and hold harmless Diamond against all liabilities, costs and expenses, including attorneys' fees, for any claim arising from, or in conjunction with, any disputes or litigation arising among/between the parties.

13. Any disputes arising among/between the parties shall be settled under the jurisdiction and venue of the laws and courts of Maryland.

14. DYNAMIC authorizes Diamond to deduct a fee in the amount of $[insert assignment fee amount here] for processing this Assignment.


_____          _____
Printed Name          Signature (SEAL)                    Date
AGREED AND ACCEPTED
DIAMOND COMIC DISTRIBUTORS, INC.


_____          _____
Printed Name          Signature (SEAL)                    Date
AGREED AND ACCEPTED
[Insert Name of Printer or Factory here]

_____          _____
Printed Name          Signature (SEAL)                    Date
AGREED AND ACCEPTED
DYNAMIC


Revised 03/18/2015

[TODAY's DATE]                                         Assignment # - - -

### Exhibit F
### PRINTER VERSION – REDACTED ASSIGNMENT

This agreement is made on the date shown above among/between Diamond Comic Distributors, Inc. ["Diamond"] of 10150 York Rd., Ste. 300, Hunt Valley, Maryland, 21030; DYNAMIC FORCES, INC. ("DYNAMIC"), of 113 Gaither Dr., Suite 205, Mt. Laurel, NJ  08054 and [Insert Name of Printer or Factory here] of [Insert Address of Printer or Factory here]

### BACKGROUND

1. Diamond agrees to sell on consignment from DYNAMIC the materials ("Product") and quantities designated as Diamond Item Numbers [Insert Item Number and Product Description Here]   - [Insert Qty to be paid for here].

### THE PARTIES AGREE AS FOLLOWS:

2.   "Assignment Amount" equals $[insert assignment dollar amount here]

2a. DYNAMIC hereby assigns to [Insert Name of Printer or Factory here] the Assignment Amount shown in Paragraph 2, which is some or all of the amount Diamond shall owe to DYNAMIC as payment for the purchase of consigned goods described in Paragraph 1.   Diamond hereby consents to the Assignment of this amount to [Insert Name of Printer or Factory here] and agrees to pay to [Insert Name of Printer or Factory here] the Assignment Amount by the agreed upon date of **mm/dd/yyyy**, provided that the product as described in Paragraph 1 is acceptable to both Diamond and DYNAMIC in terms of quantity, content and condition, and further provided that the product is made available to Diamond.

2b. DYNAMIC shall send its invoice to Diamond, in the amount of the Assignment Amount, clearly marked "Please remit payment to: [Insert Name of Printer or Factory here].

3. Should DYNAMIC owe any outstanding debt to Diamond, Diamond shall have the right to deduct that amount from the Assignment Amount, and remit only the remainder of the Assignment Amount to [Insert Name of Printer or Factory here].

4. Diamond shall have no duty to pay [Insert Name of Printer or Factory here] any amount other than the Assignment Amount, less any outstanding debt owed by DYNAMIC as described in Paragraph 3.

5. Once Diamond has paid the Assignment Amount to [Insert Name of Printer or Factory here] ,Diamond's obligation shall be considered complete in regards to both [Insert Name of Printer or Factory here], and DYNAMIC for the consignment purchase described in Paragraph 1, and its related Assignment.

5b. As the Assignment described in Paragraph 1 is for consigned goods with no established finite term of sale, Diamond shall deduct the Assignment Processing Fee and the Assignment Amount paid to [Insert Name of Printer or Factory here] from the next available payment due to DYNAMIC 30/60/90 days from issue of the Assignment Amount paid to [Insert Name of Printer or Factory here].

6. Diamond's consent to this Assignment does not relieve DYNAMIC of any liability or responsibility to [Insert Name of Printer or Factory here] under the contract between DYNAMIC and [Insert Name of Printer or Factory here] and DYNAMIC shall be responsible for any default or breach of such contract.

7. DYNAMIC warrants to Diamond that it has made no other Assignment(s) of any type or kind, to any other entity, respecting the products related to this Assignment, and further warrants to Diamond that it will not

make any other Assignment(s) until performance of this Assignment is complete.

8. No delays or failure by Diamond to exercise any right under this Agreement or under applicable law, and no partial or single exercise of that right, shall constitute a waiver of that or any other right unless otherwise expressly provided herein.

9. It is agreed that all parties must affix their signatures to this agreement for it to be effective and it is agreed that signed copies of the agreement sent by telephone facsimile (fax) will serve as acceptable documents.

10. Diamond shall have no duty to DYNAMIC or [Insert Name of Printer or Factory here] other than as described above and herein.

11. No provision of this Agreement shall be deemed to change, alter, or modify any terms or conditions of the Purchase Order(s).

12. DYNAMIC shall indemnify and hold harmless Diamond against all liabilities, costs and expenses, including attorneys' fees, for any claim arising from, or in conjunction with, any disputes or litigation arising among/between the parties.

13. Any disputes arising among/between the parties shall be settled under the jurisdiction and venue of the laws and courts of Maryland.

14. DYNAMIC authorizes Diamond to deduct a fee ███████████████ for processing this Assignment. ███████████████

███████████████████████████████████████████
███████████████████████████████████████
███████████████████

_____      _____         _____
Printed Name        Signature (SEAL)                              Date
AGREED AND ACCEPTED
DIAMOND COMIC DISTRIBUTORS, INC.

_____      _____         _____
Printed Name        Signature (SEAL)                              Date
AGREED AND ACCEPTED
[Insert Name of Printer or Factory here]

_____      _____         _____
Printed Name        Signature (SEAL)                              Date
AGREED AND ACCEPTED
DYNAMIC

**Exhibit 6**

**Heavy Metal International, LLC Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of February 1st, 2017, is made by and between Heavy Metal, a Massachusetts corporation located at 116 Pleasant St, Suite 018, East Hampton, Massachusetts 01027 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

<u>WITNESSETH:</u>

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books ("Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books ("Graphic Novels"), (iii) science fiction, fantasy and horror novels ("Novels"), (iv) miniature, role playing and collectible card playing games ("Games"), and (v) related merchandise ("Merchandise").  Collectively, Comic Books, Graphic Novels, Novels, Games, and Merchandise are "Products".  All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Appointment; Territory.</u>

    (a)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of  which generally buy under Buyers returnable trade terms.

    (b)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Comic Book Specialty Market.  "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c)    Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market.  "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing games, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)    If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer.

(e)    Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), 1(b) and l(c) hereof (collectively, the "Appointments").

2.    Term.  The initial term of this Agreement (the "Initial Term") is for two years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.  Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term").  This Agreement is effective with Products available for shipment as of November 1st, 2015, the "Commencement Date".  As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.    Supply.

(a)    Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)    Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.  Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.  In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)    Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)    With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(e)     Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)     Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the Heavy Metal trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.     Distribution Services; Additional Services.

(a)     As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services").  Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)     Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto ("Additional Services").  Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.  Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such 20.00%.  Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 15.00%.

5.     Price for Products.

(a)     Seller shall sell Products to Buyer at a discount of 60.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 2.00% of the retail price (or a 4.00% of purchase price freight rebate if any Product is solicited on a net cost basis) for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or drop shipped to only one of Buyer's distribution centers.  If alternatively Seller ships Products to each of Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges.  If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center.  Such shipments are also subject to the freight rebate.

(b)     In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 3.00% of the retail price of all Products (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market,

or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance"). For like sales in the UK, Seller shall provide Buyer an allowance of 3.00% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)     In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    Payment Terms; Book Market Returns; Etc.

(a)     On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). On a weekly basis and within 60 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount. The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 40.00% plus the net cost value of Net Products sold to Customers, less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) the Freight Rebate, less (vi) a Customer freight fee of 1.25% of retail for those Customers who require free freight for deliveries by Buyer, less (vii) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C. Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers. Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 4.00% of the retail price of such Book Market Return. In addition, if in any year of the Term of this Agreement Buyer processes Book Market Returns with a credited value in excess of 30.00% of sales made to the Book Market during such year (the "Trigger Amount"), Seller will pay to Buyer an additional fee of 4.00% of the invoices credited for Book Market Returns in excess of the Trigger Amount in such year (the "Book Market Returns Fee").

"Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means. When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction"). Seller's proportional amount will be calculated by dividing (a) sales of

Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction. Buyer will give 14 days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

       (b)    In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

       (c)    In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

       (d)    In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 30.00% of sales of Products during, at the option of Buyer, either (i) the immediately preceding 12 month period, or (ii) the immediately succeeding 12 month period based on reasonable forecasts

7.    Credit Decisions.

(a)    Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)    Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)    With respect to Book Market Customers Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 10.00% of the extended SRP (the "Deemed Cost") of all unpaid invoice lines for Seller's Products that make up the amount of the bad debt.    To the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's Deemed Cost for any such bad debt and Buyer's cost of all unpaid invoice lines for Seller's Products included in the bad debt.

(d)    For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.    Title And Risk Of Loss; Inventory.

(a)    All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer.   Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.   Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)    Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer shall maintain all insurance with respect thereto.   Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time.   Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds 2.00% of units of beginning inventory of Products held by

Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 10.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed 10% of average retail price of units of Products that are lost or damaged.

(d)     Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter   Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)     Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.     <u>Intellectual Property.</u>

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the

Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX HEAVY METAL, All Rights Reserved."

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.     <u>Termination.</u>

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which

default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default. Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)    Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

i.    Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

ii.    Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

iii.    A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

iv.    Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

v.    Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

vi.    Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

11.    <u>Effect of Termination.</u>

(a)    Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)      If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)      If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)      Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)      In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for 90 days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)      125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)     Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer. Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller

shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

      (f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.  If Buyer reasonably believes Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.  Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

      (g)    Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

      (h)  Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer.   If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

    12.    <u>Notices.</u>  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

    If to Seller:

        HEAVY METAL MAGAZINE
        116 PLEASANT ST, #018
        EASTHAMPTON, MA 01027
        Attn:
        Phone: (516)-594-2130
        Fax: (516)-594-2133

    If to Buyer:

        Diamond Comic Distributors, Inc.

10150 York Road, Suite 300
Hunt Valley, Maryland   21030
Attention: Chief Operating Officer
Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party.   Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.    Release.    By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (c).   In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (c)).

14.    Independent Contractors; No Third Party Rights.    Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.   Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.    Force Majeure.    Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.   The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.    Assignment: Binding Effect.    Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.   Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.    Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.   All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.    Entire Agreement: Modification.    This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof,    and supersede    all    other prior    oral and written representations,    agreements,    or understandings between them relating thereto.   This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified,

altered or changed except by an instrument in writing signed by both parties.   The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.    Applicable Law.   This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein.   Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party.   In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.   Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.   In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    Survival.   All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    Severability.   In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.   However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all

reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein.   If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(e)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>   IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR    NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.

23.    <u>Confidentiality.</u>   In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").   The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.   Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.    <u>Headings and Construction.</u>   Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    <u>Counterparts: Facsimile Signature Pages.</u>   This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.   Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of November 2015 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

Heavy Metal

By: _____

Date: _____

Name:

Title:


DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

## EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term.   All defined terms used in this <u>Exhibit A</u> shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein.   Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement.   In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller.   In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.      Buyer shall perform the following marketing services:

(a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM.  With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)      Buyer grants Seller 1 ad page per month in Buyer's catalog at no cost to Seller. Seller may purchase additional advertising space in the publication referred to in Paragraph l (a) above at 15% off Buyer's published advertising rates. Additionally, Seller may earn incremental free monthly page increases based on the DCD Cost of Net Products sold through Diamond as reflected in the below chart.

| 1st quarter | 2nd | 3rd | 4th | Additional Free Pages |
|---|---|---|---|---|
| 125000 | 250000 | 375000 | 500000 | 1 |
| 250000 | 500000 | 750000 | 1000000 | 2 |
| 437500 | 875000 | 1312500 | 1750000 | 3 |
| 625000 | 1250000 | 1875000 | 2500000 | 4 |

2.      Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.      To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.      To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge

to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

5.     Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

6.     The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks.   Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD.   Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product.  DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller.  DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.   In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund.   Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)".  Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.  In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.   Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# HEAVY METAL
# Summary of Key Deal Points

|  | US & UK CBSM Market | US Book Market | UK Book Market |
|---|---|---|---|
| Product Category | All | All | All |
| Section 5 (a) Base Discount | 60.00% | 60.00% | 60.00% |
| Section 6 (a) Base    Days | 30 | 60 | 60 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | n/a | n/a |
| Section 6 (a) Early   Pay Days Seller's Option | n/a | n/a | n/a |
| Section 5 (a) Freight Rebate | 2.00% of retail | 2.00% of retail | 2.00% of retail |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | 3.00% of retail | 3.00% of retail |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | 4.00% | 4.00% |
| Section 6 (a) Returns    Cap | n/a | 30.00% | 30.00% |
| Section 6 (a) Returns    Fees | n/a | 4.00% | 4.00% |

**Exhibit 7**

**Magnetic Press, LLC Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of $\underline{\text{Dec 17, 2019}}$, is made by and between MAGNETIC PRESS, LLC, a Missouri limited liability company located at 6600 Manchester Ave., St. Louis, MO 63139 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

<u>WITNESSETH:</u>

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products.")   All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     <u>Appointment; Territory.</u>

(a)     Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of   which generally buy under Buyers returnable trade terms.

(b)     Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Comic Book Specialty Market. "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of

distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c)    If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer. Seller reserves the right to run and maintain a web site, a component of which will include an e-commerce site where Seller will sell their products directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues (web site and trade shows and cons).

(d)    Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), 1(b) and l(c) hereof (collectively, the "Appointments").

2.    <u>Term.</u>  The initial term of this Agreement (the "Initial Term") is for two years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.  Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term").  This Agreement is effective with Products available for shipment as of _____, the "Commencement Date".  As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.    <u>Supply.</u>

(a)    Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)    Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.  Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.  In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)    Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)    With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 30 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost.

(e)     Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)     Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the MAGNETIC PRESS trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.     <u>Distribution Services: Additional Services.</u>

(a)     As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services").  Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)     Buyer may also elect, in its sole discretion, to offer services to Seller not specified on <u>Exhibit A</u> hereto ("Additional Services").  Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.  Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such 20.00%.  Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20.00%.

5.     <u>Price for Products.</u>

(a)     Seller shall sell Products to Buyer at a discount of 60.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 1% off of the retail price for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or shall ship Products to each of Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges.  If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center.  Such shipments are also subject to the freight rebate.

(b)     In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 2.00% of the retail price of all Products (including a 5.00% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance").  For like sales

in the UK, Seller shall provide Buyer an allowance of 3.50% of the retail price (including a 7.00% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)    In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    Payment Terms; Book Market Returns; Etc.

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). On a weekly basis and within 30 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount. The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 40.00%  plus the net cost value of Net Products sold to Customers, less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) a Customer freight fee of 1.25% of retail for those Customers who require free freight for deliveries by Buyer, less (vi) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C. Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers. Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 4.00% of the retail price of such Book Market Return.

"Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means. When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction"). Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction. Buyer will give   days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(b)    In the event that Buyer provides Seller any Distribution Services or other

service with respect to which an additional charge is imposed in accordance with <u>Exhibit A,</u> Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twelve-month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c) In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(d) Superseding all other provisions and Buyer's remedies contained in this Agreement, Seller agrees to immediately pay to Buyer any amounts due to Buyer which become 45 days old or older resulting from negative Sales and/or for services rendered to, for, or on behalf of Seller, or for any other reason(s). Such demand for payment will be effected by written request (including email) from Buyer delivered to Seller.

7. <u>Credit Decisions.</u>

(a) Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b) Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer and shall have the right to enter into any

settlement with such delinquent Customers in its reasonable discretion.

(c)     With respect to Book Market Customers, Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 15.00% of the extended SRP (the "Deemed Cost") of all unpaid invoice lines for Seller's Products that make up the amount of the bad debt.   To the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's Deemed Cost for any such bad debt and Buyer's cost of all unpaid invoice lines for Seller's Products included in the bad debt.

(d)     For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.     <u>Title and Risk Of Loss; Inventory.</u>

(a)     All Products are to be held by Buyer on consignment and remain the property of Seller until sold by Seller through Buyer.   Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's  erms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)     Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.   Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)     Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer shall maintain all insurance with respect thereto.   Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time.   Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds 2.00% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold.   This reimbursement amount is calculated as 18.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer.   The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be

liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed the printing costs associated with sum of (i) the printing costs associated with the Products that are lost or damaged and (ii) Seller's actual cost of shipping such Products to Buyer's distribution center.

(d)    Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four uarter Distribution Amount"). Provided that the "Calculated alue" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)    Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)    Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)    If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.    Intellectual Property.

(a)    Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)    Buyer acknowledges Seller's exclusive right, title, and interest in and to the

Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit.  Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement.  Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX MAGNETIC PRESS, LLC, All Rights Reserved."

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.    <u>Termination.</u>

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

i.  Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

ii.  Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

iii.  A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

iv.  Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

v.  Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

vi.  Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

11.  <u>Effect of Termination.</u>

(a)  Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)  If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable.  Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.   Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)     If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)     Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)     In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for 90 days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)     125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)     Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer. Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)     In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any

amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.   If Buyer reasonably believes Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.   Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

      (g)    Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.   Buyer will give Seller 30 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

      (h)   Promptly upon termination of this Agreement by Seller, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer.   If Seller terminates this Agreement and fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.   In the event that Buyer terminates this Agreement, Buyer shall be responsible for such removal expenses as it relates to removing such Inventory from Buyer's distribution center, and Buyer shall not have the right to either dispose of or destroy such Inventory without written consent from Seller.

    12.    <u>Notices.</u>  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

      MAGNETIC PRESS, LLC
      6600 Manchester Ave.
      St. Louis, MO 63139
      Attn: _____

If to Buyer:

      Diamond Comic Distributors, Inc.
      10150 York Road, Suite 300
      Hunt Valley, Maryland   21030
      Attention: Chief Operating Officer
      Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party.   Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate

number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.   *Intentionally deleted.*

14.   <u>Independent Contractors; No Third Party Rights.</u>   Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.   Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.   <u>Force Majeure.</u>   Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.   The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.   <u>Assignment: Binding Effect.</u>   Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.   Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.       Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.   All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.   <u>Entire Agreement: Modification.</u>   This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto. This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties.   The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.   <u>Applicable Law.</u>   This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein.   Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party.   In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.   Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and

regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.   In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    <u>Survival.</u>   All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    <u>Severability.</u>   In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.   However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i)   any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (ii) any breach of a representation or warranty set forth herein; or (iii) any breach of any covenant or agreement set forth herein.   If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(e)    The foregoing representations, warranties, covenants and indemnities shall

survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>  IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT OR TORT (INCLUDING NEGLIGENCE), EXCEPT AS SET FORTH IN PARAGRAPH 21 HEREOF.

23.    <u>Confidentiality.</u>  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").  The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.  Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.    <u>Headings and Construction.</u>  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    <u>Counterparts: Facsimile Signature Pages.</u>  This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this _Dec 17, 2019_____ and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

MAGNETIC PRESS, LLC

By: _David Steward II (Dec 17, 2019)_____

Date: _Dec 17, 2019_____

Name: _David Steward II_____

Title: _CEO_____

DIAMOND COMIC DISTRIBUTORS, INC.

By: _Tim Lenaghan_____
_Tim Lenaghan (Dec 2, 2019)_

Date: _Dec 2, 2019_____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term.   All defined terms used in this <u>Exhibit A</u> shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein.   Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement.   In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller.   In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.      Buyer shall perform the following marketing services:

(a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM.  With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)      Buyer grants Seller    ad pages per month in Buyer's catalog at no cost to Seller. Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 20% off Buyer's published advertising rates. Additionally, for every page Seller purchases in Buyer's catalog, excluding premium ad spots, Seller will receive one free additional page, to be used at a time of Seller's choosing.

(c)      Seller may select up to 10 new releases per calendar year to be designated as "Spotlight" items in Buyers catalog.

(d)      Buyer grants Seller 6 free retailer e-blasts annually at no-charge to Seller.

2.      Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.      To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.      To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

5.      Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

6.      The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## **Exhibit B**

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.  Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks.   Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD.   Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product.   DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller.   DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.   In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund.   Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)".   Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.   Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# MAGNETIC PRESS
## Summary of Key Deal Points

|  | US & UK CBSM Market |  | US Book Market |  | UK Book Market |
|---|---|---|---|---|---|
| Product Category | All |  | All |  | All |
| Section 5 (a) Base Discount | 60.00% |  | 60.00% |  | 60.00% |
| Section 6 (a) Base    Days | 30 |  | 60 |  | 60 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a |  | n/a |  | n/a |
| Section 6 (a) Early   Pay Days Seller's Option | n/a |  | n/a |  | n/a |
| Section 5 (a) Freight Rebate | 1.00% |  | 1.00% |  | 1.00% |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a |  | 2.00% of retail |  | 3.50% of retail |
| Section 6 (a) Book Market Service Fee (Retail) | n/a |  | 4.00% |  | 4.00% |
| Section 6 (a) Returns    Cap | n/a |  | n/a |  | n/a |
| Section 6 (a) Returns    Fees | n/a |  | n/a |  | n/a |

# MAGNETICPRESSDistributionAgreement_MK-FINAL_10.24.2019

**Final Audit Report**                                           2019-12-18

| | |
|---|---|
| Created: | 2019-11-01 |
| By: | Legal Department (legal@lionforge.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAuzQcmoNOv794fKojy5coWnhYTc5eQNLN |

## "MAGNETICPRESSDistributionAgreement_MK-FINAL_10.24.20 19" History

Document created by Legal Department (legal@lionforge.com)
2019-11-01 - 5:34:41 PM GMT- IP address: 50.201.95.250

Document emailed to Tim Lenaghan (ltim@diamondcomics.com) for signature
2019-11-01 - 5:38:48 PM GMT

Email viewed by Tim Lenaghan (ltim@diamondcomics.com)
2019-11-04 - 2:42:19 PM GMT- IP address: 207.114.33.3

Document e-signed by Tim Lenaghan (ltim@diamondcomics.com)
Signature Date: 2019-12-02 - 4:32:59 PM GMT - Time Source: server- IP address: 207.114.33.3

Document emailed to David Steward II (dstewardsignature@polarityltd.com) for signature
2019-12-02 - 4:33:01 PM GMT

Email viewed by David Steward II (dstewardsignature@polarityltd.com)
2019-12-18 - 2:00:15 AM GMT- IP address: 107.77.212.71

Document e-signed by David Steward II (dstewardsignature@polarityltd.com)
Signature Date: 2019-12-18 - 2:00:42 AM GMT - Time Source: server- IP address: 107.77.212.71

Signed document emailed to Mike Kennedy (mike@lionforge.com), Tim Lenaghan (ltim@diamondcomics.com), Legal Department (legal@lionforge.com), rjohnson@polarityltd.com, and 1 more
2019-12-18 - 2:00:42 AM GMT


Adobe Sign

**R.J. Inawat**

| | |
|---|---|
| **From:** | Mike Kennedy - Magnetic Press <Mike@magnetic-press.com> |
| **Sent:** | Friday, September 13, 2024 11:24 AM |
| **To:** | Emily Botica |
| **Cc:** | Rich Johnson (DBD) (jrich@diamondbookdistributors.com); Hunter Gorinson; Legal |
| **Subject:** | Magnetic Press in 2025 |
| **Attachments:** | Notice of Termination and Proposed Renewal Terms - Diamond Comic Distributors - 09.12.2024.pdf |

Hi Emily, Rich,

Pursuant to the question raised in our last call, Magnetic and Oni Press are indeed consolidating certain operations in 2025, particularly in the areas of production, logistics, and sales. The attached formal notification is being sent by certified mail, but I wanted to give you both a heads up with the hope of finding time to speak with you directly about this next week. Would you be available on Monday or Tuesday for a call with Hunter and I?

Magnetic's term formally ends on December 17th, but we would like to discuss continuing on a month-to-month basis until August 31, 2025, at the earliest.

On a side note, I should mention that we are also engaging in conversations with Alliance for our growing tabletop and gaming slate.

Let us know if you have time for a call next week.

Thank you!
Mike

**Mike Kennedy, Publisher**
**Magnetic Press**
**Premium Graphic Novels, Comics, Art Books, and Games**
**A subsidiary of POLARITY LTD.**
www.magnetic-press.com
store.magnetic-press.com



www.tezucomi.com



Monday, October 7, 2024 at 11:09:25 Central Daylight Time

| | |
|---|---|
| **Subject:** | RE: Magnetic Press in 2025 |
| **Date:** | Friday, October 4, 2024 at 2:04:01 PM Central Daylight Time |
| **From:** | Emily Botica <bemily@diamondbookdistributors.com> |
| **To:** | Mike Kennedy - Magnetic Press <Mike@magnetic-press.com> |
| **CC:** | Rich Johnson <jrich@diamondbookdistributors.com>, Hunter Gorinson <hunter@onipress.com>, Legal <legal@polarityltd.com> |
| **Attachments:** | image001.jpg, image002.jpg |

Hi Mike —

Yes, continuing on a month-by-month basis past your Dec 17 term is acceptable.

We don't need to have a formal amendment, we just need 90 days notice before you expect to make your transition.

Thanks,
Emily

**From:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Sent:** Friday, October 4, 2024 1:14 PM
**To:** Emily Botica <bemily@diamondbookdistributors.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson <hunter@onipress.com>; Legal <legal@polarityltd.com>
**Subject:** RE: Magnetic Press in 2025

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Hi Emily and Rich,

As a follow up to our call from a few weeks ago pertaining to Magnetic's account transition next year, we want to confirm our agreement to continue past our Dec 17th term expiration on a month-to-month basis.
You both mentioned verbally that should not be a problem, but we'd like to make sure this can be confirmed past that term date (eg. in writing).
I don't know if a formal addendum is necessary -- a simple email confirmation could suffice.

Please let me know if we can get something like that, or if you have other means of insuring that extension agreement past Dec 17.

Best
Mike

**From:** Emily Botica <bemily@diamondbookdistributors.com>
**Sent:** Friday, September 13, 2024 1:00 PM
**To:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson <hunter@onipress.com>;
Legal <legal@polarityltd.com>
**Subject:** RE: Magnetic Press in 2025

Mike –

Rich and I have availability at the following days/times
Monday – 3:30 ET / 2:30 CT
Tuesday – 11 ET / 10 CT or 3 ET / 2 CT

Do any of those times work?

**From:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Sent:** Friday, September 13, 2024 12:24 PM
**To:** Emily Botica <bemily@diamondbookdistributors.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson <hunter@onipress.com>;
Legal <legal@polarityltd.com>
**Subject:** Magnetic Press in 2025

---

CAUTION: This email originated from outside of the organization. Do not click links or
open attachments unless you recognize the sender's email address and know the content
is safe.

---

Hi Emily, Rich,

Pursuant to the question raised in our last call, Magnetic and Oni Press are indeed consolidating certain
operations in 2025, particularly in the areas of production, logistics, and sales. The attached formal
notification is being sent by certified mail, but I wanted to give you both a heads up with the hope of
finding time to speak with you directly about this next week. Would you be available on Monday or
Tuesday for a call with Hunter and I?

Magnetic's term formally ends on December 17th, but we would like to discuss continuing on a month-
to-month basis until August 31, 2025, at the earliest.

On a side note, I should mention that we are also engaging in conversations with Alliance for our growing
tabletop and gaming slate.

Let us know if you have time for a call next week.

Thank you!
Mike

**Mike Kennedy, Publisher**
**Magnetic Press**
**Premium Graphic Novels, Comics, Art Books, and Games**
**A subsidiary of POLARITY LTD.**
www.magnetic-press.com
store.magnetic-press.com



www.tezucomi.com



Monday, June 2, 2025 at 3:01:13 PM Central Daylight Time

| | |
|---|---|
| **Subject:** | Re: Magnetic Press in 2025 |
| **Date:** | Friday, May 30, 2025 at 2:20:52 PM Central Daylight Time |
| **From:** | Hunter Gorinson <hunter@onipress.com> |
| **To:** | Mike Kennedy - Magnetic Press <Mike@magnetic-press.com> |
| **CC:** | Emily Botica <bemily@diamondbookdistributors.com>, Polarity Legal <legal@polarityltd.com>, Spencer Simpson <spencer@onipress.com>, Douglas Youngs <ydouglas@diamondcomics.com> |
| **Attachments:** | image001.jpg, image002.jpg |

Emily,

Hey there, hope all is well!

Following on from Magnetic's Termination of Distribution letter from September 12, 2024, I'm writing to inform you that Magnetic is formally terminating its month-to-month arrangement with Diamond Comics Distributors effective August 31, 2025, and will cease distribution as of that date.

Product still in inventory at that point may continue to be made available for Direct Market distribution via Oni-Lion Forge Publishing Group, LLC, but will no longer be salable for book market distribution via Diamond Books.

We continue to be appreciative of your partnership. Please let us know if you have any questions whatsoever.

Best,
Hunter

--
**Hunter Gorinson**
**President & Publisher**



Oni-Lion Forge Publishing Group
1319 SE Martin Luther King Jr. Blvd. Suite 216
Portland, OR 97214
p: (202) 246-5927 | e: hunter@onipress.com

This transmission and any attachments to it, is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

On Fri, Oct 4, 2024 at 3:06 PM Mike Kennedy - Magnetic Press <Mike@magnetic-press.com> wrote:

Thank you!

Best

Mike

**Mike Kennedy, Publisher**

**Magnetic Press**

**Premium Graphic Novels, Comics, Art Books, and Games**

**A subsidiary of POLARITY LTD.**

www.magnetic-press.com

store.magnetic-press.com



**From:** Emily Botica <bemily@diamondbookdistributors.com>
**Sent:** Friday, October 4, 2024 2:04 PM
**To:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson
<hunter@onipress.com>; Legal <legal@polarityltd.com>
**Subject:** RE: Magnetic Press in 2025

Hi Mike –

Yes, continuing on a month-by-month basis past your Dec 17 term is acceptable.

We don't need to have a formal amendment, we just need 90 days notice before you expect to
make your transition.

Thanks,

Emily

**From:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Sent:** Friday, October 4, 2024 1:14 PM
**To:** Emily Botica <bemily@diamondbookdistributors.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson
<hunter@onipress.com>; Legal <legal@polarityltd.com>
**Subject:** RE: Magnetic Press in 2025

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Hi Emily and Rich,

As a follow up to our call from a few weeks ago pertaining to Magnetic's account transition next year, we want to confirm our agreement to continue past our Dec 17th term expiration on a month-to-month basis.

You both mentioned verbally that should not be a problem, but we'd like to make sure this can be confirmed past that term date (eg. in writing).

I don't know if a formal addendum is necessary -- a simple email confirmation could suffice.

Please let me know if we can get something like that, or if you have other means of insuring that extension agreement past Dec 17.

Best

Mike

**From:** Emily Botica <bemily@diamondbookdistributors.com>
**Sent:** Friday, September 13, 2024 1:00 PM
**To:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson <hunter@onipress.com>; Legal <legal@polarityltd.com>
**Subject:** RE: Magnetic Press in 2025

Mike –

Rich and I have availability at the following days/times

Monday – 3:30 ET / 2:30 CT

Tuesday – 11 ET / 10 CT or 3 ET / 2 CT

Do any of those times work?

**From:** Mike Kennedy - Magnetic Press <Mike@magnetic-press.com>
**Sent:** Friday, September 13, 2024 12:24 PM
**To:** Emily Botica <bemily@diamondbookdistributors.com>
**Cc:** Rich Johnson <jrich@diamondbookdistributors.com>; Hunter Gorinson <hunter@onipress.com>; Legal <legal@polarityltd.com>
**Subject:** Magnetic Press in 2025

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Hi Emily, Rich,

Pursuant to the question raised in our last call, Magnetic and Oni Press are indeed consolidating certain operations in 2025, particularly in the areas of production, logistics, and sales. The attached formal notification is being sent by certified mail, but I wanted to give you both a heads up with the hope of finding time to speak with you directly about this next week. Would you be available on Monday or Tuesday for a call with Hunter and I?

Magnetic's term formally ends on December 17th, but we would like to discuss continuing on a month-to-month basis until August 31, 2025, at the earliest.

On a side note, I should mention that we are also engaging in conversations with Alliance for our growing tabletop and gaming slate.

Let us know if you have time for a call next week.

Thank you!

Mike

**Mike Kennedy, Publisher**

**Magnetic Press**

**Premium Graphic Novels, Comics, Art Books, and Games**

A subsidiary of POLARITY LTD.

www.magnetic-press.com

store.magnetic-press.com



www.tezucomi.com



**Exhibit 8**

**Massive Publishing Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of April 1st 2023, is made by and between 1933 SE Alder St., Portland, Oregon 97214 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

<u>WITNESSETH:</u>

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products.")   All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      <u>Appointment; Territory.</u>

(b)      Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Comic Book Specialty Market.   "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c)     Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer. Seller reserves the right to run and maintain a web site, a component of which will include an e-commerce site where Seller will sell their products directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues (web site and trade shows and cons).

(e)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs I(a), I(b) and I(c) hereof (collectively, the "Appointments").

2.     <u>Term.</u>  The initial term of this Agreement (the "Initial Term") is for 3 (three) years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.  Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term").  This Agreement is effective with Products available for shipment as of August 2023, the "Commencement Date".  As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     <u>Supply.</u>

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.  Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.  In the event of any conflict between the terms of this

Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)    Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)    With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.   Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(e)    Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)    Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the PUBLISHER trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.    <u>Distribution Services: Additional Services.</u>

(a)    As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)    Buyer may also elect, in its sole discretion, to offer services to Seller not specified on <u>Exhibit A</u> hereto ("Additional Services").   Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.   Seller

and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20.00%.

5.    Price for Products.

(a)    Seller shall sell Products to Buyer at a discount of 60.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 2% off of the retail price for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or shall ship Products to each of Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center. Such shipments are also subject to the freight rebate.

(b)    In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    Payment Terms; Etc.

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean CBSM retailers and wholesalers and Hobby Game Market Customers.

(b)    In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)     Superseding all other provisions and Buyer's remedies contained in this Agreement, Seller agrees to immediately pay to Buyer any amounts due to Buyer which become 45 days old or older resulting from negative Sales and/or for services rendered to, for, or on behalf of Seller, or for any other reason(s). Such demand for payment will be effected by written request (including email) from Buyer delivered to Seller.

7.     Credit Decisions.

(a)     Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)     Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(d)     For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.     Title And Risk Of Loss; Inventory.

(a)     All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title

will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.  Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)    Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer shall maintain all insurance with respect thereto.  Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds 2.00% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold.  This reimbursement amount is calculated as 15.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer.  The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable in the normal course of business.  All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed 10% of average retail price of units of Products that are lost or damaged.

(d)    Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of

the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)     Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.     <u>Intellectual Property.</u>

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks")

and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)   In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)   Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)   Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX PUBLISHER, All Rights Reserved."

(f)   Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)   The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.   <u>Termination.</u>

(a)   Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)   Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party

shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)   Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

    i.   Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

    ii.   Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

    iii.   A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

    iv.   Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

    v.   Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

    vi.   Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

11.   <u>Effect of Termination.</u>

(a)    Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)    If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable.   Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination.   For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.  Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)    If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable.  Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.   Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)    Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination.    Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller.    Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost.  Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.   If Buyer reasonably believes Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible Buyer has the right to sell or remainder consignment inventory to recoup monies owed.  Buyer has the right to use

trademarks to facilitate the sale of said consignment inventory.

(g)   Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(h)  Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer.  If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.   Notices.  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

PUBLISHER ADDRESS

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland  21030
Attention: Chief Operating Officer
Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party.  Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.   Release.  By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (b).   In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any

claims it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (b)).

14.    Independent Contractors; No Third Party Rights.  Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.  Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller. Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.    Force Majeure.  Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.  The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.    Assignment: Binding Effect.  Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products. Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.    Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.   All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.    Entire Agreement: Modification.  This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto.   This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.    Applicable Law.  This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the

State of Maryland applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party.   In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.  Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.   In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    Survival.  All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    Severability.   In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.  However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any

recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein. If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof. Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(e)     The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.     LIMITATION OF LIABILITY.   IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR   NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.

23.     Confidentiality.   In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").     The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives. Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.     Headings and Construction.   Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.     Counterparts: Facsimile Signature Pages.   This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.   Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of April 2016 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

PUBLISHER

By: _____

Date: 4/7/23

Name: Michael Calero

Title: Majority Owner, Massive Publishing, LLC.

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term.  All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein.  Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement.  In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller.  In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.      Buyer shall perform the following marketing services:

     (a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM.  With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

     (b)      Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 20% off Buyer's published advertising rates.

2.      Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.      To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.      Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

5.      The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

6.      Beginning with Buyer's June 2023 (August 2023 On-Sale) catalog, Seller will be listed as a Deluxe Vendor in all relevant Buyer Sales and Marketing materials. Specific details are listed in Appendix A.

# Appendix A

- Preferred placement in PREVIEWS – immediately following the Premier vendor pages as it's own section in front of the "Green" Print section of catalog as it currently stands. Publisher order in this section will be established by annual revenue through Diamond.

- Preferred placement would also be reflected in digital marketing as well, with preferred status on both the Retailer Services Website as well as PREVIEWSworld.com

- Buyer will remove the 3% reorder fee on all of Seller's Collections

- Dedicated Retailer Email - One email per month

- Diamond Daily Sponsorship Ad One week flight  - Two per year

- Retailer Services Site Article - One per month

- Retailer Services Site Digital Ads One week flight - Two per year

- Featured article on PREVIEWSworld - One per year

- PREVIEWSworld E-newsletter Ad - One ad Twice per year

- Social Posts - One post per platform per quarter

- Digital Ad Placements - One, one-week flight per year

- 4 free ad pages in PREVIEWS with the option to purchase additional ad pages at a BOGO (buy one; get one) rate.

- 2 Order Form covers at 50% off of the rate card price

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks.   Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers. In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product. DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller. DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof. In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund. Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)". Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State. In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/ thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.  Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

**Exhibit 9**

**Oni-Lion Forge Publishing Group, LLC f/k/a Oni Press, LLC Agreement**

# SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT (this "Agreement") dated as of the ⟨8 TH day of SEPTEMBER, 2013, is made by and between ONI PRESS, INC., a corporation located at 1305 SE MLK Jr. Blvd. Suite A, Portland, OR 97214 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Rd., Suite 300, Hunt Valley, MD 21030 ("Buyer").

## W I T N E S S E T H:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products."). Products described in (i), (ii) and (iii) above will be referred to as "Print Products" and Products described in (iv) and (v) above will be referred to as 'Non-Print Products". All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing comic books, graphic novels, novels, merchandise and other pop culture items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of the Products in the Book Market (as defined herein) and Direct Market (as defined herein) on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of the Products for Seller in the Book Market and Direct Market on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment; Territory.

(a)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Print Products in the Book Market, and non-exclusively for Non-Print Products.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service those accounts; warehouse clubs and specialty mass merchandisers/retailers. Seller shall retain the right to sell directly to book of the month clubs, Scholastic Books, as well as sales made directly to consumers via mail order, internet or at consumer conventions.

(b)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Direct Market. "Direct Market" shall

mean hobby and specialty game and comic retailers and wholesalers that generally buy on a non-returnable basis and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry and which generally refers to sales to retail customers which purchase on a non-returnable basis). In addition, Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing, collectible card games and boxed games on a non-returnable basis and those stores are presently being serviced, or of the type of being serviced through Buyer's normal course of business.

(c)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of Products in the Direct Market, Print Products in the Book Market, and non-exclusively for Non-Print Products in the Book Market   as set forth in Paragraphs 1(a) and 1(b) hereof (collectively, the "Appointments").

2.     Term.  The initial term of this Agreement (the "Initial Term") is for two (2) years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.  Unless terminated earlier in accordance with Paragraph 9 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term").  This Agreement is effective with Products available for shipment as of September 26, 2013, the "Commencement Date".    As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     Supply.

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion. Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.  In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility, and insurance of Products naming Seller as an additional insured will be provided at no cost to Seller.

(d) With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to customers serviced by Buyer's UK distribution facility, such Products will be returned to Buyer's Olive Branch, Mississippi  distribution facility and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the

United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus twenty (20) percent.

(e) Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller. Additionally, Buyer will provide Seller with an additional monthly report containing all sales and returns activity of UK Book Market customers, in order to calculate the appropriate additional UK Book Market fees outlined in Exhibit C of this Agreement. Such additional UK Book Market fees will be deducted from the first Weekly Payment Amount payable following the month for which such fees are calculated. Buyer will have no right to deduct UK Book Market fees if not reported within sixty (60) days after the close of the month for which the fees are due.

(f) Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the Oni Press trademark during the Term (as hereinafter defined) of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry).

4.    Distribution Services; Additional Services.

(a)    As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto (collectively, the "Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)    Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto (collectively, the "Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such Additional Service plus 20%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20%.

5.    Price for Products.

(a)    Seller shall sell Print Products to Buyer at a discount of 58.5% off the cover price and Non-Print Products on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of these products what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of .25% of the retail price for all Print Products and .55% off of Buyer's cost of all Non-Print Products picked up at Seller's domestic or Canadian manufacturing/printing facilities subject to the following restriction. Diamond shall pick up from any Seller's suppliers or printers located in the United States or Canada with shipping points within a 50-mile radius of a route or destination point regularly used by Diamond's trucks moving product to a Diamond distribution center, provided space is available and schedules reasonably permit, and provided that Seller gives Diamond at least fourteen (14) days prior notice.. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center, or Seller can engage Buyer to handle these shipments of Products from non-domestic printing facilities at the exact cost Buyer pays, plus 20%.

(b)    In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 0% of the retail price of all Products sold to (i) the Book Market, or (ii) other non-Direct Market customers that place orders after Buyer's sales representatives have solicited such customers (the "Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowance along with a computation of the calculated allowance. The Fee is non-refundable, regardless of returns.

6.    Payment Terms; Book Market Returns; Etc.

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "Release Date" to the Direct Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). On a weekly basis and within 60 days after Buyer's unofficial weekly Release Date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount. The Weekly Payment Amount shall be equal to (i) the retail value of Net Products (as defined herein) sold to Customers (as defined herein) multiplied by 41.5% plus the net cost value of Net Products (as defined herein) sold to Customers (as defined herein), less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) the Freight Rebate, less (vi) a customer freight fee of 1.25% of retail for those customers who require free freight for deliveries by Buyer (for the purpose of this agreement, retailers would potentially be Wal-Mart, Target, K-Mart and other big box mass market accounts, as well as key wholesalers such as Baker & Taylor, Ingrams, Readerlink, Anderson Merchandisers), less (vii) Customer "Documented Deductions" (as defined herein), less (viii) the UK Book Market Sales Allowance of 2.50% of the retail price of all Products sold to (i) the UK Book Market, or (ii) other non-Direct Market UK customers that place orders after Buyer's sales representatives have solicited such customers (the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the UK Book Market Sales Allowance along with a computation of the calculated allowance. The Fee is non-refundable, regardless of returns. Rebates and Sales Allowances are all as summarized in Exhibit C. No amounts shall be deducted from the payment owing to Seller relating to uncollectible accounts. Buyer will provide Seller, included with each Weekly Payment Amount, a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions

"Net Products" shall mean total Products sold less credits issued for customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market customers and Direct Market customers. Products returned to Buyer from Book Market customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price. A "Book Market Service Fee" equal to 3% of the retail price of such Book Market Returns will be charged back to Seller on each weekly sales report. In addition, if in any year of the Term of this Agreement Buyer processes Book Market Returns with a credited value in excess of 40% of sales made to the Book Market during such year (the "Trigger Amount"), Seller will pay to Buyer an additional fee of 4% of the invoices credited for Book Market Returns in excess of the Trigger Amount in such year (the "Book Market Returns Fee"). Buyer will limit Oni Shortages to no more than $1,000 deducted from Seller in any specific week, unless mutually agreed upon.

"Documented Deductions" shall mean any deduction taken by a Book Market customer on their remittance. When the deduction is calculated based on the cost or value of Products (a

"Direct Deduction"), the deduction amount will be passed through in full.  When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction").  Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting customer by (b) the total sales of all products Buyer sells to the deducting customer multiplied by (c) the Indirect Deduction.  Buyer will give 14 days' notice to seller of any new documented deductions.  Seller will have the option to instruct buyer to discontinue selling to the customer that is the source of the deduction if Seller so chooses.

(b)     In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service.  Seller shall pay such invoice within 30 days of the date of the invoice.  If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

(c)     Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate books of account and records covering transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said books of account and records for the immediately preceding twelve (24) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twenty-four month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said books of account and records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods.  Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(c). Buyer shall keep all such books of account and records available for at least two years following termination of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 17 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer.  In addition, Buyer shall promptly pay the monies finally determined to be due Seller.  If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 17 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(d)     In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market customers require that Buyer sell Products to them at a higher base discount (for example, a customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement.  Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such customer.

(e)     In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer and Seller may mutually agree to deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from large Book Market channel customers only (the "Returns Reserve") in an amount which shall at all times be at least equal to 30% of sales of Products during, at the option of Buyer, either (i) the

immediately preceding twelve (12) month period, or (ii) the immediately succeeding (12) month period based on reasonable forecasts.

7. <u>Title And Risk Of Loss; Inventory.</u>

(a)      All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to customers in accordance with Diamonds Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)      Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)      Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and shall maintain all insurance with respect thereto. Buyer shall insure against any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from normal shrinkage and deterioration shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds two percent (2%) of the total units of Products shipped to Buyer's distribution centers during any year, Buyer shall reimburse Seller for the replacement costs associated with the units subject to shrinkage and deterioration in excess of the two percent (2%) threshold The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the two percent (2%) threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "hurts" and unsalable in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed the replacement costs associated with sum of (i) the printing costs associated with the Products that are lost or damaged [and (ii) Seller's actual cost of shipping such Products to Buyer's distribution center].

(d)      Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail amount) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to Products in inventory at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a charge of $0.40 per carton per month for amounts over the Prior

Four Quarter Distribution Amount. As used herein, "Calculated Value" shall mean the dollar amount (based on retail amount) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)     Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided equally 50/50 between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller (at an hourly rate of no more than $20.00), or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15.00 per order, $2.00 per title and $.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer.

8.     Intellectual Property.

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party. The execution, delivery and performance of this Agreement by Seller will not breach or conflict with any agreement between Seller and any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 2013 ONI PRESS, INC., All Rights Reserved."

      (f)      Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

      (g)      The obligations set forth in this Paragraph 8 shall survive the termination of this Agreement.

    9.    <u>Termination</u>.

      (a)      Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

      (b)      Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default. Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

      (c)      Notwithstanding Paragraph 9(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

      (1)      Buyer fails to abide by the terms of Paragraph 8 within 15 days after receipt of written notification of a violation of Paragraph 8;

      (2)      Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

      (3)      A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

      (4)      Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

      (5)      Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

      (6)      Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

10.   Effect of Termination.

(a)   Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, Buyer shall have no right to remainder Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)   If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become due and payable immediately.   Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination.  Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)   If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become due and payable immediately. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)   Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination.  Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller.  Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost.  Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)   In the event of expiration or termination of this Agreement by either party, Buyer shall accept returns of Sellers Products distributed to Book Market customers (including U.K. Book Market customers) for ninety (180) days following the effective date of termination (the "Returns Period").  In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market customers during the Returns Period.  The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)   returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)   gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer

during the Returns Period shall be owed to Buyer.   Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within thirty (30) days after such final statement is sent by Buyer.  After the Returns Period, Seller shall pay Buyer any amounts which any customer refuses to pay to Buyer on account of Sellers Products shipped to such customer by Buyer due to any deduction claimed by such customer for returns which such customer makes after the Returns Period or in connection with any dispute over the customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)     In the event of termination of the Agreement by either party, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.   If Buyer feels Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.

(g)     Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center.  If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory. Upon termination of this Agreement and in accordance with Section 1.d ii Buyer will return the UK inventory and returned Book Market Products to Buyer's Olive Branch center.   If Seller prefers this UK Product to be destroyed, Buyer will do so at Seller's request and at Seller's sole cost and expense.

11.     Notices.  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

ONI PRESS, INC.
1305 SE MLK Jr. Blvd Suite A
Portland, OR  97214
Attention:  Joe Nozemack


If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road Suite 300
Hunt Valley, Maryland 21030
Attention:  Chief Operating Officer
Fax:  (410) 683-7088

or to such other address as either party shall have designated in a notice to the other party.  Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

12.    <u>Release</u>.  This point has been mutually agreed to be not applicable to this agreement.

13.    <u>Independent Contractors; No Third Party Rights</u>.  Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.  Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.  Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

14.    <u>Force Majeure</u>.  Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.  The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms of this Agreement within 90 days after such cause is terminated.

15.    <u>Assignment; Binding Effect</u>.  Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.  Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.    Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld.  Any purported assignment by a party in contravention of this Paragraph 15 shall be void and shall constitute material breach of this Agreement.  All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

16.    <u>Entire Agreement; Modification</u>.  This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto.  This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties.  The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

17.    <u>Applicable Law</u>.  This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party. In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.  Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.  In the event that the parties are unable to agree on a single arbitrator within

thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

18    Survival.  All payment obligations hereunder and all obligations under Paragraphs 8 and 21 hereof shall survive the termination of this Agreement.

19.    Severability.  In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.  However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

20.    LIMITATION OF LIABILITY.  IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 21 HEREOF

21.    Confidentiality.

(a)    The parties agree to use reasonable commercial efforts to keep confidential and not disclose the existence or terms of this Agreement without the prior written consent of the other party.

(b)    In connection with the performance of its obligations hereunder, Buyer will be provided with access to certain information regarding Seller, including oral and written legal, business, financial and other information, ideas and data, in written, oral, electronic, photographic and/or other forms concerning Seller (collectively "Seller Confidential Information").  Such Seller Confidential Information shall be used by Buyer solely for the purpose of performing its obligations hereunder.  The Seller Confidential Information is proprietary and confidential to Seller and is, and shall remain, the property of Seller. Buyer and its employees and agents shall hold the Seller Confidential Information in strict confidence and shall not, without the prior written consent of Seller, disclose or release the Seller Confidential Information to either (a) persons within its organization not having a legitimate need to know, or (b) persons outside its organization.  Upon written request from Seller, Buyer will and will cause its employees and agents to deliver promptly to Seller all documents (and all analyses, copies, extracts or summaries thereof) furnished to Buyer or its employees or agents by or on behalf of Seller pursuant hereto.  All other Seller Confidential Information not returned to Seller, including all Seller Confidential Information prepared by Buyer or its employees or agents, shall be destroyed and no copy thereof shall be retained and, upon request, Buyer shall certify in writing to Seller that such action has been taken.  Notwithstanding the return or destruction of the Seller Confidential Information, Buyer and its employees and agents will continue to be bound by its obligations of confidentiality hereunder.

(c)    In connection with the performance of its obligations hereunder, Seller will be provided with access to certain information regarding Buyer, including oral and written legal, business, financial and other information, ideas and data, in written, oral, electronic, photographic

and/or other forms concerning Buyer (collectively "Buyer Confidential Information" and, together with Seller Confidential Information, the "Confidential Information"). Such Buyer Confidential Information shall be used by Seller solely for the purpose of performing its obligations hereunder. The Buyer Confidential Information is proprietary and confidential to Buyer and is, and shall remain, the property of Buyer. Seller and its employees and agents shall hold the Buyer Confidential Information in strict confidence and shall not, without the prior written consent of Buyer, disclose or release the Buyer Confidential Information to either (a) persons within its organization not having a legitimate need to know, or (b) persons outside its organization. Upon written request from Buyer, Seller will and will cause its employees and agents to deliver promptly to Buyer all documents (and all analyses, copies, extracts or summaries thereof) furnished to Seller or its employees or agents by or on behalf of Buyer pursuant hereto. All other Buyer Confidential Information not returned to Buyer, including all Buyer Confidential Information prepared by Seller or its employees or agents, shall be destroyed and no copy thereof shall be retained and, upon request, Seller shall certify in writing to Buyer that such action has been taken. Notwithstanding the return or destruction of the Buyer Confidential Information, Seller and its employees and agents will continue to be bound by its obligations of confidentiality hereunder.

(d)    Notwithstanding anything to the contrary set forth in this Paragraph 21, the obligations of Paragraph 21 do not apply to the following:

(1)    disclosures (A) required by law, required to implement the terms of this Agreement, or necessary to enforce a party's rights under this Agreement, or (B) to the parties' respective counsel, accountants and financial advisors, provided that (y) in the case of the foregoing clause (A) the non-disclosing party shall be provided with notice and an opportunity to review any disclosure required by applicable law or regulation prior to its publication and (z) in the cases of the foregoing clauses (A) and (B) the receiving party is informed of the confidential nature of such matters, is instructed to keep them confidential and is liable for any unauthorized disclosure; and

(2)    Confidential Information that (A) at the time of an alleged breach hereof is part of the public domain (other than as a result of a breach of confidentiality obligations by the disclosing party), (B) has been disclosed, at the time of an alleged breach hereof, by the non-disclosing party to third parties without restrictions on disclosure, (C) has, at the time of an alleged breach hereof, been received by the disclosing party from a third party without breach of a nondisclosure obligation of the third party, or (D) has been independently developed by the disclosing party without access to the non-disclosing party's Confidential Information.

(e)    The parties acknowledge and agree that there would be no adequate remedy at law for, and that irreparable harm would result from, any material breach of the provisions of this Paragraph 21. Accordingly and notwithstanding the provisions of Paragraph 17 hereof, in the event of such a breach by one party, the other party shall be entitled to injunctive relief and to specific enforcement of the terms and provisions hereof, in addition to any other remedy to which such other party may be entitled at law or in equity. It is further understood and agreed that no failure to exercise, or delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise of any such right,

power or privilege. If any action is initiated to enforce any of the provisions hereof, the prevailing party shall be entitled to reimbursement of all costs and expenses, including the reasonable fees and expenses of legal counsel, incurred by it in connection therewith.

22.    Headings and Construction.    Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement. This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

23.    Counterparts; Facsimile Signature Pages.    This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Supply Agreement to be executed and effective as of this 18th day of September 2013 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

ONI PRESS, INC.

By: _____
Name: Joe Nozemack
Title: President

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____
Name: Larry R. Swanson
Title:  Vice President of Finance and CFO

## EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Supply Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 4 below).

1.    Buyer shall perform the following marketing services:

(a)    Produce, publish and distribute a monthly catalog currently known as Diamond Previews), suitable for consumers and retailers of Products offered by Buyer to the Direct Market. With respect to each such catalog, Buyer shall reserve space for the listing of Seller's Products in the appropriate sections of each such catalogue during the Term.

(b)    Buyer will dedicate a minimum of 6 full color pages inside of Buyers monthly catalog at no cost to Seller. As part of Sellers monthly new product offerings, Seller and Buyer will mutually agree to select backlist Products to feature again in Buyers monthly catalog. Seller will also be given the option of designing these pages at Sellers expense but subject to Buyers ultimate approval. Also, Buyer will designate 12 of Sellers Products as a Featured Item during each calendar year, as well as 2 Products per month as designated as a Spotlight On feature.

(c)    Buyer will alert Seller of availability of premium spots as they become available

(d)    Seller may purchase additional advertising space in the publication referred to in Paragraph 1(a) above at 20% off Buyer's published advertising rates.

2.    Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments. Buyer will also assign a sales representative to act as Seller's sales representative to the Book Market ("Sales Rep").

The Brand Manager and Sales Rep may be the same person. Buyer shall make a reasonable effort to accommodate Seller's request for the person to act as the Sales Rep.

3.    To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con, Chicago Comic Con, American Library Association Conference, and Book Expo America convention), Buyer, at no charge to Seller, shall have present a sales rep and shall display and promote selected Products as appropriate for the type of event.

4.    To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion. In addition, Buyer will dedicate booth space at either ALA or Book Expo if space is available and if seller sends a staff member to work seller's area of the booth, at no cost to Seller as determined in Buyer's sole discretion.

5.    Seller shall be granted the right to include 3 full pages of product listings or editorial content inside each of Buyers backlist catalogs and at least 3 full pages of product listings or editorial content to be provided by Seller in any catalog or advertising booklet for distribution in the Book Market or for book industry trade show events at no cost to Seller (assuming Seller has appropriate Products and Product selection to warrant 3 full page ads for each of Buyers catalogs). Seller will be guaranteed at least 1 news story per week on Buyers web site which Direct Market retailers have access to and 1 news story per week in Buyers weekly email to Direct Market retailers, both at no cost to Seller; content to be provided by Seller.

6.    To the extent that Seller produces promotional and or giveaway items which would traditionally be inserted into one of Buyers mailings, or inserted in with shipments to Buyers customers, Seller will be allowed to insert up to 12 of these pre-printed items each year at no cost to Seller. Seller shall be responsible for providing the printed pieces for these inserts (Buyer has no responsibility for designing and or printing these on behalf of Seller).

7.    The Supply Agreement, including all amendments, attachments, and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

8. Diamond shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Oni to the extent reasonably practicable in such digital format and, further provided.

ONI PRESS, INC.
By:
Name: Joe Nozemack
Title: President
Date: *09.13.2013*

DIAMOND COMIC DISTRIBUTORS, INC.
By:
Name: Larry R Swanson
Title: Treasurer
Date: *9/25/2013*

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Vendor in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Vendor shall be accepted by Vendor under the terms and conditions of this document.  These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Vendor by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Vendor shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Vendor notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.  Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice are received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Vendor a processing fee of $100.

Vendor shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

Upon shipment of product, an invoice must be sent to:

> Diamond Comic Distributors, Inc.
> 10150 York Rd., Suite 300
> Hunt Valley, MD 21030

(Invoices should not be included with shipments, as this will result in delay of payment.)

Notwithstanding orders for Themed  Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Vendor solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of

delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.  Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event.  Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

In the event Vendor ships product to DCD which has not been ordered by DCD, Vendor assumes all risk for the product.  DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Vendor.
DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.


By accepting DCD's Purchase Order, Vendor hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label.  Vendor further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Vendor of the warranties contained herein or any act or omission of Vendor or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.  In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Vendor breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Vendor for a full refund.  Vendor shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location(s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Vendors must be shipped "delivered duty paid (DDP)".

Should failure of Vendor to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Vendor shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.  In the event of any litigation arising out of the Purchase Order, Vendor hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms are held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Vendor shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.  Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Vendor, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order.  Should Vendor have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Vendor shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
## Summary of Key Deal Points

| | Product | Section 6 (a) Base | Section 6 (a) Base | Section 6 (a) Early Pay | Section 6 (a) Early | Section 5 (a) Freight | Section 5 (b) Section 6 (a) Book Market | Section 6 (a) Book Market | Section 6 (a) Returns | Section 6 (a) Returns |
|---|---|---|---|---|---|---|---|---|---|---|
| | Category | Discount | Days | Discount | Pay Days | Rebate | Sales Allowance | Service Fee (Retail) | Cap | Fees |
| US & UK Direct Market | All | 58.50% | 30 | 0% | - | 0.25% of retail for print, 0.55% of retail for non-print | 0.00% | 0.00% | N/A | N/A |
| US Non-Direct Market | All | 58.50% | 60 | 0% | - | 0.25% of retail for print, 0.55% of retail for non-print l | 0.00% | 3.00% | 40.00% | 4% of net |
| UK Book market | All | 58.50% | 60 | 0% | - | 0.25% of retail for print, 0.55% of retail for non-print l | 2.50% | 3.00% | 40.00% | 4% of net |

ONI PRESS, INC.

Diamond Comic Distributors, Inc.

**Exhibit 10**

**Punk Bot Comics, LLC, a/k/a Alien Books Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of August 16, 2023, is made by and between ALIEN BOOKS, a New York company located at 1 N 4th Place, 24 J, Brooklyn, NY   11249 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

## WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books ("Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books ("Graphic Novels"), and (iii) related merchandise ("Merchandise").   Collectively, Comic Books, Graphic Novels, and Merchandise are "Products." All references herein to "Products" shall refer only to the English-language version thereof; for the avoidance of doubt, Seller is also in the business of licensing the rights to its trademarks, characters, storylines, images and brand to "Licensees" for a range of merchandise including but not limited to trading cards, role playing games, toys, foreign language comic books and graphic novels and other related merchandise.   Licensees are not parties to this agreement; for the further avoidance of doubt, electronic or digital forms of Products shall be excluded from the definition of the term "Products"; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Appointment; Territory.

(a)      Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the Book Market.   For the avoidance of doubt, electronic or digital forms of Products shall be excluded from the definition of the term "Products".

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of which generally buy under Buyers returnable trade terms.   Seller shall retain the right to sell directly to consumers (e.g. via website, conventions, etc.); and continuity programs (e.g. Book of the Month Club).

(b)      Seller hereby appoints Buyer as its sole and exclusive distributor worldwide

for the sale and distribution of Products in the Comic Book Specialty Market.   "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c)     Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market.   "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing games, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), 1(b) and l(c) hereof (collectively, the "Appointments").

2.     <u>Term.</u>          The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.   Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term").   This Agreement is effective with Products available for shipment as of September 1st, 2023, the "Commencement Date".   As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     <u>Supply.</u>

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document described in Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.   Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.   In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Furthermore, the Buyer acknowledges the Seller's need to employ gang-run printing and agrees to make available to the Seller storage to accommodate inventory for a 120-day period of publication.

(d)     Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(e)     With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.   Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus twenty (20) percent including credit for the original purchase price of Products.

(f)     Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(g)     Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's available titles (when Seller prints and makes such titles available for distribution) published under the © and TM 20XX ALIEN BOOKS, All Rights Reserved trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry).   Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.     <u>Distribution Services: Additional Services.</u>

(a)     As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services").   Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)     Buyer may also elect, in its sole discretion, to offer services to Seller not specified on <u>Exhibit A</u> hereto ("Additional Services").   Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.   Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such Additional Service plus an amount not to exceed 20.00% as such may be agreed to by the parties from time to time in writing. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20.00%.

(c)     Buyer shall cooperate and provide Seller with access to all necessary sales information for Seller's Product by store on no less than a monthly basis in a Microsoft excel file consistent with the format provided to seller in the past.

5.     <u>Price for Products.</u>

(a)     Seller shall sell Products to Buyer at a discount of 59.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's

unit cost will be for each specific net cost item). Seller will be responsible for all freight and delivery charges to the Buyer's North American distribution centers. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center, and any drop shipments made to Buyer's Runcorn, United Kingdom distribution center.

(b)    In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 2.50% of the retail price of all Products (including a 5.00% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance").    For like sales in the UK, Seller shall provide Buyer an allowance of 2.50% of the retail price (including a 5.00% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance").    For like sales in the select Commonwealth countries (Australia, New Zealand, India, South Africa, India, and Singapore), Seller shall provide Buyer an allowance of 8.50% of the retail price (including a 5.00% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)    In addition (i) Seller shall make all commercially reasonable efforts to not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    <u>Payment Terms; Book Market Returns and Annual Rebate; Etc.</u>

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the Direct Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).    On a weekly basis and within 60 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount.    Buyer shall grant Seller the option of a 2% net discount for payment within 10-days.    The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 41.00%    plus the net cost value of Net Products sold to Customers, <u>less</u> (ii) the Book Market Service Fee (as defined herein), <u>less</u> (iii) the Book Market Returns Fee (as defined herein), if applicable, <u>less</u> (iv) the Book Market Sales Allowance, <u>less</u> (v) the Freight Rebate, <u>less</u> (vi) a Customer freight fee of 1.25% of retail for those Customers who require free freight for deliveries by Buyer, less (vii) Customer "Documented Deductions" (as defined herein).    Fees, Rebates, and Sales Allowances are as summarized in Exhibit C.    Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns.    "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers.    Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be

returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 4.00% of the retail price of such Book Market Return.   In addition, if in any year of the Term of this Agreement Buyer processes Book Market Returns with a credited value in excess of 40.00% of sales made to the Book Market during such year (the "Trigger Amount"), Seller will pay to Buyer an additional fee of 3.00% of the invoices credited for Book Market Returns in excess of the Trigger Amount in such year (the "Book Market Returns Fee").

"Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means as such shall be reasonably determined in good faith by the parties.   When the deduction is calculated based on the cost or value of Products (a "Direct Deduction") as such shall be reasonably determined in good faith by the parties, the deduction amount will be passed through in full.   When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction") as such shall be reasonably determined in good faith by the parties.   Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction.   Buyer will give 14 days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer.   Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(b)      In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the undisputed amount due for such service.   Seller shall pay such undisputed invoice within 45 days of the date of the invoice.   If Seller fails to make payment related to undisputed amounts so outstanding within 60 days of the date of an invoice, upon prior written notice to Seller.   Buyer shall have the right to offset the undisputed amounts invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business all necessary and accurate records of transactions relating to the Appointments and this Agreement.   Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity.   Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods.   Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d).   Buyer shall keep all such records available for at least two years following each anniversary year of this Agreement.   If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer.   In addition, Buyer shall promptly pay the monies finally determined to be due Seller.   If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall

have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)     In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement.   Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(d)     In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 30% of sales of Products during, at the option of Buyer, either (i) the immediately preceding twelve (12) months period, or (ii) the immediately succeeding twelve (12) months period based on reasonable forecasts.

(e)     For each calendar year during the Term of this Agreement, Seller shall be eligible to receive a purchase discount rebate (the "Rebate") calculated as set forth below.   For each calendar year during the Term in which DCD's cost of Net Products sold exceeds the levels outlined below, Seller shall receive a Rebate in an amount determine by multiplying the DCD cost of Net Products within each threshold range by the decimal equivalent of the appropriate percentage set forth in the following chart:

DCD's Total Product Purchased of Sellers products

| Rebate | |
|---|---|
| $0 - 1,999,999 | 0.00% |
| $2,000,000-2,999,999 | 1.00% |

7.     Credit Decisions.

(a)     Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)     Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)     With respect to Book Market Customers Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 18% of the extended Standard Retail Price (the "Deemed Cost") of all unpaid invoice lines for Seller's Products that make up the amount of the bad debt.   To the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's Deemed Cost for any such bad debt and Buyer's cost of all unpaid invoice lines for Seller's Products included in the bad debt.

(d)     For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.    In such cases Buyer will still be responsible for invoicing and collection of accounts receivable.

8.     <u>Title And Risk Of Loss; Inventory.</u>

(a)     All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer.    Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale.    Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)     Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.    Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)     Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's negligence and Buyer shall maintain all insurance with respect thereto.    Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time.    Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds one and one half percent (1 1/2%) of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as printing cost price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer.    The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the one and one half percent (1 1/2%) threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business.    All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed printing and shipping cost price of units of Products that are lost or damaged.

~~(d)  Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based~~

~~on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $ 0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.~~

(e)    Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses. Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer.

(f)    If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $.25 for each piece of each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer.

9.    Intellectual Property.

(a)    Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)    Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)    In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)    Except as otherwise provided herein, upon termination of this Agreement,

Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)      Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX ALIEN BOOKS, All Rights Reserved."

(f)      Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)      The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.      Termination.

(a)      Either party may terminate this Agreement by providing the other party with at least 60 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)      Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted or breached under the terms of this Agreement and has not cured (to the extent reasonably curable) such default or breach during such 45-day notice period.    Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.    Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)      Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

i.      Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

ii.      Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6 (a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

iii.      A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

iv.      Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this

Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

v.   Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

11.   <u>Effect of Termination.</u>

(a)   Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)   If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable.   Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination.   For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to buyer from Seller otherwise due under this Agreement.   Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)   If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable.   Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination.   For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to buyer from Seller otherwise due under this Agreement.   Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)   Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination.   Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller.   Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost.   Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)    In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Sellers Products distributed to Book Market Customers for ninety (90) days following the effective date of termination (the "Returns Period").    In no event shall Buyer have any right or obligation to accept any returns after the Returns Period.    Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period.    The percentage referred to in the preceding sentence shall be equal to the following fraction:

      (i)    125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

      (ii)    Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer.    Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer.    After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.    If Buyer feels Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.    Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

(g)    Upon termination of this Agreement and in accordance with Section 3 (e), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.    Buyer will give Seller 30 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost of any liquidation or destruction including credit for the original purchase price of Products.

(h)    Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless

Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer.    If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

      12.   <u>Notices.</u>     All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

     ALIEN BOOKS
     Attn: Matias Timarchi
     1 N 4th Pl, 24 J
     Brooklyn, NY 11249

If to Buyer:

     Diamond Comic Distributors, Inc.
     10150 York Road, Suite 300
     Hunt Valley, Maryland    21093
     Attention: Chief Operating Officer
     Fax: (410) 683-7088

or to such other address as either party shall have designated in a notice to the other party. Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

      13.   <u>Release.</u>     By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (c).   In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (c)).

      14.   <u>Independent Contractors; No Third Party Rights.</u>    Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.   Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

      15.   <u>Force Majeure.</u>     Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control. The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable

after such cause is terminated.

16.  <u>Assignment: Binding Effect.</u>  Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.   Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.   Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld.   Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.   All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.  <u>Entire Agreement: Modification.</u>   This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto.   This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties.   The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.  <u>Applicable Law.</u>   This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein.   Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party.   In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.   Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association.   The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.   In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.  <u>Survival.</u>   All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.  <u>Severability.</u>  In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.   However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be

automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (ii) any breach of a representation or warranty set forth herein; or (iii) any breach of any covenant or agreement set forth herein.   If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

Buyer shall indemnify and hold harmless Seller, its officers, directors, shareholders, employees, agents and representatives, and any other affiliate of Seller, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) any breach of a representation or warranty set forth herein; or (ii) any breach of any covenant or agreement set forth herein.   If claims are asserted against Seller with respect to which Seller is entitled to indemnification hereunder, Buyer shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Seller's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Seller shall cooperate with Buyer in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Buyer shall fully cooperate with Seller in the defense thereof.

(e)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>    IN NO EVENT SHALL BUYER OR SELLER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 23 HEREOF.

23.    <u>Confidentiality.</u>    In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").    The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.    Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

24.    <u>Headings and Construction.</u> Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.    This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    <u>Counterparts: Facsimile Signature Pages.</u>    This    Agreement    may    be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 16th day of August 2023 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

ALIEN BOOKS

By: _Matias Timarchi_____

Date: _Sep 27, 2023_____

Name: Matias Timarchi

Title: Director

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this <u>Exhibit A</u> shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

    1.      Buyer shall perform the following marketing services:

        (a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

        (b)      With respect to the publication referred to in Paragraph 1 (a) above, Buyer shall provide 7 pages for new product listings in the color section per month at no charge to Seller. Seller may also purchase additional pages inside of Buyers Previews catalog at a rate of $2,080.00 net per page. For every 2 full color pages Seller buys in Buyers monthly catalog, Buyer will provide 1 additional page to Seller at no cost. In addition, Seller shall have the right to design its own pages in Buyers monthly Previews catalog (combining the solicitation pages and the ad buys into one section).

In the event that Seller is able to achieve both a 4% market-share of direct market sales and net sales through Diamond of no less than $10,500,000 per contract year, then Seller will move to the front of the Diamond Previews catalog (along with the other premier publishers). These thresholds will be reviewed at the end of each contract year and adjustments if earned will be taken into account no more than 90-days from the end of each contact year.

In the event that Seller is able to achieve through Diamond an annual invoicing of $1,000,000 per calendar year, then Seller will be listed as a Deluxe Vendor in all relevant Buyer Sales and Marketing materials.

        (c)      Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 20% off Buyer's published advertising rates.

1.      Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.    Buyer will also assign a sales representative to act as Seller's sales representative to the Book Market ("Sales Rep").    The Brand Manager and Sales Rep may be the same person.    Buyer shall make a reasonable effort to accommodate Seller's request for the person to act as the Sales Rep.

2.      At no charge to Seller, Buyer will provide Seller with a credit of $35,000 per year, to be used at Seller's discretion, for any print or digital rate card service, the ("Flexible Marketing Budget").

3.      Buyer will work with Seller to develop a rebate and/or incentive pricing initiative for targeted CBSM retailers to facilitate growth and market penetration.    Buyer will waive all administrative and development costs in association with said initiative.

4.      To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con, Chicago Comic Con, American Library Association Conference, and Book Expo America convention), Buyer, at no charge to Seller, shall have present a sales rep and shall display and promote selected Products as appropriate for the type of event and mutually agreed to in good faith by the parties hereto.

5.      To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

6.      To the extent Buyer produces a "daily email" for Buyer's customers, Buyer shall dedicate a minimum of at least 1 article per week of news coverage of Sellers choosing at no charge to Seller (as part of the overall "daily email, but not as a dedicated solo email based only on Sellers Products).

7.      Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided with Seller's approval.

8.      The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

---

## **Exhibit B**

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Vendor in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Vendor shall be accepted by Vendor under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Vendor by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Vendor shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Vendor notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Vendor a processing fee of $100.

Vendor shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   Items received without a valid scannable bar code may be either returned to the vendor, destroyed, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution as mutually agreed upon (both fees subject to future increases).   Distribution of items which arrive without valid bar codes (and are not returned to the vendor) may be delayed up to three weeks.   Vendor shall extend full return privileges to both DCD and Retailers on all items stickered by DCD.   Both the processing charge and per piece fee are subject to future increases.   Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Vendor solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event.   Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifier items returnable to its customers and to pass on the cost of those returns to the Vendor.

In the event Vendor ships product to DCD which has not been ordered by DCD, Vendor assumes all risk for the product.   DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Vendor.
DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Vendor hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label.   Vendor further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Vendor of the warranties contained herein or any act or omission of Vendor or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.   In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Vendor breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Vendor for a full refund.   Vendor shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Vendors must be shipped "delivered duty paid (DDP)".   Should failure of Vendor to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Vendor shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Vendor hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in

full force and effect and shall in no way be affected, impaired or invalidated.

Vendor shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.    Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Vendor, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order.    Should Vendor have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Vendor shall get clarification from DCD.    DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

## Exhibit C

| Channel | Comic & Hobby Markets | Book Market | Diamond UK *(Direct & Book Market)* |
|---|---|---|---|
| **Period** | 3 Years | 3 Years | 3 Years |
| **Agreement Type** | Exclusive Consignment | Exclusive Consignment | Exclusive Buy/Sell |
| **Territory** | World | World | UK & Ireland |
| **Product Category** | Comics, Graphic Novels & Books | Comics, Graphic Novels & Books | Comics, Graphic Novels & Books |
| **Diamond Discount** | 59.00% off Retail Price; +1% Freight Rebate | 59.00% off Retail Price; +1% Freight Rebate | 59.00% off Retail Price; +1% Freight Rebate |
| **Storage Fees** | Storage fees waived for duration of this contract | | |
| **Book Market Sales Allowance Fee** | n/a | 2.50% of USD Retail; ANZ/IN/SA/SG 8.5%* | 2.50% of USD Retail |
| **Book Market Customer Freight Rebate** | n/a | 1.25% of Retail *(to offset a portion of free freight costs to select book market customers)* | n/a |
| **Book Market Service Fee *on Returned Product*** | n/a | 4% on Return Value | 4% on Return Value |
| **Freight Charges to DUK** | n/a | n/a | Diamond Pays UK Freight |
| **Base Payment Terms (from Date of Sale)** | 30 days, paid weekly | 90 days, paid monthly | 90 days, paid monthly |

**Additional Marketing under DCD & DBD Exclusive Agreement**

**DCD:**

1. $35,000 Marketing Credits to be used at your discretion for any print and digital services (rate card value)

2. 7 Gratis Preview Pages (up from 5 pages)

3. Additional pages inside of Previews catalog at a discounted rate of $2,080 per page.

4. For every 2 full color pages bought in Previews, we'll provide 1 additional page to no cost.

5. Special Gratis Email Blast and Announcement (with free ad page, a Previews World Introductory Piece, and Retailer site article)

6. Gratis Monthly Direct Market Email Blast

7. Additional advertising space at 20% off rate card.

**DBD:**

1. Free First year ALA Booth (10 x 10, including Graphics and Setup, $8,500 value)

2. Special Gratis Email Blast and Announcement

3. Diamond Bookshelf Cover (to Librarians, Educators and Booksellers)

4. Gratis Seasonal eblast

5. Gratis Feature at School Library Journal (SLJ) Online Conference and at Library Con

6. Gratis Diamond Newsletter Banner Ad (monthly)

7. Social Media Coverage (pre-pub, on pub, and post title call-outs on Instagram, Facebook, and Twitter)

*Australia, New Zealand, South Africa, India, and Singapore Book Market Allowance is for the distributors serving local booksellers exclusively in their markets at a high discount ex the US, and paying freight into their markets. Title-level exclusions can be set as needed.

**Signature:**

**Email:** matias@alienbooks.com

# ltony@diamondbookdistributors.com

Final Audit Report                                                2023-09-27

| | |
|---|---|
| Created: | 2023-09-26 |
| By: | Tony Lutkus (ltony@diamondbookdistributors.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAyX043C-UTHxqgiNOE18hGtCpqNHg1id2 |

## "ltony@diamondbookdistributors.com" History

Document created by Tony Lutkus (ltony@diamondbookdistributors.com)
2023-09-26 - 7:01:07 PM GMT

Document emailed to matias@alienbooks.com for signature
2023-09-26 - 7:04:53 PM GMT

Email viewed by matias@alienbooks.com
2023-09-27 - 5:29:41 PM GMT

Signer matias@alienbooks.com entered name at signing as MATIAS TIMARCHI
2023-09-27 - 5:33:39 PM GMT

Document e-signed by MATIAS TIMARCHI (matias@alienbooks.com)
Signature Date: 2023-09-27 - 5:33:41 PM GMT - Time Source: server

Agreement completed.
2023-09-27 - 5:33:41 PM GMT

**Adobe Acrobat Sign**

**Exhibit 11**

**The Pennsylvania State University a/k/a Graphic Mundi Agreement**

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of May 1, 2021, is made by and between THE PENNSYLVANIA STATE UNIVERSITY, on behalf of its PENN STATE PRESS, a not-for-profit institution of higher education located at 820 North University Drive, University Support Bldg. 1, Suite C, University Park, PA 16802 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books") and (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"). All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment; Territory.

(a)    Seller hereby appoints Buyer as its sole and exclusive distributor in North America for the sale and distribution of English-language Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of which generally buy under Buyers returnable trade terms.

(b)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Comic Book Specialty Market. "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying

under Buyers non-returnable trade terms.

(c)     Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer. Seller reserves the right to run and maintain a web site, a component of which will include an e-commerce site where Seller will sell their products directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues (web site and trade shows and cons).

(e)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), l(b) and l(c) hereof (collectively, the "Appointments").

2.     Term.     The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of May 1, 2021, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     Supply.

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion and which shall be provided to Seller in writing to review. Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time. In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)     With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products

may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior written notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

   (e) Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

   (f) Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the GRAPHIC MUNDI trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

  4. <u>Distribution Services; Additional Services.</u>

   (a) As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

   (b) Buyer may also elect, in its sole discretion, to offer services to Seller not specified on <u>Exhibit A</u> hereto ("Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such service plus 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20.00%.

  5. <u>Price for Products.</u>

   (a) Seller shall sell Products to Buyer at a discount of 59.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 2% off of the retail price for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or shall ship Products to each of Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center. Such shipments are also subject to the freight rebate.

(b)    In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 3.00% of the retail price of all Products (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance").   For like sales in the UK, Seller shall provide Buyer an allowance of 5.00% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance").   Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)    In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    <u>Payment Terms; Book Market Returns; Etc.</u>

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).   On a weekly basis and within 30 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount.   The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 41.00%  plus the net cost value of Net Products sold to Customers, <u>less</u> (ii) the Book Market Service Fee (as defined herein), <u>less</u> (iii) the Book Market Returns Fee (as defined herein), if applicable, <u>less</u> (iv) the Book Market Sales Allowance, <u>less</u> (v) a Customer freight fee of 1.25% of retail for those Customers who require free freight for deliveries by Buyer, less (vi) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C.  Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns.   "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers.   Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 5.00% of the retail price of such Book Market Return.

"Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means.  When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction").   Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction.  Buyer will give 14 days' written

notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer.  Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(b)    In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service.  Seller shall pay such invoice within 60 days of the date of the invoice.  If Seller fails to make payment within 75 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement.  Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twenty four (24) month period relating specifically to transactions covered by this Agreement.  This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity.  Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods.  Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d).  Buyer shall keep all such records available for at least two year following each anniversary year of this Agreement.  If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer.  In addition, Buyer shall promptly pay the monies finally determined to be due Seller.  If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)    In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement in writing.  Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(d)    In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 30.00% of sales of Products during, at the option of Buyer, either (i) the immediately preceding 12 month period, or (ii) the immediately succeeding 12 month period based on reasonable forecasts

(e)    Superseding all other provisions and Buyer's remedies contained in this Agreement, Seller agrees to immediately pay to Buyer any amounts due to Buyer which become 60

days old or older resulting from negative Sales and/or for services rendered to, for, or on behalf of Seller, or for any other reason(s). Such demand for payment will be effected by written request (including email) from Buyer delivered to Seller.

7.    Credit Decisions.

(a)    Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)    Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)    With respect to Book Market Customers Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 15.00% of the extended SRP (the "Deemed Cost") of all unpaid invoice lines for Seller's Products that make up the amount of the bad debt. To the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's Deemed Cost for any such bad debt and Buyer's cost of all unpaid invoice lines for Seller's Products included in the bad debt.

(d)    For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.    Title And Risk Of Loss; Inventory.

(a)    All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance written notice and copies of all such filings.

(b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement. Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)    Buyer shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however,

that in the event that "normal shrinkage and deterioration" exceeds 1.50% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 18.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's negligence will be the responsibility of Buyer.

(d)     Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter    Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)     Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.     Intellectual Property.

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the

Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)    Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit.  Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)    In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement.  Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)    Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)    Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX THE PENNSYLVANIA STATE UNIVERSITY PRESS, All Rights Reserved."

(f)    Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)    The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.    Termination.

(a)    Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)    Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period.

Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

      (c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

      i.     Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

      ii.     Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller; or

      iii.     A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party.

11.     Effect of Termination.

      (a)     Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

      (b)     If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable.  Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.  Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

      (c)     If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable.  Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring

prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.   Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)    Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination.  Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller.  Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost, unless this Agreement is terminated as a result of default by Buyer, in which case material will be delivered at Buyer's cost.  Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)    In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for 90 days following the effective date of termination (the "Returns Period").  In no event shall Buyer have any right or obligation to accept any returns after the Returns Period.  Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period.   The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)    125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)   Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer.  Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer.  After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)    In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates.  If Buyer reasonably believes Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns)

Buyer has the right to sell or remainder consignment inventory to recoup monies owed.   Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

(g)    Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior written notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(h)   Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer.   If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.    Notices.  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

Penn State University Press
820 N. University Drive
University Support Bldg. 1, Suite C
University Park, PA 16802

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland   21030
Attention: Chief Operating Officer
Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party.   Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.    Independent Contractors; No Third Party Rights.   Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.  Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.  Nothing contained in this Agreement

shall give or is intended to give any rights of any nature to any third party.

14.    Force Majeure.  Subject to notice and mitigation obligations in this clause, neither Party shall be liable to the other for failing to perform any of its obligations under this agreement when such failure is due to causes beyond that Party's control, including but not limited to: a breakdown of communication systems, utilities, or transportation systems; labor strikes or other industrial disputes (except those involving the employees or agents of the Party seeking protection of this clause); epidemic and/or pandemic; quarantine; civil disturbance; reasonably unforeseeable weather conditions or acts of God or nature (including without limitation flood, fire, storm, tornado, earthquake, hurricane, and other natural disasters); acts of war such as invasions, military or usurped power, or sabotage; or a law, regulation, order, or other action by any public or regulatory authority or control which renders performance illegal, commercially impracticable, or impossible.  If an event gives rise to a Force Majeure defense under this Section, the Party asserting it shall not be in breach of this Agreement if: (1) it uses reasonable efforts to perform its obligations and (2) its inability to perform is not due to its failure to (a) take reasonable measures to protect itself against the events or circumstances giving rise to the Force Majeure defense or (b) develop and maintain a reasonable contingency plan to respond to the events or circumstances giving rise to the Force Majeure defense.  Any Party asserting Force Majeure as an excuse shall promptly notify the other Party of the occurrence of the event and, to the extent possible, consult with the other Party in an effort to resolve the underlying situation or otherwise reach a mutual resolution.

15.    Assignment: Binding Effect.  Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.  Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.    Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.  All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

16.    Entire Agreement: Modification.  This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof,    and supersede    all    other prior    oral and written representations,    agreements,    or understandings between them relating thereto.  This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties.  The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

17.    Applicable Law.  This Agreement shall be deemed to have been entered into in the Commonwealth of Pennsylvania and shall be interpreted and construed in accordance with the laws of the Commonwealth of Pennsylvania applicable to agreements executed and to be fully performed therein.  Both parties will attempt to resolve disputes and other problems regarding this Agreement

with communication and respect for the interests of the other party.

19.    <u>Survival.</u>  All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    <u>Severability.</u>  In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.   However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Each party shall indemnify and hold harmless the other, its officers, directors, trustees, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) its actions or negligence in the sale and distribution of Products, (ii) any claim arising due to its actions or negligence that any Product violates the right of privacy of any person or infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) its breach of a representation or warranty set forth herein; or (iv) its breach of any covenant or agreement set forth herein,  If claims are asserted to which a party is entitled to indemnification hereunder, the indemnifying party shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to the other party's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and the parties shall cooperate with each other in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and each shall fully cooperate with the other in the defense thereof.

(e)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>  IN NO EVENT SHALL BUYER BE LIABLE

FOR ANY INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 21 HEREOF.

      23.    <u>Confidentiality.</u>   Buyer and Seller agree to keep the terms of this Agreement confidential, protecting it with the same degree of care applied to their own documents of similar nature.

      24.    <u>Headings and Construction.</u>   Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

      25.    <u>Counterparts; Facsimile Signature Pages.</u>   This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.   Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of May 2021 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

PUBLISHER

By: *Kimberly J. Fisher*
Kimberly J. Fisher (Apr 29, 2021 15:44 EDT)

Date: 29-Apr-2021

Name: Kimberly J. Fisher

Title: Assistant Treasurer

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

## EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.    Buyer shall perform the following marketing services:

(a)    Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)    Buyer shall grant Seller one free page in Seller's catalog for each of Seller's new Products. Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 20% off Buyer's published advertising rates.

2.    Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.    To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.    To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

5.    Buyer will provide access to the POS tracking system known as NPD Bookscan at no cost to Seller.

6.    Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

7.    The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document. These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order. Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped. At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks. Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later. Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers. In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product. DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller. DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof. In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund. Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)". Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State. In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.   Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# PUBLISHER
## Summary of Key Deal Points

| | US & UK CBSM Market | US Book Market | UK Book Market |
|---|---|---|---|
| Product Category | All | All | All |
| Section 5 (a) Base Discount | 59.00% | 59.00% | 59.00% |
| Section 6 (a) Base Days | 30 | 30 | 30 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | n/a | n/a |
| Section 6 (a) Early Pay Days Seller's Option | n/a | n/a | n/a |
| Section 5 (a) Freight Rebate | n/a | n/a | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | 3.00% of retail | 5.00% of retail |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | 5.00% | 5.00% |
| Section 6 (a) Returns Cap | n/a | n/a | n/a |
| Section 6 (a) Returns Fees | n/a | n/a | n/a |



## Contingent Notice to
## Terminate Distribution Agreement

January 14, 2025

Dear Diamond Comic Distributors, Inc.,

The Pennsylvania State University, on behalf of its Penn State Press ("Penn State") wishes to amend the Distribution Agreement effected between the parties May 1, 2021 ("Distribution Agreement"). As such, Penn State requests that Diamond Comic Distributors, Inc., agree to the amended terms proposed within the enclosed amendment to the Distribution Agreement, by signing and returning amendment unaltered **on or before January 31, 2025**.

If the amendment is not signed and received by Penn State by COB January 31, 2025, then, pursuant to Paragraph 10(a) of the Distribution Agreement, Penn State hereby provides notice, and this letter serves as such notice, to terminate the Distribution Agreement, such termination effective on May 1, 2025.

Penn State appreciates your attention to this matter and looks forward to your reply.

Cordially,

David Aycock
Executive Director
Penn State University Press

PENN STATE
UNIVERSITY PRESS

8 University Drive
USB 1, Suite C
University Park, PA 16802

t: 814.865.1327

www.psupress.org

# AMENDMENT TO DISTRIBUTION AGREEMENT

This AMENDMENT TO DISTRIBUTION AGREEMENT ("Amendment") is effective January 28, 2025, by and between the DIAMOND COMIC DISTRIBUTORS, INC ("Buyer") and THE PENSSYLVANIA STATE UNIVERSITY, on behalf of its PENN STATE UNIVERSITY PRESS ("Seller").

WHEREAS, Buyer and Seller entered into that certain Distribution Agreement May 1, 2021 ("Distribution Agreement");

WHEREAS, Buyer and Seller desire to amend certain terms and conditions of the Distribution Agreement as specified herein.

NOW THEREFORE, in consideration of the promises and mutual covenants set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

1. Paragraph 10 of the Distribution Agreement is hereby replaced in its entirety with the following terms and conditions :

   10. *Termination.*

   *(a) Either party may terminate this Agreement by providing the other party with at least 60 days prior written notice of its intent to terminate this Agreement at any time.*

   *(b) Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period.*

   *Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 15 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default. Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.*

   *(c) Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate upon receipt of written notice if:*

   > *i. Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;*

   > *ii. Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller; or*

    *iii. A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party.*

2. All other terms and conditions of the original agreement shall otherwise remain unchanged and in full force and effect.

[SIGNATURE PAGE FOLLOWS]

In witness whereof, the parties hereto have caused this Amendment to be effected as of January 28, 2025.

**"BUYER"**                                            **"SELLER"**
**DIAMOND COMIC DISTRIBUTORS INC.**      **PENN STATE UNIVERSITY PRESS**


By: _____    By: _____

Printed Name: _____      Printed Name: _____
Title: _____      Title: _____
Date: _____      Date: _____

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of May 1, 2021, is made by and between THE PENNSYLVANIA STATE UNIVERSITY, on behalf of its PENN STATE PRESS, a not-for-profit institution of higher education located at 820 North University Drive, University Support Bldg. 1, Suite C, University Park, PA 16802 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books") and (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"). All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment; Territory.

(a)    Seller hereby appoints Buyer as its sole and exclusive distributor in North America for the sale and distribution of English-language Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of which generally buy under Buyers returnable trade terms.

(b)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Comic Book Specialty Market. "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying

under Buyers non-returnable trade terms.

(c)   Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products into the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d)   If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer. Seller reserves the right to run and maintain a web site, a component of which will include an e-commerce site where Seller will sell their products directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues (web site and trade shows and cons).

(e)   Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a), 1(b) and l(c) hereof (collectively, the "Appointments").

2.   Term.   The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of May 1, 2021, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.   Supply.

(a)   Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)   Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion and which shall be provided to Seller in writing to review. Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time. In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)   Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)   With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products

may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior written notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(e)    Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)    Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the GRAPHIC MUNDI trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.    Distribution Services: Additional Services.

(a)    As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)    Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto ("Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such service plus 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20.00%.

5.    Price for Products.

(a)    Seller shall sell Products to Buyer at a discount of 59.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 2% off of the retail price for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or shall ship Products to each of Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center. Such shipments are also subject to the freight rebate.

(b)    In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 3.00% of the retail price of all Products (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance"). For like sales in the UK, Seller shall provide Buyer an allowance of 5.00% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)    In addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    Payment Terms; Book Market Returns; Etc.

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). On a weekly basis and within 30 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount. The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 41.00% plus the net cost value of Net Products sold to Customers, less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) a Customer freight fee of 1.25% of retail for those Customers who require free freight for deliveries by Buyer, less (vi) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C. Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers. Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 5.00% of the retail price of such Book Market Return.

"Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means. When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction"). Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction. Buyer will give 14 days' written

notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(b) In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 60 days of the date of the invoice. If Seller fails to make payment within 75 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twenty four (24) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least two year following each anniversary year of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c) In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement in writing. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(d) In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 30.00% of sales of Products during, at the option of Buyer, either (i) the immediately preceding 12 month period, or (ii) the immediately succeeding 12 month period based on reasonable forecasts

(e) Superseding all other provisions and Buyer's remedies contained in this Agreement, Seller agrees to immediately pay to Buyer any amounts due to Buyer which become 60

days old or older resulting from negative Sales and/or for services rendered to, for, or on behalf of Seller, or for any other reason(s). Such demand for payment will be effected by written request (including email) from Buyer delivered to Seller.

7.  Credit Decisions.

(a)  Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)  Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)  With respect to Book Market Customers Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market Customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 15.00% of the extended SRP (the "Deemed Cost") of all unpaid invoice lines for Seller's Products that make up the amount of the bad debt. To the extent Seller has been paid for Products sold to Book Market Customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's Deemed Cost for any such bad debt and Buyer's cost of all unpaid invoice lines for Seller's Products included in the bad debt.

(d)  For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.  Title And Risk Of Loss; Inventory.

(a)  All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance written notice and copies of all such filings.

(b)  Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement. Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)  Buyer shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however,

Page 6 of 21

that in the event that "normal shrinkage and deterioration" exceeds 1.50% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 18.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's negligence will be the responsibility of Buyer.

(d)    Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter    Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)    Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)    Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)    If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.    Intellectual Property.

(a)    Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the

Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit.   Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement.  Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX THE PENNSYLVANIA STATE UNIVERSITY PRESS, All Rights Reserved."

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.   Termination.

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period.

Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)    Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

    i.    Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

    ii.    Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller; or

    iii.    A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party.

11.    <u>Effect of Termination.</u>

(a)    Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b)    If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable.  Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement.   Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c)    If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable.  Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination.  For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring

prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)     Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost, unless this Agreement is terminated as a result of default by Buyer, in which case material will be delivered at Buyer's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e)     In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers for 90 days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)     125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)     Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer. Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)     In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates. If Buyer reasonably believes Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market Customer returns)

Buyer has the right to sell or remainder consignment inventory to recoup monies owed. Buyer has the right to use trademarks to facilitate the sale of said consignment inventory.

(g)     Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior written notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(h)     Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer. If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.     Notices.  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

Penn State University Press
820 N. University Drive
University Support Bldg. 1, Suite C
University Park, PA 16802

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland  21030
Attention: Chief Operating Officer
Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party. Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.     Independent Contractors; No Third Party Rights.  Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto. Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller. Nothing contained in this Agreement

Page 11 of 21

shall give or is intended to give any rights of any nature to any third party.

14.    Force Majeure.   Subject to notice and mitigation obligations in this clause, neither Party shall be liable to the other for failing to perform any of its obligations under this agreement when such failure is due to causes beyond that Party's control, including but not limited to: a breakdown of communication systems, utilities, or transportation systems; labor strikes or other industrial disputes (except those involving the employees or agents of the Party seeking protection of this clause); epidemic and/or pandemic; quarantine; civil disturbance; reasonably unforeseeable weather conditions or acts of God or nature (including without limitation flood, fire, storm, tornado, earthquake, hurricane, and other natural disasters); acts of war such as invasions, military or usurped power, or sabotage; or a law, regulation, order, or other action by any public or regulatory authority or control which renders performance illegal, commercially impracticable, or impossible.   If an event gives rise to a Force Majeure defense under this Section, the Party asserting it shall not be in breach of this Agreement if: (1) it uses reasonable efforts to perform its obligations and (2) its inability to perform is not due to its failure to (a) take reasonable measures to protect itself against the events or circumstances giving rise to the Force Majeure defense or (b) develop and maintain a reasonable contingency plan to respond to the events or circumstances giving rise to the Force Majeure defense.   Any Party asserting Force Majeure as an excuse shall promptly notify the other Party of the occurrence of the event and, to the extent possible, consult with the other Party in an effort to resolve the underlying situation or otherwise reach a mutual resolution.

15.    Assignment: Binding Effect.   Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.   Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.        Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.   All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

16.    Entire Agreement: Modification.   This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof,   and supersede   all   other prior   oral and written representations,   agreements,   or understandings between them relating thereto.   This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties.   The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

17.    Applicable Law.   This Agreement shall be deemed to have been entered into in the Commonwealth of Pennsylvania and shall be interpreted and construed in accordance with the laws of the Commonwealth of Pennsylvania applicable to agreements executed and to be fully performed therein.   Both parties will attempt to resolve disputes and other problems regarding this Agreement

with communication and respect for the interests of the other party.

19.    <u>Survival.</u>    All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    <u>Severability.</u>    In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto. However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Each party shall indemnify and hold harmless the other, its officers, directors, trustees, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) its actions or negligence in the sale and distribution of Products, (ii) any claim arising due to its actions or negligence that any Product violates the right of privacy of any person or infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) its breach of a representation or warranty set forth herein; or (iv) its breach of any covenant or agreement set forth herein, If claims are asserted to which a party is entitled to indemnification hereunder, the indemnifying party shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to the other party's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and the parties shall cooperate with each other in the defense thereof. Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and each shall fully cooperate with the other in the defense thereof.

(e)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.    <u>LIMITATION OF LIABILITY.</u>    IN NO EVENT SHALL BUYER BE LIABLE

FOR ANY INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGE OF ANY KIND OR NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 21 HEREOF.

23.    _Confidentiality._   Buyer and Seller agree to keep the terms of this Agreement confidential, protecting it with the same degree of care applied to their own documents of similar nature.

24.    _Headings and Construction._  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.    _Counterparts; Facsimile Signature Pages._   This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.   Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

_{Signatures appear on the following page}_

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of May 2021and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

PUBLISHER

By: *Kimberly J. Fisher*
Kimberly J. Fisher (Apr 29, 2021 15:44 EDT)

Date: 29-Apr-2021

Name: Kimberly J. Fisher

Title: Assistant Treasurer


DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.　Buyer shall perform the following marketing services:

(a)　Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)　Buyer shall grant Seller one free page in Seller's catalog for each of Seller's new Products. Seller may purchase additional advertising space in the publication referred to in Paragraph I (a) above at 20% off Buyer's published advertising rates.

2.　Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.　To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.　To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

5.　Buyer will provide access to the POS tracking system known as NPD Bookscan at no cost to Seller.

6.　Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

7.    The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document. These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order. Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped. At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks. Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later. Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers. In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product. DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller. DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof. In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund. Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)". Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State. In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein.   Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# PUBLISHER
## Summary of Key Deal Points

| | US & UK CBSM Market | US Book Market | UK Book Market |
|---|---|---|---|
| Product Category | All | All | All |
| Section 5 (a) Base Discount | 59.00% | 59.00% | 59.00% |
| Section 6 (a) Base Days | 30 | 30 | 30 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | n/a | n/a |
| Section 6 (a) Early Pay Days Seller's Option | n/a | n/a | n/a |
| Section 5 (a) Freight Rebate | n/a | n/a | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | 3.00% of retail | 5.00% of retail |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | 5.00% | 5.00% |
| Section 6 (a) Returns Cap | n/a | n/a | n/a |
| Section 6 (a) Returns Fees | n/a | n/a | n/a |



## Contingent Notice to
## Terminate Distribution Agreement

January 14, 2025

Dear Diamond Comic Distributors, Inc.,

The Pennsylvania State University, on behalf of its Penn State Press ("Penn State") wishes to amend the Distribution Agreement effected between the parties May 1, 2021 ("Distribution Agreement"). As such, Penn State requests that Diamond Comic Distributors, Inc., agree to the amended terms proposed within the enclosed amendment to the Distribution Agreement, by signing and returning amendment unaltered **on or before January 31, 2025**.

If the amendment is not signed and received by Penn State by COB January 31, 2025, then, pursuant to Paragraph 10(a) of the Distribution Agreement, Penn State hereby provides notice, and this letter serves as such notice, to terminate the Distribution Agreement, such termination effective on May 1, 2025.

Penn State appreciates your attention to this matter and looks forward to your reply.

Cordially,

David Aycock
Executive Director
Penn State University Press

PENN STATE

UNIVERSITY PRESS

8 University Drive
USB 1, Suite C
University Park, PA 16802

t: 814.865.1327

www.psupress.org



June 25, 2025

**Via Email and Certified Mail**
Diamond Comic Distributors, Inc.
Attn: Chuck Parker
10150 York Rd, Suite 300
Hunt Valley, MD 21030
*pchuck@diamondcomics.com*
**Cc:** Emily Botica, Stuart Schreck, Tim Lenaghan, Robert Gorin
**Re: Notice of Termination of Distribution Agreement**

Dear Diamond Comic Distributors Leadership,

Pursuant to Section 10(a) of the enclosed amended Distribution Agreement between Diamond Book Distributors ("DBD") and The Pennsylvania State University Press ("PSUP"), this letter serves as formal notice of PSUP's intent to terminate the Agreement, effective sixty (60) days from the date of this letter—**August 17, 2025.**

This decision is not made lightly. Over the past several weeks, PSUP has expressed escalating concern regarding the status and handling of its consigned inventory. Specifically:

- On **June 10,** PSUP requested written clarification regarding a rumor that DBD was considering the liquidation or remaindering of client publishers' stock. This concern was based on reports from trusted industry sources.
- As of **June 16,** no clear denial or substantive response has been provided by DBD leadership to dispel or confirm the claim.
- On that same day, PSUP was informed by DBD's Vice President of Publisher Relations that all **no-cost orders had been halted without notice,** leaving publishers unable to retrieve their inventory from the warehouse. This operational freeze has compounded our concerns regarding inventory control and transparency, and the lack of direct communication is unacceptable.
- Despite multiple outreach attempts, DBD leadership has failed to provide assurance that PSUP's inventory will not be remaindered, liquidated, or otherwise disposed of outside the scope of our existing agreement.

In light of these developments, the continued uncertainty and lack of response have eroded our confidence in DBD's ability to uphold the terms and spirit of the Agreement.

PENN STATE
UNIVERSITY PRESS

8 University Drive
USB 1, Suite C
University Park, PA 16802

t: 814.865.1327

www.psupress.org

We further reiterate that **title to all PSUP inventory remains with the Press at all times** under Section 8(a) of our Agreement. As such, and pursuant to Section 8(f), **any unauthorized liquidation, remaindering, or disposal of PSUP-owned inventory constitutes a material breach of contract** and may give rise to a civil claim for conversion. We expressly prohibit any such action absent our prior written approval.

We request written confirmation of the following within 10 business days (by July 15, 2025):

1. That no PSUP inventory will be liquidated, remaindered, or otherwise disposed of without our express written consent.
2. That arrangements will be made to facilitate the orderly return of PSUP inventory upon termination of the Agreement.

Please direct all correspondence regarding this matter to my attention.

Sincerely,

David Aycock
Executive Director
The Pennsylvania State University Press
8 University Dr., USB 1, Ste. C
University Park, PA 16802-1003
daycock@psu.edu | 814.867.2209



June 25, 2025

**Via Email and Certified Mail**
Diamond Comic Distributors, Inc.
Attn: Chuck Parker
10150 York Rd, Suite 300
Hunt Valley, MD 21030
pchuck@diamondcomics.com
Cc: Emily Botica, Stuart Schreck, Tim Lenaghan, Robert Gorin
**Re: Notice of Termination of Distribution Agreement**

Dear Diamond Comic Distributors Leadership,

Pursuant to Section 10(a) of the enclosed amended Distribution Agreement between Diamond Book Distributors ("DBD") and The Pennsylvania State University Press ("PSUP"), this letter serves as formal notice of PSUP's intent to terminate the Agreement, effective sixty (60) days from the date of this letter—**August 17, 2025.**

This decision is not made lightly. Over the past several weeks, PSUP has expressed escalating concern regarding the status and handling of its consigned inventory. Specifically:

- On **June 10,** PSUP requested written clarification regarding a rumor that DBD was considering the liquidation or remaindering of client publishers' stock. This concern was based on reports from trusted industry sources.
- As of **June 16,** no clear denial or substantive response has been provided by DBD leadership to dispel or confirm the claim.
- On that same day, PSUP was informed by DBD's Vice President of Publisher Relations that all **no-cost orders had been halted without notice,** leaving publishers unable to retrieve their inventory from the warehouse. This operational freeze has compounded our concerns regarding inventory control and transparency, and the lack of direct communication is unacceptable.
- Despite multiple outreach attempts, DBD leadership has failed to provide assurance that PSUP's inventory will not be remaindered, liquidated, or otherwise disposed of outside the scope of our existing agreement.

PENN STATE
UNIVERSITY PRESS

8 University Drive
USB 1, Suite C
University Park, PA 16802

t: 814.865.1327

www.psupress.org

In light of these developments, the continued uncertainty and lack of response have eroded our confidence in DBD's ability to uphold the terms and spirit of the Agreement.

We further reiterate that **title to all PSUP inventory remains with the Press at all times** under Section 8(a) of our Agreement. As such, and pursuant to Section 8(f), **any unauthorized liquidation, remaindering, or disposal of PSUP-owned inventory constitutes a material breach of contract** and may give rise to a civil claim for conversion. We expressly prohibit any such action absent our prior written approval.

We request written confirmation of the following within 10 business days (by July 15, 2025):

1. That no PSUP inventory will be liquidated, remaindered, or otherwise disposed of without our express written consent.
2. That arrangements will be made to facilitate the orderly return of PSUP inventory upon termination of the Agreement.

Please direct all correspondence regarding this matter to my attention.

Sincerely,

David Aycock
Executive Director
The Pennsylvania State University Press
8 University Dr., USB 1, Ste. C
University Park, PA 16802-1003
daycock@psu.edu | 814.867.2209

**Exhibit 12**

**Titan Publishing Group, LLC Agreement**

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of January 1st, 2024, is made by and between Titan Comics a United Kingdom based corporation located at 144 Southwark St, London, England SE10UP ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books ("Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books ("Graphic Novels"), (iii) illustrated books, science fiction, fantasy, crime and horror novels ("Novels"), and (iv) Merchandise including apparel, giftware, homeware, and collectibles ("Merchandise").  Collectively, Comic Books, Graphic Novels, Novels, and Merchandise are "Products".  All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's non-exclusive distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Appointment; Territory.

        (a)      Seller hereby appoints Buyer as its non-exclusive distributor worldwide for the sale and distribution of Products in the Comic Book Specialty Market.  "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

        (b)      If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer.

        (c)      Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's non-exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a) and 1(b) hereof (collectively, the "Appointments").

2.      Term.  The initial term of this Agreement (the "Initial Term") is for three years from

the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of January 1st, 2024, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.    Supply.

(a)    Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)    Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion. Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time. In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)    Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)    Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(e)    Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's non-exclusive distributor set forth above (i) shall apply to all Seller's titles published under the Titan trademark during the Term of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4.    Distribution Services: Additional Services.

(a)    As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof.

(b)    Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto ("Additional Services"). Seller may elect to obtain any such

Additional Services from Buyer in its sole discretion.   Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such services plus 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 20.00%.

     5.     Price for Products.

     (a)     Seller shall sell Products to Buyer at a discount of 60.00% off the retail price, excluding Customer Exclusives or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 0.00% of the retail price (or a 0.00% of purchase price freight rebate if any Product is solicited on a net cost basis) for all Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or drop shipped to only one of Buyer's distribution centers.   If alternatively Seller ships Products to each of Buyer's North American distribution centers in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges.   If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center.   Such shipments are also subject to the freight rebate.

     (b)     In addition Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers.

     6.     Payment Terms; Etc.

     (a)     On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).   The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 40.00% plus the net cost value of Net Products sold to Customers, less (ii) the Freight Rebate.   Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns.   "Customers" shall mean collectively CBSM retailers.

     (b)     In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice.   If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement.   Seller and/or its duly authorized

representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement.   This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity.   Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods.   Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d).   Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods; or the Seller request is made for the sole purpose of satisfying requirements of a licensor audit and the requested records and reporting are readily available and easily obtainable. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer.   In addition, Buyer shall promptly pay the monies finally determined to be due Seller.   If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)        For each calendar year during the Term of this Agreement, Seller shall be eligible to receive a purchase discount rebate (the "Rebate") calculated as set forth below. For each calendar year during the Term in which DCD's cost of Net Products of all of Titan consolidated product sold (including Titan Books and Titan Merchandise) exceeds the levels outlined below, Seller shall receive a Rebate in an amount determine by multiplying the DCD cost of Net Products within each threshold range by the decimal equivalent of the appropriate percentage set forth in the following chart:

DCD's Total Product Purchased of Sellers products
Rebate

| | |
|---|---|
| $0 - 1,999,999 | 0.00% |
| $2,000,000-2,999,999 | 1.00% |

7.     Credit Decisions.

(a)     Buyer shall make all required credit decisions with respect to Customers hereunder, and at Buyer's sole risk, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b)     Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)    For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.    <u>Title And Risk Of Loss; Inventory.</u>

(a)    All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)    Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement. Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c)    Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer shall maintain all insurance with respect thereto. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds 2.00% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 10.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed 10% of average retail price of units of Products that are lost or damaged.

(d)    Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail value) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter Distribution Amount"). Provided that the "Calculated Value" (as

hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to inventory of Products held by Buyer at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail value) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e)     Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business.  Hurt and "Remaindered" books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 60%/40% between Seller and Buyer, alternatively if Seller makes the sale the split will be 82.5%/17.5% (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(f)     Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(g)     If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9.    Intellectual Property.

(a)     Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property").  The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit.  Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement.  Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor

file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX TITAN COMICS, All Rights Reserved." Or the copyright line of any Licensed product as specified by Titan.

(f)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.    Termination.

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

    i.     Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

    ii.     Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

    iii.    A party attempts to assign or sublicense any or all of the rights or

obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

iv. Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

v. Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

vi. Seller consummates a transaction or series of related transactions which cause the holders of the ownership interests in Seller as of the date of this agreement to beneficially own less than fifty percent of the voting rights in Seller.

11. <u>Effect of Termination.</u>

(a) Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b) If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c) If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d)     Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination.   Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller.   Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost.   Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(f)     Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer.   If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.     <u>Notices.</u>  All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

> TITAN COMICS
> Nick Landau (Managing Director)
> 144 Southwark St
> London, England
> SE1 0UP
> Phone: +44 (0)20 7620 0200
> Fax: +44 (0)20 7803 1803

If to Buyer:

> Diamond Comic Distributors, Inc.
> 10150 York Road, Suite 300
> Hunt Valley, Maryland   21030
> Attention: Chief Operating Officer
> Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party.   Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.     <u>Release.</u>  By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (c), as well as any open queries currently in dispute.   In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the commencement of such Renewal Term (except

those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (c)).

14.     Independent Contractors; No Third Party Rights.     Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.   Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.     Force Majeure.   Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control.   The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.     Assignment: Binding Effect.   Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.   Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities.     Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement.   All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.     Entire Agreement: Modification.   This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof,   and supersede   all   other prior   oral and written representations,   agreements,   or understandings between them relating thereto.   This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties.   The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.     Applicable Law.   This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein.   Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party.   In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.   Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and

regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.  In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    Survival.  All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    Severability.  In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.   However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)    Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)    Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)    Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein.   If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof.   Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

      (e)    The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

    22.    <u>LIMITATION OF LIABILITY.</u>  IN NO EVENT SHALL BUYER BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR   NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.

    23.    <u>Confidentiality.</u>  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information").  The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives.  Each party agrees on its own behalf, and on behalf of its officers, directors, employees and representatives that it (a) will not use the Confidential Information in any way detrimental to the other party, and (b) will treat such Confidential Information in a strictly confidential manner.

    24.    <u>Headings and Construction.</u>  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.  This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

    25.    <u>Counterparts: Facsimile Signature Pages.</u>  This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.  Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of this 1st day of January 2024 and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

TITAN COMICS

By: *Ricky Claydon*

Date: NOVEMBER 6, 2023

Name:   RICKY CLAYDON

Title:   PUBLISHING DIRECTOR

DIAMOND COMIC DISTRIBUTORS, INC.

By: _____

Date: _____

Name: Larry Swanson

Title: CFO

# EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.      Buyer shall perform the following marketing services:

(a)      Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the Premier sections of each such catalogue during the Term.

(b)      With respect to the publication referred to in Paragraph l (a) above, Buyer shall provide up to 30 pages for new product listings in the color section per month at no charge to SellerIf additional pages are needed during the term of this agreement Buyer and Seller will discuss a mutually agreed upon increase. In addition, Seller will be granted 1 pages in the "Manga" section of Buyer's catalog for every 4 titles listed and 1 page in the "Merchandise" section for every 2 products listed.

(c)      Buyer will designate no fewer than two of Seller's Products as "Gems" in Buyer's monthly catalog each month. Buyer will designate new series launches as FI's in the "Manga" section of the catalog.

(d)      Seller will be granted three (3) covers annually in Buyer's catalog at no charge to Seller, with final cover placement to be mutually agreed upon and subject to availability. Additional covers available outside of Buyer's contractual requirements will be made available to Premier publishers first.

(e)      The number of Offered Again Products in Buyer's catalog will be mutually agreed upon by Buyer and Seller.

(f)      Buyer will grant Seller three "Spine" ad per year in Buyer's Catalog.

(g)      Buyer will grant Seller a mutually agreed upon number of "email blasts" to Buyer's retailers with a minimum of one per week to feature weekly FOC Products.

(h)    Buyer will grant Seller two monthly banners on Buyer's Retailer Website, as well as a monthly banner ad in Buyer's Daily e-newsletter.

(i)    Buyer will grant Seller 4 Order Form covers each year at no cost to Seller.

2.    Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.    To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4.    Seller may participate as a paid sponsor in all Buyer organized CBSM industry events.   Buyer will be entitled to Silver level pricing for Gold level sponsorship for all events

5.    Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market Services set forth herein are provided to Seller to the extent reasonably practicable in digital format.

6.    The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

**Exhibit B**

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks.   Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD.   Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $150.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product.   DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller.   DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof.   In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund.   Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)".   Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State.   In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein. Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# TITAN COMICS
# Summary of Key Deal Points

| | US & UK CBSM Market | | US Book Market | | UK Book Market |
|---|---|---|---|---|---|
| Product Category | All | | n/a | | n/a |
| Section 5 (a) Base Discount | 60.00% | | n/a | | n/a |
| Section 6 (a) Base Days | 30 | | n/a | | n/a |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | | n/a | | n/a |
| Section 6 (a) Early Pay Days Seller's Option | n/a | | n/a | | n/a |
| Section 5 (a) Freight Rebate | n/a | | n/a | | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | | n/a | | n/a |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | | n/a | | n/a |
| Section 6 (a) Returns Cap | n/a | | n/a | | n/a |
| Section 6 (a) Returns Fees | n/a | | n/a | | n/a |

**Exhibit 13**

**Vault Storyworks, LLC a/k/a Vault Comics f/k/a Creative Mind Energy Agreement**

DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of December 18, 2018, is made by and between Creative Mind Energy, a Virginia corporation located at 4800 Montgomery Ave, Floor 10, Bethesda, MD, 20814 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing products in the categories (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, the "Related Merchandise", and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products.") All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Appointment Territory.

(a) Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the categories of Comic Books, Graphic Novels, Novels, and Games, excluding any digital versions thereof, in the Book Market. Seller hereby appoints Buyer as a non-exclusive distributor for the sale and distribution of Products in the category of Related Merchandise in the Book Market. "Book Market" shall mean chain book store retailers and their internet affiliates; independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; Amazon.com; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of which generally buy under returnable trade terms.

(b) Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of Products in the categories of Comic Books, Graphic Novels, Novels, and Games, excluding any digital versions thereof, in the Comic Book Specialty Market. Seller hereby appoints Buyer as a non-exclusive distributor for the sale and distribution of Products in the category of Related Merchandise in the Comic Book Specialty Market. "Comic Book Specialty Market"

(CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c) Seller hereby appoints Buyer as its sole and exclusive distributor world-wide for the sale and distribution of Products in the categories of Games, excluding any digital versions thereof, into the Hobby Gaming Market. Seller hereby appoints Buyer as a non-exclusive distributor for the sale and distribution of Products in the category of Related Merchandise in the Hobby Gaming Market. "Hobby Gaming Market" (HGM) shall mean specialty hobby gaming retailers and wholesalers that generally buy role playing, collectible card games and boxed games under Buyer's non-returnable trade terms.

(d) Seller reserves the right to run and maintain a web site a component of which will include an e-commerce site where Seller will sell their Products in all categories directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions, and to sell their Products directly to any third-party for special events. Seller also reserves the right to determine the sale price of their Products in these venues.

(e) If Buyer declines to offer any of Seller's Products, or at any time delists or otherwise ceases to offer any of Seller's previously offered Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer.

(f) Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs 1(a), 1(b) and 1(c) hereof (collectively, the "Appointments").

2. Term. The initial term of this Agreement (the "Initial Term") is for three years from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date. Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will automatically renew for one-year periods (each, a "Renewal Term"). This Agreement is effective with Products available for shipment as of January 1, 2019, the "Commencement Date". As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3. Supply.

(a) Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b) Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion. Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to

Buyer from time to time. In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c) Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d) With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's Olive Branch, Mississippi distribution facility and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus twenty (20) percent.

(e) Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f) Notwithstanding anything to the contrary set forth herein, the appointment of Buyer to serve as Seller's exclusive distributor set forth above (i) shall apply to all Seller's titles published under the Publisher Trademark Name TBD trademark during the Term (in accordance with Paragraph 2 herein) of this Agreement and (ii) shall not apply to "cross-over" books (unless Seller is the designated publisher of such "cross-over" book), "tour" books and "incentive" or "coupon" books (as such terms are commonly understood in the comic book industry). Any Product offered to Buyer by Seller which is not majority owned by Seller and published under the Seller's trademark will not be eligible for the terms and conditions outlined in this Agreement without the approval of Buyer, in its sole discretion.

4. Distribution Services: Additional Services.

(a) As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto (collectively, the "Distribution Services"). Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof

(b) Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto (collectively, the "Additional Services"). Seller may elect to obtain any such Additional Services from Buyer in its sole discretion. Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such Additional Service plus 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 10.00%.

5. Price for Products.

(a) Seller shall sell Products to Buyer at a discount of 60.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall grant Buyer a freight rebate of 2.00% of the retail price (or a 4.00% of purchase price freight rebate if any Product is solicited on a net cost basis) for all

Products picked up at Seller's domestic manufacturing/printing facility (the "Freight Rebate"), or if Seller ships Products to each of Buyer's North American distribution centers, Seller will be responsible for all freight and delivery charges. If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center.

(b) In addition to the discounts set forth in Paragraph 5(a) hereof; Seller shall provide Buyer an allowance of 2.50% of the retail price of all Products (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM customers that place orders after Buyer's sales representatives have solicited such customers (the "Book Market Sales Allowance"). For like sales in the UK, Seller shall provide Buyer an allowance of 5.00% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance"). Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c) Subject to paragraph 1 (c), in addition (i) Seller shall not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers its Products through Buyer to Customers.

6. Payment Terms; Book Market Returns; Etc.

(a) On a weekly basis and within 30 days after Buyer's unofficial weekly "Release Date" to the Direct Market for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein). On a weekly basis and within 60 days after Buyer's unofficial weekly Release Date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount. The Weekly Payment Amount shall be equal to (i) the retail value of Net Products (as defined herein) sold to Customers (as defined herein) multiplied by 40.00% plus the net cost value of Net Products sold to Customers, less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) the Freight Rebate, less (vi) a Customer freight fee of 1.25% of retail for those customers who require free freight for deliveries by Buyer, less (vii) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C. Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions. "Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns. "Customers" shall mean collectively Book Market customers, CBSM customers and Hobby Game Market customers. Products returned to Buyer from Book Market customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 8.00% of the retail price of such Book Market Return. In addition, if in any year of the Term of this Agreement Buyer processes Book Market Returns with a credited value in excess of 30.00% of sales made to the Book Market during such year (the "Trigger Amount"), Seller will pay to Buyer an additional fee of 4.00% of the invoices credited for Book Market

Returns in excess of the Trigger Amount in such year (the "Book Market Returns Fee"). "Documented Deductions" shall mean any deduction taken by a Book Market customer whether on their remittance or through other means. When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction"). Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting customer by (b) the total sales of all products Buyer sells to the deducting customer multiplied by (c) the Indirect Deduction. Buyer will give 14 days' notice to seller of any new Documented Deductions. Seller will have the option to instruct buyer to discontinue selling to the customer that is the source of the deduction if Seller so chooses.

(b) In the event that Buyer provides Seller any Distribution Services or other
service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service. Seller shall pay such invoice within 30 days of the date of the invoice. If Seller fails to make payment within 45 days of the date of an invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts. Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement. Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement. This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity. Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods. Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d). Buyer shall keep all such records available for at least one year following termination of this Agreement. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller in excess of 3% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit (not to exceed the amount of the shortfall) shall be paid by Buyer. In addition, Buyer shall promptly pay the monies finally determined to be due Seller. If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c) In the event that at any time or from time to time during the Tenn, one or more
of Buyer's Book Market customers require that Buyer sell Products to them at a higher base discount (for example, a customer requires a 55% discount rather than a 52% discount),), Buyer shall notify Seller of such requirement. Seller shall, within ten (10) days of such notification by Buyer, notify Buyer in writing of its election to either (i) have Buyer continue sales under this Agreement to such customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such customer.

7. Credit Decisions.

(a) Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted.

(b) Buyer shall have the right to sue any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c) With respect to Book Market customers Buyer will assume responsibility for the bad debt risk associated with Products once the Products have been received by Book Market customers but only to the extent of Seller's estimated actual cost of the Products, which will be deemed to be 15.00% of the retail value of the amount of the bad debt. To the extent Seller has been paid for Products sold to a Book Market customers who eventually are unable to pay Buyer for those Products, Seller will reimburse Buyer for the difference between Seller's deemed costs for any such bad debt and the invoice value related to Seller's Products included in the bad debt.

(d) For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8. Title And Risk Of Loss; Inventory.

(a) All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer. Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings

(b) Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement. Seller is also responsible for the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c) Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence and Buyer shall maintain all insurance with respect thereto. Buyer shall have no obligation to insure against, nor bear liability for, any loss due to damage to, destruction of, or normal shrinkage and deterioration of, any Product during such time. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from normal shrinkage and deterioration shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds one and one-half percent (1.5%) of the total units of Products shipped to Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 10% of average retail price of units

over the threshold so as to approximate direct manufacturing costs; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing and Seller was previously compensated are therefore now, subject to a reimbursement payment to Buyer; if such products are found within 6 months of such time as they were determined to be missing. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the one and one-half percent (1.5%) threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed the printing costs associated with sum of (i) the printing costs associated with the Products that are lost or damaged and (ii) Seller's actual cost of shipping such Products to Buyer's distribution center.

(d) Not later than 25 days following the end of each calendar quarter that this Agreement remains in effect Buyer shall provide to Seller a calculation of the dollar amount (based on retail amount) of Products sold by Buyer during the immediately preceding four (4) calendar quarter period (the "Prior Four Quarter Distribution Amount"). Provided that the "Calculated Value" (as hereinafter defined) of Products stored by Buyer at its distribution facilities at the end of a calendar month is not greater than 100.00% of the Prior Four Quarter Distribution Amount for the immediately preceding four (4) calendar quarters, Seller shall incur no charges for the storage of such inventory. With respect to Products inventory at the end of a calendar month with a Calculated Value in excess of the Prior Four Quarter Distribution Amount, Seller shall incur a storage charge of $ 0.40 per carton per month. As used herein, "Calculated Value" shall mean the dollar amount (based on retail amount) of the applicable Products stored by Buyer at its distribution facilities at the applicable time as determined by Buyer in a manner consistent with its books and records.

(e) Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(e) Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer.

(f) If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller 15 per order, 2 per title and 0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of 20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9. Intellectual Property,

(a) Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the Products by Buyer,

including all required patents, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b) Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time knowingly do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest. All rights in the Trademarks are reserved to Seller for its own use and benefit. Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c) In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement. Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d) Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(e) Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and TM 20XX Vault Comics, All Rights Reserved."

(f) Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(g) The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10. Termination.

(a) Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b) Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such

default. Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c) Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

i. Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

ii. Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller;

iii. A party attempts to assign or sublicense any or all of the rights or obligations under this Agreement, other than to an affiliate, without the prior written approval of the other party;

iv. Buyer consummates a transaction or series of related transactions which cause the holders of the ownership interests in Buyer as of date of this Agreement to beneficially own less than fifty percent of the voting rights in Buyer; or

v. Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

(d) In the event that Seller consummates a transaction or series of related transactions which cause the current holders of the ownership (as of the date of this agreement) interests in Seller to sell a majority interest to an outside party wherein they would own less than fifty percent of the voting rights in Seller, Buyer will continue to distribute Seller's Products for a period not to exceed 8 months; at which time this Agreement shall terminate.

11. Effect of Termination.

(a) Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b) If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller. Buyer is responsible for the cost of packing and shipping the existing inventory to a new facility to be named by the Seller.

(c) If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d) Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e) In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Sellers Products distributed to Book Market customers for ninety (90) days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i) Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii) Gross sales to Bookstores for such twelve-month period. Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer. Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns customer for returns which such customer makes after the Returns Period or in connection with any dispute over the customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f) In the event of termination of the Agreement by either party for any reason, Buyer shall have the right to offset any amount owed to Seller under this Agreement against any amounts owed to Buyer or any affiliate of Buyer under any other agreements with Seller or its affiliates. If Buyer determines Seller will not be able to compensate Buyer for outstanding amounts due for which offset is not possible (including exposure for Book Market customer returns) Buyer has the right to sell or remainder consignment inventory to recoup monies owed.

(g) Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic hub distribution center, currently Olive Branch Mississippi for credit. If Seller prefers this UK Product be destroyed, Buyer will do so at Seller's request and at Seller's sole cost and expense including credit for the original purchase price of Products

(h) Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless Buyer has chosen to sell or remainder this Inventory to offset amounts due from Seller to Buyer. If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12. Notices. All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, or (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, as follows:

If to Seller:

Creative Mind Energy 110 E Broadway, #20
Missoula, MT 59802 Damian Wassel
Publisher Phone: 540 958 9422

With copies to:

Creative Mind Energy
4800 Montgomery Lane
Floor 10
Bethesda, MD 20814

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland 21093
Attention: Chief Operating Officer
Fax: (410) 683-7088

Or to such other address as either party shall have designated in a notice to the other party. Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13. Release. By signing this Agreement, Seller waives and releases any claims it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (c). In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims it has against Buyer as of the

commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (c)).

14. Independent Contractors; No Third Party Rights. Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto. Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller. Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15. Force Majeure. Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, strikes or labor disputes or any other cause beyond that party's control. The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16. Assignment: Binding Effect. Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products. Buyer may assign this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities. Notwithstanding the foregoing, this Agreement, and the rights and obligations of each party hereto, shall not be assigned without the prior written consent of the other party, which consent shall not be unreasonably withheld. Any purported assignment by a party in contravention of this Paragraph 16 shall be void and shall constitute material breach of this Agreement. All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17. Entire Agreement: Modification. This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof, and supersede all other prior oral and written representations, agreements, or understandings between them relating thereto. This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified by Buyer from time to time) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18. Applicable Law. This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein. Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party. In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator. Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and

regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction. In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19. Survival. All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20. Severability. In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto. However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21. AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a) Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b) Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c) Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d) Seller shall indemnify and hold harmless Buyer, its officers, directors, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) the sale and distribution of Products, (ii) any claim that any Product violates the right of privacy of any person, is libelous or obscene, infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) any breach of a representation or warranty set forth herein; or (iv) any breach of any covenant or agreement set forth herein. If claims are asserted against Buyer with respect to which Buyer is entitled to indemnification hereunder, Seller shall assume the complete defense thereof at its sole expense, by counsel of its choice (subject to Buyer's approval of defense counsel selected, such approval not to be unreasonably withheld or delayed), and Buyer shall cooperate with Seller in the defense thereof. Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and Seller shall fully cooperate with Buyer in the defense thereof.

(e) The foregoing representations, warranties, covenants and indemnities shall
survive the termination of this Agreement.

22. LIMITATION OF LIABILITY. IN NO EVENT SHALL BUYER BE LIABLE FOR ANY
INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR
NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT,
WHETHER BASED IN CONTRACT, TORT (INCLUDING
NEGLIGENCE) OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22
HEREOF.

23. Confidentiality. In the course of performance under the Agreement, Buyer and Seller will each
provide the other with certain information including with respect to customers, operations,
financial results and related matters and may prepare analyses, compilations, studies and other
materials containing or based in whole or in part on such information (collectively, the
"Confidential Information"). The term Confidential Information shall not, however, include
information that (i) becomes generally available to the public, other than as a result of a breach of
the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii)
becomes available to either party, on a non-confidential basis from a source other than the other
party or its representatives. Each party agrees on its own behalf, and on behalf of its officers,
directors, employees and representatives that it (a) will not use the Confidential Information in any
way detrimental to the other party, and (b) will treat such Confidential Information in a strictly
confidential manner

24. Headings and Construction. Captions and headings contained in this Agreement have been
included for ease of reference and convenience and will not be considered in interpreting or
construing this Agreement. This Agreement will not be interpreted or construed in any particular
manner based on considerations as to which party drafted this Agreement.

25. Counterparts; Facsimile Signature Pages. This Agreement may be executed in counterparts,
each of which will be deemed to be an original and all of which together will be considered one
and the same instrument. Delivery of an executed signature page to this Agreement by facsimile
transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart
of this Agreement.

{Signatures appear on the following page}

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed as of the later date indicated below, and effective as of the 1st day of January 2019, and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

CREATIVE MIND ENERGY, LLC:

By:

Date:

Name:

Title:

DIAMOND COMIC ISTRIBUTORS, INC.

By:

Date:

Name:

Title:

EXHIBIT A

Buyer agrees to exercise commercially reasonable efforts in the performance of distribution and marketing services on behalf of Seller during the Term. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein. Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement. In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller. In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1. Buyer shall perform the following marketing services:

(a) Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM. With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b) With respect to the publication referred to in Paragraph 1(a) above, Buyer will provide 2 pages for new product listing per month at no cost to Seller. For every 1 page that Seller buys in Buyers monthly catalog at normal rate card price, Buyer will provide 1 additional page to Seller at no cost.

(c) Seller may purchase additional advertising space in the publication referred to in Paragraph 1 (a) above at 15% off Buyer's published advertising rates.

(d) Buyer will enroll Seller into Buyers Final Order Cutoff (FOC) Program in February of 2019.

2. Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3. To the extent Buyer has a presence at major comic industry trade show events or book industry trade show events in North America (such as the San Diego Comic Con, New York Comic Con), Buyer, at no charge to Seller, shall display and promote selected Products as appropriate for the type of event.

4. To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

5. Buyer shall have the right to distribute any marketing or related materials

provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format and, further provided.

6. The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

EXHIBIT B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document. These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order. Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

In the event DCD accepts products on a returnable basis, DCD reserves the right, at its sole discretion, to withhold payment for such products, for up to 120 days from receipt of goods, and impose on Seller a processing fee of $100.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped. At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks. Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD. Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later. Any such reorders that do

not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty-one (21) days prior to said holiday or event. Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product. DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller.

DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the products to DCD as described in the Purchase Order; (ii) said products will be of good and salable quality; and are free of all liens, claims and encumbrances; (iii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or allegation of trademark, copyright or patent infringements, defects in material, workmanship or design, personal injury, property damage, unfair competition, obscenity, libel or other invaded right, either alone or in combination, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event a claim or allegation is made against DCD regarding any of the above or if Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund. Seller shall reimburse DCD for all costs incurred due to the above.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)". Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State. In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Seller shall not assign or transfer the Purchase Order or any part thereof or any right here/thereunder without DCD's prior written consent.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein. Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

EXHIBIT C

CREATIVE MIND ENERGY
SUMMARY OF KEY DEAL POINTS

|  | US & UK CBSM Market | US Book Market | UK Book Market |
|---|---|---|---|
| Product Category | All | All | All |
| Section 5 (a) Base Discount | 60.00% | 60.00% | 61.00% |
| Section 6 (a) Base Days | 30 | 60 | 60 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | n/a | n/a |
| Section 6 (a) Early Pay Days Seller's Option | n/a | n/a | n/a |
| Section 5 (a) Freight Rebate | 2.00% of retail | 2.00% of retail | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | 2.50% | 5.00% |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | 8.00% | 8.00% |
| Section 6 (a) Returns Cap | n/a | 30.00% | 30.00% |
| Section 6 (a) Returns Fees | n/a | 4.00% | 4.00% |