**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' MOTION (I) TO ENFORCE THE AUTOMATIC STAY (II) TO ENFORCE THE SALE ORDER AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby move (this "Motion") as follows:

### Preliminary Statement

The Debtors file this motion to address ongoing, knowing and willful violations of the automatic stay by Sparkle Pop, LLC ("Sparkle Pop"). As this Court is aware, the Debtors sold certain assets to Sparkle Pop pursuant to Court Order entered May 1, 2025. As Sparkle Pop was aware, and has acknowledged, consigned inventory was expressly excluded from the sale. Nevertheless, Sparkle Pop has repeatedly sold consigned inventory and – worse yet – has refused to remit the proceeds from such sales to the Debtors. Sparkle Pop has done this despite multiple demands from the Debtors that it stop all consigned inventory sales and turn over all sale proceeds to the Debtors. Sparkle Pop's brazen actions are clear violations of both the automatic stay and the Sparkle Pop asset purchase agreement that was approved by the Court.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

56100722.7

Without question, the consigned inventory constitutes property of the estate for the purpose of the automatic stay. As explained below, the Debtors' rights in the consigned inventory bring it, and the consigned inventory's sale proceeds, within the protections of the automatic stay.[2]

Sparkle Pop's brazen and unauthorized actions must be stopped. The Debtors accordingly file this motion to enforce the automatic stay and obtain redress for Sparkle Pop's actions, including actual damages, reimbursement of legal fees, and punitive damages. In the alternative, the Debtors also seek an order of the Court enforcing the Court's prior sale order.

## Relief Requested

1.      Pursuant to sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code") the Debtors request entry of the Proposed Order substantially in the form attached hereto to as **Exhibit A** (i) enforcing the automatic stay, or alternatively the Sale Order, by directing Sparkle Pop to immediately cease all sales of consigned inventory, (ii) ordering Sparkle Pop to immediately pay to the Debtors all proceeds from its unauthorized sale of consigned inventory and compensate the Debtors for any other actual damages resulting from Sparkle Pop's unauthorized actions, and (iii) directing Sparkle Pop to pay the Debtors' legal fees and costs in connection with this Motion; and (iv) imposing punitive damages against Sparkle Pop for its willful violations of the automatic stay.

## Jurisdiction and Venue

---

[2]      To be clear, the Debtors are not seeking by this Motion a determination of the issues raised by the Debtors' *Motion for Entry of an Order (I) Approving Procedures for Sales or Other Disposition of Consigned Inventory, (II) Approving the Sales or Other Disposition of Consigned Inventory, and (III) Granting Related Relief [D.I. 531]* (the "Consignment Motion") and/or the *Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 730].[2] The Debtors reserve all rights regarding such issues.

56100722.7

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested are sections 105(a) and 362 of the Bankruptcy Code.

### Background

4.      On January 14, 2025 (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are maintaining their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On January 29, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

5.      A description of the Debtors' business as of the Petition Date and the reasons for commencing these cases are set forth in the *Declaration of Robert Gorin in Support of Chapter 11 Petitions and First Day Relief* [D.I. 20] (the "First Day Declaration").

6.      As stated in the First Day Declaration, the Debtors' goal in these chapter 11 cases was to conduct a value-maximizing sale process of all or substantially all the Debtors' assets.

7.      As of the Petition Date, the Debtors maintained the majority of their inventory, including consigned inventory, at a 600,000 square foot warehouse (the "Warehouse") located in Olive Branch, Mississippi, from which they also conducted the majority of their distribution and fulfillment functions.

8.      On February 11, 2025, the Court entered an order establishing, among other things, bidding procedures and deadlines for the Debtors' post-petition sale process [D.I. 136] (the "Bid

3

56100722.7

Procedures Order"). On February 21, 2025, the Debtors filed a motion seeking authority to sell substantially all their assets free and clear of any liens, claims, interests and encumbrances, and to assume and assign executory contracts and unexpired leases in connection with the sale of the Debtors' assets [D.I. 168].

9.       In accordance with the Bid Procedures Order, the Debtors held an auction on March 24 and 25, 2025. Following such auction, the Debtors filed the *Notice of Designation of Successful Bidder and Back-Up Bidder* [D.I. 270] identifying Alliance Entertainment, LLC ("Alliance") as the successful bidder and a combination of Universal Distribution, LLC ("Universal") and Ad Populum, LLC (an affiliate of Sparkle Pop), as the back-up bidders.

10.       The sale to Alliance did not close and the Debtors pivoted to seeking authority to sell their assets to the designated back-up bidders. *See Debtors' Motion for Entry of Orders Authorizing the Sale of Substantially All of the Debtors' Assets to the Back-Up Bidders Pursuant to the Bidding Procedures Order* [D.I. 385].

11.       On May 1, 2025, the Court entered Orders approving the sale of substantially all the Debtors' assets to Universal and Sparkle Pop. *See* D.I. 407 & 408. As used herein, the term "Sparkle Pop Sale Order" refers to the Court's *Order (I) Approving Asset Purchase Agreement Among the Debtors and Sparkle Pop, LLC; (II) Approving Sale of Certain of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (III) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [D.I. 407].

12.     Closing on the Asset Purchase Agreement approved by the Sparkle Pop Sale Order (the "Sparkle Pop APA") occurred on or about May 15 or May 16, 2025.  *See* D.I. 500[3].  A true and correct copy of the Sparkle Pop APA is attached hereto as **Exhibit B**.

13.     As contemplated by section 9.22 of the Sparkle Pop APA, the Debtors entered into a Transition Services Agreement (the "TSA") with Sparkle Pop, which is attached hereto as **Exhibit C**.

14.     The TSA was designed to address various issues.  For example, it made certain employees of the Debtors available to Sparkle Pop – at Sparkle Pop's cost and subject to Sparkle Pop's exclusive oversight and direction – through the end of June 2025, to give Sparkle Pop time to transition these employees to Sparkle Pop's various employee benefit programs. It gave the Debtors ongoing access to certain accounting, IT and other systems.  Relevant to this Motion, it gave Sparkle Pop access to and use of the Warehouse, at Sparkle Pop's cost.  *See* TSA Exhibit A ¶ A-2. Because the consigned inventory was stored in the Warehouse, and because it is an Excluded Asset under the Sparkle Pop APA, the TSA requires the Debtors to;

> pay [Sparkle Pop] a reasonable fee (to be mutually agreed upon in writing) for the storage (including storage costs) of such [consigned] goods, as well as for any and all out of pocket costs and expenses incurred by [Sparkle Pop] in connection with the processing, packing, shipping, or disposal ("Processing") of such goods.

*See* TSA Exhibit at A, ¶ B-3.

15.     This provision in the TSA was designed to compensate Sparkle Pop for storing consigned inventory at the Warehouse, and for any costs incurred in handling consigned inventory at the direction of the Debtors.

---

[3]     The Debtors and Sparkle Pop have disagreed as to whether closing on the Sparkle Pop APA occurred on May 15 (Sparkle Pop's view) or May 16, 2025 (the Debtors' view).  The actual closing date has no impact on the relief sought by this Motion.

16.     The Debtors learned in early or mid-June, 2025 that Sparkle Pop was selling consigned inventory.  The Debtors promptly – and repeatedly – demanded that Sparkle Pop stop selling consigned inventory, and directed Sparkle Pop to remit the sale proceeds to the Debtors. Attached hereto as **Exhibit D** is a list prepared by Sparkle Pop that shows Sparkle Pop's sales of inventory from the closing on the Sparkle Pop APA through July 8, 2025, in the amount of $1,353,364.  Attached hereto as **Exhibit E** is a further list prepared by Sparkle Pop showing an additional $31,258.60 of consigned inventory that Sparkle Pop sold in the period from July 9th through July 18, 2025.[4]

17.     Although, based upon conversations with representatives of Sparkle Pop, the Debtors understood that Sparkle Pop had stopped selling consigned inventory, such sales continued.  Despite the Debtors' multiple demands, Sparkle Pop has continued to sell consigned inventory, and has continued to retain all sale proceeds.

18.     Indeed, upon information and belief, as of the filing of this Motion, Sparkle Pop continues to list consigned inventory on its website as being for sale.  This despite a specific inquiry from counsel to Sparkle Pop on June 24, 2025 as follows:  "If you do not want any [consigned goods] to be sold and you would like them removed from the website, please let us know." Debtors' counsel responded to this email the following day, as follows:  "Regarding consigned goods – they should not have been included on the website and should be removed promptly."

## Basis for Relief Requested

### I.     Sparkle Pop Has No Authority to Sell the Consigned Inventory.

---

[4]     There can be no serious dispute as to whether Sparkle Pop has sold consigned inventory after closing on the sale on the Sparkle Pop APA.  Attached hereto as **Exhibit F** is a spreadsheet, provided by Sparkle Pop in response to discovery promulgated by the Ad Hoc Committee, that shows Sparkle Pop's post-May 15, 2025 sales of consigned inventory provided by the members of the Ad Hoc Committee.

56100722.7

19.     The Sparkle Pop APA provides that, "[f]or purposes of clarification, goods held on consignment by or on behalf of Seller[5] as part of the Acquired Business shall not be considered Inventory for purposes of the Agreement." *See* D.I. 407, Exhibit A, ¶ 8.  In fact, Sparkle Pop, in its recent motion to quash a subpoena filed in this Court, concedes that the consigned inventory, "is an excluded asset under the APA." *See* D.I. 741 ¶ 7.  The Debtors have not authorized and have not directed Sparkle Pop to sell or otherwise move or handle the consigned inventory in any way.

## II.     The Consigned Inventory is Property of the Estate for Purposes of this Motion.

20.     The Bankruptcy Code broadly defines "property of the estate" to include, among other things "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1) & (7) *see also In re Whittaker, Clark, & Daniels*, 663 B.R. 1, 10 (Bankr. D.N.J. 2024) ("In determining what constitutes a debtor's property, courts look to § 541, which broadly defines property of the estate"). Property of estate includes legal or equitable interest "wherever located and by whomever held." 11 U.S.C. § 541(a). A debtor can have an equitable interest in property even if it does not own the property. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *8 (Bankr. D.N.J. June 29, 2006) ("the mere fact that title to a property is in the name of an investor does not mean that [the debtor] does not have an equitable interest in the property").

21.     Property of the estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). Property of the estate is not limited to a debtor's assets. *See In re Cybergenics Corp.*, 226 F.3d 237, 246 (3d Cir. 2000) ("['a debtor's] assets' and 'property of the estate' have different meanings, evidenced in part by the

---

[5]     Seller is defined as Diamond Comic Distributors, Inc., and Diamond Select Toys & Collectibles, LLC.

56100722.7

numerous provisions in the Bankruptcy Code that distinguish between property of the estate and property of the debtor, or refer to one but not the other"). Rather, property of the estate includes "every conceivable interest of the debtor in the estate; all forms of property whether tangible or intangible, personal or real, causes of action, leasehold interests, or possessory interests are encompassed." 2 W. Norton Jr., *Norton Bankruptcy Law and Practice* § 29.04 at 10 (1981) (hereinafter *Norton*).

22.    Courts have held that section 541 reaches future, nonpossessory, contingent, speculative, and derivative interests. *In re Anderson*, 128 B.R. 850, 853 (D.R.I. 1991); *see generally Norton*, supra, § 29.04–07; 4 L. King, R. D'Agostino, M. Cook, *Collier on Bankruptcy*, § 541.06–10 (15th ed. 1991). "[A]n interest is not outside [§ 541(a)(1)'s] reach because it is novel or contingent." *In re* Bracewell, 322 B.R. 698, 703 (M.D. Ga. 2005), *aff'd*, 454 F.3d 1234 (11th Cir. 2006), *citing Segal v. Rochelle*, 382 U.S. 375, 379 (1966). The purpose of section 541 is to "bring anything of value that the debtors have into the estate." *In re Bagen*, 186 B.R. 824, 828 (Bankr. S.D.N.Y. 1995), aff'd, 201 B.R. 642 (S.D.N.Y. 1996) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76 (1977)).

23.    The consigned inventory falls within the definition of "property of the estate" under section 541(a) of the Bankruptcy Code for at least two independent reasons.[6]  First, the Debtors are in possession of the consigned inventory and possession of property is an interest in property. *In re Connecticut Pizza, Inc*., 193 B.R. 217, 226-27 (Bankr. D. Md. 1996) (holding that a possessory interest is a property interest protected by the automatic stay); *In re Convenient Food Mart No. 144, Inc.*, 968 F.2d 592, 594 (6th Cir. 1992) (holding that a holdover tenant's possessory

---

[6]    In addition to the reasons articulated herein, the Debtors contend that the Consignment Inventory is property of the estate pursuant to section 544(a) of the Bankruptcy Code and section 9-319(a) of the Uniform Commercial Code. The Debtors intend to file one or more adversary proceedings to establish their rights to some or all of the Consignment Inventory, and reserve all rights regarding such matters.

56100722.7

right over real property fell within the scope of property of the estate under section 541). A right to possession of personal property is also a legally recognizable interest in property. *Kimbrough v. Giant Food Inc.*, 339 A.2d 688, 696 (1975) (stating that a homeowner had a right to bring a larceny suit against a third party over personal property that was left behind in its house because the homeowner had a legal right to possess the property over everyone except the true owner of the personal property). At a minimum, the Debtors have a right to possess the consigned inventory, which alone is a property interest such that the consigned inventory falls within the definition of "property of the estate" under section 541(a) of the Bankruptcy Code.

24.    Second, the Debtors have contractual rights over the consigned inventory. The Debtors have not rejected any of the contracts that govern the consigned inventory. Contractual rights alone create a sufficient interest to meet the definition of "property of the estate" under section 541(a) of the Bankruptcy Code. *In re Moffett*, 356 F.3d 518, 523 (4th Cir. 2004) (holding that a contractual right to redeem property was property of the estate subject to the automatic stay); *In re Allen*, 226 B.R. 857, 866 (Bankr. N.D. Ill. 1998) ("The Debtor's contract rights . . . whether then vested or contingent, became property of the estate under § 541(a)(1) on the petition filing date."); *In re Bagen*, 186 B.R. at 830 ("prepetition contingent contractual right to postpetition property is property of the estate pursuant to Code section 541(a)(1)"); *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay.").

25.    Courts within this district have held that a contractual right to use property is property of the estate under section 541 by stating:

> the Court concludes that the Debtor had a prepetition contractual right to use the online portal. That right existed under the parties' prepetition agreement, namely the Online Access Agreement. That right held value for the Debtor in the context of her transactions with

> the Servicer. Whether that right to use is characterized as a separate
> legal or equitable interest, or a right arising out of the Online Access
> Agreement, the result for purposes of section 541 of the Code is the
> same. The Debtor's right to use the online portal and her interests in
> the Online Access Agreement came into the bankruptcy estate.

*In re Klemkowski*, 664 B.R. 681, 695 (Bankr. D. Md. 2024).

26.     Pursuant to the contracts with their consignors, the Debtors have the right, among

other things, to store, market, and sell the consigned inventory, thus making the Debtors' rights to

the consigned inventory property of the estate under section 541(a)(1) of the Bankruptcy Code for

the purposes of the automatic stay.

27.     A possessory and contractual interest in the consigned inventory brings these assets

into the estate, which in turn is protected by the automatic stay.  Besides the plain language of the

applicable statutes, case law supports the conclusion that the Debtors have an interest in the

consigned inventory. 11 U.S.C. § 541(a)(1); *In re NJ Affordable Homes*, 2006 WL 2128624, at *8

("[A]lthough bare legal title to the disputed properties is in the name of people other than [the

debtor] … [the debtor] has, at the very least, an equitable interest in the properties sufficient to

make the real estate property of the bankruptcy estate under section 541 of the Bankruptcy Code.").

### III.     Sparkle Pop Violated and Continues to Violate Section 362(a)(3) of the Bankruptcy Code by Selling Property of the Estate Without Authority

28.     Immediately upon filing of a chapter 11 case, the automatic stay goes into effect

and prohibits, among other things, "any act to obtain possession of property of the estate or of

property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

Given its essential role in bankruptcy, courts do not lightly disregard the automatic stay.  *See*

*generally Penn Terra Ltd. v. Dep't of Env' Res., Com. of Pa*., 733 F.2d 267, 274 (3d Cir. 1984)

("The automatic stay … is not discretionary and must remain in effect unless and until the bankruptcy court later grants relief.").

29.     Additionally, the automatic stay is an "existing, statutorily-created injunction" that a debtor can enforce by motion. *In re Extraction Oil & Gas, Inc.*, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (citing *In re THG Holdings LLC*, 604 B.R. 154, 162 (Bankr. D. Del. 2019) (holding that it is unnecessary "to establish each of the factors necessary to impose a preliminary injunction because the Bankruptcy Code itself establishes the basis for the enforcement of the automatic stay.")); *In re Byrd*, No. 01-25006, 2007 WL 1485441, at *12 (Bankr. D. Md. May 18, 2007), *aff'd sub nom. Byrd v. Hoffman*, 417 B.R. 320 (D. Md. 2008) (enjoining a party from prosecuting state court proceedings against a debtor after a debtor filed a motion to enforce the automatic stay).

30.     Here, Sparkle Pop was a purchaser of the Debtors' assets; it obviously was aware of the Debtors' bankruptcy filings. Sparkle Pop negotiated and is a party to the Sparkle Pop APA, which expressly excluded consigned inventory from assets that were sold to Sparkle Pop.  Sparkle Pop negotiated and is a party to the TSA, which requires the Debtors to pay Sparkle Pop for the storage, costs, and expenses incurred for processing, shipping or otherwise handling the consigned inventory, all at the direction of the Debtors, because the consigned inventory was an Excluded Asset under the APA.  And, as previously noted, Sparkle Pop even concedes in a pleadings filed with this Court that the consigned inventory was an excluded asset in the Sparkle Pop APA.  *See* D.I. 741 ¶ 7.

31.     Sparkle Pop's past and ongoing sales of the consigned inventory, and its retention of the sale proceeds, are nothing short of knowing and willful violations of the automatic stay

because, among other things, they interfere with the Debtors' rights with respect to the consigned inventory.  Sparkle Pop's actions also violate the Sparkle Pop APA and Sale Order.

IV.    **Compensatory Damages, Punitive Damages, and Corrective Measures Must be Imposed Upon Sparkle Pop to Remedy the Willful Depletion of the Consigned Inventory**

32.    Section 105(a) of the Bankruptcy Code enables a court to enforce the statutory injunction of the automatic stay contained in section 362 of the Bankruptcy Code. *See* 11 U.S.C. § 105(a). The plain language of section 105(a) provides "that a court of bankruptcy has authority to issue any order necessary or appropriate to carry out the provisions of the bankruptcy code." *In re Walters*, 868 F.2d 665, 669 (4th Cir. 1989) (holding that bankruptcy courts have civil contempt powers under section 105(a)); *see also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006) ("bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates").

33.    Section 362(k)(1) of the Bankruptcy Code states that "an individual injured by any willful violation of a stay provided by this section *shall recover* actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1) (emphasis added). The Fourth Circuit Court of Appeals has confirmed that "individual" in section 362(k)(1) includes both natural individuals and corporate entities. *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292 (4th Cir. 1986) ("We agree that it seems unlikely that Congress meant to give a remedy only to individual debtors against those who willfully violate the automatic stay provisions of the Code as opposed to debtors which are corporations or other like entities.").

34.    Compensatory damages, attorneys' fees and punitive damages are all appropriate and necessary remedies for Sparkle Pop's willful violation of the automatic stay. *Id.* (affirming an

56100722.7

order enforcing the automatic stay and sanctioning a party for willfully violating the automatic stay after a debtor filed a motion to show cause). An award of compensatory damages, attorneys' fees and punitive damages is appropriate and necessary after "there is ample evidence in the record to support the conclusion that [the third party] knew of the pending petition and intentionally attempted to repossess the [property of the estate] in spite of it." *Id.* at 292-93. "Willfulness does not require the specific intent to violate the automatic stay, but only that the creditor knew of the stay and intentionally committed an act in violation of the stay." *In re Abell*, 549 B.R. 631, 676 (Bankr. D. Md. 2016); *In re Ojiegbe*, 512 B.R. 513, 520 (Bankr. D. Md. 2014). The Court is also within its authority to enforce the automatic stay and enjoin Sparkle Pop from further sales of the consigned inventory. *See In re Byrd*, 2007 WL 1485441, at *12 (enjoining a party from further violating the automatic stay by "taking any other action to assert dominion or control over the Property or to hinder or delay the sale of the Property as authorized by this Court.").

35.     Courts within the Fourth Circuit Court of Appeals are well within their rights to award damages for violating the automatic stay and impose sanctions for violating previously entered orders. *See Budget Serv. Co.*, 804 F.2d at 292 (affirming an award of compensatory damages, punitive damages, and attorneys' fees); *In re Walters*, 868 F.2d at 670 (affirming sanctioning a party for violating a previously entered order).

36.     Sparkle Pop's actions demonstrate a clear disregard for both the automatic stay and the Sparkle Pop Sale Order. The Debtors accordingly respectfully submit that this Court should award the Debtors (i) compensatory actual damages in the form of ordering Sparkle Pop to return all proceeds received from the sale of consigned inventory[7], (ii) the Debtors' legal fees and costs

---

[7]     These compensatory damages may also include additional amounts if and to the extent Sparkle Pop sold consigned inventory at discounted prices.

in connection with this Motion and the corresponding motion to shorten the notice of this Motion and (iii) punitive damages for Sparkle Pop's knowing and willful violation of the automatic stay.[8]

### Waiver of Memorandum of Law

37.     Pursuant to rule 9013-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland, the Debtors state that, in lieu of submitting a memorandum in support of this Motion, the Debtors will rely on the grounds and authorities set forth herein.

### Notice

38.     Notice of this Motion will be given to the following parties, or, in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Maryland; (ii) the Committee; (iii) counsel to JPMorgan Chase Bank, N.A.; (iv) the United States Attorney for the District of Maryland; (v) the offices of the attorneys general for the states in which the Debtors operate; (vi) the Internal Revenue Service; (vii) the United States Attorney general; (viii) the civil process clerk for the United States Attorney for the District of Maryland; (ix) Sparkle Pop; (x) counsel to the Ad Hoc Committee of Consignors; (xi) counsel to the Consignment Group; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and proper.

*[Remainder of Page Left Intentionally Blank]*

---

[8]     In the event the Court determines that Sparkle Pop's actions violated the Sparkle Pop Sale Order and/or the Sparkle Pop APA, the Debtors reserve the right to seek other forms of relief against Sparkle Pop and/or its affiliate, Ad Populum, LLC, including without limitation sanctions.

56100722.7

Dated: August 26, 2025

**SAUL EWING LLP**

By: */s/ Jordan D. Rosenfeld*
    Jordan D. Rosenfeld (MD Bar No. 13694)
    1001 Fleet Street, 9th Floor
    Baltimore, MD 21202
    Telephone: (410) 332-8600
    Email: jordan.rosenfeld@saul.com

    -and-

    Jeffrey C. Hampton (admitted *pro hac vice*)
    Adam H. Isenberg (admitted *pro hac vice*)
    Turner N. Falk (admitted *pro hac vice*)
    1500 Market Street, 38th Floor
    Philadelphia, PA 19102
    Telephone: (215) 972-7777
    Email: jeffrey.hampton@saul.com
        adam.isenberg@saul.com
        turner.falk@saul.com
    -and-

    Mark Minuti (admitted *pro hac vice*)
    Paige N. Topper (admitted *pro hac vice*)
    Nicholas Smargiassi (admitted *pro hac vice*)
    1201 N. Market Street, Suite 2300
    Wilmington, DE 19801
    Telephone: (302) 421-6800
    Email: mark.minuti@saul.com
        paige.topper@saul.com
        nicholas.smargiassi@saul.com

    *Counsel for Debtors and Debtors in Possession*

15