**Exhibit C**

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>") is entered into as of May 15, 2025, by and among Sparkle Pop, LLC ("<u>Purchaser</u>"), and Diamond Comic Distributors, Inc. and Diamond Select Toys & Collectibles, LLC (collectively, "<u>Seller</u>").  Purchaser and Seller are referred to herein individually as a "<u>Party</u>," and collectively as the "<u>Parties</u>."  Capitalized terms used but not defined herein have the meanings given to such terms in that certain Asset Purchase Agreement, dated as of April 27, 2025 by and among Purchaser and Seller and approved by the United States Bankruptcy Court for the District of Maryland by Order entered on or about May 1, 2025 (as amended, the "<u>Purchase Agreement</u>").  Ad Populum, LLC, a Delaware limited liability company ("<u>Ad Populum</u>"), executes this Agreement pursuant to Section 6.18 hereof.

### RECITALS

WHEREAS, pursuant to the Purchase Agreement, Purchaser purchased from Seller the Acquired Assets; and

WHEREAS, Purchaser and Seller have agreed to provide certain Services (defined below) to each other as described herein following the Closing Date, pursuant to and in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

### ARTICLE I
### SERVICES

1.1    <u>Services</u>.

(a)    Subject to the terms and conditions of this Agreement, from and after the Closing Date and until the termination or expiration of this Agreement pursuant to <u>Article III</u> below:

(i)    Seller shall provide to Purchaser, in consideration for Purchaser's performance of its obligations under <u>Section 4.2</u> of this Agreement (the "<u>Seller Services</u>"):

(A)    the services of Seller's employees and independent contractors to the extent listed on <u>Exhibit A</u> hereto (the "<u>Designated Employees</u>"), in accordance with the terms and conditions and for the periods set forth in <u>Exhibit A</u> hereto, and

(B)    after the Closing Date, Seller shall conduct such portions of its Diamond Business Lines as identified by Purchaser in writing on or about the Closing Date for the account of, and at the reasonable direction of, Purchaser in the ordinary course of business, in accordance with the terms and conditions and for the periods set forth in <u>Exhibit A</u>. For purposes of clarification, Purchaser shall not order, purchase, procure, or otherwise

acquire inventory in the name of the Seller unless Purchaser, prior to directing Seller to order any such inventory, obtains Seller's prior written consent (including for the amount of such purchase of inventory) and prefunds with the Seller the full amount necessary to purchase and deliver such inventory.

(ii)    Purchaser shall provide, and as applicable, in accordance with Exhibit B the services and tasks described on Exhibit B attached hereto (the "Purchaser Services," and together with the Seller Services, the "Services"), in accordance with the terms and conditions and for the periods set forth therein and herein.

(b)    Each of the time periods set forth in Exhibit A or Exhibit B, as applicable, shall be referred to herein as a "Transition Period."  The term "Service Recipient" shall refer to Purchaser, in the case of Seller Services, and to Seller, in the case of Purchaser Services.  The term "Service Provider" shall refer to Seller, in the case of Seller Services, and to Purchaser, in the case of the Purchaser Services.

(c)    Each Party agrees to provide reasonable cooperation and to use good faith efforts to assist the other Parties, and any third parties reasonably selected by such Parties, to provide the Services in a manner designed (to the extent reasonably possible) to minimize disruptions to either of Seller's or Purchaser's respective business operations. Such cooperation shall include, but not be limited to, timely provision of information, access to personnel, systems, and facilities, and prompt decision-making and approvals as reasonably requested by the other Party.

(d)    Each Party shall use its commercially reasonable efforts to take all such actions as may be reasonably necessary to enable the other Parties to provide the Services in a timely manner, including, without limitation, providing access, necessary information, and specific authorizations and approvals to the other Parties.

(e)    Each Party shall, and shall use commercially reasonable efforts to observe and comply in all material respects with any and all applicable laws, contractual obligations, and any confidentiality, security, privacy or other policies governing or binding such Party, relating to such Party's performance of the Services.

(f)    Each Party shall use its commercially reasonable efforts to commence providing the Services upon the occurrence of the Closing Date.

1.2    Service Coordinators.  Each of Seller and Purchaser shall nominate a representative to act as the primary contact person with respect to the provision of the Services (each such person, a "Service Coordinator").  The Service Coordinator nominated by Purchaser shall be a managerial level employee of Purchaser.  The initial Service Coordinators shall be Robert Gorin for Seller and Steven Bieg for Purchaser, and each of their respective phone, facsimile numbers, and email addresses are set forth on Schedule 1.2 attached hereto. Each of Seller and Purchaser may, in their sole discretion and in compliance with this Agreement, change their Service Coordinator from time to time by providing written notice to the other Party of such change and the relevant contact information for such new Service Coordinator at least five (5) Business Days prior to such change

A-2

taking effect.  Unless Seller and Purchaser otherwise agree in writing, all material communications relating to the Services or this Agreement, including, without limitation, consents, dispute notices, notices regarding transition of Services, and service disruptions, shall be directed to the Service Coordinators in accordance with this Agreement.

1.3    <u>Personnel, Outside Vendors, Third Party Providers</u>.  In providing the Purchaser Services, Purchaser shall use its commercially reasonable efforts to make available to Seller the personnel of the Purchaser providing the applicable Purchaser Services as necessary to provide such Purchaser Services including, without limitation, any personnel specifically identified on <u>Exhibit B</u> hereto with respect to such Service (but only to the extent such personnel remain employed by Purchaser). In providing the Seller Services, Seller shall use its commercially reasonable efforts to make available to Purchaser the personnel of the Seller providing the applicable Seller Services as necessary to provide such Seller Services including, without limitation, any personnel specifically identified on <u>Exhibit A</u> hereto with respect to such Service (but only to the extent such personnel remain employed by Seller).  Each Service Party shall remain solely responsible for the proper performance of all Persons engaged by such Service Party to perform the Services, and, except as provided in <u>Section 4.3</u>, no Service Recipient shall be liable for the actions or inactions of any Persons engaged by the Service Provider to render the Services except to the extent that such liability is caused by the negligence, fraud, bad faith, or willful misconduct of such Service Recipient.

1.4    <u>No Additional Services</u>.  No implied duties or obligations shall be read into this Agreement, other than the implied duty of good faith and fair dealing, and the Service Provider shall have no responsibility under this Agreement to provide any services that are not expressly set out in <u>Exhibit A </u>or <u>Exhibit B</u>, as applicable. Notwithstanding the foregoing, for a period of ninety (90) days following the Closing Date, either Party may propose in writing to add omitted or additional services to <u>Exhibit A</u> or <u>Exhibit B</u>, as applicable, that are necessary for the operation or transition of the Business. The Parties shall negotiate in good faith upon the scope, timing, and cost (if any) of such additional or omitted services, and upon mutual agreement, the applicable Exhibit shall be amended in writing to reflect such changes. Any such amendment shall be signed by both Parties and shall become part of this Agreement.

1.5    <u>Purchase Agreement</u>.  For the avoidance of doubt, nothing contained herein shall limit the obligations of the Parties pursuant to the Purchase Agreement.

## ARTICLE II

## QUALITY OF SERVICES; SPECIFIC PERFORMANCE

2.1    <u>Quality of Services</u>.

(a)    Each Service Provider represents that it will perform the Services in a timely, efficient, workmanlike, and commercially reasonable manner in all material respects, and, with respect to specific Services, in accordance with the standards, if any, set forth in <u>Exhibit A </u>or <u>Exhibit B</u> attached hereto, as applicable, with respect to such Services.  Without limiting the generality of the foregoing, to the extent reasonably practicable and, in the case of Seller, taking into account the changes in Seller's Business as a result of the Seller's Chapter 11 Case and the

A-3

consummation of transactions contemplated by the Purchase Agreement, the Seller Services will be provided at the same general level of service, with the same degree of care, with similar response times, to the same extent, and in a manner similar in all material respects to the manner in which such Seller Services historically have been provided to or by Seller's Business or operations, as applicable, unless a higher standard for any particular Service is set forth in Exhibit A or Exhibit B attached hereto, as applicable.

(b)     To the extent reasonably practicable, each Service Provider agrees to pass through to the Service Recipient any warranties provided by third party service providers or subcontractors employed by the Service Provider to provide the Services.

(c)     In the event of a material breach of any obligation under this Agreement by Seller or Purchaser, the applicable Service Coordinator shall provide prompt written notice (a "Default Notice") to the breaching Party setting forth in reasonable detail the nature and extent of the breach. The breaching Party will then have a period of five (5) Business Days following delivery of such Default Notice to the nonperforming Party in which to cure such breach.

2.2     Specific Performance. The Parties acknowledge and agree that the other Parties may be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that any Party may have under law or equity, a Party shall be entitled to seek injunctive relief to prevent breaches of the provisions of this Agreement and to enforce this Agreement and the terms and provisions hereof.

## ARTICLE III

## TERM AND TERMINATION

3.1     Term. Unless earlier terminated pursuant to Section 3.2, with respect to each of the Services (or any portion thereof), the term of this Agreement as related to the applicable Services (or any portion thereof) will be for a period commencing as of the Closing Date and continuing until the earlier of (i) date on which the applicable Services (or portion thereof) are to be provided, as set forth in Exhibit A or Exhibit B attached hereto, as applicable or (ii) June 30, 2025 (the "Services Termination Date"), provided, however, that the Services Termination Date will be extended if and to the extent the Seller's secured creditor, JPMorgan Chase, N.A., continues to fund the Seller's chapter 11 cases (the "Extended Services Termination Date").

3.2     Early Termination. Each of the Parties shall have the right to terminate some or all of the Services provided to such terminating Party as set forth in the Exhibits to this Agreement upon five (5) Business Days' prior notice to Service Provider. Such notice may be provided by email at the email addresses set forth in Section 6.6 hereof.

3.3     Survival of Certain Obligations. This Article III and Section 4.3, Section 4.4, and Article VI shall survive the termination or expiration of this Agreement. Notwithstanding the foregoing, all of Seller's and Purchaser's obligations hereunder, including, without limitation, pursuant to the Sections and Articles referenced in the preceding sentence, shall terminate effective on the date the Bankruptcy Court enters an order closing the Chapter 11 Case and the effectiveness

A-4

of this Agreement shall not be a basis for any Party to argue that such Chapter 11 Case, should not be closed.

3.4    Extension of Services. Notwithstanding anything to the contrary in this Agreement or in Exhibit A, if the Service Recipient notifies the Service Provider in writing prior to the expiration of the applicable time period set forth in Exhibit A that continued provision of any Service is reasonably necessary for the orderly transition or operation of the Business, the Service Provider shall continue to provide such Service(s) for such additional period as may be reasonably requested by the Service Recipient, but in no event beyond the earliest to occur of (i) the effective date of a confirmed plan of liquidation or reorganization filed or to be filed by the Sellers in the Chapter 11 Case, (ii) December 31, 2025 or (iii) the Services Termination Date or, if applicable, the Extended Services Termination Date.

## ARTICLE IV

## CONSIDERATION; PAYMENT; ESCROW

4.1    Consideration for Purchaser Services.    The sole consideration for Purchaser providing the Purchaser Services shall be the provision of the Seller Services by Seller Service Providers to Purchaser.  For the avoidance of doubt, the Purchaser Services shall be provided at no cost and expense to Seller, except as otherwise set forth on Exhibit B.

4.2    Payment for Seller Services.

(a)    For purposes of this Agreement, the term "Actual Seller Expenses" means the actual direct and indirect and documented fees, costs and expenses (without mark-up, and excluding overhead) incurred by or on behalf of Seller for, in connection with or related to, the provision of the Seller Services in accordance with, and for the time periods set forth in Exhibit A. Purchaser acknowledges and agrees that the Actual Seller Expenses include, without limitation: (i) the wages or salary, commissions, incentives, insurance (including without limitation workers' compensation and liability insurance), health (including dental, prescription and vision) and retirement and other benefits, all related funding obligations required pursuant to Seller's employee benefit plans, and all employment and other taxes as required by law, in each case regarding Seller's employees who provide the Seller Services; and (ii) any and all applicable sales, use, property, gross receipts, value added, or similar tax and/or charge that is imposed as a result of, or measured by, any Seller Services rendered hereunder unless covered by an exemption certificate.  For the avoidance of doubt, Actual Seller Expenses shall include, without limitation, any increased employee benefit costs incurred by Seller due to the delay in terminating Seller's employee benefit plans as a result of or in connection with COBRA or otherwise, and shall not include attorneys' fees or professional services fees incurred by the Sellers in connection with the Chapter 11 Cases or this Agreement.  Purchaser acknowledges that Seller does not have funds available other than the funds provided by Purchaser to pay, satisfy or otherwise meet any financial obligations incurred by Seller in providing the Seller Services hereunder and that all such funding for such amounts shall be provided solely by Purchaser.  Each Party acknowledges that there shall be no setoff and/or recoupment for amounts payable hereunder.  For the avoidance of doubt, the term "Actual Seller Expenses" shall not include any fees or costs of the Seller's attorneys',

investment bankers, financial advisor, Chief Restructuring Officers or any professionals retained by the Official Committee of Unsecured Creditors.

(b)     Concurrently with the execution of this Agreement, the Parties acknowledge that Purchaser has paid to Seller the sum of $350,000 (the "Seller Service Front End Prepayment Amount").  On each Monday commencing with the calendar week following the effective date of this Agreement and until the expiration of the term of this Agreement, Purchaser shall make a further payment (each, a "Seller Service Weekly Payment") to Seller in the amount of $600,000 (or such lesser or greater amount as Purchaser Services Coordinator and Seller Services Coordinator mutually agree in writing represents a reasonable estimate of the Actual Seller Expenses that are expected to be incurred by Seller for the provision of Seller Services with respect to the calendar week in question).  At any time, the aggregate of the Seller Service Front End Prepayment Amount and the Seller Service Weekly Payments, less the aggregate of Actual Seller Expenses incurred by or on behalf of Seller as of that time, equal the "Prepaid Surplus".  For purposes of this Agreement, the "Shortfall" shall mean the aggregate amount of any Actual Seller Expenses incurred by or on behalf of Seller that cannot be satisfied out of the Prepaid Surplus.  If Seller incurs or expects to incur any Actual Seller Expenses that have resulted or would result in a Shortfall, Seller shall forward to the Purchaser Services Coordinator all invoices or statements for such fees, costs and expenses together with a written statement setting forth the amounts constituting Shortfall, whereupon Purchaser shall, within five (5) calendar days after the delivery of such invoices or statements and at the direction of the Seller Services Coordinator, either reimburse Seller for the applicable amount of the Shortfall and/or directly pay to the applicable Governmental Authority or other third parties, on Seller's behalf, in either case out of Purchaser's funds, such fees, costs and expenses which are included in the Shortfall.  Upon Purchaser's payment of any amounts to an applicable Governmental Authority or third party pursuant to this Section 4.2, Purchaser shall furnish the Seller Service Provider with reasonable documentary evidence of such payment.  In the event that Purchaser in good faith and upon reasonable grounds disputes an invoice submitted by Seller, Purchaser may withhold payment of any amount subject to dispute; provided, however, that (i) Purchaser shall continue to pay all undisputed amounts in accordance with the terms hereof, and (ii) Purchaser must notify Seller, in writing, of any disputed amounts and the reason for any dispute by the later of (i) the due date for payment of the invoice containing any disputed charges, and (ii) five (5) Business Days after receipt by Purchaser of such invoice.  In the event of a dispute regarding the amount of any invoice, the Parties will use all reasonable efforts to resolve such dispute within ten (10) calendar days after Purchaser provides written notification of such dispute to Seller.  Seller will provide full supporting documentation concerning any disputed amount or invoice within ten (10) calendar days after written notification of the dispute.  Unpaid amounts that are under good faith dispute will not be considered a basis for termination hereunder.  To the extent that a dispute regarding the amount of any amount recoverable by Seller against Purchaser under this Section 4.2 cannot be resolved pursuant to this Section 4.2, the dispute will be adjudicated as set forth in Sections 6.6, 6.7 and 6.8 hereto.  Purchaser acknowledges and agrees that certain of the costs and expenses to which Seller may become subject on account of providing the Seller Services may come to light long after the Seller Services in question are provided, and that the determined amounts of the Seller Service Prepayment Amount and the Seller Service Weekly Payment are intended to allow for Seller to maintain a reasonable reserve against such long-tail expenses; accordingly Purchaser has no right of, or expectation of, recovering any portion of the Prepaid Surplus from Seller.

A-6

(c)    Notwithstanding anything herein to the contrary, Seller shall have the right to terminate its provision of Services to Purchaser if (i) Purchaser fails to timely comply with its payment obligations set forth in <u>Section 4</u> hereof or (ii) if Seller, in its sole discretion, believes that Purchaser has asserted challenges to one or more invoices submitted by Seller in accordance with <u>Section 4.2(b)</u> hereof other than in good faith.

4.3    <u>Indemnity</u>.  Other than with respect to claims arising from Seller's or Seller Service Providers' negligence, willful misconduct, fraud, failure to comply with applicable laws, intellectual property infringement (except with respect to any intellectual property infringement occurring at the direction of Purchaser) or breach of this Agreement, Purchaser shall defend, indemnify and hold harmless Seller, all Affiliates of Seller, and their respective agents and representatives from and against any third party penalties, fines, costs, expenses (including reasonable attorneys' fees), losses, damages, or liabilities ("<u>Damages</u>") alleged by a third party against the Seller, all Affiliates of Seller, and their agents and representatives to the extent arising directly out of or resulting from the Seller's provision of the Sellers Services to or for the benefit of Purchaser.

4.4    <u>Intellectual Property</u>.

(a)    Service Recipient hereby grants to Service Provider, the other Service Provider parties and any third-party service provider, a limited nontransferable, revocable, royalty-free, fully paid-up license, without the right to sublicense, for the Term to use the intellectual property owned by Service Recipient or any of the other Service Recipient Parties to the extent necessary for Service Provider, the other Service Provider parties and any third- party service provider, to perform the Services and all other obligations hereunder.  All right, title and interest in and to the intellectual property owned by Service Recipient and not expressly granted herein are reserved by Service Recipient.

(b)    As between the Parties, each Party shall retain ownership of all right, title and interest in and to the intellectual property owned or controlled by it immediately after the Effective Date. Subject to <u>Section 4.4(a)</u> above and any other written agreement between the Parties, neither Party shall acquire any right, title or interest in or to such intellectual property of the other Party.

**ARTICLE V**

**RECORDS; ACCESS**

5.1    <u>Separation of Books and Records</u>. Service Provider shall use its commercially reasonable efforts to cause the books and records related to the Services ("<u>Service Records</u>") to be maintained separately from the books and records and accounts of any other business of Service Provider or the other Service Provider parties as promptly as practicable following the Closing (it being understood that such Service Records may be maintained on the same server that the books and records and accounts of any other business of Service Provider or the other Service Provider parties are maintained on).

A-7

5.2     Review by Recipient. In order to confirm the accuracy of Service Records, for a period of six (6) months after the termination or expiration of this Agreement, Service Recipient shall have the right, at its own cost and expense, itself or through a designated third-party reviewer, upon reasonable advance written notice to Service Provider and at a mutually agreed time during Service Provider's regular business hours, to review the Service Records and meet with applicable management personnel of Service Provider who are involved in the provision of Services; provided, that Service Recipient's exercise of the foregoing rights shall be conducted so as to minimize any interference with (a) any audit or review of the consolidated financial statements of Service Provider for any fiscal year or fiscal quarter of Service Provider and (b) Service Provider's ongoing operations.

## ARTICLE VI

## MISCELLANEOUS

6.1     No Representations or Warranties.

(a)     THE PARTIES MAKE NO REPRESENTATIONS OR WARRANTIES EXCEPT THOSE EXPRESSLY STATED IN THE PURCHASE AGREEMENT, THIS AGREEMENT, AND THE EXHIBITS, ANNEXES, AND SCHEDULES THERETO AND HERETO.

(b)     EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY STATED IN THE PURCHASE AGREEMENT, THIS AGREEMENT, AND THE EXHIBITS, ANNEXES, AND SCHEDULES THERETO AND HERETO, EACH PARTY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES, REPRESENTATIONS, AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, TO THE FULL EXTENT PERMISSIBLE, INCLUDING, WITHOUT LIMITATION, AVAILABILITY, ACCURACY, COMPLETENESS, CORRECTNESS, RELIABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT WITH RESPECT TO ANY OF THE SERVICES, GOODS, OR PRODUCTS FURNISHED PURSUANT TO THIS AGREEMENT. Without limiting the generality of the foregoing, Purchaser disclaims all liabilities in connection with its processing of information and making filings for the benefit of Seller as described in Exhibit B, and Seller shall at all times remain fully responsible and liable for the operations of its Business, whether such operations are performed by Seller, Purchaser, and/or third parties.

6.2     Liability Limitation.  IN NO EVENT SHALL ANY PARTY OR ITS AFFILIATES OR SUPPLIERS BE LIABLE FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR INDIRECT DAMAGES, WHETHER IN CONTRACT, TORT OR OTHERWISE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF SUCH CLAIM. This Section 6.2 will not limit a Party's liability for fraud, gross negligence or willful misconduct, unless otherwise stated in this Agreement.

6.3     Confidentiality.  A Party may provide (such providing Party, the "Disclosing Party") to the other Party (such receiving Party, the "Receiving Party") certain confidential,

A-8

proprietary and trade secret business and technical information in connection with the performance of this Agreement ("Confidential Information"). All information provided in connection with this Agreement by a Disclosing Party shall be presumed to be Confidential Information; provided that, "Confidential Information" shall not include (a) information that was, at the time of disclosure, or thereafter became, generally available to and known by the public other than as a result, directly or indirectly, of any breach of this Agreement by the Receiving Party or any of its Representatives; (b) was, at the time of disclosure, or thereafter became, available to the Receiving Party on a non-confidential basis from a third-party source that, at the time of the third-party disclosure, had the right to disclose the information without a confidentiality obligation; (c) was known by, or in the possession of the Receiving Party or its Representatives before being disclosed by or on behalf of the Disclosing Party; or (d) was, at the time of disclosure, or is thereafter independently developed, by the Receiving Party without reference to, or use of, any of the Disclosing Party's Confidential Information. Receiving Party shall preserve the confidentiality of all Confidential Information that is provided by a Disclosing Party in connection with this Agreement, and shall not, without the prior written consent of such Disclosing Party, disclose, display or make available to any Person, or use for its own or any other Person's benefit, other than as necessary in performance of its obligations under this Agreement, any Confidential Information of such Disclosing Party; provided, that a Receiving Party may disclose such portion of the Confidential Information relating to such Disclosing Party to the extent, but only to the extent, that the Receiving Party reasonably believes that such disclosure is required in connection with litigation between the Parties hereto relating directly to this Agreement, in connection with the Bankruptcy Case, under applicable Law, pursuant to any judgment or order or as a consequence of the rules of a securities exchange; provided, further, that the Receiving Party first notifies the Disclosing Party of such requirement and allows the Disclosing Party a reasonable opportunity, at its sole cost and expense, to seek a protective order or other appropriate remedy to prevent such disclosure if permitted by applicable Law. The Parties shall exercise a commercially reasonable standard of care to safeguard all Confidential Information of a Disclosing Party against improper disclosure or use. The Parties acknowledge that money damages would not be a sufficient remedy for any breach of the provisions of this Section 6.3 and that the non-breaching party shall be entitled to seek equitable relief in a court of law in the event of, or to prevent, a breach or threatened breach of this Section 6.3.

6.4    Entire Agreement.  This Agreement, together with any annexes, exhibits, and schedules hereto, and the Purchase Agreement constitute the entire agreement between the Parties regarding the Services and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they relate in any way to the Services.  For the avoidance of doubt, the Parties acknowledge and agree that this Agreement is in furtherance, and not in limitation, of the rights afforded to the Parties under the Purchase Agreement.

6.5    Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of Purchaser and Seller except as expressly provided herein.  No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend, modify, or supplement any provision of this Agreement.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or

A-9

affect, in any way, any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified pursuant to the first sentence of this <u>Section 6.5</u> except as otherwise provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

6.6    <u>Notices</u>.    All notices, requests, demands, claims, and other communications hereunder will be in writing except as expressly provided herein. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); or (c) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:

> The Seller Services Coordinator at the address set forth on <u>Schedule 1.2</u> or to such replacement Seller Services Coordinator as may be appointed by Seller

with a copy (which shall not constitute notice) to:

> Saul Ewing LLP
> Attn: Jeffrey C. Hampton, Esq.
> Adam H. Isenberg, Esq.
> Centre Square West
> 1500 Market Street, 38th Floor
> Philadelphia, PA 19102-2186
> Email: Jeffrey.Hampton@saul.com
> Email: Adam.Isenberg@saul.com

If to Purchaser:

> The Purchaser Services Coordinator at the address set forth on <u>Schedule 1.2</u> or to such replacement Purchaser Services Coordinator as may be appointed by Purchaser

with a copy (which shall not constitute notice) to:

> DLA Piper LLP
> 1251 Avenue of the Americas
> New York, NY 10020
> Attn: Richard A. Chesley; Jamila Justine Willis

A-10

Email:  Richard.Chesley@us.dlapiper.com
Email:  Jamila.Willis@us.dlapiper.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 6.6.

6.7    Governing Law; Jurisdiction.  This Agreement shall in all aspects be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, except to the extent that the laws are superseded by the Bankruptcy Code, and the obligations, rights, and remedies of the Parties shall be determined in accordance with such laws. The Parties irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement or the transactions contemplated hereby, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  If the Bankruptcy Court is unwilling or unable to hear any matter arising under or in connection with this Agreement or the transactions contemplated hereby, such matter shall be brought in any state or local court having competent jurisdiction in Maryland, and by execution and delivery of this Agreement, each of the Parties consents to the exclusive jurisdiction of those courts.  Each of the Parties irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, that it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated in this Agreement.

6.8    Dispute Resolution. Except as otherwise expressly set forth herein, any dispute, controversy, or claim arising out of or relating to this Agreement, including the Exhibits hereto, shall be resolved in accordance with the dispute resolution procedures set forth in the Purchase Agreement. In the event of any conflict between this Agreement and the Purchase Agreement, or where this Agreement is silent, the terms of the Purchase Agreement shall govern.

6.9    Consent to Service of Process.  Each of the Parties hereby consents to process being served by any Party in any suit, action, or proceeding by delivery of a copy thereof in accordance with the provisions of Section 6.6.

6.10    Waivers of Jury Trial.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.

6.11    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and

A-11

the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, in each case, so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

6.12    <u>Successors and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns, including, without limitation, any subsequent trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code, responsible Person, liquidating trust or trustee, or similar entity or representative of Seller or Seller's estates appointed in connection with the Chapter 11 Case.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties. Notwithstanding anything herein to the contrary, the rights and interests of Seller under this Agreement shall inure to the benefit of any trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code and/or any responsible Person, liquidating trust or trustee, or similar entity or representative appointed as a successor to Seller pursuant to a confirmed plan under chapter 11 of the Bankruptcy Code.

6.13    <u>Headings</u>.  The Section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

6.14    <u>Counterparts; Facsimile or Email Signatures</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies or pdf, each of which shall be deemed an original.

6.15    <u>No Third Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

6.16    <u>Relationship of the Parties</u>.  It is expressly understood and agreed that in rendering the Services hereunder, all of the Parties are acting as independent contractors and that this Agreement does not make any Person providing Services an employee, agent, or other representative of any other Party for any purpose whatsoever.  No Party has the right or authority to enter into any contract, warranty, guarantee, or other undertaking in the name or for the account of any other Party, or to assume or create any obligation or liability of any kind, express or implied, on behalf of any other party, or to bind any other party in any manner whatsoever, or to hold itself out as having any right, power, or authority to create any such obligation or liability on behalf of any other party or to bind any other party in any manner whatsoever (except as to any actions taken by a party at the express written request and direction of any other party); <u>provided</u>, <u>however</u>, that, for purposes of this Agreement, Purchaser and Seller shall be entitled to take all of the foregoing actions on behalf of any Purchaser Service Provider and any Seller Service Provider, respectively. No employee, contractor, or subcontractor of any Party shall be deemed to be an employee, contractor or subcontractor of any other Party.

6.17    <u>General Limitation of Obligations</u>. No implied duties or obligations shall be read into this Agreement, other than the implied duty of good faith and fair dealing. Purchaser shall have no obligation to provide any services, access, or resources to Seller except as expressly set

forth in this Agreement. Any services provided by Purchaser beyond those expressly required herein shall be at Purchaser's sole election and may be terminated at any time upon written notice. Seller shall have no obligation to provide any services, access, or resources to Purchaser except as expressly set forth in this Agreement. Any services provided by Seller beyond those expressly required herein shall be at Seller's sole election and may be terminated at any time upon written notice.

6.18    Ad Populum.  By its signature below, Ad Populum assumes all of Purchaser's obligations under this Agreement and agrees that it shall perform all such obligations in the event Purchaser does not perform any such obligations.  Purchaser and Ad Populum shall be jointly liable for the performance of the obligations of Purchaser under this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first set forth above.

**PURCHASER**:

**SPARKLE POP, LLC**
A Delaware limited liability company

By: _Joel Weinshanker_
Name:  Joel Weinshanker
Title:  Manager

**FOR PURPOSES OF SECTION  6.18 OF THIS AGREEMENT:**

**AD POPULUM, LLC**
a Delaware limited liability company

By: _Joel Weinshanker_
Name:  Joel Weinshanker
Title:  Manager

*[Signature Page to Transition Services Agreement]*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first set forth above.

**<u>PURCHASER</u>**:

**SPARKLE POP, LLC**
A Delaware limited liability company

By: _____
Name:  Joel Weinshanker
Title:  Manager

**FOR PURPOSES OF SECTION  6.18 OF THIS AGREEMENT:**

**AD POPULUM, LLC**
a Delaware limited liability company

By: _____
Name:  Joel Weinshanker
Title:  Manager

*[Signature Page to Transition Services Agreement]*

**SELLER**:

**DIAMOND COMIC DISTRIBUTORS, INC**
A Maryland corporation

By: _Robert Ge_____
Name:  Robert Gorin
Title:  Chief Restructuring Officer


**DIAMOND SELECT TOYS AND COLLECTIBLES, LLC INC**
A Maryland corporation

By: _Robert Ge_____
Name:  Robert Gorin
Title:  Chief Restructuring Officer

*[Signature Page to Transition Services Agreement]*

**<u>SELLER</u>**:

**DIAMOND COMIC DISTRIBUTORS, INC**
A Maryland corporation


By: _____
Name:  Robert Gorin
Title:  Chief Restructuring Officer


**DIAMOND SELECT TOYS AND COLLECTIBLES, LLC INC**
A Maryland corporation


By: _____
Name:  Robert Gorin
Title:  Chief Restructuring Officer

*[Signature Page to Transition Services Agreement]*

## EXHIBIT A

## SERVICES PROVIDED BY SELLER AND/OR ITS SUCCESSORS TO BUYER

The time period for the Services provided by Seller and/or its successors shall be from and after the Closing until the time period set forth in the chart below in the column "Time Period", subject to the provisions of Article III of this Agreement.  For the avoidance of doubt, in the event of any discrepancy between the applicable Time Period as set forth of this Exhibit A and the provisions of Article III of this Agreement, the provisions of Article III shall control.  Purchaser shall provide Seller with no less than five (5) calendar days' written notice in accordance with the Agreement of any intent to terminate early any portion of the Seller Services set forth herein earlier than the period set forth under the applicable Time Period.   For purposes of clarification, and notwithstanding any provisions in Exhibit A here to the contrary, Purchaser shall not order, purchase, procure, or otherwise acquire inventory in the name of the Seller unless Purchaser, prior to directing Seller to order any such inventory, obtains Seller's prior written consent (including for the amount of such purchase of inventory) and prefunds with the Seller the full amount necessary to purchaser and deliver such inventory.

| CATEGORY | DESCRIPTION | TIME PERIOD |
|---|---|---|
| Designated Employees | Seller shall continue to employ all Designated Employees.   Designated Employees shall provide services to Purchaser during the applicable Time Period, it being understood that Purchaser shall become the employer of the Designated Employees at the end of the Time Period.   Purchaser shall be solely responsible for directing the actions of all Designated Employees. Seller shall make legal personnel available to provide information on intellectual property transfer and other legal issues.   For the avoidance of doubt, Designated Employees shall remain employees of Seller during the Transition Period. Purchaser shall have no employment obligations with respect to such employees, and may direct Seller to terminate the provision of services by any Designated Employee at any time upon five (5) Business Days' written notice. Nothing herein shall obligate Purchaser to retain any Designated Employee beyond the | Until the earlier to occur of (i) Services Termination Date or (ii) the Extended Services Termination Date. |

| CATEGORY | DESCRIPTION | TIME PERIOD |
|---|---|---|
| | Transition Period or to assume any employment-related liabilities. | |
| General Business operations (Diamond Business Lines only) | Seller shall conduct the Diamond Business Lines after the Closing Date from funds provided solely by Purchaser for the account of, and at the reasonable direction of, Purchaser in the ordinary course of business to the extent practicable. This shall include but not be limited to proving the following services:<br><br>A. Operating the following systems relating to such portions of the Diamond Business Lines of Seller as identified by Purchaser in writing on about the Closing Date solely from funds provided by Purchaser:<br><br>• A/P systems<br><br>• A/R systems<br><br>• HR systems<br><br>• Order/Manufacturing/Shipping Systems<br><br>• Warehouse Management & Control Systems Contract Database/Systems<br><br>• Treasury Systems<br><br>• Commerce and Marketing Websites<br><br>• Other financial systems owned or controlled by Sellers prior to the Closing Date.<br><br>• Related infrastructure including but not limited to servers, desktops and network equipment | Until the earlier to occur of (i) Services Termination Date or (ii) the Extended Services Termination Date. |

A-2

| CATEGORY | DESCRIPTION | TIME PERIOD |
|---|---|---|
| | B.  Operating such portions of the Diamond Business Lines as identified in writing by Purchaser on or about the Closing Date from funds provided solely by the Purchaser in substantially the same manner in which such business lines were operated as of the Closing Date to the extent practicable. . | |
| Leases | Access to the leased property listed below being assumed by Purchaser from Seller at or after the Closing Date, it being understood that Purchaser shall only be responsible for rent and occupancy costs for any property or facility beginning on June 1, 2025. Seller shall remain responsible for all rent and occupancy costs incurred prior to June 1, 2025.<br><br>• Olive Branch<br>• MD DCD<br>• Georgia - CGA | On a month to month basis commencing on June 1, 2025 and terminating August 12, 2025, subject to Court approval of *Debtors' Motion for Entry of an Order Extending The Deadline for The Debtors to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4).* |
| Bank Accounts | Seller shall maintain the Diamond Business Lines customer deposit account(s). Seller shall implement a daily sweeping function to transfer all funds received in such account(s) to Purchaser's designated accounts. Seller shall, to the extent permissible, provide Purchaser with full access to account details and transaction information as necessary to reconcile customer payments. All funds received in Seller's Diamond Business Lines customer deposit account(s) after the Closing Date shall be the property of Purchaser. | One hundred fifty (150) days following the Closing Date. |

A-3

## EXHIBIT B

### SERVICES PROVIDED BY BUYER TO SELLER

The time period for the Services provided by Purchaser and/or its successors shall be from and after the Closing until the time period set forth in the chart below in the column "Time Period". For the avoidance of doubt, in the event of any discrepancy between the applicable Time Period as set forth of this Exhibit B and the provisions of Article III of this Agreement, the provisions of Article III shall control.  Seller shall provide Purchaser with no less than five (5) calendar days' written notice in accordance with the Agreement of any intent to terminate the Purchaser Services set forth herein earlier than the period set forth under the applicable Time Period. Notwithstanding anything to the contrary in the Agreement or this Exhibit B: (i) Purchaser  shall only be required to provide Services in a manner that will not unreasonably interfere with its own business operations, and (ii) Purchaser shall comply with its obligations pursuant to Paragraph 31 of the Approval Order.

| CATEGORY | DESCRIPTION | TIME PERIOD | PURCHASER ACTUAL EXPENSES |
|---|---|---|---|
| Information from IT Systems/Books and Records | To enable the Sellers to perform the Sellers' Tasks (as defined below) and the Transition, the Purchasers (i) will provide information to the Sellers from all the Existing Seller Systems as necessary to enable the Transition, (ii) will provide reasonable access to Purchasers' employees, to the extent necessary for Sellers to accomplish the Transition.  Existing Seller Systems, include, without limitation:<br><br>• A/P systems<br>• A/R systems<br>• HR systems<br>• Order/Manufacturing/Shipping Systems<br>• Contract Database/Systems<br>• Treasury Systems<br>• Other financial systems owned or controlled by Sellers prior to the Closing Date. | Until the earlier to occur of (i) Services Termination Date or (ii) the Extended Services Termination Date. | N/A |

| CATEGORY | DESCRIPTION | TIME PERIOD | PURCHASER ACTUAL EXPENSES |
|---|---|---|---|
| Purchasers Performing Tasks for Limited Period | The Purchasers shall, at the reasonable request of Sellers, provide the necessary accounting functions, employees and resources to: <br><br> • Provide detailed closing trial balances by each Seller legal entity, including, without limitation, all back-up and journal entry support for the months ended April 30, May 31, June 30 and such other months within the Extended Services Termination Date. <br><br> • Process the accounting for the general ledger for Sellers. | Until the earlier to occur of (i) Services Termination Date or (ii) the Extended Services Termination Date. | N/A |
| Access to Certain IT Systems | Solely as set forth in the Approval Order, the Purchasers shall provide the Sellers with access to the historical information within the Existing Seller Systems (with no ability to enter or adjust any data) and, to the reasonable satisfaction of the Purchasers, to access rights that are limited to reviewing the Existing Seller Systems for information covering the relevant periods ending on the Closing Date: <br><br> • A/P systems <br> • Contract Database/Systems | As set forth in the Approval Order. | N/A |
| Archival Copy of Information | Solely as set forth in the Approval Order, the Sellers shall also have the ability to create and/or copy and retain multiple instances/copies of the Sellers' financial systems/databases to ensure availability of information as appropriate. The Purchasers will have access to and the right to use such archival copies, if needed. | As set forth in the Approval Order. | N/A |

B-2

| CATEGORY | DESCRIPTION | TIME PERIOD | PURCHASER ACTUAL EXPENSES |
|---|---|---|---|
| Consignment Storage and Removal | Seller shall be solely responsible for, and shall pay, any and all reasonably documented consignment costs, fees, or expenses related to the Diamond Business Lines that are incurred or become due during the Time Period. If any consigned goods or inventory owned by Seller or held for the benefit of Seller for which Purchaser is not deriving revenue remains in any facility or property for which lease is being assumed by Seller and assigned to Purchaser, Seller shall pay Purchaser a reasonable fee (to be mutually agreed upon in writing) for the storage (including storage costs) of such goods, as well as for any and all out of pocket costs and expenses incurred by Purchaser in connection with the processing, packing, shipping, or disposal ("Processing") of such goods. If Seller removes all consigned goods from such facilities on or before May 31, 2025, no storage or rent charges shall apply; provided, however, that Seller shall remain responsible for any Processing, regardless of when such Processing occurs.<br><br>If any consigned goods or inventory of, owned by or held by Seller for which Purchaser is not deriving revenue remains in any facility or property for which lease is being assumed by Seller and assigned to Purchaser, Seller shall pay Purchaser a reasonable fee based on the then-commercially reasonable rates for storage and Processing.<br><br>Purchaser shall have no obligation to Process any consigned goods except at Seller's sole cost and expense, and Seller shall indemnify and hold | On or after June 1, 2025 except as related to processing fees and expenses. | To be determined. |

B-3

| CATEGORY | DESCRIPTION | TIME PERIOD | PURCHASER ACTUAL EXPENSES |
|---|---|---|---|
|  | Purchaser harmless from and against any claims, liabilities, or expenses arising from Seller's consigned goods, from inventory owned by Seller or held for the benefit of Seller for which Purchaser is not deriving revenue or Seller's failure to timely remove or otherwise take actions related to such goods. |  |  |

B-4

## **SCHEDULES**

### Schedule 1.2

Service Coordinator Contact Information

For Seller:

       Robert Gorin
       c/o Getzler Henrich & Associates, LLC
       295 Madison Avenue
       20th Floor
       New York, NY 10017
       Email:  rgorin@getzlerhenrich.com

For Purchaser:

       Steven Bieg
       Sparkle Pop, LLC
       603 Sweetland Avenue
       Hillside, NJ 07205
       Email: Sbieg@adpopulumllc.com

55523027.6
55523027.10