# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
# (Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered) |

## SUMMARY OF APPLICATION FOR COMPENSATION OF RAYMOND JAMES & ASSOCIATES, INC., AS INVESTMENT BANKER FOR THE DEBTORS AND DEBTORS IN POSSESSION

| | |
|---|---|
| Name of Applicant: | Raymond James & Associates, Inc. |
| Authorized to Provide Professional Services to: | Debtors and Debtors in Possession |
| Date of Retention: | Effective as of January 14, 2025 by Order Signed February 10, 2025 [D.I. 126] |
| Period for which Compensation and Reimbursement is Sought: | January 14, 2025 - August 31, 2025 |
| Amount of Compensation Sought as Actual, Reasonable and Necessary: | $3,772,831.25[2] |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $66,097.58 |

This is a:   ☐ monthly   ☐ interim   ☒ final application.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2] In accordance with the Raymond James Engagement Letter and Retention Order, the $3,772,831.25 of Compensation sought by Raymond James includes (i) Monthly Advisory Fees of $350,000.00, (ii) a DIP Financing Fee of $150,000 and (iii) Business Combination Transaction Fees of $3,422,831.25. The DIP Financing Fee includes all amounts previously approved pursuant to the Order Granting Application for Compensation for Raymond James filed April 23, 2025. Consistent with the Raymond James Engagement Letter and the Retention Order, the Business Combination Transaction Fees are net of a $150,000 credit for the DIP Financing Fee. Excluding the credit, Compensation sought would be $3,922,831.25.

## PRIOR APPLICATIONS FILED

| Date Filed | Transaction Covered | Requested Fees | Requested Expenses | Approved Fees | Approved Expenses |
|---|---|---|---|---|---|
| 4/4/2025 | DIP Financing Transaction Fee | $150,000.00 | $0.00 | $150,000.00 | $0.00 |

## SUMMARY OF FEES AND EXPENSES INCURRED DURING THE FINAL COMPENSATION PERIOD[3]

| Period Covered | Description | Fees | Credited Fees | Expenses | Total |
|---|---|---|---|---|---|
| February 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| March 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| April 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| May 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| June 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| July 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| August 2025 | Monthly Advisory Fee | $50,000.00 | $0.00 | $0.00 | $50,000.00 |
| Transaction Fee | DIP Financing Transaction Fee | $150,000.00 | $0.00 | $0.00 | $150,000.00 |
| Transaction Fee | Business Combination Transaction Fee: Alliance Assets | $2,511,802.61 | ($150,000.00) | $0.00 | $2,361,802.61 |
| Transaction Fee | Business Combination Transaction Fee: Diamond Business Lines | $748,721.10 | $0.00 | $0.00 | $748,721.10 |
| Transaction Fee | Business Combination Transaction Fee: Shares of Diamond UK | $162,307.54 | $0.00 | $0.00 | $0.00 |
| January 14 – August 31 | Expense Reimbursement | $0.00 | $0.00 | $66,097.58 | $66,097.58 |

---

[3]  This amount includes all amounts previously approved on an interim basis pursuant to the Fee Order dated April 23, 2025.

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re<br><br>Diamond Comic Distributors, Inc., *et al.*,<br><br>Debtors.[1] | Case No. 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>**Hearing Date**:<br>September 30, 2025 at 2:00 p.m. (ET)<br>**Objection Deadline**:<br>September 17, 2025 |

**FINAL APPLICATION OF RAYMOND JAMES & ASSOCIATES, INC., FOR COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED AS INVESTMENT BANKER TO THE DEBTORS AND DEBTORS IN POSSESSION FOR THE PERIOD FROM JANUARY 14, 2025 THROUGH AUGUST 31, 2025**

Raymond James & Associates, Inc. ("Raymond James" or the "Firm"), as investment banker for the above-captioned debtors and debtors in possession (collectively, the "Debtors"), submits this application (the "Application") for the final allowance of compensation for professional services rendered and reimbursement of actual and necessary expenses incurred for the period from January 14, 2025 through August 31, 2025, pursuant to sections 330 and 331 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Bankruptcy Rules"), the *Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

(the "Compensation Guidelines"), and this Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* entered on February 28, 2025 (D.I. 187) (the "Interim Compensation Procedures Order"). In support of this Application, Raymond James respectfully represents as follows:

## Jurisdiction

1. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order 2012-05* from the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of these cases and the Application is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The bases for the relief requested herein are sections 330 and 331 of the Bankruptcy Code, as supplemented by Bankruptcy Rule 2016 and Local Bankruptcy Rule 2016-1.

## Background

**A. The Chapter 11 Case**

3. On January 14, 2025 (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code (these "Chapter 11 Cases"). The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. On January 29, 2025, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee") (D.I. 90).

**B. The Retention of Raymond James**

6.      On January 17, 2025, the Debtors filed the *Debtors Application for Entry of an Order (I) Authorizing the Retention and Employment of Raymond James & Associates, Inc., as the Debtors Investment Banker, Effective as of the Petition Date and (II) Granting Related Relief* (D.I. 67) (the "Raymond James Retention Application"). The Raymond James Retention Application sought an order authorizing the retention and employment of Raymond James as the Debtors' investment banker, effective as of the Petition Date.

7.      The retention of Raymond James, as investment banker to the Debtors, was approved on February 10, 2025, effective as of January 14, 2025, by this Court's *Order (I) Authorizing the Retention and Employment of Raymond James & Associates, Inc. as the Debtor's Investment Banker, Effective as of the Petition Date, and (II) Granting Related Relief* (D.I. 126) (the "Retention Order").

8.      The Retention Order authorized Raymond James to be compensated for the following services (the "Services") in these Chapter 11 Cases:[2]

   i.   review and analyze the Debtors' business, operations, properties, financial condition and Interested Parties;

   ii.  evaluate the Debtors' debt capacity, including by advising the Debtors generally as to available financing and assist in the determination of an appropriate capital structure;

   iii. evaluate potential Transaction alternatives and strategies;

   iv.  prepare documentation within Raymond James's expertise that is required in connection with a Transaction;

---

[2] The Engagement Letter also describes various additional services that Raymond James would provide upon reasonable request. To the extent that there is any conflict between the actual terms of the Engagement Letter or the Indemnification Provisions (as such may be modified by order of the Court) and any description or summary of the same in the Application, the actual terms of the Engagement Letter or the Indemnification Provisions (as such may be modified by order of the Court) shall control, as applicable. Capitalized terms not otherwise defined herein are defined in the Engagement Letter.

3

    v.    identify Interested Parties regarding one or more particular Transactions;

    vi.    contact Interested Parties on behalf of the Debtors and with prior written consent by the Debtors, which Raymond James, after consultation with the Debtors' management, believes meet certain industry, financial, and strategic criteria and assist the Debtors in negotiating and structuring a Transaction; and

    vii.    advise the Debtors as to potential Business Combination Transactions.

9. The Retention Order also approved Raymond James' compensation structure, which is summarized below:

    i.    *Monthly Advisory Fee and Database Expense Amount.* Upon the execution of the Engagement Letter and on the first business day of every month thereafter during the term of the Engagement Letter, the Debtors shall pay Raymond James an amount equal to $50,000 (the "Advisory Fee"). Additionally, the Debtors will pay Raymond James a flat expense charge of $5,000 for Raymond James's access to electronic financial databases pertinent to this engagement, upon the Debtors' execution of the Engagement Letter (the "Database Expense Amount").

    ii.    *Financing Transaction Fee.* If, during the Term or during the twelve (12) months following any termination of the Engagement Letter (the "Tail Period"), any Financing Transaction is agreed upon and subsequently closes (the "Financing Transaction Closing"), whether on a stand-alone basis or to consummate any other Transaction, the Debtors shall pay Raymond James immediately and directly out of the proceeds of the placement, at the Financing Transaction Closing of each Financing Transaction as a cost of sale of each Financing Transaction, a non-refundable cash transaction fee (the "Financing Transaction Fee") equal to the sum of:

        1) one and one-half percent (1.5%) of the Proceeds of any senior secured debt,

        2) three percent (3.0%) of the Proceeds of all other debt, and

        3) six percent (6.0%) of equity or equity-linked securities raised.

Notwithstanding the foregoing, in the event that the incumbent senior secured lender provides debtor-in-possession financing (the "DIP Financing"), the debtor-in-possession financing fee (the "DIP Financing Fee") shall equal $150,000, one-half of which shall be paid upon the closing of the DIP Financing and one-half of which shall be paid upon entry of a final order approving the DIP Financing and shall be fully credited against the Business Combination Transaction Fee.

4

iii. *Business Combination Transaction Fee.* If, during the Term or during the Tail Period, any Business Combination Transaction closes (the "<u>Business Combination Closing</u>" and together with any Financing Transaction Closing, each a "<u>Closing</u>"), regardless of when such Business Combination Closing occurs, the Debtors shall pay Raymond James immediately and directly out of the proceeds at the Business Combination Closing, as a cost of sale of such Business Combination Transaction, a non-refundable cash transaction fee (the "<u>Business Combination Transaction Fee</u>" and together with any Financing Fee, each a "<u>Transaction Fee</u>") based upon the Transaction Value. The Business Combination Transaction Fee shall be equal to the greater of (i) $1,250,000 or (ii) the sum of (A) three and one-half percent (3.5%) of Transaction Value up to $35,000,000 and (B) five percent (5.0)% of Transaction Value greater than $35,000,000.

    a. As used in this Agreement, the term "Transaction Value" means the total amount of cash and the fair market value of all securities or other property paid or payable, directly or indirectly, to you or to your equityholders in connection with a Business Combination Transaction that is consummated, including, without limitation and without duplication: (A) cash; (B) deferred or installment payments, notes or other debt obligations issued in the Business Combination Transaction and payable in installments or otherwise deferred, including amounts held in escrow; (C) equity securities (which, if publicly traded (including over-the-counter), will be valued at the 20-trading day average as of the last trading day prior to the Business Combination Closing) and other property; (D) the value of assumed, "cashed out" or substituted options, warrants or other rights to acquire capital stock (whether or not vested); (E) any indebtedness or other liabilities of the Company (1) assumed by a Interested Party in an acquisition of assets or which remains outstanding at the time of Business Combination Closing in all other cases or (2) decreased, repaid or extinguished in connection with or anticipation of a Business Combination Transaction; (F) future contingent payments, including those related to future earnings or operations; (G) amounts paid pursuant to retention, phantom equity, change of control or similar bonus or payment arrangements; (H) amounts paid expressly for non- competition agreements in excess of those arrangements currently in existence; and (I) amounts paid to the Company's equityholders in connection with a Transaction, but not in the ordinary course of business consistent with past practice, in the form of dividends, capital distributions, or partial or liquidating distributions. The value of all non-cash consideration, other than consideration in the form of equity securities, will be the fair market value thereof on the day before the Business Combination Closing. The value of equity securities that are publicly traded will be valued as set forth in clause (C) above, and the value of securities that are not publicly traded will be the fair

5

market value on the day before the Business Combination Closing date. In the case of a Business Combination Transaction structured as a sale, transfer, exchange or purchase of equity securities, if less than 100% of the equity of the Company is transferred in the Business Combination Transaction, Transaction Value will include the value of any retained or rolled-over interest in the Company based on the value paid for or ascribed to the equity interests transferred in the Business Combination Transaction. In the case of a Business Combination Transaction structured as a sale, transfer, exchange or disposition of assets, if less than 100% of the assets of the Company are transferred in the Business Combination Transaction, Transaction Value will include the fair market value of any assets (including, without limitation, accounts receivable, inventory, investments, cash and cash equivalents) retained by the Company. In the case of a joint venture or similar transaction (a "Joint Venture"), the aggregate value of the proceeds, assets and other consideration contributed or to be contributed to such Joint Venture by the Company in connection with the Business Combination Transaction, including, without limitation, cash, notes, securities, intellectual property, licenses, marketing or distribution rights and other property and the amount of any liabilities of the type described in item (E) above assumed by such Joint Venture from the Company. The Company will pay Raymond James the Business Combination Transaction Fee corresponding to that portion of the Transaction Value subject to an escrow or other holdback upon the establishment of such escrow or other holdback. The Company will pay Raymond James the Business Combination Transaction Fee corresponding to that portion of the Transaction Value subject to an earn-out or contractual contingency (including future contingent payments, including those related to future earnings or operations) at the Business Combination Closing, based on the fair market value of such Future Contingent Payments as mutually agreed upon in writing by the Company and Raymond James. Transaction Value will not be reduced by the Transaction Fee or any other costs or expenses of the Company paid or payable in connection with a Business Combination Transaction, including, but not limited to, any expenses described in Section 3. If the Definitive Agreement provides that the Transaction Fee or any other costs or expenses of the Company paid or payable in connection with the Transaction are deducted from the purchase price, then such fees, costs or expenses will be added back to Transaction Value for purposes of calculating the Transaction Fee.

iv. *Expense Reimbursement.* Regardless of whether a Transaction is consummated, the Debtors will reimburse Raymond James, upon the earlier of (a) thirty (30) days of the Debtors' receipt of an invoice from Raymond James or (b) the Closing of any Transaction, by wire transfer of immediately

6

> available funds via wire transfer instructions set forth in Raymond James's invoice for such amounts to the Debtors, for all expenses (including, without limitation, the fees and disbursements of its outside legal counsel) reasonably incurred by Raymond James in connection with entering into and performing the services pursuant to this Agreement ("Expenses").

**C. Sale of Substantially All of the Debtors' Assets**

10. Before the Petition Date, the Debtors retained Raymond James to commence and run a sales process for all or substantially all of the Debtors' assets in connection with one or more sales or dispositions (collectively, the "Sale") of the Alliance Assets (as defined below), Diamond UK (either the Diamond UK assets or Shares of Diamond UK (as defined below)), and all other assets of the Debtors (collectively, the "Assets"). Immediately upon its retention, Raymond James focused on developing marketing materials and marketing the Debtors' Assets. In short order, the Debtors and Raymond James prepared extensive diligence materials to support the marketing effort, including a virtual data room, a seven-page nonconfidential investment overview, and a 61-page confidential information memorandum (collectively, the "Investment Material").

11. Raymond James spearheaded an all-inclusive marketing process and solicited interest from potential financial and strategic investors for bids for all or substantially all the Debtors' Assets on a going concern basis. Beginning on October 7, 2024, the Debtors and Raymond James contacted over 110 prospective acquirers, of which more than 30 executed non-disclosure agreements to access the data room and review the Investment Material.

12. Ultimately, six parties submitted indications of interest in the Debtors' Assets. After negotiating with these parties, including extensive, arm's-length negotiations regarding various asset purchase agreements, the Debtors determined that an offer from Universal Distribution LLC ("Universal" or the "Stalking Horse Bidder") to serve as a stalking horse bidder for the operating division of Alliance Game Distributors' ("Alliance") assets (the "Alliance Assets") was the most attractive at the time in view of the consideration offered thereby and in

7

comparison to other bids. On January 13, 2025, the Debtors entered into the Stalking Horse Agreement with the Stalking Horse Bidder for the sale of the Alliance Assets.

13. On January 14, 2025, the Debtors filed for Chapter 11 bankruptcy and subsequently filed on January 21, 2025 the *Debtors Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases Filed by Diamond Comic Distributors, Inc.* (D.I. 68) (the "<u>Bidding Procedures Motion</u>").

14. On February 11, 2025, the Court entered the *Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases and VI Granting Related Relief* (D.I. 136) (the "<u>Bidding Procedures Order</u>"), approving the Stalking Horse Agreement for the purchase of the Alliance Assets and the Bidding Procedures.

15. Postpetition, with the Stalking Horse Agreement in hand, the Debtors and Raymond James contacted 138 prospective strategic and financial acquirers, including 78 new prospective acquirers not previously contacted and 60 prospective acquirers that had been contacted prior to these Chapter 11 Cases by the Debtors, but did not express interest at that time.

16. Raymond James worked with interested parties by responding to information and diligence requests, discussing the sale process, describing the Debtors' activities during these

Chapter 11 Cases, coordinating and attending virtual and in-person meetings, and supporting many other diligence items to stimulate bidder interest in the Sale Process.

17. Ultimately, the Debtors received seven Qualifying Bids for the Debtors' Assets, including the Stalking Horse Bid. The seven Qualifying Bids covered four separate packages of the Debtors' assets. Consistent with the Bidding Procedures Order, the Debtors, in their business judgment, assessed each of the Qualifying Bids received and designated Baseline Bids for each of the four bid packages. Collectively, the bid packages included all assets of the Debtors, with the exception of the shares that Debtors Comic Exporters, Inc. and Comic Holdings Inc. hold in non-debtor affiliate Diamond Comic Distributors, a corporation organized under the laws of England and Wales (the "Shares of Diamond UK"). This process was designed to allow the Debtors to review the different combinations of potential sales and determine the most valuable combination of the highest and best bids. Each Qualifying Bid contained an allocation of value for the various assets the relevant Bidder sought to purchase.

18. Pursuant to the Sale Motion and Bidding Procedures, on March 24, 2025, the Debtors held an Auction for the Debtors' Assets. At the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, selected Alliance Entertainment Corporation ("Alliance Entertainment") as the Successful Bidder for substantially all of the Debtors' Assets through its asset purchase agreements (collectively, the "Alliance Entertainment Asset Purchase Agreement"), with the exception of the Shares of Diamond UK. Universal was selected as the Back Up Bidder for the Alliance Assets and an affiliate of Ad Populum LLC, Sparkle Pop LLC ("Sparkle Pop"), was selected as the Back Up Bidder for substantially all of the assets of the DCD Business, which includes Diamond Comic Distributors U.S. and Diamond Select Toys, and the

9

CGA Business (collectively, the "Diamond Business Lines"). The Shares of Diamond UK were excluded and to be monetized by the Debtors' estates thereafter.

19. On April 11, 2025, the Court entered the *Order (I) Approving Asset Purchase Agreement Among Diamond Comic Distributors, Inc., Diamond Select Toys & Collectibles, LLC and Alliance Entertainment, LLC; (II) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances and Other Interests; (III) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (D.I. 335).

20. During the period between April 11, 2025 and April 23, 2025, Raymond James assisted the Debtors and Alliance Entertainment to consummate the closing of the sale of substantially all of the Debtors' assets to Alliance Entertainment, consistent with the Alliance Entertainment Asset Purchase Agreement.

21. On April 24, 2025, Alliance provided written notice of its termination of the Alliance Purchase Agreement. The Debtors' and their advisors quickly pivoted to reengage with the Back Up Bidders, each of which reaffirmed their intention to proceed with a sale transaction and to finalize their respective asset purchase agreements to preserve the going concern value of the Debtors' estates.

22. Following extensive negotiations with Universal, a Second Amendment to the Asset Purchase Agreement between the Debtors and Universal dated as of January 13, 2025, as amended by that First Amendment to Asset Purchase Agreement dated as of April 5, 2025, was signed on April 29, 2025. Following extensive negotiations with Sparkle Pop, on April 27, 2025, the Debtors signed the Asset Purchase Agreement with Sparkle Pop. On April 29, 2025, the Debtors filed the *Debtors' Motion for Entry of Orders Authorizing the Sale of Substantially All of*

the Debtors' Assets to the Back-Up Bidders Pursuant to the Bidding Procedures Order Filed by Diamond Comic Distributors, Inc. (D.I. 385).

23. On May 1, 2025, the Court entered the *Order (I) Approving Asset Purchase Agreement Among the Debtors and Sparkle Pop, LLC (II) Approving Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and other Interests; (III) Approving Assumption and Assignment of Certain Executory Contracts And Unexpired Leases, and (IV) Granting Related Relief* (D.I. 407) and the *Order (I) Approving Asset Purchase Agreement Among the Debtors and Universal Distribution, LLC (II) Approving Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and other Interests; (III) Approving Assumption and Assignment of Certain Executory Contracts And Unexpired Leases, and (IV) Granting Related Relief* (D.I. 408).

24. In the period between May 1, 2025 and the transaction closings with Universal and Sparkle Pop, Raymond James assisted the Debtors, Universal and Sparkle Pop to consummate the transaction closings for both the Alliance Assets and the Diamond Business Lines. This included facilitating document and data transfers from the Debtors to both Universal and Sparkle Pop, the negotiation of transition services agreements between the Debtors and each of Universal and Sparkle Pop, the coordination of post-closing transition services between Universal and Sparkle Pop, the compilation of a two transaction waterfall and funds flow analyses in anticipation of two transaction closings, the reconciliation of closing working capital for the Alliance Assets and the Diamond Business Line, and daily and ad hoc closing calls hosted by Raymond James for the benefit of the Debtors, Universal and Sparkle Pop.

25. The sale of the Alliance Assets to Universal closed on May 14, 2025, and the sale of the Diamond Business Lines closed on May 16, 2025.

26. Subsequent to the sale closings and through August 31, 2025, Raymond James continued to support the Debtors with post-closing work related to the sale of the Alliance Assets and Diamond Business Lines, including analysis of the post-closing funds due to the Debtors by Universal and Sparkle Pop.

27. Diamond UK was also marketed extensively by Raymond James to interested parties both prepetition and postpetition. However, no Qualified Bids included the sale of Diamond UK. Ultimately, neither the Diamond UK assets nor Shares of Diamond UK were included in the four bid packages at the Auction. Subsequent to the Auction, Raymond James continued the marketing effort for Diamond UK. As a result of those efforts, the Debtors received two new indications of interest from interested parties.

28. Following extensive, arms-length negotiations to reach a value-maximizing alternative for the Debtors, the Debtors determined that an offer from Diamond Distributors UK, Ltd. was the most attractive at the time, in view of the consideration offered thereby and in comparison, to other bids.

29. On July 23, 2025, the Debtors entered into the Share Sale and Purchase Agreement with the Diamond Distributors UK, Ltd. for the sale of the Shares of Diamond UK.

30. On July 23, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Sale and Purchase Agreement Among Debtors Comic Exporters, Inc. and Comic Holdings Inc., and Diamond Distributors UK, Ltd; (II) Approving Sale of Shares Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; and (III) Granting Related Relief* (D.I. 638).

31. On August 18, 2025, the Court entered the *Order (I) Approving Share Sale and Purchase Agreement Among Debtors Comic Exporters, Inc. and Comic Holdings, Inc. and*

*Diamond Distributors UK, Ltd; (II) Approving Sale of Shares Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; and (III) Granting Related Relief* (D.I. 748).

32. The sale of the Shares of Diamond UK to Diamond Distributors UK, Ltd. closed on August 26, 2025.

33. The total Transaction Value, as defined in the Retention Order and the Engagement Letter, of the Sales to Universal, Sparkle Pop, and Diamond Distributors UK, Ltd.is approximately $78,956,625[3], a considerable improvement over the initial consideration provided by the Stalking Horse Bid.

## Relief Requested

34. By this Application, Raymond James requests that the Court enter an order: (i) granting the Application and authorizing (a) final allowance of compensation in the amount of $3,722,831.25[4] for professional services rendered, and (b) reimbursement of actual and necessary costs, including legal fees, in the amount of $66,097.58; (ii) directing the payment by the Debtors of $3,338,928.83[5], which is the amount outstanding and owed of the $3,838,928.83[6] allowed compensation and expenses incurred and enter the proposed order substantially in the form attached hereto as **Exhibit A**.

**A. Compensation Requested**

35. Attached hereto as **Exhibit B** are the invoices for services performed by Raymond James with respect to the Chapter 11 Cases. The invoices comply with the Retention Order.

---

[3] See Exhibit D for the calculation of the Transaction Value.
[4] Net of a $150,000 applied credit, per the Raymond James Engagement Letter and Retention Order. Gross of the applied credit, Compensation sought would be $3,922,831.25.
[5] Net of a $150,000 applied credit and net of $500,000 for (i) the $350,000 of Monthly Advisory Fees and (ii) the $150,000 DIP Financing Fee, paid to Raymond James, per the Raymond James Engagement Letter, Raymond James Retention Order, and the Order Granting Application for Compensation for Raymond James dated April 23, 2025.
[6] Net of a $150,000 applied credit, per the Raymond James Engagement Letter and Retention Order. Gross of the applied credit, Compensation and Expenses sought would be $3,988,928.83.

36. Although Raymond James, in line with market convention, does not bill by the hour, Raymond James is keeping track of its postpetition time in half-hour increments, which is attached hereto as **Exhibit C**.

37. The fees charged by Raymond James are consistent with the Retention Order and the Engagement Letter and are comparable to those fees charged by Raymond James for professional services rendered in connection with similar chapter 11 cases and non-bankruptcy matters. Raymond James submits that such fees are reasonable based upon the customary compensation charged by similarly skilled professionals in comparable bankruptcy cases.

38. The fees charged by Raymond James are covered under the Carve-Out definition in the *Final Order (I) Authorizing the Debtors to Obtain Post Petition Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying The Automatic Stay; and (V) Granting Related Relief* (D.I. 163), entered on February 19, 2025.

39. There is no agreement or understanding between Raymond James and any other person other than members of the firm, or the sharing of compensation to be received for services rendered in these Chapter 11 Cases.

40. The fees sought by Raymond James are detailed in **Exhibit D** attached hereto.

**B. Raymond James' Expense Reimbursement**

41. Raymond James incurred total out-of-pocket expenses in the amount of $66,097.58. This amount is comprised of Raymond James' own expenses, as well as those of Raymond James' outside counsel, as discussed more fully below.

42. Attached hereto as **Exhibit E** is a summary of the expenses totaling $66,097.58 that were actually incurred by Raymond James in the performance of services rendered as investment

14

banker to the Debtors. The expenses are broken down into categories of charges, which include working meals, business related travel, and other ordinary expenses. The expenses are estimates and may be updated by Raymond James with any additional amounts prior to the entry of an order approving this Application.

**C. Raymond James Legal Fees Reimbursement**

43. As provided in the Retention Order, Raymond James seeks reimbursement for its reasonable postpetition legal fees and expenses. Raymond James incurred legal fees postpetition in the amount of $22,667.00. The $22,667.00 of postpetition legal fees and expenses are included within the $66,097.58 included in Exhibit E. This amount is an estimate and may be updated by Raymond James with any additional amounts prior to the entry of an order approving this Application.

44. The invoices for legal fees are attached hereto as **Exhibit F**.

45. In accordance with § 328 and § 330 of the Bankruptcy Code, Raymond James seeks reimbursement only for the actual cost of such expenses to Raymond James. Raymond James submits that any expenses incurred were customary and necessary.

**CERTIFICATE OF COMPLIANCE AND WAIVER**

46. The undersigned representative of Raymond James certifies that he has reviewed the requirements of Local Rule 2016-1 and that the Application substantially complies with that Local Rule. To the extent that the Application does not comply in all respects with the requirements of Local Rule 2016-1, Raymond James believes that such deviations are not material and respectfully requests that any such requirements be waived.

15

**NOTICE**

47. Raymond James has provided notice of this Application to the following parties or their respective counsel: (i) the Debtors; (ii) the U.S. Trustee; (iii) the Committee; and (iv) any party that, as of the filing of this Application, have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. Raymond James submits that, in light of the nature of the relief requested, no further notice need be given.

**CONCLUSION**

WHEREFORE, Raymond James respectfully requests the Court enter the Proposed Order: (i) granting the Application and authorizing (a) final allowance of compensation in the amount of $3,772,831.25[7] for professional services rendered, and (b) reimbursement of actual and necessary costs, including legal fees, in the amount of $66,097.58; (ii) directing the payment by the Debtors of $3,338,928.83[8], which is the amount outstanding and owed of the $3,838,928.83[9] allowed compensation and expenses incurred as administrative expense claims; and (iii) granting such other and further relief to Raymond James as the Court deems just and proper.

Dated:  August 27, 2025

Respectfully Submitted,

RAYMOND JAMES & ASSOCIATES, INC.

*/s/*
Geoffrey Richards
Senior Managing Director – Investment Banking

---

[7] Net of a $150,000 applied credit.
[8] Net of a $150,000 applied credit and net of $500,000 for (i) the $350,000 of Monthly Advisory Fees and (ii) the $150,000 DIP Financing Fee, paid to Raymond James, per the Raymond James Engagement Letter, Raymond James Retention Order, and the Order Granting Application for Compensation for Raymond James dated April 23, 2025.
[9] Net of a $150,000 applied credit.

## **CERTIFICATION**

Geoffrey Richards hereby certifies:

a) I am a Senior Managing Director of the applicant, Raymond James & Associates, Inc.

b) I am familiar with the work performed on behalf of the Debtors by the professionals of Raymond James & Associates, Inc.

c) I have reviewed the foregoing Application and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I have reviewed Local Bankruptcy Rule 2016-1, the Compensation Procedures, and the Interim Compensation Procedures Order, and submit that the Application substantially complies with same.

*/s/*
Geoffrey Richards