IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| In re:<br><br>DIAMOND COMIC DISTRIBUTORS, INC., et al.<br><br>Debtors.[1] | Case No: 25-10308 (DER)<br><br>Chapter 11<br><br>(Jointly Administered) |

**SPARKLE POP, LLC'S OBJECTION TO DEBTORS' MOTION (I) TO ENFORCE THE AUTOMATIC STAY AND (II) TO ENFORCE THE SALE ORDER AND (III) GRANTING RELATED RELIEF**

Sparkle Pop, LLC ("Sparkle Pop"), by and through its undersigned counsel, hereby submits this objection to Debtors' Motion to (I) to Enforce the Automatic Stay (II) Enforce the Sale Order and (III) Granting Related Relief (the "Motion"). The grounds for Sparkle Pop's objection are as follows:

**PRELIMINARY STATEMENT**

Debtors' Motion seeks to obtain, through expedited motions practice, the foundational requirement lacking in their pending Motion for Entry of an Order (I) Approving Procedures for Sales or Other Disposition of Consigned Inventory, (II) Approving the Sales or Other Disposition of Consigned Inventory, and (III) Granting Related Relief (the "Sale Motion") [D.I. 531]: an adjudication of the extent of their interest in the Consigned Inventory. Indeed, the question of whether Consigned Inventory is even property of the Debtors' estates is the subject of a live dispute

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are Diamond Comic Distributors, Inc., (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

1

that this Court has ordered must be resolved through adversary proceedings. *See* D.I. 781.[2] The Debtors' instant Motion is procedurally improper and is nothing short of an attempt to circumvent their ongoing dispute between Debtors and the consignors in hopes that the Court will award Debtors damages with respect to the Consigned Inventory prior to any determination that Debtors even hold a valid ownership interest in the Consigned Inventory.

To do so, Debtors have thrusted Sparkle Pop in the middle of their dispute with the consignors to use as a scapegoat and to obtain interim monetary relief without any basis and without providing the proper procedural safeguards and due process to which all interested parties are entitled.

Moreover, expedited treatment of this dispute is unnecessary and unwarranted as Sparkle Pop has previously advised Debtors and Consignors:

1) That it is no longer selling any Consigned Inventory; and

2) That the proceeds of any Consigned Inventory sold since May 15, 2025 have been segregated and are being held pending clear instruction or Court order regarding who is entitled to the proceeds of those sales.

The Motion should be denied.

## BACKGROUND

1. On January 21, 2025, the Debtors filed a Motion for Entry of an Order (I) Authorizing and Approving Bidding Procedures for the Sale of All of Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and

---

[2] The Debtors' Motion also includes allegations that Sparkle Pop has breached the Asset Purchase Agreement. Any claim for breach of contract is certainly not the proper subject of the instant Motion and must be resolved through adversary proceedings as well. *See* Motion, at Preliminary Statement, ¶¶ 31, 36.

...

Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases (the "Sale Motion").[3]

2. On May 1, 2025, in connection with the Sale Motion, the Court entered two orders approving the sale of substantially all of Debtors' assets to Sparkle Pop and Universal Distribution, LLC (the "Sale Order").[4]

3. Pursuant to the Sale Order, the Court approved the asset purchase agreement (the "APA") entered into by and between Debtors and Sparkle Pop, pursuant to which Sparkle Pop would acquire certain of Debtors' assets. Debtors' inventory held on consignment (the "Consigned Inventory") is an excluded asset under the APA. The APA transaction closed on May 15, 2025.[5] *See* Declaration of Steve Bieg ("Bieg Dec.") at Ex. A.

4. In connection with the APA, Debtors and Sparkle Pop entered into a Transition Services Agreement (the "TSA"), pursuant to which Debtors agreed that they would pay Sparkle Pop "a reasonable fee (to be mutually agreed upon in writing) for the storage (including storage costs) of such goods, as well as for any and all out of pocket costs and expenses incurred by [Sparkle Pop] in connection with the processing, packing, shipping, or disposal ('Processing') of such goods."[6] TSA at Ex. B-3. The TSA does not bar or prohibit Sparkle Pop from receiving or processing orders for the Consigned Inventory.

5. The TSA further provides that "[Sparkle Pop] shall have no obligation to Process any consigned goods except at [Debtors'] sole cost and expense, and [Debtors] shall indemnify and hold [Sparkle Pop] harmless from and against any claims, liabilities, or expenses arising from [Debtors'] consigned goods, from inventory owned by [Debtors] for which [Sparkle Pop] is not

---

[3] D.I. 68.
[4] D.I. 407; D.I. 408.
[5] Notice of Sale Closing to Sparkle Pop, LLC [D.I. 500]
[6] A copy of the TSA is attached to Debtors' Motion at Exhibit C.

deriving revenue or [Debtors'] failure to timely remove or otherwise take actions related to such goods." TSA at Ex. B-3-4.

6. Prior to Closing, Debtors maintained a website through which Debtors processed orders for sale of its inventory, including the Consigned Inventory, to its end-customers. Despite having identified the Consigned Inventory as an Excluded Asset under the APA, Debtors made no effort to remove the Consigned Inventory from their website prior to Closing. After the Closing, through no fault of Sparkle Pop, the Consigned Inventory remained listed for sale on the website, which Sparkle Pop acquired in connection with the APA. Bieg Dec. ¶ 6.

7. Additionally, Debtors did not segregate, remove, transport or otherwise dispose of the Consigned Inventory from the Olive Branch, Mississippi warehouse facility that Debtors sold to Sparkle Pop as part of the APA. Bieg Dec. ¶ 8.

8. Thus, upon taking ownership of Debtors' assets, including the Olive Branch facility, Sparkle Pop could not readily distinguish between Consigned Inventory and non-consigned inventory amongst the commingled goods. Bieg Dec. ¶ 9. Making matters more difficult, certain entities thought to be consignors contacted Sparkle Pop and informed Sparkle Pop that they were not in consignment relationships with Debtors.[7]

9. Critically, following the Closing, Sparkle Pop did not know whether Debtors maintained any legal or equitable interest in the Consigned Inventory. Bieg Dec. ¶ 10. As such, Sparkle Pop undertook no affirmative efforts to market or sell the Consigned Inventory upon taking ownership of Debtors' assets. *Id.* ¶ 11.

---

[7] Practically speaking, if this were the case, such goods in the Olive Branch facility would not be considered Consigned Inventory but rather inventory that transferred to Sparkle Pop pursuant to the APA.

10. Rather, Sparkle Pop passively fulfilled orders as they were received, including for the Consigned Inventory received through the website (which remained in the same form as delivered by Debtors) in the ordinary course of business. Bieg Dec. ¶¶ 12-13.

11. Servicing such orders was critical for both Debtors and the consignors. Indeed, as is understood by Debtors and the consignors, the Consigned Inventory consists of goods and products that will lose value the longer they remain unsold and in storage.[8] As such, had Sparkle Pop failed to fulfil orders for the Consigned Inventory, the consignors likely would have had claims against Sparkle Pop for failing to secure value-maximizing sales in the ordinary course of business, and in continuation of the business expectations the consignors had developed during the course of their relationships with Debtors.

12. In recognition that the continued sale of Consigned Inventory through passive fulfillment of orders through the website may later be subject to claims by Debtors and/or the consignors, Sparkle Pop immediately began tracking sales of Consigned Inventory and segregating all proceeds from such sales with the intent of preserving the funds received for the rightful party. Bieg. Dec. ¶ 13.

13. On May 27, 2025, Sparkle Pop issued a notice to its vendors, including the consignors, informing them that Sparkle Pop had taken ownership over Debtors' assets and would be operating the business going forward.

14. For nearly a month after the Closing, Sparkle Pop continued passively fulfilling orders for Consigned Inventory placed through the website with no objection from Debtors.

---

[8] *See* Transcript of Hearing, August 18, 2025 (R. Gorin, Direct) at 99:1-9 ("A. Typically, what happens with intellectual property is the property comes out. It has a cover price. Over a period of time, that cover price becomes less. It lowers unless over time something has happened that a new character was introduced in that book or there was, you know, perhaps a character passed away or there was some significant event that would retroactively cause that comic book to rise in value. But typically, this is the path that is more typical for this type of intellectual property.").

15. On June 8, 2025, however, representatives from the Debtors contacted Sparkle Pop employees stating that Sparkle Pop required the consent of the Debtors to process sales of Consigned Inventory and demanded that Sparkle Pop cease honoring all sales of Consigned Inventory. Bieg Dec. ¶ 16.

16. During this time period, however, Sparkle Pop continued to receive additional shipments of Consigned Inventory to the Olive Branch, Mississippi facility from certain consignors for sale. Because such inventory was shipped to Sparkle Pop after Sparkle Pop had notified its vendors of Sparkle Pop's ownership and control of the business, and because Debtors no longer had any interest in the business, Sparkle Pop accepted this post-Closing Consigned Inventory and continued to honor orders passively received through the website. Bieg Dec. ¶ 17.

17. For their part, Debtors continued through June and July of 2025 with full knowledge of Sparkle Pop's passive sales of Consigned Inventory.

18. By that time, Sparkle Pop had fulfilled sales of Consigned Inventory generating $1,051,575 and $515,866 in revenue for Consigned Inventory received prior to Closing and after the Closing, respectively. Bieg Dec. ¶ 18. In doing so, Sparkle Pop incurred approximately $$251,897 and $181,373 in costs, including shipping, packaging, and other costs associated with honoring sales of Consigned Inventory received prior to Closing and after the Closing, respectively. Bieg Dec. ¶ 19. In completing those sales for the benefit of Debtors and/or consignors, Sparkle Pop operated under the assumption that Debtors would reimburse Sparkle Pop for all costs associated with Processing the Consigned Inventory, as required under the TSA. To date, Debtors have not committed to honoring this obligation under the TSA.

6

19. Despite this Sparkle Pop has segregated and continues to hold any proceeds from the sale or Processing of Consigned Inventory, pending Court Order or agreement among the interested parties regarding who should receive the proceeds of those sales.

20. As of the date of this Objection, and prior to the Filing of the Motion, Sparkle Pop identified and removed all remaining Consigned Inventory from the website. Sparkle Pop has ceased all sales of Consigned Inventory and does not intend to honor any further sales of Consigned Inventory until this Court determines who holds proper title to the Consigned Inventory.

## ARGUMENT

### A. Sparkle Pop's Actions Do Not Constitute a Violation of the Automatic Stay

21. The filing of a bankruptcy petition "operates as a stay" of any pre-petition "action or proceeding against a debtor" or any pre-petition action "to recover a claim against the debtor", subject to limited exceptions. 11 U.S.C. § 362(a)(1). The "automatic stay" benefits a debtor's estate by providing a "breathing spell" from ongoing litigation and freezing creditor actions against the debtor or actions against estate property. *See Borman v. Raymark Industries, Inc.*, 946 F.2d 1031, 1036 (3rd Cir. 1991).

22. A debtor seeking to establish a violation of the automatic stay must establish, by a preponderance of the evidence, that: (1) the defendant knew of the existence of the stay; (2) the defendant performed an intentional action; and (3) the action violated the stay. *See, e.g.*, *Schlossberg v. Abell (In re Abell)*, 549 B.R. 631, 676 (Bankr. D. Md. 2016); *Ojiegbe v. Walter (In re Ojiegbe)*, 512 B.R. 513, 520 (Bankr. D. Md. 2014).

23. It is axiomatic, then, that the automatic stay applies only to "property of the estate". 11 U.S.C. § 362(a)(3). As to the Consigned Inventory, the question of whether it constitutes property of the estate is not only unresolved, it is the subject of a live dispute before this Court that the Court has previously ordered must be resolved through an adversary proceeding. D.I. 781

7

(staying Debtors' Sale Motion pending final judgment "finding that the proposed property to be sold in connection with the Sale Motion is property of the Debtors' estates"). If the Consigned Inventory is found to be the property of a non-debtor such as the consignors, then the automatic stay would not apply.

    i.    <u>The TSA Permits Sparkle Pop to Process Consigned Inventory.</u>

24. Sparkle Pop's actions do not rise to the level of a breach of the automatic stay. The TSA, which was negotiated with and agreed to by Debtors and entered by the Court as part of the Sale Order, permits the "Processing" of Consigned Inventory. That is exactly what Sparkle Pop's actions amount to, and nothing more.

25. Following the Closing, Sparkle Pop continued to honor sales earned through the Debtors' website (which would not have arisen but for Debtors' failure to remove the Consigned Inventory from the website prior to Closing). Sparkle Pop did so based on the TSA's language, which permits, but does not require, Sparkle Pop to undertake efforts to process, package, ship or dispose of the Consigned Inventory. *See* TSA, Ex. B-3.

26. Sparkle Pop's "Processing" of such orders further provided no benefit to Sparkle Pop; as set forth above, Sparkle Pop took such actions to ensure that the Consigned Inventory was disposed of in value-maximizing sales and avoided any delay or disruption with Sparkle Pop's end customers. Proceeds obtained from Sparkle Pop's sales of Consigned Inventory remain segregated and available for distribution to the rightful party, subject to reimbursement of Sparkle Pop's cost of sales incurred by Debtors as required by the TSA.

27. Moreover, it was reasonable for Sparkle Pop to continue honoring sales generated through the website following the Closing. Importantly, Debtors made no effort to remove the Consigned Inventory from either the website or the Olive Branch, Mississippi facility. Sparkle Pop therefore reasonably believed that the remaining inventory listed for sale on the website or

remaining at the Olive Branch, Mississippi facility were either abandoned by the Debtors or not part of the estate. Sparkle Pop's actions in this regard merely retained the status quo of the estate's property as of the time of the filing of the petition. *See Klemkowski v. CitiMortgage, Inc. (In re Klemkowski)*, 664 B.R. 681, 696 (Bankr. D. Md. 2024); *City of Chi. v. Fulton*, 592 U.S. 154, 154 (2021) (holding that mere retention of estate property after the filing of a bankruptcy petition does not violate the automatic stay provision of 11 U.S.C.S. § 362(a)(3)).

28. That the TSA, and the Sale Order, permitted such Processing belies any notion that Sparkle Pop violated the automatic stay. Debtors and Sparkle Pop, represented by counsel, negotiated for the provisions in the TSA and any failure by Sparkle Pop to continue Processing orders and honoring orders passively fulfilled through the website for Consigned Inventory could have subjected Sparkle Pop to liability from consignors, or even Debtors themselves. Debtors' Motion essentially traps Sparkle Pop with a choice between two evils; refuse to Process Consigned Inventory and risk claims from consignors (for which Debtors would ultimately be liable through the TSA's indemnification obligations) or continue to Process Consigned Inventory (as is permitted by the TSA and Sale Order) and risk claims by Debtors for breach of the automatic stay.

29. Faced with such a choice, Sparkle Pop was forced to act in the best interests of all involved; Sparkle Pop's continued Processing of orders for Consigned Inventory obtained maximum value for the Consigned Inventory for the benefit of Debtors and the consignors, while preserving Sparkle Pop's reputation and relationships with its end customers.

30. In short, the TSA's terms permitting Sparkle Pop to "Process" Consigned Inventory and Debtors' lack of any action in moving or transferring Consigned Inventory (all but abandoning the Consigned Inventory) following the Closing all support the fact that Sparkle Pop undertook reasonable efforts to honor post-Closing sales of Consigned Inventory for the benefit of both

Debtors and the consignors. Sparkle Pop's impossible choice in continuing to honor sales of the Consigned Inventory—forced on Sparkle Pop by Debtors' inaction—is not a breach of the automatic stay and should not be penalized where, as set forth below, there are serious doubts as to whether the Consigned Inventory actually is part of the Debtors' bankruptcy estate at all.[9]

  ii. Debtors' Motion is an Improper End-Run Around the Court's Determination Regarding Who Owns the Consigned Inventory.

  31. Debtors' Motion should further be denied because it is not the proper procedural mechanism to accomplish what Debtors intend. Debtors' Motion goes to great lengths to establish an ownership interest in the Consigned Inventory, arguing that the Consigned Inventory is property of the bankruptcy estate because Debtors maintain both a possessory and contractual interest in the Consigned Inventory. *See* Motion at 7-10.[10]

  32. Sparkle Pop acknowledges that a genuine dispute as to who owns the Consigned Inventory exists. But that dispute is not between Debtors and Sparkle Pop, but rather between Debtors and the consignors. Debtors cannot avoid the "threshold issue" of "whether the [Consigned Inventory is] property of the estate" by seeking damages against Sparkle Pop for sale of the Consigned Inventory when this Court has not yet determined the threshold question of whether Debtors are entitled to any proceeds from such sales in the first instance. *See In re*

---

[9] Even further, the Sale Order provides that the automatic stay imposed by Section 362 of the Bankruptcy Code is modified "to the extent necessary to implement" the transactions contemplated by the Sale Order, including the APA and TSA. *See* Bieg Dec. at Ex. A at 15. Thus, the Sale Order permits Sparkle Pop's "Processing," which arguably includes the continuation of fulfillment of orders passively received from the Debtors' pre-Closing website.

[10] Sparkle Pop does not agree with Debtors' assertions that Debtors maintain a possessory or contractual interest in the consigned goods. Indeed, Debtors' "possessory" interest over the consigned goods extinguished upon Debtors' failure to remove the Consigned Inventory from the Olive Branch, Mississippi warehouse facility following the Closing, leaving the Consigned Inventory in the possession of Sparkle Pop. Sparkle Pop further does not agree with Debtors' assertion of a contractual interest in the Consigned Inventory for the reasons presented by the Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion for Entry of Order Approving (I) Procedures For Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief [D.I. 649]. Notwithstanding Sparkle Pop's disagreement with Debtors' claims of interest in the Consigned Goods – possessory or contractual – Sparkle Pop takes no position on this issue in response to the Motion.

*Whitehall Jewelers Hldgs., Inc.*, 2008 WL 2951974, at **3, 6 (Bankr. D. Del. July 28, 2008) (debtors' request to sell consigned goods free and clear of liens and claims improper without first requiring debtors to commence adversary proceedings against each consignor to establish whether debtors held any interest in consigned goods).

33. Indeed, this Court has already determined that Debtors must file adversary actions against each of the consignors to establish Debtors' ownership of or interest in the Consigned Inventory.[11] Debtors' instant Motion, which seeks an award of compensatory and punitive damages for sales of the Consigned Inventory, is a blatant attempt to circumvent the Court's order requiring commencement of adversary proceedings by which Debtors seek to obtain the sale proceeds from Consigned Inventory that they may ultimately not be entitled to, depending on the outcome of the forthcoming adversary proceedings between Debtors and the consignors.

34. And as set forth above, Sparkle Pop has segregated the proceeds generated from its passive sales of Consigned Inventory such that, when the Court makes a determination, Sparkle Pop will be ready and able to distribute the proceeds accordingly pursuant to a Court Order. Put simply, Debtors' Motion is premature at best, and underhanded at worst.

35. Rather than circumvent the Court's prior orders, the most efficient path forward is to allow Debtors and the consignors to litigate their claims of ownership and interest in the Consigned Goods. Upon the Court's final determination as to each consignor, Sparkle Pop will be prepared to distribute any proceeds generated from sales of Consigned Inventory to the proper party. To the extent the Court is inclined to order Sparkle Pop to turn over to the Debtors any

---

[11] *See* Order Granting Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion for Entry of Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief [D.I. 781].

monies at this time, Sparkle Pop requests that any such order provide that the turnover may not subject Sparkle Pop to further claims from the Consignors.

**B.      Further Injunctive Relief is Unwarranted on the Current Record**

36.     As set forth above, and as stated in the Bieg Declaration, prior to the filing of Debtors' Motion, Sparkle Pop had undertaken actions to (i) remove all Consigned Inventory from its websites (which should have been done by Debtors prior to Closing), (ii) cease all sales of Consigned Inventory; and (iii) segregate the proceeds of any Consigned Inventory that has been sold.  Bieg Dec. ¶¶ 18, 20.  Contrary to Debtors' assertions in the Motion that Sparkle Pop's sales of Consigned Inventory remain "ongoing" (Motion at 11), Sparkle Pop ceased  further sales of Consigned Inventory prior to the date of the Motion.

37.     In simple terms, Debtors will face no irreparable harm in the absence of any additional injunctive relief imposed by the Court and, through Sparkle Pop's own voluntary actions in the face of a genuine dispute as to the ownership of the Consigned Inventory, Debtors' request for injunctive relief is effectively moot.  *Larcomb v. Smith*, 2022 WL 5245776, at *3 (D. Md. Oct. 6, 2022) ("Where injunctive or declaratory relief is requested, it is possible for events occurring subsequent to the filing of the complaint to render the matter moot.").

38.     Thus, the only requested relief still available to Debtors is a request for money damages.  As set forth above, such a request is not only improper, but necessarily premature as this Court has not yet decided who holds an ownership interest in the Consigned Inventory.

39.     Further, any additional injunction imposed on Sparkle Pop will do significant harm to Sparkle Pop's reputation and its ability to continue the operations of the business as a going concern.  For example, Debtors have insisted that Sparkle Pop not communicate with any consignors during the pendency of these proceedings.  But Sparkle Pop's ability to communicate with the consignors is critical to the success of Sparkle Pop's future relationships with the

consignors, regardless of the outcome of Debtors' forthcoming adversary proceedings and/or the disposition of proceeds from the sales of the Consigned Inventory. On this basis alone, the equities do not support the imposition of injunctive relief against Sparkle Pop and the Motion should be denied.

40. In simple terms, the true dispute here lies between Debtors and the consignors. Sparkle Pop stands ready and willing to comply with any court order regarding proceeds from the sale of Consigned Inventory. But Debtors' attempt to circumvent the Court's order requiring that dispute to be litigated between Debtors and consignors should be rejected and this Court should deny the Motion.

## **WAIVER OF MEMORANDUM OF LAW**

41. Pursuant to Local Rule 9013-2, Sparkle Pop states that, in lieu of submitting a memorandum in support of this opposition, Sparkle Pop will rely on the grounds and authorities set forth herein.

WHEREFORE, Sparkle Pop respectfully request the Court deny the Motion for the reasons set forth herein.

Dated: September 5, 2025          DLA PIPER LLP US

                                    By:    /s/ *Ellen E. Dew*
                                                Ellen E. Dew (Bar No. 28830)
                                                Peter J. Artese (Bar No. 31258)
                                                Ellen.dew@us.dlapiper.com
                                                Peter.artese@us.dlapiper.com
                                                DLA Piper LLP US
                                                650 S Exeter Street, Suite 1100
                                                Baltimore, MD 21201
                                                (410) 580-3000

                                                Jamila Willis (*pro hac vice*)
                                                1251 Avenue of the Americas
                                                New York, New York 10020
                                                (212) 335-4500
                                                Jamila.willis@us.dlapiper.com

                                                *Attorneys for Interested Party Sparkle Pop, LLC*

**CERTIFICATE OF SERVICE**

I certify that, on September 5, 2025, a true copy of *Sparkle Pop, LLC's Objection to Debtors' Motion (I) to Enforce the Automatic Stay and (II) to Enforce the Sale Order and (III) Granting Related Relief* was served via CM/ECF upon parties registered to receive CM/ECF notifications in the above referenced cases.

*/s/ Ellen E. Dew*
Ellen E. Dew