# EXHIBIT A

## Sale Order

Entered: May 1st, 2025
Signed: May 1st, 2025

**SO ORDERED**



**DAVID E. RICE**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

In re

Diamond Comic Distributors, Inc., *et al.*,

Debtors.[1]

Case No. 25-10308 (DER)

Chapter 11

(Jointly Administered)

**Re: D.I. 136, 168 & 385**

I hereby certify that the foregoing is a true copy of the original thereof now on file in this office.

Dated this 8th day of
May, 2025

Clerk, U.S. Bankruptcy Court
for the District of Maryland

### ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AMONG THE DEBTORS AND SPARKLE POP, LLC; (II) APPROVING SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (III) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

Upon (I) the motion (the "Sale Motion")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") seeking entry of an order (this "Order") authorizing and

approving: (a) the proposed sale of substantially all of the Debtors' assets free and clear of all liens,

claims, encumbrances, and other interests other than any assumed liabilities; (b) the assumption of

those contracts of the Debtors identified in the applicable asset purchase agreement (the "Assigned

---

[1]    The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

[2]    Capitalized terms used but not defined herein are defined in the Sale Motion or the Supplemental Sale Motion (as defined herein).

Contracts") and assignment and sale of the Assigned Contracts to the successful bidder for the

Assets; and (c) granting related relief, and (II) the Court having entered an order (D.I. 136) (the

"Bidding Procedures Order") approving, among other things, the bidding procedures (the "Bidding

Procedures"), the proposed form of notice of the Sale Hearing, and Universal Distribution LLC,

as the Stalking Horse Bidder for the Alliance Assets, and (III) after an extensive marketing process,

an Auction was held and conducted pursuant to the terms of the Bidding Procedures Order on

March 24, 2025, and (IV) the Court having conducted a hearing on the Motion commencing on

April 7, 2025 (the "Initial Sale Hearing") after which the Court issued an Order [Docket no. 335]

approving the sale of substantially all of the Debtors' assets to Alliance Entertainment, LLC

pursuant to an Asset Purchase Agreement dated as of April 10, 2025 (the "Alliance APA"), and

(V) it appearing that Alliance Entertainment LLC issued a Notice purporting to terminate the

Alliance APA on or about April 25, 2025, and (VI) upon the Debtors' Motion For Entry of Orders

Authorizing the Sale of Substantially all of the Debtors' Assets to Back-Up Bidders Pursuant to

the Bidding Procedures, filed on April 29, 2025 [Docket No. 385] (the "Supplemental Sale

Motion" and, collectively with the Sale Motion, the "Motion"), and (VII) it appearing that all

interested parties were offered an opportunity to be heard with respect to the Motion, and (VIII)

the Court having (a) reviewed and considered the Motion, all relief related thereto, any objections

thereto and statements of counsel and the evidence presented in support of the relief requested by

the Debtors in the Motion at the Initial Sale Hearing and at the hearing on the Supplemental Sale

Motion held on April 30, 2025 (the "Supplemental Hearing" and, together with the Initial Hearing,

the "Sale Hearings"), and (b) found that, after an appropriate marketing process by the Debtors

under the facts and circumstances of these cases, Sparkle Pop, LLC ("Purchaser") has submitted

the highest or otherwise best bid for the Debtors' DCD Business, CGA Business and the Diamond

55361033.6

Select Toy Business (the "Assets"), all as defined in the Asset Purchase Agreement between
Diamond Comic Distributors, Inc. and Diamond Select Toys & Distributors, LLC (collectively,
the "Sellers") and Purchaser dated as of April 27, 2025 (as amended, the "APA"); and adequate
and sufficient notice of the Bidding Procedures, the APA, the Motion, and all transactions (the
"Sale") contemplated thereunder and in this Order were given pursuant to and consistent with the
Bidding Procedures Order; and it appearing that the relief granted herein is in the best interests of
the Debtors, their estates, creditors, and other parties in interest; and it further appearing that the
legal and factual bases set forth in the Motion and at the Sale Hearings establish just cause for the
relief granted herein; and after due deliberation thereon; and good and sufficient cause appearing
therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      **Jurisdiction and Venue**.  This Court has jurisdiction to consider the Motion under
28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these
cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion
are sections 105, 363 and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules
2002, 6004, 6006, 9007 and 9014, and the applicable requirements of the local rules of the Court.

C.      **Final Order**.  This Order constitutes a final order within the meaning of 28 U.S.C.
§ 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary
under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made
applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for
delay in the implementation of this Order, and expressly directs entry of judgment as set forth
herein.

55361033.6

D.      **Notice**. Notice of the Motion, the time and place of the proposed Auction, the time and place of the Sale Hearings and the time for filing objections to the Motion (the "Sale Notice") was reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Auction, and the Sale Hearing.

E.      As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, Sale Hearings, Sale and transactions contemplated thereby, has been provided in accordance with the Bidding Procedures Order, sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008. The Debtors have complied with all obligations to provide notice of the Motion as set forth in the Bidding Procedures Order. The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, Auction, or Sale Hearings is or shall be required. The disclosures made by the Debtors concerning the Motion, the Auction, and Sale Hearings were good, complete, and adequate.

F.      **Compliance with Bidding Procedures Order**. As demonstrated by evidence proffered or adduced, and the representations of counsel at the Sale Hearings, the Debtors have conducted a thorough marketing process and a fair and open sale process in compliance with the Bidding Procedures Order. The Bidding Procedures were non-collusive, substantively and procedurally fair to all parties, were the result of arm's-length negotiations, and afforded a full, fair, and reasonable opportunity for any interested party to obtain necessary due diligence information and to submit the materials required under the Bidding Procedures Order by the Bid Deadline. Through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors: (i) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer

55361033.6

to purchase the Debtors' Assets; (ii) provided potential purchasers sufficient information to enable them to make an informed judgment on whether to bid on the Assets; and (iii) considered any bids submitted on or before the Bid Deadline.  Based upon the circumstances and record of these chapter 11 cases, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.

G.    In accordance with the Bidding Procedures Order, the Debtors have served notices of potential assumption and assignment (D.I. 160 and 194) (collectively, the "Contract Notice"), which identifies the amount that the Debtors believe is required to be paid to cure any defaults arising under the contract pursuant to section 365(b)(1) of the Bankruptcy Code (the "Cure Amount"), upon each non-Debtor counterparty to an Assigned Contract. The service and provision of the Contract Notice was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of assumption, assignment and sale of the Assigned Contracts or establishing a Cure Amount for the respective Assigned Contract. Non-Debtor counterparties to the Assigned Contracts have had an adequate opportunity to object to assumption and assignment of the applicable Assigned Contract and the Cure Amount set forth in the Contract Notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). The deadline to file an objection to the stated Cure Amount, to the proposed assumption, assignment, or transfer of an Assigned Contract, and adequate assurance of future performance provided by the Purchaser (a "Contract Objection") has expired and to the extent any such party timely filed a Contract Objection, all such Contract Objections have been resolved, withdrawn, overruled, or continued to a later hearing by agreement of the parties.  To the extent that any such

55361033.6

party did not timely file a Contract Objection by March 12, 2025 (or other deadline applicable to such party) (the "Contract Objection Deadline"), such party shall be deemed to have consented to (i) the assumption, assignment and sale of the Assigned Contract to the Purchaser and (ii) the proposed Cure Amount set forth on the Contract Notice.

H.    **Corporate Authority**.  Subject to the entry of this Order, each Debtor (i) has the requisite corporate power and authority to execute, deliver, and perform its obligations under the APA and all other documents contemplated thereby, and has taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery and performance of its obligations under the APA and to consummate the Sale, including as required by its organizational documents, and upon execution thereof, the APA and the related documents were or will be duly executed and delivered by each Debtor and enforceable against such Debtor in accordance with their terms and, assuming due authorization, execution and delivery thereof by the other parties thereto, constituted or will constitute a valid and binding obligation of each Debtor. No government, regulatory, or other consents other than those expressly provided for in the APA were required for the execution, delivery and performance by the Debtors of the APA or the consummation of the Sale contemplated thereby. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Sale.

I.    The APA was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither the Debtors nor the Purchaser is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims or similar claims.

6

55361033.6

J.      The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Assets are subject to first priority security interests and liens (the "DIP Liens") granted to JPMorgan Chase Bank, N.A. (the "DIP Lender") under the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 163] (the "Final DIP Order"). The transfers of the Assets by Debtors to Purchaser (a) vest or will vest Purchaser with all right, title and interest of the Debtors in and to the Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all liens, claims and encumbrances (including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or untiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding,

55361033.6

law, equity or otherwise (collectively, the "Encumbrances"), with any such Encumbrances to attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Assets prior to Sale closing, and (B) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law. For the avoidance of doubt and without limiting the foregoing, the transfer of the Assets to Purchaser shall be free and clear of any Encumbrances relating to or in connection with (i) any Employee Benefit Plan or pension plans contributed to or maintained by the Debtors, or multiemployer plan participated in by the Debtors prior or subsequent to the Petition Date; (ii) the Worker Adjustment and Retraining Notification Act of 1988; (iii) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; or (iv) any collective bargaining agreement(s) to which Debtors are a party or otherwise obligated under.

K.   **Sale in Best Interests of the Debtors' Estates**. Good and sufficient reasons for approval of the APA and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization, in that, among other things, immediate consummation of the Sale to Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

L.   The Sale must be approved and consummated promptly in order to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale. Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price, the

55361033.6

proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

M.     The consummation of the Sale and the assumption, assignment and sale of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

N.     **Good Faith of Purchaser and Sellers**.  The APA was negotiated, proposed, and entered into by the Debtors and Purchaser without collusion, in good faith, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties. Based on the record in these cases and at the Hearing on this Motion, neither any of the Debtors, nor Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code section 363(n). Specifically, Purchaser has not acted in a collusive manner with any person and the Purchase Price was not controlled by any agreement among bidders. The Debtors and Purchaser have fully disclosed the identities of each entity participating in Purchaser's bid. Purchaser is purchasing the Assets, in accordance with the APA, in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to all of the protections afforded by such provision, and otherwise has proceeded in good faith in all respects in connection with the Debtors' chapter 11 cases. As demonstrated by (i) evidence proffered or adduced at the Sale Hearings and (ii) the representations of counsel made on the record at the Sale Hearing, appropriate marketing efforts and a competitive sale process were conducted in accordance with the Bidding Procedures Order and, among other things: (a) the Debtors and Purchaser complied with the provisions in the Bidding Procedures Order; (b) Purchaser agreed to

55361033.6

subject its Bid to the competitive bidding procedures set forth in the Bidding Procedures Order; and (c) all payments to be made by Purchaser in connection with the Sale have been disclosed.

O.    **Highest or Otherwise Best Offer**. The Debtors conducted the Auction in accordance with, and have otherwise complied in all material respects with, the Bidding Procedures Order.  The procedures established in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Assets. The Bidding Procedures and the opportunity to submit a higher or otherwise better bid were duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher or otherwise better offer for the Assets. The APA constitutes the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the APA constitutes the highest or otherwise best offer for the Assets is a valid and sound exercise of their fiduciary duties and constitutes a valid and sound exercise of the Debtors' business judgment.

P.    **Consideration**.  The consideration provided by Purchaser pursuant to the APA (a) is fair and reasonable, (b) is the highest or otherwise best offer for the Assets, and (c) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formally the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession, or the District of Columbia. No other person or entity or group of entities has offered to purchase the Assets for greater value to the Debtors' estates than Purchaser.

55361033.6

Q.    **Legal, Valid, and Binding Transfer**.  The Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The transfer of the Assets to the Purchaser will be a legal, valid, and effective transfer of the Assets and, except as provided in the APA or this Order, will vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of all Encumbrances, unless specifically assumed by the Purchaser pursuant to the APA, in accordance with section 363(f) of the Bankruptcy Code.  The APA is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable according to its terms.

R.    **No Merger**. Purchaser is not holding itself out to the public as a continuation of the Debtors, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and the Debtors. The Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser and Debtors and/or Debtors' bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between the Debtors and Purchaser. Purchaser is not a mere continuation of the Debtors or their bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to the Debtors or their bankruptcy estates.

S.    **No Successor**. Except for the contractual commitments of Purchaser under the Assumed Liabilities specifically to the extent set forth in the APA, Purchaser is not, and shall not be considered or deemed, as result of any action taken in connection with the Sale, to be a successor in interest of the Debtors or their estates for any purpose, including but not limited to under any federal, state, or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat or unclaimed property laws, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or

11

under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine and Purchaser and its affiliates shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "WARN Act"), 929 U.S.C. §§ 210 et seq., or the Comprehensive Environmental Response Compensation and Liability Act, and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act and/or the Fair Labor Standards Act. Except for the Assumed Liabilities and solely to the extent set forth in the APA, the (i) transfer of the Assets to Purchaser and (ii) assumption, assignment and sale to Purchaser of the Assigned Contracts do not and will not subject Purchaser to any liability whatsoever with respect to the operation of the Debtors' business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including any theory of antitrust or successor or transferee liability. For the avoidance of doubt, with respect to the Assigned Contracts, any contractual warranty claims under the Assigned Contracts and claims by counterparties to the Assigned Contracts for contribution toward third-party injury, damage, or loss are not limited, waived, released, or disclaimed and are affirmatively assumed by Purchaser to the extent provided in the Assigned Contracts.

T.    **Free and Clear**.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any Encumbrances, other than the Assumed Liabilities, to the fullest extent permitted by applicable law. Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the Sale to Purchaser was not free and clear of all Encumbrances other than the Assumed Liabilities.  The Debtors may sell the Assets free and clear of any Encumbrances of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Each entity with any Encumbrances of any kind on the Assets to be transferred on the Closing Date: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Encumbrances; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Without limiting the generality of the foregoing, the DIP Lender has consented to the sale of the Assets, free and clear of the DIP Liens, conditioned and in express reliance upon the proceeds of sale being remitted at closing to the DIP Lender in accordance with a closing statement reasonably acceptable to the DIP Lender.  All Encumbrances attach to any cash proceeds received by the Debtors that are ultimately attributable to the property against or in which such Encumbrances are asserted, subject to the terms of such Encumbrances with the same validity, force, and effect, and in the same order of priority, which such holders of Encumbrances now have against the Assets or their proceeds, if any, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

55361033.6

U.      **Not a *Sub Rosa* Plan**.  The APA and Sale do not constitute an impermissible *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.

V.      **Cure/Adequate Assurance**.   Notice of the Debtors' assumption, assignment and sale to the Purchaser of the Assigned Contracts has been provided to each non-Debtor counterparty to an Assigned Contract, together with the Cure Amount, if any, to be paid to such non-Debtor counterparty to cure any defaults under, and to otherwise comply with the requirements of section 365(b) of the Bankruptcy Code with respect to each Assigned Contract.  As to each Assigned Contract, payment of the Cure Amount listed on Exhibit 1 to the Cure Notice (or such other Cure Amount as agreed, in writing, by the Debtors, the Purchaser and the counterparty to the applicable Assigned Contract or ordered by this Court) is sufficient for the Debtors to comply fully with the requirements of section 365(b) of the Bankruptcy Code.  In addition, Purchaser has provided or will provide adequate assurance of its ability to perform its obligations under each of the Assigned Contracts within the meaning of section 365 of the Bankruptcy Code. All other requirements and conditions under the Bankruptcy Code for the assumption by the Debtors and assignment and sale to Purchaser of the Assigned Contracts have been satisfied. Therefore, subject to the terms of this Order, the Assigned Contracts may be assumed by the Debtors and assigned and sold to Purchaser.

**THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      Any objections or reservation of rights filed or asserted in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein or on the record at the Sale Hearing, are hereby overruled on the merits in their entirety with prejudice, other than objections on account of a Cure Dispute that are presently subject to the cure resolution process.

55361033.6

3.      The APA, and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved in all respects. The APA is attached hereto as **Exhibit 1**.

4.      Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are hereby authorized without the need of further approval from this Court to (a) execute any additional instruments or documents that may be reasonably necessary or appropriate to implement the APA, including without limitation a transition services agreement, *provided* that such additional documents do not materially change the APA's terms adversely as to the Debtors' estates; (b) consummate the Sale in accordance with the terms and conditions of the APA and the instruments to the APA contemplated thereby; and (c) execute and deliver, perform under, consummate, implement, and close fully the transactions contemplated by the APA, including the assumption, assignment and sale to Purchaser (in accordance with the APA) of the Assigned Contracts, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale. Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order, *provided, however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

5.      This Order and terms and provisions of the APA shall be binding in all respects upon the Debtors, their estates, their successors and assigns, all creditors of, and holders of equity interests in, the Debtors, any holders of Encumbrances in, against, or on all or any portion of the Assets (whether known or unknown), Purchaser and all successors and assigns of Purchaser, the Assets, and any trustees subsequently appointed in the Debtors' chapter 11 cases or upon a

conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases. This Order and the APA shall inure to the benefit of the Debtors, their estates and creditors, Purchaser, and the respective successors and assigns of each of the foregoing. The APA shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their equity holders, or any trustee, examiner, or receiver. Any trustee appointed in these chapter 11 cases shall be and are hereby authorized to operate the business of the Debtors to the fullest extent necessary to perform compliance with the terms of this Sale Order and the APA.

6.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.    The Sale of the Assets to Purchaser pursuant to the APA and the consummation of the transactions contemplated thereby do not require any consents other than as specifically required in the APA. Each and every federal, state and local government agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the APA. A certified copy of this Order may be filed with the appropriate clerk or recorded with any recorder of any state, county or local authority to act to cancel any Encumbrances.

8.    **Transfer of Assets Free and Clear of Encumbrances**.  Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Assets to Purchaser in accordance with the APA and such transfer shall constitute a legal, valid, binding, and effective transfer of such Assets. Such transfer of the Assets shall vest Purchaser with title in and to the Assets and, other than the Assumed Liabilities, Purchaser shall take title to and possession of the Assets free and clear of all Encumbrances (other than the Assumed Liabilities) of any kind or nature whatsoever, including but not limited to successor or

16

successor in interest liability and claims in respect of the Excluded Liabilities, with all such Encumbrances to attach to the sale proceeds, if any, with the same validity, force and effect, and in the same order of priority, which such Encumbrance had prior to the Sale, subject to any rights, claims and defenses of the Debtors or their estates in connection therewith. Without limiting the generality of the foregoing, the sale proceeds shall be remitted to the DIP Lender in accordance with the Final DIP Order and consistent with a closing statement reasonably acceptable to the DIP Lender.

9.    Unless otherwise expressly included in the Assigned Contracts or the definition of "Assumed Liabilities" in the APA and solely to the extent set forth in the APA, Purchaser shall not be responsible for any Encumbrances, including, but not limited to, in respect of the following: (a) any mortgages, deeds of trust, and security interests; (b) any claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the WARN Act, (vii) the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act, (ix) the Family Medical Leave Act, (x) the Labor Management Relations Act, (xi) the Comprehensive Environmental Response Compensation and Liability Act, (xii) other federal or state environmental laws, (xiii) state discrimination laws, (xiv) state unemployment compensation laws or any other similar state laws, or (xv) any other state or federal benefits or claims relating to any employment with the Debtors or any of its respective predecessors; (c) any bulk sales or similar law; (d) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, or any state or local tax laws; (e) any escheat or unclaimed property laws; (f) to the extent not included in the foregoing, any of the Excluded Liabilities under the APA; and

17

(g) any theories of successor or transferee liability as a result of any action taken in connection with the Sale.

10.    On the Closing Date, each of the Debtors' creditors shall and is hereby authorized to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrances or other interests in the Acquired Assets, if any, as such Encumbrances may have been recorded or may otherwise exist.

11.    If any person or entity which has filed statements or other documents or agreements evidencing Encumbrances on, against, or in, all or any portion of the Assets (other than statements or documents with respect to the Assumed Liabilities) shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Encumbrances of any kind or other interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized, and Purchaser is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets.

12.    On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to Purchaser of the Debtors' interests in the Acquired Assets.  This Order is and shall be effective as a determination that, on the Closing Date, all Encumbrances or other interest of any kind or nature whatsoever existing as to the Assets prior to the Closing Date, other than the Assumed Liabilities, shall have been unconditionally released, discharged, and terminated to the fullest extent permitted by applicable law, and that the conveyances described herein have been effected.  This Order shall

55361033.6

be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Encumbrances and other interests of record except those assumed as Assumed Liabilities.

13.    All persons or entities that are presently, or on the Closing Date may be, in possession of some or all of the Assets to be sold, transferred, or conveyed (wherever located) to Purchaser pursuant to the APA are hereby directed to surrender possession of the Assets to Purchaser on the Closing Date or at such later time as Purchaser reasonably requests. Subject to the terms, conditions and provisions of this Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the Assets to Purchaser in accordance with the terms of the APA.

14.    To the greatest extent available under applicable law, Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets to the extent transferred in the APA, and all such licenses, permits, registrations, and governmental authorizations and approvals

55361033.6

are deemed to have been transferred to Purchaser as of the Closing Date.  To the extent provided by section 525 of the Bankruptcy Code, no Governmental Unit may revoke or suspend any grant, permit, or license relating to the operation of the Assets sold, transferred, assigned, or conveyed to Purchaser or its Affiliates on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale set forth in the APA.

15.    **Prohibition of Actions Against Purchaser**.  Except for the Assumed Liabilities and any rights or obligations set forth in the Assigned Contracts and solely to the extent set forth in the APA, Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Assets. Without limiting the generality of the foregoing, and as expressly permitted in the APA, Purchaser shall not be liable for any Encumbrances (other than the Assumed Liabilities as set forth in the APA) including, but not limited to, for any liabilities, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date.

16.    Except with respect to the Assumed Liabilities and any rights and obligations as set forth in the Assigned Contracts, or as otherwise expressly provided for in this Order or the APA, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances of any kind or nature whatsoever against or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured,

contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Assets to Purchaser in accordance with the APA, hereby are forever barred, estopped, and permanently enjoined from asserting against Purchaser, its successors or assigns, its property, or the Assets, such persons' or entities' Encumbrances in and to the Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against Purchaser, its successors, assets, or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its successors, assets or properties; (c) creating, perfecting, or enforcing any Encumbrances of any kind whatsoever or any other interest against Purchaser, its successors, assets, or properties; (d) asserting any setoff or right of subrogation of any kind against any obligation due Purchaser or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Assets or conduct the business operated with the Assets.

17.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Assets to Purchaser in accordance with the terms of the APA, and this Order.

18.     Notwithstanding the foregoing, nothing herein shall prevent (a) the Debtors from pursuing an action against Purchaser arising under the APA or the related documents, or (b) any

55361033.6

administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state, and local officials from properly exercising their police and regulatory powers.

19.     **Assumption, Assignment and Sale of Contracts**.    The Debtors are hereby authorized, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, to (a) assume, assign and sell to Purchaser, in accordance with the APA, effective upon the Closing Date, the Assigned Contracts free and clear of all Encumbrances and other interests of any kind or nature whatsoever (other than the Assumed Liabilities) and (b) execute and deliver to Purchaser such documents or other instruments as Purchaser deems necessary to assign and transfer the Assigned Contracts and the Assumed Liabilities to Purchaser in accordance with the APA.

20.     The Purchaser has provided or will provide adequate assurance of future performance under the Assigned Contracts within the meaning of section 365 of the Bankruptcy Code.

21.     Effective as of the Closing Date, the Assigned Contracts shall be assumed by the Debtors and assigned and sold to Purchaser, notwithstanding any provision in any such Assigned Contract or applicable law (including those of the type described in sections 365(b)(2), 365(c), and 365(f) of the Bankruptcy Code) that directly or indirectly prohibits, restricts, or conditions such assignment or transfer, and following the Closing Date shall remain in full force and effect for the benefit of Purchaser, in accordance with the APA, and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by Purchaser in accordance with the APA; and upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, Purchaser shall be fully and irrevocably vested in all rights, title, and interest of each Assigned Contract.

55361033.6

22.    All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured on the Closing Date or as soon thereafter as practicable by payment of the Cure Amount by Purchaser. To the extent that any counterparty to an Assigned Contract did not object to its Cure Amount by the Contract Objection Deadline, such counterparty is deemed to have consented to such Cure Amount and the assumption, assignment and sale of its respective Assigned Contract(s) to Purchaser in accordance with the APA. Purchaser shall have no liability arising or accruing under the Assigned Contracts on or prior to the Closing, except as otherwise expressly provided in the APA, the Assigned Contracts or this Order. The non-Debtor counterparties to the Assigned Contracts are barred from asserting against the Debtors, their estates, Purchaser, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Assigned Contracts arising or incurred prior to the Closing, other than the Cure Amount set forth on the Contract Notice or such other Cure Amount as agreed to by the Debtors (with the consent of Purchaser) or as determined by the Court.

23.    Unless otherwise represented by the Debtors in a separate notice, on the record at the Sale Hearing, or pursuant to a contract or lease amendment entered into by the Debtors, Purchaser, and the appropriate counterparty (any such amendment being deemed approved by this Order), the Contract Notice reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults under the Assigned Contracts, and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment and sale to Purchaser of the Assigned Contracts in accordance with the APA.

23

24.     Except for the Assumed Liabilities, upon the Debtors' assignment and sale of the
Assigned Contracts to Purchaser under the provisions of this Order and any additional orders of
this Court and payment of any Cure Amount, no default shall exist under any Assigned Contract,
and no counterparty to any Assigned Contract shall be permitted (a) to declare a default by
Purchaser under such Assigned Contract or (b) otherwise take action against Purchaser as a result
of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under
the relevant Assigned Contract.  Except for the Assumed Liabilities, each non-Debtor party to an
Assigned Contract hereby is also forever barred, estopped, and permanently enjoined from (i)
asserting against the Debtors or Purchaser, or the property of any of them, any default or claim
arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or
existing as of the Closing, including those constituting Excluded Liabilities or, against Purchaser,
any counterclaim, defense, setoff, recoupment or any other claim asserted or assertable against the
Debtors; and (ii) imposing or charging against Purchaser any rent accelerations, assignment fees,
increases, or any other fees as a result of the Debtors' assumption, assignment and sale to
Purchaser of any Assigned Contract in accordance with the APA.  The validity of such assumption,
assignment and sale of each Assigned Contract shall not be affected by any dispute between the
Debtors and any non-Debtors party to an Assigned Contract.

25.     Except as provided in the APA or this Order, after the Closing, the  Debtors and
their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities
and all holders of such Assumed Liabilities of any kind whatsoever are forever barred and estopped
from asserting such claims against the Debtors, their successors or assigns, their property, or their
assets or estates.  The failure of the Debtors or Purchaser to enforce at any time one or more terms

24

or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition of the Assigned Contracts.

26.     Notwithstanding anything to the contrary in this Order or the Contract Notice, with respect to the Assigned Contracts for which the non-Debtor counterparties thereto filed timely Contract Objections that have not been resolved as of the entry of this Order, these Contract Objections are adjourned (collectively, the "Adjourned Contract Objections"). The Cure Amount of any Assigned Contract subject to an Adjourned Contract Objection shall be fixed at the amounts agreed to in writing by the Debtors (subject to the consent of Purchaser) and such counterparties, or if no such agreement is reached, fixed at the amounts ordered by this Court after a hearing at a date and time reasonably determined by the Debtors in consultation with Purchaser (or otherwise scheduled by this Court). Pending the parties' consensual resolution of the Adjourned Contract Objection or the Court's adjudication of such amounts: (i) any Assigned Contract that is the subject of an Adjourned Contract Objection solely with respect to Cure Amount may be assumed by the Debtors and assigned and sold to Purchaser, provided that the Purchaser segregates the Cure Amount the non-Debtor counterparty asserts in the Adjourned Contract Objection is required to be paid (or such lower amounts as agreed to by Purchaser and the counterparty) with proof thereof to the counterparty; and (ii) Purchaser may elect to re-designate any Assigned Contract to exclude such contract. Upon the Cure Amount subject to an Adjourned Contract Objection becoming fixed as provided for in this paragraph: (a) such fixed amount shall be the "Cure Amount" for the Assigned Contract for all purposes under this Order; (b) the Purchaser may elect to re-designate the related Assigned Contract to exclude such contract; and (c) if the Assigned Contract is not re-designated and was not previously assumed by the Debtors and assigned and sold to Purchaser,

55361033.6

such Assigned Contract shall be promptly assumed by the Debtors and assigned and sold to Purchaser.

27.     Notwithstanding anything herein to the contrary, and subject to the APA, Purchaser may remove any contract or lease from the applicable Schedule of the APA (and thereby exclude such Contract from the definition of Assigned Contracts). The Debtors shall file a schedule of the Assigned Contracts reasonably promptly after the Closing Date, and shall supplement such schedule from time to time as necessary to reflect the resolution of Adjourned Contract Objections. For the avoidance of doubt, nothing in this paragraph affects Purchaser's right to re-designate an Assigned Contract to exclude such contract following any resolution of an Adjourned Contract Objection with respect to the Assigned Contract, whether such resolution occurs before or after the Closing Date.

28.     **No Successor Liability**. Purchaser and its successors and assigns shall not be deemed, as a result of any action taken in connection with the transfer of the Assets, (i) to be a successor to the Debtors or their estates, (ii) to have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates, (iii) to be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors, (iv) to have a common identity with the Debtors, (v) to have acquired the trade or business of any of the Debtors for any purpose under applicable U.S. federal law (including the Bankruptcy Code and the Internal Revenue Code of 1986, as amended), or (vi) to be held out to the public as a continuation of the Debtors or the Debtors' trade or business, and Purchaser shall have no successor, transferee, or vicarious liability of any kind or character, including, but not limited to, under any theory of foreign, federal, state, or local antitrust, environmental, successor, tax, ERISA, assignee, or transferee liability, labor, product liability, employment, de facto merger, substantial continuity, or other law, rule, or regulation, whether

55361033.6

known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date. Except as otherwise provided herein and in the APA with respect to the Assumed Liabilities, the transfer of the Assets to Purchaser pursuant to the APA shall not result in Purchaser or the Assets having any liability or responsibility for, or being required to satisfy in any manner, whether in law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any claim against the Debtors or against any insider of the Debtors or any liens, claims, interests, or encumbrances.

29.    **Consideration**.    The consideration provided by Purchaser under the APA constitutes (i) reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable Laws of the United States, any state, territory or possession thereof, or the District of Columbia. The consideration provided by Purchaser for the Assets under the APA is fair and reasonable and may not be avoided under section 363(n) of the Bankruptcy Code.

30.    **Good Faith**.    The transactions contemplated by the APA are undertaken by Purchaser without collusion and in "good faith," as that term is used in section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption, assignment and sale of the Assigned Contracts) with Purchaser, unless such authorization is duly stayed pending such appeal. Purchaser is a good faith purchaser of the

Purchased Assets, and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code.

31.    **Books and Records**.  Notwithstanding anything to the contrary in the APA, following the closing date of the Sale, Purchaser shall grant the Debtors and their respective representatives, including any trustee or fiduciary appointed to act on behalf of the Debtors and their respective representatives, including any trustee or fiduciary appointed to act on behalf of the Debtors or as a successor to the Debtors (a "Trustee"), reasonable access to any books and records transferred to Purchaser pursuant to the APA during regular business hours and upon reasonable notice for the purpose of allowing the Debtors and their successors, the Trustee and/or their representatives to perform the duties necessary to administer the Debtors' estates.  The Purchaser and its successors and assigns shall preserve and maintain all books, records, documents, files, electronic data, in whatever format, including native format, wherever stored, that are transferred from Seller pursuant to the APA (collectively, the "Books and Records"), and shall not destroy, abandon, transfer, or otherwise render unavailable such Book and Records within three (3) years following the Closing Date without providing counsel to the Seller, any Trustee, the Committee, and any successor to the Debtors, at least sixty (60) days' advance written notice and an opportunity to take possession of the Books and Records.

32.    **Failure to Specify Provisions**.  The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA be authorized and approved in its entirety; *provided, however,* that this Order shall govern if there is any inconsistency between the APA (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are non-severable and mutually dependent.  To the extent that this

55361033.6

Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall control.

33.    **Non-Material Modifications**.  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

34.    **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan confirmed in the Debtors' cases or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of any of these cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall alter, conflict with, or derogate from, the provisions of the APA or this Order.  To the extent of any such conflict or derogation, the terms of the APA or this Order, as applicable, shall govern.

35.    **No Stay of Order**.  Notwithstanding the provisions of Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d), and pursuant to Bankruptcy Rules 7062 and 9014, this Order shall be effective and enforceable immediately upon its entry.

36.    **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned and sold by the Debtors to Purchaser in accordance with the APA, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) interpret,

55361033.6

implement and enforce the provisions of this Order and the APA; (b) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale; (c) protect Purchaser against any Encumbrances or other interests in the Debtors or the Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale; and (d) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assigned Contracts.

37. **Pokémon**. Nothing contained in this Order or in the APA, including without limitation section 9.22 of the APA, shall be deemed to authorize the assignment of the Debtors' agreement(s) with The Pokémon Company International, Inc. ("Pokémon") to Purchaser without further ten calendar days' notice of an opportunity to file an opposition thereto and with a hearing thereon to be held at least five calendar days after the filing of such opposition, and all rights of Pokémon with respect to any assignment of such agreement(s) to Purchaser are reserved.

38. **Partial Payment of DIP Lender.** Upon the Closing Date and in accordance with the terms and provisions of the Final DIP Order, all obligations (including without limitation principal, interest, charges, attorneys' fees and the DIP Facility Fee) owing and outstanding to the DIP Lender thereunder and under the DIP Credit Agreement (regardless of whether such obligations of the Debtors to DIP Lender accrued or were incurred prior to, on or after the Petition Date, pursuant to the Final DIP Order or otherwise) shall be indefeasibly paid to the extent of available sale proceeds (the "Partial DIP Lender Payoff") in accordance with a customary partial payoff letter in form and amount acceptable to the DIP Lender and reasonably acceptable to the Debtors, in consultation with the Committee (the "Closing DIP Lender Partial Payoff"). The closing statement shall include, and the DIP Lender shall be paid, a $125,000 reserve for reasonable post-closing attorneys' fees and costs incurred by the DIP Lender's professionals (the "DIP Lender's Fee Reserve"). The DIP Lender's Fee Reserve will be increased following closing

55361033.6

in accordance with the DIP Credit Agreement to reflect such additional amounts as may be incurred by the DIP Lender and its professionals, through and including full and final payoff of the DIP Lender. The DIP Lender will provide subsequent documentation to substantiate any draws made on the DIP Lender's Fee Reserve. Notwithstanding the Closing DIP Lender Partial Payoff, the DIP Lender shall retain all rights and claims to all amounts then or thereafter owing under the DIP Credit Agreement and Final DIP Order, including without limitation the right to indemnity and reimbursement in connection with the LCs (as hereinafter defined) and Commercial Card Program and related Cash Collateral, as well as the DIP Lender's right to be reimbursed for its professionals' reasonable fees and costs. . Notwithstanding the Partial DIP Lender Payoff, (i) the DIP Lender shall continue to maintain, until surrendered, cancelled or substituted by the Olive Branch landlord, the letter of credit in favor of BC Industrial Exchange Portfolio II in the amount of $1,000,000 securing the lease obligations at the Olive Branch facility and the letter of credit in the amount of $200,000 on account of a surety bond provided in connection with the Debtors' obligations regarding customs duties and/or import taxes (collectively, the "LCs"); (ii) the Commercial Card program shall be terminated, but the DIP Lender shall continue to perform all reconciliations and account adjustments pertaining to pre-termination activity under this program, (iii) the DIP Lender shall continue to maintain the Debtors' deposit accounts in accordance with the applicable bank account and treasury service agreements and this Court's Cash Management Order applicable to those accounts.

39.     Also effective upon the Closing Date, all Challenge Rights under the Final DIP Order shall be deemed to have been waived and terminated. Neither the Debtors, the Committee, nor any other individual, entity or party shall be entitled to bring or maintain a Challenge against the Prepetition Lender, the DIP lender or otherwise, and the Debtors' stipulations in the Final DIP

55361033.6

Order shall be deemed binding and enforceable against the Debtors, the Committee, and all other creditors and parties in interest.

40.     Upon and after the Closing Date, the DIP Lender shall continue to hold and retain the (i) $1,260,000 of Cash Collateral granted to the DIP Lender as Cash Collateral securing the DIP Lender's reimbursement and indemnity claims in connection with the LCs and Commercial Card program, and (ii) the DIP Lender's Fee Reserve.  Upon the cancellation or expiration of the LCs, and assuming no intervening draw has been made under the LCs, the DIP Lender shall remit any unused portion of the $1,260,000 in Cash Collateral, less any unpaid, fees, costs and expenses, to DCD or its successor. Following the entry of this Sale Order, if there are any subsequent draws under the LCs, the DIP Lender is authorized to withdraw Cash Collateral to reimburse the DIP Lender for such additional draws and any related fees without further order of the Court as and when reimbursement or other amounts are owing to the DIP Lender in connection with the LCs or the Commercial Card program.

41.     Effective two days after the Closing Date, the Debtors' commercial credit card programs under the terms and conditions of those programs shall be terminated. Notwithstanding the foregoing, from and after the Closing Date, the DIP Lender shall continue to hold the LC and Commercial Card Collateral Account (as defined in the Final DIP Order), and is authorized to retain the $250,000 of Cash Collateral the DIP Lender currently holds for any post-closing charge backs, fees for maintaining bank accounts and processing wires, additional legal fees, reimbursement or other amounts owing to the DIP Lender, for a period of 122 days following the Closing Date.  Any unused portion of the Cash Collateral remaining after 122 days shall be applied to any outstanding indebtedness under the DIP Credit Agreement and Final DIP Order.  If all obligations to the DIP Lender under the DIP Credit Agreement have been fully paid off at such

time, then any unused amounts shall be remitted to the Debtors.  Also on the 122nd day following

the Closing Date, the DIP Lender shall return to the Debtors any unused portion of the DIP

Lender's Fee Reserve.

42.    Upon entry of this Sale Order, and pursuant to the terms of the DIP Credit

Agreement, the DIP Lender shall continue to hold and maintain the Debtors' deposit accounts

(including collection accounts) for a period of 150 days, or such later date as agreed to by the DIP

Lender in its reasonable discretion, but in no event shall JPMorgan Chase Bank, N.A., or any of

its affiliates be obligated to extend credit facilities (including but not limited to accommodations

in connection with foreign exchange (f/x) programs) or to provide any related overdraft protection

in connection with these deposit accounts. For the avoidance of doubt, none of the Debtors' deposit

accounts will be assigned to Purchaser at closing, and all of these deposit accounts (and any

collections or proceeds deposited therein) will continue to be subject in all respects to the

applicable bank account and treasury service agreements and to this Court's Cash Management

Order applicable to those accounts.

43.    For the avoidance of doubt, notwithstanding anything to the contrary in this Order,

all objections raised by AIREIT Olive Branch DC LLC and Anson Logistics LLC in the pleadings

filed at Docket Nos. 215, 264 and 312 are expressly and specifically preserved and reserved for

hearing by the Court at a later date.

**END OF ORDER**

55361033.6

## **EXHIBIT 1**

**Asset Purchase Agreement**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of the 27th day of April, 2025 (the "**Effective Date**"), by and between Diamond Comic Distributors, Inc., a Maryland corporation ("**DCDI**") and Diamond Select Toys and Collectibles, LLC, a Maryland limited liability company ("**DST**") (CGA, DST and DCDI collectively referred to herein as "**Seller**"), Sparkle Pop, LLC, a Delaware limited liability company ("**Purchaser**") and Ad Populum, LLC, a Delaware limited liability company ("**Ad Populum**") pursuant to Section 9.26 of this Agreement.

<u>RECITALS</u>

WHEREAS, Diamond Comic Distributors, Inc. is a distributor of tabletop games, pop-culture merchandise, comic books, and graphic novels with four operating divisions, namely, Alliance Game Distributors ("**Alliance**"), Diamond Comic Distributors U.S. ("**DCD**"), Diamond Comic Distributors U.K. ("**Diamond UK**"), and Collectible Grading Authority ("**CGA**").

WHEREAS, Alliance is in the business of distributing board games, card games, miniatures, role playing games, and accessories in the United States, which operates under the tradename Alliance Game Distributors (the "**Alliance Business**").

WHEREAS, Diamond UK is (i) a distributor of comic books, gaming products, collectibles and other ancillary products (the "**Diamond UK Business**"), (ii) an affiliate of Seller, and (iii) wholly owned by Comic Holdings, Inc., a Maryland corporation and Comic Exporters, Inc., a Maryland corporation (collectively, the "**Diamond UK Shareholders**").

WHEREAS, DCD and DST are in the business of selling and distributing products to mass market retailers, comic book stores, collectible stores and specialty retailers in the United States and on-line (the "**DCD Business**") which business includes, without limitation, the businesses conducted by DST, and by the division commonly referred to as Diamond Select Toys, Gentle Giant Ltd., Ironguard Supplies, Diamond Comic Book Distributions, Diamond Book Distributors, Fandom World and FreeComic BookDay.com.

WHEREAS, CGA is in the business of evaluating and grading collectibles on behalf of collectors, investors, dealers, auction firms and toy makers (the "**CGA Business**", collectively with the Diamond Select Toy Business and the Diamond Comics Business, the "**Diamond Business Lines**").

WHEREAS, Seller desires to sell all or substantially all of the assets of all of the Diamond Business Lines to Purchaser, and Purchaser desires to purchase the DCD Business and all other assets acquired as a result of the joint bid submitted by Universal Distribution, LLC, a Delaware limited liability company ("**Universal**") and Purchaser on or about March 25, 2025 (other than those assets acquired by Universal (the "**Acquired Business**") to Purchaser pursuant to the terms and conditions of this Agreement.

WHEREAS, the Alliance Business, the Diamond UK Business (the "**Diamond Excluded Business Lines**") or the assets of Diamond UK or which are principally used in the Alliance

1

Business are not part of this Agreement.

WHEREAS, Seller and the Diamond UK Shareholders have filed a petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**") on January 14, 2025 (the "**Petition Date**" and the resulting case, the "**Chapter 11 Case**"), seeking relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**").

WHEREAS, in connection with the Chapter 11 Case, Seller continues in the possession and control of its assets and properties in accordance with §§1107 and 1108 of the Bankruptcy Code.

WHEREAS, on or about February 11, 2025, the Bankruptcy Court entered a Bidding Procedures Order (the "**Bidding Procedures Order**") authorizing Seller, among other things, to conduct a sale process, and approving Bidding Procedures with respect thereto including approval of the Break-Up Fee and Expense Reimbursement.

WHEREAS, the Debtors held an auction on March 24, 2025 (the "**Auction**"), and selected Alliance Entertainment, LLC, as the successful bidder for substantially all the Debtors' assets.

WHEREAS, the Debtors designated as the Backup Bid (as defined in the Bidding Procedures Order) a combined bid submitted by Universal Distribution LLC ("**Universal**") and together with Purchaser, the "**Backup Bidder**").

NOW, THEREFORE, in exchange for the Purchase Price and the other mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound, Purchaser hereby agrees to buy, and Seller hereby agrees to sell the Acquired Assets, upon the terms and conditions set forth in this Agreement.

1.    **DEFINITIONS.** As used herein, the following terms shall have the following meanings:

"Accounts Receivable" shall mean only Seller's trade accounts receivable from or related to the Acquired Business in existence as of the Closing Date (whether or not billed).

"Acquired Assets" shall have the meaning ascribed thereto in <u>Section 2.1</u> of this Agreement.

"Additional Assigned Contracts" means Contracts of Seller in connection with the Acquired Business that Purchaser wishes to assume after the Closing Date, to the extent assignable pursuant to applicable law.

"Affiliate" or "Affiliates" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Alliance Business" shall have the meaning ascribed thereto in the Recitals of this

2

Agreement.

"Allocation Methodology" shall have the meaning ascribed thereto in <u>Section 6.6(b)</u> of this Agreement.

"Allocation Schedule" shall have the meaning ascribed thereto in <u>Section 6.6(b)</u> of this Agreement.

"Ancillary Agreements" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"Approval Order" shall have the meaning ascribed thereto in <u>Section 6.2</u> of this Agreement.

"Assigned Contracts" means those Contracts of Seller in connection with the Acquired Business with Purchaser has agreed to assume pursuant to this Agreement and all of which are identified on <u>Schedule 2.1(c)</u>, to the extent assignable pursuant to applicable law.

"Assigned Leased Real Property" shall have the meaning ascribed thereto in <u>Section 2.1(f)</u> of this Agreement.

"Assigned Leases" shall have the meaning ascribed thereto in <u>Section 2.1(e)</u> of this Agreement.

"Assumed Liabilities" shall have the meaning ascribed thereto in <u>Section 2.3</u> of this Agreement.

"Avoidance Actions" means all avoidance claims or causes of action under sections 547, 548 and/or 550 of the Bankruptcy Code (including, without limitation, claims to avoid, or set aside, transfers of property by any debtor that may be avoidable under by Chapter 5 of the Bankruptcy Code).

"Bankruptcy Code" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Bankruptcy Court" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Bankruptcy Petition" means the voluntary bankruptcy petition filed by Seller with the Bankruptcy Court on the Petition Date.

"Base Purchase Price" shall have the meaning ascribed thereto in the <u>Section 2.6(a)</u> of this Agreement.

"Bidding Procedures" means the bidding procedures attached to the Bidding Procedures Order.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court in the Chapter 11 Case.

3

"Books and Records" shall have the meaning ascribed thereto in the Section 2.1(k) of this Agreement.

"Business" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Business Day" means a day, based on U.S. Eastern Time, other than a Saturday, Sunday, or U.S. federal holiday or any day in which banking institutions in the State of Maryland are authorized or required by law or other governmental action to be closed.

"Causes of Action" means any and all causes of action, defenses, counterclaims and/or other claims of any nature whatsoever, known or unknown, whether or not apparent or yet to be discovered, accruing to Seller or that is property of the Estate, based upon facts, circumstances and transactions that occurred prior to the Closing Date, and shall include, without limitation, (i) claims against past and present vendors or customers of Seller, (ii) claims against the directors, officers or other insiders of Seller, (iii) claims regarding or related in any way to any collective bargaining agreement(s), and (iv) claims against any administrative agent or other agent, lender or secured party related to any credit facility existing at any time whether prior to or after the filing of the Bankruptcy Petition. Causes of Action shall not include Avoidance Actions.

"CGA" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"CGA Business" shall have the meaning set forth in the Recitals of this Agreement.

"Chapter 11 Case" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Claims" shall have the meaning ascribed thereto in Section 6.2(b) of this Agreement.

"Closing" shall have the meaning ascribed thereto in Section 3.1 of this Agreement.

"Closing Date" shall have the meaning ascribed thereto in Section 3.1 of this Agreement.

"Closing Eligible Amount" shall have the meaning ascribed thereto in Section 2.6(a) of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" shall have the meaning ascribed thereto in Section 9.16 of this Agreement.

"Contracts" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral, other than Employee Benefit Plans.

"Critical Vendors" means the vendors providing goods or services to the Acquired Business listed on Schedule A.

"Cure Maximum Amount" means $406,000 USD, from which Purchaser may deduct the Cure Amount payable with respect to Facility Assigned Contracts, Additional Assigned Contracts,

4

Assigned Contracts, Assigned Leases and Assigned Leased Real Property, along with any other liabilities Purchaser is required to pay with respect to the Acquired Business in accordance with this Agreement whether or not such liabilities arise from a written agreement.

"Customer Information" shall have the meaning set forth in Section 2.1(p) of this Agreement.

"Cure Amounts" means all amounts, costs, and expenses required by the Bankruptcy Court to be paid to cure any defaults under the Assigned Contracts, Facility Assigned Contracts, Additional Assigned Contracts the Assigned Leases, or the Assigned Leased Real Property so that they may be assumed and assigned to Purchaser pursuant to § §363 and 365 of the Bankruptcy Code.

"DCD" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Deposit" shall mean an amount equal to $1,400,000 USD, which amount has been, or prior to the entry of the Approval Order will be, paid by Purchaser to the Escrow Agent.

"Diamond Business Lines" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Diamond Excluded Businesses" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Diamond UK" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Diamond UK Assets" shall have the meaning set forth in the Recitals of this Agreement.

"Diamond UK Business" shall have the meaning set forth in the Recitals of this Agreement.

"Diamond UK Shareholders" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Disclosure Schedules" means the disclosure schedules attached to this Agreement and incorporated herein, which contain and set forth additional information corresponding to the Section of this Agreement referenced thereon.

"Eligible Account" means any Account (as defined in the UCC) transferred to Purchaser on the Closing Date, and which as of the Closing Date, would constitute an "Eligible Account" pursuant to the JPM Agreement.

"Eligible Foreign Account" means any Account (as defined in the UCC) transferred to Purchaser on the Closing Date which as of the Closing Date would constitute an "Eligible Foreign Account" pursuant to the JPM Agreement.

"Eligible Inventory" means any Inventory transferred to Purchaser on the Closing Date, which as of the Closing Date would constitute Eligible Inventory (as defined in the JPM Agreement) pursuant to the JPM Agreement, but excluding any Prepaid Inventory.

5

"Employee" means an individual who, as of the applicable date, is employed by, or engaged to provide services to, Seller in connection with the Business.

"Employee Benefit Plans" or "Benefit Plans" means (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of Seller.

"Employment Liability" means any claim or Liability asserted against Seller or its property under any Law (or common law) arising from or relating to the former, current or future employment of a Person by Seller, whether pursuant to a contract, labor agreement, at-will arrangement or otherwise, as well as any claim asserting healthcare, pension, or other employment-related benefits, whether asserted by an employee or former employee, a retiree or future retiree, any of the aforementioned Person's agent, assigns, custodians, heirs, or representatives, a collective bargaining unit or union, any pension and/or retirement fund, or any other agent thereof.

"Environmental Law" means any applicable Law, and any governmental order or binding agreement with any Governmental Body: (a) relating to pollution or the protection of natural resources, endangered or threatened species, human health or safety, or the environment; or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any hazardous materials. "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"Escrow Agent" shall mean Omni Agent Solutions, Inc.

55508664.1

"Estate" means the estate of Seller to be created by §541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition.

"Excluded Assets" shall have the meaning ascribed thereto in Section 2.2 of this Agreement.

"Excluded Contracts" shall have the meaning ascribed thereto in Section 2.2(c) of this Agreement.

"Excluded Liabilities" shall have the meaning ascribed thereto in Section 2.4 of this Agreement.

"Expense Reimbursement" shall have the meaning ascribed thereto in the Bidding Procedures Order.

"Facility" shall have the meaning ascribed to it in Section 2.4(n) of this Agreement.

"Facility Assigned Contracts" means those Contracts of Seller in connection with the operation of the Facility which Purchaser may wish to assume, provided that such Contracts are listed on Schedule 2.3(n) hereof, to the extent assignable pursuant to applicable law.

"Final Order" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired; provided, however, that no Order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such Order, as long as such motion has not actually been filed.

"Foreign Critical Vendors" means foreign vendors providing goods or services to the Acquired Business identified in the Approval Order as critical vendors.

"GAAP" means generally accepted accounting principles generally accepted in the United States of America consistently applied, as of the date of the applicable financial report.

"Go-Forward Vendors" means, excluding insiders (as such term is defined in the Bankruptcy Code) and Affiliates of Seller, those vendors (a) specified by Purchaser in writing to Seller within twenty (20) calendar days subsequent to the Closing Date and (b) that Purchaser elects to do business with on a go-forward basis after the Closing Date. For the avoidance of doubt, the term "Go-Forward Vendor" shall not include JPMorgan Chase Bank, N.A. or its Affiliates.

"Governmental Body" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

7

"Holdback Amount" shall have the meaning ascribed thereto in <u>Section 6.2(i)</u> of this Agreement.

"Incentive Amount" shall have the meaning ascribed thereto in Section 2.6(a)(v) of this Agreement.

"Incentive Amount Notice" shall have the meaning ascribed thereto in Section 2.6(c) of this Agreement.

"Incentive Base Amount" means Five Million U.S. Dollars ($<u>5,000,000 USD) bookmark2</u> *provided*, *however*, that to the extent the Closing Eligible Amount as of the Closing Date plus the value of the Prepaid Inventory as of the Closing Date (combined, the "<u>Incentive Base at Closing</u>") is less than [$18,743,295] (the "<u>Incentive Base Target Amount</u>"), the Incentive Base Amount shall be reduced on a dollar-for-dollar basis by the amount by which the Incentive Base at Closing is less than the Incentive Base Target Amount. For example, if the Incentive Base at Closing is $1,000,000 less than the Incentive Base Target Amount, the Incentive Base Amount shall be $4,000,000. For the avoidance of doubt, the Incentive Base Amount shall not be less than $0.00.

"Income Tax" means any Tax imposed on or determined in whole or in part with reference to income, gross receipts, profits or similar measure, including any interest, penalty or other addition with respect thereto.

"Intellectual Property" shall have the meaning ascribed thereto in <u>Section 2.1(h)</u> of this Agreement.

"Inventory" means all inventory, inventory in transit paid for by Seller, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories of the Acquired Business, but excluding any Prepaid Inventory. For purposes of clarification, goods held on consignment by or on behalf of Seller as part of the Acquired Business shall not be considered Inventory for purposes of the Agreement.

"JPM Agreement" means that certain Debtor-in-Possession Credit Agreement, dated as of January 16, 2025 among Diamond Comic Distributors, Inc., the Loan Parties named therein, Stephen Geppi and JPMorgan Chase Bank, NA., as amended. To the extent that as to any definition from the JPM Agreement which is incorporated herein by reference and to the extent that the Lender (as defined in the JPM Agreement) thereunder may exercise discretion in making any determination, Purchaser shall have the same right to exercise such discretion to the same extent as the Lender may exercise such discretion in making such determination.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) the premises set forth on <u>Schedule B</u>.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that

are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Liability" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Lien" means any mortgage, deed of trust, lien, claim, Liability, Employment Liability, pledge, charge, title defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind.

"Master Assignment" shall have the meaning ascribed thereto in Section 3.5(a)(i) of this Agreement.

"Material Adverse Change" means any change, event, occurrence, fact, waste, circumstance, or effect as shall have arisen after the date of this Agreement and prior to the Closing that would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on (i) the Acquired Business or the Acquired Assets, including, without limitation, the results of operations or the condition (financial or otherwise) of the Acquired Assets, (ii) the value of the Acquired Assets, or (iii) the ability of the parties to consummate the transactions contemplated hereby on a timely basis; provided, however, that any change, circumstance, or effect that arises out of, results from or relates to the commencement or conduct of the Chapter 11 Case shall not be considered in determining whether a Material Adverse Change has occurred or any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Acquired Business operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Purchaser; (vi) any changes in applicable Laws or accounting rules, including GAAP; (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement; (viii) any natural or man-made disasters or acts of God; or (ix) any failure by the Acquired Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); provided further, however, that any event, occurrence, fact, condition or change referred to in clauses (i) through (iv) immediately above shall be taken into account in determining whether a Material Adverse Change has occurred or could reasonably be expected to occur if such event, occurrence, fact, condition or change has a disproportionate effect on the Acquired Business

9

compared to other participants in the industries in which the Acquired Business operates.

"Net Eligible COD Account" means any Account (as defined in the UCC) transferred to Purchaser on the Closing Date which as of the Closing Date would constitute "Net Eligible COD Account" pursuant to the JPM Agreement.

"Net Sales" means, for each item of Inventory acquired by Purchaser pursuant to this Agreement sold by the Purchaser on or prior to December 31, 2025, the lesser of (x) the total revenue that Purchaser receives from the sale of such Inventory net of any discounts, returns and other deductions related thereto, and reduced by the amount of any sales commissions or similar sales incentives and any royalties payable with respect to the sale of any such Inventory and (y) the cost of such Inventory.

"Outside Closing Date" shall have the meaning ascribed thereto in Section 8.1(b) of this Agreement.

"Owned FF&E" shall have the meaning ascribed thereto in Section 2.1(g) of this Agreement.

"Permits" shall have the meaning ascribed thereto in Section 2.1(l) of this Agreement.

"Person" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"Personal Information" means any data that identifies or has the capacity to identify an individual and is defined as personal information, personal data, personally identifiable information, or a similar term under any Laws, agreements, or internal or publicly posted policies, notices or statements concerning the collection, use, processing, storage, transfer and security of such information.

"Petition Date" shall have the meaning ascribed thereto in the Recitals of this Agreement.

"Prepaid Amounts" shall have the meaning ascribed thereto in Section 2.1(m) of this Agreement.

"Prepaid Inventory" means inventory which was ordered and paid for pursuant to the invoices set forth in Schedule C, but which, as of the Closing Date, has not been delivered and is not in transit, and is not otherwise included as Eligible Inventory pursuant to the JPM Agreement.

"Purchase Price" shall have the meaning ascribed thereto in Section 2.6(a) of this Agreement.

"Realized Amount" means, as of the close of business on December 31, 2025 (x) the amount actually collected by Purchaser with respect to all Accounts Receivable acquired by Purchaser hereunder on the Closing Date, net of all costs of collection related thereto and (y) the Net Sales of all Inventory acquired by Purchaser on the Closing Date.

10

"Segregated Lockbox Account" shall have the meaning ascribed thereto in Section 2.6(c).

"Tangible Personal Property" shall have the meaning ascribed thereto in <u>Section 2.1(g)</u> of this Agreement.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, unclaimed property, escheat, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any Governmental Body responsible for imposition of any such tax (domestic or foreign).

"Tax Clearance Certificate" shall have the meaning ascribed thereto in <u>Section 6.6(c)</u> of this Agreement.

"Tax Purchase Price" shall have the meaning ascribed thereto in <u>Section 6.6(b)</u> of this Agreement.

"Transactions" shall have the meaning ascribed thereto in <u>Section 2.4</u> of this Agreement.

"Transfer Tax" means any sales, use, transfer, stamp, conveyance, value added, or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees (excluding vehicle registration fees), notarial fees and other similar costs provided, however, that the term "Transfer Tax" shall not include any Income Tax.

"UCC" means the Uniform Commercial Code as in effect on the date hereof and from time to time.

Undefined terms used in this Agreement shall have the meaning ascribed to them under 11 U.S.C § 101 of the United States Bankruptcy Code.

## 2.    SALE AND PURCHASE OF ASSETS.

2.1    **Acquired Assets.** On the terms and subject to the conditions set forth in this Agreement, on the Closing Date (defined below), Purchaser shall purchase from Seller, and Seller shall sell, assign, transfer, convey and deliver to Purchaser, all of Seller's right, title and interest in and to all of its assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal, wherever located, whether owned or leased (except for the Excluded Assets (defined below)), free and clear of any Liens (collectively, the "**Acquired Assets**") used in connection with the Acquired Business. Without limiting the foregoing, the assets, properties, rights, interests, benefits and privileges sold, assigned, transferred, conveyed and delivered by Seller shall include all of Seller's right, title and interest in and to the following with respect to the Acquired Business:

(a)    all Accounts Receivable of the Acquired Business;

11

(b)      all Inventory of the Acquired Business;

(c)      all Assigned Contracts set forth on Schedule 2.1(c) of the Disclosure Schedules;

(d)      all benefits, proceeds or any other amounts payable under any policy of insurance maintained by Seller with respect to the destruction of, damage to or loss of use of any of the Acquired Assets;

(e)      the Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) the Leased Real Property, together with all amendments, extensions, rights of renewal, other agreements with respect thereto, security and other deposits related thereto, prepaid rent, and appurtenances thereto and associated therewith (collectively, the "**Assigned Leases**");

(f)      all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assigned Leases (the "**Assigned Leased Real Property**");

(g)      all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, shelving and cabinets, forklifts, tooling and spare parts, vehicles, office and computer equipment, and any other tangible personal property (including without limitation consumables located at the premises of the Acquired Business) that is in any of the foregoing cases used for the ownership, operation or management of the Acquired Business (the "**Owned FF&E**"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E (collectively, the "**Tangible Personal Property**");

(h)      all Avoidance Actions with respect to any Critical Vendor, Foreign Critical Vendor or Go-Forward Vendor;

(i)      all intellectual property interests of Seller related to the Acquired Business including, without limitation: (i) Seller's patents, patent applications, patent disclosures and improvements thereto; (ii) Seller's trademarks, service marks, trade dress, brands, logos, slogans, jingles, trade names, website domain names, social media sites and accounts, and URLs, and all content and data thereon or relating thereto; together with any licenses to use such names or parts thereof insofar and to the extent that they are used in connection with Seller's Acquired Business; (iii) Seller's copyrights and registrations, to the extent assignable by Seller, and applications for registration thereof; (iv) Seller's mask works and registrations and applications for registration thereof; (v) Seller's computer software data and documentation, software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology networks and systems (including telecommunications networks and systems for voice, data, and video) owned, leased, licensed, or used (including through cloud-based or other third-party service providers); (vi) Seller's data management system data, with respect to customers of Seller's Acquired Business, all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees (including any such item relating to the payment of Taxes (defined below)); and (vii) all claims and causes of action with respect

12

55508664.1

to the foregoing (collectively, the "**Intellectual Property**");

     (j)    all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Acquired Assets;

     (k)    originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, supplier and publisher agreements, services agreements, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any Governmental Body), sales material and records, strategic plans and marketing, and promotional surveys, material, and research related to the Acquired Business ("**Books and Records**");

     (l)    all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from a Governmental Body (collectively, "**Permits**") which are held by Seller and required for the conduct of the Acquired Business as currently conducted or for the ownership and use of the Acquired Assets;

     (m)    all prepaid expenses, credits, advance payments (including on account of the Prepaid Inventory), claims, security deposits under the Assigned Leases, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (excluding any such item relating to the payment of Taxes) (collectively, the "**Prepaid Amounts**");

     (n)    all rights with respect to the Prepaid Inventory;

     (o)    all goodwill and the going concern value of the Acquired Assets and the Acquired Business;

     (p)    all wholesale and other customer data, customer lists, and information related to customer purchases through e-commerce platforms, retail stores owned, operated or controlled by Sellers or Affiliates (the "**Customer Information**") (excluding from the foregoing any credit card numbers or related customer payment source or social security numbers); and

     (q)    all Causes of Action against Go-Forward Vendors.

    2.2    **Excluded Assets.** The following assets, properties, rights, interests, benefits and privileges of Seller are not included in the Acquired Assets (collectively, the "**Excluded Assets**"):

     (a)    all accounts receivable, loans receivable or any other amounts owed to Seller by Rosebud Entertainment, LLC, E. Gerber Products, LLC, Gemstone Publishing, Inc., Mamanook I, LLC, Mid-Atlantic Loan Acquisition I, LLC, Game Consolidators, LLC, Renegade Games, LLC, Steven A. Geppi Irrevocable Trust, Steven A. Geppi Revocable Trust, SG Resource LLC, DST Investments, LLC, Steven A. Geppi, Melinda C. Geppi, Joshua M.

55508664.1

Geppi, Comic Exporters, Inc., Comic Holdings, Inc., Diamond Comic Distributors UK, Diamond International Galleries, Inc., Armory Game Distributors, Inc., any relative of Steven A. Geppi by third level of consanguinity, current and former spouses of Steven A. Geppi;

(b)     all cash, bank deposits, securities and cash equivalents, including for this purpose (i) all cash and cash equivalents if credited to Seller's bank account(s) prior to the Closing Date, (ii) all deposits arising outside of the ordinary course of the business, including without limitation all such amounts held by Seller's attorneys, accountants, investment bankers, restructuring advisors, notice and claims agents, public relations advisors, and other professional advisors, and (iii) all financial investments;

(c)     all Contracts of Seller, other than any Assigned Contracts (the "**Excluded Contracts**");

(d)     all current assets of Seller, other than Inventory, Accounts Receivable, and prepaid expenses, credits, advance payments, security deposits under the Assigned Leases, rights of refunds, similar prepaid items constituting current assets, and other Acquired Assets set forth in Section 2.1;

(e)     Seller's related party Accounts Receivable and notes receivable;

(f)     Seller's insurance policies, and related claims and refunds in effect after the Closing Date;

(g)     all of Seller's rights with respect to Employee Benefit Plans and all Contracts, agreements, licenses, leases, warranties, commitments, and purchase and sale orders and the rights associated therewith, other than the Assigned Contracts and Assigned Leases;

(h)     any accounting records, tax records, financial records and any books, records or other information related solely and exclusively to the other Excluded Assets and all of Seller's accounting records, tax records, financial records and any books, records or other information subject to attorney client privilege, attorney work product, or other similar privilege; all records that Seller is required by Law to retain;

(i)     all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of Seller's operation of the Business or ownership, operation, utilization or maintenance of the Acquired Assets prior to the Closing Date;

(j)     all Causes of Action other than Causes of Action Against Go-Forward Vendors;

(k)     all rights to receive mail and other communications addressed to Seller that do not relate to the Acquired Assets or the Assumed Liabilities;

(l)     all assets principally used in the Alliance Business or the Diamond Excluded Businesses;

14

(m)     any ownership interest in the Diamond UK Shareholders or the Diamond UK Business;

(n)     all property, rights and assets relating to an Excluded Asset or arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities which are not Assumed Liabilities;

(o)     all rights of Seller arising under this Agreement, the Ancillary Agreements, and under any other agreement between Seller and Purchaser entered into in connection with this Agreement;

(p)     All Personal Information to the extent the sale or transfer of such Personal Information is not permitted under applicable law; and

(q)     All Avoidance Actions other than those with respect to any Critical Vendor, Foreign Critical Vendor or Go-Forward Vendor.

2.3     **Assumed Liabilities.** Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall only assume and shall only be required to perform and discharge in accordance with their respective terms the following: (a) all Liabilities with respect to the Assigned Contracts, the Facility Assigned Contracts, the Additional Assigned Contracts or the Assigned Leases, solely to the extent such Liabilities arise after and relate to the period after the Closing, (b) all Liabilities (including for any Tax) that arise after Closing with respect to Purchaser's ownership or operation of the Acquired Assets after the Closing, (c) the obligation to pay Critical Vendors as provided in <u>Section 2.4(h)</u> of this Agreement, (d) amounts due with respect to open purchase orders for inventory ordered after the Petition Date and not delivered as of the Closing Date as set forth in a schedule to be provided to Purchaser prior to the Closing Date; and (e) all Cure Amounts with respect to Additional Assigned Contracts (collectively, the "**Assumed Liabilities**"). If, within twenty (20) business days after the Closing Date, Purchaser designates, in writing and delivers to Seller, a list of the Additional Assigned Contracts, and additional Facility Assigned Contracts, Seller shall use commercially reasonable efforts to assume and assign such Additional Assigned Contracts and additional Facility Assigned Contracts to Purchaser; provided, however, that Seller shall not be required to incur any liabilities with respect to Additional Assigned Contracts during such twenty (20) day period. Notwithstanding anything to the contrary contained in this Agreement, (i) all Cure Amounts, and any other cure amount required to be paid regardless of whether there is a written agreement in place, with respect to Additional Assigned Contracts below the Cure Maximum Amount, in the aggregate, shall be paid by Seller and (ii) all Cure Amounts with respect to Additional Assigned Contracts in excess of the Cure Maximum Amount, in the aggregate, shall be paid by Purchaser and shall not be a credit against the Purchase Price, except as set forth in Sections 2.4(n) and 2.6. For the avoidance of doubt, Purchaser (subject to Bankruptcy Court approval as required) shall have the sole discretion to determine what amount needs to be paid for all Cure Amounts and any other cure amount required to be paid with respect to the Acquired Business, and Seller shall pay such amount up to the Cure Maximum Amount.

2.4     **Excluded Liabilities.** Notwithstanding anything to the contrary contained in any other provision of this Agreement, Purchaser, by its execution and delivery of this Agreement and any Ancillary Agreements, and its performance of the transactions contemplated by this

15

Agreement and any Ancillary Agreements (collectively, the "**Transactions**"), shall not assume, pay or otherwise be responsible for any Liability other than the Assumed Liabilities (the "**Excluded Liabilities**"). The Excluded Liabilities shall be the sole responsibility of Seller, and Purchaser shall have no responsibility for such Excluded Liabilities. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)     any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Agreements and the Transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)     any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Acquired Assets or the Assumed Liabilities for any pre-Closing Tax period; (ii) Taxes that arise out of the consummation of the Transactions contemplated hereby or that are the responsibility of Seller pursuant to this Agreement; or (iii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Purchaser under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)     any Liabilities relating to or arising out of the Excluded Assets or the Excluded Businesses;

(d)     any Liabilities in respect of any pending or threatened Causes of Action arising out of, relating to or otherwise in respect of the operation of the Acquired Business or the Acquired Assets to the extent such Causes of Action relate to such operation on or prior to the Closing Date;

(e)     any Liabilities of Seller arising under or in connection with any Employee Benefit Plan providing benefits to any present or former employee of Seller;

(f)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(g)     any environmental claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(h)     any trade accounts payable of Seller, including, without limitation, any Foreign Critical Vendor accounts payable, but excluding Critical Vendor accounts payable, which Critical Vendors are to be paid by Purchaser at Closing and the amount thereof deducted from the Purchase Price;

16

(i)        any Liabilities of the Acquired Business relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders, except to the extent otherwise provided in Section 2.3(d) of this Agreement;

(j)        any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(k)        any Liabilities under the Excluded Contracts or any other Contracts not constituting the Assigned Contracts or the Assigned Leases;

(l)        any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions; and

(m)        any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or governmental order.

(n)        Liabilities related to any cure obligations related to the Olive Branch warehouse facility located at 7485 Polk Lane, Olive Branch, Mississippi, as listed on Schedule B ("**Facility**"), including, without limitation, the 2024 property tax liability incurred with respect to the Facility and the pro rata portion of the 2025 property taxes incurred with respect to the Facility prior to the Closing Date (which 2024 and 2025 tax liability shall not be included in the calculation of the Cure Maximum Amount) and all cure obligations related to the Facility Assigned Contracts.

2.5        **[Reserved].**

2.6        **Purchase Price**.

(a)        Subject to the adjustment contemplated by Section 2.6(d) below, the aggregate consideration payable to Seller for the sale and transfer of the Acquired Assets shall be the sum of the following items: (i) $7,459,050 U.S. Dollars, less any Critical Vendor payment owed by Sellers under the Asset Purchase Agreement submitted by Universal and any amounts owed by Sellers to NECA, LLC, Wizkids/NECA, LLC or to its Affiliates, but solely to the extent such payment is not made by or on behalf of Universal (the "**Base Purchase Price**"), (ii) plus, the Incentive Amount, if any; (iii) minus, accounts payable due to Critical Vendors on the Closing Date; and (iv) minus, any amounts paid by Purchaser as Cure Amounts with respect to the Acquired Business, excluding Cure Amounts in connection with Additional Assigned Contracts (collectively, the "**Purchase Price**"), and the assumption by Purchaser of the Assumed Liabilities. For purposes of this Section 2.6(a):

(i)        "**Closing Eligible Amount**" means the sum of (w) ninety percent (90%) of Eligible Accounts, (x) plus ninety percent (90%) of Eligible Foreign Accounts, (y) plus ninety percent (90%) of Net Eligible COD Accounts and (z) plus forty-two percent (42%) of Eligible Inventory, valued at the lower of cost or market value, determined on a first-in-first-out basis.

17

(ii)     "**Incentive Amount**" means the greater of (x) the Incentive Base Amount and (y) an amount, as of the close of business on December 31, 2025, equal to (i) thirty percent (30%) of the lesser of the (A) Realized Amount and (B) the Closing Eligible Amount plus (ii) thirty percent (30%) of the positive amount, if any, by which the Realized Amount exceeds the Closing Eligible Amount and plus (iii) thirty percent (30%) of the cost of the Prepaid Inventory that is actually sold prior to December 31, 2025.

(b)     At the Closing, Purchaser shall deliver the Purchase Price, less the Deposit and less the Holdback Amount, and excluding the Incentive Amount (which shall be payable in accordance with Subsection (c) below), by wire transfer of immediately available funds to one or more accounts designated in writing by Seller.

(c)     [Intentionally omitted].

(d)     Within fifteen (15) days after the end of each calendar month, commencing with June of 2025 and ending on December of 2025, the Purchaser shall deliver to Seller a reasonably detailed calculation of the Incentive Amount as of the end of such calendar month (but for all months, other than December 2025, without reference to the Incentive Base Amount), with such backup documentation to show invoice-level information with respect to Accounts Receivables, Net Sales of Inventory and sales of Diamond Prepaid Inventory, in each case which was acquired by the Purchaser at the Closing pursuant to this Agreement (each, a "**Incentive Amount Notice**"). In the event that Seller has any objection to the Incentive Amount set forth in an Incentive Amount Notice, it shall provide written notice to the Purchaser not more than fifteen (15) days after delivery of the Incentive Amount Notice, or if with respect to the December 2025 Incentive Amount Notice, then not more than thirty (30) days after delivery of the Incentive Amount Notice. If no timely objection is received, or if Seller delivers written notice of its agreement to the Incentive Amount as contained in the applicable Incentive Amount Notice, the Purchaser shall pay (x) the Incentive Amount then due (which prior to the payment with respect to the Incentive Amount Notice delivered for December 2025 shall be calculated and paid without reference to the Incentive Base Amount), if any, minus (y) any prior payments with respect to the Incentive Amount made prior thereto, to the Seller not more than two Business Days after the earlier of (x) delivery of written notice of Seller to Purchaser accepting the calculation of the Incentive Amount and (y) the expiration of the fifteen (15) day period or thirty (30) day period for Seller to object to the calculation of the Incentive Amount, as applicable. If the Seller disputes the calculation of the Incentive Amount, a final determination of the Incentive Amount shall be made by the Bankruptcy Court, pursuant to procedures determined by the Bankruptcy Court.

(e)     Purchaser and Seller shall negotiate in good faith the terms of a periodic reporting and audit mechanism regarding the collection of Accounts Receivable and the sale of Inventory to ensure that Seller receives all of the Incentive Amount due to Seller under this Agreement.

(f)     At least two (2) Business Days prior to the Closing, Seller shall deliver to

18

Purchaser a statement setting forth Seller's calculation of the Purchase Price (excluding the Incentive Amount) prepared in accordance with Section 2.6(a). If Purchaser disagrees with Seller's calculation of the Purchase Price, the parties will negotiate to resolve any disputes in advance of Closing.

2.7    **Structure of Sale.** Notwithstanding any provision in the Agreement, nothing herein shall impair the Parties' right and ability to agree to an alternative structure to the transaction as contemplated herein, provided that any alternative transaction shall be subject to the agreement of the Parties in their sole and absolute discretion and shall not reduce the Purchase Price to be received by Seller, which other than with respect to the Closing Eligible Amount and the Incentive Amount (which will be paid as provided in Section 2.6(c)) and with respect to the Holdback Amount, which will be paid in accordance with Section 6.2(i)) must be paid in full at Closing.

## 3.    CLOSING; CONDITIONS TO CLOSING.

3.1    **Closing.** Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities shall take place at a time, place, and manner specified in the Approval Order. Purchaser and Seller may agree, without any obligation to do so, to further extend the time for Closing. The time and date upon which the Closing occurs is referred to herein as the "Closing Date".

3.2    **Court Approval Required.** Purchaser and Seller acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party. Purchaser acknowledges that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and/or otherwise best offer possible for the Acquired Assets, and that such demonstration will include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting an auction.

3.3    **Conditions to Obligations of Purchaser.** The obligation of Purchaser to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in Section 3.2 of this Agreement, be waived by Purchaser in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Seller set forth in Section 4 of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Seller shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by them under this Agreement at or before the Closing in all material respects.

(c)    Consents. All consents, authorizations, or approvals required to be obtained

19

from any Governmental Body shall have been obtained and be in full force and effect.

(d)    Transition Services Agreement. Purchaser and Seller shall have executed a transition services agreement reasonably acceptable to such parties and consistent with Section 9.22 of this Agreement.

(e)    No Material Adverse Change. A Material Adverse Change shall not have occurred with respect to the Acquired Business or the Acquired Assets (taken as a whole).

(f)    Approval Order. The Bankruptcy Court shall have entered the Approval Order which shall be reasonably satisfactory to Purchaser and contain certain findings and rulings including, without limitation, the following: (i) approving the sale of the Acquired Assets to Purchaser free and clear of all Liens and Claims, (ii) approving the assumption and assignment of the Assigned Contracts to Purchaser, (iii) providing for the waiver of the fourteen (14) day automatic stay contained in Federal Rule of Bankruptcy Procedure 6004(h), (iv) finding that Purchaser is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and is thereby entitled to the protection afforded a good faith, arms-length purchaser, (v) finding that the Purchase Price is fair and reasonable, (vi) finding that this Agreement was negotiated at arms-length, and (vii) finding that the sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code.

3.4    **Conditions to Obligations of Seller.** The obligation of Seller to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may, except for the condition set forth in <u>Section 3.2</u> of this Agreement, be waived by any Seller in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Purchaser set forth in <u>Section 5</u> of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date). Agreements and Covenants. Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(b)    Consents. All consents, authorizations, or approvals required to be obtained from any Governmental Body shall have been obtained and be in full force.

(c)    Approval Order. The Bankruptcy Court shall have entered the Approval Order.

3.5    **Mutual Condition.** The obligation of Purchaser and Seller to consummate the Transactions is subject to the mutual condition that Closing under this Agreement must occur on the same date as closing under the Universal APA. This condition may be waived only by both Purchaser and Seller in their respective sole discretion.

3.6    **Closing Obligations.** In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

(a)    <u>Seller Deliverables</u>. Seller shall deliver to Purchaser:

(i)    An Assignment, Bill of Sale and Conveyance Agreement (the "**Master Assignment**") for the Acquired Assets in the form set forth on <u>Exhibit A</u> executed by Seller;

(ii)    such other bills of sale, assignments, certificates of title, documents, and instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Seller;

(iii)    a certified copy of the Approval Order entered on the docket in the Chapter 11 Case; and

(iv)    countersigned instructions to be delivered to Escrow Agent to release the Deposit to Seller (which Deposit shall be delivered by the Escrow Agent to Seller at Closing).

(b)    <u>Purchaser Deliverables</u>. Purchaser shall deliver, or cause to be delivered:

(i)    the cash portion of the Purchase Price, less the Deposit (and excluding the Incentive Amount), to Seller;

(ii)    a countersigned original of the Master Assignment to Seller; and

(iii)    countersigned instructions to be delivered to the Escrow Agent to release the Deposit to Seller (which Deposit shall be delivered by the Escrow Agent to Seller at Closing).

3.7    **Delivery of Possession of Assets.** Right to possession of all Acquired Assets shall transfer to Purchaser at the Closing. Seller shall bear all risk of loss with respect to the Acquired Assets prior to Closing. Purchaser shall bear all risk of loss with respect to the Acquired Assets from and after the Closing.

4.    **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to Purchaser that the statements contained in this <u>Section 4</u> are true and correct as of the date hereof and will be true and correct through the Closing Date.

4.1    **Organization, Good Standing and Power.** Seller is legally formed and in good standing under the laws of the State of its incorporation. Subject to the applicable provisions of the Bankruptcy Code, Seller has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

21

55508664.1

4.2     **Authority Relative to this Agreement; Execution and Binding Effect.** Seller has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the Transactions applicable to Seller. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the independent director and restructuring committee of Seller, and, except for Bankruptcy Court approval, no other proceedings or approvals on the part of Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Seller, enforceable against Seller in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3     **Title and Ownership.** Except as would not have a Material Adverse Change, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets. At the Closing, Seller will have the right to transfer the Acquired Assets to Purchaser free and clear of all Liens, other than Liens included in the Assumed Liabilities.

4.4     **Contracts and Leases.** As of the Effective Date, other than as set forth on <u>Schedule 4.4</u> of the Disclosure Schedules, neither Seller nor, to Seller's actual knowledge, any other party to any of the Assigned Contracts or Assigned Leases has commenced any action against any of the parties to such Assigned Contracts or Assigned Leases or given or received any written notice of any material default or violation under any Assigned Contract or Assigned Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Approval Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assigned Contracts and Assigned Leases). Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assigned Contracts and Assigned Leases is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on <u>Schedule 4.4.</u>

4.5     **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

4.6     **No Brokers.** Except as to the entities set forth in <u>Schedule 4.6</u> hereto, Seller has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Seller, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

55508664.1

4.7    **Taxes.** After giving effect to the Approval Order and upon the Closing, there are no Tax related Liens (i) affecting or attached to the Acquired Assets, (ii) threatened in writing that could attach to or affect the Acquired Assets, or (iii) to Seller's actual knowledge, otherwise threatened that are reasonably likely to attach to or affect the Acquired Assets. The Approval Order shall contain customary provisions that provide that the Acquired Assets will be transferred to Purchaser free and clear of all Tax related Liens.

4.8    **Proceedings.** As of the date hereof, except as would not have a Material Adverse Change, and to Seller's actual knowledge, there is no action, suit, investigation or proceeding pending against, or threatened against or affecting, Seller.

5.    **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**

Purchaser represents and warrants to Seller that the statements contained in this <u>Section 5</u> are true and correct as of the date hereof and will be true and correct on the Closing Date.

5.1    **Organization, Good Standing and Power.** Purchaser is legally formed and in good standing under the laws of the State of its incorporation or formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

5.2    **Authority Relative to this Agreement; Execution and Binding Effect.** Purchaser has full power and authority to execute and deliver this Agreement and any Ancillary Agreements and to consummate the Transactions. The execution and delivery of this Agreement and any Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder or otherwise) on the part of Purchaser are necessary to approve this Agreement and any Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by Seller, this Agreement constitutes, and each of any Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3    **No Defaults.** The execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the material breach of or constitute a material default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or materially violate any (i) provision of Law, or (ii) agreement (including without limitation any loan or financing agreement), Contract, lease, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound); or (b) violate the articles of

23

incorporation or bylaws of Purchaser.

5.4 **Governmental and Other Consents.** Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code and any bulk sales filings to be made by Purchaser, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Body or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

5.5 **Financial Ability.** Purchaser has cash available that is sufficient to enable it to pay the Deposit and the Purchase Price, as well as all other amounts otherwise payable to consummate the Transactions pursuant to and in accordance with this Agreement.

5.6 **No Brokers.** Except as to the entities set forth in Schedule 5.6 hereto, Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement, any Ancillary Agreements, and the consummation of the Transactions.

6. **COVENANTS.**

6.1 **Operation of Acquired Business.** Subject to the requirements of, and the obligations imposed upon, Seller as debtor-in-possession and pursuant to the Bankruptcy Code and except as otherwise contemplated by this Agreement or the Bidding Procedures Order or as required to comply with debtor-in-possession financing obtained by Seller, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, Seller shall operate the Acquired Business in the ordinary course (relative to that in effect immediately prior to the execution of the Agreement) and, consistent with such operation and the budget set forth in Seller's debtor-in-possession credit agreement, and consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Acquired Business and the relationships with the employees, customers and suppliers of the Acquired Business. Without limiting the generality of the foregoing, from and after the date hereof until the earlier of the Closing or the termination of this Agreement in accordance with its terms, the Seller shall not (except as consented to in writing by Purchaser) do any of the following with respect to the Acquired Business: (a) hire any employees or terminate the services of any existing employees, increase, accelerate or provide for additional compensation, benefits (fringe or otherwise) or other rights to any current or former employee, or agree to do any of the foregoing, except in the ordinary course of business or as required by applicable law; (b) materially modify, change, renew, extend or terminate any Contract or relationship with any customer of the Acquired Business, other than renewals or extensions in the ordinary course of business; (c) dispose of or transfer any Acquired Asset; (d) grant any rights with respect to or otherwise disposing of or transferring any right in any Acquired Asset; (e) terminate, amend, or modify the terms of any Acquired Asset. Prior to Closing, Seller shall have paid all amounts due to any Foreign Critical Vendors; or (f) accelerate the delivery of shipment of any Prepaid Inventory.

6.2 **Approval Order.** Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Seller shall use their commercially reasonable efforts to obtain entry of

24

an order or orders by the Bankruptcy Court pursuant to §§363 and 365 of the Bankruptcy Code (the "**Approval Order**"), in form and substance reasonably acceptable to the parties which shall approve this Agreement and the Transactions. Such Approval Order shall contain the provisions set forth below (it being understood that certain of such provisions may be contained in either the findings of fact or conclusions of law to be made by the Bankruptcy Court as part of the Approval Order):

      (a)      Approval of the sale, transfer and assignment by Seller of the applicable Acquired Assets and assumption and assignment of any applicable Assigned Contracts to Purchaser pursuant to this Agreement and Bankruptcy Code §§105, 363 and 365, as applicable;

      (b)      The transfers of the Acquired Assets by Seller to Purchaser (i) vest or will vest Purchaser with all right, title and interest of Seller in and to the Acquired Assets, and to the fullest extent permitted by 11 U.S.C. § 363(f) and all other applicable laws, free and clear of all Liens and claims, including, but not limited to, any "claims" as defined in 11 U.S.C. § 101(5), reclamation claims, covenants, restrictions, hypothecations, charges, indentures, loan agreements, causes of action, instruments, contracts, leases, licenses, options, rights of first refusal, offsets, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, successor liability, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, rights of recovery, interests, products liability, alter-ego, environmental liability, successor liability, tax and other liabilities, causes of action and claims, and in each case whether secured or unsecured, choate or inchoate, filed or untiled, scheduled or unscheduled, notice or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown whether arising prior to, on, or subsequent to the date on which Seller filed their voluntary petitions under Chapter 11 of the Bankruptcy Code, whether imposed by agreement, understanding, law, equity or otherwise (collectively, "**Claims**"), with any such Liens and Claims to attach only to the proceeds of sale with the same priority, validity, force and effect as they existed with respect to the Acquired Assets prior to Closing; and (ii) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the State of Delaware. For the avoidance of doubt and without limiting the foregoing, the transfer of the Acquired Assets to Purchaser shall be free and clear of any Claims or Causes of Action relating to or in connection with (A) any Employee Benefit Plan or pension plans contributed to or maintained by Seller, or multi-employer plan participated in by Seller prior to the or subsequent to the Petition Date; (B) the Worker Adjustment and Retraining Notification Act of 1988, (C) the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar laws or regulations; (D) any collective bargaining agreement(s) to which Seller is a party or otherwise obligated under; or (E) the Seller's current or former employees;

      (c)      The sale and transfer of the Acquired Assets to Purchaser or Purchaser's occupation and use of the Acquired Assets will not subject Purchaser to any liability (including successor liability) with respect to the operation of Seller's Business or Acquired Assets prior to Closing or by reason of such transfer. Purchaser is not holding itself out to

25

the public as a continuation of Seller, and no common identity of directors, stockholders, members, or other equity holders exists between Purchaser and Seller. The Transactions do not amount to a consolidation, merger, or *de facto* merger of Purchaser and Seller and/or Seller's bankruptcy estates; there is no substantial continuity, common identity, or continuation of enterprise between Seller and Purchaser. Purchaser is not a mere continuation of Seller or its bankruptcy estates, and Purchaser does not constitute an alter ego or a successor in interest to Seller or its bankruptcy estates. Purchaser is not a successor to Seller or its bankruptcy estates by reason of any theory of law or equity;

(d)    The Transactions are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(e)    This Agreement was negotiated at arms-length;

(f)    The sale of the Acquired Assets hereunder was conducted in a "non-collusive manner" within the meaning of Section 363(n) of the Bankruptcy Code;

(g)    A determination that selling the Acquired Assets free and clear of all Liens is in the best interest of Seller's Estate;

(h)    That Purchaser shall not assume or have any responsibility or liability whatsoever for any of the Excluded Liabilities; and

(i)    In the thirty (30) day period after the Closing Date, Purchaser and Seller shall complete determination of the Closing Eligible Amount, calculated in accordance with Section 2.6(a) of this Agreement as well as a definitive calculation of the Closing Eligible Amount. Any disputes regarding such calculation of the Closing Eligible Amount shall be resolved exclusively by the Bankruptcy Court.

6.3    **Appeal of Approval Order.** If the Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; provided, however, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of Section 363(m) of the Bankruptcy Code.

6.4    **Access to Facilities Personnel, and Information.** Prior to the Closing, Seller shall permit during normal business hours and in a manner that does not unreasonably interfere with ordinary business operations, representatives of Purchaser to have access to all premises, property, books, records (excluding Tax records), Contracts, and documents of or pertaining to the Acquired Business or any of the Acquired Assets, including without limitation the Inventory, which are under Seller's control (provided that any representatives of Purchaser shall be subject to the confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to

26

55508664.1

be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder).

6.5    **Further Assurances.** Purchaser and Seller agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the Transactions contemplated by this Agreement, any Ancillary Agreements, and further secure to each party the rights intended to be conferred hereby and thereby. Without limitation of the foregoing, (i) Seller shall promptly remit to Purchaser any amount(s) collected by Seller that constitute Acquired Assets under this Agreement and (ii) Purchaser shall promptly remit to Seller any amount(s) collected by Purchaser that constitute Excluded Assets under this Agreement.

6.6    **Tax Matters.**

(a)    All Transfer Taxes incurred in connection with the purchase and sale of the Acquired Assets shall be borne equally by Purchaser and Seller in each case when due. Purchaser shall file, to the extent required by applicable Law, all necessary Tax returns and other documentation with respect to all such Transfer Taxes. To the extent required by applicable Law, Purchaser will join in the execution of any such Tax returns or other documentation.

(b)    Purchaser and Seller agree that the Purchase Price and the assumption of any Assumed Liabilities (together with any other amounts treated as consideration for Income Tax purposes) (the "**Tax Purchase Price**") shall be allocated among the Acquired Assets in a manner that is in accordance with the allocation methodology set forth on Exhibit C hereto and Section 1060 of the Code and the Treasury Regulations promulgated thereunder (collectively, the "**Allocation Methodology**"). Purchaser and Seller shall negotiate in good faith, on or prior to the Closing Date, an allocation of the Tax Purchase Price among the Acquired Assets in accordance with the Allocation Methodology (the "**Allocation Schedule**"). Purchaser and Seller shall each file all Tax returns (and RS Form 8594, if applicable) on the basis of such agreed upon allocation set forth in the Allocation Schedule, and no party shall thereafter take a Tax return position inconsistent with such Allocation Schedule unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the Internal Revenue Service or other Governmental Body responsible for Taxes. Any adjustments to the Purchase Price pursuant to this Agreement shall be allocated in a manner consistent with the Allocation Schedule. Notwithstanding such allocation of the Tax Purchase Price, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any proceeding in the Chapter 11 Case that may be proposed. Seller reserves the right on its behalf and on behalf of its estate, to the extent not prohibited by applicable law and accounting rules, for purposes of any proceeding in connection with the Chapter 11 Case, to ascribe values to the Acquired Assets and to allocate the value of the Acquired Assets to Seller in the event of, or in order to resolve, creditor disputes in the Chapter 11 Case.

(c)    If requested by Purchaser, Seller shall notify all of the Taxing authorities in the jurisdictions that impose Taxes on Seller or where Seller has a duty to file Tax returns in connection with the Transactions in the form and manner required by such Taxing authorities, if the failure to make such notifications or receive any available tax clearance

27

certificate (a **"Tax Clearance Certificate"**) could subject Purchaser to any Taxes of Seller. If any Taxing authority asserts that Seller is liable for any Tax, Seller shall promptly pay or in good faith contest any and all such amounts and shall provide evidence to Purchaser that such liabilities have been paid in full or otherwise satisfied or contested.

6.7    **Public Announcements.** Neither Purchaser nor Seller shall make any public announcements or statements concerning the transactions contemplated by this Agreement without the prior written consent of the other Party (which consent may not be unreasonably withheld, condition or delayed). Notwithstanding anything contained in this Agreement or in the Confidentiality Agreement to the contrary, Purchaser acknowledges and agrees that (i) Seller may provide copies of this Agreement to parties in interest in the Chapter 11 Case and to those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Acquired Assets or as otherwise necessary or desirable in connection with the Chapter 11 Case; and (ii) Seller shall also be entitled to file copies with the Bankruptcy Court or as otherwise required by applicable Law and shall be entitled to publish notice of the transactions contemplated by this Agreement in any newspaper selected by Seller.

6.8    **Customer Personal Information.** From and after the date of this Agreement and prior to the Closing or the earlier termination of this Agreement, Sellers shall provide to customers and prospective customers any required privacy notices and obtain any required consents related to Seller's ability to transfer customers' and prospective customers' Personal Information included in the Acquired Assets to Purchaser as is necessary to comply in all material respects with applicable Law in connection with the consummation of this transaction. Unless otherwise agreed by the Parties, Sellers shall provide such notices to customers and prospective customers no later than one (3) business days after Sellers and Buyer have mutually agreed upon such communications and notices. Sellers' notice shall provide customers and prospective customers with at least thirty (30) days from the date of the notice to opt-out of the transfer of Personal Information to Purchaser (the "Consent Period"). Sellers shall not transfer or cause to be transferred any Personal Information prior to the expiration of the Consent Period, even if the expiration of the Consent Period occurs after the Closing Date. For the avoidance of doubt, the expiration of the Consent Period shall not be a condition to Closing, and to the extent that the Consent Period has not expired as of the Closing Date, the transfer of Personal Information shall automatically occur on the day following the expiration of the Consent Period. For the avoidance of doubt, the Personal Information of any customer or prospective customer who opts-out of the transfer of their respective Personal Information to Purchaser shall be considered an Excluded Asset.

7.    **EMPLOYEES.** Purchaser intends to offer continued employment to most employees who are principally engaged in the Acquired Business on the same or similar terms as their current terms of employment; provided, however, that Purchaser is not obligated to offer continuing employment to any Seller employees, including, without limitation, senior management or executives. Purchaser, in its sole and absolute discretion, will identify those Seller employees that Purchaser chooses not to offer continued employment to prior to the Closing Date. Purchaser shall have no liability for any pay, benefits, severance, or other claims of any Seller employees earned, accrued, or otherwise relating to the period prior to the Closing Date, and all such liabilities shall constitute Excluded Liabilities, and shall remain the sole responsibility of Seller and its Affiliates, as applicable. Purchaser shall have no obligation to provide any severance, payments, or benefits

to any current or former employees or independent contractors of Seller or its Affiliates earned or accrued on or prior to the Closing Date. Seller shall be responsible for providing any notice required pursuant to the WARN Act or any similar Law that is triggered by any action that occurs on or prior to the Closing Date. Seller and Purchaser acknowledge and agree that all provisions contained in this <u>Section 7</u>, with respect to current or former Employees are included for the sole benefit of Seller and Purchaser, and that nothing herein, whether express or implied, shall create any third-party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of Seller, any participant in any Employee Benefit Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with Purchaser.

8.    **TERMINATION; EFFECT OF TERMINATION.**

8.1    **Termination.** This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by mutual, written consent of Purchaser and Seller;

(b)    by Purchaser in the event the Closing has not occurred (other than through failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before May 14, 2025 or such later date as may be agreed to by the parties (the "**Outside Closing Date**");

(c)    by Purchaser if Seller's Chapter 11 Case is converted to one under Chapter 7 of the Bankruptcy Code;

(d)    by Purchaser if any term of the Approval Order is not reasonably acceptable to Purchaser in any manner that is materially adverse to Purchaser; or

(e)    by the non-breaching party upon a material breach of any provision of this Agreement, provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of five (5) Business Days (provided that the non-breaching party shall have an immediate right to terminate if the breaching party has willfully breached any provision of this Agreement which breach is not cured).

8.2    **Effect of Termination.** If this Agreement is terminated pursuant to <u>Section 8.1(a)</u> of this Agreement or terminated by Purchaser pursuant to <u>Section 8.1(b)</u>, <u>(c)</u>, <u>(d)</u>, <u>or (e)</u> of this Agreement, Purchaser and its Affiliates shall not have any Liability or obligations under this Agreement and the Escrow Agent shall promptly return the Deposit to Purchaser, unless Seller terminates pursuant to <u>Section 8.1(e)</u>. If this Agreement is terminated by Seller pursuant to <u>Section 8.1(e)</u> of this Agreement, Seller shall be paid the Deposit by the Escrow Agent and Purchaser and its Affiliates shall be released from any further Liability under this Agreement and this Agreement shall otherwise be deemed null and void and of no further force and effect.

8.3    **Injunctive Relief.** Each Party agrees that any breach of this Agreement would

29

constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement. Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief. The rights set forth in this <u>Section 8.3</u> shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.

## 9.   GENERAL PROVISIONS.

9.1    **"As Is", "Where Is", and "With All Faults" Transaction.** PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN <u>SECTION 4</u> OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING (A) FINANCIAL PROJECTIONS, REVENUES, PROFITS OR INCOME TO BE DERIVED OR COSTS OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, (B) THE PHYSICAL CONDITION OF ANY ACQUIRED ASSETS, (C) THE ENVIRONMENTAL CONDITION OR OTHER MATTERS RELATING TO THE PHYSICAL CONDITION OF THE LEASED REAL PROPERTY OCCUPIED BY SELLER, (D) THE ZONING OF THE LEASED REAL PROPERTY OCCUPIED BY SELLER, (E) THE VALUE OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (F) THE TRANSFERABILITY OF THE ACQUIRED ASSETS, (G) THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, (H) TITLE TO ANY OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF, (I) THE MERCHANTABILITY OR FITNESS OF THE ACQUIRED ASSETS OR ANY PORTION THEREOF FOR ANY PARTICULAR PURPOSE, OR (J) ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF ALL ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 4</u> OF THIS AGREEMENT, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 4</u> OF THIS AGREEMENT, PURCHASER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS", "WHERE IS", AND "WITH ALL FAULTS."

9.2    **Transaction Expenses.** Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the Transactions are consummated.

9.3    **Certain Interpretive Matters and Definitions.** Unless the context requires, references to the plural include the singular and references to the singular include the plural; references to any gender includes the other gender; the words "include", "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation"; the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this

30

Agreement; and all references to Sections, Articles, or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

9.4 **Termination of Representations and Warranties.** The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

9.5 **Amendment.** Any provision of this Agreement may be amended if, but only if, such amendment is in writing and is signed by Seller and Purchaser (or by any successor to such Party).

9.6 **Waiver; Remedies Cumulative.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

9.7 **Notices.** All notices, demands and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to be given when hand delivered (or, if hand delivery is refused, on the date such delivery was attempted) or the date of delivery or refusal if sent by a nationally recognized overnight courier for next Business Day delivery to the addresses set forth below. A copy of all notices also shall be provided on the same Business Day.

|            |                                                   |
|------------|---------------------------------------------------|
| Seller:    | Robert Gorin                                      |
|            | c/o Getzler Henrich & Associates LLC              |
|            | 295 Madison Avenue                                |
|            | 20th Floor                                        |
|            | New York, NY 10017                                |
|            | Email: rgorin@getzlerhenrich.com                  |
|            |                                                   |
| Copy to:   | Saul Ewing, LLP                                   |
|            | 1500 Market Street, 38th Floor                    |
|            | Philadelphia, PA 19102                            |
|            | Attention: Jeffrey C. Hampton; Adam H. Isenberg   |
|            | Email: jeffrey.hampton@saul.com;                  |
|            | adam.isenberg@saul.com                            |
|            |                                                   |
| Purchaser: | Sparkle Pop, LLC                                  |

31

55508664.1

603 Sweetland Avenue
Hillside, NJ 07205
Attn: Joel Weinshanker
Email: joelw@necaonline.com;

Copy:        DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Attention: Richard A. Chesley; Jamila Justine Willis
Email: Richard.chesley@us.dlapiper.com;
jamila.willis@us.dlapiper.com

A party may designate another address by giving notice in accordance with this Section.

9.8    **Jurisdiction.** The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof; provided that in the event the Chapter 11 Case has concluded or been dismissed or the Bankruptcy Court declines to exercise jurisdiction or lacks jurisdiction, in each instance with respect to any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof, then exclusive jurisdiction shall be in the federal or state courts for the State of Maryland.

9.9    **Governing Law.** To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws.

9.10    **Damages.**  NOTWITHSTANDING  ANYTHING  HEREIN  TO  THE CONTRARY, NO PARTY SHALL BE LIABLE FOR INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

9.11    **Time is of the Essence.** Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

9.12    **Severability.** If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

9.13    **Titles and Headings.** Titles and headings of Sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

9.14    **Assignment; Successors and Assigns.** This Agreement and the rights, duties and obligations hereunder may not be assigned by any party without the prior written consent of the other parties, and any attempted assignment without consent shall be void. Subject to this paragraph, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns. Notwithstanding the foregoing, this Agreement may be assigned by

32

Purchaser to an Affiliate, provided that such Affiliate assumes all of the obligations of Purchaser under this Agreement; provided further that Purchaser shall not be released of its obligations under this Agreement such that Purchaser and its Affiliate shall be jointly and severally liable for the performance of the obligations of Purchaser hereunder.

9.15    **No Third-Party Rights.** The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

9.16    **Confidentiality Agreement.** The parties acknowledge that the Confidentiality Agreement dated January 14, 2025 between the Seller (through Raymond James & Associates, Inc., as Seller's Representative) and Purchaser (the "**Confidentiality Agreement**") shall remain in full force and effect during the term specified therein.

9.17    **Entire Agreement.** This Agreement, any Ancillary Agreements, and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, any Ancillary Agreements, or the Confidentiality Agreement.

9.18    **Prevailing Party.** If any litigation or other court action, arbitration or similar adjudicatory proceeding is sought, taken, instituted or brought by Seller or Purchaser to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing party in such action, suit or proceeding shall be borne by the party against whose interest the judgment or decision is rendered. This <u>Section 9.18</u> shall survive and the Closing. Seller agrees that any amounts awarded to Purchaser pursuant to this <u>Section 9.18</u> shall be payable as administrative expenses pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

9.19    **Execution of this Agreement.** This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

9.20    **Survival.** None of the representations or warranties of the Parties set forth in this Agreement, or any other agreement or certificate executed in connection with, or delivered pursuant to, this Agreement shall survive the Closing. Other than the requirements of further assurances and actions specifically identified to be taken post-Closing, all other covenants of the Parties shall expire upon Closing. This <u>Section 9.20</u> shall not limit any covenant or agreement of any Party which, by its term, contemplates performance after the Closing, but only to the extent such covenants and agreement are to be performed, or prohibit actions, subsequent to the Closing. The obligations, limitations and rights provided for under this <u>Section 9</u> shall survive any termination of this Agreement.

9.21    **WAIVER OF JURY.** EACH PARTY HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO

55508664.1

ANY ACTION OR CLAIM ARISING OUT OF OR ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH PARTY HAS REVIEWED THIS WAIVER AND KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

9.22   **Transition Services Agreement.**   The Parties shall negotiate in good faith the terms and conditions of a transition services agreement regarding the Facility and such other services the Purchaser reasonably requires to operate the Acquired Business and the Facility, so long as Seller can provide such services in accordance with applicable law including the Bankruptcy Code; provided, however, that the term during which Seller shall be required to provide such transition services shall not extend past the effective date of any plan of liquidation of Sellers. All costs of such transition services, including Seller's costs for personnel providing such transition services, shall be borne by Purchaser; provided, however, that Sellers shall be responsible for: (a) any costs associated with any transition services provided by Purchaser to Sellers at Seller's prior written request; and (b) any shipping costs incurred by Purchaser on behalf of Sellers at Sellers' written direction or at the direction of the Bankruptcy Court; and (c) any costs associated with the destruction of any inventory at Sellers' written direction or at the direction of the Bankruptcy Court (collective, the "**Sellers' Costs**"), which Sellers' Costs shall be deducted from the Incentive Amount.

9.23   **No Joint Liability**. Purchaser and Seller agree and acknowledge that: (i) the Backup Bidder consists of two distinct and separate entities, namely Purchaser and Universal (collectively the "**Purchaser Parties**" and individually a "**Purchaser Party**"); (ii) Universal is not a party to this Agreement; (iii) Purchaser is not a party to and has no obligations under the Asset Purchase Agreement submitted by Universal (as amended, the "**Universal APA**"); (iv) each Purchaser Party shall be solely responsible for its own obligations, representations, warranties, covenants, and liabilities arising out of or in connection with the asset purchase agreement to which such Purchaser Party is a party; (v) no joint and/or several liability exists between Purchaser and Universal; (vi) Purchaser shall not have any liability whatsoever under the Universal APA if closing fails to occur under this Agreement as a result of Universal's failure to proceed to closing under the Universal APA; and (vii) Purchaser shall not have any liability or obligation whatsoever for any action or omission by Universal, including, without limitation, for any act, omission, debt, liability, or obligation of Universal arising out of or in connection with the Universal APA. Nothing in this Agreement shall be construed to create any agency, partnership, joint venture, or other similar relationship between the Purchaser Parties. Each Purchaser Party is acting independently and not as an agent of the other Purchaser Party. The provisions of this Section 9.23 shall survive the termination or expiration of this Agreement.

9.24   **Intentionally Omitted.**

34

9.25  **Purchase Option**.

(a)     Subject to the entry of the Approval Order, the Backup Bid and Backup
        Bidder may be selected to replace the Successful Bidder. In such event, and
        if Universal does not complete closing in accordance with the terms of the
        Universal APA, Seller shall provide written notice of such failure to
        Purchaser. Purchaser shall have the option, exercisable within ten (10)
        business days from its receipt of Seller's notice, to notify Seller that
        Purchaser is electing to complete closing under the Universal APA in the
        place of Universal for a purchase price equal to the Universal Bid. Seller
        shall confirm in its notice to Purchaser whether there has been any
        amendment or other modification to the Universal APA and if so, include a
        copy of any such amendment or modification. If Purchaser exercises the
        purchase option, then Purchaser's closing under the Universal APA shall
        occur within ten (10) business days after Purchaser's notice exercising its
        purchase option. Purchaser shall not be subject to or otherwise bound by
        any amendment or modification to the Universal APA that is not included
        with Seller's notice pursuant to this Section 9.24. The purchase option is
        exercisable in Purchaser's sole and absolute discretion, without any
        obligation to do so, and Purchaser shall have no liability for failing to
        exercise such purchase option for any reason or no reason whatsoever. If
        Purchaser elects to exercise the purchase option, Purchaser shall receive a
        credit at closing against the purchase price under the Universal APA equal
        to the amount of any deposit under the Universal APA.

(b)     If the Backup Bid and Backup Bidder are selected to replace the Successful
        Bidder and Purchaser does not complete Closing in accordance with the
        Purchase Agreement, Seller shall provide written notice of such failure to
        Universal. Universal shall have the option, exercisable within ten (10)
        business days from its receipt of Seller's notice, to notify Seller that
        Universal is electing to complete closing under the Purchase APA in place
        of Purchaser for a purchase price equal to the Purchase Price under this
        Purchase Agreement. Seller shall confirm in its notice to Universal whether
        there has been any amendment or other modification to the Purchase APA
        and if so, include a copy of any such amendment or modification. If
        Universal exercises the purchase option, then Universal's closing under the
        Purchase Agreement shall occur within ten (10) business days after
        Universal's notice exercising its purchase option. Purchaser shall not be
        subject to or otherwise bound by any amendment or modification to the
        Purchase APA that is not included with Seller's notice pursuant to this
        Section 9.24. The purchase option is exercisable in Universal's sole and
        absolute discretion, without any obligation to do so, and Universal shall
        have no liability for failing to exercise such purchase option for any reason
        or no reason whatsoever. If Purchaser elects to exercise the purchase option,
        Universal shall receive a credit at closing against the Purchase Price under
        the Purchase APA equal to the amount of any deposit under Purchase

35

Agreement.

9.26    **Ad Populum.**  By its signature below, Ad Populum assumes all of Purchaser's obligations under this Agreement and agrees that it shall perform all obligations in the event Purchaser cannot perform its obligation, and Purchaser and Ad Populum shall be jointly liable for the performance of the obligations of Purchaser under this Agreement.

*(Signatures appear on the following page)*

36

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the Effective Date.

**SELLER:**
DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation

By: *Robert Gorin*

Name: Robert Gorin
Title: Chief Restructuring Officer

DIAMOND SELECT TOYS AND
COLLECTIBLES, LLC, a Maryland limited
liability company

By: *Robert Gorin*

Name: Robert Gorin
Title: Chief Restructuring Officer

**PURCHASER:**
Sparkle Pop, LLC.,
a Delaware limited liability company

By: *Joel Weinshanker*

Name: Joel Weinshanker
Title: Manager

***FOR PURPOSES OF SECTION 9.26 OF THIS AGREEMENT:***

**AD POPULUM, LLC**
A Delaware limited liability company

By: *Joel Weinshanker*

Name: Joel Weinshanker
Title: Manager

<u>Exhibit A</u>
Form — Master Assignment

This **ASSIGNMENT, BILL OF SALE AND CONVEYANCE AGREEMENT** (this "**Agreement**"), dated as of [_____, 2025] (the "**Effective Date**"), is made and entered into by and between Diamond Comic Distributors. Inc., a Maryland corporation and Diamond Select Toys and Collectibles, LLC, a Maryland limited liability company (collectively, "**Seller**") and_____ a _____ ("**Purchaser**") (each a "**Party**" and collectively, the "**Parties**").

<u>RECITALS</u>

WHEREAS, Purchaser and Seller are parties to that certain Asset Purchase Agreement, dated as of March, 2025 (the "**Purchase Agreement**").

WHEREAS, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

WHEREAS, the Parties are executing and delivering this Agreement pursuant to Section 3.5 of the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and in the Purchase Agreement, and other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.      **Sale and Transfer of Acquired Assets.** For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to, and subject to the terms and conditions of, the Purchase Agreement and that certain Order (A) Authorizing and Approving the Sale of [Substantially All] the Debtor's Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (B) Establishing a Designation Period and Deadlines for the Assumption and Assignment Or Novation of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief entered on [_____, 2025] **[NTD: Conform to caption of Final Order]** by the United States Bankruptcy Court for the District of Maryland in Case [_____] (the "**Approval Order**"), effective as of the Effective Date, Seller hereby sells, conveys, assigns, transfers and delivers to Purchaser, and Purchaser hereby accepts, purchases, acquires, assumes and takes delivery of, all of Seller's right, title and interest in and to the Acquired Assets, free and clear of all Liens to the extent provided in the Approval Order. For the avoidance of doubt, Seller is not selling, conveying, assigning, transferring, or delivering to Purchaser any of the Excluded Assets, and all right, title, and interest in and to such Excluded Assets are hereby and shall be retained by Seller. Seller agrees to execute, acknowledge (where appropriate), and deliver such bills of sale, assignments, certificates of title, and other instruments of transfer as may reasonably be requested by Purchaser to consummate the transactions contemplated by this Agreement or the Purchase Agreement, each in form and substance reasonably satisfactory to Purchaser and its legal counsel and executed by Seller.

2.      **Liabilities.** Notwithstanding any provision in this Agreement or the Purchase

Agreement to the contrary, Purchaser does not and shall not assume and does not agree to pay,

Ex. A-2

55508664.1

perform, fulfill or discharge, and shall not be responsible to pay, perform, fulfill or discharge any of Seller's Liabilities other than the Assumed Liabilities, except as may be provided otherwise in the Approval Order and Purchaser shall be responsible for the Cure Amounts. Purchaser shall be liable for all Claims and Liabilities arising in connection with the Acquired Assets arising after the Effective Date.

3.    **Entire Agreement.** This Agreement, together with the Approval Order, the Purchase Agreement, and the other agreements, instruments, certificates and documents executed and delivered in connection therewith, represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.

4.    **Amendment and Waiver.** This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

5.    **Terms of the Purchase Agreement.** This Agreement is entered into pursuant to, and subject to all of the terms and conditions of, the Purchase Agreement and the Approval Order. Nothing contained in this Agreement shall be deemed to supersede, enlarge on or modify any of the obligations, agreements, covenants or warranties of Seller or Purchaser contained in the Purchase Agreement or any provision of the Approval Order. In the event of any conflict or inconsistency between this Agreement and the Purchase Agreement and/or the Approval Order, the terms of the Purchase Agreement and Approval Order shall prevail.

6.    **Governing Law.** Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

7.    **Binding Effect.** This Agreement is being executed by Seller and Purchaser and shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns, for the uses and purposes above set forth and referred to, and shall be effective as of the Effective Date. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.

8.    **Counterparts.** This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "execution", "signed", "signature", and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pH", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and AdobeSign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law.

Ex. A-3

9.    **Headings.** The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[Remainder of page intentionally left blank.]

Ex. A-4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the Effective Date.

**SELLER:**
DIAMOND COMIC DISTRIBUTORS, INC.,
a Maryland corporation


By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer


DIAMOND SELECT TOYS AND
COLLECTIBLES, LLC, a Maryland limited
liability company


By:_____
Name: Robert Gorin
Title: Chief Restructuring Officer

**CGA**


[Signature Block]



**PURCHASER**:
SPARKLE POP, LLC
a Delaware limited liability company


By:_____
Name: Joel Weinshanker
Title: Manager

## **Exhibit B**
**Intentionally Omitted**

Ex. B-2

## Exhibit C
## Allocation Methodology[6]

Net working capital balances, including accounts receivable, inventory, prepaids, and accounts payable to be recorded at net book value as per closing financial statements. Fixed assets, including equipment to be recorded at $[_____] and leasehold improvements to be recorded at $[_____].

*Example using balances from Management Prepared Financial Statements as at August 31, 2024. All figures in USD '000s*

| | |
|---|---|
| Trade Accounts Receivable | TBD |
| Less: Aged accounts >90 days | (TBD) |
| Net AR | TBD |
| Less: Additional 10% reserve | (TBD) |
| Total Net Accounts Receivable | TBD |
| Inventory | (TBD) |
| Less: Inventory Reserve 10% | TBD |
| | (TBD) |
| Net Inventory | TBD |
| Assumed AP for Critical Vendors | (TBD) |
| Leasehold Improvements | TBD |
| FF&E | TBD |
| Intangible Assets/Goodwill | TBD |
| Enterprise Value | TBD |

---

[6] NTD:  Subject to due diligence and financial review.

55508664.1

## <u>Schedule A</u>
### Critical Vendors

None

55508664.1

## <u>Schedule B</u>

**Leased Real Property**

(i)  7485 Polk Lane, Olive Branch, Mississippi;

55508664.1

**<u>Schedule C</u>**
**Prepaid Inventory**


**See attached spreadsheet**
**(to be updated at Closing)**

55508664.1

### **Schedule 2.1(c)**

**Assigned Contracts**

None

## Schedule 2.3(n)

## Facility Assigned Contracts

| Contract CounterParty Name | Title of Contract | Debtor Party | Cure Amount |
|---|---|---|---|
| Agility Recovery | Interruption Recovery | Diamond Comic Distributors, Inc. | $13,361.12 |
| Presto-X LLC | Proposal / Agreement for Pest Management Service | Diamond Comic Distributors, Inc. | $748.70 |
| Teems & DeMoville Mechanical Contractors LLC | Service Agreement | Diamond Comic Distributors, Inc. | $16,658.06 |
| Waste Connections of Tennessee, Inc. | Customer Service Agreement | Diamond Comic Distributors, Inc. | $53,309.47 |

55508664.1

## Schedule 4.4

**Contracts and Leases – Material Defaults/Violations (Not Curable)**

55508664.1

## <u>Schedule 4.6</u>

### Seller's Brokers

- Raymond James & Associates, Inc.

- Janney Montgomery Scott

55508664.1

**Schedule 5.6**

**Purchaser's Brokers**

**None**

55508664.1