

**lone oak**
PAYROLL

3140 Neil Armstrong Blvd. #203, Eagan, MN 55121
651-203-8070 | www.loneoakpayroll.com

## FACTORING AGREEMENT

This **FACTORING AGREEMENT** ("Agreement"), is made and executed as of _Oct 10th_, 2018 ("Date of Execution") by and between **Elective Staffing Midsouth, LLC** ("Client") and **ARA, Inc. d/b/a Lone Oak Payroll** ("Factor"). Factor and Client are collectively referred to as the "Parties."

1.    Defined Terms. As used in this Agreement, the following terms shall have the meanings set out respectively after each (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

(a)    "Accounts Receivable" shall mean and include accounts, instruments, documents, chattel paper, general intangibles, returned or repossessed goods arising out of or relating to the sale of temporary staffing or similar services any time or from time to time, and all proceeds thereof.

(b)    "Customer" means any corporation or other entity that purchases temporary staffing services from Client.

(c)    "Event of Default" is defined in Section 18.

(d)    "Funds Employed" shall mean gross Accounts Receivable outstanding on Factor's books less any balance outstanding in the Reserve Account to the credit of Client. If the Reserve Account should show a debit balance, such debit balance shall be added to gross Accounts Receivable outstanding in determining Funds Employed.

(e)    "Late Invoices" means the amount of Accounts Receivable assigned hereunder which are not paid within the initial 30 days.

(f)    "Obligations" mean all obligations, liabilities and indebtedness of Client to Factor, now existing or hereafter incurred, direct or indirect, absolute or contingent, whether created under this Agreement, any supplement hereto or any other agreement between Client and Factor or otherwise, including without limitation, obligations owed by Client to others which Factor obtains by assignment.

(g)    "Purchase Price" is defined in Section 4.

(h)    "Reserve" is defined in Section 6.

(i)    "Reserve Account" is defined in Section 5.

(j)    "Solvent" shall mean that Client (i) owns property the fair saleable value of which is greater than the amount required to pay all of its indebtedness (including contingent debts), (ii) is able to pay all of its indebtedness as such indebtedness matures and (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is engaged.

(k)    "UCC" shall have the meaning given in Section 8.

2.    Appointment. Except as provided herein, Client appoints Factor as its sole factor with respect to certain sales of temporary staffing services to Customers and hereby offers to sell and assign only to Factor, as absolute owner, all Accounts Receivables arising out of such sales or services, including all such sales or services arising under any trade names or through any division or selling agent. The assignment of Accounts Receivable to Factor shall vest in Factor all of Client's rights, securities, guaranties and liens with respect to each Account Receivable, including any rights of stoppage in transit, replevin, reclamation, and any claims of lien filed by Client or held by Client on personal property, and all of Client's

Exhibit 2



defenses and rights of offset with respect to any payments received by Factor on Accounts Receivable, but Factor shall not be obligated to, and shall not be liable for, exercising or refusing to exercise any rights granted to Factor hereby.

3.  Purchase of Accounts Receivable. Factor agrees to purchase from Client at the office of Factor all Accounts Receivable first approved by Factor in writing as to credit risk and terms of sale. From time to time, Client may provide Factor with a list of Accounts Receivable that it desires Factor to purchase, in the form attached hereto as Exhibit A and attach thereto copies of all contracts which give rise to the Accounts Receivable. In no event shall Factor be obligated to purchase any Accounts Receivable and Factor may accept or reject any Accounts Receivable in its sole discretion. All orders from Customers including the amount and terms of each proposed sale or service to Customers shall be submitted in advance of purchase or rendition of service to Factor for prior written approval, which may be granted or withheld at Factor's sole discretion. Factor's approval is subject to withdrawal either orally or in writing at any time. Each purchase of an Account Receivable by Factor shall be with full recourse to Client, and Client agrees to pay Factor on demand the unpaid face value together with any unpaid fees for each Account Receivable if Customer fails to pay within 90 days of the date a Client invoice is generated, unless sooner demanded by Factor, in Factor's sole discretion.

4.  Purchase Price. The purchase price of each Account Receivable (the "Purchase Price") is the gross amount of the Account Receivable, less any discounts made available or extended to the Customer (which shall be computed on the shortest terms where optional terms are given), returns and allowances of any nature, Factor's administrative fee as set forth on Exhibit C to this Agreement (the "Administrative Fee"), and the Prime rate as set forth in Section 15 to this Agreement. Factor's commission shall be initially presumed to be the Administrative Fee plus the Prime rate (see Section 15) for accounts paid within 30 days. The actual commission shall be determined, and the Reserve Account adjusted, when payment is received by Factor. After purchase of an Account Receivable by Factor, a discount, credit, unidentifiable payment or allowance may be claimed solely by a Customer, and if not so claimed, such discount, credit, payment or allowance shall be the property of Factor.

5.  Client Reserve Account. Factor shall establish on its books in Client's name a reserve account (the "Reserve Account") which Factor shall credit with the gross amount of all Accounts Receivable purchased by Factor from Client and which Factor shall debit with all advances made to Client or on Client's behalf, as well as all credits, discounts available to Customers, anticipations earned by Customers, Commissions as defined in Section 14, and any other amounts chargeable to Client under this Agreement or any supplement hereto or any other agreement between Client and Factor. Factor may charge the Reserve Account with any Obligation, including any amounts due from Client to Factor hereunder at any time in Factor's sole discretion. Factor shall electronically make available to Client a monthly statement of its Reserve Account, and, unless exception is taken to this statement in writing mailed to Factor within 30 days after receipt by Client, the monthly statement shall be deemed correct and conclusively binding upon Client.

6.  Remittance of Funds to Client. As Accounts Receivable approved by Factor and evidenced by invoices arise, Factor shall advance to Client the "Initial Reserve Released" consisting of the Purchase Price of Accounts Receivable purchased by Factor hereunder, less a reserve equal to the percentage amount specified in Exhibit C of all such unpaid Accounts Receivable (the "Reserve"); and if Client is receiving payroll services from Factor, then Factor may further deduct from such advance any applicable sales tax on such Accounts Receivable as well as amounts for payment of payroll, payroll taxes, child support and garnishments for the current payroll and other applicable deductions. In no event without Factor's express written approval shall an Account Receivable be purchased if such purchase would cause Funds Employed at any time to exceed the Maximum Funds Employed specified in Exhibit C. Factor retains the right to increase the Reserve from time to time if, in Factor's discretion, the prospect of collection of the outstanding Accounts Receivable or any other indebtedness owing by Client to Factor, including any indebtedness with respect to unpaid Accounts Receivable, or the ability of Client to pay or perform its obligations under this Agreement or any other agreement with Factor, becomes doubtful or insecure, or additional reserves are necessary to protect Factor against returns, claims or defenses of Customers

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved     Page 3



with respect to Accounts Receivables or any other contingencies. All advances and other Obligations owing to Factor, including any debit balance in the Reserve Account and any amounts owing by Client to Factor or any of its divisions for merchandise or services purchased from any other concern factored or financed by Factor or otherwise, are repayable by Client on demand and may be charged to the Reserve Account when due. On the next weekly processing date after an assigned Account Receivable is paid in full Client shall receive the "Final Reserve Released" equal to any balance owing from the Reserve.

7. _Warranties and Representations_. Client warrants and represents that each Account Receivable sold and assigned to Factor hereunder: (a) shall be genuine and valid and shall represent a completed delivery or performance in fulfillment in every respect of the terms, conditions and specifications of a bona fide, un-cancelled and unexpired sale or service in the ordinary course of business to a Customer which is not affiliated with Client in full compliance with the specifications of such Customer; (b) is enforceable for the full amount thereof and will be subject to no dispute or claim by the Customer in whole or in part as to price, terms, quality, quantity, offsets, counterclaims, contra accounts or any other defense of any other kind and character, real or claimed; (c) will be subject to no discounts, deductions or allowances or no special terms of payment which are not shown on the face of the invoice thereof; (d) is payable in United States Dollars and has been invoiced to the Customer by an invoice that bears notice of the sale and assignment to Factor in compliance with the terms of this Agreement; and (e) is free and clear of prior liens or encumbrances.

8. _Collateral_. As security for the Obligations, Client grants Factor a security interest in Client's business assets whether now or hereafter existing or now owned or hereafter acquired, including, without limitation, all present and future accounts receivable, contract rights and other rights to payment of money. The foregoing includes all accounts and general intangibles, all rights, remedies, guaranties, security interests and liens, all records (including computer records) and other property evidencing any of the foregoing and all proceeds of the foregoing. Client further grants Factor a security interest in all property and fixtures, whether now or hereafter existing or now owned or hereafter acquired and wherever located, of any kind and description, tangible and intangible, including, but not limited to, all goods, inventory, equipment, farm products, instruments, documents, chattel paper, refunds, books and records (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records) pertaining to any of the foregoing, and all products and proceeds of any of the foregoing. Unless otherwise defined herein or the context requires otherwise, terms herein shall have the respective meanings ascribed to them in the Uniform Commercial Code, Minnesota Statutes Chapter 336 (the "UCC"). During the term of this Agreement, Client shall not sell or assign, negotiate, pledge or grant any security interest in such business assets and proceeds thereof to anyone other than Factor, without Factor's prior written consent, except for any sales of inventory in the ordinary course of business. Client authorizes Factor to pay any sums necessary to discharge any lien or encumbrance which is senior to Factor's security interest in the Collateral, which sums shall be included as Obligations owing Factor hereunder.

9. _Invoicing_. All invoices for temporary staffing services rendered shall be prepared by Factor and shall bear Factor's remittance address. Each invoice shall bear the terms of sale and no change from the original terms of sale shall be made without Factor's prior written consent. Factor reserves the right to mail original invoices to Customers at Client's expense; however, mailing, sending or delivery by Factor of a bill or invoice shall not be deemed to be any representation by Factor with respect thereto. In the event that an invoice is sent to a Customer by Client without Factor's remittance information, or in the event an invoice is paid directly to Client by a Customer, such Account Receivable shall be subject to a 15% misdirection fee, to be charged on the face value of such Account Receivable.

10. _Payment of Accounts Receivable_. ALL ACCOUNTS RECEIVABLE MUST BE PAID TO FACTOR, IRRESPECTIVE OF WHETHER FACTOR HAS PURCHASED SUCH ACCOUNTS RECEIVABLE. All payments of Accounts Receivable and other payments on behalf of Client received by Factor shall be credited to Client's account. No check, draft or other instrument received by Factor shall constitute final payment unless and until such check, draft or other

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved          Page 4



instrument shall have been actually collected by Factor in immediately available funds. Notwithstanding the foregoing, for purposes of determining the date of payment and for purposes of calculating the applicable interest, subject to Section 15 hereof, the date on which Factor (as opposed to Factor's third-party designee) receives payment shall be determinative unless the payment is subsequently dishonored, in which case the applicable date shall be the date on which the payment is actually collected in immediately available funds.

   11. <u>Remittances</u>. Any remittances received by Client with respect to Accounts Receivable shall be held in trust for Factor, and Client shall immediately deliver to Factor the identical checks, drafts, monies or other forms of payment received, and Factor shall have the right to endorse Client's name on any check, draft or other form of remittance received, where such endorsement is required to effect collection. Client hereby appoints Factor or such person as Factor may name as its attorney-in-fact to execute all necessary documents in Client's name and do all things necessary to carry out this Agreement. Client ratifies and approves all acts of the attorney and agrees that neither Factor nor the attorney shall be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law. This power being coupled with an interest is irrevocable as long as Client is indebted to Factor in any manner.

   12. <u>Customer Disputes and Claims</u>. Client agrees to notify Factor immediately of all disputes with and claims made by Customers. Factor may, but shall not be required to, allow a reasonable time for the settlement of disputes between Client and Customers without waiving Factor's right at any time to adjust any claims and disputes on an Account Receivable directly with the Customer and to charge back to the Reserve Account at any time the full amount of the Account Receivable involved. Factor may at any time charge the Reserve Account the full amount of: (a) any Account Receivable which is not paid in full when due for any reason (real or imaginary) within 90 days from the date of invoice; (b) any Account Receivable for which there is a breach of any of Client's warranties or representations set forth herein; and (c) any anticipation deducted by a Customer on any Account Receivable. Any such charge back shall not be deemed to constitute a reassignment of the Account Receivable, and Factor shall retain a security interest therein as security for all Obligations owing to Factor.

   13. <u>Collection of Accounts</u>. As owner of the Accounts Receivable, Factor shall have the right to (a) bring suit, or otherwise enforce collection, of the Account Receivable in the name of Client or Factor, (b) modify the terms of payment, settle, compromise or release, in whole or in part, any amounts owing, on terms Factor may deem advisable, and (c) issue credits in the name of Client or Factor. At any time, irrespective of whether an Event of Default has occurred, without notice to or the assent of Client, Factor may contact any account debtor by telephone, written communication or otherwise (from Factor, Factor's counsel, or otherwise) for any purpose, including collection of Accounts Receivable.

   14. <u>Commission</u>. Client agrees to pay Factor a commission ("Commission ") as set forth in <u>Exhibit C</u> attached hereto.

   15. <u>Interest</u>. Client shall pay interest upon any Late Invoices at the close of business each day at a rate specified in Exhibit C. Interest will be calculated daily (computed on the actual number of days elapsed over a year of 365 days) and shall be charged to the Reserve Account weekly at the rate specified in Exhibit C. All Customer checks and other payments received by Factor may, at Factor's option, be deemed applied to the Obligations three days after the date of Factor's receipt. The Parties agree that in addition to any interest chargeable under the Agreement, Client shall be additionally charged an amount equal to the percentage by which the Prime rate (presently accessible at http://online.wsj.com/mdc/public/page/2_3020-moneyrate.html, but in any event as published by the Wall Street Journal or its successor from time to time, and in the event of no successor, another credible financial source) exceeds the Prime rate which was in effect as of the Date of Execution. This additional rate will be charged against the gross amount of all Accounts Receivable, regardless of whether they are Late Invoices.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved  Page 5



16.    <u>Financial Statements and Information; Inspections</u>. Client shall furnish Factor with annual financial statements prepared by an independent certified public accountant acceptable to Factor and also furnish monthly financial statements and other financial information upon Factor's request. Client shall permit any representative of Factor to visit and inspect any of the properties of Client, to examine all books of accounts, records, reports and other papers, to make copies and extracts there from, and to discuss the affairs, finances and accounts of Client with its officers, employees, independent public accountants, creditors and depository institutions all at such reasonable times and as often as may be reasonably requested.

17.    <u>Financial Condition</u>. Client warrants that it is Solvent and shall remain Solvent during the term of this Agreement; that any financial statements delivered to Factor accurately and fairly state Client's financial condition; that there has been no material adverse change in Client's financial condition as reflected in the statements since the date thereof nor do the statements fail to disclose any fact or facts which might materially adversely affect Client's financial condition; that it is not subject to any outstanding state or federal tax liens; and there is no litigation pending or threatened, which taken in the aggregate if adversely determined, can reasonably be expected to have a material adverse effect on Client's financial condition.

18.    <u>Term of Agreement; Termination</u>. The initial term of this Agreement shall be for thirty-six (36) months, commencing upon the execution of this Agreement (the "Initial Term"). Said period shall be automatically extended for consecutive thirty-six (36) month periods (the "Renewal Terms") unless terminated (a) at the end of such Initial or Renewal Term by Client upon the giving of written notice of termination to Factor, not less than 90 days prior to the expiration of the Initial Term or any Renewal Term, and abiding by Section 19 hereto, or (b) by Factor at any time upon the giving of not less than 30 days prior written notice of termination to Client, or, without notice if any of the following events (each, an "Event of Default") shall occur: (i) Client shall default in the payment of any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise); (ii) any representation or warranty made in this Agreement or any supplement hereto, or in any other document executed in connection herewith, or any instrument, certification or financial statement furnished in compliance with or in reference hereto or thereto, or in any other agreement between Client and Factor, shall prove incorrect or misleading in any material respect when made or furnished; (iii) Client shall fail or neglect to perform, keep or observe any covenant or agreement contained in this Agreement or any supplement hereto or any other agreement between Client and Factor; (iv) Client or any guarantor of the Obligations shall file or have filed against it a petition, answer or consent seeking relief under the United States Bankruptcy Code, as now constituted or hereafter amended, or any other applicable Federal or state bankruptcy law or other similar law, or a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official shall be appointed for Client or any guarantor of the Obligations or any substantial part of its or his property; (v) the occurrence of any event or condition which, alone or when taken together with all other events or conditions occurring or existing concurrently therewith, Factor determines (1) has or may be reasonably expected to have a material adverse effect upon Client's business, operations, properties, condition (financial or otherwise); (2) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of this Agreement or any other agreement between Client and Factor; (3) has or may be reasonably expected to have any material adverse effect upon any security for the Obligations, Factor's liens therein or the priority of such liens; or (4) materially impairs the ability of Client to perform its obligations under this Agreement or any other agreement between Client and Factor, or the ability of Factor to enforce and collect the Obligations or realize upon any of the security for the Obligations in accordance with the terms of this Agreement or any other agreement between Client and Factor or applicable law; (vi) Client is no longer Solvent, or fails, closes, suspends, or goes out of business; or (vii) there is a change (by death or otherwise) in Client's principal stockholders or owners; or (viii) Client breaches any agreement with TempWorks Software, Inc., or any other agreement with Factor. In lieu of terminating the Agreement for an Event of Default, Factor may, in its sole and exclusive discretion, permit the Client an opportunity to cure the Event of Default on whatever terms Factor deems reasonable. During such cure period, in addition to whatever terms for cure that Factor may impose, the Administrative Fee shall be increased by one percent (1%). This increase to the Administrative Fee shall apply to all

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved        Page 6



purchases of Accounts Receivable that post-date Factor's notice of an Event of Default. Upon Client's cure of the Event of Default underlying such increase, the Administrative Fee for subsequent purchases of Accounts Receivable shall revert to the rate referenced in EXHIBIT C.

Factor may terminate this Agreement immediately if Client breaches any agreement between Client and TempWorks Software, Inc. In the event that Client exceeds the Maximum Funds Employed amount for any reason, the Agreement shall auto-renew for an additional, fixed Renewal Term.

In the event that this Agreement terminates for any reason before the expiration of the then-applicable Initial Term or Renewal Term (including, without limitation, pursuant to a payoff or buyout of this Agreement by Client or a third party), in addition to all other Obligations owing Factor under this Agreement, Client shall be obligated to pay to Factor the average weekly Administrative Fees and interest earned by Factor in any fifty-two (52) week period selected by Factor (OR, if this Agreement has been in effect for less than fifty-two (52) weeks as of the date of such termination, any shorter period as Factor may select to calculate such average, OR if this Agreement has not generated Administrative Fees or interest payable to Factor as of the date of such termination, such reasonable fees as Factor may deem appropriate), multiplied by the number of weeks remaining in the then-applicable Initial Term or Renewal Term(s) as of such termination (the "Early Termination Fee"). This obligation to pay the Early Termination Fee is not a penalty, is intended as a reasonable approximation of the earnings anticipated by Factor hereunder, and is agreed by the Parties to be reasonable and fair in all respects.

19.     **Payoff.** Client shall be obligated to pay off the Obligations in guaranteed funds by wire transfer prior to the expiration of the then-applicable Initial or Renewal Term in order to fully terminate the Agreement. In the event that Client does not timely pay off such Obligations, the Agreement shall automatically be extended for a Renewal Term. Factor shall not be obligated to provide a payoff letter to any individual or entity other than Client (including, but not limited to prospective factors which Client may desire to provide factoring services subsequent to Factor). Factor shall not be obligated to communicate with any other individual or entity other than Client to facilitate or arrange for payoff of the Obligations, and Client shall neither expect, request, nor demand, nor induce such individual or entity to request or demand same of Factor. In the event that Factor opts, in its sole and exclusive discretion, to work with an individual or entity other than Client to facilitate or arrange for the payoff of the Obligations, Factor shall be entitled to charge a fee not more than five percent (5%) of the Obligations (the "Buyout Fee"), such amount to be added to Client's Obligations, which shall immediately become due and owing. The Buyout Fee is intended by the Parties to compensate Factor for internal fees related to staff and counsel involvement in such third-party buyout, and is not a penalty damage.

20.     **Acceleration.** Upon an Event of Default, Client's intended date of termination, or the effective date of termination, whichever occurs first, all Obligations of Client to Factor shall become immediately due and payable without further notice or demand irrespective of any maturity dates established prior thereto. No such acceleration or termination shall release or abrogate any security interest held by Factor in any collateral of Client until all of Client's Obligations to Factor, including but not limited to all Accounts Receivable, commissions, interest and all costs, expenses and attorneys' fees as herein provided, are indefeasibly paid in full. In the event that Factor shall cease to act as factor for Client, Client agrees to furnish Factor with indemnity satisfactory to Factor that will protect Factor against possible charges to Client under the terms of this Agreement and with a release satisfactory to Factor of all claims Client may have against Factor and until Client does so, Factor may hold any positive balance remaining in the Reserve Account as security for all Obligations of Client to Factor. Client shall pay Factor upon demand all costs and expenses, including reasonable attorneys' fees, incurred by Factor to obtain or enforce payment of any Obligations due from Client to Factor or in the prosecution or successful defense of any action or proceeding concerning any matter arising out of or related to this Agreement, the factoring of the Client's Accounts Receivable by Factor, or any Obligations owing by Client to Factor.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved      Page 7



21.    Lien Perfection. Client hereby irrevocably authorizes Factor and any person designated by Factor to file all financing statements provided for by the UCC and all other documents or instruments which may be required by law or which Factor may request to perfect its security interest. Client agrees to cooperate with Factor in the filing, recording or renewal thereof, and to pay all filing and recording fees and expenses related thereto. Client shall authenticate, execute, acknowledge and/or deliver such other instruments as assurances as may reasonably be requested to effectuate the purposes of this Agreement. At Factor's option, this Agreement may be filed as a financing statement. Factor shall have all rights and remedies of a secured party under the UCC. If notice to Client of any intended disposition of collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given at least 10 calendar days prior to the date of intended disposition or other action. All rights and remedies of Factor shall be cumulative and may be exercised singularly or concurrently, at Factor's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other.

22.    Preferences. Client shall indemnify and hold Factor harmless from any loss, damage or expense (including attorneys' fees) incurred by Factor as a result of a claim made at any time against Factor for the repayment or recovery of any amount received by Factor in payment of any Account Receivable by the payor or legal representative thereof (including a trustee in bankruptcy or assignee for the benefit of creditors) on the grounds of preference under the provisions of the Bankruptcy Code or any other federal or state insolvency law. If such claim is ever made against Factor, in addition to all of Factor's other rights under this Agreement, Client shall pay to Factor on demand the full net face amount of any such Account Receivable, or if Factor so elects, Factor shall have the right to charge against the Reserve Account the full net face amount of any such Account Receivable, but such charge back shall not be deemed a reassignment thereof. The provisions of this paragraph shall survive the termination of this Agreement and the payment in full of the Obligations.

23.    Notices. Any notices, demands, consents, or other writings or communications permitted or required by this Agreement shall be given overnight courier or certified mail, return receipt requested, addressed to the party to be notified as follows, or to such other address as each party may designate for itself by notice given in accordance with this paragraph, and shall be deemed effective upon the date received by the noticed party. Any written notice or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice is received by the noticed party:

| | |
|---|---|
| If to Factor: | ARA, Inc. d/b/a Lone Oak Payroll<br>Attention: David Dourgarian<br>3140 Neil Armstrong Boulevard, Suite 203<br>Eagan, Minnesota 55121 |
| With copy to: | ARA, Inc. d/b/a Lone Oak Payroll<br>Attention: John H. Reid, Esq.<br>3140 Neil Armstrong Boulevard, Suite 203<br>Eagan, Minnesota 55121 |
| If to Client: | Elective Staffing Midsouth, LLC<br>Attention: Amelia Garcia Mejia<br>1666 Duke St<br>Memphis, TN 38108-2617 |

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved      Page 8



24.    Miscellaneous. The captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof. Failure of Factor to exercise any rights granted to it hereunder upon any breach or default by Client shall not be deemed a waiver thereof in the event of further breaches or defaults. The remedies of Factor hereunder shall be deemed to be cumulative and not exclusive. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns and shall become effective only from the date of Factor's written acceptance. The validity, interpretation, construction, performance, enforcement, and remedies of or relating to this Agreement, and the rights and obligations arising out of, or related to, this Agreement shall be governed and construed in all respects by the substantive laws of the State of Minnesota (without regard to the conflict of laws rules or statutes of Minnesota or any other jurisdiction that might result in the application of other law). All disputes arising under or related to this Agreement shall be commenced and maintained exclusively in the federal and state courts situated in the County of Ramsey, State of Minnesota, and Factor and Client hereby irrevocably submit to the jurisdiction and venue of any such court. All post-judgment interest shall bear interest at either the contract rate, or the highest rate allowed by law, whichever is higher. Client will pay all of Factor's costs and expenses, including, without limitation, reasonable attorney's fees and expenses, which may be expended or incurred by or on behalf of Factor in connection with the preparation or administration of this Agreement. In the event that any of the terms of this Agreement are in conflict with any applicable rule of law or statutory provision or otherwise unenforceable under applicable law or regulation, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in full force and effect.

25.    Damages. Client hereby releases and exculpates Factor, its officers, employees, and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. IN NO EVENT WILL FACTOR HAVE LIABILITY FOR ANY CONSEQUENTIAL, SPECIAL, LOST PROFIT, PUNITIVE OR RELIANCE DAMAGES, OR INDIRECT LOSS FOR DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER THEORY OR FORM OF ACTION OR WHETHER THE COMPANY OR CLIENT KNEW OR SHOULD HAVE KNOWN OF THE LIKELIHOOD OF SUCH DAMAGES IN ANY CIRCUMSTANCES. Without limiting the generality of the foregoing, Client releases Factor from any claims which Client may now or hereafter have arising out of Factor's endorsement and deposit of checks issued by Client's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

26.    8821. Client shall fully complete and execute, as taxpayer, prior to or immediately upon the execution of this Agreement, a form 8821 issued by the Department of the Treasury, Internal Revenue Service or such other forms as may be requested by Factor, irrevocably authorizing Factor to inspect or receive tax information relating to any type of tax, tax form, years or periods or otherwise desired by Factor on an ongoing basis.

27.    Taxes. Client acknowledges that it has a duty to timely pay all tax obligation(s) and that if, for whatever reason a tax lien or levy were to issue, Client shall cause such lien or levy to be satisfied or discharged within fifteen (15) days of issuance. Until such lien or levy is satisfied and discharged, Factor shall be entitled to withhold any sum(s) that may otherwise be due Client and upon request or demand from such taxing authority may remit any such sums due Client and over which Factor makes no claim to the taxing authority. Moreover, Client agrees that until the tax lien or levy is satisfied or discharged, Factor shall be entitled to collect all proceeds of accounts and apply such proceeds to Client's indebtedness to Factor. Nothing contained herein shall suspend or abate any performance due Factor by Client.

28.    Disclosure of Affiliations and Bank Accounts. Client acknowledges and agrees that, prior to executing this Agreement, it has disclosed to Factor all businesses/organizations (a) in which Client or any of its shareholders, members, partners, principals, officers and/or directors participate in any capacity, whether as a shareholder, member, partner,

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved        Page 9



principal, investor, advisor, officer, director, agent, employee, independent contractor, or otherwise, and/or (b) which are owned by Client or any of Client's shareholders, members, partners, principals, officers and/or directors. Client further acknowledges and agrees that, prior to executing this Agreement, it has disclosed to Factor all bank accounts which reflect Client's name, as well as those bank accounts of businesses/organizations that fulfill the criteria of (a) and/or (b) of this section.

29.    Rights Against Successor Entity.  In the event Client's shareholders, members, partners, principals, officers and/or directors, or any one or more of them, form a new entity during the term of this Agreement or while Client remains liable to Factor for any Obligations under this Agreement, Client acknowledges that such entity shall be deemed to have expressly accepted the security agreement contained herein, and assumed the Obligations due Factor by Client under this Agreement.  Upon the formation of any such entity, Factor shall be deemed to have been granted an irrevocable power of attorney with authority to execute, on behalf of the newly formed entity, a new UCC-1 financing statement and have it filed with the appropriate secretary of state or UCC filing office.  Factor shall be held harmless and be relieved of any liability as a result of Factor's execution and recording of any such financing statement or the resulting perfection of a lien in any of the successor entity's assets.  In addition, Factor shall have the right to notify the successor entity's account debtors of Factor's lien rights, its right to collect all accounts, and to notify any new lender who has sought to procure a competing lien of Factor's right in such successor entity's assets.

30.    Prohibition.  So long as any Obligations remain owing Factor, Client agrees that Client, its shareholders, members, partners, principals, officers and/or directors shall be prohibited from being involved with, owning, or participating in the operation of, in any capacity, whether as a shareholder, member, partner, principal, investor, advisor, officer, director, agent, employee, independent contractor, or otherwise, any other employment staffing business, whether temporary or otherwise.  Violation of this paragraph shall be deemed an Event of Default.

31.    Disclosure of Convictions.  Client shall be obligated to affirmatively disclose to Factor any crimes of dishonesty for which any of its owners, shareholders, members, partners, principals, officers and/or directors have been convicted or found liable, regardless of whether such convictions or liabilities pre-date the execution of this Agreement.  Violation of this paragraph shall be deemed an Event of Default.

32.    Factor's Financier.  Client acknowledges and understands that Factor may enter into a financing agreement with a senior secured lender, factor or financier ("Financier").  In connection with such financing, Factor may sell and/or assign all or a portion of Client's Accounts Receivable to Financier.  Client hereby consents to Factor entering into such financing agreement with Financier.  Client further agrees as follows:

a.    Client shall have no rights under the financing agreement with Financier, and will have no rights against Financier for any actions that it takes or fails to take under the financing agreement.  Client will not look to or seek to hold Financier, or its respective officers, employees, directors or agents responsible for any of Factor's obligations under this Agreement. Factor's relationship with Financier is completely separate and apart from Client's relationship with Factor except as to any lien rights and the granting and enforcing of any security interests that Financier may have and assert by reason of its purchase and/or assignment of Client's Accounts to Financier pursuant to the financing agreement entered into between Factor and Financier.

b.    In the event Client is advised that Financier has purchased or has received an assignment of all or a portion of Client's Accounts pursuant to the financing agreement between Financier and Factor, Client agrees that all of its representations and warranties set forth in this Agreement, shall extend and inure to Financier and its successors and assigns.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved      Page 10



c.   If so requested by Factor or Financier, Client shall execute any documentation or notice(s) required by Financier to evidence the fact that any or all of Client's Accounts have been sold and assigned to Financier and are payable to Financier only. Client shall take such additional actions in furtherance of the rights of Financier and Factor as Factor or Financier may reasonably require; provided, however, that Financier may not alter the terms of this Agreement, except as provided herein.

d.   Client consents to Factor sharing with Financier copies of all financial statements and information regarding Client delivered or made available to Factor under this Agreement.

33.   <u>Insurance</u>. Client shall maintain insurance on all collateral and insurable property owned or leased by Client (including but not limited to fire and business interruption insurance) in an amount sufficient to cover the full replacement value of such collateral and insurable property. All such insurance shall be in amounts and form and with insurance companies acceptable to Factor in its sole discretion. Client shall furnish to Factor (a) upon written request, any and all information concerning such insurance carried, and (b) lender loss payable endorsements (or their equivalent) in favor of Factor. All policies of insurance shall provide for not less than thirty (30) days' prior written notice of cancellation to Factor.

34.   <u>WAIVER OF JURY TRIAL</u>. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FACTOR AND CLIENT HEREBY WAIVE, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY SUPPLEMENT HERETO OR ANY OF THE OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY CLAIM, DEFENSE, RIGHT OF SETOFF OR OTHER ACTION PERTAINING HERETO, OR TO ANY OF THE FOREGOING.

35.   <u>Special Covenants</u>. For so long as any of the Obligations are outstanding, Client covenants that, unless otherwise consented to by Factor in writing, it shall comply with the covenants, if any, set forth in <u>Exhibit D</u> attached hereto.

36.   <u>Payment Inquiries</u>. Client is expected to maintain a secure network, such that its email systems are not compromised by third parties. In the event that Factor receives an email request for funding or payment to be distributed which it reasonably believes to have originated from Client (whether due to, without limitation, a spoofed Client email address, unauthorized access by a third party to Client's email accounts, or a third-party impersonation of Client's personnel) and Factor distributes funding or payment in response to such request, Client shall be responsible to repay Factor the amount of such funding or payment, in addition to all other Obligations owing under this Agreement.

37.   <u>Entire Agreement</u>. This Agreement and the supplements, Exhibits and/or Schedules referred to herein, together with each guaranty, and each contract, instrument, agreement and other document required by this Agreement, or at any time entered into or delivered to Factor in connection with this Agreement, constitute the entire agreement between Factor and Client with respect to the subject matter of this Agreement, and may only be modified by a written amendment or addendum signed by both Factor and Client. No employee, agent, or other representative of either Factor or Client has authority to bind the other with regard to any statement, representation, warranty, or other expression unless it is specifically included within the express terms of this Agreement or a written addendum signed by an authorized representative of both Factor and Client. All prior agreements, representations, statements, proposals, negotiations, understandings, and undertakings with respect to the subject matter of this Agreement are superseded by this Agreement.



IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement on the day and year first above written.

**CLIENT:**
**Elective Staffing Midsouth, LLC**

By: Amelia Garcia Mejia
Title: Owner

**FACTOR:**
**ARA, Inc. d/b/a Lone Oak Payroll**

By: David Dourgarian
Title: Chief Executive Officer

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved



## EXHIBIT A - REQUEST FOR SALE OF INVOICES/ACCOUNTS RECEIVABLE

| Customer Name | Invoice Date | Invoice No. | Invoice Amount $ |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

TOTAL    $    0.00

The undersigned hereby requests that ARA, Inc. d/b/a Lone Oak Payroll purchase the above described Accounts Receivable, each and all of which are in compliance with the provisions of the Factoring Agreement by and between ARA, Inc. d/b/a Lone Oak Payroll and the undersigned.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved          Page 13



# EXHIBIT B – GUARANTY

This Guaranty, executed contemporaneously with the Factoring Agreement to which this Guaranty is an exhibit, is made by **Amelia Garcia Mejia** (the "Guarantor"), in favor of **ARA, Inc. d/b/a Lone Oak Payroll**, 3140 Neil Armstrong Boulevard #203, Eagan, MN 55121 (hereinafter "Factor").

## WITNESSETH:

WHEREAS, pursuant to a certain Factoring Agreement, dated of even date herewith (as the same may be supplemented, amended, or otherwise modified from time to time, the "Agreement") between **Elective Staffing Midsouth, LLC** (the "Client") and Factor, and all documents, instruments and other agreements executed in connection therewith (the Agreement, together with such other documents, instruments and agreements, being herein called the "Transaction Documents"), Factor has agreed to make purchases of Accounts Receivable on the terms, and subject to the conditions, set forth in the Transaction Documents;

WHEREAS, the Guarantor is an affiliated company, officer, member, partner, director, principal, and/or shareholder of the Client and/or otherwise stands to benefit from the Transaction Documents;

NOW, THEREFORE, in consideration of the promises and covenants herein contained, and other consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees with Factor as follows:

### Guaranty

1.    Defined Terms.  As used herein, "Obligations" shall have the same meaning ascribed to it in the Agreement. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Guaranty shall refer to this Guaranty as a whole, and not to any particular provision of this Guaranty, and section and paragraph references are to this Guaranty unless otherwise specified.  The meanings given to terms defined herein shall apply equally to both the singular and plural forms of such terms.

2.    Guaranty.

a.    The Guarantor hereby unconditionally and irrevocably guarantees to Factor and its successors, endorsers, transferees and assigns, the prompt and complete payment and performance by Client when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

b.    The Guarantor further agrees to pay any and all expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by Factor in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guaranty.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved        Page 14



c.   The Guarantor agrees that the Obligations may at any time, and from time to time, exceed the amount of the liability of the Guarantor hereunder without impairing this Guaranty or affecting the rights and remedies of Factor hereunder.

d.   No payment or payments made by the Client, any other guarantor or any other person or received or collected by Factor from the Client, any other guarantor or any other person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of the Guarantor hereunder which shall, notwithstanding any such payment or payments, other than payments made by the Guarantor in respect of the Obligations or payments received or collected from the Guarantor in respect of the Obligations, remain liable for the Obligations hereunder until the Obligations are indefeasibly paid in full.

e.   The Guarantor agrees that whenever, at any time, or from time to time, he/she/it shall make any payment to Factor on account of his/her/its liability hereunder, he/she/it will notify Factor in writing that such payment is made under this Guaranty for such purpose.

f.   The Guarantor agrees that it is, directly, jointly and severally with any other guarantor, liable to Factor.

3.   Postponement of Subrogation. Notwithstanding any payment or payments made by the Guarantor hereunder or any set-off or application of funds of the Guarantor by Factor, the Guarantor shall not be entitled to be subrogated to any of the rights of Factor against the Client or any other guarantor or any collateral security or guarantee or right of offset held by Factor for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any contribution or reimbursement from the Client or any other person in respect of payments made by the Guarantor hereunder until all amounts owing to Factor by the Client on account of the Obligations are indefeasibly paid in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been indefeasibly paid in full, such amount shall be held by the Guarantor in trust for Factor, segregated from other funds of the Guarantor and shall forthwith upon receipt by the Guarantor, be turned over to Factor in the exact form received by the Guarantor (duly indorsed by the Guarantor to Factor, if required), to be applied against the Obligations, whether matured or un-matured, in such order as Factor may elect.

4.   Amendments with Respect to the Obligations; Waiver of Rights. The Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, any demand for payment of any of the Obligations made by Factor may be rescinded and any of the Obligations continued, and the Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by Factor, and the Agreement and the other Transaction Documents may be amended, modified, supplemented or terminated, in whole or in part, as Factor may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by Factor for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Factor shall not have any obligation to protect, secure, perfect or insure any lien at any time held by it as security for the Obligations or for this Guaranty or any property subject thereto. When making any demand hereunder against the Guarantor, Factor may, but shall be under no obligation to, make a similar demand on the Client or any other guarantor, and any failure by Factor to make any such demand or to collect any payments from the Client or any such other guarantor or any release of the Client or such other or guarantor shall not relieve the Guarantor of the obligations or liabilities hereunder, and shall not impair or

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved        Page 15



affect the rights and remedies, express or implied, or as a matter of law, of Factor against the Guarantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

5.　Guaranty Absolute and Unconditional. The Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by Factor upon this Guaranty or acceptance of this Guaranty, and the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guaranty; and all dealings between the Client and the Guarantor, on the one hand, and Factor on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon this Guaranty. The Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Client or the Guarantor with respect to the Obligations. The Guarantor understands and agrees that this Guaranty shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity, regularity or enforceability of the Agreement, or any other Transaction Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by Factor (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Client against Factor, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Client or the Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Client for the Obligations, or of the Guarantor under this Guaranty, in bankruptcy or in any other instance. When pursuing its rights and remedies hereunder against the Guarantor, Factor may, but shall be under no obligation to, pursue such rights and remedies as it may have against the Client or any other person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by Factor to pursue such other rights or remedies or to collect any payments from the Client or any such other person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Client or any such other person or any such collateral security, guarantee or right of offset, shall not relieve the Guarantor of any liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of Factor against the Guarantor. This Guaranty shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantor and the successors and assigns thereof, and shall inure to the benefit of Factor, and its successors, endorsees, transferees and assigns, until all the Obligations and the obligations of the Guarantor under this Guaranty shall have been satisfied by indefeasible payment in full in cash.

6.　Reinstatement. This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Factor upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Client or the Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Client or the Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

7.　Payments. The Guarantor hereby guarantees that payments hereunder will be paid to Factor without set-off or counterclaim in United States Dollars at the office of Factor set forth in the Agreement.

8.　Representations and Warranties. The Guarantor hereby represents and warrants that:

a.　he/she/it has the power and authority and the legal right and capacity to execute and deliver, and to perform his/her/its obligations under, this Guaranty;

b.　this Guaranty constitutes a legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms, except as affected by bankruptcy, insolvency, fraudulent conveyance, reorganization,

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved　　Page 16



moratorium and other similar laws relating to or affecting the enforcement of creditors' rights generally, general equitable principles and an implied covenant of good faith and fair dealing;

c.     the execution, delivery and performance of this Guaranty will not violate any requirement of law or contractual obligation of the Guarantor and will not result in or require the creation or imposition of any lien on any of the properties or revenues of the Guarantor pursuant to any requirement of law or contractual obligation of the Guarantor;

d.     no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or governmental authority and no consent of any other person is required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty;

e.     no litigation, investigation or proceeding of or before any arbitrator or governmental authority is pending or, to the knowledge of the Guarantor, threatened by or against the Guarantor or against any of his/her/its properties or revenues (1) with respect to this Guaranty or any of the transactions contemplated hereby, (2) which could have a material adverse effect on the business, property, or financial or other condition of the Guarantor

f.     the statements concerning the financial condition and net worth of Guarantor previously provided to Factor are true and correct; there is no event, fact, circumstance or condition known to the Guarantor which is inconsistent with such statements or is required to be disclosed in order to cause such statements not to be misleading.

The Guarantor agrees that the foregoing representations and warranties shall be continuing in nature and shall remain true and accurate in all material respects until such time as all of the Obligations are indefeasibly paid in cash and the Agreement and the other Transaction Documents terminated in writing.

9.     <u>Notices</u>.  Whenever any notice or communication shall or may be given to or served upon any party by any other party, or whenever any party desires to give or serve upon any other party any communication with respect to this Guaranty, each such notice or communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three (3) days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section), (c) one (1) business day after deposit with a reputable overnight courier with all charges prepaid or (d) when hand-delivered, all of which shall be addressed:

a.     if to Factor, at its address or transmission number for notices provided in the Agreement; and

b.     if to the Guarantor, at his/her/its address or transmission number for notices set forth under his/her/its signature below.

10.     <u>Severability</u>.  Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved     Page 17



11.    Integration.  This Guaranty is intended by Factor and Guarantor to be a complete, exclusive and final expression of the agreements contained herein.  This Guaranty, together with the Factoring Agreement and the supplements, Exhibits and/or Schedules referred to herein or therein, and together with each other guaranty, and each contract, instrument, agreement and other document required by this Guaranty, or at any time entered into or delivered to Factor in connection with this Guaranty or the Factoring Agreement, constitute the entire agreement between the parties.

12.    Amendments in Writing; No Waiver; Cumulative Remedies.

a.    None of the terms or provisions of this Guaranty may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Guarantor and Factor.

b.    Factor shall not by any act (except by a written instrument pursuant to paragraph 12(a) hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or event of default on the part of the Client under the Agreement or the other Transaction Documents or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of Factor, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Factor of any right or remedy hereunder on anyone occasion shall not be construed as a bar to any right or remedy which Factor would otherwise have on any future occasion.

c.    The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

13.    Section Headings. The section headings used in this Guaranty are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

14.    Successors and Assigns. This Guaranty shall be binding upon the heirs, personal representatives, successors and assigns of the Guarantor and shall inure to the benefit of Factor and its successors and assigns.

15.    GOVERNING LAW. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MINNESOTA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO THE PRINCIPLES THEREOF REGARDING CONFLICTS OF LAWS, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

16.    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

a.    THE GUARANTOR HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN MINNESOTA, COUNTY OF RAMSEY, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE GUARANTOR AND FACTOR PERTAINING TO THIS GUARANTY OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY; PROVIDED, THAT FACTOR AND THE GUARANTOR ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF MINNESOTA; AND FURTHER PROVIDED, THAT NOTHING IN THIS GUARANTY SHALL BE DEEMED OR OPERATE TO PRECLUDE FACTOR FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved       Page 18



ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF FACTOR. THE GUARANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE GUARANTOR WAIVES ANY OBJECTION WHICH HE MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE GUARANTOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO GUARANTOR AT THE ADDRESS SET FORTH UNDER HIS/HER/ITS SIGNATURE BELOW AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE GUARANTOR'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

b.   FACTOR AND THE GUARANTOR WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN FACTOR AND THE GUARANTOR ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS GUARANTY OR THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be duly executed and delivered contemporaneously with the Factoring Agreement to which this Guaranty is an exhibit.

GUARANTOR:              Amelia Garcia Mejia

ADDRESS:                5698 Michaelson Drive (as shown on Mississippi Identification Card)
                        Olive Branch, MS 38654-3557

Signature:

**NOTARIZATION**

COUNTY OF _____Shelby_____

STATE OF _____Tennessee_____

This instrument was subscribed and sworn on _____October 10_____, 20 _18_, by Amelia Garcia Mejia, who personally appeared before me.

_____
Notary Public
My Commission Expires: _10-23-2021_____

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved       Page 19

STAN R. McKINNEY II
STATE OF TENNESSEE
NOTARY PUBLIC
SHELBY COUNTY



# EXHIBIT C – COMMISSION SCHEDULE

"Commission" as set forth in this <u>Exhibit C</u> is equal to the Administrative Fee, plus Interest, plus a Minimum Weekly Adjusted Fee (if any), all as specified below.

Administrative Fee percentage shall be 2.50 percent.  The Administrative Fee shall be an amount equal to that percentage of the gross amount of Accounts Receivable assigned to Factor each week.

Minimum Weekly Adjusted Fee.  If the Administrative Fee for a given week is less than the minimum of $250.00 (the "Minimum"), then Client shall pay a Minimum Weekly Adjusted Fee equal to the difference between the Minimum and the Administrative Fee.

Interest shall be calculated per Section 15 at a rate equal to 0.1 percent per day on all Late Invoices.

Maximum Funds Employed amount is $200,000.00.

**Reserve shall be 15 percent.**

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved          Page 20



## EXHIBIT D – SPECIAL COVENANTS OF CLIENT

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved Page 21



# PAYROLL SERVICES AGREEMENT

**DISCLAIMER - COMPANY WILL NOT ALLOCATE ANY PORTIONS OF FUNDING UNDER THE FACTORING AGREEMENT, OR PERFORM ANY PAYROLL SERVICES UNDER THIS AGREMEENT, FOR CLIENT'S INTERNAL, NON-TEMPORARY STAFF. CLIENT SHALL BE SOLELY RESPONSIBLE TO SELF-PROVIDE PAYROLL SERVICES FOR ITS OWN INTERNAL, NON-TEMPORARY STAFF.**

**FOR THE AVOIDANCE OF DOUBT, THIS AGREEMENT SOLELY REGARDS PAYROLL SERVICES FOR WORK PERFORMED BY CLIENT'S TEMPORARY EMPLOYEES WHICH ARE DEPLOYED TO CUSTOMER WORKSITES. IT IS NOT INTENDED TO COVER, AND DOES NOT COVER, ANY PAYROLL SERVICES FOR CLIENT'S INTERNAL STAFF (E.G. RECEPTIONISTS, RECRUITERS, MANAGERS, ETC.)**

This Payroll Services Agreement ("Agreement") is made effective as of _____, 2018 ("Date of Execution") by and between **ARA, Inc. d/b/a Lone Oak Payroll** ("Company"), and **Elective Staffing Midsouth, LLC** ("Client"). The Company and the Client are jointly hereinafter referred to as the "Parties."

**WHEREAS**, the Company is willing and able to provide payroll processing, payroll tax services, and other services as described herein; and

**WHEREAS**, the Client desires the Company to provide such services;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1. <u>AUTHORIZATION</u>. The undersigned Parties warrant and represent that they are legally authorized to enter into this Agreement and that each party's signature is effective to bind its respective organization to this Agreement. The Parties further warrant and represent that there are no provisions of any law or company documents which prohibit the Parties from entering into this Agreement.

2. <u>SERVICES PROVIDED AND INFORMATION REQUIRED</u>. The Company will provide the Client the Services. The Services will include pay calculations, check preparation two days prior to the payroll date and check processing on or before the payroll date, as well as other services described in Schedule "A" hereto. The Company shall make all wage and payroll information and payroll tax returns for the current calendar year available to Client.

 a. The Client shall obtain (if necessary) and maintain appropriate tax identification numbers for its own tax reporting and shall obtain and maintain any necessary forms and information from and regarding its employees. The Client shall forward this information to the Company for purposes of helping enable Company to perform the Services.

 b. The Client shall be responsible for submitting accurate information requested by the Company in connection with the Services. The Company is not responsible for detecting errors, omissions, fraud or illegal acts in the Client's preparation of such information. Delivery and processing schedules shall be determined by the Parties from time to time. Client agrees to cooperate in providing authorizations and documents that Company may reasonably require to perform the Services.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved  Page 22



3.    ACCOUNT DEBITING.  On or prior to the Client's payroll, direct deposit and/or payroll tax deposit date or other applicable settlement or due date, the Client authorizes the Company to initiate debit and credit entries to either Client's funding, provided through the Factoring Agreement to which this Agreement is an exhibit, OR the Client's account (collectively, or in reference to either one of them, the "Client's Account") at the Client's depository financial institution, the routing number of which shall be provided to the Company prior to any transactions.

The Client authorizes the Company to debit the Client's Account in such amounts necessary to:

a.    Fund the Client's payroll;
b.    Pay any fees or charges associated with the Services, including, without limitation, finance charges;
c.    Pay the Client's payroll taxes;
d.    Pay any debit-correcting or reversing entry initiated pursuant to this Agreement which is later returned; and
e.    Pay any other amount that becomes owed under this Agreement, or any agreement between Client and TempWorks Software, Inc.

This authorization is to remain in full force and effect until the Company has received written notice from the Client of its termination in such time and such manner as to afford the Company and the Client's depository financial institution a reasonable opportunity to act upon it.

The Client will maintain in the Client's Account as of the applicable settlement date and time immediately available funds sufficient to cover all entries the Client originates through the Company.  The Client's obligation to pay the Company for each transaction matures at the time the Company processes payroll and is unaffected by termination of this Agreement.

The Client acknowledges that the origination of ACH transactions to its account must comply with the provisions of the United States and Minnesota law and ACH Rules.  Amounts withdrawn for payroll taxes shall be held by the Company at the Company's financial institution until those payments are due to the appropriate taxing agencies and no interest shall be paid to the Client on these amounts.

The Client authorizes Company to issue 1031 draw-down requests (the "Draw-downs") to any of Client's banking and/or financial institutions.  The Draw-downs shall be limited to the amount of (a) checks and other items, including electronic funds transfer (EFT) items issued by or in the name of Client, (b) any obligations incurred pursuant to this Agreement, including but not limited to Client's payroll, or any adjustments and chargebacks incurred in connection with this Agreement, and/or (c) any obligations incurred by Client pursuant to (i) the factoring agreement executed between Client and Company, or (ii) any agreement executed between Client and TempWorks Software, Inc.  Client hereby agrees to do all things necessary to enable Company to undertake the Draw-downs herein described, including but not limited to securing authorizations from Clients' banking or financial institutions, a copy of which authorizations shall at all times be available to Company, and which authorizations shall be irrevocable with regard to actions undertaken pursuant to sections (a)-(c) of this paragraph.

4.    INSUFFICIENT FUNDS.  If the Client does not have sufficient funds in the Client's Account to pay disbursements, fees, payroll taxes, or any other amounts due under this Agreement at the time required, or if the Client refuses to pay, or if the Client breaches this Agreement, or any agreement with Company or TempWorks Software, Inc., the Company may:

a.    Refuse to pay any collected (or collected but unremitted) payroll taxes, in which case the payroll tax liability will become the sole responsibility of the Client;

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved        Page 23



b.    Refuse to perform further services;

c.    Refund monies due to the Client less any amounts owed to the Company; and/or

d.    Immediately terminate this Agreement.

The Company may charge a fee of **$35.00** for all drafts returned due to non-sufficient funds.  Should the Services be recommenced after the resolution of the Client's Account, the Company reserves the right to require the Client's prepayment of the next five (5) pay cycles, and in the case of tax filings, request a retainer.

5.    FEES AND CHARGES.  The Client agrees to pay the Company for the Services in accordance with the fees set forth on Schedule A attached hereto and incorporated herein.  The Client shall also reimburse the Company for sales, use and similar taxes arising from this Agreement that federal, state or local governments may impose.

6.    DEPOSITS.  All deposits tendered by Client to Company are non-refundable.

7.    SOFTWARE.  During the term hereof Company will procure for Client a non-exclusive license to use TempWorks Software, Inc.'s proprietary Enterprise payroll software ("Software") subject to the following license restrictions: TempWorks Software, Inc. expressly reserves, and Client expressly acknowledges that the entire ownership right and title to the Software shall remain with TempWorks Software, Inc.  Client does not have the right to assign or sublicense the Software to others.  TempWorks Software, Inc. has the exclusive right to protect such Software, by copyright or otherwise, and the unconditional right to reproduce, publish, sell and distribute such Software and related material to anyone.  Client shall not make any claim or representation of ownership with respect to any version, copy of, instance, or copyright or other right in the Software (including, without limitation, any right to make adaptations or derivative works).  The Software may be used only by and for the benefit, and to process exclusively the data, of the Client.    Client acknowledges that such Software is proprietary to TempWorks Software, Inc. and Client shall not (and shall not allow any third party to) copy or decompile, disassemble, or otherwise reverse engineer the Software or attempt to access, reconstruct, discover or disclose any source code.  All inventions, discoveries or improvements with respect to the Software developed pursuant to this Agreement shall be the sole property of TempWorks Software, Inc., and all rights to ownership shall be solely vested in TempWorks Software, Inc.  Client's payroll information shall be maintained in the Software database, which shall include, without limitation, all information provided by the Client in the payroll report (e.g. information which Client indicates is used to calculate and pay employee payroll, pay payroll taxes to applicable taxing agencies in compliance with the laws and regulations of such taxing agencies and produce payroll tax returns and W-2 statements).  Client explicitly consents to Company being provided with any and all of Client's information and data which is (a) inputted into the Software, or (b) stored in the Software database, by, for, or on behalf of Client, in any capacity whatsoever, and Client explicitly consents to TempWorks Software, Inc. providing such information and data to Company, and Company receiving such information and data from TempWorks Software, Inc.; such information and data to be used by Company to perform the Services.

8.    CHANGES TO THE SERVICES.  The Company reserves the right to change the terms, conditions and fees for the Services at any time.  The Company shall provide thirty (30) days' prior written notice of any material change, including fees.  If the Client does not wish to be bound by such change, it may discontinue using and terminate the Services by giving fifteen (15) days advance written notice before the change becomes effective.  If the Client continues to use the Services after any change becomes effective, it shall be bound by the change.

9.    VERIFICATION OF DATA & LIABILITY.  The Client shall, prior to submitting its first payroll, review the payroll information inputted into the Software and/or provided to Company for completeness and accuracy.  Client's payroll information shall be maintained in the Software database, which shall include, without limitation, all information provided to the Company based on initial information provided by the Client in the payroll report (e.g. information which

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved    Page 24



Client indicates is used to calculate and pay employee payroll, pay payroll taxes to applicable taxing agencies in compliance with the laws and regulations of such taxing agencies and produce payroll tax returns and W-2 statements). Client explicitly consents to Company being provided with any and all of Client's information and data which is (i) inputted into the Software, or (ii) stored in the Software database, by, for, or on behalf of Client, in any capacity whatsoever, and Client explicitly consents to TempWorks Software, Inc. providing such information and data to Company, and Company receiving such information and data from TempWorks Software, Inc.; such information and data to be used by Company to perform the Services.

The Client shall correct inaccurate or missing payroll information by notifying the Company at least 48 hours prior to the applicable payroll date. The Client agrees that by submitting each payroll:

    a.    The Client has approved all payroll information;

    b.    The Client has waived and released any claim against the Company arising out of any errors in payroll information which the Client has not requested the Company to correct;

    c.    Any subsequent requests for corrections after checks and reports have been generated shall be subject to additional fees;

    d.    That final audit responsibility rests with the Client;

    e.    The Company shall not have any responsibility for verifying the accuracy of any data the Client provides or directly inputs via the Software or any other method;

    f.    Any penalty or interest incurred due to the submission of inaccurate information by the Client shall be sole responsibility of the Client; and

    g.    The Client agrees to hold the Company harmless from any and all such liability.

The Company, at its option, after giving Client reasonable notice and an opportunity to correct any inaccurate or missing information, may decide not to file the Client's payroll tax returns or pay the Client's payroll taxes if there are any unresolved problems with any information requested by the Company or submitted by the Client. The Client agrees that it is solely responsible for any obligation imposed on the Client by law to maintain records regarding the Client's business or employees.

The Client agrees to hold the Company harmless against all claims resulting from activities the Company or its agents undertake at the Client's request or at the request of anyone the Company believes in good faith to be an authorized agent of the Client including, without limitation, costs, reasonable attorneys' fees, and expert witness fees incurred in connection with such claims.

       10.    LIMITATION OF LIABILITY. THE CLIENT AGREES THAT COMPANY WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE CAUSED BY THE COMPANY'S DELAY IN FURNISHING SERVICES. IN NO EVENT WILL THE COMPANY'S LIABILITY FOR ANY ACT OR OMISSION RELATING TO OR ARISING OUT OF THE SERVICES OR THIS AGREEMENT EXCEED THE TOTAL CHARGE FOR THE SERVICES PROVIDED IN THE SIX-MONTH PERIOD IMMEDIATELY PRECEDING SUCH ACT OR OMISSION BY THE COMPANY. IN NO EVENT WILL THE COMPANY HAVE LIABILITY FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR RELIANCE DAMAGES, OR INDIRECT LOSS FOR DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER THEORY OR FORM OF ACTION OR WHETHER THE COMPANY OR CLIENT KNEW OR SHOULD HAVE KNOWN OF THE LIKELIHOOD OF SUCH DAMAGES IN ANY CIRCUMSTANCES. THE PARTIES AGREE THAT THE LIMITATIONS AND EXCLUSIONS OF LIABILITY AND DISCLAIMERS SPECIFIED IN THIS AGREEMENT WILL SURVIVE AND APPLY EVEN IF FOUND TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved     Page 25



11.    INDEMNITY. Client agrees to indemnify and hold the Company, its shareholders, directors, officers, employees, agents, successors and assigns harmless from and against any and all claims, demands, judgments and expenses arising out of or in any way connected with the performance of the Services.

12.    WARRANTIES. Except as specifically provided herein, there are no warranties, express or implied, including but not limited to any implied warranties of merchantability or fitness for a particular purpose.

13.    TERM/TERMINATION. Except as otherwise specified herein, the term of this Agreement shall run commensurate with the term of the Factoring Agreement signed between Company and Client. The termination of this Agreement shall not affect the liability of the Client to pay the Company any sums properly due and owing under this Agreement as of the effective date of the termination and shall not affect the Client's or the Company's rights with respect to transactions which occurred prior to termination. Company shall be entitled to recover any and all fees (including attorney's fees) incurred in collecting amounts owed from Client under this Agreement, including those incurred at any trial and appellate levels.

14.    INTELLECTUAL PROPERTY. Client agrees that it will not use any reproduction or imitation of Company's intellectual property, proprietary methods of operation, or undertake any conduct which is likely to cause confusion, mistake or deception, which is likely to dilute Company's rights in intellectual property.

15.    INDEPENDENT CONTRACTOR. The Parties agree that each is contracting independently of the other, and that there is no employment relationship between Company and Client, or Client's employees. The Parties further agree that no fiduciary duty exists, owing from Company to Client.

16.    ADVICE. The Company and its employees are not attorneys or accountants, and cannot give legal or financial advice. In the event that Client requires legal or financial advice, Company urges Client to seek the counsel of a licensed professional.

17.    NOTICE. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or mailed first class, postage prepaid to the addresses set forth for the respective parties in this Agreement or to such other addresses as one party may have furnished to the other in writing. This requirement may be waived if the receiving party acknowledges notice in writing.

18.    WAIVER. Failure by either party at any time to enforce any obligation by the other party to claim a breach of any term of this Agreement or to exercise any power agreed to hereunder will not be construed as a waiver of any right, power or obligation under this Agreement, will not affect any subsequent breach and will not prejudice either party in regard to any subsequent action.

19.    SEVERABILITY. If any term or provision of this Agreement shall be declared invalid by a court of competent jurisdiction, the remaining terms and conditions of this Agreement shall remain unimpaired and in full force and effect.

20.    ASSIGNMENT. Client shall not assign any rights or obligations under this Agreement without the prior written consent of Company.

21.    SURVIVAL. The provisions of this Agreement that by their nature and content are intended to survive the performance hereof shall so survive the completion and termination of this Agreement, including, without limitation, Paragraphs 5, 10, 11, 12, 13, 14, and 22.

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved        Page 26



22.    GOVERNING LAW AND VENUE.  The validity, interpretation, construction, performance, enforcement, and remedies of or relating to this Agreement, and the rights and obligations of the Parties to this Agreement, shall be governed and construed in all respects by the substantive laws of the State of Minnesota (without regard to the conflict of laws rules or statutes of Minnesota or any other jurisdiction that might result in the application of other law). All disputes arising under or related to this Agreement shall be commenced and maintained exclusively in the federal and state courts situated in the County of Ramsey, State of Minnesota, and all Parties hereby irrevocably submit to the jurisdiction and venue of any such court.

23.    COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but which counterparts shall together constitute but one and the same instrument.

24.    COMPLETE AGREEMENT.  This Agreement and its Schedule "A" are intended by Company and Client to be a complete, exclusive and final expression of the agreements contained herein.  This Agreement, together with the Factoring Agreement to which this Agreement is attached, and the supplements, Exhibits and/or Schedules referred to herein or therein, and together with each guaranty, and each contract, instrument, agreement and other document required by this Agreement or the Factoring Agreement, or at any time entered into or delivered to Company in connection with this Agreement or the Factoring Agreement, constitute the entire agreement between the parties.

**IN WITNESS WHEREOF**, the Parties hereto, through their duly authorized signatories, have executed this Agreement as of the Date of Execution.

COMPANY:
**ARA, INC. D/B/A LONE OAK PAYROLL**

By: David Dourgarian
Its: Chief Executive Officer


CLIENT:
**ELECTIVE STAFFING MIDSOUTH, LLC**

By: Amelia Garcia Mejia
Its: Owner

© 2018, ARA, Inc. d/b/a Lone Oak Payroll. All rights reserved    Page 27



# SCHEDULE "A"

### PAYROLL SERVICES PROVIDED

Company will process payroll calculations for Client based off of data entered by Client into Software. Company will process withholding tax filings, tax deposits, new hire reporting, and wage garnishments. Company will print paychecks at Company's location.

### PAYROLL SERVICES FEES

Payroll services will be provided by the Company to the Client at no cost, however, any postage/shipping charges will be passed along to Client as its responsibility under the terms of this Agreement. Fees apply to supplies, materials, and tasks not contemplated by this Agreement, including, but not limited to manual conversion of non-payroll data from prior system(s), correction of errors that are not a result of Company's actions, training, printing costs, and technical support beyond normal payroll processing assistance.





3140 Neil Armstrong Blvd. #203, Eagan, MN 55121
651-203-8070 | www.loneoakpayroll.com

1/2/2023
(the "Execution Date")

**Via DocuSign Delivery**

Xceeding Partnership Solutions LLC
8547 Dulwich Road, Memphis, Tennessee 38016, United States

Re:     Conditional Letter of Agreement for Factoring and Payroll Services ("Letter of Agreement")

ARA, Inc. d/b/a Lone Oak Payroll ("Factor", and occasionally, "Company") is pleased to inform Xceeding Partnership Solutions LLC ("Client") that, upon Client's successful completion of underwriting by Factor, and the execution by Factor and Client of (i) the factoring terms and conditions and guaranty to be subsequently provided to Client, and (ii) the payroll services terms and conditions to be subsequently provided to Client[1] , invoice factoring and payroll services will be provided by Factor to Client at the rates and on the terms as detailed in this Letter of Agreement and the Terms and Conditions.  A summary[2] of these rates follows:

| | |
|---|---|
| **Administrative Fee** | The Administrative Fee assessed to Client will be 3%, calculated on the face value of each invoice sold to Factor for a period of 30 days from the date of purchase (the "Timely Payment Period"). |
| **Minimum Weekly Adjusted Fee** | In the event fees assessable to Client in a given week fall below $250.00, Client will be assessed the difference between the fees charged in that week and $250.00.  Factor agrees to waive this fee, should it be applicable, for a period of 90 days from the Execution Date. |
| **Interest Rate** | In addition to the Administrative Fee, an interest rate of 0.2% will be charged on the face value of each invoice beginning on day 31 and continuing every 10 day(s) the invoice remains open, until the invoice is either paid in full or is charged back to Client. |
| **Reserve** | An amount equal to 10% of the face value of each invoice will be withheld by Factor, and placed into a reserve account. |
| **Maximum Funds Employed** | The maximum funds available for purchases of accounts receivable by Factor is $250,000.00.  Modifications to this amount will require a signed amendment between the parties. |
| **Initial Term** | The initial term of the factoring and payroll relationships will be for a period of 24 months. |
| **Renewal Term** | Following the Initial Term, the factoring and payroll relationships will automatically renew for consecutive terms of 24 months each until timely notice to terminate is given. |
| **Chargeback Date** | Unless charge back is otherwise permissible, invoices sold to Factor will be charged back to Client upon the elapse of 90 days. |
| **Additional Modules / Fees** | The following services fees have been quoted by Factor and/or Company to Client, and agreed to by Client, such fees to be further detailed in the ASP Agreement to be subsequently executed between Client and TempWorks Software, Inc., as well as the Payroll Services Terms to be executed between Factor and Client, as applicable:<br><br>Base cost for the software bundle of Enterprise and Beyond will be $60.00 per user/ per month. Mandatory HR Center & WebCenter package for $150.00 per month. |

---

[1] The documents identified in (i) and (ii) are referred to—individually and collectively, and inclusive of all exhibits, schedules, and/or agreements included therein—as the "Terms and Conditions."

[2] Additional details, including those regarding Factor's assessment of rates, the terms of any software license(s) extended from Factor to Client, and any additional charges to which Client may be subject—each, as applicable—are detailed in the Terms and Conditions.



Lone Oak to process payroll transactions for $1.00 per transaction.
Garnishments and authority checks will have an initial, one-time setup fee of $15.00 (optional service).

By affixing its electronic signature below, Client acknowledges and agrees that:

(a)     It has had ample time to review—and has read and understands fully—this Letter of Agreement;

(b)     it understands that execution of this Letter of Agreement and the subsequent Terms and Conditions is a condition precedent to an invoice factoring and payroll services relationship existing with Factor;

(c)     its signature upon this Letter of Agreement constitutes its acceptance of the Letter of Agreement;

(d)     this Letter of Agreement is supported by good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged;

(e)     any capitalized terms not defined in the Terms and Conditions shall derive their meaning from this Letter of Agreement;

(f)     Factor may pre-file UCC Financing Statement(s) against Client in its state of incorporation or organization, and all states in which it does business;

(g)     no event of default or breach of any agreement between Client and any third party will occur by virtue of the pre-filing of the UCC Financing Statement(s) or the transactions contemplated hereby;

(h)     it consents to all documents supporting the contemplated relationship being signed electronically, and agrees that its electronic signature upon this Letter of Agreement and the subsequent Terms and Conditions shall in all respects be binding in the same capacity as a wet-ink signature;

(i)     Factor may require the provision or execution of additional documents as a result of discoveries made by Factor in underwriting;

(j)     Factor will require personal guaranties to be executed by Client's stakeholders;

(k)     in the event document requests are made by Factor, Client will respond to them in a prompt and professional manner; and

(l)     until such time as underwriting has been successfully completed, and all Terms and Conditions have been executed, no binding or enforceable funding or payroll obligation shall exist against Factor, and no agreement for funding or payroll services will be deemed to have been executed between Factor and Client.

**IMPORTANT PROVISIONS CONTAINED WITHIN THE TERMS AND CONDITIONS INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING:**

- an agreement by Client that all accounts receivable, irrespective of whether purchased by Factor, will be paid to Factor;

- a prohibition against the direct-collection of payments on invoicing by Client;

- a pledge of a security interest and lien in favor of Factor;

- warranties by Client regarding the character and quality of accounts receivable sold to Factor;

- Client's obligation to repurchase accounts receivable from Factor under certain circumstances;

- Factor's ability to charge back invoicing to Client before it is otherwise normally due;



- the automatic renewal of the factoring and payroll services relationships unless proper notice to terminate by Client is given;

- the acceleration of all amounts owing Factor under various conditions, including for a breach by Client of its obligations to Factor;

- liability caps that apply with respect to the relationships contemplated herein; and

- a jury waiver for disputes that might arise.

This Letter of Agreement is executed as of the Execution Date by each party through its duly-authorized representative:

**FACTOR/COMPANY:**
ARA, Inc. d/b/a Lone Oak Payroll

*Brett Cavanagh*

7F0D58992789470...

Printed: Brett Cavanagh
Its: President

**CLIENT:**
Xceeding Partnership Solutions LLC

*Sharon H Zaragoza*

9D247F6ABC6D482...

Printed: Sharon H Zaragoza

Its: Member

State of Formation: Tennessee ("State of Formation")

Address: 8547 Dulwich Road, Memphis, Tennessee 38016, United States ("Principal Address")

| IMPLEMENTATION INFORMATION

INTERNAL FACTOR USE ONLY: | |
|---|---|
| Current Software Provider? | No |
| Current Funding Provider? | No |
| What type of conversion? | Installation and configuration of additional modules |



3140 Neil Armstrong Blvd. #203, Eagan, MN 55121
651-203-8070 | www.loneoakpayroll.com

## FACTORING TERMS AND CONDITIONS

CAPITALIZED TERMS THAT ARE NOT DEFINED IN THESE FACTORING TERMS AND CONDITIONS DERIVE THEIR MEANING FROM THE LETTER OF AGREEMENT PREVIOUSLY EXECUTED BETWEEN ARA, INC. D/B/A LONE OAK PAYROLL ("FACTOR"), AND XCEEDING PARTNERSHIP SOLUTIONS LLC ("CLIENT").

These Factoring Terms and Conditions (referred to herein as the "Agreement") are agreed to as of    1/3/2023    by and between Xceeding Partnership Solutions LLC, a/an Tennessee business with an address located at 8547 Dulwich Rd, Cordova, Tennessee 38016, United States, on one hand, and Factor, a Minnesota corporation with a principal address of 3140 Neil Armstrong Blvd. #203, Eagan, MN 55121 (the "Factor Address"), on the other hand.  Factor and Client are collectively referred to herein as the "Parties."

1.    Defined Terms.  The following terms shall have the meanings set out respectively after each (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

(a)    "Accounts Receivable" shall mean and include accounts, instruments, documents, chattel paper, general intangibles, returned or repossessed goods arising out of or relating to the sale of temporary staffing or similar services any time or from time to time, and all proceeds thereof.

(b)    "Customer" means any corporation or other entity that purchases temporary staffing services from Client.

(c)    "Event of Default" is defined in Section 18.

(d)    "Funds Employed" shall mean the gross Accounts Receivable outstanding on Factor's books less any balance outstanding in the Reserve Account to the credit of Client.  If the Reserve Account should show a debit balance, such debit balance shall be added to the gross Accounts Receivable outstanding in determining Funds Employed.

(e)    "Late Invoices" means the amount of Accounts Receivable assigned hereunder which are not paid within the Timely Payment Period.

(f)    "Obligations" mean all obligations, liabilities and indebtedness of Client to Factor, now existing or hereafter incurred, direct or indirect, absolute or contingent, whether created under the Agreement, any supplement hereto or any other agreement between Client and Factor or otherwise, including without limitation, obligations owed by Client to others which Factor obtains by assignment.

(g)    "Purchase Price" is defined in Section 4.

(h)    "Reserve" is defined in Section 6.

(i)    "Reserve Account" is defined in Section 5.

(j)    "Solvent" shall mean that Client (i) owns property the fair saleable value of which is greater than the amount required to pay all of its indebtedness (including contingent debts), (ii) is able to pay all of its indebtedness as such indebtedness matures and (iii) has capital sufficient to carry on its business and transactions and all business and transactions in which it is engaged.

(k)    "UCC" shall have the meaning given in Section 8.

2.    Appointment.  Except as provided herein, Client appoints Factor as its sole factor with respect to sales of temporary staffing services to Customers and hereby offers to sell and assign only to Factor all Accounts Receivable arising out of such sales or services, including all such sales or services arising under any trade names or through any division or selling agent. The assignment of Accounts Receivable to Factor shall vest in Factor all of Client's rights, securities, guaranties and liens with respect to each Account Receivable, including any rights of stoppage in transit, replevin, reclamation, and any claims of lien filed by Client or held by Client on personal property, and all of Client's defenses and rights of offset with respect to any payments received by Factor on Accounts Receivable, but Factor shall not be obligated to, and shall not be liable for, exercising or refusing to exercise any rights granted to Factor hereby.

3.    Purchase of Accounts Receivable.  Factor agrees to purchase from Client all Accounts Receivable approved by Factor as to credit risk and terms of sale. In no event shall Factor be obligated to purchase any Accounts Receivable and Factor may accept or reject any Accounts Receivable in its reasonable discretion.    All orders from

Customers, including the amount and terms of each proposed sale or service to Customers shall be submitted to Factor for prior written approval, which may be granted or withheld at Factor's sole discretion. Factor's approval is subject to withdrawal at any time. Each purchase of an Account Receivable by Factor shall be with full recourse to Client, and Client agrees to pay Factor on demand the unpaid face value together with any unpaid fees for each Account Receivable if Customer fails to pay a Client invoice by the Chargeback Date (which Chargeback Date shall be measured from the date a Client invoice is originally generated, irrespective of any sale date), unless sooner demanded by Factor, in Factor's sole discretion.

4.  Prime/Purchase Price. The Parties agree that in addition to any interest chargeable under the Agreement, Client shall be additionally charged an amount equal to the percentage by which the Prime rate exceeds the Prime rate which was in effect as of the Execution Date (the "Prime Rate"*). This additional rate will be charged against the gross amount of all Accounts Receivable, regardless of whether they are Late Invoices.

The purchase price of each Account Receivable (the "Purchase Price") is the gross amount of the Account Receivable, less any discounts made available or extended to the Customer (which shall be computed on the shortest terms where optional terms are given), returns and allowances of any nature, Factor's Administrative Fee, and the Prime Rate. Factor's commission shall be initially presumed to be the Administrative Fee plus the Prime Rate for accounts paid within the Timely Payment Period. The actual commission shall be determined, and the Reserve Account adjusted, when payment is received by Factor. After purchase of an Account Receivable by Factor, a discount, credit, unidentifiable payment or allowance may be claimed solely by a Customer, and if not so claimed, such discount, credit, payment or allowance shall be the property of Factor.

*Prime Rate is presently accessible at http://online.wsj.com/mdc/public/page/2_3020-moneyrate.html, but is, in any event, as published by the Wall Street Journal or its successor from time to time, and in the event of no successor, another credible financial source.

5.  Client Reserve Account. Factor shall establish on its books in Client's name a reserve account (the "Reserve Account") which Factor shall credit with the gross amount of all Accounts Receivable purchased by Factor from Client and which Factor shall debit with all advances made to Client or on Client's behalf, as well as all credits, discounts available to Customers, anticipations earned by Customers, Commissions (see Section 14), and any other amounts

chargeable to Client under this Agreement or any supplement hereto or any other agreement between Client and Factor. Factor may charge the Reserve Account with any Obligation, including any amounts due from Client to Factor hereunder at any time in Factor's sole discretion. Factor shall electronically make available to Client, but shall not be obligated to deliver to Client, a monthly statement of its Reserve Account, and, unless exception is taken to this statement in writing within 30 days after receipt by Client, the monthly statement shall be deemed correct and conclusively binding upon Client.

6.  Remittance of Funds to Client. As Accounts Receivable approved by Factor and evidenced by invoices arise, Factor shall advance to Client the "Initial Reserve Released" consisting of the Purchase Price of Accounts Receivable purchased by Factor hereunder, less the Reserve percentage specified in the Letter of Agreement (the "Reserve"); Factor may further deduct from such advance (i) any applicable sales tax on such Accounts Receivable, (ii) amounts for the payment of payroll, payroll taxes, child support and garnishments for Client's current payroll, (iii) any fees or charges associated with software and/or services provided to Client, whether in the name of TempWorks Software, Inc. or Factor, and (iv) other applicable deductions. In no event without Factor's express written approval shall an Account Receivable be purchased if such purchase would cause Funds Employed at any time to exceed the Maximum Funds Employed amount. Factor retains the right to increase the Reserve from time to time if, in Factor's reasonable discretion, the prospect of collection of the outstanding Accounts Receivable or any other indebtedness owing by Client to Factor, including any indebtedness with respect to unpaid Accounts Receivable, or the ability of Client to pay or perform its obligations under this Agreement or any other agreement with Factor, becomes doubtful or insecure, or additional reserves are necessary to protect Factor against returns, claims or defenses of Customers with respect to Accounts Receivable or any other contingencies. All advances and other Obligations owing to Factor, including any debit balance in the Reserve Account and any amounts owing by Client to Factor or any of its divisions for services purchased, factored or financed by Factor or otherwise, are repayable by Client on demand and may be charged to the Reserve Account when due. On the next weekly processing date after an assigned Account Receivable is paid in full Client shall receive the "Final Reserve Released" equal to any balance owing from the Reserve.

7.  Warranties and Representations. Client warrants and represents that each Account Receivable sold and assigned to Factor hereunder: (a) shall be genuine and valid and shall represent a completed delivery or performance in fulfillment in every respect of the terms, conditions and specifications of a bona fide, un-cancelled and unexpired sale or service in the ordinary course of business to a Customer

which is not affiliated with Client in full compliance with the specifications of such Customer; (b) is enforceable for the full amount thereof and will be subject to no dispute or claim by the Customer in whole or in part as to price, terms, quality, quantity, offsets, counterclaims, contra accounts or any other defense of any other kind or character, real or claimed; (c) will be subject to no discounts, deductions or allowances or no special terms of payment which are not shown on the face of the invoice thereof; (d) is payable in United States Dollars; and (e) is free and clear of prior liens or encumbrances.

8.    Collateral.  As security for the Obligations, Client grants Factor a security interest in Client's business assets, whether now or hereafter existing or now owned or hereafter acquired, including, without limitation, all present and future accounts receivable, contract rights and other rights to payment of money.   The foregoing includes all accounts and general intangibles, all rights, remedies, guaranties, security interests and liens, all records (including computer records) and other property evidencing any of the foregoing and all proceeds of the foregoing.  Client further grants Factor a security interest in all property and fixtures, whether now or hereafter existing or now owned or hereafter acquired and wherever located, of any kind and description, tangible and intangible, including, but not limited to, all goods, inventory, equipment, farm products, instruments, documents, chattel paper, refunds, books and records (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records) pertaining to any of the foregoing, and all products and proceeds of any of the foregoing.   Unless otherwise defined herein or the context requires otherwise, terms herein shall have the respective meanings ascribed to them in the Uniform Commercial Code, Minnesota Statutes Chapter 336 (the "UCC"). During the term of this Agreement, Client shall not sell or assign, negotiate, pledge or grant any security interest in such business assets and proceeds thereof to anyone other than Factor, without Factor's prior written consent, except for any sales of inventory in the ordinary course of business.  Client authorizes Factor to pay any sums necessary to discharge any lien or encumbrance which is senior to Factor's security interest in the collateral, which sums shall be included as Obligations owing Factor hereunder.

9.    Invoicing.  All invoices for temporary staffing services rendered shall be prepared by Factor and shall bear Factor's remittance address. Each invoice shall bear the terms of sale and no change from the original terms of sale shall be made without Factor's prior written consent. Factor reserves the right to mail original invoices to Customers at Client's expense; however, mailing, sending or delivery by Factor of a bill or invoice shall not be deemed to be any representation by Factor with respect thereto.

10.    Payment of Accounts Receivable.   ALL ACCOUNTS RECEIVABLE MUST BE PAID TO FACTOR, IRRESPECTIVE OF WHETHER FACTOR HAS PURCHASED SUCH ACCOUNTS RECEIVABLE.  All payments of Accounts Receivable and other payments on behalf of Client received by Factor shall be credited to Client's account.  No check, draft or other instrument received by Factor shall constitute final payment unless and until such check, draft or other instrument shall have been actually collected by Factor in immediately-available funds. Notwithstanding the foregoing, for purposes of determining the date of payment and for purposes of calculating the applicable interest, subject to Section 15 hereof, the date on which Factor (as opposed to Factor's third-party designee) receives payment shall be determinative unless the payment is subsequently dishonored, in which case the applicable date shall be the date on which the payment is actually collected in immediately available funds.

11.    Remittances. Any remittances received by Client with respect to Accounts Receivable shall be held in trust for Factor, and Client shall immediately deliver to Factor the identical checks, drafts, monies or other forms of payment received, and Factor shall have the right to endorse Client's name on any check, draft or other form of remittance received, where such endorsement is required to effect collection. Client hereby appoints Factor or such person as Factor may name as its attorney-in-fact to execute all necessary documents in Client's name and do all things necessary to carry out this Agreement. Client ratifies and approves all acts of the attorney and agrees that neither Factor nor the attorney shall be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law. This power being coupled with an interest is irrevocable as long as Client is indebted to Factor in any manner.  In the event that an invoice is sent to a Customer by Client without Factor's remittance information, or in the event an invoice is paid directly to Client by a Customer, such Account Receivable shall be subject to a 15% misdirection fee, to be charged on the face value of such Account Receivable; provided, however, that such misdirection fee shall not be payable by Client if (a) any Customer inadvertently and independently sends any payment of an invoice to Client, or (b) Client, with Factor's consent, obtains payment of a delinquent invoice from a Customer, and with respect to (a) and (b), Client promptly advises Factor that Client has received such payment and promptly forwards such payment to Factor.

12.    Customer Disputes and Claims. Client agrees to notify Factor immediately of all disputes with and claims made by Customers.  Factor may, but shall not be required to, allow a reasonable time for the settlement of disputes between Client and Customers without waiving Factor's right at any time to adjust any claims and disputes on an Account Receivable directly with the Customer and to charge back to the Reserve Account at any time the full amount of the

Account Receivable involved. Factor may at any time charge the Reserve Account the full amount of: (a) any Account Receivable where Factor believes the prospect of collection to be doubtful or uncertain in its sole discretion; (b) any Account Receivable for which there is a breach of any of Client's warranties or representations set forth herein; and (c) any anticipation deducted by a Customer on any Account Receivable. Any such charge back shall not be deemed to constitute a reassignment of the Account Receivable, and Factor shall retain a security interest therein as security for all Obligations owing to Factor.

13. <u>Collection of Accounts</u>. As owner of the Accounts Receivable, Factor shall have the right to (a) bring suit, or otherwise enforce collection, of the Account Receivable in the name of Client or Factor, (b) modify the terms of payment, settle, compromise or release, in whole or in part, any amounts owing, on terms Factor may deem advisable, and (c) issue credits in the name of Client or Factor. At any time, irrespective of whether an Event of Default has occurred, without notice to or the assent of Client, Factor may contact any account debtor by telephone, written communication or otherwise (from Factor, Factor's counsel, or otherwise) for any purpose, including collection of Accounts Receivable.

14. <u>Commission</u>. Client agrees to pay Factor a commission ("Commission") equal to the Administrative Fee, plus Interest, plus the Minimum Weekly Adjusted Fee (if any), plus the Prime Rate.

15. <u>Interest</u>. Client shall pay interest upon any Late Invoices as detailed in the Letter of Agreement. If interest is payable in periodic increments, all interest for the applicable increment shall immediately be due and payable upon the first day that falls within the increment, and Client shall not be entitled to any refund or proration of the interest charge. All Customer checks and other payments received by Factor may, at Factor's option, be deemed applied to the Obligations three days after the date of Factor's receipt.

16. <u>Financial Statements and Information; Inspections</u>. Upon Factor's written request, Client shall furnish Factor with annual financial statements prepared by an independent certified public accountant acceptable to Factor and also furnish monthly financial statements and other financial information. Client shall permit any representative of Factor to visit and inspect, whether physically, by mail, or electronically, any of the properties of Client, to examine all books of accounts, records, reports and other papers, to make copies and extracts there from, and to discuss the affairs, finances and accounts of Client with its officers, employees, independent public accountants, creditors and depository institutions all at such reasonable times and as often as may be reasonably requested.

17. <u>Financial Condition</u>. Client warrants that it is Solvent and shall remain Solvent during the term of this Agreement; that any financial statements delivered to Factor accurately and fairly state Client's financial condition; that there has been no material adverse change in Client's financial condition as reflected in the statements since the date thereof nor do the statements fail to disclose any fact or facts which might materially adversely affect Client's financial condition; that it is not subject to any outstanding state or federal tax liens; and there is no litigation pending or threatened, which taken in the aggregate if adversely determined, can reasonably be expected to have a material adverse effect on Client's financial condition.

18. <u>Term of Agreement; Termination</u>. The initial term of this Agreement shall be for a period of time equal to the Initial Term, which will commence immediately upon the Parties' execution of this Agreement. Said period shall be automatically extended for consecutive Renewal Terms unless terminated (a) at the end of the Initial Term or the then-applicable Renewal Term by Client upon the giving of written notice of termination to Factor, not less than 90 days prior to the expiration of the Initial Term or the then-applicable Renewal Term, and abiding by Section 19 hereto, or (b) by Factor at any time upon the giving of not less than 30 days prior written notice of termination to Client, or, without notice if any of the following events (each, an "Event of Default") shall occur: (i) Client shall default in the payment of any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise); (ii) any representation or warranty made in this Agreement or any supplement hereto, or in any other document executed in connection herewith, or any instrument, certification or financial statement furnished in compliance with or in reference hereto or thereto, or in any other agreement between Client and Factor, shall prove incorrect or misleading in any material respect when made or furnished; (iii) Client shall fail to execute the payroll services terms and conditions, or neglect to perform, keep or observe any covenant or agreement contained in this Agreement or any supplement hereto or any other agreement between Client and Factor; (iv) Client or any guarantor of the Obligations shall file or have filed against it a petition, answer or consent seeking relief under the United States Bankruptcy Code, as now constituted or hereafter amended, or any other applicable Federal or state bankruptcy law or other similar law, or a receiver, liquidator, assignee, trustee, custodian, sequestrator or similar official shall be appointed for Client or any guarantor of the Obligations or any substantial part of its or his property; (v) the occurrence of any event or condition which, alone or when taken together with all other events or conditions occurring or existing concurrently therewith, Factor determines (1) has or may be reasonably expected to have a material adverse effect upon Client's business, operations, properties, condition

(financial or otherwise); (2) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of this Agreement or any other agreement between Client and Factor; (3) has or may be reasonably expected to have any material adverse effect upon any security for the Obligations, Factor's liens therein or the priority of such liens; or (4) materially impairs the ability of Client to perform its obligations under this Agreement or any other agreement between Client and Factor, or the ability of Factor to enforce and collect the Obligations or realize upon any of the security for the Obligations in accordance with the terms of this Agreement or any other agreement between Client and Factor or applicable law; (vi) Client is no longer Solvent, or fails, closes, suspends, or goes out of business; or (vii) there is a change (by death or otherwise) in Client's principal stockholders or owners; or (viii) Client breaches any agreement with TempWorks Software, Inc., or any other agreement with Factor.  In lieu of terminating the Agreement for an Event of Default, Factor may, in its sole and exclusive discretion, permit the Client an opportunity to cure the Event of Default on whatever terms Factor deems reasonable**.**

Except where attributable to a material breach by Factor, or Factor's termination for convenience, in the event that this Agreement terminates for any reason before the natural expiration of the Initial Term or then-applicable Renewal Term (including, without limitation, pursuant to a payoff or buyout of this Agreement by Client or a third party), in addition to all other Obligations owing Factor under this Agreement, Client shall be obligated to pay to Factor the average weekly Administrative Fees and interest earned by Factor in any fifty-two (52) week period selected by Factor (OR, if this Agreement has been in effect for less than fifty-two (52) weeks as of the date of such termination, any shorter period as Factor may select to calculate such average, OR if this Agreement has not generated Administrative Fees or interest payable to Factor as of the date of such termination, such reasonable fees as Factor may deem appropriate), multiplied by the number of weeks remaining in the then-applicable Initial Term or Renewal Term(s) as of such termination (the "Early Termination Fee"). This obligation to pay the Early Termination Fee is not a penalty, is intended as a reasonable approximation of the earnings anticipated by Factor hereunder, and is agreed by the Parties to be reasonable and fair in all respects.

19.    Payoff.  Client shall be obligated to pay off the Obligations in guaranteed funds by wire transfer prior to the expiration of the then-applicable Initial or Renewal Term in order to fully terminate the Agreement.  In the event that Client does not timely pay off such Obligations, at Factor's discretion, the Agreement shall automatically be extended for a Renewal Term.  Factor shall not be obligated to provide a payoff letter to any individual or entity other than Client.  Factor shall not be obligated to communicate with any other individual or entity other than Client to facilitate or arrange for

payoff of the Obligations, and Client shall neither expect, request, nor demand, nor induce such individual or entity to request or demand same of Factor.

20.    Acceleration.  Upon an Event of Default, Client's intended date of termination, or the actual date of termination, whichever occurs first, all Obligations of Client to Factor shall become immediately due and payable without further notice or demand irrespective of any maturity dates established prior thereto.  No such acceleration or termination shall release or abrogate any security interest held by Factor in any collateral of Client until all of Client's Obligations to Factor, including but not limited to all Accounts Receivable, commissions, interest and all costs, expenses and attorneys' fees as herein provided, are indefeasibly paid in full. In the event that Factor shall cease to act as factor for Client, Client agrees to furnish Factor with indemnity satisfactory to Factor that will protect Factor against possible charges to Client under the terms of this Agreement and with a release satisfactory to Factor of all claims Client may have against Factor and until Client does so, Factor may hold any positive balance remaining in the Reserve Account as security for all Obligations of Client to Factor. Client shall pay Factor upon demand all costs and expenses, including reasonable attorneys' fees, incurred by Factor to obtain or enforce payment of any Obligations due from Client to Factor or in the prosecution or successful defense of any action or proceeding concerning any matter arising out of or related to this Agreement, the factoring of the Client's Accounts Receivable by Factor, or any Obligations owing by Client to Factor.

21.    Lien Perfection.  Client hereby irrevocably authorizes Factor and any person designated by Factor to file all financing statements provided for by the UCC and all other documents or instruments which may be required by law or which Factor may request to perfect its security interest. Client agrees to cooperate with Factor in the filing, recording or renewal thereof.  Client shall authenticate, execute, acknowledge and/or deliver such other instruments as assurances as may reasonably be requested to effectuate the purposes of this Agreement. At Factor's option, this Agreement may be filed as a financing statement.  Factor shall have all rights and remedies of a secured party under the UCC. If notice to Client of any intended disposition of collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given at least 10 calendar days prior to the date of intended disposition or other action.  All rights and remedies of Factor shall be cumulative and may be exercised singularly or concurrently, at Factor's option, and the exercise or enforcement of any one such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other.

22.     Preferences.  Client shall indemnify and hold Factor harmless from any loss, damage or expense (including attorneys' fees) incurred by Factor as a result of a claim made at any time against Factor for the repayment or recovery of any amount received by Factor in payment of any Account Receivable by the payor or legal representative thereof (including a trustee in bankruptcy or assignee for the benefit of creditors) on the grounds of preference under the provisions of the Bankruptcy Code or any other federal or state insolvency law. If such claim is ever made against Factor, in addition to all of Factor's other rights under this Agreement, Client shall pay to Factor on demand the full face amount of any such Account Receivable, or if Factor so elects, Factor shall have the right to charge against the Reserve Account the full face amount of any such Account Receivable, but such charge back shall not be deemed a reassignment thereof. The provisions of this paragraph shall survive the termination of this Agreement and the payment in full of the Obligations.

23.     Notices. Any notices, demands, consents, or other writings or communications permitted or required by this Agreement shall be given overnight courier or certified mail, return receipt requested, addressed to the party to be notified as follows, or to such other address as each party may designate for itself by notice given in accordance with this paragraph, and shall be deemed effective upon the date received by the noticed party. Any written notice or demand that is not sent in conformity with the provisions hereof shall nevertheless be effective on the date that such notice is received by the noticed party:

If to Factor:     ARA, Inc. d/b/a Lone Oak Payroll
                  Attention:  David Dourgarian
                  3140 Neil Armstrong Blvd. #203
                  Eagan, MN 55121

With copy to:     ARA, Inc. d/b/a Lone Oak Payroll
                  Attention: John H. Reid, Esq.
                  3140 Neil Armstrong Blvd. #203
                  Eagan, MN 55121

If to Client:     Xceeding Partnership Solutions LLC
                  8547 Dulwich Rd, Cordova, Tennessee
                  38016, United States

24.     Miscellaneous.     The captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof. Failure of Factor to exercise any rights granted to it hereunder upon any breach or default by Client shall not be deemed a waiver thereof in the event of further breaches or defaults. The remedies of Factor hereunder shall be deemed to be cumulative and not exclusive. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. The validity, interpretation,

construction, performance, enforcement, and remedies of or relating to this Agreement, and the rights and obligations arising out of, or related to, this Agreement shall be governed and construed in all respects by the substantive laws of the State of Minnesota (without regard to the conflict of laws rules or statutes of Minnesota or any other jurisdiction that might result in the application of other law). All disputes arising under or related to this Agreement shall be commenced and maintained exclusively in the federal and state courts situated in the County of Ramsey, State of Minnesota, and Factor and Client hereby irrevocably submit to the jurisdiction and venue of any such court.  All post-judgment interest shall bear interest at either the contract rate, or the highest legal rate allowed by law, whichever is higher.  Client will pay all of Factor's costs and expenses, including, without limitation, reasonable attorney's fees and expenses, which may be expended or incurred by or on behalf of Factor in connection with the preparation or administration of this Agreement.  In the event that any of the terms of this Agreement are in conflict with any applicable rule of law or statutory provision or otherwise unenforceable under applicable law or regulation, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in full force and effect.  All terms which by their nature are intended to survive the termination of this Agreement and continue until Factor is made whole under this Agreement, including but not limited to Sections 8, 20, 21 and 24, shall so survive the termination of the Agreement for any reason.

25.     Damages.  Client hereby releases and exculpates Factor, its officers, licensors, agents, employees, and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct.  IN NO EVENT WILL FACTOR HAVE LIABILITY FOR ANY CONSEQUENTIAL, SPECIAL, LOST PROFIT, PUNITIVE OR RELIANCE DAMAGES, OR INDIRECT LOSS FOR DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER THEORY OR FORM OF ACTION OR WHETHER THE COMPANY OR CLIENT KNEW OR SHOULD HAVE KNOWN OF THE LIKELIHOOD OF SUCH DAMAGES IN ANY CIRCUMSTANCES.  Without limiting the generality of the foregoing, Client releases Factor from any claims which Client may now or hereafter have arising out of Factor's endorsement and deposit of checks issued by Client's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

26.     8821.  Client shall fully complete and execute, as taxpayer, prior to or immediately upon the

execution of this Agreement, a form 8821 issued by the Department of the Treasury, Internal Revenue Service or such other forms as may be requested by Factor, irrevocably authorizing Factor to inspect or receive tax information relating to any type of tax, tax form, years or periods or otherwise desired by Factor on an ongoing basis.

27.    Taxes.  Client acknowledges that it has a duty to timely pay all tax obligation(s) and that if, for whatever reason a tax lien or levy were to issue, Client will cause such lien or levy to be satisfied or discharged within fifteen (15) days of issuance.  Until such lien or levy is satisfied and discharged, Factor shall be entitled to withhold any sum(s) that may otherwise be due Client and, upon request or demand from such taxing authority, may remit to the taxing authority any such sums due Client, and over which Factor makes no claim, to the taxing authority.  Moreover, Client agrees that until the tax lien or levy is satisfied or discharged, Factor shall be entitled to collect all proceeds of accounts and apply such proceeds to Client's indebtedness to Factor.   Nothing contained herein shall suspend or abate any performance due Factor by Client.

28.    Disclosure of Affiliations and Bank Accounts. Client acknowledges and agrees that, prior to executing this Agreement, it has disclosed to Factor all businesses/organizations (a) in which Client or any of its shareholders, members, partners, principals, officers and/or directors participate in any capacity, whether as a shareholder, member, partner, principal, investor, advisor, officer, director, agent, employee, independent contractor, or otherwise, and/or (b) which are owned by Client or any of Client's shareholders, members, partners, principals, officers and/or directors.  Client further acknowledges and agrees that, prior to executing this Agreement, it has disclosed to Factor all bank accounts which reflect Client's name, as well as those bank accounts of businesses/organizations that fulfill the criteria of (a) and/or (b) of this section.

29.    Rights Against Successor Entity.  In the event Client's shareholders, members, partners, principals, officers and/or directors, or any one or more of them, form a new entity during the term of this Agreement or while Client remains liable to Factor for any Obligations under this Agreement, or if Factor discovers an entity that Client failed to disclose pursuant to Section 28 hereto, Client acknowledges that such entity shall be deemed to have expressly accepted the security agreement contained herein, and assumed the Obligations due Factor by Client under this Agreement.  Upon the formation of any such entity, Factor shall be deemed to have been granted an irrevocable power of attorney with authority to execute, on behalf of the newly formed entity, a new UCC-1 financing statement and have it filed with the appropriate secretary of state or UCC filing office.  Factor shall be held harmless and be relieved of any liability as a result of

Factor's execution and recording of any such financing statement or the resulting perfection of a lien in any of the successor entity's assets.

30.    Prohibition.  So long as any Obligations remain owing Factor, Client agrees that Client, its shareholders, members, partners, principals, officers and/or directors shall be prohibited from being involved with, owning, or participating in the operation of, in any capacity, whether as a shareholder, member, partner, principal, investor, advisor, officer, director, agent, employee, independent contractor, or otherwise, any non-Client employment staffing business, whether temporary or otherwise.  Violation of this paragraph shall be deemed an Event of Default.

31.    Disclosure of Convictions.  Client shall be obligated to affirmatively disclose to Factor any crimes of dishonesty for which any of its owners, shareholders, members, partners, principals, officers and/or directors have been convicted or found liable, regardless of whether such convictions or liabilities pre-date the execution of this Agreement.  Violation of this paragraph shall be deemed an Event of Default.

32.    Factor's Financier.  Client acknowledges and understands that Factor may enter into a financing agreement with a senior secured lender, factor or financier ("Financier").  In connection with such financing, Factor may sell and/or assign all or a portion of Client's Accounts Receivable to Financier.  Client hereby consents to Factor entering into such financing agreement with Financier.  Client shall take such additional actions in furtherance of the rights of Financier and Factor as Factor or Financier may reasonably require; provided, however, that Financier may not alter the terms of this Agreement except as provided herein.

33.    Insurance.  Client shall maintain insurance on all collateral and insurable property owned or leased by Client (including but not limited to fire and business interruption insurance) in an amount sufficient to cover the full replacement value of such collateral and insurable property.  All such insurance shall be in amounts and form acceptable to Factor in its sole discretion.  Client shall furnish to Factor (a) upon written request, any and all information concerning such insurance carried, and (b) lender loss payable endorsements (or their equivalent) in favor of Factor.   All policies of insurance shall provide for not less than thirty (30) days' prior written notice of cancellation to Factor.

34.    WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FACTOR AND CLIENT HEREBY WAIVE, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THESE TERMS AND CONDITIONS OR ANY SUPPLEMENT HERETO OR ANY OF THE

OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY CLAIM, DEFENSE, RIGHT OF SETOFF OR OTHER ACTION PERTAINING HERETO, OR TO ANY OF THE FOREGOING.

35. <u>Payment Inquiries</u>. Client is expected to maintain a secure network such that its email systems are not compromised by third parties. In the event that Factor receives an email request for funding or payment to be distributed which it reasonably believes to have originated from Client (whether due to, without limitation, a spoofed Client email address, unauthorized access by a third party to Client's email accounts, or a third-party impersonation of Client's personnel) and Factor distributes funding or payment in response to such request, Client shall be responsible to repay Factor the amount of such funding or payment, in addition to all other Obligations owing under this Agreement.

36. <u>VMS Logins</u>. If Client utilizes a vendor management system, timekeeping system, payment system, software system, or any other system of *any* type, character or quality (collectively, or in reference to any one of them, "VMS") to have its payments of Accounts Receivable processed—or any of Client's customers utilize a VMS to process payment(s) of Client's Accounts Receivable—Client agrees that it shall provide Factor with access (including, but not limited to login and password) credentials to such VMS upon the Execution Date. Client shall additionally provide access credentials to Factor upon demand by Factor, and any time Client changes the access credentials to such VMS, or undertakes any action which might restrict or otherwise prohibit Factor's access to such VMS. Such VMS access by Factor shall be granted by Client until all Obligations owing Factor have been indefeasibly paid in full. Client agrees that during the period of VMS access, Factor may change Client's VMS access credentials, or undertake any action within such VMS which Factor believes will increase the collectability of Accounts Receivable, with or without notice to Client. In the event of any change by Factor to such VMS, Client shall have no right to reverse or undo Factor's change until all Obligations owing Factor have been indefeasibly paid in full. At all times until all Obligations have been indefeasibly paid in full to Factor, Client shall instruct such VMS that Accounts Receivable, irrespective of whether purchased by Factor, must be paid exclusively to Factor, and will cooperate with Factor in all efforts by Factor to enforce such payment instructions—and/or to obtain information stored in, or processed by, such VMS, or the company maintaining or offering such VMS.

37. <u>Termination for Stagnancy</u> In the event that no Client Accounts Receivable have been sold to Factor within sixty (60) days of the Execution Date, or a period of sixty (60) or more days has elapsed from the date the last Account Receivable was sold to Factor without any additional Account(s) Receivable being sold to Factor by Client during such period, this Agreement may, in Factor's sole and exclusive

discretion, be terminated for stagnancy. Client understands and agrees that Factor's right to terminate the Agreement for stagnancy stems from the inherent changes in underwriting risks that may be posed by a protracted period of non-sale of Account(s) Receivable(s). Factor is not obligated to terminate this Agreement for stagnancy, but shall have the absolute and unfettered right to do so in such circumstance. A termination for stagnancy shall pose no impediment to Factor's ability to recover under this Agreement, including but not limited to amounts owing Factor by Client pursuant to Paragraph 18.

38. <u>Entire Agreement</u>. This Agreement, the Terms and Conditions, the Letter of Agreement, and the supplements, exhibits and/or schedules referred to herein or therein, together with each guaranty, and each contract, instrument, agreement and other document required by this Agreement, the Terms or Conditions or the Letter of Agreement, or at any time entered into or delivered to Factor in connection with this Agreement, the Terms or Conditions or the Letter of Agreement, constitute the entire agreement with respect to their subject matter, and may only be modified by a written amendment or addendum.

By signing below, Factor and Client accept this Agreement, and agree that their electronic signatures shall in all respects be as binding as a wet-ink signature:

**FACTOR:**
ARA, Inc. d/b/a Lone Oak Payroll

Signed: *Brett Cavanagh*
7E00588902789470...
By: Brett Cavanagh
Its: President

**CLIENT:**
Xceeding Partnership Solutions LLC

Signed: *Sharon H Zaragoza*
BD247F6ABC6D482...
By: Sharon H Zaragoza
Its: Member

### EXHIBIT A to
### FACTORING TERMS AND CONDITIONS

CAPITALIZED TERMS THAT ARE NOT DEFINED IN THESE FACTORING TERMS AND CONDITIONS DERIVE THEIR MEANING FROM THE LETTER OF AGREEMENT PREVIOUSLY EXECUTED BETWEEN ARA, INC. D/B/A LONE OAK PAYROLL ("FACTOR"), AND XCEEDING PARTNERSHIP SOLUTIONS LLC ("CLIENT").

### GUARANTY

This Guaranty (referred to herein as the "Guaranty") is executed as of    1/3/2023        by Sharon Hazlett Zaragoza (the "Guarantor"), with an address located at the corresponding Guarantor Address (see signature block to this Guaranty),    in favor of Factor, a Minnesota corporation with a principal address of the Factor Address.

WITNESSETH:

WHEREAS, pursuant to (i) the Letter of Agreement previously executed between Factor and Client, and (ii) the Factoring Terms and Conditions executed contemporaneously with this Guaranty (the Letter of Agreement and the Factoring Terms and Conditions, individually and collectively, and as the same may be supplemented, amended, or otherwise modified from time to time, being hereinafter referred to as the "Agreement"), and all documents, instruments and other agreements executed in connection therewith (the Agreement, together with such other documents, instruments and agreements, being herein called the "Transaction Documents"), Factor has agreed to make purchases of Accounts Receivable from Client on the terms, and subject to the conditions, set forth in the Transaction Documents;

WHEREAS, the Guarantor is an affiliated company, officer, member, partner, director, principal, and/or shareholder of the Client and/or otherwise stands to benefit from the Transaction Documents;

NOW, THEREFORE, in consideration of the promises and covenants herein contained, and other consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

### Guaranty

1.      Defined Terms. As used herein, the term "Obligations" shall have the same meaning ascribed to it in the Factoring Terms and Conditions. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Guaranty shall refer to this Guaranty as a whole, and not to any particular provision of this Guaranty, and section and paragraph references are to this Guaranty unless otherwise specified.   The meanings given to terms defined herein shall apply equally to both the singular and plural forms of such terms.

2.      Guaranty.

a.      The Guarantor hereby unconditionally and irrevocably guarantees to Factor and its successors, endorsees, transferees and assigns, the prompt and complete payment and performance by Client when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

b.      The Guarantor further agrees to pay any and all expenses (including, without limitation, all fees and disbursements of counsel) which may be paid or incurred by Factor in enforcing, or obtaining advice of counsel in respect of, any rights with respect to, or collecting, any or all of the Obligations and/or enforcing any rights with respect to, or collecting against, the Guarantor under this Guaranty.

c.      The Guarantor agrees that the Obligations may at any time, and from time to time, exceed the amount of the liability of the Guarantor hereunder without impairing this Guaranty or affecting the rights and remedies of Factor hereunder.

d.      No payment or payments made by the Client, any other guarantor or any other person or received or collected by Factor from the Client, any other guarantor or any other person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of the Guarantor hereunder which shall, notwithstanding any such payment or payments, other than payments made by the Guarantor in respect of the Obligations or payments received or collected from the Guarantor in respect of the Obligations, remain liable for the Obligations hereunder until the Obligations are indefeasibly paid in full.

e.      The Guarantor agrees that whenever, at any time, or from time to time, he/she/it shall make any payment to Factor on account of his/her/its liability hereunder, he/she/it will notify Factor in writing that such payment is made under this Guaranty for such purpose.

f.      The Guarantor agrees that he/she/it is individually, directly, and jointly and severally with any other guarantor of the Transaction Documents, or any one of them, liable to Factor.

3.      Postponement of    Subrogation. Notwithstanding any payment or payments made by the Guarantor hereunder or any set-off or application of funds of the Guarantor by Factor, the Guarantor shall not be entitled to be subrogated to any of the rights of Factor against the Client or any other guarantor or any collateral security or guarantee or right of offset held by Factor for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any contribution or reimbursement from the Client or any

other person in respect of payments made by the Guarantor hereunder until all amounts owing to Factor by the Client on account of the Obligations are indefeasibly paid in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been indefeasibly paid in full, such amount shall be held by the Guarantor in trust for Factor, segregated from other funds of the Guarantor and shall forthwith upon receipt by the Guarantor, be turned over to Factor in the exact form received by the Guarantor (duly indorsed by the Guarantor to Factor, if required), to be applied against the Obligations, whether matured or unmatured, in such order as Factor may elect.

4.      Amendments with Respect to the Obligations; Waiver of Rights. The Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, any demand for payment of any of the Obligations made by Factor may be rescinded and any of the Obligations continued, and the Obligations, or the liability of any other party upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by Factor, and the Agreement and the other Transaction Documents may be amended, modified, supplemented or terminated, in whole or in part, as Factor may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by Factor for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Factor shall not have any obligation to protect, secure, perfect or insure any lien at any time held by it as security for the Obligations or for this Guaranty or any property subject thereto. When making any demand hereunder against the Guarantor, Factor may, but shall be under no obligation to, make a similar demand on the Client or any other guarantor, and any failure by Factor to make any such demand or to collect any payments from the Client or any such other guarantor or any release of the Client or such other or guarantor shall not relieve the Guarantor of the obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of Factor against the Guarantor.

5.      Guaranty Absolute and Unconditional. The Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by Factor upon this Guaranty or acceptance of this Guaranty, and the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon this Guaranty; and all dealings between the Client and the Guarantor, on the one hand, and Factor on the other hand, likewise shall be conclusively presumed to have

been had or consummated in reliance upon this Guaranty. The Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Client or the Guarantor with respect to the Obligations. The Guarantor understands and agrees that this Guaranty shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity, regularity or enforceability of the Agreement, or any other Transaction Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by Factor (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Client against Factor, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Client or the Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Client for the Obligations, or of the Guarantor under this Guaranty, in bankruptcy or in any other instance. When pursuing its rights and remedies hereunder against the Guarantor, Factor may, but shall be under no obligation to, pursue such rights and remedies as it may have against the Client or any other person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by Factor to pursue such other rights or remedies or to collect any payments from the Client or any such other person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Client or any such other person or any such collateral security, guarantee or right of offset, shall not relieve the Guarantor of any liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of Factor against the Guarantor. This Guaranty shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantor and the successors and assigns thereof, and shall inure to the benefit of Factor, and its successors, endorsees, transferees and assigns, until all the Obligations and the obligations of the Guarantor under this Guaranty shall have been satisfied by indefeasible payment in full in cash.

6.      Reinstatement. This Guaranty shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Factor upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Client or the Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Client or the Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

7.      Payments. The Guarantor hereby guarantees that payments hereunder will be paid to Factor

without set-off or counterclaim in United States Dollars at the office of Factor set forth in the Agreement.

8.     <u>Representations and Warranties</u>. The Guarantor hereby represents and warrants that:

a.     he/she/it has the power and authority and the legal right and capacity to execute and deliver, and to perform his/her/its obligations under, this Guaranty;

b.     this Guaranty constitutes a legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms, except as affected by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting the enforcement of creditors' rights generally, general equitable principles and an implied covenant of good faith and fair dealing;

c.     the execution, delivery and performance of this Guaranty will not violate any requirement of law or contractual obligation of the Guarantor and will not result in or require the creation or imposition of any lien on any of the properties or revenues of the Guarantor pursuant to any requirement of law or contractual obligation of the Guarantor;

d.     no consent or authorization of, filing with, or other act by or in respect of, any arbitrator or governmental authority and no consent of any other person is required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty;

e.     no litigation, investigation or proceeding of or before any arbitrator or governmental authority is pending or, to the knowledge of the Guarantor, threatened by or against the Guarantor or against any of his/her/its properties or revenues (1) with respect to this Guaranty or any of the transactions contemplated hereby, (2) which could have a material adverse effect on the business, property, or financial or other condition of the Guarantor; and

f.     the statements concerning the financial condition and net worth of Guarantor previously provided to Factor are true and correct; there is no event, fact, circumstance or condition known to the Guarantor which is inconsistent with such statements or is required to be disclosed in order to cause such statements not to be misleading.

The Guarantor agrees that the foregoing representations and warranties shall be continuing in nature and shall remain true and accurate in all material respects until such time as all of the Obligations are indefeasibly paid in cash and the Agreement and the other Transaction Documents terminated in writing.

9.     <u>Notices</u>.  Whenever any notice is provided with respect to this Guaranty, each such notice shall be in writing and shall be deemed to have been validly tendered (a) upon the earlier of actual receipt and three (3) days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by telecopy or other similar facsimile transmission (with such telecopy or facsimile promptly confirmed by delivery of a copy by personal delivery or United States Mail as otherwise provided in this Section), (c) one (1) business day after deposit with a reputable overnight courier with all charges prepaid or (d) when hand-delivered, all of which shall be addressed:

a.     if to Factor, at the Factor Address; and

b.     if to the Guarantor, at the Guarantor Address.

A notice not sent in conformity with the foregoing shall nonetheless be effective upon confirmation of receipt by the noticed party.

10.     <u>Severability</u>. Any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.     <u>Integration</u>.  This Guaranty and the Transaction Documents, together with each guaranty, and each contract, instrument, agreement and other document required by this Guaranty or the Transaction Documents, or at any time entered into or delivered to Factor in connection with this Guaranty or the Transaction Documents, constitute the entire agreement with respect to their subject matter, and may only be modified by a written amendment or addendum signed by the applicable parties.

12.     <u>Amendments in Writing; No Waiver; Cumulative Remedies</u>.

a.     None of the terms or provisions of this Guaranty may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Guarantor and Factor.

b.     Factor shall not by any act (except by a written instrument pursuant to paragraph 12(a) hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or event of default on the part of the Client under the Agreement or the other Transaction Documents or in any breach of any of the terms and conditions hereof.  No failure to

exercise, nor any delay in exercising, on the part of Factor, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Factor of any right or remedy hereunder on anyone occasion shall not be construed as a bar to any right or remedy which Factor would otherwise have on any future occasion.

c.    The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

13.    <u>Section Headings</u>. The section headings used in this Guaranty are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

14.    <u>Successors and Assigns</u>. This Guaranty shall be binding upon the heirs, personal representatives, successors and assigns of the Guarantor and shall inure to the benefit of Factor and its successors and assigns.

15.    <u>GOVERNING LAW</u>. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MINNESOTA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO THE PRINCIPLES THEREOF REGARDING CONFLICTS OF LAWS, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

16.    <u>SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>.

a.    THE GUARANTOR HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN MINNESOTA, COUNTY OF RAMSEY, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE GUARANTOR AND FACTOR PERTAINING TO THIS GUARANTY OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY; PROVIDED, THAT FACTOR AND THE GUARANTOR ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF MINNESOTA; AND FURTHER PROVIDED, THAT NOTHING IN THIS GUARANTY SHALL BE DEEMED OR OPERATE TO PRECLUDE FACTOR FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF FACTOR. THE GUARANTOR EXPRESSLY SUBMITS AND

CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE GUARANTOR WAIVES ANY OBJECTION WHICH HE/SHE/IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE GUARANTOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO GUARANTOR AT THE ADDRESS SET FORTH UNDER HIS/HER/ITS SIGNATURE BELOW AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE GUARANTOR'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

b.    THE GUARANTOR WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN FACTOR AND THE GUARANTOR ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS GUARANTY OR THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

By signing below, Guarantor accepts this Guaranty, agrees that valid consideration exists Guarantor to bind the Guarantor to its terms, and agrees that its electronic signature shall in all respects be as binding as a wet-ink signature:

**GUARANTOR:**
Sharon Hazlett Zaragoza

Signed: _[DocuSigned by signature]_

By:  Sharon Hazlett Zaragoza
Guarantor Address: 8547 Dulwich Rd, Cordova, Tennessee 38016, United States



3140 Neil Armstrong Blvd. #203, Eagan, MN 55121
651-203-8070 | www.loneoakpayroll.com

## PAYROLL SERVICES TERMS AND CONDITIONS

> COMPANY WILL NOT ALLOCATE ANY PORTIONS OF FUNDING FOR CLIENT'S INTERNAL, NON-TEMPORARY STAFF.
>
> CAPITALIZED TERMS THAT ARE NOT DEFINED IN THESE FACTORING TERMS AND CONDITIONS DERIVE THEIR MEANING FROM THE LETTER OF AGREEMENT PREVIOUSLY EXECUTED BETWEEN BETWEEN ARA, INC. D/B/A LONE OAK PAYROLL ("FACTOR") AND XCEEDING PARTNERSHIP SOLUTIONS LLC ("CLIENT").

These Payroll Services Terms and Conditions (referred to herein as the "Agreement") are executed as of 1/5/2023 by and between Xceeding Partnership Solutions LLC, a/an Tennessee business with an address located at 8547 Dulwich Road, Cordova, Tennessee 38016, United States, on one hand, and ARA, Inc. d/b/a Lone Oak Payroll, a Minnesota corporation with a principal address of 3140 Neil Armstrong Blvd. #203, Eagan, MN 55121, on the other hand. Company and Client are collectively referred to as the "Parties."

**WHEREAS**, the Company is willing and able to provide payroll processing, payroll tax services, and other services as described herein; and

**WHEREAS**, the Client desires the Company to provide such services;

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, the Parties agree as follows:

1.   <u>AUTHORIZATION</u>.  The undersigned Parties warrant and represent that they are legally authorized to enter into this Agreement and that each party's signature is effective to bind its respective organization to this Agreement.  The Parties further warrant and represent that there are no provisions of any law or company documents which prohibit the Parties from entering into this Agreement.

2.   <u>SERVICES PROVIDED AND INFORMATION REQUIRED</u>. The Company will provide the Client the Services. The Services will include pay calculations, check preparation two days prior to the payroll date and check processing on or before the payroll date, as well as other services described in Schedule "A" hereto.  The Company shall make all wage and payroll information and payroll tax returns for the current calendar year available to Client.

a.   The Client shall obtain (if necessary) and maintain appropriate tax identification numbers for its own tax reporting and shall obtain and maintain any necessary forms and information from and regarding its employees. The Client shall forward this information to the Company for purposes of helping enable Company to perform the Services.

b.   The Client shall be responsible for submitting accurate information requested by the Company in connection with the Services.  The Company is not responsible for detecting errors, omissions, fraud or illegal acts in the Client's preparation of such information.  Delivery and processing schedules shall be determined by the Parties from time to time. Client agrees to cooperate in providing authorizations and documents that Company may reasonably require to perform the Services.

3.   <u>ACCOUNT DEBITING</u>.  On or prior to the Client's payroll, direct deposit and/or payroll tax deposit date or other applicable settlement or due date, the Client authorizes the Company to initiate debit and credit entries to either (i) Client's funding, provided through the Factoring Terms and Conditions previously executed between Company and Client, OR (ii) the Client's account at the Client's depository financial institution, the routing number of which shall be provided to the Company prior to any transactions (collectively, or in reference to either (i) or (ii), the "Client's Account").

The Client authorizes the Company to debit the Client's Account in such amounts necessary to:

a.   Fund the Client's payroll;
b.   Pay any fees or charges associated with the Services, including, without limitation, finance charges;
c.   Pay the Client's payroll taxes;
d.   Pay any debit-correcting or reversing entry initiated pursuant to this Agreement which is later returned; and
e.   Pay any other amount that becomes owed under this Agreement, or any agreement between Client and/or ARA, Inc., and/or TempWorks Management Services Inc., and/or TempWorks Software, Inc.

This authorization is to remain in full force and effect until the Company has received written notice from the Client of its

termination in such time and such manner as to afford the Company and the Client's depository financial institution a reasonable opportunity to act upon it.

The Client will maintain in the Client's Account as of the applicable settlement date and time immediately available funds sufficient to cover all entries the Client originates through the Company.  The Client's obligation to pay the Company for each transaction matures at the time the Company processes payroll and is unaffected by termination of this Agreement.

The Client acknowledges that the origination of ACH transactions to its account must comply with the provisions of the United States and Minnesota law and ACH Rules.  Amounts withdrawn for payroll taxes shall be held by the Company at the Company's financial institution until those payments are due to the appropriate taxing agencies and no interest shall be paid to the Client on these amounts.

The Client authorizes Company to issue 1031 draw-down requests (the "Draw-downs") to any of Client's banking and/or financial institutions.  The Draw-downs shall be limited to the amount of (a) checks and other items, including electronic funds transfer (EFT) items issued by or in the name of Client, (b) any obligations incurred pursuant to this Agreement, including but not limited to Client's payroll, or any adjustments and chargebacks incurred in connection with this Agreement, and/or (c) any obligations incurred by Client pursuant to (i) the Factoring Terms and Conditions, or (ii) any agreement executed between Client and/or ARA, Inc., and/or TempWorks Software, Inc., and/or TempWorks Management Services Inc. Client hereby agrees to do all things necessary to enable Company to undertake the Draw-downs herein described, including but not limited to securing authorizations from Clients' banking or financial institutions, a copy of which authorizations shall at all times be available to Company, and which authorizations shall be irrevocable with regard to actions undertaken pursuant to sections (a)-(c) of this paragraph.

4. INSUFFICIENT FUNDS.  If the Client does not have sufficient funds in the Client's Account to pay disbursements, fees, payroll taxes, or any other amounts due under this Agreement at the time required, or if the Client refuses to pay, or if the Client breaches this Agreement or any agreement with ARA, Inc. or TempWorks Software, Inc. or TempWorks Management Services Inc., the Company may:

a. Refuse to pay any collected (or collected but unremitted) payroll taxes, in which case the payroll tax liability will become the sole responsibility of the Client;

b. Refuse to perform further services;

c. Refund monies due to the Client less any amounts owed to the Company; and/or

d. Immediately terminate this Agreement without penalty.

The Company may charge a fee of **$35.00** for all drafts returned due to non-sufficient funds.  Should the Services be re-commenced after the resolution of the Client's Account, the Company reserves the right to require the Client's prepayment of the next five (5) pay cycles, and in the case of tax filings, request a retainer.

5. FEES AND CHARGES.  The Client agrees to pay the Company for the Services in accordance with the fees set forth on Schedule A attached hereto and incorporated herein.  The Client shall also reimburse the Company for sales, use and similar taxes arising from this Agreement that federal, state or local governments may impose.

6. DEPOSITS.  All deposits tendered by Client to Company are non-refundable.

7. SOFTWARE.  Client agrees that it has or will enter into an agreement with TempWorks Software, Inc. for a non-exclusive license to use its proprietary Enterprise ("Software"). Client's payroll information shall be maintained in the Software database, which shall include, without limitation, all information provided by the Client in the payroll report (e.g. information which Client indicates is used to calculate and pay employee payroll, pay payroll taxes to applicable taxing agencies in compliance with the laws and regulations of such taxing agencies and produce payroll tax returns and W-2 statements).  Client explicitly consents to Company being provided with any and all of Client's information and data which is (a) inputted into the Software, or (b) stored in the Software database, by, for, or on behalf of Client, in any capacity whatsoever, and Client explicitly consents to TempWorks Software, Inc. providing such information and data to Company, and Company receiving such information and data from TempWorks Software, Inc.; such information and data to be used by Company to perform the Services. Except as specifically detailed in the Software agreement, without limitation of the fees otherwise assessable to Client under Schedule "A" of this Agreement or the Letter of Agreement, Client will be charged for all Software support services provided by Company directly— or by TempWorks Software, Inc. to Client—at then-current rates.  By requesting Software support services, Client (x) acknowledges and agrees that it had an opportunity to review the bill rates then in effect with respect to such support services, (y) agrees to pay all invoicing issued with respect to such support services, and (z) agrees that Client's access to the Software may be suspended or terminated in the event Client fails to pay any amounts due under this Agreement, irrespective of whether billings issue

from Company or TempWorks Software, Inc. Any amounts due respecting software or services provided to Client, whether by TempWorks Software, Inc. or Company, may be deducted from Client's funding with Company in its capacity as factor for Client. If insufficient funds are available, Client agrees that Company may initiate a reverse wire to recoup the amount of any funds owing with respect to such software and/or services.

8.   CHANGES TO THE SERVICES.   The fees assessable to Client shall not be increased during (i) the Initial Term (as such term is defined in the ASP Agreement executed between TempWorks Software, Inc. and Client), or (ii) if no ASP Agreement exists, the initial 12 month period of this Agreement. Company shall be permitted to increase the fees assessable to Client under (i) this Agreement in any Renewal Term (as such term is defined in the ASP Agreement executed between TempWorks Software, Inc. and Client), or (ii) any 12-month period following the initial 12 months of this Agreement; however, such fee increases shall be capped at the greater of (i) 7% of Client's then-current pricing, or (ii) the Consumer Price Index for All Urban Consumers, U.S. City Average, All Items (CPI-U) for the then immediately preceding 12-month period, published by the Bureau of Labor Statistics.

9.   VERIFICATION OF DATA & LIABILITY.   The Client shall, prior to submitting its first payroll, review the payroll information inputted into the Software and/or provided to Company for completeness and accuracy. Client's payroll information shall be maintained in the Software database, which shall include, without limitation, all information provided to the Company based on initial information provided by the Client in the payroll report (e.g. information which Client indicates is used to calculate and pay employee payroll, pay payroll taxes to applicable taxing agencies in compliance with the laws and regulations of such taxing agencies and produce payroll tax returns and W-2 statements). Client explicitly consents to Company being provided with any and all of Client's information and data which is (i) inputted into the Software, or (ii) stored in the Software database, by, for, or on behalf of Client, in any capacity whatsoever, and Client explicitly consents to TempWorks Software, Inc. providing such information and data to Company, and Company receiving such information and data from TempWorks Software, Inc.; such information and data to be used by Company to perform the Services.

The Client shall correct inaccurate or missing payroll information by notifying the Company at least 48 hours prior to the applicable payroll date. The Client agrees that by submitting each payroll:

a.     The Client has approved all payroll information;
b.     The Client has waived and released any claim against the Company arising out of any errors in payroll

information which the Client has not requested the Company to correct;
c.     Any subsequent requests for corrections after checks and reports have been generated shall be subject to additional fees;
d.     That final audit responsibility rests with the Client;
e.     The Company shall not have any responsibility for verifying the accuracy of any data the Client provides or directly inputs via the Software or any other method;
f.     Any penalty or interest incurred due to the submission of inaccurate information by the Client shall be sole responsibility of the Client; and
g.     The Client agrees to hold the Company harmless from any and all such liability.

The Company, at its option, after giving Client reasonable notice and an opportunity to correct any inaccurate or missing information, may decide not to file the Client's payroll tax returns or pay the Client's payroll taxes if there are any unresolved problems with any information requested by the Company or submitted by the Client. The Client agrees that it is solely responsible for any obligation imposed on the Client by law to maintain records regarding the Client's business or employees.

The Client agrees to hold the Company harmless against all claims resulting from activities the Company or its agents undertake at the Client's request or at the request of anyone the Company believes in good faith to be an authorized agent of the Client including, without limitation, costs, reasonable attorneys' fees, and expert witness fees incurred in connection with such claims.

10.   LIMITATION OF LIABILITY. IN NO EVENT WILL THE COMPANY'S LIABILITY FOR ANY ACT OR OMISSION RELATING TO OR ARISING OUT OF THE SERVICES OR THIS PAYROLL SERVICES AGREEMENT EXCEED THE GREATER OF (A) THE TOTAL CHARGE FOR THE SERVICES PROVIDED IN THE SIX-MONTH PERIOD IMMEDIATELY PRECEDING SUCH ACT OR OMISSION BY THE COMPANY; OR (B) $100.  IN NO EVENT WILL THE COMPANY HAVE LIABILITY FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR RELIANCE DAMAGES, OR INDIRECT LOSS FOR DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGES ARE BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER THEORY OR FORM OF ACTION OR WHETHER THE COMPANY OR CLIENT KNEW OR SHOULD HAVE KNOWN OF THE LIKELIHOOD OF SUCH DAMAGES IN ANY CIRCUMSTANCES.   THE PARTIES AGREE THAT THE LIMITATIONS AND EXCLUSIONS OF LIABILITY AND DISCLAIMERS SPECIFIED IN THIS PAYROLL SERVICES AGREEMENT WILL SURVIVE AND APPLY EVEN IF FOUND TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

11.    INDEMNITY. Client agrees to indemnify and hold the Company, its shareholders, directors, officers, employees, agents, successors and assigns harmless from and against any and all claims, demands, judgments and expenses arising out of or in any way connected with the performance of the Services.

12.    WARRANTIES. Except as specifically provided herein, there are no warranties, express or implied, including but not limited to any implied warranties of merchantability or fitness for a particular purpose.

13.    TERM/TERMINATION. Except as otherwise specified herein, the term of this Agreement shall run commensurate with the term of the Factoring Terms and Conditions executed between Factor and Client. The termination of this Agreement shall not affect the liability of the Client to pay the Company any sums properly due and owing under this Agreement as of the effective date of the termination and shall not affect the Client's or the Company's rights with respect to transactions which occurred prior to termination. Company shall be entitled to recover any and all fees (including attorney's fees) incurred in collecting amounts owed from Client under this Agreement, including those incurred at any trial and appellate levels.

14.    INTELLECTUAL PROPERTY. Client agrees that it will not use any reproduction or imitation of Company's intellectual property, proprietary methods of operation, or undertake any conduct which is likely to cause confusion, mistake or deception, which is likely to dilute Company's rights in intellectual property.

15.    INDEPENDENT CONTRACTOR. The Parties agree that each is contracting independently of the other, and that there is no employment relationship between Company and Client, or Client's employees. The Parties further agree that no fiduciary duty is owing from Company to Client.

16.    ADVICE. The Company and its employees are not attorneys or accountants, and cannot give legal or financial advice. In the event that Client requires legal or financial advice, Company urges Client to seek the counsel of a licensed professional.

17.    NOTICE. All notices required to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or mailed first class, postage prepaid to the addresses set forth for the respective parties in this Agreement or to such other addresses as one party may have furnished to the other in writing. This requirement may be waived if the receiving party acknowledges notice in writing.

18.    WAIVER. Failure by either party at any time to enforce any obligation by the other party to claim a breach of any term of this Agreement or to exercise any power agreed to hereunder will not be construed as a waiver of any right, power or obligation under this Agreement, will not affect any subsequent breach and will not prejudice either party in regard to any subsequent action.

19.    SEVERABILITY. If any term or provision of this Agreement shall be declared invalid by a court of competent jurisdiction, the remaining terms and conditions of this Agreement shall remain unimpaired and in full force and effect.

20.    ASSIGNMENT. Client shall not assign any rights or obligations under this Agreement without the prior written consent of Company.

21.    SURVIVAL. The provisions of this Agreement that by their nature and content are intended to survive the performance hereof shall so survive the completion and termination of this Agreement, including, without limitation, Paragraphs 5, 10, 11, 12, 13, 14, and 22.

22.    GOVERNING LAW AND VENUE. The validity, interpretation, construction, performance, enforcement, and remedies of or relating to this Agreement, and the rights and obligations of the Parties to this Agreement, shall be governed and construed in all respects by the substantive laws of the State of Minnesota (without regard to the conflict of laws rules or statutes of Minnesota or any other jurisdiction that might result in the application of other law). All disputes arising under or related to this Agreement shall be commenced and maintained exclusively in the federal and state courts situated in the County of Ramsey, State of Minnesota, and all Parties hereby irrevocably submit to the jurisdiction and venue of any such court.

23.    COUNTERPARTS. This Agreement, the Terms and Conditions, the Letter of Agreement, and the supplements, exhibits and/or schedules referred to herein or therein, together with each guaranty, and each contract, instrument, agreement and other document required by this Agreement, the Terms or Conditions or the Letter of Agreement, or at any time entered into or delivered to Company in connection with this Agreement, the Terms or Conditions or the Letter of Agreement, constitute the entire agreement with respect to their subject matter, and may only be modified by a written amendment or addendum signed by the parties thereto.

**SCHEDULE "A" to
PAYROLL SERVICES TERMS AND CONDITIONS**

SERVICES PROVIDED

Company will perform the services below-described (except where an "NA" appears in the description of services). Company will print paychecks at Company's location.

SERVICES FEES

Services will be provided by the Company to the Client for the following fees. Client will be billed for postage/shipping charges.

| Payroll Services: | |
|---|---|
| Company will process gross to net payroll calculations based on data input from Client.<br><br>Pricing is a per-transaction price; A transaction is defined as a live check, ACH, or pay card transaction. | $1.00 per transaction |
| **Tax Services:** | |
| Company will process withholding tax filings, tax deposits, and new hire reporting.<br><br>Tax processing services for the Federal government + 3 state(s) are included | |
| Monthly Fee Per EIN | $0 |
| Monthly Fee Per State Per EIN (after included states listed above) | $100.00/month |
| Per Employee Fee (billed by unique employees paid per month, with the determination of "unique" being limited to that month) | $0 |
| **Garnishment Setup:** | |
| Company will set up all Client garnishments sent to Company via approved method (sFTP upload or FedEx package) | $15.00 per garnishment setup |
| **Garnishment Payment Distribution:** | |
| | |

| Company will pay via ACH or live check garnishing authorities once per week, price is per ACH or live check sent | $1.00 per payment distribution |
|---|---|

Notwithstanding the foregoing, if Company processes a payroll, or otherwise performs Services, for Client which are not funded by a factoring advance, Company shall be entitled to charge industry-standard rates for the performance of such Services, and Client agrees to pay all fees charged by Company for such Services.

Further notwithstanding the foregoing, in the event that this Agreement terminates prior to the end of a calendar quarter or any other measurement period used by a taxing or other authority related to which the Services are performed (the "Measurement Period"), Company shall, at its discretion, be permitted to withhold performance of the Services respecting the Measurement Period, or, alternatively, charge industry-standard rates for the performance of the Services for the Measurement Period.

In addition, Company reserves the right to refuse and/or restrict Software access in the event Client seeks to utilize the Software for any purpose other than processing invoices factored by the Company under the Factoring Terms and Conditions executed between Company and Client on or prior to the date hereof.

Additional fees apply to supplies, materials, and tasks not contemplated by this Agreement, including, but not limited to manual conversion of non-payroll data from prior system(s), banking pass-through fees, correction of errors that are not a result of Company's actions, training, printing costs, and technical support beyond normal payroll processing assistance.

By signing below, Company and Client accept this Agreement, and agree that their electronic signatures shall in all respects be as binding as a wet-ink signature:

**COMPANY:**
ARA, Inc. d/b/a Lone Oak Payroll

Signed: *Brett Cavanagh*
7F0D58992789470...

By: Brett Cavanagh
Its: President


**CLIENT:**
Xceeding Partnership Solutions LLC

Signed: *Sharon H Zaragoza*
BD24FE6B5C6D489...
By: Sharon H Zaragoza
Its: Member



3140 Neil Armstrong Blvd. #203, Eagan, MN 55121
651-203-8070 | www.loneoakpayroll.com

## IMPORTANT NOTIFICATION REGARDING YOUR PAYMENTS

1/5/2023

Dear Accounts Payable Manager,

This letter is intended to inform you that Xceeding Partnership Solutions LLC has entered into a financial arrangement with ARA, Inc. d/b/a Lone Oak Payroll ("Lone Oak") as a source of capital funding, pursuant to which Xceeding Partnership Solutions LLC has assigned all right, title and interest to its assets, including receivables, to Lone Oak. To support this strategic alliance, this letter constitutes an authenticated notice that:

**All of Xceeding Partnership Solutions LLC's right and title and interest under all invoices issued to you and your affiliates, and all accounts receivable due from you and your affiliates, whether now existing or hereafter arising, have been assigned to Lone Oak.**

**In connection with such assignment, the undersigned hereby irrevocably instructs you to make all payments on Xceeding Partnership Solutions LLC invoicing to:**

**ARA, Inc. c/o Wells Fargo Bank, N.A.**
**P.O. Box 855917**
**Minneapolis, MN 55485-5917**

**The foregoing payment instructions are effective immediately, are irrevocable, and may not be modified without the prior written consent of Lone Oak. This letter constitutes an authenticated notice of assignment under the Uniform Commercial Code.**

Sincerely,

| ARA, Inc. d/b/a Lone Oak Payroll | Xceeding Partnership Solutions LLC |
|---|---|
| DocuSigned by: *Brett Cavanagh* 7F0D58992789470... | DocuSigned by: *Sharon H Zaragoza* BD247F6ABC6D482... |
| Printed: Brett Cavanagh Its: President | Printed: Sharon H Zaragoza Its: Member |