# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 11 |
| Debtors.[1] | (Jointly Administered) |
| | **Re: D.I. 679** |

**DEBTORS' OBJECTION TO MOTION SEEKING ENTRY OF
AN ORDER REQUIRING THE DEBTORS TO ASSUME OR REJECT
EXECUTORY CONTRACTS WITH MEMBERS OF AD HOC
COMMITTEE OF CONSIGNORS; AND FOR RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby object (this "Objection") to the *Motion Seeking Entry of an Order Requiring the Debtors to Assume or Reject Executory Contracts with Members of Ad Hoc Committee of Consignors; and for Related Relief* (the "Motion to Compel") [D.I. 679] filed by the Ad Hoc Committee of Consignors (the "Ad Hoc Committee"), and in opposition thereto respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The Ad Hoc Committee's Motion to Compel cannot be viewed in a vacuum. It was filed strategically as part of a hotly contested dispute between the Debtors and certain of their consignors regarding the Debtors' *Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Cosigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III)*

---

[1] The Debtors in these chapter 11 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

*Granting Related Relief*, as filed on June 25, 2025 [D.I. 531] (the "<u>Consignment Motion</u>").  The Ad Hoc Committee has objected to the Consignment Motion.  It also has filed a motion to stay the hearing on the Consignment Motion, as well as a "supplement" to its motion to stay, which contains additional case law supposedly in support of its position.

2.     In the midst of this flurry of pleadings, the Ad Hoc Committee filed its Motion to Compel.  Based on counsel's comments at the August 5th status conference on the Consignment Motion, as further described below, there is little question that the Ad Hoc Committee filed the Motion to Compel for purely tactical reasons; that is, not due to its members' status as counterparties to executory contracts that have not yet been assumed or rejected, but due to concerns about its likelihood of success on the Consignment Motion.  In other words, the Ad Hoc Committee filed its Motion to Compel solely to avoid (or attempt to avoid) an adverse ruling on the Consignment Motion.  The reason for this is obvious – if the relief sought in the Motion to Compel is granted, the Consignment Motion would effectively be moot.

3.     The Motion to Compel should be denied for several reasons:

4.     ***First***, the Ad Hoc Committee has not satisfied, and cannot satisfy, the legal standards that govern motions to compel assumption or rejection of executory contracts prior to the confirmation of a plan.

5.     ***Second***, the Motion to Compel seeks an order of the Court that would permit the consignors to "reclaim their consigned products immediately" (and require the Debtors to assist with such reclamation) upon the "deemed" termination of the consignment agreements.  As explained below, allowing the consignors to take back their consigned inventory would abrogate the rights of Debtor Diamond Comic Distributors, Inc. ("<u>Diamond</u>") as a hypothetical lien creditor pursuant to section 544(a) of the Bankruptcy Code and section 9-319(a) of the Uniform

Commercial Code (the "UCC")[2]. Obviously, Diamond cannot sell consigned inventory pursuant to the Consignment Motion if consignors have the right to retrieve it.

6.     And **finally**, the Motion to Compel should be denied insofar as it seeks that the proposed rejection of the underlying consignment agreements be deemed to be a termination of such agreements.  This violates well-established case law, including a recent Supreme Court decision.

7.     For these reasons, and for the other reasons set forth below, the Motion to Compel should be denied.

### FACTUAL BACKGROUND

8.     On January 14, 2025 (the "Petition Date"), each Debtor commenced a case under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On January 29, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

9.     A description of the Debtors' business as of the Petition Date, and the reasons for commencing these cases, are set forth in the *Declaration of Robert Gorin in Support of Chapter 11 Petitions and First Day Relief* [D.I. 20] and incorporated herein by reference.

---

[2]     Diamond's rights under these statutes are addressed in detail in the Debtors' Consignment Motion and in the Debtors' other recent pleadings filed with the Court.  See *Omnibus Reply in Support of Debtors' Motion For Entry of an Order Approving (I) Procedures For Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 730] and *Debtors' Objection to Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion For Entry of Order Approving (I) Procedures For Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims Interests or Encumbrances and (III) Granting Related Relief* [D.I. 727].

10. Prior to the Petition Date, the Debtors commenced a process to market and sell their assets. In furtherance of that process, on January 21, 2025, the Debtors filed the *Debtors' Motion for an Order (I) Authorizing and Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling an Auction and a Sale Hearing, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Certain Executory Contracts and Leases* [D.I. 68], which was granted by the Court on February 11, 2025.

11. On May 1, 2025, the Court entered two Orders: (a) an *Order (I) Approving Asset Purchase Agreement Among the Debtors and Sparkle Pop, LLC* ("Sparkle Pop") [D.I. 407] (the "Sparkle Pop Sale Order") and (b) an *Order (I) Approving Asset Purchase Agreement Among the Debtors and Universal Distribution LLC* [D.I. 408].

12. Consigned inventory was not sold as part of either transaction. Nevertheless, after the closing on the sale to Sparkle Pop, the Debtors learned that certain consigned inventory had been sold by Sparkle Pop. Upon discovering that consigned inventory had been sold, the Debtors contacted Sparkle Pop and demanded that Sparkle Pop immediately cease all sales of consigned inventory and remit all sale proceeds to the Debtors.

13. On June 25, 2025, the Debtors filed their *Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Cosigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 531] (the "Consignment Motion"). The Consignment Motion prompted a series of pleadings by the Ad Hoc Committee:

a. On July 16, 2025, the Ad Hoc Committee filed its *Objection to Debtors' Motion for Entry of Order Approving (I) Procedures for Sale or Other Disposition of*

*Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 601];

b. On July 24, the Ad Hoc Committee filed its *Motion to Stay Debtors' Motion for Entry of Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 649] (the "<u>Motion to Stay</u>");

c. On August 1, 2025, the Ad Hoc Committee filed its Motion to Compel; and

d. On August 12, 2025, the Ad Hoc Committee filed its *Line Filing Supplemental Cases Supporting Motion to Stay* [D.I. 713].

## <u>OBJECTION</u>

I.    **The Ad Hoc Committee Has Not Satisfied the Legal Standards Governing a Motion to Compel Assumption or Rejection.**

14.    As the Ad Hoc Committee acknowledges, "[p]ursuant to § 365(d) of the Bankruptcy Code, the debtor usually has until confirmation to assume or reject executory contracts."  Motion to Compel, ¶ 28.  Moreover, "[a] debtor's decision to reject an executory contract under section 365 is governed by the business judgment standard."  *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (*citing Grp. Of Inst. Invs. v. Chi., Milwaukee, St. Paul. & Pac. R.R. Co.*, 381 U.S. 523, 550 (1943)); *see also In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del. 2003) ("The business judgment test dictates that a court should approve a debtor's decision to reject a contract unless that decision is the product of bad faith or a gross abuse of discretion."). "Under the business judgment standard, the sole issue is whether the rejection benefits the estate." *In re HQ Glob. Holdings, Inc.*, 290 B.R. at 511; *see also NLRB v.*

*Bildisco & Bildisco (In re Bildisco)*), 682 F.2d 72, 79 (3d Cir. 1982) (noting that the "usual test for rejection of an executory contract is simply whether rejection would benefit the estate"), *aff'd*, 465 U.S. 513 (1984); *see In re Alongi,* 272 B.R. 148, 153 (Bankr. D.Md. 2001) ("A purpose of § 365 is to avoid giving administrative priority to executory contracts that are not a good bargain for a debtor's estate.").

15.     While a court may compel a debtor to assume or reject a contract, it should only do so after the moving party carries its burden to demonstrate "cause" based on consideration of the following factors:

- the importance of the contracts to the debtor's business and reorganization;
- the debtor's failure or ability to satisfy post-petition obligations;
- the nature of the interests at stake;
- the balance of hurt to the litigants and the good to be achieved;
- whether the debtor has sufficient time to appraise its financial situation and the potential value of the assets in formulating a plan;
- the safeguards afforded to the litigants;
- the damage the nondebtor will suffer beyond the compensation available under the Bankruptcy Code;
- whether there is a need for judicial determination as to whether an executory contract exits;
- whether exclusivity has been terminated;
- whether the action to be taken is so in derogation of Congress's scheme that the court may be said to be arbitrary; and
- the purpose of chapter 11, which is to permit successful rehabilitation of debtors.

*In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006); *see also In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003) (listing similar factors).

16.     These factors should be evaluated in light of the policy and purposes of the Bankruptcy Code and section 365, which is to maximize the value of the estate for the benefit of all creditors, not the unique benefit of specific creditors.  *See Public Serv. Co. of N.H. v. New Hampshire Elec. Coop., Inc. (In re Public Serv. Co. of N.H.)*, 884 F.2d 11, 15 (1st Cir. 1989) (in deciding a motion to compel assumption or rejection, "[t]he interests of the creditors collectively

and the bankrupt estate as a whole will not yield easily to the convenience or advantage of one creditor out of many").

17.     Here, these factors weigh against granting the Motion to Compel, including the following:

18.     <u>Importance to Reorganization</u>.   After an asset sale, the *Dana Corp*. factors addressing "rehabilitation" and "reorganization" should be interpreted in light of the debtor's ability to conduct a value-maximizing orderly wind-down.  As the Court is aware, the Debtors are seeking, via the Consignment Motion, to monetize the consigned inventory consistent with their business judgment.  This monetization process will produce clear benefits for the Debtors' estates and will help the Debtors pay administrative and other creditors in these cases.  The consignment agreements at issue may be important to the Debtors' ability to maximize value.  Put simply, one or more third parties may wish to acquire certain of these agreements[3] or may be unwilling to proceed with a purchase of consigned inventory if the agreements have been rejected. Alternatively, the Debtors may seek to liquidate the consigned inventory themselves through such agreements[4].   Compelling the Debtors to assume or reject the agreements now, before these potential outcomes have been determined, will limit the Debtors' options and may result in reduced value for the estates.

19.     <u>Post-Petition Obligations</u>.  The Ad Hoc Committee points to alleged amounts due to its members for post-petition sales of consigned inventory.  See Motion to Compel, ¶ 20.   The total amount asserted, as against the Debtors, is $163,368.34.  What the Ad Hoc Committee fails

---

[3]     The Debtors will seek Court approval for any proposed assumption and assignment of any of the applicable consignment agreements.

[4]     In connection with the Debtors' sale to Sparkle Pop, the parties executed a Transition Services Agreement that permits the Debtors to use Sparkle Pop's employees and facilities to market and sell remaining Debtor assets.

to disclose is that its members received far more than this during the course of these bankruptcy cases. That is, the members of the Ad Hoc Committee were paid an aggregate of approximately $1,180,000 on account of Diamond's post-petition sale of inventory.[5]

20.     With respect to sales of consigned inventory that occurred on or after May 16, 2025 (i.e., after the closing on the sale to Sparkle Pop), the Debtors are engaged in discussions with Sparkle Pop regarding the remittance of the proceeds of such sales to the estate. Absence a satisfactory resolution, the Debtors intend to file appropriate pleadings in this Court to compel Sparke Pop to release the applicable funds.

21.     The post-petition asserted claims of the members of the Ad Hoc Committee presupposes, of course, that they have a right to post-petition sale proceeds. Given the provisions of section 544(a) of the Bankruptcy Code and section 9-319(a) of the UCC, such right is doubtful. That is, if Diamond in its capacity as hypothetical lien creditor has effective ownership of consigned inventory, post-petition sale proceeds of such inventory would be the property of the Debtors, rather than consignors.

22.     <u>Balance of Hurt</u>. The balance of harms also favors the Debtors. It is important to the Debtors that they retain as much flexibility as possible in order to maximize value for creditors. Retaining the consignment agreements will help preserve value inasmuch as, among other things, the agreements may grant the Debtors certain rights that may be helpful in connection with a sale of the underlying inventory. Moreover, a buyer may want to take an assignment of one or more consignment agreements. If the Motion to Compel is granted, Diamond likely will be forced to reject the applicable consignment agreements. In that case, based on the relief requested, the

---

[5]     The Debtors reserve all rights with respect to these post-petition payments as well as with respect to the amounts asserted to be due by the members of the Ad Hoc Committee.

agreements will be deemed terminated, the consigned inventory will be subject to return to the consignors, and the Debtors will be required to facilitate such return. Clearly, this would moot the Consignment Motion; Diamond cannot both sell inventory and return it to consignors. Obviously, this outcome would wholly abrogate Diamond's rights as a hypothetical lien creditor under section 544(a) of the Bankruptcy Code and pursuant to section 9-319(a) of the UCC.

23.     In contrast, there is no clear non-monetary harm that the Ad Hoc Committee will suffer if the Motion to Compel is denied, and the Motion identifies none. In this regard, the Debtors ask the Court to consider the timing of the filing of the Motion to Compel. As discussed above, the members of the Ad Hoc Committee could have filed a motion to compel the Debtors to assume or reject their consignment agreements at any time during this case. They waited, however, until the Debtors had filed the Consignment Motion. There is little question, based on counsel's comments at the August 5th status conference on the Consignment Motion, that the Ad Hoc Committee filed the Motion to Compel for purely tactical reasons; that is, not due to its members' status as counterparties to executory contracts that have not yet been assumed or rejected, but due to concerns about its likelihood of success on the Consignment Motion.

24.     At the August 5, 2025 status conference on the Consignment Motion, counsel for the Ad Hoc Committee appeared and discussed the Motion to Compel and its relationship with the Consignment Motion as follows:

> Ms. Hopkin:     . . . there is another motion that really hasn't been discussed today. And that is my clients' pending Motion to Compel the Debtor to Assume or Reject their Distribution Agreements. That's been filed at Docket 679. . . . So, irrespective of ownership, which is going to be determined by UCC provisions, there is a separate 365 argument here that needs to be decided before anything happens to this property.
>
>                     . . .

> So, Your Honor, it is my clients' contention that the Motion to Compel Assumption or Rejection should be held first. . . . <u>That will dictate what happens to this property</u> and what the Debtor's rights and the - any subsequent third-party assignees' rights are to sell this property.

Aug. 5, 2025, Hr'g Tr. 21:21–22:5; 23:6–21 (emphasis added).[6]  Under these circumstances, it is difficult to understand what legitimate "hurt" the members of the Ad Hoc Committee would suffer from a denial of the Motion to Compel, other than a tactical loss.

    25.   <u>Other Factors</u>.  There is no dispute that the contracts are executory, or that the Debtors' exclusive period to file a plan is subject to a pending motion for extension – it is.  These facts weigh in favor of the Debtors.  The Debtors' intended treatment of the contracts and consigned inventory is entirely consistent with the Bankruptcy Code and applicable law, and the best interests of the estate and creditors; it cannot be said to be arbitrary.

    26.   For these reasons, the Ad Hoc Committee has not demonstrated, and cannot demonstrate, that cause exists to compel the Debtors to assume or reject the applicable consignment agreements.

## II.    The Motion to Compel seeks Inappropriate Relief from the Court.

### A.    The Motion to Compel Seeks to Abrogate Diamond's Rights Under Section 544(a) of the Bankruptcy Code and UCC § 9-319(a).

    27.   Paragraph 5 of the proposed form of order submitted with the Motion to Compel contains a provision that, with respect to terminated consignment agreements, provides that "[t]he Consignors . . . are entitled to reclaim their consigned products immediately . . ." and obligates the Debtors to assist with the consignors' retrieval efforts.  This relief, if granted, would completely undermine the relief sought in the Consignment Motion.  As noted above, how can Diamond sell

---

[6]    A copy of the August 5 status conference transcript is attached hereto as **Exhibit A**.

consigned inventory pursuant to the Consignment Motion, for the benefit of the estate, if it has to return the inventory to consignors?

28.     But the difficulties with this requested relief are more fundamental.  As explained in the Debtors' recent pleadings in this case,[7]  Diamond has the status of a hypothetical lien creditor pursuant to section 544(a) of the Bankruptcy Code.  As such, it is entitled to exercise the rights of its creditors pursuant to section 9-319(a) of the UCC.  These rights include the right to sell the consigned inventory at issue.

29.     The Ad Hoc Committee seeks to obstruct these rights through its Motion to Compel, which it seeks to have heard prior to the hearing on the Consignment Motion.  As explained above, there is little question that the Ad Hoc Committee filed the Motion to Compel for purely tactical reasons; that is, not due to its members' status as counterparties to executory contracts that have not yet been assumed or rejected, but due to concerns about its likelihood of success on the Consignment Motion.  The reason for this is obvious – if the relief sought in the Motion to Compel is granted, the Consignment Motion would be effectively moot.

30.     This type of legal maneuvering should not be countenanced by the Court. Notwithstanding the Ad Hoc Committee's protestations otherwise, the Consignment Motion is well grounded in law, fact and procedure.  The Debtors are entitled to be heard on their motion. Because the relief requested in the Motion to Compel, if granted, would effectively undermine the Consignment Motion, the Motion to Compel should be denied.

---

[7]     Reference is made to the Consignment Motion, the Debtor's *Omnibus Reply in Support of Debtors' Motion For Entry of an Order Approving (I) Procedures For Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [D.I. 730] and the *Debtors' Objection to Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion For Entry of Order Approving (I) Procedures For Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims Interests or Encumbrances and (III) Granting Related Relief* [D.I. 727]

**B.** **There Is No Legal Basis To Terminate Consignment Agreements Upon Their Rejection**.

31.     The Motion to Compel seeks, through paragraph 4 of its proposed form of order, the following ruling from the Court: "[t]o the extent the Debtors determine to reject the [consignment] Contracts . . . (ii) the rejected Contracts will be deemed terminated simultaneously with said rejection."

32.     This request is inconsistent with black-letter bankruptcy law.  If granted, it would violate the recent Supreme Court's ruling in *Mission Prod. Holdings.  See Mission Prod. Holdings, Inc. v. Tempnology, LLC,* 587 U.S. 370, 379 (2019) ("[r]ejection of a contract – any contract – in bankruptcy operates not as a rescission but as a breach"); *See also Eastover Bankfor Sav.* v. *Sowashee Venture (In re Austin Dev. Co.),* 19 F.3d 1077, 1082 (5th Cir. 1994) ("[t]urning to § 365, the terms rejection, breach and termination are used differently, but not inconsistently or interchangeably, as some courts have suggested"); *In re Yasin,* 179 B.R. 43, 50 (Bankr. S.D.N.Y. 1995) ("Under section 365, rejection constitutes a statutory breach, but does not repudiate or terminate the [contract]. The parties must, therefore, resort to state law to determine their rights as a result of the breach.").[8]   The law is clear:  rejection of an executory contract is not the same as termination of the contract.  The Ad Hoc Committee's request otherwise violates applicable law and should be denied.

**III.    The Motion Makes Irrelevant and/or Incorrect Factual Averments that Require Correction.**

9.     The Motion makes various allegations that are incorrect and/or irrelevant to the relief requested in the Motion.  Among these allegations is the contention that the members of the

---

[8]     In asking the Court to equate rejection with termination, the Ad Hoc Committee also ignores the terms of the applicable consignment agreements, which contemplates two rounds of written notice: a notice of a failure to pay, and a subsequent notice that the contract is terminated.  See Motion to Compel, at Ex. A, ¶ 10(c).

-12-

Ad Hoc Committee were purportedly confused by an email sent after the closing on the Debtors' asset sale to Sparkle Pop. Allegedly, the members of the Ad Hoc Committee thought, based upon this email, that Sparkle Pop had purchased the *ownership* of the Debtors, rather than certain of its *assets*.

10.     While the Debtors had no role in the creation or circulation of this email, the Ad Hoc Committee's confusion regarding the Sparkle Pop transaction is unreasonable. Clearly, the members of the Ad Hoc Committee chose to overlook the terms of the Sparkle Pop APA, the Sparkle Pop Sale Order and the motion seeking approval of the Sparkle Pop transaction, all of which clearly describe a sale of assets, not of ownership. The Motion to Compel does not link this alleged confusion to any relief sought, but the Debtors must point out that no relief is warranted simply because the members of Ad Hoc Committee chose to rely on an email authored by non-Debtors instead of the governing sale documents and Court orders.

### Waiver of Memorandum of Law

11.     Pursuant to Local Bankruptcy Rule 9013-2, the Debtors state that, in lieu of submitting a memorandum in support of this Objection, the Debtors will rely on the grounds and authorities set forth herein.

*[remainder of page left intentionally blank]*

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court deny the Motion to Compel, and such other and further relief as is just and proper.

Dated: August 15, 2025

**SAUL EWING LLP**

By: */s/ Jordan D. Rosenfeld*
Jordan D. Rosenfeld (MD Bar No. 13694)
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
Telephone: (410) 332-8600
Email: jordan.rosenfeld@saul.com

-and-

Jeffrey C. Hampton (admitted *pro hac vice*)
Adam H. Isenberg (admitted *pro hac vice*)
Turner N. Falk (admitted *pro hac vice*)
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Email: jeffrey.hampton@saul.com
      adam.isenberg@saul.com
      turner.falk@saul.com

-and-

Mark Minuti (admitted *pro hac vice*)
Paige N. Topper (admitted *pro hac vice*)
Nicholas Smargiassi (admitted *pro hac vice*)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6800
Email: mark.minuti@saul.com
      paige.topper@saul.com
      nicholas.smargiassi@saul.com

*Counsel for Debtors and Debtors in Possession*