**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re | Case No. 25-10308 (DER) |
| Diamond Comic Distributors, Inc., *et al.*, | Chapter 7 |
| Debtors.[1] | (Jointly Administered) |

**STIPULATION AND ORDER AUTHORIZING LIMITED BORROWING
AND USE OF CASH COLLATERAL BY CHAPTER 7 TRUSTEE**

This Stipulation and Order Authorizing Limited Borrowing and Use of Cash Collateral by Chapter 7 Trustee is made and entered into this 9th day of April, 2026, by and between Morgan W. Fisher, Esq., the duly appointed Chapter 7 Trustee in the above-captioned cases (the "Trustee"), and JPMorgan Chase Bank, N.A. (the "DIP Lender" or "JPMorgan"), and together with the Trustee, the "Parties"). In accordance with sections 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rule 4001(d) of the Federal Rule of Bankruptcy Procedure, and Rule 4001-5 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Rules"). The Trustee and JPMorgan hereby stipulate and agree as follows:

## RECITALS

### A. The Debtors' Bankruptcy Cases

**WHEREAS**, on January 14, 2025 (the "Petition Date"), Diamond Comic Distributors, Inc., Comic Holdings, Inc., Comic Exporters, Inc., and Diamond Select Toys & Collectables (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") commencing these cases (the "Chapter 11 Cases").

**WHEREAS**, on January 16, 2025, the Court entered an *Order Directing Joint Administration of the Debtors' Chapter 11 Cases* ordering the joint administration of the Debtors' Chapter 11 Cases under lead bankruptcy Case No. 25-10308-DER [Dkt. No. 41].

**WHEREAS**, on December 12, 2025, *the Debtors filed the Motion (A) For Entry of An Order Approving Eighth Stipulation Between Debtors and JPMorgan Chase Bank, N.A. Amending DIP Credit Agreement, and (B) For Approval of Order (I) Converting Cases From Chapter 11 to*

---

[1] The Debtors in these chapter 7 cases along with the last four digits of the Debtors' federal tax identification numbers are: Diamond Comic Distributors, Inc. (3450); Comic Holdings, Inc. (7457); Comic Exporters, Inc. (7458); and Diamond Select Toys & Collectibles, LLC (6585). The Debtors' mailing address is: 10150 York Road, Suite 300, Hunt Valley, Maryland 21030.

T01
(4-27-26 Hrg)

*a Chapter 7 of the Bankruptcy Code as of Conversion Date, (II) Approving Certain Conversion Procedures, (III) Setting Bar Date for Filing Final Chapter 11 Fee Applications and Establishing a Hearing Thereon, And (IV) Granting Related Relief* [Dkt. No. 1070] (the "Conversion Motion").

**WHEREAS**, on December 19, 2025, the Court entered an *Order (I) Approving Eighth Stipulation Between Debtors and JPMorgan Chase Bank, N.A. Amending DIP Credit Agreement, (II) Converting Cases From Chapter 11 to a Chapter 7 of the Bankruptcy Code as of Conversion Date, (III) Approving Certain Conversion Procedures (IV) Setting Bar Date for Filing Final Chapter 11 Fee Applications and Establishing a Hearing Thereon, And (V) Granting Related Relief* [Dkt. No. 1089] (the "Conversion Order") which, among other things, converted the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code pursuant to section 1112(a) of the Bankruptcy Code. On December 31, 2025, the conversion date occurred (the "Conversion Date").

**WHEREAS,** on December 23, 2025, the United States Trustee for the District of Maryland (the "U.S. Trustee") appointed the Trustee as interim chapter 7 trustee of the Debtors' bankruptcy estates [Dkt. No. 1095].

**WHEREAS,** on January 1, 2026, the Trustee became the duly appointed interim Chapter 7 trustee for the Debtors' bankruptcy estates. On February 6, 2026, the Trustee conducted the first Section 341 Meeting of Creditors, became the permanent trustee and is so acting pursuant to 11 U.S.C. § 702(d).

**WHEREAS,** on behalf of the Debtors' bankruptcy estates, the Trustee may prosecute claims and causes of action belonging to the estate, which include, without limitation, any and all rights, claims or actions under Chapter 5 of the Bankruptcy Code.

## B. The Final DIP Order and DIP Credit Agreement

**WHEREAS**, on February 19, 2025, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral; (II) Granting Adequate Protection; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* [Dkt. No. 163] (the "Final DIP Order") pursuant to which, among other things, the Debtors were granted authority to obtain senior secured postpetition financing pursuant to the terms and conditions of the Final DIP Order and that certain senior secured Debtor-in-Possession Credit Agreement, dated as of January 16, 2025 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement" together with the schedules and exhibits attached thereto, and all Stipulations, documents, and instruments executed and delivered in connection therewith, the "DIP Loan Documents").[2]

**WHEREAS**, on March 19, 2025, the Bankruptcy Court entered the *Order Approving Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Dkt. No. 243]; on April 17, 2025, the Bankruptcy Court entered the *Order Approving Second*

---

[2] Capitalized terms used but not otherwise defined shall have the respective meanings ascribed to such terms in the Final DIP Order and DIP Credit Agreement.

*Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Dkt. No. 345]; on May 1, 2025, the Bankruptcy Court entered the *Order Approving Third Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement*, [Dkt. No. 409]; on May 30, 2025, the Bankruptcy Court entered the *Order Approving Fourth Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Stipulation*, [Dkt. No. 470]; on July 3, 2025, the Bankruptcy Court entered the *Order Approving Fifth Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Dkt. No. 569], on August 27, 2025, the Bankruptcy Court entered the *Order Approving Sixth Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Dkt. No. 788]; and on October 23, 2025, the Bankruptcy Court entered the *Order Approving Seventh Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* [Dkt. No. 982].

**WHEREAS**, pursuant to and consistent with the final, non-appealable Final DIP Order and DIP Credit Agreement, the DIP Lender: (i) holds valid, binding, fully-perfected, priming, first priority senior secured liens and enforceable security interests on all DIP Collateral (as defined in the Final DIP Order) and all proceeds thereof pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and the Final DIP Order; and (ii) allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all other administrative expenses, including, without limitation, such expenses specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise. *See* Final DIP Order, at ¶¶ E(viii), G, 11(a)-(b), 13(a)-(d), 14, 15, 17(b), & 44.

**WHEREAS**, pursuant to the Conversion Order, the Debtors and DIP Lender executed the *Tenth Amendment to Debtor-In-Possession Credit Agreement* (the "Tenth DIP Credit Agreement Amendment") [Dkt. No. 1102-1]. Pursuant to the Tenth DIP Credit Agreement Amendment, the Debtors and DIP Lender, among other things, agreed to amend the DIP Credit Agreement to increase the Maximum DIP Facility Amount (as defined in the DIP Credit Agreement) to provide limited additional funding for payment of specified administrative expenses before the Conversion Date and agreed to an extension of the Maturity Date to December 29, 2025.

**WHEREAS**, all obligations of the Debtors under the DIP Loan Documents became automatically due and payable in full on the Maturity Date of December 29, 2025. The Debtors' failure to pay such obligations in full resulted in Events of Defaults under the DIP Loan Documents.

**WHEREAS**, on March 10, 2026, the DIP Lender filed its proof of claim No. 27 asserting its rights, claims, liens and interests under the DIP Loan Documents and the Final DIP Order (the "JPMorgan Proof of Claim"). In the JPMorgan Proof of Claim, the DIP Lender asserts the current outstanding amount owing from the Debtors to the DIP Lender under the DIP Loan Documents is not less than $6,579,473.92 in the aggregate, with interest, costs and attorneys' fees continuing to accrue, pursuant to the terms and conditions of the Final DIP Order and the DIP Loan Documents.

## C. **The Debtors' Sale Process**

**WHEREAS,** on February 11, 2025, the Court entered an order establishing, among other things, bidding procedures and deadlines for the Debtors' post-petition sale process [Dkt. No. 136] (the "Bid Procedures"). The Bidding Procedures include a number of requirements to become a "Qualified Bidder," including, among others, that prospective bidders submit an asset purchase agreement and deposit. Consistent with the Bidding Procedures, Alliance Entertainment, LLC ("Alliance") submitted a $3.6 million deposit (the "Initial Deposit") to the Debtors in connection with its bid package.

**WHEREAS,** the Debtors held an auction on March 24 and 25, 2025. Following such auction, the Debtors filed the *Notice of Designation of Successful Bidder and Back-Up Bidder* [Dkt. No. 270] identifying Alliance as the successful bidder and a combination of Universal Distribution, LLC ("Universal") and Ad Populum, LLC, an affiliate of Sparkle Pop, LLC ("Sparkle Pop"), as the back-up bidders (the "Back-Up Bidders").

**WHEREAS,** on April 5, 2025, the Debtors filed a *Notice of Revised Proposed Sale Orders* [Dkt. No. 314] containing asset purchase agreements with each of the Back-Up Bidders. A hearing was held on April 7 and 8, 2025 to consider the proposed sale of the Debtors' assets to the Back-Up Bidders (the "Sale Hearing"). At the conclusion of the Sale Hearing, the Debtors announced that they reached an agreement with Alliance regarding the terms by which substantially all of the Debtors' assets would be sold to Alliance.

**WHEREAS,** on April 10, 2025, Debtors Diamond Comic Distributors, Inc. and Diamond Select Toys & Collectibles, LLC and Alliance signed an Asset Purchase Agreement (the "Alliance APA"), and in connection therewith, Alliance provided an additional deposit of $4,900,000, for a total deposit of $8,500,000 (the "Final Deposit," and together with the Initial Deposit, the "Alliance Deposit").

**WHEREAS,** on April 11, 2025, the Court entered the *Order (I) Approving Asset Purchase Agreement Among Diamond Comic Distributors, Inc., Diamond Select Toys & Collectibles, LLC and Alliance Entertainment, LLC; (II) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (III) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Alliance Sale Order")[Dkt. No. 335], which, *inter alia*, approved the Alliance APA.

**WHEREAS,** the Alliance Sale Order provided that "[t]he Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The Assets are subject to first priority security interests and liens (the "DIP Liens") granted to JPMorgan Chase Bank, N.A. (the "DIP Lender") under and subject to the Final [DIP] Order." Alliance Sale Order, ¶ J.

**WHEREAS,** the Alliance Sale Order and Alliance APA contemplated that the Alliance Deposit would be applied against the purchase price for the sale of the Debtors' assets. The Alliance Deposit is part of the DIP Collateral, and the DIP Lender holds an enforceable, perfected first-priority security interest in the Alliance Deposit and any resulting proceeds therefrom under the Final DIP Order.

**WHEREAS**, the sale to Alliance did not close and the Debtors pivoted to seeking authority to sell their assets to the designated Back-Up Bidders. *See* Dkt. No. 385. The Bankruptcy Court entered orders approving the sale of certain assets to Universal Distribution and Sparkle Pop, respectively, on May 1, 2025 (collectively, the "Sale Orders") [Dkt Nos. 407, 408]. The sales to the Back-Up Bidders subsequently closed.

### D. Alliance Adversary Proceeding

**WHEREAS**, on April 29, 2025, Alliance filed an adversary complaint (the "Alliance Complaint") against Defendants Debtors, Getzler Henrich & Associates LLC ("Getzler Henrich"), Robert Gorin ("Gorin"), Charlie Tyson ("Tyson"), Dan Hirsch ("Hirsch"), and Raymond James & Associates, Inc. ("Raymond James," and collectively, with Debtors, Getzler Genrich, Gorin, Tyson, and Hirsh, the "Defendants"). Adv. Proc. No. 25-00112, Adv. Dkt. No. 1. The Complaint asserts five (5) causes of action for: (i) Count I – Breach of Contract against Debtors; (ii) Count II – Fraud against Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch; (iii) Count III – Aiding and Abetting Fraud against Raymond James, Getzler Henrich, Gorin, Tyson, and Hirsch; (iv) Count IV – Negligent Misrepresentation Against Debtors, Getzler Henrich, Gorin, Tyson, and Hirsch; and (v) Breach of Implied Covenant of Good Faith and Fair Dealing Against Debtors.

**WHEREAS**, on July 30, 2025, the Debtors filed an Answer and Counterclaims against Alliance asserting seven (7) counterclaims for: (i) Count I – Declaratory Relief; (ii) Count II – Breach of the APA; (iii) Count III – Violation of the Bidding Procedures Order and the Bidding Procedures in Connection with the APA; (iv) Count IV – Breach of AENT Auction Bid; (v) Count V – Violation of the Bidding Procedures Order and the Bidding Procedures in Connection with the AENT Auction Bid; (vi) Count VI – Breach of the Confidentiality Agreement and Final APA Injunctive Relief; and (vii) Count VII – Injunctive Relief (collectively, the "Debtors' Counterclaims"). Adv. Proc. No. 25-00112, Adv. Dkt. No. 18.

**WHEREAS**, subject to the terms of this Stipulation, JPMorgan is willing to make limited extensions of credit and to authorize use of cash collateral to facilitate the funding and prosecution of the Alliance Litigation.

### E. Consignment Litigation

**WHEREAS**, on June 25, 2025, the Debtors filed the *Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances and (III) Granting Related Relief* [Dkt. No. 531] (the "Consignment Sale Motion") seeking approval to sell inventory (the "Consignment Inventory") shipped to the Debtors consignment basis by certain vendors (the "Consignment Vendors").

**WHEREAS**, On July 24, 2025, the Ad Hoc Committee of Consignors[3] (the "Ad Hoc Committee") filed the *Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances, and (III) Granting Related Relief* [Docket No. 649] (the "Motion to Stay").

**WHEREAS**, on August 1, 2025, the Ad Hoc Committee filed the *Motion for Seeking Entry of an Order Requiring the Debtors to Assume or Reject Executory Contracts with Members of Ad Hoc Committee of Consignors; and For Related Relief* [Dkt. No. 679], and on August 18, 2025, the Consignment Group[4] filed *Motion Seeking Entry of Order Requiring the Debtors to Assume Or Reject Executory Contracts With Members Of the Consignment Group; And for Related Relief* [Dkt. No. 747](collectively, the "Motions to Compel").

**WHEREAS**, on August 25, 2025, the Court entered the *Order Granting Ad Hoc Committee of Consignors' Motion to Stay Debtors' Motion for Entry of an Order Approving (I) Procedures for Sale or Other Disposition of Consigned Inventory, (II) Approving Sales or Other Disposition of Consigned Inventory Free and Clear of Liens, Claims, Interests or Encumbrances, and (III) Granting Related Relief* (the "Order Granting Stay") [Dkt. No. 781] which stayed the prosecution of the Consignment Sale Motion until Debtors commenced separate adversary proceedings against each of Consignment Vendor and obtained a final judgment determining the respective parties' interests in the Consigned Inventory.

**WHEREAS**, on September 9, 2025, the Debtors initiated thirty-two (32) adversary proceedings against the Consignment Vendors. *See* Adv. Pro. Nos. 25-00231 through 25-00262, and 25-00385 (the "Consignor Adversary Proceedings").

**WHEREAS**, on September 19, 2025, the Court entered the *Consent Order Resolving, In Part, Debtors' (I) Motion to Enforce the Automatic Stay, (II) To Enforce the Sale Order and (III) Granted Related Relief* [Docket No. 878] (the "Consent Order"). Following entry of the Consent Order, Sparkle Pop filed a Certification on September 17, 2025 [Dkt. No. 889], certifying under penalty of perjury, that it has removed all Consigned Inventory from its marketing materials and that it has ceased all sales of Consigned Inventory.

---

[3] The Ad Hoc Committee consists of the following thirteen (13) jointly represented consignors: (i) Ablaze, LLC, (ii) American Mythology Productions LLC, (iii) Avatar Press, Inc., (iv) Andrew Kafoury d/b/a Battle Quest Comics, (v) Bryan Seaton d/b/a Action Lab, (vi) Drawn & Quarterly Books Inc., (vii) Fantagraphics Books, Inc., (viii) Green Ronin Publishing LLC, (ix) Herman and Geer Communications, Inc. d/b/a Hermes Press, (x) Living the Line LLC; (xi) Paizo, Inc., (xii) UDON Entertainment Inc., and (xiii) Zenescope Entertainment, Inc.

[4] The "Consignment Group" consists of the following fourteen (14) jointly represented consignors: (i) Aspen MLT, LLC a/k/a Aspen Comics, (ii) Black Mask Studios, LLC, (iii) DSTLRY Media, Inc., (iv) Dynamic Forces, Inc. a/k/a Dynamite Entertainment, (v) Heavy Metal International, LLC, (vi) Magnetic Press, LLC, (vii) Massive Publishing, LLC, (viii) Oni-Lion Forge Publishing Group, LLC f/k/a Oni Press, LLC, (ix) Panini UK Ltd., (x) Punk Bot Comic Books, LLC a/k/a Alien Books, (xi) The Penn State University a/k/a Graphic Mundi, (xii) Titan Publishing Group, Ltd., (xiii) Vault Storyworks, LLC a/k/a Vault Comics f/k/a Creative Mind, and (xiv) Dark Horse Comics, LLC.

**WHEREAS**, the Ad Hoc Committee subsequently filed twelve (12) third-party complaints in the adversary proceedings against third-party defendants DIP Lender and Sparkle Pop.[5]

**WHEREAS**, on October 17, 2025, the Court entered an *Order Assigning Matter to the Bankruptcy Dispute Resolution Program and Appointing Resolution Advocate* [Dkt. No. 960] assigning the Motions to Compel, Adversary Proceedings, and all consignment related claims or causes of action to mediation (the "Mediation") before the Honorable Thomas J. Catliota. In conjunction with the Mediation and the *Order Approving Seventh Stipulation Between Debtors and JPMorgan Chase Bank, N.A., Amending DIP Credit Agreement* (the "Seventh Stipulation") [Dkt. No. 982], $300,000 was placed into escrow to satisfy the post-Petition Date, pre-May 15, 2025, alleged claims of the Consignment Group and the Ad Hoc Committee if all consignment issues were settled.

**WHEREAS**, subject to the terms of this Stipulation, JPMorgan is willing to make limited extensions of credit and authorize use of cash collateral to facilitate the funding and prosecution of the Consignment Litigation.

**WHEREAS**, subject to the terms of this Stipulation, JPMorgan is also willing to make limited extensions of credit and authorize use of cash collateral to facilitate the funding and prosecution of the Avoidance Actions (as defined below).

**NOW THEREFORE**, in consideration of the recitals above, which are incorporated into and made part of this Stipulation, and the premises and covenants set forth in this Stipulation, subject to approval by the Bankruptcy Court and pursuant to the terms and conditions as set forth herein, the Parties agree as follows:

## I.     DEFINITIONS

1.1     General Terms.  For purposes of this Stipulation, in addition to the definitions above and elsewhere in this Stipulation, the terms listed below in Section 1.2 shall have the meanings set forth below. Unless otherwise specified herein, any Stipulation or contract referred to herein shall mean such Stipulation as modified, amended or supplemented from time to time.

1.2.     Specific Terms

"**Alliance Litigation**" means the legal proceedings and any and all claims, actions, defenses and/or proceedings in connection with the Alliance Complaint and Debtors' Counterclaims (as defined in the recitals) in the adversary proceeding captioned *Alliance Entertainment, LLC v. Diamond Comic Distributors, et al*, Adv. Proc. No. 25-00112 (DER).

---

[5] The applicable Ad Hoc Committee adversary proceedings are: (i) Adv. Proc. No. 25-00231 (Ablaze LLC); (ii) Adv. Proc. No. 25-00232-(Action Lab Entertainment, Inc.); (iii) Adv. Proc. No. 25-00235 (American Mythology Productions LLC); (iv) Adv. Proc. No. 25-00237 (Battle Quest Comics, Inc.); (v) Adv. Proc. No. 25-00239 (Boom Entertainment, Inc.); (vi) Adv. Proc. No. 25-00245(Fantagraphics Books, Inc.); (vii) Adv. Proc. No. 25-00247 (Green Ronin Publishing LLC); (viii) Adv. Proc. No. 25-00249 (Herman & Geer Communications, Inc.); (ix) Adv. Proc. No. 25-00251 (Living the Line, LLC); (x) Adv. Proc. No. 25-00256 (Paizo, Inc.); (xi) Adv. Proc. No. 25-00262 (Zenescope Entertainment, Inc.); and (xii) Adv. Proc. No. 25-00385 (Avatar Press, Inc.).

"**Alliance Proceeds**" means any and all recoveries after the date of this Stipulation remitted to or otherwise received by the Trustee in connection with the Alliance Litigation whether by judgment, settlement, or otherwise, including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred and liquidated in connection with the Alliance Litigation.

"**Alliance Statutory Trustee Fee**" means the Trustee's statutory commission and compensation allocable to the Alliance Proceeds pursuant to 11 U.S.C. § 326(a) and as allowed by the Bankruptcy Court.

"**Approval Order**" shall mean the order of the Bankruptcy Court approving this Stipulation and authorizing the Trustee and the DIP Lender to enter into the Stipulation. Such Approval Order shall be in form and substance acceptable to the DIP Lender and shall, to the extent permitted by the Bankruptcy Court, among other things: (a) approve the terms of this Stipulation governing use of Cash Collateral and the allocation and distribution of the Litigation Proceeds; (b) reaffirm the DIP Lender's perfected, first priority, priming security interest in and lien on the Cash Collateral and Litigation Proceeds, which security interest and lien shall not be subordinate to any other interests, liens, claims, charges, encumbrances, security interests, or surcharges; (c) waive any applicable stays for the effectiveness of the Approval Order with the Approval Order becoming immediately effective; and (d) find that the Trustee and the DIP Lender entered into this Stipulation in good faith.

"**Avoidance Actions**" means all actual or potential avoidance, turnover and tort claims and causes of action belonging to the Debtors, the Trustee or these bankruptcy estates, whether under sections 502(d), 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state or federal law.

"**Avoidance Litigation**" means the legal proceedings and any and all claims, actions, and/or proceedings in connection with the Avoidance Actions, including without limitation claims and causes of action for avoidance and recovery of preferential or fraudulent transfers, turnover of estate property, and other claims for damages whether based on contract, tort or statute.

"**Avoidance Proceeds**" means any and all recoveries after the date of this Stipulation remitted to or otherwise received by the Trustee in connection with the Avoidance Litigation whether by judgment, settlement, or otherwise, including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred and liquidated in connection with the Avoidance Litigation.

"**Avoidance Statutory Trustee Fee**" means the Trustee's statutory commission and compensation allocable to the Avoidance Proceeds pursuant to 11 U.S.C. § 326(a) and as allowed by the Bankruptcy Court.

"**Bankruptcy Estate**" means collectively the jointly administered estates of (a) Diamond Comics under lead bankruptcy Case No. 25-10308 (DER), (b) Comic Holdings (Case No. 25-

10311), (c) Comic Exporters (Case No. 10309) and (d) Diamond Select (Case No. 23-10817), each created pursuant to section 541 of the Bankruptcy Code.

"**Cash Collateral**" shall have the meaning set forth in the Final DIP Order and section 363(a) of the Bankruptcy Code, including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral, and in each case subject at all times to the DIP Liens and the terms of the Final DIP Order.

"**Common Interest Agreement**" means a separate written common interest and confidentiality agreement governing the sharing of information, analyses, work product, and communications by and between the Trustee, Trustee's Professionals, the DIP Lender and the DIP Lender Professionals in connection with the investigation, prosecution, defense, and/or Settlement of the Litigation Claims.

"**Consignment Litigation**" means the legal proceedings and any and all claims, actions, defenses and/or proceedings in connection with the Debtors' thirty-two (32) adversary proceedings against the Consignment Vendors. *See* Adv. Pro. Nos. 25-00231 through 25-00262, and 25-00385.

"**Consignment Proceeds**" means any and all recoveries after the date of this Stipulation remitted to or received by the Trustee in connection with the Consignment Litigation, whether by judgment, settlement, or otherwise, including the sale of any Consignment Inventory and any Settlement with Sparkle Pop, and likewise including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred and liquidated in connection with the Consignment Litigation.

"**Consignment Professional Fees**" collectively refers to all accrued and unpaid hourly rate attorneys' fees, costs and expenses incurred by the Trustee's Professionals, to the extent allowed by the Bankruptcy Court, arising from or relating to legal services related to the Consignment Litigation.

"**Consignment Statutory Trustee Fee**" means the Trustee's statutory commission and compensation allocable to the Consignment Proceeds pursuant to 11 U.S.C. § 326(a) and as allowed by the Bankruptcy Court.

"**DIP Lender**" means JPMorgan Chase Bank, N.A., in its capacity as prepetition lender and debtor-in-possession lender under the DIP Credit Agreement and Final DIP Order.

"**DIP Lender Professionals**" means the law firm of Troutman Pepper Locke LLP, in its capacity as counsel for JPMorgan Chase Bank, N.A., as Prepetition Lender and DIP Lender.

"**Kramon & Graham**" or "**K&G**" means the law firm of Kramon & Graham, P.A. 750 E Pratt St Ste. 1100, Baltimore, MD 21202, as special litigation counsel for the Trustee.

**"K&G Contingency Fee"** shall have the meaning set forth in the K&G Engagement Terms attached to this Stipulation as <u>Exhibit A.</u>

**"K&G Expenses"** shall have the meaning set forth in the K&G Engagement Terms, attached to this Stipulation as <u>Exhibit A.</u>

**"K&G Flat Fee"** shall have the meaning set forth in the K&G Engagement Terms, attached to this Stipulation as <u>Exhibit A.</u>.

**"K&G Engagement Terms"** means the proposed terms by which the Trustee wishes to retain K&G in accordance with 11 U.S.C. §§ 327 and 328(a) set forth on <u>Exhibit A</u> to this Stipulation.

**"Larry Strauss"** means Larry Strauss Esq. CPA & Associates, Inc., 2310 Smith Ave. Baltimore, MD 21209, as accountant to the Trustee.

**"Litigation Claims"** collectively means the Alliance Litigation, the Consignment Litigation and the Avoidance Actions. The Litigation Claims shall remain subject at all times to the DIP Lender's first-priority DIP Lien and superpriority claims, as set forth in the Final DIP Order and DIP Credit Agreement.

**"Litigation Proceeds"** collectively means the proceeds of the Alliance Litigation, the Consignment Litigation and the Avoidance Actions.

**"Maximum DIP Facility Amount"** means $8,200,000.

**"Settlement"** means any compromise, discontinuance, waiver, payment, release or other form of settlement whatsoever where cash, property or other value passes to the Trustee in circumstances in which the Litigation Claims, in whole or in part, do not commence or continue as a result of, on in connection with, the passing of that value; and "Settle", "Settles" and "Settled" have corresponding meanings.

**"Shapiro Sher"** means the law firm of Shapiro Sher Guinot & Sandler, P.A., 250 West Pratt Street, Suite 2000, Baltimore, MD 21201, as lead general bankruptcy counsel for the Trustee.

**"Stipulation"** means this Stipulation and Order Authorizing Limited Borrowing and Use of Cash Collateral between the Trustee and DIP Lender, as amended from time to time.

**"Trustee"** means Morgan W. Fisher, Esq., the duly appointed Chapter 7 Trustee, in the above-captioned cases.

**"Trustee Borrowings"** means the extensions of credit by JPMorgan both through new advances made to the Trustee, as well as through the authorized use of Cash Collateral by the Trustee from and after the date of this Stipulation and in accordance with the terms, conditions and requirements of this Stipulation. Trustee Borrowings shall be made initially through the use of Cash Collateral and, then, when Cash Collateral is insufficient, through new advances by

JPMorgan, in each instance subject to the Trustee Borrowing Cap and the Maximum DIP Facility Amount.

"**Trustee Borrowing Cap**" means such uses of cash collateral as are authorized under this Stipulation, plus—when Cash Collateral is insufficient or unavailable—new advances not to exceed $766,000.00. At no time shall the Trustee's Borrowings ever exceed the Maximum DIP Facility Amount.

"**Trustee's Professionals**" means K&G, Larry Strauss, Shapiro Sher and Zvi Guttman, and any financial advisor that the Trustee may retain, in each case subject to the Bankruptcy Court's approval of such retention in accordance with 11 U.S.C. § 327.

"**Trustee's Professionals Fees**" collectively refers to all accrued and unpaid reasonable hourly rate attorneys' fees, costs and expenses incurred by the Trustee's Professionals (other than K&G), to the extent allowed by the Bankruptcy Court at any time if and to the extent such approval is required, whether by interim order, procedural order or otherwise, arising from or relating representation of the Trustee, including without limitation, the Litigation Claims. Once allowed and eligible for payment, Trustee's Professionals Fees shall be paid first from the Trustee's Professionals Retainer to the extent funds are available from such retainer.  Any Trustee's Professionals Fees in excess of the Trustee's Professionals Retainer cannot be funded through Trustee's Borrowings absent prior written consent from JPMorgan.

"**Trustee's Professionals Retainer**" refers to the $350,000 retainer to be funded through the Trustee Borrowings and held as a source of payment for the Trustee's Professional Fees.  This retainer will be held in trust for the benefit of the Bankruptcy Estate by Shapiro Sher.

"**Zvi Guttman**" means The Law Offices of Zvi Guttman, P.A., P.O. Box 32308 Baltimore, MD 21282, as general counsel to the Trustee.

## II.     AUTHORIZATION FOR USE OF CASH COLLATERAL AND RELATED MATTERS

2.1     General. Upon the terms and subject to the conditions set forth in this Stipulation (including, but not limited to, approval by the Bankruptcy Court), the DIP Lender has agreed to make limited new loans to the Trustee—initially through the authorized use of Cash Collateral and, when Cash Collateral is unavailable or insufficient, through new advances by the DIP Lender. These Trustee Borrowings, once approved in writing by JPMorgan and funded, shall constitute DIP Loans under the Final DIP Order, and shall increase the balance owing to JPMorgan under the Final DIP Order and DIP Credit Agreement.  Such Trustee Borrowings shall be subject in all respects to the Final DIP Order and DIP Credit Agreement, and shall be secured by all of the DIP Collateral, including but not limited to the Litigation Claims and Litigation Proceeds.

2.2     Use of Trustee Borrowings. The Trustee Borrowings shall remain subject at all times to the Trustee Borrowing Cap, the Maximum DIP Facility Amount, and the other terms of this Stipulation, and may be used only for (i) payment of the Trustee's Professionals Retainer, (ii) payment of the K&G Flat Fee in accordance with the schedule set forth in the K&G Engagement

Terms and K&G Expenses, (iii) payment of the Trustee Professional Fees to the extent approved in writing by JPMorgan and actually incurred. Trustee Borrowings shall be funded initially from authorized use of Cash Collateral and, when Cash Collateral is unavailable or insufficient, from new advances by JPMorgan—with such borrowings never at any time exceeding the Trustee Borrowing Cap or the Maximum DIP Facility Amount.

2.3    No Commitment for Additional Financing. JPMorgan has no obligation to make or permit any further extensions of credit or use of Cash Collateral beyond the Trustee Borrowings expressly referenced herein, and in no event shall any Trustee Borrowings be made in excess of the Trustee Borrowing Cap or the Maximum DIP Facility Amount.

2.4    Technical Amendments of Final DIP Order and DIP Credit Agreement and Reinstatement of DIP Credit Agreement.  The DIP Credit Agreement is reinstated, effective upon the Bankruptcy Court's approval of this Stipulation. The Maturity Date under the DIP Credit Agreement is extended through and including June 30, 2027.  The Maximum DIP Facility Amount is increased to and including $8,200,000.  All references in the Final DIP Order, the DIP Credit Agreement and the DIP Loan Documents to the Debtors/Borrowers shall be deemed amended to include the Trustee as the authorized Borrower under the DIP Credit Agreement. Following return of the Letter of Credit (as defined in the Final DIP Order), the DIP Lender is authorized to draw and apply the funds securing the Letter of Credit to the outstanding indebtedness under the DIP Credit Agreement without further order of the Court.

2.5    Unauthorized Use of Cash Collateral Event of Default or other Breach of Stipulation. Any use of Cash Collateral or Litigation Proceeds in violation of this Stipulation or other breach of this Stipulation shall constitute an Event of Default  and shall, without the need for further order of the Bankruptcy Court, immediately terminate the Trustee's authority to make further use of Cash Collateral or to incur additional Trustee Borrowings, subject in all respects to the DIP Lender's rights and remedies under the DIP Loan Documents and the Final DIP Order. All other covenants and obligations under the DIP Loan Documents and Final DIP Order remain in full force and effect, and JPMorgan retains all rights and remedies in connection with an Event of Default under the Final DIP Order, DIP Credit Agreement and DIP Loan Documents.

2.6    Retention of Professionals.  The Trustee shall file applications to retain Shapiro Sher and K&G as soon as practicable.  It shall be a condition precedent to the Trustee Borrowings that the Bankruptcy Court has approved the retention of these two firms, and has likewise specifically approved the K&G Engagement Terms.

III.    **LITIGATION PROCEEDS**

3.1    Alliance Litigation Payment Waterfall. If the Alliance Litigation is concluded and/or Settled in whole or in part, then, the distribution of any Alliance Proceeds remaining after payment of any unpaid portion of the K&G Flat Fee, any amount due to K&G for the K&G Contingency Fee, and any unreimbursed and authorized K&G Expenses shall be made as soon as practicable, and allocated as follows:

(i)    **First**, to repayment of all Trustee Borrowings then outstanding.

(ii)   **Second**, to payment of the Alliance Statutory Trustee Fee;

(iii)  **Third**, to payment of any portion of the Trustee's Professional Fees in excess of the Trustee's Professionals Retainer, specifically approved and authorized by JPMorgan in writing following consultation among and between the Trustee and JPMorgan, and pertaining to services and expenses actually performed and incurred in the Alliance Litigation, and

(iv)   **Fourth**, to JPMorgan to be applied to the amounts outstanding under the Final DIP Order, the DIP Credit Agreement and this Stipulation until JPMorgan has been paid in full;

(v)    **Fifth**, to the Bankruptcy Estate. Any remaining portion of unpaid Trustee's Professional Fees in excess of the Trustee's Professional Retainer and *not* specifically approved and authorized by JPMorgan shall be paid from this portion of the Alliance Proceeds.

3.2    Consignment Litigation Payment Waterfall. If the Consignment Litigation is concluded and/or Settled in whole or in part, then, the distribution of any Consignment Proceeds shall be made as soon as practicable, and allocated as follows:

(i)    **First**, to repayment of all Trustee Borrowings then outstanding.

(ii)   **Second**, to payment of the Consignment Statutory Trustee Fee;

(iii)  **Third**, to payment of any portion of the Trustee's Professional Fees in excess of the Trustee's Professionals Retainer, specifically approved and authorized by JPMorgan in writing following consultation among and between the Trustee, JPMorgan and Shapiro Sher, and pertaining to services and expenses actually performed and incurred in the Consignment Litigation, and;

(iv)   **Fourth**,

(a) Seventy-five percent (75%) of the remaining Consignment Proceeds to JPMorgan (to be applied to the amounts outstanding under the Final DIP Order, the DIP Credit Agreement and this Stipulation until JPMorgan has been paid in full;

(b) Twenty-five percent (25%) of the remaining Consignment Proceeds to the Bankruptcy Estate. Any remaining portion of unpaid Trustee's Professional Fees in excess of the Trustee's Professional Retainer and *not* specifically approved and authorized by JPMorgan shall be paid from this portion of the Consignment Proceeds.

3.3 <u>Avoidance Litigation Payment Waterfall</u>. If any Avoidance Litigation is concluded and/or Settled in whole or in part, then, the distribution of any Avoidance Proceeds shall be made as soon as practicable, and allocated as follows:

(i) **First**, to repayment of all Trustee Borrowings then outstanding.

(ii) **Second**, to payment of the Avoidance Statutory Trustee Fee;

(iii) **Third**, to payment of any portion of the Trustee's Professional Fees in excess of the Trustee's Professionals Retainer, specifically approved and authorized by JPMorgan in writing following consultation among and between the Trustee, JPMorgan and Shapiro Sher, and pertaining to services and expenses actually performed and incurred in the Avoidance Litigation, and;

(iv) **Fourth**,

    (a) Seventy-five percent (75%) of the remaining Avoidance Proceeds to JPMorgan (to be applied to the amounts outstanding under the Final DIP Order, the DIP Credit Agreement and this Stipulation until JPMorgan has been paid in full;

    (b) Twenty-five percent (25%) of the remaining Avoidance Proceeds to the Bankruptcy Estate. Any remaining portion of unpaid Trustee's Professional Fees in excess of the Trustee's Professional Retainer and *not* specifically approved and authorized by JPMorgan shall be paid from this portion of the Avoidance Proceeds.

## IV. SETTLEMENT

4.1 <u>Right to Settle</u>. Any proposed settlement of the Litigation Claims shall be presented to the Bankruptcy Court for approval under Fed. R. Bankr. P. 9019, with JPMorgan, K&G and all other parties in interest reserving all objections to such settlement. By separate motion, the Trustee may seek approval by the Bankruptcy Court of an omnibus settlement authorization protocol that permits an abbreviated process for settlement of Avoidance Actions at specified levels of approval authority to be requested by the Trustee and approved by the Bankruptcy Court.

4.2 <u>Good Faith Coordination Regarding Settlements</u>. The Trustee, JPMorgan and, with respect to the Alliance Litigation, K&G, shall confer and cooperate in good faith regarding any potential Settlement of the Litigation Claims.

## V. RATIFICATION, CONFIRMATION AND ACKNOWLEDGMENT.

5.1 <u>Ratification of DIP Loan Documents.</u> The Trustee hereby ratifies, confirms and agrees to be bound by all terms and provisions of the Final DIP Order, DIP Credit Agreement and the other DIP Loan Documents and agrees that all such terms and provisions, as amended hereby, remain in full force and effect. The Trustee acknowledges and agrees that the amounts owing under the Final DIP Order, DIP Credit Agreement and other DIP Loan Documents are valid, enforceable,

due and owing as of March 10, 2026 in an amount not less than $6,579,473.92 in the aggregate, with interest, costs and attorneys' fees continuing to accrue, and without defense, offset, recoupment, avoidance or subordination of any kind, and that the DIP Liens and superpriority administrative expense claims and other rights, claims and remedies granted to the DIP Lender pursuant to the Final DIP Order are valid, properly perfected and fully enforceable, and that JPMorgan at all relevant times holds first-priority liens and claims in these proceedings. with interest, costs and attorneys' fees continuing to accrue.  The Trustee acknowledges that the JPMorgan Proof of Claim shall be allowed as filed in an amount not less than 6,579,473.92, and that such amount will be increased to reflect subsequently accruing interest, costs and attorneys' fees, as well as the amount of any Trustee Borrowings—all without the need for JPMorgan to further amend or update its JPMorgan Proof of Claim.

5.2    No Other Amendments or Waivers. Except as otherwise expressly set forth herein, nothing herein shall be deemed to constitute an amendment, modification or waiver of any of the provisions of the Final DIP Order, DIP Credit Agreement or the other DIP Loan Documents, all of which remain in full force and effect as of the date hereof and are hereby ratified and confirmed. No delay or failure by the DIP Lender in exercising any right or remedy under the Final DIP Order or the DIP Loan Documents, or applicable law shall be deemed a waiver thereof.

5.3.    Common Interest Agreement. The Trustee and the DIP Lender acknowledge that, at all relevant times, they have and continue to share a common legal interest in (i) the investigation, prosecution, defense, and/or Settlement of the Litigation Claims, and (ii) matters arising in or relating to the Bankruptcy Cases that may affect the Litigation Claims and the Litigation Proceeds. As soon as reasonably practicable after the Effective Date, the Trustee (including the Trustee's Professionals) and the DIP Lender (including the DIP Lender Professionals) shall negotiate in good faith and enter into a separate written Common Interest Agreement.

## VI.    CONDITIONS PRECEDENT

6.1    Conditions Precedent to this Stipulation. The effectiveness of this Stipulation is subject to the satisfaction of all the following conditions precedent:

(a)    The Parties will have each received fully executed copies of this Stipulation;

(b)    The Bankruptcy Court shall have entered an order approving this Stipulation and all of the actions and transactions provided herein, and authorizing the Trustee and DIP Lender to enter into the Stipulation and to consummate such actions and transactions; and

## VII.    GOVERNING LAW; JURISDICTION

10.1    Governing Law. This Stipulation and the enforcement of rights and remedies hereunder, shall be governed and construed in accordance by the laws of the State of New York, without giving effect to the choice of law provisions thereof, except as governed by the United States Bankruptcy Code.

10.2    Jurisdiction. The Bankruptcy Court will retain jurisdiction, to the greatest extent permitted by law, over any and all disputes that arise in connection with the interpretation, performance, or enforcement of this Stipulation, the Litigation Claims, or the Litigation Proceeds. The Parties submit to the jurisdiction of the Bankruptcy Court for any such proceeding to the fullest extent of the Bankruptcy Court's applicable jurisdiction, and waive any objection based on improper venue.

## VIII.    **MISCELLANEOUS**

11.1    Heading; Construction. The headings of the sections and subsections of this Stipulation are for convenience of reference only and shall not limit or otherwise affect the interpretation of any provision hereof.

11.2    Notice. Any notice, notification or request shall be given to any party to this Stipulation at such party's address set forth beneath its signature on the signature page to this Stipulation (or at such other address or email address as such party may hereafter specify in a notice given in the manner required under this section), and shall be deemed properly given when delivered by hand, by nationally recognized overnight courier, by registered or certified mail (return receipt requested), or by email (with confirmation of transmission).

11.3    Severability. In case any provision in or obligation of this Stipulation is adjudicated to be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby, and such provision shall be enforced to the maximum extent permissible.

11.4.    No Waiver. Nothing in this Stipulation shall operate as a waiver of any defaults under the DIP Loan Documents, or as a waiver or estoppel or establish a course of dealing with respect to any rights or remedies that may be presently available to the DIP Lender, or any other rights or remedies that may be subsequently available to the DIP Lender under the DIP Loan Documents or applicable law or equity, all of which rights are expressly reserved to the fullest extent possible. Any waiver must be in a writing signed by the DIP Lender and shall be limited to its express terms.

11.5    Entire Stipulation. This Stipulation constitutes the entire Stipulation between the Trustee and DIP Lender with respect to the specific matters addressed herein, and integrates all prior discussions and drafts with respect to those specific matters. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing signed by the Trustee and DIP Lender. No provision of this Stipulation may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than as specifically agreed in writing by the Trustee and DIP Lender. Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Stipulation and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

11.6.    <u>Binding Effect; Successors</u>. This Stipulation is and shall be binding on, enforceable by, and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including, but not limited to, any successor Chapter 7 trustee appointed in these cases and any successor or assignee of the DIP Lender. This Stipulation may not be assigned to any other person or entity by the Trustee without the DIP Lender's prior written consent and approval of the Bankruptcy Court. The DIP Lender may assign its rights and obligations under this Stipulation in accordance with the DIP Loan Documents and applicable law.

11.7.    <u>Counterparts; Electronic Signatures</u>. This Stipulation may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Stipulation by facsimile, email (including by .pdf) or other electronic means shall be equally effective as delivery of an original executed counterpart.

11.8.    <u>Cooperation; Further Assurances.</u> The Trustee and the DIP Lender agree to cooperate in good faith and to execute and deliver such additional documents and to take such further actions as may be reasonably necessary or appropriate to effectuate and implement the terms and intent of this Stipulation, including, without limitation, to document any Settlement of the Litigation Claims consistent with this Stipulation and to effectuate the distribution of Litigation Proceeds as provided herein.

**IN WITNESS WHEREOF,** each of the parties below has duly executed this Stipulation as of the date first written above.


**Chapter 7 Trustee**

*/s/ Morgan W. Fisher*
Morgan W. Fisher (Bar No., 28711)
The Law Offices of Morgan Fisher, LLC
18 West Street
Annapolis, Maryland 21401
mwf@morganfisherlaw.com
(410) 626-6111


**JPMORGAN CHASE BANK, N.A.,**
as DIP Lender



*/s/ Jonathan W. Young*

Toyja E. Kelley (Bar No. 26949)
Indira K. Sharma (Bar No. 28269)
Jonathan W. Young (admitted *pro hac vice*)
**TROUTMAN PEPPER LOCKE LLP**
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
Tel: (202) 274-2950
Email: Toyja.Kelley@troutman.com
Indira.Sharma@troutman.com
Jonathan.Young@troutman.com

-and-


Katherine E. Culbertson (admitted *pro hac vice*)
**TROUTMAN PEPPER LOCKE LLP**
111 South Wacker Drive, Suite 4200
Chicago IL 60606
Tel: (312) 443-0256
Email: Katherine.culbertson@troutman.com


*Counsel for JPMorgan Chase Bank, N.A.*

## EXHIBIT A

## TERMS OF ENGAGEMENT OF KRAMON & GRAHAM, P.A.

These terms of engagement, together with the attached Appendix I (collectively, the "K&G Terms of Engagement"), are entered into by and among Morgan W. Fisher, Esq., in his capacity as the duly appointed Chapter 7 Trustee (the "Trustee") and Kramon & Graham, P.A. ("K&G", together with the Trustee, the "Parties"). These K&G Terms of Engagement set forth the agreed terms and conditions governing the retention and engagement of K&G (the "Engagement"), as proposed special litigation counsel for the Trustee and the bankruptcy estate to represent the Trustee in connection with the investigation and prosecution of the adversary proceeding captioned *Alliance Entertainment, LLC v. Diamond Comic Distributors, et al*, Adv. Proc. No. 25-00112 (DER)(the "Alliance Litigation"). Notwithstanding anything to the contrary in the accompanying Stipulation and Order Authorizing Limited Borrowing and Use of Cash Collateral (the "Trustee Borrowing Stipulation"), and subject to approval of the Court, the Trustee hereby agrees to engage K&G as special litigation counsel in accordance with these K&G Terms of Engagement. Subject to (i) these Terms of Engagement, (ii) the terms of the Trustee Borrowing Stipulation and (iii) the Court's approval of the Trustee Borrowing Stipulation, pursuant to which JPMorgan consents to the use of the Trustee Borrowings (as defined in the Trustee Borrowing Stipulation) to pay the amounts owing to K&G herein.

1.  Scope and Term of Engagement

The scope of this Engagement is limited to K&G's representation of the Trustee, as client, as his special litigation counsel in the Alliance Litigation. Unless earlier terminated by the Trustee or by K&G, the term of this Engagement shall commence upon the Court's approval of this Engagement and shall terminate upon the conclusion of the Alliance Litigation, whether by settlement, dismissal or summary judgment entered prior to trial, or final adjudication and judgment on the merits after trial. This Engagement does not include any appeals, retrials, or new trials (a separate engagement agreement will be required for any such additional services). The Trustee will file an application to employ and retain K&G pursuant to section 328 of the Bankruptcy Code in accordance with these Terms of Engagement.

2.  Fee Structure

    a.  Flat Fee

K&G is guaranteed by the bankruptcy estate a minimum total fee of $700,000 (the "K&G Flat Fee") payable according to the following installment schedule: (i) $100,000 upon K&G's entry of appearance; (ii) $250,000 due ninety (90) days after entry of appearance; (iii) $250,000 due one hundred eighty (180) days after K&G's entry of appearance; and (iv) $100,000 due two hundred seventy (270) days after K&G's entry of appearance. The K&G Flat Fee shall be deemed earned upon the Court's approval of K&G's employment and represents the minimum amount of K&G's compensation for professional services rendered for this Engagement. In the event the Alliance Litigation concludes with a gross recovery exceeding $2,800,000 prior to the due date of

all scheduled K&G Flat Fee installments, any then-remaining unpaid K&G Flat Fee installments shall become immediately due and payable upon such conclusion.

b.   Potential Additional Contingency Fee

In addition to the guaranteed K&G Flat Fee, K&G shall be entitled to a contingency fee equal to twenty-five percent (25%) of any gross recovery exceeding $2,800,000 (the amount at which twenty-five percent (25%) equals the K&G Flat Fee) (the "K&G Contingency Fee"). For the avoidance of doubt: if twenty-five percent (25%) of the gross recovery is less than or equal to $700,000 (*i.e.*, if the gross recovery is $2,800,000 or less), the K&G Contingency Fee is $0, in which case, K&G is not entitled to any additional contingency compensation, and K&G's total compensation shall be limited to the K&G Flat Fee; and (ii) if twenty-five percent (25%) of the gross recovery exceeds $700,000 (*i.e.,* the gross recovery exceeds $2,800,000), then the K&G Contingency Fee shall equal twenty-five percent (25%) of the gross recovery minus $700,000, such that K&G's total compensation equals exactly twenty-five percent (25%) of the gross recovery when the gross recovery is $2,800,000 or greater. If any portion of the recovery consists of non-cash assets or property, the K&G Contingency Fee shall be calculated based on the market value of such assets or property. Appendix I attached hereto includes illustrations demonstrating how any additional K&G Contingency Fee is to be calculated. The K&G Contingency Fee, if any, shall be due and payable contemporaneously with, or promptly upon, the Trustee's receipt of any gross recovery giving rise to such fee.

3.   Expenses

The K&G Flat Fee and K&G Contingency Fee do not include expenses or costs incurred by K&G in connection with the Engagement (the "K&G Expenses"). Reimbursement of K&G Expenses shall be due from the estate without regard to the outcome of the Alliance Litigation and is in addition to the K&G Flat Fee and any K&G Contingency Fee. K&G Expenses typically include, but are not limited to, the following expenses: document reproduction charges; long distance charges; travel expenses; fees for reports; fees charged by experts or consultants; court filing fees; fees for deposition transcripts and court reporters; fees for litigation support services (*e.g.*, trial graphics); and postage and delivery fees. In cases involving e-discovery, where electronically stored information is produced by the client or any other party and stored on K&G's e-discovery platform (currently Relativity), the client shall be responsible for the monthly storage fees charged by Relativity. The current monthly Relativity storage fee is $8 per GB. Some of these costs may be advanced by K&G. K&G Expenses in excess of $25,000 per specific expenditure or $200,000 in the aggregate shall be subject to notice to, consultation with and approval by JPMorgan as set forth in the Trustee Borrowing Stipulation.

4.   Cooperation and Common-Interest

The cooperation of JPMorgan and Trustee with K&G will be necessary throughout the Engagement, which includes their agreement not to settle any claims without notice to and an opportunity to be heard for K&G, as well as approval by the Bankruptcy Court under FED. R. BANKR. P. 9019.  Pursuant to the Common Interest Agreement (as defined in the Trustee Borrowing Stipulation), the Trustee and JPMorgan acknowledge and agree that they share a

common-interest in the Alliance Litigation and that their interests and objectives are aligned with respect to its outcome. Accordingly, the Parties agree that their communications with and among K&G and themselves concerning the Alliance Litigation shall be governed and protected by the common-interest privilege, notwithstanding that K&G represents the Trustee and not JPMorgan, which has its own counsel.

5.   Document Retention

Upon the conclusion of K&G's representation, K&G will, at the client's request, return any original documents furnished by the client to K&G and will provide copies of any other documents in K&G's file. The client shall be responsible for all copy and delivery charges associated with such requests. K&G will not retain physical paper files after the conclusion of the representation. Electronic copies of the files will be maintained for a period of seven (7) years, after which K&G may destroy the file without further notice to the client.

<u>APPENDIX I</u>

<u>Illustration 1</u>
Gross recovery:              $10,000,000
25%:                         $2,500,000
K&G Flat Fee (fully paid):   $700,000
K&G Contingency Fee (due):   $1,800,000 (or $2,500,000 — $700,000)
K&G Flat Fee (balance due):  $0

<u>Illustration 1A</u>
Gross recovery:                $10,000,000
25%:                           $2,500,000
K&G Flat Fee (partially paid): $600,000
K&G Contingency Fee (due):     $1,800,000 (or $2,500,000 — $700,000)
K&G Flat Fee (balance due):    $100,000

<u>Illustration 2</u>
Gross recovery:              $2,000,000
25%:                         $500,000
K&G Flat Fee (fully paid):   $700,000
K&G Contingency Fee (due):   $0 (because 25% is less than $700,000)
K&G Flat Fee (balance due):  $0

<u>Illustration 2A</u>
Gross recovery:                $2,000,000
25%:                           $500,000
K&G Flat Fee (partially paid): $600,000
K&G Contingency Fee (due):     $0 (because 25% is less than $700,000)
K&G Flat Fee (balance due):    $100,000

<u>Illustration 3</u>
Gross recovery:              $2,800,000
25%:                         $700,000
K&G Flat Fee (fully paid):   $700,000
K&G Contingency Fee (due):   $0 (because 25% is equal to $700,000)
K&G Flat Fee (balance due):  $0

<u>Illustration 3A</u>
Gross recovery:                $2,800,000
25%:                           $700,000
K&G Flat Fee (partially paid): $600,000
K&G Contingency Fee (due):     $0 (because 25% is equal to $700,000)
K&G Flat Fee (balance due):    $100,000