**EXHIBIT AHC-1**

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "Agreement") dated as of February 15, 2023 (the "Commencement Date"), is made by and between Paizo, Inc., a Washington corporation located at 7120 185th Avenue North East, Suite 120, Redmond, Washington 98052 ("Seller") and DIAMOND COMIC DISTRIBUTORS, INC., a Maryland corporation located at 10150 York Road, Hunt Valley, Maryland 21030 ("Buyer").

WITNESSETH:

WHEREAS, Seller is engaged in the business of publishing, manufacturing, selling, and distributing (i) comic books (collectively, the "Comic Books"), (ii) related graphic novel, trade paperback and hard-cover books and compilations of the Comic Books (collectively, the "Graphic Novels"), (iii) science fiction, fantasy and horror novels (collectively, the "Novels"), (iv) miniature, role playing and collectible card playing games (collectively, the "Games"), and (v) related merchandise (collectively, and together with the Comic Books, the Graphic Novels, the Novels, the Games, the "Products.")   All references herein to "Products" shall refer only to the English-language version thereof; and

WHEREAS, Buyer is engaged in the business of selling and distributing Products and other items; and

WHEREAS, the parties had entered into a previous agreement on July 22, 2021 with respect to the subject matter herein and now desire to restate their relationship and replace such previous agreement in its entirety; and

WHEREAS, Seller desires to appoint Buyer as Seller's distributor of Products on the terms and conditions set forth in this Agreement; and

WHEREAS, Buyer desires to accept the appointments as distributor of Products for Seller on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Appointment; Territory.

(a)    Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Book Market.

"Book Market" shall mean chain book store retailers and their internet affiliates; online booksellers (i.e.,; Amazon.com); independent book stores (i.e., stores whose revenues are derived primarily from the sale of books, as opposed to magazines, comic books, or other items); mass-market merchandisers and their internet affiliates; libraries; and the wholesalers who service these accounts; warehouse clubs and specialty mass merchandisers/retailers; and other retailers; all of  which generally buy under Buyers returnable trade terms.

(b)     Seller hereby appoints Buyer as its sole and exclusive distributor worldwide for the sale and distribution of English-language Products in the Comic Book Specialty Market. "Comic Book Specialty Market" (CBSM) shall mean comic retailers and wholesalers, and those stores that are presently being served, or of the type being served, through the direct sales channel of distribution (as the term "direct sales" is commonly understood in the comic book industry), buying under Buyers non-returnable trade terms.

(c)     If Buyer declines to offer any of Seller's Products, Seller shall have the right to sell those specific items direct to retailers and other interested parties without any involvement from Buyer. Seller reserves the right to run and maintain a web site, a component of which will include an e-commerce site where Seller will sell their products directly to consumers. Seller also reserves the right to sell their products directly to consumers at both industry and consumer trade shows and conventions. Seller also reserves the right to determine the sale price of their products in these venues (web site and trade shows and cons). Seller also reserves the right to remainder Seller's Products at higher discount thresholds than Seller offers to Buyer.

(d)     Subject to the terms and conditions of this Agreement, Buyer hereby accepts the appointments as Seller's sole and exclusive distributor for the sale and distribution of the Products as set forth in Paragraphs l(a) and 1(b) hereof (collectively, the "Appointments").

2.     <u>Term.</u>   This Agreement supercedes and replaces any previous agreement between the parties with respect to the subject matter herein. The initial term of this Agreement (the "Initial Term") is for one year from the Commencement Date (as defined herein) with respect to Products shipped as of such Commencement Date.   Unless terminated earlier in accordance with Paragraph 10 hereof, this Agreement will renew for one-year periods provided both parties consent to such a renewal in writing within 90 days of the Commencement Date (each, a "Renewal Term").   This Agreement is effective with Products available for shipment as of the Commencement Date.   As used herein, "Term" shall mean collectively the Initial Term and any Renewal Terms.

3.     <u>Supply.</u>

(a)     Subject to Paragraph 3(c) hereof, during the Term, Seller hereby agrees to consign to Buyer, and Buyer hereby agrees to accept from Seller, such amounts of Products as are required to meet Buyer's distribution needs, as such amounts are determined by Buyer in its reasonable discretion.

(b)     Buyer shall place consignment orders (referred to herein as "Shipping Requests") with Seller for all Products to be shipped to Buyer pursuant to the terms of this Agreement through delivery to Seller of a written or electronically transmitted document in the form attached hereto as Exhibit B (the "Purchase Order Form") with such changes as Buyer may make from time to time in its reasonable discretion.   Buyer shall deliver such Shipping Requests to Seller to the address provided for notices to Seller in this Agreement, or to such other address as may be provided by Seller to Buyer from time to time.   In the event of any conflict between the terms of this Agreement and the Purchase Order Form, the terms of this Agreement shall control.

(c)     Buyer will warehouse Products on consignment in a clean, dry, secure, and fire-protected facility.

(d)      With respect to Products shipped to Buyer's UK distribution facility, which ultimately cannot be sold to Customers serviced by Buyer's UK distribution facility, such Products may be returned to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller.  Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(e)      Buyer will include all shipments of Products to its UK distribution facility in its regular sales reporting to Seller.

(f)      PRODUCTS ARE FURNISHED TO BUYER "AS IS."  SELLER MAKES NO REPRESENTATION OR WARRANTY WITH REGARD TO ANY PRODUCT OR OTHER ITEM FURNISHED UNDER THIS AGREEMENT, EXCEPT AS OTHERWISE SET FORTH HEREIN.  SELLER DISCLAIMS ALL OTHER WARRANTIES AND OBLIGATIONS OF CLIENT, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY PRODUCTS OR OTHER ITEMS DELIVERED BY OR ON BEHALF OF SELLER UNDER THIS AGREEMENT (INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE).

4.      Distribution Services: Additional Services.

(a)      As Seller's distributor, Buyer shall perform each of the distribution and marketing services specified on Exhibit A hereto ("Distribution Services").  Distribution Services shall be provided free of charge to Seller, except as otherwise specifically set forth on Exhibit A and in Paragraph 6 hereof. To assist in the performance of the Distribution Services, Seller shall provide to Buyer free of charge reasonable amounts of sales literature, promotional, and training materials ("Sales Materials"). Buyer shall not produce or otherwise distribute any other Sales Materials related to the Products without the prior written consent of Seller. Buyer acknowledges that certain Sales Materials, as identified by Seller, have value only if distributed promptly within the time period specified by Seller.

(b)      Buyer may also elect, in its sole discretion, to offer services to Seller not specified on Exhibit A hereto ("Additional Services").  Seller may elect to obtain any such Additional Services from Buyer in its sole discretion.   Seller and Buyer shall agree upon the cost to Seller for such Additional Services in advance, but in no event shall Buyer offer the Additional Services to Seller at a cost in excess of Buyer's direct cost for providing such service plus 20.00%. Additional Services do not include those services for which Seller establishes a published price (the "Rate Card Services") that shall be provided based on such Rate Card less 5.00%.

5.      Price for Products.

(a)    Seller shall sell Products to Buyer at a discount of 60.00% off the retail price or on a net cost basis (i.e. Seller will notify Buyer at time of solicitation of the Products, what Buyer's unit cost will be for each specific item) and shall ship Products to Buyer's North American distribution center in quantities specified by Buyer, Seller will be responsible for all freight and delivery charges.   If Seller prints its Products outside of North America, Seller will be responsible for paying all freight, customs and duties charges to deliver the Products to Buyer's Olive Branch, MS distribution center.

(b)    In addition to the discounts set forth in Paragraph 5(a) hereof, Seller shall provide Buyer an allowance of 1.50% of the retail price of all Products (including a 3.00% of purchase price allowance for any Product solicited on a net cost basis) sold to (i) the Book Market, or (ii) other non-CBSM and non-HGM Customers that place orders after Buyer's sales representatives have solicited such Customers (the "Book Market Sales Allowance").   For like sales in the UK, Seller shall provide Buyer an allowance of 5.00% of the retail price (including a 7.50% of purchase price allowance for any Product solicited on a net cost basis; the "UK Book Market Sales Allowance").   Buyer will provide Seller, included with each Weekly Payment Amount calculation; a listing of Products sold which are subject to the Book Market Sales Allowances along with a computation of the calculated allowance.

(c)    In addition (i) Seller shall make commercially reasonable efforts to not make Products available to any other channel of distribution at a time reasonably calculated to permit the customer of such distribution channel to release the Product prior to Buyer's scheduled release date to Customers, and (ii) Seller shall not offer its Products to any other channel of distribution at prices more favorable than it offers to Buyer.

6.    Payment Terms; Book Market Returns; Etc.

(a)    On a weekly basis and within 30 days after Buyer's unofficial weekly "release date" to the CBSM for each Product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount (as defined herein).   On a weekly basis and within 60 days after Buyer's unofficial weekly release date to the Book Market for each product invoiced, Buyer shall pay Seller an amount equal to the Weekly Payment Amount.   The Weekly Payment Amount shall be equal to (i) the retail value of Net Products sold to Customers multiplied by 45.00%  plus the net cost value of Net Products sold to Customers, less (ii) the Book Market Service Fee (as defined herein), less (iii) the Book Market Returns Fee (as defined herein), if applicable, less (iv) the Book Market Sales Allowance, less (v) a Customer freight fee of 0.5% of retail for those Customers who require free freight for deliveries by Buyer, less (vi) Customer "Documented Deductions" (as defined herein). Fees, Rebates, and Sales Allowances are all as summarized in Exhibit C.   Buyer will provide Seller, included with each Weekly Payment Amount a Consignment Sales Report showing the foregoing calculation of the Weekly Payment Amount, including all fee deductions.

"Net Products" shall mean total Products sold less credits issued for Customer reported damages, shortages and actual returns.   "Customers" shall mean collectively Book Market retailers and wholesalers, CBSM retailers and wholesalers and Hobby Game Market Customers.   Products returned to Buyer from Book Market Customers (each a "Book Market Return") will either be returned to the consignment inventory, or removed from inventory as damaged goods, for full credit to Buyer of Buyer's original purchase price less a "Book Market Service Fee" equal to 5.00% of the retail price of such Book Market Return.

"Documented Deductions" shall mean any deduction taken by a Book Market Customer whether on their remittance or through other means.  When the deduction is calculated based on the cost or value of Products (a "Direct Deduction"), the deduction amount will be passed through in full. When the deduction is based on a fixed amount or an amount not directly related to the cost or value of Products, Buyer will deduct from Seller the Sellers proportional amount of the deduction (an "Indirect Deduction").  Seller's proportional amount will be calculated by dividing (a) sales of Sellers Products to the deducting Customer by (b) the total sales of all products Buyer sells to the deducting Customer multiplied by (c) the Indirect Deduction.  Buyer will give 14 days' notice to seller of any new type of Documented Deduction not previously taken by a Book Market Customer. Seller will have the option to instruct buyer to discontinue selling to the Customer that is the source of the newly taken deduction if Seller so chooses.

(b)     In the event that Buyer provides Seller any Distribution Services or other service with respect to which an additional charge is imposed in accordance with Exhibit A, Buyer will send a monthly invoice to Seller for the amount due for such service.  Seller shall pay such invoice within 30 days of the date of the invoice.   If Seller fails to make payment within 45 days of the date of such true and accurate invoice, Buyer shall have the right to offset the invoiced amount against any subsequent Weekly Payment Amounts.

Buyer shall keep, maintain, and preserve at Buyer's principal place of business accurate records of transactions relating to the Appointments and this Agreement.  Seller and/or its duly authorized representative shall have the right, once per year during normal business hours, upon no less than 15 days written notice to Buyer, to examine said records relating to the immediately preceding twelve (12) month period relating specifically to transactions covered by this Agreement.   This examination may only take place during the twelve month period following the Agreement's anniversary date and is limited to the previous anniversary year's activity.  Seller shall have no right to examine any of said records which relate to previous anniversary periods unless, for whatever reason, adjustments were made during the current year to those prior year periods.   Seller, at Seller's sole expense, may copy any of the material referenced in this Paragraph 6(d).  Buyer shall keep all such records available for at least one year following each anniversary year of this Agreement.  If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates a shortfall in payments to Seller, Buyer shall promptly pay all monies finally determined to be due Seller. If such shortfall is in excess of 5% of the amounts due Seller for any year of the Term of the Agreement, its reasonable direct out-of-pocket costs of the audit shall be paid by Buyer in addition to the monies finally determined to be due Seller.  If any audit conducted by Seller as finally agreed in accordance with the terms hereof (including Paragraph 18 hereof) indicates an overpayment by Buyer in payments to Seller for any year of the Term of the Agreement, Buyer shall have the right to offset the overpayment amount against any subsequent Weekly Payment Amounts.

(c)     In the event that at any time or from time to time during the Term, one or more of Buyer's Book Market Customers require that Buyer sell Products to them at a higher base discount (for example, a Customer requires a 55% discount rather than a 52% discount), Buyer shall notify Seller of such requirement.   Seller shall, within ten (10) days of such notification by Buyer, notify Buyer of its election to either (i) have Buyer continue sales under this Agreement to such Customer, in which event Buyer may deduct such percentage increase from the Weekly Payment Amount otherwise payable, or (ii) have Buyer discontinue sales to such Customer.

(d)     In addition to the deductions made in calculating the Weekly Payment Amount (as provided above), Buyer may deduct those amounts necessary for Buyer to establish and maintain a reserve account for Product returns from the Book Market channel only (the "Returns Reserve") in an amount which shall at all times be at least equal to 30.00% of sales of Products during, at the option of Buyer, either (i) the immediately preceding 12 month period, or (ii) the immediately succeeding 12 month period based on reasonable forecasts. A Returns Reserve will only be established if either (i) Buyer and Seller mutually agree to maintain a reserve, or (ii) the termination of this agreement results in a potential negative balance owed to Buyer due to projected returns from Book Market Customers.

(e)     Superseding all other provisions and Buyer's remedies contained in this Agreement, Seller agrees to immediately pay to Buyer any amounts due to Buyer which become 45 days old or older resulting from negative Sales and/or for services rendered to, for, or on behalf of Seller, or for any other reason(s).  Such demand for payment will be effected by written request (including email) from Buyer delivered to Seller.

7.     Credit Decisions.

(a)     Buyer shall make all required credit decisions with respect to Customers hereunder, based on commercially reasonable and objective criteria, including but not limited to the decision whether to extend credit to any such Customers and the extent of credit to be granted. Products sold to Customers under such credit extension by Buyer will be treated as any other sale. For sake of clarity, Buyer shall remain liable to Seller for all payments due on products sold to Customers under such credit extensions.

(b)     Buyer shall have the right to take legal action against any delinquent Customers to seek recovery of amounts owed Buyer, and shall have the right to enter into any settlement with such delinquent Customers in its reasonable discretion.

(c)     [reserved].

(d)     For any Customer with respect to which Buyer declines to extend credit, Seller may elect, in its sole discretion, to assume that Customer's credit risks by providing Buyer with written notice of such election.

8.     Title And Risk Of Loss; Inventory.

(a)     All Products are to be held by Buyer on consignment, and remain the property of Seller until sold by Seller through Buyer.   Seller shall retain title to Products while they are stored in Buyer's distribution center, which title will pass to Customers in accordance with Buyer's Terms of Sale. Buyer will cooperate with Seller in the execution of any financing statements or continuations or amendments to financing statements Seller reasonably deems necessary to provide adequate notice of its rights as consignor hereunder, naming Buyer as consignee or debtor, and identifying the Products as consigned goods, and further authorizes Seller to file such financing statements in all filing offices Seller reasonably deems appropriate, provided that Seller provides Buyer with reasonable advance notice and copies of all such filings.

(b)     Seller will be responsible for all personal property, inventory and other taxes associated with Products distributed by Buyer under this Agreement.   Seller is also responsible for

the quality of the Products and that Products have been tested to comply with various local, state, national and international laws.

(c) Seller shall retain all risk of loss or damage with respect to Products while they are located in Buyer's distribution centers except where such damage or loss results from Buyer's gross negligence, and Buyer shall maintain all insurance with respect thereto in amounts sufficient to fully cover all of Seller's Products stored there. Buyer shall provide proof of valid insurance on an annual basis or whenever coverage changes, whichever is more frequent. Buyer agrees that any shipments lost after receipt by Buyer or its authorized agents or partners shall be the responsibility of Buyer to replace or reimburse. Notwithstanding anything to the contrary set forth herein, loss or damage to Products resulting from "normal shrinkage and deterioration" shall be the responsibility of Seller, provided, however, that in the event that "normal shrinkage and deterioration" exceeds 2.00% of units of beginning inventory of Products held by Buyer plus the total units of Products received at the Buyer's distribution centers during any year, Buyer shall reimburse Seller for the excess over the threshold. This reimbursement amount is calculated as 25.00% of average retail price of units over the threshold; provided however, that if Buyer can objectively demonstrate to have found intact and in sellable condition Products that initially had been determined by Buyer to be missing, and for which Seller was previously compensated; reimbursement of the compensated amount shall be paid to Buyer. The parties acknowledge and agree that the following shall not constitute shrinkage or deterioration which would be factored into the calculation of the 2.00% threshold above or for which Buyer would otherwise be liable: (i) disputed shortages of Product; (ii) Products called in as damaged by Customers; (iii) returns of Products to the extent the amount of such returns are in dispute; and (iv) books deemed as "Hurts" or Unsalable (as those terms are used in the Book Market) in the normal course of business. All loss or damage to the value of Products while in the custody of Buyer resulting from Buyer's gross negligence will be the responsibility of Buyer, provided that such loss or damage shall not exceed 25% of average retail price of units of Products that are lost or damaged.

(d) Buyer will not maintain in inventory books deemed as "hurts" and unsalable in the normal course of business. Hurt books will either, at the sole discretion of Seller be (i) sold at such price as determined by Buyer with the proceeds from this sale divided 50%/50% between Seller and Buyer, (ii) disposed of, at the sole cost and expense of Seller, or (iii) returned to Seller, at Seller's sole cost and expenses.

(e) Proceeds of any mutually agreed upon remainder sale transactions will be divided 50%/50% between Seller and Buyer

(f) If Buyer is requested by Seller to ship Product as a No Cost Replacement (as defined herein) then Buyer will charge Seller $15 per order, $2 per title and $0.25 for each SKU shipped. "No Cost Replacement" shall mean Products and items distributed on behalf of the Seller that are not purchased by a Customer. Seller will be charged an hourly rate of $20 less a 10.00% discount for processing any direct to Seller returns, which aren't included in No Cost Replacement shipments.

9. Intellectual Property.

(a) Seller hereby represents and warrants to Buyer that it owns or has a valid license for all rights, including intellectual property rights, required for the distribution of the

Products by Buyer, including all required patents, copyrights, trademarks (registered or unregistered), service marks, trade names, assumed names, copyrights and all applications therefor (collectively, the "Intellectual Property"). The performance by Buyer of its obligations hereunder will not infringe upon the Intellectual Property or any other rights of any third party.

(b)     Seller's Products involve valuable patent, copyright, trade secret, trade name, trade dress, trademark, and other proprietary rights of Seller ("Proprietary Rights"). No title to or ownership of any such Proprietary Rights are transferred to Buyer under this Agreement or by use of any trademark, patent or other Proprietary Rights. Seller reserves all such Proprietary Rights. Buyer acknowledges Seller's exclusive right, title, and interest in and to the Products and related trademarks, service marks, and any registrations that have been issued or may be issued to Seller (collectively, the "Trademarks") and Buyer will not at any time do or cause to be done any act or thing contesting or impairing any part of such right, title, and interest.   All rights in the Trademarks are reserved to Seller for its own use and benefit.   Buyer acknowledges that Buyer shall not acquire any rights whatsoever in the Trademarks as a result of Buyer's use thereof, and that use of the Trademarks by Buyer shall inure to the benefit of Seller.

(c)     Seller hereby grants Buyer a royalty-free limited right to use the Trademarks in the agreed-upon sales channels during the Term solely for the purpose of identifying the Products in conjunction with Buyer's marketing and sale of the Products under this Agreement, and solely in accordance with Seller's product quality standards and all other distribution standards issued from time to time by Seller. Buyer will properly identify and accurately describe as a product of Seller all of the Products.   Buyer will not alter, remove, deface or obscure any notice of trademark, trade name, patent, copyright, Proprietary Right or trade secret on a Product and will not add to a Product any other additional trademark. In connection with Buyer's use of the Trademarks, Buyer shall not in any manner represent that Buyer has any ownership in the Trademarks, or in any material supplied to Buyer or created by Seller pursuant to this Agreement.   Buyer agrees that Buyer shall not at any time apply for any registration of any copyright, trademark, service mark, or other designation, nor file any document with any governmental authority, or to take any action that would affect the ownership of the Trademarks or Seller's copyrights or other intellectual property.

(d)     Buyer agrees that it will not during the Term attack Seller's right or title to the Trademarks. Buyer agrees to execute and deliver to Seller any documents that Seller may reasonably request to confirm Seller's ownership of its rights hereunder. Buyer hereby irrevocably appoints Seller as its attorney-in-fact coupled with an interest to sign any documents bearing on rights or interests in the Trademarks in Buyer's name.   Buyer agrees not to take any action that will bring Seller, the Products, or the Trademarks into disrepute. Buyer shall promptly notify Seller of any apparently unauthorized use or infringement by third parties of the Products or the Trademarks, and will cooperate fully in any action at law or in equity undertaken by Seller with respect to such unauthorized use or infringement.   Buyer shall not institute any suit in connection with any apparently unauthorized use or infringement of the Products or the Trademarks without first obtaining the written consent of Seller to do so, and Seller shall have the sole right to determine whether or not any action shall be taken on account of any such unauthorized uses or infringements. Buyer will provide for Seller's review and approval prior to use copies of all proposed advertising, marketing and other public relations materials Buyer intends to use in connection with the services hereunder which contain Seller's name, Trademarks or representations of any Products.   Seller reserves the right, in its sole discretion, to approve in advance of use, Buyer's marketing and public

relations concepts and not require advance approval of the actual materials.   Buyer will indemnify Seller from any loss or damage arising from the publication of any materials not approved in advance by Seller.

(e)     Except as otherwise provided herein, upon termination of this Agreement, Buyer will not at any time thereafter adopt or use without Seller's prior written consent, any word or mark which is identical or confusingly similar to the Trademarks.

(f)     Buyer shall, or shall cause to be, permanently affixed to all advertising, promotional, and display material incorporating or relating to the Products and/or their contents in a reasonably prominent position in the following order and in the manner specified in the following clause:

"© and ™ 20XX Paizo, Inc., All Rights Reserved."

(g)     Buyer shall use no markings, legends, or notices on or in association with the Products, including advertising, other than as specified above and any notices as may from time to time be specified by Seller, without obtaining Seller's prior written approval.

(h)     The obligations set forth in this Paragraph 9 shall survive the termination of this Agreement.

10.     <u>Termination.</u>

(a)     Either party may terminate this Agreement by providing the other party with at least 90 days prior written notice of its intent to terminate this Agreement upon the expiration of the Initial Term or the then current Renewal Term.

(b)     Either party may terminate this Agreement prior to the expiration of the Term upon 45 days prior written notice to the other party if the other party has materially defaulted under the terms of this Agreement and has not cured such default during such 45-day notice period. Notwithstanding the foregoing, in the event of any material default by a party hereunder, which default is incapable of cure during such 45-day period, the defaulting party shall have an additional 75 days to cure such default, provided, however, that such defaulting party is diligently attempting to cure such default.   Such extended cure period shall not apply to the payment of amounts owed by a party under this Agreement.

(c)     Notwithstanding Paragraph 10(b) hereof, this Agreement shall immediately terminate, upon receipt of written notice if:

     i.     Buyer fails to abide by the terms of Paragraph 9 within 15 days after receipt of written notification of a violation of Paragraph 9;

     ii.     Buyer fails to pay amounts owed to Seller within the time stated in this Agreement per section 6(a) and such failure continues for more than 15 days after Seller provides written notice to Buyer that such amounts are owing to Seller; or

iii. Either Buyer or Seller files a petition in bankruptcy, is adjudicated a bankrupt, has a petition in bankruptcy filed against it (which is not dismissed within 60 days), becomes insolvent, makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law or other similar laws regarding insolvency, discontinues its business, or has a receiver appointed for it or its business, or any similar event has occurred with respect to Buyer or Seller.

11. <u>Effect of Termination.</u>

(a) Upon termination of this Agreement, all rights granted to Buyer hereunder shall immediately terminate, Seller shall be free to appoint others to act as distributor for Seller in the sale and distribution of Products, and Buyer shall have no further right to exploit or in any way deal with the Products, including, without limitation, the distribution of Products to Customers who have submitted orders to Buyer prior to the termination of this Agreement

(b) If this Agreement is terminated as a result of a default by Buyer under this Agreement, all amounts owed to Seller shall become immediately due and payable. Seller shall have no further obligations to Buyer, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement with respect to any Products sold as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Seller reserves the right of offset of what is due Seller from Buyer against what Buyer owes Seller.

(c) If this Agreement is terminated as a result of a default by the Seller under this Agreement, all amounts owed to Buyer shall become immediately due and payable. Buyer shall have no further obligations to Seller, monetarily or otherwise, other than for credits, allowances and payments otherwise due under this Agreement as of the date of termination. For clarity, any amounts deducted from Buyer by Customers after the Terminations date related to sales occurring prior to the Termination date will still be subject to all fees and other payments owed to Buyer from Seller otherwise due under this Agreement. Buyer reserves the right of offset of what is due Buyer from Seller against what Seller owes Buyer.

(d) Except as provided herein, the termination of this Agreement shall not relieve or release any party from any of its obligations existing prior to such termination. Upon termination of this Agreement, title to all material containing the Trademarks, or Seller's copyrights, service marks, or similar rights shall be deemed to have automatically vested in Seller. Unless otherwise agreed to by Seller, Buyer shall immediately deliver such material to Seller, at Seller's cost. Buyer, at Seller's option, may destroy such material at Seller's cost, and upon such destruction furnish Seller a certificate of destruction satisfactory to Seller and signed by an officer of Buyer.

(e) In the event of expiration or termination of this Agreement by either party for any reason, Buyer shall accept returns of Seller's Products distributed to Book Market Customers

for 90 days following the effective date of termination (the "Returns Period"). In no event shall Buyer have any right or obligation to accept any returns after the Returns Period. Buyer may withhold, from amounts otherwise due with respect to sales of Sellers Products to Book Market Customers made in each of the three (3) full calendar months immediately preceding the effective date of termination or expiration, a percentage of such amounts otherwise due, such percentage to serve as a reserve for returns (the "Returns Reserve") that Buyer may receive from Book Market Customers during the Returns Period. The percentage referred to in the preceding sentence shall be equal to the following fraction:

(i)     125% of Returns of Publisher Books, based on credit value, for the twelve (12) months immediately prior to the effective date of termination or expiration; divided by

(ii)    Gross sales to Bookstores for such twelve-month period.

Any portion of the Returns Reserve that is not applied to credits issued for actual returns received by Buyer during the Returns Period shall be owed to Seller, and any amount by which the Returns Reserve is insufficient to cover credits issued for actual returns received by Buyer during the Returns Period shall be owed to Buyer. Buyer shall produce a final settlement statement within sixty (60) days after the end of the Returns Period and the appropriate party will settle the balance within sixty (60) days after such final statement is sent by Buyer. After the Returns Period, Seller shall pay Buyer any amounts which any Customer refuses to pay to Buyer on account of Sellers Products shipped to such Customer by Buyer due to any deduction claimed by such Customer for returns which such Customer makes after the Returns Period or in connection with any dispute over the Customer's right to return any Sellers Product after the Returns Period, but only to the extent that Buyer has not been able to recoup such amount from the Returns Reserve or through a credit against amounts due to Seller from Buyer.

(f)     Upon termination of this Agreement and in accordance with Section 3 (d), Buyer may return the UK consignment Inventory and Book Market Products to Buyer's domestic United States inventory hub (currently Olive Branch, Mississippi) and associated freight costs will be deducted from the next Weekly Payment Amount due from Buyer to Seller. Buyer will give Seller 10 days prior notification of the intent to return Products to the United States, and Seller may elect to have Buyer either liquidate or destroy the Products, rather than return them, with Seller reimbursing Buyers direct cost plus 20.00% including credit for the original purchase price of Products.

(g)     Promptly upon termination of this Agreement, Seller will remove at its own expense all Products held on consignment ("Inventory") from Buyer's distribution center; unless the parties mutually agree to sell or remainder this Inventory to offset amounts due. If Seller fails to remove such Inventory within sixty (60) days after the later of the termination of this Agreement and written demand from Buyer that such Inventory be removed, Buyer shall have the right either to dispose of such Inventory as it deems best or to destroy such Inventory.

12.     Notices. All notices given to a party hereunder must be given in writing and (a) delivered in person, (b) mailed by certified or registered mail, postage prepaid, return receipt requested, (c) sent by recognized overnight, express, or other prepaid receipted courier delivery service, or (d) by email with return correspondence to the email address, if any, included as part of

the notice address below or as agreed by the parties from time to time as follows:

If to Seller:

PAIZO INC
7120 185TH AVE NE
STE 120
REDMOND, WA 98052-0577
mike.webb@paizo.com

If to Buyer:

Diamond Comic Distributors, Inc.
10150 York Road, Suite 300
Hunt Valley, Maryland   21030
Attention: Chief Operating Officer
Fax: (410) 683-7088
ltim@diamondcomics.com

Or to such other address as either party shall have designated in a notice to the other party.   Each such notice shall be effective (i) if given by telecommunication, when transmitted to the appropriate number and the appropriate answer back is received, or (ii) if given by any other means, upon receipt.

13.    Release.   By signing this Agreement, Seller waives and releases any claims relating to deficient payments for Products it has against Buyer as of the date of this Agreement, except those arising from the post term audit rights as defined in accordance with section 6 (b).   In addition, as of the commencement of any Renewal Term under this Agreement, Seller waives and releases any claims relating to deficient payments for Products it has against Buyer as of the commencement of such Renewal Term (except those claims of which Buyer has received written notice from Seller prior to the commencement of the Renewal Term and any claims arising from Seller auditing the last twelve months books and records of Buyer as described in section 6 (b)).

14.    Independent Contractors; No Third Party Rights.   Seller and Buyer are contractors independent of one another, and neither has the authority to bind the other to any third person or otherwise to act in any way as the representative of the other, unless otherwise expressly agreed to in writing signed by both parties hereto.   Nothing set forth herein shall constitute a joint venture, partnership or similar relationship between Buyer and Seller.   Nothing contained in this Agreement shall give or is intended to give any rights of any nature to any third party.

15.    Force Majeure.   Neither party shall be liable to the other for any failure of or delay in the performance of this Agreement for the period that such failure or delay is due to acts of God, public enemy, civil war, pandemic, strikes or labor disputes or any other cause beyond that party's control.   The party limited by a force majeure agrees to notify the other promptly of the occurrence of any such cause and to carry out the terms and conditions of this Agreement as promptly as practicable after such cause is terminated.

16.    Assignment: Binding Effect.   Seller may assign the right to receive payments under this Agreement to any other person or entity upon written notice to Buyer and may assign this Agreement to any affiliate organized for the purpose of publishing the Products.   Buyer may assign

this Agreement to any affiliate of Buyer organized for the purpose of conducting substantially all of Buyer's distribution activities. All terms and provisions of this Agreement shall be binding upon, and inure to the benefit of, and be enforceable by Seller and Buyer and their respective successors, permitted assigns, and legal representatives.

17.    Entire Agreement: Modification.    This Agreement and any Exhibits attached hereto constitute the entire Agreement between the parties with respect to the subject matter hereof,    and supersede    all    other prior    oral and written representations,    agreements,    or understandings between them relating thereto.    This Agreement and any Exhibits attached hereto (other than Buyer's Purchase Order Form, which may be modified from time to time according to the provisions herein) may not be modified, altered or changed except by an instrument in writing signed by both parties. The failure of either Seller or Buyer to enforce, or the delay by Seller or Buyer in enforcing any of said party's rights under this Agreement shall not be deemed a waiver or continuing waiver, and said party may, within such time as is provided by applicable law, commence appropriate suits, actions, or proceedings to enforce any or all such rights.

18.    Applicable Law.    This Agreement shall be deemed to have been entered into in the State of Maryland and shall be interpreted and construed in accordance with the laws of the State of Maryland applicable to agreements executed and to be fully performed therein.    Both parties will attempt to resolve disputes and other problems regarding this Agreement with communication and respect for the interests of the other party.    In the event of a dispute which the parties are unable to resolve, the parties will attempt to agree on a single arbitrator.    Such disputes will be submitted to the selected arbitrator and will take place in Baltimore, Maryland in accordance with the rules and regulations of the American Arbitration Association. The decision of such arbitrator will be final and binding on the parties hereto, and it may be enforced in any court of jurisdiction.    In the event that the parties are unable to agree on a single arbitrator within thirty (30) days after a request by a party for an agreement on an arbitrator, the parties shall be entitled to all rights and remedies to which such parties may be entitled at law or in equity

19.    Survival.    All payment obligations hereunder and all obligations under Paragraphs 9 and 21 hereof shall survive the termination of this Agreement.

20.    Severability.    In the event that any provision of this Agreement, or any portion hereof, shall be declared invalid or unenforceable by a court of competent jurisdiction in any jurisdiction, such provision, or portion thereof, shall, as to such jurisdiction, be ineffective to the extent declared invalid or unenforceable without affecting the validity or enforceability of the other provisions of this Agreement, or any portion thereof, and the remainder of this Agreement shall remain binding on the parties hereto.    However, in the event that any such provision, or any portion thereof, shall be declared unenforceable because of its scope, breadth, or duration, then it shall be automatically modified to the scope, breadth, or duration permitted by law and shall be fully enforceable in such jurisdiction as so modified as if such modification was made upon the effective date of this Agreement.

21.    AGREEMENTS, WARRANTIES AND REPRESENTATIONS

(a)    Each of Seller and Buyer covenants represents and warrants to the other that it has full corporate power and authority to enter into this Agreement and to perform this Agreement in accordance with its terms.

(b)     Seller represents and warrants to Buyer that the execution and performance of this Agreement does not violate any other contract or agreement to which Seller is a party.

(c)     Buyer represents and warrants to Seller that the execution and performance of this Agreement does not violate any other contract or agreement to which Buyer is a party.

(d)     Each party shall indemnify and hold harmless the other, its officers, directors, trustees, shareholders, employees, agents and representatives, and any other seller of the Products, from and against any claim, demand, suit, action, prosecution, proceeding, damage or judgment, including all reasonable and necessary expenses, attorney's fees, amounts paid in settlement and all other liabilities, suffered or incurred in connection therewith based upon (i) its actions or negligence in the sale and distribution of Products, (ii) any claim arising due to its actions or negligence that any Product violates the right of privacy of any person or infringes the copyright, trademark or any other rights of any third party, or contains any recipe, formula or instruction that is injurious to the user; (iii) its breach of a representation or warranty set forth herein; or (iv) its breach of any covenant or agreement set forth herein. Seller and Buyer shall each promptly notify the other of any such claims, demand, actions or proceedings, and each shall fully cooperate with the other in the defense thereof.

(e)     The foregoing representations, warranties, covenants and indemnities shall survive the termination of this Agreement.

22.     LIMITATION OF LIABILITY.  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGE OF ANY KIND OR    NATURE, INCLUDING LOST PROFITS, ARISING OUT OF THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT OR STRICT LIABILITY, EXCEPT AS SET FORTH IN PARAGRAPH 22 HEREOF.

23.     Confidentiality.  In the course of performance under the Agreement, Buyer and Seller will each provide the other with certain information including with respect to Customers, operations, financial results and related matters and may prepare analyses, compilations, studies and other materials containing or based in whole or in part on such information (collectively, the "Confidential Information"). Confidential Information may include but is not limited to information with respect to Customers, operations, products, specifications, know-how, research, prospective licensees or business partners, game designs, rules and playing strategies, customer lists, supplier lists, marketing plans, business terms, financial information, general business operations, costs or pricing information, and information regarding the terms of this Agreement. The term Confidential Information shall not, however, include information that (i) becomes generally available to the public, other than as a result of a breach of the terms hereof, (ii) was available on a non-confidential basis prior to its disclosure herein, or (iii) becomes available to either party, on a non-confidential basis from a source other than the other party or its representatives. During the term of this Agreement or at any time thereafter, each party may not disclose or allow the disclosure to any third parties, or use other than in the performance of that party's obligations under this Agreement, any Confidential Information of the other party, without that party's prior written consent.

24.     Headings and Construction.  Captions and headings contained in this Agreement have been included for ease of reference and convenience and will not be considered in interpreting or construing this Agreement.   This Agreement will not be interpreted or construed in any particular manner based on considerations as to which party drafted this Agreement.

25.      <u>Counterparts; Facsimile Signature Pages.</u>  This Agreement may be executed in counterparts, each of which will be deemed to be an original and all of which together will be considered one and the same instrument.   Delivery of an executed signature page to this Agreement by facsimile transmission or emailed PDF scan shall be effective as delivery of a manually signed counterpart of this Agreement.

*{Signatures appear on the following page}*

IN WITNESS WHEREOF, the parties have caused this Distribution Agreement to be executed and effective as of the Commencement Date and do each hereby warrant and represent that their respective signatory whose signature appears below has been and is on the date of this Agreement duly authorized by all necessary and appropriate corporate action to execute this Agreement.

Paizo, Inc.

By: _____

Date: _____ 7/2/2024

Name: Jim Butler

Title: President



DIAMOND COMIC DISTRIBUTORS, INC.

By _____

Date: _____ /2024

Name: Larry Swanson

Title: CFO

## EXHIBIT A

Buyer agrees to exercise Diligent Efforts in the performance of distribution and marketing services on behalf of Seller during the Term. As used in this Exhibit A and Agreement, "Diligent Efforts" means, with respect to a given goal, the application of material and substantial energy toward the achievement of that goal as expeditiously as reasonably possible. All defined terms used in this Exhibit A shall have the same meaning as defined in the Distribution Agreement by and between Buyer and Seller of even date herewith (the "Agreement"), unless otherwise specified herein.  Unless otherwise specified herein, (a) all terms used herein to describe distribution and marketing services shall have the meaning customarily ascribed to them in the business of distributing Products to Customers; and (b) Buyer shall receive no fee or other compensation for any such Distribution Services other than the allowances specified in this Agreement.  In addition to the items set forth below, Buyer shall provide Seller with a wide range of core distribution, marketing and consulting services in a manner consistent with industry standards, including communicating Customer feedback and market information to Seller.  In addition, Buyer shall assist Seller in the development of programs and products and other similar services, at no fee, provided that (i) the service does not require customized computer programming and (ii) can reasonably be performed by the Brand Manager (as described in Section 2 below).

1.        Buyer shall perform the following marketing services:

(a)        Produce, publish and distribute a monthly catalog currently known as Diamond Previews, suitable for consumers and retailers of Products offered by Buyer to the CBSM.  With respect to each such catalog, Buyer shall reserve space for the listing of all Products in the appropriate sections of each such catalogue during the Term.

(b)        Seller may purchase additional advertising space in the publication referred to in Paragraph l (a) above at 5% off Buyer's published advertising rates.

2.        Buyer will assign a brand manager (the "Brand Manager") to act as a liaison between Seller and all Buyer departments.

3.        To the extent Buyer produces a catalog or advertising booklet for distribution in the Book Market or for book industry trade show events, Buyer shall provide Seller, at no charge to Seller, a reasonable amount of editorial content to be provided by Seller as determined in Buyer's sole discretion.

4.        Buyer shall have the right to distribute any marketing or related materials provided for hereunder in digital format, provided, that the basic Direct Market and Book Market Services set forth herein are provided to Seller to the extent reasonably practicable in such digital format.

5.        The Distribution Agreement, including all amendments, attachments and exhibits thereto, is hereby incorporated by reference into this Exhibit A.

## Exhibit B

PURCHASE ORDER TERMS

Diamond Comic Distributors, Inc.'s Purchase Order Terms are to be maintained by Seller in its permanent file and all orders placed by Diamond Comic Distributors, Inc. with Seller shall be accepted by Seller under the terms and conditions of this document.   These Purchase Order Terms supersede all prior written or oral agreements.

Diamond Comic Distributors, Inc. ("DCD") shall place all orders with Seller by any number of means including, but not limited to, mail, courier, facsimile transmission or other electronic means, and all such orders shall be construed as being subject to this document.

Seller shall be deemed to have accepted Diamond's Purchase Order under the terms and conditions stated herein unless Seller notifies the DCD Order Processing Department in writing within five (5) days of its receipt of the Purchase Order.   Upon notification DCD will either cancel the existing Purchase Order and decide whether to place a new Purchase Order, or accept the product on a returnable basis subject to fees and conditions outlined below.

If the product and/or invoice is received with a different retail price, terms, or other documentation than stated on the Purchase Order, DCD may accept the most favorable terms and/or pay the lower of the two prices, and all products will be fully returnable.

Seller shall include a packing list with each shipment to include title, DCD item code, quantity shipped and DCD's purchase order number.

A scannable bar code must be printed or stickered on all items shipped.   At DCD's sole discretion, items received without a valid scannable bar code may be either returned to the Seller, or assessed a $150.00 per sku/per shipment processing fee, as well as an additional $.20 per piece fee to cover expenses associated with creating, printing and stickering each piece for distribution (both fees subject to future increases). Distribution of items which arrive without valid bar codes (and are not returned to the Seller) may be delayed up to three weeks.   Seller shall extend full return privileges to both DCD and Retailers on all items stickered by DCD.   Both the processing charge and per piece fee are subject to future increases.

Notwithstanding orders for Themed Products (as hereinafter defined), any Purchase Order for a Product which Diamond is ordering for the first time ("Initial Order") shall be valid for a period of thirty (30) days after the Seller solicited ship month, after which date the Purchase Order shall be void and of no further force or effect.

If a Purchase Order is placed after the Initial Order for the same Product ("Reorder") the Reorder must ship within fourteen (14) days of delivery of the Initial Order shipment, or within fourteen (14) days of the order date printed on the Reorder, whichever is later.   Any such reorders that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any and all items that are related to holidays or other media events ("Themed Products") must ship at least twenty one (21) days prior to said holiday or event.   Any such Themed Products that do not ship within the above described time frame will be canceled, or if indicated by DCD in writing, accepted on a fully returnable basis.

DCD requires that any incentive items (items for which Customer qualifying orders were required) must ship within 30 days of the shipment of the item(s) designated as qualifiers.   In the event that this 30 day window passes and the incentive item has not shipped, DCD reserves

the right to make the qualifying item(s) returnable from Customers and to pass on the cost of those returns to the Seller.

Any Products that are received by DCD after the shipping deadlines outlined in the previous 4 paragraphs are subject to a $250.00 late fee per late shipping purchase order line.

In the event Seller ships product to DCD which has not been ordered by DCD, Seller assumes all risk for the product. DCD shall be under no obligation to receive, store, secure, inventory, or return such unsolicited product to Seller. DCD shall not be obligated to make any payment for such unsolicited product under any circumstances.

By accepting DCD's Purchase Order, Seller hereby warrants to DCD that (i) it owns all rights to market and sell the Products to DCD as described in the Purchase Order; (ii) said products conform to affirmations of fact made by Seller in its solicitations, catalogs and product descriptions; and (iv) said products are adequately contained, packaged and labeled in compliance with law and conform to the promises and affirmations of fact made on the container and label. Seller further agrees to indemnify and hold DCD, its agents, affiliates and subsidiaries (collectively "DCD") harmless, from and against any loss, damage or expense suffered by DCD, including reasonable attorneys' fees and costs, by reason of breach by Seller of the warranties contained herein or any act or omission of Seller or trademark, copyright or patent infringements, and any settlement, judgment or payment with respect to any claim, lawsuit or cause of action against DCD as a result thereof. In addition to and not in limitation of any rights DCD may have under this paragraph, by law or statute, in the event Seller breaches the warranties contained herein, DCD shall have the right, in its sole discretion, to either receive quantities DCD ordered, cancel the Purchase Order without further obligation on its part, or return the products to the Seller for a full refund. Seller shall reimburse DCD for all reasonable costs incurred due to any such breach of above warranty.

Shipments of product shall be delivered F.O.B. to the location (s) designated on the Purchase Order, unless other arrangements have been agreed to by DCD, in writing.

Shipments from International Sellers must be shipped "delivered duty paid (DDP)". Should failure of Seller to follow DCD's shipping instructions result in freight cost in excess of what would have been incurred using the given instructions, Seller shall reimburse DCD for the difference in cost.

The Purchase Order shall be governed by the laws of the State of Maryland, excepting the conflict of law rules of the State. In the event of any litigation arising out of the Purchase Order, Seller hereby agrees that jurisdiction and venue shall rest exclusively within the courts of the State of Maryland, including the United States District Court for the District of Maryland.

If any term or provision of these Purchase Order Terms is held by a court to be invalid, void, or unenforceable, the remainder of the terms and provisions of these Purchase Order Terms shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

These Purchase Order Terms are intended by the parties to be a final, exclusive and complete statement of the terms of their agreement, and acceptance is expressly limited to the terms stated herein and in the Agreement executed by the parties. Neither trade usage nor any terms and conditions that may be contained in any acknowledgment, invoice or other documentation of Seller, nor course of prior dealing between the parties shall be relevant to supplement or explain any terms used in the Purchase Order or Agreement. Should Seller have any questions as to the meaning of any terminology or phrasing used in these Purchase Order Terms, Seller shall get clarification from DCD. DCD's Purchase Order Terms and the Agreement shall constitute the entire agreement between the parties and may not be modified or rescinded except by a writing signed by both parties.

# Exhibit C
# Paizo
# Summary of Key Deal Points

| | US & UK CBSM Market | | US Book Market | | UK Book Market |
|---|---|---|---|---|---|
| Product Category | All | | All | | All |
| Section 5 (a) Base Discount | 60.00% | | 60.00% | | 60.00% |
| Section 6 (a) Base    Days | 30 | | 60 | | 60 |
| Section 6 (a) Early Pay Discount Seller's Option | n/a | | n/a | | n/a |
| Section 6 (a) Early   Pay Days Seller's Option | n/a | | n/a | | n/a |
| Section 5 (a) Freight Rebate | n/a | | n/a | | n/a |
| Section 5 (b) Section 6 (a) Book Market Sales Allowance | n/a | | 1.50% of retail | | 5.00% of retail |
| Section 6 (a) Book Market Service Fee (Retail) | n/a | | 5.00% | | 5.00% |
| Section 6 (a) Returns    Cap | n/a | | n/a | | n/a |
| Section 6 (a) Returns    Fees | n/a | | n/a | | n/a |