Transcript of Robert Gorin
Conducted on August 15, 2025

**Page 1**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF MARYLAND

(Baltimore Division)

-----------------------------------X

IN RE                            :

DIAMOND COMIC DISTRIBUTORS, INC.,   : Case No.

et al.,                          : 25-10308 (DER)

          Debtors          : Chapter 11

-----------------------------------X

Corporate designee deposition of

DIAMOND COMIC DISTRIBUTORS, INC.

By and through its Corporate Designee

ROBERT GORIN

Conducted remotely

Friday, August 15, 2025

10:00 a.m.

Job No.:  596645

Pages 1 - 166

Reported by:  Dianna C. Kilgalen

**Page 2**

Deposition of ROBERT GORIN, conducted virtually with all parties attending remotely.

Pursuant to Notice, before Dianna C. Kilgalen, Notary Public for the State of Maryland.

**Page 3**

APPEARANCES

ON BEHALF OF THE DEBTORS:

MARK MINUTI, ESQUIRE

SAUL EWING, LLP

1201 North Market Street

#2300

Wilmington, Delaware 19801

302.421.6800

ON BEHALF OF THE AD HOC COMMITTEE OF CONSIGNORS:

CATHERINE KELLER HOPKIN, ESQUIRE

YVS LAW, LLC

185 Admiral Cochrane Drive

Suite 130

Annapolis, Maryland 21402

443.569.0788

ON BEHALF OF ASPEN MLT, LLC, ET AL.:

CRAIG M. PALIK, ESQUIRE

McNAMEE, HOSEA, JERNIGAN, KIM, GREENAN

AND LYNCH, P.A.

6411 Ivy Lane, Suite 200

Greenbelt, Maryland 20770

301.441.2420

**Page 4**

APPEARANCES CONTINUED

ON BEHALF OF JPMORGAN CHASE:

KATHERINE E. CULBERTSON, ESQUIRE

TROUTMAN PEPPER LOCKE, LLP

111 South Wacker Drive

Chicago, Illinois 60606

312.443.0700

ALSO PRESENT:

Darby Fowler

Chip Mosher

Frank Mastromauro

Gary Gross

Mike Riddell

Nick Barrucci

Juan Claudo (phonetically spelled)

CONTENTS

EXAMINATION OF ROBERT GORIN          PAGE

By MS. HOPKIN:                    7, 159

By MR. PALIK:                     116

EXHIBITS

(Exhibits 1-20 attached to the transcript. Exhibit 21 was retained by counsel.)

ACH DEPOSITION EXHIBIT          PAGE

1    First set of Requests For Production of Documents to Diamond Comic Distributors, Inc., et al.          165

2    Distribution Agreement          165

3    7044 Paizo Consignment Vendor Sales  165

4    Avatar Press unpaid from Diamond     165

5    Fantagraphics Books Consignment Vendor Sales          165

6    Drawn & Quarterly Consignment Vendor Sales          165

7    American Mythology Consignment Vendor Sales          165

8    Ablaze Consignment Vendor Sales     165

EXHIBITS CONTINUED

ACH DEPOSITION EXHIBIT          PAGE

9    Living The Line Consignment Vendor Sales          165

10   Hermes Press Consignment Vendor Sales          165

11   Green Ronin Consignment Vendor Sales          165

12   Zenescope Consignment Vendor Sales          165

13   Udon Entertainment Consignment Vendor Sales          165

14   Avatar Press Consignment Vendor Sales          165

15   5/31/25 Monthly Operating Report     165

16   Transition Services Agreement       165

17   Ablaze Interrogatory responses      165

18   Historical Inventory Composition Analysis          165

19   Consignment Inventory Sale Listing  165

20   SparklePop offer          165

21   Web page printout          165

PROCEEDINGS

ROBERT GORIN, having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE AD HOC COMMITTEE OF CONSIGNORS

BY MS. HOPKIN:

Q.   Good morning, Mr. Gorin.  My name is Catherine Hopkin.  I represent the Ad Hoc Committee of Consignors.  I'm going to be starting today's deposition.  Mr. Palik will follow my -- my questioning.

Could you please state your current title?

A.   Chief restructuring officer.

Q.   Is that the chief restructuring officer of Diamond Comic Distributor and its related entities that are currently in Chapter 11 bankruptcy?

A.   Yes, ma'am.

Q.   And could you describe your duties in your capacity as chief restructuring officer?

A.   I have been involved in overseeing the operations of the organization and involved in the sale process of the assets as well as involved in the activities associated with the bankruptcy.

Q.   Have you ever been deposed before?

A.   I have.

Q.   Approximately how many times have you been deposed?

A.   Three or four.

Q.   Ms. Kilgalen asked you to raise your right hand.  You understand you are under oath today?

A.   Yes, ma'am.

Q.   Are you under the influence of any substance or medication or medical condition that would prevent you from answering questions truthfully and accurately today?

A.   No.

Q.   And Ms. Kilgalen gave us one very good ground rule, which is we will try not to talk over each other.  I would also ask that you let me finish my question in full before you answer

the stock being provided in order to determine which consignors to pay?

A.    How do you define quality?  I'm sorry.  I'm not trying to be cute.  There are different ways to look at it.

Q.    The marketability or desirableness of the product.

A.    If something would sell faster?  Is that what you are asking?

Q.    That could be one example, yes.

A.    That could well be considered.

Q.    And if your answer is that you can't recall a single factor, then please tell me, but I'm -- I'm just trying to understand any of the factors that went into the debtors' decisions about which consignors to pay for sales through May 15th.  Can you recall a single factor?

A.    I would imagine sales margin was considered.

Q.    Did you say sales market?

A.    Margin.

Q.    Margin.  Okay.  Anything else?

A.    Not that I can recall right now.

Q.    Did the debtor have any agreement outside of the distribution agreements regarding payment of that amount through May 15 that we are focused on now?

MR. MINUTI:  Objection to form.

A.    I don't know what kind of agreement you are making reference to.  I don't understand.

Q.    Are you aware of any Diamond employee that separately made any agreement with any consignor to pay it more or less than what another consignor was going to receive?

A.    Not as I'm sitting here, no.

MS. HOPKIN:  I'm going to pull up what we will mark as AHC Exhibit -- I think we are up to 17. Ms. Fowler, are we up to 16 or 17?

MS. FOWLER:  I have it we are at 16, but there is a small chance I missed one.

MS. HOPKIN:  I think it's at 16.  Okay.  We will mark this Exhibit AHC 16.

BY MS. HOPKIN:

Q.    All right.  Mr. Gorin, I'm going to

enlarge it.  Do you see a document on your screen entitled Transition Services Agreement?

A.    Yes.

Q.    This is 25 pages long.  I'm happy to scroll through it, but I will represent to you that this is a document that the debtor produced in response to the document production request that we marked as Exhibit 1.

Is this your signature on page 16 of the agreement?

A.    It is.

MR. MINUTI:  I have a copy of this agreement with me.  Do you mind if I hand it to the witness?

MS. HOPKIN:  That would be great.  Thank you.

Q.    All right.  Just looking at page 1, sir, can you tell me generally what is this document?

A.    This is a document with the estate and SparklePop to provide services, business services, to each other over the course of a transition period while they get up and running on their own.

Q.    Is that transition period still ongoing or has it concluded?

A.    My understanding is there's a few small areas where it continues, but the bulk of it has concluded.

Q.    Do you know which areas it continues?

A.    I believe one involves the warehouse, the warehouse lease, until they negotiate their own lease.

Q.    Anything else?

A.    I believe there is another that -- as they transition to their own bank accounts.

Q.    Okay.  What amount does SparklePop pay for the lease of the warehouse?

A.    It would be the -- it would be the full amount of the -- of the rent paid to the landlord.  I don't know if that's in here or not specifically.

Q.    Okay.  That's okay.

Do you know the range, approximately the range, of the lease that Sparkle --

A.   I believe it's somewhere between 200 and 300,000 a month is the full -- is the full amount.

Q.   Does the debtor actually collect that amount or does it offset it against amounts due from SparklePop?

A.   It is collected from SparklePop and then it pays the rent.

Q.   Okay.  Earlier in your testimony you testified that the debtor did not assign any of my clients' distribution agreements to SparklePop, correct?

A.   Correct.

Q.   Would it be accurate to say that there is no such assignment in this Transition Services Agreement either?

A.   That could be accurate, yes.

Q.   I'm going to look at page 23 if you want to flip to that page.  It's actually Exhibit B to this agreement.  And just let me know when you are there.

A.   Exhibit B?

Q.   Yes.  Exhibit B is actually on page 21.

A.   Page 21?

Q.   Correct.  And you can see it on my screen if you need to confirm.

A.   Yes.

Q.   Can you describe what Exhibit B reflects?

A.   These are services provided by the buyer, SparklePop, to the estate.

Q.   And if you flip two more pages on this Exhibit B, I see on page 23 a category called consignment, storage and removal.
     Let me know when you are there.

A.   I'm there.

Q.   Okay.  If you want to read it silently, just let me know.  But otherwise, if you are familiar with this provision, could you explain to me your understanding of what this services that the buyer SparklePop is providing to the debtor?

A.   Yes, given that they did not buy any of the consigned inventory and are holding it, that

it's being held in that facility, this is a storage fee for holding that in the facility.

Q.   Okay.  Now, where I see this language here, it says:  Seller shall pay purchaser a reasonable fee to be mutually agreed in writing.
     Did the parties agree to a fee for the storage of the consigned stock?

A.   We did.

Q.   What is that fee?

A.   It is approximately $144,000 a month.

Q.   Now, has the debtor calculated a reduction in that fee given that SparklePop has sold some of the stock?

A.   Not yet.  We don't know the exact amount they have sold yet.

Q.   Does the debtor intend to reduce the amount of that fee given that not all of the consigned stock is being warehoused?

A.   I think that is a reasonable request on our part.

Q.   Have you or anyone on behalf of the debtor discussed that with SparklePop yet?

A.   We don't have -- not yet.  We are waiting for a reporting to have any conversation associated with that.

Q.   And if the consignors were to retrieve their stock either by court order or by agreement, is it fair to say the debtor would be relieved of its obligation to make that storage payment?

A.   Are you asking if all -- if all of the consigned inventory was no longer at the Olive Branch warehouse, would there be storage fee due?  Is that the question?

     MS. HOPKIN:  Correct.

A.   There would not.

Q.   Is there a mechanism for the parties to reduce that storage fee as stock is removed from the warehouse?

A.   It's to be agreed upon by the parties.

Q.   And just to confirm, I think you answered this, but the debtor has not proposed to make a reduction at this time?

A.   No.  We still don't have final numbers

as I pointed out.

Q. I'm almost done. I'm going to pull up one -- I think one last document, which is the debtors' answers to my clients' Interrogatories. I will enlarge it.

Do you see on your screen, sir, a document with a caption from the debtors' case, and it says: Debtors' Responses and Objections to First Set of Interrogatories to Diamond Comic Distributors, Inc.?

A. I do.

Q. I will be happy to flip through. I will represent to you this is what the debtor provided in response to my client's Interrogatories. Do you want me to e-mail it or are you comfortable testifying about this document?

MR. MINUTI: Sorry. I have a copy with me. May I show the witness?

MS. HOPKIN: Yes. Thank you.

Q. Mr. Gorin, did you help prepare the Answers to the Interrogatories my client propounded?

A. I did.

Q. Who else helped prepare the answers, if anyone?

A. Members of my team.

Q. Would that be Ramy Aly, the senior director of Getzler?

A. Yes, ma'am.

Q. And Waleed Aly, the director of Getzler?

A. Yes.

Q. Tom Garey and Tim Lenaghan that I see here on the top of page 6?

A. They are former employees that were available to help with the -- to help with some of the software issues and answer some of -- and answer questions as needed.

Q. Okay. I want to direct your attention -- and let me just ask.

Since these Interrogatory Answers were served, have you updated them or made any changes that I should be aware of?

A. Not to my knowledge.

Q. And I will confirm to you I have not received any supplements or amendments from your attorney's office.

Looking at Interrogatory Number 5, we asked for each of the creditors listed in any of the debtors' bankruptcy schedules, identify those creditors which you contend supplied goods to the debtors on consignment or as buy/sell, as applicable.

And I see that there is an objection.

And then if you look at the next page, without waiving that objection, it says: The debtors will produce documents responsive to this Interrogatory.

Has the debtor produced anything that you believe is responsive to this Interrogatory?

A. I believe we have.

Q. What did you -- I'm sorry. I could not hear you. Did you say you have or have not?

A. I believe we have.

Q. Okay. What did you produce that you believe is responsive?

A. I believe there is a report that indicates from the system which -- which are buy/sell and which are not.

Q. Okay. And I'm going to show you a document and ask you if it's the report that you are referring to.

Well, actually, I will do it this way. I'm going to show you my screen which has the eight documents that the debtors provided to my office.

I know it's small. I don't know if I can enlarge it, but I can read the titles.

Do you see there's eight documents on my screen right now?

A. It is small, but I do see them, yes.

Q. Okay. I will represent to you that this is all of the documents that the debtor produced to date. And I will tell you the titles and you can let me know which of these you think indicates on the debtors' schedules which are buy/sell creditors.

This consigned inventory available to be sold, it would not be on that, correct?