# Exhibit A

## SETTLEMENT AGREEMENT AND RELEASES

This Settlement Agreement and Releases (this "**Agreement**") is entered into as of August __5__, 2026, by and among Morgan W. Fisher, Esq. (the "**Trustee**"), the duly appointed, qualified, and acting trustee for the Chapter 7 Bankruptcy Estates (the "**Estates**") of Diamond Comic Distributors, Inc., a Maryland corporation (the "**Debtor**"), and Diamond Select Toys & Collectibles, LLC, a Maryland limited liability company ("**Diamond Select**"), Comic Holdings, Inc., a Maryland corporation ("**Comic Holdings**"), and Comic Exporters, Inc. ("**Comic Exporters**" and, collectively with Diamond Select and Comic Holdings, the "**Affiliated Debtors**" and, collectively with the Debtor, the "**Debtors**") in the Bankruptcy Case (as defined herein), and the persons and entities listed on Schedule 1 attached hereto (each, a "**Consignment Group Member**" or "**Member of the Consignment Group**" and, collectively, the "**Consignment Group**").

## RECITALS

A.    The Debtors commenced the Bankruptcy Case on January 14, 2025 (the "**Petition Date**"), by the filing of voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the Baltimore Division of the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**").

B.    Prior to the Petition Date, the Debtor and each Member of the Consignment Group entered into distribution or supply agreements (each such distribution or supply agreement, a "**Distribution Agreement**" and, collectively, the "**Distribution Agreements**") for the Debtor's distribution of certain products of each Member of the Consignment Group, such as comic books, graphic novels, novels, games, and merchandise in certain territories, as described in the Distribution Agreements.

C.    On May 1, 2025, an Order was entered by the Bankruptcy Court: (i) Approving Asset Purchase Agreement (the "**Purchase Agreement**") by and among the Debtors and Sparkle Pop, LLC, a Delaware limited liability company ("**Sparkle Pop**"), and the other parties thereto, (ii) Approving Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and other Interests; (iii) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (iv) Granting Related Relief (the "**Sparkle Pop Sale Order**").

D.    Pursuant to the Sparkle Pop Sale Order, goods held by Debtors on consignment (i.e., Consigned Inventory) were excluded from the Purchase Agreement.

E.    On May 15, 2025, the Debtors and Sparkle Pop closed on the transactions contemplated by the Purchase Agreement and the Sparkle Pop Sale Order.

F.    Prior to the Petition Date, and thereafter, the Debtors (and/or Sparkle Pop if after May 15, 2025—i.e., closing of the Purchase Agreement) received Consigned Inventory, which Consigned Inventory is currently stored at the Debtors' former distribution facility in Olive Branch, Mississippi (the "**Warehouse**").

022935.50372.001.03

G.      Following the approval of sale transactions, and in connection with the closing of the Purchase Agreement, and pursuant to the Sparkle Pop Sale Order, Sparkle Pop and the Debtors entered into a Transition Services Agreement, dated May 15, 2025 (the "**TSA**"), that, among other things, addressed warehousing, systems access, consigned goods handling, and related transition services with respect to the Consigned Inventory.

H.      Following the closing of the Purchase Agreement, the Debtor filed a motion to sell all of its consignment stock, to which the Consignors objected.  The Consignors filed a motion to stay the proposed sale, to which the Debtors objected and which motion the Bankruptcy Court granted. The Consignors also filed a motion to compel assumption/rejection of their distribution agreements, alleging that the Debtor was in breach of the respective Distribution Agreements, and seeking immediate return of the Consigned Inventory.  The motion to compel was continued by the Bankruptcy Court multiple times and is currently pending.  The Debtor then commenced adversary proceedings against Members of the Consignment Group (all collectively, the "**CG Adversary Proceedings**") and other non-Consignment Group consignors. Chase and Sparkle Pop are named as third-party defendants in the Consignment Group Adversary Proceedings.

I.      Also following closing of the Purchase Agreement, a dispute arose between the Debtors and a number of consignors (including Members of the Consignment Group and other non-Consignment Group consignors) on the one hand, and Sparkle Pop, on the other hand, regarding post-closing sales of the Consigned Inventory by Sparkle Pop, which dispute was partially resolved on September 12, 2025 by the Bankruptcy Court's Consent Order Resolving, in Part, Debtors' Motion (i) to Enforce the Automatic Stay, (ii) to Enforce the Sale Order, and (iii) Granting Related Relief (the "**Consent Order**"). Pursuant to the Consent Order, Sparkle Pop deposited funds in the amount of Eight Hundred Forty Thousand One Hundred Fifty-One Dollars ($840,151.00) into the registry of the Bankruptcy Court (the "**Court Registry Escrow**") of which Six Hundred Sixty Nine Thousand Four Hundred and Ten Dollars ($669,410.00) represents proceeds from certain sales of the Consignment Group Consigned Inventory that were made after May 15, 2025 through approximately mid-October 2025, for Consignment Group Inventory that was delivered prior to May 15, 2025.

J.      Furthermore, Sparkle Pop currently holds (or should be holding) additional funds in the amount of not less than Four Hundred Seventeen Thousand Four Hundred and Ninety Six Dollars (the "**SP Escrow**") on account of Consigned Inventory both received and sold after May 15, 2025 through February 13, 2026 (i.e., after the Sparkle Pop Sale Order), of which Two Hundred Seventy Three Thousand Five Hundred Three Dollars ($273,503.00) represents proceeds from certain sales of the Consignment Group Consigned Inventory.  The Consignment Group consignors maintain that Sparkle Pop has also sold or removed from the Warehouse additional Consignment Inventory that is not yet disclosed, and represents amounts in addition to the SP Escrow and Court Registry Escrow.

K.      On December 19, 2025, the Bankruptcy Court entered an Order converting the Chapter 11 Bankruptcy Cases to Chapter 7 (the "**Conversion Order**") as of 11:59 PM on December 31, 2025, and provided related procedures for the case transition.  The Trustee was appointed effective 11:59 p.m. Eastern Standard Time, on December 31, 2025.

2

022935.50372.001.03

L.      On February 19, 2026, the Trustee filed an Emergency Motion to Extend Deadline to Assume or Reject Executory Contracts Related to Consigned Goods in which, in part, the Trustee requested an extension to the deadline to assume or reject executory contracts related to certain consigned goods, including, but not limited to, the Distribution Agreements (the "**Trustee Emergency Motion**").  The Consignment Group objected to the Trustee Emergency Motion and a hearing was held thereon.

M.      On February 26, 2026, the Bankruptcy Court denied the Trustee Emergency Motion (the "**Denial Order**").

N.      On March 12, 2026, the Trustee filed an appeal of the Denial Order (the "**Denial Order Appeal**"), which remains pending in the District Court.

O.      Disputes exist and have been asserted among and between the Estates and various consignors, including the Consignment Group, regarding title to, rights in, and disposition of the Consigned Inventory and Other Consigned Inventory, sales and accounting related thereto, and costs and claims associated with warehousing, storage, handling, and removal of such inventory.

P.      The parties desire to resolve, compromise, and settle fully and finally, subject to Bankruptcy Court approval pursuant to a Bankruptcy Rule 9019 Order, the disputes among and between them as set forth herein on the terms and conditions stated below.

Q.      It is the purpose and intention of the parties that this Agreement will fully, completely, and finally resolve the disputes and any and all other disputes, known or unknown, asserted or un-asserted, by and among them.

R.      The parties have determined that this Agreement is fair, reasonable, adequate, and in the best interests of the Bankruptcy Estates and all parties hereto.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and subject to Bankruptcy Court approval, the parties agree as follows:

## AGREEMENT

**1.      Incorporation of Recitals**.  The foregoing Recitals are true and correct and incorporated herein by reference.

**2.      Definitions**. As used in this Agreement, the following terms shall have the meanings set forth below:

2.1.    "9019 Order" means a Final Order granting the 9019 Motion.

2.2.    "9019 Motion" has the meaning set forth in Section 3.1 herein.

2.3.    "Administrative Claim" means a Claim for costs and expenses of administration pursuant to Sections 502(h), 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code.

3

022935.50372.001.03

2.4. "Authorized Storage Representatives" has the meaning set forth in Section 4.3.1 herein.

2.5. "Bankruptcy Case" means the bankruptcy case of the Debtor and the Affiliated Debtors (as applicable) pending under Case No.: 25-10308-DER in the Bankruptcy Court.

2.6. "Bankruptcy Code" has the meaning set forth in the Recitals.

2.7. "CG Adversary Counterclaims" shall mean any counterclaims filed in the Bankruptcy Case by any Member of the Consignment Group against the Estates and/or Chase.

2.8. "CG Adversary Proceedings" has the meaning set forth in the Recitals.

2.9. "CG Releasees" has the meaning set forth in Section 10.1 herein.

2.10. "CG Releasors" has the meaning set forth in Section 10.1 herein.

2.11. "Chase" means JPMorgan Chase Bank, N.A., the Debtors' pre and post petition secured lender.

2.12. "Claim" means any claim, as such term is defined in Section 101(5) of the Bankruptcy Code, against any of the Debtors or any other party.

2.13. "Consent Order" has the meaning set forth in the Recitals.

2.14. "Court Registry Escrow" has the meaning set forth in the Recitals.

2.15. "Consigned Inventory" means inventory delivered to the Debtor (and/or Sparkle Pop if after May 15, 2025) and now located at the Warehouse. The Consigned Inventory is allocable to a particular Consignor based upon the books and records of the Debtor, a consignor and/or Sparkle Pop.

2.16. "Consignment Group Consigned Inventory" means Consigned Inventory allocable to Members of the Consignment Group.

2.17. "Consignment Group Pik&Pak Costs and Expenses" has the meaning set forth in Section 4.1 herein.

2.18. "Consignment Group Pik&Pak Option" has the meaning set forth in Section 4.1 herein.

2.19. "Conversion Order" has the meaning set forth in the Recitals.

2.20. "Denial Order" has the meaning set forth in the Recitals.

2.21. "Denial Order Appeal" has the meaning set forth in the Recitals.

2.22. "Distribution Agreement" has the meaning set forth in the Recitals.

4

022935.50372.001.03

2.23.    "Effective Date" has the meaning set forth in Section 3.3 herein.

2.24.    "Estates" has the meaning set forth in the Preamble.

2.25.    "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, review, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

2.26.    "Non-Participating Consignor" means an entity that provided the Debtor and/or the Estates with inventory on a consignment basis and is not enumerated on Schedule 1.

2.27.    "Other Consigned Inventory" means inventory of a Non-Participating Consignor.

2.28.    "Pik&Pak" means services to be provided by Sparkle Pop or each Member of the Consignment Group, as applicable, to ready the Consignment Group Consigned Inventory for pickup by a Consignor, and includes but is not limited to segregating and packaging the Consignment Group Consigned Inventory for each Consignment Group consignor, in a manner that is both consistent with industry standards, and which permits each member of the Consignment Group to retrieve from the Warehouse and ship its respective Consignment Inventory without further expense or effort.

2.29.    "Pik&Pak Option" means the pricing/handling option as so ordered by the Bankruptcy Court, for the release of the Consignment Group Consigned Inventory, as set forth in Section 4.1.

2.30.    "Purchase Agreement" has the meaning set forth in the Recitals.

2.31.    "Releasees" has the meaning set forth in Section 10.2 herein.

2.32.    "Releasors" has the meaning set forth in Section 10.2 herein.

2.33.    "SP Escrow" has the meaning set forth in the Recitals.

2.34.    "Sparkle Pop Consignment Rent Claim" has the meaning set forth in Section 6 herein.

2.35.    "Sparkle Pop Pik&Pak Costs and Expenses" has the meaning set forth in Section 4.1 herein.

2.36.    "Sparkle Pop Pik&Pak Option" has the meaning set forth in Section 4.1 herein.

5

022935.50372.001.03

2.37.   "Sparkle Pop Sale Order" has the meaning set forth in the Recitals.

2.38.   "Trustee Emergency Motion" has the meaning set forth in the Recitals.

2.39.   "TSA" has the meaning set forth in the Recitals.

2.40.   "Warehouse" has the meaning set forth in the Recitals.

**3.    Bankruptcy Court Approval; Conditions Precedent; Effectiveness.**

3.1.    Promptly following the execution of this Agreement, the Trustee shall file with the Bankruptcy Court a motion pursuant to Rule 9019 of the Bankruptcy Rules, together with required supporting papers and required notices, seeking approval of this Agreement and authorizing the parties to take all actions necessary to enforce the Agreement (the "**9019 Motion**").

3.2.    Each party shall use reasonable efforts to support entry of the 9019 Order, including providing reasonable information and declarations, subject to applicable privileges and confidentiality obligations.

3.3.    This Agreement shall become effective immediately upon entry of a 9019 Order approving the terms of this Agreement (such date, the "**Effective Date**").

3.4.    The Bankruptcy Court shall retain exclusive jurisdiction to interpret, implement, and enforce this Agreement and the 9019 Order.

**4.    Consignment Group Consigned Inventory Release and Pik&Pak Logistics.**

4.1.    Release Mechanism. Upon the Effective Date, with respect to the release of all of the Trustee's and Estates' rights in and to the Consignment Group Consigned Inventory, such Estates' rights in the Consigned Inventory shall be released to each Consignment Group Member by either (the "**Pik&Pak Options**"): (i) the Consignment Group, at their sole, respective cost and expense (the "**Consignment Group Pik&Pak Costs and Expenses**"), by accessing the Warehouse as allowed by the TSA (or by the Consignment Group's separate agreement with Sparkle Pop) in order to pick, pack, and palletize the Consignment Group Consigned Inventory for each Consignment Group Member for removal from the Warehouse  (the "**Consignment Group Pik&Pak Option**"), or, alternatively, (ii) consistent with the TSA and at the Trustee's direction to Sparkle Pop under the TSA, at cost and expense no greater than the Consignment Group Pik&Pak Costs and Expenses (the "**Sparkle Pop Pik&Pak Costs and Expenses**"), at the sole cost and expense of which shall be borne by the Consignment Group, to have Sparkle Pop pick, pack, palletize, and make available for pick-up by each Consignment Group Member the Consignment Group Consigned Inventory for removal (the "**Sparkle Pop Pik&Pak Option**").  The 9019 Motion shall state that the parties hereto prefer the[Consignment Group Pik&Pak Option.  The Bankruptcy Court shall retain jurisdiction to ensure compliance with the selected Pik&Pak Option, as set forth in the 9019 Order and the Trustee shall support the Consignment Group's efforts to reclaim the Consignment Group Consigned Inventory as set forth herein.

4.2.    Identification and Confirmation. The Parties shall cooperate in good faith to finalize Schedule 2 following the 9019 Order, if feasible and in accordance with any inspection

6

022935.50372.001.03

notices and/or discovery the Consignment Group has filed in the CG Adversary Proceedings, subject to any further identification and/or confirmation, including as may be as ordered by the Bankruptcy Court.  Any costs and expenses of identifying and confirming the Consignment Group Consigned Inventory shall be borne entirely by the Consignment Group.

      4.3.    Consignment Group Pik&Pak Option.  In the event that the Consignment Group chooses the Pik&Pak Option, then the following shall apply with respect to timing, pickup and shipping, risk of loss, and insurance:

      4.3.1.  Timing.  The Consignment Group shall identify no more than three (3) authorized storage representatives to access the Warehouse (including, but not limited to, the loading dock) during hours that do not materially impair Sparkle Pop's ability to conduct other business (which may be during non-business hours) in order to Pik&Pak the Consignment Group Consigned Inventory (the "**Authorized Storage Representatives**"). If the Consignment Group and Sparkle Pop cannot mutually agree on designated dates and times to Pik&Pak then the Consignment Group will request a hearing to allow the Bankruptcy Court to consider and order dates and times for the Pik&Pak. Each Consignment Group Member shall be required to notify Sparkle Pop, in writing or by electronic mail, the dates and times that any of the Authorized Storage Representatives will be accessing the Warehouse and coordinate such activity with Sparkle Pop.  If the Consignment Group or any of the Authorized Storage Representatives do not remove any of their Consigned Inventory on the loading dock upon Pik&Pak within thirty (30) days after the respective Consignment Group Member who owns such Consigned Inventory is notified in writing that the Consigned Inventory has been placed on the loading dock, unless there is an executed written agreement in place between Sparkle Pop and that Consignment Group Member before such thirty (30) day deadline, then such Consigned Inventory shall be deemed abandoned and Sparkle Pop shall have the sole and absolute discretion to dispose of that Consigned Inventory; unless the failure to retrieve the Consigned Inventory is a result of Sparkle Pop's refusal to permit access or otherwise adhere to the requirements of the TSA and/or any Bankruptcy Court order.

      4.3.2.  Pickup/Shipping; Risk of Loss; Insurance.  Each Consignment Group Member shall arrange and pay for pickup and transportation of its Consignment Inventory from the Warehouse at such dates and times as determined pursuant to Section 4.3.1 above. Risk of loss shall transfer to the applicable Consignment Group Member upon the earlier of: (a) loading at the Warehouse dock for pickup, or (b) tender to the carrier for shipments arranged by such Consignment Group Member. Each Consignment Group Member shall obtain insurance sufficient to cover its respective Consigned Inventory, naming any Authorized Storage Representatives and Sparkle Pop as additional insureds, prior to exercising the Consignment Group Pik&Pak Option with respect to its Consigned Inventory.

      4.3.3.  The Trustee shall support the Consignment Group's efforts in connection with this Section 4.3.

7

022935.50372.001.03

4.4.    Sparkle Pop Pik&Pak Option.  In the event that the Consignment Group chooses the Sparkle Pop Pik&Pak Option, then the following shall apply with respect to timing, pickup and shipping, risk of loss, and insurance:

4.4.1. Timing. Sparkle Pop and the Consignment Group may agree for Sparkle Pop to make the identified Consignment Group Consigned Inventory available for pickup or shipment within ten (10) business days (or such other agreed time) of the receipt of payment of the estimated Sparkle Pop Pik&Pak Costs and Expenses (in an amount as agreed to by the Consignment Group and Sparkle Pop). The Consignment Group Consigned Inventory shall be made available at the Warehouse loading dock as agreed by the Consignment Group and Sparkle Pop. If the Consignment Group Member does not remove its Consigned Inventory within thirty (30) days after the date of the notice by Sparkle Pop, unless there is an executed written agreement in place between Sparkle Pop and that Consignment Group Member before such thirty (30) day deadline, the Consigned Inventory shall be deemed abandoned and Sparkle Pop shall have the sole and absolute discretion to dispose of that Consigned Inventory, unless the failure to retrieve the Consigned Inventory is a result of Sparkle Pop's refusal to permit access or otherwise adhere to the requirements of the TSA and/or any Bankruptcy Court order.

4.4.2. Pickup/Shipping; Risk of Loss. Each Consignment Group Member shall arrange and pay for pickup and transportation of its Consignment Inventory from the Warehouse at the time reasonably designated by Sparkle Pop, subject to Section 4.4.1 above. Risk of loss shall transfer to the applicable Consignment Group Member upon the earlier of: (a) loading at the Warehouse dock for pickup, or (b) tender to the carrier for shipments arranged by Sparkle Pop at the Consignment Group Members' cost.

4.5.    Warehouse Access and Safety. Access to the Warehouse shall be coordinated with Sparkle Pop's designee, subject to standard facility rules, safety requirements, and insurance requirements specified in the 9019 Order and/or herein, or otherwise agreed between them.

4.6.    Destruction of Consignment Inventory. Each Consignment Group Member shall have the option to request that Sparkle Pop destroy any of its Consignment Inventory, any such costs and expenses to be paid entirely by each such Consignment Group Member. In the event that a Consignment Group Member decides to exercise this option, the Consignment Group Member shall send prior written notice to Sparkle Pop of the specific Consignment Inventory that it wants Sparkle Pop to destroy. This option is enforceable regardless of which Pik&Pak Option is chosen, and shall be at a price agreed-upon by the respective Consignment Group Member and Sparkle Pop. If the parties cannot agree to a price for destruction of the identified Consignment Inventory, they will file a notice with the Bankruptcy Court seeking a determination as to a fair and reasonable price.

5.    **Termination of Distribution Agreements**.  Upon the Effective Date, all of the Distribution Agreements shall be deemed rejected under Section 365 of the Bankruptcy Code, and terminated in their entirety with no further obligations of any parties thereto and no Claims arising

8

022935.50372.001.03

against the Estates or Trustee from such rejection. Notwithstanding the immediately preceding sentence, Trustee permits the Consignment Group to enforce any provision in any Distribution Agreement that permits any Member of the Consignment Group to retrieve any Consignment Group Consigned Inventory of any such Member from the Warehouse, including but not limited to any provision requiring the return of the Consignment Inventory to the respective Consignment Group Member upon termination of the Distribution Agreement. For the avoidance of doubt, following rejection and termination of the Distribution Agreements, (i) the Trustee acknowledges and agrees that the Distribution Agreements require, upon termination, that the Trustee make the Consignment Inventory available for pickup by the respective Consignment Group Members at their cost of shipping; (ii) the respective Consignment Group Members agree to bear the cost of picking and packing the Consignment Inventory as more fully set forth herein; and (iii) the Trustee shall not be required to pay any costs or expenses with respect to any Consignment Group Members' retrieval and removal of its Consigned Inventory from the Warehouse. The parties agree that this Agreement shall satisfy any termination notice requirements in any of the Distribution Agreements and the parties otherwise waive any such termination notice requirements therein.

The Trustee agrees and acknowledges that the Consignment Group Members were the owners of their respective Consignment Inventory at all times prior and subsequent to the Petition Date, and that the TSA did not permit or authorize Sparkle Pop to sell, distribute or dispose of Consignment Inventory on behalf of either the Consignment Group Members or the Debtors other than in accordance with the Distribution Agreements and at the Debtor's sole and express direction.

6. **Administrative Claims**. Notwithstanding the release provisions set forth in Section 10 below, Members of the Consignment Group shall have Administrative Claims against the Estates if, and only if either:

(1) Sparkle Pop obtains a judgment, which becomes final and non-appealable, against any Member of the Consignment Group for rent, storage, or similar charges with respect to such Member's Consigned Inventory stored at the Warehouse ("**Sparkle Consignment Rent Claim**"). In the event that Sparkle Pop obtains a Sparkle Consignment Rent Claim against any Member of the Consignment Group, it (they) shall be allowed an administrative Claim against the Estates in an amount equal to and capped at twenty-five percent (25%) of such Sparkle Consignment Rent Claim. Notwithstanding anything to the contrary, the Consignment Group shall be fully liable and responsible for all costs and expenses associated with any litigation or other disputes resulting in a Sparkle Consignment Rent Claim, and the Estates shall have no such liability. Notwithstanding the foregoing, the Trustee shall continue to have the right to settle any rent, storage, or similar charges Claims with Sparkle Pop following the Effective Date; or

(2) Sparkle Pop or the Consignment Group obtain a finding that any consignment inventory delivered by any Member of the Consignment Group was unreported as being sold by the Debtor prior to this Agreement, but was in fact sold by or at the Debtor's direction, and paid to or for the benefit of Debtor (the "Missing Inventory"). The respective Member(s) of the Consignment Group that delivered any such Missing Inventory shall be entitled to a chapter 7 administrative claim against the Debtors ("Missing Inventory Claim"). Notwithstanding anything to the contrary in this section

9

or otherwise in this Settlement Agreement, any Missing Inventory Claim shall be subordinate to: (a) all Trustee compensation, expenses and commissions under Sections 326 and 330 of the Bankruptcy Code; (b) all allowed fees and expenses of any Trustee employed professional in the Bankruptcy Cases; (c) the claims of JPMorgan Chase as allowed in the Order Approving Stipulation and Order Between JPMorgan Chase, Bank, N.A. And Chapter 7 Trustee Authorizing Limited Borrowing and Use of Cash Collateral By Chapter 7 Trustee, ECF No. 1281; and (d) all allowed chapter 7 administrative claims of Sparkle Pop.

**7.    Disbursement of the Escrows.**

7.1.    <u>Court Registry Escrow</u>. The parties agree that the amount attributable to each Consignment Group Member of the Court Registry Escrow is set forth on <u>Schedule 3</u> in the aggregate amount of Six Hundred Sixty Nine Thousand Four Hundred and Ten Dollars ($669,410.00). The Parties shall jointly move the Bankruptcy Court to release the aggregate amount allocable to the Consignment Group from the Court Registry Escrow to each Consignment Group Member and the Trustee, respectively, as set forth on <u>Schedule 3</u> and subject to the Consent Order and further order of the Bankruptcy Court. The Court Registry Escrow shall be distributed as follows: (a) Fifty Thousand Dollars ($50,000.00) to the Consignment Group (to be allocated as it/they deem appropriate); and (b) the remainder to the Trustee.

7.2.    <u>SP Escrow</u>. The Parties agree that the amount attributable to each Consignment Group Member of the SP Escrow is set forth on <u>Schedule 3</u> in the aggregate amount of Two Hundred Seventy Three Thousand Five Hundred Three Dollars ($273,503.00). The Parties shall jointly move the Bankruptcy Court to order that Sparkle Pop release the aggregate amount allocable to each Consignment Group Member and the Trustee from the SP Escrow, as set forth on <u>Schedule 3</u> subject to the Consent Order and further order of the Bankruptcy Court. The SP Escrow shall be distributed entirely to the Trustee.

7.3.    <u>Additional Escrow Funds</u>. In the event any Member of the Consignment Group recovers additional funds from Sparkle Pop on account of unauthorized sales of or shortages in the Consigned Inventory in excess of the Court Registry Escrow and SP Escrow, such Member of the Consignment Group shall pay five percent (5%) (the "Additional Escrow Payment") of any such recovery to the Estates, net of any legal fees and expenses required to collect such amounts. Upon collection of any such recovery on account of additional unauthorized sales of the Consigned Inventory, the respective Member of the Consignment Group shall file a statement reflecting the total recovery from Sparkle Pop; the total legal fees and expenses incurred with regard to collection of such recovery; and the Additional Escrow Payment. The Bankruptcy Court shall retain sole jurisdiction to hear and resolve any such collection efforts with regard to additional escrow funds owed by Sparkle Pop; however, the Trustee shall have no obligation or requirement to litigate any such matter other than as it pertains to the collection of the Additional Escrow Payment.

**8.    Abandonment, Dismissal, and Assignment.**

8.1.    <u>Abandonment</u>. The Trustee, at a point in time when it is most convenient for the Trustee but not to exceed sixty (60) days from the Effective Date, will file a notice of

022935.50372.001.03

abandonment pursuant to Bankruptcy Code § 554 abandoning all of the non-Consignment Group Consigned Inventory [and Consignment Group Consigned Inventory] located in the Warehouse.

8.2.    Dismissal. Within ten (10) days of the Effective Date, (i) the Trustee will file a notice of dismissal of the Denial Order Appeal, and (ii) the Members of the Consignment Group, as applicable, will file a notice of dismissal of the CG Adversary Counterclaims. To the extent a stipulation of dismissal is required, the Members of the Consignment Group, as applicable, will endeavor to obtain consents to the dismissal or otherwise seek dismissal from the Bankruptcy Court.

8.3.    Assignment. Within ten (10) days after the Effective Date, the Trustee shall assign to the Consignment Group all of his right, title, and interest, without representation or warranty of any kind, in and to the CG Adversary Proceedings as plaintiff therein.

9.    **Reservation of Rights**. Except as otherwise set forth herein, nothing in this Agreement shall be construed as a release, waiver, or limitation of any right, remedy, claim, or cause of action that any party hereto may have against any other person or entity not a party hereto, whether arising under contract, tort, statute, equity, or otherwise. Each party hereto hereby expressly reserves all such rights, remedies, claims, and causes of action against all third parties, and this Agreement shall not be used or cited by any third party as evidence of any release, compromise, or waiver of any kind.

10.    **Releases**.

10.1.    Consignment Group Releases. Upon entry of a final, non-appealable 9019 Order approving this Agreement, and subject only to Section 6 above, each Consignment Group Member, on behalf of itself and its predecessors, successors, assigns, affiliates, representatives, professionals, agents, and any persons or entities acting or purporting to act on their behalf (collectively, the "**CG Releasors**"), hereby fully, finally, and forever releases and discharges the Trustee, the Estates, the Debtors, Chase, and each of their respective current and former parents, subsidiaries, affiliates, members, managers, officers, directors, shareholders, employees, agents, representatives, attorneys, insurers, successors, and assigns (collectively, the "**CG Releasees**"), from any and all claims, demands, causes of action, liabilities, obligations, damages, and rights of any kind or nature whatsoever, whether known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, asserted or unasserted, in law or in equity, that the CG Releasors ever had, now have, or may hereafter have against the CG Releasees, arising out of or relating to any act, omission, transaction, event, or occurrence occurring on or before the date hereof, excluding any such claims prior to the Petition Date, including, without limitation: (i) any matters arising out of or relating to the TSA, the Distribution Agreements, or any claims for rent, storage, or similar charges; (ii) any matters relating to the Court Registry Escrow or the SP Escrow; and (iii) the Consigned Inventory; *provided, however*, that nothing herein releases any obligations or rights expressly granted under or preserved by this Agreement or the 9019 Order.

10.2.    Trustee Releases; "Preference" Claims Waiver. Upon entry of a final, non-appealable 9019 Order approving this Agreement, the Trustee, on behalf of himself and the Estates, the Debtors and their predecessors, successors, assigns, representatives, professionals, agents, and any persons or entities acting or purporting to act on their behalf (collectively, the "**Releasors**"),

11

hereby fully, finally, and forever releases and discharges the Consignment Group Members and each of their respective current and former parents, subsidiaries, affiliates, members, managers, officers, directors, shareholders, employees, agents, representatives, attorneys, insurers, successors, and assigns (collectively, the "**Releasees**"), from any and all claims, demands, causes of action, liabilities, obligations, damages, and rights of any kind or nature whatsoever, whether known or unknown, fixed or contingent, liquidated or unliquidated, matured or unmatured, asserted or unasserted, in law or in equity, that the Releasors ever had, now have, or may hereafter have against the Releasees, arising out of or relating to any act, omission, transaction, event, or occurrence occurring on or before the date hereof, including, without limitation: (i) any matters arising out of or relating to the TSA, Distribution Agreements, or any claims for rent, storage, or similar charges; and (ii) any matters relating to the Court Registry Escrow or the SP Escrow; *provided, however*, that nothing herein releases any obligations or rights expressly granted under or preserved by this Agreement or the 9019 Order. The Release in this Section 10.2 shall include a release by the Releasors of all claims pursuant to Section 547 of the Bankruptcy Code.

10.3.   <u>Mutuality; No Release of Non-Parties</u>. The releases in this <u>Section 10</u> are mutual as set forth above, and do not release any claims against third parties.

## 11.   <u>Treatment of Non-Participating Consignors</u>.

11.1.   <u>No Third-Party Beneficiaries</u>. Persons not party to or specifically released in this Agreement, including Non-Participating Consignors, are not released under this Agreement and shall not receive benefits hereunder except as expressly provided in the 9019 Order or a separate order or stipulation approved by the Bankruptcy Court.

11.2.   <u>Protections</u>. Nothing in this Agreement shall impair the Trustee's rights, claims, defenses, or remedies as against any Non-Participating Consignor, all of which are expressly reserved.

11.3.   <u>Interpleader/Reserve</u>. If a *bona fide* adverse claim by a Non-Participating Consignor to specific Consigned Inventory otherwise subject to release is identified and not resolved, the parties will (a) reserve such inventory from release pending resolution; or (b) seek further guidance from the Bankruptcy Court, including potential interpleader or dispute-resolution procedures.

11.4.   [Intentionally Deleted]

## 12.   <u>Representations; No Admission; Authority; Miscellaneous</u>.

12.1.   <u>No Admission</u>. This Agreement reflects a compromise of disputed claims and is not an admission of liability by any party.

12.2.   <u>Authority</u>. Each signatory represents that it has full authority to execute and deliver this Agreement on behalf of the party or entity for whom it signs and to bind such party to the terms hereof; *provided, however*, the parties acknowledge that the Trustee shall not have such authority until entry of the 9019 Order.

022935.50372.001.03

12.3.   Independent Counsel; No Reliance. Each party represents that it has consulted with counsel, has not relied upon any representations not set forth herein, and enters into this Agreement voluntarily.

12.4.   Notices. Notices shall be in writing and delivered by recognized overnight courier or email to the addresses below (or as updated by notice): (a) To the Trustee: Morgan W. Fisher, Law Offices of Morgan Fisher LLC, 18 West St., Annapolis, MD 21401. Email: mwf@morganfisherlaw.com with a copy to: Zvi Guttman, The Law Offices of Zvi Guttman, P.A., POB 32308, Baltimore, MD 21282. Email: Zvi@zviguttman.com and Richard M. Goldberg, Shapiro Sher Guinot & Sandler, P.A., Email: rmg@shapirosher.com. (b) To Consignment Group (coordinating counsel/representative): c/o Catherine Hopkin, Esq., YVS Law, LLC, 185 Admiral Cochrane Drive, Suite 130, Annapolis, MD 21401, e-mail: chopkin@yvslaw.com.

12.5.   Prior Orders. Nothing herein impairs or modifies the provisions of the Sale Order or the Conversion Order except as expressly approved by the Court in the 9019 Order.

12.6.   Governing Law; Venue; Jurisdiction. This Agreement shall be governed by federal bankruptcy law, and to the extent applicable, the laws of the State of Maryland without regard to conflicts principles. The Bankruptcy Court shall retain exclusive jurisdiction to interpret and enforce this Agreement and the 9019 Order.

12.7.   Counterparts; Electronic Signatures. This Agreement may be executed in counterparts, each of which is deemed an original. Electronic signatures shall be deemed originals.

12.8.   Severability. If any provision is determined unenforceable, such provision shall be severed, and the remainder shall remain in full force, provided the Parties' overall economic bargain is not materially impaired.

12.9.   Entire Agreement; Amendments. This Agreement, together with schedules and exhibits, is the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a written instrument signed by the Trustee and Consignment Group Members affected by the amendment.

*[Signatures on the following page and Schedule 1]*

13

022935.50372.001.03

Docusign Envelope ID: FA3E51A0-3E39-81F2-82B2-99BEE93FB247

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement and Releases as of the date first written above.

**Trustee:**

By: _Morgan W. Fisher_

Morgan W. Fisher, Esq., Chapter 7 Trustee for Diamond Comic Distributors, Inc., Diamond Select Toys & Collectibles, LLC, Comic Holdings, Inc., and Comic Exporters, Inc.

*[Signatures continue on Schedule 1]*

022935.50372.001.03

14

## **SCHEDULES**

**Schedule 1**: Consignment Group Members Signature Pages

**Schedule 2**: Inventory List

**Schedule 3**: Escrow Disbursement Waterfall; Amounts and Payees

022935.50372.001.03

Docusign Envelope ID: A27F666A-EF56-8F93-8291-79ABB789BD1A

## Schedule 1

### Consignment Group Members Signature Pages

Ablaze, LLC

By: _____

Name: Amy Jackson

Title: Operations and Editorial


American Mythology Productions LLC

By: _____

Name: James Kuhoric

Title: President


Avatar Press, Inc.

By: _____

Name: William Christensen

Title: President


Andrew Kafoury d/b/a Battle Quest Comics

_____
Andrew Kafoury


*[Signatures continued on the next page]*

022935.50372.001.03

Docusign Envelope ID: A27F666A-EF56-8F93-8291-79ABB789BD1A

Bryan Seaton d/b/a Action Lab Comics

By: _Bryan Seaton_
    F1EA93056762448...

Name: Bryan Seaton

Title: Owner


Drawn & Quarterly Books Inc.

By: _peggy burns_
    E5CA7F4E905F48F...

Name: peggy burns

Title: President/Publisher


Fantagraphics Books, Inc.

By: _Gary Groth_
    06CE79BF4DCE4CA...

Name: Gary Groth

Title: President


Green Ronin Publishing LLC

By: _Chris Pramas_
    37C9B464C7FE4B9...

Name: Chris Pramas

Title: President


*[Signatures continued on the next page]*

17

022935.50372.001.03

Docusign Envelope ID: A27F666A-EF56-8F93-8291-79ABB789BD1A

Herman and Geer Communications, Inc.
d/b/a Hermes Press

By: _Dan Herman_____
      9B5918508B4D48A...

Name: Dan Herman_____

Title: Publisher/President_____


Living the Line LLC

By: _Sean Michael Robinson_____
      1F4D5C47F12C48D...

Name: Sean Michael Robinson_____

Title: owner_____


Paizo, Inc.

By: _Jim Butler_____
      D896AF3CD6F545D...

Name: Jim Butler_____

Title: Chief Executive Officer_____


UDON Entertainment Inc.

By: _____
      A38CEF790F7B4AC...

Name: Erik Ko_____

Title: Chief of Operations_____


*[Signatures continued on the next page]*

18

022935.50372.001.03

Zenescope Entertainment, Inc.

By:_____

Name:_____

Title:_____

And Separately By Boom Entertainment, LLC and Dynamic Forces, (Not Members of the Ad Hoc Committee):

Boom Entertainment, LLC

By:___*Keith A Clayton*___

Name:___Keith Clayton___

Title:___SVP, Publisher, RH Worlds Group___

Dynamic Forces, Inc. a/k/a Dynamite Entertainment

By:_____

Name:_____

Title:_____

19

Zenescope Entertainment, Inc.

By: _____
        79B2113B14934I7...

Name: Joseph Brusha
_____

Title: President
_____


And Separately By Boom Entertainment, LLC and Dynamic Forces,  (Not Members of the Ad Hoc Committee):

Boom Entertainment, LLC


By: _____

Name: _____

Title: _____


Dynamic Forces, Inc. a/k/a Dynamite Entertainment

By: _Juan Collado_____
        CD41E9BE946B4B2...

Name: Juan Collado
_____

Title: President /COO
_____

19

022935.50372.001.03

## Schedule 2

### Inventory List

To be finalized and attached following the 9019 Order, in accordance with Section 4.2.

022935.50372.001.03

## Schedule 3

## Escrow Disbursement Waterfall; Amounts and Payees

*[See attached]*

022935.50372.001.03

Court Registry Escrow

| Consignor Group Member | Collected |
|---|---|
| Ablaze, LLC | [$19,498.00] |
| American Mythology Productions LLC | [$2,796] |
| Avatar Press, Inc. | [$50,666.00] |
| Andrew Kafoury d/b/a Battle Quest Comics | [$81.00] |
| Action Lab Comics | [$11,712.00] |
| Drawn & Quarterly Books Inc. | [$496.00] |
| Fantagraphics Books, Inc. | [$32,090.00] |
| Green Ronin Publishing LLC | [$1,522.00] |
| Herman and Geer Communications, Inc. d/b/a Hermes Press | [$3,535.00] |
| Living the Line LLC | [$18,089.00] |
| Paizo, Inc. | [$195,007.00] |
| UDON Entertainment Inc. | [$22,113.00] |
| Zenescope Entertainment, Inc. | [$34,764.00] |
| Boom Entertainment, LLC | [$0.00] |
| Dynamic Forces, Inc. | [$300,754] |
| **Total** | **[$669,410]** |

Court Registry Escrow (attributable to Consignment Group)

| | |
|---|---|
| **Total** | [$669,410.00] |
| **Due to Trustee** | [$619,410.00] |
| **Due to Consignment Group** | [$50,000.00] |

22

022935.50372.001.03

## SP Escrow

| Consignor Group | Collected |
|---|---|
| Ablaze, LLC | [$0.00] |
| American Mythology Productions LLC | [$20,363.00] |
| Avatar Press, Inc. | [$0.00] |
| Andrew Kafoury d/b/a Battle Quest Comics | [$2,332.00] |
| Action Lab Comics | [$0.00] |
| Drawn & Quarterly Books Inc. | [$0.00] |
| Fantagraphics Books, Inc. | [$10,219.00] |
| Green Ronin Publishing LLC | [$0.00] |
| Herman and Geer Communications, Inc. d/b/a Hermes Press | [$0.00] |
| Living the Line LLC | [$0.00] |
| Paizo, Inc. | [$33,319.00] |
| UDON Entertainment Inc. | [$0.00] |
| Zenescope Entertainment, Inc. | [$34,764.00] |
| Boom Entertainment, LLC | [$0.00] |
| Dynamic Forces, Inc. | [$172,506.00] |
| **Total** | **[$273,503.00]** |

SP Escrow (attributable to Consignment Group)

| | |
|---|---|
| **Total** | [$273,503.00] |
| **Due to Trustee** | [$273,503.00] |
| **Due to Consignment Group** | $0 |

23

022935.50372.001.03